UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL NO. 05-40026-FDS |
| | ) | |
| | ) | |
| V. | ) | |
| | ) | |
| MUHAMED MUBAYYID and | ) | |
| EMADEDDIN Z. MUNTASSER, | ) | |
| Defendants | ) | |
| | ) | |

---

**DEFENDANTS' MOTION TO DISMISS AND INCORPORATED MEMORANDUM**

Now come Defendants Emadeddin Z. Muntasser and Muhammed Mubayyid and

respectfully move, pursuant to Fed. R. Crim. P. 12(b), that this Honorable Court dismiss the

above-captioned indictment. As reason therefor, Defendants state that the government's theory

of their criminal liability for false statements and concealment of material facts under 18 U.S.C.

§ 1001(a)(1) and for a <u>Klein</u> conspiracy under 18 U.S.C. § 371, as reflected in the allegations

stated in the indictment, is barred by the First Amendment to the United States Constitution, by

the requirement of fair notice and the corresponding rule of lenity, by the IRS's own regulations

and instructions, and by Supreme Court precedent concerning selective prosecution.[1]

---

[1] These are issues which the Court can and should decide before Defendants are subjected
to a prosecution which is doomed as a matter of law from the outset. "It is perfectly proper, and
in fact mandated, that the district court dismiss an indictment if the indictment fails to allege
facts that constitute a prosecutable offense." <u>United States v. Coia</u>, 719 F.2d 1120, 1123 (11th
Cir. 1983). <u>See, e.g., United States v. Brown</u>, 925 F.2d 1301, 1302 (10th Cir. 1991); <u>United
States v. Risk</u>, 843 F.2d 1059, 1061 (7th Cir.1988); <u>United States v. Garcia-Ortiz</u>, 1992 WL
71803 (N.D. Ill. 1992) at *5; <u>United States v. Castellano</u>, 610 F.Supp. 1359, 1397 (S.D.N.Y.
1985). "The court must decide every pretrial motion before trial unless it finds good cause to
defer a ruling." Fed. R. Crim. P. 12(d). Here, there is no good cause to defer a ruling and every
reason to address the issues before subjecting Defendants and the Court to a lengthy trial at
which Defendants' contentions as to the unconstitutionality of the government's theory and the
insufficiency, as a matter of law, of the facts alleged in the indictment to state a false

As further reasons therefor, Defendants refer the Court to the Memorandum incorporated herein and to the documents from the public record[2] attached as an Appendix to this motion.[3]

### REQUEST FOR ORAL ARGUMENT

Defendants request oral argument on the within motion.

### LOCAL RULE 7.1(A)(2) STATEMENT

Counsel (by Malick W. Ghachem, Esq.) have conferred with Stephanie Siegmann, AUSA, and  have attempted in good faith to resolve or narrow the issues.

### MEMORANDUM

I. Introduction

On May 13, 2005, Judge Rya Zobel of the United States District Court for the District of Massachusetts, sitting in the Eastern Division in Boston, announced that after a series of delays by the government, she was scheduling a hearing to decide on the merits of a naturalization petition filed three years earlier by Emadeddin Muntasser, now the defendant in the instant

---

statement/concealment of material facts violation or a Klein conspiracy offense will be amply borne out.  That the Court may need to hold an evidentiary hearing and find facts does not preclude resolution of the issue at this juncture.  See Coia, 719 F.2d at 1123.

[2] This Court may take judicial notice of matters in the public record on a hearing of a motion to dismiss.  See U.S. v. Briddle, 212 F.Supp. 584, 589 (D.C.Cal. 1962) ("This Court has the power to receive evidence – including evidence adduced by means of judicial notice – upon the hearing of the defendants' motions to dismiss the indictment at bar. . . . [I]t is now too clear for debate, as a matter of common knowledge, that the 1933 economic emergency ended long before 1962.  Accordingly, this Court should and does now judicially notice the fact."); and Arturet Velez v. Reynolds Tobacco Co., 429 F.3d 10, 13 n.2 (1st Cir. 2005) (on motion to dismiss, court may consider "facts subject to judicial notice").  An affidavit attesting to the authenticity of the document copies included in the Appendix is attached to this motion.

[3] Defendants move to dismiss Count Six of the indictment on the selective prosecution grounds set forth infra at 44, and on grounds stated in a sealed motion filed concurrently with the instant motion.

criminal case.[4]  Judge Zobel had earlier denied the government's request for a remand to the

Department of Homeland Security.  She had twice allowed the Government stays to produce

additional evidence that would justify denying Mr. Muntasser his citizenship; both times the

Government failed to produce such evidence.

       In evident retaliation for Mr. Muntasser's naturalization lawsuit, and in a transparent

effort to block Judge Zobel's potential – and, we believe, likely – grant of citizenship, the

government secured this facially unconstitutional indictment.  It is also evident that the

government cynically manipulated its ability to select the proper venue for hearing this case,

apparently in order to avoid the risk of being assigned the same federal judge presiding over Mr.

Muntasser's naturalization petition in a manner perhaps too independent for the executive

branch's taste, and in order to secure a judge and jury pool that the government perceived as

more favorable to it.  On the Criminal Case Cover Sheet that the Government filed under seal

with its Criminal Complaint on April 6, 2005, the Government first indicated (correctly) "Boston

and elsewhere" and "Suffolk and elsewhere" as the city and county wherein the alleged instant

offenses took place.  The Government then crossed out the words "Boston" and "Suffolk" and

replaced both with "Worcester."  See App. at 00006.  This was done even though the charitable

organization that is at issue in the criminal case, Care International, is a Boston-based rather than

Worcester-based organization.

       That this indictment is flawed on its face is manifest.  That it represents a series of blatant

efforts at manipulation of a citizenship case and forum shopping in this criminal case is clear

---

[4] Emadeddin Z. Muntasser v. Michael Chertoff et al., No. 04-CV-1259-RWZ (Electronic
Clerk's Notes for proceedings held April 7, 2005).  Mr. Muntasser's naturalization petition is
attached hereto as App. at 00001.

from the government's own handwriting.  That it reflects a transparent effort to manipulate the venue and judicial assignment system of the federal courts should not be ignored.

Muntasser submitted his application for naturalization nearly four years ago, on October 18, 2002.  When interviewed by the U.S. Immigration and Naturalization Service (INS) a year later, on November 6, 2003, he submitted amendments to the application which completed and corrected any omissions in the application filed by prior counsel; he was told that his application was complete and that all that remained were for his fingerprints to be cleared by the FBI. Under 8 U.S.C. § 1447(b), the Department of Homeland Security then had 120 days from the date of Mr. Muntasser's interview to decide the application.   No decision was forthcoming.  At that point, Mr. Muntasser had the right to file suit, which he did on June 8, 2004, more than seven months after his naturalization interview.  Twice in that lawsuit, the Government sought to postpone the required hearing, which Judge Zobel permitted, to give the Government more time to respond, but she refused to remand the proceeding to the Department of Homeland Security, holding that the defendant had a right to a hearing and a decision before the district court.  She set a hearing date of May 12, 2005 and made clear to the Government that no further delays would be permitted.[5]

On the day before the citizenship hearing was to take place in Boston, and even though everything related to the instant criminal case had taken place in the Eastern Division, the government secured an indictment of Mr. Muntasser by a grand jury sitting in the Central Division of Massachusetts.  The indictment alleged false statements, concealment of material

---

[5] "The next hearing will take place on May 12th, and I do not expect the government to ask for a further continuance at that time, despite its request for more time now.  We will go forward at the next – on the next date."  See App. at 00013 (transcript of April 7, 2005 scheduling conference in Emadeddin Z. Muntasser v. Michael Chertoff et al., No. 04-CV-11259-RWZ).

facts, and a <u>Klein</u> conspiracy with respect to protected First Amendment activities that occurred between 1993 and 1996.[6]  As noted above, on the Criminal Case Cover Sheet that accompanied the Government's criminal complaint, and in a stunningly frank acknowledgment of the extent of its forum shopping, the Government crossed out "Boston" and "Suffolk" and scribbled "Worcester" in their place for purposes of designating a presumably safe venue for the instant case.  <u>See</u> App. at 00006.[7]

Judge Zobel later denied the Government's motion to dismiss Mr. Muntasser's naturalization lawsuit, retaining jurisdiction and ordering a stay pending the conclusion of the instant proceedings.

In an implicit acknowledgment of the frailties of this case and of the Government's awareness that Mr. Muntasser is not in any way connected to terrorism – notwithstanding the indictment's insinuations and sensationalistic newspaper headlines to the contrary[8] – the Government immediately agreed to Mr. Muntasser's release pending trial.  To our knowledge, this is the very rare case involving charges colored to even remotely suggest "terrorism" where the government did not even seek detention.

More important, this indictment fails to pass even minimal constitutional scrutiny.  On its face, the indictment classifies as criminal activity conduct which is clearly protected by the First Amendment's free exercise of religion and free speech provisions.  It fails to pass muster under

---

[6] The indictment also alleged a single false statement involving a 1995 overseas trip with respect to Mr. Muntasser's naturalization application.

[7] <u>See also</u> Defendants' Motion for Jury Selection from the Eastern Division of Massachusetts and the Affidavit of Attorney Malick W. Ghachem attached thereto (filed October 5, 2006).

[8] <u>See</u> the false, prejudicial and near-hysterical reports in the *Worcester Telegram & Gazette* attached as App. at 00019 to Defendants' Motion for Jury Selection from the Eastern Division of Massachusetts (filed on October 5, 2006).

the requirements of due process and fair warning. The vagueness of the indictment requires

dismissal under long-standing principles of lenity in the construction of criminal statutes. The

Government should not be rewarded for its blatant forum shopping and efforts to manipulate Mr.

Muntasser's quest for citizenship.  For all of these reasons, this indictment should be dismissed.

<u>II.  The Indictment</u>

Emadeddin Muntasser has lived in the United States since 1981 and been a permanent

resident of the U.S. since 1992.  A graduate of Worcester Polytechnic University, he lives in

Braintree, Massachusetts with his wife and two children, and owns a chain of furniture stores in

the greater-Boston area that employs about forty-five persons.

Muhamed Mubayyid attended undergraduate education at the Wentworth Institute of

Technology, receiving his degree in 1989.  He continued his post-graduate education at Boston

University, and received a Master's Degree as a Systems Engineer in 1992.  He is a naturalized

Australian citizen, and is married with a wife and three children, two of whom are American

citizens.  He is currently unemployed, as the Department of Homeland Security has refused to

issue him the yearly extension of his work permit after he was charged in this case.  Mr.

Mubayyid became treasurer of Care in 1998.

As a young, idealistic graduate student nearly two decades ago, Mr. Muntasser, like

many young Muslims and Americans (including high and low government officials) alike, was

impressed by the courage of the Afghan Muslims who were fighting against the Soviets in

Afghanistan.[9]  Mr. Muntasser founded the organization Care in 1993 to provide charitable relief

to Muslims affected by the conflicts then underway in Afghanistan and other Muslim countries,

---

[9] <u>See, e.g.</u>, Robert D. Kaplan, *Soldiers of God: With the Mujahidin In Afghanistan*
(Boston: Houghton Mifflin, 1990).

and served as its President until resigning in 1996.  Care's work was carried out by religiously minded volunteers from the local Muslim community.  Care sought to accomplish its mission by collecting *zakat* (the Muslim equivalent of Jewish *tzedakah* or Christian tithing), which is every Muslim's religious obligation to donate to charity,[10] by giving to destitute Muslims abroad so that they could observe the Ramadan feasts of Eid, by distributing charitable donations to the widows and orphans affected by the Afghan war, by publishing a newsletter and by distributing other educational and religious materials.  This indictment seeks to punish Defendants for engaging in these activities, even though they are i) facially protected by the First Amendment, ii) common to other religious groups, and, importantly, iii) identical to activities engaged in by other charities in the area *funded and sanctioned directly by the United States* through the National Endowment for Democracy and the United States Agency for International Development.

The indictment in this case does not charge Defendants or Care with providing any form of material support to terrorists.  It does not charge them with arming America's enemies or providing military equipment to one side.  Rather, it charges that the charity of an established religion put forward ideas, distributed educational material, solicited funds, and published a book and newsletter.  Indeed, the Government has itself conceded that the underlying conduct specified in the indictment is perfectly legal.[11]  Established precedent, the identical or analogous

---

[10] See Yaacov Lev, *Charity, Endowments, and Charitable Institutions in Medieval Islam* (Gainesville, FL: University of Florida Press, 2005), at ix ("The notion of charity . . . is deeply embedded in the religious thought and ethics of the three monotheistic religions and was central to the lives of medieval Jews, Muslims, and Christians.  It represented the essence of their piety and quest for nearness to God").

[11] See Government's Opposition to Defendants' Motion for Bill of Particulars (Dkt #114) at 7 n.1 ("The government does not allege in the Indictment nor has it ever alleged in any public hearings or any pleading that such activities were illegal"); and Government's Memorandum and Opposition to Defendants Motion for Discovery (filed under seal July 7, 2006) at 15 ("The

practices of other charities, and the recent history of Government support of similar activities by other charities in the area all preclude the Government from deeming such protected activity an appropriate basis for these highly selective criminal charges.

The Government may seek to avoid the prohibitions of the First Amendment by claiming, disingenuously, that it is not seeking to punish religious activity or protected speech but only the failure to disclose to the government that Care was planning to engage in such activity. For the following reasons, any such argument should be rejected out of hand as the red herring it is.

*First,* the forms filed by Care made clear that the charity would be engaged in religious and educational activity. See App. at 00043 (Care International's Articles of Incorporation, which provided that Care was organized for "charitable, religious, educational, and scientific purposes, including but not limited to, engage in, establish, promote, contribute and carry out human welfare, charitable and relief activities, programs, projects, organizations, institutions, and funds"). The Government plainly understood this; indeed, it was sufficiently clear that the Government deferred acting on Care's application for charitable status because of what the IRS described as "political [sic] sensitive" concerns relating to United States military involvement in the areas of the world in which Care proposed to operate. See App. at 00052 (IRS annotated review file for Care International).

*Second,* the only reason to require additional information is if the government could indeed have made a different decision in light of it – that is, if that information would be "material" to the decision-making process. But knowing in greater detail about the ideological basis of a group's constitutionally protected charitable activities could hardly serve as a basis for denying its application for 501(c)(3) status. The unconstitutional conditions doctrine precludes

_____

Defendants, in this case, are not charged with . . . material support of terrorism").

the government from accomplishing indirectly what it cannot do directly.  See Perry v.

Sindermann, 408 U.S. 593, 597 (1972) (under the unconstitutional conditions doctrine, the

Government "may not deny a benefit to a person on a basis that infringes his constitutionally

protected interests – especially, his interest in freedom of speech"); Speiser v. Randall, 357 U.S.

513, 526 (1958) (state could not condition property tax exemption on loyalty oath); Rosenberger

v. Rector & Visitors of the Univ. of Va., 515 U.S. 819 (1995) (public university could not

condition funds for student publications on their secular perspective); and FCC v. League of

Women Voters, 468 U.S. 364 (1984) (FCC could not condition federal funds to radio stations on

editorial content).  The materiality doctrine limits criminal responsibility to information which

could have influenced a government decision.  United States v. Notarantonio, 758 F.2d 777, 785

(1st Cir. 1985) (a materially false statement is one that had "a natural tendency to influence, or

was capable of influencing, the decision of a government agency in making a determination

required to be made").  Whether Care was generally sympathetic to the plight of the *mujahideen*

at the hands of the Soviets, and to the concept of *jihad* to throw off Soviet suppression of Islam

in Afghan life, surely does not fit into that category.  This is especially so given that (1) many

other 501(c)(3) organizations engaged in similar activities in this and similar conflicts around the

world, and (2) the federal government itself supported these very same charities and, through

them, the cause of the Afghan mujahideen.[12]  In any event, the grant of charitable status certainly

may not be conditioned on government approval of the charity's ideological point of view.  And

charitable status may only be revoked where a charitable organization engages in activity that is

---

[12] The federal government also provided direct material aid to the Afghan mujahideen.
But for purposes of this indictment, such direct material support is less significant than the
provision of grants by the National Endowment for Democracy and the USAID to tax-exempt
organizations.

contrary to fundamental public policy.  See Bob Jones University v. U.S., 461 U.S. 574, 598

(1983).[13]  Far from engaging in activity contrary to fundamental public policy, the Government's

allegations against Care International implicate conduct that was entirely consistent with the

public policy of the United States throughout the 1980s and into the 1990s.

This is what Care is charged with having done according to the precise terms of the

indictment:

– "engaged in activities involving the solicitation and expenditure of funds to support and
promote the mujahideen and jihad, including the distribution of pro-jihad
publications."  App. at 00111.

– "published reports and articles in support of the mujahideen in its newsletter or on its
website."  Id. at 00117- 118.

– "distributed brochures entitled 'Zakat Calculation Guide', in which the mujahideen was
identified as one of the eight categories of eligible recipients."  Id. at 00118.

– publishing a website that "contained direct solicitations for tax deductible donations to
support the mujahideen."  Id.

– "published and distributed a newsletter, Al-Hussam . . . which actively promoted
'jihad', or holy war, involving 'mujahideen,' or Islamic holy warriors."  Id. at
00119.

– "published articles about the military operations and activities of the mujahideen on its
website."  Id.

– "printed and distributed solicitations for tax deductible donations to support the
mujahideen."  Id.

---

[13] Nor could the government have sought to recoup revenues from the donors to Care
International, who were entitled to rely on the IRS's grant of tax-exempt status to Care
International when deducting their individual contributions to the charity.  Bob Jones University
v. Simon, 416 U.S. 725, 729 ("An organization's inclusion in the Cumulative List assures
potential donors in advance that contributions to the organization will qualify as charitable
deductions under s 170(c)(2).  The Service has announced that, with narrowly limited
exceptions, a donor may rely on the Cumulative List for so long as the beneficiaries of his
largesse maintain their listing, regardless of their actual tax status.").

> – "published and distributed an English translation of 'Join the Caravan,' a pro-jihad
> book authored by Abdullah Azzam." <u>Id.</u>[14]

Every one of these activities is protected on its face by the First Amendment according to well-established precedent.  The indictment, to the extent that it uses these activities as the basis for its conspiracy charge, is in clear violation of the First Amendment, and must be dismissed.

Advocacy in support of religious and political causes is at the core of the protection afforded by the First Amendment to free speech and to the free exercise of religion.   This would be true even if – and this is not the case here - that advocacy goes so far as to call on its listeners to employ violence, unless it can be shown that the speech is likely to incite imminent violence.  <u>See</u> <u>Brandenburg v. Ohio</u>, 395 U.S. 444 (1969) and further discussion, *infra*.  It is a measure of the special protection accorded to speech, particularly religious speech, that even advocacy of violence, short of "fighting words," is accorded constitutional protection.  <u>See</u> <u>Chaplinsky v. New Hampshire</u>, 315 U.S. 568 (1942).

---

[14] The indictment also charges that Care failed to disclose that it was a "successor" to or "outgrowth" of the Al-Kifah Refugee Center, and quotes "media reports" linking the Al Kifah Refugee Center to the 1993 World Trade Center bombings.  This allegation is addressed more fully below at 44.  The short of the matter is that the government's claim linking Care and Al-Kifah is a red herring, except insofar as Care was formed precisely for the purpose of disassociating the new organization from Al-Kifah.  Al-Kifah was not, in any event, a Massachusetts corporation, nor even a 501(c)(3) organization, and Care did not assume any of the assets or liabilities of Al-Kifah, which continued to exist independently and continued to publish a newsletter under a title ("The Sword") that is far from unique in the Islamic world.

Incidentally, the very *New York Times* report upon which the Government appears to rely quotes a federal law-enforcement official stating anonymously in 1993 that there was little incentive in going after the Al-Kifah Refugee Center on criminal charges because the group had been involved in a war that the Government supported.  "The mujahideen went to fight the Soviets when the Soviets were our enemies," the official said.  "Now the Soviets have become our friends, and our former allies have turned against the U.S. in favor of terrorism.  The obvious conclusion is this is coming back to haunt us."  "After Blast, New Interest in Holy-War Recruits in Brooklyn," *The New York Times*, April 11, 1993.

The activities specified in the indictment as well as those actually engaged in by Care – publishing and distributing newsletters taking positions and reporting on developments in foreign battles, soliciting support for the relief of widows and orphans in war-torn areas of the world, publishing and distributing books that discuss and espouse controversial ideas about religious conflict in the contemporary world, printing and distributing charitable tax guides that conform to the historically complex teachings of an Abrahamic faith – all of these are precisely the sorts of activities other 501(c)(3) religious groups conduct on a regular basis.[15]  More to the point, these activities are virtually identical to those supported by grants from the federal government, through the National Endowment for Democracy (NED) and the United States Agency for International Development (USAID), to charities active in the very same area beginning with the Soviet invasion of Afghanistan and continuing well into the 1990's.[16]

As explained in further detail below, moreover, the giving of *zakat* (alms) is required of all Muslims as one of the five pillars of Islam, and the Koran is commonly (but not universally) interpreted to include the *mujahideen* as one of eight eligible recipients *of zakat*.[17]

---

[15] The tax-exempt activities of Catholic and Protestant groups in support of one side or the other in Northern Ireland and Jewish groups in support of Israel are exemplary in this regard. See, e.g., App. at 00126 (solicitation materials posted on the website of the Jewish National Fund, a 501(c)(3) organization, requesting donations to finance the purchase of bulletproof vests, helmets, and firetrucks in connection with the 2006 Israel-Lebanon conflict); App. at 00130 ("A Personal Report from the North Battle Front," detailing the impact of the 2006 Israel-Lebanon conflict, posted on the website of the United Jewish Communities, a 501(c)(3) organization); App. at 00133 ("A Personal Message from Israel's Home Front Command," also recently posted on the UJC website).

[16] See infra at 19.

[17] See Aron Zysow, "Zakat," *The Encyclopedia of Islam*, new ed., vol. 11, pp. 406 – 422. *Zakat* is "the obligatory payment by Muslims of a determinate portion of specified categories of their lawful property for the benefit of the poor and other enumerated classes." Id. at 406-07 (emphasis added).  The word *zakat* means purification and is derived from the verb zaka, which means "to thrive," "to be wholesome," "to be pure."  *Zakat* is one of the five pillars of Islam, so called because they constitute the minimum conduct required of all Muslims.  It is to be

For a federal court to supply its own definitions to such matters would involve it directly and impermissibly in the definition of religion, in direct violation of the First Amendment. <u>See</u> <u>United States v. Ballard</u>, 322 U.S. 78 (1944); and <u>Van Schaick v. Church of Scientology</u>, 535 F. Supp. 1125 (D. Mass 1982).

To punish Mr. Muntasser now for engaging in precisely the same kind of conduct engaged in by federally funded and federally recognized charities would violate not only all notions of fair play and equal protection of the laws, but would run afoul of the Due Process requirement of fair warning, fair notice, and clear statement and the rule of lenity in criminal

---

distinguished from *sadaka*, which refers to alms voluntarily given (although the term *sadaka* is often used for *zakat*). <u>Id.</u> at 407.

Those entitled to receive *zakat* are listed in Sura 9 verse 60 of the Koran ("ayat al sadaka," or the *sadaka* verse):

> The freewill offerings are for the poor and needy,
> those who work to collect them, those whose hearts are
> brought together, the ransoming of slaves, debtors, in
> God's way, and the traveller; so God ordains; God is
>         All-knowing, All-wise.

*The Koran Interpreted*, trans. Arthur J. Arberry (New York: Oxford University Press, 1982), 186. <u>See</u> App. at 00136.

At issue is category 7, those described as "in God's way," or "in the path of God." According to Zysow:

> The most common interpretation is that these are the volunteers engaged in
> *djihad*. They are to be given *zakat* to meet their living expenses and the expenses
> of their military service (animals, weapons). The Twelvers [that is, Shiite
> Muslims who acknowledge the authority of a line of twelve infallible leaders
> (*imams*) beginning with the Prophet Muhammad's cousin Ali] came to adopt a
> broader interpretation that encompasses a range of public services, including the
> repair of mosques and bridges. . . . The Hanafis [one of the four schools of Sunni
> Islamic law], among others, rejected the use of *zakat* for such purposes on the
> ground that the valid payment of *zakat* requires a transfer of ownership from one
> person to another.

<u>Id.</u> at 416. (A copy of Dr. Zysow's article appears at App. at 00139).

13

law. It is simply not possible to seek to punish an individual or organization for engaging in conduct engaged in and supported by the government.

III.  The First Amendment provides broad protection to religious groups to distribute literature and handbills in support of their causes, and to accompany the distribution of literature with solicitations for funds.

At the heart of this case is the right of an established religious charity to collect funds and distribute literature.  That right has been repeatedly reaffirmed by the Supreme Court, even where municipalities and other local governments found the message of the charities offensive and their fundraising downright reprehensible. See International Krishna Consciousness v. Lee, 505 U.S. 672 (19xx) ("We have long recognized that the right to distribute flyers and literature lies at the heart of the liberties guaranteed by the Speech and Press Clauses of the First Amendment." Schneider v State Town of Irvington, 308 U.S. 147 (1939); Murdock v Pennsylvania, 319 U.S. 105 (1943).  That speech protection is at its greatest when the underlying cause is religious in nature; and it does not matter that solicitation of funds is involved.  In *Jamison v. Texas*, 318 U.S. 413, 417 (1943), the Court, without dissent, held that although purely commercial leaflets could be banned from the streets, a state could not "prohibit the distribution of handbills in the pursuit of a clearly religious activity merely because the handbills invite the purchase of books for the improved understanding of the religion or because the handbills seek in a lawful fashion to promote the raising of funds for religious purposes."

In cases dating back as far as Cantwell v. Connecticut, 310 U.S. 296 (1940), the United States Supreme Court has gone so far as to create a hybrid class of cases in which otherwise neutral laws may not be applied if their tendency is to burden the exercise of religion.  Here, by analogy, to interpret the tax law so as to limit the ability of Care to collect *zakat* or provide

rhetorical support for *jihad* (especially as both are correctly understood) would itself create major constitutional problems.

As the Court recognized in <u>Employment Division v. Smith</u>:

The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise clause in conjunction with other constitutional protections, such as freedom of speech and of the press. See *Cantwell v. Connecticut*, 310 U.S., at 304-307 (invalidating a licensing system for religious and charitable solicitations under which the administrator had discretion to deny a license to any cause he deemed nonreligious); *Murdock v. Pennsylvania*, 319 U.S. 105 1943) (invalidating a flat tax on  solicitation as applied to the dissemination of religious ideas); *Follett v. McCormick*, 321 U.S. 573 (1944) (same); or consider the right of parents, acknowledged in *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), to direct the education of their children (see, *Wisconsin v. Yoder*, 406 U.S. 205 (1972) (invalidating compulsory school attendance law applied to Amish parents who refused on religious grounds to send their children to school).

<u>Employment Division v. Smith</u>, 492 U.S. 872, 881 (1990).  Indeed, so vital is the interest in religious freedom that Congress requires federal courts to engage in a case-by-case analysis before facially neutral federal laws may be construed so as to interfere with the free exercise of religion, even if it is a law of general application, such as an anti-fraud law, that imposes the burden.  In the <u>Smith</u> case, <u>supra</u>, the Court had rejected the rule that the Constitution requires a case by case analysis of the burden imposed on the free exercise of religion by a facially neutral statutory rule.  Congress responded by enacting the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb, which was intended to provide greater protection to the exercise of religious freedoms by restoring traditional strict judicial scrutiny.  As the Court explained in <u>Gonzalez v. O Centro Espirita Beneficente Uniao Do Vegetali</u>:

Under RFRA, the Federal Government may not, as a statutory matter, substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability.  The only exception recognized by the statute requires the Government to satisfy the compelling interest test– to demonstrate that application of the burden to the person – (1) is in furtherance of a compelling

government interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

Gonzalez v. O Centro Espirita Beneficente Uniao Do Vegetali, 126 S.Ct. 1211, 1216-17 (2006).

The complaint in this case does not even assert a compelling interest in denying 501(c)(3) status to CARE, much less one that could not be secured through a less restrictive alternative.  See also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 533 (1993) ("Although a law targeting religious beliefs as such is never permissible . . . if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral . . . and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest).

### IV.  Care, Inc.  was a religious charity pursuing  religious goals.

 The indictment makes clear that Care was involved in religious activities, although the government does evidence an egregious misunderstanding of basic and judicially-noticeable concepts of Islam.  The indictment is replete with terms drawn from the Koran, the Holy Book of Islam.  While it is far beyond the province of this court to be defining religious terms, it is well-established among all respectable sources that *jihad*, *mujahideen*, and *zakat* are all concepts which derive to varying degrees from the Koran and have enormous religious significance to practicing Muslims.  Under the teachings of the Koran, Muslims have an obligation to give *zakat*; the *mujahideen* are widely interpreted to be one of the eight categories of recipients entitled to *zakat*.[18]  The gravamen of the indictment is that Care was devoted to the support of "*jihad*" which the government simplistically defines as "holy war," as if doing so negates the charitable and religious basis of Care's and Mr. Muntasser's claim to First Amendment

---

[18] See App. at 00139 (previously referenced article by Aron Zysow on *zakat*); and App. at 00136 (extract from the Koran describing the categories of eligible recipients of *zakat*).

protection and creates an obligation to supply information that would normally not be seen as material to such an application for tax-exempt status.

But the *government's own expert intelligence literature* specifically and categorically rejects this definition of *jihad*, and in doing so, undercuts the very foundation of this case. If *jihad* means what the government experts say it means, it utterly undercuts this indictment.[19] In Defense Intelligence Memorandum 32-91, <u>see</u> App. at 00157, the United States Defense Intelligence Agency in 1991 defined *jihad* in a way that totally undermines the government's claimed definition in this case:

> Of all Islamic doctrines, the concept of jihad is the most overused, misunderstood, and misinterpreted. Often narrowly and erroneously translated as "holy war," jihad literally translates to "utmost effort" or "struggle" and refers to the obligation of all Muslims to promote and defend Islam. Because certain radical Muslim groups have adopted the word as part of their name, Westerners often associate jihad with terrorism. Jihad actually is a complex religious concept, fraught with contradiction, that holds powerful emotional appeals for Muslims and must be understood in the context of Islam as a whole. Most Muslims do not view jihad as a violent form of proselytizing but rather as a defensive doctrine. The Koran commands Muslims not to seek out conflict but to defend Islam whenever and wherever it is threatened.

The newsletters the government seeks to criminalize contain the very same sorts of discussions of the meaning of *jihad* as are developed in the memorandum published by the Government

---

[19] Given that the government's own experts agree with Defendants' definition of *jihad*, that definition is binding on the government for purposes of this case. <u>See, e.g.</u>, <u>Hawkins v. U.S.</u> 96 U.S. 689, 691-692 (1877) (the government or a public authority is bound by the acts or declarations of its public agents when those agents are acting within the scope of their authority). <u>See also</u> <u>U.S. v. One Big Six Wheel</u>, 987 F.Supp. 169, 175 (E.D. N.Y., 1997) ("If Congress meant both to expand the jurisdictional reach of its criminal proscriptions and to change the meaning of [a term] that underlies the substantive definition of criminal behavior, it is unlikely that it would have done so as cryptically as the government suggests").

itself. How can this possibly be criminal? If the mere discussion and publication of materials related to *zakat* and *jihad* are criminal, then discussion or distribution of the Koran itself by Muslim charities becomes a criminal activity. Indeed, the newsletters which the indictment seeks to criminalize include interpretations of the Koran offered by Muslim scholars, including their thoughts on the very questions posed by the Defense Intelligence Memorandum. Yet by the terms of the indictment, had Mr. Muntasser circulated even that memorandum, he would have been engaged in criminal activity.

This indictment is a prime example of the tendency of the government, in the wake of the terrorist attacks of September 11, 2001, to re-write not only the meaning of important words and concepts concerning the religion of Islam, but to re-write as well the positions, roles, and activities undertaken and supported by the United States government itself during, especially, the fight against the Soviet occupiers of Afghanistan. It is an attempt to rewrite history itself. Indeed, to bring the matter to the local level, during the Afghan war, the United States (through the United States Information Agency) went so far as to fund a journalism program at Boston University whose goal was to teach Arab and Afghan journalists to write sympathetically about the Afghan *jihad*. See App. at 00163. Similarly, until at least 1992 the United States Agency for International Development and the National Endowment for Democracy (a 501(c)(3) entity) funded the publication of a magazine entitled *Afghan Jehad* put out by the Cultural Council of the Afghan Resistance. See infra at 19. Would Boston University or the National Endowment for Democracy now be subject to prosecution under the same theory that underlies this indictment?

Moreover, even if *jihad* is understood in the simplistic way the government seems to claim, it *still* does not follow that discussion or even advocacy of it is criminal. This was

precisely the holding of <u>Brandenburg</u>, <u>supra</u> and <u>infra</u>, in which the Court held that even

advocacy of violence could not be the basis of a criminal prosecution, absent a showing of

incitement to imminent violence.  And yet there is no allegation in this indictment, nor could

there be, that Mr. Muntasser was in any way responsible for inciting any acts of violence in

connection with the newsletters, solicitations, or other activities of Care.  This indictment is, on

its face and by its own terms, concerned with and limited to activity clearly protected by the First

Amendment.

> V.  <u>The United States Government itself funded 501 (c)(3) organizations to enable them
> to perform precisely the sort of activities that form the basis of this  indictment.</u>

 The underlying activities specified in the indictment as the basis for the government's

theory of liability are *identical* to ones supported and financed by the federal government

through the National Endowment for Democracy and the Agency for International Development

during the Soviet occupation of Afghanistan and then well into the 1990's.

> **a.**    **National Endowment for Democracy**

The National Endowment for Democracy (NED) is 501(c)(3) initiative of the United

States Government, chartered by the Congress in November 1983.  Pursuant to the terms of its

enabling legislation, the NED has been directly funded by annual appropriations from the

Congress ever since.  App. at 00192 (NED's 1023 application, stating that "[t]he authorizing

legislation provides that the Endowment receive an annual appropriation from the U.S. Congress

in the form of a grant from the United States Information Agency").  In the words of the NED's

website, the NED was "premised on the idea that American assistance on behalf of democracy

efforts abroad would be good both for the U.S. and for those struggling around the world for

freedom and self-government."  App. at 00198 (David Lowe, "Idea to Reality: NED at 20").

The first chairman of the NED was Congressman Dante Fascell, who was succeeded by John Richardson, a former Assistant Secretary of State. The NED's first President was Carl Gershman, previously the Senior Counsel to the U.S. Representative to the United Nations.

In the NED's 1023 application for 501(c)(3) status, filed by Carl Gershman, the NED described its proposed activities and purposes as follows:

> The [NED] was incorporated in November 1983 for the general purpose of promoting and strengthening democratic values and institutions throughout the world. The Endowment does not conduct programs itself but provides support in the form of grants to other private sector organizations which present program proposals which further the states purposes of the Endowment. Those purposes are enumerated in the articles of incorporation . . . and in the National Endowment for Democracy Act, Public Law 98-164, which was passed by Congress in November 1983.

In its Articles of Incorporation, the NED stated its purposes as follows:

> – to encourage the free and democratic institutions throughout the world through private sector initiatives, including activities which promote the individual rights and freedoms, including internationally recognized human rights and fundamental freedoms, which are essential to the functioning of democratic institutions.

> – to facilitate exchanges between United States private sector groups (labor and business) and democratic groups abroad;

> – to promote United States nongovernmental participation, especially through the two major American political parties, labor, business, and other private sector groups, in democratic training programs and democratic institution-building abroad;

> – to strengthen democratic electoral processes abroad through timely measures in cooperation with indigenous democratic forces;

> – to support the participation of labor, business, and other United States private sector groups in fostering cooperation with those abroad dedicated to the cultural values, institutions, and organizations of democratic pluralism;

> – to encourage the establishment and growth of democratic development *in a manner consistent both with the broad concerns of United States national interests and with the specific requirements of the democratic groups in other countries* which are aided by programs funded by the Endowment; and

> – in addition, the corporation shall have all other powers now or hereafter granted to non-profit corporations pursuant to the District of Columbia Nonprofit Corporation Act to be used in furtherance of the above purposes.

App. at 00211– 212 (emphasis added).  In so stating, the Articles of Incorporation track the language of the National Endowment for Democracy Act, Public Law 98-164, attached as App. at 00222.

### b.     United States Agency for International Development

The United States Agency for International Development (USAID) is a federal agency created by act of Congress in November 1961.  In the words of USAID's website, the creation of USAID "represented a recommitment to the very purposes of overseas development.  USAID was established to unify assistance efforts, to provide a new focus on the needs of a changing world, and to assist other countries in maintaining their independence and becoming self-supporting."  App. at 00227 ("USAID History" from the USAID website).  Like all other federal agencies, USAID receives an annual appropriation from the Congress to fund its foreign assistance programs.  The 1961 Foreign Assistance Act that created USAID gave it responsibility for implementing and overseeing, *inter alia*, a Development Loan Fund whose primary purpose was to foster plans and programs to "develop economic resources and increase productive capacities" and a Development Grant Fund to focus on "assisting the development of human resources through such means as programs of technical cooperation and development" in less developed countries.  App. at 00230.

### c.     American Friends of Afghanistan

The American Friends of Afghanistan (AFA) is a 501(c)(3) organization established in September 1979.  App. at 00234.  The NED awarded AFA a grant in the amount of $75,300 in

1990 "to enable the Cultural Council of the Afghan Resistance (CCAR) of Islamabad, Pakistan

to conduct the first program activities of its newly established independent, non-governmental

Afghan Institute for Policy Studies and to publish a quarterly journal."  App. at 00236 (entries

from the NED's "Democracy Projects Database", available through the NED website).  In 1991,

the NED awarded AFA a grant in the amount of $57,068 "to enable [CCAR] to continue

publishing the magazine Afghan Jehad and to support its Afghan Institute for Policy Studies

Program."  Id.  In 1992, the NED awarded AFA a grant in the amount of $61,344 "to support

activities intended to encourage the adoption of democratic concepts as part of an Afghan

solution, particularly through the publication of the quarterly journal, Afghan Jehad."  CCAR

was an organization led by the a one Sabahuddin Kushkaki, a former journalism professor at the

University of Kabul.  CCAR operated under the aegis of the alliance of three moderate

nationalist *mujahideen* parties then fighting in Afghanistan with US support.[20]

  Selected pages from the 1990-92 issues of *Afghan Jehad* are attached as App at 00238.

The April-June 1990 issue featured, on its cover, a picture of "Mujaheddin commanders who met

in June in Paktia province to discuss the Afghan situation and coordinate military activities."

App. at 00240.  The October-December 1991 issue included an article entitled "The Islamic

Revolution and Jehad in Afghanistan," which was introduced as follows: "So our objective now

should be an Islamic Revolution and an Islamic Revolution can only be ushered in through the

adoption of jehad as its primary instrument."  App. at 00242.  The article continued:

---

[20] These parties were the National Islamic Front of Afghanistan led by Sayyid Ahmad
Gailani; the Islamic National Salvation Front, led by Hazrat Sibghatullah Mojaddedi; and the
Movement of the Islamic Uprising of Afghanistan, led by Muhammad nabi Muhammadi.  At the
Constitutional Loya Jirga held by the US-supported government of Afghanistan in December
2003, Gailani was the opening interim chair; Mojaddedi was elected as the permanent chair; and
Muhammadi's son (his father had died) chaired one of the working groups.

> Now at this momentous cornerstone of our history, the Afghans through the successful application of the Islamic doctrine of jehad have because of the defeat of a super-power – the USSR – shown the beacon of light to the entire Muslim World and are the veritable torch bearers and trail-blazers for the revival of jehad not merely as a static doctrine to be discussed by the ulama and the intellectuals but as a practical phenomenon which can be the sum-total of our concept of Grand Strategy [sic] for the Muslims of the world.

Id.  This and other issues of *Afghan Jehad* are replete with accounts of military battles then taking place in Afghanistan, pictures of *mujahideen* leaders and fighters, and editorials expressing support for the *mujahideen* and the concept of *jihad*.  The October-December 1992 issue, to take one further example, included an editorial entitled "Afghanistan and Current Problems" noting that "[w]hen we took up arms against the infidels and the communists . . . God helped us and granted us victory over the enemy."  App. at 00244.

CCAR and its newsletter, *Afghan Jehad*, were also supported by USAID.  See App. at 0245 (USAID Cooperative Agreement identifying CCAR as among the sub-grantees supported by USAID through a 1990 grant to the Asia Foundation).

NED's involvement with AFA and CCAR dates back to 1985, when NED awarded AFA a major grant to provide educational opportunities, including literacy and photography courses, to the Afghan mujahideen.  The grant also provided support for the filming of documentaries describing military uprisings.  See App. at 00249.  In a 1986 report to the NED reporting on AFA's progress in the program, AFA's then-president Thomas Goutierre appended a news article in which he was quoted as having "expressed his disappointment over the soft-peddling of the [Afghan] issue by the Islamic Conference and not declaring a holy war (jehad) against the Russians."  As evidenced above, despite this invocation of "holy war," NED and USAID support for AFA's activities continued into the 1990s.  App. at 00275.

### d.    **Freedom Medicine**

Freedom Medicine is a 501(c)(3) organization established in 1985. Its 1023 application stated "its immediate principal purpose is to provide medical relief to people from Afghanistan from illness, injury and displacement resulting from the revolution in Afghanistan. . . Because the organization is humanitarian in its goals and efficiently operational in its focus, it anticipates significant help from U.S. grant agencies and other 501(c)(3) organizations. The purpose section of its charter has been drawn with these purposes in mind. The organization was formed to provide medical assistance to victims of natural and man-made disasters around the world. The group's current focus is in Afghanistan and Pakistan." App. at 00284.

Freedom Medicine received more than eighty percent of its funding from USAID to support medical training and medical relief for members of the Afghan *mujahideen*. App. at 00336 (Boston Globe article dated July 31, 1988). In a March 1989 "Summary and Comments on Freedom Medicine's Quarterly Report," a USAID official stated with evident approval that "Freedom Medicine continues to provide valuable medical support and training for the Afghan resistance." See App. at 00338.

### e.    Free Afghanistan Alliance

The Free Afghanistan Alliance (FAA) is a 501(c)(3) organization founded in 1979 that became tax-exempt in 1986. It stated in its 1023 application that it was founded "following the Russian invasion of Afghanistan . . . to provide humanitarian aid for the Afghan people and to publicize their cause." App. at 00341. In its Articles of Incorporation, FAA stated that it "is dedicated to humanitarian support of the Afghanistan people in their effort to *regain control and occupancy of their country and re-establish a free and democratic government*. It is likewise dedicated to such other peoples as may similarly be denied their country or place, now or in the future, by an illegally occupying force or government" (emphasis added). App. at 00353. The

24

materials provided by FAA to the IRS in support of its claim to tax-exempt status included a February 18, 1986 letter from President Ronald Reagan to the organization's president, Scott Kramer, stating that President Reagan was "proud to reaffirm my commitment to the Afghan people in their struggle to regain their freedom." App at 00368. In a July 1, 1986 letter to the chief of the IRS Exempt Organizations Rulings Branch, Mr. Kramer stated that while FAA does "not provide direct aid to any of the resistance fighters . . . some supplies are used to treat the wounded in the hospitals and they would also receive benefit from our provisions to refugee camps when they return from the field for rest periods." Mr. Kramer further stated that while FAA has

> no connection with the Afghan National Liberation Front or any other factions . . . [w]e do, however, bring medical cases from the various camps. All of the camps come under one or another of the factions. . . . We have received five cases brought to us by the Afghan National Liberation Front. We also receive cases from the camps controlled by other factions. Patients are brought to the United States on Air Force and commercial air lines.

App. at 00370.

In conjunction with Freedom Medicine, FAA received funding from USAID to fly injured mujahideen fighters to the United States aboard federally-funded flights known as the McCollum humanitarian flights (so-named after the congressman who sponsored the appropriations legislation for these flights). See App. at 00336 (Boston Globe July 31, 1988 article). FAA also flew injured children to the United States, and on at least one occasion did so under the supervision of a high-ranking official of the Afghan National Liberation Front, one of the *mujahideen* groups. App. at 00344 (*New York Times* December 19, 1985 article). On January 24, 1986, President Reagan issue a statement thanking the FAA for its activities in Afghanistan, and noting as follows:

The United States Government, with the support of Congress, provided funds for humanitarian assistance, including medical training, to the freedom fighters and victims of the Soviet war.  The American people, particularly groups such as the Free Afghanistan Alliance and the Committee for a Free Afghanistan, have given generously to alleviate the plight of the refugees and those who remain in Afghanistan.

App. at 00377.

### f.    Committee for a Free Afghanistan

The Committee for a Free Afghanistan (CFA) is a 501(c)(3) organization established in 1984.  In its 1023 application, it stated that it would "conduct studies concerning the social, economic and political situation in Afghanistan since the Soviet invasion and occupation of that country. . . . The organization will also provide a forum for discussion of the situation in Afghanistan. . . . The results of all research will be made available to interested parties on a nondiscriminatory basis."  App. at 00381.  CFA's Articles of Incorporation also noted that CFA would "engage in nonpartisan research, study and analysis for the benefit of the general public regarding the role of the United States in Afghanistan." App. at 00402.

CFA published flyers featuring a picture of an Afghan child with a dove on his head and, beneath him, the message "Support the Afghan Freedom Fighters."  Ex. __.  It also published flyers featuring images of mujahideen fighters and the following text: "How Long Must They Wait?  The Afghans Still Stand Alone Against the Might of the Soviet Army. . . . Support Free Afghanistan."  App. at 00426.  CFA also published a newsletter entitled "Free Afghanistan Report" replete with editorials and images supportive of the mujahideen.  The August 1982 issue of this newsletter, for example, featured an article referring to the "mujahideen – freedom fighters" and imploring the United States to "provide them with the weapons they desperately need to defend themselves, particularly the shoulder-fired anti-aircraft missiles that could make such a difference in this war." App. at 00428.  Short news accounts depicted various episodes in

26

the "freedom fighters' valiant struggle to regain their national sovereignty."  Id.  The May 1983

issue featured on its cover a picture of President Reagan meeting with "freedom fighters"

dressed in their native Afghan garb.  Id.  The issue also included stories recounting congressional

debates over the level and type of aid to supply to the mujahideen, and an advertisement

announcing the availability of t-shirts with the words "Support the Afghan Freedom Fighters –

He Fights for You" emblazoned on the front, and selling for a then-pricey $15.  Id.  The March

1984 issue included a narrative account of a CFA member or supporter that opened with the

following: "I met with the Islamic alliance of the Afghanistan Mujahedin in late June."  Id.  In

February 1985, the "Free Afghanistan Report" announced that CFA would be hosting a

delegation of the "freedom fighters" themselves in Washington.  Id.  That same issue included a

solicitation for contributions, stating that "[t]he Afghans don't want American troops, but they

urgently need our support.  The Committee is working to help them get this. . . . WE NEED

YOUR TAX-DEDUCTIBLE CONTRIBUTION!"  Id. (emphasis in the original).  In September

1985, the newsletter announced that CFA was helping to bring wounded Afghan "freedom

fighters" to the U.S. for medical treatment.  A news brief in that same issue announced that

"Mujahedeen kill 100 Soviets," and obituaries lauded by individual name the "courageous

Afghan commanders who lost their lives this past year."  Id.  The Summer 1986 issue featured a

front-page photograph of President Reagan again meeting with a delegation from the Afghan

mujahideen alliance, and a solicitation for donations to fund the medical treatment of injured

Afghans .  Id.

### g.    Afghanistan Relief Committee

The Afghanistan Relief Committee (ARC) is a 501(c)(3) organization established in

1980.  Its 1023 application stated that the "purpose of the fund raising activities is to raise

monies for humanitarian aid to the refugees from Afghanistan, currently estimated to be in excess of 450,000, primarily in Pakistan." App. at 00451. Its Articles of Incorporation stated its purposes as follows: "to provide charitable, educational, humanitarian, and benevolent aid and assistance to the people of Afghanistan wherever they may be situated by soliciting, collecting, and otherwise raising money for such purposes." App. at 0000464.

ARC was an affiliate of Freedom Medicine, discussed infra, the organization that flew injured mujahideen to the United States for medical treatment with funding from the U.S. Congress. ARC received a grant from USAID in 1990 to support the publication of a journal, WUFA, edited by the Writers Union of Free Afghanistan, based on Peshawar, Pakistan. App. at 00490. The WUFA journal was also supported in 1995 by a grant from the NED to finance the distribution of booklets to "commanders, elders, religious scholars, and intellectuals" in Afghanistan. See App. at 00493.

### h.    Afghan Information Center

The Afghan Information Center (AIC) was founded in 1981 as an arm of Freedom House, a 501(c)(3) organization founded in 1943. AIC is responsible for collecting and disseminating Freedom House information on Afghan issues. Both AIC and Freedom House have been linked by media reports to the funneling of assistance to the Afghan *mujahideen* and Arab supporters. See App. at 00495. The NED awarded AIC with a $50,000 grant in 1990 and a $24,000 grant in 1993 to support its publications and related work. See App. at 00500. The United States Information Agency (USIA), a federal agency acting through a grant to Boston University, also commissioned AIC in 1987 to help train Afghan journalists to provide sympathetic coverage of *mujahideen* military actions. See App. at 00503.

AIC's publications included the "Afghan Information Centre Monthly Bulletin." The March-June 1992 issue of this bulletin included articles discussing the "just status of [the Afghan] jehad" and noting the "sacrifices of more then [sic] one million martyrs by the Afghan nation to prevent the advance of the Red Army to Pakistan and the Gulf." App. at 00510. A news brief recounted that "most of the mujahideen of the area have left for Kabul," and an article described the history of "mujahideen . . . attacks on the regime forces and Soviet troops." Another article reprinted the remarks of an Afghan mujahideen leader, Moulvi Yunus Khalis, stating "May Allah give reward for the role played by the organizations in the jehad for independence." Id. And an open letter letter to AIC readers in the same issue noted that "AIC joined the convoy of the Afghan Resistance in its struggle against Russia to safeguard the freedom, territorial integrity, and national sovereignty of Afghanistan." Id.

The January 1991 issue of the AIC Monthly Bulletin included an article announcing that "[w]e are the only nation in the modern history that has offered great sacrifices for its freedom in the war. The international effects of the Afghan jehad brought the Soviet empire to its knees and possibly to collapse. Regretfully, we should point out that our blood is like the oil of a lamp which burns itself out but provides light for others." The article went on to describe "victor[ies] for the mujahideen," and to note that the "U.S. was a country of the world that extended great economic, military and political support to the Afghan mujahideen." App. at 00517. Another item stated that "Jehad will continue unless an Islamic government replaced the infidel and atheist regime in the country." Id. Other articles reported on the nationwide council (*shura*) of *mujahideen* commanders meeting in December 1990, and covered *mujahideen* rocket attacks on various military outposts of the Afghan regime. Id.

### i.    Asia Foundation

The Asia Foundation is a 501(c)(3) organization originally incorporated in 1951 under the name Committee for a Free Asia. Its Articles of Incorporation specified that it would "promote, aid and assist the cause of individual and national freedom in Asia, as opposed to Communist and other totalitarian doctrines." App. at 00526. The IRS issued a determination letter recognizing the Committee for a Free Asia as a tax-exempt organization in 1952. App. at 00551. In 1992, the Asia Foundation received a grant from USAID in the amount of $56,471 "to provide support and to implement the Asia Democracy Program." App. at 00554. Under the terms of the USAID grant, the Asia Foundation would fund the Cultural Council of the Afghan Resistance (CCAR) and its quarterly journal, *Afghan Jehad*, the organ of the seven-party *mujahideen* alliance discussed <u>infra</u> at 21. App. at 00554. The USAID grant further provided, under the "Sub-Grantee Information" heading for CCAR, that "*Afghan Jehad*, and complete proceedings of seminars have been produced regularly and circulated to readers in Pakistan, Afghanistan, and overseas. 5000 copies of the journal, in Pushto and English, reach influential Afghans and potential policy makers throughout the world." App. at 00561. <u>See also</u> App. at 00245 (USAID Cooperative Agreement detailing 1990 grant to Asia Foundation, with sub-grant information concerning CCAR).

### j.  **Management Sciences for Health**

Management Sciences for Health (MSH) is a 501(c)(3) organization based in Cambridge, Massachusetts and incorporated in 1971. MSH stated on its 1023 application that its activities "are charitable, educational, and scientific in nature. Its primary concern is the analysis of health care and family planning programs and the suggestion of methods of increasing the efficiency of their management so the programs will have a more effective impact on the target populations." App. at 00574. MSH also stated in its 1023 attachments that it had entered into a contact with

USAID to provide family planning services in Afghanistan on a cost reimbursement, no-fee basis.  <u>See</u>. App. at 00578.  MSH's Articles of Organization provided that its purposes were "to analyze, assist, promote, evaluate, manage and perform research on the delivery of health case; to produce, publish and distribute educational materials; and to establish methods and procedures leading to the improvement of health and social services generally." App. at 00588.

In 1986, USAID signed a Cooperative Agreement with MSH to manage a $60 million Afghanistan Health Sector Support Project extending from 1986 to 1994. App. at 00636.  As noted in MSH's April 1994 report on the project, one of the project's two major objectives was to "strengthen the capability of the Afghan Seven Party Alliance Health Committee (now the Ministry of Public Health of the Interim Government of Afghanistan) to plan, operate, and monitor expanded health services in Afghanistan. <u>Id.</u>  (The seven party alliance is another expression for the seven *mujahideen* factions.)  A June 10, 1986 MSH project update to USAID stated that MSH's "health activities will follow a number of strategic principles to gain and maintain the confidence of the Afghan parties," including "respect for the values of the Jihad." App. at 00639.  A September 22, 1986 letter from the USAID representative in Islamabad, Pakistan to MSH outlining the terms of the USAID grant to MSH instructed that MSH's efforts were to be directed to, inter alia, [a]ssisting the Alliance Health Committee (AHC) in the expansion and improvement of general health care for the civilian population *and Mujahideen*." App. at 00645 (emphasis added).  A July 15, 1988 letter from the MSH team leader in Peshawar, Pakistan to the USAID representative in Islamabad reported that the MSH "service area extends to those provinces where a mujahideen administration . . . under Commander Masood has been developed."  App. at 00648.  An August 1988 USAID assessment of the Afghanistan Health Sector Support stated that "the MSH team's work with the AHC And Regional Commanders has

required that priority be given to solving organizational and operational problems so that

provision of health care services to the mujahideen and the civilian population could be

expedited, and coordinated."  App. at 00673.  A January 25, 1989 letter by an MSH project

officer referenced "training of the Mujahidin" in the context of MSH's Alliance Health

Committee training program.  App. at 00739.

A 1994 MSH report entitled "Health Care in Muslim Asia: Development and Disorder in

Wartime Afghanistan stated as follows:

> [n]o distinct dividing line existed [in Afghanistan] between combatants and
> noncombatants; many degrees of active military involvement existed:
>     – full-time resistance soldiers . . .
>     – part-time resistance soldiers . . .
>     – anyone carrying weapons or in any other way assisting the first two are
> thus [also] considered mujahed.
> *Likewise, anyone providing medical care to the fighters was involved in jihad.*

App. 00744 (emphasis added).

### k.      University of Nebraska at Omaha

The University of Nebraska at Omaha (UNO) is a non-profit, publicly-funded

educational institution.

UNO signed a $31.2 million contract with USAID to fund an Education Sector Support

Project (ESSP) in Afghanistan from 1987 to 1992 (USAID Project No. 306-0202).  In its

presentation to Congress on USAID activities for the fiscal year 1990, USAID noted that as a

result of the UNO's work on the Education Sector Support Project, "[t]wenty thousand

mujahideen have received literacy training in camps in Pakistan." App. at 00746.

The USAID contact for UNO's mujahideen literacy project was renewed in May 1992 for

a three-year term with total funding of $18 million.  See App. at 00751 (September 30, 1993

letter by UNO project director Thomas Goutierre).  In UNO's own report on the project under

the renewed contract, UNO reported that its "Education Center for Afghanistan" was initially

formed in 1986 with the aim of establishing, inter alia, a "literacy course for mujahideen."  App.

at 00758.

A June 1994 USAID report summarizing the results of the project stated that "[f]rom

FY87 to FY92 some 43,694 Mujahideen were provided literacy courses in the Winter camps

along the border using the Alphabet of Jehad Liberacy books . . . prepared by the ESSP."  App.

at 00748 (USAID End of Project Report, June 30, 1994, at 17).

An example of the training pamphlets that UNO used in its literacy courses appears as

App. at 00812.  On the cover sheet, the term "jehad" appears along with "Afghans" and "Learn

English 3."  Id.

**l.**            **Boston University Media Project**

Boston University is a private, non-profit institution of higher education.

On December 9, 1985, Boston University (BU) submitted a proposal to the United States

Information Agency (USIA), a federal agency, to train Afghan journalists to provide sympathetic

coverage of the Afghan *mujahideen*.  See App. at 00814 ("The Afghan Media Project: A

Proposal Submitted to the United States Information Agency by Boston University," December

9, 1985).  The purpose of the BU project was to train Afghans in everything from newswriting

and reporting, to photojournalism ("including setting up and running a darkroom"), to identifying

military hardware and combat tactics.  App. at 00180-181.  In its first six months, USIA granted

BU's Afghan Media Project $180,364.  App. at 00816 ("The Afghan Media Project," USIA,

October 1, 1986.)  Part of U.S.-government-wide efforts "to maximize coverage of the war and

publicity favorable to the resistance," BU's program successfully "train[ed] qualified afghan

mujahedin in basic media skills."  ("Memorandum for Mr. Frank C. Carlucci," January, 24,

1989, App. at 00817, and "Afghan Media Project: Next Steps," Confidential Cable, February 23,

1987, App. at 00822.)

**

As the above examples illustrate – and there are many, many more that can be provided –

humanitarian aid on a scale far beyond that alleged in this indictment was financed with U.S. tax

dollars via the government-funded National Endowment for Democracy (NED) and the United

States Agency for International Development (USAID).  No one questioned the 501(c)(3) status

of the organizations involved (including the 501(c)(3) status of the NED itself).  With the end of

Soviet occupation and communist rule in 1991-92, the American strategic interest in Afghanistan

appeared to diminish, and the well of aid ran dry; it was then left to private Muslim groups to

take over the charitable and humanitarian responsibilities remaining in the hopes of aiding those

who were damaged during the war against the occupation.  But that does not change the

character of the activities involved.  *Activities that were considered charitable in 1985, 1989,*

*1991, or 1992 do not become non-charitable in 1993 because the identity of the donor changes*,

or because the United States' strategic interest in *jihad* has lessened.  Certainly, the protection

afforded to these activities cannot turn on whether U.S. policy is or is not pro-*jihad* or favors one

or another *mujahideen* faction on a particular date.  See <u>R.A.V. v. City of St. Paul</u>, 505 U.S. 377

(1992) (striking down Minnesota hate crime ordinance because of constitutionally impermissible

viewpoint discrimination).  And USAID funding for the UNO and BU projects demonstrates

clearly that the U.S. government deemed pro-jihad and pro-mujahideen publications and projects

to fall under the rubric of "educational" activities.  <u>Compare</u> App. at 00043 (Care International's

Articles of Incorporation, which provided that Care was organized for "charitable, religious,

*educational*, and scientific purposes, including but not limited to, engage in, establish, promote,

34

contribute and carry out human welfare, charitable and relief activities, programs, projects, organizations, institutions, and funds") (emphasis added).[21]  For the government now to maintain the contrary would be to violate the longstanding principle of due process according to which criminal statutes must provide clarity and notice in order to serve as the basis for a conviction. See, e.g., United States v. Bass, 404 U.S. 336, 347-48 (1971) ("ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.  In various ways over the years, we have stated that when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.").

VI.  Other religious charities fund and perform precisely the same sorts of activities.

Even the most cursory review of the websites of other mainstream religious charities, from the Jewish National Fund to Catholic Charities, reveals the sorts of activities that are virtually identical to the ones that the government is charging are beyond the scope of First Amendment protection here.  Legitimate Muslim charities may not be placed in a separate and unequal category relative to traditional – and more familiar to most Americans – Protestant, Jewish and Catholic charities.

The website of the Jewish National Fund, for example, contains detailed information about Israel's military successes, and the plight of its widows and orphans, in the manner of the conduct alleged in the indictment.  A number of Jewish charities conducted emergency appeals in the wake of the latest Lebanon offensive, not to provide military aid, but for ancillary assistance for victims.  Those charities also published newsletters to solicit further support, just

---

[21] And see Olmstead v. United States, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) ("Our Government is the potent, the omnipresent teacher.  For good or for ill, it teaches the whole people by its example.") (Brandeis, J., dissenting).

as Care is alleged to have done, and just as many other federally funded American charities did during the Afghan war.[22]  The prosecution's attempt to give these charitable endeavors a sinister color is not only misguided as such, but also lacks a limiting principle and would lead to the criminalization of a vast sphere of charitable activity that can only be described as perfectly benign when the relevant words and concepts are correctly analyzed and understood.

Moreover, to the extent that persons, other than defendants, who may have been involved in Care engaged in any activities not in keeping with Care's primary and stated mission, defendants cannot be held liable for failing to disclose those activities.  See NAACP v. Claiborne Hardware Co., 458 U.S. 886, 931, 934 (1982) ("To impose liability without a finding that the NAACP authorized – either actually or apparently – or ratified unlawful conduct would impermissibly burden the rights of political association that are protected by the First Amendment. . . . A court must be wary of a claim that the true color of a forest is better revealed by reptiles hidden in the weeds than by the foliage of countless freestanding trees.")

To distinguish in this way between more and less established, or more and less popular, religions is clearly unconstitutional.  Such discrimination violates both the First Amendment's free exercise clause and the prohibition on the establishment of certain religions over others.  It is absolutely clear that the government is not free to prefer one religion over another: if Jews and Catholics are free to raise money and support their chosen causes domestically and internationally, no different rules may be applied, retroactively no less, to a religion which has in

---

[22] See, e.g., App. at 00126 (solicitation materials posted on the website of the Jewish National Fund, a 501(c)(3) organization, requesting donations to finance the purchase of bulletproof vests, helmets, and firetrucks in connection with the 2006 Israel-Lebanon conflict); App. at 00130  ("A Personal Report from the North Battle Front," detailing the impact of the 2006 Israel-Lebanon conflict, posted on the website of the United Jewish Communities, a 501(c)(3) organization); App. at. 00133 ("A Personal Message from Israel's Home Front Command," also recently posted on the UJC website).

recent years become less popular in America.  "[T]he free exercise clause protects all religions, old and new, alike once its protection attaches."  Van Schaick v. Church of Scientology, 535 F.Supp. 1125, 1137 (D. Mass. 1982).  See also United States v. Ballard, 322 U.S. 78, 86 (1944) ("Men may believe what they cannot prove.  They may not be put to the proof of their religious doctrines or beliefs. . . But it would hardly be supposed that they could be tried before a jury charged with the duty of determining whether those teachings contained false representations.") And yet it is precisely these precepts that the Government trenches upon by bringing this indictment.

> VII.  To punish CARE for engaging in the same activities as Government-funded charities and other religious charities deprives defendant of the fair warning that due process requires, and violates the rule of lenity.

No principle is more basic to due process than the requirement that an individual cannot be required to guess, at his peril, about what activities the criminal law prohibits.  The rules must be clear and knowable, and their application reasonably foreseeable.   Otherwise the criminal law becomes a trap for the unwary; and too much discretion becomes vested in the prosecutor to choose what conduct, or what individual, is subject to prosecution.  See, e.g., Papachristou v. City of Jacksonville, 405 U.S. 156 (1972); United States v. Bass, 404 U.S. 336, 347-48 (1971); and Morissette v. United States, 342 U.S. 246 (1952).

Here, the indictment is both vague and overbroad.  It is vague in that it would make what many Muslim charities do criminal, since Islam commands support for *zakat,* advocacy of *mujahideen,* and, according to some interpretations, advocacy of *jihad*.  It is overbroad in that it fails to specify which *jihads* and which *mujahideen* of all those that have existed or exist today it is illegal to advocate for, and to whom *zakat* may, or may not, be directed. Given this reality, it

inevitably vests virtually unlimited discretion in government prosecutors (and, one must add in this case, immigration and naturalization agents) to decide whom to prosecute and for what. Under such a regime, that is at the same time replete with endless laws but without sufficient substance and specificity to give fair warning, the individual cannot hope to conform his conduct to the requirements of law, short of stopping support for and participation in a vast variety of common Muslim and other religious charitable causes altogether. This, of course, is the very essence of a prohibited chilling effect in the vital area of the free exercise of religion. And yet that is precisely how the government managed to generate the eleventh hour indictment in this case that resulted in postponing, and perhaps preventing altogether, another member of the Muslim faith from becoming an American citizen.[23]

Conduct should not and cannot be criminalized depending upon what definition of religious terms a judge and jury decide to apply retrospectively.  Religion permeates this entire case.  Care was set up to advance religious goals; *jihad* is a religious concept; *zakat* is a religious obligation; support for the *mujahideen* is, according to certain interpretations of the Koran, a religious command.

The definition of these terms, far from being a matter for judge and jury, is precisely what the First Amendment commands courts and juries to avoid and instead to leave to religions themselves.  There is in fact a long line of cases requiring courts to abstain from all forms of religious disputes which require judicial resolution of religious terms.  In the leading case of United States v. Ballard, 322 U.S. 78 (1944), the court dealt with a mail fraud conviction of a

---

[23] See also Big Mama Rag, Inc. v. U.S., 631 F.2d 1030 (D.C. Cir. 1980) (holding that IRS Reg. § 1.503(c)(3)-1(d)(3)(i), defining "educational" for 501(c)(3) exemption purposes, is unconstitutionally vague, leaving too much room for discriminatory denial of tax-exempt status). The Big Mama Rag Court criticized the IRS for "doctrinaire," "value-laden" judgments in denying exemption based on the content of the organization's speech.  Id. at 1039-40.

promoter of a religious movement. The defendant sold memberships on the strength of the

movement's professed religious beliefs. The conviction was reversed by the Supreme Court,

which admonished that religious freedom "embraces the right to maintain theories of life and

death . . . which are rank heresy to followers of the orthodox faiths," and that "if one could be

sent to jail because a jury in a hostile environment found those teachings false, little indeed

would be left of religious freedom." Id. at 86, 87.

Indeed, in the landmark case of Walz vs. Tax Commission of the City of New York, 397

U.S. 664 (1970), the Court declined to declare unconstitutional the exemption of churches from

property taxes. The Court reasoned that the church did not have to justify its exemption by

proving its work in the social services arena, for example, since that requirement "would

introduce an element of governmental evaluation and standards to the worth of particular social

welfare programs, thus producing a kind of continuing day-to-day relationship which the policy

of neutrality seeks to minimize." Id. at 674.

And yet these kinds of prohibited interference in and judgment of the varied practices and

beliefs of what (to most jurors) are unfamiliar religious beliefs and practices are precisely what

the court and the jury would be required to engage in here in order to resolve this case.  The

specter of a predominantly or exclusively non-Muslim jury and court called upon to define the

most basic requirements of Islam and then draw the lines between what is and is not considered

religious is just the sort of affront to the free exercise of religion that both the free exercise and

establishment clauses were intended to avoid.  If the government has evidence that this

defendant engaged in unlawful or terrorist-related activity, it should have produced it to the

grand jury and should be required to produce it now.[24]  If, on the other hand, the government is

---

[24] It is not enough for the government to produce evidence of wrongdoing (if any exists) by an errant member of Care.  This legal requirement would be satisfied only by evidence of

relying upon vague assertions that the defendants, by virtue of their charitable activities, are

*jihadists* and that they failed to disclose that on a tax-exemption application or in a government

interview, this indictment should be dismissed. On the face of the indictment, the latter, not the

former, appears to be the case.

>    VIII.  Even apart from the free exercise of religion, the First Amendment's guarantee of
>
>    free speech prohibits the government from punishing defendants for what amounts
>
>    to pure advocacy as opposed to inciting imminent lawless conduct.

All of the activities charged in the indictment relate to speech, writings, and publications.

There is no reference whatsoever to any acts of violence incited by either of the defendants or

Care.  The Supreme Court has drawn a sharp line between advocacy and action, making clear

that only the latter may constitutionally be prohibited.  In Brandenburg v Ohio, supra, the

Supreme Court struck down an Ohio criminal syndicalism statute that punished "persons who

advocate or teach the duty, necessity, or propriety of violence as a means of accomplishing

industrial or political reform; or who publish or circulate or display any book or paper containing

any such advocacy." Brandenburg, 395 U.S. at 444-45.  The Court found that "[n]either the

indictment nor the trial judge's instructions to the jury in any way refined the statute's bald

definition of the crime in terms of mere advocacy not distinguished from incitement to imminent

lawless action."  Id. at 448-49.

This requirement that only speech that incites imminent lawless action – as opposed to

mere advocacy – can be punished was further strengthened when the Court struck down a city's

---

wrongdoing committed by defendants or someone with whom they were engaged in a
conspiracy.  Mere membership or even leadership of Care is not the kind of conspiracy pursuant
to which defendants can be held criminally responsible for any errant acts of other individuals
who may have been associated with Care.  NAACP v. Claiborne Hardware Co., 458 U.S. 886,
931, 934 (1982).

hate crime statute in 1992 when applied to the burning of a cross on the lawn of an African American.  The ordinance, the court held, was facially unconstitutional even though it was written to be limited to "fighting words," because it impermissibly drew lines based on the point of view expressed.  R.A.V. v. City of St. Paul, 505 U.S. 377 (1992).  The majority concluded that the ordinance was not viewpoint neutral because in practice it would punish fighting words from only one side of the fence.  Justice Scalia, writing for the majority, gave an example: "One could [under St. Paul's ordinance] hold up a sign saying, for example, that all 'anti-Catholic bigots' are misbegotten; but not that all 'papists' are, for that would insult and provoke violence 'on the basis of religion.' St. Paul has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensbury rules."  Similar, the federal government does not have the authority to pick and choose which religious activities or, for that matter, which religions, it will favor.

In a more recent cross-burning case, the Supreme Court held that cross-burning could be punished only where the jury is able to conclude that in the context of the facts of a particular case, it is clear that the cross-burning was intended to constitute a threat within the traditional meaning of that term, rather than a symbolic act of hatred.  Virginia v. Black, 538 U.S. 343 (2003).  This makes even more vivid the line that must be drawn between protected activity and criminal activity.

If the Klu Klux Klan cannot be punished for burning a cross on the lawn of a black family notwithstanding local hate crime laws, and Jehovah's Witnesses are permitted to solicit notwithstanding local licensing regulations, and the Government itself is free to fund other local charities to do exactly what it alleges Care was doing a mere two or three years before, it should go without saying that advocacy of *jihad*, promotion of *zakat,* and support of *mujahideen* do not

strip a charitable organization of its 501(c)(3) status, and that an organization's engagement in such advocacy, promotion and support cannot strip it of charitable status. Hence, these issues become immaterial.

IX.  The IRS's own regulations makes clear that the content of a charity's speech advocating social or civic change is not to be viewed as relevant to the 501(c)(3) exemption question.

Applicable IRS regulations reinforce defendants' free exercise of religion and free speech claims.  IRS Reg. § 1.501(c)(3)-1(d)(2) states as follows:

> The fact that an organization, in carrying out its primary purpose, advocates social or civic changes or presents opinion on controversial issues with the intention of molding public opinion or creating public sentiment to an acceptance of its view does not preclude such organization from qualifying under section 501(c)(3) so long as it is not an action organization of any one of the types described in paragraph (c)(3) of this section.[25]

IRS Reg. § 1.501(c)(3)-1(d)(2).  This regulation makes clear that according to the IRS's own definition of the 501(c)(3) exemption, the content of a charity's speech, or the fact that a charity engages in certain speech, is not to be viewed as relevant to the exemption question.  From this it follows *a fortiori* that the IRS has not required and does not require charities to provide specifications in their forms 1023 and 990 about this kind of activity.  Finally, an organization reading this regulation would not know that failing to provide more detail about its intended speech would make a form 1023 or 990 a false filing.

X.  Selective Prosecution.

In order to prevail on a claim of selective prosecution, a defendant must prove by "clear evidence" that the decision to prosecute (1) was motivated by a discriminatory purpose and (2)

---

[25] Paragraph (c)(3), in turn, provides that an "action" organization is one that focuses on advocating the passage or defeat of legislation.

had a discriminatory effect.  <u>United States v. Armstrong</u>, 517 U.S. 456, 464 (1996).  If a defendant makes "a credible showing of different treatment of similarly situated persons," he may obtain discovery as to selective prosecution issues.  <u>Id.</u> at 470.

In this case, the evidence of discriminatory purpose and effect alike are manifestly clear. As set forth above in the introduction to this memorandum, the government plainly brought this facially unconstitutional indictment in order to cut off the possibility that Judge Zobel might have granted Mr. Muntasser's petition for naturalization.  The evidence of forum shopping cited above (and in connection with Defendants' concurrently filed Motion for Jury Selection from the Eastern Division of Massachusetts) simply confirms that the government has acted with the improper purpose of interfering with the jurisdiction of a federal court and with the unfolding of a federal proceeding lawfully brought under the authority of a statute of the United States.  That Mr. Muntasser, in bringing his naturalization lawsuit, had the courage to insist that the INS treat immigrants of all backgrounds and faiths with equal dignity and respect only makes all the more egregious the government's manipulation of congressionally mandated procedures put in place to ensure the equitable and efficient disposition of citizenship applications.  If this be not improper purpose, it is difficult to imagine what would be.

As for discriminatory effect, defendants reincorporate by reference the extensive discussion, <u>supra</u> at 19, of similarly situated, government-funded charities "engaged in activities involving the solicitation and expenditure of funds to support and promote the mujahideen and jihad, including the distribution of pro-jihad publications."  App. at 00108 (Indictment at ¶5).  To this evidence can be added the abundant evidence of other recognized 501(c)(3) organizations, too numerous to mention, that engaged in widely publicized, pro-*mujahideen* and pro-*jihad* conduct in connection with the conflicts in Afghanistan during the 1980s and well into the

1990s, with no hint of a suggestion that their 501(c)(3) might have been called into question. Defendants submit that the evidence assembled in the appendix to this motion more than carries their burden with respect to the discriminatory effect prong of the selective prosecution test. That other, more familiar and more mainstream religious charities have also engaged in conduct analogous to that specified as the basis for criminal liability in this indictment only confirms what is more than plain for any disinterested observer to see: namely, that the government in this case is selectively targeting two defendants for criminal prosecution because of who they are and what religion they practice rather than because of anything they may have done as individuals that can reasonably be described as criminal. This is the very essence of discriminatory effect under the Court's selective prosecution jurisprudence. Unless the government is prepared to investigate and indict the entire leadership of the National Endowment for Democracy, the U.S. Agency for International Development, the United States Information Agency, and charities too numerous to mention, ranging from the now-defunct Americans Friends of Afghanistan to Management Sciences for Health (which continues to operate in Afghanistan to this day), this indictment must fall as a classic embodiment of a selective prosecution.

### XI.  The successor/outgrowth issue and the ambiguity of the Form 1023 instructions.

The indictment also charges that Care failed to disclose that it was a "successor" to or "outgrowth" of the Al-Kifah Refugee Center, and quotes "media reports" linking the Al Kifah Refugee Center to the 1993 World Trade Center bombings. Except insofar as Care was formed precisely for the purpose of disassociating the new organization from the Al-Kifah Refugee Center, the government's claim linking Care and the Al-Kifah Refugee Center is a red herring that consists entirely of prejudicial insinuation compounded by layers of hearsay. The Al-Kifah Refugee Center was not, in any event, a Massachusetts corporation, nor even a 501(c)(3)

organization, and Care did not assume any of the assets or liabilities of Al-Kifah, which continued to exist independently and continued to publish a newsletter under a title ("The Sword") that is far from unique in the Islamic world.

More to the point, the same vagueness and lack of notice objections that extend to this indictment generally, see supra at 37-40, also condemn the government's theory of liability with respect to the relationship between the Al-Kifah Refugee Center and Care International. Question #5 of the IRS Form 1023 filed by Care asked in relevant part "[i]s the organization the outgrowth of (or successor to) another organization, or does it have a special relationship with another organization by reason of interlocking directorates or other factors?"  App. at 00036. The 1993 instructions for Form 1023 contain absolutely no instructions as to the meaning of the terms "outgrowth" or "successor."  App. at 00826.

Hence, when Mr. Muntasser filed Care's 1023 application, the IRS instructions then available to him provided not the least bit of guidance as to the proper way to answer a question as open-ended and vague as whether Care may have been the "successor" or "outgrowth" of another organization.  In these circumstances, it is not possible to say that defendants had clear notice that the conduct the government now seeks to proscribe was illegal.  Papachristou, 405 U.S. at 162 (finding a constitutional violation where an ordinance or regulation "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute").[26]

The current (2006) Form 1023, moreover, has entirely done away with the "outgrowth" inquiry.  The current Question #5 (under the heading "Part VII: Your History") asks simply:

---

[26] This is particularly the case where the statutes under which the government seeks to charge defendants are equally broad and open-ended as the federal false statements/concealment of material facts statute and the Klein conspiracy statute.

"Are you a successor to another organization?"  App. at 00838.  The deletion of the "outgrowth"

inquiry demonstrates that today "outgrowth" is not seen by the IRS as even relevant to the

exemption question.  In further contrast to the 1993 forms and instructions, the current form and

the current instructions together provide a tight definition of "successor" (a definition that

happens to be plainly inapplicable to the formation history of Care International).  Thus, the

current form 1023 directs an applicant to answer "yes" to the "successor" inquiry "if you have

taken or will take over the activities of another organization; you took over 25% or more of the

fair market value of the net assets of another organization; or you were established upon the

conversion of an organization from for-profit to non-profit status."  App. at 00857.

The current (2006) instructions state in a very similar vein that a "successor"

organization is one that has "substantially taken over all of the assets or activities of another

organization, been converted or merged from another organization, or installed the same officers,

directors, or trustees as another organization that no longer exists and that had purpose(s) similar

to your purpose(s)."  App. at 00871.[27]

It is true that while the current form no longer poses the "outgrowth" inquiry that

featured in the 1993 version of Form 1023, the current form, under the heading "Part VIII: Your

Specific Activities," does ask the question "[d]o you have a close connection with any

organizations?"  App. at 00838.  It is equally true, however, that the current instructions provide

an elaborate definition of the phrase "close connection."  Thus, for example, a "close

connection" exists if "you control the organization or it controls you through common officers,

directors, or trustees, or through authority to approve budgets or expenditures," or if "you and

---

[27] As an incidental matter, it is incontrovertible, and the government acknowledges, that
the Al-Kifah Refugee Center continued to exist until well after Mr. Muntasser founded Care
International.

the organization were created at approximately the same time and by the same persons." App. at

00873. Even assuming, as a hypothetical matter, that any part of this definition would have

brought Care International within its scope, it is also the case that nothing near this level of

specificity was provided to filers in 1993.

In short, the government's theory of liability with respect to an alleged "successor" or

"outgrowth" relationship between Care International and the Al-Kifah Refugee Center must fail

for one of the same reasons that its theory of liability with respect to Care's alleged promotion of

*jihad* and the *mujahideen* must fail: namely, the rule of lenity and the due process requirement

that a defendant may not be convicted under a statute or regulation that fails to give him clear

notice of the conduct that the government seeks to criminalize. See, e.g., United States v. Bass,

404 U.S. 336, 347-48 (1971) ("ambiguity concerning the ambit of criminal statutes should be

resolved in favor of lenity. In various ways over the years, we have stated that when choice has

to be made between two readings of what conduct Congress has made a crime, it is appropriate,

before we choose the harsher alternative, to require that Congress should have spoken in

language that is clear and definite.").[28]

---

[28] Lest there be any doubt that the relevant IRS forms and instructions did not provide defendants with clear notice of the conduct that the government now seeks to proscribe, it should be noted that the IRS Form 990s filed by Care International asked the following, at line 80: "Is the organization related (other than by association with a statewide or nationwide organization) through common membership, governing bodies, trustees, officers, etc. to any other exempt or nonexempt organization? (See instructions)." App. at 00905 (1994 Form 990 filed by Care International). That is all that asked that relates even remotely to the "successor" and "outgrowth" inquiries. Question 80, with its quite narrow scope of inquiry, remains unchanged in today's Form 990. The 1994 instructions for Form 990 provide that, in determining whether to answer "yes" to Question 80, an applicant should

[d]isregard any coincidental overlap of membership with another organization; that is, when membership in one organization is not a condition of membership in another organization. For example, assume that a majority of the members of a section 501(c)(4) civic organization also belong to a local chamber of commerce described in section 501(c)(6). The civic organization should answer 'No' on

<u>Conclusion</u>

For all of the above reasons, Defendants respectfully urge this Court to dismiss the

Indictment.  Defendants urge this Court to dismiss Count Six of the indictment on the selective

prosecution grounds outlined in this motion, as well as on the basis of the argument set forth in

Mr. Muntasser's concurrently filed and seal Motion to Dismiss Count Six.

Respectfully submitted,

MUHAMMED MUBAYYID,                    EMADEDDIN Z. MUNTASSER
By his attorney,                                  By his attorneys,


 /s/ Michael C. Andrews                        /s/ Malick W. Ghachem
Michael C. Andrews BBO# 546470)         Norman S. Zalkind (BBO# 538880)
21 Custom House Street                         Elizabeth A. Lunt (BBO# 307700)
Boston, MA 02110                               Malick W. Ghachem (BBO#661018)
(617) 951-0072                                  Zalkind, Rodriguez, Lunt & Duncan LLP
                                                65a Atlantic Ave.

---

line 80 if it does not require its members to belong to the chamber of commerce.

Also disregard affiliation with any statewide or nationwide organization. . . .

App. at 00936.  This explicit instruction to *disregard* the only possible scenarios that may, in theory, have reflected the actual relationship, if any, between Care International and the Al-Kifah Refugee Center is enough, by itself, to dispose of the government's theory of liability on this issue.

Boston, MA 02110

 /s/ Susan R. Estrich
Susan R. Estrich
Robert Kingsley Professor of Law and Political
Science
University of Southern California Law School
University Park, MC-0071
Los Angeles, CA 90089-0071

 /s/ Harvey Silverglate
Harvey Silverglate (BBO # 462640)
607 Franklin St.
Cambridge, MA 02139

Dated: October 5, 2006


<u>Certificate of Service</u>

I hereby certify that I have served a copy of the foregoing document by electronic notice upon the following attorneys of record this 5th day of October 2006.

B. Stephanie Siegmann
Assistant U.S. Attorney

Aloke Chakravarty
Assistant U.S. Attorney


/s/ Malick W. Ghachem
Malick W. Ghachem

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
UNITED STATES OF AMERICA,               )        CRIMINAL NO.  05-40026-FDS
                    Plaintiff           )
                                        )
V.                                      )
                                        )
MUHAMED MUBAYYID and                    )
EMADEDDIN Z. MUNTASSER,                 )
                    Defendants          )
_____)

**AFFIDAVIT OF ATTORNEY MALICK W. GHACHEM**

Now comes Attorney Malick W. Ghachem, on behalf of defendant Emadeddin Z.

Muntasser, and being duly sworn does depose and say as follows:

The documents contained in the Appendix to Defendants' Motion to Dismiss and

Incorporated Memorandum of Law filed herewith are true and authentic copies of the originals.

Signed under the penalties of perjury this 5th day of October, 2006.


                                          /s/ Malick W. Ghachem_____
                                        Malick W. Ghachem (BBO# 661018)

<u>Certificate of Service</u>

I hereby certify that I have served a copy of the foregoing document by electronic notice upon the following attorneys of record this 5th day of October 2006.

B. Stephanie Siegmann
Assistant U.S. Attorney

Aloke Chakravarty
Assistant U.S. Attorney

Michael Andrews
Counsel for Muhammed Mubayyid

/s/ Malick W. Ghachem
Malick W. Ghachem