UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

)
UNITED STATES OF AMERICA,            )      CRIMINAL NO. 05-40026-FDS
                    Plaintiff         )
                                      )
V.                                    )
                                      )
MUHAMED MUBAYYID and                  )
EMADEDDIN Z. MUNTASSER,               )
                    Defendants        )
                                      )

### DEFENDANTS' MOTION TO SUPPRESS EVIDENCE OBTAINED FROM FISA SEARCHES AND SURVEILLANCE AND ALL FRUITS THEREOF AND INCORPORATED MEMORANDUM OF LAW

#### FILED UNDER SEAL

Now come Defendants Emadeddin Z. Muntasser and Muhamed Mubayyid and move this

Honorable Court for the entry of an order suppressing any and all evidence obtained or derived

from Foreign Intelligence Surveillance Act of 1978, as amended, ("FISA") surveillance of either

Defendant and from FISA searches of Defendants' premises. The Court should suppress the

evidence under 50 U.S.C. §§ 1806(a), 1806(e), 1806(g), 1825(a), 1825(f), 1825(h), U.S. Const.

Amend. IV, and the Due Process Clause of U.S. Const. Amend. V.

### I.    Introduction

All evidence obtained and derived from FISA searches and FISA surveillance of Mr.

Muntasser or Mr. Mubayyid should be suppressed on the following grounds: (a) the FISA

applications may fail to establish probable cause that either Defendant was an agent of a foreign

power and, to the extent that Defendants were not targets, that the target was an agent of a

1



foreign power; (b) the FISA applications may contain intentional or reckless material falsehoods or omissions, and the surveillance therefore may violate U.S. Const. Amends. IV and V under the principles of *Franks v. Delaware*, 438 U.S. 154 (1978); *see also United States v. Duggan*, 743 F.2d 59, 77 n. 6 (2d Cir. 1984); (c) minimization procedures may be inadequate, and the government may have failed to comply with those procedures; (d) the government may not have made the required certifications in the FISA applications, or those certifications in the FISA applications may be clearly erroneous; and (e) the government may not have issued the required statements in conjunction with disclosure of information obtained pursuant to FISA as required under §§ 1806(b) and 1825(c). We address these points in order.[1]

## II.    FISA Surveillance in This Case

Pursuant to a stipulation dated November 22, 2005, the Government provided Defendants with a summary of the materials they derived from electronic surveillance conducted pursuant to the FISA. According to the Government's representations, the electronic surveillance conducted pursuant to FISA began on or before August, 1994, and continued until at least April, 2003. This included surveillance of telephone conversations and emails. *See* Gov't Letter Dated Feb. 22, 2006 and Attached Documents. In addition, according to the affidavit of Denis Drum, the government conducted one physical search of a storage locker in October, 2001. Drum Affidavit 4, Apr. 7, 2003.

---

[1] Because we have not had access to the underlying FISA materials, we can only speculate about their inadequacies. If the Court grants the Defendants' motion for access to the FISA materials, we will seek leave to supplement this memorandum.

2

## III.   Statutory Context

FISA "was enacted in 1978 to establish procedures for the use of electronic surveillance in gathering foreign intelligence information. . . . The Act was intended to strike a sound balance between the need for such surveillance and the protection of civil liberties." *In re Kevork,* 788 F.2d 566, 569 (9th Cir. 1986) (quotation omitted). FISA authorized "applications for a court order approving the use of electronic surveillance to obtain foreign intelligence information." S. Rep. 95-701, reprinted in 1978 U.S.C.C.A.N. 3973.  FISA was passed in response to the Church Committee's review of the Nixon Administration's surveillance of the activities of political opponents, including the Democratic Party, under the guise of national security.[2]

Through FISA, Congress attempted to limit the propensity of the Executive Branch to engage in abusive or politically motivated surveillance.  FISA was Congress's attempt to balance the "competing demands of the President's constitutional powers to gather intelligence deemed necessary to the security of the Nation, and the requirements of the Fourth Amendment." H.R. Rep. No. 95-1283, at 15.

As enacted in 1978, FISA covered only electronic surveillance.  However, Congress amended FISA in 1994 to cover physical searches.  *See* citing Pub. L. No. 103-359, 108 Stat. 3444 (Oct. 14, 1994); 50 U.S.C. §§ 1821-1892.  The United States Foreign Intelligence Surveillance Court of Review has explained that because FISA's provisions regarding physical searches are similar to those regarding electronic surveillance, most of the FISC Court of Review's statutory analysis of the electronic surveillance provisions will also apply to the

---

[2] S. Rep. 95-701, 709. See also Ira Shapiro, The Foreign Intelligence Surveillance Act: Legislative Balancing of National Security and the Fourth Amendment, 15 Harv. J. on Legis. 119, 120 (1977-78); David Johnston, Administration Begins to Rewrite Decades-Old Spying Restrictions, N.Y. Times, Nov. 30, 2002, at A1.

3

physical search provisions. *In re: Sealed Case*, 310 F.3d 717, 722, n.7 (FISC 2002).

FISA establishes procedures for surveillance of foreign intelligence targets. Though Congress amended FISA in 2001 as part of the Patriot Act, the procedures that must be satisfied in order to conduct searches or surveillance under FISA, as amended, remain largely the same as before it was amended, with one important difference involving the government's purpose of the surveillance, discussed in further detail below.

First, under FISA, Congress created a FISA Court – the Foreign Intelligence Surveillance Court, or "FISC" – to which the government must apply for an order authorizing electronic monitoring. 50 U.S.C. §§ 1803, 1804; *see also* §§ 1823, 1824 (setting forth procedural requirements for obtaining approval for a physical search under FISA). With certain limited exceptions, "FISA requires judicial approval before the government engages in an electronic surveillance for foreign intelligence purposes." *United States v. Cavanagh*, 807 F.2d 787, 786 (9th Cir. 1987).

Second, the statute requires that any application to the FISA court be approved by the Attorney General and contain certain information and certifications. 50 U.S.C. § 1804, 1823. Of particular significance here, an application to the FISC must include "a statement of the facts and circumstances relied upon by the applicant to justify his belief that . . . the target of the electronic surveillance is *a foreign power or an agent of a foreign power*" *Id.* § 1804(a)(4)(A) (emphasis added); *United States v. Posey*, 864 F.2d 1487, 1490 (9th Cir. 1989). *See also* 1823(a)(7)(A) (setting forth identical certification requirement for physical searches under FISA). FISA defines the term "foreign power," as relevant here, as "a group engaged in international terrorism or activities in preparation therefor." 50 U.S.C. §§ 1801(a)(4), 1821(1).

4

An "agent of a foreign power," as applied to a "United States person,"[3] means (as relevant here) "any person who . . . knowingly engages in . . . international terrorism, or activities that are in preparation therefor, for or on behalf of a foreign power," and "any person who . . . knowingly aids or abets any person in the conduct of" such activities. *Id.* §§ 1801(b)(2)(C), (E), 1821(1).

An application to the FISC must also provide a "statement of proposed minimization procedures." *Id.* §§ 1804(a)(5), 1823(a)(5). FISA specifies the requirements for such procedures with respect to electronic surveillance and physical searches. *Id.* § 1801(h) (setting forth the requirements for minimization procedures for electronic surveillance); *id.* § 1821(4) (setting forth parallel requirements for physical searches). The applicant must set forth certain "certifications" by an appropriate executive branch official. FISA, as enacted in 1978, required the official to certify "that the purpose of the surveillance is to obtain foreign intelligence information," and that "such information cannot reasonably be obtained by normal investigative techniques." *Id.* § 1804(a)(7)(B), (C) (1978). *See also* § 1823(a)(7)(B), (C) (1994). Effective October 26, 2001, Congress amended sections 1804(a)(7)(B) and 1823(a)(7)(B) through the Patriot Act to require certification only that "a significant purpose," rather than "the purpose" of the surveillance is to obtain foreign intelligence information.

Third, the statute specifies findings that the FISC must make before it can approve electronic surveillance or a physical search. *Id.* §§ 1805, 1824. The court must find that the procedural requirements of FISA have been satisfied, including the minimization requirements.

---

[3] The term "United States person" includes an "alien lawfully admitted for permanent residence." 50 U.S.C. § 1801(i). At all relevant times, both Mr. Muntasser and Mr. Mubayyid were permanent resident aliens.

*See, e.g., id.* §§ 1805(a)(1),(2), (4), 1824(a)(1),(2),(4). In addition, the FISC must find (among other things) "probable cause to believe that . . . the target of the electronic surveillance is a foreign power or an agent of a foreign power." Id. § 1805(a)(3)(A); *see also* 1824(a)(3)(A) (setting forth parallel probable cause requirement for FISA physical searches). Where, as here, the target of the searches and surveillance is a "United States person," the FISC must also determine that the government's certifications under sections 1804 and 1823 are not "clearly erroneous." *Id.* §§ 1805(a)(5), 1824(a)(5).

Fourth, FISA authorizes any "aggrieved person" to move to suppress "evidence obtained or derived from" electronic surveillance or physical searches if "the information was unlawfully acquired" or "the surveillance was not made in conformity with an order of authorization or approval." *Id.* §§ 1806(e), 1825(f). For the purposes of electronic surveillance, FISA defines the phrase "aggrieved person" as "a person who is the target of electronic surveillance or any other person whose communications or activities were subject to electronic surveillance." *Id.* § 1801(k). For the purposes of physical searches, FISA defines "aggrieved person" as "a person whose premises, property, information, or material is the target of physical search or any other person whose premises, property, information, or material was subject to physical search." *Id.* § 1821(2). Under these definitions, the Defendants are "aggrieved persons" as to the electronic surveillance that intercepted their conversations and the FISA search(es), whether or not Defendants were the targets of the FISA surveillance and searches. *See, e.g., Cavanagh*, 807 F.2d at 789 (person incidentally overheard during FISA surveillance of another target is an "aggrieved person"); *United States v. Belfield*, 692 F. 2d 141, 143, 146 n.21 (D.C. Cir. 1982) (same).

6

## IV.    Argument

**A.    Evidence Seized Pursuant to FISA Searches and Surveillance and All Fruits Thereof May Be Subject to Suppression Pursuant to 50 U.S.C. §§ 1806(a), 1806(e), 1806(g), 1825 (a), 1825 (f), 1825 (h), U.S. Const. Amend. IV, and the Due Process Clause of U.S. Const. Amend. V.**

**1.    FISA Application May Fail to Establish Probable Cause that Mr. Muntasser, Mr. Mubayyid or Other Targets Were Agents of a Foreign Power**

As noted above, before issuing an order authorizing FISA surveillance, the FISC

must find (among other things) "probable cause to believe that . . . the target of the electronic

surveillance is a foreign power or an agent of a foreign power." 50 U.S.C. § 1805(a)(3)(A); *see*

*also id.* § 1824(3)(A) (setting forth the same probable cause requirement for physical searches).

An "agent of a foreign power," as applied to a "United States person" such as Mr. Mubayyid or

Mr. Muntasser, means (as relevant here) "any person who . . . knowingly engages in international

terrorism, or activities that are in preparation therefore, for or on behalf of a foreign power," and

"any person who . . . knowingly aids or abets any person in the conduct" of such activities. *Id.* §§

1801(b)(2)(C), (E), 1821(1).

The Supreme Court recently reiterated that criminal probable cause requires "a

reasonable ground for belief of guilt," and that "the belief of guilt must be particularized with

respect to the person to be searched or seized." *Maryland v. Pringle*, 124 S. Ct. 795, 800 (2003)

(quotation omitted). Under FISA, the probable cause standard is directed not at the target's guilt

of a crime, as with a traditional warrant, but at the target's status as "a foreign power or an agent

of a foreign power." Thus, this Court must initially determine, with respect to each application

for surveillance of Mr. Mubayyid, Mr. Muntasser, or other targets, whether the application

7

established a reasonable, particularized ground for belief that the target(s) of the surveillance fell within this definition. 50 U.S.C. §§ 1801(b)(2)(C), (E), 1805(a)(3)(A), 1821(1), 1824(3)(A); *see* Gregory Birkenstock, *The Foreign Intelligence Surveillance Act and Standards of Probable Cause: An Alternative Analysis*, 80 Geo. L.J. 843, 851-53 (Feb. 1992) (discussing the FISA probable cause standard).

In the present case, given that the government has not charged the Defendants with material aid to terrorism and has not alleged that Defendants engaged in terrorist activity, it is highly unlikely that the government met its burden of establishing in its application that there was a reasonable, particularized ground for belief that either Defendant is or was an agent of a foreign power, to the extent that either of the Defendants was the target of the FISA searches and surveillance. Indeed, the Defendants were engaging in charitable fund-raising activities which were perfectly legal.[4] *See* Government's Opposition to Defendant's Motion for Bill of Particulars (Dkt # 114) at 7 n.1 ("The government does not allege in the Indictment nor has it ever alleged in any public hearings or any pleading that such activities were illegal"). Moreover, the government has charged defendants with ordinary tax and false statement offenses, a far cry from any charge that Defendants in any way aided or abetted terrorists.

Furthermore, as is discussed in great detail in Defendants' motion to dismiss, Defendants' activities as alleged in the indictment are protected by the First Amendment. FISA explicitly provides that "no United States person may be considered a foreign power or an agent of a

---

[4] Defendants do not have information indicating who the targets of the government's FISA surveillance were. As such, Defendants are unable to present arguments regarding the sufficiency of the evidence establishing that any other individuals who may be targets are agents of a foreign power as defined under 50 U.S.C. §§ 1801(b)(2)(C), (E), 1805(a)(3)(A), 1821(1), 1824(3)(A).

8

foreign power solely upon the basis of activities protected by the first amendment to the Constitution of the United States." 50 U.S.C. § 1805 (a)(3)(A); *see also* 1824(a)(3)(A).

However, without reviewing the FISA applications in this case, the Defendants cannot address the specific contents of these applications. They therefore urge the Court, if it ultimately declines to produce the applications to the defense, to examine them with care to determine whether they satisfy the statutory mandates.

> ### 2.    The FISA Applications May Contain Intentional or Reckless Material Falsehoods and Omissions and, Therefore, the Surveillance May Violate the Fourth and Fifth Amendments of United States Constitution under the Principles of *Franks*.

In *Franks v. Delaware*, the United States Supreme Court established the circumstances under which the target of a search may obtain an evidentiary hearing concerning the veracity of the information set forth in a search warrant affidavit. "[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks*, 438 U.S. at 156-57.

Franks establishes a similar standard for suppression following the hearing: "In the event that at the hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Id.* at 156; see *United States v. Blackmon*, 273

9

F.3d 1204, 1208-10 (9th Cir. 2001) (applying Franks to Title III wiretap application); *United States v. Meling*, 47 F.3d 1546, 1553-56 (9th Cir. 1995) (same); *Duggan*, 743 F.2d at 77 n.6 (suggesting that *Franks* applies to FISA applications under Fourth and Fifth Amendments); *see also, e.g., United States v. Hammond*, 351 F.3d 765, 770-71 (6th Cir. 2003) (applying *Franks* principles); *United States v. Hill*, 142 F.3d 305, 310 (6th Cir. 1998) (same).

The *Franks* principles apply to omissions as well as false statements. *See, e.g., United States v. Carpenter*, 360 F.3d 591, 596-97 (6th Cir. 2004); *United States v. Atkin*, 107 10 F.3d 1213, 1216-17 (6th Cir. 1997). Omissions will trigger suppression under *Franks* if they are deliberate or reckless and if the search warrant affidavit, with omitted material added, would not have established probable cause. *See, e.g., id.* Because the government has denied Defendants access to the FISA applications in this case, it is impossible at this point to identify any specific false statements or material omissions.

Therefore, in the case at bar, this Court should disclose the FISA applications and related materials to the defense and, following the disclosure, conduct a *Franks* hearing at which Mr. Muntasser and Mr. Mubayyid will have the opportunity to prove that the affiants before the FISC intentionally or recklessly made materially false statements and omitted material information from the FISA applications. If it declines to order disclosure, this Court should review the applications to determine whether they may contain any material falsehoods or omissions.

### 3.   The Minimization Procedures May Be Inadequate and the Government May Have Failed to Comply with Those Procedures.

FISA mandates that each application contain "a statement of the proposed minimization procedures." *Id.* §§ 1804(a)(5), 1823(a)(5). Before issuing an order authorizing FISA

10

surveillance, the FISC must find that "the proposed minimization procedures meet the definition of minimization" contained in the statute. *Id.* §§ 1805(a)(4), 1824(a)(4).

As relevant here, FISA defines minimization, with respect to electronic surveillance, as "(1) specific procedures, which shall be adopted by the Attorney General, that are reasonably designed in light of the purpose and technique of the particular surveillance, to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information," and "(2) procedures that require that nonpublicly available information, which is not foreign intelligence information . . . shall not be disseminated in a manner that identifies any United States person, without such person's consent, unless such person's identity is necessary to understand foreign intelligence information or assess its importance." *Id.* § 1801(h)(1),(2); *see also id.* § 1821(4)(A),(B) (defining minimization procedures in the physical searches context). The statute adds that, notwithstanding these provisions, minimization procedures may "allow for the retention and dissemination of information that is evidence of a crime which has been, is being, or is about to be committed and that is to be retained or disseminated for law enforcement purposes." *Id.* §§ 1801(h)(3), 1821(4)(C); *In re: Sealed Case*, 310 F.3d at 73.

If this Court does not order disclosure of the FISA applications and FISC orders, Defendants ask that the Court review these materials to determine whether they comply with the statutory minimization standards. In addition, we request that this Court review the intercepted communications of the Defendants to determine whether the government satisfied the minimization requirements that the statute and the FISC orders impose. Those applications

which do not comply with FISA's minimization procedures must be suppressed.

Furthermore, Defendants' due process rights may have been violated if the government was not required to preserve exculpatory evidence obtained during the searches or surveillance. *See Brady v. Maryland*, 373 U.S. 83 (1963). This Court should review the FISA applications and orders to determine whether such a violation of Defendants' rights occurred.

## 4.   The Government May Not Have Made the Required Certifications, or Those Certifications May Be Clearly Erroneous

This Court should ensure that the FISA applications contain the certifications required under 50 U.S.C. §§ 1804(a)(7) and 1823(a)(7). In addition, the Court should examine the record to determine whether those certifications are clearly erroneous. *Id.* §§ 1805(a)(5), 1824(a)(5). As the Ninth Circuit has observed in the Title III context, "[t]he procedural steps provided in the Act require 'strict adherence,'" and "utmost scrutiny must be exercised to determine whether wiretap orders conform to [the statutory requirement]." *Blackmon*, 273 F.3d at 1207 (*quoting United States v. Kalustian*, 529 F.2d 585, 588, 589 (9th Cir. 1975)).

This Court should examine two certifications with particular care. First, the government presumably certified that "the purpose" of pre-October 26, 2001 searches and surveillance that was "to obtain foreign intelligence information," 50 U.S.C. §§ 1804(a)(7)(B), 1823(a)(7)(B), and that the searches and surveillance conducted after October 2, 2001 was conducted with "the primary purpose" of "obtain[ing] foreign intelligence information." §§ 1804(a)(7)(B), 1823(a)(7)(B), as amended. Second, the government was required to certify that the foreign intelligence information "cannot reasonably be obtained by normal investigative techniques," *id.* §§ 1804(a)(7)(C), 1823(a)(7)(C), and to provide a "statement of the basis for the

certification,"*id.* §§ 1804(a)(7)(E)(iii), 1823(a)(7)(E). As the Ninth Circuit has observed

concerning the similar provision in Title III, 18 U.S.C. § 2518(1)(c), "the necessity requirement

exists in order to limit the use of wiretaps, which are highly intrusive." *Blackmon*, 273 F.3d at

1207 (quoting *United States v. Bennett*, 219 F.3d 1117, 1121 (9th Cir. 2000) (internal quotation

omitted)). The necessity requirement, together with the statement of supporting facts, "ensure

that wiretapping is not resorted to in situations where traditional investigative techniques would

suffice to expose the [information sought]." *Id.*; *see, e.g., Giacalone*, 853 F.2d 470, 480 (6th Cir.

1988) (discussing necessity requirement under Title III); *Alfano*, 838 F.2d 158, 163-64 (6th Cir.

1988) (same).

## 5. The Government May Not Have Issued The Required Statements or Obtained the Required Authorization Pursuant to 50 U.S.C.§§ 1806(b) and 1825(c).

The government is prohibited under 50 U.S.C. §§ 1806(b) and 1825(c) from disclosing

any information acquired pursuant to FISA for law enforcement purposes without issuing a

statement accompanying the disclosure that said "information, or any information derived

therefrom, may only be used in a criminal proceeding with the advance authorization of the

Attorney General."

Moreover, the Department of Justice's own 1995 "Procedures for Contacts Between the

FBI and the Criminal Division Concerning Foreign Intelligence and Foreign Counterintelligence

Investigations" required the creation of a "wall" to prevent FBI intelligence officials from

communicating with the Criminal Division regarding ongoing foreign intelligence and foreign

counterintelligence investigations. *In re: Sealed Case*, 310 F.3d at 728 (citing *Final Report of*

*the Attorney General's Review Team on the Handling of the Los Alamos National Laboratory*

13

*Investigation*, Chapter 20 at 721-34 (May 2000)). These procedures were in effect until new procedures were approved by the Attorney General on March 6, 2002.[5] The government should be deemed bound by these "wall" procedures, particularly in this case which involve charges for "ordinary" crimes.

Therefore, Defendants request that this Court suppress any and all evidence derived from FISA searches or surveillance to the extent that such evidence was disclosed for law enforcement purposes without satisfying the requirements set forth in sections 1806(b), 1825(c), and the 1995 procedures.

**B.    The FBI's Searches and Surveillance of the Defendants and their Premises in this Case Did Not Conform to Constitutional Requirements that Govern the Conduct of Criminal Investigations.**

**1.    FISA Search and Surveillance Orders Are Not Warrants Within the Meaning of the Fourth Amendment**

As an initial matter, FISA search and surveillance orders are not warrants within the meaning of the Fourth Amendment. The Supreme Court has held that a warrant must be issued by a neutral, disinterested magistrate; must be based on a demonstration of probable cause to believe that the evidence sought will aid in a particular apprehension for a particular offense; and must particularly describe the things to be seized as well as the place to be searched. *See Dalia v. United States*, 441 U.S. 238, 255 (1979). FISA court orders do not satisfy these requirements. On the contrary, FISA empowers the government to conduct the most intrusive kinds of searches and surveillance without meaningful prior judicial review, without showing criminal probable

---

[5] These procedures were adopted by the FISA court in November, 2001 as "minimization procedures" applying to all cases before the court. This adoption was subsequently held by the FISA Court of Review to be error. *In re: Sealed Case*, 310 F.3d at 729-30.

14

cause, and without meeting particularity requirements. *See In re Sealed Case*, at 741 (acknowledging that FISA orders "may not be... 'warrant[s]' contemplated by the Fourth Amendment").

Because FISA court orders are not warrants, searches conducted under FISA are presumptively unreasonable. *See, e.g., Payton v. New York*, 445 U.S. 573, 586 (1980); *Chimel v. California*, 395 U.S. 752, 762-63 (1969). The searches and surveillance at issue in this case cannot overcome that presumption. As discussed below, the searches and surveillance of Defendants here fell far short of the requirements that the Supreme Court has held to be reasonable in the context of criminal investigations.

## 2.    The Searches and Surveillance Were Conducted Without Compliance With the Fourth Amendment's Probable Cause Requirement

The Fourth Amendment ordinarily prohibits the government from conducting intrusive searches and surveillance without first demonstrating criminal probable cause – probable cause to believe that "the evidence sought will aid in a particular apprehension or conviction for a particular offense." *See Dalia*, 441 U.S. at 255. To the extent that the government's primary purpose in this case was to obtain evidence of criminal activity, it failed to satisfy the criminal probable cause requirement.

FISA authorizes the government to conduct intrusive searches and surveillance if it can show what is known as "foreign intelligence probable cause" – probable cause to believe that the search and surveillance target is a foreign power or agent of a foreign power. 50 U.S.C. §§ 1805(a)(3)(A), 1824(a)(3)(A). The statute does not require the government to advance any reason whatsoever – let alone probable cause – to believe that its surveillance will yield

15

information about a particular criminal offense. Indeed, foreign-intelligence probable cause

bears only a passing resemblance to criminal probable cause as is indicated in an FBI document

entitled, "What do I have to do to get a FISA?" which states, in relevant part that:

> ... the showing of [nexus to] criminality does not apply to FISA applications in the same way it does to ordinary criminal cases. *As a result, there is no showing or finding that a crime has been or is being committed, as in the case of a search or seizure for law enforcement purposes.* The activity identified by the government in the FISA context may not yet involve criminality, but if a reasonable person would believe that such activity is likely to lead to illegal activities, that would suffice. *In addition, and with respect to the nexus to criminality required by the definitions of "agent of a foreign power," the government need not show probable cause as to each and every element of the crime involved or about to be involved.*

"What do I have to do to get a FISA?," at 2 (Document released by FBI in response to August 21

Freedom of Information Act request submitted by ACLU et al.) (emphases added.)[6] It is clear

that foreign-intelligence probable cause is not "probable cause" within the ordinary meaning of

the Fourth Amendment.

The searches and surveillance at issue in this case were not premised on criminal

probable cause and accordingly was unreasonable within the meaning of the Fourth Amendment.

## 3.    The Surveillance in this Case Was Conducted Without Compliance With the Fourth Amendment's Particularity Requirement

The surveillance in this case was extensive. The government intercepted hundreds of e-

mails and telephone calls, at the very least. Because the duration of these intercepts was not

strictly limited, the surveillance violated the Fourth Amendment's particularity requirement.

The Fourth Amendment ordinarily prohibits the government from conducting intrusive

---

[6] This document is available at
<http://www.aclu.org/patriot_foia/FOIA/Sept2002Doc.pdf>.

16

surveillance unless it first obtains a warrant describing with particularity the things to be seized as well as the place to be searched. *See Berger v. New York*, 388 U.S. 41, 58 (1967) (noting that Fourth Amendment particularity requirement was intended to prevent the government's reliance on "general warrants" that allow "the seizure of one thing under a warrant describing another"); *see also Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

In *Berger*, the Supreme Court noted that the importance of the particularity requirement "is especially great in the case of eavesdropping." *Berger*, 388 U.S. at 56. The Court explained: "By its very nature eavesdropping involves an intrusion on privacy that is broad in scope." *Id.* It continued: "[T]he indiscriminate use of such devices in law enforcement raises grave constitutional questions under the Fourth and Fifth Amendments, and imposes a heavier responsibility on this Court in its supervision of the fairness of procedures."

With respect to eavesdropping devices and wiretaps, the particularity requirement demands not simply that the government describe in detail the communications it intends to intercept but also that the duration of the intercept be strictly limited. *See Berger*, 388 U.S. at 58-60. In *Berger*, the Supreme Court struck down New York's eavesdropping statute in part because the statute authorized surveillance orders with terms of up to two months. *See Berger*, 388 U.S. at 44 n.1. In addition, Title III, which Congress enacted shortly after *Berger* was decided, limits the term of surveillance orders to 30 days. *See* 18 U.S.C. § 2518(5). FISA, by contrast, authorizes surveillance terms of up to 120 days. See 18 U.S.C. § 1805(e)(1)(B).[7]

Given *Berger*, there can be no argument that FISA's provisions relating to the duration of

---

[7]An order authorizing surveillance of a foreign power (rather than an agent of a foreign power) may have a term of up to one year. *See* 50 U.S.C. § 1805(e)(1)(A).

surveillance orders meet Fourth Amendment requirements for criminal investigations. FISA authorizes surveillance orders of as long as 120 days – twice the duration of the orders that the Supreme Court found constitutionally unacceptable in *Berger*. Accordingly, the surveillance at issue in this case was unreasonable within the meaning of the Fourth Amendment.

## 4.    The Searches and Surveillance Were Conducted Without Compliance with the Fourth Amendment's Notice Requirement.

Defendants in this case were not notified of the FISA surveillance of their email accounts, telephone communications or the FISA searches of their physical premises until weeks or months after the searches and surveillance took place, if at all. To the extent that the searches and surveillance were conducted with the intent to gather evidence of criminal activity, the government's failure to notify the defendants of the searches and surveillance was unreasonable.

The Fourth Amendment ordinarily requires that the subject of a search be notified that the search has taken place. *See Wilson v. Arkansas*, 514 U.S. 927 (1995) (holding that the common-law "knock-and-announce" principle informs Fourth Amendment reasonableness inquiry); *Miller v. United States*, 357 U.S. 301, 313 (1958). While in some contexts the government is permitted to delay the provision of notice, *see, e.g., United States v. Donovan*, 429 U.S. 413, 429 n.19 (1977) (holding that delayed-notice provisions of Title III supply a constitutionally adequate substitute for contemporaneous notice), the Supreme Court has never upheld a statue that, like FISA, authorizes the government to search a person's home or intercept his communications without *ever* informing her that her privacy has been compromised. Indeed, in *Berger*, the Supreme Court struck down a state eavesdropping statute in part because the law did not make any provision for notice.

18

The non-provision of notice in FISA investigations is particularly problematic because notice is withheld as a categorical rule, and not upon an individualized showing of necessity. *See Richards v. Wisconsin,* 520 U.S. 385, 393-94 (1997) (rejecting categorical exception to knock-and-announce principle for searches executed in connection with felony drug investigations); *see also Berger,* 388 U.S. at 60).

Except in the very few investigations that end in criminal prosecutions, FISA targets *never* learn that their homes or offices have been searched or that their communications have been intercepted. Accordingly, most FISA targets have no way of challenging the legality of the surveillance or obtaining any remedy for violations of their constitutional rights. *See Franks v. Delaware*, 438 U.S. 154, 168-72 (1978) (holding that subject of an allegedly illegal search must be afforded an opportunity to challenge the propriety of the search in a proceeding that is both public and adversarial).

Even those FISA targets who are prosecuted and receive notice that their privacy was compromised have no meaningful opportunity to obtain a remedy for violations of their constitutional rights. Criminal defendants are routinely denied access to FISA surveillance applications and underlying affidavits. *See* 50 U.S.C. §§ 1806(f), 1825(g); *United States v. Nicholson*, 955 F.Supp. 588, 592 (E.D. Va. 1997). Having no access to the factual allegations in these documents severely handicaps a defendant's ability to argue that the surveillance orders violate the Fourth Amendment. The courts have never upheld similar restrictions in criminal prosecutions based on evidence obtained under Title III or Rule 41.

19

**5.      The Searches and Surveillance in this Case Were Conducted Without Meaningful Prior Judicial Review.**

The searches and surveillance at issue in this case were conducted without meaningful judicial review. To conduct searches or surveillance in an ordinary criminal investigation, the FBI must obtain the prior authorization of a neutral, disinterested magistrate who has the authority to determine whether the requirements of Rule 41 or Title III have been satisfied. *See* Fed. R. Crim. P. 41 (governing physical searches in criminal investigations); 18 U.S.C. § 2518 (governing electronic surveillance in criminal investigations); *see also Johnson v. United States*, 333 U.S. 10, 13-14 (1948) ("The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime"). The FISA Court does not have a corresponding authority to determine whether, in any particular foreign intelligence investigation, the FBI has satisfied the requirements of FISA.

The government satisfies most of FISA's requirements simply by certifying that the requirements are met. *See* 50 U.S.C. §§ 1804(a)(7), 1823(a)(7)(E) (enumerating necessary certifications). While certain (but not all) of these certifications must be accompanied by "a statement of the basis for the certification," 50 U.S.C. §§ 1804(a)(7)(E), 1823(a)(7)(E), the statute makes clear that the FISA Court is not to scrutinize such statements, but rather is to defer to the government's certification unless it is "clearly erroneous on the basis of the statement made under § 1804(a)(7)(E)." *Id.* § 1805(a)(5). *See also* § 1824(a)(5) (setting forth parallel

20

standard of review of applications for physical searches). As the FISA Court of Review has acknowledged, "this standard of review is not, of course, comparable to a probable cause finding by the judge." *In re Sealed Case,* 310 F.3d at 739.

Judicial oversight under Title III, by contrast, is substantially more robust. To obtain a surveillance order under Title III, the government must provide the court with "a full and complete statement of the facts and circumstances relied upon by the applicant[] to justify his belief that an order should be issued." 18 U.S.C. § 2518(1)(b). The government cannot meet any of the statute's substantive requirements merely by certifying that it has met them. On the contrary, with respect to most of the statute's substantive requirements, the statute requires the court to find probable cause to believe that they are satisfied. *See id.* § 2518(3).

The searches and surveillance at issue in this case were conducted without meaningful prior judicial review and accordingly were unreasonable within the meaning of the Fourth Amendment.

**C. FISA's Departures From Ordinary Fourth Amendment Principles Are Constitutionally Defensible Only Where the Government's *Primary Purpose* is to Gather Foreign Intelligence Information**

Even if FISA's departures from ordinary Fourth Amendment principles are reasonable where the government's primary purpose is monitoring activities of foreign powers and their agents inside the United States, they are clearly unreasonable where the government's primary intent is to prosecute the surveillance target. Since 1978, when FISA was enacted, numerous federal courts have clearly and repeatedly emphasized that the reasonableness of FISA surveillance is predicated on the fact that the foreign intelligence exception is available to the government *only where its primary purpose is to gather foreign intelligence*. In direct conflict

21

with that principle, Section 218 of the Patriot Act for the first time delineates a class of *criminal* investigations in which the government may disregard the core requirements of the Fourth Amendment. As discussed below, that class of cases remains undefined and could be virtually limitless. The Supreme Court has held, in the "special needs" cases, that the government may not justify such a broad departure from the Fourth Amendment where its primary purpose is criminal investigation.

## 1. Numerous Federal Courts Have Held that the Fourth Amendment Forecloses the Government From Relying on the Foreign Intelligence Exception Where its Primary Purpose is to Gather Evidence of Criminal Activity.

The possibility of a foreign intelligence exception to the Fourth Amendment's ordinary requirements appears to have been first proposed to the Supreme Court in *United States v. U.S. District Court for Eastern District of Michigan, Southern Division*, 407 U.S. 297 (1972) (*Keith*).[8] *Keith* involved the criminal prosecution of individuals accused of having planted a bomb at CIA offices in Ann Arbor, Michigan. None of the individuals was alleged to have any connection to a foreign power. The central issue before the Supreme Court was whether certain wiretaps, which the government had conducted without a warrant, were nonetheless lawful as a reasonable exercise of the President's authority to protect the national security. The Court wrote:

> We are told ... that these surveillances are directed primarily to the collecting and maintaining of intelligence with respect to subversive forces, and are not an attempt to gather evidence for specific criminal prosecutions. It is said that this type of surveillance should not be subject to traditional warrant requirements which were established to govern investigation of criminal activity, not ongoing intelligence gathering.

---

[8] The issue arose earlier in *United States v. Smith*. The court in that case held that "in wholly domestic situations there is no national security exemption from the warrant requirement of the Fourth Amendment," 321 F.Supp. 424, 429 (C.D. Cal. 1971), but reserved the question whether another argument might prevail in cases involving foreign powers. *Id.* at 428.

*Keith*, 407 U.S. at 318-19. The Court rejected these arguments, reasoning that the President's domestic security role "must be exercised in a manner compatible with the Fourth Amendment." *Id.* at 320. The Court acknowledged, however, that surveillance for intelligence purposes may implicate different concerns than surveillance for law enforcement purposes. *See id.* at 322 (noting that "Congress may wish to consider protective standards for [domestic security surveillance] which differ from those already prescribed for specified crimes in Title III").

The Court's discussion, though addressed to surveillance of domestic groups, gave credence to the idea that the executive branch might permissibly conduct foreign intelligence surveillance according to different standards than those that govern ordinary criminal investigations.

After *Keith*, several Circuit Courts recognized a foreign intelligence exception to ordinary Fourth Amendment requirements. Critically, however, these courts emphasized that the exception was limited to *intelligence* surveillance, and could not be relied upon as justification for disregarding ordinary Fourth Amendment requirements in *criminal* investigations. *See, e.g., United States v. Truong Dinh Hung*, 629 F.2d 908, 915 (4th Cir., 1980) (recognizing a foreign intelligence exception to ordinary Fourth Amendment requirements but strictly limiting the exception to cases in which "the surveillance is conducted primarily for foreign intelligence reasons.")[9] The Court in *Truong* explained its reasoning:

> [O]nce surveillance becomes primarily a criminal investigation, the courts are entirely competent to make the usual probable cause determination, and... individual privacy interests come to the fore and government foreign policy concerns recede when the government is primarily attempting to form the basis for a criminal prosecution.

---

[9] While *Truong* was not decided until 1980, it involved surveillance that took place before FISA's enactment in 1978. *See Truong*, 629 F.2d at 915, n.4.

23

*Id.* at 915. Other Circuits that acknowledged a foreign intelligence exception before FISA's enactment adopted similar reasoning. *See, e.g., United States v. Butenko*, 494 F.2d 593, 606 (3d Cir. 1974) ("Since the primary purpose of these searches is to secure foreign intelligence information, a judge, when reviewing a particular search must, above all, be assured that this was in fact its primary purpose and that the accumulation of evidence of criminal activity was incidental."), *cert. denied*, 419 U.S. 881 (1974); *United States v. Brown*, 484 F.2d 418, 426 (5th Cir. 1973), *cert. denied*, 415 U.S. 960 (1974); *id.* at 427 (Goldberg, J., concurring).

Importantly, each of these cases involved surveillance conducted *before* FISA was enacted – that is, before there was any statutory basis for a primary purpose restriction. Thus the basis for the restriction was found not in the statute but in the constitution. The Fourth Circuit made this abundantly clear:

> [T]he executive can proceed without a warrant only if it is attempting primarily to obtain foreign intelligence from foreign powers and their assistants. We think that the unique role of the executive in foreign affairs and the separation of powers will not permit this court to allow the executive less on the facts of this case, *but we are also convinced that the Fourth Amendment will not permit us to grant the executive branch more*.

*Truong*, 629 F.2d at 916 (emphasis added).

The text of FISA as originally enacted did not expressly include a "primary purpose" requirement. Instead, it authorized the FBI to rely on a foreign intelligence exception for "the purpose" of obtaining foreign intelligence information. Most courts asked to consider FISA's constitutionality, however, generally interpreted that requirement as a primary purpose requirement, consistent with the Fourth Circuit's view that the Constitution does not permit the government to rely on the foreign intelligence exception where its primary purpose is to gather evidence of criminal activity. *See, e.g., United States v. Johnson*, 952 F.2d 565, 572 (1st Cir.

24

1991), *cert. denied,* 506 U.S. 816 (1992) (stating that "the investigation of criminal activity cannot be the primary purpose of the surveillance," and that FISA may "not be used as an end-run around the Fourth Amendment's prohibition of warrantless searches"); *United States v. Pelton,* 835 F.2d 1067 (4th Cir. 1987), *cert. denied* 486 U.S. 1010 (1988) (interpreting "purpose" to mean "primary purpose"); *United States v. Badia,* 827 F.2d 1458, 1464 (11th Cir. 1987) *cert. denied*, 485 U.S. 937 (1988); *United States v. Duggan*, 743 F.2d at 77.

Ironically, when the government first urged the Supreme Court to recognize an intelligence exception to the Fourth Amendment, it did so based on the argument "that these surveillances are directed *primarily* to the collecting and maintaining of intelligence with respect to subversive forces, and are not an attempt to gather evidence for specific criminal prosecutions." *Keith*, 407 U.S. at 318-19 (emphasis added); *see also Smith*, 321 F.Supp. at 428 ("The government has emphasized that the purpose of the surveillance involved was not to gather evidence for use in a criminal prosecution but rather to provide intelligence information needed to protect against the illegal attacks of such organizations." (Internal quotation marks omitted)). It was based on this argument that the Supreme Court opened the door to a foreign intelligence exception. Now, some thirty years later, the government contends that it must be permitted to rely on the foreign intelligence exception even where its primary purpose is to gather evidence of criminal activity. Accepting the government's new argument, however, requires rejecting the argument that justified the foreign intelligence exception in the first place.

25

### 2. FISA is Unconstitutional Because it Would Allow the Government to Evade Fourth Amendment Requirements in a Virtually Limitless Class of Ordinary Criminal Investigations.

Section 218 allows the government to evade Fourth Amendment requirements in criminal investigations merely by asserting that an investigation also has some connection to foreign intelligence. The consequence is that the government is now permitted to evade Fourth Amendment requirements in a virtually boundless class of ordinary criminal investigations.

FISA supplies no guidance as to how this class might be limited in any meaningful way. The government has always been entitled to engage in intrusive surveillance if it can meet the requirements of the Fourth Amendment. Because Section 218 now authorizes a departure from those standards in a broad and undefined class of cases, it creates an overwhelming incentive for the FBI to characterize criminal investigations as foreign intelligence investigations.

### 3. The Supreme Court's "Special Needs" Cases Confirm That the Government Cannot Constitutionally Rely on the Foreign Intelligence Exception Where Its Primary Purpose is to Gather Evidence of Criminal Activity

The question whether a special need, such as the need to protect the country from terrorist attacks, can justify a departure from the Fourth Amendment's usual requirements has arisen before. The Supreme Court's consistent answer has been that "[a] search unsupported by probable cause can be constitutional ... when special needs, *beyond the normal need for law enforcement*, make the warrant and probable-cause requirement impracticable." *Veronica School District 47J v. Acton*, 515 U.S. 646, 653 (1995) (internal quotation marks omitted and emphasis added); *see also Graves v. City of Coeur d'Alene*, 2003 WL 21768966, at *11 n.22 (9th Cir. 2003).

26

The Supreme Court recently reaffirmed this well-settled rule in *Ferguson v. City of Charleston*, 532 U.S. 67 (2001). *Ferguson* involved a public hospital's policy of testing pregnant patients for drug use and employing the threat of criminal prosecution as a means of coercing patients into substance-abuse treatment. The Court invalidated the policy. "In other special needs cases," the Court wrote, "we ... tolerated suspension of the Fourth Amendment's warrant or probable cause requirement in part because there was no law enforcement purpose behind the searches in those cases, and there was little, if any, entanglement with law enforcement." *Id.* at 79 n.15; *see also id.* at 88 (Kennedy, J., concurring). In *Ferguson*, however, "the central and indispensable feature of the policy from its inception was the use of law enforcement." *Id.* at 80. While protecting the country from terrorist attack is obviously a worthy aim, that ultimate goal does not exempt the government from the Fourth Amendment when its immediate purpose is criminal prosecution. The Supreme Court wrote in *Ferguson* that:

> Because law enforcement involvement always serves some broader social purpose or objective, under respondents' view, virtually any nonconsensual suspicionless search could be immunized under the special needs doctrine by defining the search solely in terms of its ultimate, rather than immediate, purpose.

In sum, the Supreme Court's "special needs" cases confirm that the government cannot rely on the foreign intelligence exception where the government is gathering evidence primarily for use in a criminal prosecution.

## V.    Conclusion

For the foregoing reasons, the Court should suppress all evidence and communications obtained from FISA searches or surveillance in this case and all fruits thereof.

Respectfully submitted,

MUHAMMED MUBAYYID,
By his attorney,

*Michael Andrews* (see)

Michael C. Andrews (BBO# 546470)
21 Custom House Street
Boston, MA 02110
(617) 951-0072

EMADEDDIN Z. MUNTASSER
By his attorneys,

*Elizabeth A. Lunt*

Norman S. Zalkind (BBO# 538880)
Elizabeth A. Lunt (BBO# 307700)
Malick W. Ghachem (BBO#661018)
Zalkind, Rodriguez, Lunt & Duncan LLP
65a Atlantic Ave.
Boston, MA 02110

*Susan Estrich* (see)

Susan R. Estrich
Robert Kingsley Professor of Law and Political
Science
University of Southern California Law School
University Park, MC-0071
Los Angeles, CA 90089-0071

*Harvey Silverglate* (see)

Harvey Silverglate (BBO # 462640)
607 Franklin St.
Cambridge, MA 02139

Dated: October 13, 2006

Certificate of Service

I hereby certify that I have served a copy of the foregoing document by mail upon the
following attorneys of record this 13th day of October 2006.

B. Stephanie Siegmann
Assistant U.S. Attorney

Aloke Chakravarty
Assistant U.S. Attorney

*Elizabeth A. Lunt*

Elizabeth A. Lunt