UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. 05-40026-FDS |
| | ) | |
| MUHAMED MUBAYYID, and | ) | |
| EMADEDDIN Z. MUNTASSER, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION FOR JURY SELECTION FROM THE EASTERN DIVISION OF THE DISTRICT OF MASSACHUSETTS**

The United States, by and through Michael J. Sullivan, and B. Stephanie Siegmann and Aloke Chakravarty, Assistant United States Attorneys for the District of Massachusetts, hereby opposes Defendants' Motion for Jury Selection from the Eastern Division of the District of Massachusetts on the grounds that the defendants have no constitutional right to a trial within a particular division of the district of Massachusetts. The Sixth Amendment requires that a trial be held in the "district wherein the crime shall have been committed." U.S. Const. amend. VI. Furthermore, as described below, the government did not, as suggested by the defendants, improperly attempt to manipulate the division assignment of this case. With regards to the charges alleged in the indictment, significant criminal conduct occurred in both Worcester county and Suffolk county. Accordingly, the case could properly be assigned to either the Worcester or Boston division. Lastly, the defendants baldly assert, without any

1

evidentiary basis, that an impartial jury cannot be selected in
Worcester County as a result of five articles published in the
Worcester Telegram and Gazette months before any trial is
anticipated to commence.  The merits of any claim that the jury
pool in Worcester County has been unfairly prejudiced against the
defendants by pre-trial publicity is further undermined by the
extrajudicial statements of defendant Muntasser's own counsel
published in local and national newspapers in violation of Local
Rule 83.2A.

**I.   The Defendants Have No Right to Have The Jury Selected from
      the Eastern Division of the District of Massachusetts Rather
      than the Central Division of Massachusetts.**

Assignment of this case to the Central Division of the
District of Massachusetts does not violate the constitutional
rights of the defendants.  The Sixth Amendment of the
Constitution requires that a trial be held in the "State and
district wherein the crime shall have been committed."  Rule 18
of the Federal Rules of Criminal Procedure state that "the
government must prosecute an offense in a district where the
offense was committed.  The court must set the place of trial
within the district with due regard for the convenience of the
defendant and the witnesses, and the prompt administration of
justice."

The defendants do not dispute that venue is proper in the
District of Massachusetts.  The defendants argue that their Sixth

Amendment venue rights, however, have been violated by the
assignment of their case to the Central Division of Massachusetts
rather than the Eastern Division of Massachusetts.  There is,
however, "no constitutional right to a trial within a particular
division" of a district.  United States v. Cates, 485 F.2d 26, 28
n.4 (1st Cir. 1974) (citations omitted); United States v. Osum,
943 F.2d 1394, 1399 (5th Cir. 1991); United States v. Betancourt,
734 F.2d 750, 756 (11th Cir. 1984); accord United States v.
Ezeodo, 748 F.2d 97, 98 (2d Cir. 1985) ("Rule 18 does not mandate
that a trial be held in any particular location within a federal
district.").

The defendants further allege that the government's conduct
violated Local Rule 40.1(E), which provides that "[c]riminal
cases shall be assigned to that division in which the most
significant criminal conduct related to the alleged violations
occurred within the District of Massachusetts."  Despite the
defendants' inflammatory accusations to the contrary,[1] the

---

[1]Based upon a single document, the criminal cover sheet for
a complaint filed against one of the defendants, Muntasser, the
defendants leap to the conclusion that the government engaged in
impermissible forum shopping.  This conclusion is
unsubstantiated.  Additionally, regardless of whose handwriting
changed the location of the offenses from Boston to Worcester on
the cover sheet for the complaint charging Muntasser with
violations of 18 U.S.C. § 1001, it is simply irrelevant as to the
proper place for the trial of two defendants on the six-count
indictment presently at issue.  In fact, the criminal cover
sheets for the indictment filed with respect to each of the two
defendants clearly indicates the place of the offenses was in
both "Worcester and Suffolk" counties.  The clerk's office then

government has complied with this local rule as significant
criminal conduct occurred in Worcester County as well as the
Eastern Division of Massachusetts.  Evidence of the defendants'
criminal conduct was found during two searches, one in 2001 and
one in 2003, of a storage unit located in Westboro,
Massachusetts, which contained the records of Care International
dating back to 1993.  One of the two defendants, Mubayyid, is
believed to have lived at all relevant times to the indictment,
and continues to live, in Worcester County and committed several
criminal acts from his home located in Worcester County.  The
defendants and their unindicted co-conspirators committed several
criminal acts in Worcester county; they arranged for lectures to
promote, and solicited money for the mujahideen, in Worcester
County.  At least three of the alleged fraudulent tax returns
filed on behalf of Care International were prepared in Worcester
by Khalid Naseem, including one of which that was signed by
defendant Emadeddin Muntasser.  Lastly, for some period of time
in 1997-1998, Care International was using a Worcester address as
its place of business.

Accordingly, the defendants' claim that the government
violated the defendants' Sixth Amendment rights and manipulated
the rules regulating case assignment within the District of
Massachusetts should be rejected.  Likewise, the defendants'

---

assigned the case to Worcester.

extraordinary request for the selection of a jury outside the
division in which the court will convene in this matter should be
denied.  Even if this Court were to conclude that more
significant criminal conduct with the respect to the indictment
occurred in the Eastern District of Massachusetts than the
Central Division, that finding would not require a inter-district
transfer of the case or deviation from the uniform jury selection
rules in Massachusetts to remedy any minor violation of the local
rules without a strong showing of prejudice.  "[L]ocal rules
governing the assignment of cases are intended to promote the
efficient operation of the district courts and do not normally
give defendants vested rights to any particular procedure."
Osum, 943 F.2d at 1401 n.3.  Moreover, the defendants have failed
to submit any evidence of hardship or prejudice (except the
prejudice allegedly caused by pretrial publicity discussed below)
resulting from the assignment of this case to Worcester.

     In addition to the extreme inconvenience of requiring
potential jurors who live in the Eastern Division (Counties of
Barnstable, Bristol, Dukes, Essex, Middlesex, Nantucket, Norfolk,
Plymouth, and Suffolk) to sit for a trial held in Worcester, the
defendants' request appears to violate the District of
Massachusetts Plan for Random Selection of Jurors ("Massachusetts
Plan") adopted pursuant to the Jury Selection and Service Act, 28
U.S.C. §§ 1861 et seq.  See Massachusetts Plan for Random

Selection of Jurors (adopted 2000) at §§ 2, 5(c) ("Pursuant to 28 U.S.C. §1869(e), the Master Jury Wheel for the District of Massachusetts is hereby divided into three divisions for petit and grand jury selection . . ." and petit jury selection for "Central Division" is to be selected from "[t]he county of Worcester."; "names of persons to be considered for service as grand or petit jurors, on or after the effective date of the Plan shall be selected at random from the numbered local resident lists within the relevant division").  The Massachusetts Plan is binding upon each district judge and deviations from the jury selection plan may be grounds to vacate a conviction.  See In re United States, 426 F.3d 1, 6-8 (1st Cir. 2005) (ordered district court to comply with valid existing jury plan and rejected argument that court's supervisory power authorized one district judge to disregard provisions of existing jury plan adopted by all of the judges of the district court); accord United States v. Bahna, 68 F.3d 19, 24-25 (2d Cir. 1995) (in upholding New York jury selection plan, court concluded that the Jury Selection and Service Act authorizes selection of petit jury from only one division and not whole district).

**II.  Five Articles Published in Worcester Telegram and Gazette Months Prior to the Anticipated Trial Date in this Case Does Not Prevent the Selection of an Impartial Jury from the Central Division of Massachusetts.**

Months before the likely trial in this case, the defendants

6

assert that no impartial jury could be selected in the Central Division, Worcester County, as a result of five articles published in the Worcester Telegram and Gazette.  Without having this Court first engage in the voir dire process, the defendants have requested the extreme measure of having the jury selected from the Eastern division of Massachusetts.  The defendants cannot meet their heavy burden of establishing presumed or actual prejudice necessary to warrant a pre-voir dire deviation from the jury selection plan of Massachusetts, which is akin to a change of venue.

In determining whether a change of venue, or, in this case, a change in the selection of the jury pool, is necessary based upon pretrial publicity, "'the court must determine if prejudice exists from the publicity.'" <u>United States v. Gonzalez</u>, 445 F.3d 39, 46 (1st Cir. 2006) (citation omitted).  This prejudice determination requires the consideration of two factors.  First, whether "the facts show that jury prejudice should be presumed" and second, "if prejudice should not be presumed, whether the jury was actually prejudiced against the defendant." <u>Id.</u> (citation omitted).  The First Circuit Court of Appeals has provided guidance as to how to determine when prejudice should be presumed:

> Prejudice may be presumed where inflammatory publicity
> has so saturated a community as to render it difficult
> to draw an impartial jury or where enough jurors admit
> to prejudice to cause concern as to any avowals of

> impartiality by the other jurors.  But mere exposure of
> the potential jury pool to news reports regarding the
> crime does not, in and of itself, result in an
> inability to select an impartial jury.

Id.; see United States v. Drougas, 748 F.2d 8, 29 (1st Cir. 1984)

("Extensive knowledge in the community of either the crimes or

the defendants is not sufficient, by itself, to render a trial

constitutionally unfair.")

    Based upon this high standard, a handful of newspaper

articles, even if they are arguably inflammatory, does not

justify a presumption of prejudice amongst the entire jury pool

in Worcester county.  Compare United States v. Rodriquez-Cardona,

924 F.2d 1148, 1158 (1st Cir. 1991) (media coverage consisting of

"ten full first pages in newspapers; more than one hundred first

rate news items; and more than ten T.V. clippings . . . fell well

below that of other cases in which we have found no presumption

of prejudice.")  As demonstrated during voir dire in other cases

before this District Court, there is only a very remote

possibility that a high percentage of the Worcester county

population has in fact read the allegedly inflammatory articles

published in the Worcester Telegram & Gazette, let alone been

prejudiced by them.

    While jurors must be impartial, in Irvin v. Dowd, 366 U.S.

717 (1961), the United States Supreme Court held that:

> [i]t is not required . . . that the jurors be totally
> ignorant of the facts and issues involved.  In these
> days of swift, widespread and diverse methods of

8

> communication, an important case can be expected to
> arouse the interest of the public in the vicinity, and
> scarcely any of those best qualified to serve as jurors
> will not have formed some impression or opinion as to
> the merits of the case.  This is particularly true in
> criminal cases.  To hold that the mere existence of any
> preconceived notion as to the guilt or innocence of an
> accused, without more, is sufficient to rebut the
> presumption of a prospective juror's impartiality would
> be to establish an impossible standard.  It is
> sufficient if the juror can lay aside his impression or
> opinion and render a verdict based on the evidence
> presented in court.

Id. at 722-723.  Similarly, the First Circuit has concluded that the relevant question to determine whether the jurors are actually prejudiced against the defendant is "whether a juror has such a fixed opinion that he or she cannot impartially judge the guilt of the defendant" and not whether a juror has been exposed to any media coverage of a case.  Drougas, 748 F.2d at 30.  This determination should be made during a thorough voir dire examination of the potential jurors.  Such a voir dire examination will ensure an impartial jury is selected in this case.  See United States v. Orlando-Figueroa, 229 F.3d 33, 43 (1st Cir. 2000) (voir dire did not reveal bias).  No other remedy or deviation of standard practice is warranted under the circumstances.

As demonstrated above, the defendants cannot meet their burden.  Thus, this Court should decline to deviate from the Massachusetts Jury Selection Plan by selecting a jury from outside the Central Division to hear a trial in Worcester prior

to attempting to select an impartial jury.

Furthermore, defendant Muntasser's allegation concerning pretrial publicity is somewhat surprising as his own counsel has made extrajudicial statements for publication in at least two newspapers, the Worcester Telegram and Gazette and The Washington Times, in violation of Local Rule 83.2A.  Defendant Muntasser should not now be allowed to complain about publicity his own counsel has, in part, incited or encouraged.

From the time of the filing of an indictment until the commencement of trial, Rule 83.2A prohibits counsel for the prosecution or defense from making extrajudicial statements concerning "[a]ny opinion as to the accused's guilt or innocence as to the merits of the case or the evidence in the case."  L.R. 83.2A(6).

On September 19, 2006, defendant Muntasser's counsel wrote a letter for publication to the editor of the Worcester Telegram & Gazette.  See Attachment 1.  In this letter, Muntasser's counsel commented on the charges currently pending against Muntasser in violation of Local Rule 83.2A.  One of the articles to which the defendant cite as evidence of unfair pretrial publicity was published in response to another editorial written by counsel for both defendants in July 2006.  See Attachment 2.

On October 18, 2006, another editorial written by Susan Estrich, who has applied *pro hac vice* to represent Muntasser in

10

this matter, and Harvey Silvergate, who has recently filed a
notice of appearance for Muntasser, was published in the
Washington Times in direct violation of Local Rule 83.2A.  <u>See</u>
Attachment 3.  This editorial is extremely prejudicial to the
government and jeopardizes the public's interest in a fair trial
as it extensively comments on the government's decision to indict
the defendants in this case and the merit of the evidence against
Muntasser.  Further, in this editorial, Muntasser's lawyers
inaccurately describes the charges contained in the indictment,
categorizes the indictment as "ill considered," and opine that
Muntasser's conduct in supporting jihad was "patriotic" and as
"American as apple pie."

**CONCLUSION**

For the foregoing reasons, the government respectfully
requests this Court to deny Defendants' Motion for Jury Selection
from the Eastern Division of the District of Massachusetts.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney


By: <u>/s/ B. Stephanie Siegmann</u>
B. STEPHANIE SIEGMANN
ALOKE CHAKRAVARTY
Assistant U.S. Attorneys

Dated: October 26, 2006

11

<u>Certificate of Service</u>

I do hereby certify that a copy of foregoing opposition was served upon the following attorneys by electronic notice on this 26th day of October 2006:

Michael Andrews, Esq. for Muhamed Mubayyid

Norman Zalkind, Esq. for Emadeddin Muntasser


<u>/s/ B. Stephanie Siegmann</u>
B. Stephanie Siegmann
Assistant U.S. Attorney

12

Printer Friendly Version                                                    Page 1 of 1

ATTACHMENT 1



To print this article open the file menu and choose Print.
Click here to return to previous page
Article published Sep 19, 2006

Sep 19, 2006

# U.S. gave to charities promoting mujahideen

Once again, Kevin Keenan's article (Telegram & Gazette, Sept. 11) has dutifully carried the government's water in reporting about the prosecution against our client, Emadeddin Muntasser. He fails to note that in the 1980s and early 1990s, many Muslim-American charities were aiding widows and orphans in Afghanistan, and the American government was providing military and humanitarian support to the Afghan resistance itself. In fact, the CIA poured many millions into helping the anti-Soviet resistance.

The reason why Mr. Muntasser is not charged with supporting or financing terrorists is quite simply because he did not in fact aid terrorists in any way. The government alleges that Care International acted outside the scope of the charitable tax laws by soliciting funds in support of the same groups supported by official American policy and taxpayers' money. Indeed, the United States government contributed substantial amounts of money to pro-resistance charities, including the Afghan mujahideen's own cultural council. The government does not claim that Mr. Muntasser had any involvement in running Care International after 1996, years before American policy shifted course after Sept. 11, 2001.

Mr. Keenan offered to submit questions to us in writing but then never followed up when we agreed to respond to them. Had he done so, and had he taken the time to consult the many publicly available documents demonstrating United States government support for charities promoting the Afghan mujahideen, he might have avoided the many mistakes in his article.

NORMAN S. ZALKIND

ELIZABETH A. LUNT

MALICK W. GHACHEM

Counsel for Emadeddin Muntasser

Boston



Order the Telegram & Gazette, delivered daily to your home or office!
www.telegram.com/homedelivery

Copyright 2006 Worcester Telegram & Gazette Corp.

## ATTACHMENT 2



To print this article open the file menu and choose Print.
Click here to return to previous page
Article published Jul 20, 2006

Jul 20, 2006

# Story had errors on suspect charity

**NORMAN ZALKIND, Boston / MICHAEL ANDREWS, Boston**

Three-quarters of the way through an article about our clients' case ("Pair in terrorist-funding case rebuts fed charges/Shrewsbury man allegedly bankrolled jihadists via charity," Telegram & Gazette, July 7), it is clearly and correctly stated that they "are not charged with providing material support to terrorist organizations."

Why, then, does the headline refer to this case as a "terrorist funding case" when it is not?

The first line of the article states, entirely erroneously, that our clients "are accused of funneling money to Islamic terrorists through a charity." They are not.

The mistakes in the article are serious, falsely implicating our clients with involvement in activities in which they have no part.



The headline writers should read the story more carefully before creating the headline, and T&G reporters writing on legal matters must first seek to read the legal documents at issue, such as the indictment, before submitting their stories for publication, especially in these times of sensationalized terror prosecutions.

We ask that the T&G retract the erroneous statements and issue a correction.

NORMAN ZALKIND

Boston

MICHAEL ANDREWS

Boston

EDITOR'S NOTE: Norman Zalkind is a lawyer representing Emadeddin Z. Muntasser. Michael Andrews is a lawyer representing Muhamed Mubayyid. The Telegram & Gazette stands by the story.

Order the Telegram & Gazette, delivered daily to your home or office! www.telegram.com/homedelivery

Copyright 2006 Worcester Telegram & Gazette Corp.

Citation                    Found Document          Rank 20 of 49            Database
10/18/06 WATIMES A18                                                         WATIMES

10/18/06 Wash. Times (D.C.) A18
2006 WLNR 18089069

Washington Times (DC)
Copyright 2006 Inc.

October 18, 2006


Section: LETTERS

Financing jihad: did he or didn't he?

THE WASHINGTON TIMES

"Those who cannot remember the past," as George Santayana taught us, "are
condemned to repeat it." Likewise, when governments seek to rewrite history,
citizens and non-citizens alike are exposed to the dangers that accompany
official revisionism. A recent opinion column in this newspaper demonstrates
these lessons all too clearly.

The United States Department of Justice has indicted a Boston businessman,
Emadeddin Z. Muntasser, our client, for his involvement in the 1980s and early
90s in a Boston-based Muslim charity that, the indictment alleges, was involved
in supporting Afghan mujahideen engaged in pursuing jihad. Rachel Ehrenfeld and
Alyssa A. Lappen ("Jihadists and Jews," Op-Ed, Monday) would have readers of
this newspaper believe that in asking the federal court in Massachusetts to
dismiss this indictment on constitutional grounds, we are seeking to establish
that the First Amendment's speech and religion protections apply to what the
authors term "a now-defunct Boston-based al Qaeda front organization" that
engages in support of a terrorist organization that advances "holy war against
the United States."

Ms. Ehrenfeld and Ms. Lappen are wrong on every count. In fact, the indictment
alleges that the organization, Care International, was engaged in lending
financial assistance to the very same groups and causes that the United States
government financed during and after the Afghan struggle to liberate their
country from Soviet occupation and communist rule. In charging Mr. Muntasser
with failing to inform the Internal Revenue Service, when seeking tax-exempt
charitable status for Care, that the organization supported jihad, mujahideen,
and zakat (the Muslim equivalent of charitable giving), the U.S. government is
engaging in an insidious form of revisionism. It is also betraying a deeply
flawed misunderstanding of these fundamental Islamic principles a
misunderstanding that, apparently, the coauthors have uncritically lifted out of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10/18/06 WATIMES A18

the Department of Justice playbook.

Don't take our word for it. The U.S. government's own expert intelligence literature, which we quoted in our motion to dismiss the indictment, defines jihad in a way that totally undermines the indictment as well as the Ehrenfeld-Lappen thesis: "Of all Islamic doctrines, the concept of jihad is the most overused, misunderstood, and misinterpreted," the intelligence report says. "Often narrowly and erroneously translated as 'holy war,' jihad literally translates to 'utmost effort' or 'struggle' and refers to the obligation of all Muslims to promote and defend Islam. Because certain radical Muslim groups have adopted the word as part of their name, Westerners often associate jihad with terrorism. Jihad actually is a complex religious concept."

As Ms. Ehrenfeld and Ms. Lappen note, the government alleges that Care's newsletter "actively advocated for jihad or holy war, involving mujahideen or Islamic holy warriors." Yet as we also detail in our motion, the U.S. government financed similarly situated tax-exempt organizations to do the exact same thing. Consider, for instance, the $57,068 the National Endowment for Democracy bestowed upon the American Friends of Afghanistan in 1991 to continue publishing the quarterly magazine Afghan Jehad. The October-December 1991 issue of that magazine opined that "our objective now should be an Islamic Revolution and an Islamic Revolution can only be ushered in through the adoption of jehad as its primary instrument."

In short, what the indictment, as well as the FBI affidavit on which the coauthors rely, failed to mention was that this was official American policy and the object of munificent federal funding at the time.

The notion that we are arguing that the Constitution protects "war in or against America" and that the Internal Revenue Code should grant tax-exemption to funds so directed, is absurd. What we do argue, however, is that given the similarity between the conduct alleged in the indictment and the aims of our government at the time of these events, that conduct is fully protected by the Constitution and statutes of the nation. Moreover, the publications that Care is charged with sponsoring were quite ordinary calls for assistance for the aims of the U.S. government and are protected by the free speech and free press doctrines.

Ms. Ehrenfeld, in particular, should understand the importance of enforcing the First Amendment's protections for liberty. She recently filed a lawsuit against Saudi businessman Khalid Salim A Bin Mahfouz, who has made a career of suing, in foreign courts of nations without a First Amendment, American writers, including Ms. Ehrenfeld, who dare to criticize terrorist financiers in American publications that occasionally find their way into foreign lands. Ms. Ehrenfeld's case, which seeks a declaration that all such foreign judgments are invalid in this country, is currently pending in the Second Circuit Court of Appeals in New York. In her brief, Ms. Ehrenfeld points out that Americans "have a strong First Amendment interest in preserving broad access to speech no matter how controversial or inflammatory."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10/18/06 WATIMES A18

We agree. Hopefully when Ms. Ehrenfeld learns more about the ill-considered prosecution of our client, she will see that he is entitled to the same First Amendment protection that she seeks, especially since the activities that he allegedly undertook, far from being "controversial or inflammatory," were as patriotic as the National Endowment for Democracy or, one might say, as American as apple pie.

SUSAN ESTRICH

Robert Kingsley Professor of Law and Political Science

University of Southern California

Gould School of Law School

Los Angeles

HARVEY SILVERGLATE

Criminal defense and civil liberties attorney

Good and Cormier

Boston

---- INDEX REFERENCES ----

COMPANY: INTERNAL REVENUE SERVICE; CARE; AMERICAN; FURR S RESTAURANT GROUP INC

NEWS SUBJECT:  (Legal (1LE33); International Terrorism (1IN37); Government Litigation (1GO18))

REGION:  (Afghanistan (1AF45); Massachusetts (1MA15); USA (1US73); Americas (1AM92); New England (1NE37); North America (1NO39); Western Asia (1WE54); Asia (1AS61))

Language:  EN

OTHER INDEXING:  (AFGHAN; AMERICAN; AMERICAN FRIENDS OF AFGHANISTAN; BIN MAHFOUZ; CARE; CARE INTL; CIRCUIT COURT OF APPEALS; CONSTITUTION; DEPARTMENT OF JUSTICE; FBI; GOULD SCHOOL OF LAW SCHOOL; INTERNAL REVENUE CODE; INTERNAL REVENUE SERVICE; ISLAMIC REVOLUTION; JEWS; NATIONAL ENDOWMENT FOR DEMOCRACY; SAUDI; STATES DEPARTMENT OF JUSTICE; UNITED; UNIVERSITY)  (Alyssa A. Lappen; Cormier; Ehrenfeld; Emadeddin Z. Muntasser; Good; Lappen; Likewise; Muntasser; Political Science; Rachel Ehrenfeld; Robert Kingsley)

Word Count: 1151
10/18/06 WATIMES A18
END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.