UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff<br><br>v.<br><br>MUHAMED MUBAYYID and EMADEDDIN Z. MUNTASSER, Defendants | CRIMINAL NO. 05-40026-FDS |

**DEFENDANTS' REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION FOR JURY SELECTION FROM THE EASTERN DIVISION**

Now come defendants Emadeddin Z. Muntasser and Muhamed Mubayyid to submit this reply to the Government's Opposition to their Motion for Jury Selection from the Eastern Division of Massachusetts.

At a minimum, the Government's argument amounts effectively to an administrative repeal of Local Rule 40.1(E), which states that "[c]riminal cases shall be assigned to that division in which the most significant criminal conduct related to the alleged violations occurred within the District of Massachusetts." If this provision is to have any meaning, it must be that if "the most significant criminal conduct" alleged in this case occurred in the Eastern Division of Massachusetts, then Defendants should be tried by a jury drawn from that same division. The Supreme Court, interpreting an earlier provision of the Judicial Code that is fundamentally indistinguishable from Local Rule 40.1(E),[1] held as follows:

[1] The former Section 53 of the Judicial Code (Comp. St. § 1035) read as follows:

> When a district contains more than one division, * * * all prosecutions for crimes or offenses shall be had within the division * * * where the same were committed, unless the court, or the judge thereof, upon the application of the defendant, shall order the cause to be transferred for prosecution to another division of the district.

> In our opinion the real purpose of the provision, that which best comports with its terms when taken in the light of the circumstances in which it was enacted, is to require, where a district contains more than one division, that the trial be had in the division where the offense was committed, unless the accused consents to be tried in another.

Salinger v. Loisel, 265 U.S. 224, 235 (1924).[2]  That Local Rule 40.1(E) contains no exception allowing for a defendant to consent to trial in a district other than the one in which the alleged offense occurred simply underscores the importance of the rule that trials be had in the district of the alleged offense.[3]

The Government further argues counterfactually that it has complied with Local Rule 40.1(E) "as significant criminal conduct occurred in Worcester County as well as the Eastern Division of Massachusetts."  Government's Opposition to Defendants' Motion for Jury Selection

---

[2] An unrelated holding of the Salinger Court respecting the availability of habeas corpus has been superseded by statute.  Pridgen v. Shannon, 380 F.3d 721, 727 (3rd Cir. 2004).

[3] Defendants also have a constitutional right to have a jury selected from the eastern division of Massachusetts in this case.  The Sixth Amendment requirement that a defendant be tried "by an impartial jury of the State and district wherein the crime shall have been committed" requires that the jury be drawn not only from the "state" of the alleged offense, but also from the *intrastate* "district" wherein the alleged offense took place within that state.  See Akhil Reed Amar, *America's Constitution: A Biography* (2005) at 330.  While the framers did not provide for a right to be tried before a jury from the common-law "vicinage," and while the Sixth Amendment technically permits Congress to treat an entire state as a single district, id. at 331, the term "district" as used in the Sixth Amendment is best interpreted as referring to any *intrastate* divisions that the Congress or the federal judiciary may in their discretion choose to impose upon the administration of federal justice in any of the states.  Where, as here, the state of Massachusetts, although a single "district," has been divided into three divisions in order to give effect to the language and spirit of the Sixth Amendment, and where a Local Rule requires that cases be assigned to the division wherein "the most significant criminal conduct" alleged took place, the proper interpretation of the Sixth Amendment is that defendants have a constitutional right to be tried by a jury drawn from the eastern division of Massachusetts.  The Government's interpretation, moreover, renders the term "district" in the Sixth Amendment completely redundant, as the amendment would have the exact same meaning here were it to be rewritten to read simply that a defendant must be tried "by an impartial jury of the State wherein the crime shall have been committed."

at 4. Here too, the Government's interpretation defies a straightforward reading of the rule, which provides not that a case may be assigned to any division wherein significant criminal conduct occurred, but rather that a case shall be assigned to that division wherein "*the most significant* criminal conduct related to the alleged violations" occurred. Local Rule 40.1(E) (emphasis added). It does not require a detailed catalog of the discovery in this case to understand that, by any reasonable measure, "the most significant criminal conduct" here alleged occurred in the Eastern Division of Massachusetts.

In an effort to persuade this Court otherwise, the Government completely glosses over a number of crucial questions underlying Defendants' instant motion. On April 6, 2005, the Government brought a sealed criminal complaint against Mr. Muntasser. On the Criminal Case Cover Sheet that accompanied the criminal complaint (attached to the Affidavit of Attorney Malick Ghachem as Exhibit 2), the Government indicated in typescript the words "Boston and elsewhere" and "Suffolk and elsewhere" as the city and county wherein the alleged offenses took place. The Government subsequently drew a line through the words "Boston" and "Suffolk" and replaced both with "Worcester." Who typed the initial designations of "Boston" and "Suffolk" on this form? Who caused both words to be changed to "Worcester"? Why were the changes made? The Government is completely and tellingly silent on these points. This Court is entitled to receive, and the Government should provide, straightforward answers to these questions.

Instead of doing so, the Government asserts disingenuously that the Clerk's Office was responsible for assigning this case to Worcester. It is true that, having failed to disguise the extent of its forum shopping with respect to the criminal case cover sheet appended to the Criminal Complaint, the Government subsequently took greater care to do so with respect to the

criminal case cover sheet filed in conjunction with the Indictment, which stated "Westboro and Boston" and "Worcester and Suffolk" as the city and county wherein the alleged criminal conduct took place.  Compare Docket #3 (Criminal Case Cover Sheet appended to Criminal Complaint) with Docket #5 (Criminal Case Cover Sheet appended to Indictment).  The Government draws from this dubious distinction the conclusion that "[t]he clerk's office then assigned the case to Worcester."  Government's Opposition to Defendants' Motion for Jury Selection at 3-4 n.1  This conveniently omits the fact that the Government had *already* filed a criminal complaint and criminal case cover sheet designating Worcester as the county of the alleged offenses, and had *already* convened a grand jury in Worcester.  In short, as a practical matter, the decision to assign this case to Worcester was made not by the Clerk's Office, which evidently had no basis for determining where "the most significant criminal conduct" alleged took place other than the peremptory statement provided to it by the Government, but by the U.S. Attorney's Office in Boston, which is of course an interested party that still stands to benefit from having this case tried in the central rather than eastern division.

Two further distortions by the Government must be noted.  The Government states that Defendants seek to impose upon jurors drawn from the eastern division the "extreme inconvenience" of sitting for a trial held in Worcester.  Government's Opposition to Defendants' Motion for Jury Selection at 5.  Defendants seek no such thing, but rather have applied to have this case heard by this Court (that is, by Judge Saylor) sitting in the U.S. Courthouse in Boston before a jury drawn from the eastern division.  It is not uncommon for magistrate and district court judges based in Worcester to hold proceedings out of the U.S. Courthouse in Boston.  Indeed, at least one previous hearing in this case has been held in Boston, and the next status

hearing will be heard by Magistrate Judge Hillman in Boston rather than Worcester.

Finally, the Government completely mischaracterizes the role of Defendants' counsel in the pretrial publicity surrounding this case. The two letters written by Defendants' counsel to the editor of the *Worcester Telegram and Gazette* were exactly that: letters, not "editorials." Furthermore, they were letters written *in response to* enormously prejudicial headlines and articles published in that newspaper describing Defendants as having been criminally charged with "supporting or financing terrorists." See Defendants' Motion for Jury Selection from the Eastern Division of Massachusetts, Exhibit 3. The same is true of the letter – again, not "editorial", as the Government misleadingly posits – that counsel for Mr. Muntasser submitted to *The Washington Times*. A copy of the op-ed to which Mr. Muntasser's counsel responded – another inflammatory if not libelous mischaracterization of this case as involving charges of the material support of terrorism, published under the title "Jihadists and Jews" – is attached hereto as Exhibit 1.[4] The Government states that the letter responding to this op-ed was "extremely prejudicial" to its case. Government's Opposition to Defendants' Motion for Jury Selection at 11. If describing this matter as the Klein conspiracy case that it is rather than as the sensationalistic "terrorism" case the media would like it to be is "prejudicial" to the Government, then so be it. Certainly the Government is not in a very strong position to lecture defendants and

[4] The *Washington Times* op-ed piece by Rachel Ehrenfeld and Alyssa Lappen quoted from one of the FBI affidavits that the Government has publicly released in this case. The response to that op-ed – a mere letter to the editor – was occasioned not only by hostile publicity generated by a private party, but by a private party acting on the basis of a Government-issued version of the facts of this case. While the Government may assert that it has refrained from taking active steps to generate publicity in this case, it must also recognize that private parties stigmatize defendants such as Mr. Muntasser and Mr. Mubayyid on the basis of materials that the Government itself issues – materials that represent the "spin" that an interested party wishes to cast upon the facts of this case.

their counsel about the prejudicial impact of news media reporting on this case, having chosen to make certain unspecified and genuinely prejudicial "media reports" concerning the 1993 bombing of the World Trade Center part of the centerpiece of its allegations, see Indictment ¶3, and having issued a press release on the occasion of Defendants' indictment and arrest in order to trumpet the Government's success in bringing this highly inflammatory and ill-considered case. See Ex. 2.

In any event, none of the three letters to the editor submitted by Defendants' counsel has expressed "[a]ny opinion as the accused's guilt or innocence as to the merits of the case or the evidence in the case." Local Rule 83.2A(6). None of the evidence governed by the protective order in this case has been disclosed or commented upon, even in the most indirect way. Nor is there a "reasonable likelihood" that publication of any of the letters "will interfere with a fair trial or otherwise prejudice the due administration of justice." Local Rule 83.2A. If anything, the exact opposite is true. Defendants and their counsel have sought simply to correct the public record as to the nature of the charges brought against Defendants, in the face of what has been an unremittingly hostile stream of newspaper, internet, and radio coverage, dating back to the day of Defendants' arrest, that has sought to portray Defendants as financiers of terrorism.[5] This is to say nothing of the generally hostile attitude towards persons of Muslim background in the United States that has prevailed in much of the media and in much public opinion for the past several years.[6] Regardless of whether this atmosphere has been fostered by the Government or by private

---

[5] Selected examples of this coverage are attached as Exhibits 3 -5.

[6] See, e.g., Ex. 5 at 2 (blog entry stating that "Muslim groups are infiltrating all over the place to take over. It's the mandate from their deity as stipulated in their so-called Holy Book – the Koran.").

parties, the fact of such a poisonous climate requires that Defendants at some point respond. The hostile publicity at issue here was particularly problematic because the *Worcester Telegram and Gazette* is the major newspaper in the area from which, if the Government has its way, a jury will be selected.

Contrary to the Government's suggestions, Defendants and their counsel did not seek any of this pretrial publicity, and they are not required to live with it forever. The Government has brought an indictment that, perhaps by its very nature, has triggered and sustained such publicity. Consistent with the spirit of the local rules, Defendants and their counsel have taken certain highly restrained steps to contain the indisputably prejudicial impact of that publicity and to preserve Defendants' fading chances for an impartial jury trial.

Respectfully submitted,

MUHAMMED MUBAYYID,
By his attorney,

/s/ Michael C. Andrews
Michael C. Andrews BBO# 546470)
21 Custom House Street
Boston, MA 02110
(617) 951-0072

EMADEDDIN Z. MUNTASSER
By his attorneys,

/s/ Malick W. Ghachem
Norman S. Zalkind (BBO# 538880)
Elizabeth A. Lunt (BBO# 307700)
Malick W. Ghachem (BBO#661018)
Zalkind, Rodriguez, Lunt & Duncan LLP
65a Atlantic Ave.
Boston, MA 02110

Susan R. Estrich
Robert Kingsley Professor of Law and Political Science
Univ. of Southern California Law School
University Park, MC-0071
Los Angeles, CA 90089-0071

Harvey Silverglate (BBO # 462640)
607 Franklin St.
Cambridge, MA 02139

Dated: November 8, 2006

The Washington Times
www.washingtontimes.com

# Jihadists and Jews

By Rachel Ehrenfeld and Alyssa A. Lappen
Published October 16, 2006

Advertisement
Ads by Google Advertise on this site
**Discount Wristbands**
Top 5 sites for great resources on Wristbands. Compare and save.
www.Allgive.com
**Iraq War**
Should The US Pull Out Of Iraq Now? Vote Now To See Survey Results!
www.popularq.com
**Nationwide Cookie Swap**
Register & DuPont Will Donate To Treat The Troops. Free Hosting Kit.
DuPont.com/GreatAmericanCookieSwap
**Patriotic Country™**
Support our troops, enjoy 18 great songs, and show your American pride
SendaCDtoaSoldier.com

Democratic strategist and former Michael Dukakis campaign manager Susan Estrich, and the former American Civil Liberties Union president in Massachusetts, Harvey Silvergate, recently joined the attorneys representing two alleged Boston al Qaeda funders.

Emadeddin Z. Muntasser and Muhammed Mubayyid face charges in U.S. District Court of Massachusetts for the soliciting and expenditure "of funds to support and promote the mujahideen and jihad, including the distribution of pro-jihad publications." Their Care International "charity," a now-defunct Boston-based al Qaeda front organization, published, among other things, the English version by al Qaeda co-founder Abdullah Azzam of "Join the Caravan," which states: "[t]he obligation of Jihad today remains [individually required] until the last piece of land, which was in the hand of the Muslims, but has been occupied by disbelievers, is liberated."

In their Oct. 5 request for a dismissal, the defendants effectively -- and unwittingly -- explain all the reasons why the federal government should outlaw Islamic charitable giving in the United States.

In their motion, attorneys Mrs. Estrich, Malick Ghachem, Norman Zalkind and Elizabeth Lunt, argue that the defendants merely exercised their religious freedom and obligation to give "zakat" (Islamic charity).

Their motion cites Chapter 9, verse 60 of the Koran, which describes "those entitled to receive zakat." According to the definition of zakat in The Encyclopedia of Islam, "category 7" of eligible recipients are "volunteers engaged in jihad" for whom the zakat cover "living expenses and the expenses of their military service (animals, weapons)."

Incredibly, the suspects' attorneys also argue that such charitable giving, to support the jihad and mujahideen, is rightfully tax-exempt under U.S. constitutional protection of religious freedom. Moreover, they compare their support of Islam's "holy war" to the Jewish National Fund (JNF) appeals for tax-deductible "donations to finance the purchase of bulletproof vests, helmets and firetrucks in connection with the 2006 Israel-Lebanon conflict."

Equating the supply of bulletproof vests to defend Israeli civilians from Hezbollah's jihad

with the funding of weapons and martyrs (holy warriors) for the jihad is preposterous. The JNF does not promote religiosity. Rather, it was incorporated in the United States in 1926 to develop the ancient Jewish homeland and to maintain and encourage the connection of the Jewish people to it. In contrast, Care was established to promote and advance al Qaeda's version of Islam.

Messrs. Muntasser and Mubayyid, the respective founder and treasurer of Care International, were indicted on May 11, 2005, for lying about the true nature of their organization and their charitable, tax-exempt activities. They now claim that their fund-raising from 1993 to 1996 conformed to the "teachings of an Abrahamic faith." Moreover, they claim, their activities correspond to those that "other 501(c)(3) religious groups conduct on a regular basis."

Their own publications, according to an FBI affidavit, state that Care was established in 1993 in Boston by Mr. Azzam, and not by Mr. Muntasser, as he stated in Care's Articles of incorporation, and on Care's application for tax exemption as a "charity." Mr. Azzam was also a key leader of the Muslim Brotherhood.

According to the FBI affidavit, Care's publication "Al-Hussam" (the Sword in Arabic) actively advocated for "jihad" or holy war, involving "mujahideen" or Islamic holy warriors. In addition, the affidavit states that Care was "the outgrowth of and successor to the Al-Kifah Refugee Center branch in Boston." After September 11 the U.S. designated Al-Kifah -- Sheikh Abdul Rahman's outfit in Brooklyn -- as a terrorist organization for "its involvement in the 1993 World Trade Center bombing."

Care documents show that between 1993-2003 it "collected more than $1.3 million in contributions... specifically directed towards mujahideen." Court records show Care's deposited checks with handwritten notes such as: "for jihad only" and "Bosnia Jihad fund" and "Chechen Muslim Fighters."

Although the U.S. Constitution provides protections for religious freedom, it most certainly was never intended to protect religiously sanctioned or encouraged war in or against America. Yet, that is exactly what the legal team for Messrs. Muntasser and Mubayyid argues.

Apparently, Mrs. Estrich once again is banking on political strategy, in the assumption that jurors from Eastern Massachusetts -- notable for having one of the highest geographic concentrations of liberals in the United States -- are likely to side with al Qaeda, against the U.S. government.

The First Amendment bars Congress from enacting laws "respecting an establishment of religion, or prohibiting the free exercise thereof." Yet even the flightiest prospective juror will surely see that the Constitution offers no protection to any group supporting "holy war" against the United States or its citizens -- whether in the name of Islam, or anything else.

Rachel Ehrenfeld is author of" Funding Evil", and director of the American Center for Democracy. Alyssa A. Lappen is a senior fellow at the American Center for Democracy.

Copyright © 2006 News World Communications, Inc. All rights reserved.

**Return to the article**



Want to use this article? Click here for options!
Copyright The Washington Times valeoip beacon

**United States Department of Justice**
***Michael J. Sullivan***
U.S. Attorney
District of Massachusetts

*United States Attorney's Office*
*John Joseph Moakley U.S. Courthouse*
*1 Courthouse Way, Suite 9200*
*Boston, MA 02210*
*Press Office: (617) 748-3139*

May 12, 2005

PRESS RELEASE

**FORMER OFFICERS OF CARE INTERNATIONAL, INC. INDICTED**

Worcester, MA... A Libyan national and a Lebanese national were arrested today on federal charges arising from their involvement with Care International, Inc. ("Care"), a purported charitable organization based in Boston.

United States Attorney Michael J. Sullivan; Kenneth W. Kaiser, Special Agent in Charge of the Federal Bureau of Investigation in New England; Joseph A. Galasso, Special Agent in Charge of the U.S. Internal Revenue Service, Criminal Investigation; and Robin M. Avers, Special Agent in Charge of Immigration and Customs Enforcement, announced that a six-count Indictment was unsealed today charging EMADEDDIN MUNTASSER, age 40, of Braintree, Massachusetts, and MUHAMED MUBAYYID, age 40, of Shrewsbury, Massachusetts, each with one count of Engaging in a Scheme to Conceal Material Facts from the United States and one count of Conspiring to Defraud the United States. MUNTASSER is also charged in one count with Making False Statements; and MUBAYYID is charged in three separate counts with Making and Filing False Tax Returns.

"Organizations that conceal their true activities to abuse our tax laws, and in this case fund their support of the mujahideen and jihad, will be prosecuted to the fullest extent of the law," stated U.S. Attorney Sullivan. "Making false statements and representations to government officials as is alleged in this case will not be tolerated. Our government requires truthful and complete information to uphold our nation's laws."

According to the Indictment, in the 1990's MUNTASSER was involved in operating the Boston branch office of the Al-Kifah Refugee Center ("Al-Kifah"), a supporter of "mujahideen," or Muslim holy warriors, engaged in "jihad," or religiously-based military conflict overseas. Al-Kifah Boston published a pro-jihad newsletter called "Al-Hussam," meaning "The Sword" in Arabic. According to the Indictment, following media reports in 1993 linking Al-Kifah to the 1993 World Trade Center bombing, MUNTASSER founded Massachusetts Care International, Inc. ("Care"), a purported charitable organization. The Indictment alleges despite MUNTASSER's representations on Care's Articles of Incorporation that the organization was exclusively involved in "charitable, religious, educational, and scientific purposes," Care was in fact engaged in the solicitation and expenditure of funds to support the mujahideen and promote jihad, was located at Al-Kifah Boston's office and assumed publication of Al-Kiffah's pro-jihad newsletter, Al-Hussam.

Count One of the Indictment alleges that between April 1993 and April 2003 MUNTASSER, as Care's president, and MUBAYYID, as Care's Treasurer, engaged in a scheme to conceal material facts from the IRS, FBI and the former INS related to Care. The Indictment specifically alleges that MUNTASSER and MUBAYYID concealed the fact that Care was an outgrowth of, and successor to, Al-Kifah Boston and was engaged in non-charitable activities.

"Those who defraud the Government to obtain tax exempt status for charities will be held accountable," stated ICE Special Agent in Charge Avers. "Today's arrests are the result of a collaborative law enforcement investigation and demonstrate our joint commitment to enforcing these violations."

Count Two of the Indictment alleges that MUNTASSER and MUBAYYID conspired together and with others to defraud the United States in connection with Care's qualifying with the IRS for tax exempt status. According to the Indictment, shortly after Care was incorporated in 1993, MUNTASSER sought, and was granted, a tax exempt status for Care from the IRS under Section 501(c)(3) on the basis that Care was a charitable organization. An organization granted such tax exempt status renders tax deductible any donations the organization receives. According to the Indictment, from 1993 to 2003, Care collected approximately $1.7 million in tax deductible donations. The Indictment specifically alleges that from 1993 to 2003, MUNTASSER and MUBAYYID and others conspired to deceive the IRS concerning Care's designation as a Section 501(c)(3) charitable organization in 1993 and that it should continue to be accorded that status thereafter. According to the Indictment, in addition to publishing the pro-jihad newsletter, Al-Hussam, Care published articles about military operations

and activities of the mujahideen on its website from approximately 1998 to 2001, and printed and distributed solicitations for tax deductible donations to support the mujahideen from approximately 1994 to 2001, as well as published and distributed an English translation of "Join the Caravan", a pro-jihad book.

Joseph Galasso, Special Agent in Charge of IRS Criminal Investigation in Boston stated, "One of the enforcement priorities in the IRS Strategic plan is the review of charitable organizations in order to discourage and deter non-compliance within tax-exempt and government entities."

Counts Three, Four and Five of the Indictment allege that MUBAYYID made and filed false tax returns for Care for calendar years 1997, 1999, and 2000 by never revealing to the IRS that Care was engaged in activities involving the solicitation and expenditure of funds to support the mujahideen and promote jihad.

The last count of the Indictment alleges that on April 7, 2003, MUNTASSER made false statements to the Federal Bureau of Investigation by stating that he had not traveled to Afghanistan in 1994. It is alleged that in fact, MUNTASSER had traveled to Pakistan and Afghanistan in 1994 in furtherance of Care's activities.

MUNTASSER and MUBAYYID were arrested this morning on the charges and appeared in federal court in Worcester before U.S. Chief Magistrate Judge Charles B. Swartwood, III. MUNTASSER was ordered released to home confinement with electronic monitoring. MUBAYYID is being detained pending a detention hearing scheduled for Monday, May 16, 2005 at 11:00 a.m. If convicted, MUNTASSER and MUBAYYID each face up to 5 years in prison on each of the Engaging in a Scheme to Conceal Material Facts from the United States and Conspiring to Defraud the United States counts. MUBAYYID also faces up to 3 years in prison on each of the three False Tax Return counts; and MUNTASSER faces up to 5 years in prison on the False Statements count.

The investigation is continuing.

The case was investigated by the Federal Bureau of Investigation, the U.S. Internal Revenue Service, Criminal Investigation, and Immigration and Customs Enforcement. It is being prosecuted by Assistant U.S. Attorneys Michael D. Ricciuti and B. Stephanie Siegmann in Sullivan's Anti-Terrorism and National Security Unit.

The details contained in the Indictment are allegations. The defendants are presumed to be innocent unless and until proven guilty beyond a reasonable doubt in a court of law.

Press Contact: Samantha Martin, (617) 748-3139

Articles: News & Opinions

# GLOBE GIVES UNION SWEETEST DEAL EVER; GLOBE GIVES TRAVEL WRITER SWEETEST BUM DEAL EVER; RIGHTS FOR JIHADIS; AND SO FORTH

*by Dig Staff*
Issue 8.42
Wed, October 18, 2006

**THE MEDIA WORLD WAS ABUZZ** last week with news of the contract the ***Globe*** was trying to cram down the throats of their writers. According to an ***Editor & Publisher*** report, a provision in the contract would tie all future salary increases to print revenues at the *Globe*, though rising revenues at **Boston.com** won't count. So no raise unless the paper itself makes more money. Which is sort of like saying, "Jimmy, you can have a cookie as soon as you can find a shark willing to fuck this cat."

The news created something of a revolt at *Globe* HQ, with 194 staffers signing a petition opposing the contract. Among those involved are some of the best writers the *Globe* has, such as movie critic **Ty Burr**, arts critic **Geoff Edgers**, political reporter **Frank Phillips**, Pulitzer-winning science writer **Gareth Cook**, ***Globe Mag***'s **Charlie Pierce** and ace political columnist **Scot Lehigh**.

"I've never seen people this agitated before," one staffer told the Farm. "It's sort of a future-of-newspapers question."

The thinking behind all the bad feeling is that revenues at actual newspapers aren't exactly going to skyrocket in the coming years, and that, according to a staffer, "If we are alive in 10 years, it's because we have a healthy online operation." Furthermore, an increasing number of writers are being compelled to blog for Boston.com and aren't being paid extra for it. So basically, you're required to blog for free, and if your blog takes off, you won't be compensated for it.

The contract—which the Boston Writers Guild is apparently pushing pretty hard, out of fear that the management's going to start swinging around the layoff option—will be put to a vote on October 18. Follow the *Dig*'s blog for updates.

***

**MEANWHILE**, as further evidence that Boston's becoming increasingly inclement to writers, the *Globe* recently severed its relationship with Amherst-based freelance travel writer **Eric Goldscheider** after it

was discovered that Goldscheider runs **benlaguer.com**, a website dedicated to vindicating convicted rapist **Ben LaGuer**. Yes, that Ben LaGuer: the same guy **Deval Patrick**'s presently getting creamed for going to bat for.

According to sources close to the action, the *Globe* was afraid it would get embarrassed (the *Herald*'s name came up here) if its writer's controversial extracurricular activities were discovered, even though he's a travel writer.

For what it's worth, Goldscheider's last *Globe* piece was about a puppet museum. And if you can find a hidden message about Ben LaGuer in here, you deserve **a half-assed media column of your own**: "The setting is about as unassuming as the name is grand. The four small galleries and gift shop of the Ballard Institute and Museum of Puppetry are strung through ordinary rooms of what was once a residential cottage for the mentally retarded."

***

**WE WERE LOOKING AT THE LATEST *IMPROPER***, and ... does this passage depress the shit out of anyone else? It's from the mag's "primer for the solitary eater." Here's the offending line: "Most places that welcome solo diners also welcome their laptop computers. Hop online and you're no longer alone. Nobody's alone on the internet."

Sure, nobody's alone on the internet! You're *surrounded* by friends when you're on the internet. Right? *Right?* OH GOD WE'RE SO FUCKING ALONE!

***

**EVERYBODY KNOWS** that questioning the government helps the terrorists, but ***Phoenix* "Freedom Watch" columnist Harvey Silverglate** has done Everybody one better: He's literally helping the terrorists.

Silverglate and **Susan Estrich**, the former campaign manager for **Mike "Tank Commander" Dukakis**, are serving as the defense lawyers for a Brookline man accused of raising money for a charity that has funneled money to jihadist and mujahedin causes. Silverglate and Estrich don't deny that the charity is tainted; instead, they're arguing that the First Amendment protects their client's right to finance jihad:

> Religion permeates this entire case. Care was set up to advance religious goals; jihad is a religious concept; zakat (giving to charity) is a religious obligation; support for the mujahedin is, according to certain interpretations of the Koran, a religious command. It is absolutely clear that the government is not free to prefer one religion over another: If Jews and Catholics are free to raise money and support their chosen causes domestically and internationally, no different rules

> may be applied … At the heart of this case is the right of an established religious charity to collect funds and distribute literature. That right has been repeatedly reaffirmed by the Supreme Court, even where municipalities and other local governments found the message of the charities offensive and their fundraising downright reprehensible. That speech protection is at its greatest when the underlying cause is religious in nature; and it does not matter that solicitation of funds is involved.

**CBS analyst Jon Keller**'s reaction: "Your donation for tree-planting in Israel, or that contribution you made for Katrina relief at Mass? The same as funding jihad. Incredible."

Media Farm's take: While lawyers have the right to defend terrorist fundraisers, do we really want one as our governor?

***

**DEAR *HERALD***, whoever's idea it was to use this uproariously inappropriate sad-sack photo of the late **Cory Lidle** on Page 1 deserves a raise, so he has money to buy Gatorade as he burns in hell for it. It's almost as offensive as the first Lidle joke we heard after the crash: "That kid really brought the high heat."

***

**FINALLY, WE LEAVE YOU** with this characteristically good passage from *Globe* campaign columnist **Dan Payne**'s October 12 piece, which we sort of dug:

> **12-step process**. In campaigns I know, for Kerry and Mike Dukakis, there's a pattern to how Democrats react when attacked. It's 12-step process: 1) I can't believe (opponent) is doing this. 2) I won't dignify it with response. 3) People won't believe it. 4) Press won't let them get away with it. 5) Press is letting them get away with it. 6) People are believing it. 7) I didn't do anything wrong. 8) If it looks like I did something wrong, it's because other side is distorting facts. 9) Let's not panic until we see poll. 10) Don't let anyone see these poll results. 11) If they're going to cheat like this, find something on them. 12) Let's attack them. Note: Republicans skip first 11 steps.

» Read more "news + opinions" from our archive

November 2006
Next Month »

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

## Search for events

By Keyword
By Category

GO

*Copyright © 2006 Metrocorp Inc, All Rights Reserved.*

http://cbs4boston.com/kellerblog/local_blogentry_284130545.html

The Right To Wage Jihad

Oct 11, 2006 1:06 pm

That's what two prominent defense lawyers – including Susan Estrich, a nationally-known liberal pundit and the campaign manager for the 1988 Democratic presidential nominee – claim the Constitution guarantees.

No, we couldn't possibly make this up. The Worcester Telegram reports that Estrich and civil-libertarian Harvey Silverglate have filed a motion in federal district court to dismiss an indictment against Emadeddin Z. Muntasser on charges he misled the government about the activities of a "charity" he ran, which the government alleges was a fundraising vehicle for jihadist and mujahedin groups. According to the FBI, the "charity," Care International, was an offshoot of the Al-Kifah Refugee Center," an organization tied to the 1993 World Trade Center bombing.

Estrich and Silverglate appear to be arguing that jihad is a constitutionally-protected right. "Religion permeates this entire case," they write in a court filing. "Jihad is a religious concept… It is absolutely clear that the government is not free to prefer one religion over another: If Jews and Catholics are free to raise money and support their chosen causes domestically and internationally, no different rules may be applied."

Your donation for tree-planting in Israel, or that contribution you made for Katrina relief at Mass? The same as funding jihad. Incredible.

Email Jon your comments and feedback

Who is this singer?
Answer for a FREE* Sidekick® 3!
P. Diddy
Usher
Snoop D
* see offer details
©2006InternetOpinionGroup.com

J. Grant Swank  AUTHOR · COLUMNIST · PASTOR

Tuesday, May 17, 2005

# MUSLIM CHARITY A FRONT FOR MURDERERS GLOBAL?

J. Grant Swank, Jr.

"Two former officers of a U.S.-based Islamic charity were indicted on federal charges accusing them of lying to authorities investigating the charity's alleged ties to terrorist organizations," reports Theo Emery for the Associated Press.

It gets murky. It's Muslim mess-up in Boston. And it's just the start.

Care International. Sound legit? Sound compassionate? Sound on the up-and-up? Not.

Emadeddin Muntasser headed Care International. Muhammed Mubayyid was his right hand man — the treasurer for Care International.

They both were taken to police headquarters. Then they were charged with "concealing information from federal agencies, conspiring to defraud the United States, and making false statements to the FBI. The charity is now defunct."

Good. Just in time.

Money flows from good-hearted American purses for

PREVIOUS POSTS

AFRICA: BUSH GETS AHEAD OF GLOBAL MURDERERS
BUCHANAN IS WRONG. CONSERVATISM IS NOT PAST TENSE
JORDAN: MUSLIM LEADERS JUST DON'T KNOW HOW TO BE HAPPY
KUWAIT FEMALES CAN NOW VOTE
ISLAM: CALL IT A CULT AND SHUT IT DOWN!
ETHIOPIA: ONBOARD THE VOTING TRAIN!! DEMOCRACY POPULAR
RICE: 'REMARKABLE' RE NEW IRAQ
REPUBLICANS: UNITE FOR THE NUCLEAR OPTION. . .FILIBUSTER OUT!
RECENT STUDY: ABORTION ENDANGERS NEXT CHILD
IMMIGRATION: TOO BAD THAT MEXICO'S FOX IS TICKED

humanitarian assistance that is in reality coin spillage into Judas' purse. The moneys are used to kill off non-Muslims — infidels. It's used to murder the apostate. It's the cash needed to do in the Allah enemies.

"'Organizations that conceal their true activities to abuse our tax laws, and in this case fund their support of the mujahideen and jihad, will be prosecuted to the fullest extent of the law,' said U.S. Attorney Michael Sullivan."

Fine. More power to you, Mr. Sullivan. More power to you.

And what you are going to uncover is just the tip of the iceberg here in the grand USA. Muslim groups are infiltrating all over the place to take over. It's the mandate from their deity as stipulated in their so-called Holy Book — the Koran.

Of course, Islam's deity is Lucifer. Their so-called Holy Book is unholy in that it has been dictated by hell's demons. It is in fact the killing manual for doing away with the global citizenry except for Muslims. That's it. Islam: the only religion on the planet that has as its prime endeavor obliterating all but Islamics.

Buddhism, Hinduism, Confucianism, Shintoism, Judaism, and Christianity are world religions. But none of them exist to kill, slaughter and lay low mortals. However, Islam is unique in that it is not so much a religion as a killing cult.

In America, the authorities do away with killing cults. Therefore, as soon as the powers-that-be get the truth about Islam — instead of calling it a "peace religion" — the nation will shut down Islam as the murdering machine that it really is.

Islam has nothing to do with peace. It has nothing to do with humanitarianism. It is all about doing away

with non-adherents. Allah demands it. The Koran demands it. The clerics preach it. The mosques are waiting stations for it all to happen.

Therefore, when Mr. Sullivan and legal crew go forth to put these two Muslims behind bars, they will have come upon simply the symbolic representatives of Muslim corruption aplenty.

"The indictment and arrests were disclosed the same day Muntasser was scheduled to have a hearing in federal court on his application for U.S. citizenship. U.S. District Judge Rya Zobel held off on ruling on the application."

Did you get that? Muntasser was going to legitimatize his criminality by positioning himself as a law-abiding United States citizen. How many more are there just like him? Too many, that is for certain. And their number is growing as more and more illegal immigrants flood across our borders. It's happening as we breathe.

"Muntasser's attorney, Jeremiah Friedman, declined to comment after a brief closed-door meeting about the case with prosecutors and Zobel. Both men appeared in U.S. District Court in Worcester. Muntasser was ordered released to home confinement with electronic monitoring. Mubayyid's detention hearing is scheduled for Monday.

"Reached by phone at his home late Thursday, Muntasser declined to comment, saying he may make a statement on Friday through his attorney. A message left at a phone number for Jumana Munlla, who is listed as Mubayyid's wife in his bankruptcy filing in U.S. Bankruptcy Court in Worcester, was not immediately returned."

And so the beat goes on. . .and on. . .and on.

America the beautiful. America the land of the free and the brave. America the land now being

undermined by a cult that sets its goal of slaughtering every American who does not bow down to Allah and confess him as deity worshiped.

And for those Muslims who do not squeal on their infidel neighbors? They are renegades and must be put away by zealot Muslims — the truly devout. Is this a peace religion? Not. It's a killing cult that must be shut down by America yesterday.

"Muntasser, 40, the owner of the Logan Furniture chain and a Libyan national, was a founding president of the Boston-based charity Care International. The organization, which is not affiliated with the global relief group CARE International, has been scrutinized because of its links to groups that support terrorism.

"Mubayyid, 40, Care's treasurer, has been employed by a software firm that was in the news two years ago after federal agents searched its offices as part of an investigation into funding of terrorist groups.

"Care International says in its promotional materials that it was formed to help war orphans, widows and refugees in Muslim nations. According to the indictment, Care was raising and spending money to support and promote mujahideen fighters and jihad, and published a pro-jihadist newsletter. It didn't reveal those activities in its tax forms and didn't reveal its links to Al-Kifah."

How interesting. Helping orphans and widows and the destitute and so forth and so forth? Just what Americans open their pocketbooks for. For sure. That's the American way, after all.

So how many more Care clones are there from sea to shining sea? And how many more neighborhoods are being infiltrated by Muslims seeking US citizenship in order to squash the neighborhood? And how many more Islamics are set to pray five times daily in order to beseech Allah's power thrust through their

swords? It's a killing cult. It must be shut down by American authorities — like yesterday.

"Muntasser also failed to tell the FBI's Joint Terrorism Task Force in a 1999 interview about the group's support for jihad, and didn't mention that on a trip to Pakistan several years earlier, he also traveled to Afghanistan.

"Muntasser has described his work with Care as humanitarian."

There you have it. Muslim liars. Muslim stealers. Muslim frauds. Muslim US citizen applicants. Muslim businessmen in our neighborhoods who are collecting moneys from well-meaning Americans — all to slaughter those very same Americans.

America: wise up before it's too late. This is just the tip of the iceberg. Just the tip.

Stay tuned.

POSTED BY J. GRANT SWANK, JR. AT 3:34 PM

<< Home