UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                            )
            v.              )    Crim. No. 05-40026-FDS
                            )
MUHAMED MUBAYYID, and       )
EMADEDDIN Z. MUNTASSER,     )
                            )
            Defendants.     )

## GOVERNMENT'S MEMORANDUM AND OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

The United States, by and through its attorney, Michael J. Sullivan, the United States Attorney for the District of Massachusetts, and Aloke Chakravarty and B. Stephanie Siegmann, Assistant United States Attorneys, hereby responds to the Defendants' motion to dismiss dated October 5, 2006. For the reasons stated herein, and in the accompanying affidavits[1], the Government respectfully requests that the Defendants' Motion be denied.

## INTRODUCTION

As alleged in the Indictment, in the early 1990's, defendant Emmadeddin Muntasser ("Muntasser") was involved in operating the Boston branch office of the Al-Kifah Refugee Center ("Al-Kifah"). Al-Kifah supported Muslim holy warriors ("mujahideen") engaged in violent, religiously-based military conflict overseas ("jihad").

---

[1] See Affidavits of Special Agent Lauren Youngquist ("Youngquist Aff.") and Sealed Affidavit of Special Agent James Marinelli ("Marinelli Aff.") filed herewith.

1

Al-Kifah also published a pro-jihad newsletter called "Al-Hussam," an Arabic term meaning "the Sword."

In April 1993, after media reports linked the New York office of Al-Kifah to the 1993 World Trade Center bombing, Muntasser founded and incorporated Care International, Inc. ("Care"), in Massachusetts, and served as its president. Muntasser represented in Care's articles of incorporation that it was "organized exclusively for charitable, religious, educational, and scientific purposes . . .". In June 1993, Muntasser then filed an IRS Form 1023, Application for Recognition of Exemption under Section 501(c)(3) of the Internal Revenue Code ("1023 Application") with the Internal Revenue Service ("IRS") seeking to exempt Care from taxation on the grounds that it was a charitable organization. To obtain this exemption, Muntasser was required to furnish complete and truthful information to the IRS in the 1023 Application. Muntasser stated in the application that Care would provide charitable services such as "assistance to victims of natural and man-made disasters . . . primarily in Bosnia and later in African countries . . . [and] develop a program for orphan sponsorships." Muntasser also stated that Care was not an "outgrowth of (or successor to) another organization." Finally, Muntasser stated under the pains and penalties of perjury that the application was "true, correct and complete." Based on Muntasser's statements

signed under penalty of perjury, the IRS granted Care tax exempt status.

Contrary to Muntasser's statements in the application, Care was, in fact, a successor to, Al-Kifah. Like Al-Kifah, Care solicited and spent money to support and promote Muslim holy warriors engaged in armed conflict overseas.  Care was initially located at Al-Kifah's Boston office, distributed pro-Jihad publications, and assumed publication of Al-Kifah's pro-Jihad newsletter, Al-Hussam ("The Sword"). Had Muntasser disclosed in the Form 1023 that it intended to solicit and spend money to support and promote Muslim holy warriors engaged in armed conflict overseas, the IRS would not have granted it tax-exempt status.[2]

After obtaining its tax-exempt status, Care published articles about the military operations and activities of the mujahideen on its website and solicited tax-deductible donations to support the mujahideen.  It also published and distributed an English translation of "Join the Caravan," a pro-jihad book authored by Abdullah Azzam.

Between 1993 and 2002, Muntasser and defendant Muhamed

---

[2]As described in the indictment although some of Care's activities may have been legitimate charitable activities, a substantial part of their activities were in fact solicitation of money for the purpose of supporting jihad – a fact, which if known to the IRS, would have resulted in a denial of Care's applications for tax exempt status.

Mubayyid ("Mubayyid"), Care's treasurer, filed annual tax returns on IRS Forms 990 ("990 tax returns") in which they stated that Care distributed money for various charitable purposes, including assistance to orphans and widows, food distribution, and welfare assistance.  They never disclosed in these reports that Care was soliciting and spending money to support and promote Muslim holy warriors engaged in armed conflict overseas.  Had they done so, the IRS would not have continued to accord them tax exempt status.

As a result of these allegations, the Grand Jury returned an indictment on May 11, 2005, charging both defendants with a scheme to conceal material facts, in violation of 18 U.S.C. § 1001(a)(1) (Count One), and conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (Count Two).  The grand jury also charged Mubayyid with three counts of filing a false tax return, in violation of 26 U.S.C. § 7206(1) (Counts Three - Five), and charged Muntasser with one count of making false statements, in violation of 18 U.S.C. § 1001(a)(2) (Count Six).

Defendants have now moved pursuant to Federal Rule of Criminal Procedure 12(b)(6) to dismiss all six counts of the indictment. The defendants' motion advances several fragmentary arguments why the indictment in this case is defective. Essentially they assert four bases for the indictment to be dismissed: (1) the First Amendment prohibits prosecution of the

defendants; (2) the defendants were not on fair notice of the proscribed activity and the activity is constitutionally vague; (3) the IRS could not have denied the defendants' organization a tax exemption as a matter of law; and (4) the defendants are being selectively prosecuted for an impermissible reason.

Defendants' motion in its entirety lacks merit and should be denied. The indictment does not violate defendants' First Amendment rights because they are not being prosecuted for their religious beliefs or speech but for concealing facts from the government in Care's application for tax-exempt status and its tax returns. The IRS' regulations put the defendants on fair notice that concealing those facts was a crime, and neither the First Amendment nor the IRS' own regulations precluded the IRS from taking those facts into consideration in deciding whether to grant and continue to grant Care tax-exempt status. Finally, the defendants have failed to meet their heavy burden of establishing by clear evidence that their prosecution had a discriminatory effect and was motivated by a discriminatory purpose. Consequently, the motion should be denied.

<u>**ARGUMENT**</u>

**I. THE INDICTMENT PASSES FIRST AMENDMENT SCRUTINY**

**A. STANDARD OF REVIEW**

The Federal Rules of Criminal Procedure permit a defendant to "raise by pretrial motion any defenses, objection, or request

that the court can determine without a trial of the general issues." Fed.R.Crim.P. 12(b)(2). When considering a motion to dismiss an indictment, a court assumes all facts in the indictment are true[3] and must view all facts in the light most favorable to the government. United States v. Sampson, 371 U.S. 75, 78-79 (1962). Consequently, arguments raised in a motion to dismiss that rely on disputed facts should be denied. United States v. Covington, 395 U.S. 58, 60 (1969).

**B.    THE CHARGING STATUTES ARE BEING APPLIED CONSTITUTIONALLY TO THE CONDUCT ALLEGED IN THE INDICTMENT.**

The defendants claim that the government has applied the charged statutes in a constitutionally impermissible manner. A challenger to the constitutionality of a statute must demonstrate that "no set of circumstances exist under which the Act would be valid." United States v. Salerno, 481 U.S. 739 (1987); Kolender v. Lawson, 461 U.S. 352, 358 n.1 (1983). The defendants cannot substantiate such a claim with respect to conspiracy or false statements charges.[4] Because the allegations contained in an

---

[3]The definitions contained in the indictment are binding upon the court at this stage of the proceedings. See United States v. Sattar, 314 F.Supp.2d 279 (S.D.N.Y. 2004)(refusing to strike indictment's definition of jihad and related terms)

[4]The defendants likewise have not demonstrated standing to contest the restriction of Care's First Amendment Rights. The defendants gloss over this fundamental constitutional distinction. It goes without much elaboration, that in order to assert a violation of a constitutional right, one must have adequate standing to claim that their own right was violated.

6

indictment are considered to be true for purposes of a motion to dismiss, factual issues involving varying interpretations must be resolved at trial.  <u>See</u> <u>United States v. Sattar</u>, 314 F. Supp. 2d 279 (S.D.N.Y. 2004)(refusing to strike indictment's definition of jihad and related terms); <u>United States v. Goba</u>, 220 F. Supp. 2d 182 (W.D.N.Y. 2002)(admitting evidence of defendants' interpretation of jihad such as publications and recordings); <u>United States v. Benkahla</u>, 2000 WL 35455044 (E.D.Va. 2000)(same).

Defendants' assertion that Care -- and they themselves through Care -- was engaged in religious activity does not mean that this prosecution implicates their Free Exercise rights. That is because defendants are charged with fraud and lying, and even defendants do not claim that fraud and lying were part of their religious practice or beliefs.[5]  Committing fraud upon the government is not protected activity, and that the fraud incidentally includes the defendants' speech, or is driven by the

---

<u>Warth v. Seldin</u>, 422 U.S. 490, 498 (1975)(explaining that standing is a threshold question in every federal case); <u>see also</u> <u>United States v. Payner</u>, 447 U.S. 727 (1980)(a criminal defendant lacks standing to object, pursuant to Fourth Amendment, to documents unlawfully seized from another person).  The defendants cannot assert Care's constitutional rights on their own behalf. <u>See</u> <u>Wine and Spirits Retailers, Inc. v. Rhode Island</u>, 418 F.3d 36, 49 (1st Cir. 2005)("A party ordinarily has no standing to assert the First Amendment rights of third parties.")(<u>citing</u> <u>Eulitt v. Me. Dep't of Educ.</u>, 386 F.3d 344, 351 (1st Cir. 2004)).

[5]<u>See</u> <u>Church of Scientology v. Commissioner</u>, 83 T.C. 381, 506 (1984)("Were we to sustain petitioner's exemption, we would in effect be sanctioning petitioner's right to conspire to thwart the IRS at taxpayer's expense.")

defendants' interpretation of their religion, does not change the constitutionality of the prosecution.  See United States v. Lanier, 920 F.2d 887, 893 (11th Cir. 1991)("an overt act need not be criminal, and may indeed by otherwise innocent"); United States v. Al-Arian, 308 F. Supp. 2d 1322, 1342 ("The reason that an overt act can include even protected speech is that it is the agreement that is punishable in a conspiracy charge and not the overt act itself.")

It is axiomatic that several crimes are committed through speech. Conspiracies are characteristically committed through speech, whether they are to commit violence, narcotics trafficking, or to violate the tax laws.  See, e.g., 18 U.S.C. §§ 371, 373(a); 21 U.S.C. § 846; see United States v. Rahman, 189 F.3d 88, 117 (2nd Cir. 1999)(defendant's speech and religious conduct did not immunize him from prosecution);[6] United States v. Rowlee, 899 F.2d 1275, 1278 (2nd Cir. 1990)(First Amendment inapplicable to tax protester).  However, if the evidence shows

---

[6]In denying Sheikh Rahman's motion to dismiss, District Court Judge Mukasey stated quite aptly:
> To be sure, [the crimes charged], like most others, may have a component of speech in the course of their commission. Indeed, it is the rare offense, particularly the rare conspiracy or aiding and abetting offense, that is committed entirely in pantomime.  However, that speech – even speech that includes reference to religion – may play a part in the commission of a crime does not insulate such crime from prosecution. '[S]peech is not protected by the First Amendment when it is the very vehicle of the crime itself.'
1994 WL 388927 at *1-2 (S.D.N.Y. July 22, 1994)(Mukasey, D.J.)(denying motion to dismiss based on First Amendment claims).

that the speech crosses the line into criminal solicitation, procurement of criminal activity, or conspiracy to violate the laws, the prosecution is permissible.  See United States v. Spock, 416 F.2d 165, 169-171 (1ˢᵗ Cir. 1969); McConnell v. Fed'l Election Comm'n, 540 U.S. 93 (2003)(holding that soliciting and donating funds is more like expressive conduct than pure speech); Buckley v. Valeo, 424 U.S. 1, 20-21 (1976).  The defendants' solicitations for money for the mujahideen are simply not immune from prosecution by committing their crimes through, or for, political or religious activity.

> **1.    THE CONDUCT BEING PROSECUTED IS CONCEALING MATERIAL INFORMATION FROM THE GOVERNMENT.**

The point of this prosecution is that the defendants concealed from the government crucial information which could have affected the IRS determination of Care's tax exemption status. See Spies v. United States, 317 U.S. 492, 499 (1943)(defining tax evasion as "any conduct, the likely effect of which would be mislead or conceal."); United States v. Hurley, 957 F.2d 1, 3 (1ˢᵗ Cir. 1992).  That the activities which the defendants concealed have religious overtones is of no significance.[7]  Lying to the government was not a First Amendment

---

[7] The defendants' organization was not organizationally or operationally created for, or engaged, in exclusively charitable purposes.  If they had disclosed the information necessary for the government to realize this, they would not have received a tax exemption.  The defendants' purposes of raising funds for the mujahideen, was a substantial non-charitable purpose, if not also

protected activity. <u>See</u> <u>e.g.</u> <u>United States v. Lindh</u>, 212 F. Supp. 2d 541, 567 (E.D.Va. 2002)("Discriminatory purpose cannot be inferred from a recitation of historical facts that merely provide context for criminal charges").

Significantly, in Care's 1023 Application and subsequent Form 990 tax returns, the defendants never mentioned that there was anything religious about their organization.  Nor did the defendants file with the IRS as a church or religious organization.[8]  In their tax filings, the defendants omitted any reference to any religious justifications for their activity, which they raise now for the first time.  They did not mention that they would engage in any activity that was religiously inspired, including publication and distribution of materials which solicited money for armed fighters in overseas conflicts, in the name of their religion.  There was no reference to jihad or mujahideen in any document filed with the government.

_____

independently illegal.

[8]When filing for IRC section 501(c)(3) status, the IRS Form 1023 instructions which were applicable in 1993 lists the requirements for *religious* organizations:
"To determine whether an organization meets the religious purposes test of section 501(c)(3), the IRS maintains two basic guidelines,
1) That the particular religious beliefs of the organization are truly and sincerely held.
2) That the practices and rituals associated with the organization's religious belief or creed are not illegal or contrary to clearly defined public policy."  <u>See</u> IRS. Pub. 577: Instructions Section 501(c)(3) organizations, p. 23.

Criminally defrauding the government is not protected by the First Amendment.  Employment Div., Dept. Of Human Resources v. Smith, 494 U.S. 872, 878-879 (1990)("We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate."); Welch v. United States, 750 F.2d 1101, 1107 (1st Cir. 1985)(holding that First Amendment does not protect someone who assists in the creation of an operation of a tax evasion scheme).

The defendants' argument leads to the absurd conclusion that any crime should be immune from prosecution if done in the name of religion, or through the medium of speech.  The defendants in this case do not stand charged with illegally associating with any organization or entities, but rather are charged with concealing certain jihad-related activities from the IRS, which were material to the determination of whether they were entitled to a benefit that they ultimately received, a tax exempt status. See Boin v. Quranic Literacy Foundation for Relief and Development, 291 F.3d 1000, 1026 (7th Cir. 2002)("There is no constitutional right to provide weapons and explosives to terrorists, nor is there any right to provide the resources with which the terrorists can purchase weapons and explosives . . . Rather, such a [conspiracy charge] is aimed at prohibiting the funding of violent acts that these organizations wish to carry

11

out.")  Where, as here, the defendants' conspiracy[9] involved

actions which transcended First Amendment protected activity, a

motion to dismiss on these grounds cannot lie.

   **2.   THE DEFENDANTS' ACTIVITIES DO NOT IMPLICATE THEIR FREE SPEECH RIGHTS.**

   The mere fact that speech is used to carry out a crime does

not prohibit prosecution.  See Wisconsin v. Mitchell, 508 U.S.

476, 489 (1993)("The First Amendment, moreover, does not prohibit

the evidentiary use of speech to establish the elements of a

crime or to prove motive or intent.").  A defendant has no First

Amendment right to make false, fraudulent and misleading

statements to third parties.  United States v. Rasheed, 663 F.2d

843, 846 (9th Cir. 1981)("The First Amendment does not protect

fraudulent activity performed in the name of religion.")(citing

Cantwell v. Connecticut, 310 U.S. 296 (1940)).  Similarly, as

detailed below, the Internal Revenue Code is not a restriction on

an individual's free exercise of his religion.  See Muste v.

Commissioner, 35 T.C. 913, 918-919 (1961)(clarifying that "[I]t

is [permissible] to impose a tax on the income or property of a

preacher.")

---

   [9] The indictment details many of Care's activities which the
defendants concealed from the government in obtaining tax
benefits.  For example, disseminating publications and statements
in support of sending money to mujahideen, and the use of zakat
as a vehicle to raise money to send to mujahideen were all
activities which were non-charitable in nature, and within the
scope of their criminal conspiracy.

Conspiracy to commit a crime, or to withhold information from the government in order to evade taxes, is not protected speech; it is an action, even if it consists of various instances of speech.  <u>See</u> <u>United States v. Rowlee</u>, 899 F.2d 1275, 1278 (2nd Cir. 1990)(First Amendment not applicable to conspiracy to defraud IRS where defendant demonstrated to others how to avoid taxes); <u>United States v. Schulman</u>, 817 F.2d 1355, 1359 (9th Cir. 1987); <u>United States v. Kellev</u>, 769 F.2d 215, 216-217 (4th Cir. 1985).

A defendant's speech is not protected if his actions go beyond mere words, and include affirmative conduct, including facilitating tax crimes.[10]  <u>See</u> <u>United States v. Kuball</u>, 976 F.2d 529, 531-532 (9th Cir. 1992)(holding First Amendment does not protect tax fraud).  Likewise, when speech, or religious activity, is combined with conduct, such as criminal conduct, it transcends the bounds of any First Amendment defense. <u>See</u> <u>Rowlee</u>, 899 F.2d at 1279-80; <u>United States v. Freeman</u>, 761 F.2d 549, 552 (9th Cir. 1985)(holding First Amendment question was for jury to decide).

Finally, as discussed in greater detailed below, a defendant

---

[10] "Speech is not protected by the First Amendment when it is the very vehicle of the crime itself . . . The gist of the crime of conspiracy is agreement to violate the law . . . Thus it is both possible and permissible to charge that criminal statutes were violated entirely by means of speech." <u>United States v. Rahman</u>, 1994 WL 388927,*1 S.D.N.Y. 1994).

whose speech is contrary to public policy, or incites imminent lawless action, including violating the tax laws, is also not protected by the First Amendment.  See Brandenburg v. Ohio, 395 U.S. 444, 448 (1969); United States v. Johnson, 952 F.2d 565 (1st Cir. 1991).

### 3.    DEFENDANTS' RIGHT TO FREE EXERCISE OF THEIR RELIGION WAS NOT RESTRICTED.

Similarly, defendants claim that this prosecution will impermissibly require the Court to determine whether certain practices -- such as contributing to armed struggle -- are part of the Muslim religion, but that is a red herring as well.  It makes no difference to this prosecution whether contributing to armed struggle is a religious practice of Muslims or anyone else. The IRS, could deny Care's application for tax exemption independent of infringing on their first amendment rights to free exercise of religion.  See United States v. Lee, 455 U.S. 252 (1982).  Accordingly, any conduct that impeded the IRS from performing its government functions in ascertaining whether an organization qualified for a tax exempt status could serve as the basis of a criminal prosecution.

Courts have long held, that the freedom of religion clause cannot be used as a blanket shield to prevent the government from inquiring into the possible existence of criminal activity. Davis v. Beason, 133 U.S. 333, 342-43 (1890). The watershed case in this area was Employment Division, Department of Human

14

<u>Resources of Oregon v. Smith</u> ("<u>Smith</u>"), 494 U.S 872 (1990), in
which the Supreme Court confirmed that strict constitutional
scrutiny does not apply to facially neutral laws.  Similarly,
this content-neutral prosecution does not warrant strict
constitutional scrutiny.

    This case does not hinge on the legitimacy of the
defendants' religion, nor the motivation for their actions.
Defendants' arguments notwithstanding, there is no recognized
"jihad" defense to soliciting support for overseas armed
conflict, nor for lying to the government.[11]  The IRS had a right
to know what activities Care was going to participate in so that
it could fairly determine whether Care was charitable.  If the
defendants' organization was truly a religious one, such as a
place of worship, additional information should have been
supplied on the IRS Form 1023, and a separate tax exemption
analysis would have applied.[12]  The defendants' beliefs are
immaterial to the critical question -- which is whether they

---

[11]A First Amendment protection simply does not apply in a
case where the defendants are not being prosecuted for their
speech or the practice of their religion.  <u>See</u> <u>United States v.
Rahman</u>, 189 F.3d 88 (2nd Cir. 1999)("If the evidence showed that
[the defendant] conspired [. . .] or solicited others to commit
crimes [. . .] -- it would not constitute a defense that he was
justified in doing so within a framework of Islamic law.").

[12]<u>See</u> 26 C.F.R. §1.501(a)-1(b)(1)(iii) (requiring detailed
information with respect to religious organizations' missions,
goals and organizational structure so that the IRS can determine
whether the organization is in fact a bona fide religious
organization eligible for tax-exempt status.).

disclosed sufficient, accurate information about their organization and its activities, which would allow the IRS to make a fulsome assessment of the charitable purpose and activities of Care.  See 26 C.F.R. § 1.501(c)(3)-1(b)(1)(v)(requiring submission of detailed statement of proposed activities.)  One cannot fail to disclose to the IRS that they were going to solicit money for armed fighters regardless of their religious beliefs.

**C.  IF THE COURT CHOOSES TO ENGAGE IN CONSTITUTIONAL SCRUTINY THEN THE IRS' RESTRICTIONS SHOULD NOT BE ANALYZED WITH GREATER THAN INTERMEDIATE SCRUTINY**

The court should not apply constitutional scrutiny in this case because the defendants First Amendment rights are not restricted by this prosecution.  Likewise, the defendants cannot claim the IRS unfairly restricted their First Amendment rights, because the IRS in fact granted them the tax exemption. However, if the Court embarks on constitutional analysis as to the potential government restrictions on the defendants, the appropriate standard of constitutional scrutiny, would be at most, intermediate scrutiny.  See Turner Broad. Sys. v. FCC, 512 U.S. 622, 661-662 (1994); United States v. O'Brien, 391 U.S. 367, 376-382 (1968); but also see Kleindienst, 408 U.S. 753 (applying rational basis review in rejecting First Amendment claims by citizens wanting to associate with a foreign journalist.)  Under intermediate First Amendment scrutiny, a law is constitutional

16

"if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." O'Brien, 391 U.S. at 377.  "To satisfy this standard, a regulation need not be the least speech-restrictive means of advancing the Government's interest. Rather, the requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation . . . [and does not] burden substantially more speech than is necessary to further the government's legitimate interest." Turner Broad. Sys., 512 U.S. at 662.  The tax code easily satisfies this analysis in this case.

Because the tax laws are not aimed at the expressive component of the defendants' conduct, intermediate scrutiny applies, because the regulation serves purposes unrelated to the content of expression.  Humanitarian Law Project v. Reno, 205 F.3d at 1135; United States v. O'Brien, 391 U.S. 367, 376-77 (1968).  The government action in this case satisfies this level of constitutional scrutiny because even if the government action narrowly restricts First Amendment speech or exercise of religion, it is being done for at least three compelling (rather

17

than merely substantial) state interests -- foreign policy,
national security, and the collection of taxes.  Here, the
ability of the IRS to preclude U.S. taxpayers from receiving a
tax exemption when they are soliciting money to support violent
combatants in holy war is a compelling, legitimate governmental
purpose, and it is largely the province of the executive to
enforce it.  See Boim v. Quranic Literacy Inst., 291 F.3d 1000,
1026 (7th Cir. 2002)("the government's interest in preventing
terrorism is not only important but paramount."); Nichol v. Ames,
173 U.S. 509, 515 (1899)("The power to tax is the one great power
upon which the whole national fabric is based.  It is as
necessary to the existence and prosperity of a nation as the air
he breathes to the natural man."); Regan v. Wald, 468 U.S. 222
(1984)("[m]atters relating to the conduct of foreign relations .
. . are so exclusively entrusted to the political branches of
government as to be largely immune from judicial inquiry or
interference.").

    Neither can the defendants find relief in Brandenburg v.
Ohio, 395 U.S. 444 (1969).  In Brandenburg, the Supreme Court
articulated a test to determine the constitutionality of the
regulation of content-specific advocacy which was directed at
inciting lawless acts.  Brandenburg, 395 U.S. 444.  In this case,
the prosecution is based on content-neutral statutes and
regulations, and is not directed at the defendants' advocacy.

18

See Madsen v. Women's Health Center, Inc., 512 U.S. 753
(1994)(holding whether motive or through some other mechanism,
disproportionate punishment for those who hold a certain
viewpoint does not render a statute content or viewpoint.)
Nevertheless, even under the Brandenburg analysis, the
defendants' solicitation of money for the global jihad would
otherwise qualify as incitement of imminent lawless conduct and
would be likely to result in such conduct.[13] See United States v.
Al-Arian, 308 F. Supp. 2d 1322 (M.D. Fl. 2004); see also United
States v. Lindh, 212 F. Supp. 2d at 569 ("Those who choose to
furnish such material support to terrorists cannot hide or shield
their conduct behind the First Amendment."); see e.g. 18 U.S.C.
§2339B (Material support to terrorists), §956 (Conspiracy to
injure persons or damage property in a foreign country), §960
(Neutrality act); cf. Rev. Rul. 75-384 (urging demonstrators to
commit violations of local ordinances and breaches of public
order does not qualify for exemption under section 501(c)(3).).
The authority of the government to regulate matters affecting
threats to national security cannot seriously be questioned.[14]

_____

[13]See United States v. Fleschner, 98 F.3d 155 (4th Cir.
1996), cert. denied, 117 S.Ct. 2484 (1997); Colten v. Kentucky,
407 U.S. 104 (1972).

[14]There is precedent in similar regulatory schemes for such
restriction, for example, the State department can revoke a
passport based on the risk that a holder's activities may cause
in the realm of foreign policy or national security.  See Haig v.
Agee, 453 U.S. 280 (1981); Gillars v. United States, 182 F.2d 962

It is axiomatic that soliciting money for the *mujahideen* is likely to result in the receipt of and the transference of money destined for the mujahideen. This would be contrary to law. The defendants' solicitations for funding for these purposes clearly satisfies the most rigorous First Amendment Analysis.

**II. THE DEFENDANTS WERE GIVEN FAIR WARNING THAT THEIR CONDUCT WAS ILLEGAL**

**A. STANDARD OF REVIEW**

"Due process requires that a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal, for 'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'" <u>Buckley v. Valeo</u>, 424 U.S. 1, 77 (1976)(per curiam) (internal quotation marks and citations omitted). A criminal statute must "give fair warning of the conduct that it makes a crime." <u>Bouie v. City of Columbia</u>, 378 U.S. 347, 350-51 (1964); <u>McBoyle v. United States</u>, 283 U.S. 24, 27 (1931)(warning must be "in language that the common world will understand, of what the law intends to do if a certain line is passed"). The defendants claim that the rule of lenity entitles them to dismissal of the indictment.

The rule of lenity, a manifestation of the fair warning

---

(D.C. Cir 1950)('Axis Sally' case, affirming conviction propagandist for Nazis during WWII); <u>Harisiades v. Shaughnessy</u>, 342 U.S. 580 (1952)(upholding Alien Registration Act requirement that alien not advocate overthrow of U.S. government).

requirement, "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." United States v. Lanier, 520 U.S. 259, 266 (1997).  However, the constitutional doubt doctrine and the rule of lenity enter into play only when no other means is available to resolve statutory ambiguity.  See United States v. Johnson, 529 U.S. 53, 59 (2000)("Absent ambiguity, the rule of lenity is not applicable to guide statutory interpretation.")  The touchstone inquiry is "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." Id. at 267.  The administrative interpretation of a statutory obligation, such as the IRS' regulation, is entitled to deference, and provides adequate notice, if the statute is deficient in this regard. Babbit v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 704 n.18 (1995).[15]

Finally, if the government proves a scienter requirement, that the accused knowingly committed the crime, the fair warning

_____

[15]Significantly, Congress expressly considered the risk of abusing the charitable exemption provisions of the tax code and enacted the "exclusively" language to avoid overly-liberal interpretations of charitable institution. See Senate Report No. 81-2375 at 29 (1950).  The IRC and regulations are broad in their scope of applicability, but are expressly authorized by the wide grant of authority to administer the tax laws.  See PGA Tour, Inc. V. Martin, 532 U.S. 661, 689 (2001)(stating "[t]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity.")

concerns are lessened, and hence raises the bar for a defendants' due process claim.  See Vill. Of Hoffman Estates v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499 (1982); United States v. Hussein, 351 F.3d 9, 14 (1st Cir. 2003)(citation omitted).

The Due Process concern is not that the defendant actually knew that he was committing this crime, but rather "that a legislature establish minimal guidelines to govern law enforcement." Kolender v. Lawson, 461 U.S. 352, 357-58(1983) (quoting Smith v. Goquen, 415 U.S. 566 (1974)).  In this case, the indictment states that the defendants knowingly and intentionally engaged in the proscribed conduct, hence as a factual matter, they knew the information that they were omitting would be material to the IRS, hence, that is why they omitted it - to obtain the tax benefit. See Vill. Of Hoffman Estates v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499 (1982); United States v. Hussein, 351 F.3d 9, 14 (1st Cir. 2003). This allegation, and the evidence of the defendants' awareness of their criminal exposure lessens any fair warning concerns. United States v. Ragen, 314 U.S. 513, 542 (1942).

Making material misrepresentations to the government is clearly proscribed conduct. See Broadrick v. Oklahoma, 413 U.S. 601, 610 (1973)("[E]ven if the outermost boundaries of [the statute] are imprecise, any such uncertainty has little relevance here, where [taxpayers'] conduct falls squarely within the 'hard

22

core' of the statute's proscriptions.") In this case, the
statutes and IRS regulations requiring full and accurate
disclosure of material information are crystal clear. See 26
C.F.R. §1.501(c)(3)-1(b)(v)("An organization must, in order to
establish its exemption, submit a detailed statement of its
proposed activities with and as part of its application for
exemption..."); United States v. Maxwell, 254 F.3d 21 (1ˢᵗ Cir.
2001)(holding publication in Federal Register satisfies
constitutional notice.). Similarly, the alleged *mens rea* in this
case is knowledge and intent, so the defendants have a harder row
to hoe because as a matter of fact, the indictment alleges that
they knowingly engaged in this scheme; indeed the defendants even
signed tax forms which iterated the questions that the IRS wanted
answered, and in which the defendants indicated that they shall
not lie.  See Vill. of Hoffman Estates v. The Flipside, Hoffman
Estates, Inc., 455 U.S. 489, 499(1982) (explaining that "a
scienter requirement may mitigate a law's vagueness, especially
with respect to the adequacy of notice to the complainant that
his conduct is proscribed"); United States v. Ragen, 314 U.S.
513, 542 (1942)("[a] mind intent on willful evasion is
inconsistent with surprised innocence.").

**B.    THE DEFENDANTS WERE ON FAIR NOTICE THAT THEIR
        MISREPRESENTATIONS WERE ILLEGAL**

The prosecution is based on the proposition that no person
is permitted to make material misrepresentations to the

23

government. 18 U.S.C. §§1001, 371; <u>see also</u> IRC §
501(c)(3)(organization must be exclusively for charitable
purposes); 26 C.F.R. §1.501(c)(3)-1 (interpretory regulations).
In the first instance, lying is *malum in se*, and all individuals
are on constructive, if not actual notice, that they are not to
conceal material information from the government. <u>See</u> <u>United
States v. Hussein</u>, 351 F.3d 9, 16 (1st Cir. 2003); <u>see also</u>
<u>Tillinghast v. Edmead</u>, 31 F.2d 81 (1st Cir. 1929)(describing
perjury as *malum in se*). Secondly, the statutory and regulatory
notice was not only clear based on the plain meaning of the
statutes, it was also actually provided and acknowledged by the
defendants in the forms that they completed.[16]

The type of information which the IRS felt was material was
also clear as a factual matter; indeed, the forms requested the
information explicitly. (<u>See e.g.</u> Form 1023, requesting detailed
description of the activity and operational information about the
organization, and the association of the organization with any
other organization). <u>Compare with</u> <u>United States v. Welch</u>, 750
F.2d 1101, 1112 (1985)(finding "frivolous, "self-assessment," and
"substantially incorrect" were "commonly-understood terms in the

---

[16]<u>See</u> Def. Exhibit 5, Form 1023 ("I declare under the
penalties of perjury that I am authorized to sign this
application on behalf of the above organization and that I have
examined this application, including the accompanying schedules
and attachments, and to the best of my knowledge it is true,
correct and complete." <u>See</u> <u>also</u> Pub. 577, Form 1023 Instructions.

context of the federal income tax laws so that a person
exercising ordinary common sense could know what conduct is
prohibited.") For example, the requirement that the defendants
provide a full and complete disclosure about their organization's
activities, and disclose their relationship with Al-Kifah was in
no way ambiguous. See United States v. Damrah, 334 F. Supp 2d
967, 979-982 (N.D.Oh. 2004)(holding that the defendant was put on
fair notice that he was obligated to notify the INS that he was
affiliated with Al Kifah Refugee Center when asked about his
affiliations.)

The defendants alternatively appear to claim that they were
deprived of due process in the administrative context, that is
the IRS did not fairly announce the type of conduct which a
501(c)(3) application was required to report to the IRS.
Assuming *ad arguendo* that the defendants have standing to raise
this issue, due process scrutiny is lesser at the administrative
level than in a criminal context. See e.g., Kokinda, 497 U.S. at
725; United States v. Mendoza-Lopez, 481 U.S. 828 (1987)
(affording due process right of review of administrative decision
only when the defendant was foreclosed from judicial review). The
executive is well within its discretion to decide which conduct
is entitled to special benefit.[17]  The IRS regulations that have

---

[17]Political questions are typically the province of the
Executive to resolve. See Haig v. Agee, 453 U.S. 280, 292(1981);
People's Mojehedin Organization v. Department of State, 182 F.3d

been uniformly applied and have operated successfully for several decades. In the context of an application for charitable exemption, there is no ambiguity as to whether the applicant is required to disclose any non-charitable activities in which they do or plan to engage, and whether they are a successor to another organization. See Reno v. ACLU, 521 U.S. 844, 871-72 (1997) (the vagueness inquiry is most rigorous in a criminal context, where there is a high risk speech will be chilled); Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982)("The degree of vagueness that the Constitution tolerates-as well as the relative importance of fair notice and fair enforcement-depends in part on the nature of the enactment."). In this case, the defendant's could have easily obtained clarification (and right to judicial review) of whether their activities were exclusively charitable by disclosing this information to the IRS, as they were required to do.

Finally, in this case, the indictment emphasizes that the defendants were aware of what type of information would be material to the government.  The defendants made the deliberate decision as to the type of activities that they wished to conceal from the government. Indeed, the defendants' decision to conceal their religiously motivated activities from the IRS was neither

17, 23 (D.C. Cir. 1999).

26

an accident nor mistake of fact.  After the then-recent World
Trade Center bombing of 1993, and the publicized links with Al-
Kifah, Muntasser chose to incorporate a new organization with no
connection on paper to Al-Kifah and file a 1023 application that
omitted any reference to Care's relationship to Al-Kifah or
Care's planned religiously motivated activities, designed to
support the mujahideen, to ensure that no decision-maker at the
IRS would deny Care's application for tax exempt status.[18]
Consequently, neither the indictment, nor the law and IRS
guidelines are in this regard, are unconstitutionally vague.

### III. THE IRS COULD HAVE CONSTITUTIONALLY DETERMINED THAT CARE WAS NOT ENTITLED TO A TAX EXEMPTION BECAUSE IT WAS NOT AN EXCLUSIVELY CHARITABLE ORGANIZATION

#### A.   DENIAL OF DEFENDANT'S APPLICATION WAS APPROPRIATE UNDER STATUTE AND REGULATIONS

The defendants curiously argue that the IRS *could* not have
denied the tax exemption to Care, consequently their omissions
and misrepresented activities could not, as a matter of law, be
material.[19]  Whether the IRS had the legal authority to deny

---

[18]The defendants did not make any religious references in
their Form 1023 application.  There is no mention of jihad or
mujahideen, or Islam or zakat in Care's description of its
purposes or activities to the IRS.  See Form 1023.  The
defendants' application also mentions Afghanistan as only one of
six areas in which they would be providing humanitarian
assistance.

[19]The defendants actually received the tax exemption which
they say that IRS could not constitutionally deprive them of;
consequently, the defendants' claim is moot.  See Dennis v.
United States, 384 U.S. at 867 (holding that defendant who

Care's tax exemption is irrelevant to the defendants' material
misrepresentations.  See Bryson v. United States, 396 US. 64, 71
(1969); United States v. Barra, 149 F.2d 489 (2nd Cir.
1945)(affirming §1001 conviction based on failure to disclose
membership in Nazi Party on a form which he claimed was invalid);
United States v. Holroyd, 732 F.2d 1122, 1127 (2nd Cir. 1984)(26
U.S.C. §7206 case); United States v. Parten, 462 F.2d 430, 432
(5th Cir. 1972)(affirming §1001 conviction even if Customs
service had no right to require defendants to execute form on
which they lied). Nevertheless, even on the merits of the
argument, the IRS surely could have denied them the tax benefit
if they were aware of the defendants' hidden activities, and
would have been obligated to do so.

The IRS has jurisdiction to determine whether an
organization is charitable within the meaning of the Internal
Revenue Code, and thus qualified for the benefits the Code
provides in support of charitable endeavors. The IRS applies
standards for determining the charitable organization tax
exemption that are detailed and time-tested, and require an
organization be both organized and operated exclusively for one

---

engages in "self-help" ... "may not escape the consequences by
urging that his conduct be excused because the [requirements]
which he sought to evade [are] unconstitutional" or unauthorized
by statute or regulation.)

or more of the purposes specified in I.R.C. 501(c)(3)[20];. <u>See Bob Jones University</u>, 461 U.S. at 597-598; <u>see also</u> 26 C.F.R. §1.501(c)(3)-1(a). The first prong of the test is whether the organization was organized exclusively for charitable purposes. 26 C.F.R. §1.501(c)(3)-1(c)[21]("The organizational test provides in general that an organization is organized exclusively for exempt purposes if its articles of incorporation limit it to exempt purposes and do not expressly empower it to engage, other than as an insubstantial part, in activities that do not further exempt purposes.")  The second prong of the test is whether the organization operated exclusively for charitable purposes.  26

---

[20]Section 501(C)(3) permits tax exempt status on the following types of organizations (emphasis added):

> Corporations, and any community chest, fund, or foundation, organized and operated **exclusively** for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

[21]26 C.F.R. § 1.501(c)(3)-1(b) states the Organizational test.  The Organizational test requires that the organization's founding documents (1) limit its purpose to "one or more exempt purposes," and (2) do not expressly empower the charity to engage in more than "an insubstantial part of its activities" in conduct that fails to further its charitable goals.

29

C.F.R. §1.501(c)(3)-1(a).[22]   If an organization fails either the

"organizational" or "operational" tests, it cannot qualify for

tax exemption under section 501(c)(3).[23] 26 C.F.R. §1.501(c)(3)-

1(a)(1).

Serving even one substantial non-exempt purpose will make an

organization ineligible for tax exempt status, even if all of its

other purposes are exempt.  Better Business Bureau v. United

States, 326 U.S. 279, 283 (1945).  Further, the requirements to

be organized and operated exclusively for I.R.C. 501(c)(3)

purposes continue after an organization's application is

approved.  Failure of an organization to operate for exclusively

I.R.C. 501(c)(3) purposes can result in revocation of exemption,

which will be applied retroactively when the activities differ

materially from the activities and operations the organization

described in its application.  See Freedom Church of Revelation

v. United States, 588 F.Supp. 693 (D.D.C. 1983)("Tax avoidance

_____

[22]26 C.F.R. § 1.501(c)(3)-1(c)(1) states:
Operational test-(1) Primary activities. An organization
will be regarded as operated exclusively for one or more
exempt purposes only if it engages primarily in activities
which accomplish one or more of such exempt purposes
specified in furtherance of an exempt purpose.


[23]In administrative proceedings contesting the propriety of
a denial of tax-exempt status, the petitioner bears the burden of
demonstrating that the tax exemption was improperly denied. See
I.R.S. Rule 217(C)(2)(A); Nationalist Foundation v. C.I.R., T.C.
Memo 2000-318, 2000 WL 1507460 (2000).  A criminal defendant
should similarly be compelled to proffer such justification, lest
they benefit from a lesser burden as a result of their
malfeasance.

schemes do not qualify as 'other exempt purposes.' Because more than an insubstantial part of its activities is not in furtherance of an exempt purpose, plaintiff has not met the 'operational test' set forth at 26 C.F.R. § 1.501(c)(3)-1(c)(1))."[24] Given this analytical framework, the IRS was well within its jurisdiction to determine that Care did not qualify as an exclusively charitable organization – provided defendants had given it an opportunity to fully do so by truthfully and completely describing its operations.

The legislative history of this provision also confirms the IRS is empowered to take on the time-tested task of determining whether an organization is charitable. See Bob Jones, 461 U.S. at 597-598. ("Guided, of course, by the Code, the IRS has the responsibility, in the first instance, to determine whether a particular entity is "charitable" for purposes of §170 and §501(c)3.") Since the Revenue Act of 1950, organizations who are seeking a tax exemption as a charitable organization are required

---

[24]The IRS engages in a quantitative as well as qualitative test to determine whether a non-charitable activity of an organization satisfies the "organizational test" by being substantial activity toward a non-exempt purpose. The IRS considered the question of substantiality of non-charitable activity in IRS General Counsel Memo 34631 (October 4, 1971), which stated: "[I]f only .01% of [a charitable organization's] activities were directed to robbing banks, it would not be exempt. This is an example of an act having a substantial non-exempt quality, while lacking substantiality of amount. *A very little planned violence or terrorism would constitute 'substantial' activities not in furtherance of exempt purposes.*" (Emphasis added)

to provide detailed specifics as to the nature of their organization.  See Section 341 Revenue Act of 1950, 994 Pub.L. 81-814.  That section provided, in pertinent part, that a charity must provide information about its finances to the revenue service, or face a penalty.  The legislative history to that Act makes clear that the reporting requirements were designed, in part, to determine whether the organization was engaged in any business which was not "substantially related" to the reasons why the organization was exempt.  See Senate Report No. 81-2375 at 29 (1950).  See also 26 C.F.R. 1.501(c)(3)-1(c)(No exempt organization may engage in a substantial amount of activity that does not further exempt purpose.) The House of Representatives was unequivocally concerned with the risk of abuse.[25]  The President's original request for the Congress to legislate in this arena similarly was unambiguously designed to prevent non-charitable activities of charitable organizations.[26]  In the Tax Reform Act of 1969, Congress enacted substantially the same

---

[25]See Statement of John W. Snyder, Secretary of the Treasury, testimony before the House Ways and Means Committee (1950)("The correction of present abuses [among educational and charitable institutions], which shift additional burdens to the rest of the population, becomes essential for reasons of equity. This calls for a solution which will elminate the abuse but will not interfere with the basic activities of these organizations.")
[26]Statement of the President to Congress (January 23, 1950)("Some tax loopholes have also been developed through the abuse of the tax exemption accorded educational and charitable organizations. . . . But the few glaring abuses of the tax-exemption privilege should be stopped.")

charitable organization standards as existed in 1993-2003.  <u>See</u>
The House Report on the Tax Reform Act of 1969, Pub.L. 91-172, 83
Stat. 487 (stating that the § 501(c)(3) exemption was available
only to institutions that served "the specified charitable
purposes," H.R.Rep. No. 413 (Part 1), 91st Cong., 1st Sess. 35
(1969), U.S.Code Cong. & Admin. News 1969, p. 1645, and described
"charitable" as "a term that has been used in the law of trusts
for hundreds of years." <u>Id.</u>, at 43, U.S.Code Cong. & Admin.News
1969, p. 1688.).

> **B.  IF THE IRS HAD DENIED THE DEFENDANTS' APPLICATION
> FOR TAX EXEMPTION, SUCH DENIAL WOULD HAVE BEEN
> CONSTITUTIONALLY APPLIED**

The IRS was also well within constitutional precedent to
deny Care a tax exemption if their activities were substantially
non-charitable, illegal, or contrary to public policy. <u>Better
Business Bureau v. United States</u>, 326 U.S. 279, 283 (1945).
Vagueness and overbreadth challenges to criminal statutes are
examined in light of the facts of the case at hand. <u>See</u> <u>Chapman
v. United States</u>, 500 U.S. 453, 467 (1991).  In an 'as applied'
scenario, a statute is void for vagueness if it reaches a
substantial amount of constitutionally protected conduct. <u>See</u>
<u>Jordan v. Pugh</u>, 425 F.3d 820, 828 (10th Cir. 2005).

In First Amendment cases, courts will not void a challenged
statute unless it is shown to embrace a substantial amount of
protected speech, judged in relation to the statute's plainly

legitimate sweep.  <u>Virginia v. Hicks</u>, 539 U.S. 113 (2000)(<u>quoting</u>
<u>Broaderick v. Oklahoma</u>, 413 U.S. 601, 615 (1973).  The IRS
plainly can legitimately grant and deny tax exemptions based on
the charitable nature of an organization's activities.  With
respect to the facts at hand, this scrutiny is easily satisfied,
first, because the regulatory action would occur independent of
the defendant's religion or free speech rights, but rather
because the defendants would be supporting violent combatants,
and because the vast majority of the tax-exemption determinations
are made in a constitutionally valid fashion, First Amendment
rights are not violated.

        In fact, tax fraud prosecutions based on a defendant's
speech have repeatedly been upheld as Constitutional.  <u>See</u>
<u>Freeman</u>, 761 F.2d at 552("Words alone may constitute a criminal
offense, even if they spring from the anterior motive to effect
political or social change.") When a taxpayer's exercise of
speech is so closely related to the commission of tax fraud, the
First Amendment does not protect such speech.  <u>United States v.</u>
<u>Holecek</u>, 739 F.2d 331, 335 (8th Cir. 1984)(holding First
Amendment inapplicable trial defense); <u>United States v. Barnett</u>,
667 F.2d 835, 842-43 (9th Cir. 1982). In fact, the government's
research has not revealed one case in which the Supreme Court has
held that the Free Exercise Clause requires the government to
grant a person an exemption from a generally applicable, neutral

tax law.  The defendants present a poor case to make new law.

The breadth of the IRS' discretion to determine that Care's activities are not "charitable" is not constitutionally overbroad.  See Bob Jones, 461 U.S. at 590. This argument fails because the IRS' regulations clearly permit it to examine the non-charitable nature of an organization before granting it benefits, and as described *infra*, because the IRS can take such action, even if it restricts a First Amendment protected activity.[27] See Prince v. Massachusetts, 321 U.S. 158 (1944) (finding no constitutional infirmity in "excluding [Jehovah's Witness children] from doing [in a child labor situation] what no other children may do.") Similarly, the defendants are not entitled to an exemption for soliciting money for fighters, when no other charitable organization would be.

The theory of prosecution, consequently, is not constitutionally overbroad, and does not capture pure First

---

[27]The government's public policy regarding funding mujahideen cannot have been more explicit since 1995.  Since Executive Order 12947, 60 Fed. Reg. 5079 (1995), which declared a national emergency with respect to the Middle East peach process, which threatened United States' national security, foreign policy and economy, the support of terrorist organizations has been closely regulated.  Pursuant to Executive Order 12947, the Secretary of Treasury was authorized to and did prohibit transactions with specially designated terrorists ("SDT").  Many former mujahideen groups are now SDTs.  The Department of Treasury's regulations promulgated to implement Executive Order 12947 are found at 31 C.F.R. 595.  Specifically, Section 595.408(a) prohibits charitable contributions to SDTs, including "donation[s] of funds, goods, services, or technology to relieve human suffering, such as food, clothing, or medicine."  This prohibition extends to inchoate offenses. 31 C.F.R. 595.205.

Amendment protected activity. <u>See</u> <u>Hammerschmidt v. United States</u>, 265 U.S. 182, 188 (1924)("To conspire to defraud the United States means primarily to cheat the Government out of property or money, but it also means interfere with or obstruct one of its lawful governmental functions by deceit, craft, or trickery, or at least by means that are dishonest."); <u>Welch v. United States</u>, 750 F.2d 1101, 1108-1110 (1st Cir. 1985)(holding that liability for a fraudulent tax return does not implicate and cannot be avoided by evoking the First Amendment); <u>United States v. Cambara</u>, 902 F.2d 144, 146 (1st Cir. 1990).  As the IRS clearly had the authority to regulate the charitable exemption given to Care, the charging statutes do not violate the protections of the First Amendment. <u>See</u> <u>New York v. Ferber</u>, 458 U.S. 747, 761-762 (1982)("It rarely has been suggested that the constitutional freedom for speech ... extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." <u>quoting</u> <u>Giboney v. Empire Storage & Ice Co.</u>, 336 U.S. 490 (1949).); <u>United States v. Rowlee</u>, 899 F.2d 1275, 1278 (2nd Cir. 1990)(holding First Amendment defense inapplicable to <u>Klein</u> conspiracy because the statute punishes the act of conspiracy and does not implicate speech).

      **C.**   **PUBLIC POLICY ALSO PERMITTED THE IRS TO DENY CARE TAX EXEMPT STATUS**

Finally, even under First Amendment analysis, the IRS could have denied Care an exemption on principles of public policy.  An

organization is not eligible to be tax exempt if the organization
engages in activities which are contrary to public policy.  See
IRC § 501(c)(3), Form 1023 Application; Rev. Ruling 71-447 (to
qualify for tax exempt status under Section 501(c)(3), an
institution must show that it falls within one of that section's
categories and its activities may not be contrary to public
policy.)  The seminal case involving the Supreme Court's
determination of whether certain activities of a charitable
organization warranted the revocation of tax-exempt status, is
Bob Jones University v. United States, 461 U.S. 574, 586
(1983)("Bob Jones")("[A]n institution seeking tax-exempt status
must serve a public purpose and not be contrary to established
public policy.").  In Bob Jones, the Court concluded that racial
discrimination in education was contrary to public policy, and
consequently, could not be shielded from federal income taxation
by claiming that the discrimination was being done pursuant to
religious beliefs. Id.  This position was also made explicit by
the IRS in a Revenue Ruling, 71-447, 1971-2 C.B. 230. The Court
cataloged the history of charitable tax exemptions, and made
clear that such tax exemption only makes sense if the charity's
activities are consistent with local laws and public policy.  Id.
The Court concluded that the governmental interest in eradicating
racial discrimination substantially outweighed the tax burden on

37

the school's exercise of their religious beliefs.[28]

The instant case presents a similar analysis, should the Court decide to engage in it.  The governmental interest in restricting the flow of money from the United States to mujahideen in various countries across the world is compelling, as is the interest in a fair and regular tax law.  The governmental interests at stake in this case are paramount for any government: national security, foreign policy, and the power to tax.  Conversely, the First Amendment burden on an organization for the denial of a tax exemption is far outweighed by the governmental interests, especially, as described above, when such an exemption does not restrict the defendants' speech, but rather, merely deprives the organization of a tax exemption.

The conduct to be deterred in this case, is the withholding of material information about the purported use of and destination of funds raised by an ostensible charity. The concealment of any activity which may be for a non-exempt purpose, or which may affect the determination of the exempt status of the organization would be material to the IRS' decision.[29]  See Green v. Connally, 330 F. Supp. 1150 (D.D.C.),

_____

[28]The IRS' determination of whether an organization is, although appealable, an executive function which is not an element of any of the charged offenses.  See e.g. United States v. Molly-Butcher, 560 F.Supp. 550 (D.Ma. 1983)(where Commerce Secretary's determination of controlled commodity for Export Act purposes is not element of offense).

[29]To qualify as a tax exempt charitable organization, an organization must be organized exclusively and operated

aff'd per curiam sub nom., Coit v. Green, 404 U.S. 997
(1971)(emphasizing that alleged charities which engage in illegal
activities cannot receive tax exemptions otherwise "Fagan's
school for pickpockets would qualify for a charitable trust.").
This is not protected conduct, and is contrary to public
policy.[30]  Even if such activity were inspired by the defendants'
religious beliefs, the potentially deterrent effect would not be
on the ability for the defendant to exercise his religion,
rather, it would be to encourage full disclosure of an
organizations' activities.  This would hardly be a substantial
burden to First Amendment protected activity, and is required of
all other religious institutions which are exempted from paying
taxes.  See I.R.C. § 501(c)(3). Moreover, the organization can
always continue its activity without the tax exemption.  See

_exclusively_ for exempt purposes.  See Quality Auditing Company v.
Commissioner, 114 T.C. 498, 504 (2000)(emphasis added).  If a
nonexempt purpose is substantial, the organization will not
satisfy the operational test regardless of the number or
importance of truly exempt purposes.  See Income Tax Regulations
section 1.501(c)(3)-1(c)(1); see also Better Business Bureau v.
United States, 326 U.S. 279 (1945); Church of Scientology v.
Commissioner, 83 T.C. 381 (1984), aff'd, 823 F.2d 1310, 1315 (9th
Cir. 1987.)  A tax exemption can be denied to any organization
who bestows benefits on non-charitable class of beneficiaries.
See American Campaign Acad. V. Commissioner, 92 T.C. 1053, 1068
(1989).  The mujahideen do not qualify as a charitable class.
    [30]Defendants' citation to the 26 C.F.R. §1.501(c)(3)-
1(d)(2), the Treasury regulations prohibiting the IRS from
denying an exemption merely based on the unpopularity or
controversial nature of an organization is inapt.  That
regulation does not foreclose the IRS from denying an exemption
for an organization engage in illegal activities or those
contrary to public policy.  See e.g. Rev. Rul. 71-477. 1971-2
C.B. 230; Bob Jones, 461 U.S. at 597-598

Smith, 494 U.S. at 878-879.

By the same token, that someone else, even aid agencies which were supported by and/or funded by the U.S. Government, may have been doing the same thing as the defendants, *ad arguendo*, is wholly irrelevant to whether the defendants concealed from the Government that they were engaging in such activity. See also United States v. Holy Land Foundation for Relief and Development, 03-CR-240-G, N.D.Tx. November 2, 2006)("[T]he fact that other entities have supported the same organizations that the defendants are being prosecuted for supporting is not probative of the defendants' knowledge or intent in supporting those organizations."). The defendants cannot correlate the potential of the U.S. Government's support for Afghan mujahideen at or before the same time as the defendants were funding them with any legal defense, aside from impermissible allusions to jury nullification.  The U.S. Government's foreign policy position on this issue is irrelevant to this case. Consequently, the IRS could have legally denied Care an exemption, and the defendants have no Constitutional remedy.

**IV.  DEFENDANTS HAVE FAILED TO MEET HEAVY BURDEN OF PRODUCING CLEAR EVIDENCE OF SELECTIVE PROSECUTION.**

The Attorney General and United States Attorneys retain "broad discretion" as to whom to prosecute.  Wayte v. United States, 470 U.S. 598, 607 (1985) (quoting United States v. Goodwin, 457 U.S. 368, 380 n.11 (1982)).  "[S]o long as the

40

prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." United States v. Armstrong, 517 U.S. 456, 464 (1996) (quoting Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978)).  The decision whether to prosecute, however, may not be based on "'an unjustifiable standard such as race, religion, or other arbitrary classification.'"  Armstrong, 517 U.S. at 464 (citation omitted).

The United States Supreme Court has granted broad discretion to the government as to whom to prosecute largely in recognition of its conclusion that the "decision to prosecute is ill-suited to judicial review." Wayte, 470 U.S. at 607.  The Supreme Court explained in Wayte v. United States its assessment of the inability of the courts to review such prosecutorial decisions:

> such factors as the strength of the case, the prosecution's general deterrence value, the Government's deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.

Id.

The Supreme Court has also voiced concern that judicial inquiry of prosecutorial decisions threatens the performance of a core executive constitutional function.  Armstrong, 517 U.S. at 465. "Examining the basis of a prosecution delays the criminal

41

proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy."  Id.  Thus, the Supreme Court has repeatedly announced that the standard of proving selective prosecution claims "is particularly demanding, requiring a criminal defendant to introduce 'clear evidence' displacing the presumption that a prosecutor has acted lawfully."  Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471, 489 (1999) (citing United States v. Armstrong, 517 U.S. 456, 463-65 (1996)).

To overcome the presumption of prosecutorial good faith, the defendant must prove by clear evidence that the decision to prosecute had (1) a discriminatory effect and (2) it was motivated by a discriminatory purpose.  Armstrong, 517 U.S. at 465; see United States v. Magana, 127 F.3d 1, 8 (1st Cir. 1997) (to prove selective prosecution, defendant must demonstrate by clear evidence "both that she has been singled out for prosecution when others similarly situated have not been prosecuted and that the prosecutor's reasons for doing so were impermissible.") (citations omitted).  Failure to prove both of these requirements is fatal to any selective prosecution claim. The defendants cannot meet this burden.  The defendants have failed to prove by clear evidence either a discriminatory effect

or a discriminatory purpose.

**A.   Defendants have failed to establish discriminatory effect.**

In support of its motion to dismiss on selective prosecution grounds, the defendants allege that they are being selectively targeted "because of who they are and what religion they practice . . ." Def. Mot. at 44.  To establish a discriminatory effect in a religious discrimination case, a defendant must show that similarly situated individuals of a different religion could have been prosecuted but were not.  See Armstrong, 571 U.S. at 465 ("in race case, the claimant must show that similarly situated individuals of a different race were not prosecuted"); Maqana, 127 F.3d at 8 (merely offering evidence that Spanish speaking persons were prosecuted without identifying non-Spanish speaking persons who could also be prosecuted but were not failed to make *prima facie* standard for discovery on selective prosecution claim).  Accordingly, the defendants must identify non-Muslim individuals who could have been prosecuted for committing the same type of crime in substantially the same manner as the defendants but were not.  To meet this burden, the defendants point to numerous organizations and alleged charities[31] that were

---

[31]According to IRS records, at least one of the organizations that the defendants claim was a §501(c)(3) charitable organization, American Friends for Afghanistan, was never granted this status.  See Youngquist Aff. at 7.

43

purportedly involved, in various degrees,[32] in providing support
to the Afghan mujahideen like the defendants.  Nothing in the
defendants' appendix, however, demonstrates that other non-Muslim
individuals were also involved in a complex conspiracy to
defraud, and scheme to conceal material information from, the
United States government, that could have been criminally charged
but were not.  See United States v. Hedaithy, 392 F.3d 580, 607-
08 (3d Cir. 2004) (non-Arab cheaters on English proficiency
examination used to determine foreign students admission
eligibility not similarly situated to defendants of Arab and/or
middle eastern descent because no evidence that non-Arab cheaters
engaged in widespread conspiracy or paid imposters to take exam);
Branch Ministries v. Rossotti, 211 F.3d 137, 144 (D.C. Cir. 2000)

---

[32]The defendants appendix does not contain any examples of
other alleged charities that were, like the defendants,
soliciting money to directly support fighting or recruit
individuals to join the mujahideen in fighting overseas.  For
instance, in response to IRS inquiries, Free Afghanistan Alliance
told the IRS "[w]e do not provide direct aid to any of the
resistance fighters.  However, some supplies used to treat the
wounded in the hospitals and they would also receive benefit from
our provisions to refugee camps when they return from the field
for rest periods."  Def. App. at 00371.  Similarly, the
Management Sciences for Health obtained funding from the United
States Agency for International Development from 1986 through on
or about 1994 to, among other things, expand and improve the
general health care for the civilian population and mujahideen.
Def. App. at 00636-738.  The other activities identified in
defendants' appendix consisted of proving literacy programs to
Afghans as well as the mujahideen and the distribution of
educational newsletters that presented a "full and fair
exposition of the pertinent facts on both sides of any issue."
See, e.g., def. app. at 00381, 00249-271.  Furthermore, the
majority of these activities occurred in the 1980s, well before
Muntasser's incorporation of Care in April 1993.

(no selective prosecution where church failed to establish that other churches engaged activities that involved "placement of advertisements in newspapers with nationwide circulations opposing a candidate and soliciting tax deductible contributions to defray their cost."); St. German of Alaska E. Orthodox Church v. United States, 840 F.2d 1087, 1096 (2d Cir. 1988) (no selective prosecution based upon (1) mere allegation that other "better known" organizations not scrutinized in same way by IRS without showing that such organizations committed same criminal conduct as indicted church and (2) single instance of IRS' failure to investigate religious organization for soliciting donation of depressed real estate). Accordingly, the defendants have failed to meet the first prong of their selective prosecution claim.

The defendants attempt to minimize their criminal misconduct. In fact, the defendants engaged in a long and complex conspiracy to defraud the government and conceal material information from several agencies of the government, including law enforcement. For instance, although one of the main activities of Care in 1993-1995 was the biweekly and later monthly publication and distribution of Al Hussam, a pro-mujahideen newsletter, that encouraged individuals to join the mujahideen, Islamic fighters, on the battlefield and that discussed the importance of participating in violent jihad,

45

Muntasser did not disclose this non-charitable activity to the IRS in its 1023 Application[33] or the annual tax returns he signed on behalf of Care for tax years 1993, 1994, and 1995. In the 1023 Application, Muntasser also concealed from the IRS the relationship between Care and Al-Kifah Refugee Center, the Brooklyn office of which had been linked to the 1993 World Trade Center bombing. See Marinelli Aff. at 4-5. In addition to submitting materially false tax filings to the IRS, defendant Muntasser lied to the FBI and concealed information from the Immigration and Naturalization Service (now known as Immigration and Customs Enforcement).

The defendants fail to identify any specific individuals of a different religious affiliation who are similarly situated but who have not been prosecuted, but rather has assembled a mixture of public filings and media reports about activities of

---

[33]The September 1990 version of the 1023 Application, which Muntasser signed under the penalty of perjury on June 1, 1993, required that Muntasser "provide a detailed narrative of all the activities of the organization - past, present, and planned. . ." Despite this instruction, Muntasser failed to disclose that Care had begun publishing Al-Kifah's pro-mujahideen newsletter, Al-Hussam. Care published its first issue of Al-Hussam on April 16, 1993, three days after Muntasser signed its Articles of Incorporation. See Sealed Affidavit of James Marinelli ("Marinelli Aff.") at 20 n. 9. On April 2, 1993, an issue of Al-Hussam was published, which indicated that it was the newsletter of Al-Kifah. Id. As described in the sealed affidavit of James Marinelli, these newsletters, in addition to the Zakat Calculation Guides, which Care began distributing in or about 1994, were used to solicit money for the mujahideen. Subsequently, beginning in 1999, Care's website was used for this same purpose.

organizations that largely occurred in the 1980s, which the
defendants contend are similar in nature to what they are charged
with committing in the indictment.  There are several defects in
the defendants argument.  First, they did not point to any
specific individuals of a different religious affiliation, known
to the government, that committed criminal offenses similar to
those alleged in the indictment, who were treated differently
than the defendants.  Second, none of the reported activities of
the other alleged charitable organizations was similar in nature
to the crimes charged in the indictment (*i.e,* tax fraud).

"Discrimination cannot exist in a vacuum; it can be found
only in the unequal treatment of people in similar
circumstances." Attorney General v. Irish People, Inc., 684
F.2d, 928, 946 (D.C. Cir. 1982).  Thus, in determining whether
persons are similarly situated, a court must examine all relevant
factors: the type of charged conduct; the manner in which the
conduct was committed; the deterrence value of a prosecution; the
relationship of the charged crime and perpetrator to the
Government's enforcement priorities and enforcement plan; and the
strength of the evidence.  United States v. Olvis, 97 F.3d 739,
744 (4th Cir. 1996); see United States v. Smith, 231 F.3d 800,
810 (11th Cir. 2000) (similarly situated person is defined as
"one engaged in the same type of conduct, which means that the
comparator committed the same basic crime in substantially the

47

same manner as the defendant -- so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan -- and against whom the evidence was as strong or stronger than the defendant.")   When these factors are considered, the defendants have failed to identify anyone similar situated to them.   Nor have the defendants established that the government "could prove beyond a reasonable doubt that someone else [of a different religious affiliation] had engaged in the same type of conduct, committing the same crime in that or substantially the same manner."  Smith, 231 F.3d at 811 (black defendant failed to carry burden of establishing discriminatory effect).

Although the defendants speculate that others were similarly situated to them and could have been prosecuted, speculation does not meet the clear evidence standard for a selective prosecution claim.  See United States v. Fares, 978 F.2d 52, 59 (2d Cir. 1992) ("[m]ere assertions and generalized proffers" insufficient to establish selective prosecution claim.)   In Fares, the Second Circuit Court of Appeals concluded that the district count committed no error in denying a motion to dismiss an indictment and for discovery on the grounds of selective prosecution where the defendant, a Lebanese national whom the FBI believed was a member of Hizballah, failed to present evidence of

(1) similarly situated persons known to the government who had not been prosecuted and (2) that the government's decision to prosecute him was invidious or made in bad faith.  Id. at 60.

Lastly, the defendants argue that charities are rarely prosecuted and that no other charities have been prosecuted for committing pro-mujahideen and pro-jihad conduct in connection with the conflicts in Afghanistan.  As this Court itself has recognized, however,

> there is nothing inherently wrong or suspicious in a prosecution that is legally and factually unique. While the government may not, of course, single out a defendant for prosecution on race, religion, or other improper basis, it is not confined to routine prosecutions or well-worn statutory theories. Moreover, it is entitled to re-evaluate its priorities and adapt to new threats.

United States v. Lewis, No. 05-40001, slip op. at 13 n.11 (D. Mass. filed May 11, 2006).  As one court has recognized, "[t]he reality resulting from limited law enforcement and judicial resources is that not every criminal violation of the United States Code can be prosecuted."  United States v. Smith, 231 F.3d 800, 807 (11th Cir. 2000).  Accordingly, the government should not be penalized for selectively prosecuting those individuals who it deems constitute serious threats to security as long as the prosecution was not based upon an impermissible consideration such as race or religion.  See generally Marinelli Aff.; see also United States v. Khan, 461 F.3d 477, 498 (4th Cir. 2006) (in response to argument that government has not investigated or

49

prosecuted other alleged terrorist organizations as aggressively as it prosecuted Muslim defendants believed to be members of Lashkar-e-Taiba, the military wing of a Pakistani organization, court concluded that "[t]he Executive branch has the right to focus its prosecutorial energies on alleged terrorist groups that present the most direct threat to the United States and its interests."). Since September 11, 2001, the United States government has focused its investigative efforts on charities that were believed to be used as fronts to launder money and assets to jihadists who believe that terror will result in the establishment of an Islamic state. See J. Millard Burr and Robert O. Collins, Alms for Jihad (2006) 1-10.

**B.  Defendants Not Being Prosecuted Because of Their Religion.**

Even if this Court were to find that the defendants have made a *prima facie* showing of discriminatory effect, the defendants have failed to present any evidence that their prosecution was motivated by their religion or any other impermissible reason. They have only offered an unsubstantiated claim that the government is retaliating against Muntasser for bringing a lawsuit to adjudicate his naturalization petition.[34]

---

[34]This bare allegation is also insufficient to establish a claim of vindictive prosecution. To prove such a claim the defendant must produce evidence of actual prosecutorial vindictiveness or demonstrate a likelihood of vindictiveness sufficient to justify such a presumption. United States v. Stokes, 124 F.3d 39, 45 (1st Cir. 1997). Like the burden imposed on defendants when raising a selective prosecution claim, this

Such an allegation does not constitute clear evidence of discriminatory purpose required to support a motion to dismiss for selective prosecution.  This allegation, which is based largely on the timing of indictment, is, as discussed below, directly rebutted by the affidavit of FBI/JTTF Special Agent James Marinelli that establishes that the investigation of the defendants culminating in their indictment began years before any naturalization lawsuit was filed by Muntasser.  <u>See</u> <u>United States v. Alameh</u>, 341 F.3d 167, 174 (2d Cir. 2003) (no discriminatory motive where most of investigation of Arab and Muslim defendant occurred before September 11, 2001, the event on which defendant based allegation of discriminatory motivation).

Further if, as Muntasser contends, he is being prosecuted in retaliation for his naturalization lawsuit, then it is inexplicable as to why would the government would simultaneously bring charges against Mubayyid, who has not sued the government.  As the Supreme Court has noted,

> '[D]iscriminatory purpose' . . . implies more than . . . intent as awareness of consequences.  It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.

---

burden is not met by mere allegation or speculation.  The First Circuit has issued caution: "courts should go very slowly in embracing presumptions of prosecutorial vindictiveness in pretrial proceedings." <u>Id.</u> Here, like any allegation of purposeful discrimination, any allegation of vindictiveness has been completely rebutted by the affidavits filed by the government in support of this opposition.

<u>Wayte</u>, 470 U.S. at 610 (<u>quoting</u> <u>Personnel Administrator of</u>
<u>Massachusetts v. Feeney</u>, 442 U.S. 256, 279 (1979)).

As demonstrated in the sealed affidavit of Special Agent
James Marinelli of the Federal Bureau Investigation, Joint
Terrorism Task Force, the investigation of the defendants began
long before any lawsuit was filed by Muntasser.  One of the
searches that yielded a wealth of evidence against the defendants
regarding the non-charitable activities of Care intended to
support the mujahideen occurred in October 2001, one year before
Muntasser even filed his naturalization petition.  In October
2002, when the defendant filed his naturalization petition with
the Immigration and Naturalization Service (now known as
Immigration and Customs Enforcement), he concealed the fact that
he had traveled to Afghanistan and omitted any reference to being
a member of Al-Kifah Refugee Center and Care International.  When
Muntasser was interviewed in April 2003, he lied about traveling
to Afghanistan.  As demonstrated in the affidavits filed in
support of this Opposition and this memorandum, the government
chose to prosecute the defendants for legitimate purposes, most
importantly, deterrence, accountability, and incapacitation.  The
government clearly has a vested interest in ensuring that alleged
charitable organizations do not abuse the tax laws and improperly
use a tax exemption status to collect and channel money overseas
for terrorist related activities.

In conclusion, the defendants have failed to meet their burden of presenting clear evidence of both discriminatory effect and intent.  In contrast, the government has demonstrated the absence of any impermissible considerations in is decision to prosecute the defendants.  The government therefore respectfully requests this Court to deny defendants' motion to dismiss on selective prosecution grounds.

                        Respectfully submitted,
                        MICHAEL J. SULLIVAN
                        United States Attorney

By:    /s/ Aloke Chakravarty
                        ALOKE S. CHAKRAVARTY
                        Assistant U.S. Attorney

                         /s/ B. Stephanie Siegmann
                        B. STEPHANIE SIEGMANN
                        Assistant U.S. Attorneys

Date: November 21, 2006

CERTIFICATE OF SERVICE

    I hereby certify that I have sent this document on this date, November 21, 2006 via Electronic notice to counsel for the Defendants in this case, Malick Ghachem, Esq. and Michael Andrews.

                         /s/ Aloke Chakravarty
                        ALOKE CHAKRAVARTY
                        ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA          )
                                  )
              v.                  )    Crim. No. 05-40026-FDS
                                  )
MUHAMED MUBAYYID, and             )
EMADEDDIN Z. MUNTASSER,           )
                                  )
                                  )
              Defendants.         )

## AFFIDAVIT OF LAUREN A. YOUNGQUIST

I, Lauren A. Youngquist, Special Agent with the United
States Internal Revenue Service, Criminal Investigation, do
hereby depose and state as follows:

### INTRODUCTION, BACKGROUND AND QUALIFICATIONS

1.   I am a Special Agent with the United States Internal Revenue
Service ("IRS"), Criminal Investigation ("CI"). I have been so
employed for more than 18 years. I am currently assigned as a
supervisory special agent overseeing a group of 10 special agents
within the Boston Field Office of CI. I have held this position
since October 2005.

2.   Prior to October 2005, I was assigned to the White Collar
Crime Squad of the Boston Office of the Federal Bureau of
Investigation ("FBI"). I was assigned to the FBI from 2001 to
October 2005. While on assignment with the FBI, I also assisted
other squads on investigations including the Joint Terrorism Task
Force.

1

3.   My duties as a special agent with the IRS-CI, include conducting investigations involving violations of the Internal Revenue Code, the Bank Secrecy Act, and related offenses.  In particular, I have conducted and/or assisted in hundreds of investigations involving tax fraud, money laundering and the illegal structuring of financial transactions.  In my capacity as a special agent with IRS-CI, I have received specialized training . in many subject areas including but not limited to the following: tax law, criminal law, financial investigative techniques, Money Laundering Control Act violations, and the Bank Secrecy Act violations.

4.   The information contained in this affidavit is based on my personal involvement in this investigation, my training and experience, my review of documents, and information provided to me by other law enforcement officers, revenue officers, and employees of IRS.  This affidavit is submitted for the limited purpose of supporting the Government's Opposition to Defendants' Motion to Dismiss.  Therefore, it does not set forth each and every fact that I have learned during the course of this investigation.

5.   I understand that the defendants have alleged that their prosecution is unique and unprecedented.  Pursuant to the Criminal Investigation's Management Information System database, between October 1, 2001 through October 31, 2006, IRS-CI had 114

2

criminal investigations with fraud scheme codes involving charities. I am unaware of the religious affiliation, if any of these organizations, with the exception of Care International, Inc. ("Care")[1], because this information is not tracked.

6. Between 2002-2006, 81 indictments were returned involving conspiracies to defraud the IRS (Klein conspiracies) in violation of 18 U.S.C. §371 and 143 indictments were returned involving the making or subscribing of materially false tax returns in violation of 26 U.S.C. §7206(1) arising out of tax investigations of IRS-CI Boston Field Office.

7. I was involved in the investigation of Care and defendants Emadeddin Muntasser ("Muntasser") and Muhamed Mubayyid. As a result, I have reviewed the tax filings of Care as well as the evidence collected during this investigation that spanned several years. I also interviewed several witnesses, including revenue agents and tax law specialists assigned to Tax Exempt and Government Entities Division ("TE/GE"). This IRS Operating Division is responsible for processing applications for charitable exempt status under 26 U.S.C. §501(c)(3) and auditing Form 990 tax returns of §501(c)(3) organizations.

8. In 1987, because of perceived abuses of the laws applicable

---

[1]Although I am now aware that Care was a purported Muslim oriented charity from their own publications and website, no tax filing submitted to the Internal Revenue Service, the application for 26 U.S.C. 501(c)(3) exempt status or any Form 990 annual tax return, made any mention to their religious affiliation.

3

to tax exempt organizations, Congress created a new disclosure requirement under 26 U.S.C. §6104 that required that tax exempt organizations make their tax filings available to the public, including Applications for Recognition of Exemption under Section 501(c)(3) of the Internal Revenue Code ("1023 Application") and Form 990 annual tax returns. The legislative history indicates that legislators believed that the increased availability of information to the public would help assure that the double tax benefits of deductibility of contributions and exemption from income tax would thereby be limited to organization whose assets were devoted exclusively to charitable purposes as required by the tax laws.

9. Based upon my personal involvement in this case and training, I believe Care was not entitled to a charitable exempt status under 26 U.S.C. §501(c)(3) for the reasons cited in the Indictment. Specifically, Care engaged in non-charitable activities, which were concealed from the IRS, that made them ineligible for a charitable tax exemption. From 1993 to 2003, through its agents, including the defendants, Care collected at least $1.3 million in tax-deductible contributions, according to their own tax returns filed with the IRS, all of which was tax exempt. None of this money should have been deemed tax deductible resulting in a tax loss to the United States of approximately $364,000. Any defendant regardless of their

4

religious affiliation would be prosecuted under these circumstances.

10. It is undisputed by senior tax exempt specialists and attorneys assigned to the Tax Division of the Department of Justice that if defendant Muntasser had truthfully completed its application for recognition of exemption or properly disclosed the true nature of its activities, it would not have been issued an IRS determination letter recognizing it exempt from tax and eligible to receive tax-deductible charitable contributions. Thus, even if Care were able to solicit contributions, its activities would not have been subsidized by United States taxpayers as contributors would not have been eligible to take charitable deductions against taxable income.

11. Based upon the official policies that existed in 1993, the IRS would have denied a charitable tax exempt status to an organization that advocated engaging in criminal or other activities contrary to public policy.

12. The information requested in 1023 applications is material and important to the IRS' ultimate determination as to whether an organization is exclusively charitable and therefore qualifies for a tax exemption status. The September 1990 version of the 1023 Application, which Muntasser signed on June 1, 1993 under the penalty of perjury to obtain charitable tax exempt status for Care, allegedly a newly formed organization with no relationship

5

to any other organization, required applicants to "[p]rovide a detailed narrative description of **all** activities of the organization - past, present, and planned. . ." (emphasis added). I believe an applicant's failure to follow this instruction and disclose non-charitable or disqualifying activities of an organization would render the Form 1023 application materially false. Accordingly, Muntasser's omission of all of Care's activities, including those involving the solicitation of money for an illegal purpose, impeded the government's ascertainment of whether Care qualified as a tax exempt organization. Similarly, Care omitted any information about its non-charitable activities in its annual Form 990 tax returns, thereby concealing material information from the IRS.

13. The 1023 Application, which Muntasser signed, also required that he state whether Care was an outgrowth or successor to another organization. Muntasser answered no to this question. I believe this answer was materially false. See 1023 Application at Def. App. at 0087. Based upon my review of the evidence collected in this case, Muntasser was a director of the Boston office of Al-Kifah Refugee Center[2] from approximately 1991-1993. After the media linked the Brooklyn Office of Al-Kifah to the World Trade Center Bombing on or about April 11, 1993, Muntasser

_____

[2]Although Muntasser occasionally indicated the Boston office of Al-Kifah was a §501(c)(3) charitable organization, no Al-Kifah office was granted that status by the IRS.

6

incorporated Care as a new organization with the same address as the Boston office of Al-Kifah. On the Articles of Incorporation, he indicated that he would serve as president of Care. By the time he signed the 1023 Application for Care, he had begun transferring the assets of Al-Kifah to Care.

14. I have been advised by tax law advisors and technical ruling specialists at TE/GE, which adjudicated this application, that if Muntasser had truthfully answered this question, they would have requested all relevant information about Al-Kifah Refugee Center, including but not limited to: information about its activities, membership, and other affiliated offices and organizations; whether its was a non-profit or for profit organization; and why that organization had been dissolved and/or replaced by Care.

15. According to the records of the IRS, one of the alleged charities identified by the defendants as committing similar activities as Care, American Friends of Afghanistan was never granted tax exempt status under 26 U.S.C. §501(c)(3).

16. In conclusion, had Muntasser, Mubayyid, or any other Care officer provided truthful information about all of Care's activities, including those non-charitable in nature, to the IRS, the IRS would not have granted tax exempt status to Care in 1993

7

nor continued to accord it that status through 2003.

On this 21st day of November 2006, I declare under penalty of perjury that the foregoing is true and correct.

LAUREN A. YOUNGQUIST
Special Agent
Internal Revenue Service
Criminal Investigation

8