UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA,    )     CRIMINAL NO.  05-40026-FDS
                   Plaintiff    )
                          )
v.                      )
                          )
MUHAMED MUBAYYID and     )
EMADEDDIN Z. MUNTASSER,    )
                Defendants   )
_____)

**DEFENDANT' MOTION FOR LEAVE TO REPLY TO
GOVERNMENT'S OPPOSITION TO MOTION TO DISMISS**

Now come Defendants Emadeddin Z. Muntasser and Muhamed Mubayyid, pursuant to

Local Rule 7.1(B)(3), to move this Honorable Court for leave to reply to the Government's

Opposition to their Motion to Dismiss.  As grounds therefor, Defendants states as follows:

1. The Government's fifty-three page Opposition brief misstates Defendants' challenge to

the indictment as a whole, fails to respond to that challenge on at least four principal

points, and confuses almost every issue it addresses.

2. Defendants' proposed reply brief will facilitate this Court's efforts to evaluate the

constitutional and statutory claims set forth in their Motion to Dismiss, and in assessing

the meaning and validity of the Governments' arguments in opposition.

3. The hearing on Defendants' Motion to Dismiss will not take place for another month

(January 16, 2007).

5. The interests of justice recommend that this motion be granted.

WHEREFOR Defendants respectfully request that this Honorable Court grant their

motion for leave to file a reply to the Government's Opposition to their Motion to Dismiss.

Defendants' proposed reply is attached to this Motion as an exhibit.  Defendants' proposed

sealed addendum to their reply brief is being submitted under seal.

Respectfully submitted,

MUHAMMED MUBAYYID,                    EMADEDDIN Z. MUNTASSER
By his attorney,                       By his attorneys,


  /s/ Michael C. Andrews                   /s/ Malick W. Ghachem
Michael C. Andrews BBO# 546470)         Norman S. Zalkind (BBO# 538880)
21 Custom House Street                  Elizabeth A. Lunt (BBO# 307700)
Boston, MA 02110                        Malick W. Ghachem (BBO#661018)
(617) 951-0072                          Zalkind, Rodriguez, Lunt & Duncan LLP
                                        65a Atlantic Ave.
                                        Boston, MA 02110

                                        Susan R. Estrich
                                        Robert Kingsley Prof. of Law and Political
                                        Science
                                        Univ. of Southern California Law School
                                        University Park, MC-0071
                                        Los Angeles, CA 90089-0071

                                        Harvey Silverglate (BBO # 462640)
                                        607 Franklin St.
                                        Cambridge, MA 02139

Dated: December 17, 2006

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
UNITED STATES OF AMERICA,          )          CRIMINAL NO.  05-40026-FDS
                                                    )
                                                    )          **Leave to file granted on _____**
V.                                                  )
                                                    )
MUHAMED MUBAYYID and             )
EMADEDDIN Z. MUNTASSER,          )
                               Defendants    )
_____)

## DEFENDANTS' REPLY TO GOVERNMENT'S OPPOSITION TO MOTION TO DISMISS

Now come Defendants Emadeddin Z. Muntasser and Muhamed Mubayyid to submit this

reply to the Government's opposition to Defendants' motion to dismiss.  The Government

persists in the revisionist fallacy that a Muslim charity can be guilty of tax fraud merely because

it failed to disclose to the Internal Revenue Service (IRS) that its intended charitable activities

fulfilled a religious obligation – the Koranic obligation of *zakat* – and that its solicitations for

donations would refer to the religious concepts of *zakat*, *jihad*, and the *mujahideen*.  Had the IRS

but known the omitted information, the Government argues repeatedly, the IRS would never

have granted the charity tax-exempt status.  But this decision, the Government remarkably

claims, is not subject to First Amendment scrutiny.  The Government in its memorandum

repeatedly claims the authority to regulate, and to make decisions concerning, the conduct of

private, religious groups – specifically Muslim charitable groups promoting *jihad* – based on the

content of their speech.  And it seeks to exercise this power utterly immune from constitutional

scrutiny.  In the Government's view, Muslim charities are subject to special rules of disclosure

and special limits on fundraising; ignorance of these unwritten rules carries with it the possibility

of prison.  But the enforcement of these rules, steeped in fear of *jihad* as that term is currently understood by the Government, is said to be immune from constitutional scrutiny, raising no First Amendment issues.

The Government has, in short, adopted a radical stance apparently not applied to religious entities until after September 11, 2001, and even now applied selectively only to Muslim charities.  The rule proposed here criminalizes pure speech in support of religion, at least when that speech advocates "jihad" – even a *jihad* that our Government actually supported.  Such a rule must be subject to constitutional scrutiny; and once scrutinized, it cannot survive.  In a society dedicated to the pursuit of religious freedom, the Government's approach to Defendants is the equivalent of decreeing that a Christian charity can be guilty of tax fraud because it failed to disclose to the IRS the religious basis for its charitable activities and its intention to refer to Christian precepts in its solicitations.[1]  The Government has never imposed such a disclosure requirement on Christian charities; it cannot impose such a requirement on their Muslim counterparts.  "[W]e apply the limitations of the Constitution with no fear that freedom to be intellectually and spiritually diverse or even contrary will disintegrate the social organization. . . . [F]reedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order."  West Virginia Board of Education v. Barnette, 319 U.S. 624, 641-42 (1943) (protecting Jehovah's Witnesses' right to refuse to pledge allegiance to and salute the

---

[1] In Christianity no less than in Islam, the very term charity incorporates certain religious understandings, traditions, and precepts.  See "Charity," *Oxford English Dictionary*, 2nd ed. (1989) (defining charity as, *inter alia*, "[m]an's love of God and his neighbour, commanded as the fulfilling of the Law, Matt. xxii. 37, 39.").

flag, even in time of war, and defining the broad concept of tolerance for diverse religious beliefs and traditions).

The Government attempts to evade the First Amendment by pretending that this is simply a case about concealment. But the Government by turns ignores or distorts the subject of the alleged "concealment" even though it is essential to the materiality inquiry (which the Government also ignores). In attempting to position this case as an ordinary criminal case, the Government has filed a brief that both misstates the nature of Defendants' challenge to the indictment as a whole and specifically fails to respond to that challenge on at least four principal points.

First, the Government gets the law wrong, plain and simple. The Government relies on the proposition that an individual's religious beliefs do not excuse him from compliance with neutral, generally applicable laws. This proposition has been explicitly overruled where <u>federal</u> action is concerned by the Religious Freedom Restoration Act and <u>Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal</u>, 126 S.Ct. 1211 (2006).

Second, insisting that tax-exempt status is a "privilege" rather than a "right," the Government fails to explain why the unconstitutional conditions doctrine – under which the Supreme Court has long rejected any distinction between "rights" and "privileges" for constitutional purposes – does not apply to this case. That doctrine eviscerates the Government's central, privilege-based analysis. The Government cannot use its power to grant charitable tax exemptions as a subterfuge to regulate or prohibit activity that it could not regulate or prohibit outright. Moreover, the Government cannot escape the application of First Amendment scrutiny by claiming that all that was at stake was paying taxes, when it is now using the false

statement/concealment of material fact and <u>Klein</u> conspiracy[2] statutes to impose criminal

penalties for what at bottom are charitable activities with a clear religious purpose and mandate.

Third, the Government repeatedly emphasizes that the alleged criminal conduct here

consists of concealing "material" information from the Internal Revenue Service (IRS), and yet

repeatedly relies upon material support of terrorism jurisprudence in an effort to persuade the

Court that the information allegedly withheld from the IRS is "material" in the false

statement/concealment sense.  The confusion seems intentional.  Despite the Government's many

prejudicial insinuations of terrorist support on the part of Defendants, it continues to be unable to

point to any alleged acts that are not classic First Amendment protected activities under either the

Free Speech or Free Exercise clauses.[3]  This confusion of the nature and meanings of

"materiality" seems plainly calculated to relieve the Government of the duty to apply, much less

satisfy, classic First Amendment scrutiny in order to establish the presence of a "clear and

present danger" sufficient to bar speech.  <u>Brandenburg v. Ohio</u>, 395 U.S. 444 (1969).

Finally, the Government has almost completely failed to respond to the hundreds of pages

of documents from the public record, filed in support of the motion to dismiss, demonstrating

that until as late as 1994 and 1995, the IRS deemed activities fundamentally indistinguishable

from those alleged in the indictment to be charitable activities entitled to tax-exempt status.  That

---

[2] <u>See</u> <u>United States v. Klein</u>, 247 F.2d 908 (2d Cir. 1957).

[3] As demonstrated in Defendants' Motion to Dismiss at 10-11 and ff., the indictment in
this case consistently defines "supporting and promoting *jihad* and the *mujahideen*" not in terms
of providing military support, but rather in terms of publishing newsletters, publishing a book,
soliciting funds, and publishing a website – activities that are all clearly protected under the First
Amendment.  Unless the Government is trying to confuse the Court as to the scope of Care's
alleged activities, the uncontraverted facts, along with the indictment itself, make clear that by
"supporting and promoting *jihad* and the *mujahideen*," the Government can only mean simply
describing or lauding in writing the efforts of one or another party to an armed conflict abroad,
not participating in it directly.

evidence is legally relevant not only because it undergirds Defendants' vagueness/due process

challenge, and because a charitable organization may reasonably rely upon prior IRS

determinations as to what constitutes charitable conduct, but also because it belies the

Government's argument that advocacy of *jihad* and the *mujahideen* was clearly contrary to the

public policy of the United States at all times relevant to this indictment.  And all of this, of

course, is highly relevant to whether the disclosures to which the Government claims the IRS was

entitled are indeed <u>material</u> to any determination that the IRS was entitled to make.  The

Government ignores the legal issues raised by the undisputed record of federal support –

continuing into the time frame of this indictment – for charities engaged in precisely the same

activities as those alleged in the indictment.

<u>I.Current Free Exercise Law</u>

The Government's understanding of free exercise law is, at best, woefully out of date.

Citing <u>Employment Division, Department of Human Resources of Oregon v. Smith</u>, 494 U.S.

872 (1990), the Government writes:

> Courts have long held, that the freedom of religion clause cannot be used as a
> blanket shield to prevent the government from inquiring into the possible
> existence of criminal activity.

Government's Opposition to Defendants' Motion to Dismiss (hereafter "Government's

Opposition) at 14.  The Government fails to note, however, that in 1993 Congress overruled the

Supreme Court's holding in <u>Smith</u> with the Religious Freedom Restoration Act, 42 U.S.C.A. §

2000bb ("RFRA").  In RFRA, Congress made clear its view that "laws 'neutral' toward religion

may burden religious exercise as surely as laws intended to interfere with religious exercise." <u>Id.</u>

Congress specifically mandated that "Government shall not substantially burden a person's

exercise of religion even if the burden results from a rule of general applicability" except where

the application of the burden to a particular person "is in furtherance of a compelling

governmental interest" and "is the least restrictive means of furthering that compelling

governmental interest."  Id.  Moreover, Congress clearly intended RFRA to apply in criminal as

well as civil cases by providing that a person whose religious exercise has been burdened "may

assert that violation as a claim or defense in a judicial proceeding."  Defendants have asserted

RFRA as a defense in this proceeding.[4]

Although the Supreme Court subsequently struck down so much of RFRA as purported to

apply to the states through Congress' enforcement powers under Section 5 of the Fourteenth

Amendment,[5] RFRA continues to apply to the federal government.  As recently as February

2006, the Supreme Court held unanimously that the Government failed to demonstrate a

compelling interest in enforcing the Controlled Substances Act to ban a religious sect's use of

hoasca, a tea containing a hallucinogen, in religious ceremonies.  O Centro Espirita, 126 S.Ct.

1211.[6]

---

[4] The purely religious nature of the speech at issue in this case is perhaps best
demonstrated by the Care International *zakat* calculation guide referenced in the indictment.  See
Sealed Addendum to this Reply, Ex. 1.

[5] City of Boerne v. Flores, 117 S.Ct. 2157 (1997).

[6] Effectively conceding that Defendants' free exercise claim is meritorious, the
Government insists that "[i]f the defendants' organization was truly a religious one, such as a
place of worship, additional information should have been supplied on the IRS Form 1023, and a
separate tax exemption analysis would have applied."  Government's Opposition at 15.  But Care
International was under no obligation to register with the IRS as a "place of worship" or similar
entity: the IRS provisions relating to tax-exempt status for churches and other religious
organizations are, by definition, inapplicable to Care, which is not a mosque, but simply a charity
pursuing its charitable activities in accordance with Islamic law.  See "Tax Guide for Churches
and Religious Organizations," IRS Publ. 1828 (Rev. 09-2006) (detailing the special rules that
apply to compensation for ministers and other matters specific to churches and cognate religious
organizations).  Moreover, even if Care can be analogized to a church or other religious
organization, the suggestion that the only religious pursuits entitled to the protections of the Free
Exercise Clause are those conducted by churches or mosques preapproved to do so by the IRS is

Moreover, as Defendants' argued in their motion to dismiss, <u>Smith</u> itself provides clear support for Defendants' First Amendment claim here. The <u>Smith</u> majority made clear that where free speech and free exercise concerns are combined, neutral laws of general applicability may be made to yield. <u>Smith</u>, 492 U.S. at 881.[7]

## II. Unconstitutional Conditions Doctrine

The Government states at numerous points in its opposition that "tax fraud prosecutions based on a defendant's speech have repeatedly been upheld as Constitutional." <u>See</u>, <u>e.g.</u>, Government's Opposition at 34. At other points, the Government argues that "[c]onspiracy to commit a crime, or to withhold information from the government in order to evade taxes, is not protected speech; it is an action, even if it consists of various instances of speech." <u>See</u>, <u>e.g.</u>, <u>id.</u>

_____

frivolous.

[7] The Government's suggestion that Defendants have no standing to pursue their First Amendment claims in this case because they are challenging "the restriction of Care's First Amendment Rights" is also frivolous. Government's Opposition at 6 n.4. RFRA specifies that "[s]tanding to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution." 42 U.S.C.A. § 2000bb-1(c). Defendants' own First Amendment rights are being violated in this case. The Government seems to be confusing third-party standing in a facial challenge context from the first-party, as-applied challenge to the enforcement proceeding in this case. It would be difficult to imagine a more direct violation of an individual's First Amendment rights than a situation where that individual has been indicted for exercising those rights without giving specific notice to the IRS. In any event, Defendants have standing both to assert their own, individual First Amendment rights and to assert the organizational rights of Care International. Indeed, once a criminal proceeding is pending, the ability of a defendant to raise a constitutional challenge except as a defense to a criminal case has been substantially limited by concerns of comity and equity, as well as federalism. <u>See</u>, <u>e.g.</u>, <u>Younger v. Harris</u>, 401 U.S. 37 (1971). Moreover, it is axiomatic that standing is to be construed broadly in cases involving First Amendment overbreadth or Due Process vagueness challenges, even where a party's own conduct was clearly barred by the statute in question. <u>See</u>, <u>e.g.</u>, <u>Kolender v. Lawson</u>, 461 U.S. 352 (1983) (permitting a party to attack statute that clearly applied to his own conduct on the ground that it would be impermissibly vague as applied to someone else); <u>Chicago v. City of Morales</u>, 527 U.S. 41 (1999) (sustaining a facial challenge to a municipal ordinance making it a crime to "loiter" in a public place following dispersal order). In the instant case, Defendants are raising First Amendment and Due Process challenges in respect of their own alleged speech and conduct.

7

at 13.  These statements mistakenly suggest that the speech at issue in this case consists of filling out a tax form rather than pursuing charitable activities from a distinctly religious perspective, a suggestion that is confused and confusing at best and disingenuous at worst.  Most significantly, the Government's statements reveal a failure to appreciate the relationship between the materiality requirement of the false statement/concealment and <u>Klein</u> conspiracy statutes, on the one hand, and the First Amendment, RFRA, and Due Process claims made by Defendants, on the other.

Strictly speaking, this tax fraud prosecution is not based on anything Defendants said or did at all – that is, it is not based on either speech or action *per se*, but rather on the alleged concealment of information that the Government claims was necessary in order to make a determination as to whether Care International was entitled to tax-exempt status.[8]  But the IRS may not insist that an applicant for tax-exempt status answer questions about his or his organization's political convictions, religious affiliation, or belief system – such as whether Care International intended to fulfill its Koranic *zakat* obligation by advocating on behalf of *jihad* and the *mujahideen* – because a grant or denial of tax-exempt status could not constitutionally be based upon the answers to such questions, whether truthful or not.  Such questions would be, and are, immaterial to the tax-exempt inquiry.  <u>Cf.</u> Affidavit of IRS Special Agent Lauren A. Youngquist (Dkt# 161, Nov. 21, 1006) at 3 (noting that information concerning the religious affiliation of charitable organizations "is not tracked").

---

[8] The Government's foray in defense of "the tax code" as satisfying intermediate scrutiny divulges yet another area of confusion.  Government's Opposition at 16-18.  <u>See also</u> <u>id.</u> at 12 ("the Internal Revenue Code is not a restriction on an individual's free exercise of his religion").  Defendants have not challenged the constitutionality of any provision of the Internal Revenue Code in this case.  Their challenge is to the application of the false statement/concealment of material facts and <u>Klein</u> conspiracy statutes to the circumstances of this case: this is the only "government action" thus far at issue here.

Thus, for example, if the IRS were to insist that an applicant for 501(c)(3) status answer the question "will your organization adhere to Islamic precepts?" in its 1023 or 990 form, the applicant has an absolute constitutional right either to refuse to answer such questions, or even to provide a false answer. The refusal to answer, no less than the false response, would not be material as a matter of law, because the answer to such a question implicates constitutionally protected facts that could not lawfully be taken into account by the IRS in deciding whether to grant or to continue tax-exempt status. Moreover, the IRS may not lawfully infer from constitutionally protected facts that an applicant was engaged in criminal activity, whether the activity consists of providing material support for terrorism or engaging in a scheme to conceal from the IRS the fact that a charitable organization was providing material support to terrorism. Thus, the IRS could not lawfully infer from the fact that an applicant is Muslim or that his organization intended to adhere to Muslim precepts such as *zakat* and *jihad* that the applicant or his organization intended to or actually did support terrorism. Cf. Sweezy v. New Hampshire, 354 U.S. 234 (1957) (state's inquiry into content of academic's lectures and political associations violated First Amendment right to free speech). Such inferences constitute the very essence of racial and religious stereotyping and are *per se* unconstitutional as a basis for granting or withholding tax-exempt status, or for bringing criminal prosecution. See, e.g., Loving v. Virginia, 388 U.S. 1, 13 (1967) ("it is simply not possible for a state law to be valid under our Constitution which makes the criminality of an act depend upon the race of the actor") (Stewart, J., concurring).[9]

---

[9] Moreover, an applicant's <u>motive</u> in refusing to answer or in providing false answers to such questions is entirely irrelevant to the constitutional inquiry before this Court on Defendant's motion to dismiss. The questions themselves – and any inferences that the Government might wish to draw from the answers to them – are off limits to the Government. The Government errantly argues that "the alleged *mens rea* in this case is knowledge and intent, so the defendants

This is so not only because IRS regulations make it so,[10] and not only because, as a matter of practice, the IRS freely granted tax-exempt status to any number of organizations whose *raison d'être* was to advocate on behalf of the Afghan *mujahideen* in the 1980s and early 1990s,[11] but also because of the unconstitutional conditions doctrine.  The Government effectively takes the position that because tax-exempt status is a privilege rather than a right, Care could have been denied tax-exempt status if the IRS had been told that Care intended to engage in advocacy of *jihad* and the *mujahideen*.  See Government's Opposition at 35 ("defendants are not entitled to an exemption for soliciting money for fighters"); id. at 39 ("'the organization can always continue its activity without the tax exemption").  But this argument

---

have a harder row to hoe because as a matter of fact, the indictment alleges that they knowingly engaged in this scheme."  Government's Opposition at 23.  This is nonsense.  If there is to be a trial in this case, the *mens rea* requirement may well post an insurmountable obstacle to the Government, because of the difficulty of establishing intentional violation of an admittedly vague and uncertain law.  But such factual disputes need not be addressed at this point, nor do they foreclose this motion.  Because of the materiality requirement and the unconstitutional conditions doctrine, an applicant cannot be punished for not answering questions the IRS had no right to ask, regardless of his intent.  This is true as a matter of law, without regard to any factual dispute that might emerge later as to whether Defendants' alleged "concealment" was intentional or not.

[10] See IRS Reg. § 1.501(c)(3)-1(d)(2):

> The fact that an organization, in carrying out its primary purpose, advocates social or civic changes or presents opinion on controversial issues with the intention of molding public opinion or creating public sentiment to an acceptance of its views does not preclude such organization from qualifying under section 501(c)(3) so long as it is not an action organization of any one of the types described in paragraph (c)(3) of this section.

Paragraph (c)(3), in turn, provides that an "action" organization is one that focuses on advocating the passage or defeat of legislation.  The Government does not allege that Care International was such an organization.  Even the ban on legislative advocacy would be plainly unconstitutional were it to be applied based on the content of the advocacy, rather than enforced neutrally with respect to all organizations.

[11] See Part IV below.

relies on a distinction between rights and privileges that has long since been rejected by the Supreme Court for purposes of constitutional analysis.  See, e.g., Speiser v. Randall, 357 U.S. 513, 518-20 (1958) (a discriminatory denial of a tax exemption for engaging in speech is a limitation on free speech); and Perry v. Sindermann, 408 U.S. 593, 597 (1972) (under the unconstitutional conditions doctrine, the Government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests – especially, his interest in freedom of speech").

As a result, even though this prosecution is, strictly speaking, based on an alleged concealment of information from the IRS, the materiality requirement and the unconstitutional conditions doctrine make clear what it really entails: an attempt, under the guise of a garden-variety false statement prosecution, to punish Defendants for engaging in constitutionally protected religious speech.  Worse – the Government is applying this technique in an unequal manner, for it would not apply, and has not applied, this prosecutorial technique to charities (and there are many)[12] that pursue their goals in accordance with familiar Christian or Jewish principles of charitable obligation and good works.

In this regard, the instant prosecution also raises a substantial equal protection issue, since the Fourteenth Amendment prohibits the Government from denying to any person or class of persons the equal protection of the laws.  A racially or religiously discriminatory application of the false statement/concealment of material fact and Klein conspiracy statutes – in this case to punish Muslim charities who carry out their charitable endeavours with reference to the Islamic religious concepts of *zakat*, *jihad*, and the *mujahideen*, properly understood – would violate the

---

[12] See Defendants' Motion to Dismiss at 19-34; and Appendix to Defendants' Motion to Dismiss at 00190 to 00825.

Equal Protection Clause.  The requirement of a showing of discriminatory purpose, <u>Washington v. Davis</u>, 426 U.S. 229 (1976), is met here.  <u>See</u> Defendants' Motion to Dismiss at 19-34, 42-44; Appendix to Defendants' Motion to Dismiss at 00190 to 00825.

<u>III. This is Not a Material Support of Terrorism Case</u>

In an effort to persuade this Court that something other than the attempted regulation of protected religious speech is at issue in this case, the Government shamelessly cites to a profusion of decisions resting on the material support of terrorism statute, 18 U.S.C. § 2339(A-C) and cognate laws.  It does so even though these cases have no direct or relevant bearing on the instant case, as a matter of fact or law.  The material support of terrorism citations play a special and utterly cynical role in the Government's briefing of this case because they so transparently constitute an effort to shore up the constitutional and other holes in the Government's tax fraud theory by suggesting not only that more than pure religious speech is involved here, but also seeking to create a relationship where none exists between these defendants and defendants in legitimate terror prosecutions.  At a minimum, the Government's use of these cases seems intentionally to confuse the materiality required in false statement cases, which the Government otherwise fails to address, much less establish, with the material aid to terrorism cases, giving the Government an excuse to cite decisions that are highly prejudicial and entirely irrelevant to an indictment which does not charge that crime.[13]

---

[13] <u>See</u>, <u>e.g.</u>, Government's Opposition at 11 (citing <u>Boin v. Quranic Literacy Foundation for Relief and Development</u>, 291 F.3d 1000, 1026 (7th Cir. 2002) ("There is no constitutional right to provide weapons and explosives to terrorists")), which manages to appear one sentence removed from, and is cited in support of, the Government's assertion that "defendants in this case do not stand charged with illegally associating with any organization or entities." Government's Opposition at 11.  <u>See also</u> <u>id.</u> at. 18 (again citing <u>Boin</u> for the proposition that "the government's interest in preventing terrorism is not only important but paramount"); Government's Opposition at 19 (citing <u>United States v. Al-Arian</u>, 308 F. Supp. 2d 1322 (M.D. Fl. 2004), a widely publicized material support case in Florida; and <u>United States v. Lindh</u>, 212

At least until the filing of Defendants' Motion to Dismiss, the Government took the position that the underlying activities specified in the indictment – publication of the newsletter "Al-Hussam," publication of *Join the Caravan*, the *zakat* calculation guide, etc. – were perfectly legal activities.  See Government's Opposition to Defendants' Motion for Bill of Particulars (Dkt #114) at 7 n.1 ("The government does not allege in the Indictment nor has it ever alleged in any public hearings or any pleading that such activities were illegal"); and Sealed Addendum to this Reply.  If the Government has changed its position on this matter,[14] it should charge Defendants accordingly and produce the requisite evidence, which has not been produced to date.  For reasons that Defendants explain in their sealed exhibit accompanying this reply, however, the Government has now effectively conceded once again that it has no such evidence, which means that it is simply playing "material support games" with this Court and with Defendants' liberty.  See Sealed Addendum to this Reply.  These games are unbecoming of officers of this Court and are prejudicial in the extreme.

What remains, after the bluffing is done, and after it is understood that the materiality requirement and the unconstitutional conditions doctrine lead inexorably to a First Amendment analysis, is an indictment bereft of any allegations that Defendants engaged in anything other than protected religious and political speech.  See Defendants' Motion to Dismiss at 10-11 and

---

F. Supp. 2d at 569 ("Those who choose to furnish such material support to terrorists cannot hide or shield their conduct behind the First Amendment")); and Government's Opposition at 31 (citing IRS General Consul Memo 34631 (October 4, 1971) for the proposition that "*A very little planned violence or terrorism would constitute 'substantial' activities not in furtherance of exempt purposes.*") (emphasis provided by the Government).

[14] In its opposition to Defendants' Motion to Dismiss, the Government now hedges on this issue, stating that "defendants' purposes of raising funds for the mujahideen, was [sic] a substantial non-charitable purpose, if not also independently illegal."  Government's Opposition at 9-10 fn. 7.

ff. (detailing each of the alleged activities specified in the indictment and explaining why each constitutes protected religious and political speech that cannot be indirectly burdened or penalized through the false statement/concealment of material facts and <u>Klein</u> conspiracy statutes).

Apparently recognizing this fatal weakness, the Government conjures up a novel, indeed extraordinary theory of criminal liability in an effort to avoid the dilemma it has created for itself and salvage its case. This theory is not based on what Defendants actually did, or intended to do, but rather on what the Government believes they <u>likely</u> did or <u>would have</u> done. The Government argues that "it is axiomatic that soliciting money for the mujahideen is <u>likely</u> to result in the receipt of and transference of money destined for the mujahideen" (emphasis added). Government's Opposition at 20. It states further that "the regulatory action would occur independent of the defendants' religion or free speech rights, but rather because the defendants <u>would be</u> supporting violent combatants." <u>Id.</u> at 34. These formulations amount to an unprecedented theory of liability, whereby a defendant may somehow be convicted for an uncharged offence that he "likely" committed or for an uncharged offence that the Government suspects he "would have" committed. The Government's theory amounts to something very different and far more radical than a conventional attempt to show by circumstantial evidence that a crime was committed. Here, the Government is saying that a person may be convicted of one charged crime (tax fraud) because he "likely" is guilty of committing another uncharged crime (material support of terrorism). Such a theory is truly unprecedented in our law because it violates the most fundamental requirements of due process.

IV. Relevance of Government Support for Similarly Situated Charities

The Government offers two meagre observations in response to Defendants' discussion and production of documents from the public record evidencing U.S. Government support – most notably through the offices of the U.S. Agency for International Development and the National Endowment for Democracy (NED) – to a host of tax-exempt organizations that advocated on behalf of the Afghan *mujahideen* both before and during the time period at issue in this indictment. First, the Government asserts that one (and only one) of these many "alleged charities" – the American Friends for Afghanistan (AFA) – was never in fact granted tax-exempt status. Assuming this to be the case, the Government evidently does not contest the tax-exempt status of every other 501(c)(3) cited in Defendants' Motion to Dismiss and Appendix. Moreover, what makes the AFA activity significant, regardless of the group's own charitable status, is its relation to the NED, an organization that not only was tax-exempt, but that knowingly gave multiple and substantial grants as late as 1992 for the specific purpose of funding the publication of a newsletter entitled *Afghan Jehad*. See Ex. 1.[15] It cannot be ignored that the NED, the Government's very own 501(c)(3) initiative, was engaged in funding the very kind of activities that the Government now says are incompatible with 501(c)(3) status and merit criminal punishment.

The Government disagrees, stating (by way of a second observation) that "defendants cannot correlate the potential of the U.S. Government's support for Afghan mujahideen at or before the same time as the defendants were funding them with any legal defense, aside from impermissible allusions to jury nullification." Government's Opposition at 40. Not so. As Part

_____

[15] The NED grants and the contents of the *Afghan Jehad* newsletter have been summarized in Defendants' Motion to Dismiss at 21-23 and reproduced in the Appendix at 00237-00255.

III above of this Reply makes clear, if there is a potential for jury nullification in this case, it is the potential for the jury to be so inflamed by the Government's prejudicial insinuations regarding unrelated and uncharged terrorist activity (such as the 1993 bombing of the World Trade Center and 9/11) that it could nullify the legal protections accorded Defendants by the First Amendment, IRS regulations, and the materiality doctrine and convict against the law and evidence.

The legal relevance of Defendants' discussion of the NED, USAID, and other organizations is fourfold. First, the evidence that many other 501(c)(3)s received federal financial assistance to engage in activities that the Government now claims are inconsistent with tax-exempt status is relevant because a defendant must have had clear notice that his alleged conduct was barred. Papachristou v. City of Jacksonville, 405 U.S. 156 (1972). In the context of a prosecution such as this, a defendant must at least have had clear notice that his alleged conduct was material to a determination of tax-exempt status. See Scull v. Com. of Va. ex rel. Committee on Law Reform and Racial Activities, 359 U.S. 344, 352-353 (1959) (holding that, where defendant was subpoenaed to answer questions before a state legislative committee in an investigation that "touched an area of speech, press, and association of vital public importance," it is "all the more essential" that defendant know with reasonable certainty that his refusal to answer questions constituted a crime).[16] As a matter of law, it cannot be said that a defendant

---

[16] See also Morissette v. U.S., 342 U.S. 246, 263 (1952) ("where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them.").

could know with reasonable certainty that his alleged activities were prohibited when government-sponsored charities were engaging in precisely the same activities.

Second, a charitable organization can reasonably rely upon prior IRS determinations as to what constitutes charitable conduct.  "It is well settled that the doctrine of equitable estoppel, in proper circumstances, and with appropriate caution, may be invoked against the United States in cases involving internal revenue taxation."  Simmons v. U.S., 308 F.2d 938, 945 (5th Cir. 1962). See also Perkins v. Thomas, 86 F.2d 954, 956 (5th Cir. 1936), affirmed, 301 U.S. 655 (1937) ("It is manifestly unjust to allow the government, having thus informed the taxpayer he could not have the deduction for his invested capital in 1928, now to say he could have it only then."); U.S. v. Asmar, 827 F.2d 907, 912 (3rd Cir. 1987) (recognizing the validity of an estoppel defense against the IRS).[17]

Third, precisely because Defendants could naturally and predictably rely on the grant of 501(c)(3) status to similarly-situated charities, and could assume the propriety of Care International's application for such status, there is a further Due Process issue in this case.  The

---

[17] While leaving open the issue of whether estoppel may run against the Government, the Supreme Court has stated that it is "hesitant . . . to say that there are no cases in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government."  Heckler v. Community Health Services of Crawford County, Inc., 467 U.S. 51, 60-61 (1984).  The First Circuit has recognized an estoppel defense against the Government in an immigration context in Akbarin v. Immigration and Naturalization Service  669 F.2d 839, *843 (C.A.1, 1982).  To the extent Akbarin requires affirmative government misconduct, that element of the estoppel defense is easily met in this case for reasons explained in connection with Defendants' selective prosecution claim set forth in their Motion to Dismiss at 42-44 (describing the instant prosecution as a form of retaliation against Mr. Muntasser for having brought a naturalization suit against the Government under * U.S.C. 1447(b).

Government may not engage in conduct virtually calculated to cause people and organizations to act in a certain manner deemed to be in the national interest, and then seek to pull the rug out from under them by alleging criminal conduct.  Defendants here could have reasonably relied on an assumption that the IRS was familiar with and favorably disposed towards this type of charity. When the Government leads one to believe that certain conduct is lawful or even favored, it cannot then charge, after the fact, when public policy changes, a violation of law.  Raley v. Ohio, 360 U.S. 423, 438-439 (1959) ("A State may not issue commands to its citizens, under criminal sanctions, in language so vague and undefined as to afford no fair warning of what conduct might transgress them. . . . Here there were more than commands simply vague or even contradictory. There was active misleading. . . . We cannot hold that the Due process clause permits convictions to be obtained under such circumstances.") (internal citations omitted); Cox v. Louisiana, 379 U.S. 559, 571 (1965) ("under all the circumstances of this case, after the public officials acted as they did, to sustain appellant's later conviction for demonstrating where they told him he could would be to sanction an indefensible sort of entrapment by the State – convicting a citizen for exercising a privilege which the State had clearly told him was available to him.  The Due Process Clause does not permit convictions to be obtained under such circumstances.") (internal citations and quotation marks omitted).  The Government had every right, of course, to change the public policy of the United States by withholding further support after the mid-1990s from charitable organizations engaged in advocacy on behalf of the Afghan *mujahideen*.  But it does not have the right to criminally punish those who properly conformed their conduct and expectations to the charitable standards set by the earlier policy.

Fourth, the evidence of NED and USAID support for the Afghan *mujahideen* during the 1980s and well into the 1990s reveals the bankruptcy of the notion that advocacy of *jihad* and the

*mujahideen* was clearly contrary to the public policy of the United States at all times relevant to this indictment.[18]  Indeed, the Government itself does not go this far in its opposition, maintaining in a revealing footnote only that "[t]he government's public policy regarding funding mujahideen cannot have been more explicit *since 1995*."  Government's Opposition at 35 (emphasis added). 1995, of course, is a good two years <u>after</u> Care International's 1023 application was filed.  The footnote goes on to discuss Executive Order 12947 and the "Middle East peach [sic] process," without bothering to explain how any of this is relevant to the issue at hand, which is whether advocacy of *jihad* and the *mujahideen* is prohibited by those with tax-exempt status and, if so, exactly how and when the public policy of the United States (however that concept should be defined in this context) made it so.  <u>Id.</u>  The footnote then asserts that "[m]any former mujahideen groups are now [specially designated terrorists]", without bothering to note that at the Constitutional Loya Jirga held by the U.S.-supported government of Afghanistan in December 2003, three of the seven former *mujahideen* party leaders served as official representatives.  <u>See</u> Defendants' Motion to Dismiss at 22 fn. 20.  The leaders of at least two other *mujahideen* parties, Gulbuddin Hekmatyar and Ahmed Shah Massoud, received massive arms transfers from the U.S. Government until as late as the early 1990s.  <u>See</u> Steve Coll, *Ghost Wars: The Secret History of the CIA, Afghanistan, and Bin Laden, from the Soviet Invasion to September 10, 2001* (2005), 238.  Of course, simply because the CIA was funding

---

[18] In this connection, it is worth noting that the Government appears to concede that a charity may, consistent with 501(c)(3) status, provide food and medical care for persons engaged in armed conflict abroad who are being cared for in hospitals and refugee camps.  <u>See</u> Government's Opposition at 44 n.32 (noting that the Free Afghanistan Alliance stated in response to IRS inquiries that "[w]e do not provide direct aid to any of the resistance fighters. However, some supplies are used to treat the wounded in the hospitals and they would also receive benefit from our provisions to refugee camps when they return from the field for rest periods.") (citing Defendants' Appendix to Motion to Dismiss at 00371).

and transferring arms to the Afghan *mujahideen* parties does not mean that a 501(c)(3) organization could do the same.  The point goes to the nature of American public policy regarding the Afghan conflict (which is a historical question), not the scope of permissible charitable activity (which is a legal question, governed in part by the First Amendment).

It would be comical, were it not so tragic, to see the Government attempting to rewrite all of this history before the eyes of this Court.  But the Government goes even further.  It cites <u>Bob Jones University v. U.S.</u>, 461 U.S. 574, 586 (1983), for the proposition that revocation of a charity's tax-exempt status is warranted where that charity's activities are clearly contrary to public policy.  At issue in <u>Bob Jones</u> was the public policy, stemming from the Thirteenth Amendment[19] and dating back at least to the Supreme Court's decision in <u>Brown v. Board of Education</u>, 347 U.S. 483 (1954), of refusing to tolerate racial discrimination and segregation in educational institutions.  For the Government to compare this longstanding, clear-cut public policy with a murky, purported public policy against advocating on behalf of *jihad* and the *mujahideen* that even the Government concedes was not operative (if it ever was at any time before 9/11) until 1995 – at least two years after Care International applied for tax-exempt status – is the final straw on the camel's back.[20]

---

[19] <u>See</u> <u>Green v. Connally</u>, 330 F.Supp. 1150, 1163 (D. D.C. 1971), <u>aff'd per curiam sub nom.</u>, <u>Coit v. Green</u>, 404 U.S. 997 (1971) (tracing the sources of American public policy against racial discrimination to the Thirteenth Amendment and congressional legislation abolishing "all badges and incidents of slavery").

[20] It would be far more accurate to say that, until some ill-defined point in the 1990s, the Government fostered a compelling public policy interest in <u>promoting</u> – rather than suppressing – advocacy of *jihad* and the *mujahideen* in Afghanistan.  <u>See also</u> <u>Ould v. Washington Hospital for Foundlings</u>, 95 U.S. 303, 311 (1877) ("A charitable use, where neither law nor public policy forbids, may be applied to almost any thing that tends to promote the well-doing and well-being of social man.").

<u>V. Additional Points</u>

The allegation that Defendants committed a false statement/concealment of material fact by failing to indicate on Care's 1023 form that Care was the successor or outgrowth of the Al-Kifah Refugee Center is addressed in Defendants' Motion to Dismiss at 44-47 (setting forth due process and rule of lenity arguments). With respect to the due process argument, <u>see also Humanitarian Law Project v. U.S. Dept. of Treasury</u>, 2006 WL 3477787 (C.D. Cal. 2006) (finding Executive Order 13224 unconstitutionally vague on its face and unconstitutionally overbroad with regard to "otherwise associated with" provision). Defendants further note that the Government's theory of liability with respect to this issue is barred by the principles of <u>NAACP v. Claiborne Hardware Co.</u>, 458 U.S. 886 (1982). The gist of the allegation is to suggest that, because Defendants may also have been members of an altogether different organization that has been implicated by the news media in wrongdoing, this Court may infer that the new organization Mr. Muntasser incorporated in 1993, Care International, should be held liable as a successor or outgrowth for the acts of the other organization. This is an impermissible inference under <u>Claiborne Hardware</u>, 458 U.S. at 931, 934 ("To impose liability without a finding that the NAACP authorized – either actually or apparently – or ratified unlawful conduct would impermissibly burden the rights of political association that are protected by the First Amendment. . . . A court must be wary of a claim that the true color of a forest is better revealed by reptiles hidden in the weeds than by the foliage of countless freestanding trees.")

With respect to Defendants' selective prosecution claim, the Government relies heavily on two assertions both of which fail to respond to the thrust of that claim. First, the Government argues that this claim is rebutted by the new affidavit of FBI Special Agent James Marinelli, which asserts that "the investigation of the defendants culminating in their indictment began

years before any naturalization lawsuit was filed by Muntasser." Government's Opposition at 51. But this assertion has no logical correlation with and so does not speak to the issue of whether the indictment was in retaliation for Mr. Muntasser's naturalization lawsuit. Nor is it particularly surprising, in the current environment, that someone in Muntasser's position would be under some generalized investigation: he is Muslim, of Libyan birth, and not yet an American citizen. In our era of "profiling," it would be surprising if he were <u>not</u> under investigation. The Government has also produced an affidavit by IRS Agent Lauren A. Youngquist pointing out that between 2002 and 2006 the IRS Criminal Investigations field office in Boston has secured 81 indictments for conspiracies to defraud the IRS and 143 indictments for the filing of materially false tax returns. Notably missing from these figures is what proportion of these totals involve charitable organizations. For the same period, Defendants' research has turned up a grand total of <u>one</u> federal criminal case within the First Circuit involving allegations that the founder of an organization granted tax-exempt status materially misrepresented his organization as charitable in nature. And even that one case, <u>U.S. v. George</u>, 449 F.3d 96 (1st Cir. 2006), involved principally allegations of personal income tax evasion.

The Government also states that because Mr. Muntasser was indicted along with Mr. Mubayyid, Mr. Muntasser cannot be the target of a retaliatory prosecution for having brought a naturalization lawsuit against the Government. Government's Opposition at 51. There are several difficulties with this suggestion. First, it seems transparent that the Government has dragged Mr. Mubayyid into this case as a pawn in order to satisfy the statute of limitations and facilitate a conspiracy charge against Mr. Muntasser. Second, many other individuals were associated with Care International as officers and members between 1993 and the present, and yet the Government has tellingly declined to prosecute any of them. Third, it would not matter

how many of Mr. Muntasser's fellow officers and members of Care International the

Government decides to bring into this prosecution, because that would have nothing to do with

whether the Government selected Mr. Muntasser for prosecution because he has tried to become

a citizen, or because he engaged in First Amendment protected activities.

<u>Conclusion</u>

There is much at stake in this case. At the most basic and mundane level, this case

exemplifies in the extreme the principle that "[a] criminal proceeding . . . is an inappropriate

vehicle for pioneering interpretations of tax law." <u>U.S. v. Dahlstrom</u> 713 F.2d 1423, 1428 (9th

Cir. 1983). At a more important level, this case tests whether our commitments to religious

liberty, freedom of speech, due process, and equality will continue to retain their lustre after 9/11

no less than before. At perhaps the most fundamental level, this case, which stems from a

naturalization lawsuit filed by an Arab-Muslim immigrant to the United States, is about how we

will decide to treat those who struggle to enjoy the privileges and responsibilities of American

citizenship, despite the obstacles they face in the aftermath of a national tragedy.

For all of the above reasons, Defendants respectfully urge this Honorable Court to grant

their motion to dismiss.

Respectfully submitted,

MUHAMMED MUBAYYID,                EMADEDDIN Z. MUNTASSER
By his attorney,                  By his attorneys,


  /s/ Michael C. Andrews              /s/ Malick W. Ghachem
Michael C. Andrews BBO# 546470)    Norman S. Zalkind (BBO# 538880)
21 Custom House Street             Elizabeth A. Lunt (BBO# 307700)
Boston, MA 02110                   Malick W. Ghachem (BBO#661018)
(617) 951-0072                     Zalkind, Rodriguez, Lunt & Duncan LLP
                                   65a Atlantic Ave.
                                   Boston, MA 02110

                                   _____Susan R. Estrich
                                   Robert Kingsley Prof. of Law and Political
                                   Science
                                   Univ. of Southern California Law School
                                   University Park, MC-0071
                                   Los Angeles, CA 90089-0071

                                   Harvey Silverglate (BBO # 462640)
                                   607 Franklin St.
                                   Cambridge, MA 02139

Dated: December 17, 2006

Home     About     Grants     Fellowships     Events     Publications     Research     Pres

Research >> Democracy Projects Database Search >> **Democracy Projects Database Results**

Your search for FIND ("Grantee" / "Subgrantee" ct American Friends of Afghanistan) returned the following:

**Search Again**
**Database Help**

**Grantor:** NATIONAL ENDOWMENT FOR DEMOCRACY (NED)
**Grantee:** American Friends of Afghanistan
**Subgrantee:** Cultural Council of the Afghan Resistance (CCAR) Afghan Institute for Policy Studies
**Country(ies):** Afghanistan
**Region:** Asia
**Subject(s):** Media and Publishing
**Grant Awarded:** 1991
**Amount:** $ 57,068
**Publication(s):** Afghan Jehad
**Program Summary:** To enable the Cultural Council of the Afghan Resistance to continue publishing the magazine Afghan Jehad and to support its Afghan Institute for Policy Studies program.

---

**Grantor:** NATIONAL ENDOWMENT FOR DEMOCRACY (NED)
**Grantee:** American Friends of Afghanistan
**Subgrantee:** Cultural Council of the Afghan Resistance (CCAR) Afghan Institute for Policy Studies
**Country(ies):** Afghanistan
**Region:** Asia
**Subject(s):** Media and Publishing
**Grant Awarded:** 1990
**Amount:** $75,300
**Program Summary:** To enable the Cultural Council of the Afghan Resistance (CCAR) of Islamabad, Pakistan to conduct the first program activities of its newly established independent, non governmental Afghan Institute for Policy Studies and to publish a quarterly journal.

---

**Grantor:** NATIONAL ENDOWMENT FOR DEMOCRACY (NED)
**Grantee:** American Friends of Afghanistan
**Subgrantee:** Lawyers Association of Free Afghanistan
**Country(ies):** Afghanistan
**Region:** Asia
**Subject(s):** Human Rights; Rule of Law
**Grant Awarded:** 1990
**Amount:** $13,750
**Program Summary:** To support the Lawyers Association of Free Afghanistan's work on behalf of the rule of law, human rights and pluralism in a post-war Afghanistan.

---

**Grantor:** NATIONAL ENDOWMENT FOR DEMOCRACY (NED)
**Grantee:** American Friends of Afghanistan
**Country(ies):** Afghanistan
**Region:** Asia
**Subject(s):** Media and Publishing
**Grant Awarded:** 1992

**Amount:** $61,344
**Publication(s):** Afghan Jehad
**Program Summary:** To support activities intended to encourage the adoption of democratic concepts as part of an Afghan solution, particularly through the publication of the quarterly journal, Afghan Jehad.

projects-report  | < | << |

---

Powered by DB/Text *WebPublisher*, from INMAGIC