UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
    )
        v.    )    Crim. No. 05-40026-FDS
    )
MUHAMED MUBAYYID, and    )
EMADEDDIN Z. MUNTASSER,    )
and    )
SAMIR AL-MONLA a/k/a    )
SAMIR ALMONLA,    )
    )
        Defendants.    )

**GOVERNMENT'S MOTION FOR NOTICE IN ADVANCE OF TRIAL OF ADVICE OF COUNSEL DEFENSE OR ALTERNATIVELY, RULING THAT ANY COMMUNICATIONS BETWEEN DEFENDANT MUNTASSER (OR ANY OTHER CARE/ALKIFAH REPRESENTATIVE) AND ABDULLAH BADE NOT PROTECTED AS PRIVILEGED**

The United States, by and through Michael J. Sullivan, and B. Stephanie Siegmann, Aloke Chakravarty, and Donald Cabell, Assistant United States Attorneys for the District of Massachusetts, hereby moves for advance notice of whether defendant Emadeddin Muntasser ("Muntasser") intends to raise an advice of counsel defense at trial to avoid the necessity of a mid-trial continuance to prepare to rebut such a defense. Alternatively, the government moves for a ruling from this Court that any communications between defendant Muntasser (or any other representative of Al-Kifah Refugee Center and Care International, Inc. ("Care")) and attorney Abdullah Bade on the subject of Care's application for tax exempt status pursuant to 26 U.S.C. §501(c)(3) are not privileged on the ground that (1) they were not intended to remain confidential, and (2) they fall within the

1

crime-fraud exception to the attorney-client privilege.  Lastly, if the Court agrees with either of the government's positions -- that Muntasser is required to provide advance notice of the advice of counsel defense or that the communications between Muntasser (or any representative of Al-Kifah or Care) and Bade are not privileged -- the government moves for the right to issue a Fed. R. Crim. P. 17(c) subpoena to Abdullah Bade with a return date of October 24, 2007.

## I.   Relevant Facts

According to The 9/11 Commission Report,[1] in the mid-1980s, Al-Kifah Refugee Center ("Al-Kifah") was established in New York as one of the first outposts of Sheik Abdullah Azzam and Osama Bin Ladin's Makhtab al-Khidamat ("MAK")[2] to recruit American Muslims to fight in Afghanistan.  The 9/11 Commission Report at 58.  In public, however, Al-Kifah represented itself to be an Islamic organization which solicited money for the victims

---

[1] The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States (2004) ("The 9/11 Commission Report").

[2] According to public source materials, including The 9/11 Commission Report, in the 1980s, Abdullah Azzam and Usama bin Laden established MAK, a "Bureau of Services," in Peshawar, Pakistan, "which channeled recruits into Afghanistan."  After the Soviets withdrew from Afghanistan in 1989, MAK was transformed into "a base or foundation (al Qaeda) as a potential general headquarters for future jihad" or armed world conflict.  See The 9/11 Commission Report at 56.  On September 24, 2001, the United States government designated "Makhtab Al-Khidamat/Al Kifah" as a Specially Designated Global Terrorist.  See generally Sealed Affidavit of James Marinelli dated November 21, 2006 [D. 163].

of war in Afghanistan.  <u>See</u> Sealed Affidavit of James Marinelli
dated November 21, 2006 at 3 [D. 163] ("Marinelli Aff.").  By no
later than 1991, a branch office of Al-Kifah was established in
Boston ("Al-Kifah Boston").  According to defendant Muntasser's
own admissions to the Immigration and Naturalization Service and
later its successor, Immigration and Customs Enforcement, he was
a member of the Boston Branch of Al-Kifah from 1991-1993.  <u>Id.</u> at
3-4.

During 1991-1993, Al-Kifah Boston solicited money for, and
promoted, the mujahideen (an Arabic term meaning "Muslim holy
warriors").  From in or about 1992 to April 2, 1993, Al-Kifah
Boston distributed a newsletter entitled "Al-Hussam" (an Arabic
term meaning "the Sword").  <u>See</u> Marinelli Aff. at 6-7, 19-20.
The common theme of these newsletters was that jihad (defined by
Al-Kifah as "armed conflict") was the "highest ranked devotion."
<u>See id.</u>  For example, an Arabic version of the March 5, 1993
issue of Al-Hussam, bearing the name Al-Kifah Refugee Center[3] and
address 1085 Commonwealth Avenue, Suite 124, Boston,
Massachusetts, encouraged readers to become a martyr and join the
mujahideen.  This issue contained two articles.  The first
discussed the benefits of engaging in jihad and becoming a martyr

---

[3]On the top of this issue, immediately above the name Al-
Kifah Refugee Center and underneath the Arabic title of the
newsletter "Al-Hussam", the Arabic words "Mujahideen Services
Bureau, Boston - USA" were written.

while the second entitled "Boston offers more martyrs" described
how a person by the name of Abou Al Layth left Boston to join the
mujahideen in Afghanistan in 1991.  Id. at 20-21.

Similarly, an undated flyer distributed by Al-Kifah Boston
explicitly stated its intentions to support the mujahideen on the
frontlines of the fighting.  This flyer was signed by defendant
Muntasser using the name "Abu Abdulrahman"[4] as the "Director,
Boston Branch" of Al-Kifah.  This flyer stated, among other
things, that:

> Alkifah Refugee Center is an organization founded
> by Sh. Abdullah Azzam to serve the cause of Jihad.
> This non-profit organization administers schools,
> hospitals, and refugee camps.  In addition, the
> organization actively supports the Mujahideen in
> the front.

See id. at 8 n. 4.  A copy of this flyer is also attached hereto
as Ex. 1.  This flyer also stated that Al-Kifah Boston
distributed a Zakat Calculation Guide.  Lastly, this flyer
indicated that any donations made to Al-Kifah Boston were tax
exempt.  On the contrary, Al-Kifah never applied for, or
obtained, tax exempt status from the Internal Revenue Service
("IRS") under 26 U.S.C. §501(c)(3).  See attached Affidavit of
Lauren Youngquist ("Youngquist Aff.") at 4.

Muntasser also used an invalid tax identification number to
open a bank account for Al-Kifah Boston at Baybank.  On the

---

[4]Muntasser admitted to Special Agent Marinelli that he was
also known by this name.  Marinelli Aff. at 9 n.8.

account signature card obtained from Baybank during the course of
this investigation, Muntasser indicated that Al-Kifah had a tax
identification number of 112910960.  That number was never
assigned to Al-Kifah.  Muntasser signed this signature card as
the "Acting Chairman, Boston."  See Youngquist Aff. at 4.  A copy
of this card is attached hereto as Exhibit 2.

     In April 1993, media reports linked the New York office of
Al-Kifah to the February 26, 1993 World Trade Center bombing.
Two days after the New York Times reported this link, on April
13, 1993, Muntasser founded and incorporated in Massachusetts
Care International, Inc. ("Care").  Youngquist Aff. at 5.
Muntasser represented in Care's Articles of Incorporation, filed
with the Massachusetts Secretary of State's Office, that Care was
"organized exclusively for charitable, religious, educational,
and scientific purposes, including but not limited to, engage in,
establish, promote, contribute and carry out human welfare,
charitable and relief activities, programs, projects,
organizations, institution and funds."  Superseding Indictment at
1-2.  In these articles, Muntasser indicated that Care was
located at the same address as Al-Kifah Boston -- 1085
Commonwealth Avenue, Suite 124, Boston, Massachusetts.  See
Exhibit A to Youngquist Aff. at 19.

     Shortly after Care was incorporated in Massachusetts,
Muntasser sought a tax exemption for Care from the IRS pursuant

to 26 U.S.C. §501(c)(3) on the basis that Care was a charitable organization.  On or about May 22, 1993, Muntasser retained the services of Abdullah Bade, an attorney located in Indianapolis, Indiana ("Bade"), to assist him in the filing of the Form "1023 Tax Exemption Application."  See Form 2848, Power of Attorney and Declaration of Representative, Ex. A to Youngquist Aff. at 2-3. On June 1, 1993, Muntasser executed an Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code, IRS Form 1023 ("1023 Application").  On June 11, 1993, Bade filed this 1023 Application along with his power of attorney and Care's Articles of Incorporation and Bylaws with the IRS.  See letter of Bade to IRS, Ex. A to Youngquist Aff. at 1.

Question 1 of Part II of the 1023 Application requested that Muntasser "[p]rovide a detailed description of all the activities of the organization -- past, present, and planned."  Muntasser responded that Care was recently incorporated, would become operational shortly, and would provide charitable services such as "provid[ing] assistance to victims of natural and man-made disasters ... primarily in Bosnia and later in African countries. ... [and] develop[ing] a program for orphan sponsorships." Nowhere in this response did Muntasser disclose that Care planned to support jihad and the mujahideen by soliciting contributions for, and distributing publications, including any newsletters, to promote, jihad and the mujahideen.  See Care's Form 1023

Application, Ex. A to Youngquist Aff. at 5; Superseding
Indictment at 3-4.

The 1023 Application also asked Muntasser whether "the
organization [is] the outgrowth of (or successor to) another
organization, or does it have a special relationship with another
organization by reason of interlocking directorates or other
factors? . . . If . . . answered "Yes," explain." See Care's
Form 1023 Application at Question 5, Part II, Ex. A to Youngquist
Aff. at 6. Muntasser answered "no" to this question, and
concealed from the IRS in the Form 1023 Application that Care was
an outgrowth of, and successor to, Al-Kifah. See Superseding
Indictment at 4.

At the time this application was signed by Muntasser and
filed by Bade with the IRS, Care had assumed the activities of
Al-Kifah, including its distribution of the pro-mujahideen
newsletter, Al-Hussam.

On June 11, 1993, the same day Bade filed Care's 1023
Application, Care published an Arabic version of Al-Hussam that
extolled the virtues of jihad and indicated that Care, referred
to as "the Services Bureau":

> was successful in distributing 3000 Udahi
> [sacrificed animals] to the brothers on the
> front lines and to the Muslims of Bosnia.
> This is on top of what was distributed to the
> Mujahideen and Muslims in Afghanistan, Kashmir, and Tajikistan.

After Care assumed the publication of Al-Hussam, neither the

format nor the contents of the newsletter changed; the common

theme remained the promotion and support of the Mujahideen and

violent jihad.  See Marinelli Aff. at 7-8, 18-22.  For instance,

an issue dated December 16, 1994, published under the name Care

states that:

> *Mujahideen* are not harmed by 'those who let
> them down.'. . . one is let down only by
> those from whom one anticipated allegiance
> and support.  So, we see that let-down comes
> only from Muslims who do not uphold their
> responsibility for backing and supporting the
> *Mujahideen. . . .* People have different
> reasons and excuses for letting down the
> *Mujahideen.*  A man may forsake them because
> of feelings of defeatism and frustration,
> which render him unable to hold out and
> perform *Jihad.*  Or, the reason may be fear;
> he may be afraid for his position, his
> business, his children or his passport; or he
> might be scared of losing his residency
> rights.  People, Muslims at that, forsake
> their principles, their religion, their
> dignity and their manhood, on account of
> fear.

Id. at 21.

In or about October 1993, the IRS granted Care tax exempt

status under 26 U.S.C. §501(c)(3) and its regulations based upon

the fraudulent information Muntasser supplied in Care's Form 1023

application.  See Superseding Indictment at 4.

**II.  Argument**

   **A.    Attorney-Client Privilege.**

The attorney-client privilege only protects communications

that are confidential and made for the purpose of seeking or

receiving legal advice.  See United States v. Mass. Inst. of
Tech., 129 F.3d 681, 684 (1st Cir. 1997).  The party who invokes
a claim of attorney-client privilege "bears the burden of
establishing that it applies to the communications at issue and
it has not been waived."  In re Keeper of Records (Grand Jury
Subpoena Addressed to XYZ Corp.), 348 F.3d 16, 22 (1st Cir. 2003)
("XYZ Corp.").  For instance, if otherwise privileged
communications are disclosed to a third party, the disclosure
destroys the confidentiality upon which the privilege is premised
and the privilege is thereby waived.  Mass. Inst. of Tech., 129
F.3d at 684.

      The First Circuit Court of Appeals construes the attorney-
client privilege narrowly because it hinders the search for the
truth by the grand jury and the courts.  XYZ Corp., 348 F.3d at
22 ("attorney-client privilege must be narrowly construed because
it comes with substantial costs and stands as an obstacle of
sorts to search for the truth."); see Cavallaro v. United States,
284 F.3d 236, 246 (1st Cir. 2002) (narrow construction of
attorney-client privilege based, in general, upon belief that
"'investigation of truth and the enforcement of testimonial duty
demand restriction, not expansion, of these privileges.'")
(citations omitted).  Thus, the attorney-client privilege should
be strictly applied "only to the extent necessary to achieve its
underlying goal of ensuring effective representation through open

communication." <u>In re Grand Jury Subpoena (Custodian of Records,</u>
<u>Newparent, Inc.)</u>, 274 F.3d 563, 571 (1st Cir. 2001).

   **B.   <u>DISCLOSURE OF ADVICE OF COUNSEL DEFENSE PRIOR TO TRIAL.</u>**

   Where a party places privileged information in issue for
personal benefit, courts have deemed the privilege waived by
implication. <u>XYZ Corp.</u>, 348 F.3d at 24. Accordingly, if a
defendant raises an advice of counsel defense, "communications
embodying the subject matter of the advice typically lose
protection." <u>Id.</u>; <u>see</u> <u>Saint-Gobain/Norton Indus. Ceramics Corp.</u>
<u>v. General Electric Co.</u>, 884 F. Supp. 31, 33 (D. Mass. 1995) (the
assertion of an advice of counsel defense "waives the attorney-
client privilege with respect 'to all communications to and from
counsel concerning the transaction for which counsel's advice was
sought.'"). This rule is premised upon fairness concerns that a
defendants not be allowed to use the attorney client privilege as
both a shield and a sword. <u>Id.</u>; <u>see</u> <u>United States v. Bilzerian</u>,
926 F.2d 1285, 1292 (2d Cir. 1991). "Were the law otherwise, the
client could selectively disclose fragments helpful to his cause,
entomb other (unhelpful) fragments, and in that way kidnap the
truth-seeking process." <u>XYZ Corp.</u>, 348 F.3d at 24.

   Here, during several hearings on discovery matters,
Muntasser's counsel have implied that Muntasser may raise an
advice of counsel defense. At times, in arguing about the
discoverability of IRS records, Muntasser's counsel have

insinuated that the government does not know what Muntasser was advised by his attorney.  Because Care's Form 1023 is a central focus of its case against Muntasser, the government anticipates that Muntasser will assert an advice of counsel defense or a good faith defense[5] as to the responses on the Form 1023 that the government alleges were fraudulent.  Pursuant to the Court's inherent judicial power to regulate discovery and trial management, the government requests this Court to order the defendant to provide advance notice of whether it intends to raise such a defense to prevent the necessity of a lengthy mid-trial continuance and to allow the government to properly prepare for trial.

Although the Federal Rules of Criminal Procedure do not specifically require a defendant to provide pre-trial notice of an advice of counsel defense,[6] this Court has the inherent judicial power to order a defendant to provide such notice and reciprocal discovery to the government or risk sanctions for non-

---

[5]A good faith defense will similarly put in issue any advice Muntasser received from his attorney.  See Bilzerian, 926 F.2d at 1292-94 (defendant's testimony regarding his good faith would necessarily implicate any advice received from his attorney and waive attorney-client privilege).

[6]A defendant is required to provide pre-trial notice of the defenses of alibi, insanity, and public authority pursuant to Fed. R. Crim. P. 12.1-12.3.  Such advance notice is required to allow the government to properly prepare for trial and avoid the necessity of continuances in the middle of trial, "thus unnecessarily delaying the administration of justice."  See Fed. R. Crim. P. 12.2, Advisory Committee Notes.

compliance.  <u>Carlisle v. United States</u>, 517 U.S. 416, 425-26
(1996) ("federal courts 'may within limits, formulate procedural
rules not specifically required by the Constitution or the
Congress.'") (citation omitted); <u>see</u> <u>United States v. Nobles</u>, 422
U.S. 225, 236-41 (1975) (in upholding exclusion of testimony
sanction for failure to comply with discovery order, recognized
district court's inherent power to order defense to produce its
investigator's report to government).  This inherent power was
codified in Fed. R. Crim. P. 57(b), which states that "a district
judge may regulate practice in any manner consistent with federal
law, these rules, and the local rules in the district."

Courts have historically invoked their inherent powers to
address situations similar to that raised here.  For instance,
before the enactment of Fed. R. Crim. P. 12.2 (pre-trial notice
of insanity defense), several circuit courts "recognized the
existence of inherent judicial authority to order a defendant to
order a defendant to give the government notice of a psychiatric
defense and to submit to examination by a government expert."
<u>United States v. Beckford</u>, 962 F. Supp. 748, 754-55 (E.D.Va.
1997) (citations omitted).

Fed. R. Crim. P. 16 does not prevent this Court from
ordering pre-trial notice of whether Muntasser intends to assert
an advice of counsel defense.  Nor does any other federal rule of
criminal procedure.  The Advisory Notes to Rule 16 indicate that

the rule was "not intended to limit the judge's discretion to order broader discovery in appropriate cases" but rather was "intended to prescribe the minimum amount of discovery to which the parties were entitled." Id. at 756-57.  Similarly, accelerating the disclosure date of a particular defense does not violate a defendant's constitutional rights because a criminal trial is not "a poker game in which players enjoy an absolute right always to conceal their cards until played." Williams v. Florida, 399 U.S. 78, 82 (1970) (rule requiring advance notice of alibi defense not unconstitutional as it "only compelled [defendant] to accelerate the timing of his disclosure, forcing him to divulge at an earlier date information that [he] planned to divulge at trial.")

In the interest of fairness and to avoid the necessity of any delay during trial, the government asks this Court to order the defendant to provide the government notice 45 days prior to trial as to whether it intends to assert an advice of counsel defense.  If the defendant fails to comply with such an order, the government requests that the he be precluded from offering any testimony to support an advice of counsel defense or a good faith defense premised on any statements made to him by an attorney.

### C.    ATTORNEY-CLIENT PRIVILEGE DOES NOT PROTECT INFORMATION INTENDED TO BE DISCLOSED IN IRS FILING.

A communication is only protected by the attorney-client

13

privilege if it meets eight essential elements:

> (1) legal advice of any kind is sought (2)
> from a professional legal adviser in his
> capacity as such, (3) the communications
> relating to that purpose, (4) made in
> confidence (5) by the client, (6) are at his
> instance permanently protected (7) from
> disclosure by himself or by the legal
> adviser, (8) except the protection be waived.

Mass. Inst. of Tech., 129 F.3d at 684. Muntasser cannot

establish that his communications with counsel pertaining to the

filing of Care's Form 1023 are privileged. Where, like here, the

subject communications pertained to information that was intended

to be disclosed to the IRS, no privilege attaches. When a client

knows that counsel is going to communicate facts to third parties

(and, as here, authorizes such conduct), there can be no

reasonable expectation of confidentiality and, hence, no

attorney-client privilege. In re Grand Jury Proceedings, 727

F.2d 1352, 1356-58 (4th Cir. 1984) ("privilege does not apply . .

. where it is the intention or understanding of the client that

the communication is to be made known to others.") ; see, e.g.,

Colton v. United States, 306 F.2d 633, 638 (2d Cir. 1962)

(information provided to attorney for inclusion in a tax return

not privileged); United States v. Oloyede, 982 F.2d 133, 141 (4th

Cir. 1993) (information communicated by clients to attorney for

use in filing citizenship applications with INS not privileged);

United States v. Lawless, 709 F.2d 485, 487 (7th Cir. 1983) (no

expectation of confidentiality in information transmitted to

14

attorney for use on tax return regardless of whether information actually disclosed on return).

Moreover, even information that was never actually disclosed to the government or a third party is not privileged if it was disclosed for the purpose of preparing a public filing. See Lawless, 709 F.2d at 488 (no privilege applied to information that never made it on tax return because "disclosure of tax information effectively waives the privilege 'not only to the transmitted data but also as to the details underlying that information.'") (quoting United States v. Cote, 456 F.2d 142, 145 (8th Cir. 1972)). For instance, in In re Grand Jury Proceedings, the Fourth Circuit addressed the issue of whether discussions between an attorney and client during preparation of a prospectus to be used in the enlistment of investors were privileged. Even though the prospectus was never actually mailed to third parties, the Court had little problem rejecting the claim of attorney-client privilege:

> [I]t is irrelevant that no prospectus was ever actually issued in this case. The significant fact is that the information given the [attorney] was to assist in preparing such prospectus which was to be published to others and was not intended to be kept in confidence. That is the critical circumstance, to wit, the absence of any intent that the information was to be kept confidential. Remembering that the privilege itself is not "favored" and is to be "strictly confined within the narrowest possible limits," we have no difficulty in concluding under the admitted facts of this case that all information given the [attorney] by any of the joint venturers connected with the subject-matter of the proposed issuance of participations is without the

protection of the attorney-client privilege.

Id. at 1358.

Unlike the prospectus in In re Grand Jury Proceedings, the
information contained in Care's Form 1023 Application was
disclosed to third parties; it was filed with the IRS.  Given
these facts, Muntasser cannot meet his burden of demonstrating
the requisite intention to maintain confidentiality necessary to
support a claim of attorney-client privilege regarding
communications with Bade pertaining to Care's 1023 Application.[7]

---

[7]Muntasser lacks standing to assert the attorney-client
privilege as any privilege as to communications between Muntasser
and Bade regarding Care's acquisition of tax exempt status in or
about 1993 belongs to the corporation, not Muntasser
individually.  Typically, in the case of solvent corporations,
the power to assert the privilege "rests with the corporation's
management and is normally exercised by its officers and
directors."  In re Grand Jury Proceedings, 219 F.3d 175, 183-84
(2d Cir. 2000) (internal quotation and citations omitted); see
Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 348
(1985) (implicitly recognizing authority of corporate officers to
assert and waive privilege).  Accordingly, only current
management has the authority to assert or waive the corporation's
attorney-client privilege.  In re Grand Jury Subpoena, 274 F.3d
563, 571 (1st Cir. 2001).  Because Muntasser is no longer an
officer or director of Care, he has no power to assert the
privilege.  Nor does any other person have such a right.  On
February 28, 2002, Care was dissolved as a Massachusetts
corporation.  Where courts have been unable to identify an active
manager of corporate affairs, such as where a receiver is merely
assigned the assets of a bankrupt corporation, the corporate
privilege may not be invoked.  See Federal Deposit Insurance
Corp. v. McAtee, 124 F.R.D. 662, 664 (D. Kan. 1988) (rejecting
the privilege where the entity controlling the privilege no
longer exists); Federal Deposit Insurance Corp. v. Amundson 682
F. Supp. 981, 987 (D. Minn. 1988)(rejecting Weintraub analogy
where the corporate entity no longer exists); Lewis v. U.S., 2004
WL 3203121 (W.D. Tenn. 2004)(unpub.) (concluding that the
corporate attorney-client privilege does not apply after

**D.    CRIME-FRAUD EXCEPTION TO ATTORNEY-CLIENT PRIVILEGE BARS ASSERTION OF PRIVILEGE TO COMMUNICATIONS BETWEEN DEFENDANT MUNTASSER AND ABDULLAH BADE ON SUBJECT OF FORM 1023.**

At a minimum, Muntasser sought and obtained the services of Abdullah Bade to file Care's fraudulent Form 1023 Application. He falsely completed Care's Form 1023 application by failing to list all of Care's activities in response to Question 1 of Part II. Muntasser also lied when he indicated that Care was not a successor or outgrowth of another organization. By so doing, Muntasser concealed Care's relationship to Al-Kifah from the IRS. In essence, Muntasser was willing to lie to ensure Care obtained what he viewed to be necessary to Care's collection efforts -- tax exempt status.[8] Based upon Muntasser's fraudulent representations, communicated by Bade to the IRS, the IRS granted Care tax exempt status under 26 U.S.C. §501(c)(3). Bade's services therefore aided Muntasser's commission of a fraud. As a result, communications between Muntasser and Bade are not protected by the attorney-client privilege.

The attorney-client privilege only protects confidential communications between attorney and client made to facilitate

---

dissolution).

[8]Muntasser knew from his experience with Al-Kifah that tax exempt status was a powerful tool for collection efforts; this observation explained Muntasser's willingness to deceive Al-Kifah's donors on solicitation materials that Al-Kifah had obtained Section 501(c)(3) status when it had not.

legal services for the client; it does "not extend to
communications made for the purpose of getting advice for the
commission of a fraud or crime." <u>Cavallaro</u>, 284 F.3d at 245-46;
<u>United States v. Reeder</u>, 170 F.3d 93, 106 (1st Cir. 1999)
(<u>quoting</u> <u>United States v. Zolin</u>, 491 U.S. 554, 563 (1989)
(internal quotation marks and citation omitted).  It is further
intended "to encourage full and frank communication between
attorneys and their clients and thereby promote broader public
interests in the observance of law and administration of
justice." <u>Upjohn Co. v. United States</u>, 449 U.S. 383, 389 (1981).
When a client communicates with his attorney for the purpose of
advancing a criminal or fraudulent enterprise, "the rationale
that underpins the [attorney-client] privilege vanishes." <u>In re
Grand Jury Proceedings (Gregory P. Violette)</u>, 183 F.3d 71, 75
(1st Cir. 1999).  Thus, the privilege is "forfeited *inter alia*
where the client sought the services of the lawyer to enable or
aid the client to commit what the client knew or reasonably
should have known to be a crime or fraud." <u>United States v.
Rakes</u>, 136 F.3d 1, 4 (1st Cir. 1998).

Once the attorney-client privilege has been asserted, the
party invoking the crime-fraud exception to pierce the privilege
must make a two-pronged reasonable cause showing:  "(1) that the
client was engaged in (or was planning) criminal or fraudulent
activity when the attorney-client communications took place; *and*

18

(2) that the communications were intended by the client to facilitate or conceal the criminal or fraudulent activity." If the challenger succeeds in making such a showing, no privilege applies to the subject communications. Even if the challenger cannot make a reasonable cause showing that the lawyer's services were used by the client to foster a crime or fraud, a district court may nonetheless conduct an in camera review of the allegedly privileged materials to determine whether the crime-fraud exception applies upon a lesser evidentiary standard. See Zolin, 491 U.S. at 572. The Supreme Court described this "lesser evidentiary standard" as "a showing of a factual basis adequate to support a good faith belief by a reasonable person" that in camera review may reveal evidence to establish the applicability of the crime-fraud exception. Id. at 572 (citation omitted).

The government's evidence is sufficient to meet the reasonable cause standard to vitiate the attorney-client privilege. At a minimum, the government has met the lower threshold standard needed for a Zolin in camera review.

The government has established that in April 1993, Muntasser incorporated Care shortly after media reports linked Al-Kifah to the 1993 World Trade Center bombing. Between April and June 1993, when the alleged privileged communications were believed to have occurred, Muntasser began transferring Al-Kifah's assets to Care and Care assumed the publication of Al-Kifah's newsletter.

19

As evidenced by the allegations contained in the Superseding Indictment returned in this case, the grand jury concluded there was probable cause to believe that in June 1993, Muntasser completed and executed a fraudulent Form 1023 application on behalf of Care that concealed the relationship between Care and Al-Kifah and the true nature of Care's then existing and planned activities. Muntasser retained Bade's services and communicated to him during the May-June 1993 time frame for the purpose of completing his fraudulent activity and obtaining a charitable, tax exempt status for Care, to which it was not entitled.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court (1) order that the defendant Muntasser provide the government notice 45 days prior to trial as to whether he intends to assert an advice of counsel defense; and/or (2) find that any communications between Muntasser (or any representative of Al-Kifah Boston or Care) and Bade pertaining to the filing of Care's 1023 Application are not privileged on the grounds that they were never intended to remain confidential or fall within the crime-fraud exception to the attorney-client privilege.

The government further moves that it be permitted to serve Abdullah Bade with a Fed. R. Crim. P. 17(c) subpoena requiring the production of documents to the government at least 21 days

prior to trial if Muntasser decides to assert an advice of counsel defense or this Court finds that the communications pertaining to Care's Form 1023 Application are not privileged. Under either of those circumstances, the documents pertaining to any communications between Bade and the defendant or any Al-Kifah/Care representative would certainly be relevant to the allegations in the indictment. Through this subpoena, the government would only seek to obtain documents pertaining to communications or correspondence regarding Care's 1023 Application filed on June 11, 1993, most importantly, communications about the information sought and provided in Part II of Care's Form 1023 Application. If the Court were to deny this request, the government will not be able to properly prepare for trial. See <u>United States v. Nixon</u>, 418 U.S. 683, 700 (1974) (articulating four elements to obtain Fed. R. Crim. P. 17(c) subpoena with return date prior to trial).

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: <u>/s/ B. Stephanie Siegmann</u>
B. STEPHANIE SIEGMANN
ALOKE CHAKRAVARTY
DONALD CABELL
Assistant U.S. Attorneys

Date: May 21, 2007

21

<u>Certificate of Compliance with Local Rule 7.1</u>

I do hereby certify that I have attempted to confer to narrow the issues set forth in this motion with David Duncan, counsel for Defendant Emadeddin Muntasser.

<u>/s/ B. Stephanie Siegmann</u>
B. Stephanie Siegmann
Assistant U.S. Attorney


<u>Certificate of Service</u>

I do hereby certify that a copy of foregoing motion was served upon the counsel of record for the defendants by electronic notice on this 21st day of May 2007.

<u>/s/ B. Stephanie Siegmann</u>
B. Stephanie Siegmann

22

**EXHIBIT 1**

بسم الله الرحمن الرحيم

# Alkifah Refugee Center, Inc.    مكتب خدمات المجاهدين

1085 Commonwealth Ave., Suite124
Boston, MA 02215
(617) 354-1574

"انفروا خفافاً وثقالاً وجاهدوا بأموالكم وأنفسكم
في سبيل الله ذلكم خير لكم إن كنتم تعلمون"

*"Go ye forth, (whether equipped) Lightly or heavily, and strive And struggle, with your goods And your persons, In the Cause of Allah. That is best for you, If ye (but) knew." Q: 9:41*

Dear Muslim:

Alkifah Refugee Center is an organization founded by Sh. Abdullah Azzam to serve the cause of Jihad. This non-profit organization administers schools, hospitals, and refugee camps. In addition, the organization actively supports the Mujahideen in the front.

We call upon your faith in Allah, your love of his prophet, peace be upon him, and your belief in a brighter day for Islam and Muslims to help our Mujahideen brethren around the world.

Thousands of Mujahideen, widows, and orphans have been and still are without proper clothing, food, or shelter. And the conditions are worsening. In these rough times, it is our duty - as one Muslim Ummah - to support them in their struggle to gain unity and pride for all Muslims and to establish Khilafah.

Therefore, we urge you - dear fellow Muslim - to spend your Zakat on this cause of Allah. We assure you that this is a great opportunity to please your Lord and win his mercy.

We have provided, for your convenience, a Zakat calculation guide and worksheet. Please use the provided envelope to mail your Zakat-ul-Mal, Zakat-ul-Fitr and Sadaka as soon as possible. Unless you specify a country designation, our Shura Council will distribute funds according to priority and need. May Allah accept from us all.

Thank you, Wassalamu Alaykum.

Sincerely,

*Abu Abdalrahman*

Abu Abdulrahman, Director
Boston Branch

# AFGHANISTAN • ALGERIA • BOSNIA
# KASHMIR • PALESTINE

*ALL DONATIONS ARE TAX-EXEMPT*

**EXHIBIT 2**

**BayBank®**  Business Account Signature Card

| BANK | BRANCH | ACCOUNT NUMBER |
| --- | --- | --- |
| 03 | 029 | 31266378 |

LEGAL NAME OF BUSINESS DEPOSITOR: Care International Inc.

TAX IDENTIFICATION NUMBER: 043680558

In consideration of BayBank accepting this account, on behalf of the Depositor(s), I/we agree to be bound by such Rules and Regulations and any Schedule of Charges applicable to the above account and any related account as may now or hereafter be established by BayBank from time to time. BayBank is hereby authorized to recognize any of the signatures appearing below, which are the true signatures of persons empowered to act for and on behalf of the Depositor(s). BayBank may obtain any credit information it believes is necessary with respect to opening or handling the account and may give information concerning the account to any persons who may legally receive it.

AUTHORIZED SIGNATURES                    TITLE

SIGNER 1: X Muntther Brara — Treasurer

SIGNER 2: Emadeddin Muntasser — Chairman

---

**BayBank®**  Business Account Signature Card

| BANK | BRANCH | ACCOUNT NUMBER |
| --- | --- | --- |
| MIDDLESEX | 013 | 2627813 |

LEGAL NAME OF BUSINESS DEPOSITOR: ALKIFAH REFUGEE CENTER 1129109110

TAX IDENTIFICATION NUMBER:

In consideration of BayBank accepting this account, on behalf of the Depositor(s), I/we agree to be bound by such Rules and Regulations and any Schedule of Charges applicable to the above account and any related account as may now or hereafter be established by BayBank from time to time. BayBank is hereby authorized to recognize any of the signatures appearing below, which are the true signatures of persons empowered to act for and on behalf of the Depositor(s). BayBank may obtain any credit information it believes is necessary with respect to opening or handling the account and may give information concerning the account to any persons who may legally receive it.

AUTHORIZED SIGNATURES                    TITLE

SIGNER 1: X Emadeddin Muntasser, Acting Chairman, Boston

SIGNER 2:

---

Title: EMADEDDIN MUNTASSER

Signature(s)
(1) X Emadeddin Muntasser
(2)

**BayBank®**

Acct. #: 3914935 2
Tax ID:
Opened By: 052357
Bank/Branch: 03 013
Date Opened: 2/4/93

AGREEMENT: By signing above, I agree that I have received and will be bound by the Rules and Regulations, Schedule of Charges, and BayBank Card Cardholder Agreement applying to the above account(s). You may give information concerning the account(s) to any persons who may legally receive it. You may obtain any credit information you believe is necessary with respect to opening or handling the account(s). If two persons sign above, the account(s) is (are) joint account(s), and each guarantees that the signature of the other is genuine. Either person may make withdrawals or any instrument you permit for such account(s) on his or her sole signature or by using any authorized card, and each person may address for deposit any instrument payable to either or both. The survivor will have exclusive control of the account(s). If there is a Reserve/BayPlus Credit line associated with the account(s), I have received and agree to be bound by your credit agreement and other applicable rules and regulations and am responsible for any outstanding balance.

BAYBANK CARD REQUEST: Please issue a BayBank Card or BayBank Card with X-Press Check for use with my selected account(s) to each person who signs below and checks the box above his or her name.

☐ Card Requested          ☐ Card Requested

X _____     X _____
Signature of Applicant      Date    Signature of Co-Applicant     Date
For joint account(s), both account holders must sign here before a BayBank Card may be issued to either.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
)
v. )    Crim. No. 05-40026-FDS
)
MUHAMED MUBAYYID, and )
EMADEDDIN Z. MUNTASSER, )
and )
SAMIR AL-MONLA a/k/a )
SAMIR ALMONLA, )
             Defendants. )

## AFFIDAVIT OF LAUREN A. YOUNGQUIST

I, Lauren A. Youngquist, Special Agent with the United States Internal Revenue Service, Criminal Investigation, do hereby depose and state as follows:

## INTRODUCTION, BACKGROUND AND QUALIFICATIONS

1.     I am a Special Agent with the United States Internal Revenue Service ("IRS"), Criminal Investigation ("CI"). I have been so employed for more than 18 years. I am currently assigned as a supervisory special agent overseeing a group of 10 special agents within the Boston Field Office of CI. I have held this position since October 2005.

2.     Prior to October 2005, I was assigned to the White Collar Crime Squad of the Boston Office of the Federal Bureau of Investigation ("FBI"). I was assigned to the FBI from 2001 to October 2005. While on assignment with the FBI, I also assisted other squads on investigations including the Joint Terrorism Task Force.

3.     My duties as a special agent with the IRS-CI, include conducting investigations involving violations of the Internal Revenue Code, the Bank Secrecy Act, and related

1

offenses. In particular, I have conducted and/or assisted in hundreds of investigations involving tax fraud, money laundering and the illegal structuring of financial transactions. In my capacity as a special agent with IRS-CI, I have received specialized training in many subject areas including but not limited to the following: tax law, criminal law, financial investigative techniques, Money Laundering Control Act violations, and the Bank Secrecy Act violations.

4.      The information contained in this affidavit is based on my personal involvement in this investigation, my training and experience, my review of documents, and information provided to me by other law enforcement officers, revenue officers, and employees of IRS. This affidavit is submitted for the limited purpose of supporting the Government's Motion for Notice in Advance of Trial of Advice of Counsel Defense or Alternatively, Ruling that Any Communications Between Defendant Muntasser (or Any Other Care/Al-Kifah Representative) and Abdullah Bade Is Not Protected as Privileged. Therefore, it does not set forth each and every fact that I have learned during the course of this investigation.

5.      I was involved in the investigation of Care and defendants Emadeddin Muntasser, Muhamed Mubayyid, and Samir Al-Monla. As a result, I have reviewed the tax filings of Care as well as the evidence collected during this investigation that spanned several years.

6.      The witness interviews conducted and documents obtained during the course of this investigation establish that a Boston office of Al-Kifah Refugee Center ("Al-Kifah Boston") was organized in or about 1991. During 1991-1993, Al-Kifah Boston, which

2

was located at 1085 Commonwealth Avenue, Suite 124, Boston, Massachusetts,

solicited money for, and promoted the mujahideen (an Arabic term meaning "Muslim

holy warriors") engaged in jihad or violent, religiously-based military conflict overseas.

Al-Kifah Boston distributed a bi-weekly newsletter entitled "Al-Hussam" (an Arabic term

meaning "the Sword") and audiotapes that attempted to recruit individuals to join the

mujahideen and encouraged individuals to financially support them.

7.    Attached to the government's motion as Exhibit 1 is an undated flyer distributed

by Al-Kifah Boston.  This flyer was signed by defendant Muntasser using the name

"Abu Abdulrahman" as the "Director, Boston Branch" of Al-Kifah.  Muntasser had

admitted to agents of the Federal Bureau of Investigation, including James Marinelli,

that he also used that name.  Other witnesses and documents have also corroborated

this fact.  This flyer stated, among other things, that:

> Alkifah Refugee Center is an organization founded
> by Sh. Abdullah Azzam to serve the cause of Jihad.
> This non-profit organization administers schools,
> hospitals, and refugee camps.  In addition, the
> organization actively supports the Mujahideen in
> the front.

This flyer also stated that Al-Kifah Boston distributed a Zakat Calculation Guide.  Lastly,

this flyer indicated that any donations made to Al-Kifah Boston were tax exempt.

8.    I requested all IRS records on Al-Kifah Boston to determine whether Al-Kifah had

been granted tax exempt status as claimed in their solicitation flyer.  Included in my

search request were any records regarding other offices of Al-Kifah, including the

Brooklyn office.  No records were found of any office of Al-Kifah Refugee Center ever

applying for or obtaining tax exempt status from the Internal Revenue Service under 26

3

U.S.C. §501(c)(3).

9.      Attached as Exhibit 2 to the government's motion is a account signature card

obtained from Baybank during the course of this investigation.  In or about 1992,

Muntasser opened a bank account at Baybank for Al-Kifah.  Muntasser signed this card

as the "Acting Chairman" of Al-Kifah Boston.  On this card, he indicated that Al-Kifah

Boston was assigned a tax identification number of 112910960.  Based upon searches

I personally conducted of IRS databases, Al-Kifah Boston was never assigned any tax

identification number.  Further, this number is not a valid tax identification number.

10.     I requested and obtained from the custodian of records of the IRS all tax filings

for Care during this investigation.  Attached are true and accurate copies of Care's

Application for Recognition of Exemption Under Section 501(c)(3) of the Internal

Revenue Code, IRS Form 1023 ("1023 Application").  Abdullah Bade, an attorney

retained by Muntasser on or about May 22, 1993, filed this application with the IRS on

behalf of Care along with his power of attorney, Care's Articles of Incorporation and

Care's Bylaws.  Muntasser executed all of these documents, including Care's 1023

Application.

11.     According to Care's Articles of Incorporation, Muntasser founded and

incorporated Care in Massachusetts on April 13, 1993, two days after the New York

Times reported that the New York office of Al-Kifah was linked to the February 26, 1993

World Trade Center bombing.  These articles further indicate that Care was located at

the same address as Al-Kifah Boston – 1085 Commonwealth Avenue, Suite 124,

Boston, Massachusetts.

4

12.    The 1023 Application, which Muntasser signed, required that he state whether Care was an outgrowth or successor to another organization. Muntasser answered no to this question. I believe this answer was materially false based upon the evidence collected during this investigation described above. Additionally, by the time Muntasser signed the 1023 Application for Care in June 1993, Care had assumed the activities of Al-Kifah, including its distribution of the pro-mujahideen newsletter, Al-Hussam and Muntasser had begun transferring the assets of Al-Kifah to Care. Furthermore, in an interview conducted by Special Agents James Marinelli and Christopher Peet of the Federal Bureau Investigation on April 7, 2003, Muntasser admitted that Care and Al-Kifah had the same basic mission, that Care used the same address as Al-Kifah, and some of Al-Kifah's officers became officers of Care.

13.    Based upon my personal involvement in this case and training, I believe Care was not entitled to a charitable exempt status under 26 U.S.C. §501(c)(3) for the reasons cited in the Indictment. Specifically, I believe Muntasser fraudulently concealed information from the IRS in Care's Form 1023 Application when he indicated that Care was not an outgrowth of (or successor) to another organization in Question 5, Part II. I further believe that Muntasser failed to completely and accurately answer Question 1, Part II of Care's 1023 Application, which requested that he list all of Care's activities "past, present, and planned." When Muntasser completed this application,

5

Care was engaged in non-charitable activities, which were concealed from the IRS, that likely made them ineligible for a charitable tax exemption.

On this 21st day of May 2007, I declare under penalty of perjury that the foregoing is true and correct.

_LAUREN A. YOUNGQUIST_
Special Agent
Internal Revenue Service
Criminal Investigation

6

## EXHIBIT A TO YOUNGQUIST AFFIDAVIT

### *ABDULLAH A. BADÉ*
ATTORNEY AT LAW

628 CIRCLE TOWER
5 E. MARKET STREET
INDIANAPOLIS, INDIANA 46204

OFFICE TEL.: 317-635-5375
RESIDENCE TEL.: 317-257-2600

June 1, 1993

REC'D WITH REMITTANCE

The Internal Revenue Service
E.P./E.O. Division
P.O. Box 1680, GPO
Brooklyn, NY 11202

JUN 8 1993

EP/EO FFEO—SPB
BROOKLYN, N.Y

Re:  CARE INTERNATIONAL, INC. Tax Exemption Application

Dear Sir/Madam:

Enclosed herewith are my Power of Attorney, completed 1023, 872-C, and 8718 Applications for the above referenced association with copies of Articles of Incorporation, By-Laws, and a check in the amount of $375.00.

Your prompt consideration of the application for the exemption ruling will be very much appreciated. Please contact me if you have any questions or need any clarification.

Thank You.

Yours Truly,

Abdullah A. Bade
Attorney for the Applicant

**Ex A - 1**

Form **2848**
(Rev. March 1991)
Department of the Treasury
Internal Revenue Service

# Power of Attorney
## and Declaration of Representative
► For Paperwork Reduction and Privacy Act Notice, see the instructions.

OMB No. 1545-0150

Expires 5-31-93

**Part I**    Power of Attorney

**1    Taxpayer Information**

| Taxpayer name(s) and address (Please type or print.) | Social security number(s) | Employer identification number |
|---|---|---|
| CARE INTERNATIONAL, INC.<br><br>510 Commonwealth Ave., #275<br>Boston, MA 02215 | Daytime telephone number<br>( 317 ) 635 5375 | 04-3190252<br><br>Plan number (if applicable) |

hereby appoint(s) the following representative(s) as attorney(s)-in-fact:

**2    Representative(s)** (Please type or print.)

| Name and address | |
|---|---|
| Abdullah A. Bade Attorney at Law<br>628 Circle Tower, 55 Monument Circle<br>Indianapolis In 46204 | CAF No. ...........................<br>Telephone No. ( 317 )-635-5375<br>Fax No. (317 )-257-2600<br>Check if new: Address ☐ Telephone No. ☐ |
| Name and address | CAF No. ...........................<br>Telephone No. ( ) ...................<br>Fax No. ( ) ...................<br>Check if new: Address ☐ Telephone No. ☐ |
| Name and address | CAF No. ...........................<br>Telephone No. ( ) ...................<br>Fax No. ( ) ...................<br>Check if new: Address ☐ Telephone No. ☐ |

to represent the taxpayer(s) before the Internal Revenue Service for the following tax matters:

**3    Tax Matters**

| Type of Tax (Income, Employment, Excise, etc.) | Tax Form Number (1040, 941, 720, etc.) | Year(s) or Period(s) |
|---|---|---|
| 1023 Tax Exemption Application | 1023 | 1993 and future |
| | | |
| | | |

**4    Specific Use Not Recorded on Centralized Authorization File (CAF).**—If the power of attorney is for a specific use not recorded on CAF, please check this box. (See the instructions for *Specific Use Not Recorded on CAF* on page 4.)  .  .  .  .  .  .  .  .  ►  ☐

**5    Acts Authorized.**—The representatives are authorized to receive and inspect confidential tax information and to perform any and all acts that I can perform with respect to the tax matters described in line 3, for example, the authority to sign any agreements, consents, or other documents. The authority does not include the power to receive refund checks or the power to sign certain returns. (See instructions.)
List any specific additions or deletions to the acts otherwise authorized in this power of attorney: ..................................
.................................................................................................................................................

**Note:** *In general, an unenrolled preparer of tax returns cannot sign any document for a taxpayer. See Revenue Procedure 81-38, printed as Pub. 470, for more information.*

**Note:** *The tax matters partner/person of a partnership or S corporation is not permitted to authorize representatives to perform certain acts. See the instructions for more information.*

**6    Receipt of Refund Checks.**—If you want to authorize a representative named in line 2 to receive, **BUT NOT TO ENDORSE OR CASH,** refund checks, initial here _____ and list the name of that representative below.

Name of representative to receive refund check(s) ►

Cat. No. 11980J    *Accepted R J C*    Form **2848** (Rev. 3-91)
*10-27-93*

**Ex A - 2**

Form 2848 (Rev. 3-91)                                                                                                    Page 2

7  **Notices and Communications.**—Notices and other written communications will be sent to the first representative listed in line 2.

   **a**  If you want the second representative listed to receive such notices and communications, check this box . . . . . . . . ▶ ☐

   **b**  If you do not want any notices or communications sent to your representative, check this box . . . . . . . . . . . ▶ ☐

8  **Retention/Revocation of Prior Power(s) of Attorney.**—The filing of this power of attorney automatically revokes all earlier power(s) of attorney on file with the Internal Revenue Service for the same tax matters and years or periods covered by this document. If you do not want to revoke a prior power of attorney, check here . . . . . . . . . . . . . . . . ▶ ☐

   **YOU MUST ATTACH A COPY OF ANY POWER OF ATTORNEY YOU WANT TO REMAIN IN EFFECT.**

9  **Signature of Taxpayer(s).**— If a tax matter concerns a joint return, both husband and wife must sign if joint representation is requested, otherwise, see the instructions. If signed by a corporate officer, partner, guardian, tax matters partner/person, executor, receiver, administrator, or trustee on behalf of the taxpayer, I certify that I have the authority to execute this form on behalf of the taxpayer.

   ▶ If this power of attorney is not signed, it will be returned.

Care International, Inc.

| | | |
|---|---|---|
| *Bassibla Muntasir* | 6-1-93 | President |
| Signature | Date | Title (if applicable) |
| | | |
| Print Name | | |
| | | |
| Signature | Date | Title (if applicable) |
| | | |
| Print Name | | |

**Part II**   **Declaration of Representative**

Under penalties of perjury, I declare that:

- I am not currently under suspension or disbarment from practice before the Internal Revenue Service;
- I am aware of regulations contained in Treasury Department Circular No. 230 (31 CFR, Part 10), as amended, concerning the practice of attorneys, certified public accountants, enrolled agents, enrolled actuaries, and others;
- I am authorized to represent the taxpayer(s) identified in Part I for the tax matter(s) specified there; and
- I am one of the following:

   **a**  Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.

   **b**  Certified Public Accountant—duly qualified to practice as a certified public accountant in the jurisdiction shown below.

   **c**  Enrolled Agent—enrolled as an agent under the requirements of Treasury Department Circular No. 230.

   **d**  Officer—a bona fide officer of the taxpayer organization.

   **e**  Full-Time Employee—a full-time employee of the taxpayer.

   **f**  Family Member—a member of the taxpayer's immediate family (*i.e.*, spouse, parent, child, brother, or sister).

   **g**  Enrolled Actuary—enrolled as an actuary by the Joint Board for the Enrollment of Actuaries under 29 U.S.C. 1242 (the authority to practice before the Service is limited by section 10.3(d)(1) of Treasury Department Circular No. 230).

   **h**  Unenrolled Return Preparer—an unenrolled return preparer under section 10.7(a)(7) of Treasury Department Circular No. 230.

▶ If this power of attorney is not signed, it will be returned.

| Designation—Insert above letter (a–h) | Jurisdiction (state) or Enrollment Card No. | Signature | Date |
|---|---|---|---|
| a | Indiana 2504-49 | *A/Bade* | May 22, 1993 |
| | | | |
| | | | |

Ex A - 3

08315-Y

**Form 1023**
(Rev. September 1990)
Department of the Treasury
Internal Revenue Service

## Application for Recognition of Exemption
## Under Section 501(c)(3) of the Internal Revenue Code

OMB No. 1545-0056

If exempt status is approved, this application will be open for public inspection.

Read the instructions for each Part carefully.
**A User Fee must be attached to this application.**

If the required information and appropriate documents are not submitted along with Form 8718 (with payment of the appropriate user fee), the application may be returned to you.

**Part I** — Identification of Applicant

| | |
|---|---|
| **1a** Full name of organization (as shown in organizing document)<br><br>CARE INTERNATIONAL, INC. | **2** Employer identification number (If none, see instructions)<br><br>04:3190252 |
| **1b** c/o Name (if applicable)<br><br>Emadeddin Z. Muntasser | **3** Name and telephone number of person to be contacted if additional information is needed<br><br>Abdullah A. Bade<br>Attorney at Law<br>(317) 635-5375 |
| **1c** Address (number, street, and room or suite no.)<br><br>510 Commonwealth Ave., #275 | |
| **1d** City or town, state, and ZIP code<br><br>Boston, MA 02215 | **4** Month the annual accounting period ends<br><br>December |

| | | | | |
|---|---|---|---|---|
| **5** Date incorporated or formed<br>4/13/1993 | **6** Activity codes (See instructions.)<br>902   560   179 | | **7** Check if applying under section:<br>a ☐ 501(e)   b ☐ 501(f)   c ☐ 501(k) | |

**8** Did the organization previously apply for recognition of exemption under this Code section or under any other section of the Code? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes  ☒ No
If "Yes," attach an explanation.

**9** Has the organization filed Federal income tax returns or exempt organization information returns? . . . . . ☐ Yes  ☒ No
If "Yes," state the form numbers, years filed, and Internal Revenue office where filed.

REC'D WITH REMITTANCE

11  JUN 8 1993

DIR. INT. REV. EPEO—SPB
BROOKLYN, N.Y

**10** Check the box for your type of organization. BE SURE TO ATTACH A COMPLETE COPY OF THE CORRESPONDING DOCUMENTS TO THE APPLICATION BEFORE MAILING.

**a** ☒ Corporation— Attach a copy of your Articles of Incorporation, (including amendments and restatements) showing approval by the appropriate State official; also include a copy of your bylaws.

**b** ☐ Trust— Attach a copy of your Trust Indenture or Agreement, including all appropriate signatures and dates.

**c** ☐ Association— Attach a copy of your Articles of Association, Constitution, or other creating document, with a declaration (see instructions) or other evidence the organization was formed by adoption of the document by more than one person; also include a copy of your bylaws.

If you are a corporation or an unincorporated association that has not yet adopted bylaws, check here . . . . . . . ▶ ☐

I declare under the penalties of perjury that I am authorized to sign this application on behalf of the above organization and that I have examined this application, including the accompanying schedules and attachments, and to the best of my knowledge it is true, correct, and complete.

Please Sign Here ▶ _(Signature)_ _____   President _(Title or authority of signer)_   6-1-93 _(Date)_

For Paperwork Reduction Act Notice, see page 1 of the instructions.

**Complete the Procedural Checklist (page 7 of the instructions) prior to filing.**

Ex A - 4

**PART II    Activities and Operational Information**

1    Provide a detailed narrative description of all the activities of the organization—past, present, and planned. **Do not merely refer to or repeat the language in your organizational document.** Describe each activity separately in the order of importance. Each description should include, as a minimum, the following: (a) a detailed description of the activity including its purpose; (b) when the activity was or will be initiated; and (c) where and by whom the activity will be conducted.

The organization is recently incorporated and will become operational within a couple of months. It plans to carry out the following activities under its control and participation as follows:

1.    It will provide assistance to victims of natural and man-made disasters, including financial, food, shelter, and medical relief. Local volunteers in the affected areas will carry out these activities including the management, initially. Within the next three months, these activities will be initiated and carried out at a smaller scale, and within eight months, at a larger scale, primarily in Bosnia and later in African countries.

2.    It will develop a program for orphan sponsorships within a couple of months. Monthly contributions and donations will be solicited and collected to provide food, lodging, and education for orphans in disaster areas overseas, primarily in Bosnia, Afghanistan, and Kashmir. The organization will work closely with the established orphanages in the above parts of the world. It will also promote and find sponsors who will assist this program and orphans for a longer period of time.

3.    It will develop rehabilitation programs for refugees coming from the disaster affected areas, to U.S., and other countries within the second year. These programs will include teaching of basic trades e.g. carpetmaking, weaving, handicrafts, etc. This program will be implemented with cooperation of refugee camp administrators in the aforementioned countries.

4.    In the third year, the organization will develop programs to support reconstruction projects in disaster struken areas, mainly in Bosnia, Somalia, Sudan, and Bangladesh. This program will include encouraging to volunteer the services of qualified individuals in the U.S.and overseas for research in irrigation projects, other agricultural programs, and water resources. It also intends to participate in United Nations and U.S. sponsored reconstruction projects in the above mentioned areas at a later period.

5.    Within a couple of years it will develop programs to support educational assistance and needs of inner city and poor neighborhood children and schools in the U.S., and in the above stated countries. This program will include modernizing curriculum and continuing training to teachers through workshops and seminars. In the beginning, a few schools will be selected for special aid with a view to follow them as model schools.

2    What are or will be the organization's sources of financial support? List in order of size.

1.    Donations, contributions, and grants from individuals, organizations, general public, and businesses.

2.    Income from investments, if any, in the future.

3    Describe the organization's fundraising program, both actual and planned, and explain to what extent it has been put into effect. Include details of fundraising activities such as selective mailings, formation of fundraising committees, use of volunteers or professional fundraisers, etc. Attach representative copies of solicitations for financial support.

1.    We have initiated our collecting of contributions from our personal contacts and friends.

2.    Substantial fundraising efforts will commence within the next couple of months by means of:

      1.    Fundraising committees to be formed.
      2.    mailings
      3.    through personal contacts and friends

**Ex A - 5**

Form 1023 (Rev. 9-90)                                                                        Page 3

**Part III**    Activities and Operational Information *(Continued)*

4    Give the following information about the organization's governing body:

| a  Names, addresses, and titles of officers, directors, trustees, etc. | b Annual Compensation |
|---|---|
| 1.    Emadeddin Z. Muntasser - 2 Kimball Ct., #109, (President)              Woburn, MA 01801 | NIL |
| 2.    Munther Baara - 15 Leicester St., #C, Brighton, MA (Treasurer)     02135 | |
| 3.    Ahmad Nawras - 56 Arlington St., Everett, MA 02149 (Secretary) | |

Direc-4.    Afif Kadri - 15 Walbridge St., #27, Allston, MA 02134
tors:  5.    Mohamad Akra - 784 Main St., #1, Cambridge, MA 02139-3573
(4-6)  6.    Wa... im Abu Yasin - 11 Hancock St., #60, Everett, MA 02149

c   Do any of the above persons serve as members of the governing body by reason of being public officials or being
appointed by public officials? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes   ☒ No
If "Yes," name those persons and explain the basis of their selection or appointment.

d   Are any members of the organization's governing body "disqualified persons" with respect to the organization
(other than by reason of being a member of the governing body) or do any of the members have either a
business or family relationship with "disqualified persons"? (See the specific instructions for line 4d.) . . . . ☐ Yes   ☒ No
If "Yes," explain.

5    Does the organization control or is it controlled by any other organization? . . . . . . . . . . . . . . ☐ Yes   ☒ No
Is the organization the outgrowth of (or successor to) another organization, or does it have a special relationship
with another organization by reason of interlocking directorates or other factors? . . . . . . . . . . . . ☐ Yes   ☒ No
If either of these questions is answered "Yes," explain.

6    Does or will the organization directly or indirectly engage in any of the following transactions with any political
organization or other exempt organization (other than 501(c)(3) organizations): **(a)** grants; **(b)** purchases or
sales of assets; **(c)** rental of facilities or equipment; **(d)** loans or loan guarantees; **(e)** reimbursement
arrangements; **(f)** performance of services, membership, or fundraising solicitations; or **(g)** sharing of facilities,
equipment, mailing lists or other assets, or paid employees? . . . . . . . . . . . . . . . . . . . . . ☐ Yes   ☒ No
If "Yes," explain fully and identify the other organizations involved.

7    Is the organization financially accountable to any other organization? . . . . . . . . . . . . . . . . ☐ Yes   ☒ No
If "Yes," explain and identify the other organization. Include details concerning accountability or attach copies of
reports if any have been submitted.

**Ex A - 6**

Form 1023 (Rev. 9-90)                                                                                                                                      Page **4**

**Part II**     Activities and Operational Information *(Continued)*

8    What assets does the organization have that are used in the performance of its exempt function? (Do not include property producing investment income.) If any assets are not fully operational, explain their status, what additional steps remain to be completed, and when such final steps will be taken. If "None," indicate "N/A."

                                                            N/A

9a   Will any of the organization's facilities or operations be managed by another organization or individual under a
     contractual agreement? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes   ☒ No
  b  Is the organization a party to any leases? . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes   ☒ No
     If either of these questions is answered "Yes," attach a copy of the contracts and explain the relationship
     between the applicant and the other parties.

10   Is the organization a membership organization? . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes   ☒ No
     If "Yes," complete the following:
  a  Describe the organization's membership requirements, and attach a schedule of membership fees and dues.

  b  Describe your present and proposed efforts to attract members, and attach a copy of any descriptive literature
     or promotional material used for this purpose.

  c  What benefits do (or will) your members receive in exchange for their payment of dues?

11a  If the organization provides benefits, services or products, are the recipients required, or will they be
     required, to pay for them? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ N/A   ☐ Yes   ☒ No
     If "Yes," explain how the charges are determined, and attach a copy of your current fee schedule.

  b  Does or will the organization limit its benefits, services or products to specific individuals or classes
     of individuals? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ N/A   ☐ Yes   ☒ No
     If "Yes," explain how the recipients or beneficiaries are or will be selected.

12   Does or will the organization attempt to influence legislation? . . . . . . . . . . . . . . . ☐ Yes   ☒ No
     If "Yes," explain. Also, give an estimate of the percentage of the organization's time and funds which it devotes
     or plans to devote to this activity.

13   Does or will the organization intervene in any way in political campaigns, including the publication or distribution
     of statements? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes   ☒ No
     If "Yes," explain fully.

Ex A - 7

Form 1023 (Rev. 9-90)                                                                                    Page **5**

**Part III**  **Technical Requirements**

1  Are you filing Form 1023 within 15 months from the end of the month in which you were created or formed?  ☒ **Yes**   ☐ **No**
If you answer "Yes," do not answer questions 2 through 6.

2  If one of the exceptions to the 15-month filing requirement shown below applies, check the appropriate box and proceed to
question 7.
**Exceptions**—You are not required to file an exemption application within 15 months if the organization:

☐ **(a)** Is a church, interchurch organization, local unit of a church, a convention or association of churches, or an integrated
auxiliary of a church;

☐ **(b)** Is not a private foundation and normally has gross receipts of not more than $5,000 in each tax year; or,

☐ **(c)** Is a subordinate organization covered by a group exemption letter, but only if the parent or supervisory organization timely
submitted a notice covering the subordinate.

3  If you do not meet any of the exceptions in question 2, do you wish to request relief from the 15-month filing
requirement?  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  ☐ **Yes**   ☐ **No**

4  If you answer "Yes" to question 3, please give your reasons for not filing this application within 15 months from the end of the month
in which your organization was created or formed. **(See the instructions before completing this item.)**

5  If you answer "No" to both questions 1 and 3 and do not meet any of the exceptions in question 2, your
qualification as a section 501(c)(3) organization can be recognized only from the date this application is filed
with your key District Director. Therefore, do you want us to consider your application as a request for
recognition of exemption as a section 501(c)(3) organization from the date the application is received and not
retroactively to the date you were formed?  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  ☐ **Yes**   ☐ **No**

5  If you answer "Yes" to question 5 above and wish to request recognition of section 501(c)(4) status for the period beginning with the
date you were formed and ending with the date your Form 1023 application was received (the effective date of your section
501(c)(3) status), check here ► ☐ and attach a completed page 1 of Form 1024 to this application.

**Ex A - 8**

Form 1023 (Rev. 9-90)                                                                                          Page **6**

**Part III**  **Technical Requirements** *(Continued)*

7  Is the organization a private foundation?
   ☐ **Yes**  (Answer question 8.)
   ☒ **No**   (Answer question 9 and proceed as instructed.)

---

8  If you answer "Yes" to question 7, do you claim to be a private operating foundation?
   ☐ **Yes**  (Complete Schedule E)
   ☐ **No**

   After answering this question, go to Part IV.

---

9  If you answer "No" to question 7, indicate the public charity classification you are requesting by checking the box below that most appropriately applies:

   **THE ORGANIZATION IS NOT A PRIVATE FOUNDATION BECAUSE IT QUALIFIES:**

| | | |
|---|---|---|
| **(a)** ☐ As a church or a convention or association of churches (CHURCHES MUST COMPLETE SCHEDULE A). | | Sections 509(a)(1) and 170(b)(1)(A)(i) |
| **(b)** ☐ As a school (MUST COMPLETE SCHEDULE B). | | Sections 509(a)(1) and 170(b)(1)(A)(ii) |
| **(c)** ☐ As a hospital or a cooperative hospital service organization, or a medical research organization operated in conjunction with a hospital (MUST COMPLETE SCHEDULE C). | | Sections 509(a)(1) and 170(b)(1)(A)(iii) |
| **(d)** ☐ As a governmental unit described in section 170(c)(1). | | Sections 509(a)(1) and 170(b)(1)(A)(v) |
| **(e)** ☐ As being operated solely for the benefit of, or in connection with, one or more of the organizations described in (a) through (d), (g), (h), or (i) (MUST COMPLETE SCHEDULE D). | | Section 509(a)(3) |
| **(f)** ☐ As being organized and operated exclusively for testing for public safety. | | Section 509(a)(4) |
| **(g)** ☐ As being operated for the benefit of a college or university that is owned or operated by a governmental unit. | | Sections 509(a)(1) and 170(b)(1)(A)(iv) |
| **(h)** ☒ As receiving a substantial part of its support in the form of contributions from publicly supported organizations, from a governmental unit, or from the general public. | | Sections 509(a)(1) and 170(b)(1)(A)(vi) |
| **(i)** ☐ As normally receiving not more than one-third of its support from gross investment income and more than one-third of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions (subject to certain exceptions). | | Section 509(a)(2) |
| **(j)** ☐ We are a publicly supported organization but are not sure whether we meet the public support test of block (h) or block (i). We would like the Internal Revenue Service to decide the proper classification. | | Sections 509(a)(1) and 170(b)(1)(A)(vi) or Section 509(a)(2) |

If you checked one of the boxes (a) through (f) in question 9, go to question 14.
If you checked box (g) in question 9, go to questions 11 and 12.
If you checked box (h), (i), or (j), go to question 10.

Ex A - 9

Form 1023 (Rev. 9-90)                                                                                                                          Page **7**

**PART III** Technical Requirements *(Continued)*

**10** If you checked box (h), (i), or (j) in question 9, have you completed a tax year of at least 8 months?
☐ Yes—Indicate whether you are requesting:
  ☐ A definitive ruling (Answer questions 11 through 14.)
  ☐ An advance ruling (Answer questions 11 and 14 and attach 2 Forms 872-C completed and signed.)
  ☒ **No—You must request an advance ruling by completing and signing 2 Forms 872-C and attaching them to your application.**

**11** If the organization received any unusual grants during any of the tax years shown in Part IV-A, attach a list for each year showing the name of the contributor; the date and the amount of the grant; and a brief description of the nature of the grant.

**12** If you are requesting a definitive ruling under section 170(b)(1)(A)(iv) or (vi), check here ▶ ☐ and:
a Enter 2% of line 8, column (e) of Part IV-A _____
b Attach a list showing the name and amount contributed by each person (other than a governmental unit or "publicly supported" organization) whose total gifts, grants, contributions, etc., were more than the amount you entered on line 12a above.

**13** If you are requesting a definitive ruling under section 509(a)(2), check here ▶ ☐ and:
a For each of the years included on lines 1, 2, and 9 of Part IV-A, attach a list showing the name of and amount received from each "disqualified person."
b For each of the years included on line 9 of Part IV-A, attach a list showing the name of and amount received from each payer (other than a "disqualified person") whose payments to the organization were more than $5,000. For this purpose, "payer" includes, but is not limited to, any organization described in sections 170(b)(1)(A)(i) through (vi) and any governmental agency or bureau.

| **14** Indicate if your organization is one of the following. If so, complete the required schedule. (Submit only those schedules that apply to your organization. **Do not submit blank schedules.**) | Yes | No | If "Yes," complete Schedule: |
|---|---|---|---|
| Is the organization a church? . . . . . . . . . . . . . . . . . . . | | X | A |
| Is the organization, or any part of it, a school? . . . . . . . . . . . . | | X | B |
| Is the organization, ... ... ... ... ... ...tal or medical research organization? . . . . . . . . . | | X | C |
| Is the organization a ... ... ... ... ... ...porting organization? . . . . . . . . . | | X | D |
| Is the organization an op... ... ... ... . . . . . . . . . | | X | E |
| Is the organization, or any part of it, a home for the aged or handicapped? . . . . . . . . | | X | F |
| Is the organization, or any part of it, a child care organization? . . . . . . . . . . | | X | G |
| Does the organization provide or administer any scholarship benefits, student aid, etc.? . . . . . . | | X | H |
| Has the organization taken over, or will it take over, the facilities of a "for profit" institution? . . . . . . . | | X | I |

**Ex A - 10**

Form 1023 (Rev. 9-90)                                                                                          Page 8

**Part IV    Financial Data**

*Complete the financial statements for the current year and for each of the 3 years immediately before it. If in existence less than 4 years, complete the statements for each year in existence. If in existence less than 1 year, also provide proposed budgets for the 2 years following the current year.*

### A.—Statement of Revenue and Expenses

| | | Current tax year | 3 prior tax years or proposed budget for 2 years | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | (a) From April to Dec '93 | (b) 19 94 | (c) 19 95 | (d) 19 ...... | (e) TOTAL |
| Revenue | 1 Gifts, grants, and contributions received (not including unusual grants—see instructions) . . | 40,000 | 200,000 | 300,000 | | 540,000 |
| | 2 Membership fees received . . | | 2000 | 3000 | | 5000 |
| | 3 Gross investment income (see instructions for definition) . . | | | | | |
| | 4 Net income from organization's unrelated business activities not included on line 3 . . . . . | | | | | |
| | 5 Tax revenues levied for and either paid to or spent on behalf of the organization . . . . . | | | | | |
| | 6 Value of services or facilities furnished by a governmental unit to the organization without charge (not including the value of services or facilities generally furnished the public without charge) . . . . . . . . | | | | | |
| | 7 Other income (not including gain or loss from sale of capital assets) (attach schedule) . . | | | | | |
| | 8 Total (add lines 1 through 7) . | | | | | |
| | 9 Gross receipts from admissions, sales of merchandise or services, or furnishing of facilities in any activity that is not an unrelated business within the meaning of section 513 . . . . . . . . . . | | | | | |
| | 10 Total (add lines 8 and 9) . . . | | | | | |
| | 11 Gain or loss from sale of capital assets (attach schedule) . . . | | | | | |
| | 12 Unusual grants . . . . . . | | | | | |
| | 13 Total revenue (add lines 10 through 12) . . . . . . . | 40,000 | 202,000 | 303,000 | | 545,000 |
| Expenses | 14 Fundraising expenses . . . . | 6000 | 10000 | 15000 | | |
| | 15 Contributions, gifts, grants, and similar amounts paid (attach schedule) . . | | 5000 | 10000 | | |
| | 16 Disbursements to or for benefit of members (attach schedule) . | 25000 | 160,000 | 240,000 | | |
| | 17 Compensation of officers, directors, and trustees (attach schedule) . . . . . . . . | | | | | |
| | 18 Other salaries and wages . . . | | 8000 | 16000 | | |
| | 19 Interest . . . . . . . . | | | | | |
| | 20 Occupancy (rent, utilities, etc.) . | | 3000 | 5000 | | |
| | 21 Depreciation and depletion . . | | | | | |
| | 22 Other (attach schedule) . . . | 7000 | 10000 | 12000 | | |
| | 23 Total expenses (add lines 14 through 22) . . . . . . . | 38000 | 196000 | 298000 | | |
| | 24 Excess of revenue over expenses (line 13 minus line 23) . . . . . . . . . . | 2000 | 6000 | 5000 | | |

Ex A - 11

CARE INTERNATIONAL, INC.
04-3190 252

Schedules for Part IV of 1023

Column 15

These funds will be contributed to other charities
or relief organizations to be selected by the Board
of Directors. upon the applications of such organ-
izations.

Column 16

This organization is not a membership organization
and there is no other column to show the disbursement
of the funds. These funds will be utilized for
carrying out the projects and programs described in
Part II of this application.

Column 22

| Expenses other than Fundraising Expenses | 1993 | 1994 | 1995 |
|---|---|---|---|
| Office supplies and printing | $1,000 | $1,500 | $2,000 |
| Professional Fees | $3,500 | $1,000 | $1,000 |
| Transportation, lodging, etc. | $1,000 | $3,500 | $4,000 |
| Mailing and postage | $500 | $1,500 | $2,000 |
| Telephone and fax | $1,000 | $2,500 | $3,000 |
| TOTALS: | $7,000 | $10,000 | $12,000 |

Ex A - 12

# The Commonwealth of Massachusetts

OFFICE OF THE MASSACHUSETTS SECRETARY OF STATE

MICHAEL J. CONNOLLY, Secretary

ONE ASHBURTON PLACE, BOSTON, MASSACHUSETTS 02108

## ARTICLES OF ORGANIZATION

### (Under G.L. Ch. 180)

#### ARTICLE I

The name of the corporation is:

CARE INTERNATIONAL, INC.

#### ARTICLE II

The purpose of the corporation is to engage in the following activities:

The corporation is organized exclusively for charitable, religious, educational, and scientific purposes including, but not limited to, engage in, establish, promote, contribute and carry out human welfare, charitable and relief activities, programs, projects, organizations, institutions and funds.

93-103038

_Examiner_

_Name Approved_

C ☐
P ☑
M ☐
R.A. ☒

P.C.

Note: If the space provided under any article or item on this form is insufficient, additions shall be set forth on separate 8½ x 11 sheets of paper leaving a left hand margin of at least 1 inch. Additions to more than one article may be continued on a single sheet so long as each article requiring each such addition is clearly indicated.

Ex A - 13

## ARTICLE III

If the corporation has one or more classes of members, the designation of such classes, the manner of election or appointments, the duration of membership and the qualification and rights, including voting rights, of the members of each class, may be set forth in the by-laws of the corporation or may be set forth below:

- As stated in By-Laws -

The corporation shall have no membership. The members of the Board of Directors shall be members of the corporation and each member shall have one vote.

## ARTICLE IV

\* Other lawful provisions, if any, for the conduct and regulation of the business and affairs of the corporation, for its voluntary dissolution, or for limiting, defining, or regulating the powers of the corporation, or of its directors or members, or of any class of members, are as follows:

See attached Article IV

\* If there are no provisions, state "None".

Note:  The preceding four (4) articles are considered to be permanent and may ONLY be changed by filing appropriate Articles of Amendment.

(2)

Ex A - 14

## ARTICLE IV

The corporation shall have the following powers in furtherance of its corporate purposes:

(a)    The corporation shall have perpetual succession in its corporate name.

(b)    The corporation may sue and be sued.

(c)    The corporation may have a corporate seal which it may alter at pleasure.

(d)    The corporation may elect or appoint directors, officers, employees and other agents, fix their compensation and define their duties and obligations.

(e)    The corporation may purchase, receive or take by grant, gift, devise, bequest or otherwise, lease or otherwise acquire, own hold, improve, employ, use and otherwise deal in and with, real or personal property, or any other interest therein, wherever situated, in an unlimited amount.

(f)    The corporation may solicit, and receive contributions from any and all sources and may receive and hold, in trust or otherwise, funds received by gift or bequest.

(g)    The corporation may sell, convey, lease, exchange, transfer or otherwise dispose of, pledge, encumber or create a security interest in, all or any of its property, or any interest therein, wherever situated.

(h)    The corporation may purchase, take, receive, subscribe for, or otherwise acquire, own, hold, vote, employ, sell,lend, lease, exchange, transfer, or otherwise dispose of, pledge, use and otherwise deal in and with, other obligations, shares, or other securities issued by others, whether engaged in similar or different business.

(i)    The corporation may make contracts, give guarantees in furtherance of its corporate purposes and incur liabilities, borrow money as the corporation may determine, issue its notes, and other obligations, and secure any of its obligations by pledge or encumbrance of, or security interest in, all or any of its property or any interest therein, wherever situated.

(j)    The corporation may lend money, invest and reinvest its funds, and take and hold real and personal property as security for the payment of funds so loaned or invested.

(k)    The corporation may do business, carry on its operations, and have offices and exercise the powers granted by Massachusetts General Laws, Chapter 180, in any jurisdiction within or without the United States, although the corporation shall not be operated for the primary purpose of carrying on for profit a trade or business unrelated to its tax exempt purposes.

3

Ex A - 15

(l)    The corporation may make donations in such amounts as the members or directors shall determine, irrespective of corporate benefit, for the public welfare or for community fund, hospital, charitable, religious, educational, scientific, civic, or similar purposes, within or without United States, provided that, as long as the corporation is entitled to exemption from federal income tax under Section 501 (c)(3) of the Internal Revenue Code, it shall make no contribution for other than religious, charitable, scientific, literary or educational purposes.

(m)    The corporation may be an incorporator of other corporations of any type or kind.

(n)    The corporation may be a partner in any business enterprise which it would have power to conduct by itself.

(o)    The directors may make, amend or repeal the by-laws in whole or in part, except with respect to any provision thereof which by law or the by-laws requires action by the members, if any.

(p)    Meetings of the members if any may be held anywhere in the United States.

(q)    The corporation shall, to the extent legally permissible and only to the extent that the status of the corporation as an organization exempt under Section 501(c)(3) of the Internal Revenue Code is not affected thereby, indemnify each of its directors, officers, employees and other agents (including persons who serve at its request as directors, officers, employees, or as agents of another organization in which it has an interest) against all liabilities and expenses, including amounts paid in satisfaction of judgments, in compromise or as fines and penalties, and counsel fees, reasonably incurred by him in connection with the defense or disposition of any action, suit or other proceeding, whether civil or criminal, in which he may be involved or with which he may be threatened, while in office or thereafter, by reason of his being or having been such a director, officer, employee or agent, except with respect to any matter as to which he shall have been adjudicated in any proceeding not to have acted in good faith in the reasonable belief that his action was in the best interests of the corporation; provided, however, that as to any matter disposed of by a compromise payment by such director, officer, employee or agent, pursuant to a consent decree or otherwise, no indemnification either for said payment or for any other expenses shall be provided unless such compromise shall be approved as in the best interests of the corporation, after notice that it involves such indemnification:

        (a) by a disinterested majority of the directors then in office; or (b) by a majority of the disinterested directors then in office, provided that there has been obtained an opinion in writing of independent legal counsel to the effect that such director, officer, employee or agent appears to have acted in good faith in the reasonable belief that his action was in the best interests of the corporation; or (c) by a majority of the disinterested members entitled to vote, voting as a single class. Expenses including counsel fees, reasonably incurred by any such director, officer, employee or agent in connection with the defense or disposition of any such action, suit or other proceeding, may be paid from time to time by the corporation

4

**Ex A - 16**

in advance of the final disposition thereof upon receipt of an undertaking by such individual to repay the amounts so paid to the corporation if he shall be adjudicated to be not entitled to indemnification under Massachusetts General Laws, Chapter 180, Section 6. The right of indemnification hereby provided shall not be exclusive of or affect any other rights to which any director, officer, employee or agent may be entitled. Nothing contained herein shall affect any rights to indemnification to which corporate personnel may be entitled by contract or otherwise under law. As used in this paragraph, the terms "directors", "officers", "employees", and "agents" include their respective heirs, executors and administrators, and an "interested" director is one against whom in such capacity the proceeding in question or another proceeding on the same or similar grounds is then pending.

(r)   No person shall be disqualified from holding any office by reason of any interest. In the absence of fraud, any director, officer, or member of this corporation individually, or any individual having any interest in any concern in which any such directors, officers, members, or individuals have any interest, may be a party to, or may be pecuniarily or otherwise interested in, any contract, transaction, or other act of this corporation, and

    (1)   such contract, transaction, or act shall not be in any way invalidated or otherwise affected by that fact;

    (2)   no such director, officer, member, or individual shall be liable to account to this corporation for any profit or benefit realized through any such contract, transaction, or act; and

    (3)   any such director of this corporation may be counted in determining the existence of a quorum at any meeting of the directors or of any committee thereof which shall authorize any such contract, transaction, or act, and may vote to authorize the same;

the term "interest" including personal interest and interest as a director, officer, stockholder, shareholder, trustee, member or beneficiary of any concern; the term "concern" meaning any corporation, association, trust, partnership, firm, person, or other entity other than this corporation.

(s)   No part of the assets of the corporation and no part of any net earnings of the corporation shall be divided among or inure to the benefit of any officer or director of the corporation or any private individual or be appropriated for any purposes other than the purposes of the corporation as herein set forth; and no substantial part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting, to influence legislation except to the extent that the corporation makes expenditures for purposes of influencing legislation in conformity with the requirements of Section 501(h) of the Internal Revenue Code; and the corporation shall not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office. It is intended that the corporation shall be entitled to exemption from federal income tax under Section 501(c)(3) of the Internal Revenue Code and shall not be a private foundation under Section 509(a) of the Internal Revenue Code.

**Ex A - 17**

(t) Upon the liquidation or dissolution of the corporation, after payment of all of the liabilities of the corporation or due provision therefor, all of the assets of the corporation shall be disposed of to the North American Islamic Trust, Inc., or in its absence, to one or more organizations as the Board of Directors may select, that are exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code.

(u) In the event that the corporation shall be determined as a private foundation as that term is defined in Section 509 of the Internal Revenue code, then notwithstanding any other provisions of the articles of organization or the by-laws of the corporation, the following provisions shall apply:

The directors shall distribute the income for each taxable year at such time and in such manner as not to become subject to the tax on undistributed income imposed by Section 4942 of the Internal Revenue Code.

The directors shall not engage in any act of self dealing as defined in Section 4941(d) of the Internal Revenue Code, nor retain any excess business holdings as defined in Section 4943(c) of the Internal Revenue Code; nor make any investments in such manner as to incur tax liability under Section 4944 of the Internal Revenue Code; nor make any taxable expenditures as defined in Section 4945(d) of the Internal Revenue Code.

(v) The corporation shall have and may exercise all powers necessary or convenient to effect any or all of the purposes for which the corporation is formed; provided that no such power shall be exercised in a manner inconsistent with Massachusetts General Laws, Chapter 180 or any other chapter of the General Laws of the Commonwealth of Massachusetts; and provided, further, that the corporation shall not engage in any activity or exercise any power which would deprive it of any exemption from federal income tax which the corporation may receive under Section 501(c)(3) of the Internal Revenue Code.

(w) Notwithstanding anything elsewhere herein provided, the corporation is organized and shall be operated exclusively for religious, charitable, educational and scientific purposes, as said terms have been and shall be defined in and pursuant to Sections 170(c) and 501(c)(3) of the Internal Revenue Code of 1986, as amended, and as said sections may from time to time be amended or added to, under any successor sections thereto. Powers of this corporation shall be exercised only in such manner as to assure religious, charitable, educational and scientific purposes, as so defined, it being the intention that this corporation shall be exempt from Federal income taxes and that contributions to it shall be deductible pursuant to said sections of said Code, and all purposes and powers herein shall be interpreted and exercised consistent with this intention.

(x) All references herein: (i) to the Internal Revenue Code shall be deemed to refer to the Internal Revenue Code of 1986, as now in force or hereafter amended; (ii) to the General Laws of the Commonwealth of Massachusetts, or any chapter thereof, shall be deemed to refer to said General Laws or chapter as now in force or hereafter amended; and (iii) to particular sections of the Internal Revenue Code of the General laws of the Commonwealth of Massachusetts shall be deemed to refer to similar or successor provisions hereafter adopted.

6

**Ex A - 18**

## ARTICLE V

By-laws of the corporation have been duly adopted and the initial directors, president, treasurer and clerk or other presiding, financial or recording officers, whose names are set out below, have been duly elected.

## ARTICLE VI

The effective date of organization of the corporation shall be the date of filing with the Secretary of the Commonwealth or if a later date is desired, specify date, (not more than 30 days after date of filing).

The information contained in ARTICLE VII is NOT a PERMANENT part of the Articles of Organization and may be changed ONLY by filing the appropriate form provided therefor.

## ARTICLE VII

a. The street address of the corporation IN MASSACHUSETTS is: (post office boxes are not acceptable)   1085 Commonwealth Avenue, Suite 124, Boston, Massachusetts 02215

b. The name, residence and post office address of each of the initial directors and following officers of the corporation are as follows:

| NAME | RESIDENCE | POST OFFICE ADDRESS |
|---|---|---|

President: Emadeddin Z. Muntasser – 2 Kimball Ct., #109, Woburn, MA 01801

Treasurer: Munther Baara – 15 Leicester St. #Q, Brighton, MA 02135

Clerk: Ahmad Nawras – 56 Arlington Street, Everett, MA 02149

Directors: (or officers having the powers of directors).

| NAME | RESIDENCE | POST OFFICE ADDRESS |
|---|---|---|

Afif Kadri – 15 Walbridge St., #27, Allston, MA 02134

Mohamad Akra – 784 Main St., #1, Cambridge, MA 02139-3573

Wassim Abu-Yasin – 11 Hancock St., #60, Everett, MA 02149

c. The fiscal year of the corporation shall end on the last day of the month of:   December

d. The name and BUSINESS address of the RESIDENT AGENT of the corporation, if any, is:   Emadeddin Z. Muntasser
2 Kimball Ct., #109
Woburn, MA 01801

I/We the below-signed INCORPORATORS do hereby certify under the pains and penalties of perjury that I/We have not been convicted of any crimes relating to alcohol or gaming within the past ten years. I/We do hereby further certify that to the best of my/our knowledge the above-named principal officers have not been similarly convicted. If so convicted, explain.

IN WITNESS WHEREOF and under the pains and penalties of perjury, I/WE, whose signature(s) appear below as incorporator(s) and whose names and business or residential address(es) ARE CLEARLY TYPED OR PRINTED beneath each signature do hereby associate with the intention of forming this corporation under the provisions of General Laws Chapter 180 and do hereby sign these Articles of Organization as incorporator(s) this   13   day of   April         1993

_Emadedd. Z. Muntasser_

| Emadeddin Z. Muntasser | ~~Ahmad Nawras~~ |
|---|---|
| 2 Kimball Court, Apt. 109 | ~~56 Arlington Street~~ |
| Woburn, Massachusetts 01801 | ~~Everett, Massachusetts 02149~~ |

NOTE: If an already-existing corporation is acting as incorporator, type in the exact name of the corporation, the state or other jurisdiction where it was incorporated, the name ... of said corporation and the title he/she holds or other authority by which such action is taken.

(7)

Ex A - 19

426656

# THE COMMONWEALTH OF MASSACHUSETTS

## ARTICLES OF ORGANIZATION

### GENERAL LAWS, CHAPTER 180

I hereby certify that, upon an examination of the within-written articles of organization, duly submitted to me, it appears that the provisions of the General Laws relative to the organization of corporations have been complied with, and I hereby approve said articles; and the filing fee in the amount of $35.00 having been paid, said articles are deemed to have been filed with me this *3 TH*

day of *APRIL*                                                          19 *93*

Effective date

MICHAEL J. CONNOLLY
Secretary of State

**A PHOTOCOPY OF THESE ARTICLES OF ORGANIZATION SHALL BE RETURNED**

TO:  Emadeddin Z.

  2 Kimball Court, Apartment 109

  Woburn, Massachusetts 01801

Telephone: _____

(8)

Ex A - 20

BY-LAWS
OF

CARE INTERNATIONAL, INC.

### ARTICLE I: PURPOSES

This corporation, CARE INTERNATIONAL, INC. is organized exclusively for charitable, religious, educational, and scientific purposes including, but not limited to, engage in, establish, promote, contribute and carry out human welfare, charitable and relief activities, programs, projects, organizations, institutions and funds.

### ARTICLE II: OFFICES

The principal office of the location shall be located at, 2 Kimball Court, Apartment #109, Woburn, MA 01801, and it may have such offices within or without United States of America, as the Board of Directors may require.

### ARTICLE III: BOARD OF DIRECTORS

1.  The corporation shall have no membership.

2.  The Board of Directors of this corporation shall be composed of a minimum five, and a maximum nine qualified persons.

3.  The qualifications for the suitability of the Board member shall include interest, devotion, substantial knowledge and experience in carrying out the objectives of the corporation or similar organizations.

4.  The Board shall elect from among its members a President, Vice-President, a Secretary, and a Treasurer.  Officers shall serve for a period of one year.

5.  In case of a resignation, expired term, or termination of a Board member, the Board shall fill the vacancy by appointing a qualified individual with the approval of two-thirds (2/3) of the remaining members.

6.  The term of the Board of Directors is one year and the directors may be reelected any number of times.  The term of a reappointed director shall be an additional one year.

7.  *Compensation*: Directors shall not receive any remuneration for their services as such, unless specifically resolved by the Board to remunerate a member for the specified services or position.  The corporation will reimburse them for their expenses incurred in attending meetings and other expenses incurred pursuant to authorization by the Board.

1

Ex A - 21

8.    *Termination of Membership*: Any member of the Board may be terminated, at any time, from office by a majority vote of the remaining Board members at any of their meetings by a secret ballot, if in its judgement the best interest of the corporation will be served thereby.

## ARTICLE IV: OFFICERS

1.    *President.* The President shall:

   (i)    be the Chief Executive Officer of the corporation, shall sign all deeds, conveyances, assignments, notes, bonds, and other instruments and documents required to be executed by the corporation;

   (ii)    preside over meetings of the Board;

   (iii)    perform such other acts as are usually customary and incidental to the Office of a President of a corporation and shall perform acts required by the Board;

   (iv)    may also perform the duties of any other office of the corporation except those of the Secretary; and

   (v)    may delegate his duties to any other member as needed.

2.    *Vice-President.* The Vice-President shall:

   (i)    perform the duties of the President in the absence of the President or in the event of the President's inability or refusal to act as President; and

   (ii)    perform other customary and incidental duties related to an Office of a Vice-President

3.    *Secretary.*  The Secretary shall:

   (i)    keep or cause to be kept minutes of all meetings, including meetings of committees appointed by the Board;

   (ii)    cause all notices of the corporation to be given in accordance with the By-laws or as otherwise required by law;

   (iii)    perform such other duties as are usually customary and incidental to the an office of a Secretary and or the By-laws may require, or the Board may prescribe.

2

ExA - 22

4.    *Treasurer.* The Treasurer shall:

    (i)    keep or cause to be kept complete and accurate records of accounts, showing at all times, the financial condition of the corporation

    (ii)    be the legal custodian of all funds, notes, securities, and other valuables which may from time to time come into the possession of the corporation

    (iii)    receive and immediately deposit, or cause to be deposited all funds of the corporation in financial institutions to be designated by the Board, and shall keep such bank accounts in the name of the corporation.

    (iv)    disburse the funds of the corporation as the Board directs; and

    (v)    sign checks together with the President or Vice President, or in a manner the Board of Directors may prescribe by its resolution.

    (vi)    furnish at meetings of the Board, or whenever requested, a statement of the financial condition of the corporation including annual financial reports; and

    (vii)    perform such other duties which are customary and incidental to an office of a treasurer or as the By-Laws may require, or the Board may prescribe.

## ARTICLE V: MEETINGS

1.    There shall be at least two meetings of the Board during any calendar year including an annual meeting to be held in a place and time to be determined by the President, or in his absence, by the Vice-President.

2.    The presence of two-thirds (2/3) of the Board members shall constitute a quorum.

    There shall be no substitutes or proxies for absent members. However, a member who cannot be present may communicate his views to the President of the Board, prior to the meeting date. The President shall present these views to the Board.

4.    A meeting shall be called by the President of the Board, or at the request of any two Directors.

5.    A notice for a regular meeting shall be communicated to the members of the Board at least ten (10) days prior to the date of the meeting. A notice for an emergency or a special meeting shall be communicated at least two (2) days in advance.

6.    Each member shall have one (1) vote.

3

**Ex A - 23**

7. Decisions of the Board will be arrived at by the concurrence of a simple majority of the members present at a duly convened meeting. The President may veto any decision, which may be overruled by three-fourths (3/4) votes of the Board of Director. The President can make a decision after conferring with, and getting an approval of a majority of the members of the Board. Such decisions must be communicated to the remaining Board members promptly.

8. A meeting may be held by teleconference.

## ARTICLE VI: FINANCES

1. All expenditures of the corporation shall be budgeted yearly, and shall be approved by the Board no later than sixty (60) days from the beginning of the fiscal year.

2. The financial records shall be audited annually by an auditor appointed by the Board.

## ARTICLE VII: FISCAL YEAR

1. The fiscal year of the corporation shall commence on January 1 and end on December 31 of the same year.

## ARTICLE VIII: AMENDMENTS

1. The Articles of Incorporation of the corporation may be amended by a two-thirds (2/3) majority vote of a duly convened meeting of the corporation called for the purpose of acting upon such amendment.

2. The By-Laws of the corporation may be amended by a two-thirds (2/3) majority vote of a duly convened meeting of the Board called for the purpose of acting on such amendment.

---

We, Emadeddin Muntasser the President, and AHMAD NAWRAS, the Secretary of The CARE INTERNATIONAL, INC., hereby certify that these By-Laws are duly adopted by the Board of Directors in a meeting held on ___ -\\ , 1993.

_Emadeddin Muntasser_
President

_A. Ahmad_
Secretary

4

Ex A - 24

Form **872-C**

(Revised 9-90)

Department of the Treasury
Internal Revenue Service

**Consent Fixing Period of Limitation Upon Assessment of Tax Under Section 4940 of the Internal Revenue Code**

(See instructions on reverse side.)

OMB No. 1545-0056

To be used with Form 1023. Submit in duplicate.

Under section 6501(c)(4) of the Internal Revenue Code, and as part of a request filed with Form 1023 that the organization named below be treated as a publicly supported organization under section 170(b)(1)(A)(vi) or section 509(a)(2) during an advance ruling period,

CARE INTERNATIONAL, INC.

*(Exact legal name of organization as shown in organizing document)*

510 Commonwealth Ave., #275

*(Number, street, city or town, state, and ZIP code)*

and the

District Director of Internal Revenue, or Assistant Commissioner (Employee Plans and Exempt Organizations)

Consent and agree that the period for assessing tax (imposed under section 4940 of the Code) for any of the 5 tax years in the advance ruling period will extend 8 years, 4 months, and 15 days beyond the end of the first tax year.

However, if a notice of deficiency in tax for any of these years is sent to the organization before the period expires, the time for making an assessment will be further extended by the number of days the assessment is prohibited, plus 60 days.

Ending date of first tax year ......... 12/31/93

*(Month, day, and year)*

| Name of organization (as shown in organizing document) | Date |
|---|---|
| CARE INTERNATIONAL, INC. | 6-1-93 |

Officer or trustee having authority to sign

Signature ▶ *[signature]*

**For IRS use only**

| District Director or Assistant Commissioner (Employee Plans and Exempt Organizations) | Date |
|---|---|
| *[signature]* | AUG 9 1993 |

By ▶ *[signature]*

For Paperwork Reduction Act Notice, see page 1 of the Form 1023 Instructions.

Ex A - 25