UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 05-40026-FDS |
| | ) | |
| MUHAMED MUBAYYID | ) | |
| EMADEDDIN Z. MUNTASSER | ) | |
| SAMIR AL-MONLA | ) | |

DEFENDANTS' MOTION IN LIMINE AND TO STRIKE
RE: "OUTGROWTH OR SUCCESSOR" AND SUPPORTING MEMORANDUM

FILED UNDER SEAL

The defendants respectfully submit this motion and supporting memorandum to address legal issues occasioned by the testimony of an IRS representative, taken at an evidentiary hearing before Magistrate Judge Hillman on June 13, 2007, on the subject of the "outgrowth of (or successor to)" language in IRS Form 1023. The testimony was offered by the government to "narrow the inquiry" regarding "what's at issue in this indictment which the government alleges the defendants are lying about." (Transcript of Testimony, June 13, 2007 (hereafter "Tr. at") at 7).

A. The Superseding Indictment

The Superseding Indictment sets out eight charges. The first count alleges a scheme by defendants to conceal material facts from the IRS in violation of 18 U.S.C. § 1001(a)(1). In particular, the count specifies that, at the time of filing for

exempt status in 1993, defendants "concealed the fact that Care International, Inc., was an outgrowth of and successor to the Al-Kifah Refugee Center" and also the fact that Care "was engaged in non-charitable activities involving the solicitation and expenditure of funds to support and promote mujahideen and jihad."

The second count alleges a conspiracy to defraud the United States in violation of 18 U.S.C. § 371.  In describing both the manner and means of the alleged conspiracy as well as the overt acts of the conspiracy, the Indictment states that defendants did not disclose that Care was an outgrowth of or successor to Al-Kifah.

Count Eight alleges a violation of 26 U.S.C. § 7212(a), among other things, that defendants concealed from the IRS that Care was "an outgrowth of and successor to the Al Kifah Refugee Center."

These specific portions of Counts One, Two, and Eight derive from the answer provided to a question on Care's IRS Form 1023 submitted as part of Care's 1993 application for charitable status (a copy of which is attached hereto as Exhibit A). Question 5 of Part II of Form 1023 asked whether "the organization [is] the outgrowth of (or successor to) another organization, or does it have a special relationship with another organization by reason of interlocking directorates or other

factors? ... If 'Yes,' explain." The Care application answered "no" to this question. The Government alleges that this statement was false on the grounds that Care International was located in the old office of the Boston branch of Al-Kifah Refugee Center and published a newsletter with the same title as Al-Kifah's newsletter. There is no allegation that Care International took over any of the assets or debts of Al-Kifah. The Indictment does, however, describe media reports linking the New York office of Al-Kifah to the 1993 World Trade Center bombing.

B. The Government's Anticipated Proof Regarding Care's Alleged Links to Al-Kifah

According to government discovery, Al-Kifah Refugee Center, Inc., is a New York corporation incorporated in New York in December 1987, and located in Brooklyn, N.Y. See Exhibit B. The government has listed the corporate papers of Al Kifah as exhibits it intends to introduce at trial. The Superseding Indictment alleged that "[i]n the early 1990s, there were branch offices of Al-Kifah in several cities, including Boston." ¶ 2.

The government maintains, as set out in the indictment, that Care was "an outgrowth of and successor to the Al Kifah Refugee Center." But Al Kifah Refugee Center was a New York corporation, with branches in many cities, including Boston. The Boston branch was not separately incorporated, and had no operations in New York or in other cities. The government contends that the

Al-Kifah Refugee Center became Care as a consequence of a Newsweek article entitled "The Trail to the Jihad Office," Newsweek, March 29, 1993. The article was a speculative exposition of possible links between the Brooklyn office of Al-Kifah and 1993 World Trade Center bombing. The government will seek to offer at trial the article, a copy of which is attached as Exhibit C.

At this late date before trial, it remains unclear whether any government witness will testify that Al-Kifah morphed into Care as a consequence of the Newsweek article. Indeed, a prospective government witness will testify to the opposite, that he "did not consider Care a continuation of Al-Kifah, but believed [that] a new organization was being formed." He "was aware that the Boston Al Kifah was not pleased with how the New York Al Kifah was using the money it received from Boston. He said that over the years, he has learned that the reason for the creation of Care was related to a control issue over finances." FBI 302, dated August 16, 2007. Although this witness' account directly contradicted a key government contention and for that reason was conspicuously Brady material, the government did not disclose the interview (conducted by the government on August 16, 2007) until October 12, 2007.

In addition, the affidavit of Agent Drum, disclosed in discovery stated: "I believe that Care was formed in Boston in or

about the late 1980's or early 1990's," preceding and independent of the Newsweek article. See Affidavit of Agent Drum, ¶ 42.

Notwithstanding the absence of foundational proof that the Newsweek story bore any relationship to Care's founding, and, indeed, in the face of late-disclosed information about the animus between the people involved with Al-Kifah in Boston and Al-Kifah headquarters in New York, the government proposes to offer "expert testimony" that Care was merely Al Kifah by a different name, a charity publicly "exposed" (presumably by the Newsweek article), and "reopening under [a] new name[] ..." Bates MUB29045. The "expert testimony," if permitted, would include the opinion that Care was an "outgrowth" or "successor" to Al-Kifah, see e.g., MUB29044, although the words would not be used in the same technical sense as used by the IRS (see discussion, infra).

In support of its claim that Care conducted activities similar to those of Al-Kifah, the government limits its contentions to activities carried on by the Al-Kifah branch in Boston, ignoring that Al-Kifah Refugee Center had substantial activities in New York and elsewhere, and had continued its corporate existence. The government contends that Care mailed a newsletter using the same name as used by Al-Kifah in Boston. The newsletter, however, was not a substantial part of Care's activities. For example, the costs associated with office

supplies and printing as well as for mailing and postage (budget projections in the 1993 Form 1023 which would have included the costs of the newsletters), were $1,500 in 1993, $3,000 in 1994 and $4,000 in 1995. See Care's IRS Form 1023, Exhibit A. The government further contends that Care was located in the old office of the Boston branch of Al-Kifah, which was 1085 Commonwealth Avenue, Suite 124, Boston, but has produced no evidence that this address was a working office of either Al-Kifah or Care. While the Articles of Incorporation for Care, as filed, listed that same address, the Application for Recognition of Exemption, IRS Form 1023, dated June 1, 1993, listed 510 Commonwealth Avenue, #275, Boston as the new address for Care. Exhibit A. Form 1023 also listed Muntasser's home address, 2 Kimball Court, #109, Woburn, as Care's President's address. The same Woburn address also appears on the By-Laws of Care, as the principal address.

Finally, there does not seem to be any evidence that Care took over assets or debts of Al-Kifah Refugee Center (which is unsurprising since it had broken away from it).

C. Testimony of the IRS Representative

In the course of trial preparation, the defense sought disclosure relating to Form 1023 and its "outgrowth of (or successor to)" language. In response, the government offered a witness, Lucinda (Cindy) M. Westcott, Senior Manager of Exempt

Organization Determinations for the IRS, to testify on behalf of
the IRS.  Ms. Westcott has been with the IRS working on exempt
organization determinations for 24 years.  She was part of the
team that made substantial revisions to Form 1023 in 2004.  These
revisions included changing Question 5, the "outgrowth of (or
successor to)" question, that was present on the 1993 form.  In
her authorization to testify, she was instructed that she was to
testify "as to facts of which [she had] personal knowledge in
[her] official capacity with respect to the revisions the Service
published in 2004 to the Form 1023 Application for Recognition of
Exemption under Section 501(c)(3) of the Internal Revenue Code
and the official position of the Service with respect to such
revisions."  See Authorization Letter, dated June 11, 2007, which
was an exhibit at the June 13, 2007 hearing, and is here attached
as Exhibit D.  Government counsel explained that Ms. Westcott's
testimony was offered to "narrow the inquiry" regarding "what's
at issue in this indictment which the government alleges the
defendants are lying about."  Tr. at 7, see Exhibit E.

    Ms. Westcott testified that, in 2004, Form 1023 was
substantially revised.  The primary aim of this revision was "to
gather more information up front" by making the application form
simpler and more organized with better instructions.  Tr. at 17.
The IRS had found that those filing Form 1023 tended to be first
and only time filers, and tended to leave out information that

they were instructed to include forcing the IRS to make follow-up inquiries. Tr. 17-18.

The 2004 revision changed the question about "outgrowth of (or successor to)" to a question about successor only, now Question 1 in Part VII (the relevant part of the 2004 revised form 1023 is attached hereto as Exhibit F). Ms. Westcott testified that the reason the language of "outgrowth of (or successor to)" was changed was because "there was discussion [that] outgrowth and successor really is redundant," Tr. at 20-21, and "we consider it redundant." Tr. at 35. She explained that the IRS did not view this change as altering the meaning of the question:

> Q: But it's meant still to get at the same thing--
>
> A: Yes.
>
> . . .
>
> Q: Is it your understanding from reviewing the form that it has narrowed the scope of the term successor?
>
> . . .
>
> A: It's not my understanding that it's limited in any way.
>
> Q: So you expect that the answer to successor if properly done in 2006 would turn out the same set of people as it would have in 1992 in the answer to the 1992 question?
>
> A: Yes.

Tr. at 24, 28.

Though the old question and the new question were meant to capture the same set, the new question has an explanation of what that set includes. The question instructs:

> Answer "Yes," if you have taken or will take over the activities of another organization; you took over 25% or more of the fair market value of the net assets of another organization; or you were established upon the conversion of an organization from for-profit to non-profit status.

The accompanying instructions to the new Form 1023 states that an organization is a successor if it has:

- Substantially taken over all of the assets or activities of another organization,
- Been converted or merged from another organization, or
- Installed the same officers, directors, or trustees as another organization, that no longer exists and that had purpose(s) similar to your purpose(s).

The relevant part of the post-2004 instructions is attached as Exhibit G. Consistent with these instructions to the revised question, Ms. Westcott stated that if someone had called her office in 1992 regarding the original question, she "would have been communicating to them, the organization, that if they took over the assets or operated as another organization that they needed to answer yes to those questions." Tr. at 27-28. Without limiting the meaning of the question, these instructions were meant to make clear that minimal organizational links were not intended to be covered. As Ms. Westcott put it, "we don't want organizations to believe that if they, an organization operated with $100 that they have to answer yes to that question" Tr. at 28.

The revised Form 1023 instructs organizations to complete Schedule G if they answer "yes" to the successor question. The

Schedule G contains nine questions, some with sub-parts. The questions primarily concern financial relations between organizations. Ms. Westcott explained that the questions on the Schedule G reflect the same inquiry that the IRS would have undertaken in 1992, as a follow-up inquiry, if an organization had indicated it was a successor:

> Q: And are those questions, on Schedule G are those the type of question that you would have asked in 1992 as a follow up if someone answered that questioned, yes,--
>
> A: Yes.
>
> Q: --are you a successor?
>
> A: Yes.
>
> Q: Okay, So that's what this is intended to do, it's intended to ask in written form the questions that you would have asked as follow-ups if someone said yes?
>
> A: Yes, that is correct.

Tr. at 31. Consistent with this evidence, Ms. Westcott testified that the purpose of the original question was to find shifts in debts or assets between organizations:

> Q: I'm asking whether the purpose of that question on the 1990 Form 1023 or 1992 Form 1023 was to look for shifts of either debt from a taxable entity or taxable assets into a tax free organization.
>
> A: Yes, that was the purpose in them.
>
> Q: Now, do you recall during the course of this committee to change this question whether the purpose of that question changed in any way?
>
> A: No, I'm not aware that there was a - the purpose was not to change the question in any way.

Tr. at 21-22.

ARGUMENT

I. Motions In Limine and To Strike

A. Legal Standards For Motion To Strike and Motion In Limine.

Only relevant evidence may be admitted at trial. See Fed. R. Evid. 402. Evidence is relevant if it has "a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Even relevant evidence "may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of issues or misleading the jury or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." Fed. R. Evid. 403. Under this rule, the court has "considerable latitude in determining whether to admit or exclude evidence." Santos v. Sunrise Medical, Inc., 351 F.3d 587, 592 (1st Cir. 2003) (citing Espeaignnette v. Gene Tierney Co., Inc., 43 F.3d 1, 5 (1st Cir. 1994)).

Defendants request two evidentiary rulings concerning the relevance and value of potential evidence in this case. First, defendants request that the Court strike various portions of the Superseding Indictment. "Upon the defendant's motion, the court may strike surplusage from the indictment or information." Fed. R. Crim. P. 7(d). This judicial power serves to protect the

defendant "against immaterial or irrelevant allegations in an indictment or information, which may ... be prejudicial." Fed. R. Crim. P. 7(d), advisory committee note; *see also* United States v. Lewis, 40 F.3d 1325, 1346 (1st Cir. 1994); United States v. Fahey, 769 F.2d 829, 841-42 (1st Cir. 1985). In this case, defendants request that the Court strike paragraphs and allegations relating to the activities or nature of Al-Kifah Refugee Center (Introductory Allegation paragraphs 1, 2, 3, and 5; Count Two paragraph 8; and Portions of Counts One and Eight).

Defendants also request a motion in limine in similar fashion. The motion in limine would prevent the introduction of certain irrelevant and prejudicial evidence unless specifically permitted by the court. See United States v. Marino, 200 F.3d 6, 11 (1st Cir. 1999) ("rulings on motions in limine normally are considered provisional, in the sense that the trial court may revisit its pretrial evidentiary rulings at retrial when an evidentiary proffer may be more accurately assessed in the context of the government's other evidence"). In particular, defendants request that the government be prevented from introducing at trial information regarding the nature and actions of Al-Kifah Refugee Center and its alleged links to terrorist activities.

These requests may also be viewed as a motion to dismiss the offending allegations. Fed. R. Crim. P. 12(b)(2) provides that

"[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." A motion to dismiss is appropriate where a defense does not rely on any disputed facts, but rather is sufficient as a matter of law. See United States v. Covington, 395 U.S. 57, 60 (U.S. 1969) ("A defense is thus 'capable of determination' [for motion to dismiss purposes] if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense"); United States v. Labs of Virginia, Inc., 272 F.Supp.2d 764, 768 (N.D. Ill. 2003) ("An indictment, or a portion thereof, may be dismissed if it is otherwise defective or subject to a defense that may be decided solely on issues of law"); United States v. Ferris, 807 F.2d 269, 271 (1st Cir. 1986).

Defendants respectfully request that portions of Counts One, Two and Eight be dismissed. For the reasons set forth herein, these portions of the Indictment may be appropriately resolved without trial as a matter of law.

B. IRS's Interpretation Of "Successor or Outgrowth" on Form 1023 Binds the Government in this Case.

Ms. Westcott testified on behalf of the IRS, thus her testimony constitutes the IRS' view of the meaning of the terms in Form 1023, and in particular the terms "successor" or "outgrowth" that are central to the government's charges in this case. In her authorization to testify, she was instructed that

she was to testify “in [her] official capacity” and “with respect to ... the official position of the Service.” See Exhibit D. As part of her explanation of the 2004 revision of Form 1023, Ms. Westcott was required to explain the meaning of the pre-2004 form. The Government itself described Ms. Westcott as “competent to testify not only to what the Form 1023 is itself but the provisions and process .... She is familiar with the significant [re]vision process that occurred between late 1999 to 2004 ....” Tr. at 7. In this context, Ms. Westcott’s testimony reflects the IRS’s “official position” with respect to Form 1023 and its revisions.

The government is bound by this interpretation, having advanced Ms. Westcott as the spokesperson of the IRS. It is a situation akin to that where a government attorney makes a factual statement, which then constitutes an admission of the government under Fed. R. Evid. 801(d)(2)(D), see United States v. Kattar, 840 F.2d 118, 130-31 (1st Cir. 1988). But unlike a factual admission, which may be introduced into evidence against the party making it but is not conclusive, in this case the issue is one of interpretation of terms which have legal significance, by the agency which developed the terms. Under such circumstances, the government should fairly be bound by the agency’s determination of what its own terms mean, and the issue

whether the defendants falsely answered questions using those terms should be determined based on the agency's interpretation.

As an official agency interpretation, Ms. Westcott's explication of the phrase "outgrowth of (or successor to)" would be entitled to substantial deference if it were challenged by a nongovernmental party. In that context, the courts have held that the IRS is in the best position to interpret its own language.

Agencies receive deference in interpreting their own regulatory provisions. Chevron, U.S.A., Inc. v. NRDC, Inc., 467 U.S. 837, 843-844 (1984) ("If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."). The IRS is no exception; the IRS' interpretation of the tax code demands judicial deference. See United States v. Nat'l Bank of Commerce, 472 U.S. 713, 730 (1985) ("The IRS's understanding of the terms of the Code is entitled to considerable deference"); cf. Kristen E. Hickman, The Need for Mead: Rejecting Tax Exceptionalism in Judicial Deference, 90 Minn. L. Rev. 1537 (2006).

In this case, the issue is not the interpretation of a statutory provision, but rather the interpretation of the IRS's

own rules and regulations. Form 1023 is the IRS's implementation of the tax code. The Supreme Court has established a very high standard of deference to agencies in interpreting their own rules. "An agency's interpretation of its own rules may only be rejected if it is plainly erroneous or inconsistent with the regulation from which it arises." Auer v. Robbins, 519 U.S. 452, 461 (U.S. 1997). In short, an interpretation of an agency's own rules and regulations receives an even higher degree of deference than does the an agency's statutory interpretation. See Horizon Mut. Sav. Bank v. Federal Sav. & Loan Ins. Corp., 674 F.2d 1312, 1316 (9th Cir. 1982) ("The question whether [an agency's] interpretation is "clearly contrary to the plain and sensible meaning of the regulation" or "demonstrably irrational" must be considered in light of the "great deference" we must give an agency's construction of its own regulations, a deference even greater than that we give when an agency is construing a statute it is charged with administering.").

Agency deference is generally applicable in the criminal context. See Stanford N. Greenberg, Who Says It's A Crime?: Chevron Deference to Agency Interpretations of Regulatory Statutes That Create Criminal Liability, 58 U. Pitt. L. Rev. 1, 35 (1996) ("agencies frequently do exercise their expertise when they construe their organic statutes in ways that only indirectly create criminal liability"). For example, in Babbitt v. Sweet

Home Chapter of Cmtys. for a Great Or., 515 U.S. 687, 704 n.18
(1995), the Supreme Court explained that deference to agency
interpretation took precedence over the rule of lenity in
interpreting criminal sanctions.  If agency interpretation can
create criminal liability in Babbitt, it must also be able to
eliminate criminal liability.  While a few scholars have opposed
the use of agency deference in the criminal context, these
objections are based on the possibility of unfairly imposing
criminal sanctions based on the agency interpretation.  See,
e.g., Cass R. Sunstein, Law and Administration After Chevron, 90
Columbia L. Rev. 2071, 2115-16 (1990); Mark D. Alexander,
Increased Judicial Scrutiny for the Administrative Crime, 77
Cornell L. Rev. 612 (1992).  No such objection would exist where,
as in this case, the agency interpretation would eliminate the
government's theory of criminal liability.  Here agency deference
supplements, rather than conflicts with, the considerations of
lenity and notice.  These doctrines line up to demand that the
government be bound by the IRS interpretation as testified to by
Ms. Westcott.

C.    The Government's Prosecution of the "Successor"
      Statement Relies Upon an Interpretation Which Is
      Unsupported by the IRS.

     Ms. Westcott testified that the "outgrowth of (or successor
to)" language was framed to capture organizations which had taken
on the assets or debts of other organizations, to look for

"shifts of either debt from a taxable entity or taxable assets into a tax free organization." Tr. at 21-22. The IRS's concern has been with the shift of taxable assets and debts, either between for-profit and non profit organizations, or between merging or transforming organizations. Organizational links are not enough to make a successor, unless it takes over more than 25% of another organizations assets, or if it substantially takes over all of its activities. In each instance, the focus is on ferreting out possible tax evasion, where assets are shifted from profit to non-profit treatment.

The government alleges that "Muntasser and others operated Care in the same manner as Al-Kifah by publishing Al-Hussam and/or soliciting money for mujahideen and jihad through mail and wire solicitations." Criminal Complaint, at ¶ 6. The government conflates the activities of Al-Kifah's New York headquarters with Boston's activities, despite acknowledging in the newly disclosed FBI 302 that the Boston office had financial differences with Al-Kifah's main office in Brooklyn, which led to a split off. Under the circumstances, and recalling that the Form 1023 question asked whether Care was "successor to another organization," it is difficult to maintain that Care took over the activities of Al-Kifah, which remained an ongoing organization. Further, the IRS testimony dispels the idea that the successor question was intended to cover all operational similarities. For example, the

costs associated with publishing the newsletter were negligible. See, e.g., 26 CFR 1.501(c)(3)1(c)(1)[non-exempt expenses or activities are permissible if "insubstantial" parts of overall activities]. Finally, the government alleges that defendant Muntasser falsely failed to disclose links to an organization with alleged ties to jihad, as if the IRS' Form 1023 question implicated such a concern. But Ms. Westcott's testimony in this case demonstrates that no such concerns were implicated in that question. That is, the government is relying on an interpretation of the question that the IRS did not intend.

The issue is whether this core accusation may proceed to trial where it is untethered to the IRS's interpretation of its own query (leaving aside the conspicuous problem that the government is offering a witness who will testify that Care and Al-Kifah were at financial odds). Muntasser's answer to the successor question in 1993 was totally true in relation to the IRS's own intent, insofar as there was no transfer of meaningful assets alleged in the indictment. Nor could Care, a Boston organization, have taken on substantially all of the activities of Al-Kifah, a New York corporation with multi-city branches and activities in all of them that Care had nothing to do with. The literal truth of Muntasser's answer is reinforced by the IRS's subsequent changes to the Form which confirmed anew that the IRS's question drove at asset transfers and tax evasion. Compare

United States v. Good, 326 F.3d 589 (4th Cir. 2003) (in which a
negative response was deemed literally true even when subsequent
changes to a government form suggested the government's intent
was to include defendant).

D.    Defendants' Response To IRS Form 1023 Was Not Material.

        To subject a defendant to criminal liability, a false
statement must be material.  Courts have reached a consensus
definition for materiality: "The statement must have a natural
tendency to influence, or [be] capable of influencing, the
decision of the decision making body to which it was addressed."
United States v. Gaudin, 515 U.S. 506, 509 (1995); see also
United States v. Notarantonio, 758 F.2d 777, 785 (1st Cir. 1985)
(a materially false statement is one that "had a natural tendency
to influence, or was capable of influencing, the decision of a
government agency in making a determination required to be
made"); United States v. Corsino, 812 F.2d 26, 30 (1st Cir. 1987)
(citing cases).  It is not required that the government show that
a false statement actually influenced an agency, but rather that
it was capable of such influence.  Notarantonio, 758 F.2d at 785
("[t]he government need not show that the agency was actually
influenced by the statements involved"); United States v. Alemany
Rivera, 781 F.2d 229, 235 (1st Cir. 1985) ("the test for
materiality under 18 U.S.C. § 1001 is not whether a false

statement actually influenced a government function, but whether it had the capacity to influence a government function").

If the allegedly false answer to the "outgrowth of (or successor to)" question is to be considered material, it must be because the answer had the capacity to influence the IRS. That is, it must be the case that had defendants answered "yes" to the question, the IRS might have reached a different result. The IRS explained that, if an organization answered "yes," it would have asked as follow-up essentially the same questions that now are found in Schedule G to Form 1023. These questions concern financial links with a prior organization. That is, what was material to the "successor to (or outgrowth of)" question was the transfer of debts and assets and the resulting tax consequences. In fact, the IRS explicitly testified that the purpose of the question was to track shifts in taxable assets. This IRS testimony echos the existing case law on materiality. As the First Circuit has remarked, in the context of false statements to the IRS, "[a] 'material' matter is one that is likely to affect the calculation of tax due and payable, or to affect or influence the IRS in carrying out the functions committed to it by law, such as monitoring and verifying tax liability." United States v. Boulerice, 325 F.3d 75, 82 n.3 (1st Cir. 2003).

Whether Care published the same newsletter as Al-Kifah was not material to the "successor" inquiry. As a result, even if

defendant's response could in any way be construed as false, it
was not false in any way material to the IRS.  It is worth noting
that, in order to sustain a false statement prosecution, the
statement must be one that "has a natural tendency or was capable
of influencing, *the decision of the decision-making body to which
it is addressed*."  Kungys v. United States, 485 U.S. 759, 770
(1988) (citation omitted; emphasis added), *reiterated in* Gaudin,
515 U.S. at 509.  The fact that a false statement might bear on
some sort of government activity is not enough to create
materiality.  Rather, the false statement must be capable of
influencing the agency in the particular decision to which it is
addressed.  Here, the 1993 decision regarding tax exemption was
oriented towards distinct considerations to which many facts were
not material.  The fact that post-9/11 law enforcement may find
significance in these facts cannot be used to manufacture
materiality.

E.   The "Outgrowth or Successor" Claim Cannot Proceed to Trial.

     A federal criminal prosecution is not an appropriate vehicle
for expansion of the intended scope of an agency question.  Where
there is, as a matter of law, a reading upon which a statement is
literally true, it is appropriate for a court to prevent a false
statement charge from reaching a jury.  In Bronston v. United
States, 409 U.S. 352 (1973), the Supreme Court held that the
literal truth of a statement refuted a charge of perjury and held

that it was inappropriate for the jury to consider such a charge. As noted by the First Circuit in United States v. Richardson, 421 F.3d 17, 34 (1st Cir. 2005), "Bronston thus requires dismissal of an indictment 'where ... the government hinges its charge on the false implications of a statement that is not alleged to be false in itself.' [cite omitted]." See also Bronston, 409 U.S. at 359 ("A jury should not be permitted to engage in conjecture whether an unresponsive answer, true and complete on its face, was intended to mislead or divert the examiner"); United States v. Finucan, 708 F.2d 838, 847-848 (1st Cir. 1983)("Where the government cannot prove that the defendant's testimony, although incomplete and evasive, was not actually a false response to the question posed, the district court does not err in dismissing the indictment.").

In parallel circumstances, federal courts have proven unsympathetic to efforts to prosecute persons for unresponsive answers, saying the burden of clarity is on the questioner. Bronston, 409 U.S. at 362 ("any special problems arising from the literally true but unresponsive answer are to be remedied through the 'questioner's acuity' and not by a federal perjury prosecution"). In the atypical case, such as this one, where the answer given is actually truthful according the intention of the questioner, there is even more reason to dismiss any charge of making a false statement.

Literal truth will protect an answer that is true even if it is not responsive to the question as intended by the questioner. False statement prosecution is barred where there exists an "objectively reasonable interpretation" of a question according to which the response is not false. United States v. Rowe, 144 F.3d 15, 21 (1st Cir. 1998) ("in a false statement prosecution, an answer to a question is not fraudulent if there is an objectively reasonable interpretation of the question under which the answer is not even false."); United States v. Prigmore, 243 F.3d 1, 18 (1st Cir. 2001) ("in a prosecution based on the theory that a defendant has defrauded the government by making false statements in information defendant was duty-bound to divulge to the government (or by failing to divulge information defendant was duty-bound to divulge), there has been no crime if the statements were not false (or if there was no duty to divulge) under an objectively reasonable interpretation of the law imposing the duty."). In this case, the interpretation which makes the defendant's answer true was not only reasonable, but actually intended. The IRS asked a question intended to elicit certain information, and the response provided did not defeat that intent. It is not for a jury to challenge this understanding.

The defense of literal truth is not limited to perjury, but applies to other false statement allegations as well. See United

States v. Poutre, 646 F.2d 685 (1st Cir. 1980); United States v. Attick, 649 F.2d 61 (1st Cir. 1981); United States v. Good, 326 F.3d 589, 592 (4th Cir. 2003) ("The principle articulated in Bronston holds true for convictions under Section 1001 and in this case today."); United States v. Moses, 94 F.3d 182, 188-89 (5th Cir. 1996) ("We cannot uphold a conviction ... where the alleged statement forming the basis of a violation of section 1001 is true on its face."); United States v. Vesaas, 586 F.2d 101, 104 (8th Cir. 1978) ("[A] prosecution for a false statement under § 1001 or under the perjury statutes cannot be based on an ambiguous question where the response may be literally and factually correct.").

The allegations of a false statement must be dismissed if there is an objectively reasonable interpretation of the successor question under which defendant's answer was not false. The IRS has laid out such an interpretation and it is entitled to deference from this Court.

E.   In Light of the IRS Testimony, The Allegations
     Pertaining to the Successor Question in Counts I, II
     and VIII Should Be Dismissed For Lack of Notice.

In light of the June 2007 testimony from the IRS, defendants respectfully renew their contention that the "outgrowth of (or successor to)" question did not provide sufficient notice of its meaning. This Court has previously held that the successor question was not so "fundamentally ambiguous" that the alleged

false statements be kept from the jury. United States v. Mubayyid, 476 F.Supp.2d 46, 57-58 (D. Mass. 2007). The Court based this decision on assumptions as to the meaning of the words in the Form 1023 question. The Court focused on explication of the normal meaning given to the words "outgrowth" and "successor." Without challenging the wisdom of this explication, defendants suggest that this issue should be revisited in light of the IRS's interpretation of its own question.

The widely used description of when a question is fundamentally ambiguous is when it "is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony." United States v. Lattimore, 127 F.Supp. 405, 410 (D.D.C. 1955), adopted in, e.g., United States v. Richardson, 421 F.3d 17, 34 (1st Cir. 2005). Context is "critically important" in determining whether a question is fundamentally ambiguous. Richardson, 421 F.3d at 33.

In the context of the IRS's interpretation, the phrase "outgrowth of (or successor to)" – if not interpreted to make defendant's response true – is at least fundamentally ambiguous. The IRS provides a developed interpretation of the phrase which is decidedly at odds with how this Court interpreted the phrase. This Court viewed "outgrowth" and "successor" to be two distinct

concepts, whereas the IRS considered them "redundant." This Court also viewed the question to cover any "offshoot or spin-off," Mubayyid, 476 F.Supp.2d at 57, whereas the IRS intended that an organization must have "[taken] over the assets or operated as another organization." Tr. at 27-28. This Court's initial interpretation would encompass any organization that "continued the activities of ... another organization," id., which is very different than the IRS's interpretation requiring that an organization have, "[s]ubstantially taken over all of the assets or activities of another organization."

This Court's reading of the question varies significantly from the IRS's interpretation. This difference is plain evidence that "men of ordinary intellect" could and do arrive at different interpretations of this question. The difference is surely enough to indicate that the phrase is at least as ambiguous as others that courts have deemed fundamentally ambiguous. See, e.g., United States v. Manapat, 928 F.2d 1097 (11th Cir. 1991) (finding "record of convictions" to be fundamentally ambiguous); United States v. Ryan, 828 F.2d 1010 (3d Cir. 1987) (finding "previous address" to be fundamentally ambiguous); United States v. Wall, 371 F.2d 398 (6th Cir. 1967) (finding "been on trips" to be too ambiguous for a perjury conviction); United States v. Lighte, 782 F.2d 367 (2d Cir. 1986) (finding "you" to be fundamentally ambiguous between personal and trustee capacities);

United States v. Anzalone, 766 F.2d 676 (1st Cir. 1985) (finding that "transactions of more than $10,000" provided inadequate notice); United States v. Serafini, 167 F.3d 812 (3d Cir. 1999) (finding the question "Is there another check that you are aware of that is connected to this investigation" to be fundamentally ambiguous); United States v. Tonelli, 577 F.2d 194 (3d Cir. 1978) (finding "handling a check" to be ambiguous); United States v. Lattimore, 127 F. Supp. 405 (D.D.C. 1955) (finding "promoter of Communist interests" and "follower of the Communist line" fundamentally ambiguous); United States v. Watts, 72 F.Supp.2d 106 (E.D.N.Y. 1999) (finding a question of whether improvements were "made" or "not made" fundamentally ambiguous). Given the difference between the interpretation of the phrase "outgrowth of (or successor to)" offered by this Court and the IRS's interpretation, the phrase must be considered fundamentally ambiguous.

G. Evidence Concerning Al-Kifah is not Relevant to the "Successor" Inquiry.

The determination of whether a piece of evidence is admissible is a deliberate one. The First Circuit has cited the following instructive commentary as its law: "Where relevancy is not immediately apparent, the judge and counsel should clearly identify the terms of the relevancy relationship in the particular case. That is, they should describe the item of evidence being proffered, the consequential fact to which it is

directed, and the hypothesis required to infer the consequential fact from the evidence. Without this analysis it is impossible to decide how the evidence may alter the probability of the existence of the consequential fact." 1 Weinstein's Evidence, 401, 401-30, cited in United States v. Mann, 590 F.2d 361, 369 (1st Cir. 1978). To conclude that evidence is relevant, a court must find that there is some hypothesis on which the evidence in question makes an aspect of the offence more probable.

The offences with which defendants are charged are a scheme to conceal material facts, and a conspiracy to defraud the government. The IRS testimony alluded to above decisively resolves the relevance of certain evidence in two ways. First, the IRS testimony limits the evidence relevant to showing that Care was the outgrowth of Al-Kifah to evidence of shared and transferred financial assets. As a result, there is no hypothesis on which evidence regarding Al-Kifah's newsletter or initial address or, least of all, its alleged links to the 1993 bombings could prove that Care was an outgrowth or successor of Al-Kifah for the purpose of Form 1023. This evidence is also not relevant to how Care itself conducted its activities. Cf. United States v. Mann, 590 F.2d 361 (1st Cir. 1978) (it was not relevant that a defendant accused of soliciting another airline passenger to smuggle drugs for him had previously been on a plane and familiar with someone found to be carrying drugs); United States

v. Lamberty, 778 F.2d 59 (1st Cir. 1985) (reversing a conviction of a postmaster for illegally opening packages because the testimony that other packages had been taken previously was irrelevant and prejudicial); United States v. Rodriguez Cortes, 949 F.2d 532 (1st Cir. 1991) (holding that Columbian Identification Card was not relevant and "the effect of the introduction of the identification card into evidence was to allow the jury to determine guilt based on [defendant's] supposed nationality").

In short, the IRS testimony explains what would count as a false answer to the outgrowth or successor question on Form 1023. Essentially, the defendants' answer would be false if Care took on taxable assets or debts of Al-Kifah Refugee Center or substantially all of the activities of the New York headquarters. In light of the IRS testimony (and taking into account the late-disclosed FBI 302 describing differences between Boston and Al-Kifah's headquarters), any other alleged links between the organizations are irrelevant. A motion in limine would appropriately limit the evidence that defendants' answer was false to the type of evidence that the IRS has asserted to be relevant. Given the clear interpretive guidance of the IRS, what evidence is relevant in this case is significantly circumscribed.

H.    The Evidence is Prejudicial.

The conspicuous fact, as described at page 4, supra, is that the government is calling a witness who will disavow that Care and Al-Kifah's headquarters were acting in concert, and who will say that Care was at odds with Al-Kifah "over finances" (and therefore hardly "successor to [its] organization"). Anticipating such testimony, it may seem imprudent for the Court to allow the government to introduce claims which will go conspicuously unproven, particularly where the evidentiary fallout is so lethal.

According to Rule 403, even relevant evidence may be excluded when it is sufficiently prejudicial. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. R. 403.

Evidence creates an unfair prejudice when it threatens to influence a factfinder in an illicit manner. "Evidence is generally deemed unfairly prejudicial if it has an undue tendency to prompt a decision by the factfinder on an improper basis." United States v. Benedetti, 433 F.3d 111, 118 (1st Cir. 2005) (citing Old Chief v. United States, 519 U.S. 172, 180 (1997)).

Prime examples of this sort of improper influence would be evidence that plays off stereotypes, associations or fear.

As will be developed further in defendants' motion in limine addressing proposed expert testimony, the prejudicial effect of allowing in evidence of alleged links to Al-Kifah, including media reports linking it to the first World Trade Center bombing, would be deeply prejudicial and very worrisome. This is particularly important in a case where the government charges a Klein conspiracy, readily acknowledging that this is not a so-called "material support" case. But even a brief glance at the government's expert disclosures, for example, shows greater prosecutorial ambitions. In its letter of January 3, 2007, the government advised that it would call an expert witness who would testify in the following fashion:

> Dr. Levitt will describe the formulation, structure, and activities of Mahtab al-Khidamat also known as the Human Services Office. Dr. Levitt will provide a description of individuals who were affiliated with Al-Kifah or Care or whose name appears in records of Al-Kifah (Boston chapter) and Care, including Sheikh Abdullah Azzam, Usama bin Laden, Omar Abdel Rahman, Ahmad Alkattan, and Mohamad Siyam. Dr. Levitt will testify about how Islamic charities, in general, were used to support terrorism prior to September 2001 and the funding of jihad-related activities overseas. Dr. Levitt will explain how charities that supported jihad related activities of front organizations for terrorist organizations would outwardly espouse their support of legitimate charitable activities ... while simultaneously, with or without the knowledge of its donors, funneling money to the mujahideen or a terrorist related organization.... Finally, Dr. Levitt will opine on the significance of certain bank records

> of Care or Al-Kifah, documents distributed by Care or Al-Kifah, and/or other materials provided to the defense in discovery. Dr. Levitt will opine ... that Care's activities were consistent with that of other purported charities that were used to funnel money for non-charitable or illegal purposes, which promoted or supported jihad related activities abroad.

A second expert "will testify, without limitation, about the formulation, structure and activities of Al-Kifah Refugee Center, Mahtab al-Khidamat," and several other organizations, and would provide a "description" of persons "affiliated" with Al-Kifah or Care, including Azzam (alleged mentor to bin Laden), bin Laden, Omar Abdel Rahmen (the "Blind Shiek"), and numerous others. He would further opine that "Islamic charities such as Al-Kifah and Care were used to promote jihad and recruit individuals to fight overseas." See Government Letter, dated January 3, 2007 at 2-4. Both "experts" would impermissibly claim that Care's alleged methods of fund collection and distribution mimicked the methods of other Islamic charities which had provided material support to terrorism. To this, the government would add the Newsweek story linking Al-Kifah to the first World Trade Center attack, and in this fashion bring together all the atmospherics of a material support case. The proffered evidence threatens to insinuate criminal activity not at issue in this trial. Cf. Krulewitch v. United States, 336 U.S. 440, 454 (U.S. 1949) ("It is difficult for the individual to make his own case stand on its own merits in the minds of jurors who are ready to believe that birds of a

feather are flocked together."); United States v. Benedetto, 571 F.2d 1246 (2d Cir. 1978) (in which, in the course of finding evidence of other uncharged bribery inadmissable, the court noted that passing bills in the course of a handshake as "method of bribery is about as unique as using glassine envelopes to package heroin"). It is therefore particularly important that this Court take steps to confine the charged atmosphere as much as possible.

## CONCLUSION

For each of these reasons, defendants seek to strike allegations in the indictment asserting that defendants concealed the fact that Care International, Inc., was an outgrowth of and successor to the Al-Kifah Refugee Center, and relating to the activities or nature of Al-Kifah Refugee Center, including Introductory Allegation paragraphs 1, 2, 3, and 5; Count Two paragraph 8; and relevant portions of Counts One and Eight.

MUHAMED MUBAYYID
By his attorney

/s/ Michael C. Andrews

Michael C. Andrews
B.B.O. #546470
21 Custom House
Boston, MA 02110

EMADEDDIN Z. MUNTASSER
By his attorneys,

/s/ David Duncan

David Duncan
B.B.O. #546121
Norman Zalkind
B.B.O. #538880
Elizabeth A. Lunt
B.B.O. #307700
Zalkind Rodriguez Lunt & Duncan
65a Atlantic Avenue
Boston, MA 02110

SAMIR AL-MONLA
By his attorney

/s/ Charles P. McGinty

Charles P. McGinty
B.B.O. #333480
Federal Defender Office
408 Atlantic Avenue, 3rd Floor
Boston, MA 02110
Tel: 617-223-8061

CERTIFICATE OF SERVICE

I, Charles P. McGinty, hereby certify that I have served a copy of the foregoing motion upon Assistant United States Attorneys Aloke S. Chakravarty and Donald L. Cabell by causing copies to be delivered to them on October 19, 2007.

/s/ Charles P. McGinty
Charles P. McGinty

# EXHIBIT A

083154

Form 1023 (Rev. September 1990) Department of the Treasury Internal Revenue Service

# Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code

OMB No. 1545-0056

If exempt status is approved, this application will be open for public inspection.

Read the Instructions for each Part carefully.
**A User Fee must be attached to this application.**

If the required information and appropriate documents are not submitted along with Form 8718 (with payment of the appropriate user fee), the application may be returned to you.

**Part I Identification of Applicant**

1a Full name of organization (as shown in organizing document)
CARE INTERNATIONAL, INC.

2 Employer identification number (If none, see instructions.)
04 3190252

1b c/o Name (if applicable)
Emadeddin Z. Muntasser

3 Name and telephone number of person to be contacted if additional information is needed
Abdullah A. Bade
Attorney at Law
(317) 635-5375

1c Address (number, street, and room or suite no.)
510 Commonwealth Ave., #275

1d City or town, state, and ZIP code
Boston, MA 02215

4 Month the annual accounting period ends
December

5 Date incorporated or formed
4/13/1993

6 Activity codes (See instructions.)
902 | 560 | 179

7 Check here if applying under section: a ☐ 501(e) b ☐ 501(f) c ☐ 501(k)

8 Did the organization previously apply for recognition of exemption under this Code section or under any other section of the Code? ☐ Yes ☒ No
If "Yes," attach an explanation.

9 Has the organization filed Federal income tax returns or exempt organization information returns? ☐ Yes ☒ No
If "Yes," state the form numbers, years filed, and Internal Revenue office where filed.

REC'D WITH REMITTANCE
11 JUN 8 1993
DIR. INT. REV. EPEO—SPS BROOKLYN, N.Y

10 Check the box for your type of organization. BE SURE TO ATTACH A COMPLETE COPY OF THE CORRESPONDING DOCUMENTS TO THE APPLICATION BEFORE MAILING.

a ☒ Corporation— Attach a copy of your Articles of Incorporation, (including amendments and restatements) showing approval by the appropriate State official; also include a copy of your bylaws.

b ☐ Trust— Attach a copy of your Trust Indenture or Agreement, including all appropriate signatures and dates.

c ☐ Association— Attach a copy of your Articles of Association, Constitution, or other creating document, with a declaration (see instructions) or other evidence the organization was formed by adoption of the document by more than one person; also include a copy of your bylaws.

If you are a corporation or an unincorporated association that has not yet adopted bylaws, check here ▶ ☐

I declare under the penalties of perjury that I am authorized to sign this application on behalf of the above organization and that I have examined this application, including the accompanying schedules and attachments, and to the best of my knowledge it is true, correct, and complete.

Please Sign Here ▶ [signature] (Signature) President (Title or authority of signer) 6-1-93 (Date)

For Paperwork Reduction Act Notice, see page 1 of the Instructions.

Complete the Procedural Checklist (page 7 of the Instructions) prior to filing.

**Part II Activities and Operational Information**

1. Provide a detailed narrative description of all the activities of the organization—past, present, and planned. Do not merely refer to or repeat the language in your organizational document. Describe each activity separately in the order of importance. Each description should include, as a minimum, the following: (a) a detailed description of the activity including its purpose; (b) when the activity was or will be initiated; and (c) where and by whom the activity will be conducted.

The organization is recently incorporated and will become operational within a couple of months. It plans to carry out the following activities under its control and participation as follows:

1. It will provide assistance to victims of natural and man-made disasters, including financial, food, shelter, and medical relief. Local volunteers in the affected areas will carry out these activities including the management, initially. Within the next three months, these activities will be initiated and carried out at a smaller scale, and within eight months, at a larger scale, primarily in Bosnia and later in African countries.
2. It will develop a program for orphan sponsorships within a couple of months. Monthly contributions and donations will be solicited and collected to provide food, lodging, and education for orphans in disaster areas overseas, primarily in Bosnia, Afghanistan, and Kashmir. The organization will work closely with the established orphanages in the above parts of the world. It will also promote and find sponsors who will assist this program and orphans for a longer period of time.
3. It will develop rehabilitation programs for refugees coming from the disaster affected areas, to U.S., and other countries within the second year. These programs will include teaching of basic trades e.g. carpetmaking, weaving, handicrafts, etc. This program will be implemented with cooperation of refugee camp administrators in the aforementioned countries.
4. In the third year, the organization will develop programs to support reconstruction projects in disaster struken areas, mainly in Bosnia, Somalia, Sudan, and Bangladesh. This program will include encouraging to volunteer the services of qualified individuals in the U.S.and overseas for research in irrigation projects, other agricultural programs, and water resources. It also intends to participate in United Nations and U.S. sponsored reconstruction projects in the above mentioned areas at a later period.
5. Within a couple of years it will develop programs to support educational assistance and needs of innercity and poor neighborhood children and schools in the U.S., and in the above stated countries. This program will include modernizing cirriculum and continuing training to teachers through workshops and seminars. In the beginning, a few schools will be selected for special aid with a view to follow them as model schools.

2 What are or will be the organization's sources of financial support? List in order of size.

1. Donations, contributions, and grants from individuals, organizations, general public, and businesses.
2. Income from investments, if any, in the future.

3 Describe the organization's fundraising program, both actual and planned, and explain to what extent it has been put into effect. Include details of fundraising activities such as selective mailings, formation of fundraising committees, use of volunteers or professional fundraisers, etc. Attach representative copies of solicitations for financial support.

1. We have initiated our collecting of contributions from our personal contacts and friends.
2. Substantial fundraising efforts will commence within the next couple of months by means of:
   1. Fundraising committees to be formed.
   2. mailings
   3. through personal contacts and friends

US-00827

Form 1023 (Rev. 9-90) Page 3

**Part II Activities and Operational Information** *(Continued)*

4 Give the following information about the organization's governing body:

a Names, addresses, and titles of officers, directors, trustees, etc. | b Annual Compensation

1. Emadeddin Z. Muntasser - 2 Kimball Ct., #109, Woburn, MA 01801 (President) — NIL
2. Munther Baara - 15 Leicester St., #Q, Brighton, MA 02135 (Treasurer)
3. Ahmad Nawras - 56 Arlington St., Everett, MA 02149 (Secretary)

Directors: (4-6)

4. Afif Kadri - 15 Walbridge St., #27, Allston, MA 02134
5. Mohamad Akra - 784 Main St., #1, Cambridge, MA 02139-3573
6. Wassim Abu Yasin - 11 Hancock St., #60, Everett, MA 02149

c Do any of the above persons serve as members of the governing body by reason of being public officials or being appointed by public officials? ☐ Yes ☒ No

If "Yes," name those persons and explain the basis of their selection or appointment.

d Are any members of the organization's governing body "disqualified persons" with respect to the organization (other than by reason of being a member of the governing body) or do any of the members have either a business or family relationship with "disqualified persons"? (See the specific instructions for line 4d.) ☐ Yes ☒ No

If "Yes," explain.

5 Does the organization control or is it controlled by any other organization? ☐ Yes ☒ No

Is the organization the outgrowth of (or successor to) another organization, or does it have a special relationship with another organization by reason of interlocking directorates or other factors? ☐ Yes ☒ No

If either of these questions is answered "Yes," explain.

6 Does or will the organization directly or indirectly engage in any of the following transactions with any political organization or other exempt organization (other than 501(c)(3) organizations): (a) grants; (b) purchases or sales of assets; (c) rental of facilities or equipment; (d) loans or loan guarantees; (e) reimbursement arrangements; (f) performance of services, membership, or fundraising solicitations; or (g) sharing of facilities, equipment, mailing lists or other assets, or paid employees? ☐ Yes ☒ No

If "Yes," explain fully and identify the other organizations involved.

7 Is the organization financially accountable to any other organization? ☐ Yes ☒ No

If "Yes," explain and identify the other organization. Include details concerning accountability or attach copies of reports if any have been submitted.

US-00828

USAO-MUB-00000828

**Part II** **Activities and Operational Information** *(Continued)*

8 What assets does the organization have that are used in the performance of its exempt function? (Do not include property producing investment income.) If any assets are not fully operational, explain their status, what additional steps remain to be completed, and when such final steps will be taken. If "None," indicate "N/A."

N/A

9a Will any of the organization's facilities or operations be managed by another organization or individual under a contractual agreement? . . . ☐ Yes ☒ No

b Is the organization a party to any leases? . . . ☐ Yes ☒ No

If either of these questions is answered "Yes," attach a copy of the contracts and explain the relationship between the applicant and the other parties.

10 Is the organization a membership organization? . . . ☐ Yes ☒ No

If "Yes," complete the following:

a Describe the organization's membership requirements, and attach a schedule of membership fees and dues.

b Describe your present and proposed efforts to attract members, and attach a copy of any descriptive literature or promotional material used for this purpose.

c What benefits do (or will) your members receive in exchange for their payment of dues?

11a If the organization provides benefits, services or products, are the recipients required, or will they be required, to pay for them? . . . ☐ N/A ☐ Yes ☒ No

If "Yes," explain how the charges are determined, and attach a copy of your current fee schedule.

b Does or will the organization limit its benefits, services or products to specific individuals or classes of individuals? . . . ☐ N/A ☐ Yes ☒ No

If "Yes," explain how the recipients or beneficiaries are or will be selected.

12 Does or will the organization attempt to influence legislation? . . . ☐ Yes ☒ No

If "Yes," explain. Also, give an estimate of the percentage of the organization's time and funds which it devotes or plans to devote to this activity.

13 Does or will the organization intervene in any way in political campaigns, including the publication or distribution of statements? . . . ☐ Yes ☒ No

If "Yes," explain fully.

**Part III** **Technical Requirements**

1 Are you filing Form 1023 within 15 months from the end of the month in which you were created or formed? ☒ Yes ☐ No
If you answer "Yes," do not answer questions 2 through 6.

2 If one of the exceptions to the 15-month filing requirement shown below applies, check the appropriate box and proceed to question 7.
**Exceptions**—You are not required to file an exemption application within 15 months if the organization:

☐ (a) Is a church, interchurch organization, local unit of a church, a convention or association of churches, or an integrated auxiliary of a church;

☐ (b) Is not a private foundation and normally has gross receipts of not more than $5,000 in each tax year; or,

☐ (c) Is a subordinate organization covered by a group exemption letter, but only if the parent or supervisory organization timely submitted a notice covering the subordinate.

3 If you do not meet any of the exceptions in question 2, do you wish to request relief from the 15-month filing requirement? ☐ Yes ☐ No

4 If you answer "Yes" to question 3, please give your reasons for not filing this application within 15 months from the end of the month in which your organization was created or formed. **(See the instructions before completing this item.)**

5 If you answer "No" to both questions 1 and 3 and do not meet any of the exceptions in question 2, your qualification as a section 501(c)(3) organization can be recognized only from the date this application is filed with your key District Director. Therefore, do you want us to consider your application as a request for recognition of exemption as a section 501(c)(3) organization from the date the application is received and not retroactively to the date you were formed? ☐ Yes ☐ No

6 If you answer "Yes" to question 5 above and wish to request recognition of section 501(c)(4) status for the period beginning with the date you were formed and ending with the date your Form 1023 application was received (the effective date of your section 501(c)(3) status), check here ▶ ☐ and attach a completed page 1 of Form 1024 to this application.

**Part III Technical Requirements** *(Continued)*

7 Is the organization a private foundation?
☐ Yes (Answer question 8.)
☒ No (Answer question 9 and proceed as instructed.)

8 If you answer "Yes" to question 7, do you claim to be a private operating foundation?
☐ Yes (Complete Schedule E)
☐ No

After answering this question, go to Part IV.

9 If you answer "No" to question 7, indicate the public charity classification you are requesting by checking the box below that most appropriately applies:

**THE ORGANIZATION IS NOT A PRIVATE FOUNDATION BECAUSE IT QUALIFIES:**

| | | |
|---|---|---|
| (a) ☐ | As a church or a convention or association of churches (CHURCHES MUST COMPLETE SCHEDULE A). | Sections 509(a)(1) and 170(b)(1)(A)(i) |
| (b) ☐ | As a school (MUST COMPLETE SCHEDULE B). | Sections 509(a)(1) and 170(b)(1)(A)(ii) |
| (c) ☐ | As a hospital or a cooperative hospital service organization, or a medical research organization operated in conjunction with a hospital (MUST COMPLETE SCHEDULE C). | Sections 509(a)(1) and 170(b)(1)(A)(iii) |
| (d) ☐ | As a governmental unit described in section 170(c)(1). | Sections 509(a)(1) and 170(b)(1)(A)(v) |
| (e) ☐ | As being operated solely for the benefit of, or in connection with, one or more of the organizations described in (a) through (d), (g), (h), or (i) (MUST COMPLETE SCHEDULE D). | Section 509(a)(3) |
| (f) ☐ | As being organized and operated exclusively for testing for public safety. | Section 509(a)(4) |
| (g) ☐ | As being operated for the benefit of a college or university that is owned or operated by a governmental unit. | Sections 509(a)(1) and 170(b)(1)(A)(iv) |
| (h) ☒ | As receiving a substantial part of its support in the form of contributions from publicly supported organizations, from a governmental unit, or from the general public. | Sections 509(a)(1) and 170(b)(1)(A)(vi) |
| (i) ☐ | As normally receiving not more than one-third of its support from gross investment income and more than one-third of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions (subject to certain exceptions). | Section 509(a)(2) |
| (j) ☐ | We are a publicly supported organization but are not sure whether we meet the public support test of block (h) or block (i). We would like the Internal Revenue Service to decide the proper classification. | Sections 509(a)(1) and 170(b)(1)(A)(vi) or Section 509(a)(2) |

**If you checked one of the boxes (a) through (f) in question 9, go to question 14.**
**If you checked box (g) in question 9, go to questions 11 and 12.**
**If you checked box (h), (i), or (j), go to question 10.**

**US-00831**

USAO-MUB-00000831

USAO-MUB-00000831

**Part III Technical Requirements** *(Continued)*

10 If you checked box (h), (i), or (j) in question 9, have you completed a tax year of at least 8 months?

☐ Yes—Indicate whether you are requesting:

☐ A definitive ruling (Answer questions 11 through 14.)

☐ An advance ruling (Answer questions 11 and 14 and attach 2 Forms 872-C completed and signed.)

☒ No—**You must request an advance ruling by completing and signing 2 Forms 872-C and attaching them to your application.**

11 If the organization received any unusual grants during any of the tax years shown in Part IV-A, attach a list for each year showing the name of the contributor; the date and the amount of the grant; and a brief description of the nature of the grant.

12 If you are requesting a definitive ruling under section 170(b)(1)(A)(iv) or (vi), check here ▶ ☐ and:

a Enter 2% of line 8, column (e) of Part IV-A ________

b Attach a list showing the name and amount contributed by each person (other than a governmental unit or "publicly supported" organization) whose total gifts, grants, contributions, etc., were more than the amount you entered on line 12a above.

13 If you are requesting a definitive ruling under section 509(a)(2), check here ▶ ☐ and:

a For each of the years included on lines 1, 2, and 9 of Part IV-A, attach a list showing the name of and amount received from each "disqualified person."

b For each of the years included on line 9 of Part IV-A, attach a list showing the name of and amount received from each payer (other than a "disqualified person") whose payments to the organization were more than $5,000. For this purpose, "payer" includes, but is not limited to, any organization described in sections 170(b)(1)(A)(i) through (vi) and any governmental agency or bureau.

| 14 Indicate if your organization is one of the following. If so, complete the required schedule. (Submit only those schedules that apply to your organization. **Do not submit blank schedules.**) | Yes | No | If "Yes," complete Schedule: |
|---|---|---|---|
| Is the organization a church? | | X | A |
| Is the organization, or any part of it, a school? | | X | B |
| Is the organization, or any part of it, a hospital or medical research organization? | | X | C |
| Is the organization a section 509(a)(3) supporting organization? | | X | D |
| Is the organization an operating foundation? | | X | E |
| Is the organization, or any part of it, a home for the aged or handicapped? | | X | F |
| Is the organization, or any part of it, a child care organization? | | X | G |
| Does the organization provide or administer any scholarship benefits, student aid, etc.? | | X | H |
| Has the organization taken over, or will it take over, the facilities of a "for profit" institution? | | X | I |

US-00832

USAO-MUB-00000832

USAO-MUB-00000832

**Part IV** Financial Data

*Complete the financial statements for the current year and for each of the 3 years immediately before it. If in existence less than 4 years, complete the statements for each year in existence.* **If in existence less than 1 year, also provide proposed budgets for the 2 years following the current year.**

**A.—Statement of Revenue and Expenses**

| | | Current tax year | 3 prior tax years or proposed budget for 2 years | | | |
|---|---|---|---|---|---|---|
| | | (a) From April to Dec. '93 | (b) 19 94 | (c) 19 95 | (d) 19 ...... | (e) TOTAL |
| Revenue | 1 Gifts, grants, and contributions received (not including unusual grants—see instructions) | 40,000 | 200,000 | 300,000 | | 540,000 |
| | 2 Membership fees received | | 2000 | 3000 | | 5000 |
| | 3 Gross investment income (see instructions for definition) | | | | | |
| | 4 Net income from organization's unrelated business activities not included on line 3 | | | | | |
| | 5 Tax revenues levied for and either paid to or spent on behalf of the organization | | | | | |
| | 6 Value of services or facilities furnished by a governmental unit to the organization without charge (not including the value of services or facilities generally furnished the public without charge) | | | | | |
| | 7 Other income (not including gain or loss from sale of capital assets) (attach schedule) | | | | | |
| | 8 **Total** (add lines 1 through 7) | | | | | |
| | 9 Gross receipts from admissions, sales of merchandise or services, or furnishing of facilities in any activity that is not an unrelated business within the meaning of section 513 | | | | | |
| | 10 **Total** (add lines 8 and 9) | | | | | |
| | 11 Gain or loss from sale of capital assets (attach schedule) | | | | | |
| | 12 Unusual grants | | | | | |
| | 13 **Total** revenue (add lines 10 through 12) | 40,000 | 202,000 | 303,000 | | 545,000 |
| Expenses | 14 Fundraising expenses | 6000 | 10000 | 15000 | | |
| | 15 Contributions, gifts, grants, and similar amounts paid (attach schedule) | | 5000 | 10000 | | |
| | 16 Disbursements to or for benefit of members (attach schedule) | 25000 | 160,000 | 240,000 | | |
| | 17 Compensation of officers, directors, and trustees (attach schedule) | | | | | |
| | 18 Other salaries and wages | | 8000 | 16000 | | |
| | 19 Interest | | | | | |
| | 20 Occupancy (rent, utilities, etc.) | | 3000 | 5000 | | |
| | 21 Depreciation and depletion | | | | | |
| | 22 Other (attach schedule) | 7000 | 10000 | 12000 | | |
| | 23 **Total** expenses (add lines 14 through 22) | 38000 | 196000 | 298000 | | |
| | 24 Excess of revenue over expenses (line 13 minus line 23) | 2000 | 6000 | 5000 | | |

INC.
04-3190252

## Schedules for Part IV of 1023

**Column 15** These funds will be contributed to other charities or relief organizations to be selected by the Board of Directors, upon the applications of such organizations.

**Column 16** This organization is not a membership organization and there is no other column to show the disbursement of the funds. These funds will be utilized for carrying out the projects and programs described in Part II of this application.

| Expenses other than Fundraising Expenses | 1993 | 1994 | 1995 |
|---|---|---|---|
| Office supplies and printing | $1,000 | $1,500 | $2,000 |
| Professional Fees | $3,500 | $1,000 | $1,000 |
| Transportation, lodging, etc. | $1,000 | $3,500 | $4,000 |
| Mailing and postage | $500 | $1,500 | $2,000 |
| Telephone and fax | $1,000 | $2,500 | $3,000 |
| TOTALS: | $7,000 | $10,000 | $12,000 |

# EXHIBIT B

# NYS Department of State

## Division of Corporations

# Entity Information

**Selected Entity Name:** ALKIFAH REFUGEE CENTER, INC.

| | |
|---|---|
| **Current Entity Name:** | ALKIFAH REFUGEE CENTER, INC. |
| **Initial DOS Filing Date:** | DECEMBER 29, 1987 |
| **County:** | KINGS |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC NOT-FOR-PROFIT CORPORATION |
| **Current Entity Status:** | ACTIVE |

**DOS Process** (Address to which DOS will mail process if accepted on behalf of the entity)
ALKIFAH REFUGEE CENTER, INC.
552 ATLANTIC AVE
BROOKLYN, NEW YORK 11217

**Registered Agent**
NONE

**NOTE:** New York State does not issue organizational identification numbers.

[ Search Results ] [ Search the Database ]

[ Division of Corporations, State Records and UCC Home Page ] [ NYS Department of State Home Page ]

# EXHIBIT C

Case 4:05-cr-40026-FDS Document 309-3 Filed 10/19/2007 Page 14 of 17

# The Trail to 'the Jihad Office'

## Connecting the players in the WTC bombing

To Muslims along Brooklyn's Atlantic Avenue, it's known simply as "the jihad office." For nearly a decade, the Alkifah Refugee Center has been a hub for Islamic militants coming and going from the guerrilla war in Afghanistan. It's also an institution that touched virtually every principal figure implicated in the World Trade Center bombing. More than an unassuming storefront, the center is a fixture in the matrix of fundamentalist passion, political rivalry and bloodshed that may ultimately provide some answers to the Feb. 26 explosion.

The path to the Brooklyn office begins in Peshawar. For centuries the northern Pakistan city was a dusty trading crossroads near the Khyber Pass. But Peshawar emerged in the early 1980s as a thriving staging area for Muslims headed to fight Soviet aggression in Afghanistan. The call to arms was led by Abdullah Azzam, a Palestinian scholar and former professor at the Sharia (Islamic Law) faculty of Jordan University. Azzam remained an idol at the school, which later counted among its students young Mohammed Salameh, indicted last week for aiding in the blast. Azzam called the Afghan war "pure jihad." For young Palestinian men, it was a way to strike a blow for Muslim identity. The holy warriors included two sons of Egyptian cleric Sheik Omar Abdel-Rahman. Rahman himself traveled to Peshawar twice, staying for several months in 1990.

To broaden the movement, Azzam sent a trusted lieutenant, Mustafa Shalabi, to the United States. Shalabi preached widely in the United States and settled into the Atlantic Avenue storefront office. Among the services he offered the faithful was weapons training. Court records say one of the Alkifah members who sharpened his eye at a Connecticut shooting range in 1989 was El Sayyid Nosair, tried and acquitted in the 1990 murder of radical Zionist Meir Kahane. Nosair, convicted on weapons charges related to the case, was visited in prison by Salameh. He is also a distant cousin of another figure indicted last week, Ibrahim Elgabrowny.

One volunteer who became a trusted assistant in Shalabi's Brooklyn circle was Mahmud Abouhalima, an Egyptian cabdriver and Afghan-war veteran now sought by bombing investigators. The two quickly became friends, according to a man who knew them both. Shalabi even employed Abouhalima in his electrical-contracting business. "They were very cooperative with each other," said the acquaintance. Federal investigators have told NEWSWEEK that witnesses place Salameh and Abouhalima at a New York-area gas station the night before the blast. Salameh was reportedly driving a van. Officials say Abouhalima, who disappeared after the bombing, may be in Pakistan.

In 1990 Rahman, who had been under arrest in Egypt for his links to terrorism, slipped into the United States. Shalabi welcomed him, providing an apartment and making Abouhalima available as a driver and personal assistant. But as the Russians retreated from Afghanistan the holy warriors began turning against each other. Azzam and two of his sons were killed by a car bomb in Peshawar in 1989. According to a friend of Shalabi's, Rahman and Shalabi clashed over the center's mission. Rahman believed his quest for an Islamic state in Egypt had a basis in the Koran; Shalabi did not. During the gulf war, a leaflet signed by Rahman denounced Shalabi as a bad Muslim. In March 1991 he was found murdered in his apartment. The case has never been solved.

There is still no clear connection between this legacy of violence and the trade-center bombing. Rahman, who went on a media counteroffensive last week, denies any knowledge of Abouhalima, Salameh, Shalabi's death or the bombing. Federal investigators concede that they have no hard evidence against the cleric. But NEWSWEEK has learned that authorities are still pursuing possible Iranian and Pakistani connections to the money trail that fed cash to Salameh and Nidal Ayyad, the other alleged coconspirator indicted last week, as well as Rahman. Under special scrutiny are a half dozen semipublic Iranian foundations that pay out millions in welfare checks and benefits to veterans of the Iran-Iraq War. State Department experts say that heavily endowed organizations like the Foundation for the Oppressed and Disabled often use their philanthropy as a cover for subsidies to terrorists. But investigators acknowledge that nearly a month after the blast, they have a skein of tantalizing leads—without a clear direction. After a series of investigative breaks and quick arrests, the probe may be entering a second and more painstaking phase.

BILL TURQUE *with* CHRISTOPHER DICKEY *in Cairo,* STEVE LEVINE *in Peshawar,* PATRICK ROGERS *and* TOM MASLAND *in New York and* BOB COHN *and* DOUGLAS WALLER *in Washington*

SYGMA

**Mohammed A. Salameh**

**Prosecutors say the Palestinian-born drifter rented the van that carried the bomb to the WTC. In jail in Manhattan, Salameh, 25, says he's innocent.**

SYGMA

**Nidal A. Ayyad**

**Chemical engineer indicted for aiding in bombing. Authorities say Salameh phoned him the day before the blast and that they shared a bank account.**

ABC NEWS

**Sheik Omar Abdel-Rahman**

**Denies any responsibility for bombing, but violent rhetoric and past links to suspects keep investigators looking for evidence.**

CHENET—NEWSWEEK

**Mahmud Abouhalima**

**Sought by authorities, who say he was with Salameh on Feb. 25. A friend of Mustafa Shalabi, the murdered Muslim organizer who clashed with Abdel-Rahman.**

GUZOFSKY—SYGMA

**Ibrahim A. Elgabrowny**

**Indicted for hitting a federal agent, but suspected of a wider role in conspiracy. Police say a phony passport for Nosair was found in his apartment.**

MUB-00028885

USAO-MUB-00028885 / 1 USAO-MUB-00028885

# EXHIBIT D



OFFICE OF
CHIEF COUNSEL

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

June 11, 2007

MEMORANDUM FOR: CINDY M. WESTCOTT
Manager, EO Determinations
Exempt Organizations Division
Tax Exempt and Government Entities
SE:T:EO:RA

FROM: NANCY J. MARKS
Division Counsel/Associate Chief Counsel
Tax Exempt & Government Entities
CC:TEGE

SUBJECT: Testimony Authorization
*United States v. Muhamed Mubayyid, et. al.*
Criminal Action No. 05-40026-FDS (U.S.D.C. D. MASS.)

Pursuant to the District Court's Order of April 24, 2007, as modified by the United States Motion to Modify of May 1, 2007, which the Court granted on May 11, 2007, and the United States' Motion to Continue the Hearing, you have been ordered to appear at an evidentiary hearing in connection with the above-captioned case. You are to testify in your official capacity as an employee of the Internal Revenue Service. The deposition is scheduled to take place at the Federal Courthouse, Donohue Federal Building, 595 Main Street, Worcester, Massachusetts, on Wednesday, June 13, at 3:00 p.m.

The above-captioned case is a criminal case brought by the United States under 18 U.S.C. § 371 (Conspiracy to Defraud the United States); 26 U.S.C. § 7206(1) (False Tax Return); 18 U.S.C. § 1001(a)(1) (Scheme to Conceal Material Fact); 18 U.S.C. § 1001(a)(2) (Making False Statements); and 26 U.S.C. § 7212(a) (Obstructing and Impeding IRS) in connection with Care International, Inc. and the filing of its Form 1023 Application for Recognition of Exemption under Section 501(c)(3) of the Internal Revenue Code in 1993 and the filing of its Form 990, Return of Organization Exempt from Income Tax in 1993-2003.

Pursuant to Delegation Order No. 11-2, Treasury Regulation § 301.9000-1, and the Order and Motion to Modify, you are authorized to appear and testify at the evidentiary

hearing, under the guidance of counsel for the Government, subject to the following limitations.

**You may:**

- Testify as to facts of which you have personal knowledge in your official capacity with respect to the revisions the Service published in 2004 to the Form 1023 Application for Recognition of Exemption under Section 501(c)(3) of the Internal Revenue Code and the official position of the Service with respect to such revisions.

**You may not:**

- Testify as to matters of which you have no personal knowledge;
- Testify as to your personal views, opinions and intentions with respect to any matter;
- Testify in response to hypothetical questions;
- Testify in response to general questions concerning the positions, policies, procedures, or records of the Internal Revenue Service, except those that are relevant to the proceeding or are reasonably calculated to lead to the discovery of admissible evidence;
- Testify as to matters of official business not relevant to the proceeding or reasonably calculated to lead to the discovery of admissible evidence;
- Disclose any information that is protected by the attorney-client, attorney work product or deliberative process privileges, or the work product doctrine, except and only to the extent waived by this authorization;
- Disclose returns or return information of any third party taxpayer, *i.e.*, a taxpayer not a party to this proceeding, except as may be authorized by I.R.C. § 6103(c) or § 6103(h)(4);
- Disclose information that may tend to identify a confidential informant, if any;
- Disclose information subject to I.R.C. § 6105, if any; OR
- Disclose information that is secret pursuant to FED.R.CRIM.P. 6(e), if any;

This case is a "tax administration" proceeding. Therefore, post-testimonial feedback to a disclosure office pursuant to IRM 11.3.35.14(3) is not required.

If the evidentiary hearing is rescheduled to a date different from that which appears in the Court's notice, this authorization remains valid, provided that there is no material change as to the nature of your deposition testimony.

This authorization does not waive any objections that may be made by Government counsel. Attorneys from the Department of Justice and Office of Chief Counsel will be present at the evidentiary hearing. You should consult with them during the hearing if you have any questions or concerns about your authority to testify.

Inquiries concerning this matter may be directed to Don Spellmann of the Office of Chief Counsel at 202-927-6799 or 703-402-6296.

# EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

EMADEDDIN Z. MUNTASSER
MUHAMED MUBAYYID

CRIMINAL NO. 05-40026-FDS

BOSTON, MASSACHUSETTS
JUNE 13, 2007

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE TIMOTHY S. HILLMAN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government: Aloke Chakravarty, Esquire
Donald Cabell, Esquire
U.S. Attorney's Office
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-748-3191

For Emadeddin Muntasser: Norman Zalkind, Esquire
David Duncan, Esquire
Zalkind, Rodriguez, Lunt & Duncan, LLP
65a Atlantic Avenue
Boston, MA 02110
617-742-6020

For Al-Monla: Charles McGinty, Esquire
Federal Defender Office
408 Atlantic Avenue, 3rd Fl.
Boston, MA 02210
617-223-8061

Court Reporter:

Proceedings recorded by digital sound recording, transcript produced by transcription service.

*MARYANN V. YOUNG*
Certified Court Transcriber
240 Chestnut Street
Wrentham, MA 02093
(508) 384-2003

# I N D E X

**WITNESSES:**

| **Defendant's:** | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** |
| --- | --- | --- | --- | --- |
| Lucinda Westcott | 11 | -- | -- | -- |

**P R O C E E D I N G S**

(Court called into session)

THE CLERK: The Honorable Timothy S. Hillman presiding. Today's date is June 13, 2007 in the case of U.S.A. v. Muhamed Mubayyid et al, Criminal Action No. 05-40026-FDS. Counsel please identify yourself for the record.

MR. CHAKRAVARTY: Good morning, Your Honor, for the government Assistant U.S. Attorney Aloke Chakravarty. With me also is IRS from the counsel's office Don Spellman.

THE COURT: Good morning and welcome.

MR. SPELLMAN: Good morning. Thank you.

MR. CABELL: Good morning, Your Honor, Donald Cabell, also for the government. And, Your Honor, I have a request for the Court and I don't think any of the defendant's object, we have an intern whose been working with us this summer and working on this case. His name is James Nagle. He's here today and with the Court's permission I'd ask that he be able to sit at the table behind us.

THE COURT: I'm not sure I care if you object, but do you?

MR. ZALKIND: No.

THE COURT: Thank you. Yes, he may.

MR. CABELL: Thank you.

MR. DUNCAN: Good morning, Your Honor, David Duncan for the defendant, Emadeddin Muntasser.

THE COURT: Good morning, Mr. Duncan, welcome.

MR. DUNCAN: Thank you.

MR. ZALKIND: Norman Zalkind for the defendant, Your Honor.

THE COURT: Good morning, Mr. Zalkind. How are you?

MR. ZALKIND: Good.

MR. MCGINTY: For Mr. Al-Monla, Charles McGinty from the federal defender office. Good morning.

THE COURT: Good morning, Mr. McGinty.

(Pause)

THE COURT: Anybody heard from Mr. Andrews?

MR. MCGINTY: Who?

THE COURT: Mr. Andrews.

MR. MCGINTY: I'm sorry, what?

THE COURT: Mr. Andrews.

MR. CHAKRAVARTY: We have not, Your Honor. I don't think any counsel knows why although there are a lot of different reasons why given the narrow contents of this motion why the interest of his client would be accurately represented by co-counsel and that may very well be it.

THE COURT: He's always here and he's very good about staying in touch so. Before we get to Mr. Spellman, do I owe you folks anything that you're aware of? I have a scheduling proposal from you?

MR. DUNCAN: That actually I think was supposed to go

to Judge Saylor.

THE COURT: Yeah. I was going--

MR. DUNCAN: I must have pressed the wrong button. I don't know exactly.

THE COURT: No, I think that - I think somehow under CMECF it gets sent to me but really in reality should go to Saylor, but I don't think that's anything that you did. So aside from this, is anybody aware of me owing you anything?

MR. CHAKRAVARTY: I think this is it, Your Honor.

THE COURT: Okay.

MR. CHAKRAVARTY: --this issue.

THE COURT: All right.

MR. CHAKRAVARTY: And a lot of this stuff is going to you obviously you got to read the ECF.

THE COURT: Okay. Did you guys give any discussion to the order of examination of Mr. Spellman?

MR. CHAKRAVARTY: Yes, actually, Your Honor, Mr. Spellman here, he's here from the counsel's office but--

THE COURT: Yep.

MR. CHAKRAVARTY: --it's going to be Ms. Westcott, Cindy Westcott--

THE COURT: Oh okay.

MR. CHAKRAVARTY: --is the person who's actually going to be the witness. We have - because essentially this is as Your Honor recalls defense request to get additional

information after we gave disclosure about what the IRS witness would say, essentially an affidavit as an attorney letter. In lieu of having this interrogatory process, a civil device, we said that a competent witness would be made available to examine and that might get to the nub of the issues much quicker and more efficiently. Accordingly, IRS graciously offered Ms. Westcott for that purpose. Because they were essentially defense questions, I thought that it would, might frame the issues better if I just made a very brief presentation, introduced a couple of exhibits, which I think frames the issue for Your Honor, and then offered Ms. Westcott for the defense to examine and then except for something that might be unclear maybe briefly we could rehabilitate some of those?

THE COURT: Any objection to that?

MR. DUNCAN: No, Your Honor.

THE COURT: All right. Let's begin.

MR. CHAKRAVARTY: Thank you, Your Honor. Your Honor, Cindy M. Westcott is here to testify on behalf of the government with regards to this, the issue before Your Honor which just to frame the issue again, it's in response to the defense request for discovery, the documents that were memoranda, and of email, any documents that reflect the process for which the Form 1023, which as Your Honor may recall the form which is submitted to the IRS when a organization is

applying for a charitable exemption under Section 501(c)(3). Any documents related to that form and any revision to that form and dating back as far I believe as 1990 through 2006 which is the current form. And they further specified I think in an effort to narrow the inquiry specifically requesting what's at issue in this indictment which the government alleges the defendants are lying about. Any provisions to those particular questions, they want to be able to inquire of the witness on.

The government has, tends to be brief, thinks that these are beyond the pale of not only discovery but any trial issue. Nevertheless, Ms. Westcott is here competent to testify not only to what the Form 1023 is itself but the provisions and process. She's been with IRS for probably the last 24 years, working exclusively primarily in this area. She is familiar with the significant provision process that occurred between late 1999 to 2004, which is the substantial revision of the form from 1993 when the defendants initially submitted that form.

Again the government's argued that what happened 11 years later is irrelevant, but I say that I suppose for gratuitous argument as opposed to frame the issue. That substantial revision, the October 2004 revision is the four year process that the IRS ultimately arrived and that has slightly changed for the 2006 revision. I think some of it's

minor fees and some other things have changed, the format has changed a little bit. So she's going to - she was integral to that process. She helped start it up. She was a team leader to that process. She's going to testify about that.

And then finally she's going to testify about what it would take to try to collect the information that the defense is asking for. And that process spans just to her office which is based out of Cincinnati, Ohio. It also includes the office in Washington, D.C. which was described in detail in the letter which we submitted to the Court. So at the beginning I would offer as Exhibits 1 and Exhibits 2 for this hearing and to frame the issue, first the authorization to testify that was created by the Internal Revenue Service for Ms. Westcott. It basically said that she can't speculate about other answers and she can't bind the service with regard to the issues outside of her province. And then the letter which was sent to Your Honor which is already on the docket but it details from one Marvin Freelander who was also integral to the process what the process would entail. Ms. Westcott has spoken with Mr. Freelander as well, although she did not personally participate with all of his discussions.

Finally, I would just suggest, Your Honor, as Your Honor considers the testimony and the motions, the motions were submitted, the discovery were submitted before the motion to dismiss was heard and adjudicated by Judge Saylor. A large

portion of the motion, the defendants' motion before you, pertain to information that they could use for purposes of that motion to dismiss. The motion has been heard and denied. With that context I think Your Honor should consider the testimony that you're going to hear before ruling on this motion for discovery. So at this point I'd offer Exhibits 1 and 2 and then--

THE COURT: All right, have you shared the exhibits with your brother?

MR. DUNCAN: Yes. Yes, this is the letter, yes.

THE COURT: Any objection?

MR. DUNCAN: No objection to that.

THE COURT: All right. They shall be marked.

(Government Exhibit No.'s 1 and 2, marked)

MR. DUNCAN: I just want to get it clear because from what Mr. Chakravarty said I'm not sure I'm quite on the same page with him. My understanding was that the motions for discovery have been acted on and this is the end product of those motions, that the Court has allowed us by way of modification from the government to question a representative of the IRS, about the changes. That being the case, I'm not sure that there's much point in going into questions about how much it would take to gather documents because my understanding is the Court's ruled on that. But if I'm wrong, I'm happy to go there.

THE COURT: You know, I'm not sure that I have.

MR. DUNCAN: Oh, I thought you had.

THE COURT: No. I think that the idea was let's find out a little bit more about what the process was that was undertaken and if need be then I would listen to maybe, maybe listen to further argument about whether or not you would be entitled to get to some of the documents. I think as I indicated in the order I believe you pulling ahead with your oar on this, but I think insofar as the process is concerned let's get into that and see what is involved and maybe that will satisfy your purposes.

MR. DUNCAN: Well, then let's see.

THE COURT: Okay.

MR. DUNCAN: I'll proceed accordingly.

THE COURT: Mr. Chakravarty, why don't you call Ms.--

MR. CHAKRAVARTY: The government calls Cindy M. Westcott.

THE COURT: --Westcott.

MR. CHAKRAVARTY: Make her available for defense questioning.

GOVERNMENT WITNESS, CINDY WESTCOTT, SWORN

THE CLERK: Could you state your name and spell your last name for the record.

THE WITNESS: My legal name is Lucinda M. Westcott and I go by Cindy. My last name is spelled W-E-S-T-C-O-T-T.

THE COURT: Good morning and welcome.

THE WITNESS: Hi.

MR. DUNCAN: Good morning. Your Honor, with your permission I'll proceed from the podium because I realize that reaching down to the table is going to be a little harder.

THE COURT: I may have to flag you if you come closer only because we need to pick you up.

MR. DUNCAN: Move the whole thing?

THE COURT: Let's see.

(Pause)

THE COURT: Let's try it from there and see if the mic is picking you up.

MR. DUNCAN: Can you hear me now?

THE COURT: Yes.

MR. DUNCAN: Okay. Thank you.

THE COURT: Mr. Cabell, we'll apologize in advance for the back of Mr. Duncan.

MR. CABELL: Thank you. But just to be in Mr. Duncan's presence, Your Honor, is—

MR. DUNCAN: Others have said that as well.

DIRECT EXAMINATION

BY MR. DUNCAN:

Q Good morning, Ms. Westcott. My name is David Duncan. I represent one of the defendants in this case, Emadeddin Muntasser, and I'm going to be asking you some questions today

about the revisions to Form 1023. And the first thing I'd like to ask is, were you involved in the committee that was overseeing those revisions?

A Yes.

Q And were you on the committee?

A Yes.

Q Were you on the committee for the entire time that it was involved in making revisions?

A It started in Cincinnati and went, and was passed off to our Washington office and we worked with them for a period of time and then ultimately the Washington office just took over in the end.

Q And when was that, in the end?

A They worked on the responses that were received after we got the - we went out for public comment in October of 2002. Responses came back and the Washington office pretty much worked on the revisions to the form after that.

Q And did you have any input into the revisions that were made after that?

A They had several conference calls with our office and, which I participated in calls with our director and Marvin Freelander and our director of rulings and agreements.

Q And did you see the comments as they came on? Did you review them?

A Actually some of the comments were sent into me and I just

briefly scanned through them and then sent them to the Washington office because I was transitioning into a new position.

Q Did you review the changes that were made to the form as they were produced by Washington?

A Early on. After a while when I was transitioning into the new position I was not reviewing the revisions.

Q What was your position when you started?

A Are you talking about my position at the IRS or--

Q I'm not talking about when you started at the IRS, but I mean when this process started, what was your position with the IRS?

A I was an exempt organizations rulings and agreement analyst.

Q And--

A When - let me back up. There was a customer satisfaction survey team that started in approximately June of 1999, and I was a staff assistant at that time and I was asked to be a member of that customer satisfaction survey team.

Q And that was reviewing customer satisfaction specifically with the 1023 and 990 forms?

A There were surveys that went out to organizations that applied for tax exempt status. Surveys were sent out to them. Responses came back into an outside consulting group and that outside consulting group came, and they were from California

and they came into Cincinnati and met with individuals who were identified to be on the team and there were six of us on the team, and they met with us. They provided us the results of the customer satisfaction survey, and they were consolidated responses. They provided our team with that response and as a result of that our team decided to work on changing our determination letters and also changing the Form 1023.

Q Okay, and this was the genesis of the committee--

A Yes.

Q --that you were on?

A Yes.

Q And then you were on that committee that was going to change the 1023 up until the time that responses to the official comments or the comments to the request for comments started being made?

A Yes.

Q Okay. And what - did you position into a, to a transit - did you make a transition into a position outside of exempt organizations?

A No, I've been with exempt organizations determinations for 24 plus years.

Q Okay. So even after you made that transition you were still involved in the exempt organization--

A Yes.

Q --branch, and you were still in Cincinnati?

A Yes.

Q And you saw the results of the 1023 revisions?

A Yes. Actually, I'm the program manager for the whole exempt organization determination program.

Q So you're pretty familiar with that form as it stands now?

A Yes.

Q And I take it you're familiar with the form as it was before?

A Yes. I started in April 1983 actually working determination applications, reviewing them and making determinations.

Q Okay.

THE COURT: Ms. Westcott?

THE WITNESS: Yes?

THE COURT: Can you speak a little more slowly for me, please?

THE WITNESS: I'm sorry.

BY MR. DUNCAN:

Q Now, the revision that the current Form 1023 was significantly revised as of 2004, correct?

A Yes.

Q And what was the previous - was there a previous significant revision of that form and when was it?

A There was no other significant revision to the form since I've worked there. I, again, started in April of 1983. The

application was changed in March of 1986, I think September of 1990, July of 1993, September 1998 and then October of 2004. And it was changed again in June of 2006.

Q Now those changes between the time you began and the one in October of 2004, you said those were not significant changes?

A No.

Q Did any of them make any changes to the question involving successor or outgrowth?

A No.

Q Okay. So effectively at least from 1992 until October of 2004 the question about successor and outgrowth was questioned by the Part 2 of Form 1023; is that correct?

A Yes.

Q Okay. Now you said that the genesis of this committee was a customer satisfaction survey or a series of such surveys. And we also have an exhibit which is Mr. Freelander's response to questions. Is it fair to say that the purposes in making these substantial revisions was to simplify that process for applicants or one of the purposes?

A The real purpose in this form when our team in Cincinnati got involved we reviewed the results of the customer satisfaction survey. One of the top priority improvement areas identified by the customers was explanation of tax per rides, length of process, explanation of the process. So we, our team

in Cincinnati decided to work on revising our determination letters and in order to address the length of the process we decided that it would be better to revise the Form 1023 application to try to ask more questions up front in the application process because what we did - the taxpayers would submit their application and they would answer the questions and we had to write several letters for additional information to the organizations. And we were trying to gather more information up front and to organize the actual application form by putting like questions in the same place and asking more questions up front so that we did have to correspond with the organizations to gather more information.

Q So typically before this October 2004 revision you would expect to do follow ups with applicants on the 1023 Form?

A Right.

Q And would you say that it's fair to say that the significant number of the applicants filling out 1023 Forms were first time non-professionals filling out that form?

A The majority of the organizations that filled them out are first time, only time filers.

Q Okay. And did you find that there were errors and omissions in those forms as they came into you prior to October of 2004?

A There were some omissions to the form where we would have to go out or write to the organizations to gather more

information.

Q So they would leave information out?

A They had to submit documents like their organizing documents. Sometimes the taxpayers would not do that. We would have to ask for those specific items along with other follow up questions based on responses that were submitted to the application.

Q And the application specifically asked for those organizing documents, correct?

A The instructions did.

Q Yes. So in other words these, many of these first time applicants would not follow the instructions; is that correct?

A Yes.

Q Okay. Is it also the case that there was a significant increase in applications for tax exempt status say between 1992 and 2002?

A The applications have steadily increased until approximately last year and then they started decreasing.

Q And was there during that period of time also reduction of staff available to handle those applications?

A Yes.

Q Okay. So all of that feeds into your desire or the desire of the IRS to try to make sure that the application form encompassed or got as much information from the applicant and was as clear as possible to the applicant first time out; is

that correct?

A We revised it to try to ask more questions in the initial application so that we would not have to write as many follow-up letters.

Q And you also said at some point I believe that you were trying to separate out those things that went together that there might have been questions that didn't go together in the original application?

A There were certain questions that were spread throughout the application and we tried to put all of the questions dealing with the organizing document together. We tried to put it in some kind of logical order so that the questions dealing with the organizing document were together, questions dealing with officers and directors were together, questions dealing with the activities of the organization were together.

Q And part of the reason for that was to make it clear to the applicant what was being asked of them; is that correct?

A Yes, but we would have had to write for additional information if the organization did not put that in their initial application.

Q Right. So you were hoping that they would provide you with more information--

A Yes.

Q --with this application? All right, now with respect to the question involving the 2003 form involving successor and

outgrowth, you're familiar with that original question, right--

A Yes.

Q --question five of Part 2? Is it fair to say that the purpose - well first of all that was actually two questions under one, correct?

A Yes.

Q And the first question asked if an organization controlled or is controlled by another organization, right?

A Yes.

Q And the second question - it's actually a three part question; is that correct?

A I would have to look at the question.

Q It asked if the organization is an outgrowth of or a successor to another organization or if it has a special relationship of another organization by reason of interlocking directorates or other factors, correct?

A Yes.

Q Okay. So there's really three questions there, right?

A Yes.

Q Now was there any discussion or any comments that you can remember in the course of your service either on this customer feedback committee or on the committee that was involved in revisions with regard to trying to change that question?

A Only that there was discussion about the outgrowth and

successor really is redundant but no questions as far as that it was confusing or anything. That was not the subject of any discussion that I'm aware of.

Q No one said this is confusing?

A No.

Q Okay.

A And the taxpayers did not in the response to their customer satisfaction surveys either.

Q Did anybody suggest that there was some reason to split that question up and move parts of it to different parts of the application form?

A Only that we wanted to get like questions together.

Q But you don't remember any specific--

A I don't remember any specific discussion as far as separating it or anything of that nature.

Q Is it fair to say that the purpose of that questions was to look for applicants who might be either shifting debt or shifting taxable income into a non-taxable organization?

A I'm sorry, could you - there was no discussion about that, but--

Q No, I'm not asking if--

A Okay.

Q --there was a discussion, I'm sorry.

A I'm sorry.

Q I'm asking whether the purpose of that question on the

1990 Form 1023 or 1992 Form 1023 was to look for shifts of either debt from a taxable entity or taxable assets into a tax free organization?

A Yes, that was the purpose in them.

Q Now, do you recall during the course of this committee to change this question whether the purpose of that question changed in any way?

A No, I'm not aware that there was a - the purpose was not to change the question in any way.

Q The purpose was still to get at, the information that you were trying to get at with question 5 of Part 2--

THE COURT: Your Honor, I'd object to kind of the series of questions about the purpose of why they would make these changes seems to be getting to the substance of, you know, what these documents would tend to show but not necessarily the responses.

THE COURT: I don't know, I think the witness has done a pretty good job of explaining it to me so overruled for now. Let's see where we're going with this.

BY MR. DUNCAN:

Q Okay. So there was - you recall no discussion or no comments, nothing in the course of your committee work that would suggest that the purpose of that question was changing from the 2000 to 2004 From 1023?

A There was no discussion in the Cincinnati office as far as

the purpose of that question changing. Once the Washington office got more involved in revising the form, they felt a need based on our discussion, my discussion with Marvin and Lois Lerner, who was my director at the time, that the Washington office felt that there was a need to ask more questions in the application to try to identify abuses by charities in general.

Q And you're talking about abuses involved in trying to shelter taxable income improperly?

A Yes.

Q Okay. And that was something that they sought to do both by asking more questions and by clarifying the questions that had been asked before; is that correct?

A It wasn't clarifying the questions that were asked because I don't, I don't believe that we in Cincinnati even changed that question when we sent the initial draft up to the Washington office, that it was the Washington office that actually expanded more questions.

Q And there was nothing either in committee discussions or in any feedback to you in the Cincinnati office that suggested that in doing that they were changing what the questions purpose was?

A Right.

Q Okay. Now it is the case, is it not, that the instructions to question 5 Part 2 in - let me see if I can pick a date that, I'll call it 1992 and 2004 just because 1992 is

where this case is and 2004 is the revision; is that fair?

A Okay.

Q You'll understand the difference?

A Okay.

Q Okay. In 1992 the instruction asked, the instructions to line 5 was, if your organization controls or is controlled by another exempt organization or a taxable organization, answer yes. And then the second sentence says examples of special relationships are common officers and the sharing of office space or employees. That's, I represent to you that I've read that; is that something you're familiar with?

A Yes.

Q Okay. So is it fair to say that in those instructions there really was nothing saying what either outgrowth or successor meant?

A Correct.

Q Correct. And is it also the case that in the 2004 form the question has been reduced to a question about successor only; is that correct?

A Yes.

Q Okay. And it's in a section that's now labeled your history?

A Yes.

Q But it's meant still to get at the same thing--

A Yes.

Q --correct? Okay. And in fact the questions about control were, are still on the form, is that not true?

A That's correct.

Q But they've been moved elsewhere?

A That's correct.

Q Okay. And nobody suggested that those rules were anything other than trying to group like with like as you testified earlier, right?

A That's correct.

Q Okay. So there was some kind of a conclusion somewhere. Were you involved in it, that like was not put with like in this question in the 1992 form?

A I was not involved in the development of the 1992 form.

Q No, I'm not asking that question. I should be clearer, I apologize. Was there any discussion in making these changes to move the control question into another part of the form? Was there any discussion, were there any comments that you're aware of about that change?

A Only that the fact that we were trying to move like questions together and put them in a logical order so that meant the question had to be moved.

Q Okay. So there was no - it was a generic discussion. There was no specifics, somebody said, oh, yes, there's some unlike things in this question. We should split them up?

A No.

Q That you might know?

A I'm not aware of any discussion there.

Q Okay. You are aware that in the 2006 form or 2004 form, if I can try to be consistent with myself, there is a test for successor, correct?

A I'm not sure what you mean by test.

Q Well, in fact there's more than one test, but let's start with in the instructions it tells you, you are a successor if you have substantially taken over all of the assets or activities of another organization, been converted or merged from another organization or installed the same officers, directors or trustees of another organization that no longer exists and that had purposes similar to your purposes. That's--

A I don't.

Q That's an instruction in the--

A That's an instruction. I didn't view that as a test.

Q But it's a way--

A It's an instruction.

Q --of someone looking and saying are we or are we not a successor?

A Yes.

Q There was no such test in the 1992 Form 1023; is that correct?

A That's correct.

Q Okay. But was this basically the test or instruction that you would have given someone had they asked you what do you mean by successor if someone had called?

A We would have expected an organization to provide the information to say even more in the old version of the form.

Q What would--

A Because if they're unclear that they should be submitting information, we expect organizations to provide all the information up front and then if we have questions we would have written to them and asked them.

Q Well, but the question that you ask in Form 1023 in 1992 is, are you are a successor of or outgrowth of another organization?

A Yes.

Q Okay. There's no definition of those terms in the instructions for Form 1023, correct?

A Right.

Q What I'm asking you is if someone called up Cincinnati in 1992 and said what do you mean by successor, is this basically what you would have told them what is in the instructions for the Form 1023 in 2006?

A We would not have, I would not personally have went and asked them about this 25% or anything of that nature. I would have been communicating to them, the organization, that if they took over the assets or operated as another organization that

they needed to answer yes to those questions.

Q Okay. So you would have given them a somewhat looser set of answers?

A Yes.

Q Okay. Well, is it the case or was there any - let me ask you this, was there any discussion or any suggestion that you were narrowing the scope of the term successor in creating a new form in 2004?

A There was no discussion that I'm aware of and there was none in the Cincinnati office.

Q Okay. Is it your understanding from reviewing the form that it has narrowed the scope of the term successor?

A I don't believe - we don't want organizations to believe that if they, an organization operated with $100 that they have to answer yes to that question but the Washington office is the one who came up with the definition for that successor that's in the glossary.

Q Well, I understand that but I'm asking you--

A It's not my understanding that it's limited in any way.

Q So you expect that the answer to successor if properly done in 2006 would turn out the same set of people as it would have in 1992 in the answer to the 1992 question?

A Yes.

Q There's a second set of criteria slightly different in the actual question. Instead of saying if you have substantially

taken over, it says if you have taken over or will take over the activities of another organization. Do you recall any discussion about why there would be two different set of criteria given?

A No, I do not recall any discussion.

Q And you don't recall any sets of memoranda, any comments that might suggest why there are two there?

A No.

Q Now there's now a Schedule G to Form 1026 which asks a series of questions if someone in fact answers yes to that question about successor. In other words if they look at these factors and say, yes, we satisfy one of those factors, either we have taken over all of the assets of another organization or we have taken over all of the activities, those three factors that are given, correct?

A Yes.

Q All right. Is it fair to say that most of those questions are questions about financial relationships?

A I don't recall without looking at them, the early--

THE COURT: It would be helpful if the witness had a copy in front of her. I've got mine if you'll--

MR. DUNCAN: And I wish I had made one.

THE COURT: Here.

(Pause)

THE COURT: I'm going to give--

THE WITNESS: Thank you.

THE COURT: --the witness is the attachments to the original motion for discovery which was docket 180.

MR. DUNCAN: Does that have the 2006 form?

THE WITNESS: No, this is the 1990--

THE COURT: Check in the back.

THE WITNESS: Oh.

THE COURT: Keep going.

(Pause)

THE COURT: No?

THE WITNESS: Oh, this is discuss - I'm sorry, the Schedule G is here.

MR. DUNCAN: It has Schedule G?

THE WITNESS: Yes.

BY MR. DUNCAN:

Q So there's some nine questions there, some of them with sub-parts?

A Yes.

Q And is it fair to say that most of those questions are questions involving whether there are or were financial relationships between successor and predecessor organization or individuals involved in the two?

A There are, there are questions in - there are other questions in addition to just the financial transactions but, yes, there are a number of questions about the financial

transactions.

Q There are some questions about whether the predecessor corporation of a company or organization applied for 501(c)(3) status and did or didn't get it, correct? That would be questions 2(b), (c) and (d)?

A Yes.

Q Right?

A Yes.

Q Most of the other questions, in fact all of the other questions are either asking for individuals and their financial relationships with the organization who's applying or financial relationships between the predecessor and successor, correct?

A Yes.

Q And are those questions, on Schedule G are those the type of question that you would have asked in 1992 as a follow up if someone answered that questioned, yes,--

A Yes.

Q --are you a successor?

A Yes.

Q Okay. So that's what this is intended to do, it's intended to ask in written form the questions that you would have asked as follow-ups if someone said yes?

A Yes, that is correct.

Q All right.

MR. DUNCAN: May I have Your Honor's indulgence?

(Pause)

BY MR. DUNCAN:

Q Do you have any knowledge of where the documentation, correspondence, comments that were generated in the course of this committee's work are kept?

A The comments back from the public or all of our team's documents?

Q Are they kept separately?

A I'm not aware of where the documents are in the Washington office. As far as in the Cincinnati office, everyone who was involved in any part of this process probably has individual records or they have destroyed them. So in total I do not believe that they're in any one location. They're spread all over the place.

Q Okay. And the nature of the documents that were generated would it be things like emails, letters, the comments from the public I assume are formal letters that come in.

A Yes, but there was--

Q Are those kept--

A There was a lot of discussion, like for example I met with a group of people from the AICPA and then also I went to, I speak at an ABA meeting with my director and a lot of comments and discussion, verbal comments and discussions took place that those are not necessarily documented anywhere.

Q Okay, but it's your testimony that you don't remember a

single comment, discussion or anything in any of these meetings having to do with this outgrowth or successor question?

A That's correct.

Q And you don't remember seeing any document cross your desk that involved a specific discussion of the outgrowth or successor question?

A That is correct.

Q Okay. And--

(Pause)

MR. ZALKIND: Per Your Honor's indulgence because--

THE COURT: Yeah go ahead, go ahead.

MR. ZALKIND: --Mr. Duncan wasn't really ready.

(Pause)

BY MR. DUNCAN:

Q Is it typically the case that when a process like this has concluded there is some kind of a summary memo done and submitted to whoever it is that has to approve the form changes?

A That is not a common--

Q It is not?

A --occurrence. No.

Q Okay. And as far as you know are there any - is there any document or set of documents that summarize the conclusions of the committee that led to the changes?

A No, there is no document.

Q No document. And do you have a file that you have kept with materials that you gathered in the course of serving on this committee?

A I have a file with like emails as far as being the chairperson of the, of this customer satisfaction survey team, but I don't have everything that other people may have kept. They may have their own file. I have my own like emails that were back and forth from my involvement.

Q And how voluminous is that file?

A Oh, it's got like hundreds of emails. I did not keep a copy of the responses - some of the responses were sent back to me. I did not keep a copy of those. I sent those to the Washington office.

Q I see. And who would have those?

A I don't really even know. I mean there's people that were involved on our team. Some of the people don't even work there anymore. Some people have retired. Some people moved to different offices, and I'm not even sure where they're even located anymore.

Q Okay. And to your knowledge is there any central repository, single place where documents involved in this committee's work would be kept?

A As far as this process I'm not aware of a single location for any of the documents.

Q Okay. And it's your memory that none of the emails that you received had comments specifically about the successor or outgrowth question?

A That's correct.

Q Okay. And it's your memory that none of the documents that you saw that you don't have had any specific comments about the outgrowth or successor?

A That's correct.

Q And you have no knowledge about - other than the general comment that you've given that the idea was to separate out historic or separate out unlike questions and put like questions with like, you have no specific knowledge about how the changes were made to isolate successor from the questions about control?

A That's correct.

Q Okay. And did you participate in any discussions or see any comments about why outgrowth and successor were determined to be basically redundant of one another?

A Just other than the fact that we consider it redundant, other than that, there was no discussion that I'm aware of.

Q You just always considered it redundant even before the changes were made or?

A I wouldn't, I don't believe there was any discussion about it prior to serving on this team.

Q But was there discussion while you were serving on this

team?

A Just in as far as revising the application as a whole, what changes could we make to basically just simplify the whole application process and gather the information that we need.

Q Okay. Somebody just said it's redundant, let's get rid of it?

A It's redundant, yes.

Q Nobody said, hey, what does outgrowth mean?

A No.

Q And what does successor mean?

A Right.

Q And let's analyze the two--

A It was just like that's redundant, let's get rid of it.

Q And everybody just looked and said, yes? That's as far as you--

A That's as far as I recall.

Q --can recall? Okay.

MR. DUNCAN: Can I have Your Honor's indulgence?

(Pause)

BY MR. DUNCAN:

Q To your knowledge do any of your superiors, I guess that would be in Washington, you're the--

A I'm the--

Q --director at--

A I'm the top person in the Cincinnati office--

Q Right.

A --for the exempt organization determination program--

Q Okay.

A --and outside of Cincinnati.

Q Who would be your, I guess your superiors in Washington?

A The director of exempt organization, rulings and agreement is my direct boss and his name is Robert Troy. He was not in the Washington office when we worked through this process. Lois Lerner is now our director of exempt organizations and she was the director of exempt organizations, rulings and agreements at the time this process was taking place. And Steve Miller was our director of exempt organizations and now he's the commissioner of tax exempt government entities. So it was really Lois Lerner, Steve Miller, myself as the analyst. I worked for Lois. And then Marvin Freelander is the, he's the manager of exempt organizations technical in the Washington office.

Q Okay. So he's not your--

A He's not above me.

Q --superior. He's--

A No, he's more of my peer.

Q --lateral.

A Yeah.

Q Okay. To your knowledge do any of those people have files on this process?

A I'm sure Marvin probably would have his files just like I have my files but I don't know that, I'm not aware of him having everything because he doesn't have my stuff.

Q So what files people have would be the files they generated on their own?

A Yes.

Q Okay. So as far as you know there wasn't like a committee secretary whose purpose it was to keep track of all the files?

A No, we didn't have anything like that.

Q Okay. And do you know what happens to public comments, when something's published in the federal register what happens to those comments?

A I'm not, I do not know.

(Pause)

MR. DUNCAN: No further questions, Your Honor. Thank you.

THE COURT: Mr. McGinty, do you want to add anything?

MR. MCGINTY: I do not, Your Honor. Thank you.

THE COURT: Thank you.

MR. DUNCAN: Thank you, Ms. Westcott.

THE COURT: Mr. Chakravarty or Mr. Cabell, whoever's going to be examining, do you have any questions?

MR. CHAKRAVARTY: Your Honor, I don't think we have any questions.

THE COURT: Okay. I have a couple.

THE WITNESS: Okay.

THE COURT: The customer satisfaction survey team, is there actually a customer satisfaction survey that was conducted with respect to the `91 version of the Form 1023?

THE WITNESS: It's not really a specific version of the form. Survey questions are sent out to organizations that have applied for exemption and received some type of letter from our office. And the results of the survey were sent back to this outside consulting group where it was compiled and the results of the survey were sent to - they actually brought them with us because it was really a pilot project that started in approximately June of 1999.

THE COURT: The customer satisfaction survey?

THE WITNESS: Yes. So the survey had actually been sent out before which I wasn't aware of the fact that surveys were even being sent out. The first that I became aware of it was approximately June of 1999 when the outside consulting group met with our people in Washington and said that they wanted to establish a customer satisfaction survey team. So it was really a pilot project at that time. And a group of individuals, there were six of us, there were three managers and three bargain unit employees that were put on this team and we were given the--

THE COURT: All Cincinnati people?

THE WITNESS: Yes.

THE COURT: Is Cincinnati where the exempt organizations are basically headquartered except for Washington?

THE WITNESS: Yes. It was not always that way. It has evolved over the years, but the Cincinnati office is the headquarter site for the determination program but we have people across the country. So the customer satisfaction survey team was created, one for employee plans, one for exempt organizations, and there were a group of six of us that we met with representatives from the consulting group to review the results of the survey. And they walked us--

THE COURT: So it was a formal document that was sent out and correlated?

THE WITNESS: Yes. And the results of that survey were given to us and they went through the actual report, the customer satisfaction survey report that was compiled, I think it was by quarter if I remember correctly.

THE COURT: By quarter?

THE WITNESS: Yes. So they compile it by quarter and then they shared the results with our team and went through some of the top priority improvement areas. And I recall one of them being explanation of taxpayers' rights, length of process, explanation of process. So our group of six of us met and decided what things that we feel that we can work on to change that might help to improve those top priority

improvement areas. And one of them being the explanation of taxpayer rights, that confused our team because we thought what are they, what are the public looking for because we do give organizations their appeal rights when we deny their applications so they are getting their rights and we don't deny that many organizations so what are they looking for? So we actually start reviewing some of the narrative comments and what we saw was that the, it seemed like the organizations were really asking what are our responsibilities as an exempt organization and that is when we decided to change our determination letters.

When I started our determination letters were preprinted front and back because we didn't have computers back then. But after a while the letters evolved to like five and six pages and a lot of legalities and it was confusing. So we changed our letters back to one to two page plain English letters so the organization got it, they knew they were exempt, the contributions were deductible, it stated that. And then we took the majority of the rest of the determination letter and made it an information document so that it was clear for the organizations and that was to address the explanation and taxpayer rights. To address the explanations of process we revised our acknowledgement notices to explain to the taxpayer what the process was after they submitted their application and then the length of the process we believed if we revised the

Form 1023 to try to work these questions together and ask more questions up front that we wouldn't have to be writing back and forth with the public so that we would hopefully be able to make determinations quicker. And also besides the fact that we were losing staff and applications were increasing and we needed to find ways to be more efficient. That's how this whole decision to revise the Form 1023 can into play.

THE COURT: Was it effective?

THE WITNESS: Yes, because in the past the Washington office did not ever ask us even for our comments and we were the ones who saw the applications the most and we didn't necessarily like that, so we thought this was our golden opportunity to get the changes.

THE COURT: Good for you. What's AICPA?

THE WITNESS: American Institute of Certified Public Accountants.

THE COURT: Oh, okay. And the ADA?

THE WITNESS: ABA is American Bar Association.

THE COURT: Oh, ABA?

THE WITNESS: Yeah, yeah, I'm sorry.

THE COURT: That one I should know, okay.

THE WITNESS: We met with different groups of those people and they were involved in helping to provide comments back to us too actually before it went out to the public.

THE COURT: Thank you very much, Ms. Westcott.

MR. DUNCAN: Your Honor?

THE WITNESS: You're welcome?

MR. DUNCAN: Can I just ask one question following up one you just--

THE COURT: Sure.

BY MR. DUNCAN:

Q Who were the people that were surveyed in those initial surveys that you did? Where did--

A Oh, all the taxpayers who got - it was, they selected random number of surveys--

Q Taxpayers.

A --that went out to the organizations, yes.

Q Was it to taxpayers or to organizations?

A Well, they go out to the organizations but they have officers that would be responding for the organization.

Q I see. So the applicant organization?

THE WITNESS: Yes, yes.

MR. DUNCAN: Okay. Thank you.

THE COURT: Thank you very much.

THE WITNESS: You're welcome. Do you want this back?

THE COURT: I do. I do.

(Witness excused)

(Pause)

THE COURT: Mr. Duncan, let me--

MR. DUNCAN: I'm just trying to figure out where to

go from here.

THE COURT: Well, I was just going to ask the same question and maybe what we ought to do is give you all a chance to caucus and decide whether or not you want to, whether the information that Ms. Westcott gave you satisfies the needs that you have or whether you wanted to make a further request from the Court and then we can deal with it in due course?

MR. DUNCAN: That, I think that's reasonable if we could have a little bit of time to do that.

THE COURT: Sure.

MR. DUNCAN: Because I came into this not realizing that that was on the table so I'd like to think about it and if so we--

THE COURT: Okay.

MR. ZALKIND: One suggestion cause we, maybe we - we were only focusing really on getting her testimony not about really the other available information that was here. Maybe we should be - I'd like to get a transcript of her testimony, but I - what we didn't focus on as much in this hearing is other documentation that other people, we thought it would just be what her knowledge was, not what others might have and I think, I want to think about it a little bit about getting the Washington people's, you know, the summary of the file.

THE COURT: Well, I think that's what I just said. I'll listen to your request but I think you all need a chance

to digest--

MR. ZALKIND: Okay.

THE COURT: --what was said and--

MR. ZALKIND: Okay.

THE COURT: --understanding that my earlier opinion was that you are pulling ahead your oar, but I'm certainly willing to listen to your request.

MR. ZALKIND: Okay.

THE COURT: And this, by the way, I thought was very informative.

MR. ZALKIND: Yes, it was.

THE COURT: Thank you.

MR. ZALKIND: Thank you.

THE COURT: Anything--

MR. CHAKRAVARTY: No, we don't have a problem with the, you know, the time to reconvene. I just think that Your Honor should recall the context, I think Your Honor does, but it's been some time so I just think--

THE COURT: Yep. No, I--

MR. CHAKRAVARTY: --I wanted to remind the Court.

THE COURT: I understand. Can I just see you all over here for a minute? This is going to be off the record.

THE CLERK: Off the record.

(Court adjourned)

//

46

CERTIFICATION

I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.

_______________________________ June 19, 2007

Maryann V. Young

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**(508) 384-2003**

# EXHIBIT F

Form **1023**
(Rev. June 2006)
Department of the Treasury
Internal Revenue Service

# Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code

OMB No. 1545-0056

**Note:** *If exempt status is approved, this application will be open for public inspection.*

*Use the instructions to complete this application and for a definition of all* ***bold*** *items.* For additional help, call IRS Exempt Organizations Customer Account Services toll-free at 1-877-829-5500. Visit our website at **www.irs.gov** for forms and publications. If the required information and documents are not submitted with payment of the appropriate user fee, the application may be returned to you.

Attach additional sheets to this application if you need more space to answer fully. Put your name and EIN on each sheet and identify each answer by Part and line number. Complete Parts I - XI of Form 1023 and submit only those Schedules (A through H) that apply to you.

## Part I Identification of Applicant

1 Full name of organization (exactly as it appears in your **organizing document**)

2 c/o Name (if applicable)

3 **Mailing address** (Number and street) (see instructions) Room/Suite

4 Employer Identification Number (EIN)

City or town, state or country, and ZIP + 4

5 Month the annual accounting period ends (01 – 12)

6 Primary contact (officer, director, trustee, or **authorized representative**)

a Name:

b Phone:

c Fax: (optional)

7 Are you represented by an authorized representative, such as an attorney or accountant? If "Yes," provide the authorized representative's name, and the name and address of the authorized representative's firm. Include a completed Form 2848, *Power of Attorney and Declaration of Representative,* with your application if you would like us to communicate with your representative. ☐ Yes ☐ No

8 Was a person who is not one of your officers, directors, trustees, employees, or an authorized representative listed in line 7, paid, or promised payment, to help plan, manage, or advise you about the structure or activities of your organization, or about your financial or tax matters? If "Yes," provide the person's name, the name and address of the person's firm, the amounts paid or promised to be paid, and describe that person's role. ☐ Yes ☐ No

9a Organization's website:

b Organization's email: (optional)

10 Certain organizations are not required to file an information return (Form 990 or Form 990-EZ). If you are granted tax-exemption, are you claiming to be excused from filing Form 990 or Form 990-EZ? If "Yes," explain. See the instructions for a description of organizations not required to file Form 990 or Form 990-EZ. ☐ Yes ☐ No

11 Date incorporated if a corporation, or formed, if other than a corporation. (MM/DD/YYYY) / /

12 Were you formed under the laws of a **foreign country?** If "Yes," state the country. ☐ Yes ☐ No

# EXHIBIT G

**Part V** Compensation and Other Financial Arrangements With Your Officers, Directors, Trustees, Employees, and Independent Contractors *(Continued)*

b Describe any written or oral arrangements you made or intend to make.
c Identify with whom you have or will have such arrangements.
d Explain how the terms are or will be negotiated at arm's length.
e Explain how you determine or will determine you pay no more than fair market value or that you are paid at least fair market value.
f Attach a copy of any signed leases, contracts, loans, or other agreements relating to such arrangements.

**Part VI** Your Members and Other Individuals and Organizations That Receive Benefits From You

The following "Yes" or "No" questions relate to goods, services, and funds you provide to individuals and organizations as part of your activities. Your answers should pertain to *past, present,* and *planned* activities. (See instructions.)

1a In carrying out your exempt purposes, do you provide goods, services, or funds to individuals? If "Yes," describe each program that provides goods, services, or funds to individuals. ☐ Yes ☐ No

b In carrying out your exempt purposes, do you provide goods, services, or funds to organizations? If "Yes," describe each program that provides goods, services, or funds to organizations. ☐ Yes ☐ No

2 Do any of your programs limit the provision of goods, services, or funds to a specific individual or group of specific individuals? For example, answer "Yes," if goods, services, or funds are provided only for a particular individual, your members, individuals who work for a particular employer, or graduates of a particular school. If "Yes," explain the limitation and how recipients are selected for each program. ☐ Yes ☐ No

3 Do any individuals who receive goods, services, or funds through your programs have a family or business relationship with any officer, director, trustee, or with any of your highest compensated employees or highest compensated independent contractors listed in Part V, lines 1a, 1b, and 1c? If "Yes," explain how these related individuals are eligible for goods, services, or funds. ☐ Yes ☐ No

**Part VII** Your History

The following "Yes" or "No" questions relate to your history. (See instructions.)

1 Are you a **successor** to another organization? Answer "Yes," if you have taken or will take over the activities of another organization; you took over 25% or more of the fair market value of the net assets of another organization; or you were established upon the conversion of an organization from for-profit to non-profit status. If "Yes," complete Schedule G. ☐ Yes ☐ No

2 Are you submitting this application more than 27 months after the end of the month in which you were legally formed? If "Yes," complete Schedule E. ☐ Yes ☐ No

**Part VIII** Your Specific Activities

The following "Yes" or "No" questions relate to specific activities that you may conduct. Check the appropriate box. Your answers should pertain to *past, present,* and *planned* activities. (See instructions.)

1 Do you support or oppose candidates in **political campaigns** in any way? If "Yes," explain. ☐ Yes ☐ No

2a Do you attempt to **influence legislation**? If "Yes," explain how you attempt to influence legislation and complete line 2b. If "No," go to line 3a. ☐ Yes ☐ No

b Have you made or are you making an **election** to have your legislative activities measured by expenditures by filing Form 5768? If "Yes," attach a copy of the Form 5768 that was already filed or attach a completed Form 5768 that you are filing with this application. If "No," describe whether your attempts to influence legislation are a substantial part of your activities. Include the time and money spent on your attempts to influence legislation as compared to your total activities. ☐ Yes ☐ No

3a Do you or will you operate bingo or **gaming** activities? If "Yes," describe who conducts them, and list all revenue received or expected to be received and expenses paid or expected to be paid in operating these activities. **Revenue and expenses** should be provided for the time periods specified in Part IX, Financial Data. ☐ Yes ☐ No

b Do you or will you enter into contracts or other agreements with individuals or organizations to conduct bingo or gaming for you? If "Yes," describe any written or oral arrangements that you made or intend to make, identify with whom you have or will have such arrangements, explain how the terms are or will be negotiated at arm's length, and explain how you determine or will determine you pay no more than fair market value or you will be paid at least fair market value. Attach copies or any written contracts or other agreements relating to such arrangements. ☐ Yes ☐ No

c List the states and local jurisdictions, including Indian Reservations, in which you conduct or will conduct gaming or bingo.

# Instructions for Form 1023

Department of the Treasury
Internal Revenue Service

(Rev. June 2006)

## Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code

Section references are to the Internal Revenue Code unless otherwise noted.

**Contents** **Page**

What's New . . . . 1
How to Get Tax Forms and Publications . . . . 1
Overview of Section 501(c)(3) Organizations . . . . 1
**General Instructions**
Purpose of Form . . . . 3
Obtaining Tax-Exempt Status . . . . 3
What to File . . . . 3
When to File . . . . 4
Where to File . . . . 4
Filing Assistance . . . . 4
Signature Requirements . . . . 4
Representation . . . . 5
Public Inspection . . . . 5
Foreign Organizations in General . . . . 5
**Specific Instructions**
Part I. Identification of Applicant . . . . 6
Part II. Organizational Structure . . . . 6
Part III. Required Provisions in Your Organizing Document . . . . 7
Part IV. Narrative Description of Your Activities . . . . 8
Part V. Compensation and Other Financial Arrangements With Your Officers, Directors, Trustees, Employees, and Independent Contractors . . . . 8
Part VI. Your Members and Other Individuals, and Organizations That Receive Benefits From You . . . . 9
Part VII. Your History . . . . 9
Part VIII. Your Specific Activities . . . . 9
Part IX. Financial Data . . . . 12
Part X. Public Charity Status . . . . 14
Part XI. User Fee Information . . . . 16
Schedule A. Churches . . . . 16
Schedule B. Schools, Colleges, and Universities . . . . 17
Schedule C. Hospitals and Medical Research Organizations . . . . 18
Schedule D. Section 509(a)(3) Supporting Organizations . . . . 19
Schedule E. Organizations Not Filing Form 1023 Within 27 Months of Formation . . . . 21
Schedule F. Homes for the Elderly or Handicapped and Low-Income Housing . . . . 22

**Contents** **Page**

Schedule G. Successors to Other Organizations . . . . 22
Schedule H. Organizations Providing Scholarships, Fellowships, Educational Loans, or Other Educational Grants to Individuals and Private Foundations Requesting Advance Approval of Individual Grant Procedures . . . . 23
Appendix A. Sample Conflict of Interest Policy . . . . 25
Appendix B. States with Statutory Provisions Satisfying the Requirements of Internal Revenue Code Section 508(e) . . . . 27
Appendix C. Glossary of Terms . . . . 30
Index . . . . 37

## What's New

The user fee for the initial application for recognition of exemption under IRC Section 501(c)(3) has been increased. Part XI of Form 1023 has been revised to reflect the new fee. See Rev. Proc. 2006-8, 2006-1 I.R.B. 245 for more information about user fees that may be applicable to tax-exempt organizations.

## How To Get Forms and Publications

### Personal Computer

You can access the IRS website 24 hours a day, 7 days a week at *www.irs.gov* to:

- Order IRS products online.
- Download forms, instructions, and publications.
- Get answers to frequently asked tax questions.
- Search publications online by topic or keyword.
- Send us comments or request help by email.
- Sign up to receive local and national tax news by email.

### CD-ROM

You can order Publication 1796, IRS Tax Products CD, and obtain:

- Current-year forms, instructions, and publications.
- Prior-year forms, instructions, and publications.
- Bonus: Historical Tax Products DVD — Ships with the final release.
- Tax Map: an electronic research tool and finding aid.
- Tax Law frequently asked questions (FAQs).
- Tax Topics from the IRS telephone response system.
- Fill-in, print, and save features for most tax forms.
- Internal Revenue Bulletins.
- Toll-free and email technical support.
- The CD is released twice during the year.
  - o The first release will ship the beginning of January 2007.
  - o The final release will ship the beginning of March 2007.

Purchase the CD from National Technical Information Service at *www.irs.gov/cdorders* $25 (no handling fee) or call 1-877-CDFORMS (1-877-233-6767) toll-free to buy the CD for $25 (plus a $5 handling fee). Price is subject to change.

### By Phone and In Person

You can order forms and publications by calling **1-800-TAX-FORM** (1-800-829-3676). You can also get most forms and publications at your local IRS office.

## Overview of Section 501(c)(3) Organizations

### Who Is Eligible for Section 501(c)(3) Status?

Organizations organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition, or for the prevention of cruelty to children or animals are eligible to file Form 1023 to obtain recognition of exemption from federal income tax under section 501(c)(3) of the Internal Revenue Code.

***Form 1023 not necessary.*** The following types of organizations may be considered tax exempt under section 501(c)(3) even if they do not file Form 1023.

- Churches, including synagogues, temples, and mosques.
- Integrated auxiliaries of churches and conventions or associations of churches.
- Any organization that has gross receipts in each taxable year of normally not more than $5,000.

taxable and non-taxable, should be documented and copies retained in your permanent records.

**Line 4g.** "Reasonable compensation" is the amount that would ordinarily be paid for like services by like organizations under like circumstances as of the date the compensation arrangement is made. Establishing and documenting reasonable compensation is important because excessive compensation may result in excise taxes on both the individual and the organization. In addition, this may jeopardize the organization's tax exemption.

**Line 5a.** A "conflict of interest" arises when a person in a position of authority over an organization, such as a director, officer, or manager, may benefit personally from a decision he or she could make. A *Sample Conflict of Interest Policy* is included as *Appendix A*.

Adoption of a conflict of interest policy is not required to obtain tax-exempt status. However, by adopting the sample policy or a similar policy, you will be choosing to put in place procedures that will help you avoid the possibility that those in positions of authority over you may receive an inappropriate benefit.

**Line 6a.** A "fixed payment" means a payment that is either a set dollar amount or fixed through a specific formula where the amount does not depend on discretion. For example, a base salary of $200,000 that is adjusted annually based on the increase in the Consumer Price Index is a fixed payment.

A "non-fixed payment" means a payment that depends on discretion. For example, a bonus of up to $100,000 that is based on an evaluation of performance by the governing board is a non-fixed payment because the governing body has discretion over whether the bonus is paid and the amount of the bonus.

**Line 7a.** Do not include purchases of goods and services in your normal course of operations that are available to the general public under similar terms and conditions.

***Arm's length.*** An arm's length standard exists where the parties have an adverse (or opposing) interest. For example, a seller wants to sell his goods at the highest possible price, while a buyer wants to buy at the lowest possible price. These are adverse interests.

In negotiating with a person, an adverse interest is assumed if that person is otherwise unrelated to you in the sense of not being in a position to exercise substantial influence over you or your affairs. If the person is in a position to exercise substantial influence over your affairs, then an arm's length standard requires additional precautions to eliminate the effect of the relationship.

Using a conflict of interest policy, information about comparable transactions between unrelated parties, and reliable methods for evaluating the transaction, are examples of precautions that would help make the negotiation process equivalent to one between unrelated persons.

***Fair market value.*** This is the price at which property or the right to use property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy, sell, or transfer property or the right to use property, and both having reasonable knowledge of relevant facts.

**Line 7b.** Do not include sales of goods and services in your normal course of operations that are available to the general public under similar terms and conditions.

**Line 9a.** Answer "Yes" if any of your officers, directors, or trustees:
- Is an officer, director, or trustee in another organization (other than a section 501(c)(3) organization) that has a lease, contract, loan, or other agreement with you.
- Possess more than a 35% ownership interest in any organization that has a lease, contract, loan, or other agreement with you. For example, you would answer "Yes" if one of your directors were an officer for a section 501(c)(4) organization with whom you had a lease for office space. You would also answer "Yes" if one of your directors owns more than 35% of the voting stock of a corporation to which you made a loan.

## Part VI. Your Members and Other Individuals, and Organizations That Receive Benefits From You

**Line 1a. Benefits to individuals.** Describe any programs where you provide goods, services, or funds to individuals. For example, describe programs by which you provide food to the homeless, employment counseling to senior citizens, or grants to victims of a disaster.

**Line 1b. Benefits to organizations.** Describe any programs where you provide goods, services, or funds to organizations. For example, programs where you provide equipment, accounting assistance, or grants to other organizations.

**Line 2.** For programs that are available only for members, include a sample membership application and a schedule of membership dues. Also, describe any different membership levels and the benefits each membership level receives.

**Line 3.** Describe any business or family relationship between individuals who receive goods, services, or funds through your programs with any officer, director, trustee, or with any of the five-highest compensated employees or independent contractors listed in *Part V*, lines 1a, 1b, or 1c.

## Part VII. Your History

**Line 1.** You are a "successor" if you have:
- Substantially taken over all of the assets or activities of another organization,
- Been converted or merged from another organization, or
- Installed the same officers, directors, or trustees as another organization that no longer exists and that had purpose(s) similar to your purpose(s).

*The predecessor organization may be or may not have been a tax-exempt or non-exempt organization.*

## Part VIII. Your Specific Activities

**Line 1.** You participate in a political campaign if you promote or oppose the candidacy of an individual for public office. Your explanation should include representative copies of your political literature, brochures, pamphlets, etc. Candidate debates and nonpartisan voter education are permitted.

*Organizations described in section 501(c)(3) are prohibited from supporting or opposing candidates for public office in any political campaign. If you answer "Yes," you are not qualified for tax exemption under section 501(c)(3) and should reconsider whether the filing of application Form 1023 is appropriate for your organization. See Publication 557 for a description of other Internal Revenue Code sections under which you may qualify.*

**Line 2a.** You are attempting to "influence legislation" if you directly contact or urge the public to contact members of a legislative body for the purpose of proposing, supporting, or opposing legislation. You are also attempting to influence legislation if you advocate the adoption or rejection of legislation. If you answer "Yes," your explanation should include the percentage of your total time and total funds spent on such legislative activities. Also, submit representative copies of your legislative literature, brochures, pamphlets, etc.

Organizations described in section 501(c)(3) are prohibited from engaging in a substantial amount of legislative activities. Whether you are engaged in substantial legislative activities depends on all of the facts and circumstances.

**Line 2b.** By filing Form 5768 your legislative activities will be measured solely by expenditure limits under section 501(h) rather than by whether legislative activity is considered substantial. Form 5768 is included in Package 1023 for your convenience. It describes the types of organizations that are eligible to make an election. For a discussion of the requirements of section 501(h), see Publication 557. If you are an organization that elects to use