UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

)
UNITED STATES OF AMERICA,     )     CRIMINAL NO.  05-40026-FDS
                  Plaintiff   )
)
V.                       )
)     **FILED UNDER SEAL**
MUHAMED MUBAYYID,     )
EMADEDDIN Z. MUNTASSER and     )
SAMIR AL-MONLA,     )
               Defendants   )
_____)

## MOTION *IN LIMINE* TO PRECLUDE OR, IN THE ALTERNATIVE, LIMIT THE TESTIMONY OF CERTAIN OF THE GOVERNMENT'S PROPOSED EXPERT WITNESSES

     Now come the defendants, Muhamed Mubayyid, Emadeddin Muntasser and Samir Al-Monla, and move this Honorable Court to exclude the testimony of the Government's proposed expert witnesses, Evan Kohlmann and Matthew Levitt.  The reasons for this motion are set forth in the accompanying memorandum.

Respectfully submitted,          MUHAMED MUBAYYID
EMADEDDIN Z. MUNTASSER         By his attorney,
By his attorneys,
/s/Susan R. Estrich_____     /s/ Michael C. Andrews_____
Susan R. Estrich              Michael C. Andrews (BBO#: 546470)
Robert Kingsley Professor of Law and     21 Custom House Street
Political Science            Boston, MA 02110
University of Southern California     (617) 951-0072
Law School
University Park, MC-0071        SAMIR AL-MONLA
Los Angeles, CA 90089-0071      By his attorney,

/Norman S. Zalkind_____     /s/ Charles P. McGinty
Norman S. Zalkind (BBO#: 538880)     Charles P. McGinty (BBO # 333480)
Elizabeth A. Lunt (BBO#: 307700)     Federal Defenders
David Duncan (BBO#: 546121)      408 Atlantic Avenue
Zalkind, Rodriguez, Lunt & Duncan, LLP     Boston, MA 02110
65a Atlantic Avenue          (617) 223-8061
Boston, MA   02110
(617) 742-6020           Dated: October 19, 2007

**Certificate of Service**

I hereby certify that the foregoing document was served this 19th of October, 2007 by hand delivery upon all counsel of record.

/s/ Elizabeth A. Lunt
Elizabeth A. Lunt

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
UNITED STATES OF AMERICA,                 )      CRIMINAL NO.  05-40026-FDS
                    Plaintiff             )
                                          )
V.                                        )
                                          )      **<u>FILED UNDER SEAL</u>**
MUHAMED MUBAYYID,                         )
EMADEDDIN Z. MUNTASSER and                )
SAMIR AL-MONLA,                           )
                    Defendants            )
_____)


<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**</u>
<u>**MOTION *IN LIMINE* TO PRECLUDE OR, IN THE ALTERNATIVE,**</u>
<u>**LIMIT THE TESTIMONY OF CERTAIN OF**</u>
<u>**THE GOVERNMENT'S PROPOSED EXPERT WITNESSES**</u>

**<u>1. Summary of Argument</u>**

This is a tax case. The indictment against the defendants charges that they wrongfully failed to disclose to the Internal Revenue Service that Care International, the charity defendant Muntasser founded, was engaged in activities to support and promote mujahideen and jihad, and that it was the legal "outgrowth or successor" to the Al Kifah Refugee Center within the meaning of the tax laws. The indictment also charges that they conspired to defraud the IRS in determining the charitable status of Care International, and obstructed and impeded the operation of the IRS by concealing that Care was engaged in non-charitable activities and was the successor to the Al-Kifah Refugee Center. The indictment also charges  defendant Muhammed Mubayyid with submitting false tax returns for the 1997, 1999, and 2000 calendar years, defendant Emad Muntasser with making a false statement in an interview with the FBI by saying he had not been to Afghanistan and defendant Samir Al-Monla with making a false statement by saying that he did not know a man named Bassam Kanj.

-1-

This is not a terrorism case. There is no charge that Care was a terrorist organization. There is no charge that Mr. Muntasser, or any of his codefendants, provided material aid to any terrorist organization. The government has acknowledged that it cannot prove that one penny of the money collected by Care International went to support the purchase of weapons, the financing of holy war, or the commission of any act of violence, much less that the defendants so intended (Marinelli Aff. ¶ 29). There is no charge that the money collected by Care was spent or anything other than the stated purposes of providing humanitarian relief to people in dire need and publishing and distributing books and newsletters protected by the First Amendment (Drum Aff. ¶¶ 12-14, 65) (acknowledging that no funds can be traced from Care to terrrorist activities).

The jury may well benefit from the assistance of experts in tax law who can explain the intricacies of the Code's definitions of charitable purpose and successor organizations, and both sides have proposed to present such expert testimony. The jury may also benefit from the testimony of witnesses and experts who can describe for them the conditions in Afghanistan, Pakistan, Bosnia and Kosovo in the period following the Soviet withdrawal which created the humanitarian crisis Care was founded to address, and the defense has proposed to present such testimony.

What the jury most definitely does not need is the testimony of experts in terrorism committed by individuals and organizations nowhere mentioned in the indictment, engaged in crimes not charged in the indictment, in parts of the world and by organizations that these defendants had absolutely nothing to do with. Such testimony, even if the individuals giving it are considered "experts" – and that itself is a substantial question – is plainly irrelevant and prejudicial, and could not be the basis of testimony by fact witnesses, much less the occasion for expert opinion. What the jury absolutely does not require, and should not be allowed to hear, is opinions by experts in

-2-

terrorism as to the ultimate issues of tax law which will determine criminal liability in this case, summaries by experts in terrorism of the exhibits which the government proposes to introduce in this case, "overviews" by experts in other fields and other areas of the world which would put this case in a "context" in which it does not belong, certainly not in a court of law.

The United States Supreme Court and the Courts of Appeals have entrusted to the federal district court the role of gatekeepers in the admission of expert testimony. *Correa v. Cruisers*, 289 F.3d 13, 24 (1st Cir. 2002) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 592 (1993)). "Expert evidence," the Court warned in the seminal *Daubert* case, "can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403...exercises more control over experts than lay witnesses." *Daubert*, 509 U.S. at 595 (quoting 138 F.R.D. 631, 632 (1991)). As Judge Easterbrook of the Seventh Circuit has warned, judges "should not be buffaloed by unreasoned expert opinions." *Mid State Fertilizer Co. V. Exchange Nat'l Bank*, 877 F.2d 1333, 1340 (7th Cir. 1989). A district court "protect[s] the interests of the judicial system" by exercising its discretion to exclude the testimony of an expert who has "cast aside his scholar's mantle and bec[ome] a shill" for those who pay him. *Id.*

## 2.     The Legal Standard: Reliability and Fit

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, *supra,* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the United States Supreme Court laid down the standards governing the admission of expert testimony, requiring that the district court determine not only that the proposed witness is indeed an "expert" in the field, but that his testimony "both rests on a reliable foundation and is relevant to the task at hand." *Kumho Tire,* 526 U.S. at 141 (quoting *Daubert*, 509 U.S. at 597)

The reliability prong of the test relates to the qualifications of the individual being put forward as an expert and the methods he uses to form his opinions. *Daubert*, 509 U.S. at 592-93. The "fitness" prong takes into account not only the relevance of the proposed testimony to the facts at issue in the case, and whether its probative value is outweighed by its prejudicial effect, but also the need of the laymen on the jury for the assistance of an expert in understanding the evidence or issues as to which the expert seeks to opine. *Id.* at 591.

In place of the previous standard for admissibility, which turned solely on whether the expert's theory was "generally accepted" in a relevant scientific community, the *Daubert/Kumho Tire* rulings mandated a broader inquiry in which general acceptance is only one factor to be considered. Under the new test, even a theory which is not generally accepted may be the basis of an admissible opinion if other criteria are met, such as extensive testing, peer review, and a low enough error rate to satisfy the judge of the theory's reliability and value. *Daubert*, 509 U.S. at 592-94.

This increased flexibility in the determination of admissibility was coupled with the admonition that the judge, with his discretion thus broadened, must act as the "gatekeeper" and take that role seriously, in order to prevent the introduction of unreliable or irrelevant evidence into the trial. As Justice Scalia emphasized, in words which have been much quoted,[1] "discretion in choosing the manner of testing expert reliability . . . is not discretion to abandon the gatekeeping function. I think it is worth adding that it is not discretion to perform the function inadequately.

---

[1]*E.g., McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005); *Jinro Am., Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1005 (9th Cir. 2001); *J.B. Hunt Transp., Inc. v. GMC*, 243 F.3d 441, 445 (8th Cir. 2001); *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000); *Smith v. GE*, 2004 U.S. Dist. LEXIS 7011, 7019 (D. Mass. 2004).; *Albert v. Warner-Lambert Co.*,234 F. Supp. 2d 101, 104 (D. Mass. 2002); *Polaino v. Bayer Corp.*, 122 F. Supp. 2d 63, 66 (D. Mass. 2000).

Rather it is discretion to choose among reasonable means of excluding expertise that is *fausse* and science that is junky." *Kuhmo Tire*, 526 U.S. at 158-59 (Scalia, J., concurring).

The party seeking to introduce the expert testimony must meet the burden of proving reliability and relevance by a preponderance of the evidence. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994). The Federal Rules and Advisory Committee notes amplify the list of factors set forth in *Daubert*, emphasizing both the standards of the academic and scientific community and the distinction between experts "proposing to testify about matters growing naturally and directly out of research conducted independent of the litigation" as opposed to those who have "developed opinion[s] expressly for purposes of testifying." FED. R. EVID. 702. As in *Kumho Tire*, the district court is encouraged to ask whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting." *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997).

Because *Daubert* and *Kumho Tire* establish a flexible test subject to review only for abuse of discretion, there are few hard and fast rules governing the admission of expert testimony. *Kuhmo Tire*, 526 U.S. 141, 142. Nonetheless, a review of the case law, in this circuit and elsewhere, affords clear guidance as to what is plainly *not* allowed.

First, experts are meant to assist the jury, not "usurp" their role. *United States v. Casas*, 356 F.3d 104, 120 (1st Cir. 2004). This means that experts are not permitted to testify as to issues of fact and law that the jury is capable of understanding and charged with determining on its own. *Andrews v. Metro N. C. R.* Co., 882 F.2d 705, 708 (2nd Cir. 1989). Rule 704 specifically prohibits experts from testifying on the ultimate issue of whether a defendant had the requisite intent to violate the

law. FED. R. EVID. 704. But intent is not the only issue as to which experts are precluded from drawing ultimate conclusions: Where an issue is comprehensible to lay jurors without the aid of experts, expert testimony is not permitted. *United States v. Montas*, 41 F.3d 775, 784 (1st Cir. 1994) (citing *United States v. Weiner*, 3 F.3d 17, 21-22 (1st Cir. 1994) (error to admit expert testimony of "a routine inference that the jury could draw on its own."). "Expert testimony that is well within the bounds of a jury's ordinary experience generally has little probative value. On the other hand, the risk of unfair prejudice is real. By appearing to put the expert's stamp of approval on the government's theory, such testimony might unduly influence the jury's own assessment of the inference that is being urged." *Id.*

The role of the expert is to shed light on "some obscure or complex aspect of the crime," *id.* at 783, not to inject bias in the guise of explanation on matters the jury is perfectly capable of adjudicating on its own. *See United States v. Finley*, 301 F.3d 1000, 1009 (9th Cir. 2002) ("The subject matter at issue must be beyond the common knowledge of the average layman"); *United States v. Amaral*, 488 F. 2d 1148, 1152-53 (9th Cir. 1973) (expert opinion allowed only when "such testimony serves to inform the court [and jury] about affairs not within the full understanding of the average man.") (quoting *Farris v. Interstate Circuit*, 116 F.2d 409, 412 (5th Cir. 1941). "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004) (en banc) citing 4 WEINSTEIN'S FEDERAL EVIDENCE § 702.03[2][a].

A second rule, related to the first, is that expert testimony is intended to provide specialized knowledge to the jury, not simply to affirm the charges of the indictment or bolster the credibility of the government's witnesses. Experts are not permitted to simply restate the charges in the

indictment or summarize the testimony of others in the form of an opinion or an "overview," giving what is in fact no more than a summary the imprimatur of superior understanding. See *United States v. Johnson*, 54 F.3d 1150, 1157-58 (4th Cir. 1995) ("Rule 703 does not afford the expert unlimited license to testify or present a chart in a manner that simply summarizes the testimony of others without first relating that testimony to some 'specialized knowledge' on the expert's part as required under Rule 702 of the Federal Rules of Evidence"); *United States v. Griffin*, 324 F.3d 330, 349 (5th Cir. 2003) (condemning overview testimony by a government agent based on evidence yet to be introduced "as a tool used by the government to paint a picture of guilt before the evidence has been admitted") (followed in *Casas*, *supra*, 356 F.3d at 119). Nor are experts allowed to "opine as to the credibility of the testimony of other witnesses at the trial." See *United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988), *rev'd in part on other grounds*, 856 F.2d 5 (2d Cir. 1988); *see also Nimely v. City of New York*, 414 F.3d 381, 397-98 (2d Cir. 2005) (stating that "[i]t is a well-recognized principle of our trial system that "determining the weight and credibility of [a witness's] testimony . . . belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men."); *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (approving exclusion of expert testimony that would have "usurped" the role of the jury and instructed jurors on a credibility assessment); *United States v. Paracha*, 2006 WL 12768, 23-24 (S.D.N.Y. 2006); (*Paracha* Transcript 7.)

Third, an expert may only testify in his area of expertise; his opinions must relate to disputed issues in that particular case; and there must be a clear link between the data or research which is the basis of his expertise and the conclusion which he offers. See *Calhoun v. Yamaha Motor Corp, USA*, 350 F.3d 316, 324 (3d Cir. 2003) (an expert may be generally qualified but may lack qualifications

to testify outside his area of expertise; general knowledge does not provide a basis to support more specific opinions); *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) ("it is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support.") As Judge Stearns of this District emphasized in explaining his decision to exclude expert testimony:

> Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. . . . [W]hile methodology remains the central focus of a *Daubert* inquiry, this focus need not completely pretermit judicial consideration of an expert's conclusions. Rather, trial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable.  *Polaino v. Bayer Corp*., 122 F. Supp. 2d 63, 67 (D. Mass. 2000) (citing to *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling, Inc.*, 161 F.3d 77, 81 (1st Cir. 1998)).

Simply offering a bottom line conclusion, unsupported by research or facts presented to the court, is unacceptable; as Judge Posner has put it, "an expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."  *Mid-State Fertilizer Co. v. Exchange National Bank*,  877 F.2d 1333, 1339 (7th Cir. 1989).

Finally, even where expert testimony is otherwise admissible, it must still be excluded by the district judge if its probative value is outweighed by its potential prejudicial impact. Fed. R. Evid. 403.  In other words, Rule 702 provides the initial test, but not the final one; the expert testimony must still be subject not only to the test of relevance, but also to the district judge weighing under Rule 403 just how much it proves as against the likelihood of unfair prejudice.

Thus, where the government has sought to use expert witnesses to describe the conduct of individuals other than the defendants as a basis for inferring a defendant's guilt, that testimony, even

if slightly probative, may be excluded as unduly prejudicial.  *See*, *e.g.*, *United States v. Cruz*, 981 F.2d 659, 663 (2d Cir. 1992) ("Guilt may not be inferred from the conduct of unrelated persons."); *United States v. Castillo*, 924 F.2d 1227, 1234 (2d Cir. 1991) ("[W]e take serious issue with the Government's use of an expert witness to propound the impermissible theory that appellants' guilt could be inferred from the behavior of unrelated persons.").

That does not mean that all expert testimony about unrelated persons is automatically excluded: where, for instance, the defendant is charged with drug trafficking, courts have allowed expert testimony on the typical operations of drug networks.  But in such instances, the testimony must address "esoteric aspects [of drug trafficking] reasonably perceived as beyond the ken of the jury," and "cannot be used solely to bolster the credibility of the government's fact witnesses by mirroring their version of events." *United States v. Montas*, 41 F.3d at 784 (quoting *United States v. Tapia-Ortiz*, 23 F.3d 738, 740 (2d Cir. 1994)).  *See*, *e.g.*, *United States v. Echeverri*, 982 F.2d 675, 680 (1st Cir. 1993) (expert may "identify an otherwise inscrutable document as a drug ledger and explain its contents"); *United States v. Castiello*, 915 F.2d at 3 (1st Cir. 1990) (statement phrased in drug world jargon "was not so readily comprehensible to the layman that it could not bear elucidation by a law enforcement agent knowledgeable in the ways of the drug world"); *United States v. Ladd*, 885 F.2d 954, 959-60 (1st Cir. 1989) (expert may testify that type of packaging and number of packages of drugs is consistent with distributive intent, not personal use, because "jurors are not expected to be familiar with the . . . workings of the heroin community").  See also *United States v. Angiulo*, 897 F.2d 1169, 1189 (1st Cir. 1990)  (expert testimony that defendants played certain roles in criminal activities is helpful to jury because of the crime family's "extensive criminal organization. . . . the complexity of the interrelationships within the organization, and the use of

criminal jargon by defendants in their conversations"); *United States v. Amuso*, 21 F.3d 1251, 1263-64 (2d Cir. 1994) (approving expert testimony that explained complex workings of organized crime families and did not merely bolster credibility of government witnesses); *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993); *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988).

Analogizing to the drug trafficking and organized crime cases, courts in terrorism cases have allowed experts to provide specialized knowledge as to the organization, leadership and activities of terrorist organizations which defendants have been charged with assisting. See, e.g., *United States v. Paracha*, 2006 WL 12768 at 22-23 (allowing expert testimony as to the history and operations of Al Qaeda in case charging defendant with providing material support to Al Qaeda); *United States v. Al-Arian*, 280 F. Supp. 2d 1345 (M.D. Fla. 2003) (allowing expert testimony on the operations of Palestinian Islamic Jihad in case charging racketeering and material support of Palestinian Islamic Jihad); *United States v. Hammoud*, 381 F.3d 316, 326 (4th Cir. 2004), *rev'd and remanded on other grounds*, *Hammoud v. United States*, 543 U.S. 1097 (4th Cir. 2005) (allowing expert testimony related to terrorist activities by Hizbollah in case charging money laundering, mail fraud, credit card fraud, racketeering and conspiracy to provide material support and providing material support to a designated FTO, Hizbollah). But with one exception to be discussed below, *every single case in which terrorism experts have been permitted to testify involved charges of terrorism*: of material aid to terrorism and/or conspiracy to commit murder or participate in terrorist activities abroad in support of the group about which the expert testified; *just as every case allowing testimony by experts on drug trafficking involved drug charges and every case involving expert testimony about the operation of organized crime families involved charges of illegal participation in organized crime activities. See*, *e.g.*, *Hammoud*, 381 F.3d at 326 (Hizbollah), *Paracha*, 2006 WL

12768 at 1 (Al Qaeda), *United States v. Holy Land Found. for Relief & Dev.*, 493 F.3d 469, 469(5th Cir. 2007)(Hamas). See also *United States v. Chandia* (E.D. Va. 2006) (unreported) (Lashkar -e-Taiba); *United States v. Padilla*, 2007 WL 107909 (conspiracy to commit murder); *United States v. Khan*, 461 F.3d 477 (4th Cir. 2006) ("expert" limited to fact testimony in case charging support for Taliban and  LET).  We have, notwithstanding the careful and comprehensive research detailed in this motion, found *not a single tax case in which terrorism experts have been permitted to testify.*

The *United States v. Paracha* case is illustrative of the careful and rigorous exercise of the "gatekeep[ing]" function by a district court dealing with expert testimony in a terrorism case.  In both a written opinion, *Paracha*, 2006 WL 12768 at 19, and in the hearing in open court, *Paracha* Motion in Limine Hearing (*Paracha* Transcript), the court imposed strict limits on the terrorism-related testimony that the government sought to introduce.  *Paracha* involved the testimony of Evan Kohlmann, one of the experts proposed in this case.  Initially, the court found the government's offer of proof as to Kohlmann's expertise to be inadequate, and conducted a lengthy *Daubert* hearing to review his methodology and qualifications. Ultimately, the court concluded that Mr. Kohlmann would be permitted to testify as an expert, even though his work had never been subject to peer review, and his Islamic studies were limited to his undergraduate days. *Compare United States v. Abu-Ali*, (N.D. Va. 2005), (Abu-Ali Transcipt 12) (rejecting Kohlmann as an expert); *United States v. Khan,* 309 F. Supp. 2d 789, 812 (E.D. Va. 2004) (Kohlman not an expert but only a fact witness on what appears internet sites).  But, rejecting the government's proffer, the court imposed strict limits on the scope of Kohlmann's testimony.

Paracha was charged with material support to Al Qaeda; Judge Stein ruled that Mr. Kohlmann would be allowed to testify as to the origins and organizational structure of al Qaeda, it

leaders, and its tradecraft.  2006 WL 12761 at 21.  Citing to the organized crime precedents, Judge

Stein reasoned that "similarly, here the government may use expert testimony to assist the jury in

understanding the nature and functioning of the organization Paracha is *alleged to have assisted."*

*Id.(emphasis added).*

But Judge Stein did not allow Mr. Kohlmann to testify as to the two alleged Al Qaeda

operatives who were specifically involved in the case, because of his expressed concern that

Kohlmann's testimony regarding them was based "in not insubstantial part on Kohlmann's review

of the unclassified summaries of statements made by those individuals . . . . his proposed testimony

regarding those two individuals is too close to a summary of factual evidence from sources that the

government cannot introduce directly." (*Paracha* Transcript 11-12.) As the Judge explained later in

his written opinion, "When an expert's conclusions are drawn largely from his knowledge of

materials in the government's case file, 'rather than upon his extensive general experience' in the

field, those conclusions are beyond the proper limits for expert testimony." *Paracha*, 2006 WL

12768 at 22 (citing to *United States v. Dukagjini*, 326 F.3d 45, 55 (2d Cir. 2002)).

Kohlmann was also precluded from testifying about two other individuals who were alleged

co-conspirators in the case.   Judge Stein concluded that their actions, as they related to the current

case, were appropriately the subject of testimony from fact, not expert, witnesses. *Id.*   As to their

involvement in prior terrorist plots, Judge Stein excluded such information altogether, on the

grounds that its probative value was outweighed by the potential for unfair prejudice of such

testimony. (*Paracha* Transcript 12.)

Nor was Kohlmann permitted to testify as to Al Qaeda's use of counter-interrogation or

disinformation techniques: "despite the government's protestations to the contrary, the relevance of

that testimony -- that Al Qaeda operatives ... are trained to provide deceptive, false and misleading answers to their interrogators when captured -- is solely to undermine the credibility of the witnesses' statements that tend to exculpate Paracha. Because the Court finds this area of expert testimony impermissibly intrudes on the jury's function in the context of this case, it is excluded." *Paracha*, 2006 WL 12768 at 23. Quoting from *Nimely v. City of New York*, Judge Stein said that precedent clearly established "'that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702. *Id.* (quoting 414 F.3d 381, 397-98 (2d Cir. 2005)).

Finally, even though the case involved material aid to Al Qaeda itself, Judge Stein, acting pursuant to Rule 403, excluded any reference to the 1993 World Trade Center bombing, to 9/11, and to any specific terrorist plot. (*Paracha* Transcript 12.) Notwithstanding the fact that Paracha was charged with supporting terrorism, specifically Al Qaeda, specifically in New York, and that the attacks and plots involved targets of Al Qaeda in New York, the Judge concluded that "[t]he probative value of the specific plots is substantially outweighed by the danger of unfair prejudice. Mr. Paracha is not alleged to have any connection to those plots, and describing them with specificity unnecessarily focuses attention on them." (*Paracha* Transcript 12-13.)  *Every single limit imposed by Judge Stein in Paracha is exceeded in the proposed testimony of Mr. Kohlmann outlined in his expert's report in this case* – and *Paracha* actually contained charges of material support for terrorism, charges notably absent from this case.

The only *non*-terrorism case that the defendants have been able to locate in which a terrorism expert was permitted to testify is *United States v. Damrah*. 412 F.3d 618 (6th Cir. 2005).  In *Damrah*, the defendant was charged with a single count of unlawful procurement of naturalization

in violation of 18 U.S.C. § 1425(a) and (b). *Id*. at 621-22. Specifically, Damrah was charged with (1) knowingly procuring naturalization contrary to law and to which he was not entitled by failing to disclose membership in or affiliation with Afghan Refugee Services, the Palestinian Islamic Jihad ("PIJ"), and the Islamic Committee for Palestine ("ICP"); (2) falsely stating that he had never ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion; and (3) failing to disclose that he had been arrested and charged with assault in January of 1989 in New York City. *Id.* at 622.

The "persecution" question, which related to PIJ and ICP, was central to the trial. The Court of Appeals, which affirmed Damrah's conviction, summarized the nature of the organizations involved by noting that the PIJ opposes the existence of the State of Israel and is committed to eliminating it. *Id. at 620*. Terrorist attacks orchestrated by the PIJ have resulted in its designation as a Specially Designated Global Terrorist Organization by the United States Department of State and its inclusion, since 1989, as a major terrorist group in the Department of State publication, Patterns of Global Terrorism. *Id.* The ICP was used to raise funds for the PIJ in the United States. Damrah's own characterization of the ICP, captured on video at a fund-raising event and quoted by the Court of Appeals, makes clear that he understood exactly who he was supporting: "A brief note about the Islamic Committee for Palestine: It is the active arm of the Islamic Jihad Movement in Palestine. We prefer to call it the `Islamic Committee for Palestine' for security reasons." *Id.* at 621.

In the district court, Damrah filed a motion *in limine* to limit the testimony of Dr. Matthew Levitt, whom the government has also noticed as its expert in this case. *Damrah*, 412 F.3d at 625. Because the case involved Palestinian terror organizations and Palestinian attacks, the area of Dr. Levitt's expertise, there was little question that if anyone's expertise was required, it would be his.

-14-

(*See Damrah* Motion Transcript 27-28.)  Moreover, because the case involved membership in a groups involved in "persecution," evidence as to terrorism-related activities by these groups was obviously and directly relevant.  Even so, the court imposed substantial limits on Dr. Levitt's testimony and, through him, the government's efforts to tie Mr. Damrah to terrorist activities (*See Damrah* Motion Transcript 27-63.)

*First,* Dr. Levitt was limited in terms of timing: terrorist designations as well as terrorist activities occurring after the date of Mr. Damrah's naturalization application were ordered excluded. (*Damrah* Motion Transcript 27-28.)

*Second,* the government itself dropped its request to offer any testimony related to the World Trade Center bombing in 1993, notwithstanding the fact that Mr. Damrah was alleged to have been a founder of the Al Kifah Refugee Center in New York. (*Damrah* Motion Transcript 29.)  Ironically, the government in this case seeks to introduce just such inflammatory, prejudicial testimony in the form of "media reports" associating Al Kifah with the World Trade Center bombing,  (*See* Superseding Indictment 3), even though the Al Kifah Brooklyn office was central to the *Damrah* case and is utterly irrelevant in this one.

*Third,* Dr. Levitt was prohibited from testifying or even naming Hamas and Hizbollah, two organizations that cooperated with PIJ and ICP, absent some showing that Mr. Damrah himself was involved in such cooperation, or at least had knowledge of it.  (*Damrah* Motion Transcript 33); in this case, which has nothing to do with Hamas and Hizbollah, Dr. Levitt proposes to discuss both, at length.

*Fourth*,  the government was prohibited from eliciting testimony about the murder of Meier Kahane, the Jewish Defense League leader, absent a preliminary showing of an actual connection

-15-

between Al Kifah and the killing. (*Damrah* Motion Transcript 33.) Dr. Levitt's proposed testimony in this case, like Mr. Kohlmann's, is rife with details about terrorist plots having absolutely no connection to any of the defendants.

*Fifth*, the government was instructed to distinguish activities at the New York mosque from activities of Al Kifah, which had its offices in the same building as the mosque. (*Damrah* Motion Transcript 41.) In demanding such "cautio[n]," the Court pointed out, in language equally pertinent to this case, that "the location at the same address is not the same thing as being run by the same people or having the same participants." (*Damrah* Motion Transcript 41-42.)

*Sixth,* and perhaps most important of all, the trial judge limited Dr. Levitt's use of "inflammatory rhetoric" even though it might well be "the parlance of the argot of his field," as the prosecutor described it. (*Damrah* Transcript 51-52.) In the court's words, references to "radical Islamic militants" and "dangerous global Jihadists," while they "may have some legitimacy in his field, [have] a danger of inflaming the jury." App C at 52. (*Damrah* Motion Transcript 51-52.) Addressing the prosecutor, the judge went on: "[T]ell him [Dr. Levitt] to stay away from those type of terms. And as we get into his testimony, I would remind counsel for the defendant, if you think that some of it is tending towards descriptions that are improper, approach the bench and I'll hear the parties at that time. But I'll generally grant the motion and direct the government to stay away from the use of the terms that have been mentioned at this time." (*Damrah* Motion Transcript 53.)

Both Dr. Levitt and Mr. Kohlmann make free use of these terms, and worse, in their reports, and presumably intend to do so in their testimony in this case. Indeed, the reports submitted by the two proposed experts in this case run afoul of *every ruling* of the courts in *Damrah* and *Paracha,* rulings that Kohlmann and Levitt must surely be familiar with, since it was their testimony that was

at issue and was subject to limitation. The fact that the experts have chosen to ignore established law is no reason for this court to do so. The rules governing their testimony should be no less stringent here than in *Paracha* and *Damrah*; indeed, given that this is solely a tax and false statement case, the rules should be that much stricter, not more lax.

### 3. Proposed Expert Testimony on Terrorism

The government has proposed to introduce expert testimony from three terrorism "experts": Dr. Matthew Levitt, Mr. Evan Kohlmann, and Dr. Edward Valla. Each of the three pose particular problems under the rules applicable to expert testimony.

Dr. Levitt is unquestionably an expert; the question is, in what?

Mr. Kohlmann, a recent law school graduate, claims expertise based on his undergraduate minor, a self-published book, and the fact that he has become an expert at being an expert. (Kohlmann Report 1.) His only consistent employment appears to be as a government expert.

Finally, there is almost nothing to say about Dr. Valla because, according to all our research, his oeuvre is limited to a letter to the Editor and a book review of less than 500 words. His PhD thesis was on religion, Catholicism in particular, not taxation of non-profits or anything to do with Islam. He has published nothing but the two items noted above, and has been quoted by no one.

The government has yet to produce an expert report from Dr. Valla, and the reports provided by Dr. Levitt and Mr. Kohlmann propose testimony far beyond the scope of anything allowed by the judges in the cases discussed above. A careful review of these reports makes that manifest, and leaves no question about the need for this court either to exclude their testimony altogether or, at a minimum, to impose clear limits on the scope of such testimony under both Rule 702 and Rule 403.

### A. Dr. Matthew Levitt

Dr. Matthew Levitt is a well-regarded expert in his field. He is the author of a monograph on Middle Eastern terrorist groups (Targeting Terror), a Yale University Press (peer-reviewed) book on Hamas, and a forthcoming book from Rowman & Littlefield which appears to be an expansion of his Ph.D. thesis focusing on the impact of Palestinian and Israeli terrorist attacks on the Arab-Israeli peace process. (Levitt Report 3.) A graduate of Yeshiva University, he is fluent in Hebrew, which is obviously useful in the Middle East, but of no apparent use in the context of this case. He appears to have traveled extensively in the Middle East, but we can find no record of his ever being in Afghanistan, Pakistan or Bosnia, certainly not in the time period at issue here. All of the chapters, lectures, and testimony he cites in his CV focus on issues of Middle Eastern terrorism: specifically on Hamas and Hizbollah, two Middle Eastern terrorist organizations; on Iranian and Syrian state sponsored terrorism, which are of obvious importance in the Middle East; and on the prospects for peace in Israel. (Levitt Report 3-7.) Dr. Levitt is currently serving his second stint at the Washington Institute for Near East Policy (WINEP), a think tank that is devoted to issues related to Israel's security, and was founded by a former Director of the American-Israel Public Affairs Committee (AIPAC). (Levitt Report 2.)

WINEP is, according to its website, devoted to study of the Middle East. *See* www.washingtoninstitute.org. Its mission is defined solely in terms of American policy towards the Middle East:

- "Founded in 1985, The Washington Institute for Near East Policy was established to advance a balanced and realistic understanding of American interests in the Middle East. Under the guidance of a distinguished and bipartisan Board of Advisors, the Institute seeks to bring scholarship to bear on the making of U.S. policy in this vital region of the world. Drawing on the research of its scholars and the experience of policy practitioners, the Institute promotes an American engagement in the Middle East committed to strengthening alliances, nurturing friendships, and promoting

security, peace, prosperity, and democracy for the people of the region." *See id.* (Follow "Our Mission" hyperlink).

Its areas of research are limited to countries in the Near/Middle East, and significantly, do NOT include Afghanistan, Pakistan, or the Balkans, the areas of Care's charitable giving under Mr. Muntasser's leadership. *See id.* The list of "research areas" of WINEP is as follows:

> Egypt
> Iran
> Iraq
> Israel
> Jordan
> Lebanon
> North Africa
> Palestinians
> Persian Gulf States
> Syria
> Turkey, *Id.*

Dr. Levitt has repeatedly testified in terrorism cases dealing with Hamas, Hizbollah and Palestinian Islamic Jihad. (Levitt Report 4-5.)  He has never testified in a case with no connection to either Palestine or Israel.  *See Hammoud*, 381 F.3d at 316 (Hizbollah); *United States v. Fowad Assed* (E.D.N.Y. 2003) (Palestinian defendant acquitted of making threats to Jewish Defense League after Israel announced a crackdown on Palestinian terrorists following suicide bombings in Israel); *Damrah*, 412 F.3d at 618 (Palestinian Islamic Jihad and Islamic Committee for Palestine); *United States v. Mohammed Ali Hassan Al-Moayad*  (E.D.N.Y. 2005) (Palestinian Islamic Jihad and Al Qaeda); *United States v. Sami Amin Al-Arian et al*, 329 F. Supp. 2d 1294 (M.D. Fla. 2004) (Palestinian Islamic Jihad); *United States v. Holy Land Foundation*, 2007 WL 2059722 (D.Tx. 2007) (material support of Hamas).

By his own description, the Middle East, Middle Eastern terrorism, and Middle Eastern

terrorist groups are the focus of Dr. Levitt's research and writing, and his experience.  (Levitt Report 1-6.) Asked in the *Damrah* trial about his testimony before Congress, Dr. Levitt responded: "[My] testimony is always on middle eastern terrorist issues."  (*Damrah* Trial Transcript 6 /507.)  Asked if he focused on any particular terrorist groups, he replied, "Middle eastern terrorist groups, groups that operate in the Middle East or emanate from the Middle East." (*Damrah* Trial Transcipt 3/504) Defendant's objection to Dr. Levitt's testimony, therefore, is not that he fails a test of expertise, in terms of education, peer review, standing in the community, or methodology, but that his expertise, even in the subject of terrorism, relates to a totally different area of the world than that which was the focus of Care's activities.

Even more fundamentally, terrorism, whether of the Arab-Israeli, Pakistani-Afghani, Bosnian or Chechan variety, is not the issue in this case.   Dr. Levitt's CV, and his past testimony, both in court cases and in Congress, evince no expertise on the subject of the appropriate tax treatment of charitable organizations, the requirements for disclosure in Forms 1023 and 990, and the meaning of "successor or outgrowth" for purposes of the tax law.  His expertise is thus doubly irrelevant to the issues in this case.

Nonetheless, the very first sentence of Dr. Levitt's expert report in this case expresses a conclusion on a subject on which he has no expertise: to wit, "that CARE International (CARE) is an outgrown (sic) of the al Kifah Refugee Center, a part of the Maktab al-Kidmat (MAK) support network founded by Usama bin Laden and Abdullah Azzam." (Levitt Report 1.)

Whether Care is an "outgrowth" of the Al Kifah Refugee Center is a question of tax law unrelated to Dr. Levitt's knowledge of Middle Eastern terrorism.   Moreover, in the succeeding six pages of his report, detailing his experience, writings, and areas of expertise, there is absolutely no

indication that Dr. Levitt has done any research independent of this case on the relationship between Care International and Al-Kifah, which might serve as a basis for this conclusion, even if it were not a tax question. (Levitt Report 1-7.). "Expertise is a rational process and a rational process implies expressed reasons for judgment." *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 627 (1944) (Frankfurter, J., dissenting). An "opinion has a significance proportioned to the sources that sustain it." *Petrogradsky Mejdunarodny Kommerchesky Bank v. Nat'l City Bank*, 253 N.Y. 23, 35 (1930) (Cardozo, J.). Here, there are no sources to sustain Dr. Levitt's opinion, and no expressed reasons to qualify his conclusion. Against all precedent requiring that an expert's conclusions be derived from his research and independent expertise, Dr. Levitt's opinion as to Care International's relationship with Al Kifah appears, as his summary paragraph itself states, to be based only on "a comprehensive review of the material presented by the US Attorney's office," which is precisely the sort of expert summary of fact evidence that is beyond the proper scope of even a qualified expert's opinion, much less an expert in a different field.

What is worse, Dr. Levitt slips into his conclusion about the relationship between Care International and Al Kifah utterly gratuitous references to the man who is the best known terrorist in the world, Usama bin Laden, though he has no connection to this case. (Levitt Report 1, 7, 16.) References to bin Laden, to terrorist plots, to 9/11, and to the World Trade Center bombing should plainly be prohibited in a tax case, as they have been even when the charges alleged material aid to Al Qaeda.

The problems of the first paragraph of Dr. Levitt's "Summary" are compounded in the twenty pages (7-27) that constitute the "Expert Opinion" section of his report. In this case, the devil is in the details as well.

Dr. Levitt begins by addressing the history of Maktab al Khidmat in the period preceding the founding of Care, history which is utterly irrelevant to the question whether Care had anything to do with Al Kifah, or whether the existence or contents of its newsletter should have been disclosed to the IRS. (Levitt Report 7-8.) Of what possible relevance are the struggles between bin Laden and Azzam in the 1980's, or the "mysterious 1991 death of MAK head Mustapha Shalabi," to the issues in this case? (Levitt Report 7.) Why does it matter what rumors have been spread about bin Laden's role in Azzam's death, particularly where, according to Levitt, it took 13 years for such rumors to be known publicly. (*See* Levitt Report 7, n. 1) (citing to a 2002 book to explain the 1989 killing). And on what basis does Dr. Levitt include the hearsay opinion of another terrorism scholar, Rohan Gunaratna, who is not a witness in this case and not available for cross-examination, that "`prior to its formation, however, al Qaeda existed as Maktab-il Khidmat (MAK-Afghan Service Bureau) for four years'" (Levitt Report 7), particularly given the fact that the conclusion is derived from a book published, according to Dr. Levitt, in 2008; are Mr. Muntasser and his co-defendants being held to know something that the rest of the world will apparently have to wait until next year to learn?

Dr. Levitt goes on to buttress his conclusion as to Al Kifah's relationship to Care by reference to the 9/11 Commission report, which nowhere mentions Care, but simply states that Al Kifah had offices in various cities, and then, worse still under the standards of expert testimony, by reference to a flyer that is one of the Government's exhibits, and the affidavits of government investigators provided to him by the prosecutors in this case. (Levitt Report 8.) He is, in short, doing no more than summarizing the fact testimony and the materials in the government's file, a prohibited exercise in casting an expert's gloss on testimony that is appropriately presented only by fact witnesses.

As if that weren't troubling enough, Dr. Levitt then proceeds to define the "MAK model" as

"a prototype of the typical Islamic NGO, including militant Islamic groups such as Hamas, Hezbollah, and Palestinian Islamic Jihad." (Levitt Report 8.) Such statements should be absolutely prohibited.

First, it is simply wrong, and offensive, to equate the "typical Islamic NGO" with three of the most recognizable and most dangerous foreign terrorist organizations in the world. Such an equation smacks of the sort of racial and cultural stereotyping which courts have prohibited independent of the relevancy, reliability, and expertise constraints of Rule 702. *See,e.g., United States v. Verduzco, 373 F.3d 1022, (9th Cir.), cert. denied, 2004 U.S. LEXIS 7611 (2004) (*excluding expert testimony of cultural stereotyping); *Jinro America Inc. v. Secure Investments, Inc.*, 266 F.3d 993, 1007 (9th Cir. 2001) ("allowing an expert witness in a civil action to generalize that most Korean businesses are corrupt, are not to be trusted and will engage in complicated business transactions to evade Korean currency laws is tantamount to ethnic or cultural stereotyping, inviting the jury to assume the Korean litigant fits the stereotype"); United States v. Ramirez,383 F. Supp. 2d 1179 (D.Neb. 2005) (excluding expert testimony as cultural stereotyping of Mexicans of no probative value which invited even more inflammatory stereotyping on cross-examination).

Second, Hizbollah, Hamas, and Palestinian Islamic Jihad have absolutely nothing to do with this case; their invocation adds nothing of relevance, but can only prejudice the jury's opinion of the defendants, by suggesting that they had something to do with these much-feared organizations, when no such connection has been alleged, or could be proven.

Dr. Levitt's next section, "Dawa in Islam," reports on the Salafi strain of Islam in a discussion that continues the pattern of irrelevancy. Notwithstanding the inflammatory title of this section of the report – "Dawa, Violence and Extremism" - even Dr. Levitt himself ultimately

acknowledges that there is no necessary connection between dawa and violence or between dawa and extremism, and that dawa organizations play an important communal role in Islamic history and culture. (Levitt Report 11.) The fact that dawa can also be connected to jihad, according to a report of the Dutch General Intelligence Service published in 2004, after Care was defunct and having nothing whatsoever to do with Care International, is plainly prejudicial and inflammatory, as well as irrelevant, except as an occasion for Dr. Levitt to once again inveigh, in this tax case, against "radical Islamist organizations," using precisely the inflammatory terms banned in the terrorism cases discussed above. (Levitt Report 11, n. 14.)

So why discuss any of this? Why have a whole section on dawa, when there is no connection between the material in the section and the issues in this case? Page 11 provides the answer. There is not a single reference to Care, to Al Kifah, to any of the defendants in this case, to anything mentioned anywhere in the indictment in this case. But there are, and this is painfully typical of this "expert's report," seven references to Al Qaeda on this one page alone, part of Dr. Levitt's pattern of literally hundreds of references to terrorist organizations which had nothing whatsoever to do with Care, are never mentioned in this indictment and are unrelated to tax status of Care. Yet, by the use of such terms, Dr. Levitt insinuates a connection between these defendants and crimes nowhere charged by the government.

The next section of Dr. Levitt's report is equally inflammatory, and equally irrelevant. In the section improperly entitled: "Al Kifah/Care International: Part of the Global Jihadist Network," Dr. Levitt does little more than to summarize various issues of Al Hussam, which will presumably be introduced into evidence, and which, with very few exceptions, and certainly none that are decisive of any issue in this case, are entirely self-explanatory. (Levitt Report 12-18.) Issues or facts which

the jury can understand are not appropriately the subject of expert opinion, much less appropriately summarized in the form of argument by a government-paid expert. This is precisely what is meant by "usurping" the role of the jury, and using experts to provide overviews instead of expertise. See *United States v. Casas*, *supra*, 356 F.3d at 120; *United States v. Montas*, *supra*, 41 F.3d at 784. And yet that is all Dr. Levitt does here, occasionally embellishing his selective summaries of Care publications by referring to government indictments, complaint affidavits, 2003 and 2006 State Department designations of terrorist organizations, and of course repeated references to Al Qaeda. (Levitt Report 12-18.)

Take, for example, the reference to the U.S. Government's conclusion that "The Libyan Islamic Fighting Group threatens global safety and stability through the use of violence and its ideological alliance with al Qaeda and other brutal terrorist organizations." This is an excerpt from the 2006 designation of the UK based entities financing the Libyan group, which Dr. Levitt *ipse dixit* ties to a reference eleven years earlier in an interview in Al Hussam. (Levitt Report 15, nn. 38-40) Connected? No. Relevant? Hardly. But prejudicial beyond words.

Or take the reference, a few pages earlier, to the excerpt from "Join the Caravan" including telephone numbers for travelers to call in Peshawar to join the jihad effort. (Levitt Report 12.) Those telephone numbers, as Dr. Levitt must surely know, were not operational at the time the translation was originally published, much less years later when it was reprinted by Care. The translator, in a footnote, says as much. What possible value is there in highlighting the inclusion of non-functioning telephone numbers, as if they were of use to anyone Care might have distributed the pamphlet to? Instead of shedding light on "complex and obscure" aspects of the case, the effect of such testimony is to complicate and obscure what should be straightforward issues.

As noted, page 12 of Dr. Levitt's expert report discusses Join the Caravan; page 15 does the same thing again, using it as yet another opportunity to invoke Usama bin Laden as the mentee of its long-deceased author. (Levitt Report 15-16.) What follows are more summaries, of the book, of conversations to be introduced into evidence that afford Levitt the opportunity to make gratuitous connections to bin Laden (Kanj is "a leading Bin Laden operative" according to *a single news article* in the Boston Globe, for instance, and "reportedly trained at a jihadi terrorist training camp," according to that one article, nowhere vouched for by anyone, Levitt included. (Levitt Report 16, n. 45.) "Newspaper articles," Dr. Levitt explains in his testimony in *Damrah*, "are not necessarily the most reliable. So sometimes I'll see something in a newspaper that I hadn't seen before, and then I have to go through a process of checking those facts off of other more knowledgeable sources." (*Damrah* Trial Transcript at 511).

> The Court: I'm sorry, what did you say about newpaper articles being reliable?
> The Witness (Dr. Levitt): I said they are not always the most reliable. At least that's what I intended to say.
> The Court: You are under oath, right?
> The Witness: Yes, sir.

*Damrah* Trial Transcript at 512.

"CARE also maintained relationships with other terrorist-affiliated organizations," Dr. Levitt writes. (Levitt Report 16.) Other terrorist affiliated organizations? Is Dr. Levitt suggesting that, notwithstanding the absence of any terrorism charges, notwithstanding the absence of the word terrorism in this indictment, CARE was itself a "terrorist-affiliated organization," or that its officers should have divined that, a decade after the event, other organizations that it had worked with would be so designated (though Care was not)? This is precisely what he suggests in the next section, which addresses the practice of terrorist organizations operating under aliases. On page 19, Dr.

Levitt refers to an undated Treasury document entitled: "Background Information on Certain FTOs with Aliases Appearing as Potential Fundraising Front Organizations" which, according to its title and Dr. Levitt's own description, "provides several examples of Foreign Terrorist Organizations which operate fundraising front organizations that amount to nothing more than aliases for the FTO itself." (Levitt Report 19.) He then cites five such terrorist groups, the Japanese cult Aleph, the Jewish terrorists groups KACH and Kahane Chai, the Real IRA, and Jamaat ud Dawa - JUD. (Levitt Report 19.) None of these groups have anything to do with this case. Nor do the next five groups he discusses: the al Haramain Islamic Foundation, the Indonesian branch of al Haramain, the Al-Rashid Trust, the Al Akhtar Trust, the IIRO, and the Moro Islamic Liberation Front. (Levitt Report 19-20.) *Ten terrorist groups*, none having anything to do with this case, in a single paragraph!

The point of this roll call of terror is to draw an analogy to the allegations in the indictment in this case that Care was founded because of the media reports in the spring of 1993 linking Al Kifah to the 1993 World Trade Center bombing. As noted above, Judge Stein in *Paracha* refused to allow references to the 1993 WTC bombing, or to any other specific terrorist plot, even in a terrorism case alleging material support and conspiracy to provide material support to Al Qaeda. There is even less basis for the reference here. The analogy is flawed at its core: Al Kifah Boston was not (ever) designated a terrorist organization, much less at the time Care was founded. There is no connection, even in media reports, between the Al Kifah Boston chapter, Mr. Muntasser, CARE or any of the other co-defendants, and the World Trade Center attack. Much less is there any connection established between these defendants and the later 9/11 attacks that Dr. Levitt repeatedly references, literally dozens of times, in his report. The basis for Dr. Levitt's non-analogy is apparently nothing more than a reading of the indictment and a review of the media reports included

as proposed exhibits, making this yet one more occasion where all the expert does is summarize government "evidence," in this case, inadmissible hearsay, in support of a conclusory opinion not based on his own research.

The next section, "CARE International is an Outgrown (sic) of al Kifah Boston," also includes absolutely nothing but summaries of government exhibits.  (Levitt Report 20-21.) Footnotes 71-75 make this clear: they are all simply references to government exhibits, obviously the materials provided to Dr. Levitt and which he proposes to regurgitate for the jury in summary form.  None of these exhibits are beyond the ability of the jury to read and understand: if the copyright holders, addresses and names, and titles on Al Hussam are relevant, the jury is certainly capable of reading them for itself, and drawing whatever inference it may.  Simply summarizing them is not the appropriate testimony of an expert.

Section 5 of Dr. Levitt's report then reiterates the irrelevant and prejudicial aspects of section 4. "Use of Charities as Front Organizations" builds on the tale of other charities, not involved in this case, begun in "Charities Opening Under New Names."  The government has not alleged that CARE operated as a "Front Organization" for "terrorists," even if "charities in general and zakat committees in particular are especially susceptible to abuse by terrorists."  (Levitt Report 21.) There is no basis for concluding that Care is a "textbook example" of crimes never charged against it: offering "a veil of legitimacy for terrorist fundraising" (Levitt Report 21); providing "grassroots support for the terrorist groups in the region," (Levitt Report 22); not to mention that it was an "ideal money laundering mechanism."  (Levitt Report 22).  Other crimes committed by other charities, including Hamas and the Palestinian Islamic Jihad, as well as the Islamic Red Crescent, none of which figure even remotely in this case, have no place in this expert report, or in the expert's testimony before the

jury.  Dr. Levitt's conclusion to this section, that "[t]he mixing of funds across different Hamas wings also shields the group's terrorist activities under a veil of political and humanitarian legitimacy, as discussed in more detail below," (Levitt Report 22-23) illustrates as clearly as his resume that Dr. Levitt's knowledge and expertise relates to charities that are only irrelevant and highly prejudicial when mentioned here; allowing him to provide that knowledge "in more detail" only compounds the problem.

Yet that is precisely what he does.  The next three pages, like so many that came before, include not a single reference to any of the defendants in this case or to Care, or to anything having anything to do with any of them.  (Levitt Report 22-25.)  Instead, in another effort to infer guilt by false association, Dr. Levitt recounts the details of a 2003 speech  by Hezbollah leader Sheikh Hassan Nasrallah on the need to support Palestinian militants, including a long excerpt from that speech which, it is then pointed out, "mirrors the position that of (sic) Hezbollah's benefactor, Iran's Ayatollah Khomeini."  (Levitt Report 23.)  Ayatollah Khomeini!  The much-hated Iranian leader responsible for the seizing of American hostages who were both seized and freed before Care was even formed, when the defendants was literally teenagers.  But Dr. Levitt doesn't even stop there; he doesn't just refer to Khomeini; he actually quotes him, from a Syrian Ministry of Information Publication, as if the defendants in this case have anything to do with him, or he with them.  (Levitt Report 23.)

Dr. Levitt goes on to point out the Sheikh Yousef Qardawi, a prominent Muslim Brotherhood theologian who, "though better known for his religious rulings (fatwa) calling on Muslims to murder American and other civilians in Iraq and justifying Hamas suicide bombings against Israeli civilians," (Levitt Report 24) also supports economic jihad.  So does the London-based Sheikh Omar

Bakri Mohammed, according to a 2004 speech (which post-date's CARE's very existence) and, better yet, so does Saddam Hussein.  Saddam Hussein!  Dr. Levitt quotes one of the few men in the world who, in his time, has been hated as much as Usama bin Laden and Ayatollah Khomeini. (Levitt Report 24.)  If only Adolph Hitler had said something about economic jihad!

"Many radical Islamist terrorist groups have perfected the technique of raising funds by calling on supporters to engage in economic jihad," Dr. Levitt argues, another irrelevant and inflammatory observation which provides the opportunity, for the next three pages, for him to take another expert frolic and detour into the world of Hamas and Palestinian Islamic Jihad.  (Levitt Report 24-26.)  In this case, he provides the details of speeches given by Fawaz Damrah, the defendant in one of Dr. Levitt's previous expert engagements by the government, in paragraphs which are explicitly based on the government exhibits in that case.  (Levitt Report 25-26.)  There is no showing that any of these defendants ever attended any of the meetings where he spoke or heard his message.  Even so, Dr. Levitt uses this as an occasion to detail Damrah's endorsement of various Palestinian terrorists who murdered Jews in Israel, including "Nidal Zalloum, of Islamic Jihad, who grabbed a dagger and stabbed four Jews in the courtyard of the Holy Sanctuary," and "that mujahid, who took the bus and killed more than twenty Jews."  (Levitt Report 25-26.)  He also includes comments made by Damrah and PIJ co-founder Bashir Narif at a conference in Chicago in 1989, about providing weapons to the Occupied Territories.  (Levitt Report 26.)  The fact that this was all years before Care was founded, and that there is no allegation that any of the defendants in *this* case ever attended *that* conference, much less had anything to do with providing weapons to kill Jews, does not stop Dr. Levitt from quoting Damrah's statement at the conference that "the first principle is that terrorism, and terrorism alone, is the path to liberation.... The second principle is that

`settlement is decided by the sword.'" (Levitt Report 26.)

The only reference to CARE in this entire section comes in the concluding paragraphs which, unrelated to what has preceded them except in the sense that they are the answer to the invitation to guilt by association, refer to government exhibits of checks including the word jihad in Arabic written in the memo line by certain donors.  (Levitt Report 26.)  Of course, Dr. Levitt himself does not speak or read or write Arabic; here, and in the last two paragraphs of this section leading to his "Conclusion," he again simply summarizes someone else's translations of government exhibits in this case, adding nothing to them and offering nothing to connect these exhibits to the tome on terrorism that precedes them.  (Levitt Report 27.)

Dr. Levitt's final section, his "Conclusion," convicts Care International of crimes for which it has never been charged.  CARE is "a textbook case study of a radical Islamist organization raising funds for mujahideen, *terrorist groups* and radical individuals;" it is "a prime example of how mujahideen, *terrorist groups* and their supporters use charity as a cover to provide a veneer of legitimacy to otherwise illicit activities"; it is a "prime example of tainted, exposed, designated or indicted charities or organizations reopening under new names and continuing the same support for violent jihad and *terrorism." (*Levitt Report 27-28, *emphasis added*.)

That is Dr. Levitt's conclusion. It is a conclusion, or a series of conclusions, reached without benefit of reasoned analysis.  It is edict, not admissible evidence.  As Judge Easterbrook of the Seventh Circuit has warned, "ukase in the guise of expertise is a plague in contemporary litigtion." *Mid State Fertilizer Co. V. Exchange Nat'l Bank*, 877 F.2d 1333, 1340 (7th Cir. 1989) (citing P. Meier*, Damned Liars and Expert Witnesses*, 81 J.Am. Statistical Ass'n 269 (1986)).

The only appropriate conclusion for the court to reach here is that, given the substance of Dr.

Levitt's report, given the total disconnect between his own research and the activities of CARE, the repeated references to "terrorism," literally the hundreds of references to Al Qaeda, Hamas and Hizbollah, as well as other terrorist groups, terrorist plots, Usama bin Laden and 9/11, none of which should be allowed in this case, or would have been in either *Paracha* and *Damrah*, even though both had closer connections to these issues than this tax case does, Dr. Levitt has very little to offer the jury in terms of useful opinions. Even more important, any single page of his report, if repeated in his testimony, would infect this entire case with fatal prejudice.

Stripped to its essentials, Dr. Levitt makes a (very) few points explaining incidents referred to in Al Hussam with which the jury may be unfamiliar. But the details of those particular incidents are in no way essential to the jury's overall evaluation of Al Hussam. And beyond those few sentences, Dr. Levitt offers nothing more than a parade of terror and terrorists unconnected to anyone in this case, along unnecessary summaries of government exhibits which the jury is perfectly capable of understanding on its own, and which are in any event the appropriate domain of fact witnesses. Given the risks of his proposed testimony, the irrelevance of most of it and the inflammatory nature of virtually all of it, he should not be permitted to testify in this case.

**B. Mr. Evan Kohlmann**

With all due respect to the courts who have allowed his testimony, Evan Kohlmann is not an expert. His claim to expertise is based on his undergraduate minor, one semester as a research assistant to a Muslim professor at Georgetown, his college internship, a self-published book (*See Ahmed Omar Abu Ali Motions Hearing Trans.* 12) (refusing to allow Kohlmann as an expert witness because, among other things, he "probably published [his book] himself") and his maintenance of

an obscure website.[2]   Unlike Dr. Levitt, he does not have an advanced degree in international

relations and he has no training in research methodology; he is simply a 2005 law school graduate

who, according to his CV, has apparently never practiced law or even passed the bar, which hardly

qualifies him to opine on either tax issues or terrorism.  (Kohlmann Report 1-2.)

Unlike Dr. Levitt, Kohlmann has never taught a course, graduate or undergraduate, in this

field; indeed, he apparently has never taken a graduate course.  (Kohlmann 1-2.)  While the CV

provided with his designation revealed no consistent employment other than his work as a

government expert, Mr. Kohlmann's report now claims that he "currently work[s]" as an investigator

with the Nine Eleven Finding Answers Foundation and as an on-air analyst with NBC News.

(Kohlmann 1.)  (Evan Kohlmann: Global Terror Alert, http://www.globalterroralert.com/about.htm

(last visited Oct. 14, 2007)).  In an earlier version, he described himself as the "Doogie Howser" of

the terrorism world, a fitting reference not only to his youth, but to the ephemeral nature of his

credentials.[3]  At best, Mr. Kohlmann is a "self-styled" expert whose expertise has not been

recognized within his own field, but only by those who admittedly are well outside of it.  He has

never written a peer-reviewed article or book; what he has done is to testify at seven trials in the last

---

[2] Alexa.com ranks websites in terms of the traffic to them.  Mr. Kohlmann's website in recent months
has ranked between 500,000-750,000 among internet websites, see
http://www.alexa.com/data/details/traffic_details?url=Globalterroralert.com.  The percent of internet users
who have visited this site in the last three months is .000165%.  By contrast, Jihad Watch is ranked at
48,8523; expert Daniel Pipes is ranked at 71,412, and Agentbedhead.com is at 239,997.  Advertising revenue
is based on these rankings; our research has found that websites that are twice as popular as Kohlmann's
generate as little as $5-$10 a month from their google ads, which are the only ads found on
Globalterroralert.com.

[3]Doogie Howser was a fictional character in a television show, a teenage doctor.  Although
Kohlmann no doubt intended his reference to highlight his precocious prowess, more accurately it reflects
the fictional nature of his credentials.

three years, which we would suggest a *Daubert* hearing would reveal as his primary source of income.  Being an expert at being an expert is precisely what Justice Scalia seemed to have in mind in emphasizing in his concurring opinion in *Kumho Tire* the district courts' obligation to exercise discretion to exclude "expertise that is *fausse*."

Part I of Mr. Kohlmann's report addresses "Usama bin Laden and the Rise of Al-Qaida in Afghanistan."  It is important to point out, again, that neither bin Laden nor Al-Qaeda are mentioned anywhere in the indictment in this case; there is no claim that Mr. Muntasser or any of his codefendants ever met bin Laden or ever joined Al Qaeda; the only reference we have found to bin Laden in any of the government's files (other than the CNN interview of bin Laden, which has no place in this case), is a derogatory one.[4]

Nonetheless, Mr. Kohlmann elaborates at length on these irrelevant and inflammatory matters, quoting extensively from Abdullah Azzam's last press conference in the late 1980's (before CARE was founded) in which he praised bin Laden.  (Kohlmann Report 3.)  Going far beyond what he was allowed to testify to in *Paracha*, a case directly charging support for Al Qaeda, Mr. Kohlmann proceeds to list every single terrorist attack with which Al Qaeda has been associated since 1988, including the 1991 failed bombing of US troops in Yemen, the 1993 WTC bombing, the 1994 Air France hijacking, plots in the Phillipines, bombings in East Africa in 1998, the failed Millenium bomb plots in Jordan and Los Angeles, and of course the 9/11 suicide hijackings of four commercial jets.  (Kohlmann Report 4.)  None of these Al Qaeda plots have anything remotely to do with the defendants in this case, or vice versa; reference to them can only unfairly and

---

[4]See infra (reference to "fundamental differences with Bin Laden" in the notes of the 1995 Chicago meeting, discussed below).

irredeemably prejudice the defendants by association in the eyes of the jury; and no mention of them should be allowed.

But Mr. Kohlmann does not stop there. He does not even hesitate.    On pp. 5-25, Mr. Kohlmann shows off his knowledge of a trio of other terrorist groups in other parts of the world which are equally irrelevant and prejudicial, but give him an opportunity to detail additional actual and planned attacks which would terrrify anyone even though they have absolutely nothing to do with this case. (Kohlmann Report 5-25.)

First, there is Al-Gamaat al-Islamiyya (AGAI) in Egypt, a terrorist group with, as Mr. Kohlmann acknowledges, varying goals, from replacing Hosni Mubarak as Egypt's leader to destroying Israel and attacking the United States. (Kohlmann Report 5-9.) One splinter group, Mr. Kohlmann tells us, was responsible for gunning down 58 European tourists in Luxor, an act of violence which has as little relevance to this case as the speech of the blind Sheikh at a public school in Brooklyn "only weeks prior to the World Trade Center bombing" in 1993. (Kohlmann Report 6-7.) Judge Stein would never have allowed this kind of testimony in the terrorism case he tried, and knowing this, Mr. Kohlmann's inclusion of it here is an insult to the parties and the court. But it gets worse: Mr. Kohlmann  goes on, in this same section, to detail Al Qaeda's response to the Blind Sheikh's arrest for the WTC plot, including the summary of testimony presented in the 2001 trial of Usama bin Laden by Al Qaeda turncoat Jamal al-Fadl who, unlike any of the defendants in this case, attended leadership meeting in Sudan in the 1990's with Bin Laden and his aides. (Kohlmann Report 8.)  He also includes an account by an Algerian Al-Qaeda operative of a fatwa issued by the Blind Sheikh from prison, as well as the circumstances surrounding its being sneaked out by a defense lawyer and paralegals, and then quotes from its text at length. (Kohlmann Report 8-9.)  The

misdeeds of a defense lawyer who has nothing to do with this case in her representation of a

defendant having nothing to do with this case have no rightful place in this case.

Next, there is the Armed Islamic Group of Algeria (GIA), which Mr. Kohlmann tells us was

founded in 1982 by a pioneering Islamic militant named Mustafa Bouyai, who was captured and

executed in 1987. (Kohlmann Report 9-19.) According to Mr. Kohlmann, Bouyali was little known

to the media (and presumably therefore to the then-teenage defendants) but he gets a half page to

himself in the report, and since the report is a summary, presumably would get even more attention

in Mr. Kohlmann's testimony. (Kohlmann Report 9.)   Worse yet, Mr. Kohlmann spends the next

four pages on the goings-on in Algeria until "the landmark October 1992 militant conference" which

led Ahmad Al-Wud to agree to merge the forces of Mansour Meliani with Abdelhaqq Layda's

Unified Alliance, and marked the official beginning of GIA, well before, one might add, the official

beginning of CARE. (Kohlmann Report 9-12.) We learn, too, of a series of GIA leaders whose

reigns "tended to be brief and end in violence." (Kohlmann Report 12-13.) What possible point

could there be in telling these tales to a jury in a tax case in Massachusetts except to prove to them

that birds of a feather flock together?

The struggles between the GIA and other Algerian Islamist activists occupy Mr. Kohlmann

next, struggles which seem in some way connected to the deaths of over 200 teachers, and more than

100 competing clerics; to attacks on foreigners in 1994, which left 90 civilians dead and lead most

Europeans to leave Algeria; the failed hijacking of an Air France flight in December 1994, which

is described in detail for two full pages; the war of attrition between GIA and the Algerian military;

the capture and beheading of seven French monks near Medea in 1996, after another GIA leader had

guaranteed their safety; the 1996 assassination of Djamel Zitouni, the "notorious" GIA leader whose

tactics were "crude and divisive," by his "fellow jihadists"; the ascension of Antar Zourabi, a junior member of GIA to a leadership position and his "erratic and unsettling grip over the GIA" which lead to a split in its ranks; a wave of "shameful massacres in isolated villages and rural areas, killing hundreds of innocent civilians – including a `great many' women and children; the "shocking new fatwa" distributed by Zouabri in the summer of 1997, that condemned the entire Muslim population of Algeria, took responsibility for killing, slaughtering, massacring, burning and even raping women of their opponents, and included obscenities and vulgarities; the reaction to the fatwa, viewed as a stab in the back from the GIA to the Muslim world and the mujahideen in Algeria; and the subsequent efforts of other North African mujahideen organizations to distance themselves from the GIA. (Kohlmann Report 13-19.) All told, Mr. Kohlmann spends 10 pages – or 20% of his report – on a horrific Algerian terrorist group that has nothing whatsoever to do with this case. (Kohlmann Report 9-19.) What's worse, much of the section appears to be a summary of someone else's work: in the course of the 10 pages, he cites Abu Hamza Al-Masri's Khawwaarij and Jihad (Birmingham UK 2000) a total of 25 times (Kohlmann Report 9-19) hardly a reflection of the sort of social science methodology involving review of numerous sources, personal interviews, and careful vetting which would demonstrate true expert analysis.

Third, there is the Libyan Islamic Fighting Group (LIFG), which Mr. Kohlmann tells us, according to testimony in federal court in 2001, played an early role for Al Qaeda by serving as its designated regional franchise organization. (Kohlmann Report 19-20.) LIFG recruits were indoctrinated in Afghanistan by influential "Jihadist clerics" such as Abdullah Azzam, who of course died in 1989. (Kohlmann Report 21, 27.) LIFG "also found kinship" among other North African groups, and has been a vocal ally of the blind Sheikh. (Kohlmann Report 21-22.) Mr. Kohlmann

quotes a statement issued in 1997 on behalf of the Egyptian sheikh arrested in 1993, and then returns to an even earlier period to describe LIFG's efforts to strengthen its ties with Osama Bin Laden. According to Kohlmann, back in 1992, LIFG leader Saif al-Liby and computer specialist Abu Anas al-Liby enrolled in an elite course taught by a bin Laden operative, which trained them in surveillance; Abu Anas al-Liby continued his close relationship with Al Qaeda while in exile in Khartoum, and was one of several Al Qaeda operatives who traveled to Kenya in 1993 to case local targets for possible terrorist attacks, including the U.S. AID office and the U.S. embassy. (Kohlmann Report 22-23.) Abu Anas distances himself from Al Qaeda after LIFG operatives were kicked out of Sudan in 1995, but Mr. Kohlmann tells us that a May 2000 search of his residence in England found documents and training manuals linking him to that organization. Abu Anas was named as a Specially Designated Global Terrorist in October 2001. (Kohlmann Report 23.) In this narrative, Mr. Kohlmann cites to trial testimony in the federal court case of United States v. Usama Bin Laden eleven times, once again suggesting that this interesting but utterly irrelevant summary of terrorist activities having nothing to do with this case is just that, a summary and not a work of scholarship. (Kohlmann Report 20-23.) In this account, pages and pages go by without so much as a veiled reference to the case which he is supposed to be helping the jury to understand. (Kohlmann Report 3-37.)

Part II of Mr. Kohlmann's report tells the story of Gulbuddin Hekmatyar and the Hezb-i-Islami. (Kohlmann Report 24-29.) While the government may try to rely on handwritten notes by an unknown individual or individuals supposedly summarizing a meeting in Chicago in which Hekmatyar may have been referenced (notes which should be excluded because of the anonymity of their author, see accompanying Motion in Limine: Documentary Evidence, Non-Expert testimony

and Wiretaps), Mr. Kohlmann's summary has nothing to do with those notes or that meeting. Instead, he tells the unrelated story of Hekmatyar's travels in the 1970's (when Mr. Muntasser was a child, and Mr. Kohlmann had not yet been born), and summarizes his former website as it bears on his political philosophy. (Kohlmann Report 24.)  The website, according to Mr. Kohlmann, "suggests a social code that can only be described (retrospectively) as Taliban-like;" according to Mr. Kohlmann, Hekmatyar exhorted young Muslims to rise up in a jihad around the world. (Kohlmann Report 25.) Retrospective descriptions of websites which there is no evidence that these defendants ever viewed hardly qualifies under any test for the admission of expert testimony.

Hekmatyar is held responsible, in Mr. Kohlmann's account, for the activities of one of the instructors at his camp in Afghanistan, who was later indicted by the United States, and of one of the recruits, a junior Al Qaeda operative who helped build the suicide bombs used in the 1998 East Africa embassy bombings.  That a recruit who trained at a camp established by Hekmatyar went on to do terrible things can hardly be deemed relevant to the issues in this case, which deal with the relationship, if any, between the defendants and Hekmatyar years earlier.  So what place does it have in this summary?  We then learn that while many of Hekmatyar's former allies joined up with the Taliban, Hekmatyar himself was forced into exile in Iran by the Taliban; but according to MR. Kohlmann, his ambitions "has been given a new breath of life" by September 11, evidenced by the fact that United States forces in 2002 fired a missile at him, and missed.  (Kohlmann Report 29-30.) In this section, Mr. Kohlmann repeatedly relies on government documents and exhibits from other cases, which either should be introduced as exhibits, if relevant here, or if not, excluded from serving as the basis of an "expert" overview.

Even more notably, what Mr. Kohlmann leaves out, but any honest scholar would surely

know and include, is the long history (going into the 1990s) of U.S. financed support and provision

of weapons to the Afghans in their war both against the Russian invaders and the Russian puppet

government that remained after the Russian withdrawal, and the massive humanitarian crisis that left

millions of Afghani refugees displaced within their own country and abroad.  Does he not know that

Hekmatyar and other mujahideen leaders were called "freedom fighters" by President Reagan, and

met regularly with U.S. officials as recently as the Clinton years?  Instead of educating the jury as

to the realities of American cooperation with Hekmatyar, Kohlmann chooses to focus – inaccurately

according to his own sources– on what he deems the "close connection" between Hekmatyar and

Osama bin Laden.[5]  Again, the reference to Osama bin Laden is irrelevant and highly prejudicial, and

according to Mr. Kohlmann's own sources, entirely unsupported.

     Nowhere in this summary does Mr. Kohlmann address the relationship, if any, between Care

International and Hekmatyar; he doesn't give it context, explain its significance, place it

appropriately in the time period.  His narrative provides the jury with nothing of substance that might

aid its resolution of the issues in *this* case.  Instead, Mr. Kohlmann once again focuses on irrelevant

events, personalities, perceived relationships, real or not, and of course terrorists and terrorism plots

---

[5]His own sources show that he overstates, if not mistakes, this alleged connection.  Mr. Kohlmann cites an Arabic language documentary film about Al Qaeda to demonstrate the supposedly "close connection" between the two men.  On its face, it seems to prove just the opposite.  Asked about his relationship with Bin Laden, Hekmatyar said: "Usama Bin Laden came to Afghanistan when many states used to encourage their youths to go to Afghanistan to take part in the battles there....A number of Muslims used to come from the United States too.  They participated in the battles during the Russian invasion of Afghanistan.  Usama Bin Laden also came at the same time... He stayed in Afghanistan." (Kohlmann Report 27.)  If knowing when someone came or stayed is the definition of a "close connection," then it would be equally fair to argue that Mr. Kohlmann himself had a close relationship with Bin Laden and Hekmatyar.  If this is the best quote Mr. Kohlmann could find to illustrate that relationship, there is clearly something amiss in that relationship.  But not so amiss to prevent Mr. Kohlmann from including a picture of Hekmatyar sitting next to Enaam Arnaout, who is described as a senior Al Qaeda operative, in the text of his report.  Presumably, there is no picture of Hekmatyar and bin Laden together, notwithstanding their supposed "close connection," or Mr. Kohlmann would have included it, rather than rely on the surrogate association.

that have absolutely nothing to do with this case, and are plainly inflammatory and prejudicial.

Parts III of Mr. Kohlmann's report (30-35) and IV (35- 37) deal with the expeditions of what Mr. Kohlmann's own account makes clear was a small number of Arab-Afghans who traveled to Bosnia or Chechnya in a doomed effort to continue the jihad begun in Afghanistan.  (Kohlmann Report 30-37.) After the Soviet withdrawal, Mr. Kohlmann tells us, nine Arab-Afghans, led by the notorious "Barbaros," went to Bosnia to assess the situation there..  (In Mr. Kohlmann's world view, a trip by nine Arab-Afghans, none of whom are connected to this case, takes precedence over any description of the millions of refugees, widows and orphans, the drastic shortages of medical supplies, and the horrendous humanitarian crisis which the nine left behind.)  Two years later, a memorandum from the Bosnian government reports that Barbaros' stay in Bosnia may be related to the transfer of some 1000 fighters from African-Asian countries into the units of the Bosnian army. (Kohlmann Report 31.)  Never missing an occasion for a gratuitous reference to an irrelevant act of terrorism, Mr. Kohlmann also recounts the Egyptian involvement in Bosnia, in the form of a speech given by the Blind Sheikh on January 16,1993 "only weeks to the World Trade Center bombing in New York."  (Kohlmann Report 32.)  Libyans and Algerians, we are told, also played key roles in Bosnia (even if the defendants in this case did not),  including the Libyan doctor from Austria who brought medical skills and a sharp mind to the task, and the anonymous Algerian Arab-Afghan who is quoted as saying "I hate the French."  (Kohlmann Report 33.)  None of this has any relevance to this case, nor does Mr. Kohlmann himself make any connection between the defendants and the individuals and acts he describes.

Mr. Kohlmann also addresses several Arab-language propaganda videos that featured the stories of Mujahideen in Bosnia.  He opines: "From my research, I recognize the primary purpose

of this video as twofold: to solicit financial contributions from wealthy foreign donors and to inspire

a wide audience of human volunteers to travel to Bosnia-Herzegovina...." (Kohlmann Report 34.)

But despite the reference to "my research," Mr. Kohlmann *cites absolutely no research* to support

his conclusions, suggesting that they are either self-evident (in which case his expertise is not

needed) or unsupported.  As with Afghanistan, Mr. Kohlmann fails to refer to the humanitarian

disaster in Bosnia, nor does he discuss the acts of genocide against Bosnian Muslims and "ethnic

cleansing" in Muslim areas.  Moreover, as he himself acknowledges, a "wide audience" of human

volunteers did *not* travel to the Balkans, and the assistance of those who did was largely rejected by

the Bosnian Army and by Bosnian Muslims, who found their actions "embarrassing."  (Kohlmann

Report 34)  His report, in sum, is neither scholarly nor relevant.

  As for Chechnya, Mr. Kohlmann focuses on ibn-ul-Khattab, who "became famous" when

he fought in Jaji, Afghanistan "alongside many of the most famous mujahideen leaders, including

Usama bin Laden, Sheikh Abdullah Azzam, Abu Zubair al-Madani, and Sheikh Tameem Adani,"

under the command of Abu Abdur-Rahman As-Sarehi, his "personal teacher and trainer."

(Kohlmann Report 35.)  A jury, hearing this list of names, might think the battles in Jaji and the men

who fought there had something to do with this case, but of course, they would be wrong.  Khattab

went on to become "particularly recognizable" in his role as senior commander of mujahideen

forces" in Chechnya.  (Kohlmann Report 35-36.)  According to Mr. Kohlmann, Khattab and eight

other "senior Arab mujahideen commanders,"[6] (making again, as in Bosnia, for a tale of nine men,

none of whom have anything to do with CARE or the Massachusetts-based defendants) teamed up

---

  [6]Given that Mr. Kohlmann describes himself as a "senior investigator" as of his freshman year in college, it is not at all clear what these repeated references to "senior" mean; virtually everyone in his narratives appears to be "senior."

with "notorious warlord Shamil Basayev" who "had an even more notorious reputation," presumably

than Khattab himself.  (Kohlmann Report 36.)  We learn of the background of this notorious

Chechan in the 1980's, and his 2005 involvement in "the bloody Beslan school seige and subsequent

massacre in Ingushetia, a Caucasus region adjacent to Chechnya" which ended in the deaths of 330

innocent people, "many of them young children," details that are doubly unacceptable given that they

deal with the activities of an irrelevant terrorist before and after CARE even existed.  (Kohlmann

Report 36-37.)  We also learn that several of the 9/11 hijackers including the mastermind of the plot

tried –*but were unable*- to join Khattab in Chechnya, and so went to Afghanistan where they were

drawn into Al Qaeda, as if this somehow connects them to this case.  (Kohlmann Report 37.)

Khattab, by the way, has been now dead for five years, having been "finally poisoned and killed" by

assassins recruited by the Russians from his own organization.  (Kohlmann Report 37.)  The entire

tale is utterly irrelevant from start to finish, and totally inflammatory and prejudicial.

It is not until Part V of his report, beginning on page 37, that Mr. Kohlmann even gets to the

charity at issue in this case, and when he does, he has very little "expertise" to add to the government

exhibits.    According to his first paragraph, Care did "much more" than merely provide charity aid

to war victims and refugess; "in fact, long prior to its official founding in 1993, the organization

acted as the local branch office of the Al-Kifah Refugee Center (a.k.a Makhtab-e-Khidamat) in

Boston."  (Kohlmann Report 37.)  How Care could act as anything before it even existed is

something Mr. Kohlmann does not explain; nor does he bother to point out that Al Kifah had a local

branch at the time.  Exactly what it did prior to 1993 is something he never tells us, even though it

is well established that conclusory opinions without facts or expertise to support them are

inadmissible.  More "ukase," *Mid State Fertilizer Co.,supra,*  877 F.2d at 1340 (Easterbrook, J.)

Instead of offering the jury assistance in resolving the issues in this case, Mr. Kohlmann returns to

the past, to government scrutiny of Al Kifah in the period before CARE existed, to the 1993 World

Trade Center bombing and a "subsequent interlinked cell plotting to attack a series of major

landmarks in the New York metropolitan area" (which is precisely what he was prohibited from

addressing in *Paracha*, even though, unlike this case, it was a New York-based terrorism case

dealing specifically with material support for Al Qaeda).  (Kohlmann Report 37-38.) He also

describes a call from the Blind Sheikh taped by the FBI, in which he was told that all of the camps

in Pakistan were closed, and his own 2002 interview in London (there is no sign that Mr. Kohlmann

ever went to Pakistan, Afghanistan, Bosnia, or Chechnya, and why his trip to London bears on this

case is a mystery) with an Al Qaeda spokesman about the mujahideen stranded in Afghanistan.

(Kohlmann Report 37-38.)  That seems to be the end of Mr. Kohlmann's independent knowledge.

Beginning on page 38, Mr. Kohlmann does no more than summarize government exhibits

provided to him by the United States Attorney's office, adding little if anything to the documents,

but choosing to quote and display them independent of their introduction into evidence as part of an

apparent "overview," in plain violation of the rules, which Mr. Kohlmann must know after seven

trials, of expert testimony.  (Kohlmann Report 1-2, 38.)  He summarizes the handwritten notes

relating to the 1995 meeting discussed above (although he cannot and does not say whose notes they

were, various flyers and fundraising appeal letters, found by his former mentor, Steven Emerson, at

the Brooklyn office of Al Kifah and turned over to the government, and opines that these letter

"directly implicate" Care International officials from Boston, a conclusion which is the jury's and

not his to reach.  (Kohlmann Report 38-39.)  He does no more than describe and summarize a few

issues of Al Hussam, which the jury is perfectly capable of reading itself, including an essay by an

unknown author titled "The Story of a Mujahid." (Kohlmann Report 39-40.)  He says that he is "also aware," presumably because he was told by the government, of the death of Bassam Kanj, and then summarizes the wiretap conversation he was provided by the government on that subject, at length. (Kohlmann Report 40-41.)

Two paragraphs on "Support for the Foreign Mujahideen in Bosnia-Herzegovina" are presumably supposed to justify the many pages of irrelevant and inflammatory details provided earlier.  But Mr. Kohlmann makes no effort to connect the one issue of Al Hussam that he quotes, *which calls for doctors – not fighters – to volunteer,* and the "numerous evidentiary documents provided to me by the United States Attorney's Office in Boston" detailing financial transfers from Care to Bosnia, to the military activities which are the sole focus of his earlier and much more extended descriptions**.**  (Kohlmann Report 42.)   Nor do these items of evidence support his conclusion that Care "was attempting to enlist human volunteers for illicit purposes."  The only independent document he cites, and his only feint at drawing such a connection, is a 1993 letter from an al-Kifah official in Zagreb to the Brooklyn office "begging" for the purchase of an ambulance, along with a newspaper article, also from 1993, in which the Zagreb official says he received his orders from the Al-Kifah representatives in United States, presumably from Brooklyn, which is where he addressed his request. (Kohlmann Report 41-42.) This correspondence was not addressed to, not did it concern Care, and is therefore irrelevant and inadmissible, as is any reference to it by Mr. Kohlmann. Mr. Kohlmann goes on to cite a Bosnian Muslim military intelligence report dated November 28, 1995 for the proposition that said intelligence mistakenly believed that the top American al-Kifah contact for the mujahideen – Abdul Wali Zindani – was located  in Boston, not Brooklyn**.**   (Kohlmann Report 41.)  Mr. Kohlmann speculates that this error – by an unknown

individual – occurred because "so much activity was taking place specifically at the Care/Al-Kifah office in Boston in supporting jihad in Bosnia-Herzegovina." (Kohlmann Report 41.) Such speculation is not admissible as expert testimony.

In the case of Hekmatyar, Kohlmann summarizes two issues of Al Hussam, and once again summarizes the meeting notes from 1995, as if that is enough to justify the life story, tales of terrorism, accounts of his instructors and trainees, that came earlier. (Kohlmann Report 42-44.) With only one exception, a document from 1991, before CARE even existed, every single citation in this section is a reference to a government exhibit; as for providing context, or expertise, Mr. Kohlmann neglects to mention that the discussions which were the focus of the meeting he summarizes amounted to nothing; and that there is no evidence that the letter to Hekmatyar that he quotes at length was ever sent. But that doesn't stop him from concluding that meeting proposal would have placed Hekmatyar in "a remarkably similar role to that of Taliban leader Mullah Mohammed Omar on behalf of Usama Bin Laden in present day Afghanistan," and from using "the fundamental disagreement with Bin Laden," referred to in the notes (the only mention of Bin Laden anywhere in any document actually related to this case) as an opportunity to rehearse once again the terrorist's history with Azzam. (Kohlmann Report 44.)

The next subsection, "Support for the Armed Islamic Group (GIA), the group to which Mr. Kohlmann devotes 10 pages full of grisly details earlier in his report, relies entirely on two articles in Al Hussam, one in 1994 expressing relief at the prospect of Muslims unifying their efforts in Algeria, and the other, a GIA communique reprinted from its own magazine, accusing America of trying to influence Algeria "in a smart and contorted way to pressure and affect Jihad." (Kohlmann Report 44-54.) The fact that this seems to be all there is about GIA that connects it to CARE might

be taken by some as evidence of the absence of any connection sufficient to justify the details included earlier, but for Mr. Kohlmann, it is instead proof of the opposite. He concludes this brief section by stating: "I have never seen, nor have I been provided, with any evidentiary documents or copies of Al Hussam that would indicate that Care International ever renounced its tacit endorsement of the GIA, even after the latter group accepted responsibility for kidnapping, torturing, and killing innocent Muslims." (Kohlmann Report 45.) In Mr. Kohlmann's world, two articles in a decade constitute "tacit endorsement," and the absence of any other reference amounts to a connection justifying all the horrific details of acts that Care had no part in. One need not be a scholar to recognize that this is not scholarship, or science of any sort, social or otherwise.

The next two subsections, on the LIFG and Chechnya, follow precisely the same pattern. Having detailed the exploits of various Libyan terrorists at length earlier, in a context having absolutely nothing to do with CARE, Mr. Kohlmann now attempts to justify his discourse by reference to exactly *one* issue of Al Hussam, which includes an interview *not* with any of the terrorists whose exploits were detailed earlier, but with the spiritual leader Shaykh Abul-Mundhir As-Saidi. (Kohlmann Report 45-46.) In Mr. Kohlmann's summary, we are told absolutely nothing about the Shaykh's activities in connection with Libya, the subject of the earlier section, but only of the fact that he returned to Afghanistan in 1998 where he was honored by the Taliban for his educational and charitable efforts. And, of course, there is the excerpt from Al Hussam, which is supposed to justify all that came earlier. "When asked during his 1995 interview `what are your words to the publisher and respected readers of Al Hussam' he replied, `I say to the Al-Hussam team: May Allah reward you well for providing this great opportunity. I pray to Allah for your success, and ability to exert even more effort in propogation through the media, for the service of this

religion, for establishing the truth and dispelling falsehood." (Kohlmann Report 45-46.) This prayer is apparently supposed to justify page after page of details about terrorist acts by persons never even alluded to here. (Kohlmann Report 46.) It does not.

So, too, with Chechnya. CARE is not alleged to have had any role in the violence and terrorism documented in such detail by Mr. Kohlmann. Rather, it is condemned, and the exegisis apparently justified, by the fact that Al Hussam "was one of the first publications" to print firsthand reports of mujahideen fighting the Russian military, and also "one of the fist sources to authoritatively document the presence and `martyrdom' of Arab mujahideen fighters during battle in Chechnya." (Kohlmann Report 46.) Again, exactly *one issue* of Al Hussam is referenced (indeed, there is only one footnote, to it, in this section). By use of selective quotations Mr. Kohlmann mischaracterizes the content and tone of this news article about the Chechen takeover of the Russian town of Budyonnovsk.

The final sections of Mr. Kohlmann's report are little more than summaries of various government documents and exhibits on the subject of the Global Relief Foundation, the American Islamic Group, and Azzam's "Join the Caravan." (Kohlmann Report 47-53.) All three are covered summarily in six and a half pages, and virtually all of the citations are to Government Exhibits in this case (cited fifteen times in five and a half pages) and the Treasury Department documents relating to the designation of Global Relief as a terrorist organization and the freezing of its assets (cited seven times on a single page), which is the subject of pending federal court litigation (a fact which Mr. Kohlmann either doesn't know or neglects to mention). (Kohlmann Report 47.) No "overview," which is all that Mr. Kohlmann provides here, is either required or appropriate.

Mr. Kohlmann offers no conclusions; he need not. His report is full of precisely the sort of

conclusory arguments, irrelevant material, and highly prejudicial and inflammatory language that every federal court, including the Supreme Court, has held have no place in expert testimony. Mr. Kohlmann's decision to flaunt those limits so brazenly in his report in this case suggests a level of disrespect for the court and the rule of law which alone should disqualify him from testifying here.

     C. Dr. Edward J. Valla

There is almost nothing to say about Dr. Edward J. Valla, because the defense literally knows nothing about him. Based on the government's designation, he appears to be a third expert on the same subjects proposed to be covered by Dr. Levitt and Mr. Kohlmann, with the important exception that his credentials and qualifications have never been subject to the review of any court anywhere in a Daubert hearing, making it essential that this court conduct such a hearing before his testimony is allowed. We have no report from Dr. Valla to review. His CV is, to say the least, conclusory: it includes three items, all summarized briefly. The resume places him in the United States Army Reserve for 20 years, serving mainly in military intelligence units. During this same time, he worked for the FBI for six and a half years. For five years before working for the FBI, and on two occasions since, in 1999 and 2007, he has been an adjunct faculty member at Bridgewater State College. He includes no books, book chapters, articles for scholarly or popular journals on his resume, nor does he disclose how he has actually earned a living for all but the seven years he was working for the FBI.

A google search of Edward J. Valla returns not a single report. A Lexis-Nexis search of all federal and state cases and pleadings, which might disclose his work anywhere as an expert witness about anything, returns no records on Edward J. Valla. A Nexis search of "all news" reveals exactly two references to Edward J. Valla: a brief letter to he editor of the Christian Science Monitor in 2000 on the topic of civic engagement; and a 487 word book review on Terrorism in America: A

Commonsense Strategy for a Democratic Society. By Philip B. Heymann, Cambridge, MIT Press, 1998 (179 pps.), written for the May 1999/June 1999 issue of Counterterrorism & Security Reports. A search of the Bridgewater State College website for a faculty/staff member by the name of Edward Valla returns the following: "No records were found." His PhD thesis from 1997, listed on the University of Connecticut website, is entitled: "The Catholic Church and the re-emergence of civil society in Czechoslovakia: 1985-1990." It appears to have absolutely nothing to do with his claimed expertise in terrorism, or with the facts of this case.

## 4. Conclusion and Prayer for Relief

"The importance of safeguarding the integrity of the [judicial] process requires the trial judge, when he believes that an expert's testimony has fallen below professional standards, to say so, as many judges have done." *Deltak, Inc. v. Advanced Systems, Inc.*, 574 F. Supp. 400, 406 (N.D. Ill. 1983), *vacated on other grounds*, 767 F.2d 357 (7th Cir. 1985). *See also* Learned Hand, *Historical and Practical Considerations Regarding Expert Testimony*, 15 Harv.L.Rev. 40 (1901). Here, there is no question, as the detailed analysis above makes manifest, that the expert testimony proposed in this case falls below such "professional standards" and fails to meet the tests of reliability and fit, and of probative value over prejudice, which district courts have been repeatedly admonished must be enforced with special stringency in the case of expert, opinion testimony.

Defendants repectfully request a hearing on this motion in limine, and an opportunity to question the proposed experts on their qualifications and proposed testimony, as outlined by *Daubert*.

We respectfully suggest that even in the absence of such questioning, it is clear that the testimony of Dr. Levitt, Mr. Kohlmann and Dr. Valla should be excluded from this case, because their expertise, if any, is irrelevant to the tax and false statement issues which are the only appropriate

issues in this case. The government should be prohibited in no uncertain terms from using expert testimony to rewrite the charges of the indictment and effectively seek to convict the defendants for acts of terrorism, or association with terrorist organizations, when no such charges have been returned by the grand jury.

If one or more of these witnesses is allowed to testify, the defendants respectfully request that the Court, as in *Paracha* and *Damrah*, establish clear limits governing the introduction of evidence and testimony through expert witnesses in this case, so as to avoid the certainty that absent such limits, defendants will be tried and convicted on the basis of evidence of terrorism, terrorist plots, inflammatory language, etc., all of which have no lawful or legitimate connection to the defendants, to the crimes charged, or to the legitimate issues in this case. At a very minimum, this Court, like the courts in *Paracha* and *Damrah*, should:

- prohibit the experts from reciting or summarizing government evidence or drawing conclusions based solely on materials provided by the government in this case, or from otherwise testifying to facts, whether regarding these defendants or regarding other persons or events not part of this case.

- prohibit the experts from opining regarding "outgrowth", "successor" or any other tax matter as to which they have no expertise.

- prohibit the experts from testifying to "common practices" by Islamic charities that funnel money to terrorist activity or otherwise financially support religiously-based fighting.

- specifically prohibit the experts from making any reference to Usama bin Laden, Al Qaeda, the WTC bombing, the 9/11 attacks, or any other act of terrorism, plot to commit terrorism or putative terrorist, or to tapes and publications related to terrorism and acts of terrorism that

are irrelevant to the tax and false statement issues in this case.

• prohibit the experts from using inflammatory, prejudicial, and irrelevant references to "Islamists," "jihadists," "terrorists," "economic jihad" except when they are direct quotes from admissible evidence in this case.

• prohibit the expert witnesses from testifying regarding the designation as a terrorist organization of any organization to which Care gave money before such desgnation, or designation at any time of any organization to as to which the government has no evidence that Care ever gave money.

• limit all government witnesses, including the experts, from providing detailed testimony regarding groups reported on in *Al Hussam* beyond identifying any such group as engaged in religiously-based fighting.

These specific prayers are all in aid of the defendants' general prayer, that the court take all necessary steps to preclude the government from trying a case it did not charge, to wit, a terrorism case in the guise of a tax and false statement prosecution.

This should be, and could be, a straightforward and streamlined trial, if it is limited to the charges included in the indictment. The list of witnesses provided by the government, other than the expert witnesses, suggests a rather typical offer of proof as to the tax violations and false statements alleged here. The expert witnesses addressed in this motion, however, if allowed to testify as they and the government have proposed, would turn this tax case into a showcase for terrorism plots, personalities, and permutations which would fundamentally, and with fatal prejudice, alter the nature of this case.

The government should not be allowed to use expert witnesses to rewrite its indictment,

convict by association, and brand as terrorists individual defendants who have been charged with

nothing more than tax and false statement violations.  To do so strikes at the heart of the fairness and

fair notice that the Constitution mandates.  The use of expert witnesses to literally "hijack" a trial goes

beyond any of the precedent cited here, and would fundamentally violate the basic principles of due

process which govern all criminal proceedings.  It is the job and the responsibility of this court, in the

vigorous exercise of its gatekeeping function, to avert that outcome.  The government, and its

experienced experts, may assume that this court, so carefully chosen through the government's earlier

forum shopping, may be unwilling to impose the strict limits on government proof that other courts

have routinely applied in far less compelling circumstances.  The defendants have greater confidence

in the Court.

Respectfully submitted,
EMADEDDIN Z. MUNTASSER
By his attorneys,

/s/Susan R. Estrich
Susan R. Estrich
Robert Kingsley Professor of Law and
Political Science
University of Southern California
Law School
University Park, MC-0071
Los Angeles, CA 90089-0071

/Norman S. Zalkind
Norman S. Zalkind (BBO#: 538880)
Elizabeth A. Lunt (BBO#: 307700)
David Duncan (BBO#: 546121)
Zalkind, Rodriguez, Lunt & Duncan, LLP
65a Atlantic Avenue
Boston, MA   02110
(617) 742-6020

Dated: October 19, 2007

MUHAMED MUBAYYID
By his attorney,

/s/ Michael C. Andrews
Michael C. Andrews (BBO#: 546470)
21 Custom House Street
Boston, MA 02110
(617) 951-0072

SAMIR AL-MONLA
By his attorney,

/s/ Charles P. McGinty
Charles P. McGinty (BBO # 333480)
Federal Defenders
408 Atlantic Avenue
Boston, MA 02110
(617) 223-8061

**Certificate of Service**

I hereby certify that the foregoing document was served this 19th of October, 2007 by hand delivery upon all counsel of record.

_____

Elizabeth A. Lunt

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,
Plaintiff

v.

MUHAMED MUBAYYID, EMADEDDIN Z. MUNTASSER and SAMIR AL-MONLA,
Defendants

**APPENDIX TO**
**DEFENDANTS' MOTION IN LIMINE TO PRECLUDE OR, IN THE ALTERNATIVE,**
**LIMIT THE TESTIMONY OF CERTAIN OF THE GOVERNMENT'S**
**PROPOSED EXPERT WITNESSES**

Michael C. Andrews (BBO# 546470)
121 Custom House Street
Boston, MA 02110
1(617) 951-0072

Charles P. McGinty (BBO # 333480)
Federal Defender's Office
408 Atlantic Avenue
Boston, MA 02110
(617) 223-8061

Norman S. Zalkind (BBO # 538880)
Elizabeth A. Lunt (BBO # 307700)
David Duncan (BBO # 546121)
Zalkind, Rodriguez, Lunt & Duncan LLP
65a Atlantic Avenue
Boston, MA 02110
(617) 742 – 6020

Date: October 19, 2007

APPENDIX TO:
## DEFENDANTS' MOTION IN LIMINE TO PRECLUDE OR,
## IN THE ALTERNATIVE, LIMIT THE TESTIMONY OF CERTAIN OF
## THE GOVERNMENT'S PROPOSED EXPERT WITNESSES

A. Evan Kohlmann's summary of expert testimony in the case of Mubayyid, Muntasser and Al-Monla, Crim. No. 05-40026-FDS

B. Matthew Levitt's summary of expert testimony in the case of Mubayyid, Muntasser and Al-Monla, Crim No. 05-40026-FDS

C. United States v. Uzair Paracha, transcript of motion hearing before the Honorable Judge Stein, New York Southern District Federal Court, November 3, 2005.

D. United States v. Fawaz Damrah, transcript of motion hearing before the Honorable Judge Gwin, Northern District of Ohio Federal Court, June 14, 2004.

E. United States v. Fawaz Damrah, transcript of trial testimony of Matthew Levitt, June 16, 2004.

F. United States v. Ahmed Omar Abu Ali, transcript of motion hearing before the Honorable Judge Lee, Eastern District of Virginia Federal Court, October 27, 2005.



# Expert Report
# U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla
### Criminal Action No. 05-40026-FDS.

Evan F. Kohlmann (evan@globalterroralert.com)
September 2007

## INTRODUCTION

My full name is Evan Francois Kohlmann. I am an International Terrorism Consultant who specializes in tracking Al-Qaida and other contemporary terrorist movements. I hold a degree in International Politics from the Edmund A. Walsh School of Foreign Service (Georgetown University), and a Juris Doctor (professional law degree) from the University of Pennsylvania Law School. I am also the recipient of a certificate in Islamic studies from the Prince Alwaleed bin Talal Center for Muslim-Christian Understanding (CMCU) at Georgetown University. I currently work as an investigator with the Nine Eleven Finding Answers (NEFA) Foundation and as an on-air analyst for NBC News in the United States. I also run an Internet website Globalterroralert.com that provides information to the general public relating to international terrorism. I am author of the book Al-Qaida's Jihad in Europe: the Afghan-Bosnian Network (Berg/Oxford International Press, London, 2004) which has been used as a teaching text in graduate-level terrorism courses offered at such educational institutions as Harvard University's Kennedy School of Government and the Johns Hopkins School of Advanced International Studies (SAIS). At various times, I have served as a paid consultant in terrorism matters on behalf of the United States Federal Bureau of Investigation (FBI), the United States Department of Justice (USDOJ), the London Metropolitan Police SO-15 Counter Terrorism Command, the United Kingdom Crown Prosecution Service (CPS), the Australian Federal Police (AFP), the Office of the High Representative (OHR) in Sarajevo, and the International Criminal Tribunal for the former Yugoslavia (ICTY) at the Hague.

As part of my research beginning in approximately 1997, I have traveled overseas to interview known terrorist recruiters and organizers (such as Abu Hamza al-Masri) and to attend underground conferences and rallies; I have reviewed thousands of open source documents; and, I have amassed one of the largest digital collections of terrorist multimedia and propaganda in the world. The open source documents in my collection include sworn legal affidavits, original court exhibits, video and audio recordings, text communiqués, and eyewitness testimonies. I have testified as an approved expert witness in United States federal court in seven criminal cases; including:

- United States v. Sabri Benkhala (Eastern District of Virginia, 2004)
- United States v. Ali Timimi (Eastern District of Virginia, 2005)
- United States v. Uzair Paracha (Southern District of New York, 2005)
- United States v. Ali Asad Chandia (Eastern District of Virginia, 2006)

- United States v. Yassin Aref (Northern District of New York, 2006.
- United States v. Sabri Benkhala (Eastern District of Virginia, 2007)
- United States v. Rafiq Sabir (Southern District of New York, 2007)

In United States v. Uzair Paracha, Federal District Judge Sidney Stein held a Daubert hearing on my qualifications as an expert witness and issued a ruling concluding: "Evan Kohlmann has sufficient education, training, and knowledge to be qualified as an expert, and... Kohlmann's methodology—that is, his process of gathering sources, including a variety of original and secondary sources, cross-checking sources against each other, and subjecting his opinions and conclusions to peer review—is sufficiently reliable to meet the standards for admissibility of expert testimony set by the Federal Rules of Evidence."

Separately—outside of the United States—I have testified as an expert witness on behalf of Crown Prosecutors in the United Kingdom in two cases: Regina v. Palvinder Singh (Snaresbrook Court, 2006) and HMA v. Mohammed Atif Siddique (High Court in Glasgow, 2007). I have also testified as a fact witness on behalf of the U.K. Crown Prosecution Service (CPS) in Regina v. Tsouli, Mughal, and Daour (Woolwich Crown Court, 2007). Finally, I have testified as an approved expert witness on behalf of international war crimes investigators before the Supreme Court of Bosnia-Herzegovina (SUD-BiH) in Sarajevo in the matter of International Prosecutors v. Abduladhim Maktouf (2005).

At the request of the U.S. Attorney's Office for the District of Massachusetts, I have created the below summary of facts and circumstances relevant to my proposed expert testimony in the case United States v. Muntasser et al. This narrative is a summary only, and should not be considered as the absolute extent of my knowledge base in these various areas of scholarship.

## PART I: Usama Bin Laden and the Rise of Al-Qaida in Afghanistan

Usama bin Mohammed Bin Laden is the exiled son of the wealthy and powerful Bin Laden merchant family in Saudi Arabia. During the jihad against the Soviet Union in Afghanistan during the 1980s, Bin Laden traveled to nearby Pakistan in order to provide assistance to Afghan mujahideen ("holy warrior") organizations. Bin Laden quickly became a top student of Shaykh Abdullah Azzam, a militant Palestinian Islamic cleric who is overwhelmingly accepted and revered as the "godfather" of modern military jihad. Ultimately, Azzam sought not only to evict the Russian armies, but moreover, to subsequently remove all "infidel" regimes (such as the United States) and to reestablish the rule of a greater Islamic empire. During one recorded lecture, Azzam issued what has become one of his most famous dictates, endorsing the use of terrorism as part and parcel of the strategy of the mujahideen: "We are terrorists, and terror is an obligation in the book of Allah. Let the west and east know that we are terrorists and we strike fear: 'Against them make ready your strength to the utmost of your power—including steeds

of war—to strike terror into (the hearts of) the enemies of Allah and your enemies'... So, Terror is an obligation in the creed of Allah."[1]

Pooling their efforts, Azzam and Bin Laden jointly founded an organization for the purpose of facilitating the arrival of Arab mujahideen recruits, known as the Makhtab-e-Khidamat al-Mujahideen ("The Mujahideen Services Office"), later named by the U.S. government as a Specially Designated Global Terrorist (SDGT) entity for being "the pre-cursor organization to al Qaida and the basis for its infrastructure... MK was initially created by Usama bin Laden's mentor, Shaykh Abdullah Azzam... as an organization to fund mujahideen in the Soviet-Afghan conflict."[2] In order to broaden the scope of its fundraising and recruitment, Makhtab-e-Khidamat quickly established foreign branch offices in countries around the world—including the United States—under the innocuous name of the "Al-Kifah Refugee Center" (a.k.a. "The Human Services Organization", HSO).

What Azzam's top student Usama Bin Laden lacked in actual religious knowledge he made up for with a fiery ideological zeal and deep, generous pockets. At his last public press conference, Azzam spoke of the key role Bin Laden was playing in the growing Arab-Afghan movement:

> "He came himself, with his wealth, in the way of Allah, and he is paying for [mujahideen] tickets and looking after their families, paying for their rent and their transport, and their sustenance inside Afghanistan. He is in the frontline, where the fighting is... One hundred Arabs have given their lives for Allah. What have they come for? Someone like Usama Bin Ladin, like Wael Jalaidan, and others from leading families in Saudi Arabia... [who] have come in search of paradise. They believe that there is a God and that there is a paradise, and that life is cheap."[3]

Bin Laden has on numerous occasions publicly declared his intentions to strike violently at the United States, its economy, and its nationals. In August 1996, he published his first "Declaration of War" against the infidels. The document announced that "[i]t is a duty now on every tribe in the Arab Peninsula to fight, Jihad, in the cause of Allah and to cleanse the land from ['American soldiers']. Allah knows that there blood is permitted (to be spilled)... their wealth is a booty to those who kill them."[4] In February 1998, Usama Bin Laden convened a meeting in Afghanistan of the "World Islamic Front Against Jews and Crusaders." Bin Laden and other Middle Eastern terrorist leaders in attendance jointly agreed that "the ruling to kill the Americans and their allies—civilians and military—is an individual duty for every Muslim who can do it in any country in which it is possible to do it."[5]

---

[1] Al-Sahab Media Productions. "State of the Ummah." (a.k.a. "The Destruction of the U.S.S. Cole). Video recording produced in mid-2001.

[2] "Additional Background Information on Charities Designated Under Executive Order 13224: Makhtab al-Khidamat / Al Kifah." United States Treasury Office of Terrorism and Financial Intelligence (TFI). http://www.treasury.gov/offices/enforcement/key-issues/protecting/charities_execorder_13224-i.shtml.

[3] Videotape of the last press conference of Shaykh Abdallah Azzam.

[4] Committee for the Defense of Legitimate Rights (CDLR) <100043.1420@CompuServe.COM>. "MSANEWS: THE LADENESE EPISTLE: DECLARATION OF WAR (I)." MSANews. http://msanews.mynet.net. October 12, 1996.

[5] "Text of World Islamic Front's Statement Urging Jihad Against Jews and Crusaders." *Al Quds al Arabi*. Feb. 23, 1998.

In approximately April 1988, Bin Laden, Azzam, and others together established a new military organization that they referred to as "Al-Qaida", or the "Solid Foundation" for the desired Islamic society. In an article published in Peshawar, Pakistan's Al-Jihad Magazine, Azzam explained the logic behind forming Al-Qaida, reasoning that every revolutionary ideology requires a rugged, elite cadre to protect it, inspire it, and lead it to ultimate victory. This Leninist-style vanguard, hardened by toil and sacrifice, "constitutes the solid foundation for the desired society." According to Azzam, the war in Afghanistan emblemized a divine "trial by fire" of the vanguard; it was a test of their true commitment to establish Islam at any cost. Only by continued armed struggle would the unified strength of the Muslims be brought to bear on their supposed enemies. In concluding, Azzam issued what he referred to as "the final call": "We shall continue the Jihad no matter how long the way is until the last breath and the last beating of the pulse or we see the Islamic state established."[6] Picking up where Makhtab-e-Khidamat had left off, Al-Qaida was responsible for managing several foreign mujahideen training camps inside Pakistan and Afghanistan for the purpose of schooling recruits in terrorist and urban warfare tactics.

Consequently, under the tutelage of Bin Laden and his advisors, graduates from Al-Qaida training camps have carried out numerous anti-Western terrorist attacks around the world since 1988; including, the 1991 failed bombing of U.S. troops stationed in Yemen; the 1993 World Trade Center bombing; the RPG attack on U.S. helicopters during the 1993 Battle of Mogadishu; the December 1994 hijacking of an Air France commercial jet; Project Bojinka in the Philippines (a January 1995 plot to simultaneously bomb between ten and twelve U.S. commercial jets over the Pacific); the 1998 U.S. embassy bombings in East Africa; the October 2000 suicide bombing attack on the U.S.S. Cole in the port of Aden, Yemen; the failed twin Al-Qaida millennium bomb plots in Jordan and Los Angeles; and, the September 11, 2001 suicide hijackings of four U.S. commercial jets.

When Bin Laden and Azzam formed the Al-Qaida terrorist organization in Afghanistan in 1988, it was initially conceived as a loose confederation of regional Arab mujahideen movements active in Afghanistan and hailing from across the Middle East. According to the U.S. Congressional 9/11 Commission, Bin Laden "understood better than most of the volunteers the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost worldwide organization."[7] Though Bin Laden's "affiliates" maintained their own leaderships and corporate infrastructures, they shared the same training camps as other Al-Qaida groups in Afghanistan and could be called upon to provide material resources for the benefit of Al-Qaida. According to founding Al-Qaida Shura Council member Mamdouh Mahmud Salim (a.k.a. Abu Hajer al-Iraqi), "Abu Abdullah [Bin Laden] had tendency to favor a policy of centralization... and felt obligated to assemble the Arabs in one location, train and prepare them to be a single mobilized fighting brigade."[8] These "franchises" often had varying relationships with Bin Laden and his advisors. It was fairly common for

---

[6] Azzam, Dr. Abdallah. *"Al-Qa'ida." Al-Jihad.* No. 41; April 1988. *Page 46.*

[7] The 9/11 Commission Report. Final Report of the National Commission on Terrorist Attacks Upon the United States. July 22, 2004. Page 55.

[8] Muhammad, Basil. *Al-Ansaru l'Arab fi Afghanistan.* The Committee for Islamic Benevolence Publications; ©1991. Page 199.

veteran Arab-Afghan disciples to work interchangeably with Al-Qaida—even if they preferred to remain independent of the confines of Bin Laden's inner circle. These Al-Qaida "associate branches" included (but are not limited to) Al-Gama`at al-Islamiyya (the Egyptian Islamic Group), the Egyptian Islamic Jihad Movement, the Algerian Armed Islamic Group (GIA), the Libyan Islamic Fighting Group (LIFG), Jemaah Islamiya in Indonesia.

Al-Qaida's "openness" and the perceived lack of formal hierarchy held great appeal in the minds of young jihadist recruits. In the world of Al-Qaida and the Arab-Afghans, even the most junior of operatives could potentially gain high status within the organization by either demonstrating useful skills, or else by volunteering to sacrifice themselves on behalf of the mission. In other words, Al-Qaida offered an equal opportunity at fame and recognition to nearly any sympathetic soul willing to risk death or imprisonment. When agents from the U.S. Federal Bureau of Investigation (FBI) apprehended a junior Al-Qaida operative who helped build the suicide truck bombs used to attack two U.S. embassies in East Africa in 1998, he boasted of his own role in the plot and explained that he "was attracted to Usama Bin Ladin and the group Al Qaeda because it did not matter what nationality you were" and because Al Qaeda members did not explicitly follow "orders from a chain of command" in the same way as more traditional terrorist organizations.[9]

In an interview with Asharq al-Awsat, former Saudi Arab-Afghan Hassan abd-Rabbuh al-Surayhi noted that following the assassination of Abdullah Azzam in November 1989, a mass of predominantly Egyptian mujahideen began to congregate at the residence of Usama Bin Laden in Peshawar—eager to win his support and feed his ego by "put[ting] him in the spotlight."[10] Al-Surayhi added, "Bin-Ladin's finances were not a secret to anyone and I think the Egyptians wanted to exploit this angle." They praised his virtues and convinced the young Saudi commander to wage an expansive global jihad against the international enemies of Al-Qaida. Surayhi suggested further that "[p]erhaps [Bin Laden] accepted the idea in order to become an amir so that all the Islamic jihad groups would be under his control, especially those that are in Egypt which are famous and well known."[11] With Bin Laden's blessings, the Arab-Afghans were free to turn their attention to new targets outside of the borders of Afghanistan.

- **Al-Gamaat al-Islamiyya (AGAI) - Egypt**
  - o Since 1977, the clandestine Egyptian Islamist movement known as Al-Gamaat al-Islamiyya ("The Islamic Group") "has been the dominant political power in the universities and the means of protest against the regime."[12] The goals of Al-Gamaat al-Islamiyya have typically centered

---

[9] Government Exhibit GX-6 (Interview of Mohammed Sadiq Odeh by FBI Agent John Anticev). U.S. v. Usama Bin Laden, et al. S(7) 98 Cr. 1023 (LBS). United States District Court, Southern District of New York.

[10] Al-Banyan, Hasin. "Saudi 'Afghan' Talks About Involvement With al-Qa'ida, Bin-Ladin, Related Topics." Al-Sharq al-Awsat. November 25, 2001.

[11] Al-Banyan, Hasin. "Saudi 'Afghan' Talks About Involvement With al-Qa'ida, Bin-Ladin, Related Topics." Al-Sharq al-Awsat. November 25, 2001.

[12] Moussalli, Ahmad S. Historical Dictionary of Islamic Fundamentalist Movements in the Arab World, Iran, and Turkey. Scarecrow Press; Lanham, MD. ©1999. *Page 148.*

on the strict application of Shariah law and an end to peaceful relations
with the neighboring state of Israel.

o  The U.S. government has officially named Al-Gamaat al-Islamiyya as a
Designated Foreign Terrorist Organization (FTO) under the executive
authority granted by the 1996 Anti-Terrorism and Effective Death Penalty
Act. According to the U.S. State Department publication "Patterns of
Global Terrorism: 2002", AGAI is "Egypt's largest militant group",
operating primarily in the Al-Minya, Asyut, Qina, and Sohaj provinces of
southern Egypt (with additional support from student groups based in
Cairo, Alexandria, and other "urban locations")—not to mention its
"worldwide presence, including in the United Kingdom, Afghanistan,
Yemen, and various locations in Europe." As suggested by the State
Department in Patterns of Global Terrorism, the conglomerate of
individuals behind the AGAI have varying goals, ranging from simply
overthrowing the current Egyptian regime of Hosni Mubarak and violently
replacing it with an Islamic state to "carrying out attacks against US and
Israeli interests."[13]

o  The acts of violence committed by Al-Gamaat al-Islamiyya came under
sharp scrutiny in November 1997, when AGAI militants gunned down 58
European tourists in Luxor. The incident came only four months after the
declaration of a unilateral cease-fire by six "historic" leaders of the AGAI
movement, including several of those responsible for the 1981
assassination of Sadat.[14] This was a tragic reminder that Al-Gamaat al-
Islamiyya, like the Algerian Islamist parties, had somewhat splintered into
more moderate and more extreme factions, largely as a result of the
radicalized Arab-Afghans. Less than two years later, both Swiss and
Egyptian authorities concluded that the Luxor attack had been financed
and "ordered directly or indirectly" by Mustafa Hamza, a prominent IG
commander and senior aide to Usama Bin Laden. Egyptian officials
added at the time that following the attack, Hamza fled his temporary
residence in the Sudan for the safety of Bin Laden's camps in
Afghanistan.[15]

o  During sworn testimony by former Al-Qaida member Jamal al-Fadl in
U.S. federal court in 2001, al-Fadl was asked to discuss the
"relationship... between al Qaeda and Gamaa al Islamiya." He explained,
"The Gamaa al Islamiya help al Qaeda for their agenda, and at the same
time al Qaeda help Gamaa al Islamiya for their agenda."[16] When asked if
he had ever been told "by the people who belonged to Gamaa al
Islamiya... about what the group's purposes were", he responded, "I

---

[13] "Appendix B: Background Information on Designated Foreign Terrorist Organizations." Patterns of
Global Terrorism 2002. Office of the Secretary of State and Office of the Coordinator for
Counterterrorism; U.S. Department of State. Released April 2003.

[14] Rouleau, Eric. "Egypt's Islamists Caught in a Bind." Le Monde Diplomatique. January 1998.
http://www.monde-diplomatique.fr/en/1998/01/08egypt.

[15] Hauser, Christine. "Bin Laden 'behind Luxor strike.'" Middle East Times. May 23, 1999.

[16] Trial Transcript; February 6, 2001. U.S. v. Usama Bin Laden, et al. S(7) 98 Cr. 1023 (LBS). United
States District Court, Southern District of New York. Page 294.

remember I talk one time with Abu Yasser el Masry because he is emir of Gamaa al Islamiya… He helped the Gamaa al Islamiya for their agenda under al Qaeda, and at the same time if any fatwah or any meeting with the al Qaeda people, he took it back to his people… I remember I have conversation with him, and he says he try to make Islamic government in Egypt."[17]

o In February 1998, a prominent Al-Gamaat al-Islamiyya faction in Afghanistan led by Abu Yasser al-Masri (a.k.a. Rifa'i Ahmad Taha Musa) agreed to officially bring the movement under the all-encompassing umbrella of Bin Laden's "World Islamic Front for Jihad Against Jews and Crusaders."[18] This faction appears to have the blessing of Al-Gamaat al-Islamiyya co-founder and spiritual leader, the blind Shaykh Omar Abdel Rahman—likewise the religious inspiration behind Al-Qaida Deputy Commander Dr. Ayman al-Zawahiri's Al-Jihad Movement in Egypt.

o The blind Shaykh is said to have been quite close to Usama Bin Laden from the days of the Afghan jihad, and allegedly was among the group of Egyptians who first persuaded Bin Laden to "have a clear idea to use [the Arab recruits] after Afghanistan for other wars."[19] In an Arabic-language radio broadcast in 1993, Shaykh Omar condemned the United States, explaining, "Americans are descendants of apes and pigs who have been feeding from the dining tables of the Zionists, Communism, and colonialism."[20]

o In Brooklyn, Rahman helped run the "Al-Kifah Refugee Center," the U.S. branch of Makhtab-e-Khidamat, the Peshawar-based Arab mujahideen "services office" founded by Abdullah Azzam and Bin Laden. On January 16, 1993, only weeks prior to the World Trade Center bombing in Manhattan, Shaykh Omar Abdel Rahman spoke at a charitable fundraising lecture for mujahideen in Bosnia-Herzegovina at Public School 179 in Brooklyn, ridiculing the "Western mass media" for "accusing those who perform Jihad for the sake of God of being terrorists." Rahman countered, "we welcome being terrorists. And, we do not deny this charge to ourselves… we must be terrorists and we must terrorize the enemies of Islam and to frighten them and to disturb them and to shake the earth under their feet." He directed listeners to "ready your strength to the utmost of your power, including steeds of war, with which you frighten the enemies of Allah, your enemies."[21]

---

[17] Trial Transcript; February 6, 2001. U.S. v. Usama Bin Laden, et al. S(7) 98 Cr. 1023 (LBS). United States District Court, Southern District of New York. Page 295.

[18] Bin Laden, Shaykh Usama et al. "Jihad Against Jews and Crusaders: World Islamic Front Statement." February 23, 1998.

[19] Engelberg, Stephen. "One Man and a Global Web of Violence." The New York Times. January 14, 2001.

[20] Friedman, Robert I. "The CIA and the Sheik." The Village Voice. March 30, 1993.

[21] Shaykh Omar Abdel Rahman. "The Inevitability of Jihad for the Solution of our Problems and for the Frightening of the Enemies of God." Speech given at the Conference on Solidarity with Bosnia/Herzogovina. January 16, 1993.

o  In October 1995, Rahman was convicted in U.S. federal court of seditious conspiracy for inspiring an aborted wave of terrorism targeting New York landmarks (including the World Trade Center) and he was sentenced to life in prison. In pamphlets sent to security authorities and posted for public display in at least two southern Egyptian provinces two days after Shaykh Omar's conviction, Al-Gamaat Al-Islamiyya issued a dire and very serious threat: "We warn you (Americans) with the use of all means of violence."[22] At the time, Shaykh Omar's son Abdallah scoffed at the notion that an American jury would find his father guilty: "We are not surprised because the United States is the enemy of Islam."[23] A year later in 1996, the CIA acknowledged several reports from a "foreign government service" that "an Algerian national" (affiliated with the Al-Kifah Refugee Center) and another senior Algerian "commander of the mujahedin" were, in the late fall of 1995, "preparing for an unspecified terrorist attack in Europe if Shaykh Umar Abdal-Rahman... were convicted."[24]

o  Usama Bin Laden and his cohorts did not take the subsequent arrest and federal conviction of Shaykh Omar in the U.S. lightly. Following the detention of the blind Shaykh in wake of the 1993 World Trade Center bombing, Al-Qaida turncoat Jamal al-Fadl attended leadership meetings in Khartoum, Sudan with other senior Bin Laden aides. According to al-Fadl, Al-Qaida regarded Shaykh Omar's arrest as "very sad and... very bad... and we have to do something... They talk about what we have to do against America."[25] In September 2000, a new videotape mysteriously surfaced of Bin Laden and other terrorist leaders meeting in Afghanistan. Bin Laden addressed the camera and promised "to work with all our power to free our brother, Sheikh Omar Abdel Rahman, and all our prisoners in America, Egypt, and Riyadh."[26] Also in attendance at the meeting was Shaykh Omar's son Asadullah, who vigorously applauded Bin Laden's words and urged Muslims to "move forward and shed blood."[27]

o  In response to U.S. tomahawk missile strikes on Al-Qaida training camps in Afghanistan in August 1998, Shaykh Omar Abdel Rahman issued a new call to arms in the form of a religious fatwah (edict). The fatwah was smuggled out of Shaykh Omar's American prison cell with the help of his paralegals and lawyer Lynne Stewart. The fatwah urged all Muslims:

> "[The Jews and Christians] are the ones that are fighting every Muslim resurrection in the whole world, they act to spread prostitution, usury,

---

[22] Nasrawi, Salah. "Islamic Group Warns Americans Over Conviction of Sheik." The Associated Press. October 3, 1995.

[23] Ghalwash, Mae. "Sons of Omar Abdel-Rahman." The Associated Press. October 2, 1995.

[24] January 1998 CIA Report on "International Islamic NGOs" and links to terrorism. Page 10.

[25] United States v. Usama bin Laden, et al. S(7) 98 Cr. 1023 (LBS). United States District Court, Southern District of New York. Trial Transcript, February 6, 2001. Page 296.

[26] "Bin Laden vows to free Islamist sheikh jailed in US." Agence France Presse. September 22, 2000.

[27] Cooley, John K. "We Will Free Our Brothers." ABC News. September 25, 2000.

and other kinds of corruption all over the land. Oh, Muslims everywhere! Cut the transportation of their countries, tear it apart, destroy their economy, burn their companies, eliminate their interests, sink their ships, shoot down their planes, kill them on the sea, air, or land. Kill them when you find them, take them and encircle them, paralyze their every post. Kill those infidels... Allah will torment by your hands those who wish to kill you; Allah will put shame upon them, he will blow wind in the chests of the believers and show the anger of their hearts."[28]

o   Acknowledged Algerian Al-Qaida operative Ahmed Ressam later recalled the same fatwah distributed widely in the Afghan military training camps in 1998-1999 "issued by Sheikh Omar Abdel Rahman with his picture on it... It said it was a fatwah by Omar Abdel Rahman from prison. It says fight Americans and hit their interest everywhere."[29]

- **The Armed Islamic Group (GIA) – Algeria**
  o   The U.S. government has officially named the Armed Islamic Group (GIA) as a Designated Foreign Terrorist Organization (FTO) under the executive authority granted by the 1996 Anti-Terrorism and Effective Death Penalty Act.[30]  The origins of the Islamic extremist movement in Algeria can be traced to the year 1982 and a pioneering Islamic militant named Mustafa Bouyali.  According to Arab-Afghan spokesman Abu Hamza al-Masri, Bouyali is one of the "most famous" Algerian jihadists and is at "the root of the militant Islamic groups in Algeria in general."[31] In the early 1980s, after an ugly dispute with the ruling regime, Bouyali formed a secret terror cell known as the Algerian Islamic Movement (MIA). In a brazen and unprecedented raid, the MIA stole a number of rifles and explosives from a military arms depot and fled to the hinterlands in a bid to wage a guerilla war against the Algerian government.[32] Bouyali was eventually captured by the Algerian military and executed in 1987.  London-based mujahideen spokesman Abu Hamza al-Masri has attempted to explain the nature of Bouyali's underground mystique: "He took his struggle to the mountains and he was avoiding the population to the best of his ability.  He was little known to the media but his struggle was known of by the Islamic militant groups, some of whom still feel proud if they find a way to relate themselves to him in some way."[33]

---

[28] Excerpted from the will and testament of Shaykh Omar Abdel Rahman, written in an American prison cell. *Al-Minhaj. Page 27.* http://www.badr.com. Dated: 1997.

[29] Direct Examination of Ahmed Ressam. United States v. Mokhtar Haouari. United States District Court Southern District of New York. Case: 00CR15. June 27-July 6, 2001. *Page 552.*

[30] "Appendix B: Background Information on Designated Foreign Terrorist Organizations." Patterns of Global Terrorism 2002. Office of the Secretary of State and Office of the Coordinator for Counterterrorism; U.S. Department of State. Released April 2003.

[31] Al-Masri, Abu Hamza. Khawaarij and Jihad. Maktabah al-Ansar; Birmingham, UK. ©2000. Page 83.

[32] Messaoudi, Khalida and Elizabeth Schemla. Unbowed. University of Pennsylvania Press; Philadelphia, PA. ©1998. *Page 66.*

[33] Al-Masri, Abu Hamza. Khawaarij and Jihad. Maktabah al-Ansar; Birmingham, UK. ©2000. Page 83.

o   Between 1987 and 1993, an estimated 1,000 to 1,500 hardcore foreign mujahideen veterans abandoned their posts in Pakistan and Afghanistan and returned to settle in Algeria.[34]   Many of these men had dreams of bringing their Islamic revolution back with them, and they rallied groups of disaffected Muslim youths inside Algeria who were inspired by the legendary tales of their fellow countrymen in Afghanistan.  This younger generation "lionized" the "Afghan" returnees, adopting their unusual, non-native forms of dress and conduct.[35]   The sudden influx of so many Afghan-trained mujahideen—matched with the flourishing of a domestic jihadist movement within Algeria itself—would eventually cause dramatic and disastrous consequences.

o   Many Arab-Afghan veterans who returned to Algeria were disappointed with the lack of progress by Islamist political parties like the Islamic Salvation Front (FIS) in achieving power.   These hardliners, who embraced the "Afghan" philosophy of jihad until victory or martyrdom, scoffed at FIS for being far too moderate and political in its approach. Abdelaziz Belkhadem, a former Algerian parliamentary speaker, explained, "People who had been in Afghanistan said: 'Listen, it's not your method that will give you power.  The right way is what we did in Afghanistan, where we broke the Soviet Union into pieces.'"[36]   Shortly after the cancellation of the 1992 general elections in Algeria, remaining "Afghans" began defecting from the Islamic Salvation Front in order to form their own enigmatic splinter groups.  With the FIS leadership in jail and the party torn between its political and military objectives, these splinter groups grew to define the very essence of the Algerian civil war.

o   Amid this chaotic struggle for power, a new union of Algerian Islamic extremists began to evolve and coalesce—eventually becoming known as al-Jama'a al-Islamiyya al-Musallaha, or the Armed Islamic Group (GIA). According to Abu Hamza al-Masri, "the GIA formed from a collection of militant groups that all at one time had struggled against the military government of Algeria.  Some senior Mujaahidin formed from [Mustafa] Buyali's group and others later followed suit with them.  There then appeared scattered groups which were not well known, nor did they have swelling memberships."[37]   Between 1989 and 1991, this amalgamation was responsible for executing a series of significant military operations, including attacks in Bilada, Kasaba, Bufarik, and Baraki.[38]   In August 1991, an initial, though still nameless GIA nucleus was founded under the leadership of commander Nur ad-Din Salaamina.[39]   Three months later, an extremist cell in league with Salaamina and led by Afghan-trained

---

[34] Compass Media.  "Arab veterans of Afghanistan war lead new Islamic Holy War."  October 28, 1994.

[35] Dahlburg, John-Thor.  "Algerian Veterans the Nucleus for Mayhem."  Los Angeles Times.  August 5, 1996.  Part A; Page 11.

[36] Dahlburg, John-Thor.  "Algerian Veterans the Nucleus for Mayhem."  Los Angeles Times.  August 5, 1996.  Part A; Page 11.

[37] Al-Masri, Abu Hamza.  Khawaarij and Jihad.  Maktabah al-Ansar; Birmingham, UK.  ©2000.  Page 84.

[38] Al-Masri, Abu Hamza.  Khawaarij and Jihad.  Maktabah al-Ansar; Birmingham, UK.  ©2000.  Page 84.

[39] Al-Masri, Abu Hamza.  Khawaarij and Jihad.  Maktabah al-Ansar; Birmingham, UK.  ©2000.  Page 84.

mujahideen commander Tayeb al-Afghani (a.k.a. Aissa Messoudi) launched a stunning raid on an Algerian army barracks in the town of Guemar—an infamous event that has become known since as "the butchery at Guemar."[40] (Tayeb al-Afghani would later officially join the GIA and ascended to become one of its most senior leaders). The date of the attack in Guemar—November 29, 1991—is regarded by at least some observers as the unofficial birth date of the Armed Islamic Group.

o Following the subsequent deaths of commander Nur ad-Din Salaamina and his official successor Mohammed Aalaal, the quickly coalescing GIA network was taken over by Abdelhaqq Layada (a.k.a. Abu Adlane). According to Abu Hamza al-Masri, "when Abu Adlan took over control of the group, this caused the formation of the core of the GIA, although it didn't have the name yet. This group then did quite a few difficult operations that annoyed the government and... forced other groups to reunite and others to join them or to try to unite the other groups into one mass in other areas."[41] The GIA network was particularly interested in acquiring the allegiance of commander Mansour Meliani, a former top MIA lieutenant under the legendary Mustafa Bouyali.[42] In July 1987, amid wide press coverage, Meliani was sentenced to death—a directive that was only to be rescinded two years later in a show of "good faith" by the Algerian government.[43] Meliani quickly broke his shaky truce with the government and, on February 1992, organized a brazen raid on a naval base near the capital Algiers by an Afghan-trained squad of mujahideen commandos. The attack killed a navy sailor and wounded two policemen. Meliani was also fingered by Algerian authorities as the mastermind behind the August 26, 1992 bombing of the international airport in Algiers, killing 9 and wounding 123. The accused ringleaders behind the airport bombing also included a commercial airline pilot for the national carrier Air Algerie and an Algiers municipal city official.[44] Clearly, by 1992, Mansour Meliani was moving far away from Mustafa Bouyali's early strategy of retreating to the mountains and avoiding innocent casualties at all costs.

o Meliani's subsequent capture by the Algerian government in the late summer of 1992 and his replacement by commander Ahmad al-Wud offered the GIA a new opportunity at force consolidation.[45] During later media interviews, the former top religious advisor to the GIA, Omar Chikhi, has offered a detailed narrative of the events leading up to the formal establishment of the GIA in October 1992:

[40] Dahlburg, John-Thor. "Algerian Veterans the Nucleus for Mayhem." Los Angeles Times. August 5, 1996. Part A; Page 11.

[41] Al-Masri, Abu Hamza. Khawaarij and Jihad. Maktabah al-Ansar; Birmingham, UK. ©2000. Page 84.

[42] Ellman, Paul. "Algeria to execute four rebels." The Guardian (London). July 11, 1987.

[43] Ellman, Paul. "Algeria to execute four rebels." The Guardian (London). July 11, 1987.

[44] "38 death sentences handed down for airport bomb attack." Agence France Presse (AFP). May 26, 1993.

[45] Al-Masri, Abu Hamza. Khawaarij and Jihad. Maktabah al-Ansar; Birmingham, UK. ©2000. Page 85.

> "With Djaafar El Afghani [Slim al-Abbasi] as the intermediary, I
> contacted Abdelhak Layada in Algiers. He had told me of his wish to
> unify the ranks... He asked me to serve as an interlocutor to convince
> [former Mustafa Bouyali lieutenant Abdelkader Chebouti] and Mansour
> Meliani to act under a single leadership. He suggested his house in
> Baraki for the meeting. At the time, Mansour was in jail. Indeed, but I
> knew everyone who was active with him and the majority of whom were
> 'Afghans.' I managed to bring the two parties together. There was Ali
> Zouabri (Antar Zouabri's brother), Djaafar El Afghani, Abdelhak
> Layada, Brahim Zekioui, a man named Mounir who was close to
> Meliani, Fethi, Sid Ahmed, Lahrani, and myself... We had chosen
> Layada as our emir and Meliani's people were charged with the basic
> organizational work since they had experience in that area. Lahrani
> suggested the name Armed Islamic Group. The seal was already ready.
> He had brought it back from Afghanistan... Layada accepted and
> announced the creation of the GIA in October 1992 in his house which
> was called Dar el hadja in Baraki... [Layada] drew up GIA's statutes and
> charged me with leading it in the wilaya of Bouira. That was the starting
> point."[46]

o   As a result of the landmark October 1992 militant conference, Ahmad al-
    Wud finally agreed to merge the forces of Mansour Meliani with
    Abdelhaqq Layada's unified alliance: "From this day, it was called the
    GIA (Armed Islamic Group). Mr. La'ayaayda became the leader for the
    GIA and issued a statement which claimed responsibility for large
    operations all over the country. He then issued the main rule of conduct
    for the Jama'ah of GIA... From then onwards, the world started to know
    about the GIA, as the faction began to expand very rapidly and strengthen
    itself politically."[47]

o   A reflection of both the ferocity of the GIA military campaign and the
    severe counterstrikes by the Algerian government, the reign of individual
    GIA leaders tended to be brief and end in violence. In June 1993,
    Abdelhaqq Layada was captured by authorities in neighboring Morocco
    and extradited home to face criminal charges. Two months later, in
    August 1993, Layada's replacement 'Isa ibn 'Ammar was killed in a clash
    with Algerian security forces. Ibn 'Ammar's own appointed successor—
    Saifullah Jaffar—was himself killed in February 1994 and was thereupon
    replaced by commander Cherif Gousmi (a.k.a. Abu Abdullah Ahmad).[48]
    The high rate of attrition also meant that the ranks of the GIA were
    continuously being refilled with increasingly more junior fighters: "the
    average age of the mujahadeen is 19-20, up to 24. The leaders of the GIA
    are 27. Occasionally you get an old one who's 30 or 35."[49]

[46] Tlemcani, Salima and Tayeb Belghiche. "Interview with Omar Chikhi, a founding member of the Armed
Islamic Group (GIA)." El-Watan (Algiers). April 13, 1999.

[47] Al-Masri, Abu Hamza. Khawaarij and Jihad. Maktabah al-Ansar; Birmingham, UK. ©2000. Page 85.

[48] Al-Masri, Abu Hamza. Khawaarij and Jihad. Maktabah al-Ansar; Birmingham, UK. ©2000. Page 85.

[49] Benesh, Peter. "Algeria's violence strikes fear in Europe." Pittsburgh Post-Gazette. May 8, 1995. Page
A1.

o With their wide representation in the GIA, Arab-Afghan veterans helped in large part to define the essential image of the group. GIA propaganda materials—such as the Al-Qitaal newsletter—gave special emphasis to "martyred" Algerian mujahideen "who were Afghanistan veterans." One such dispatch recounted the biography of "Brother Abu Zakariyya" who was "well-known to brothers in Afghanistan" and later was killed during an Algerian government artillery attack in "the fourth zone."[50] According to Omar Chikhi, the GIA's former religious affairs advisor, the direct links between Usama Bin Laden and the GIA date back to 1993, when Algerian Arab-Afghans "acted as go-betweens, sending envoys to meet GIA chiefs who did not have satellite phones at the time."[51] Former Al-Qaida member Jamal al-Fadl testified in U.S. federal court in 2001 that the GIA movement was treated as an affiliate of Al-Qaida and had a standing representative within the Al-Qaida organization identified as "Qari Said al-Jazairi."[52] In a 1998 report delivered to an Interpol convention in Madrid, the director of the Algerian Judiciary Police likewise charged that bin Laden was directly colluding with the GIA and was responsible for running "a genuine network supplying arms and military equipment to the Algerian guerillas."[53]

o Distancing itself from other Algerian Islamist activists, the GIA began to adopt increasingly more stringent interpretations of Islamic law—and killed anyone who dared to violate them. By late 1995, the GIA was responsible for the deaths of over 200 school teachers (guilty of "taming the youth") and more than 100 other competing Muslim clerics and political leaders whom it deemed to be heretics.[54] In the fall of 1993, GIA supreme commander Saifullah Jaffar deemed it necessary to racially purify Algeria and declared open season on hunting all foreigners living there. In a subsequent communiqué, GIA commanders explained:

> "The GIA has fought all Unbelievers of all ethnicities and groups, and ordered every Unbeliever to leave these lands (Algeria), and gave them a period of one month... similar to what the Messenger of Allah, peace and blessings be upon him, did... And so GIA has cut them off from the security of living in Algeria, and allowed the spilling of their blood if they chose to stay in our land. Some have heeded the warning, and others refused, so GIA started to kill them, singles and in groups, and after that another group fled, after that only those whose presence is

---

[50] "Theater of Operation: MUSLIM ALGERIA." Islam Report. American Islamic Group (AIG). April 4, 1996.

[51] Tazaghart, Atmane. "Meet Algeria's 'Salafi Group.'" Al-Majalla. June 17, 1999.

[52] United States of America v. Usama Bin Laden et al. U.S. District Court Case S(7) 98 Cr. 1023; Southern District of New York. Page 297. February 6, 2001.

[53] Manresa, Andreu. "Algiers accuses the Saudi millionaire Bin-Ladin of paying the GIA terrorists." El Pais (Madrid). October 8, 1998.

[54] Phillips, James. "The Rising Threat of Revolutionary Islam in Algeria." The Heritage Foundation. Backgrounder No. 1060. November 9, 1995.

essential to fight Muslims and Islam have stayed behind. Among those are politicians, military personnel, and missionaries."[55]

The campaign begun by GIA commander Saifullah Jaffar targeting Western nationals resulted in the assassination of over 90 innocent civilians and eventually forced a mass European exodus out of Algeria.[56]

o  In December 1994, the GIA launched its most sophisticated international terrorist attack to date: the hijacking of an Air France jetliner in a failed bid to suicide crash it into the streets of Paris.[57] During a dramatic 54-hour long regional crisis, a cell of four GIA terrorists (known as the "Signatories with Blood" group) seized control of an Air France flight in Algiers with the goal of carrying out—in the words of their comrades— the "first Martyrdom operation... to blow up the Air France [flight] with its... passengers over Paris."[58] On December 24, the four operatives were able to sneak through security onto the tarmac at Boumedienne International Airport in Algiers. According to a communiqué later issued by the Armed Islamic Group, their illicit entrance was facilitated by sympathetic "contacts at the highest levels" within the airport itself. The men approached their target in a small vehicle, boarding the Air France jetliner and—after introducing themselves as Algerian security police— began checking passports and identity cards. Once the cabin door was closed, and before the jet could depart, the terrorists revealed their true identities and announced that the plane was in fact being hijacked.[59]

o  The situation grew more serious as the hijackers ordered the pilots to fly from Algiers to Marseilles, where the aircraft was be fully fueled at their explicit direction. By this time, the French government was running out of patience. French military commandos stormed the plane without warning, freeing all 171 passengers and killing the four hijackers.[60] The GIA scoffed at media accounts that celebrated the miraculous rescue: "the escape of the plane and its passengers was not because of the bravery of these special forces, but because of the Will of Allah, the four kilograms of explosives [onboard] did not detonate."[61] Then-GIA chief Djamel Zitouni eulogized the fallen hijackers in an open letter, mourning "O'

---

[55] Zitouni, Djamel. "Communiqué No. 43: Issuing a Communiqué on the Kidnapping of the Monks (Tahreer al-Bayan Hawla Khatf al-Ruhban)." Armed Islamic Group (GIA). April 18, 1996. As reprinted in the Islam Report. American Islamic Group (AIG). May 26, 1996.

[56] Phillips, James. "The Rising Threat of Revolutionary Islam in Algeria." The Heritage Foundation. Backgrounder No. 1060. November 9, 1995.

[57] U.S. Department of State. Patterns of Global Terrorism 1999. April 2000. See "Terrorist Group Profiles: Armed Islamic Group (GIA)."

[58] "Malhamat al-Shahadah: A political analysis of the goal of the Martyrdom Operation." Islam Report. American Islamic Group (AIG). December 31, 1994.

[59] "Malhamat al-Shahadah: A political analysis of the goal of the Martyrdom Operation." Islam Report. American Islamic Group (AIG). December 31, 1994.

[60] "Malhamat al-Shahadah: A political analysis of the goal of the Martyrdom Operation." Islam Report. American Islamic Group (AIG). December 31, 1994.

[61] "Malhamat al-Shahadah: A political analysis of the goal of the Martyrdom Operation." Islam Report. American Islamic Group (AIG). December 31, 1994.

Martyred convoys, O' Deathmakers, Know well that you have made for the khilafah [the Islamic empire] a new height with your blood, and a towering structure from your body parts."[62]

o   Within days, an "official" inquiry began within the highest ranks of the GIA to determine why the hijacking operation had failed—and what lessons it provided for the future of terrorism.  The Algerian mujahideen identified two specific technical errors that had cost valuable time and opportunities: announcing the hijacking before the plane had taken off and making an interim stop in Marseilles "under the reason of taking on more fuel, although the plane had enough fuel" to fly to Paris.  A follow-up communiqué issued by well-connected GIA activists suggested, "Since they were half way, Mujahideen may have wanted to fill up the tanks of the plane for later blowing it up over Paris.  These will be lessons learned for future operations."  Furthermore, "in conclusion... this operation is the start of a new phase which is the Martyrdom phase in which the enemy will be completely overwhelmed by the attacks. This is a result of an organized Mujahideen army which now includes a huge number of Muslim youths... Mujahideen have the resources, the personnel, the ability and the power to do that. The operation will be imprinted forever in our Islamic history."[63]

o   The Air France hijacking marked a new and troubling escalation in the GIA's campaign of violence.  Reflecting its rapidly expanding vision, the GIA had initially offered to free some of the airliner hostages in exchange for the release of captured fellow militants from elsewhere in the Muslim world—such as Shaykh Omar Abdel Rahman (a.k.a. "The Blind Shaykh").  Rahman had recently been arrested by U.S. federal authorities for his role in organizing a series of terrorist plots targeting New York landmarks (including the World Trade Center)—and the GIA boasted in its communiqués that "in calling for the release of Dr. Omar Abdel Rahman... it showed the main principles of Islam adopted by GIA in aiding Muslims everywhere and in carrying the message of Jihad to the whole world."[64]

o   The popularity of the GIA suffered as it engaged in a tit-for-tat war of attrition against the Algerian military and anyone allied with it.  Recognizing the threat, the Algerian government decided to provide weapons to civilian villagers in order to defend themselves against attacks by GIA militants.  This policy had a debilitating impact on GIA recruitment and support in these areas: "[It] put the armed civilians at war with the Islamic groups, particularly the GIA... Step by step, this government trap managed to create a war between the GIA and the general

---

[62] Zitouni, Djamel. "A Letter to Death Makers." Armed Islamic Group (GIA).  As reprinted in the Islam Report.  American Islamic Group (AIG).  December 30, 1994.

[63] "Malhamat al-Shahadah: A political analysis of the goal of the Martyrdom Operation." Islam Report. American Islamic Group (AIG).  December 31, 1994.

[64] "Malhamat al-Shahadah: A political analysis of the goal of the Martyrdom Operation." Islam Report. American Islamic Group (AIG).  December 31, 1994.

population of Algeria."[65]  The GIA managed to further exacerbate tensions with the public by orchestrating elaborate revenge plots on would-be spies, informants, and supporters of the government.  The attacks eventually extended out to target family members of the accused.  In retrospect, even Abu Hamza al-Masri has characterized this tragic turn of events as "unfortunate."[66]

o   Furthermore, while notorious GIA commander Djamel Zitouni (a.k.a. Abu Abdelrahman Amin) may have been admired for "taking the war to the streets of France", some of his "innovative" tactics were crude and divisive.  In March 1996, GIA commandos raided a monastery near Medea, kidnapping seven French monks living there.  Within weeks, the GIA issued a communiqué claiming custody of the hostages and offering to exchange them for "Muslim prisoners, and we mentioned among the list Brother Abdel Haq Liyadeh... we said: 'If you set them free, we set the Monks free, and if you refuse we will slaughter [them].'"  When the French government publicly refused to negotiate with the GIA, an enraged Zitouni wasted no time in ordering his men to behead the seven monks.[67]  The killing of the monks was very controversial, especially since their personal safety had previously been guaranteed by another lower-ranking GIA commander.  According to former GIA religious affairs advisor Omar Chiki:

> "Zitouni told me had carried out this act to make France move and create a buzz in the French media about himself.  We knew that Sayah Attia had assured them that they would not be killed.  But with Zitouni, the fatwas had changed.  He kidnapped them and sent an emissary, who discussed matters with the French ambassador.  Zitouni had an audio cassette recorded in which the emissary recounted the contents of the discussion.  He told them to put an end to the arrest operations in Islamist circles in France and support of the Pouvoir, following which the seven monks would be freed... At that time Zitouni had changed.  He was starting to make decisions without asking his close advisers for their advice."[68]

Zitouni would ultimately die ingloriously not in battle with the "apostates", but instead at the hands of fellow jihadists.  In July 1996, he was abruptly assassinated "in an ambush by some of those who had separated from him."[69]

o   Rather than serving as an impetus for various GIA factions to reconcile and re-unite, this development only caused increased infighting and

---

[65] Al-Masri, Abu Hamza. Khawaarij and Jihad. Maktabah al-Ansar; Birmingham, UK. ©2000. Page 87.

[66] Al-Masri, Abu Hamza. Khawaarij and Jihad. Maktabah al-Ansar; Birmingham, UK. ©2000. Page 87.

[67] Zitouni, Djamel. "Communiqué No. 44: The Evident Declaration of the Execution of the French Monks (Al-I'lan al-Mubeen 'an Qatl al-Ruhban al-Farancien." Armed Islamic Group (GIA). May 21, 1996. As reprinted in the Islam Report. American Islamic Group (AIG). May 26, 1996.

[68] Tlemcani, Salima and Tayeb Belghiche. "Interview with Omar Chikhi, a founding member of the Armed Islamic Group (GIA)." El-Watan (Algiers). April 13, 1999.

[69] Al-Masri, Abu Hamza. Khawaarij and Jihad. Maktabah al-Ansar; Birmingham, UK. ©2000. Page 88.

internecine violence. In the wake of Zitouni's demise, there was an immediate power vacuum at the top ranks of the GIA. In short order, one of the most junior members of Zitouni's GIA Shura Council— Antar Zouabri—stepped forward from the shadows to seize the reins of power.[70] Zouabri did not have especially noteworthy military credentials himself, relying instead upon the fame of his brother Ali as one of the original founders of the GIA. What Zouabri lacked in practical experience, he made up for with blind ruthlessness. According to former GIA advisor Omar Chikhi:

> "He did not even ask for a meeting for him to be appointed as emir... Even the douates (muftis) who dared [speak back to him] were killed. He started killing anyone he did not like. He used to tell us that he would never engage in a dialogue; as for me, I used to tell him that our deeds had to result in that possibility. There were some elements who withdrew and tension began to reign within the group."[71]

o  Zouabri's erratic and unsettling grip over the GIA only further alienated the group's own membership and fellow Islamists in North Africa. Defying repeated threats from Zouabri and his followers, the leader of FIS's military wing broke ranks and began the process of negotiating a peace accord with the Algerian government. As these negotiations continued on with FIS, mysterious armed assailants carried out a wave of shameful massacres in isolated villages and rural areas, killing hundreds of innocent civilians—including a "great many" women and children.[72] Though the GIA was always considered a possible culprit, initial suspicion widely focused on the Algerian security services because the killings had equally targeted "people who used to give the biggest help and support to the GIA Mujaahidin and many of [its partisans] were recruited from these areas."[73]

o  Indeed, the remaining supporters of the GIA—particularly those outside Algeria—initially scoffed at allegations that the group had played any role in the massacres, which made headlines around the world and caused revulsion in the Muslim world. Abu Hamza al-Masri has commented, "No one at the time believed that this could be the work of any Islamic group, even the anti-Muslims themselves, they have all agreed that this is the work of the Algerian government, trying to put people off from Islam and Islamic ideas."[74] However, even some of the GIA's most trusted foreign contacts began to grow suspicious when they discovered inexplicable inconsistencies in published communiqués claiming attacks on the Algerian military: "strangely enough, these so-called operations

[70] Al-Masri, Abu Hamza. Khawaarij and Jihad. Maktabah al-Ansar; Birmingham, UK. ©2000. Page 88.
[71] Tlemcani, Salima and Tayeb Belghiche. "Interview with Omar Chikhi, a founding member of the Armed Islamic Group (GIA)." El-Watan (Algiers). April 13, 1999.
[72] Al-Masri, Abu Hamza. Khawaarij and Jihad. Maktabah al-Ansar; Birmingham, UK. ©2000. Page 93.
[73] Al-Masri, Abu Hamza. Khawaarij and Jihad. Maktabah al-Ansar; Birmingham, UK. ©2000. Page 93.
[74] Al-Masri, Abu Hamza. Khawaarij and Jihad. Maktabah al-Ansar; Birmingham, UK. ©2000. Page 88.

were dateless and it looked as if some of these mythical operations were claimed previously."[75] Various attempts by these representatives seeking an explanation for these inconsistencies were met with even more silence: "it appeared they were fed up with their own supporters, even those outside Algeria."[76]

o During the summer of 1997, Zouabri finally crossed the line when he began to distribute a shocking new fatwah "so chilling" that the GIA's own official spokesmen abroad "were unsure if this had been the same group that they had known before."[77] Though the document was dated August 9, 1997, pre-release copies had reached other Arab jihadist leaders as early as mid-July.[78] The statement "boldly" and "for the first time since the genesis of the GIA" condemned the entire Muslim population of Algeria as "kuffar, apostates, and hypocrites" for "not supporting them in their struggle against the government."[79] Though the edict did not offer any specifics, it generally accepted responsibility "for killing, slaughtering, massacring, burning and even kidnapping and raping women of their opponents and [enslaving] the women of their opponents. They classed all of that as sacrificing for the cause of Allah and a sign of sincere worship."[80] In a major departure from the typically carefully composed language of mujahideen communiqués, Zouabri's "abusive" letter included "obscenities" and "vulgarity", which was a public embarrassment and "a delight for everyone opposed to jihaad."[81] Any hopes among jihadists that the letter might be clever trick by the Algerian government were quickly dashed when further contacts with the GIA "confirmed that the statement was indeed from them and that they meant every word contained therein."[82]

o The letter was a major setback—not just for other Algerian Islamists, but also for the larger brotherhood of Arab-Afghan mujahideen organizations. At the time, Abu Hamza al-Masri recalled "there was a mixture grief and sadness among the ranks that this could be the Islamic end of one of the most terrifying group to the kuffar this century." He described Zouabri's communiqué as "horrible" and "a stab in the back from the GIA to the Muslim Ummah in general and the Mujaahidin in Algeria and worldwide in particular."[83]

---

[75] Al-Masri, Abu Hamza. Khawaarij and Jihad. Maktabah al-Ansar; Birmingham, UK. ©2000. Page 93.
[76] Al-Masri, Abu Hamza. Khawaarij and Jihad. Maktabah al-Ansar; Birmingham, UK. ©2000. Page 93.
[77] Al-Masri, Abu Hamza. Khawaarij and Jihad. Maktabah al-Ansar; Birmingham, UK. ©2000. Page 93.
[78] Al-Masri, Abu Hamza. Khawaarij and Jihad. Maktabah al-Ansar; Birmingham, UK. ©2000. Page 93.
[79] Al-Masri, Abu Hamza. Khawaarij and Jihad. Maktabah al-Ansar; Birmingham, UK. ©2000. Pages 88, 93.
[80] Al-Masri, Abu Hamza. Khawaarij and Jihad. Maktabah al-Ansar; Birmingham, UK. ©2000. Pages 88, 93.
[81] Al-Masri, Abu Hamza. Khawaarij and Jihad. Maktabah al-Ansar; Birmingham, UK. ©2000. Pages 88, 93.
[82] Al-Masri, Abu Hamza. Khawaarij and Jihad. Maktabah al-Ansar; Birmingham, UK. ©2000. Page 94.
[83] Al-Masri, Abu Hamza. Khawaarij and Jihad. Maktabah al-Ansar; Birmingham, UK. ©2000. Pages 89, 93.

o Other North African mujahideen organizations quickly took steps to distance themselves from the spiraling mess caused by Antar Zouabri and the GIA. In June 1996, the Libyan Islamic Fighting Group (LIFG) issued a statement acknowledging that it had been engaged in "support[ing] the Jihad against the apostates in Algeria" and "the Armed Islamic Group in Algeria... based on the clear and scrupulous path that this group adopted throughout the years."[84] However, the LIFG also announced that it was immediately halting all such "support and assistance" rendered to the GIA:

> "After [Djamel Zitouni] became the leader of the group, there was a noticeable change in the characteristics of the jihad waged under the banner of the Armed Islamic Group. Breaches and violations of Shariah law increased incrementally day after day... Blood was spilled, and even now, there is still no clear or compelling Shariah basis for its spilling... This was the case with [the killing of] Shaykh Mohammed al-Said, Abdelrazak Radjam, and others. Even some people whose sincerity and faith were recognized by the Armed Islamic Group were killed such as Abdelwahab Li-Amara... The group allowed itself to kill anyone who was not in line with it, even if he was striving to avoid dividing the ranks. Many Algerian Muslims were killed and their death was either denounced or was said to be as an act of deterrence or something like that. Eventually, the struggle appeared to be a battle between the movement and the Muslims of Algeria."[85]

- **Libyan Islamic Fighting Group (LIFG) – Libya**
  o While exiled abroad in Pakistan and Afghanistan, the LIFG began to morph into an identifiable organization.[86] Former LIFG Shura Council member Noman Benotman notes that by 1992 "the Muqatilah [LIFG] was well and truly established" and committed to "overthrow[ing] Mu'ammar Qadhafi and replac[ing] his regime with a hard-line Islamic state."[87] Benotman explained, "Our organization was ruled by a Shura Committee and, according to its charter, the Shura Committee needed a quorum of 7 people for its decisions to be legally binding. Usually there were up to 15 people in the Shura at any given point in time."[88]
  o Indeed, beyond merely fighting communist-led forces in Afghanistan, the gradually coalescing LIFG sought to "develop... fighting skills in anticipation of the day" they "would return to Libya to fight the Qadhafi

---

[84] "Communiqué #6 from the Islamic Fighting Group Regarding the Jihad in Algeria." Libyan Islamic Fighting Group (LIFG). June 6, 1996. http://www.almuqatila.com/AMEER/bayanat/bayan6.htm.
[85] "Communiqué #6 from the Islamic Fighting Group Regarding the Jihad in Algeria." Libyan Islamic Fighting Group (LIFG). June 6, 1996. http://www.almuqatila.com/AMEER/bayanat/bayan6.htm.
[86] "Treasury Designates UK-Based Individuals, Entities Financing Al Qaida-Affiliated LIFG." U.S. Treasury Department Press Release. February 8, 2006. http://www.treasury.gov/press/releases/js4016.htm.
[87] "Interview with Noman Benotman, former member of the LIFG Shura Committee." Jamestown Foundation. March 15, 2005. http://www.jamestown.org/news_details.php?news_id=101. See also: "Treasury Designates UK-Based Individuals, Entities Financing Al Qaida-Affiliated LIFG." U.S. Treasury Department Press Release. February 8, 2006. http://www.treasury.gov/press/releases/js4016.htm.
[88] "Interview with Noman Benotman, former member of the LIFG Shura Committee." Jamestown Foundation. March 15, 2005. http://www.jamestown.org/news_details.php?news_id=101.

regime."[89]   According to credible mujahideen sources, the main base for Libyan fighters "was in the Salman al-Farisi camp in the area of Ghindaw... located in the Pakistani tribal zone along the border with Afghanistan."[90]   In approximately 1986, the same Salman al-Farisi training camp frequented by the Libyans was "taken over" by associates of Saudi exile Usama Bin Laden following a joint decision made by founding Al-Qaida Shura Council members Abu Hassan al-Madani (a.k.a. Wael Jalaidan) and Abu Rida al-Suri (a.k.a. Mohammed Loay Bayazid). According to Abu Rida, "We would meet all the newcomers, explain the situation, give them information about the fronts and give them something useful to do."[91]   Abu Hassan similarly recalled, "The training... was concentrated in the hands of Abu Mohammed al-Sudani, Issam al-Liby [the Libyan], and an Afghani officer... each brother specialized in a particular type of gun, so that they could later train others how to use it."[92]

o   Confessed former Moroccan Al-Qaida operative L'Houssaine Kherchtou testified in U.S. federal court in 2001 that the LIFG played an early role for Al-Qaida by serving as its designated regional "franchise" organization:

> "Q.  Any other countries besides Algeria that had a group within al Qaeda?
> A.  We have the Libyan Fight Group...
> Q.  Did you know who the representatives of the Libyan Fighting Group were within al Qaeda?
> A.  Who is emir [commander]?
> Q.  Yes.
> A.  Saif al Liby.
> Q.  Do you know any other members of the Libyan Fighting Group who also belonged to al Qaeda?
> A.  I remember Abu Jaffar al Liby, and Abu Anas al Liby, and Hamzallah al Liby, and Abu Abdel Qader al Liby.  This is what I remember now.
> Q.  You mentioned this morning that there was a person named Hamzallah al Liby who worked in Pakistan helping you to get the passports and travel documents.  Is that the same person who was a member of the Libyan Fighting Group?
> A.  Yes.
> Q.  You mentioned this morning a person named Hamas al Liby.  Is that the same person who was a member of the Libyan Fighting Group?

---

[89] "Interview with Noman Benotman, former member of the LIFG Shura Committee." Jamestown Foundation. March 15, 2005. http://www.jamestown.org/news_details.php?news_id=101.
[90] "The Roots of the 'Libyan Fighting Group'... the story of the failure of the 'jihad movement' during the eighties." April 11, 2006. http://www.al-boraq.com/showthread.php?t=7247.
[91] Muhammad, Basil. *Al-Ansaru l'Arab fi Afghanistan*. The Committee for Islamic Benevolence Publications; ©1991. Page 119.
[92] Muhammad, Basil. *Al-Ansaru l'Arab fi Afghanistan*. The Committee for Islamic Benevolence Publications; ©1991. Page 119.

A. Yes."[93]

o   In addition to receiving military training from Al-Qaida instructors, LIFG recruits were also indoctrinated in Afghanistan by influential jihadist clerics such as Al-Qaida co-founder Dr. Abdullah Azzam, whose jihadist writings were later posted on the LIFG's Internet website.[94]  Indicating the extent of that indoctrination, the LIFG website also contained audio and video recordings of Bin Laden himself, imprisoned Egyptian jihad leader Shaykh Omar Abdel Rahman, the El-Mudzahid Brigade in Bosnia-Herzegovina, and Shaykh Mohammed al-Mohaisany—a prominent Saudi cleric who was detained by Saudi security forces following September 11, 2001 when he admonished his followers, "direct your forces against America, the center of disbelief and corruption... Oh Allah, direct your forces against them... Oh Allah, disintegrate their country... Oh Allah, eradicate them with your power and omnipotence!"[95]  Simply stated, while their primary goal remained deposing Muammar Qadhafi and establishing an Islamic state in Libya, as their stay in Afghanistan lengthened, LIFG leaders increasingly embraced their fellow mujahideen brethren from across North Africa and the Middle East, including Usama Bin Laden.

o   Like other regional Islamist movements, the LIFG also found kinship with arguably the most dominant force among Afghan-trained extremists in North Africa: the Egyptian terrorist organization Al-Gama`at al-Islamiyya. By the mid-1990s, supporters of Al-Gama`at in Europe and North America began distributing news updates regarding LIFG operations targeting the "apostate" Libyan regime.[96]  Likewise, according to Al-Qaida deputy commander Dr. Ayman al-Zawahiri, LIFG propaganda magazines published corresponding statements received from representatives of Al-Gama`at al-Islamiyya.[97]  The LIFG has been a particularly vocal ally of Al-Gama`at al-Islamiyya's imprisoned spiritual leader, the blind Shaykh Omar Abdel Rahman. In October 1995, Rahman was convicted in U.S. federal court of seditious conspiracy for inspiring an aborted wave of terrorism targeting New York landmarks (including the World Trade Center) and he was sentenced to life in prison.  Yet, even after Rahman was found guilty, the LIFG continued to issue propaganda material in his defense.  In May 1997, the LIFG released a new statement on Rahman's behalf:

---

[93] Trial Transcript; February 22, 2001. U.S. v. Usama Bin Laden, et al. S(7) 98 Cr. 1023 (LBS). United States District Court, Southern District of New York. Page 1281.

[94] http://www.almuqatila.com/audio&v/duroos/azaam.htm.  March 2001.

[95] http://www.almuqatila.com/audio&v/doros1.htm. March 2001. See also: http://www.almuqatila.com/audio&v/duroos/almuhayasane.htm.  March 2001. See also: http://www.citylinkcomputers.com/duafull.swf. August 2003.

[96] American Islamic Group. "Theater of Operation: MUSLIM LIBYA." Islam Report. February 16, 1996.

[97] "Al-Sharq Al-Awsat Publishes Extracts from Al-Jihad Leader Al-Zawahiri's New Book." Al-Sharq Al-Awsat, December 2, 2001.

"Shaykh Omar Abdel Rahman—may Allah set him free—refused to sell out his religion and decided to keep his words vivid and alive in the hearts of those who knew him and were raised on his teachings... His positions and efforts shall always be a model for those who are loyal to our banner and to the whole Islamic nation. Those who oppressed our Mujahid Shaykh and paid no heed to his senior clerical status, his age, and his blindness should know that by doing so they have offended the entire Islamic nation which admires Shaykh Omar Abdel Rahman and considers him to be a true role model and leader. The Islamic Fighting Group declares its support for Shaykh Omar Abdel Rahman and reminds Muslims everywhere about his predicament. [The LIFG] also warns the Americans to take heed of the growing anger among Muslims who have had enough with the American tyranny that has spread across the whole world."[98]

○ Others within the senior echelons of the LIFG sought to strengthen their ties directly with Usama Bin Laden and Al-Qaida. In 1992, just prior to leaving Afghanistan, top LIFG military commander Saif al-Liby and LIFG computer specialist Abu Anas al-Liby (a.k.a. 42-year old Tripoli native Nazih al-Raghie) enrolled in an elite course taught by another high-ranking Bin Laden associate on "surveillance, how to make surveillance of targets and how to collect information about these targets... for example... whether to go to see the target, then you take pictures of that target, then locate the target in a map, then if you can go in the target so as to see how many people are working there, if there are some people there or not... We trained how to use different cameras, especially small cameras."[99] According to former Moroccan Al-Qaida operative L'Houssaine Kherchtou (who was present for the training course), "At the end, Abu Anas al-Liby brought two computers so as to teach us how to put all this information we collected. Instead of reporting you put them in the computer and just put them in a disk so as to be easy to carry."[100]

○ Afterwards, while in exile in Khartoum, Abu Anas al-Liby continued his close relationship with Al-Qaida, allegedly spending time at local Al-Qaida guesthouses and holding various meetings with Bin Laden's personal secretary Wadih el-Hage.[101] Even after seeking political asylum in the United Kingdom, Abu Anas remained "in contact... by phone, and sometimes by e-mail" with his Al-Qaida instructor from Afghanistan.[102] Shortly thereafter, in 1993, Abu Anas al-Liby, his former instructor, and

---

[98] "A Support Letter from the Islamic Fighting Group to Shaykh Omar Abdel Rahman." http://www.almuqatila.com/AMEER/omarabdrahman.htm. May 31, 1997.

[99] Trial Transcript; February 21-22, 2001. U.S. v. Usama Bin Laden, et al. S(7) 98 Cr. 1023 (LBS). United States District Court, Southern District of New York. Pages 1143, 1281.

[100] Trial Transcript; February 21, 2001. U.S. v. Usama Bin Laden, et al. S(7) 98 Cr. 1023 (LBS). United States District Court, Southern District of New York. Page 1145.

[101] Trial Transcript; February 6, 2001. U.S. v. Usama Bin Laden, et al. S(7) 98 Cr. 1023 (LBS). United States District Court, Southern District of New York. Page 260.

[102] Trial Transcript; February 22, 2001. U.S. v. Usama Bin Laden, et al. S(7) 98 Cr. 1023 (LBS). United States District Court, Southern District of New York. Pages 1274-1275.

22

several other Al-Qaida operatives traveled to Nairobi, Kenya, in order to case local targets for possible terrorist attacks—including the French Cultural Center, the British Consulate, the local offices of the U.S. Agency for International Development, and the U.S. embassy. According to court documents, these attacks were being prepared "in retaliation for the United States' participation in Operation Restore Hope in Somalia."[103] L'Houssaine Kherchtou later testified in court that he had personally seen Abu Anas al-Liby less than 500 meters away from the U.S. embassy in Nairobi while carrying a surveillance camera.[104] Following subsequent terrorist attacks by Al-Qaida targeting U.S. embassies in Kenya and Tanzania in 1998, U.S. federal prosecutors indicted a number of Al-Qaida operatives in connection with the bombings—including Abu Anas al-Liby, who was charged with "conspiracy to murder, kidnap and maim at places outside the United States"; "conspiracy to destroy buildings and property of the United States"; and, "conspiracy to attack national defense utilities."[105]

o   Though Abu Anas allegedly distanced himself from Al-Qaida after LIFG operatives were forced to abandon their base in Sudan in 1995, Metropolitan police who searched his Manchester residence in the United Kingdom five years later in May 2000 discovered a 180-page computer file described as the "Declaration of Jihad Against the Country's Tyrants: Military Series,"[106] In its introduction, the document explained twice in identical language, "The confrontation that we are calling for with the apostate regimes does not know Socratic debates, Platonic ideals, nor Aristotelian diplomacy. But it knows the dialogue of bullets, the ideals of assassination, bombing, and destruction, and the diplomacy of the cannon and machine-gun."[107] The manual featured fairly complex and specific lessons on surveillance, hostage-taking, "assassinating enemy personnel as well as foreign tourists", "blasting and destroying the embassies and attacking vital economic centers", and "blasting and destroying bridges leading into and out of the cities."[108] On October 12, 2001, Abu Anas al-Liby was finally named by the U.S. government as a Specially Designated Global Terrorist (SDGT) for links to "acts of terrorism that threaten the

---

[103] Indictment. U.S. v. Usama Bin Laden, et al. S(7) 98 Cr. 1023 (LBS). United States District Court, Southern District of New York. Page 20.

[104] Trial Transcript; February 21, 2001. U.S. v. Usama Bin Laden, et al. S(7) 98 Cr. 1023 (LBS). United States District Court, Southern District of New York. Pages 1190-1192; 1211-1212.

[105] Indictment. U.S. v. Usama Bin Laden, et al. S(7) 98 Cr. 1023 (LBS). United States District Court, Southern District of New York. See also: http://www.fbi.gov/wanted/terrorists/teralliby.htm. See also: Trial Transcript; February 6, 2001. U.S. v. Usama Bin Laden, et al. S(7) 98 Cr. 1023 (LBS). United States District Court, Southern District of New York. Page 325.

[106] Trial Transcript; May 1, 2001. U.S. v. Usama Bin Laden, et al. S(7) 98 Cr. 1023 (LBS). United States District Court, Southern District of New York. Page 5239.

[107] Government Exhibit GX-1677. U.S. v. Usama Bin Laden, et al. S(7) 98 Cr. 1023 (LBS). United States District Court, Southern District of New York.

[108] Government Exhibit GX-1677. U.S. v. Usama Bin Laden, et al. S(7) 98 Cr. 1023 (LBS). United States District Court, Southern District of New York.

security of U.S. nationals or the national security, foreign policy, or economy of the United States."[109]

## PART II: Gulbuddin Hekmatyar and the Hezb-i-Islami

Gulbuddin Hekmatyar is a controversial Afghan mujahideen military commander, and is the leader of a mujahideen political faction active in Afghanistan and Pakistani tribal areas known as "Hezb-i-Islami" ("The Party of Islam"). Hekmatyar is a Ghilzai Pashtun by origin, born in 1947 in the northern Konduz province of Afghanistan to nomads who had recently arrived from the south. During the mid-1960s, Hekmatyar enrolled in the local military academy, but switched in 1968 to the faculty of engineering at Kabul University. At Kabul University, Hekmatyar came into contact with a number of Afghan Islamist professors and student activists who formed the first official Muslim youth political organization in Afghanistan, Jawanan-e-Musulman. At the head of this group of Islamist intellectuals was Professor Burhanuddin Rabbani, a scholar educated in Middle Eastern ideas of Islamic resurgence who would later help lead Afghan resistance to the Soviet army.[110] As early as the 1970s, Hekmatyar is reported to have participated in violent demonstrations at Afghan universities against offering equal rights for women—protests that included throwing acid on female students who were "shameful enough" to wear Western-style attire. He is also alleged responsible for the killings of females who dared to support RAWA, the Afghan women's communist league.[111]

On July 17, 1973, Mohammed Daoud (joined by key military officers and the minister of the interior) led a nationalist revolution in Kabul against the monarchical regime and seized power in a near-bloodless coup. Within a short period, Daoud soon came to be hated by large and influential sections of Afghan society, including both extreme left and right wing activists. Facing a purge by Daoud of radical activists of both leanings, Gulbuddin Hekmatyar fled to exile in Pakistan in 1973, where he became an official member of Burhanuddin Rabbani's Jamiat-e-Islami faction.[112] Pakistan, concerned about Daoud's dreams of an independent Pashtunistan straddling the Durand line, was more than happy to serve as a safe haven for Rabbani, Hekmatyar, and others plotting to overthrow Daoud's nascent nationalist regime.

Hekmatyar thereupon returned to his native land in July 1975 to participate in a series of anti-government Islamist uprisings led by activists of Rabbani's Jamiat-e-Islami.[113] The sporadic insurgency in the Panjsher, Laghman, and elsewhere targeted government buildings and other symbols of authority. Though Hezb-e-Islami representatives maintain that this campaign included "a couple of major attacks on the

---

[109] "31 CFR Chapter V (Appendix A): Blocked Persons, Specially Designated Nationals, Specially Designated Terrorists, Foreign Terrorist Organizations, and Specially Designated Narcotics Traffickers: Additional Designations of Terrorism-Related Blocked Persons." Rules and Regulations; U.S. Treasury Department; Office of Foreign Assets Control. Federal Register. Vol. 66; No. 208. October 26, 2001.
[110] http://www.afghan-web.com/bios/today/ghekmatyar.html. March 2004.
[111] http://rawa.fancymarketing.net/meenakillers-en.htm. March 2004.
[112] Roy, Olivier. Islam and Resistance in Afghanistan. Cambridge University Press; Cambridge, UK. ©1990. Pages 69-71.
[113] Rashid, Ahmed. The Taliban. Yale University Press; New Haven, CT. ©2000. Page 85.

regime of Daoud," it did not persist for long.[114]    Hekmatyar, accompanied by many other Jamiat fighters (among them, a young, wounded Ahmad Shah Massoud) fled back into Pakistan. These and other Afghan Islamist exiles were quickly coalescing in Peshawar to form resistance factions against both Daoud and growing pro-Marxist factions in Kabul.

However, it was not long before Hekmatyar's ruthless ambition earned him a notorious reputation among the leadership of the future Afghan mujahideen movement independent of Rabbani and Jamiat-e-Islami. Gulbuddin's supporters now insist that it was Rabbani and others who "split" from his group (rather than vice versa), taking "the first step towards the disunity of Mujahideen." Free of his former comrades, Hekmatyar birthed his own separate armed faction—the Hezb-e-Islami—which promptly "started the Jihad and established its fronts all over the country."[115]    Atlantic Monthly journalist Robert Kaplan concluded in 1988 that "Hekmatyar has built a tightly structured party apparatus that openly seeks to dominate the other parties in order to create an Islamic state under his leadership."[116]

The former website of the Hezb-i-Islami makes a vague attempt at elucidating Hekmatyar's proposed political platform. It is a revealing look at how Hekmatyar has attempted to shroud himself in a shallow façade of populist Islam. Under the section marked General, the Internet site explains that Afghanistan is destined for "an Islamic order" and all those opposed to it "will be the real foes of duty (obligation) of all the individuals."[117]    The Legislative Reforms sub-section lists the various prescriptions that Hezb intends to make as the basis for a new "Islamic order" in Afghanistan. The Quran and Muslim Sunnah (tradition) "will form the basis and source of our first rules, laws... Social problems and affairs will be settled through Hanafi Jurisprudence.    An authoritative Dept. will be founded for bringing all legislation and state rules and regulations in perfect harmony and agreement with the spirit of Islam in the shortest possible time."[118]    The secular legal code would be overthrown and replaced with arbitrary judgment by respected religious clerics.

The Hezb-i-Islami website also suggests a social code that can only be described (retrospectively) as Taliban-like: "efforts will be made to ban all kinds of evil-doing and immorality and ways and means, by which moral and ethical crimes are spread and deployed, will be ended... measures will be taken in the light of which fear of the Almighty will be revived in the conscience of the believers. They will also realise their religious obligations and their respect to religious laws and limits will be further developed."[119]    Hekmatyar lured his supporters with dreams of a utopian Islamic revolutionary state ruled by fear of God and a corresponding fear of "divinely-inspired" authority. According to Saifur Rahman Halimi (Hezb-i-Islami's foreign representative in the West), in Hekmatyar's Islamic utopia, "Allah is the greatest. Allah is much more superpower. Allah is the one who supports, who protects you.... When you say Allahu

---

[114] Rached N Zantout (rzantout@magnus.acs.ohio-state.edu). "Subject: Afghanistan and Hekmatyar." Newsgroups: soc.culture.afghanistan, soc.sulture.pakistan, soc.culture.arabic. January 19, 1994.

[115] Rached N Zantout (rzantout@magnus.acs.ohio-state.edu). "Subject: Afghanistan and Hekmatyar." Newsgroups: soc.culture.afghanistan, soc.sulture.pakistan, soc.culture.arabic. January 19, 1994.

[116] Kaplan, Robert. "Driven Toward God." The Atlantic Monthly. Vol. 262; No. 3. September 1988. *Page 16.*

[117] http://www.hezb-e-islami.org/general.html. March 2000.

[118] http://www.hezb-e-islami.org/legal.html. October 1999.

[119] http://www.hezb-e-islami.org/legal.html. October 1999.

Akbar ['God is the Greatest'], you are seeking help from Allah, then Allah will give you help. Allah will send his angels to protect you, to support you."[120]

Halimi expanded further on the theme of a larger, apocalyptic confrontation between the Western and Islamic world—and the need for a "united Muslim front" (with little discussion of what such a front would actually represent). At an Islamic conference held in the U.S. in 1992, he admonished, "We are here from different nationalities, from different countries, from different regions, different colors! But it is the Islam that makes us brothers and sisters. If you compare Islamic rules with Western rule, you cannot compare it... They know the power of Islam, they know that if the Muslims are united... if the Muslims establish an Islamic state in any part of this world, this movement will struggle against devils."[121] Hekmatyar's battle to seize control of Afghanistan was being portrayed as a critical phase of the universal battle between good and evil—a test of faith of the true believers in Islam. Saifur Rahman Halimi declared, "We know that different hands are working to stop the Islamic state in Afghanistan... East, West, kuffaar [non-believers], mushrikeen, they are stopping us, they are creating us problems... this is our responsibility: how to suffer, how to stand in front of them, and how to struggle, and how to continue our Jihad."[122]

Daoud Nassimi, a self-proclaimed ambassador on behalf of Hekmatyar in the U.S., wrote in 1994 that the Muslim world was blessed for having a leader with "such uncompromising commitment and determination for leading this miraculous Jihad which became the means of defeating and perishing the power and idealogy[sic] of Communism and a so called Super power."[123] Nassimi was quick to add that the battle against communism in Afghanistan was "only the beginning of the Mujahideen's struggle for the rest of the Ummah. [Gulbuddin] believes in continuing of Jihad for all of his life time and he feels very seriously responsible to support the oppressed Muslims all around the world." Nassimi rambled on into various Western conspiracies, including that Hekmatyar's position as the "backbone of jihad in Afghanistan" made him a natural target for the unspecified "enemies of Islam."[124] Hekmatyar, himself, has made no secret of his virulently anti-Western belief system. In a 1994 interview with the Illinois-based Al-Thilal newsletter (published by the Global Relief Foundation), he reportedly declared "they say [we are] fundamentalists and extremists... [because] eliminating Hizb Islami would please America and her stooges."

Hekmatyar's dominant position among the Afghan mujahideen and his commitment to fundamentalist Sunni Islam attracted the attention of Arab jihadists gathering in Pakistan under the lead of Al-Qaida co-founder Shaykh Abdullah Azzam.

---

[120] Videotape of 17th Annual Conference of the Islamic Circle of North America (ICNA); July 17-19, 1992. Session: "Freedom and Struggle in the Ummah." Speaker: Sair ur Rehman Halimi (Hezb-i-Islami Afghanistan). Topic: "Afghanistan: the Challenge Today."
[121] Videotape of 17th Annual Conference of the Islamic Circle of North America (ICNA); July 17-19, 1992. Session: "Freedom and Struggle in the Ummah." Speaker: Sair ur Rehman Halimi (Hezb-i-Islami Afghanistan). Topic: "Afghanistan: the Challenge Today."
[122] Videotape of 17th Annual Conference of the Islamic Circle of North America (ICNA); July 17-19, 1992. Session: "Freedom and Struggle in the Ummah." Speaker: Sair ur Rehman Halimi (Hezb-i-Islami Afghanistan). Topic: "Afghanistan: the Challenge Today."
[123] Rached N Zantout (rzantout@magnus.acs.ohio-state.edu). "Subject: Afghanistan and Hekmatyar." Newsgroups: soc.culture.afghanistan, soc.sulture.pakistan, soc.culture.arabic. January 19, 1994.
[124] Rached N Zantout (rzantout@magnus.acs.ohio-state.edu). "Subject: Afghanistan and Hekmatyar." Newsgroups: soc.culture.afghanistan, soc.sulture.pakistan, soc.culture.arabic. January 19, 1994.

Prior to his assassination in November 1989, Azzam acknowledged to his colleagues, "I had a passion to unite [Shaykh Abdul Rasool] Sayyaf and Hekmatyar because I saw in them most honest and ability to lead the jihad, so I tried endlessly to unite them... Hekmatyar was the one who had first called for jihad and [had control over] the largest forces inside Afghanistan—at that time he had 40% of the mujahideen—and he succeeded in most parts of Afghanistan."[125]    Azzam was especially impressed by Hekmatyar's raw contempt for America and the West. In a video produced for Makhtab-e-Khidamat by the Islamic Center of Lawrence, Kansas, Azzam led a panel discussion in Arabic about the state of the Afghan jihad, boasting:

> "Those with the military weight inside Afghanistan refused to deal with the Americans and refused American aid to begin with. Hekmatyar visited the United States in October 1985 and Reagan asked to meet Hekmatyar and Hekmatyar refused to meet Reagan, and the envoy who was sent to him by Reagan told him: 'you are crazy'... This envoy could not believe that there is someone in the world who would refuse to meet Reagan. He [Hekmatyar] said, 'Yes, I refuse to meet him and if you continue to insist on this, I will leave America right away. He held a press conference and... said America did not give us anything."[126]

In every speech he gave, Gulbuddin exhorted young Muslims to rise up in a jihad around the world.    At the end of the Soviet-Afghan jihad, Hekmatyar suggested to a meeting of American Muslims that "the Islamic movement in Afghanistan and the Jihad in Afghanistan is a very good effort and a very good example to be followed by the sons of Muslims throughout the world... We hope we could transfer this holy heritage to our brothers outside in the Islamic movements... We need to launch an all-embracing war in Afghanistan for three basic reasons – it will increase the casualties and losses of the enemy, it will enable the sons of Muslims to survive for a long time." He did not hesitate to refer to both superpowers as "the enemies of Jihad, the enemies of the Mujahideen of Afghanistan... we have kept the independence of this jihad from the filthy hands of the superpowers and very determined that inshallah [God-willing], we will continue to do so."[127]

As one of Al-Qaida's earliest Afghan allies, Hekmatyar has also had a close connection with its leader Usama Bin Laden. In an Arabic-language documentary film about Al-Qaida, Hekmatyar was asked about his relationship with Bin Laden:

> "Usama Bin Laden came to Afghanistan when many states used to encourage their youths to go to Afghanistan to take part in the battles there... A number of Muslims used to come from the United States too. They participated in the battles during the Russian invasion of Afghanistan. Usama Bin Laden also came at the same time... He stayed in Afghanistan."[128]

---

[125] Muhammad, Basil. *Al-Ansaru l'Arab fi Afghanistan*. The Committee for Islamic Benevolence Publications; ©1991. *Page 37.*

[126] Videotaped Interview with Abdullah Azzam. Produced by the Mujahideen Services Office (Makhtab-e-Khidamat al-Mujahideen). ©1988.

[127] 1989 audio recording of Gulbuddin Hekmatyar speaking in the U.S.; Comments in Pashto, then translated into English by an assistant.

[128] Najm, Salah and Jamal Ismail. "Usama Bin Laden, the Destruction of Al-Qaida." Al-Jazeera. First aired: June 10, 1999.

A multitude of evidentiary documents exhibited by the U.S. Attorney's Office in Chicago, Illinois in the case of <u>U.S. v. Enaam Arnaout</u> help to document the far-reaching extent of this longstanding relationship. In archives detailing Bin Laden's early history in Afghanistan, Hekmatyar is portrayed as a close ally, a ready source of weapons and ammunition, and a willing recruiter for the nascent Al-Qaida military federation. In a video recovered by the FBI, Hekmatyar is shown using a satellite telephone while seated next to Enaam Arnaout (a.k.a. Abu Mahmud Al-Suri), a senior Al-Qaida operative who ran the radio room at Bin Laden's underground



headquarters in Afghanistan.[129] Separately, in a book on the Afghan jihad published by Arnaout's Benevolence International Foundation (BIF), Hekmatyar is quoted as praising the actions of Al-Qaida's leaders at their "al-Massada" (a.k.a. "The Lion's Den") frontline camp inside Afghanistan: "The diligence shown by the Arab brothers in Al-Maasada, and their repulsion of five breakthrough attempts had a devastating impact on the enemy's morale."[130]

In the southeastern Afghan province of Khost, Hekmatyar established a major Hezb-i-Islami military training camp complex known as "Jihad Wal"—which quickly became "one of his most important camps", and was likewise critical to Al-Qaida's own worldwide terrorist operations.[131] One of the instructors at Jihad Wal was Egyptian Al-Qaida Shura Council member Abu Mohammed al-Masri (a.k.a. Abdullah Ahmed Abdullah).[132] Abu Mohammed al-Masri was later indicted on federal charges in the Southern District of New York, including murder of U.S. nationals outside the United States; conspiracy to murder U.S. nationals outside the United States; attack on a federal facility resulting in death; conspiracy to kill U.S. nationals, to murder, to destroy buildings, property, and national defense utilities of the United States. He is currently considered one of FBI's "most wanted terrorists"[133] Former Al-Qaida member Jamal al-Fadl, who studied under Abu Mohammed al-Masri and other almost exclusively Egyptian instructors, has testified in federal court about his knowledge of the camp:

---

[129] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. *See also*: "Jihad Report." *Al-Jihad*. P.O. Box 802; Peshawar, Pakistan. July 1987.

[130] Muhammad, Basil. *Al-Ansaru l'Arab fi Afghanistan*. The Committee for Islamic Benevolence Publications; ©1991. Page 362.

[131] Muhammad, Basil. *Al-Ansaru l'Arab fi Afghanistan*. The Committee for Islamic Benevolence Publications; ©1991. Page 179.

[132] Trial Transcript; February 6, 2001. U.S. v. Usama Bin Laden, et al. S(7) 98 Cr. 1023 (LBS). United States District Court, Southern District of New York. Pages 186-187.

[133] http://www.fbi.gov/wanted/terrorists/terabdullah.htm.

"We went to Jihad Wal camp... We got training under somebody, his name Abu Feda el Masry [from Egypt], and that time it's how to use a small gun... We got general training about how to use explosive and how to study them... We got training under Abu Jaffar [from Egypt] and he teach us how to load the different styles of explosives... He teach us about what kind of explosive, like TNT and C4 and how to use them, how to save them and how to make trick with them. Trick, if you want to kill somebody, if you want to stop somebody and you want to explode him and you know his car is going to be 2:00, he going to go somewhere, you need to put explosives in that road and time it and when he come, it's going to explosive... They got another training for more specific about explosives. That for people, they going to use them for specific operation, so they give them more details about the explosives."[134]

Another of the mujahideen recruits who trained at the Jihad Wal camp was Palestinian Mohammed Sadiq Odeh—a junior Al-Qaida operative who helped build the suicide truck bombs used in the 1998 East Africa embassy bombings. During questioning by the FBI, Odeh documented his experiences as an operative for Al-Qaida:

"ODEH stated that eventually one year passed before he decided to make beyat to BIN LADIN and AL QAEDA. During that one year, ODEH spent time at,... the Jihad Wael[sic] Camp for more advanced training in military tactics,.. ODEH remained in this camp for approximately 45 days which was the beginning of 1992. After the additional training [at Jihad Wal], ABU KHADIJAH told ODEH that he was ready and qualified to go to Peshawar to make beyat... After joining AL QAEDA, ODEH returned to the Jihad Wael Camp in Khost, Afghanistan, to get his assignment."[135]

Throughout the most disastrous stages of the ensuing Afghan civil war in the mid-1990s, Hekmatyar staunchly refused to compromise with other warlords and mujahideen leaders in a coalition government to try and bring peace to Afghanistan. Even after being appointed Prime Minister of the interim Afghan government by his former mentor Burhanuddin Rabbani, Hekmatyar insisted that he would not negotiate or accept sharing power with any reformed communists and continued to display his remarkable duplicity even as the Taliban slowly conquered Afghanistan, moving inexorably towards Kabul. Hekmatyar insisted on fighting deadly and fruitless turf battles over control of the capital with other militia commanders, including Ahmad Shah Massoud. The internecine bickering crippled the anti-Taliban resistance movement and ultimately razed the capital Kabul down to the ground.

Interestingly, as the Taliban gradually took over, many of Hekmatyar's Pashtun mujahideen following quickly surrendered and defected to the Taliban (who, more or less, espoused the same general quasi-Islamic hardline ideology as Hekmatyar). For all his rhetoric about Muslim brotherhood and a united front, Hekmatyar's influence has dwindled during his time spent in exile following the Taliban takeover of Kabul. Central Asian scholar Ahmed Rashid has since noted that allying themselves with Hekmatyar (and later the Taliban), this dubiously-loyal "Pashtun cadre developed its own agenda,

---

[134] Trial Transcript. U.S. v. Usama Bin Laden, et al. S(7) 98 Cr. 1023 (LBS). United States District Court, Southern District of New York. February 6, 2001. Pages 183-187.
[135] Government Exhibit GX-6 (Interview of Mohammed Sadiq Odeh by FBI Agent John Anticev). U.S. v. Usama Bin Laden, et al. S(7) 98 Cr. 1023 (LBS). United States District Court, Southern District of New York. Page 5.

aimed at furthering Pashtun power and radical Islam in Afghanistan at the expense of the ethnic minorities and moderate Islam."[136] In a 1988 interview, noted former University of Kabul Professor Sayd Majrooh scoffed at the notion of Gulbuddin as a legitimate Afghan political leader. He added, "Both Marxism and [Hekmatyar's brand of] fundamentalism are revolutionary and without roots in Afghan history. Each represents a strong, centralizing force, which Afghans—who have always resisted concentrations of power—completely reject."[137]

Although it seemed that Hekmatyar's days of jihad were over after he was chased into exile in Iran by the competing Taliban fundamentalist movement, his ambition has been given a new breath of life with the coalition military campaign in Afghanistan post-September 11. In May 2002, U.S. officials informed various media sources that a CIA-controlled drone aircraft had fired a missile at Hekmatyar, but missed its target. A Bush administration spokesman explained the action: "We do have concerns about Hekmatyar and possible plans against U.S. forces and his contacts with elements inside and outside Afghanistan -- Taliban and al Qaeda -- that would pose a threat to U.S. forces... So there are some serious concerns regarding Hekmatyar, both his associations as well as possible threats to U.S. forces."[138]

## PART III: The Foreign Mujahideen Brigade in Bosnia-Herzegovina

The civil conflict in the former Yugoslavia first erupted in June 1991 after Slovenia and Croatia declared their respective independence from Serbia. When ethnic Serbs rebelled against Bosnia-Herzegovina's self-declared independent government in April 1992, the Muslim-led Bosnian government was on the defensive and the ARBiH struggled to hold out against a superior military force. This predicament captured the attention of sympathetic Muslims elsewhere in the world, and particularly in the Middle East. While much of the aid from the Muslim world to the Bosnian government was given in the form of money and weapons in violation of an international arms embargo, there was also a volunteer battalion of foreign "mujahideen," or "holy warriors." These ideological mercenaries—originating from a wide range of countries including Saudi Arabia, Egypt, Yemen, Algeria, Morocco, Tunisia, Libya, Afghanistan, Pakistan, Palestine, Turkey, Syria, Jordan, France, the United Kingdom, Italy, and beyond—were led almost exclusively by Sunni Muslim extremists.

"At the forefront" of the movement of Arab volunteer soldiers to Bosnia were the mujahideen veterans of the anti-Soviet jihad in Afghanistan, which had served as "an institute for the teaching of jihad."[139] The Bosnian war happened to occur at a propitious time for the Arab-Afghans. In January 1993, the Pakistani government, eager to put the Afghan jihad in the past, ordered the closure of Arab mujahideen offices in the country and threatened official deportation to any illegal foreign fighters who attempted to remain in Pakistan. A month later, the U.S. Federal Bureau of Investigation secretly recorded a

---

[136] Rashid, Ahmed. The Taliban. Yale University Press; New Haven, CT. ©2000. *Page 188.*
[137] Kaplan, Robert. "Driven Toward God." The Atlantic Monthly. Vol. 262; No. 3. September 1988. *Page 16.*
[138] Aldinger, Charles. "CIA missile misses Afghan warlord Hekmatyar." Reuters. May 10, 2002.
[139] Azzam Publications. "The Martyrs of Bosnia: Part I." PAL/NTSC Format. Length: 150 minutes approximately. ©2000. EX: V000-3764-V000-3764

senior Egyptian jihad leader offering over the telephone to send new volunteers to the Arab-Afghan training camps in Pakistan. He was told, "all of them [are] closed, Sheik, nothing is left open... even the Base [Al-Qaida] is closed completely and from here... except for special situations."[140] These displaced men faced a serious problem, because return to their countries of origin meant likely arrest or even death. At the time, a Saudi spokesman for the Arab-Afghans in Jeddah explained in the media, "the Algerians cannot go to Algeria, the Syrians cannot go to Syria or the Iraqis to Iraq. Some will opt to go to Bosnia, the others will have to go into Afghanistan permanently."[141] His assessments were predictably accurate and a number of prominent Arab guerillas left South Asia destined for a new life amidst the brewing conflict in the Balkans.

Following the mujahideen conquest of Kabul in April 1992, a group of five senior Arab-Afghan military commanders led by the Saudi Shaykh Abu Abdel Aziz "Barbaros" traveled with four other unidentified veteran Arab-Afghan commanders to Bosnia-Herzegovina to "check out the landscape" and determine if the Balkans would serve as fertile ground for the displaced Arab-Afghan movement, which was no longer officially welcomed in Pakistan.[142] According to "Barbaros", "Many Arab mujahideen believe[d] that Jihad would be continuous [after Afghanistan] but did not know where it would be and how to get there. By Allah's power, 15 days after the jihad in Afghanistan finished the Jihad in Bosnia started... This jihad against the Christian forces marks a starting point for the Jihad of the Muslims (against the Christians)... This is a great opportunity now to make Islam enter Europe via jihad. This can only be accomplished through jihad."[143] A 1994 Bosnian government memorandum from a senior officer in the ARBiH Security Service acknowledged that Abu Abdel Aziz had previously fought "in Afghanistan, Philippines, Kashmir, Pakistan, and Albania" and that, moreover, "under the auspices of material aid, there is an indication that his stay in Middle Bosnia is related to the organized transfer and engagement of some 1000 fighters from African-Asian countries into the units of the R BH Army who are hiding from the prosecutorial authorities of their countries of origin."[144]

For North African militants trained in Afghanistan, the real value of Bosnia-Herzegovina was as a step in the ladder towards Western Europe and the regimes controlling Egypt, Algeria, Tunisia, and Morocco. It was a place with proximity to London, Riyadh, and Cairo—where terrorist recruits could train, coalesce into cells, and seek shelter from prosecution by foreign law enforcement. In another conversation wiretapped by the FBI, a lieutenant of Al-Gama'at al-Islamiyya leader Shaykh Omar Abdel Rahman explained the strategy of using the Bosnian war as a cover for a greater

---

[140] FBI Transcript of conversation involving Omar Ahmad Ali Abdel Rahman, "Muhammad" LNU, and two unidentified males. March 20, 1993. United States v. Omar Ahmad Ali Abdel Rahman et al. S3 93 Cr. 181(MBM). Government Exhibit 7057. *Page 11*.

[141] Evans, Kathy. "Pakistan clamps down on Afghan Mojahedin and Orders Expulsion of Arab Jihad Supporters." The Guardian (London). January 7, 1993. *Page 7*.

[142] Tabib, Tawfig. "Interview with Sheikh al-Mujahideen Abu Abdel Aziz." Al-Sirat Al-Mustaqeem. Issue No. 33; August 1994.

[143] "The Jihad in Bosnia." Al-Daawah (Islamabad). P.O. Box 3093; Islamabad, Pakistan. Publisher: Shaykh Waseem Ahmed. January 1993.

[144] "Disruption of the enemy's activities." Memorandum dispatched from Zenica by Colonel Ramiz Dugalic, commander of the Ministry of Defense Security Administration – Republic of Bosnia and Herzegovina. Army of Bosnia and Herzegovina (ARBiH) Security Service Department. Classified No. 258-33. September 14, 1994.

mission: mujahideen recruits "go to Bosnia, I mean, they depart... And whoever survives, I mean, could come and... [instruct] somewhere else, or Egypt, or any other place, etc... we can get started at anyplace where Jihad is needed."[145]

Indeed, as early as September 1992, Mohammed Abdel-Gayyed—a representative of Al-Gama'at Al-Islamiyya—admitted to journalists, "We have fighters in Bosnia. I can't say how many they are... that's a strategic secret."[146] The leaders of North African militant groups led by Al-Gama'at al-Islamiyya turned to the opportunities presented by the Bosnian war with a fanatic gusto. On January 16, 1993, only weeks to the World Trade Center bombing in New York, Shaykh Omar addressed a "Conference on Solidarity with Bosnia/Herzogovina" and demanded, "Who is the one who is fighting the Muslims? And, who is the one who wants to destroy them? There are two main enemies. The enemy who is at the foremost of the work against Islam are America and the Allies. Who is assisting the Serbs? And who is providing them with weapons and food? Europe, and behind it is America."[147] Furthermore, according to Shaykh Omar, because the U.S. and Great Britain seek to "exterminate the Muslims [in Bosnia]... then, we must be terrorists and we must terrorize the enemies of Islam and to frighten them and to disturb them and to shake the earth under their feet." He concluded by directing listeners to "ready your strength to the utmost of your power, including steeds of war, with which you frighten the enemies of Allah, your enemies."[148]

Other North African extremists besides merely Egyptians also played key roles in the growing mujahideen network anchored in Bosnia. Dr. Abul-Harith al-Liby (a.k.a. Mohammed Abdelwahab Yousef)—a Libyan in his late 30s from Austria—was among the top military commanders of the Arab mujahideen in Bosnia-Herzegovina beginning in December 1992. His medical skills and sharp mind were invaluable assets for militants who were often easily provoked. Mujahideen sources have since written of Dr. Abul-Harith:

> "With a Kalashnikov rifle in one hand and a medical kit in the other, he accompanied the mujahideen in all of their operations. Fighting in the front line one minute and attending to the injured in the second line in the next minute, Abul-Harith used the medical knowledge that Allah had given him, and became the doctor in charge of the mujahideen... His wisdom, intelligence, and strong character made him a senior figure amongst the foreign fighters."[149]

Nor can one ignore the key roles played by Algerian nationals, many of whom were disciples of the Armed Islamic Group (GIA). Algerian mujahideen volunteers saw themselves as heirs to a legacy of confrontation with Christian "crusaders"—whether it

---

[145] FBI Transcript of conversation between Emad Salem and Siddig Ibrahim Siddig Ali. United States v. Omar Ahmad Ali Abdel Rahman et al. S3 93 Cr. 181(MBM). Government Exhibit 641-1T. Pages 19-21.
[146] Sammakia, Nejla. "Government Uneasy As Fundamentalists Rally To Cause of Bosnian Brethren." The Associated Press. September 26, 1992.
[147] Shaykh Omar Abdel Rahman. "The Inevitability of Jihad for the Solution of our Problems and for the Frightening of the Enemies of God." Speech given at the Conference on Solidarity with Bosnia/Herzogovina. January 16, 1993.
[148] Shaykh Omar Abdel Rahman. "The Inevitability of Jihad for the Solution of our Problems and for the Frightening of the Enemies of God." Speech given at the Conference on Solidarity with Bosnia/Herzogovina. January 16, 1993.
[149] Azzam Publications. "Under the Shades of Swords."

be in North Africa or in Europe. "I hate the French," an Algerian Arab-Afghan in Sarajevo bitterly noted, "hate them—more than I do other countries, because of what they did in Algeria. We drove them out of my country and we will also win in Bosnia."[150] One Algerian commander in particular distinguished himself by rising quickly through the ranks of the mujahideen in Bosnia-Herzegovina: Abu el-Ma`ali (a.k.a. Abdelkader Mokhtari, "The Gendarme"). Abu el-Ma`ali was a recent university graduate working in Italy in 1992 who traveled to Bosnia soon after hearing "about the aggression on BiH" and "was among the first Arab volunteers to join the BiH Army Defense Forces."[151] By mid-1993, he was the undisputed top "amir" of the Bosnian El-Mudzahidin Unit, answering only to Shaykh Anwar Shaaban. Abu el-Ma`ali was no exception among his militant North African colleagues: he has since been described by U.S. officials as a "junior Osama bin Laden."[152] In reflection, Abu Hamza al-Masri, an Egyptian Arab-Afghan recruiter based in London who has known Abu el-Ma`ali since the early days of the Bosnian jihad, mused "I think he's a good person, a good-hearted person. Hard-working. He was a leader... hard worker, a lion in fighting... a good brother—but he's too young and he's too naive."[153]

On September 22, 1995, in a communiqué issued from Zenica, Abu el-Ma`ali adamantly demanded of his "enemies" in the U.S., French, and British governments:

> "[W]hy were you surprised to see the victory of Muslims? The reason is well-known; the US which controls this ailing world along with the Jews and Christians... hated to see the [Muslims] becoming victorious over the worshippers of the cross, the Orthodox, and they wanted to use this for their own advantage... We know that we will have a day in which to fight the Jews, and the Almighty will grant us victory, and also we know that the best soldiers will fight the Christians and all of these are promises and rejoices from the Messenger of Allah."[154]

Several days later, Abu el-Ma`ali followed this declaration with an appeal directly to the international supporters and sympathizers of the Bosnian mujahideen movement to "RISE UP IN SUPPORT OF YOUR BROTHERS, and remove the obstacles from around you. We send you our greetings... despite the plots of the enemies and the un-believers in an evil attempt to suppress these successes and conquests in order to claim it for themselves." Abu el-Ma`ali blamed these "conspiracies" on "the US and the Crusade West, so be aware of the plots of the enemies of Allah and their hate of Islam and Muslims, and Allah is well aware of what they do."[155]

---

[150] Fisk, Robert. "An alien 'brother' fights for Muslims." The Independent (London). July 14, 1993. Page 9.

[151] Beganovic, Ezher and Kemal Bakovic. "Commander of the El-Mudzahid Detachment Abu el-Maali: 'We Did Not Commit War Crimes.'" Saff Magazine. July 8, 2005. Pages 20-23.

[152] Pyes, Craig with Josh Meyers and William Rempel. "Bosnia Seen as Hospitable Base and Sanctuary for Terrorists." Los Angeles Times. October 7, 2001.

[153] Interview with Shaykh Abu Hamza al-Masri at the Finsbury Park Mosque; June 28, 2002.

[154] "Importat[sic] Communique to Muslims." Armije Republike BH 3, Korpus; Odred "El-Mudzahidin": Unidentified communiqué issued by Abu el-Ma`ali, dated September 22, 1995. Islam Report. The American Islamic Group (AIG). September 23, 1995.

[155] "Congratulatons[sic] to the Muslim World." Armije Republike BH 3, Korpus; Odred "El-Mudzahidin": Unidentified communiqué issued by Abu el-Ma`ali. Islam Report. The American Islamic Group (AIG). September 25, 1995.

The activities of Arab mujahideen in Bosnia-Herzegovina became widely-publicized, especially in the Muslim world, as the result of several Arabic-language propaganda videos produced by the El-Mudzahidin Unit. Among the most popular of these productions was the video "Operation Badr al-Bosna", which featured the stories of Arab mujahideen fighting in central Bosnia in 1995—culminating in their grisly "martyrdom" during the final, triumphant operation of the Bosnian war, Operation Badr. The video also includes lengthy footage of senior Egyptian Al-Gama'at al-Islamiyya leader Anwar Shaaban (a.k.a. Abu Abdelrahman al-Masri); the top commander of the Arab mujahideen in Bosnia-Herzegovina, Algerian national Abu el-Ma'ali; and the reputed head of Arab mujahideen intelligence operations in Bosnia, Syrian national Aiman Awad (a.k.a. Abu Ayman). From my research, I recognize the primary purpose of this video as twofold: to solicit financial contributions from wealthy foreign donors and to inspire a wide audience of human volunteers to travel to Bosnia-Herzegovina (or another equally suitable jihadi frontline) and join the mujahideen—presumably in a quest for "martyrdom."

The suspicions of the Bosnian-Muslim government regarding their foreign allies increased over time after the mujahideen carried out a series of embarrassing atrocities—including the killing of Western aid workers and even fellow Muslims. The same 1994 memorandum from the Bosnian Muslim Military Security Service Department sternly warned top Bosnian Army commanders and the BiH Ministry of Defence:

> "...The unit does not execute the Commandant's orders. They persistently refuse to provide their personal data for preparing the unit explaining that they do not trust the authorities of the RiK of the R BH Army and that they fear that the authorities of their countries of origin may find out about them. This attitude is in contrary with the advocating activities of some individuals, that they should fight the positive legal provisions of the R BH, as addition to ignoring them... Individuals treat disparagingly the educational, cultural and other features of the Bosniacs-Muslims. Neglecting the national characteristics, particularly religious traditionalism, individuals cause political damage in and outside the R BH due to not yet definitely established motives... [The refusal of the mujahideen to] provid[e] their personal data is most probably due to possible links with [intelligence agencies] or committed criminal offences in their countries of origin... in case their countries learnt about their stay here, they would demand their extradition... There is the assessment of the responsible persons from the 3rd Corps, as well, that the members of 'El-Mujahidin' Unit cause political damage to the R BH."[156]

Among the specific events cited in the report was a confrontation that took place on August 1, 1994 when "two armed members of "El-Mujahidin" Unit came down to the hall of the Croats' Cultural Center of Zenica and demanded that the children should stop performing a cultural-entertainment program or they would use weapons." [157]

[156] "Disruption of the enemy's activities." Memorandum dispatched from Zenica by Colonel Ramiz Dugalic, commander of the Ministry of Defense Security Administration – Republic of Bosnia and Herzegovina. Army of Bosnia and Herzegovina (ARBiH) Security Service Department. Classified No. 258-33. September 14, 1994.

[157] "Disruption of the enemy's activities." Memorandum dispatched from Zenica by Colonel Ramiz Dugalic, commander of the Ministry of Defense Security Administration – Republic of Bosnia and Herzegovina. Army of Bosnia and Herzegovina (ARBiH) Security Service Department. Classified No. 258-33. September 14, 1994.

34

In May 1995, the Bosnian Muslim Military Security Service issued a second major analytical report to senior Bosnian Army commanders regarding the foreign mujahideen, warning:

"Service of military security came to the conclusion that these activities, although as a rule carried out under the pretext of humanitarian and military aid provided to Bosnians-Muslims, rather often served as a base for creating of the intelligence positions of the states that are not amicably inclined towards the R BiH, and even as a base for 'indoctrination' of the Bosnians-Muslims believers, in posing them the new approach to the Islam according to the 'vehabijski mesheb' [Wahhabi ideology]... Special security problem presents that the command of the unit 'El Mudzahedin' is hiding the real manpower of its unit and that all members of this unit live and act under the false names and when they arrived to our country, majority of the volunteers from this unit did not respect the law regulations to register their place of residence... A number of persons that acquired our citizenship/passport... are hiding their identity, because they are the persons from the Interpol wanted circulars... With their behavior and acting, the members of the 'El Mudzahedin' unit frequently violate current law regulations of our country and incidents are taking place every day, whose perpetrators are the members of this unit... it has the significant negative and multiple damaging consequences for the BiH state... [T]he activities of the persons from Afro-Asian countries are causing rather negative consequences, and these persons are present in BiH as members of the Army... Persons from Afro-Asian countries are the perpetrators of numerous illegal activities, thus causing the anxiety and revolt of the citizens from this area... the adequate legal measures cannot be undertaken against the perpetrators because they are hiding their identity and because of that they are not available for the bodies of prosecution... it is necessary that on the level of the highest state and military bodies, clear standpoints should be assumed, that would result in tasks for bodies and services of security on solving of this problematic that... could considerably ruin the reputation of the R BiH state and our Army.[158]

## PART IV: Ibn-ul-Khattab, Shamil Basayev, and the Mujahideen in Chechnya

Ibn-ul-Khattab (a.k.a. Samir al-Suwailem) was born in Saudi Arabia in 1970. In 1987, at the age of 17, Khattab first left his home in Saudi Arabia in a bid to join the jihad in Afghanistan. He became famous when he fought in the "Lion's Den" military operation near Jaji, Afghanistan alongside many of the most famous mujahideen leaders, including Usama Bin Ladin, Sheikh Abdullah Azzam, Abu Zubair al-Madani, and Sheikh Tameem Adnani. The commander of the Lion's Den operation was Abu Abdur-Rahman As-Sarehi (a.k.a. Hassan As-Sarehi), the personal teacher and trainer of Ibn-ul-Khattab who had taught him much of what he knew from the time Khattab came to Afghanistan as a young teenager. In 1995, the Pakistani government arrested As-Sarehi and extradited him to Saudi Arabia to face charges of involvement in the terrorist bombing of a U.S. military facility in Riyadh.[159]

---

[158] "Review of the Information on Activities of the Persons from Afro-Asian Countries Directly Before the War and During the War in the Territory of BIH Republic." Report written by the BIH Administration of the Military Security Service– Department for Analytical and Informative Affairs." Sarajevo; May 6, 1995.
[159] Itstrue289077511(itstrue289077511@aol.com). "Imprisoned brothers." Newsgroups: soc.culture.pakistan.religion. November 25, 2001.

After winning glory and respect among the Arab mujahideen on the Afghan frontline, Khattab went on to lead mujahideen delegations on expeditions into other emerging conflict zones in the Muslim world, including in Tajikistan and the Caucasus region. Khattab became particularly recognizable in his role as senior commander of foreign mujahideen forces in Chechnya, including for his insistence on personally participating in combat operations. In the spring of 1995, Ibn-ul-Khattab and eight other Arab-Afghans first arrived in Chechnya to aid the native resistance. Among this group of well-known senior Arab mujahideen commanders who had fought together in Afghanistan and Tajikistan were Yaqub al-Ghamidi (and his deputy Abu Walid al-Ghamdi), Abu Jafar al-Yemeni, Hakim al-Madani, and Abu Bakr Aqeedah.[160] Teamed up with a well-trained Chechen Islamist guerilla, Shamil Basayev, Khattab and his "friends" quickly established a "foreign holy warrior" battalion in Chechnya to both offer military training to willing locals and to conduct guerilla attacks on Russian forces. That battalion was primarily responsible for no less than five major armed assaults (Khartashoi in 1995; Shatoi in 1996; Yashmardy in 1996; and twice in Dagestan in 1997 and 1999). By estimates from Moscow, the April 1996 ambush at Shatoi alone left 223 Russian soldiers dead (including 26 "senior officers") and 50 military vehicles destroyed. The Arab battalion was also involved in the now-famous guerilla operation that retook Grozny from Russian control in August 1996, and a daring attack on a military base some 100 kilometers inside Russia in December 1997.[161]    Additionally, Khattab was responsible for restarting the Chechen war when he led several thousand guerillas in an armed adventure to "liberate" neighboring Dagestan from Russian control in August 1999.

Khattab's partner in Chechnya—notorious warlord Shamil Basayev—had an even more notorious reputation. As civil conflict threatened to emerge in the Caucasus during the late 1980s, Basayev traveled to the tense regions of Abkhazia and Nagorno-Karabakh, where he actively fought "the Crucifixers." When the USSR finally crumbled in the summer of 1991, he organized "several units" to receive training and indoctrination at the Arab mujahideen camps in Afghanistan. Those units, presumably along with Shamil himself, were subsequently dispatched to fight alongside Islamic militants in Tajikistan. However, Basayev really earned his reputation during the first Russo-Chechen war for literally bringing the Russian army "to its knees." In June 1995, he led a daring raid on the southern Russian town of Budyonnovsk, where 100 Chechens successfully held out against almost 15,000 enemy troops. Basayev also claims to have commanded the 11,000 guerillas who forcibly evicted the Russian military from Grozny in August 1996. In late August 2005, Basayev acknowledged his involvement in the bloody Beslan school siege and subsequent massacre in Ingushetia, a Caucasus region adjacent to Chechnya: "All we were doing was holding people, demanding an end to the war and the genocide in Chechnya, and it was the Russists who killed their own people."[162]  By the end of the

[160] "World Exclusive Interview with Field Commander Shamil Basayev." Azzam Publications. February 21, 2000. http://www.qoqaz.net.
[161] "Profile: Ibn-ul-Khattab, Commander of the Foreign Mujahideen in the Caucasus." http://www.qoqaz.net.
[162] "No-one can prevent me from doing what God permits me to do." Kavkaz Centre Interview with Shamil Basayev. March 24, 2005.
http://www.kavkazcenter.com/eng/content/2005/03/24/3640.shtml/t_blank.

disastrous siege in Beslan, 330 innocent people were murdered, many of them young children.

Between 1995 and 2002, Ibn-ul-Khattab became a widely acknowledged "hero" among trans-nationalist Islamic militants as a result of his carefully documented exploits in waging jihad against Russia in the Caucasus. Russian authorities blame him for, among other things, a series of bombings that rocked Moscow apartment complexes in August 1999. Conversely, in response to Al-Qaida terrorist attacks on Western targets, Khattab commented, "There is no difference between the American Army and the Russian Army. They seized our territory, and Muslims have the right to seek such a solution."[163] In mid-1997, after settling his family in Karachi, Pakistan, Khalid Sheikh Mohammed—the future mastermind of the September 11 suicide hijackings—"tried to join the mujahid leader Ibn al Khattab in Chechnya" but was "unable to travel through Azerbaijan."[164] Following his capture, KSM later told American interrogators that "several" of the 9/11 hijackers had also initially sought to join Ibn-ul-Khattab but similarly "faced problems traveling to Chechnya and so went to Afghanistan, where they were drawn into al Qaeda."[165] In March 2002, Ibn-ul-Khattab was finally poisoned and killed by assassins recruited from within his own organization by Russian security services.[166]

## PART V: Care International / The Al-Hussam Newsletter

Care International was founded in April 1993 in Boston, Massachusetts. The stated purpose of the charity organization was to "provide assistance to war victims and to war refugees around the Muslim world," in countries such as Chechnya, Bosnia, Palestine, Afghanistan, Kashmir, Sudan, Bangladesh, and Turkey. However, Care International has done much more than merely provide charity aid to refugees and war victims. In fact, long prior to its official founding in 1993, the organization acted as the local branch office of the Al-Kifah Refugee Center (a.k.a. Makhtab-e-Khidamat) in Boston.

In early 1993, just prior to the emergence of Care, the wide-ranging network behind Makhtab-e-Khidamat suddenly became the focus of several international governments, including the United States and Pakistan. In America, the Al-Kifah headquarters in Brooklyn was forced to close after being linked to the terrorist cell responsible for the 1993 World Trade Center bombing and a subsequent interlinked cell plotting to attack a series of major landmarks in the New York metropolitan area. Meanwhile, over in Pakistan, the government decided it was long since time to put the Afghan jihad in the past, and ordered the closure of Arab mujahideen offices in the country—threatening official deportation to any illegal foreign fighters who attempted to remain in Pakistan. A month later, the FBI secretly recorded Shaykh Omar Abdel Rahman offering over the telephone to send new volunteers to the Arab-Afghan training

---

[163] Gall, Carlotta. "Muslim Fighter Embraces Warrior Mystique." The New York Times. October 17, 1999. Section 1; *Page 16.*

[164] The 9/11 Commission Report. Final Report of the National Commission on Terrorist Attacks Upon the United States. July 22, 2004. *Page 139.*

[165] The 9/11 Commission Report. Final Report of the National Commission on Terrorist Attacks Upon the United States. July 22, 2004. *Page 233.*

[166] "Biography of Ibn-ul-Khattab VCD." http://www.waislamah.net. ©2002.

camps in Pakistan. He was told, "all of them [are] closed, Sheik, nothing is left open... even the Base [Al-Qaida] is closed completely and they all departed from here... except for special situations."[167]   In an interview conducted at the Finsbury Park mosque in London in July 2002, mujahideen spokesman Abu Hamza al-Masri told me that these stranded jihadis began to debate among themselves, "shall we go, shall we run to Afghanistan... provided we go out [of Pakistan]... But then even if we tell them go inside Afghanistan... people would not take the chance to go inside... I would not dare to go there without weapons and without hand grenades."  Thus, in order for the Arab mujahideen to continue their activities in the region, they would require a trustworthy native Afghan ally to protect them and a credible cover for the now explicitly-forbidden activities of the Makhtab-e-Khidamat al-Mujahideen.

The U.S. Attorney's Office in Boston has provided me with an evidentiary document which appears to be the minutes of a meeting that took place on April 23, 1995 between several individuals, who I believe included Emaddedine Muntasser (a.k.a. Abu Abdelrahman), Mohamad Akra (a.k.a. Abu Idris), and Mohammad Chehade (a.k.a. Abu Fayez).  The meeting appears to be a conference of senior U.S.-based representatives of Makhtab-e-Khidamat.  The

# What is CARE International?

**CARE** is a non-profit organization founded by Imam Abdullah Azzam to provide services to war victims and refugees around the world. For over eight years it has been administering schools, hospitals, and refugee camps .

minutes reflect a clear acknowledgment of events in Pakistan, noting that "guest homes, the Islamic Center, [and the] Peshawar office [have been] closed due to the situation." There are also several references to "changing the name of the Services Office", creating a "separate structure", and attempting to "frame... general policies (some written and some understood) for the work in America."[168]  In line with these stated objectives, the corporate entity known as "Care International" seems little more than a flimsy public cover for the continuing fundraising and recruitment activities of Makhtab-e-Khidamat al-Mujahideen.  The cover was so flimsy that the organization kept the same officers and a virtually identical newsletter, continued to advertise its association with Makhtab-e-Khidamat founder Shaykh Abdullah Azzam, and even—in some cases—used the exact same mailing address as Al-Kifah.

Indeed, a number of flyers and fundraising appeal letters found at the Brooklyn headquarters of Al-Kifah directly implicate Care International officials from Boston in fundraising, recruiting, and providing other forms of key logistical support for violent jihad.  A December 1991 letter from the "Islamic Coordinating Committee" was addressed to one-time Care International President Emadeddin Muntasser at the Al-Kifah

---

[167] FBI Transcript of conversation involving Omar Ahmad Ali Abdel Rahman, "Muhammad" LNU, and two unidentified males. March 20, 1993. United States v. Omar Ahmad Ali Abdel Rahman et al. S3 93 Cr. 181(MBM). Government Exhibit 7057. Page 11.

[168] Exhibit CI1347. U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla. Criminal Action No. 05-40026-FDS. United States District Court; District of Massachusetts.

Refugee Center location in Brooklyn. Muntasser's name also appeared on at least three separate envelopes containing donation checks destined for Abdallah Azzam and the Mujahideen Services Office in Peshawar.[169] Ahmad Nawras, the registered agent and former treasurer of Care International, also appears several times in documents in the files of the Brooklyn office of Al-Kifah. In one such letter, he sent an $80 check to Al-Kifah in Brooklyn and asked for "five video tapes of Ibn Taimiyya" in return. He ended the letter with the words, "May God bless you."

Care International's fundraising literature, publications, and website have all openly glorified jihad and martyrdom. In 1993, Care International issued a flyer to local Muslims titled, "A Call to Jihad in Bosnia." After discussing the human tragedy in Bosnia, the flyer followed: "Ask yourself what you are doing for these Muslims. Ask Muslim governments what they are doing for these Muslims and their freedom. If you Desire to provide the Emerging Jihad Movement in Bosnia with more than Food and Shelter, Please send your [religious donations] to: Bosnia Fund c/o Alkifah Refugee Center, 1085 Commonwealth Avenue Suite 124", which is in fact the registered corporate address of Care International.[170] Care's notorious, now-defunct newsletter, known as "Al-Hussam" ("the Sword"), described itself as an exclusive, authentic source of information about "Jihad action".[171] In the Spring of 1993, the masthead of Al-Hussam identified it intermittently as both the official newsletter of Care International and the Al-Kifah Refugee Center. All copies of the printed newsletter bore the official Al-Kifah logo. Care International's first website was also the home of Al-Hussam online. Al-Hussam contained such violent exhortations as "Fight them, and Allah will punish them by your hands, and disgrace them, and help you (to victory) over them" and "it is now that fighting has come and there will always be a group of [Muslims] who fight in the path of Allah... they fight until the day of Judgment."[172] The newsletter also contained highly unusual news reports from illicit terrorist or extremist organizations with links to the Afghan jihad; for instance, one such edition of Al-Hussam printed in mid-December 1995 contained breaking information about the activities of Al-Gama`at al-Islamiyya, the GIA, the LIFG, and the foreign mujahideen in Bosnia-Herzegovina (in the form of a direct communication with deputy commander Dr. Abul-Harith al-Liby).[173]

The July 28, 1995 edition of Al-Hussam featured an essay titled, "The Story of a Mujahid." The article, written by an unknown author, explicitly encouraged Muslims living in the United States to abandon their jobs and families in order to sacrifice their lives in the cause of violent jihad in various conflict zones across the Muslim world:

---

[169] Letter from Ahmad Elkadi, Committee Chairman of the Islamic Coordinating Committee. P.O. Box 38. Plainfield, IN 46168. Letter was addressed to: "Br. Emadeddin Muntasser. Al Kifah Refugees Center Inc. P.O. Box 294. Brooklyn, NY 11217."

[170] "Bosnia Fund c/o Alkifah Refugee Center." 1085 Commonwealth Avenue, Suite 124. Boston, MA 02215. "A Call For Jihad in Bosnia." Flyer found amongst material found at the former headquarters of the Al-Kifah Refugee Center in Brooklyn, NY.

[171] Tabib, Tawfig. "Interview with Comm. Abu Abdel Aziz Barbaros." Al-Sirat Al-Mustaqeem. August 1994. Please note the following prefaced section: "For updates on 'Jihad action' consult the homepage of CARE INTERNATIONAL, INC. or al-Hussam on-line (The Sword on-line)."

[172] Al-Hussam Newsletters. Care International. Editions released on April 16, 1993 and February 5, 1993.

[173] Exhibit CI1258. U.S. v. Muhamed Mubayyid, Emadeddin Muntasser. and Samir Al-Monla. Criminal Action No. 05-40026-FDS. United States District Court; District of Massachusetts. Originally taken from: Al-Hussam. Vol 4; No. 16. December 15, 1995.

"This story contains a lesson and wisdom—a reminder to those who sit back and... [are] hesitant who are fearful for their worldly lives... This story is centered around one of our Muslim brothers who completed his studies in his country and then journeyed to the U.S., spurred on by his parents, in order to attain specialization... In America, his eyes were opened to the wounds of the ummah. He was seared by the horrifying pictures reaching us from all over... by the reports of Muslim women's chastity being violated at the hands of the Crusader criminals... He realized... that there could not be a life in this country, for his life could only be lived in the land of jihad and ribat (frontier-guarding). Thus, he packed his suitcase and left, never to return... He left, leaving everything behind him, taking nothing with him other than jihad apparel and some money... We used to hear these stories from afar and become elated by them, but finally, we saw it in real life. As much as it instilled pride in our hearts for our brother, it [also] left a great impression on us."[174]

I have been provided with numerous copies of the Al-Hussam newsletter (in addition to my own collection) by the U.S. Attorney's Office in Boston, which shed further light on the mission of Care International and its efforts to recruit American nationals to fight abroad in the cause of violent jihad. The edition of Al-Hussam released on August 16, 1994 under the "Care International" letterhead contains an Arabic-language excerpt from Al-Jihad Magazine, the official publication of Makhtab-e-Khidamat in Peshawar, Pakistan. The article admonishes, "Jihad with money without Jihad of the soul is not beneficial to the person even if they spend all the money on earth. It is useless if they do not take part in wars."[175] Another of the Al-Hussam newsletters provided to me, dated March 5, 1993, includes an article titled "Boston offers more martyrs", which relates the story of Morabit Yahya (a.k.a. "Al Layth Abou Al Layth", a 26-year old immigrant to the U.S. from Morocco who first arrived in 1990 and worked at a local Dunkin Donuts. While living in Boston, Yahya "met some [people] who loved and worked to support Jihad. He joined the Mujahideen in Afghanistan in 1991, where he went to training camps and later fought different battles." The article further identified the young Moroccan-American as at least the fourth known recruit from the Boston area who was killed fighting alongside the mujahideen in Afghanistan.[176]

Furthermore, I am also aware that Bassam Kanj, a former resident of Boston and alleged activist on behalf of Care International, was killed in January 2000 in a clash with Lebanese security forces during a failed Sunni Islamist uprising in the northern Lebanese city of Tripoli. The U.S. Attorney's Office in Boston has provided me with the transcript of an FBI wiretap on a conversation between Mohammad Chehade and Sameer [LNU] that took place on April 6, 2000. During that conversation, "Sameer" (presumably Sameer al-Monla) commented, "I was very affected by the brother (Kanj).. I am very happy that I.. that the God the Almighty willed it that I stand by the brother.. when I was there (Lebanon), I stayed with him for about two or three weeks.. my family would get on my case 'are you here to see him or us?'... By God the Almighty, I can give you details

[174] Care International. "The Story of a Mujahid." Al-Hussam. Vol. 4; No. 9. July 28, 1995. Pages 1-2.
[175] Exhibit CICR 07932-07933. U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla. Criminal Action No. 05-40026-FDS. United States District Court; District of Massachusetts. Originally taken from: "Words & Blood." Al-Hussam. Vol. 3; No. 9. August 26, 1994.
[176] Exhibits CI1570, CI1576. U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla. Criminal Action No. 05-40026-FDS. United States District Court; District of Massachusetts. Originally taken from: Al-Hussam. Vol. 1; No. 22. March 5, 1993.

that.. he used to warn me, that one (Kanj), our friend… And I went and saw with my own eyes.. I saw.. I mean, I went up, and we went, and we returned and he introduced me to many men… Many, many, many… I just want to tell you that by God, the people are in need… Our brothers and our beloved that are there.. anyone that left (was martyred)… We are responsible for.. by God."[177]

- **Support for the Foreign Mujahideen in Bosnia-Herzegovina**

In addition to explicitly recruiting mujahideen fighters, Care International was also attempting to enlist human volunteers for other illicit purposes. Another Al-Hussam newsletter provided to me by the U.S. Attorney's Office in Boston, dated June 1993, includes an Arabic-language appeal directly "to the brothers that are doctors" living in Boston: "the services bureau informs you that we are in need for Doctors to volunteer to work for one month in our hospitals and infirmaries in Bosnia."[178] I have independently obtained a correspondence taken during a private search of the Al-Kifah Refugee Center in Brooklyn, New York dated one month later—July 11, 1993—from "Hassan Hakim", the deputy director of the Al-Kifah office in Zagreb, Croatia, begging Al-Kifah managers in the U.S. to arrange for the purchase of an ambulance from Germany. Hakim suggested that the ambulance would initially be taken on a goodwill tour of Bosnian Muslim refugee camps and makeshift civilian hospitals "with the help of doctors volunteering from Boston," at least "until we get an opportunity to hand it over to the mujahideen in the field."[179] When later contacted by the Washington Post, Hakim reportedly admittedly to receiving all of his orders and funding for operations in Bosnia-Herzegovina directly from Al-Kifah representatives based in the U.S.[180]

In fact, so much activity was taking place specifically at the Care/Al-Kifah office in Boston in support of the jihad in Bosnia-Herzegovina that the Bosnian-Muslim military intelligence service mistakenly believed that the top American Al-Kifah contact for the Arab mujahideen—Abdul Wali Zindani—was actually located in Boston and not

بسم الله الرحمن الرحيم




وَإِنْ أَسْتَصَرْوَكُمْ فِى ٱلدِّينِ فَعَلَيْكُمُ ٱلنَّصْرُ

HUMAN SERVICES OFFICE

HUMANITARNI POSLOVNI URED

اسستمارة كفاللسة

مكتب الخدمات:
أعمله الشعبية عبد الله ت آتر

بتيسم \ اوملسة

سوغ البوسنة والهرسك - زغروب

---

[177] FBI Wiretap Transcript of telephone call from Mohamad Chehade to Sameer [LNU] at 508-799-0906. April 6, 2000; 1856.

[178] Exhibit CI1357. U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla. Criminal Action No. 05-40026-FDS. United States District Court; District of Massachusetts. Originally taken from: Al-Hussam. Vol 2; No. 3. June 11, 1993.

[179] Letter from "Hassan" at the Al-Kifah Zagreb office to the Al-Kifah Refugee Center, 552 Atlantic Avenue; Brooklyn, NY. Dated July 11, 1993.

[180] Coll, Steve and Steve LeVine. "Global Network Provides Money, Haven." The Washington Post. August 3, 1993. *Page A1.*

Brooklyn.[181] The reasons for this oversight by the Bosnian army are much clearer in the context of the numerous evidentiary documents provided to me by the U.S. Attorney's Office in Boston which indicate significant financial transfers, totaling in the hundreds of thousands of dollars, between Care International's office in Boston and the "Human Services Office" (a.k.a. the Al-Kifah Refugee Center) regional headquarters in Zagreb, Croatia—including Exhibits CICR03899, CICR03623, CICR03624, CICR03626, CICR03627, CICR03630, CICR03631, CICR03634, CICR03635, CICR03641, and CICR03642. With the Al-Kifah Refugee Center office in Brooklyn closed down by the spring of 1993 (only one year into the war in the Balkans), the Boston branch became the de-facto U.S. hub of recruitment and financing activities by Makhtab-e-Khidamat in support of the jihad in Bosnia-Herzegovina.

- **Support for Gulbuddin Hekmatyar (Hezb-e-Islami)**

Care International's newsletter Al-Hussam featured regular news updates on the jihad in Afghanistan, often marked with a noteworthy bias against certain mujahideen commanders such as Ahmad Shah Massoud, while offering limitless praise for others—namely Gulbuddin Hekmatyar and his Hezb-e-Islami faction. For example, in one edition of the Al-Hussam newsletter issued in February 1995, the Afghanistan news section is populated almost exclusively by positive articles about the ideology and achievements of Hekmatyar's Hezb-e-Islami.[182] Only days earlier, a previous edition of Al-Hussam had featured a lengthy first-person report on a meeting near Kabul, Afghanistan at Char Asyab between Gulbuddin Hekmatyar and Arab mujahideen representatives:

> "After the sunset on Saturday most of the Arab attendees at the conference met in Kabul with the leader Hikmatyar at his headquarters in Char Asyab to strengthen the Jihad and brotherly unity, and to discuss the relevant issues in Afghanistan... [Hekmatyar told us], 'To form an Islamic nation with an Islamic president by elections will be impossible before Jihad under non-Muslim regimes. Whoever chooses this way will be wrong... I think it is better... to stay in jail than to get out being forced to accept dialogue... Dear brothers, the experience is unprecedented for ages, and the enemies know the meaning of an Islamic country after Jihad.'"[183]

I have been provided with evidentiary documents by the U.S. Attorney's Office in Boston which appear to be copies of a letter addressed to Gulbuddin Hekmatyar on behalf of the Al-Kifah Refugee Center office in Boston. The letter makes mention of two previous face-to-face meetings, including one with Saifur Rahman Halimi (previously cited in this report as Hekmatyar's representative in the West) and another that apparently

---

[181] "Foreign Donors to 'El Mudzahidin" ("Donatori Jedinice 'El Mudzahidin'"). "Shema Hijerarhijskih Odnosa OpO 'Vazal.'" Memorandum issued by the Army of the Republic of Bosnia-Herzegovina (ARBiH) Military Security Service. November 28, 1995.

[182] Exhibit C.I. – ELSUR 00259. U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla. Criminal Action No. 05-40026-FDS. United States District Court; District of Massachusetts. Originally taken from: Al-Hussam. Vol. 3; No. 21. February 10, 1995.

[183] Exhibit C11392. U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla. Criminal Action No. 05-40026-FDS. United States District Court; District of Massachusetts. Originally taken from: Al-Hussam. Vol. 3; No. 20. January 27, 1995.

took place in the context of Hekmatyar's aforementioned conference with Arab mujahideen at Char Asyab near Kabul. According to the letter:

> "To his presence the virtuous brother and prince, engineer Kalb Al-Deen Hikmatyar, May God protect him... We, those who love you, from the Boston Office write to you asking for your direction for us in matters concerning serving the Jihad for the cause of Allah. As you know we have vowed our support through your deputy, brother Saif Al-Rahman Haleemy, in New York two years ago. And we have renewed this vow to you when I met you in Shihar Siab two months ago. Upon my return it was suggested that we fold under their brigade and join under their banner and subjugating our policies and our educational and financial programs to how you see fit. They told us this is what you would like and want. If this is the case and you wish us to do so then we wish you to write about that at the bottom of this page and we are then God willing to abide by your commands and we are forever in the fold of obedience and military."[184]

The U.S. Attorney's Office in Boston has also provided me with an evidentiary document which appears to be the minutes of a meeting that took place on April 23, 1995 between several individuals, who I believe included Emaddedine Muntasser (a.k.a. Abu Abdelrahman), Mohamad Akra (a.k.a. Abu Idris), and Mohammad Chehade (a.k.a. Abu Fayez). During the meeting, the participants refer to themselves as a "brigade" or "battalion", which I interpret as a reference to the overall franchise unit of Makhtab-e-Khidamat operating in the United States. The minutes reflect a heated discussion between these individuals about the need for an overarching commander, or "ameer", in charge of jihad operations. They also indicate that the "battalion's position" was that "we see that one of the commanders is closer to truth than any other commander - based on this we see that is dutiful to uphold this truth and are; thereby, not allowed to retire from it or stop."[185] At one point during the minutes, there is specific discussion as the identity of the "ameer", or commander, chosen to head the jihadi movement:

"Lebanese: Who is your Ameer [commander]?
Abu Abdulrahman: Idrees hinted [it is] the engineer."[186]

There are several other similar references to the "engineer" being nominated as an appropriate candidate to be the overall "ameer" of the mujahideen. The moniker "the Engineer" is unmistakable pseudonym and a clear reference to Gulbuddin Hekmatyar, who often goes by the formal title "Engineer Gulbuddin Hekmatyar." Attached to these minutes, I have been provided a hand-drawn chart (and translation) which appears to be a visual representation of the relationship between Makhtab-e-Khidamat franchises and representatives based in the U.S. with the "Ameer" or commander of the "Battalion."[187] Based upon the above documentation, I believe it is likely that this chart is attempting to

---

[184] Exhibits CIF0333 and CI1324. U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla. Criminal Action No. 05-40026-FDS. United States District Court, District of Massachusetts.
[185] Exhibits CI1313 - CI1337. U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla. Criminal Action No. 05-40026-FDS. United States District Court, District of Massachusetts.
[186] Exhibits CI1313 - CI1337. U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla. Criminal Action No. 05-40026-FDS. United States District Court, District of Massachusetts.
[187] Exhibit CI1347. U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla. Criminal Action No. 05-40026-FDS. United States District Court, District of Massachusetts.

depict how the Makhtab-e-Khidamat would function as part of an organized, hierarchical international jihadi network headed by, presumably, "Engineer" Gulbuddin Hekmatyar. In this sense, Hekmatyar would be playing a remarkably similar role to that of Taliban leader Mullah Mohammed Omar on behalf of Usama Bin Laden in present day Afghanistan.

Interestingly, the minutes of the April 1995 meeting make mention of a "fundamental disagreement with Bin Laden" that has evidently caused them to prefer Hekmatyar as their choice for the overall leader of the mujahideen. The minutes seem to suggest that the disagreement is between Bin Laden and other Arab mujahideen fighters, rather than directly with the Makhtab-e-Khidamat. This appears to be a reference to a long-term strategic dispute that arose between Bin Laden and Abdullah Azzam—one that may have cost the latter his life. Bin Laden was interested in centralization, regimentation, and utmost secrecy. Using the Afghan war as a cover, he wanted to segregate all the foreign jihadi recruits together and train them as one body—preparing them as a mobile international Islamist blitzkrieg unit, trained to seize power quickly and violently. Azzam was more of a practicalist; by contrast, he was more concerned with forging long-term bonds with Afghani Islamist allies in hopes of establishing a future Islamic state there and consolidating mujahideen power. With Afghanistan as the "solid foundation," Azzam hoped to then later use a unified Muslim army—comprised of Arab and Afghan alike—to "liberate" the entire Islamic world. Azzam's lieutenant Shaykh Tamim al-Adnani later attempted to explain the uneasy schism: "It was as if [Bin Laden] wanted to profit from the jihad rather than the jihad profiting from us, whereas we wanted the jihad to benefit from us rather than us benefiting from the jihad. The conceptual difference is a very minor one since it was jihad in either case."[188]

Nonetheless, given the political conditions in 1995 and Bin Laden's uncertain future existence in Sudan, Hekmatyar—who held great sway and territorial control inside Afghanistan—was quite evidently a more attractive mujahideen ally than Bin Laden. The minutes record conference participants commenting, "one of the leaders is closer to the truth, and tells that must help and support and we cannot retire or stop.... The engineer [Hekmatyar] for Muslims not [just] the Afghans and he supports all jihad matters."[189]

- **Support for the Armed Islamic Group (GIA)**

When the Algerian government cancelled national elections in 1992 to prevent a victory by the Islamic Salvation Front (FIS), several militant factions took up arms against the government and its security forces. Despite this, only one of these groups was ever favorably profiled in jihadi news reports printed in Care International's official newsletter Al-Hussam: the Armed Islamic Group (GIA), a.k.a. Al-Jamaa al-Islamiyya al-Musallah. The GIA also happened to be arguably the most extreme of the anti-regime mujahideen factions, and the one with the closest ties to the Arab mujahideen fighting in Afghanistan. In December 1994, Al-Hussam editors printed an article declaring their

---

[188] Muhammad, Basil. *Al-Ansaru l'Arab fi Afghanistan*. The Committee for Islamic Benevolence Publications; ©1991. *Page 201.*

[189] Exhibit CII347. U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla. Criminal Action No. 05-40026-FDS. United States District Court; District of Massachusetts.

relief upon hearing the news that more moderate Islamist fighters had "come around" and agreed to merge their forces with the GIA, giving jihadi extremists "what Allah has wanted us to hear. The Mujahideen have done what they promised... After heavy communications and advice, the Phalanges of the Muslim Military finally joined the armed Jama'a Islamiya. Now, with courage and dependence on Allah, they are united in Jihad."[190]

In February 1996, Care International's Al-Hussam newsletter printed an Arabic-language GIA communiqué taken from its official magazine, Usraat al-Ansaar. The communiqué gloated about the "big catastrophe that Islam could create if it reaches the government" in Algeria, but lamenting how the West "controls" the Muslim world "through democracy":

"So if the [democratically-elected Islamic Salvation] Front rules today, if it rejects the results of democracy and diversity, tomorrow the West could militarily come in and remove it from authority. That is why the Jama'a Islamiyya [the GIA] is a threat to them [the West] today because they cannot control it... America did not define its stand toward Algeria because it is still studying the situation. It is trying to enter the arena in a smart contorted way to pressure and affect Jihad. This will not happen because Allah promised to give victory to His religion today and tomorrow, thanks be to Allah... Jihad is a principle which threatens the enemies of Allah, the tyrants, the apostates, the polytheists, and this principle needs to be spread."[191]

I have never seen, nor have I been provided, with any evidentiary documents or copies of Al-Hussam that would indicate that Care International ever renounced its tacit endorsement of the GIA, even after the latter group accepted responsibility for kidnapping, torturing, and killing innocent Muslim civilians.

- **Support for the Libyan Islamic Fighting Group (LIFG)**

As with the GIA in Algeria, the "Jihad News" section of Care International's newsletter Al-Hussam was limited to reports from only one militant faction: the Libyan Islamic Fighting Group (LIFG). The LIFG used its relationship with Al-Hussam to help spread word of assassination attempts on Libyan government officials and to deny any supposed relationship with Western intelligence agencies. In October 1995, Al-Hussam featured a lengthy, exclusive front-page interview with Shaykh Abul-Mundhir As-Saidi, the spiritual leader of the LIFG who first joined the jihad in Afghanistan in 1988.[192]  A decade later, in 1998, al-Saidi returned to Afghanistan and established various educational and charitable enterprises on behalf of the ruling Taliban movement. In appreciation for al-Saidi's efforts, Taliban supreme commander Mullah Mohammed

---

[190] Exhibit CI1378.  U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla.  Criminal Action No. 05-40026-FDS.  United States District Court; District of Massachusetts.  Originally taken from: Al-Hussam.  Vol. 3; No. 18.  December 30, 1994.

[191] Exhibit CI1105.  U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla.  Criminal Action No. 05-40026-FDS.  United States District Court; District of Massachusetts.  Originally taken from: Al-Hussam.  Vol. 4; No. 18.  February 16, 1996.

[192] Exhibit CICR 07913.  U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla.  Criminal Action No. 05-40026-FDS.  United States District Court; District of Massachusetts.  Originally taken from: Al-Hussam.  Vol. 4; No. 14.  October 13, 1995.

Umar reportedly bestowed upon him the title of "the Shaykh of the Arabs in Afghanistan."[193] Al-Saidi was reputed for delivering stern speeches to Arab fighters training in Afghanistan, admonishing them to strictly follow the laws of the Taliban as long as they remained in the country.[194] When asked during his 1995 interview "what are your words to the publishers and respected readers of Al-Hussam", he replied, "I say to the Al-Hussam team: May Allah reward you well for providing this great opportunity. I pray to Allah for your success, and ability to exert even more effort in propagation through the media, for the service of this religion, for establishing the truth and dispelling falsehood."[195]

- **Support for Chechen Mujahideen / Shamil Basayev**

Care International's Al-Hussam newsletter was one of the first such publications to print firsthand reports from mujahideen representatives fighting the Russian military in the Caucasus, particularly Chechnya. Al-Hussam was also one of the first sources to authoritatively document the presence and "martyrdom" of Arab mujahideen fighters during battle in Chechnya. Once again, Al-Hussam was careful about who among the native Chechen resistance it would give endorsements to, favoring those who expressed a fervent commitment to fundamentalist Sunni Islam. One of Al-Hussam's favorite subjects of study in Chechnya was notorious Islamist warlord Shamil Basayev, who has openly conceded his involvement in such terrorist acts as the 2003 Moscow theater siege and the botched Beslan school hostage-taking massacre. There seems little doubt that the editors of Al-Hussam understood exactly what Shamil Basayev's mission and method were; in June 1995, they printed a highly positive article endorsing Basayev's terrorist takeover of a civilian hospital in Budyonnovsk, seventy miles inside Russian territory. At least 105 civilians in Budyonnovsk were killed during the incident, including 18 women, and nearly 400 hostages were wounded. Nonetheless, Al-Hussam celebrated Basayev as an unqualified hero and endorsed his strategy of "fighting evil with evil":

> "Minute by minute the whole world watched with agony, as some of the Mujahideen (not exceeding 80), under the leadership of Mujahid Shamil Basyev took 1500 Russians, demanding that the Russian government stop its operations against the unarmed Muslim Chechnyan population... The prince of the group Basayev refused a Russian offer for a sum of money and private plane which would take them to any place on earth. Those who have sold this world and bought the other refuse such cheap offers because they are waiting for the more precious one-Paradise. The aim of this operation was to reach Moscow and take control of the Russian Parliament, but the Mujahideen did not have enough money to get them to Moscow... The Chechnya Mujahideen from suicide brigades performed suicide attacks against the Russian Forces... We cannot depend on

---

[193] "The Shaykh of the Arabs in Afghanistan Al-Saadi who was handed over to Libya by the Americans." Al Hayat (London). February 16, 2005.

[194] "The Shaykh of the Arabs in Afghanistan Al-Saadi who was handed over to Libya by the Americans." Al Hayat (London). February 16, 2005.

[195] Exhibit CICR 07917. U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla. Criminal Action No. 05-40026-FDS. United States District Court, District of Massachusetts. Originally taken from: Al-Hussam. Vol. 4; No. 14. October 13, 1995.

anybody's help; we have to fight evil with evil. The operation of the Mujahid Shamil Basayev is perfect proof."[196]

## PART VI: The Global Relief Foundation (GRF)

On December 14, 2001, the Department of Treasury froze the assets of Global Relief Foundation ("GRF") as a result of their financial support of Al-Qaida.[197]   On October 18, 2002, the U.S. Treasury Department's Office of Foreign Assets Control (OFAC) listed GRF as a "Specially Designated Global Terrorist."[198]   According to the Treasury Department, "Global Relief Foundation, has connections to, has provided support for, and has provided assistance to Usama Bin Ladin, the al Qaida Network, and other known terrorist groups."[199]   According to the Treasury Department, high-ranking al Qaeda financier Mohammed Zouaydi, who was arrested in April 2002 in Spain, had given more than $200,000 to GRF.[200]   The Treasury Department further reported that a GRF pamphlet produced in 1995 and recovered by the U.S. government explained that, "God equated martyrdom through JIHAD with supplying funds for the JIHAD effort. All contributions should be mailed to: GRF."[201]   Another GRF newsletter reportedly requested donations "for God's cause – they [the Zakat funds] are disbursed for equipping the raiders, for the purchase of ammunition and food, and for their [the Mujahideen's] transportation so that they can raise God the Almighty's word . . . it is likely that the most important of disbursement of Zakat in our times is on the jihad for God's cause…"[202]   The Treasury Department further disclosed that, "Rabih Haddad, a senior GRF official who co-founded GRF and served as its president throughout the 1990s and in the year 2000, worked for Makhtab al-Khidamat (MAK) in Pakistan in the early 1990s."[203]   Through the course of my research, I have known of a particularly close relationship between GRF and its corporate officers with Makhtab-e-Khidamat al-Mujahideen in Pakistan.

I have independently reviewed an original copy of an Arabic-language newsletter known as "Al-Thilal" that was produced by GRF and distributed in the U.S. in January 1996. The flyer advertised that, despite the end of the war in Bosnia-Herzegovina,

---

[196] Exhibit CI1516.   U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla.   Criminal Action No. 05-40026-FDS.   United States District Court, District of Massachusetts.   Originally taken from: Al-Hussam.   Vol. 4; No. 7.   June 30, 1995.

[197] U.S. Department of the Treasury, Office of Foreign Assets Control. Executive Order 13224 blocking Terrorist Property and a summary of the Terrorism Sanctions Regulations, Terrorism List Governments Sanctions Regulations, and Foreign Terrorist Organizations Sanctions Regulations. February 26, 2003.

[198] U.S. Department of the Treasury, Office of Foreign Assets Control. Executive Order 13224 blocking Terrorist Property and a summary of the Terrorism Sanctions Regulations, Terrorism List Governments Sanctions Regulations, and Foreign Terrorist Organizations Sanctions Regulations. February 26, 2003.

[199] "Treasury Department Statement Regarding the Designation of the Global Relief Foundation." United States Treasury Department Office Of Public Affairs.   October 18, 2002.

[200] "Treasury Department Statement Regarding the Designation of the Global Relief Foundation." United States Treasury Department Office Of Public Affairs.   October 18, 2002.

[201] "Treasury Department Statement Regarding the Designation of the Global Relief Foundation." United States Treasury Department Office Of Public Affairs.   October 18, 2002.

[202] "Treasury Department Statement Regarding the Designation of the Global Relief Foundation." United States Treasury Department Office Of Public Affairs.   October 18, 2002.

[203] "Treasury Department Statement Regarding the Designation of the Global Relief Foundation." United States Treasury Department Office Of Public Affairs.   October 18, 2002.

mujahideen recruits were still needed to create "a nightmare for the American troops in Bosnia" and argued that their continued presence was absolutely necessary to enable local Bosnians "to stay true to their Islamic values and open their mind to Jihad and the love of martyrdom for Allah." Moreover, according to the flyer, "[t]he mujahideen have a school which trains hundreds of mujahideen every month... those fighters win all their battles because of their love of martyrdom for Allah."[204]

The U.S. Attorney's Office in Boston has provided me with numerous evidentiary documents that, taken as a whole, indicate a close relationship between Care International and the Global Relief Foundation (GRF) based primarily upon their mutual association with Makhtab-e-Khidamat. These documents include the transcripts of wiretaps involving conversations between representatives of Care International and GRF, financial documents, and—perhaps none more explicitly—the minutes of an April 1995 sit-down conference involving corporate officers from both groups, which aimed to "specify the general provisions, draw various policies for the activity in America and Canada, in accordance with the directions and recommendations of" the leadership of the "Battalion."[205] At least some of those in attendance were in favor of GRF and Care merging their operations: "There is no need for us to stay separate... I met with Imad [Muntasser] and Mohammad [Chehade] and found acceptance. We pray the Lord may unite us and remove hatred from within us." An individual under the name "Abu Abdulrahman" (presumably Emaddedine Muntasser) responded, "After the latest developments - we sought a meeting with the brothers - how to [establish] the relationship and coordinating with the battalion - some brothers are nervous in Boston. There can be more coordination among us if we agree on some of the issues - Afghanistan has priority."[206] Several Care International officers appear to have "defended independence", expressing a "fear" of merging with GRF and being swallowed in the morass of an admittedly larger organization: "we will loose more... control."[207] Other participants pushed hard for a compromise to avoid the "severely short sighted" outcome of having two competing Makhtab-e-Khidamat franchises trying to sustain themselves on the same small piece of local turf: "Boston cannot accommodate two jobs i.e. CARE and GRF."[208]

## PART VII: The American Islamic Group / The Islam Report Newsletter

In 1993, two individuals from southern California, Mohammad Zaki and Kifah Jayyousi, established a haven of radical Muslim fundamentalist thought in Southern California. Their extremist ideals were channeled into the creation of three closely-linked entities: the American Islamic Group (AIG), American World-Wide Relief

[204] Al-Thilal. Published by the Central Information News Agency Network and the Global Relief Foundation. January 1996.

[205] Exhibit CI1347. U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla. Criminal Action No. 05-40026-FDS. United States District Court; District of Massachusetts.

[206] Exhibits CI1313 - CI1337. U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla. Criminal Action No. 05-40026-FDS. United States District Court; District of Massachusetts.

[207] Exhibits CI1313 - CI1337. U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla. Criminal Action No. 05-40026-FDS. United States District Court; District of Massachusetts.

[208] Exhibit CI1347. U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla. Criminal Action No. 05-40026-FDS. United States District Court; District of Massachusetts.

(AWW), and the Islamic Information Center of the Americas. Essentially, the three groups played separate but integral roles in a critical terrorist recruitment and support center for disciples of Usama bin Laden. AIG served as the political front, issuing regular communiqués and news reports. AWW (formerly known as "Save Bosnia Now") was the charitable arm, providing substantial financial support to Al-Qaida-affiliated terrorist groups in Algeria, Bosnia, Chechnya, and elsewhere. By networking with other extremists across North America and Europe, the AIG was able to expand its reach to the east coast of the United States (through Florida resident Adham Hassoun) and eventually to continents around the world. Evidence provided to me in the present case would tend to indicate that Care International and the American Islamic Group were essentially franchise sub-units (along with the Global Relief Foundation) within a shared larger international organization: Makhtab-e-Khidamat al-Mujahideen.

Following the violent death of Mohammed Zaki in 1995 while fighting alongside the mujahideen in Chechnya, the responsibility of managing AIG was primarily assumed by Kifah Jayyousi. Jayyousi, a Palestinian-American engineer, authored the organization's press releases, including their infamous "Islam Reports." In February 1994, Jayyousi published an open e-mail concerning the details of a planned resurgent Muslim empire. He explained, "I am a Muslim citizen of the great upcoming Islamic State." Jayyousi referred to those opposed to this new Islamic state as "bloodsuckers... who are enslaving Muslims in Asia and Africa and around the World, they are the ones who are fueling the war using their agents." He urged other Muslims to "be an achiever and help form it... Help rid the land of [the infidels] and [the hypocrites]." More specifically, Jayyousi wrote, "as to [Egyptian President Hosni] Mubarak, may Allah curse him, his departure or assassination, [God willing], will be a major Fath or victory to strengthen Islam." Moreover, although Egypt and other secular Middle Eastern regimes were deemed to be troublesome adversaries by Jayyousi, he made a point to "reiterate that the west is Islam's enemy No.1." When Jayyousi's e-mail was met with criticism and ridicule from other subscribers to the message forum, Jayyousi angrily replied, "I will take your advise[sic] and not waste my time with people who are followers of [secular Pakistani leaders]. See You in Peshawar." Peshawar is, of course, the infamous Pakistani town that has served as the gateway to jihad in Afghanistan for thousands of international mujahideen recruits.[209]

Like Care International's sister publication Al-Hussam, the official newsletter of the AIG—the so-called "Islam Report"—was arguably one of the most radical English-language jihadist propaganda publications in recent history, with impeccable sources and credentials. The April/May 1994 print edition of AIG's "Islam Report" featured a particularly noteworthy endorsement from "Mujahideen Camps in Kabul, Afghanistan": "'Islam Report is a powerful voice of truth, please send it regularly, our brothers read every word of it as it keeps us informed."[210] On many of the Islam Reports between 1994 and 1995, while legally disclaiming connections to any actual guerilla outfits, Kifah

---

[209] Imran Anwar (imran@panix.com). "Attacks on Pakistanis & B. Bhutto Fwd: Re: Islam Report (News & Analysis." Newsgroups: soc.culture.pakistan. February 11, 1994.

[210] "Editorials." Islam Report. Vol 1; Issue 7. April/May 1994. American Islamic Group (AIG). Page 2.

Jayyousi wrote that, nevertheless, "we would be proud to identify with GIA and other mujahideen."[211]

- AIG published numerous English translations of communiqués through the "Islam Report" originally authored by "Abu Al-Ma`ali," the Algerian leader of the foreign mujahideen brigade fighting in Bosnia-Herzegovina.[212]
- Using the "Islam Report", the AIG has led a tireless campaign to free convicted terrorist mastermind Shaykh Omar Abdel Rahman. Rahman, spiritual leader of Al-Gama'at al-Islamiyya and the Egyptian Islamic Jihad (both Al-Qaida subgroups), is currently serving a prison sentence in the U.S. for his central role in the 1993 World Trade Center bombing conspiracy. However, according to Jayyousi, the trial of Rahman was "The Greatest Conspiracy Against Islam."[213] Jayyousi explained to readers that the trial was part of a larger "US-Egyptian regime plot to silence Islamic opposition to the oppressive regime of Hosni Mubarak."[214] AIG issued numerous fundraising appeals purportedly to help pay the legal expenses of Rahman, with an ultimate goal of raising over $300,000.
- AIG issued a flurry of special-edition "Islam Reports" to republish GIA communiqués concerning the December 1994 hijacking of an Air France commercial airliner by a GIA suicide team. In May 1996, AIG published another violent dispatch from the "Ameer", or commander, of the GIA, Abu Abdel Rahman Ameen, on the subject of seven French Catholic monks who were abducted by the mujahideen.[215] In July 1996, AIG posted an Islam Report celebrating the following inflammatory excerpts from Issue No. 35 of the GIA newsletter Al-Qital:

> "Mujahideen never felt a day of truce with those apostates who sold out their religion and waged war (on Islam) with everything at their hands... It is a cry repeated today by every Mujahid youth of GIA, he repeats it with courage and steadfastness and do not fear anyone of the apostates nor do they fear the cowardice of the sick-hearted people away from the straight path [of Islam], it is the cry of No Truce, No Reconciliation and No Dialogue... Repeat it, my brother, while you are in your trench awaiting the soldiers of the apostates despite their hate... Repeat it while on your way in a raid over the Mubtadi`a despite the hate of the hypocrites and rumor spreaders. Repeat it while you are beheading France."[216]

[211] American Islamic Group (islam@powergrid.electriciti.com). "Islam Report (Air France Real Story Part II)." Newsgroups: soc.religion.islam. January 2, 1995.

[212] American Islamic Group (islam@powergrid.electriciti.com). "Islam Report(Jihad in Europe! Now A Muslim Brigade!)" Newsgroups: alt.current-events.bosnia. September 23, 1995.

[213] American Islamic Group (islam@Powergrid.electriciti.com). "Islam Report (Just In! $800 Million spent to destroy Islam)." Newsgroups: Koleksi Diskusi Isnet (http://www.isnet.com). December 8, 1994.

[214] American Islamic Group (islam@powergrid.electriciti.com). "Islam Report(US Trial of Islam Service to La Mubarak)." Newsgroups: soc.religion.islam. February 1, 1995.

[215] American Islamic Group (islam@powergrid.electriciti.com). "ISLAM REPORT(EMERGENCY! ALGERIA JIHAD COMMUNIQUES!)" Newsgroups: soc.religion.islam. May 25, 1996.

[216] Syed Yusuf (yusuf921@harrier.csrv.uidaho.edu). "Islam Report (Algeria Jihad! No Truce!)" Newsgroups: alt.religion.islam. July 18, 1996.

The U.S. Attorney's Office in Boston has provided me with countless evidentiary documents containing references to the American Islamic Group, the Islam Report, American World-Wide Relief, Save Bosnia Now, Kifah Jayyousi, Adham Hassoun, and Mohammed Zaky (a.k.a. "Abu Omar al-Masri")—including as many as thirty separate wiretap transcripts of telephone correspondences between either Jayyousi or Hassoun and corporate officers of Care International that took place in a period of only two years from 1996 to 1998. These wiretaps, in combination with other documents, show Jayyousi and Hassoun using their various organizations to work hand-in-hand with Care International in Boston in hopes of pooling their joint efforts and resources for Makhtab-e-Khidamat. This included identifying Adham Hassoun in fundraising literature as the preferred direct postal recipient of certain donations collected under the name of Care International.[217]

Conversely, documents seized by the Federal Bureau of Investigation show at least a handful of personal visits by Kifah Jayyousi to the Boston area between 1996 and 1998 that were carefully coordinated and arranged by Care International and its officers.[218] One such document purports to be a letter from Samir al-Monla (a.k.a. Abu Waleed): "I would like to ask for your participation and assistance to help our brother KIFAH JAYYOUSI brings to your Masjid the latest video tape from CHECHNYA showing how Groznyy was recaptured by Muslims and how the CHECHENS are struggling to implement the Islamic rule in their land by help of Allah (S.W.T). It will be a fund raising event. For the Donations we have our direct contact to CHECHNYA."[219]

Care International and its staff were particularly cooperate in spreading word of the "martyrdom" of the founder of the American Islamic Group, Mohammed Zaky, while fighting alongside the mujahideen in Chechnya. Jayyousi was warmly welcomed to the Boston area in order to bring the news to local Muslims. Organizers were told to arrange the following in honor of Zaky: "Please write an introduction about the following -- CARE International offers you its thanks for welcoming him since he went to relay to you the Muslims news in Chechnya. We ask you to distribute the donation cards when the Sheikh finishes collecting donations. At the end pray for their success. Note: A short memoir is to be printed (Brother Kifah Jayyousi)."[220] A fundraising flyer advertising one of these events and provided to me by the U.S. Attorney's Office states unequivocally: "It is our duty support the family of brother Mohamed Zaki. The Messenger of Allah said, 'Who ever look after the family of a Mujahid will get half his reward.'"[221]

Similarly, Care International's Al-Hussam newsletter was also used to broadcast the message of Mohammed Zaky's sacrifice and to raise money in order to support his family. An Arabic-language article featured by Al-Hussam in June 1995 narrated:

---

[217] Exhibit CICR08010. U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla. Criminal Action No. 05-40026-FDS. United States District Court; District of Massachusetts.
[218] Exhibit CICR 07218. U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla. Criminal Action No. 05-40026-FDS. United States District Court; District of Massachusetts.
[219] Exhibit CICR08010. U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla. Criminal Action No. 05-40026-FDS. United States District Court; District of Massachusetts.
[220] Exhibit CICR 07219. U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla. Criminal Action No. 05-40026-FDS. United States District Court; District of Massachusetts.
[221] Exhibit CICR08010. U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla. Criminal Action No. 05-40026-FDS. United States District Court; District of Massachusetts.

"He had been in Chechnya for one month, on the front lines fighting the Russians when his appointment with martyrdom came to. He was participating in a religious lesson when a shell landed in the center of the meeting. Allah (swt) chose only him from among the Mujahideen, for he was hit by several pieces of shrapnel and fell unconscious. He regained consciousness after receiving first aid treatment; he raised his hand to the sky and said to those around him: I saw the hoor alain, and they told me I would follow them. Following this, Abu Umar fell asleep under the influence of the sedative given him... Brother Abu Umar was one of the best Mujahideen; he began his odyssey in Afghanistan, and continued on this path in Bosnia, and ended on this path in Chechnya."[222]

Days later, Zaky was the subject of a matching front page, English-language eulogy carried by Al-Hussam titled, "Abu Umar... A Martyr in Chechnya."[223]

## PART VIII: Shaykh Abdullah Azzam's "Join the Caravan"

If Makhtab-e-Khidamat founder Shaykh Abdullah Azzam can rightfully be considered as the godfather of modern jihad, then no single written work of his has been more influential in that respect than his landmark book "Join the Caravan." The title itself refers to the "Caravan of Martyrs" ("Qawafil ash-Shuhadaa") who have given their blood as "martyrs" in the military service for Islam. A foreword written by the publisher of the second English-language edition of the book explained:

"Join the Caravan is a translation of the book. Ilhaq bil-Qaafilah written by Shaheed Sheikh Abdullah Azzam in April 1987 at the peak of the Afghan Jihad. This book was one of the principal inspirations for thousands of Muslims from all over the World to go and fight in Afghanistan to defend Muslim blood, property, and honour... Due to popular demand and the book being sold out, we decided to publish a Second English Edition. Although a part of the book focuses on Afghanistan, most of it is applicable to Jihad in general."[224]

In this book, Azzam declares that "Jihad today is individually obligatory... by self and wealth, on every Muslim... Allah has not excused anybody to abandon Jihad other than the ill, the cripple, and the blind, as well as children who have not yet reached puberty, women who have no way of emigrating and performing Jihad and those advanced in years... Anybody else has no excuse before Allah, whether he is a professional, a specialist, an employer, or a great businessman. None of these is excused from performing Jihad personally or permitted to merely contribute materially."[225] Azzam continues on in Join the Caravan by celebrating the "faithful youth," whose

---

[222] Exhibit CI1178. U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla. Criminal Action No. 05-40026-FDS. United States District Court; District of Massachusetts. Originally taken from: Al-Hussam. Vol 4; No. 5. June 2, 1995.

[223] Exhibit CI1161. U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla. Criminal Action No. 05-40026-FDS. United States District Court; District of Massachusetts. Originally taken from: Al-Hussam. Vol. 4; No. 6. June 16, 1995.

[224] "Publishers Foreword." Join the Caravan: Second English Edition. Azzam Publications. BCM UHUD. London WC1N 3XX, U.K. August 2001. Page 5.

[225] Exhibit CICR08091. U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla. Criminal Action No. 05-40026-FDS. United States District Court; District of Massachusetts.

"hearts are burning with a fire, spurting forth enthusiasm, and blazing with zeal that their pure blood may irrigate the earth of the Muslims."[226] In other words, according to Dr. Azzam, the only Muslims who will be ultimately redeemed by Allah are those who sacrifice their lives in the greater "cause of Islam."

The U.S. Attorney's Office in Boston has provided me with an English-language copy of "Join the Caravan" which appears to have been published and printed by Care International.[227] I recognize the individual listed as responsible for translating the document—Abu Shaheed—from other English translations of Abdullah Azzam material posted on the former Internet website of Care International. During his foreword, Abu Shaheed echoes the notion that though "the book focuses on the Afghan jihad... most of what is mentioned is applicable to jihad in general."[228]

---

[226] Exhibit CICR08091. <u>U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla.</u> Criminal Action No. 05-40026-FDS. United States District Court; District of Massachusetts.
[227] Exhibit CICR08091. <u>U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla.</u> Criminal Action No. 05-40026-FDS. United States District Court; District of Massachusetts.
[228] Exhibit CICR08091. <u>U.S. v. Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla.</u> Criminal Action No. 05-40026-FDS. United States District Court; District of Massachusetts.



## Dr. Matthew Levitt

Senior Fellow and Director of the Stein Program on Terrorism, Intelligence and Policy
The Washington Institute for Near East Policy
**Expert testimony in the case of MUBAYYID, MUNTASSER and AL-MONLA**
**Crim. No. 05-40026-FDS**

### I.  Summary Opinion

Based on my knowledge, experience, training and education, and after a
comprehensive review of the material presented by the US Attorney's Office, it is my
expert opinion that CARE International (CARE) is an outgrown of the al Kifah Refugee
Center, a part of the Maktab al-Kidmat (MAK) international support network founded by
Usama Bin Laden and Abdullah Azzam.

Straying from its purported charitable and humanitarian missions, CARE solicited
funds for terrorist activities under the rubric of promoting jihad (holy war) and supporting
mujahideen (Islamic fighters) through its website and its newsletter, Al-Hussam (The
Sword). In line with the radical Islamist principle of Economic Jihad (Jihad bin Mal),
such solicitations were issued in the context of a religious obligation to donate alms
(zakat) and to make certain at least some of those alms went to each of eight specific
causes, including jihad.

It is my expert opinion that CARE International represents a classic case study of
a radical Islamic militant organization with ties to a variety of radical individuals and
terrorist organizations – in this case, individuals and organizations associated with Global
Jihadist elements tied to al Qaeda.

### II.  Qualifications to render expert opinion

My qualifications as a noted expert in international terrorism, with a focus on
Middle East terrorist groups and particular expertise in their logistical and financial
support networks, are based on a multidisciplinary combination of my academic
education, professional training and experience.

I am a United States citizen, residing in the Washington, D.C. area. I hold both a
Masters of Law and Diplomacy (MALD) and a Ph.D. from The Fletcher School of Law
and Diplomacy at Tufts University. The Fletcher School, a member of the Association of
Professional Schools of International Affairs and one of the country's preeminent
graduate programs in international affairs, is renowned for its interdisciplinary
curriculum and approach to international studies.

My Masters degree included concentrations in Conflict Resolution, International
Security Studies, and the Middle East. My doctoral dissertation entitled "The Impact of
Acute Security Crises on the Process of Ongoing Negotiations," examines the impact of
terrorism on the Arab-Israeli peace process. The dissertation examines acts of terrorism
carried out by both Islamic and Jewish terrorists. I was awarded several fellowships and

grants in support of this research, including a graduate research fellowship from the Program on Negotiation at Harvard Law School. While at Harvard I conducted extensive field research in the West Bank and Gaza Strip. In a letter supporting my application for funding for my doctoral work, an assistant director of the FBI described the project as one that "will be of great benefit to the FBI and the U.S. Intelligence Community (USIC)."

Prior to joining the Washington Institute, I served as a counterterrorism intelligence analyst with the Federal Bureau of Investigation (FBI) providing tactical and strategic analysis in support of counterterrorism operations. There I developed a special focus on fundraising and logistical support networks for Middle East terrorist groups. In addition, I was honored to participate as a team member in a number of crisis situations, including the terrorist threat surrounding the turn of the millennium and the September 11 attacks. In my official capacity as a U.S. government intelligence analyst, I researched and analyzed trends and patterns of international terrorist groups, produced written products and oral presentations for FBI management, FBI field agents and other agencies, and liaised with U.S. intelligence community counterparts, other U.S. government agencies, and foreign services. In this capacity I also made several trips to the Middle East. Indicative of my expertise, I earned three letters of commendation for my analytical contributions to FBI counterterrorism operations, as well as five awards in recognition of superior service rendered to the FBI.

In November 2001 I joined The Washington Institute for Near East Policy as a Senior Fellow in Terrorism Studies. Founded in 1985, The Washington Institute seeks to "advance a balanced and realistic understanding of American interests in the Middle East" by bringing "scholarship to bear on the making of U.S. policy in this vital region of the world." The Institute's Board of Advisors includes several former Secretaries of State, a former Director of Central Intelligence, and other former senior government officials and diplomats. The Washington Institute holds annual conferences and periodic policy forums, hosts blue-ribbon presidential study groups, and publishes scholarly research.

From November 2005 through January 2007 I served as Deputy Assistant Secretary for intelligence and analysis in the United States Department of the Treasury. In that capacity, I served both as a senior official within the department's terrorism and financial intelligence branch and as deputy chief of the Office of Intelligence and Analysis, one of sixteen U.S. intelligence agencies coordinated under the Office of the Director of National Intelligence. During my tenure at Treasury, I was at the center of the government's efforts to protect the U.S. financial system from abuse and to deny terrorists, weapons proliferators, and other rogue actors the ability to finance threats to U.S. national security.

In February 2007 I returned to the Washington Institute, where I am a Senior Fellow and Director of the since renamed Stein Program on Terrorism, Intelligence and Policy. In this capacity I am frequently sought after as an analyst and commentator on terrorism issues for major media outlets including CNN, ABC, NBC, CBS, PBS, The

New York Times, The Washington Post, The Wall Street Journal, National Public Radio, BBC and more. I have lectured and consulted on terrorism for a variety of government and other organizations, including the U.S. Departments of State, Homeland Security and Justice, the Commission on Terrorist Attacks Upon the United States (9-11 Commission) and others, and write frequent policy briefs and articles on issues relating to terrorism and U.S. policy. Along with a collection of journal articles, I am also the author of *Targeting Terror* (Washington Institute, 2002), H*amas: Politics, Charity and Terrorism in the Service of Jihad* (Yale, 2006), and the forthcoming *Negotiating Under Fire: Preserving Peace Talks in the Face of Terror Attacks* (Rowman & Littlefield, forthcoming).

At the Institute my work includes the study of Middle Eastern terrorist groups, front organizations and state sponsors, the logistical and financial support networks that facilitate their activities, and the extremist and militant ideologies that drive their recruitment and radicalization efforts. In my efforts to study and understand terrorism and militant Islamist ideology I interview experts, officials, academics and others with insight into these issues, both in the United States and Europe and in the Middle East. I engage in private, personal meetings, public conferences, group discussions, and talks that are both on and off the record. I travel to the Middle East regularly, including recent trips to the Palestinian territories, Israel, Jordan and Egypt, and Turkey. I also attend conferences and academic and professional lectures, and read books, newspapers, academic and policy journals, and research these materials on the internet (including the websites, video and audio clips and images on sites geared towards counterterrorism and those of terrorist groups and their sympathizers as well). These are the standard sources and methods in the academic and policy communities for developing the kind of specialized knowledge and expertise I have accumulated – and for which I have been awarded and commended – in my field. Indeed, the Sixth Circuit has described my research methodology as "the gold standard."

Compiling information from sources such as these, I study and evaluate the information and data I collect, and write about and lecture on my findings. I engage in regular discussions with other experts both to compare notes and as a means of affording myself an ongoing process of peer-review and fact-checking.

The awards and honors I have received include:

• Exceptional Service Award, U.S. Department of the Treasury, January 2007

• Certificate of Appreciation, United States Central Command Directorate of intelligence, February 2006

• Selected by CNN as one of "The 2005 New Guard: Washington's Next Generation of Newsmakers," April 2005

• European Union Visitors Program (EUVP) 2005

• Visiting Scholar, Security Studies Department, the Paul H. Nitze School of Advanced

MUB-00029020

International Studies (SAIS), Johns Hopkins University, March 2003

• U.S. Department of State Speaker and Specialist Grant (2), April 2002 (lectures in Lithuania), and January 2003 (lectures in Austria)

• Letter of Commendation from Deputy Assistant Director (3), Federal Bureau of Investigation, July 2000, August 2000, July 2001

• Performance Awards (2), Federal Bureau of Investigation, December 1999, November 2000

• Special Act or Service Award, Federal Bureau of Investigation, September 1999

• Graduate Research Fellow, The Program On Negotiation at Harvard Law School, 1997-1998

• International Security Studies Fellow, International Security Studies Ph.D. Dissertation Fellowship, the Fletcher School of Law and Diplomacy, 1996-1997

• International Security Studies Program Graduate Student Research Grant on the Emerging Issues of Ethnic, Sectarian, and Religious Conflict, William H. Donner Foundation, 1996

• Doctoral Scholarship, the Fletcher School of Law and Diplomacy, 1995-1996

• Sarah Scaife Frank Rockwell Barnett Memorial Grant in International Security Studies, The Fletcher School of Law and Diplomacy, 1994 and 1996

In addition to my work at the Institute, I use my specialized expertise to teach and consult (both for the U.S. and other governments and private sector firms). I was a member of the Council on Foreign Relations' task force on terrorist financing, and am an adjunct professor in the security studies department of the Paul H. Nitze School of Advanced International Studies (SAIS) at Johns Hopkins University. I am a member of the international advisory boards for the Institute for Counter-terrorism (ICT) in Israel and the International Centre for Political Violence & Terrorism Research (ICPVTR) in Singapore. I am a CTC Fellow at the Combating Terrorism Center (CTC) at U.S. Military Academy (West Point) and a term member of The Council on Foreign Relations.

I am frequently called upon to testify before the United States Senate and House of Representatives as an expert on international terrorism, militant Islam, and terrorist financing.

I have been qualified as an expert witness in eight prior federal court proceedings, including: Qualified as an expert witness and provided expert testimony in several federal court proceedings, including US v. Mohamed Yousef Hammoud, et al (Western District of North Carolina, June 2002); US v. Fowad Assed (Eastern District of New

York, March 2003); US v. Fawaz Damrah (Northern District of Ohio, June 2004); Stanley Boim et al v. Quranic Literacy Institute et al (Northern District of Illinois, Eastern Division, December 2004); US v Mohammed Ali Hassan Al Moayad (Eastern District of New York, February 2005); US v Sami Amin Al Arian et al (Middle District of Florida); US v Mousa Abu Marzook et al (Northern District of Illinois, Eastern Division, November 2006); US v Holy Land Foundation for Relief and Development et al (Northern District of Texas, Dallas Division, July 2007).

I am widely published. Highlights of my publications include:

Books:

• Negotiating Under Fire: Preserving Peace Talks in the Face of Terror Attacks (Lanham, MD: Rowman & Littlefield, forthcoming 2007)

• Hamas: Politics, Charity and Terrorism in the Service of Jihad, (New Haven, CT: Yale University Press, 2006)

• Targeting Terror: US Policy toward Middle Eastern Terrorist Groups and State Sponsors in the War on Terror (Washington, DC: The Washington Institute for Near East Policy, 2002)

Chapters:

• "Hizballah Finances: Funding the Party of God," in *Terrorism Financing and State Responses in Comparative Perspective* (Stanford CA: Stanford University Press, 2006)

• "Hamas Social Welfare: In the Service of Terror," in James JF Forest, editor, *The Making of a Terrorist: Recruitment, Training, and Root Causes* (New York: Praeger Publishers, 2005)

• "Iran and Syria: State Sponsorship in the Age of Terror Networks," in *Confronting Terrorism Financing* (Lanham, MD: University Press of America - American Foreign Policy Council, 2004)

Journal Articles:

• "Could Hamas target the West?" *Studies in Conflict and Terrorism* (forthcoming, November 2007)

• "Countering the Theological Case for 'Economic Jihad' is Vital," *RUSI/Jane's Homeland Security and Resilience Monitor*, (July 1, 2005)

• "Zarqawi's Jordanian Agenda," (with Julie Sawyer), *Terrorism Monitor: In-Depth Analysis of the War on Terror*, Vol. II, Issue 24, The Jamestown Foundation (December 16, 2004)

MUB-00029022

6

- "Untangling The Terror Web: Identifying and Counteracting The Phenomenon Of Crossover Between Terrorist Groups," *SAIS Review*, vol. XXIV, no. 1 (Winter-Spring 2004)

- "Hamas from Cradle to Grave," *Middle East Quarterly*, vol. 11, no. 1 (January 2004)

- "Stemming the Flow of Terrorist Financing: Practical and Conceptual Challenges." *The Fletcher Forum of World Affairs*, vol. 27, no. 1, (Winter/Spring 2003)

- "The Politics of Terrorist Financing in the Middle East," *The Middle East Review of International Affairs (MERIA) Journal*, vol. 6, no. 4 (December 2002)

- "Eradicating Evil: Cracking Down on Terrorist Financing," *Harvard International Review online,* vol. XXIV, Issue 3, (Fall 2002)

- "Sponsoring Terrorism: Syria and Islamic Jihad," *Middle East Intelligence Bulletin (MEIB)*, vol. 4, no. 11 (November 2002)

Editorial Articles:

- "Hamas' Hidden Economy," *Los Angeles Times*, July 3, 2007 (also ran in the *Singapore Straits Times* on July 5, 2007 as "The Covert Funding of Hamas")

- "Making Iran Feel the Pain," *Wall Street Journal Europe*, July 2, 2007

- "Prized Fighter: How Nicolas Sarkozy Could Help Destroy Hezbollah," (with Michael Jacobson), *The New Republic Online*, May 28, 2007

- "Pulling Tehran's Purse Strings," Transatlantic Issues #16, May 4, 2007

- "Blocking Terror Finances," UPI Outside View, May 3, 2007

- "Putin's New Friends: Moscow Hosts Hamas," *The Weekly Standard*, March 19, 2007

- "Target Iranian Forces," *The Washington Times*, February 16, 2007

- "Hamas's Muddied Waters," *The Chronicle Review*, May 12, 2006

- "No Excuse," *The Wall Street Journal Europe*, July 28, 2005

- "A Major Blow to Al-Qaeda," *The National Post* (Canada), May 5, 2005

- "Injustice in Gaza," *The Baltimore Sun*, October 18, 2004

MUB-00029023

• "A Report whose Tactical and Strategic Goals Don't Square," *The Daily Star*, August 30, 2004

• "Turning a Blind Eye to Hamas in London," *The Wall Street Journal Europe*, October 24, 2003

• "Blood Money," *The Wall Street Journal*, June 4, 2003

### III.  Expert Opinion

### 1. Maktab al Khidmat (MAK)

Following the final Soviet withdrawal from Afghanistan in February 1989, debate raged among the leaders of the mujahideen as to where to shift the focus of their jihad. While Osama Bin Laden would later claim that he had already pinpointed America as his ultimate enemy while fighting the USSR, his immediate goal, he articulated, would be to topple existing Muslim governments and establish a new caliphate. In contrast, Sheikh Abdullah Azzam, formerly the chief Islamic ideologist of campaign in Afghanistan, believed that the next jihad should be against Israel, a new spin on a campaign once dominated by secularists and leftists.  The subsequent assassination of Azzam in November highlighted the rift, as Bin Laden is suspected to have ordered the killing.[1] Similarly, the New York office of the Maktab al-Khidmat (MAK) – also known as the Afghan Services Bureau or the Human Services Office – set up in the 1980s by Bin Laden and Azzam, officially as an Islamic NGO providing money to victims of the Afghan war, fell under the leadership of Bin Laden loyalist Wadih El-Hage following the mysterious 1991 death of MAK head Mustapha Shalabi, who was known to advocate Azzam's vision.[2]  According to terrorism scholar Rohan Gunaratna, "prior to its formation, however, al Qaeda existed as Maktab-il Khidamat (MAK – Afghan Service Bureau) for four years."[3]

Describing "the rise of Bin Laden and al-Qaeda" in the period from 1988 to 1992, the 9/11 Commission Report noted the following:

> Mosques, schools, and boardinghouses served as recruiting stations in parts of the world, including the United States.  Some were set up by Islamic extremists or their financial backers.  Bin Laden had an important part in this activity.  He and the cleric Azzam had

---

[1] Daniel Benjamin and Steven Simon, The Age of Sacred Terror, New York: Random House, 2002,  pp. 102-104.

[2] Anonymous, Through Our Enemies' Eyes/Osama Bin Laden, Radical Islam, and the Future of America, Washington, D.C.: Brassey's, 2002, pp. 40-41.

[3] Rohan Gunaratna, "The Evolution of al Qaeda," in Thomas J. Biersteker and Sue E. Eckert, Eds., *Countering the Financing of Terrorism* (New York: Routledge, 2008), p. 50

MUB-00029024

joined in creating a "Bureau of Services" (Mektab al Khidmat, or MAK), which channeled recruits into Afghanistan.[4]

Expanding on the presence of MAK offices in the United States, the 9/11 Commission Report added:

> This pattern of expansion through building alliances extended to the United States. A Muslim organization called al Kifah had numerous branch offices, the largest of which was in the Farouq mosque in Brooklyn. In the mid-1980s, it had been set up as one of the first outposts of Azzam and Bin Ladin's MAK. Other cities with branches of al Khifa included Atlanta, Boston, Chicago, Pittsburgh, and Tuscon. Al Khifa recruited American Muslims to fight in Afghanistan; some of them would participate in terrorist actions in the United States in the early 1990s and in al Qaeda operations elsewhere, including the 1998 attacks on U.S. embassies in East Africa.[5]

A flyer distributed by Alkifah Refugee Center, Inc., in Boston, corroborates this description. According to the flyer, "Alkifa Refugee Center is an organization founded by Sh. Abdullah Azzam to serve the cause of Jihad." The flyer was signed by Emadeddin Muntasser using the name "Abu Abdulrahman" and the title "Director, Boston Branch." Given Azzam's prominence as a supporter of mujahideen, it is telling the Muntasser himself acknowledges that Azzam founded Alkifah.[6]

In the late 1990s, as U.S. officials began to realize efforts to constrict al Qaeda's operating environment, the subject of MAK was emblematic of a routine obstacle they faced. Despite the willingness of counterparts in various Arab and Muslim countries to crackdown on al Qaeda, all denied any knowledge of MAK, arguing that organizations that supported any cause deemed legitimate by the majority of their constituents (aid to Afghan war victims, Hamas, mujahideen in Chechnya,) would not be subject to any constraints.[7] As such, the MAK model soon became a prototype of the typical Islamic NGO, including militant Islamic groups such as Hamas, Hezbollah, and Palestinian Islamic Jihad.[8] Headquartered in Peshawar, MAK built on Azzam's continuing work coordinating the flow of fighters into Afghanistan by adding Bin Laden's money and foreign investors. This union of Azzam and Bin Laden's resources and expertise was divided into a wide range of committees responsible for logistics and training at MAK's camps, as well as for official "humanitarian" concerns.[9]

---

[4] The 9/11 Commission Report, authorized edition (New York: Norton, 2004), pages 56-57; available online at http://www.9-11commission.gov/report/911Report.pdf
[5] The 9/11 Commission Report, authorized edition (New York: Norton, 2004), pages 58-59; available online at http://www.9-11commission.gov/report/911Report.pdf
[6] Alkifa Ceenter Flyer, also see Youngquist and Marinelli affidavits
[7] Daniel Benjamin and Steven Simon, The Age of Sacred Terror, New York: Random House, 2002, pp. 287-288.
[8] Anonymous, Through Our Enemies' Eyes/Osama Bin Laden, Radical Islam, and the Future of America, Washington, D.C.: Brassey's, 2002, p. 271.
[9] Anonymous, Through Our Enemies' Eyes/Osama Bin Laden, Radical Islam, and the Future of America, Washington, D.C.: Brassey's, 2002, p. 99.

MUB-00029025

9

## 2. Dawa in Islam

According to Islamic tradition, all Muslims are obligated to submit themselves to God (ibadah) and preach or propagate (dawa, literally "a call to God") true Islam. The obligation to spread true Islam covers a wide spectrum of outreach activity, from outright proselytizing (which benefits the soul) to charitable giving and social welfare activities (which benefit the body). To fulfill these social welfare duties, the Islamic endowments (waqf, or awqaf in the plural) that are responsible for the upkeep of mosques and holy sites in contemporary Muslim societies also typically manage social service institutions. Throughout the Muslim world, revenue derived from the waqf's endowed properties and individual donations typically fund "a veritable network of welfare and charitable services (such as schools, orphanages, soup kitchens)." These not only provide for the temporal needs of the population, but are also a means of drawing in the people to whom religious leaders want to preach.[10]

Within the more radical Salafi strain of Sunni Islam, dawa activities are seen as protecting the umma (Islamic community, or nation) from insufficiently Islamic rulers and other perceived enemies of Islam, such as non-Muslim infidels. Salafiyya is a school within Sunni Islam that spread throughout the Arab world in the twentieth century. Its name comes from the Arabic words al-salaf al-salih, "the venerable forefathers," which refers to the generation of the Prophet Mohammad and his companions. Salafis believed Islam had been corrupted by idolatry, and they sought to bring it back to the purity of its earliest days as it was practiced in the time of the Prophet. Accordingly, Salafis today reject modernizing tendencies, and believe that the Koran and Hadith (traditions of the Prophet) should be interpreted as they were during the first few generations after Mohammad's death. Salafis are sometimes considered extreme in belief; after 9-11 the term has been used to describe various groups within Sunni Islamic ideology that practice purist or reactionary interpretations of Islam--especially the militant expressions of these ideologies.[11]

To promote their particular version of Islam, many Salafis use dawa activities to promote a "pure" Islamic practice modeled after the lifestyle of the Prophet Mohammed, emphasizing individual piety and self-purification. When, as with Salafis, the goal is "the transformation of society through religious education, and moral and social reform," the wide array of social services that make up the dawa are ideally suited to complement religious goals of reviving and propagating the faith in a population. This Salafist ideological framework is common to the various modern militant Islamist organizations that grew out of the Muslim Brotherhood and the Afghan jihad against the Soviets. As the Congressional Research Service notes of the leader of another well known terrorist organization, "Bin Laden has identified Salafist thinkers such as his former mentor Abdallah Azzam, Hamas founder Ahmed Yasin, World Trade Center bombing conspirator Omar Abdel Rahman, Saudi dissident clerics Salman al-Awdah and Safar al-

---

10. For dawa definition see R. Hrair Dekmejian, Islam in Revolution: Fundamentalism in the Arab World (Syracuse: Syracuse University Press, 1985), 44; Quote regarding waqf from Michael Dumper, Islam and Israel: Muslim Religious Endowments and the Jewish State (Washington D.C.: Institute for Palestine Studies, 1994), 1-2.

11. See Robert Worth, "The deep intellectual roots of Islamic terror," New York Times, October 13, 2001; Wikipedia Online Encyclopedia, s.v. "Salafi," http://en.wikipedia.org/wiki/Salafi

Hawali, and thirteenth century Islamic scholar Ibn Taymiyah as prominent ideological influences."[12]

## Dawa, Violence and Extremism

One of the ideological principles developed by Muslim Brotherhood theoretician Sayyid Qutb is that "the duty of the faithful Muslim is to revive Islam to transform the jahili [immoral, pre-Islamic] society through proselytization (dawah) and militant jihad." Islam scholar Olivier Roy has noted that militant behavior in Islamist groups appears to be motivated more by a particularly aggressive style of religious preaching than by political training. For Roy, the word dawa is defined as "militant preaching" (he literally translates the word as "call" or "invitation") and is a more significant cause of militant behavior than is strictly political training. Indeed, Muslim Brotherhood founder Hassan al-Banna wrote a tract titled Da'watuna (Our Militant Preaching). Among Muslim militants, Roy points out, "Preaching (da'wa) is the instrument of the march to power."[13]

Many open societies, particularly democratic ones, are concerned about the preaching and social welfare activities of groups with militant ties, particularly because the dawa culture often promotes anti-democratic and anti-western undertones. The Dutch General Intelligence and Security Service (AIVD) outlined these concerns in a report entitled, "From Dawa to Jihad: The Various Threats from Radical Islam to the Democratic Legal Order." Groups that focus on dawa activities, the report claimed, "follow a long-term strategy of continuous influencing based on extreme puritanical, intolerant and anti-Western ideas." The report warned that, "the choice of [some] dawa-oriented groups for non-violent activities does not always imply that they are non-violent on principle. Often they simply do not yet consider armed Jihad expedient for practical reasons (Jihad can be counterproductive or impossible because of the other side's superiority) or for religious reasons (the Jihad against non-believers is only possible when all Muslims have returned to their 'pure' faith)."[14]

Of course, there is nothing inherently violent or antisocial about dawa activities, per se. Indeed, the opposite is true: dawa organizations--frequently formed as local charities, non-governmental organizations or private voluntary organizations--play an important communal role in Islamic history and culture. Like their Salafi cousins, however, radical Islamist organizations take advantage of the otherwise laudable Islamic

---

12. John Esposito, Islam: The Straight Path (Oxford: Oxford University Press, 1988), 200; Christopher M. Blanchard, Al Qaeda: Statements and Evolving Ideology, Congressional Research Service, CRS Report RL32759, February 4, 2005, http://www.fas.org/irp/crs/RL32759.pdf; For an insightful discussion of Salafi means of spreading Islam, from dawa to violent activity, see Quintan Wiktorowicz and John Kaltner, "Killing in the Name of Islam: Al-Qaeda's Justification for September 11," Middle East Policy 10, no. 2 (2003), http://www.mepc.org/public_asp/journal_vol10/0306_wiktorowiczkaltner.asp
13 For Qutb quote see Dekmejian, Islam in Revolution, 91; Olivier Roy, The Failure of Political Islam, trans. Carol Volk, (Cambridge: Harvard University Press, 1994), 57 and 70.
14. General Intelligence and Security Service, "From Dawa to Jihad: The Various Threats from Radical Islam to the Democratic Legal Order," The Netherlands Ministry of the Interior and Kingdom Relations (December 2004): 7 and 27, http://www.minbzk.nl/contents/pages/42345/fromdawatojihad.pdf

tradition of charity and good works not only to teach their particular version of Islam but also to actively support terrorist operations.[15]

Radical individuals and organizations, however, have taken advantage of the religious obligation of zakat to raise funds for terrorism. Using religious arguments to justify, promote and raise funds for terrorism and other acts of violence, terrorist groups and their ideological, financial and logistical supporters have long abused Islamic ideals to promote their extremist causes. As Dr. Shmuel Bar describes in his book on Islamic religious rulings (Fatwa) used to support jihad, "Financially supporting armed jihad may be performed through a number of mechanisms, foremost of which is zakat – the tithe that each Muslim must pay to the community for orphans, widows, and poor within the community and for building religious institutions."[16] The 9/11 Commission concluded that "Al Qaeda and its friends took advantage of Islam's strong calls for charitable giving, zakat. These financial facilitators also appeared to rely heavily on certain imams [preachers] at mosques who were willing to divert zakat donations to al Qaeda's cause."[17] The Commission found that, like radical preachers at certain mosques, charities – some abused by corrupt employees and other full and witting terror financiers – also played a critical role in financing al Qaeda.

> Al Qaeda also collected money from employees of corrupt charities. It took two approaches to using charities for fund-raising. One was to rely on al Qaeda sympathizers in specific foreign branch offices of large, international charities-particularly those with lax external oversight and ineffective internal controls, such as the Saudi-based al Haramain Islamic Foundation. Smaller charities in various parts of the globe were funded by these large Gulf charities and had employees who would siphon the money to al Qaeda.
>
> In addition, entire charities, such as the al Wafa organization, may have wittingly participated in funneling money to al Qaeda. In those cases, al Qaeda operatives controlled the entire organization, including access to bank accounts. Charities were a

---

15. For more on legitimate dawa activity as NGOs, see Testimony of Quintan Wiktorwicz, "Prepared Statement to a Hearing on the Role of Charities and NGO's in the Financing of Terrorist Activities," United States Senate Committee on Banking, Housing, and Urban Affairs, Subcommittee on International Trade and Finance, August 1, 2002, http://banking.senate.gov/02_08hrg/080102/wiktorow.htm; For MB ties to suspect NGOs, see, for example, Edward Alden, Mark Huband, and Mark Turner, "Al-Qaeda 'Financiers' Active In Europe: A UN Report Reveals A Lack Of Action Over Youssef Nada and Ahmed Idris Nasreddin," Financial Times, November 14, 2003; See also Testimony of Matthew Levitt, "Untangling the Terror Web: The Need for a Strategic Understanding of the Crossover Between International Terrorist Groups to Successfully Prosecute the War on Terror" United States Senate Committee on Banking, Housing, and Urban Affairs, October 22, 2003,
http://www.washingtoninstitute.org/templateC07.php?CID=15

[16] Shmuel Bar, Warrant for Terror: The Fatwas of Radical Islam and the Duty to Jihad (Lanham, MD: Rowman & Littlefield, 2006), p 74

[17] The 9/11 Commission Report, authorized edition (New York: Norton, 2004), p. 170; available online at http://www.9-11commission.gov/report/911Report.pdf

12

source of money and also provided significant cover, which enabled operatives to travel undetected under the guise of working for a humanitarian organization.[18]

In tandem with its specific calls for funding jihad, Al Kifah/CARE published a "Zakat Simplified Guide." In a note to their readers, the editors of the edition of Al-Hussam that included the zakat guide urge contributions and add: "Brothers and Sisters may send their zakat money to CARE International during this blessed month when rewards are multiplied. Note that our office always distributes zakat money according to the Holy Qur'an."[19]

### 3. Al Kifah/CARE International: Part of the Global Jihadist Network

As noted above, Muntasser himself (using the name Abu Abdulrahman) acknowledged that the "Alkifah Refugee Center is an organization founded by Sh. Abdullah Azzam to serve the cause of Jihad."[20] Al-Hussam quoted Azzam explicitly calling on readers to join jihad, noting that "the individual obligatory nature of jihad remains in effect until the lands are purified from the pollution of the disbelievers."[21] A clear sign of CARE's relationship to mujahideen involved in Jihad is found in the edition of Azzam's publication "Join the Caravan" published by CARE. Pages 72-73 of the publication invite readers to join the Jihad in Afghanistan and become mujahideen. The reader is then provided contact information in Afghanistan to facilitate such travel:

> Whoever wished to come to Afghanistan should call one of the following telephone numbers in Peshawar:
>> 43203
>> 43708
>> 42397
>> 42311
>> 42040
> So, when you reach Peshawar, call one of these numbers, and ask the person who answers the call to come to where you are. Then, someone will come to you and take care of you.[22]

Al Kifah (a key part of the international network of MAK organizations), operating under this name and later operating as CARE International, played a central role raising funds for radical organizations and causes affiliated with the global jihadist movement. For example, Al Kifah/CARE specifically urged donors to include donations for jihad in order to fulfill their zakat obligations and warned that "the one who withholds the zakat will be serverely tortured in Hell-fire unless Allah forgives him."[23] Under a section entitled "Delivery of Zakat Ul-Fitr," the editors of the April 2, 1993, edition of Al-Hussam note that as part of its zakat delivery process Al Kifah/CARE "called our

---

[18] The 9/11 Commission Report, authorized edition (New York: Norton, 2004), pages 170-171; available online at http://www.9-11commission.gov/report/911Report.pdf
[19] Al-Hussam, volume 5, number 7, Ramadan 1417/January 1997
[20] Alkifah Refugee Center Flyer
[21] Al-Hussam, volume 4, number 11, Rabi'awal 28, 1416/August 25, 1995
[22] Azaam, Join the Caravan, Pp 72-73
[23] "The Obligation of Zakat," Al Hussam, volume 5, number 7, Ramadan, 1417/January 1997

offices in various areas where there is Jihad, and we asked for the amounts to be spent before Eid prayer. When a specific destination was designated by payees, Zakat was sent to that destination."[24]

CARE openly acknowledged in its newsletters that it provided funds and goods to mujahideen. For example, a textbox in the June 11, 1993, edition of Al-Hussam informs that "The Services Bureau was successful in distributing 3000 Udahi [sacrificed animals] to the brothers on the front lines and to the Muslims of Bosnia. *This is on top of what was distributed to the Mujahideen and Muslims in Afghanistan, Kashmir and Tajikistan*" [italics added].[25] This is corroborated by CARE financial statements which reveal that from August 1993 to June 1995, MUNTASSER, in the name of Care or Al Kifah, wire transferred close to $167,000 to the Human Service Office (HSO, or variations on that name) in Bosnia.[26]

Al Kifah/CARE publications and websites regularly provided updates ("news briefs") on attacks by mujahideen in various parts of the world where groups affiliated with al Qaeda's global jihadist movement operate, like Chechnya, Afghanistan, Bosnia, and Algeria. The clear implication is that the mujahideen groups lionized in Al Kifah/CARE publications are worthy recipients of donor funding to fulfill the requirement of zakat.

For example, CARE's website ran a news update entitled "News from the Battle Fields of Chechnya," which recounts battles between mujahideen and Russian forces. The subheading of the news update is "A message from the leaders of Jihad to all Muslims," and includes a call for readers to be aware of the "ordeal of their brothers in Chechnya, that they do not forget them...." In the context of CARE's zakat calculation guide, which also appeared on CARE's website, remembering the mujahideen is an apparent reference to financing them.[27]

The December 30, 1994, edition of Al-Hussam included an interview with "one of the leaders of Chechnya." Asked, "Is Jihad going to continue in your country?" the reported Chechen leader responds "Yes, we will fight the Russians even if just one Muslim remains." He goes on to say that his wish for the Muslims is that "We wish the Muslims of the world would unite, and pray for us, that is all we ask." However, the editor of Al-Hussam added an Editor's Note stressing that praying for Chechen fighters is not enough – Muslims must also fight with them or at least fund them:

> When some people hear the word "pray for us, which is all we ask", they rejoice and think that there is no need for men or money. This is a grave error; if they do not need us, we need them so we can accomplish Jihad together... And if they say we do not need anything, it is because they have integrity and will not ask, even if they need help.[28]

---

[24] Al-Hussam, volume 1, number 24, Shawal 9, 1413/April 2, 1993

[25] Al-Hussam, Issue # 3, June 11, 1993

[26] Marinelli complaint affidavit, para. 24

[27] "News from the Battle Fields of Chechnya," http://web.archive.org/web/20001209030300/care-intl.org/news.htm

[28] Al-Hussam, #18, Year III, Friday 27 Rajab 1415/30 December 1994

14

Other news updates included glowing references to the "famous Chechen commander Shamel Basiev" and his exploits conducting attacks against Russian targets.[29] In August 2003, the U.S. State Department designated Shamil Basayev as a terrorist, citing his leadership of the Riyadus-Salikhin Reconnaissance and Sabotage Battalion of the Chechem Martyrs (RSRSBCM). The State Department listed several terrorist attacks attributed to Basayev, including suicide and truck bombings he orchestrated, and specified that because of his ties to al Qaeda the U.S., United Kingdom and Russian Federation all asked the United Nations to include Basayev on its consolidated list of terrorists.[30] In one instance, al-Hussam noted "It is worth noting that Shamel has humiliated the Russians in the last operation on the hospital in Bodenvesk."[31] The reference is to an incident in June 1995 when Basayev led a group of terrorists who took over a hospital and took more than 1,000 people hostage and killed more than 100 people, including civilians.[32]

Al Hussam also referred positively to the "Group of Mujahideen under the leadership of Ibn Al-Khattab" and their attacks against Russian targets.[33] A graduate of the Afghanistan jihad, Khattab reportedly joined the Chechen jihad in 1995. "With expertise developed in Afghanistan during the 1980s and honed in Tajikistan early the following decade, Ibn al-Khattab made a qualitative contribution to the fight against the Russians."[34]

In another instance, Al-Hussam carried an update on the operations of another mujahideen group tied to al Qaeda and the Taliban. In February 2003, the State Department designated Gulbuddin Hekmatyar, head of the Hizbi Islami party, who "participated in and supported terrorist acts committed by al-Qa'ida and the Taliban. Hekmatyar was also added to the United Nations' terrorist list.[35] Hekmatyar's group, Hizbi Islmami, was among those whose "operations" were recorded and glorified in Al-Hussam:

> After a period of relative calm that overshadowed most of the provinces in Afghanistan and after fighting in Kabul between government forces and Taliban forces only, Hizbi Islami carried out some successful operations in Northern Afghanistan. Mujahideen of Hizbi Islami were able to capture the city of Morghab in Heart. In Salanj, Mjahideen were able to advance and take over four new positions. In Faryab and Badghis Hizbi

---

[29] Al Hussam, volume 4, number 5, Safar 16, 1416/July 14, 1995
[30] "Designation of Shamil Basayev under Executive Order 13224," August 8, 2003, available online at http://www.state.gov/r/pa/prs/ps/2003/23147.htm
[31] Al Hussam, volume 4, number 5, 1416/July 14, 1995
[32] Michael Specter, "Chechen Rebels Said to Kill Hostages at Russian Hospital," *The New York Times*, June 16, 1995; Judith Ingram, "Wanted Chechen Rebel Leader Basayev Killed," Associated Press, July 10, 2006
[33] Al Hussam, issue number 15, Year IV, Friday Rajab 1416/24 November 1995
[34] Lorenzo Vidino, "How Chechnya became a Breeding Ground for Terror," *Middle East Quarterly*, Summer 2005, available online at http://www.meforum.org/article/744
[35] "U.S. Designates Gulbuddin Hekmatyar a Terrorist," February 19, 2003, available online at http://italy.usembassy.gov/viewer/article.asp?article=/file2003_02/alia/A3021910.htm

MUB-00029031

15

forces wee able to take over two posts. Fighting continues and more details will be published in the next issue, 'In sha'Allah.[36]

In 1995, Al-Hussam ran an "exclusive" interview with Shaykh abul-Mudhir As-Sa'idi. Al Sa'idi is described in the Militant Ideology Atlas produced by the Combating Terrorism Center at the U.S. Military Academy (West Point) as one of the "most prominent leaders" of The Libyan Islamic Fighting Group (LIFG), designated a Foreign Terrorist Organization by the U.S. and listed as a terrorist group at the United Nations.[37] According to the U.S. government, "The Libyan Islamic Fighting Group threatens global safety and stability through the use of violence and its ideological alliance with al Qaida and other brutal terrorist organizations."[38]

> The LIFG was formed in the early 1990s in Afghanistan, and formally announced its existence in 1995. The group relocated to Libya where it sought to overthrow Mu'ammar Qadhafi and replace his regime with a hard-line Islamic state. The LIFG mounted several operations inside Libya including a 1996 attempt to assassinate Qadhafi, but these failed to topple the regime. Following a Libyan government security campaign against LIFG in the mid- to late 1990s, the group abandoned Libya and continued its activities in exile.[39]

In the preface to the interview with this LIFG leader, the editors of Al-Hussam hailed "the recent heroic operations led by the mujahideen youth of Libya against the supporters of the apostate Qadhafi, are considered by the mujahidin to be a turning point in the path of Islamic work in the Libyan region." The editors ended the preface to the interview saying that "the shaykh gracefully accepted Al-Hussam's invitation" to be interviewed, and concluded the interview wishing "May Allah reward Shaykh Abul-Mundhir As-Sa'idi well for this advice, and for his consent to the staging of this interview with our publication. We ask Allah to give victory to His servants, and to establish (in power) for us our religion which He has approved for us, for indeed He is the One to do that and is able to."[40]

CARE published "Join the Caravan," the radical manifesto of Sheikh Abdullah Azzam, mentor to Usama Bin Laden and co-founder of MAK. The manifesto is a call to jihad. Consider, for example, the preface to the second edition: "We hope that Allah will provide us with sincerity and steadfastness and that He will accept our deeds from us, and bring us our end in martyrdom." Among its principles, the monograph informs that "Jihad is the highest peak of Islam," that "Jihad is the most excellent form of worship," and warns that "a person who discourages people from jihad is like the one who discourages people from fasting. Whoever advises an able Muslim not to go for jihad is

---

[36] Al Hussam, volume 4, number 9, Safar 30, 1416/July 28, 1995

[37] William McCants, ed., *Militant Ideology Atlas, Research Compendium 2006*, U.S. Military Academy, Combating Terrorism Center, 2006, available online at http://www.etc.usma.edu/atlas/Atlas-ResearchCompendium.pdf

[38] "Treasury Designates UK-Based Individuals, Entities Financing Al Qaida-Affiliated LIFG," February 8, 2006, available online at http://www.ustreas.gov/press/releases/js4016.htm

[39] "Treasury Designates UK-Based Individuals, Entities Financing Al Qaida-Affiliated LIFG," February 8, 2006, available online at http://www.ustreas.gov/press/releases/js4016.htm

[40] Al Hussam, volume 4, number 14, 18 Jamada El Oula, 1416/October 13, 1995

just like the one who advises him to eat in Ramadan while he is healthy and in residence."[41]

In an interview with Al Hussam, Azzam's wife ("The Wife and Mother of Martyrs") tells how upon hearing that her husband and several sons were killed in a bomb attack she said she called the Services Office (MAK) and "I told them we are for it (jihad and shahada) [holy war and martyrdom] and we have come from our countries for it." She continued: "I thanked Allah that his three eldest children were all martyred with him."[42]

In a telephone conversation with Mohamad Chehade, CARE official Samir Al-Monla noted that he "was very affected by the brother [Bassem Kanj]." Asked which brother, "the one that got married?," Samir replied "yes."[43] Radical Islamists frequently use terminology about marriages to refer to attacks or martyrdom in an effort to evade detection from authorities. Bassam Kanj, a Lebanese and longtime resident of Boston, was killed in an attack on Lebanese military forces in 2000. Kanj was the subject of an FBI investigation into Islamist extremists in the United States, according to the 2005 testimony of FBI Director Mueller.[44] Kanj, "a leading Bin Laden operative," reportedly trained at a jihadi terrorist training camp in Afghanistan in the late 1980s.[45] Referring to Kanj's family and their commitment to support them financially, Samir stated in the same telephone call, "These five...they are a light... a shining flame for all of us... for all of you...a for everyone... they are a shining flame for each one of you." Mohamad Chehade responds, "I am in agreement with you, however, these matters we are supposed to... I mean, we agreed that this is a continuing sponsorship (of the Kanj family)... that is not a problem."[46] In his 2003 interview with the FBI, Samir al-Monla denied knowing Bassam Kanj.[47]

CARE also maintained relationships with other terrorist-affiliated organizations in the United States. In his April 7, 2003, FBI interview, Samir Al-Monla – CARE president from in or about 1996 to 1998 – acknowledged that CARE sometimes cooperated with groups like the Global Relief Foundation (GRF) if a donor designated a recipient charity with which CARE had no direct contact.[48] The transcript of a telephone call between Kifah Jayousi and Samir al-Monla reveals that in 1996 Jayousi was planning to travel for or on behalf of GRF. Jayousi stated "But I am coming through GRF organization," adding "I mean we will all cooperate together."[49]

[41] Abdullah Azzam, *Join the Caravan*, CARE International (1995)

[42] Al Hussam, volume 4, number 4, Zul-Hijra 19, 1415/May 19, 1995

[43] Mohamad Chehade telephone transcript, 4/6/2000

[44] Testimony of Robert S. Mueller, III, Director, Federal Bureau of Investigation, Before the Senate Committee on Intelligence of the United States Senate, February 16, 2005

[45] Stephen Kurkjian and Judy Rakowsky, "Terror Suspects Linked 2 Loved in Everett, Drove Boston Cabs," *The Boston Globe*, December 22, 2000; Stephen Kurkjian and Peter DeMarco, "FBI Probes 'Sleeper Cell' Possibility," *The Boston Globe*, June 27, 2004

[46] Mohamad Chehade telephone transcript, 4/6/2000

[47] FD-302 of Samir Almonla interview with FBI, April 7, 2003

[48] FD-302 of Samir Almonla interview with FBI, April 7, 2003

[49] Transcript of telephone conversation between Samir al-Monla and Kifah Jayoussi, 10/27/1996

According to its indictment, the Department of Justice charged that Kifah Wael Jayyousi "actively recruited mujahideen fighters and raised funds for violent jihad." Jayyousi founded the American Islamic group, and assumed control of American Worldwide Relief Organization after its founder, Mohamed Zaky, died in 1995. (Zaky is referred to as a martyr in two editions of Al-Hussam).[50] Jayyousi published "The Islam Report", a newsletter promoting jihadist activities and "solicited donations to support mujahideen operations and mujahideen families." In 1999 and 2000, Jayyousi, in conversations with unindicted co-conspirators (whose names have not been made public), stated that he was raising funds for "the brothers" and transferring them through the Global Relief Foundation.[51]

According to the U.S. government, "one of the founders of GRF was previously a member of the Makhtab Al-Kidamat, the precursor organization to al Qaida. The GRF has received funding from individuals associated with al Qaida." The U.S. government designated GRF as a terrorist organization in 2002 and detailed GRF's ties to the Taliban, al Qaeda, and other terrorist groups affiliated with the Global Jihadist Movement. Tellingly, while the designation only took place in 2002, the information on GRF's terrorist activities went back to the 1990s.[52]

In one of its volumes, the editors of Al-Hussam responded to an article someone submitted and referred in their response to GRF's magazine, Al Thilal, as "our sister magazine, Al Thilal."[53] Like Al Kifah/CARE's al-Hussam, GRF publications also issued calls to fund and support armed jihad:

> GRF has published several Arabic newsletters and pamphlets that advocate armed action through jihad against groups perceived to be un-Islamic. For example, one 1995 GRF pamphlet reads "God equated martyrdom through JIHAD with supplying funds for the JIHAD effort. All contributions should be mailed to: GRF." Another GRF newsletter requested donations "for God's cause – they [the Zakat funds] are disbursed for equipping the raiders, for the purchase of ammunition and food, and for their [the Mujahideen's] transportation so that they can raise God the Almighty's word . . . it is likely that the most important of disbursement of Zakat in our times is on the jihad for God's cause . . . ."[54]

As noted above, Mohammed Zaki was an associate of Kihaf Jayousi and was involved with the American Worldwide Relief Organization until his death in Chechnya.

---

[50] See June 2, 1995, and June 16, 1995, editions of Al-Hussam

[51] United States District Court, Southern District of Florida, Miami Division. Case number 04-60001-CR-COOKE, United States of America v. Jose Padilla, et. al.

[52] "Treasury Department Statement Regarding the Designation of the Global Relief Foundation," October 18, 2002, available online at www.ustreas.gov/press/releases/po3553.htm

[53] Al Hussam, volume 4, number 5, Safar 16, 1416/July 14, 1995

[54] "Treasury Department Statement Regarding the Designation of the Global Relief Foundation," October 18, 2002, available online at www.ustreas.gov/press/releases/po3553.htm

18

According to a summary of a 1995 telephone conversation, was sought after to participate in a CARE fundraising event for Bosnia to be held in Boston.[55]

Aside from its affiliations and the radical groups and personalities it lauds, Al Kifah/CARE even defines the term jihad in explicitly violent terms. The term jihad literally translates as "struggle," and has two meanings – only one of which is violent. The non-violent meaning of jihad refers to the personal struggle for virtue and morality, the striving to follow God's will. According to John Esposito, a leading scholar on Islam, jihad can also refer to "fighting injustice and oppression, spreading and defending Islam, and creating a just society through preaching, teaching, and, if necessary, armed struggle or holy war." The two broad meanings of jihad, non-violent and violent, are exemplified in a well-known Prophetic tradition: after returning from a military expedition, the Prophet Mohammad said, "We have returned from the lesser jihad (jihad al-asghar) to the greater jihad (jihad al-akbar)." When asked, "O, Messenger of Allah, what is the greater jihad?" Mohammad answered, "It is the jihad against one's soul." In the context of acts of violence and terrorism, the term jihad clearly refers to the violent struggle against perceived enemies of Islam.[56]

But Al Kifah/CARE's publication Al-Hussam ran an article explicitly rejecting the interpretation that jihad defined as self-improvement maintains primacy over jihad defined as fighting. An article entitled "The Slandered Jihad" ran in the January 27, 1995, edition of Al-Hussam in which readers of the Al Kifah/CARE publication were told that the idea that striving to improve oneself ("struggling against desires") is considered the Greater Jihad while actual "jihad of the battlefield" is the Lesser Jihad is a false and "erroneous" interpretation of Islamic tradition.[57] Similarly, an article entitled "The Alleged Jihad" ran in the March 24, 1995, edition of Al-Hussam which extols the virtues of militant Jihad over that of "self Jihad." The article notes that if a person were to participate in a Jihad battle he would understand. "Think of those who are under the missiles and bombs, and they see from down below: hands, feet, and stomachs flying. Then the perfect bodied ones end up one-eyed, with one leg, on arm or paralyzed." The article lectures that "those who see Jihad's hardships find it impossible to compare personal Jihad with other peaceful calls."[58]

## 4. Charities Opening Under New Names

There is a well established trend by which tainted, exposed, designated or indicted charities or organizations reopen under new names, often with some of the same officials, sometimes using the same address, phone number, fax number, and even explicitly continuing the former organization's activities (like publishing its literature). This clearly is the case with CARE International, which continued to publish Al-Kifah's Al-Hussam

---

[55] Transcript of telephone call between Mohammed Zaki and "Abu Abed Al-Rahman," 11/9/94-11/13/94, Tape #3, SD 5144-S, 454-7725

[56] John Esposito, "Understanding Islam," *al-Jazeera*, July 18, 2003; Koranic excerpts from Abdul Hadi Palazzi, "The Islamists Have it Wrong," *Middle East Quarterly*, vol 9, no 3, 2001

[57] Al-Hussam, volume 3, number 20, Sha'ban 25, 1415/January 27, 1995

[58] Al-Hussam, Issue #24, 22 Shawal 1415/March 24, 1995

MUB-00029035

magazine, operated for a period out of the same office, and included some of the same persons.

The academic literature on banned charities reopening under new names is robust. For example, the Italian journalist and economist Loretta Napoleoni, author of *Terror Incorporated: Tracing The Dollars Behind The Terror Networks,* has written that "Charities closed in one country often reappear after a few months somewhere else under a new name."[59] Similarly, Dr. Phil Williams, Professor of International Security in the Graduate School of Public and International Affairs at the University of Pittsburgh, an expert in transnational crime, wrote that "terrorist financial support structures are not static targets. Even when they have been included on the United Nations list, Islamic charities have adapted in a variety of ways. In some cases, the head office has closed but branch operations continue to operate unhindered. In other cases, the charities have simply re-registered and re-opened under new names but with the old infrastructure intact."[60]

Indeed, the U.S. Treasury Department has produced a document entitled "Background Information on Certain FTOs with Aliases Appearing as Potential Fundraising Front Organizations" in which it provides several examples of Foreign Terrorist Organizations (FTOs) which operate fundraising front organizations that amount to nothing more than aliases for the FTO itself. Some of the examples Treasury cites include the Japanese cult Aleph (Aum Shinrikyo/Aum Supreme Truth), the Jewish terrorist groups KACH and Kahane Chai, the Irish Republican Prisoners Welfare Association (Real IRA), and Jamaat ud Dawa – JUD (Lashkar e Tayyiba – LT).[61]

Treasury has further noted that after being designated a terrorist organization in March 2002, the Bosnian branch of the al Haramain Islamic Foundation "reconstituted itself and continue operations under the name 'Vazir.'" In another case, Treasury also noted that the Indonesian branch of Al-Haramain also attempted to operate under an assumed name, "Yayasan Al-Manahil-Indonesia."[62] Similarly, the Al-Rashid Trust was designated a terrorist group by the U.S. on September 23, 2001 and by the UN 1267 Sanctions Committee on October 6, 2001. U.S. intelligence indicates that, as of mid-March 2002, Al Akhtar Trust was conducting all activities of the former Al-Rashid

---

[59] Loretta Napoleani, "Terrorism Financing in Europe," in Jeanne K. Giraldo and Harold A. Trinkunas, Eds., *Terrorism Financing and State Responses* (Stanford University Press, 2007)

[60] Phil Williams, "Warning Indicators and Terrorist Finances," in Jeanne K. Giraldo and Harold A. Trinkunas, Eds., *Terrorism Financing and State Responses* (Stanford University Press, 2007)

[61] "Background Information on Certain FTOs with Aliases Appearing as Potential Fundraising Front Organizations," U.S. Department of the Treasury, available online at http://www.treas.gov/offices/enforcement/key-issues/protecting/fto_aliases.shtml

[62] U.S. Department of Treasury, Office of Public Affairs, "Treasury Announces Joint Action with Saudi Arabia Against Four Branches of Al-Haramain In The Fight Against Terrorist Financing," Document number JS-1108, January 22, 2004, http://www.treas.gov/press/releases/js1108.htm

MUB-00029036

Trust.[63]  In the Philippines, the IIRO was renamed "the Islamic Mercy Foundation" and continued Moro Islamic Liberation Front activities under that title.[64]

In the case of Alkifah and CARE, the timing of the name change is particularly significant coming as it did on the heels of press reports linking Alkifah to the 1993 World Trade Center bombing.  Articles in such major publications as *The New York Times* (April 11, 1993) and *Newsweek* magazine (March 29, 1993) linked Alkifah to the 1993 attack.  Two days after the second of these articles appeared, on April 13, 1993, Muntasser incorporated the new organization under the name CARE International, Inc.[65] Just a month earlier, in its March 5, 1993, issue of Al-Hussam, Alkifah ran an article encouraging readers to engaging in Jihad and becoming a martyr as well as another article entitled "Boston Offers More Martyrs" announcing the death of someone from the Boston area who died fighting in Afghanistan.[66]

## CARE International is an Outgrown of al Kifah Boston

While Suheil Laher, president of CARE at the time, claimed that CARE was a separate organization from al Kifah, even he admitted that the officers of al Kifah Boston carried over and became officers of CARE, according to his 2003 interview by the FBI's Joint Terrorism Task Force (JTTF).[67]  Shared leadership is a common red-flag indicating that one organization may be nothing more than an outgrowth of a predecessor organization.  Muntasser, for example, not only founded and incorporated CARE in Massachusetts, but according to an Alkifah flyer he also served as Director of the Boston branch of Alkifah Refugee Center.[68]

Al Kifah published a bi-monthly newsletter called Al-Hussam (The Sword).  In the early 1990s the header for this publication announced it was a "newsletter of the AlKifah Refugee Center – USA" in English as well as an Arabic subtitle – immediately below the enlarged title "Al-Hussam" and above the words "Alkifa Refugee Center" English – stating "Maktab al-Kidmat" (Afghan Services Bureau) in Arabic.[69]  As early as June 1993, however, CARE International assumed publication of Al-Hussam, with a header that looked very similar but now read "Al-Hussam; Newsletter published by Maktab al-Kidmat, Boston USA; Care International."[70]

---

[63] U.S. Department of Treasury, Office of Public Affairs, "U.S. Designates Al Akhtar Trust Pakistani Based Charity is Suspected of Raising Money for Terrorists in Iraq," Document number JS-899, October 14, 2003, http://www.treas.gov/press/releases/js899.htm

[64] Zachary Abuza, "Funding Terrorism in Southeast Asia: The Financial Network of Al Qaeda and Jemaah Islamiyah," The National Bureau of Asian Research, 14, no. 5, (2003)

[65] CARE International, Inc., Articles of Organization, The Commonwealth of Massachusetts; Bill Turque et al, "The Trail to 'the Jihad Office,'" *Newsweek*, March 29, 1993; Alison Mitchell, "After Blast, New Interest in Holy-War Recruits in Brooklyn," *The New York Times*, April 11, 1993

[66] Al-Hussam, Issue # 22, March 5, 1993

[67] Suhail Ismail Laher statement to FBI, April 8, 2003; James T. Marinelli affidavit, April 2005

[68] Youngquist affidavit and Alkifah Refugee Center flyer

[69] See, for example, Issue #22 of Al-Hussam, March 5, 1993

[70] See, for example, Issue #3 of Al-Hussam, June 11, 1993

MUB-00029037

Similarly, a zakat calculation guide originally published and distributed by Al-Kifah's Boston branch was later published and distributed by CARE, in another example of CARE continuing Al-Kifah's work. One copy of the zakat calculation guide includes a copyright for 1993 by Alkifah Refugee Center (a translation of the Arabic directly above that reads "Office Services of the Mujahideen. Another copy of the zakat guide includes a copyright for 1994 by CARE International.[71]

According to its articles of incorporation, filed in or about April 1993, CARE's address was listed as 1085 Commonwealth Avenue, suite 124, Boston, Massachusetts, 02215.[72] The September 18, 1992, edition of Al-Hussam (volume 1, number 10), published as the "newsletter of Alkifah Refugee Center – USA," lists the same address for Alkifa as the one under which CARE later incorporated: 1085 Commonwealth Avenue, suite 124, Boston, Massachusetts, 02215.[73]

In its March 24, 1995, volume of al-Hussam, CARE advertised sale of a book by Abdullah Azzam entitled "In the Shadow of the Surah of Repentance." The address provided for inquiries, however, was "The Offices of Services" at the 510 Commonwealth Avenue, #274 address. That same address is cited as the address for CARE on the cover of that same edition of al-Hussam.[74]

In fact, in several instances CARE continued to refer to itself as a branch office, implying it remained a local branch of a larger organization as it was under the name Alkifah. In the January 27, 1995, and January 1997 editions of Al-Hussam, for example, the organization is referred to as "Care International Boston Branch."[75]

As noted above, shared leadership, address and publications are some of the typical signs that an organization with a new name is simply an outgrowth of a former or an existing organization and is continuing the original organization's operations under this new name.

## 5. Use of Charities as Front Organizations

Charities in general and zakat charity committees in particular, are especially susceptible to abuse by terrorists and their supporters for whom charitable or humanitarian organizations are particularly attractive front organizations. Care International is a textbook example of such abuse. Indeed, terrorist groups have long exploited charities – and the Islamic requirement to give charity (zakat) – for a variety of purposes. Charities offer a veil of legitimacy for terrorist fundraising, attracting unwitting donors who are unaware that monies they donate for humanitarian purposes fund terror. Those social welfare organizations funded by the terrorist group engender

---

[71] Zakat Calculation Guide and Worksheet, 1993 and 1994 versions
[72] Suhail Ismail Laher statement to FBI, April 8, 2003; Marinelli affidavit
[73] Al-Hussam, volume 1, number 10, Rabi-Awal 21, 1413/September 18, 1992
[74] Al-Hussam, Issue # 24, 22 Shawal 1415/March 24, 1995
[75] Al-Hussam, January 27, 1995, and January 1997 editions

MUB-00029038

grassroots support for the terrorist group in the regions where they disperse these funds, creating fertile spotting and recruitment grounds.

Beyond engendering grassroots support, those charities focused on providing funds to the families, orphans and widows of martyrs remove any existing financial disincentives to prospective mujahideen and provide an incentive for participation in Jihad. Knowing their families will be provided for after their "martyrdom" enables mujahideen to focus on their violent Jihad activities with the peace of mind that their own families will enjoy the benefits of what amounts to a life insurance policy for mujahideen. Alkifah/CARE actively solicited funds for families of mujahideen, and discussed the subject on intercepted telephone calls as well. Consider, for example, an online solicitation for Orphans Sponsorship that opens with the statement: "Do you know who I am? I am an orphan whose father died in defense of the faith." It continues, "Won't you sponsor me, and fulfill part of your obligation to my father? Won't you sponsor me? I am not really a stranger to you; I am your brother's child."[76]

Charities are also ideal money laundering mechanisms. They tend to operate in zones of conflict and traditionally involve the flow of money in only one direction, both of which are characteristics that would arouse suspicion in other organizations. They enable terrorist groups to move personnel, funds and material to and from high-risk areas under cover of charity work, and provide terrorist operatives with day jobs that provide both salary and cover facilitating their terrorist activities. Moreover, terrorists co-opt charitable giving through a range of diverse tactics. Some charities are founded with the express purpose of financing terror, as authorities believe was the case with the Benevolence International Foundation (al Qaeda), the Holy Land Foundation for Relief and Development (Hamas) and the Islamic Committee for Palestine (Palestinian Islamic Jihad). Others are infiltrated by terrorist operatives and supporters and co-opted from within. For example, the Islamic Red Crescent has been infiltrated by al Qaeda and Palestinian terrorists. Recognizing that analysis of this particular preferred means of terror financing demands a discerning and discriminating levels of analysis approach, Ambassador Francis X. Taylor, then the State Department's Coordinator for Counterterrorism, noted in 2002 that "any money can be diverted if you don't pay attention to it. And I believe that terrorist organizations, just like criminal enterprises, can bore into any legitimate enterprise to try to divert money for illegitimate purposes."

Not only are donors more willing to give to humanitarian causes, but in the Muslim world they often do so as part of their religiously mandated annual zakat contributions. Such donations have long been known to lend themselves to abuse, and not only by terrorists. In Pakistan, for example, scholars note that zakat recipients have included "orphans" with living parents, "impoverished woman" decorated in gold jewelry and "old people" who long since died. The mixing of funds across different Hamas

---

[76] "Orphans Sponsorship," CARE website, http://web/archive.org/web/20001209030900/care-intl.org/orphans1.htm

MUB-00029039

23

wings also shields the group's terrorist activities under a veil of political and humanitarian legitimacy, as discussed in more detail below.[77]

### 5. "Economic Jihad"

Dawa organizations are key nodes in what radical Islamist leaders frequently describe as the "economic jihad" (al-Jihad bil-mal), a phrase that features prominently in their fundraising techniques. The concept is simple in practice. Radical leaders claim their followers have a religious duty to engage in jihad--either by physically fighting Islam's enemies or by supporting those who do. Proponents of this logic ground their position in a Quranic verse in Surah 9 (al-Tawbah) Verse 41: "Fight with your possessions and your souls in the way of Allah." Typically, "possessions" translates into "money," for purposes of expediency.

The call to wage economic jihad is a staple of radical leaders of various stripes. For example, speaking of the need to support Palestinian militants in a "Jerusalem Day" speech in December 2003, Hezbollah leader Sheikh Hassan Nasrallah said, "All the institutions, committees, parties, private and collective initiatives throughout the Moslem world must be spurred on to collect money, everywhere in the world, and to bring that money to Palestine. With it they will buy bread and rebuild their houses. The money will bandage their wounds. With that money they are assured of the ability to buy weapons, for the men and women of Palestine will not be weakened. The [challenge] of our era is found today in Palestine . . . If we cannot give them arms, we can give them the money to buy them."[78]

Sheikh Nasrallah's position mirrors that of Hezbollah's benefactor, Iran's Ayatollah Khomeini. A Syrian Ministry of Information publication records Khomeini as saying that it is the duty of all Muslims "to get rid of that germ corruption [Israel] in any way possible," and that to achieve that goal "it is not enough to extend practical support to [Palestinians to achieve] the goal but to direct resources to that end from the zakat and other Islamic charity monies."[79]

---

77  Information on the Islamic Red Crescent from Senate Committee on Banking, Housing and Urban Affairs, "Prepared testimony of Jean-Charles Brisard, international expert on terrorism financing lead investigator, 9/11 lawsuit CEO, JCB Consulting International," October 22, 2003, accessed through Federal News Service; Agence France Presse, "Saudi pilot on FBI list denies terror links," October 16, 2001, and U.S. Department of the Treasury, Office of Public Affairs, "Treasury Department Statement on the Designation of Wa'el Hamza Julidan," September 6, 2002, http://www.treas.gov/press/releases/po3397.htm; For Taylor quote see U.S. Department of State, International Information Programs, "State's Taylor Summarizes Annual Global Terrorism Report," Washington File, May 21, 2002, http://www.usembassy.it/file2002_05/alia/a2052103.htm; For Pakistan see Timur Kuran, "Islam and Mammon: Book Excerpt," The Milken Institute Review: A Journal of Economic Policy (3rd Qtr. 2004), 76.
78. C.S.S. Special Information Bulletin, "The speech given by Hassan Nasrallah, Hezbollah leader," Jerusalem Day, December 2003, http://www.intelligence.org.il/eng/bu/iran/jerusalem.htm
79. Adnan Hussein Abu Nasser, Palestine in the Speeches of the Ayatollah Khoeini (Arabic), The Syrian Ministry of Information (2000), 120, as cited in C.S.S., Internal, Part I,

Sheikh Yousef Qardawi, a prominent Muslim Brotherhood theologian who founded the Union of Good, has also issued numerous calls for economic jihad. Though better known for his religious rulings (fatwa) calling on Muslims to murder American and other civilians in Iraq and justifying Hamas suicide bombings against Israeli civilians, Qardawi has also decreed that it is more important that Muslims donate money to "support Palestinians fighting occupation and other struggles of Muslim populations, such as in Bosnia" than that they make the Hajj (the pilgrimage to Mecca required of every able Muslim at least once in his or her life). In an interview with the *Palestine Times*, he said of Islamist resistance in Lebanon and the Occupied Territories, "if we can't carry out acts of jihad ourselves, we at least should support and prop up the mujahideen financially and morally so that they will be steadfast until God's victory." A more calculating variation on Qardawi's theme was played by Sheikh Omar Bakri Mohammad. Speaking to followers in his hometown of London, the sheikh said, "The market of jihad has opened. Now all we need is the people who are the merchandise, the ones who want to buy jennah (paradise). If you cannot do it physically, do it verbally, do it financially, but do it."[80]

Even secular Muslim leaders have echoed the call of economic jihad. Former Iraqi dictator Saddam Hussein argued in 2002 that Arab leaders should shun further peace plans and commit "to support the Palestinian people in armed fighting." He added, "If we are incapable of offering aid to the armies, our support should be by [giving] money or buying them arms, or by giving Muslims and Arabs the option of volunteering [to help the Palestinian people.]"[81]

Many radical Islamist terrorist groups have perfected the technique of raising funds by calling on supporters to engage in an economic jihad. In the case of Hamas, for example, the Halhoul charity committee--which received over the years at least $100,741 from the Holy Land Foundation for Relief and Development--issued a letter of thanks to the U.S.-based foundation in May 2000. This letter was subsequently included in a booklet marking the foundation's "Ten Years of Achievement." Quoting a saying of the prophet Mohammad (hadith), the letter expressly echoed the theme of economic jihad: "[The prophet Mohammad,] may Allah bless him and grant him salvation, said: 'Whoever strives for the widow and the poor is like a person engaged in a holy war [jihad] in the way of Allah'." Similarly, a pamphlet produced by a Quranic memorization center

80. For Qardawi see "The Muslim Brotherhood Movement in Support of Fighting American Forces in Iraq," Middle East Media Research Institute (MEMRI), Special Dispatch Series, No. 776, September 3, 2004, http://memri.org/bin/articles.cgi?Page=subjects&Area=middleeast&ID=SP77604; Amany Abdel-Moneim, "Online with the Sheikh," Al Ahram Weekly, Issue no 563, December 2001. For Palestube Times see Palestine Times, "Sheikh Yousuf al-Qaradawi: Hamas and the Islamic Jihad represent the glorious face of the Islamic Umma- Interview," September 1999, http://www.ptimes.org/issue99/index0.htm; For Sheikh Omar Bakri Mohammad see Douglas Davis, The Jerusalem Post, "UK Muslim Cleric Faces Deportation for Calling on Followers to Join Al-Qaida," January 19, 2005.

81. The Middle East Media Research Institute (MEMRI), "Palestinian Authority and Iraqi Media on Iraqi Support of the Intifada," Special Dispatch--Iraq/Jihad and Terrorism Studies, no. 415, August 28, 2002, http://www.memri.org/bin/opener_latest.cgi?ID=SD41502 (accessed August 29, 2002).

MUB-00029041

sponsored by the Ramallah-al-Bireh charity committee lists thirty ways to enter heaven, including "Jihad for the sake of Allah by fighting with one's soul and money."[82]

In November 2002, Hamas issued a communiqué on one of its web sites calling on supporters worldwide to atone for their sins and ensure themselves a place in heaven by helping to finance Hamas. "We call on you," the statement read, "my brother the Jihad fighter and my sister the Jihad fighter to donate part of your money to the Jihad fighters who are protecting the honor of the Islamic nation. . . . Even if you cannot participate yourselves alongside us in the Jihad, your [financial] donation to us from the money that Allah gave you is not less important [than participating in the Jihad]."[83]

Fawaz Damrah took a page from the same radical Islamist book in his fundraising pitches to U.S. audiences of radicalized Muslims. Damrah was the imam of Cleveland's largest mosque and a major fundraiser for Palestinian Islamic Jihad (PIJ) before his conviction in 2004 of unlawfully obtaining citizenship via false statements to immigration officials, including failure to note affiliations with terrorist groups. His investigation by federal authorities gives us a model of how an Islamist fundraiser uses religious rhetoric to drum up financial support for Palestinian terrorism. Transcripts of phone conversations between Damrah and individuals such as senior PIJ officials Sami al Arian, Sheikh Abdelaziz Awda, Bashir Nafi, Ghassan Ballut, and others, along with videos of Damrah sharing the dais with them at PIJ conferences, were key pieces of evidence at the trial. [84]

For example, at a "Round Table Discussion About Jihad and the Intifada" held in Cleveland, Ohio, on April 7, 1991, Damrah was videotaped saying, "God says, ... "[w]hoever equipped a raider for the sake of God, has himself raided.' Whoever donates for a mujahid so that he may throw stones, as if he too is fighting the Holy War, and will be rewarded like him, even if he stays home."[85]

When he lobbied for donations at fundraisers, Damrah often promised that the funds would go to PIJ. "O brothers," he said at one event, "I would like to open the door to donations . . . to the Intifada, to Islamic Jihad in Palestine." At another fundraiser he enticed potential donors to give in the name of a PIJ martyr: "I ask you to donate to Islamic Jihad," Damrah said, "Nidal Zalloum, of Islamic Jihad, who grabbed a dagger and stabbed four Jews in the courtyard of the Holy Sanctuary. Nidal Zalloum, from

---

82. "Selected Recipients of HLFRD Funds: Jan. 1997 – Sept. 2000," declassified FBI table marked page 0732 of evidentiary material brought in Stanley Boim et al. v. Quranic Literacy Institute et al.; C.S.S., Interpal, Part I, and C.S.S. Special Information Bulletin, Interpal, Part II, December 2004, http://www.intelligence.org.il/eng/sib/12_04/images/dec15_04.pdf

83. IDF Spokesperson, "Hamas is Conducting A Global Search for Financing for Terrorism Activities," November 29, 2002, www.imra.org.il

84. Damrah also served as an officer of Maktab al-Khidmat (MAK), also known as the Afghan Services Bureau or Alkifah Refugee Center. See United States of America v. Fawaz Damrah (United States District Court for the Northern District of Ohio, Eastern Division), 2004; and United States of America v. al Arian et al (United States District Court for the Middle District of Florida, Tampa Division), 2005.

85. "Round Table Discussion about Jihad and the Intifada" held in Cleveland, Ohio, on April 7, 1991, transcript p. 13, in court documents from United States of America v. Fawaz Damrah.

Islamic Jihad, is saying to you, 'Be compassionate upon my blood. Avenge my blood.'
And that mujahid, who took the bus and killed more than twenty Jews. He is from Islamic
Jihad. This is the Islamic Jihad movement. I say to you donate so that this money will
serve you with God. I am offering the chance for this medal so that a brother steps
forward and donates for the sake of God." Damrah then presided over an auction of a
medal in honor of the martyrs.[86]

Such explicit calls to engage in economic jihad include comments made by
Damrah and other PIJ officials at a conference hosted by the Islamic Committee for
Palestine (ICP, a since defunct front organization for Islamic Jihad) in Chicago in
December 1989. Responding to a question from the audience, PIJ co-founder Bashir
Nafi said, "If the problem, as far as you are concerned, is the problem of weapons . . .
how would weapons reach the Occupied Territories, then meet me outside the
conference." Damrah himself explained [at the same conference] that, "The first
principle is that terrorism, and terrorism alone, is the path to liberation . . . The second
principle is that 'settlement is decided by the sword'." At another point, Damrah clarified,
"If what they mean by jihad is terrorism, then we are terrorists!"[87]

While fundraisers frequently frame their fundraising pitch in terms of the terrorist
group's humanitarian support activities, sometimes--especially before the extra scrutiny
brought on by the attacks of September 11--they have also called on donors to fund
overtly violent, militant activities. That was clearly the case with Al Kifah/CARE, which
specifically called for funding violent jihad. Indeed, Al Kifah/CARE received checks
from donor with directions to support various jihad causes, such as comments on the
memo line of checks stating "Bosnia mujahideen," or 'jihad," or 'for jihad only," or
"Chechen Muslim Fighters."[88]

Alkifa audiotapes also highlighted the concept of Economic Jihad. One tape,
entitled Sacrifice and the Orphans, was marked with the names Abdallah Azzam, Ahmad
Alkattan and Mohamad Siyam. According to a summary of the tape, one speaker "urges
all Palestinians to pay their monthly zakat for the cause of Jihad and to expect the victory
from Allah. He asks the people of Palestine to fight with rocks, guns, cannons and
whatever else they could put their hands on." Another speaker explicitly calls on his
listeners "to commit Jihad with their wealth as well as their souls," in a textbook example
of the Economic Jihad fundraising pitch. On this same tape, listeners are told that
"training on weapons is open to all and that all should take advantage of this opportunity
to receive training."[89]

---

86. For "O brothers" quote see Residence, Box 9, Tape #12, Fundraiser, Beit Hanina Club, Cleveland,
Ohio, 9/27/91, p. 3, in court documents from United States of America v. Fawaz Damrah; For quote on
Zalloum, see "Round Table Discussion about Jihad and the Intifada."

87. Tape of 2nd Annual Conference of ICP, Chicago Ill, 22-25 December 1989, Fourth Symposium:
"Palestine, the Intifada and the Horizons of Islamic Resurgence," in court documents from United States of
America v. Fawaz Damrah.

88 James T. Marinelli affidavit, April 2005

89 Tape B, C.I. 1034 through C.I 1046

An intercepted telephone call between Almonia and Jayousi further underscores the theme of Economic Jihad. In the course of a May 7, 1997, conversation, Almonia refers to the mujahideen as "brothers who are 'picking apples'," following up to make sure Jayousi understood the reference by asking "Do you understand me?" Almonla describes the activity he and Jayousi are engaged in as being "in the rear lines, or we finance the brothers who are 'picking apples'."[90]

In some cases, however, Al Kifah/CARE went so far as to express the opinion that engaging in economic jihad – supporting others actively engaged in jihad – is insufficient. An article that ran in Al-Hussam entitled "Words and Blood" informed that "there is no worship greater than the worship offered in Jihad and there is no more serious worship than the worship offered in Jihad. Jihad of the self [personally participating in jihad] is a must, those who do not practive that do not benefit in their souls and spirits." The article goes on to state explicitly that "Jihad with money without Jihad of the soul is not beneficial to the person even if they spend all the money on earth. It is useless if they do not take part in wars."[91] In another article that appeared in Al-Hussam's "Sisters' Corner," readers were informed that they must not be held back "from fulfilling one of the most difficult, yet one of the most rewarding of absolute obligations on every Muslim: jihad, in its physical form, for the sake of Allah." Only in the event that one is truly unable to go fight in jihad ("being blind, lame or ill"), "then at least express your support and encouragement for those brothers among us who are able and willing."[92]

## IV. Conclusion

Over the course of my professional and academic careers I have studied terrorist groups and their logistical and financial support networks. It is my expert opinion, based on this expertise and experience, that:

- Care International is an outgrowth of the Al Kifah Refugee Center, and that both functioned as part of the Maktab al-Kidmat (MAK) network (also known as the Afghan Services Bureau, or the Human Services Office).
- Al Kifah/CARE provide a textbook case-study of a radical Islamist organization raising funds for mujahideen, terrorist groups and radical individuals as a fulfillment of economic jihad.
- Draping its support for militancy under the façade of charity and humanitarian support, Al-Kifah/CARE also explicitly raised funds for violent jihad.
- Al Kifah/CARE is a prime example of how mujahideen, terrorist groups and their supporters use charity as a cover to provide a veneer of legitimacy to otherwise illicit activities, in this case supporting mujahideen engaged in violent jihad.

---

[90] May 7, 1997, telephone call, C.I-ELSURE 02268

[91] Al-Hussam, Issue #9, Year III, Friday 19 Rabi' Awel 1415/August 26, 1994

[92] Al-Hussam, volume 4, number 5, Muharram 4, 1416/June 2, 1995

MUB-00029044

28

- Al Kifah/CARE is also a prime example of tainted, exposed, designated or indicted charities or organizations reopening under new names and continuing the same support for violent jihad and terrorism.

MUB-00029045



i

5B3HPARC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                    v.                      03 Cr. 1197 (SHS)

5   UZAIR PARACHA,

6                    Defendant.

7   ------------------------------x

8
                              New York, N.Y.
9                             November 3, 2005
                              3:30 p.m.
10
    Before:
11
                       HON. SIDNEY H. STEIN
12
                                          District Judge
13
                         APPEARANCES
14
    MICHAEL J. GARCIA
15       United States Attorney for the
         Southern District of New York
16  ERIC BRUCE
    KARL METZNER
17       Assistant United States Attorneys

18  EDWARD WILFORD
    ANTHONY RICCO
19       Attorneys for Defendant

20

21

22

23

24

25

MUB-00029192

5B3HPARC

1          (In open court)

2          THE DEPUTY CLERK:  United States v. Uzair Paracha, 03

3   Cr. 1197.

4          Counsel, please state your names for the record.

5          MR. BRUCE:  Good afternoon, your Honor.  Eric Bruce

6   and Karl Metzner for the government.

7          THE COURT:  Good afternoon, gentlemen.

8          MR. WILFORD:  Good afternoon, your Honor.  For the

9   defendant, Edward Wilford and Anthony Ricco.

10          Mr. Paracha is present.

11          THE COURT:  Good afternoon.

12          Let's handle some administrative matters and then I

13   wish to give you my determinations on the expert testimony and

14   the 403 issues.

15          I signed the order that was presented to me by the

16   defense counsel permitting the defendant to be wearing civilian

17   clothes.  In fact, I prefer that he be wearing civilian

18   clothes.

19          MR. RICCO:  Those clothes have been delivered to the

20   MCC and accepted.

21          THE COURT:  All right.

22          I have received the jury questionnaire with the names

23   filled in on page 4.  If the questionnaire is acceptable to

24   both sides, I will present this to the jury administrator.

25          I take it, it is the jury administrator who makes the

MUB-00029193

5B3HPARC

1   copies, is that correct?

2          MR. METZNER:  Actually, I think they would like us to,

3   and we are happy to.

4          THE COURT:  Then I will give this back to you and you

5   can make the copies.

6          Is the jury questionnaire acceptable to the

7   government?

8          MR. METZNER:  It is, your Honor.

9          THE COURT:  To the defense?

10          MR. WILFORD:  Yes, your Honor.

11          THE COURT:  I am going to give this back to the

12   government.

13          As I stated, the jury administrator believes that the

14   questionnaires will be filled out by 3:00.  Then it is the

15   government that is going to make copies, is that correct?

16          MR. METZNER:  Yes, your Honor.

17          THE COURT:  The attorneys for both sides then will

18   work on them --

19          MR. BRUCE:  Yes.

20          THE COURT:  -- here, and if the defense wants the

21   participation of the defendant, that is fine as well.

22          MR. WILFORD:  I'm sorry, your Honor, I didn't hear

23   you.

24          THE COURT:  I said if the defense wants the

25   participation of the defendant in that process, that is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MUB-00029194

5B3HPARC

1    acceptable.

2            When do the lawyers want the panel to be back here?

3            We can have them back here Tuesday morning if you

4    think that that is adequate time for the attorneys to go over

5    them.  It is somewhat preferable to have them back here on

6    Tuesday, but it is nonsensical if you don't think you are going

7    to be ready Tuesday morning.

8            MR. WILFORD:  Your Honor, we have been trying to get

9    some sense of how long it would take, and just doing a rough

10   estimate, if each of the attorneys get half of the

11   questionnaires, that would be approximately 87 questionnaires,

12   spending five minutes on each one would take approximately

13   seven hours just to review all the questionnaires.  That is

14   without any discussion between ourselves or with our client in

15   terms of decisions that need to be made.

16           So what we propose is the following, and this is in

17   consultation with the government, that we get together at 1:00

18   on Tuesday, have the jury present at 2:15, and we should be

19   able to have our discussion between 1 and 2 and arrive at the

20   joint cause challenges and be able to present them to the

21   court.

22           THE COURT:  If I understand you, you want the panel

23   back here at 2 on Tuesday.

24           MR. WILFORD:  Yes, and perhaps we could probably meet

25   with the government at 12, which would give us an opportunity

MUB-00029195

5

5B3HPARC

1   to see if there were any differences that you could resolve or

2   whether or not it is actually necessary to have that particular

3   juror present for additional questioning.

4           THE COURT:  The parties can arrange whenever and

5   however they want to meet.  We will have the panel back here

6   or, rather, assemble wherever the jury administrator is having

7   them assemble, at 2 on Tuesday.

8           The first order of business, then, is the attorneys

9   and the defendant will come into the courtroom at 2.  You will

10  give me the list of those who both sides agree should be

11  excused for cause, and I will have that done.  The jury

12  administrator can do that.  But I want to see who they are.

13  Then we will jointly decide who is to be questioned further and

14  bring them up in groups.

15          Then I will have the jury administrator bring the

16  panel back at 2 on Tuesday.

17          In light of the fact that due to a prior appointment

18  by defense counsel we cannot have court on November 22nd --

19  that is the date, Mr. Wilford, is that right?

20          MR. WILFORD:  Yes, your Honor.

21          THE COURT:  I am trying to rearrange my schedule so we

22  will have at least a half a day on November 15th.

23          Do you remember I said we couldn't meet on November

24  15?

25          MR. WILFORD:  Yes.

MUB-00029196

5B3HPARC

1     THE COURT: We will have at least half a day because,
2  again, I want to have the evidence go in as efficiently and
3  serially as possible.

4     We won't have court on the 22nd. We will have at
5  least a half a day on November 15th.

6     Yes.

7     MR. BRUCE: Excuse me, your Honor. I am just curious,
8  do you know if we would be having court in the morning or in
9  the afternoon?

10    THE COURT: Probably in the morning.

11    MR. BRUCE: Just so we can arrange the witnesses.

12    THE COURT: Now I want to give you my determinations
13  on the expert and the Rule 403 determinations.

14    I am going to be referring to the slides as given to
15  me yesterday.

16    For the record, government, were they denominated
17  something? Are they government exhibit something, as revised?
18  Remember what you gave me yesterday was the revised list.

19    MR. METZNER: 6, your Honor.

20    THE COURT: Government 6 at the Daubert hearing.

21    My determination is as follows:

22    On September 20, the government provided defendant
23  with notice of its intent to call Evan Kohlmann as an expert
24  witness to testify on certain matters.

25    On October 4th, the defendant submitted a letter

MUB-00029197

5B3HPARC

1    motion seeking an in limine ruling precluding admission of the
2    government's proposed expert testimony on several grounds,
3    including that expert testimony failed to meet the requirements
4    of Rule 702, as elucidated in the *Daubert* and *Kumho Tire* cases.
5    Alternatively, the defendant sought a pretrial Daubert hearing
6    to test the reliability of the expert's methodology.

7        On October 28th, I heard oral argument on this issue
8    and I issued preliminary rulings regarding the scope of the
9    expert testimony.  Specifically, I concluded that the expert
10   testimony regarding the origins and organizational structure of
11   al Qaeda, the identification of leaders and members, and an
12   explanation of certain alleged al Qaeda tradecrafts,
13   specifically its use of operating by cells and its use of
14   individuals to provide logistical support are permissible
15   topics for the expert.

16       I concluded, though, that expert testimony regarding
17   al Qaeda's alleged use of counter-interrogation techniques,
18   including disinformation, would not be permitted on the ground
19   that such testimony impermissibly usurps the jury's fundamental
20   function of judging the credibility of witnesses.  *See United*
21   *States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) and *United*
22   *States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1998), rev'd in part
23   on other grounds, 856 F.2d 5 (2d Cir. 1988).

24       Additionally, the court granted defendant's request
25   for a Daubert hearing to test the reliability of the expert's

MUB-00029198

1  methodology and its application to the specific expert opinions

2  to be rendered. That hearing was a full-day hearing and was

3  held yesterday, November 2nd. As I say, I heard testimony for

4  the proposed expert as well as additional oral argument.

5  My rulings are as follows:

6  The government has met its burden of establishing by a

7  preponderance of the proof that its proposed expert, Evan

8  Kohlmann, has sufficient education, training, and knowledge to

9  be qualified as an expert, and that Kohlmann's methodology --

10  that is, his process of gathering sources, including a variety

11  of original and secondary sources, cross-checking sources

12  against each other, and subjecting his opinions and conclusions

13  to peer review -- is sufficiently reliable to meet the

14  standards for the admissibility of expert testimony set by the

15  Federal Rules of Evidence.

16  Everyone heard his qualifications yesterday. He is

17  employed as the president and founder of globalterroralert.com,

18  a clearinghouse for information concerning terrorism. He has

19  degrees in law and foreign service and Islamic studies, and he

20  has authored several thesis on topics related to the testimony

21  he proposes to give. He has conducted research into terrorist

22  organizations specifically, including al Qaeda, as well as what

23  he calls Arab-Afghan groups of Mujahadeen fighters in various

24  locales who are affiliated, he claims, with al Qaeda.

25  He has also performed research into the development of

MUB-00029199

5B3HPARC

1   groups, including al Qaeda.  He has gathered various original
2   source materials, including audio and video materials and
3   publications authored by various terrorist groups.  He has
4   himself conducted a number of interviews with individuals who
5   are designated terrorists, or have associations with terrorist
6   groups.  He has had experience working at a think tank devoted
7   to research in terrorist organizations, whose name is the
8   Investigative Project.

9           His methodology consists of gathering multiple sources
10   of information, including, as I said, original and secondary
11   sources.  He testified that he juxtaposes new information
12   against existing information and evaluates new information to
13   determine whether his conclusions remain consonant with the
14   most reliable sources.  He works collaboratively with his peers
15   in his field, gathering additional information and seeking out
16   and receiving comments on his own work and cross-checking the
17   information he has on his own proprietary database.

18           The facts and sources that form the basis of his
19   opinions and inferences, although they do include secondary
20   sources, are, I find, of a type reasonably relied upon by
21   experts in his particular field.  That is the standard of
22   Federal Rule of Evidence 703.  Experts may testify to opinions
23   based on hearsay or other admissible evidence where experts in
24   that field reasonably rely on such evidence in forming their
25   opinions.  *United States v. Daly*, 842 F.2d 1380, 1387 (2d Cir.

MUB-00029200

5B3HPARC

1   1988).

2         He has relied on sources regularly relied upon in his
3   field, including the 9/11 Commission report, confessions of al
4   Qaeda members, information made available on the Foreign
5   Broadcast Information Service, and original sources from
6   terrorist groups.  He does rely on hearsay materials in
7   addition to the source materials.

8         As for peer review, he testified to various matters in
9   which his conclusions and opinions are subjected to review by
10   academics and other experts in his field.  He explained the
11   process by which his written publications are submitted for
12   comment and critique by academics and peers in his field before
13   publication, and how his postings on the internet, and
14   presentations of public forums, are subject to review by his
15   peers, the comments of whom he considers and incorporates when
16   he deems it appropriate in his analysis.

17         Whatever the pitfalls of this vetting process, and
18   obviously it is not the same peer review as in a formal
19   academic setting, it is a sufficiently reliable methodology to
20   meet the requirements of Rule 702, and the weight to be given
21   that testimony is for the jury to determine.  *See United States
22   v. Hammoud,* 381 F.3d 316, 337 (4th Cir. 2004).

23         So my first conclusion is that his methodology is
24   sufficiently reliable.

25         The second finding is that the government has met its

MUB-00029201

1    burden of establishing by a preponderance that Kohlmann
2    reliably applied that methodology in reaching his conclusions
3    about the origins and structure of al Qaeda, the identification
4    of its leaders and its use of cells as a means of operating and
5    its use of individuals to provide logistical support, and that
6    testimony will be permitted, assuming the government chooses to
7    adduce it.

8         My third area of conclusion in regard to scope, I am
9    affirming my earlier ruling that Kohlmann will be permitted to
10   testify regarding, one, the origins and organizational
11   structure of al Qaeda; two, identification of its leaders;
12   three, explanation of al Qaeda tradecraft, insofar as its use
13   of cells and the use of individuals to provide logistical
14   support is concerned.  But I am not going to permit the expert
15   to testify regarding the two alleged al Qaeda operatives who
16   are specifically involved in the allegations of this case; that
17   is, Ammar al-Baluchi and Majid Khan.

18        I am concerned by the fact that Kohlmann's testimony
19   regarding al-Baluchi's and Khan's role in al Qaeda is based in
20   not insubstantial part on Kohlmann's review of the unclassified
21   summaries of statements made by those individuals that are the
22   same summaries that have been offered to the defendant as a
23   substitution for his constitutional right to have live
24   deposition or trial testimony from those witnesses.

25        My concern, based on the testimony of Mr. Kohlmann, is

MUB-00029202

5B3HPARC

1  that his proposed testimony regarding those two individuals is

2  too close to a summary of factual evidence from sources that

3  the government cannot introduce directly.  This is of

4  particular concern here where the government proposes no fact

5  witness on those issues that would permit the defendant to test

6  through cross-examination the credibility of that factual

7  evidence.  So there is going to be no evidence from Kohlmann on

8  Ammar al-Baluchi or Majid Khan.

9       Next, he will not be permitted to offer testimony

10  regarding Iyman Faris or Aafia Siddiqui.

11       I do not see the relevance of the proposed testimony

12  regarding Faris and, as the defense noted yesterday, the

13  description of his involvement in al Qaeda still refers to a

14  specific plot here in New York, which I have excluded.

15       Next, the expert will not be permitted to testify

16  regarding al Qaeda's use of counter-interrogation or

17  disinformation techniques.  I think I have already said that.

18       Next, 403 rulings.

19       Pursuant to Rule 403, with a specific finding that the

20  probative value is substantially outweighed by the danger of

21  unfair prejudice, I am excluding testimony concerning any

22  specific terrorist plot.  You know that ruling applies to 9/11

23  and the 1993 World Trade Center bombing because I have already

24  excluded those.  But now I am extending the 403 ruling to apply

25  to descriptions of any specific terrorist plot.  The probative

MUB-00029203

1    value of the specific plots is substantially outweighed by the
2    danger of unfair prejudice.

3          Mr. Paracha is not alleged to have any connection to
4    those plots, and describing them with specificity unnecessarily
5    focuses attention on them.

6          Kohlmann may refer to terrorist plots and attacks
7    generically without specifying individual plots and attacks.
8    In other words, he cannot talk about a plot to hijack 12
9    airlines or a plot to bomb embassies or a plot to bomb the USS
10   Cole.  He can talk about terrorist attacks in general.

11         Next, I am denying the defendant's Rule 403 objection
12   to general references to attacks against the United States.
13   Those references can stay in, and those are under the KSM
14   slide.  Those references are not unfairly prejudicial.

15         The defendant is alleged to have provided material
16   support to a person he knew to be an al Qaeda member in order
17   to make it possible for the al Qaeda member to enter the United
18   States.  The role of al Qaeda in the United States is therefore
19   pertinent to this case and the risk of unfair prejudice is
20   sufficiently taken care of by my elimination of references to
21   specific attacks, whether in the United States or anywhere in
22   the world.  So the reference to the United States may remain.

23         Just so there is no doubt in my mind, let's go through
24   the slides on Government 6.

25         The first substantive page, UBL's Influences and

MUB-00029204

5B3HPARC

1    Mentors, there is no objection, so that stays.  The expert can
2    identify those individuals.

3         The next page regarding Bin Laden, the fourth bullet
4    point goes out because it is specific.  The government can make
5    a generic reference to bombings if it wishes, or bombings in
6    1988 even.

7         The next slide, which is The Organization and
8    Structure of AQ, 2001 to 2003, the third level goes out because
9    there is not going to be anything on Ammar al-Baluchi and Khan.

10        The rest of the slide, that is, the first two levels,
11   have not been objected to and they are permissible.

12        The next slide, the KSM slide, the defendant objected
13   to the third bullet point, and I have specifically addressed
14   that.  That stays.

15        The reference to the United States I am permitting.

16        The fourth bullet point goes out for the reasons I
17   have said, at least in the form that now exists because it is a
18   reference to a specific plot.  The government should come up
19   with the generic if it wants.  Helped fund and plan a series of
20   terrorist plots in 1995, that is acceptable.  But that is up to
21   the government.

22        Then you have the Ammar al-Baluchi slide.  There are
23   two Ammar al-Baluchi slides.  They go out because they include
24   Ammar al-Baluchi, and also Jose Padilla and Tawfiq Attash.
25   They are out.  They are out on relevancy and 403.

MUB-00029205

15

5B3HPARC

1          The next slide is Majid Khan.  The entire slide is

2    out.

3          I am excluding Iyman Faris and Aafia Siddiqui as well

4    pursuant to 403.

5          The last slide I think is just a duplicate of what

6    went earlier.  I don't know if that is a mistake or you were

7    including it as a summation, the wrap up.  Again, the ruling is

8    the same.

9          I think that handles it.

10         Should we plan on meeting again on Monday just to see

11   if anything else has come up, or are we OK waiting until I see

12   you on Tuesday afternoon?

13         I think we are a little safer.  I may need to speak to

14   the parties on Monday.

15         Presumably, based on our two conferences ago, the

16   government is going to make a national security presentation to

17   me tomorrow, so I will need to render rulings based on that,

18   which I think probably you should come in, why don't we do it

19   on Monday.  I want you to have started to make some headway in

20   the questionnaires by then.

21         Shall we plan on Monday at 4:30?  If I don't need you,

22   I will let you know.

23              MR. WILFORD:  That is fine, Judge.

24              MR. BRUCE:  Your Honor, could I ask --

25              THE COURT:  Government, is that all right, 4:30?

MUB-00029206

⌐○

5B3HPARC

1    MR. BRUCE: That is fine. Of course.

2    If I could ask two questions about your ruling

3  regarding the expert.

4    THE COURT: Yes, sir.

5    MR. BRUCE: First, as I indicated last Friday,

6  Mr. Wilford indicated that the defense was willing to stipulate

7  that Majid Khan and Ammar al-Baluchi were al Qaeda members.

8    I would like to know if that stipulation is still

9  available.

10    THE COURT: I think you all have agreed it is not

11  seriously at issue.

12    Mr. Wilford.

13    MR. WILFORD: No objection.

14    THE COURT: All right. Then put that in writing,

15  gentlemen.

16    MR. WILFORD: Yes.

17    THE COURT: You said no objection.

18    MR. WILFORD: No, I didn't say no objection. I said

19  no, we are not willing to stipulate, Judge.

20    THE COURT: I'm sorry. I thought you said no

21  objection.

22    What is your current position? You want to discuss

23  that with the government?

24    MR. WILFORD: We will discuss that with the

25  government.

MUB-00029207

5B3HPARC

1    MR. BRUCE:  I think we need to reach some resolution.

2    THE COURT:  He is going to discuss it with you.  He

3    just doesn't want something on the record right now, but he is

4    going to discuss it with you right now.  As soon as we are

5    over, correct?

6    MR. WILFORD:  Yes.

7    MR. BRUCE:  If in fact, your Honor, we can't reach a

8    stipulation as to that --

9    THE COURT:  I am not going to force a stipulation.  By

10   the same token, you heard me say I think in reality it is not

11   an issue, but you should follow up with Mr. Wilford.

12   MR. BRUCE:  I will, and if it is not an issue, that

13   would be great.  That is why I hoped we could get a

14   stipulation.  But he just said he is not willing to do that.

15   So I don't have a lot of hope in that regard.

16   THE COURT:  It depends upon the glass is half full or

17   half empty.  He said he wants to talk to you.

18   MR. BRUCE:  OK.  If in fact we can't reach a

19   resolution, your Honor, I would like to visit the issue, and

20   maybe we have to revisit it on Monday, as to whether a

21   different expert who hasn't read the unclassified summaries,

22   perhaps even an FBI agent, could testify as to the al Qaeda

23   affiliation of these two individuals.  Because as I have tried

24   to lay out on a number of occasions, I think it is critical to

25   the case, it is clearly relevant, in our view, and, as you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MUB-00029208

5B3HPARC

1    indicated, it really shouldn't be in dispute.

2              But now we are left with a hole based on your Honor's

3    ruling as to what evidence is going to be presented to the

4    jury.  If we can reach an accommodation, that would be great,

5    but if not, we have to have some back up.

6              THE COURT:  I understand.

7              MR. RICCO:  I think on this subject we are on a long

8    run for a short slide.  I think this issue will be resolved

9    before we walk out of the courtroom.

10             THE COURT:  Fine.

11             MR. BRUCE:  That would be wonderful.

12             THE COURT:  What else?

13             MR. BRUCE:  The only other thing is, with respect to

14   specifically Aafia Siddiqui --

15             THE COURT:  I'm sorry.  What was the metaphor?

16             MR. RICCO:  Long run for a short slide.

17             THE COURT:  All right.

18             MR. BRUCE:  I don't know what it means either.

19             THE COURT:  I have an image.

20             MR. BRUCE:  Specifically with respect to Aafia

21   Siddiqui, your Honor, I understand your ruling.  I am not going

22   to reargue it now.

23             THE COURT:  To the extent she is relevant, you will

24   put her in through a fact witness.  She is not appropriate for

25   expert.  It is 403.  That is how I see it.

MUB-00029209

19

5B3HPARC

1          MR. BRUCE:  I would ask for permission to revisit it

2    after you have seen the proof if we think it is appropriate.

3          THE COURT:  Yes.

4          MR. BRUCE:  Thank you.

5          THE COURT:  4:30 on Monday.

6          Thank you, gentlemen.

7          (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MUB-00029210



```
1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF OHIO
2                            EASTERN DIVISION

3

4    UNITED STATES OF AMERICA,          )
                                        )
5                         Plaintiff,    )
                                        )
6              vs.                      )   Criminal Action No.
                                        )   1:03cr484
7    FAWAZ MOHAMMED DAMRAH,             )
     aka FAWAZ DAMRA,                   )
8                                       )
                          Defendant.    )
9

10                          - - - -

11              TRANSCRIPT OF TRIAL PROCEEDINGS
           HAD BEFORE THE HONORABLE JAMES S. GWIN,
12            JUDGE OF SAID COURT, ON MONDAY,
                JUNE 14, 2004 AT 8:20 A.M.
13
                          - - -
14
                          VOLUME I
15
                          - - -
16

17   APPEARANCES:

18   For the Government:    JAMES V. MORONEY, JR., ESQ.
                            Assistant U.S. Attorney
19                          U.S. District Court
                            Suite 400
20                          801 W. Superior Avenue
                            Cleveland, Ohio  44113
21
                            CHERIE L. KRIGSMAN, ESQ.
22                          U.S. Department of Justice
                            Criminal Division
23                          Suite 6500
                            601 D Street, NW
24                          Washington, DC  20530

25
```

```
 1   For the Defendant:      JOHN D. KLINE, ESQ.
                             NANCY HOLLANDER, ESQ.
 2                           Freedman, Boyd, Daniels,
                             Hollander, Goldman & Cline
 3                           Suite 700
                             20 First Plaza
 4                           Albuquerque, NM  87102

 5                           LARRY W. ZUKERMAN, ESQ.
                             Zukerman, Daiker & Lear
 6                           Suite 700
                             2000 East Ninth Street
 7                           Cleveland, Ohio  44115

 8

 9   Court Reporter:         Richard G. DelMonico
                             568 U.S. Courthouse
10                           Two South Main Street
                             Akron, Ohio  44308
11                           (330)472-1830

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           THE COURT:  I was going to indicate, this

2     is an open hearing so if there is anybody that wants

3     to come in, you should know that.

4           We reconvene on case 2003-CR-484, United

5     States versus Damrah.  There are certain motions

6     pending before the court, specifically motions in

7     limine, and I thought today I would afford the

8     parties an opportunity to make argument in support

9     of the motions.

10           I believe I've collated all the motions

11     but if either party believes there is a motion I

12     have overlooked, please bring it to my attention.

13           The first motion that I record that has

14     not yet been ruled on is document number 90, which

15     is the May 17th, 2004 motion in limine filed by the

16     defendant seeking to exclude certain evidence from

17     trial.

18           Mr. Cline, do you want to speak to that?

19           MR. CLINE:  Yes, your Honor, I would be

20     glad to.

21           And to some extent, your Honor, the motion

22     in limine that you've just referred to overlaps with

23     the motion in limine aspect of our Daubert motion,

24     but I'll address the motion in limine first.

25           The first category of evidence, your

1    Honor, that we are asking that you exclude is
2    evidence of events occurring after April 29th, 1994.
3    The events that we have here is alleged to have run
4    from October 18th, '93 when Mr. Damrah completed the
5    Form N400, through April 29th, 1994, when he was
6    naturalized.

7              The key issues here are going to be
8    whether he made false statements on the form or in
9    his interview in December of '93, and whether he
10   knew that his statements were false at the time.
11   There are other issues as well, but those are the
12   core issues.  Events that occurred after April 29th,
13   1994 certainly aren't relevant to whether either of
14   those things happened.

15             Now I'm not talking about, for example,
16   statements Mr. Damrah made after April 29th, 1994
17   concerning pre-April 29th, 1994 events, those if
18   they are otherwise admissible, could certainly be
19   relevant.  Certainly documents created after
20   April 29th, 1994 that bear upon or events occurring
21   on or before that date, certainly would not be
22   inadmissible because they were created after
23   April 29th, 1994.

24             What I'm really focusing on though are
25   events of the following kind.  Attacks that

```
1     Palestinian Islamic Jihad carried out after
2     April 29th, 1994.  The fact that in January of 1995
3     and again in 1997, the United States Government
4     designated the Palestinian Islamic Jihad as a
5     terrorist organization, other events concerning, for
6     example, Dr. Sami Al-Arian, that occurred after
7     April 29th, 1994.
8              THE COURT:  You are not seeking to exclude
9     evidence of contacts before that date?
10             MR. CLINE:  I'm sorry?
11             THE COURT:  With regard to Al-Arian, you
12    are not seeking to exclude testimony about contacts
13    before the naturalization date?
14             MR. CLINE:  No, at least not on that
15    basis.  There may be some contacts for one reason or
16    another are not admissible but if they occurred
17    before April 29th, 1994 they are at least within the
18    ambit of potentially admissible evidence.  But
19    contacts with Dr. Al-Arian after April 29th, 1994,
20    unless, for example, they are specifically
21    discussing events that occurred before that date,
22    shouldn't be admissible.
23             Certainly, conduct of Dr. Al-Arian after
24    April 29th, 1994 should not be admissible.
25             So that there is a lot of evidence, and I
```

1        think a considerable amount of it would come in, if

2        it came in at all, through the testimony of

3        Mr. Levitt and I believe that that testimony should

4        be excluded relevant to Rule 403 grounds.

5                 The relevance is nonexistent, as far as I

6        can tell, and the potential prejudice from some of

7        the events I described, particularly involving

8        Palestinian Islamic Jihad is.

9                 THE COURT:  Let me afford the United

10       States an opportunity to respond and then you can,

11       if you have any rebuttal argument, I'll hear it at

12       that time.

13                Mr. Moroney.  Let me just ask you to hold

14       for just a second.

15                I apologize.

16                Do you intend to offer any evidence of

17       acts or statements after '94?

18                MR. MORONEY:  Yes, your Honor.  In three

19       respects, if I could.  And as I understand it, the

20       defendant has now clarified their position about

21       post offense statements in interviews that relate

22       back to events that are relevant.  As I understand

23       it, they are not arguing about those.

24                We do intend to introduce admissions that

25       result from interviews that did take place after

1       April 29 of 1994.

2               I believe as far as post April '94 events

3       that's going to come up in two respects, your Honor,

4       in our case.

5               One would be the execution of search

6       warrants in November of '95 on the residence of Sami

7       Al-Arian, and on the office of WISE, an organization

8       connected to Sami Al-Arian.  Evidence we intend to

9       use in our case came from --

10              THE COURT:  Does that evidence -- I mean,

11      is it indicative of activity before the '94

12      citizenship?

13              MR. MORONEY:  Yes, your Honor.  Yes, your

14      Honor.

15              THE COURT:  Okay.

16              MR. MORONEY:  So that's one respect, your

17      Honor.

18              The search, as I indicated, was November

19      of '95.  But for instance, videos and documents that

20      relate to the defendant and his associations with

21      the Palestinian Islamic Jihad and the alleged front

22      group ICP were obtained in that search.

23              So that's in one respect.  And the other,

24      your Honor.

25              THE COURT:  But again, the matters you are

1          talking about are ones that reflect a contact before
2          the date of citizenship. They don't directly deal
3          with activities after the date of citizenship.
4                    Is that what you are saying?
5                    MR. MORONEY:  Yes.
6                    THE COURT:  Okay.
7                    MR. MORONEY:  And then the other respect
8          your Honor, is we continue to assert that the
9          designations of the Palestinian Islamic Jihad which
10         occurred in '95 and '97, '95 by the Treasury
11         Department, '97 as a designated FTO or Foreign
12         Terrorist Organization by the U.S. Department of
13         State.  Those are official actions of the United
14         States Government.
15                   THE COURT:  Well, what evidence rule would
16         allow it?
17                   MR. MORONEY:  Your Honor, for one, several
18         things.  I believe the designations themselves are
19         records of official action or public records.  I
20         also think that there is a specific provision in the
21         law regarding taking judicial notice of those
22         official actions.  But we also believe that it's
23         appropriate for the expert to opine on the
24         designation process, what's involved in it, and the
25         fact that the events which led to the designations

1       predate those designations, in many respects by
2       years.
3               THE COURT:  Let me just ask you to hold
4       for a second.
5               Don't you have the problem here that you
6       are talking about public records and documents right
7       here, that's the exception to the hearsay rule?  The
8       general -- the statement made by the government
9       outside the presence of the jury would be hearsay,
10      wouldn't it?
11              MR. MORONEY:  Absent an exception, your
12      Honor, such as a learned treatise exception, or the
13      803(8) exception, your Honor.
14              THE COURT:  But how would it fit under
15      803(8)?  Doesn't that specifically say you generally
16      don't use government documents in law enforcement
17      activities in criminal cases?
18              MR. MORONEY:  Well, it is -- except, your
19      Honor, it's the fact of the designation going to the
20      determination of the nature of the organization.
21              THE COURT:  Well, again, you are making --
22      you are seeking to have an out of court statement,
23      the government's designation used to prove the truth
24      of the asserted fact, which is the fact that PIJ's a
25      terrorist organization.  And they may be or they may

```
 1        not, but don't we generally require testimony
 2        subject to cross examination before that's allowed?
 3                  MR. MORONEY:  Well, I think, your Honor,
 4        it is both with respect to a determination by the
 5        State Department under 803(8) but also in terms of
 6        what is appropriate for Matt Levitt to testify to.
 7                  THE COURT:  That's a separate question as
 8        to whether the evidence rules, they speak generally
 9        expert witnesses aren't allowed to disclose
10        non-admissible evidence.
11                  MR. MORONEY:  Except that they can if it's
12        probative and it's difficult to conceive of
13        something that would be more within the realm of --
14        I mean, we would be offering him as an expert on
15        Middle Eastern terrorism.  And the fact there is a
16        formal process to determine who the, you know, who
17        the suspected or designated organizations are.
18                  THE COURT:  Well, let's go to -- you may
19        have some problems with that argument but.
20                  MR. MORONEY:  Just to clarify, your Honor,
21        to what I said, is the judicial notice provisions
22        in, I believe 201 are specifically referenced in the
23        Code of Professional -- or I'm sorry in the Code of
24        Federal Regulations relative to recognizing the
25        designation process, your Honor.
```

1             THE COURT:   I'm not sure I understand what
2      you are saying.
3             MR. MORONEY:   Well, I believe that the --
4      in the case law, it specifically references under
5      the CFR that the court should take judicial notice
6      of the designation of the results of the designation
7      process.
8             THE COURT:   What CFR section do you say
9      controls that?
10            MR. MORONEY:   Your Honor, I can provide
11     that to the court this morning, if that's -- I will
12     provide it, judge.
13            THE COURT:   Do you know what they are
14     referring to?
15            MR. CLINE:   I beg your pardon, your Honor?
16            THE COURT:   Do you know what code section
17     or regulation they are referring to that supposedly
18     supports it?
19            MR. CLINE:   No, I don't.
20            THE COURT:   We can revisit this but at
21     this point in time -- well, let me ask one other
22     additional question on this area.
23            How do you get around the time problem,
24     though?   They designate them as a terrorist
25     organization after the application has already been

1    approved.

2              MR. MORONEY:  Your Honor, simply that the
3    point is, that it isn't a static process, or a
4    snapshot taken at that particular point in time.
5    It's based on a record of events that goes well into
6    the previous period of time.  And it's based upon
7    attacks that are taking place earlier in those
8    years.

9              THE COURT:  I understand that, and I think
10   that's probably correct.  But in terms of this
11   defendant, though, isn't the important thing whether
12   he had notice before he signed the application that
13   it would have been material that the PIJ was omitted
14   because it had previously been determined to be a
15   terrorist organization by the government?

16             MR. MORONEY:  I'm not sure I understand
17   that.

18             THE COURT:  What I'm going for is, we are
19   not trying whether PIJ was a terrorist organization,
20   we are trying whether or not he failed to
21   appropriately complete the citizenship application.

22             And to make that determination, isn't the
23   more salient fact whether or not he should have
24   known that PIJ was a terrorist organization and yet
25   he failed to reference that in the application?

```
1              MR. MORONEY:  Yes, your Honor.  And I
2      agree with that.  It's just that the -- you know,
3      again, the designation is the -- it's the formal
4      result of several different processes that relate to
5      what the organization was involved in during the
6      time period of the citizenship application.
7              I think the evidence is going to show in a
8      number of respects his knowledge of what types of
9      activities are being undertaken.
10              THE COURT:  Okay.  And that may well be
11      admissible, but let me ask Mr. Cline, do you have
12      any response?
13              MR. CLINE:  Yes, your Honor, I do.
14              First, on a matter that's not controverted
15      in terms of the execution of the search warrant in
16      November of '95.
17              Again, we don't have a problem with -- in
18      fact, we have stipulated in evidence the execution
19      of the search warrant, provided the documents
20      themselves that were seized or the items that were
21      seized are admissible.  That again would depend
22      whether they predate 4/29/94.  Mr. Moroney says they
23      do, so that's not an issue.
24              In terms of the designation of Palestinian
25      Islamic Jihad.  There is a hearsay problem, of
```

1    course, and there is no exception that I'm aware of
2    that permits that to be introduced. And there is a
3    confrontation clause problem as well, and we object
4    on that basis. And the extent of that problem is
5    highlighted by what Mr. Moroney asserts.
6              He says the designation is based in part
7    on events that occurred before April 29th, 1994.
8              Well, we can't cross examine that
9    designation. We don't know and we won't know to
10   what extent it was based on events occurring before
11   4/19/94 and to what extent it was based on events
12   occurring after that date.
13             So that's a problem that's an objection we
14   have, and it's certainly a problem. The timing
15   problem in terms of Rule 401 and 403 I think is
16   insurmountable by the government.
17             Mr. Damrah, again the issue is, did he
18   knowingly falsify this form? Did he falsify it at
19   all or did he do so knowingly? The fact that the
20   organization that he's supposedly lied about was
21   designated a year later as a terrorist organization
22   has nothing to do with whether he lied at the time
23   and whether his answer was false at the time.
24             If Mr. Levitt wants to testify and his
25   testimony is otherwise admissible about acts by

1     Palestinian Islamic Jihad before April 29th, 1994,

2     he can do that.  But it is unfair and inadmissible

3     to let him go on and testify about a designation

4     that occurred after that date.  Something that

5     Mr. Damrah could not possibly have known about

6     because it hadn't happened yet.  And for that matter

7     in terms of materiality, the agency itself wouldn't

8     have known about when it was making that

9     determination.

10              THE COURT:  That portion of the motion in

11     limine, I'm going to grant it.

12              Now these will be somewhat interim rulings

13     but I will direct the government to stay away from

14     opening statements or testimony about the State

15     Department's designation of PIJ as a terrorist

16     organization, absent approaching the bench and

17     getting an interim ruling that it's somehow become

18     relevant.  I base this in part upon the time factor.

19     The designation occurred after he had completed the

20     citizenship application.  And for that reason, it is

21     not seemingly relevant.

22              Second of all, I don't think that -- it

23     also has the hearsay problem that at least to my

24     knowledge at this time, it's not been overcome.

25     It's not an out-of-court statement offered to prove

1    the truth of the assertion and I find no exception

2    that's been pointed out that would allow its

3    admission.  There is the accompanying confrontation

4    problem.

5              So for those reasons, I'll exclude

6    testimony about the designation, although this

7    should not be understood to exclude testimony about

8    acts that may underlie the designation.

9              So for instance, if the expert testifies

10   that there were certain terrorist activities that

11   occurred before the '94 timeframe, those would

12   arguably still be admissible, absent some other

13   grounds.  Okay.

14             You also, in your May 17th motion seek to

15   exclude evidence concerning the World Trade Center

16   bombing case.

17             MR. CLINE:  May I go back for one moment,

18   your Honor?

19             THE COURT:  Yes.

20             MR. CLINE:  In terms of the post

21   April 29th, 1994 evidence, we have focused on the

22   designation.  May I infer, your Honor, that your

23   ruling applies to other post April 19th, 1994,

24   matters?

25             THE COURT:  I think so, unless there is

1       some connection that the defendant, you know, that
2       somehow it becomes relevant. But with regard to
3       activities that occurred by the PIJ after that date,
4       I don't see a relevance as to what knowledge he had
5       and what intent he had to falsify the application
6       for citizenship.
7                   MR. CLINE:  Thank you, your Honor.
8                   Moving to the World Trade Center bombing.
9                   The government says in it's response
10      pleading it does not intend to offer that evidence.
11      All I would ask -- and that should resolve the
12      issue.  All I would ask, if the government changes
13      its mind it approach the bench and get permission
14      beforehand.
15                  THE COURT:  I understand you have no
16      objection to that.
17                  MR. MORONEY:  Yes, your Honor.  And if the
18      issue ever were to arise, we would obviously ask to
19      approach.
20                  Our concern in that respect is simply that
21      there are some issues going allegedly to the
22      defendant's credibility that involve associations
23      with individuals from AlKifah Refugee Services that
24      center, and al-Farooq Mosque, where the defendant
25      was questioned about those associations.

1           Now, those people were involved in those

2      other matters, we don't intend to elicit directly

3      any testimony, but there is that possibility that it

4      could be injected into the process, judge.

5           THE COURT:  Okay.  Well, I would order and

6      direct that before you go into that, just approach

7      the bench and make a showing that it's become

8      admissible.

9           The same motion seeks to exclude

10     testimonies concerns Hamas Hizbollah and other

11     terrorist organizations, but those not named in the

12     indictment.

13          MR. CLINE:  Yes, your Honor.

14          Our view, of course, is that the

15     activities of those organizations, even before

16     April 29th, 1994 are irrelevant to this case.

17          THE COURT:  What about Levitt's testimony

18     that oftentimes they act in collaboration with PIJ?

19          MR. CLINE:  I would say this.  If the

20     government could show knowledge on Mr. Damrah's part

21     before April 29th, 1994 that that was the case, then

22     it might arguably be relevant.  But if what they are

23     saying is just that Mr. Levitt has divined that they

24     acted together before that date unbeknownst to

25     Mr. Damrah, I don't see the relevance of it and the

1       prejudicial impact is great. Hamas and Hizbollah
2       are notorious organizations and have done awful
3       things, and to associate him through the expert's
4       testimony not only with Palestinian Islamic Jihad
5       were in the indictment, but other organizations --
6       we'll get to al-Qaeda -- I think is horrible, and
7       has minimum, if any, probative value.

8                   THE COURT: Do you want to respond to
9       that? Do you intend to bring such testimony?

10                  MR. MORONEY: Your Honor, I would note
11      that there are references to other organizations in
12      the videotape evidence. There are discussions of
13      Fatah and DFLP, you know, organizations such as that
14      which we would contend are also involved in
15      terrorist activities.

16                  And the court will also recall in the Matt
17      Levitt Daubert proceedings about the Afula attack on
18      April 26th, 1994. And the fact that in telephone
19      intercepts that are incorporated in the, what is
20      known as the Kerry Meyers affidavit, based on those
21      telephone intercepts, both Hamas and PIJ claimed
22      responsibility for that attack, which does predate
23      shortly the granting of naturalization.

24                  So there may be, you know, Mr. Levitt, his
25      opinion also references organizational cross over,

1        the fact that you can't always distinguish these
2        groups.  And there are several respects where that
3        may well come up, referencing groups outside of PIJ,
4        AlKifah, and MAK, those type of things, judge.
5                    THE COURT:  Do you have any response?
6                    MR. CLINE:  Again, your Honor, we'll talk
7        about when we get to Mr. Levitt this particular
8        attack in April, early April of 1994.  But in
9        general, unless the government can show that
10       Mr. Damrah knew of this alleged association
11       between --
12                   THE COURT:  I mean, that's not the
13       standard we typically apply, is it?
14                   MR. CLINE:  I beg your pardon?
15                   THE COURT:  I mean, we typically allow
16       circumstantial evidence to support a finding of what
17       someone's mind set was.  I can't tell what you are
18       thinking, you can't tell what I'm thinking, we can't
19       tell what Mr. Moroney's thinking, so we instruct the
20       jury they can consider the circumstances in making a
21       decision as to what knowledge someone had or what
22       intent somebody had.
23                   MR. CLINE:  But only if that's a rationale
24       inference.  Only if it's a rationale inference.
25                   If there is some rationale basis on which

1       the jury can draw the inference that a person knew.
2       Here, there is no rationale basis that I know of for
3       the government to contend or for your Honor to find
4       that Mr. Damrah by April 29th, 1994 knew of some
5       alleged collaboration between Hamas and Palestinian
6       Islamic Jihad.

7                The government's expert says there was a
8       connection between the two but that's as far as it
9       goes.  They don't in any way tie that to Mr. Damrah.

10               For example, there is no taped
11      conversation between Mr. Damrah and Dr. Al-Arian
12      before April 29th, 1994 saying what a great attack
13      that was that Hamas or Palestinian Islamic Jihad, or
14      they had something like that.  Some bit of evidence
15      suggesting that there was a known connection, known
16      to Mr. Damrah before April 29th, 1994 between PIJ
17      and Hamas or Hizbollah, then the government would be
18      entitled to get it in.  And there is not and the
19      prejudice is huge.

20               THE COURT:  I'm going to, in part, ask you
21      to stay away from reference to these other
22      organizations without showing.  But we'll revisit
23      this at the time almost Dr. Levitt testifies.  And
24      he may be able to go into it or not but we'll likely
25      conduct a voir dire on that particular issue if he

1       still seeks to exclude his testimony in that regard.
2       Okay.
3                    MR. CLINE:   The next issue, your Honor, is
4       the Meir Kahane assassination.   The government says
5       in it's papers, asks your Honor to defer ruling on
6       that and I don't have a problem with that as long
7       as, again, it's understood before the government
8       mentions it in opening or in testimony, we'll come
9       to the bench.
10                   THE COURT:   Will you stay away from that
11      in terms of evidence?
12                   MR. MORONEY:   Your Honor, again —
13                   THE COURT:   He's supposedly associated
14      with the mosque in Brooklyn.
15                   MR. MORONEY:   Correct, your Honor.   And
16      that's an aspect where again if — we don't intend
17      to, except that the person who murdered Meir Kahane,
18      we believe had interactions out of AlKifah and out
19      of several mosques.   And Mr. Damrah was questioned
20      legitimately about his knowledge of El Sayyid Nosair
21      and provides differing responses.   And we definitely
22      intend to elicit that.
23                   THE COURT:   I think this is potentially
24      admissible, so I'm going to deny the motion in
25      limine as to this at this time.

```
 1                 I think there is -- help me again, and I'd
 2      seen it but the date of Kahan's assassination was?
 3                 MR. CLINE:  It was pre '94.  I forget the
 4      exact date.
 5                 MR. MORONEY:  1990, judge.
 6                 THE COURT:  I think there is some
 7      relevance in terms of that, at least the materials
 8      I've seen in the interview of your client there was
 9      an indication that he had some contact kind of
10      differing versions of how much contact he had with
11      the person convicted of the assassination.  And I
12      think that may be evidence that the government can
13      offer to the jury in terms of at least associations
14      your client had with criminals that were in this
15      area.
16                 MR. CLINE:  Well, your Honor, associations
17      with criminals is not the -- that's not what he's
18      alleged to have lied about.  Association with El
19      Sayyid Nosair is not what he's alleged to have lied
20      about.  And if the government were to show, your
21      Honor, that El Sayyid Nosair, your Honor, was a
22      member of AlKifah, and there was some particularly
23      close relationship between him and Mr. Damrah, that
24      might be probative on the issue of whether
25      Mr. Damrah was affiliated, whatever that means, with
```

1    AlKifah.

2                But the fact that Nosair murdered Meir
3    Kahane has nothing do with it.  And to let that
4    extremely inflammatory fact in, I believe would be
5    horribly prejudicial and probative of very little
6    that's involved in this case.

7                If there is a connection between Nosair,
8    AlKifah, and Damrah, that might be probative but the
9    fact that Nosair murdered Meir Kahane really isn't,
10   and it's horribly prejudicial.

11               THE COURT:  Well, I thought your argument
12   was that he was connected at the Brooklyn mosque.

13               MR. MORONEY:  That's -- I'm sorry, that's
14   our understanding.

15               MR. CLINE:  Your Honor, Nosair was at this
16   mosque, there is no question about that.  His
17   question with AlKifah, AlKifah had an office at this
18   mosque.  Mr. Damrah was the Imam of this mosque.
19   Nosair attended the mosque, worshipped there and
20   Mr. Damrah, according to some statements, had a
21   passing acquaintance with him.

22               I don't believe the government has
23   evidence that Mr. Nosair was associated with AlKifah
24   in particular, which is different than the mosque,
25   number one.

1           And number two, even if it did, what's the
2      relevance, especially when balanced against the
3      unfair prejudice of the fact that Mr. Nosair
4      murdered Meir Kahane?  What does that add to the
5      affiliation between Mr. Damrah and AlKifah?  There
6      is no evidence.
7                THE COURT:  I thought it went to the issue
8      as to whether or not AlKifah supported terrorism.
9                MR. CLINE:  I don't think there is going
10     to be any claim at all in this case, at least I
11     haven't seen the evidence of it, that AlKifah,
12     AlKifah in particular sponsored or in some way
13     participated in the murder of Meir Kahane.
14               THE COURT:  I didn't mean that.  I thought
15     the evidence was AlKifah supports terrorism
16     generally, and the jury may be able to draw an
17     inference from the fact that someone who had some
18     contact with it thereafter assassinated Kahane.
19               MR. CLINE:  Your Honor, I don't think so.
20     What AlKifah did at the time Mr. Damrah was there,
21     as I understand the evidence will show, is it
22     provided money and arguably, I think the government
23     would contend, arms to the Afghan resistance
24     fighters in Afghanistan who was resisting the
25     Soviets.  Those are the people we were supporting,

```
1        at least at that point in time.  AlKifah was not
2        supporting what we describe as terrorism.  It was
3        supporting legitimate resistance.  There is a
4        difference, whole difference in the world in
5        providing money for arms to resist Afghan fighters,
6        who we, the U.S. Government, is also providing
7        support, than murdering somebody without any
8        justification at all.
9                 THE COURT:  In your argument with regard
10       to the organization, I thought was that after, after
11       Russia left, which is what?  '89?
12                 MR. MORONEY:  Yes, your Honor.
13                 THE COURT:  That this AlKifah continued
14       to, you know, do training, military training, things
15       of that type.  And so the question immediately
16       arises for what --
17                 MR. CLINE:  But, your Honor, let's suppose
18       that's true.  I don't know that we agree with that
19       but let's suppose that's true.  What's the
20       connection between that and Nosair murdering Meir
21       Kahane?  I don't think there is any evidence that
22       AlKifah in any way supported, encouraged, funded,
23       prompted --
24                 THE COURT:  Let me go somewhere else.
25                 MR. CLINE:  Nosair --
```

1          THE COURT:  I think his better argument
2     was this Nosair -- do you have evidence that he was
3     more closely associated with AlKifah other than
4     simply attending the mosque at the same site where
5     AlKifah was based?
6          MR. MORONEY:  We do have that evidence,
7     judge.  In fact, it would be our intention in large
8     part through the defendant's own admissions that
9     Nosair and Mustafa Shalabi were closely associated.
10         THE COURT:  Just to set the record,
11    Shalabi is one of the main leaders of AlKifah with
12    Mr. Damrah, according to your version.
13         MR. MORONEY:  Correct, your Honor.
14         THE COURT:  I think it's potentially
15    relevant to make a showing that after the '89, you
16    know, departure of the Soviet Union from Afghanistan
17    that this organization continued and at least one of
18    its persons, the government says it will offer
19    evidence associated with AlKifah, thereafter engaged
20    in this murder.
21         So I think there is some relevance,
22    although it is largely dependent upon the
23    government's making a preliminary showing that there
24    was this connection between Nosair and AlKifah.
25         So what I'm going to do is, I'm going to

1    deny that but I'm going to make the government's use
2    of this material contingent upon a prior showing
3    that there was a connection between the murder and
4    AlKifah.  And more of a showing than just simply the
5    fact that he attended the mosque in Brooklyn.
6              Okay.
7              MR. CLINE:  And your Honor, I take it we
8    all --
9              THE COURT:  You can come back to that, in
10   terms of whether or not they have made that
11   sufficient showing.  But at least at this time I'm
12   not going to foreclose them from that.
13             MR. CLINE:  All right.
14             The next issue, your Honor, involves
15   recruitment at the al-Farooq mosque to fight Soviets
16   and Afghanistan.
17             And I want to be clear on this.  If the
18   government wants to show that AlKifah was gathering
19   funds or providing arms to the resistance fighters
20   in Afghanistan, I think they are entitled, within
21   limits of the rules of evidence, of course, to do
22   that.
23             What I want to stay away from is evidence
24   that the al-Farooq Mosque generally, as opposed to
25   the AlKifah office, which was located at the

1        al-Farooq Mosque, was engaging in these activities.

2                    The focus, in other words, should be on

3        AlKifah and not the al-Farooq Mosque.

4                    THE COURT:  Do you object to them

5        generally laying before the jury evidence that

6        they are both located at the same --

7                    MR. CLINE:  No.  No.  In fact, they

8        clearly were, and we won't have any problem with

9        that at all.

10                   But if they are going to present evidence

11       of recruiting and providing money and articles.  My

12       point is, I believe it needs to be evidence that

13       it's linked specifically to AlKifah as to a

14       generalized assertion that there were people at this

15       mosque who were doing this.

16                   THE COURT:  Do you have any objection to

17       that?

18                   MR. MORONEY:  No, your Honor.  The

19       evidence is going to be about the activities of

20       AlKifah understanding that it was co-located and in

21       many respects the activities were one in the same.

22                   MR. CLINE:  Well, that's where we get into

23       a disagreement.

24                   THE COURT:  I'm not sure that's being

25       cautious in terms of reference to that extent.  The

1    location at the same address is not the same thing
2    as being run by the same people or having the same
3    participants.

4                MR. MORONEY:  I just -- you know, to be
5    fair, judge, I'm just saying that again through the
6    defendant's own words, we expect to offer evidence
7    that the defendant as the Imam of the mosque,
8    conceived the idea of opening and locating an office
9    in the mosque, and that a number of the same people
10   who were involved in the mosque were involved in
11   AlKifah and vice versa.

12                THE COURT:  Okay.

13                MR. MORONEY:  And that's how we expect the
14   evidence to come in, judge.

15                THE COURT:  Okay.  What your statement
16   though was as Imam of the Mosque.  You believe there
17   is going to be evidence that that was one of the job
18   descriptions of the religious position at the
19   mosque, or is your argument simply that while he had
20   one hat, that was as the religious leader of the
21   mosque, he also had a second hat where he was
22   carrying out the responsibilities of organizing this
23   effort in Afghanistan?

24                MR. MORONEY:  I think that they were
25   continuous activities, judge.

1            What I mean by that is, we expect the
2     evidence to show that the defendant approached the
3     Board of the mosque about opening this office and
4     that matters relating to AlKifah were taken to the
5     Board of the mosque and there were discussions about
6     positions and the activity, and things of that
7     nature.

8            Who's going to be the Emir of Jihad?  Who
9     is going to be the Emir of Palestine?  What's going
10    to happen with the money?  You know, what it could
11    be used for?

12           There was a dispute about checks that the
13    defendant got ahold of and what was done with those
14    checks.  So the activities of the mosque and AlKifah
15    are much more intertwined, I think, than the
16    defendant is admitting.

17           MR. CLINE:  But the claim here is that he
18    didn't disclose an affiliation with AlKifah, not
19    that he didn't disclose an affiliation with the
20    mosque.  They are saying it's basically one in the
21    same thing.  I think they have just taken themselves
22    out of the case because he did disclose his
23    affiliation with the mosque.

24           If they are going to try to make a case
25    about AlKifah as distinct from the mosque, they need

1      to make a case about AlKifah distinct from the

2      mosque.

3              THE COURT:  I'll deny the motion in that I

4      think the government can set the contextual

5      background of his activities.  And so I think that

6      as a matter of logic will involve some discussion of

7      the mosque and some discussion of AlKifah, if that

8      is deemed appropriate.

9              So as to that branch of the motion in

10     limine, I'll deny it.

11             MR. CLINE:  By the way, your Honor, the

12     last portion of the general motion in limine

13     separating that from the Levitt motion, has to do

14     with the Al-Arian laundering scheme, for lack of a

15     better term.

16           Two points I want to make about that to

17     start with.

18             One is that this subject came up for the

19     first, and as far as I know from the evidence, the

20     only time in a intercepted telephone call between

21     Mr. Al-Arian, Dr. Al-Arian and Mr. Damrah, in March

22     of 1994.  So it was after his October 18th, 1993

23     interview -- forum, I mean, and after his December,

24     1993, interview.  So it's within the timeframe of

25     April 29th, '94 is less than, less than squarely

1    relevant, let's say, to whether he lied on those two
2    occasion.  That's number one.
3              The second point is that again, from all
4    of the evidence that we have seen, this matter that
5    was discussed was never carried out.  Nothing ever
6    came of this.  It was just something that came up
7    briefly in a conversation and it was never executed,
8    as far as I can tell from the evidence.
9              So it's got minimal probative value.  It
10   is essentially 404(b) evidence.  It is other acts by
11   the defendant that are -- that have a potential
12   character impact that is improper under 404.
13             And again, the prejudicial impact of
14   succeeding that he engaged in financial impropriety
15   is considerable.
16             THE COURT:  Let me ask the government to
17   respond.
18             Are you going to seek to offer any such
19   evidence?
20             MR. MORONEY:  Yes, your Honor.  And it is
21   my belief that that particular scheme is
22   fundraising.  And it comes up in two conversations,
23   I think the March 6th, and a later.
24             THE COURT:  Why don't you set it more
25   accurate than March 6th?  Of what year?

1          MR. MORONEY:  March 6th of 1994.

2          THE COURT:  Okay.

3          MR. MORONEY:  And what's going on judge,

4      is that it's a discussion between Sami Al-Arian and

5      the defendant and the reference to cash that

6      Al-Arian has raised for Palestinian Islamic Jihad.

7      And the defendant tells him if he, if Al-Arian gives

8      him the cash he can generate additional cash by

9      giving that cash to high tax bracket members of the

10     defendant's current mosque who can then re-donate

11     it, and then kick back part of the charitable

12     deduction tax refund.

13          And in our view the fact that the

14     defendant says well that's 404(b), just their

15     calling that doesn't necessarily win the day, as far

16     as characterizing it.  This goes right to

17     affiliation, and membership, in terms of what these

18     individuals are willing to do to raise money to

19     support PIJ and ICP.  And in our view that is

20     critical evidence.

21          THE COURT:  Well, let me ask Mr. Cline to

22     respond.

23          Is this evidence that goes to the overall

24     scheme of the financial support the government

25     alleges that the defendant provided to this

1    organization?

2            MR. CLINE:  Well, except it was never

3    carried out, so it may be probative of some intent

4    but nothing was ever done here.

5            I would add this, your Honor.  That one of

6    the things that the Sixth Circuit looks to in

7    determining whether 404(b) is admissible, is whether

8    there is other evidence to prove.

9            I'm going to assume for the moment, your

10   Honor, the government is offering this for

11   legitimate purpose to prove knowledge, let's say, on

12   Mr. Damrah's part of his affiliation or associations

13   with Palestinian Islamic Jihad.  One of the factors

14   the court looks to is if there is other evidence of

15   that, less prejudicial evidence, other non-404(b)

16   evidence.

17           And here the government intends to offer

18   videotapes of Mr. Damrah exhorting people to

19   contribute money.  Their point is, it is to show

20   that he was working with Dr. Al-Arian to contribute

21   money they have plenty of evidence.  Whether that

22   amounts to affiliation of a membership is another

23   story.  There is no need on the government's part to

24   interject this very prejudicial evidence of

25   suggesting financial dishonesty into the case.

1          THE COURT:  Let me ask, how do you
2     envision presenting this?
3          MR. MORONEY:  Your Honor, the parties are
4     still discussing the --
5          THE COURT:  What I'm really getting at is,
6     is there a way to tailor the presentation that
7     obviates the, you know, the money laundering side of
8     it while still permitting the government to offer
9     the evidence of discussions of the financial
10    relationship with Al-Arian?
11          And what I'm really referring to is the
12    more prejudicial part of it seems to be this
13    discussion of funneling the monies through the high
14    income people who could otherwise take advantage of
15    the tax break.
16          Depending on how you were going to offer
17    the evidence, there may be ways that that portion of
18    it can be deleted.
19          MR. MORONEY:  Well, judge, again I
20    would -- the intention would be to present them
21    through actual intercepts of conversations from the
22    Al-Arian FISA.
23          THE COURT:  You mean the actual tapes?
24          MR. MORONEY:  Your Honor, we are still
25    working out the prospects of stipulations.  But yes,

```
 1        if we don't have a stipulated transcript of the
 2        content, that's what we would be involved in, judge.
 3                   But again, our position is that it is not
 4        404(b).  It's direct evidence of the affiliation and
 5        membership.  And I submit that it's important
 6        evidence to show the extent -- well, his connection
 7        with Al-Arian and the extent they are willing to go
 8        to raise money to support the activities, which we
 9        think are going to be at issue in the case.
10                   THE COURT:  Okay.  Do you have any final
11        response?
12                   MR. CLINE:  No, your Honor.
13                   THE COURT:  Okay.  I am going to deny this
14        motion in limine, but I'll revisit this when we get
15        to the actual method that that evidence would be
16        presented, and if feasible, I would support the
17        notion of removing some of the language that may
18        deal with money laundering, and while allowing
19        testimony in evidence concerning the general
20        discussions with Al-Arian about the raising of
21        monies and the discussion.
22                   It seems to me in terms of 403 that the
23        more prejudicial part of it is the discussion of
24        the, you know, of the efforts that circumvent the
25        tax laws.
```

1          MR. CLINE:  I agree, your Honor.  And I
2     think it is entirely doable to take these -- the one
3     transcript in particular that I'm thinking of, there
4     may be a second -- and remove those references and
5     leave in the fact we are talking about raising
6     funds.

7          We are not going to run away from the fact
8     that there was talk about raising funds.  It is the
9     money laundering aspect that is prejudicial here and
10    we think ought to be excluded.

11         THE COURT:  We'll come back to that but I
12    won't foreclose the government from a general
13    comment that he engaged in this but I want you to
14    stay away from opening statements or questions
15    specifically dealing with whether this was a
16    violation of the tax laws.

17         MR. MORONEY:  All right, judge.

18         THE COURT:  Okay.

19         Do you have any other motions in limine?

20         MR. CLINE:  Your Honor, we have a motion

21    in limine dealing with aspects of Mr. Levitt's

22    testimony.  And with your permission, Miss Hollander

23    will address a couple discrete issues but I can

24    address the more general issues we raised.

25         One of our main points had to do with the

1      post April 29th, 1994 stuff that he was proposing to
2      talk about in his expert disclosure. I think you've
3      ruled on that.

4                A second point had to do with what we have
5      characterized as deliberately inflammatory
6      materials. I'll give you two examples.

7                Mr. Levitt likes to refer to radical
8      Islamic militants. At another point he references
9      to dangerous global Jihadists. I mean, those are
10     two concrete examples of simply inflammatory
11     rhetoric that doesn't help the jury at all and is
12     obviously very prejudicial, particularly now when we
13     are fighting radical Islamic militants overseas, to
14     have offered into evidence, particularly by an
15     expert where Rule 404 under Daubert and Rockis apply
16     with particular strictness.

17                I realize that we can't anticipate and
18     advance every verbal formulation Mr. Levitt might
19     come up with but at least to those I ask your Honor
20     to require him to stay away from, and similar
21     formulations as well.

22                THE COURT: Do you have any response?
23                MR. MORONEY: Well, your Honor, I think
24     we've been over the post April '94 events and I
25     think I understand where the court is coming from on

1       that.

2                 As fast as the materials, judge.

3       Mr. Levitt did testify that in the parlance in the

4       argot of his field, those terms have definite

5       meanings.  And in fact, when Miss Krigsman was cross

6       examining --

7                 THE COURT:  I don't think that's their

8       motion.  I think their motion is while it may have

9       some legitimacy in his field, it has a danger of

10      inflaming the jury unfairly.

11                MR. MORONEY:  I was just referring the

12      discussion about what an Islamist is and that being

13      an ideology.  And Mr. Levitt did discuss that also

14      and that is a specific frame of reference.

15                I would also note the idea about dangerous

16      global Jihadists.  There will be evidence in the

17      tapes about the defendant referencing that we need

18      to get the Mujahideen from Afghanistan to come to

19      Palestine and contribute currency into this issue of

20      moving these people around to wage Jihad.  And

21      that's where that reference is coming from.

22                THE COURT:  Okay.  Well, I'm going to

23      generally grant the motion but it will be subject to

24      the context of the case, and the context of the

25      testimony.

1          But tell him to stay away from those type
2     of terms. And as we get into his testimony, I would
3     remind counsel for the defendant, if you think that
4     some of it is tending towards descriptions that are
5     improper, approach the bench and I'll hear the
6     parties at that time.

7          But I'll generally grant the motion and
8     direct the government to stay away from the use of
9     the terms that have been mentioned at this time.

10         Do you have any other motions?

11         MR. CLINE: Yes, your Honor. I'm just
12    making a note.

13         Again, specifically with respect to
14    Mr. Levitt. And Miss Hollander, I think will
15    address this in part as well.

16         But Mr. Levitt wants to testify about a
17    suicide attack I believe occurred on April 6th or
18    April 4th, 1994. That attack has been characterized
19    by the State Department and every other official
20    source until very recently, as a Hamas attack, not a
21    Palestinian Islamic Jihad attack.

22         Very recently the government has taken the
23    position in the Myers affidavit that Palestinian
24    Islamic Jihad was involved in that. And that
25    apparently is based on some communication between

1    Dr. Al-Arian and another person we have not had
2    access to, and as far as I know, Mr. Levitt has not
3    had access, in which there was some discussion of
4    that.

5              What we have in effect is a situation
6    where Levitt proposes to testify that PIJ was
7    involved in this suicide attack on April 6th, 1994
8    based on the hearsay affidavit by Kerry Myers, an
9    FBI agent, which in turn is based on other hearsay.

10             What he is doing by offering that
11   testimony is not providing any additional input as
12   an expert, anything that is going to help the jury.
13   He is basically channelling hearsay. He's taking
14   the hearsay from the affidavit which is in turn
15   based on hearsay, and providing that to the jury,
16   which is inadmissible. And he's providing that in
17   the guise of expert testimony.

18             That's exactly the type of thing Rule 703
19   as amended in 2000 keeps out. That type of
20   inadmissible evidence can come in only if the
21   government shows that or proponent shows -- the
22   government in this case -- shows the probative value
23   in assisting the testimony substantially outweighs
24   the prejudice.

25             I don't believe they can show that and I

1     don't believe he should be permitted to testify, not
2     merely as an expert at all, but simply as a conduit
3     for hearsay.
4               THE COURT:   Okay.  Do you have any
5     response?
6               MR. MORONEY:  Yes, your Honor.
7               And again, what it is, is contemporaneous
8     phone intercepts that are declassified and revealed
9     later.  But these are contemporaneous discussions by
10    Sami Al-Arian, very specific discussions where
11    . they are saying that, you know, the boy was ours,
12    and the bomb was Hamas.  It was 90,000.  This is how
13    it was paid.
14              And those are right off the Al-Arian FISA
15    intercepts in and around April of '94.  And there
16    are numerous intercepts over a period of time like
17    that.
18              Now, the fact they are discovered later
19    and that Hamas claimed responsibility for the Afula
20    attack but at the same time there are PIJ leaders
21    like Sami Al-Arian that is saying this is a joint
22    operation and this is our part of it, and this is
23    your part of it.  That's in our view highly credible
24    and highly reliable.  And the fact that those
25    intercepts are then incorporated in the Myers

```
1       affidavit and in the Al-Arian indictment.

2                  THE COURT:   Have they had the ability to

3       review the FISA tape or the transcripts of the

4       Al-Arian statement?

5                  MR. CLINE:   No, is the short answer.

6                  THE COURT:   I mean, just because you have

7       almost triple hearsay, you have Al-Arian who was

8       himself purportedly not involved in the actual

9       bombing, testifying about what somebody told him

10      about the connection between PIJ and the bombing.

11                 MR. MORONEY:   He'll telling --

12                 THE COURT:   Well, he's telling somebody

13      else but he doesn't presumptively -- he doesn't have

14      personal knowledge.   He's repeating what somebody

15      else told him about the connection between PIJ and

16      the bombing.

17                 But then you have the Myers problem.   That

18      Myers, they don't have access to the underlying

19      tapes.   And your expert doesn't have access to the

20      tapes.   He's just presuming that Myers accurately

21      recorded the content.

22                 MR. MORONEY:   Well, judge, if the court --

23      the defense has been provided with the indictment

24      which incorporates the conversations and the

25      affidavit.   If the court is suggesting we can make
```

1    those transcripts or whatever available, if that is
2    significant, our point is that the indictment and
3    the Grand Jury finding and the affidavit with the
4    magistrate finding becomes sufficient for --
5              THE COURT:  How would the Grand Jury
6    finding would be sufficient to support it?
7              MR. MORONEY:  It's a probable cause
8    standard, judge.  And the issue is simply, is it
9    reasonable for --
10             THE COURT:  An expert to rely upon?
11             MR. MORONEY:  To opine on a search warrant
12   affidavit signed by a magistrate judge and a finding
13   incorporated into a Grand Jury.
14             THE COURT:  Except we don't know from the
15   magistrate, who signed the search warrant, we don't
16   have any clue whether he found that credible or not
17   credible.  He may have found everything else
18   credible and found that lacking in credibility.
19 ·            MR. MORONEY:  And I think --
20             THE COURT:  So I don't think you can draw
21   any conclusions.  I think you are wrong in terms of
22   saying that because a magistrate issued a search
23   warrant that we should therefore draw a conclusion
24   that the Myers' affidavit was necessarily correct.
25             But have you had access to the underlying

1      conversation that's purportedly --

2               MR. CLINE:  No.  And I believe we have

3      asked for it, have we not?

4               MS. HOLLANDER:  We have.  Your Honor, if I

5      can be heard also.

6               We've discussed this, as you recall, at

7      the Daubert hearing and we asked Mr. Levitt if he

8      had had access to the underlying document.  There is

9      really only one document alleged in this whole

10      affidavit which goes in the affidavit, and the

11      affidavit takes it from the indictment.  And that's

12      an alleged fact in Arabic, according to these

13      documents, that came from somewhere in the Middle

14      East, that says something about Shiqaqi's statements

15      about PIJ.  That's where that all allegedly begins.

16               But Mr. Levitt hasn't seen it and says he

17      doesn't have it.  The government has not provided it

18      to us, so we have absolutely nothing.  And he's not

19      opined, he's simply restating what Kerry Myers says

20      in his affidavit, which comes -- all of it comes

21      from one source, as near as we can tell.

22               And your Honor asked Mr. Levitt

23      specifically if he had any other sources.  He

24      couldn't --

25               THE COURT:  I recall that testimony.

1           Let me just ask Mr. Moroney.

2                Is there any reason you can't -- that we

3           should not defer this and give them a copy of both

4           the fax and the intercept?

5                MS. KRIGSMAN:  I think I can make that

6           happen, your Honor.

7                THE COURT:  Why don't you give that to

8           them and we'll revisit the issue before Levitt

9           testifies.

10               MR. CLINE:  The next issue, your Honor,

11          has to do with al-Qaeda and Osama bin Laden.

12               THE COURT:  Are you going to go into that?

13          Are you going to try to make any reference that this

14          defendant or PIJ was directly associated with

15          al-Qaeda, other than --

16               MR. MORONEY:  It's --

17               THE COURT:  -- or AlKifah was directly

18          associated with it?

19               MR. MORONEY:  Your Honor, I believe both

20          through the expert and in some respects through the

21          testimony of New York JTTF Agent Louis Napoli.

22          Simply where we are going with that is that AlKifah

23          arose out of a world wide organization known as MAK

24          or Maktab al-Khidmat.  And the founders of MAK and

25          therefore AlKifah were Sheik Abdullah Azzam, and

1    Osama bin Laden.  And Sheik Azzam is blown up, I
2    believe, in late 1989 in Pakistan.

3              And that relates to what we were talking
4    about earlier, judge, is that the Soviets are gone
5    from Afghanistan but AlKifah and Shalabi and his
6    assistants continue to operate that, and the money
7    is used for other purposes, our contention being
8    Jihad, in other jurisdictions.

9              THE COURT:  I understand.  But what's the
10   connection with al-Qaeda you think you are going to
11   offer evidence on other than the fact that MAK may
12   have been founded by someone who subsequently
13   founded al-Qaeda?

14             MR. MORONEY:  As Mr. Levitt addressed in
15   part in the Daubert, he had indicated that it is not
16   even subject to dispute in the literature in the
17   area that MAK and AlKifah were the predecessor
18   organizations to al-Qaeda.  That that was the
19   launching pad for the base, so to speak, and that
20   the money that was funneling in, you know, bin Laden
21   then began to add his money into that effort after
22   Sheik Azzam is killed and the Soviets are expelled.
23   But the money keeps rolling and it's directed to
24   other activities.

25             MR. CLINE:  Whether or not MAK later moved

1     into -- or AlKifah for that matter -- moved into
2     al-Qaeda, unless they can show that it moved into
3     al-Qaeda at the time Mr. Damrah's dealing with it --
4     which they can't -- I don't see any relevance and
5     enormous impact of unfair prejudice because of the
6     notoriety of al-Qaeda today.

7           Same with Osama bin Laden. Let's assume
8     he has had something to do with the founding of the
9     organization that later became AlKifah or later
10    still became al-Qaeda. Why do we have to bring his
11    name up in this case? Osama bin Laden in 1994, '93,
12    wasn't the Osama bin Laden that he is today. And to
13    allow that evidence in is enormously prejudicial and
14    adds little or nothing as to whether Mr. Damrah lied
15    on his application form, lied in his interview.

16          THE COURT: Any final response?

17          MR. MORONEY: Judge, the issue again is,
18    from '89 afterwards. And again as I indicated Azzam
19    is blown up. AlKifah keeps operating. In fact,
20    Mustafa Shalabi is murdered in March of '91, and you
21    know, the evidence is that the blind Sheik then
22    becomes involved in operating AlKifah. And that
23    organization keeps operating up through the time
24    where the defendant applies for citizenship. And we
25    think that the activities of AlKifah, as it

```
1    continued, are very relevant to why would the
2    defendant --
3                THE COURT: I understood his point to be
4    instead that the activities after '94 of AlKifah are
5    not relevant to what he knew and what he made
6    application with regard to.
7                MR. CLINE: Maybe I should go even further
8    today, your Honor. Certainly after '94 they are
9    not, but the evidence is going to be that Mr. Damrah
10   was out of this mosque and out of any alleged
11   connection to AlKifah in 1990 some time. So what
12   happened to AlKifah or Osama bin Laden or al-Qaeda
13   in '91 or '92 or '93, has little, if any, relevance
14   to anything in the case. Mr. Damrah was gone by
15   then.
16               THE COURT: Do you have any evidence
17   supporting his connection after he's moved to
18   Cleveland to AlKifah?
19               MR. MORONEY: I believe there will be
20   indications from his statements that he remained in
21   contact with some of the people involved in the
22   operation, judge.
23               THE COURT: I'm going to grant the motion
24   at this time. Again, this is something of an
25   interim ruling, I'll reconsider it. But stay away
```

1        from references to al-Qaeda and bin Laden.  I think

2        under 403 they are likely significantly more

3        prejudicial than probative and their relevance is

4        fairly marginal, while risk of inflaming the jury is

5        great.

6                MR. CLINE:  Your Honor, we incorporated in

7        the Levitt motion the other topics that we've

8        already discussed.  And I'm going to assume that

9        your rulings on those will apply to his testimony as

10       well.

11              We had also asked that under Rule 703, as

12       amended in 2000, that inadmissible hearsay be kept

13       out unless the government can show the probative

14       value substantially outweighs the prejudice.

15             THE COURT:  The main thing you are talking

16       about is this attack in '94?

17             MR. CLINE:  That's the principle thing but

18       there may be other instances as well that

19       Mr. Levitt --

20             THE COURT:  Raise that.  It will be your

21       obligation to raise it by way of an objection if you

22       feel he's tending to offer testimony that is

23       inadmissible hearsay in support of his opinions.

24             MR. CLINE:  I believe in your Daubert

25       order you said we would have the obligation to raise

1    that unless the government could make the showing it
2    should be excluded.
3              The last part of the motion concerning
4    Mr. Levitt had to do with Rule 704(b) and testimony
5    about the defendant's knowledge or intent. And I
6    believe you addressed that in your Daubert order as
7    well.
8              THE COURT: Do you have any other
9    procedural matter you ask us to deal with now?
10             MR. CLINE: Your Honor, I just wanted to
11   point out that we filed -- I think it is now
12   probably on file -- and provided to the government
13   over the weekend some supplemental jury instructions
14   based on the fact that Mr. Damrah's arrest was
15   sealed in New York. And in New York law a sealed
16   arrest and prosecution is essentially expugnable.
17   That's not something we have to address now, I just
18   wanted your Honor to be aware we filed that.
19             We also filed a motion to dismiss or
20   require election because the indictment is
21   duplicitous, which has been become particularly
22   clear in light of the government's proposed jury
23   instructions and memorandum in support. That I
24   understand the government's going to respond to that
25   today and I believe that's something that probably

```
 1        needs to be resolved, at least before we begin

 2        taking opening statements and taking evidence.

 3               But I simply -- it can't be resolved now

 4        because the government hasn't responded, but I

 5        wanted your Honor to be aware of that.

 6               THE COURT:  When do you expect you'll get

 7        a response in?

 8               MS. KRIGSMAN:  Good morning, your Honor.

 9               As far as the response on the duplicitous

10        argument, we have a draft that's prepared and we

11        just need to put it in formal form for the court.

12        We could get that to your Honor this morning.

13               Just so your Honor knows, I don't intend

14        to touch on issues that bear on duplicity in my

15        opening.  I'm just going to describe the indictment

16        in very bare bones fashion.  So I don't agree with

17        Mr. Cline that that necessarily has to be resolved

18        before opening.

19               With respect to the question of the arrest

20        being sealed, we'll have an argument on that, your

21        Honor, and we are preparing something for your Honor

22        right now on that.  We do not believe it is

23        equivalent to an expungement.  In any event, it

24        wouldn't absolve the defendant of being truthful

25        under oath in filling out an application for
```

1      citizenship.

2                  THE COURT:  You will set that forth.

3                  It's equivalent of a motion for acquittal,

4      isn't it?

5                  MR. CLINE:  It has several impacts.  It

6      is -- we certainly intend to raise it in the form of

7      motion for judgment of acquittal.  And we say that,

8      we propose jury instructions based on that in the

9      event your Honor doesn't grant a judgement of

10     acquittal.  And I would expect to mention it in

11     opening because it is basically the answer to that

12     part of the charge.

13                 THE COURT:  Well, depending upon when we

14     get the response from the government, we'll try to

15     turn to it but we have a fairly complicated other

16     matter this afternoon that's scheduled at 2:00

17     o'clock.  So depending upon when we get your

18     response, we'll try to turn to it as quickly as we

19     can and try to give you some advice.  But there

20     would be no guarantee that you would have a ruling

21     on that by the time of opening.

22                 Let's talk a little bit about the

23     schedule, unless you have something else any other

24     procedural motion or matters you want to bring

25     before the court.

1          MS. KRIGSMAN: Your honor, I just have one

2     but I would ask the court's leave to approach you.

3          THE COURT: Okay. Mr. Cline.

4          (The following discussion was between

5          court and counsel at the side bar.)

6          MS. KRIGSMAN: Your Honor, we also have

7     filed a motion for jury notification. We don't need

8     a response -- your Honor, we don't need a response

9     to that. They responded to that.

10         THE COURT: You said you weren't going to .

11    raise that?

12         MR. CLINE: We are not.

13         MS. KRIGSMAN: I learned of something

14    yesterday. Apparently there was an article in the

15    Chicago Tribune yesterday to the effect that Dr.

16    Alexander was not going to be testifying at trial

17    because of the outrage from the local Jewish

18    community in Chicago. There was, apparently

19    according to the article, an outrage in Chicago

20    regarding his testimony at the Daubert and his

21    expert report. And he has told the newspaper that

22    he will not be testifying at trial. And I would

23    just ask that the defense not be allowed to mention

24    that in front the jury at all.

25         THE COURT: You recall Dr. Alexander has

1    testified.

2              MR. CLINE:  Ms. Krigsman has accurately

3    reflected the testimony in the newspaper.  After his

4    Daubert testifying here there was an uprising

5    apparently in the Jewish community in Chicago, a

6    great deal directed at Dr. Alexander.  And he told

7    us in light of that he can't testify to that because

8    his job might be at stake and he might have other

9    problems.

10             THE COURT:  So do you intend to try to

11   enforce the subpoena or do you intend to try to --

12             MR. CLINE:  No.

13             THE COURT:  Okay.  But you will still

14   waive that?

15             MR. CLINE:  Yes.

16             THE COURT:  In terms of opening statement?

17             MR. CLINE:  Yes.

18             THE COURT:  Any comment.

19             I don't know how it could be offered in

20   any case, you know, by way of opening statement.  If

21   you can't -- if you are not going to have him

22   testify, and the circumstances of it, I don't see

23   how it could be admissible.

24             Just on another matter of the experts.

25   What's the status of your expert?  When are we going

1     to do the Daubert?

2                MR. CLINE: He's here and he's available

3     any time for the Daubert. We intend to refer to his

4     testimony in opening. If your Honor has not

5     conducted the Daubert by the time of opening, what I

6     anticipate doing is talking about his testimony

7     within the general parameters that you accept for

8     Dr. Alexander's testimony.

9                THE COURT: All right. Is he in the

10    building, or is he just in town?

11               MR. CLINE: Where is he?

12               MS. HOLLANDER: He's at the hotel.

13               THE COURT: Why don't we tentatively try

14    to schedule that for say 3:15, something in that

15    time range, today. Independent on how long -- the

16    other argument is supposed to start at 2:00 and you

17    know, I'll try to bring it to a conclusion after

18    about an hour. We can then move to the Daubert

19    before tomorrow morning.

20               MR. CLINE: All right.

21               THE COURT: Okay.

22               MS. HOLLANDER: Your Honor, we have one

23    other thing I think we should bring up.

24               THE COURT: Do we need this? I don't want

25    to do a bench conference, if there are so many --

1              MS. HOLLANDER:  Do we need a bench

2         conference on this?

3              THE COURT:  You don't need this in camera

4         any more, this discussion?

5              MS. HOLLANDER:  I don't know.  That's my

6         question.  The document you found on Levitt.

7              MS. KRIGSMAN:  Oh.

8              MS. HOLLANDER:  Do we need that to be in

9         camera to discuss it?

10             MS. KRIGSMAN:  I think so.

11             MS. HOLLANDER:  We probably do.

12             I didn't bring it up out there, but

13        evidently your Honor has instructed the government

14        to search for any documents.  And I believe Miss

15        Krigsman referred they found one.

16             MS. KRIGSMAN:  And I don't understand it's

17        directly relevant, your Honor, but it was an article

18        he wrote.  It may be relevant, so we asked them to

19        ship it out.  It is classified.

20             I would just like to take a quick look at

21        it so it doesn't refer to the ongoing investigation

22        and if it does not, I would be happy to show it.

23             THE COURT:  Did they do a search on it?

24             MS. KRIGSMAN:  Yes, your Honor, they did.

25        And they responded back they did not find any

1      responses.

2               THE COURT:  To what question?

3               MS. KRIGSMAN:  There were three reports

4      offered by Levitt dealing with -- you asked for

5      Levitt reports dealing with pre-1994, pre-May 1994

6      tax with regard to fundraising by PIJ mosque or the

7      Palestinian groups.  And I can't remember if --

8      there was a third category, I can't remember off the

9      top of my head.

10              And I conveyed that to the FBI and they

11     searched those three categories, and said on their

12     ACS computer check they didn't find anything.

13              And I said there has to be.

14              And they went back and looked on the

15     intelligence and they found some.

16              THE COURT:  Turn that over to them.

17              MS. KRIGSMAN:  If there is reference to an

18     ongoing investigation, I'll try to redact it.

19              THE COURT:  When do you intend to get it?

20              MS. KRIGSMAN:  Today, your Honor.

21              THE COURT:  Alert them or alert us that

22     you have gotten it and if there is some reason it

23     can't be turned over, again advise them and advise

24     us.

25              MS. KRIGSMAN:  Yes, your Honor.

1                          - - -

2                    C E R T I F I C A T E

3          I, Richard G. Delmonico, Official Court Reporter

4     in and for the United States District Court, for the

5     Northern District of Ohio, Eastern Division, do hereby

6     certify that the foregoing is a true and correct

7     transcript of the proceedings herein.

8

9

10                              _____
                                Richard G. DelMonico
11                              Official Court Reporter
                                568 U.S. Courthouse
12                              Two South Main Street
                                Akron, Ohio  44308
13                              (330)252-6021

14

15

16

17

18

19

20

21

22

23

24

25



*testimony from USAV. Damrah*
*N)Ohio (ED)  1:03CR484*
*06/16/2004*

6-16-04.TXT

4     want you to be cautious not to be trying to support

5     that opinion with him just relating matters as to

6     which he's got no personal knowledge.

7             I think in the context of the examination

8     you'll see where I'm going on this.  But I'm just

9     cautioning, make sure he has a personal foundation

10    before he starts discussing the details of a

11    particular, you know, occurrence.

12            Okay.  Why don't we start.

13            MR. MORONEY:  Okay.

14            THE COURT:  We'll see where it goes.

15            (The following proceedings were

16    conducted in open court.)

17            THE COURT:  Again, who is the United

18    States' next witness?

19            MR. MORONEY:  The United States would call

20    Matthew Levitt.

21            THE COURT:  Would you raise your right

22    hand.

23                    - - -

24                MATTHEW LEVITT

25    called as a witness by and on behalf of the

                                            503

1     Government, being first duly sworn, was examined

2     and testified as follows:

3             THE COURT:  Please come forward.

4             Tell the jury your name and spell your

5     last name.

6             THE WITNESS:  Matthew Levitt.

7     L-E-V-I-T-T.

8             THE COURT:  Mr. Moroney.
                Page 39

MUB-00030833

6-16-04.TXT

9                MR. MORONEY:  Thank you, your Honor.

10                          - - -

11                    DIRECT EXAMINATION

12    BY MR. MORONEY:

13    Q    Mr. Levitt, the city and state where you reside,

14    please?

15    A    Silver Springs, Maryland.

16    Q    And how are you employed, sir?

17    A    I'm a Senior Fellow in Terrorism Studies at the

18    Washington institute for the Near East Policy.

19    Q    What is the Washington Institute?

20    A    The Washington Institute is an independent think

21    tank focused on US policy in the Middle East.

22    Q    How long have you been there?

23    A    I've been there since November, 2001.

24    Q    Do you have a title, particular title there?

25    A    Senior Fellow in Terrorism Studies.

                                                504

1    Q    And I ask you, can you describe for the jury what

2    your duties are as a Senior Fellow at the institute?

3    A    As a Senior Fellow at the institute I write journal

4    articles, policy briefs, I lecture frequently at

5    universities, conferences, testify before the United

6    States Congress, conduct analyses of terrorism,

7    particularly terrorism in the Middle East as it relates

8    to U.S. policy.

9    Q    You mentioned policy briefs.  What are those?

10    A    I'm sorry, it's a little difficult to hear.

11    Q    You mentioned policy briefs?

12    A    The institute puts out two page briefs, policy

13    briefs or memos for decision makers, journalists, what

                         Page 40

MUB-00030834

6-16-04.TXT

14    have you, on issues relating to the Middle East, or any

15    issues from the peace process to terrorism, Gulf issues,

16    et cetera.

17    Q    Do you have any special area or areas of

18    concentration at the Washington Institute?

19    A    My focus has been on logistical and financial

20    support networks for terrorist groups.

21    Q    Any particular terrorist groups?

22    A    Middle eastern terrorist groups, groups that

23    operate in the Middle East or emanate from the Middle

24    East.

25    Q    What is your academic background, sir?

505

1    A    I have a Bachelors degree, a Masters of Law and

2    Diplomacy from the Fletcher School of Law and Diplomacy,

3    where I am currently in the last stages of finishing a

4    Ph.D. in International Relations.

5    Q    Where are you at in finishing your Ph.D.?

6    A    Technically it's called ABD, which means all but

7    dissertation.  I'm finishing the last chapter now.  I'm

8    expecting to have a degree in November.

9    Q    Of this year?

10    A    Yes.

11    Q    And can you describe for the jury what your

12    dissertation involves?

13    A    Yes, the dissertation is on the impact of terrorist

14    attacks on the process of an ongoing negotiation.  So

15    you'll have a negotiation that is in process, a terrorist

16    attack happens, how does that affect the process?  How

17    can you bolster the process, protect them from such

18    attacks?

Page 41

MUB-00030835

6-16-04.TXT

19  Q    Are you using any particular approach in your

20  dissertation?

21  A    I'm using a methodology called the focus comparison

22  methodology.  It involves taking several case studies --

23  I take three -- applying the same set of questions to

24  each of them, and then writing a chapter that analyzes

25  each of those issues coming across the three case

                                                    506

1   studies.

2   Q    And the case studies involve what, sir?

3   A    The first is a 1994 attack by a Jewish extremist

4   terrorist, Mark Goldstein, who killed 40 Arab Muslim

5   worshipers in Hebron.

6            The second that year, 1994, is the abduction

7   and murder of Nachsund Waxman.

8            And the third is a series of attacks, mostly

9   suicide bombings, in February and March of 1996.

10  Q    And you expect your dissertation to be finished

11  shortly?

12  A    Yes.

13  Q    Mr. Levitt, how were you employed by the Washington

14  Institute?

15  A    I was a counter-terrorism analyst at The Federal

16  Distribution Headquarters.

17  Q    Over what period of time?

18  A    Just over three years, 1998 to November, 2001.

19  Q    And can you briefly describe your duties at the

20  FBI?

21  A    I conducted analysis, provided tactical and

22  strategical analysis in support of FBI investigations.  I

23  would highlight gaps in information, areas for further

                            Page 42

MUB-00030836

6-16-04.TXT

24    investigation, analyze information that was collected by

25    agents in the field, liase with other members of the U.S.

507

1    intelligence community and U.S. Government, brief my

2    senior management, et cetera.

3    Q    Mr. Levitt, in the course of your work at the

4    institute, have you been a consultant for any U.S.

5    agencies?

6    A    I have.  I've consulted for the Department of

7    Justice, for the Immigration Service, which is now part

8    of homeland security for the 911 commission.  I've

9    lectured on behalf of the State Department.

10            THE WITNESS:  Is it possible to get some

11        water?

12            THE COURT:  Yes, we'll get you some water.

13            MS. KRIGSMAN:  May I help him, your Honor?

14            THE WITNESS:  Thank you.

15    BY MR. MORONEY:

16    Q    Mr. Levitt, have you had occasion to testify before

17    the U.S. Congress in any matters?

18    A    Several times before both the House and the Senate.

19    Q    And what in brief did your testimony concern?

20    A    Testimony is always on middle eastern terrorist

21    issues.  I've done a lot of work on terror financing, and

22    testified several times on that issue.  Testified on the

23    Syrian support for terrorism and on Saudi Arabia's

24    activities in the war on terrorism.

25    Q    Have you been invited to international conferences

508

1    as a speaker, presenter or instructor?

Page 43

MUB-00030837

6-16-04.TXT
2   A     Yes, regularly.  On behalf of the State Department
3   and on behalf of universities.

4             Just, for example, a few weeks ago I lectured
5   at two universities in Turkey.  Next month I'm lecturing
6   at George C. Marshall Center, which is jointly run by the
7   German and U.S. governments in Germany.  And I'm
8   lecturing in France and Spain, conferences put together
9   by counter terrorism magistrates in those two countries.
10  Q     Let me ask you about publications.  Have you
11  published any material?
12  A     Yes, I've written a monograph, a short book called
13  Targeting Terror, came out in, I believe it was, October,
14  2002 through the Washington Institute.

15            I've authored several academic journal
16  articles, many policy briefs, editorial pieces in
17  newspapers.
18  Q     Mr. Levitt, are you, in the course of your duties
19  at the institute, called upon to render opinions within
20  the area of your expertise?
21  A     I am.
22  Q     Let me ask you if you could, please, let the jury
23  know how the methodology that you use in reaching
24  opinions that you are called upon to render?
25  A     In social sciences, which is not a pure science

509

1   like biology, the main practice is to collect information
2   and then fact check it, double check it.  There is an
3   ongoing process of peer review, where other academics, in
4   my case both people within my institute and others
5   outside the institute will review my work, whether it is
6   for publication of a book or a journal article.  You are

Page 44

MUB-00030838

6-16-04.TXT
 7  collecting information and you are venting it instead of
 8  just accepting things at face value.  You talk to others
 9  in the field and see that it is if fact accepted
 10 information.
 11 Q    You mentioned a process of peer review?
 12 A    Yes.
 13 Q    Who do you look to peer review your work?
 14 A    Well, I look to a wide array of people.  In fact,
 15 I'm frequently seeking out new people to review my work.
 16 The entire idea of the peer review is that you are not
 17 only be being reviewed by people that you know and have a
 18 relationship with you and therefore might be soft or kind
 19 to you, you want to be reviewed by people who are
 20 independent of you.
 21       So, for example, in my latest book, which is
 22 has been submitted to several publishing houses, those
 23 publishing houses have had the manuscripts reviewed by
 24 people who are completely unknown to me, they are
 25 anonymous, I have no idea who they are.

                                                510

 1  Q    Do you attempt to have your work reviewed by people
 2  of differing views and perspectives?
 3  A    Absolutely.  It's important to talk to people who
 4  don't always share the exact same viewpoint you do.
 5       So, for example, in preparation of preparing
 6  this manuscript of my current book, I convened a round
 7  table of some 30 scholars, diplomats, U.S. Government
 8  officials, foreign diplomats from the Arab world, from
 9  Europe, many of whom don't agree with everything I have
 10 written, but all of whom gave me some very good input and
 11 constructive criticism on this draft.

                       Page 45

MUB-00030839

6-16-04.TXT
12   Q      Have you had your worked reviewed by any
13   Palestinians?
14   A      My work has been reviewed by Egyptians.  We have
15   had Palestinians as visiting fellows at the institute who
16   have reviewed my work.  I don't know if the books have
17   been reviewed by any Palestinians.
18   Q      Does your methodology involve open source analysis?
19   A      Yes, I write and publish in open source, meaning
20   unclassified places.  The newspaper, or an academic
21   journal, and so by definition all this material has to be
22   declassified.
23   Q      Does your travel factor in into your methodology?
24   A      It is a very important part.  It's important to
25   have spent time in the area, and talked to people, get

511

1    firsthand knowledge on the ground.  Kind of, you know,
2    rub your elbows and drink the coffee.  And that's a very,
3    very important part.  Specifically in social science of
4    collecting information.
5    Q      And how about the interview process?
6    A      Both when I go abroad and when I'm here, being in
7    Washington, people frequently are coming to my town.  I
8    interview almost anybody that I can get access to, to
9    gather information, to check facts that I receive from
10   other sources, and to continue to collect information so
11   that I can do the kind of trend analysis these focus
12   comparisons that are factored on what I do.
13   Q      What is the role of newspapers and media articles
14   in your methodology or in the process by which you
15   reached opinions?
16   A      Newspaper articles are useful, they are not

Page 46

6-16-04.TXT
17   necessarily the most reliable.  So sometimes I'll see

18   something in a newspaper that I haven't seen before, and

19   then I have to go through a process of checking those

20   facts off of other more knowledgeable sources.

21                 In other cases I'll have a piece of

22   information that I know to be true and will sometimes

23   source it to a magazine or a newspaper so that the people

24   who are reading my work will have footnotes, something

25   this could refer to as opposed to having to take my word

                                                    512

1    for it.

2                 THE COURT:  I'm sorry, what did you say

3         about newspaper articles being reliable?

4                 THE WITNESS:  I said they are not always

5         the most reliable.  At least that's what I intended

6         to say.

7                 THE COURT:  You are under oath, right?

8                 THE WITNESS:  Yes, sir.

9    BY MR. MORONEY:

10   Q    Mr. Levitt, in the course of your preparation for

11   appearing here today, have you reviewed certain materials

12   that pertain to this case?

13   A    Yes, I have.

14   Q    Can you give the jury an idea of what you've

15   reviewed?

16   A    I received from the office of the U.S. Attorney

17   transcripts of videotapes and copies of videotapes of

18   Mr. Damrah and others at conferences and events.

19   Transcripts of telephone calls, and faxes.  I received a

20   copy of the Palestinian Islamic Jihad manifesto, laying

21   out the group's ideology and goals.

                        Page 47

MUB-00030841

6-16-04.TXT
22                MS. HOLLANDER:  Objection, your Honor.

23        May we approach?

24                THE COURT:  No.  Overruled.

25                THE WITNESS:  I received a manifesto, and

                                                513

1     I think that's the bulk of what I reviewed.

2                I then also used, for example in my expert

3        opinion, other sources but --

4     BY MR. MORONEY:

5     Q    Did you consult other publications and reference

6     materials in the area of terrorism?

7     A    Yes.

8     Q    Can you cite what types of things you might have

9     consulted in the course of your work?

10    A    Sure.  The two most prominent books I cited were

11    the two most highly recognized books on the Palestinian

12    Islamic Jihad; one is by an Israeli scholar named Meir

13    Hatina, the other is by a Palestinian scholar named

14    Ashuer Amier. [SIC]

15                I referred to information from press

16    releases, there are, as you mentioned, some newspaper

17    sources in there.  Again information that has been fact

18    checked.  Again, when you are working with, you know,

19    open source information that's the type of sourcing you

20    are going to have.

21    Q    Are you familiar with a publication known as

22    Patterns of Global Terrorism?

23    A    Patterns of Global Terrorism is a Congressionally

24    mandated document that is produced by the State

25    Department, has been every year since 1989.  It goes into

                                                514

MUB-00030842

6-16-04.TXT

1   the Federal Register.  It is considered the U.S.

2   Government's premier open source annual publication on

3   international terrorism.

4              MR. MORONEY:  May I approach, your Honor?

5              THE COURT:  Yes.

6   BY MR. MORONEY:

7   Q    Mr. Levitt --

8              THE COURT:  Do you have a set of copies of

9        those for me?

10             If you have any other exhibits you are

11        going to refer to, I would like a copy of them.

12  BY MR. MORONEY:

13  Q    Mr. Levitt, I've handed you what's been marked,

14  there is a series of documents marked exhibits, I believe

15  32-1 through 32-7?

16  A    Yes.

17  Q    Do you recognize those?

18  A    These are photocopies of portions, not the whole

19  thing, of Patterns In Global Terrorism from 1989 through

20  1995.

21  Q    And those are excerpts from the documents?

22  A    Yes.

23  Q    Excerpts containing what, sir?

24  A    Excerpts containing the cover page, introduction to

25  the document, things like the legislative requirements

                                                 515

1   and the definitions used, et cetera.  And then the

2   sections on Palestinian Islamic Jihad.

3              Palestinian Islamic Jihad has been included

4   in patterns of global terrorism since the document was

5   first created in 1989, and included under a section

                        Page 49

MUB-00030843

6-16-04.TXT

6    called major terrorist groups.

7    Q      If you would, Mr. Levitt, for the record, if you

8    could identify what each exhibit, the year for the

9    pattern's publication?

10   A      with the Exhibit Number.

11   Q      Yes.

12   A      G32-1 is Patterns of Global Terrorism, 1989.  G32-2

13   is Patterns in 1990.  G32-3 is Patterns, 1991.  G32-4 is

14   Patterns, 1992.  G32-5 is Patterns, 1993.  G32-6 is

15   Patterns, 1994 and G32-7 is patterns 1995.

16   Q      And did you consult the Patterns of Global

17   Terrorism reports in your work on this case?

18   A      I did.

19   Q      And you are familiar with the contents of those

20   documents?

21   A      I am.

22   Q      You mentioned, Mr. Levitt, the Palestinian Islamic

23   Jihad?

24   A      Yes.

25   Q      Is that organization referenced in those reports?

D

                                                              516

1    A      It is.  It has been included in these reports since

2    1989.  It is described as a Palestinian religious Islamic

3    terrorist group bent on the destruction of Israel.

4    Several Meirs describe the group's threats against United

5    States interests.  The group was founded by several

6    individuals, including Fathi Shiqaqi, Sheik Abdel Aziz

7    Odeh, Bashir Nafi.

8            Mostly by Palestinians who had been studying

9    Egypt in the 1970's.  Many of them started off not being

10   very religious and came around to a more Islamic

                         Page 50

MUB-00030844

6-16-04.TXT

11    orientation.  They were followers and great fans of the

12    Islamic revolution in Iran in 1979.

13              After President, Egyptian President Anwar

14    Sadat was assassinate in 1991, Fathi Shiqaqi was kicked

15    out of Egypt, went to Gaza and in 1981 officially

16    established the Palestinian Islamic Jihad.

17    Q    Mr. Levitt, is Palestinian Islamic Jihad known by

18    any other name or reference?

19    A    It's commonly also known, it's a literal

20    translation of the Arabic as the Islamic Jihad movement

21    in Palestine.

22    Q    Are you familiar with the reference to Palestinian

23    rejection movements?

24    A    Yes.

25    Q    What does that mean?

□

                                                          517

1     A    There are several Palestinian groups, terrorist

2     groups that reject peace with Israel, reject any type of

3     two state solution, and advocate a complete destruction

4     of Israel.  Some of those groups have softened their.

5     stance in the wake of the 1993 Oslo Accords, others have

6     not.  The Palestinian Islamic Jihad is one of those

7     groups that has not.

8                    MS. HOLLANDER:  May we approach?

9                    THE COURT:  Yes.

10                   (The following discussion was

11              conducted at the side bar, between court and

12              counsel, out of the hearing of the jurors, as

13              follows:)

14                   MS. HOLLANDER:  Your Honor, he's talking

15              now in the present.

                    Page 51

MUB-00030845

6-16-04.TXT

| 16 | THE COURT: I'm sorry. |
| 17 | MS. HOLLANDER: He's talking in the |
| 18 | present. He's talking now. And the court has |
| 19 | specifically limited this to 1994. |
| 20 | THE COURT: I think that's correct. |
| 21 | MR. MORONEY: I can reference the |
| 22 | timeframe, judge. |
| 23 | THE COURT: Well, before the time that we |
| 24 | are talking about, before '94, or up to the time, up |
| 25 | to that time, you know. |

518

| 1 | (The following proceedings were |
| 2 | conducted in open court.) |
| 3 | THE COURT: I'm going to sustain the |
| 4 | objection. And I'll instruct the jury to disregard |
| 5 | that last testimony. |
| 6 | BY MR. MORONEY: |
| 7 | Q   Mr. Levitt, when was the Palestinian Islamic Jihad |
| 8 | formed? |
| 9 | A   It was officially formed in 1981 when Fathi Shiqaqi |
| 10 | returned to Gaza. |
| 11 | Q   You mentioned Fathi Shiqaqi? Is he known by any |
| 12 | other name? |
| 13 | A   He's known as Fathi Ibrahim sometimes. He's the |
| 14 | key thinker and founder behind Islamic Jihad. |
| 15 | Q   Were there any other founders involved in the |
| 16 | formulation of the Palestinian Islamic Jihad? |
| 17 | A   His chief partner was a local preacher from Gaza |
| 18 | named Sheikh Abdel Aziz, A-B-D-E-L A-Z-I-Z, Odeh, |
| 19 | O-D-E-H.  There are other spellings. |
| 20 | Others have also been identified by scholars |

Page 52

MUB-00030846

6-16-04.TXT

21    as co-founders, people who were there as Palestinian

22    students in Egypt at the time, including Bashir Nafi.

23    Q    And what was the role of Sheikh Odeh or Odeh?

24    A    He's primarily the spiritual leader.  And together

25    with Fathi Shiqaqi was thinkers behind the groups

519

1    ideology.

2    Q    As the group was formed and focusing up to late

3    April of 1994, can you tell the jury what the goals of

4    the Palestinian Islamic Jihad were?

5    A    Well, Palestinian Islamic Jihad is bent on the

6    destruction of Israel.  It opposes any recognition of

7    Israel.  It opposes any peace deal that will relinquish,

8    in it's terminology, any part at all, any inch, a moat --

9    that term they often use of Palestine.  And to achieve

10   those goals it engages in acts of violence and murder.

11   Q    Mr. Levitt, were there attempts prior to 1994 to

12   reach a peaceful resolution of the Israeli Palestinian

13   situation?

14   A    There were two; the first in the wake of the first

15   Gulf War came out of the Madrid Peace Conference.  And

16   the United States hosted negotiations in Washington at

17   the State Department between Israel and its neighbors,

18   including Palestinians, who were part of the Jordanian

19   delegation.

20            And then the Oslo Process of 1993, in which

21   Israelis and Palestinians negotiated the on their own,

22   simultaneous, while these other negotiations were going

23   on in Washington, started a much more rigorous peace

24   process.

25   Q    Did the leaders of the PIJ oppose those processes?

Page 53

MUB-00030847

6-16-04.TXT

520

1   A      Yes.

2   Q      I asked you about the goals of the PIJ.  What means

3   were used by them to achieve those goals?

4              THE COURT:  Set a time frame.

5   BY MR. MORONEY:

6   Q      Prior to -- from the formation or inception up to

7   1994?

8   A      Islamic Jihad is one of the most violent of the

9   Palestinian groups.  It engaged in a series of attacks,

10  murders, shooting attacks, stabbing attacks, attacks with

11  a pitchfork, attacks on Israeli soldiers, attacks on

12  Israeli civilians.  One of sort of attack is mentioned

13  several times on the videos I reviewed, killed two

14  elderly Israeli civilians from Jerusalem, for example.

15  Q      What attack was that?  Is referenced on the tape?

16  A      May I reference a note?  I just want to be

17  accurate?

18  Q      Yes.

19  A      This would be the May 3rd, 1989 attack by Nadul

20  Zalloum.  Nadul Zalloum is mentioned by name several

21  times on these tapes.

22  Q      Any other attacks for which, prior to 1994, for

23  which PIJ members claim responsibility?

24  A      There were a series.  In particular, an Islamic

25  Jihad operative by the name of Mesbah Al-Souri, who is

521

1   also mentioned by name on these tapes, led a prison

2   escape in May of 1987.  That led to approximately five

3   months of Islamic Jihad attacks by him and his cohorts

Page 54

MUB-00030848

6-16-04.TXT
4   who escaped with him.  Including a very famous

5   confrontation with Israeli forces in Gaza, which is

6   commonly referred to the al-Shuja'iyyah Battle named

7   for the neighborhood in Gaza where it took place.

8           At least one Israeli officer was killed.

9   Three of the escapees were killed, two others escaped to

10  Egypt.

11          There are a series of other attacks.

12  Probably the most important to note would be the October,

13  1986 Gate of Moors operation, as it's called, where --

14  Q     What was that?

15  A     That was an attack in Jerusalem at the western wall

16  at a graduation ceremony for Israeli soldiers where

17  Islamic Jihad operatives through grenades at the crowd

18  wounding, I think it was, some 70 people and killing the

19  father of one of the conscripts.

20  Q     Do you recall references in the tapes you reviewed

21  to the hijacking or seizure of a bus?

22  A     Yes, that was in July, 1989.  Sometimes it's

23  referred to as Al-Qastall attack.  Al-Qastall was a

24  fortress, an ancient fortress on the Jerusalem Tel Aviv

25  Highway, not far from where this occurred.  Somewhere

0

                                                        522

1   between 14 and 20 people were killed, many, many more

2   were injured.  They received a tremendous amount of press

3   at the time.  People burned alive on the bus.  And the

4   Islamic Jihad operative commandeered the bus and drove it

5   off the highway into a ravine.

6   Q     Mr. Levitt, are you familiar with, again focusing

7   prior to 1994, with how the PIJ was financed?

8   A     Yes.

Page 55

MUB-00030849

6-16-04.TXT

9   Q   Can you tell the jury about that?

10  A   PIJ received a good deal of funding from Iran. And

11  enjoyed safe haven in the form of a headquarters in

12  Damascus. Fathi Shiqaqi who had gone, was kicked out of

13  Egypt and went to Gaza and founded Islamic Jihad in '81,

14  was subsequently arrested and deported. He then set up

15  shop in Damascus. So the group received some support for

16  Damascus as well.

17          The group would also -- also benefited from

18  fund raisers, including fund raisers here in the United

19  States, by supporters who set up groups, whose function

20  was to raise money for Palestinian Islamic Jihad.

21  Q   Let me ask you; are you familiar with an individual

22  by the name of Ramadan Abdullah Shallah?

23  A   Yes.

24  Q   who is that?

25  A   Ramadan Shallah is the Secretary General, the

523

1   world- wide leader of Palestinian Islamic Jihad.

2          Prior to that, he had lived in Tampa, Florida

3   where he was affiliated with two organizations that have

4   now widely been reported to have been servicing as front

5   organizations for Islamic Jihad, WISE, W-I-S-E, and the

6   ICP.

7   Q   You had testified earlier about Fathi Shiqaqi?

8   A   Yes.

9   Q   what happened to him?

10  A   Fathi Shiqaqi was assassinated in Malta. And

11  immediately following his assassination Ramadan Shallah

12  appeared in Damascus as the new leader.

13  Q   Focusing on the period of time though prior to

Page 56

6-16-04.TXT
14   April of 1994, was Ramadan Shallah involved in the

15   operations of PIJ?

16   A    Yes, Ramadan Shallah, for example appears on one of

17   the videotapes that I reviewed at a conference here in

18   the United States which PIJ supporters are present and

19   are raising funds for the organization.

20   Q    Do you recognize, or do you know of an individual

21   by the name of Sami Al-Arian?

22   A    Yes.

23   Q    And who is he?

24   A    Sami Al-Arian was in Tampa, Florida. He is the

25   head, the President of ICP and was the head and founder

524

1    as well of WISE.

2    Q    And did you also see him on the videotapes that you

3    reviewed?

4    A    Many times.

5    Q    And you mentioned the organization known as ICP.

6    What was that?

7    A    Originally, originally named Islamic Concern

8    Project, subsequently renamed Islamic Community for

9    Palestine.

10           ICP had held fundraisers and various types of

11   events and conferences at which dignitaries from Islamic

12   Jihad, like Bashir Nafi or one of the founders, Sheikh

13   Odeh, would be present as speakers and at which they

14   would raise funds, specifically for Palestinian Islamic

15   Jihad.

16   Q    Under the name of ICP?

17   A    Yes. In two different instances Mr. Damrah says

18   the ICP is the name of Palestinian Islamic Jihad in the

Page 57

MUB-00030851

6-16-04.TXT
19  United States.  In one instance he says it outright.  And
20  I believe it is the same tape a little bit later on he
21  says, and I'm paraphrasing, I can look it up from the
22  transcript if you like, but what he says is let me be
23  frank, donate to Palestinian Islamic Jihad.
24          Two sentences later or so he says you can
25  make your checks out to the ICP.

525

1                    MR. MORONEY:  One second, your Honor.
2   Q    Mr. Levitt, are you familiar with the process
3   relating to terrorist organizations known as Designation?
4   A    I am.
5   Q    And can you tell the jury what Designation means in
6   the context of terrorist organizations?
7   A    Designation means that the government or
8   international body, whether it's the UN or the government
9   such as the United States Government or Canada,
10  Australia, will, based on information available to it,
11  it's own information or information that has been made
12  available to it, decide that an individual or a group is
13  in fact a group engaged terrorism, and will designate,
14  will list it on a list of terrorist organizations or
15  entities so that it can include groups or front
16  organizations or individuals.
17          What it usually involves is banning any type
18  of financial transaction with those entities, often
19  freezing the funds of those entities.  If it's the UN
20  list it often involves restriction on travel
21  internationally.
22  Q    Is there a process of designation used by the
23  United States Treasure Department?

Page 58

MUB-00030852

6-16-04.TXT
24  A    There is.

25  Q    And what can you tell them about that?

526

1   A    That's called the Specially Designated Global
2   Terrorism Entity List.  It is one of the lists the U.S.
3   Government has.  To be included on that list means that
4   your assets are frozen, and it is forbidden, it is
5   illegal to engage in any financial dealings with that
6   entity.

7   Q    And is there also a State Department designation
8   process?

9   A    There is.

10  Q    What is that?

11  A    That is an earlier process.  It's called the
12  Foreign Terrorist Organizations List or FTO list.  To be
13  included on that list it means that, very similarly, the
14  group or the individual has been determined to be a
15  terrorist organization and banned from doing any type of
16  business with it.

17  Q    This process of designation, it involves facts
18  preceding the designation?

19  A    Yes, it has to involve facts that preceded the
20  designation to that point.

21  Q    And if you know, are these designations pronounced
22  by executive order?

23  A    They are pronounced by executive order; they are
24  listed in the Federal Registry.

25  Q    Do you know, under this designation process, if the

527

1   Palestinian Islamic Jihad has been designated?

2                MS. HOLLANDER:  Your Honor, we are going
                         Page 59

MUB-00030853

6-16-04.TXT

3          to object, based on previous objections.

4                    THE COURT:  And I'll overrule the

5          objection.

6                    THE WITNESS:  I'm sorry, can I answer?

7                    THE COURT:  Go ahead and answer.

8                    THE WITNESS:  Yes.  Palestinian Islamic

9          Jihad appears on both of those lists.

10    BY MR. MORONEY:

11    Q     Let me direct your attention to January of 1995.

12    Was there a designation of the PIJ?

13    A     Yes.  That was the original inception of the State

14    Department's FTO, Foreign Terrorist Organization List,

15    and PIJ was then designated.  PIJ meaning Palestinian

16    Islamic Jihad.

17                    MR. MORONEY:  One second, your Honor.

18                    Your Honor, that concludes the part of the

19          presentation before the tapes.

20                    THE COURT:  We'll take a brief recess.  We

21          are going to get some equipment set up and we'll

22          continue the examination in about ten or so minutes.

23          So we'll adjourn until 5 after ten o'clock.

24                    Same rules continue to apply.  Don't talk

25          about the case amongst yourselves or with anyone

□

                                                          528

1          else.  Be back in the jury room in about ten minutes

2          and we'll reconvene.

3                         (Brief recess)

4                    THE COURT:  What's the grounds for the

5          objection?

6                    MR. CLINE:  -- We object on the basis that

7          the government has not laid a foundation to

                              Page 60

6-16-04.TXT

8      authenticate the tapes.  The cases generally say,

9      and I'll refer to the stem case I found for

10     authenticating cases, United States versus Taylor,

11     530 F.2d 639, from the Fifth Circuit, 1976.

12            .I have another case, a more recent case is

13     United States versus Stephens, it's 202 F.Supp.2d

14     1361 from the District Court for the Northern

15     District of Georgia.  That case was reversed in

16     part, but on other grounds.

17            THE COURT:  What's the citation again?

18            MR. CLINE:  202 F.Supp.2d 1361.  The

19     cases, as I say, as I read them, your Honor, there

20     are two different general ways to authenticate a

21     videotape.

22            One is to have someone present for the

23     event.  Say I was there, I've seen the videotape,

24     and the videotape fairly and accurately depicts what

25     happens.

0

529

1      The other is what one calls the silent

2      witness approach.  Where you don't have somebody who

3      is present, but you have somebody who can come in

4      and say, the camera was running that day, it was

5      operating correctly at the conclusion of the

6      videotaping.  We retrieved the film from the camera,

7      it was maintained an in an in tact form, it wasn't

8      altered, and so on.

9            And if the proponent of the evidence can

10     lay that sort of foundation, that is generally

11     considered to be suitable authentication as well,

12     even if you don't have somebody who was actually
                        Page 61

MUB-00030855

6-16-04.TXT

13      there at the event who can say it fairly and
14      accurately depicts it.
15              Here we don't have either one of those
16      things.  No one has appeared and testified
17      concerning being at these events and saying these
18      are accurate depictions; and no one has testified
19      about the operation of the camera, how it was done,
20      that it was running continuously, that it is
21      reliable.
22              Nor is there any evidence at all about the
23      custody of these things up until the FBI seized them
24      in 1995.  From that point on we have no dispute, but
25      before that there is no evidence at all about

530

1      whether they were preserved or tampered with.
2              And so I'm going to ask if your Honor
3      would allow Mr. Zuckerman, who reviewed with an eye
4      to these, some of the indicia on the tapes, they may
5      not be in their original form.
6              MR. ZUCKERMAN:  Thank you, your Honor.
7              Your Honor, I've had the opportunity to
8      laboriously review the videotapes, and each copy of
9      each subsequent DVD.  And from my view of the
10      original videos, your Honor, it appears many of
11      these have been edited and altered in some way or
12      another.  By whom we don't know.
13              Particularly Government's Exhibit 6.  It
14      appears edited.  There are times when there is
15      sound, no speakers, we don't know when it began,
16      when it ended, it's just video that was taken.  At
17      some point in time there are stops in some of the
                        Page 62

MUB-00030856

6-16-04.TXT

18    video.  It appears to have been edited.

19              Seven, Government's Exhibit 7, it appears

20    is edited.  It also, again, there are parts of it

21    that do not contain the whole video, and thus we

22    don't know what, if anything, was put in it, if

23    anything was deleted from it.  We don't know what

24    form it's in now as opposed to what it was in when

25    it was allegedly videoed.

531

1              Exhibit 8, it doesn't start at the

2     beginning.  So while we don't know what the

3     beginning is, it just starts at some point in time.

4     It appears mid-stream.  So again, we don't know what

5     happened before this began.

6              And Exhibit 9, it absolutely appears

7     edited at the beginning, because there was a sound

8     track added.  There were all these posters added.

9     It was clearly edited before the government even

10    came in possession of it.  We don't know who edited

11    it, when it was edited, how it was edited.

12             So the evidence in and of itself shows

13    that a proper foundation can't be made as to

14    authenticity of these videos.

15             MS. KRIGSMAN:  Your Honor, the

16    government's position is that the videotapes are

17    authenticated through the circumstantial evidence

18    pertaining to their content and their seizure.  I

19    would direct your Honor specifically to Federal Rule

20    of Evidence 901(b)(4) which says that, that's the

21    rule of authentication, and it says the appearance,

22    contents, substance, internal patterns or other

Page 63

MUB-00030857

6-16-04.TXT

23    distinctive characteristics, taken in conjunction
24    with other circumstances may be considered when
25    determining the authenticity of the document.

532

1    There is also a Sixth Circuit case which
2    relates to authenticating a document.  But in a
3    similar manner, that's United States versus Jones
4    107 F.3d 1147.

5    There is also a first circuit case, United
6    States versus Newton, 891 F.2d 944.  That's First
7    Circuit 1989.  And in that case the court concluded
8    that a document which contains a statement from the
9    witness, it can be inferred that the defendant
10    authored the document was properly authenticated.

11    Your Honor in this case, the following
12    factors corroborate the authenticity of the tapes.

13    First of all, the defendant has stipulated
14    to the fact that these items were seized from the
15    home or the office of Sami Al-Arian.  There has been
16    abundant evidence in this cases showing a connection
17    between Sami Al-Arian, the defendant, and the PIJ
18    and the ICP.  There is no issue with respect to
19    chain of custody from Tampa to Cleveland.

20    We have evidence that was adduced
21    yesterday during, I can't remember which law
22    enforcement officer it was, but one of Fawaz
23    Damrah's admissions to a law enforcement officer was
24    that he did not participate in fundraising
25    activities with Sami Al-Arian after 1994.  And he

533

Page 64

MUB-00030858

6-16-04.TXT

1    was also questioned specifically about the occasions

2    when he attended fundraising events in Cleveland in

3    1991.  And he did not deny these.

4            In fact, in one interview with law

5    enforcement officers he admitted that he used a

6    reference to ICP and PIJ back in 1991 to work up the

7    crowd.

8            He admitted going to a conference in

9    Chicago to Agent Napoli and, your Honor, the texts

10   themselves, the language itself and the tapes serves

11   to authenticate the time period which the speakers

12   are referring to.

13           The tapes repeatedly refer to the first

14   Intifada, the first Gulf War, the first anniversary

15   of Intifada.  There are time stamps on the tapes,

16   and many posters and banners, your Honor, which are

17   seen being placed in the same physical location with

18   the speakers.  Sometimes in the front of the dais,

19   sometimes behind the speakers.

20           And, your Honor, finally, there is no

21   allegation that the individuals on these tapes are

22   actors, or that these events were somehow concocted.

23           Therefore, your Honor, I would argue that

24   the totality of the circumstantial evidence

25   authenticates the tapes sufficiently for them to

                                                   534

1    reach the jury.  And the defendant can argue the

2    weight.

3            THE COURT:  I will allow them.

4    Specifically, I think they are largely themselves

5    self-authenticating, and also to a degree

                        Page 65

MUB-00030859

6-16-04.TXT

6    corroborated by some of the other things that

7    counsel for the government's referred to.

8         Beyond that, the Rule 901 called for a

9    flexible approach.  And I think in terms of

10   authentication it's true.  In this case the

11   description leads me to believe that it is largely

12   authentic, even if there may be some portions of it

13   that may not have been maintained in the original

14   condition.  I think that goes to weight.  And you

15   can also offer evidence that there were things said

16   at the conference that are not repeated on the tape.

17        So I think the important question then is

18   whether or not the tapes themselves accurately

19   reflect the portions of the event that are reflected

20   in them.  And I think there is sufficient evidence

21   to support that.

22        Actually, I also find that the Stephens

23   case you cited to use is one in which the court

24   found that an undercover tape itself.

25             MR. CLINE:  Actually, both cases I cited

535

1    found that the tapes were admissible.

2             THE COURT:  But in any case, I'll allow

3    the tapes.

4             MR. MORONEY:  Your Honor, if we hand out

5    transcripts to the jurors because of the scrolling,

6    the translation appears on the tapes.  My only

7    concern would be as they are following on the

8    screens if anybody has any difficulty.

9             THE COURT:  Difficulty doing what?

10            MR. MORONEY:  Reading or following.

Page 66

MUB-00030860

6-16-04.TXT

11          THE COURT:  I'm not sure how it will show

12     up on the screen.  I suspect they will be able to

13     see them.

14          MS. KRIGSMAN:  Just for clarity, we've

15     already introduced the original videotapes.  I don't

16     think there is any dispute by the defense that the

17     DVDs reflect excerpts that were on the original

18     videotapes.

19          Could we have Mr. Moroney refer back to

20     the video that the DVD was taken from?

21          MR. CLINE:  We don't have any problem with

22     that.

23          THE COURT:  Could the attorneys approach

24     for a second.  There has been a motion to separate

25     witnesses.  Is your expert present?

                                                    536

1          MS. HOLLANDER:  We have discussed this

2     with the prosecution.  We have agreed the experts

3     can listen to each other.

4          MR. MORONEY:  Yes.

5          THE COURT:  I just wanted to make a note

6     of that.

7          (The jurors were returned to the

8      courtroom and the following proceedings

9      were conducted in open court, as follows:)

10          THE COURT:  If the jury will take their

11     seat, and everyone else.

12          I'll ask the examination continue.

13          MS. KRIGSMAN:  Your Honor, may we

14     approach.

15          (The following discussion was

Page 67

6-16-04.TXT

16    conducted at the side bar, between court and

17    counsel, out of the hearing of the jurors, as

18    follows:)

19        MS. KRIGSMAN:  I didn't want you to think

20    we were trying to pull a fast one.  We went ahead

21    and used the names of the titles from the labels at

22    the beginning of the tapes.  So if your Honor -- I

23    just wanted to advise your Honor you can instruct

24    the jury to disregard.

25        MS. HOLLANDER:  It's hearsay.

537

1        THE COURT:  Can't he scroll beyond them?

2        MR. MORONEY:  The title?  I think he can.

3        THE COURT:  Instruct him to do that before

4    he puts it up.

5        (The following proceedings were

6        conducted in open court.)

7        MR. MORONEY:  Your Honor, at this time the

8    United States is prepared to play Exhibit Number 8-6

9    which is the DVD version of the videotape marked

10    8-1.  I would ask the court --

11        THE COURT:  Go ahead and proceed.

12        (At this point in the trial the

13        videotape was played in open court.)

14    BY MR. MORONEY:

15    Q    Mr. Levitt, I believe you had testified about the

16    reference to ICP for security purposes?

17    A    Yes.

18    Q    Okay.  And have you considered what -- first of

19    all, what is your view of the reference to security

20    purposes in that portion of the tape?  What is it

Page 68

MUB-00030862

6-16-04.TXT

21   showing?

22   A      It demonstrates that people are cognizant of the

23   fact that the group is involved in things that require

24   people to be quiet about it.  By this point, the

25   Palestinian Islamic Jihad had carried out several attacks

538

1    and murders.  It had been, since 1989, listed as a major

2    terrorist group in the patterns of global terrorism.

3    Supporting that group was something that people

4    apparently believed had to be kept secret.

5                 (The playing of the tape continued.)

6    BY MR. MORONEY:

7    Q      Mr. Levitt, in the immediately preceding references

8    there was a statement about the beginning of the

9    Intifada.  What is that?

10   A      The Intifada was the popular revolt that most

11   people, dates the beginning of December of 1987.

12   Palestinian Islamic Jihad prefers to date the slightly

13   earlier to October, October 6th, 1987, what's frequently

14   referred to as the al-Shuja'iyyah battle in the Gaza

15   neighborhood which it took place, which Sami Al-Arian

16   here referenced.  This battle of Israeli forces which

17   three of these prison escapees were killed, two others

18   escaped.  The Palestinian Islamic Jihad believes that

19   this battle, this heroic battle, as they described it,

20   was what ignited, what subsequently became as the

21   Intifada; it sparked the revolve.

22   Q      There was also a reference to Mesbah Al-Souri?

23   A      Yes.  Mesbah Al-Souri, as I mentioned earlier, was

24   arrested several months after this Gate of Moors

25   operation, the great attack on Jerusalem.  And that was

Page 69

MUB-00030863

6-16-04.TXT

539

1   in December, 1986. And then in May of 1987 he led this
2   prison escape of six Islamic Jihad members, who proceeded
3   to conduct a series of attacks and murders; one of which
4   is referenced here the killing of an Israeli commander in
5   Gaza. They don't give a date here.

6           It appears to be reference to the August 2nd,
7   1987 attack on Run Tau.

8           And then on October 1st, 1987, Mesbah
9   al-Souri was killed in another confrontation with Israeli
10  soldiers just a few days before this al-Shuja'iyyah
11  battle that they reference.

12  Q   And there was also a reference to they hunted down
13  the settlers. What was that?

14  A   As is mentioned in several points in the tape, and
15  as I just said, after the prison escape this cell led
16  several attacks. I don't know which specific attacks
17  they are referring to here, whether they are referring to
18  attacks on the settlers, meaning Israelis who live in the
19  West Bank of Gaza in settlements there. They may not be
20  soldiers, they may be civilians, but they are living on
21  this disputed occupied territory.

22  Q   Thank you.

23           (The tape continued to be played.)

24  Q   Mr. Levitt, there was a reference, actually at page
25  9 of the transcript -- I'm sorry, at the bottom of page

540

1   10, where Fawaz Damrah, or Abu Damrah is stating,
2   "whoever equipped a raider for the sake of God has
3   himself raided."

4           What is that a reference to?
                    Page 70

MUB-00030864

6-16-04.TXT

5    A    This is quoting a saying of the profit Mohammed.

6    And as it's explained, whoever donates money for one who

7    engages in these acts of violence, it is as if he or she

8    himself --

9              MS. HOLLANDER:  Objection.

10              THE COURT:  Sustained.  Disregard the last

11        portion.

12    BY MR. MORONEY:

13    Q    Are you familiar with the concept of economic

14    Jihad?

15    A    Yes, this is a term that is used to explain this

16    idea whereby one is told that if one cannot engage in

17    these acts one's self, one can fund them and one is given

18    the credit as if one has actually committed these acts

19    themselves.

20    Q    And then proceeding to the next page, Mr. Levitt.

21    The reference to Nidal Zalloum of the Islamic Jihad.

22    A    This is the same Nidal Zalloum that I referenced

23    earlier who stabbed two elderly Israelis in Jerusalem

24    stabbing them and killing then them and wounding several

25    more.  That was in May, 1989.

541

1    Q    And the reference right there after that Mujahid

2    who took the bus and killed more than 20 Jews, he is from

3    Islamic Jihad.  What is that a reference to?

4    A    Also, one of the attacks I referenced earlier, the

5    July 6th, 1989 derailing of a bus on the Tel Aviv

6    Jerusalem Highway, this is the same one that is sometimes

7    referred to as the Al-Qastall attack.

8              (The playing of the video continued.)

9    BY MR. MORONEY:

Page 71

MUB-00030865

6-16-04.TXT

10  Q    Mr. Levitt, there were references in several points
11  in that tape to Palestine from the sea to the river?
12  A    Yes.
13  Q    What does that mean?
14  A    That is a reference to old historic Palestine,
15  meaning the area that is now Israeli the West Bank and
16  Gaza. As I mentioned earlier, the Palestinian Islamic
17  Jihad movement does not believe in the two state
18  solution, it believes in a sole Palestinian state from
19  the Jordan River along the border of the state of Jordan
20  to the Mediterranean state.
21  Q    And there were also numerous references in the
22  fundraising to sponsoring or fence?
23  A    Yes.
24  Q    What is that a reference to?
25  A    The reference is to -- one of the meanings used to

542

1   raise funds is to sponsor the orphans of people who have
2   been killed in fighting, people who are children of
3   detainees, people who are in jail, people who have been
4   deported. As is mentioned in some of the other tapes, I
5   think specifically for instance regarding Nadul Zalloum,
6   this is a means of recruiting further people for acts of
7   violence by telling them that their children will be
8   taken care of.
9              MS. HOLLANDER:  Objection.
10             THE COURT:  Sustained.  Disregard that
11        last portion.
12  BY MR. MORONEY:
13  Q    And the reference in several points to martyrs.
14  What is that, Mr. Levitt?

Page 72

MUB-00030866

6-16-04.TXT

15    A    Martyrs meaning people who died for the cause.

16              MS. HOLLANDER:  I'm going to object.

17              THE COURT:  Sustained.  How could he know

18        what someone else means when they use the word

19        martyrs.

20    BY MR. MORONEY:

21    Q    Does it have a frame of reference in the context of

22    fundraising for an organization like the Palestinian

23    Islamic Jihad?

24              THE COURT:  I don't think he can testify

25        to what somebody else intended who used that phrase.

                                                      543

1        I think it embodies a number of possibilities.

2              So I'll sustain the objection.

3              MR. MORONEY:  Your Honor, may we approach?

4              THE COURT:  Yes.

5              (The following discussion was

6        conducted at the side bar, between court and

7        counsel, out of the hearing of the jurors, as

8        follows:)

9              MR. MORONEY:  Judge, we have a very short

10        tape, and then there are three more.  They are not

11        as long as the first one.  But --

12              THE COURT:  Why don't we do one of the

13        short ones now.

14              MS. KRIGSMAN:  This one is literally five

15        minutes.  We may get two.

16              THE COURT:  If I had my druthers, I would

17        break around noon.  I would rather break between

18        tapes rather than have a real long one and start.

19              MS. KRIGSMAN:  I think this one might be

                      Page 73

MUB-00030867

6-16-04.TXT

20        right around 30, 40 minutes.  The second one.

21                THE COURT:  34 minutes.

22        MS. KRIGSMAN:  30 to 40, I think.

23                THE COURT:  Okay.

24                (The following proceedings were

25        conducted in open court.)

544

1                MR. MORONEY:  At this time the United

2         States would like to play Exhibit 7-6, which is a

3         DVD version of the original tape 7-1.

4                THE COURT:  Get it to the point where you

5         want to cue it up.  There had been some discussion

6         about it before.

7                Can you see anything on your screens?

8                THE JURORS:  No.

9                THE COURT:  Can you see it now?

10               THE JURORS:  Yes.

11               (The tape was played in open court.)

12               THE COURT:  Mr. Levitt, just briefly.  Who

13        is that individual, Mr. Levitt?

14               THE WITNESS:  Thanks Sheikh Abdelaziz

15        Odeh.

16               THE COURT:  A spiritual leader?

17               THE WITNESS:  Spiritual leader and one of

18        the founders of Palestinian Islamic Jihad.

19               (The playing of the tape continued.)

20               MR. MORONEY:  Your Honor, we'll cut the

21        tape at that point.

22               THE COURT:  Okay.  We are going to take

23        the lunch time recess at this time.  We'll stand

24        adjourned until quarter 'til 1:00 o'clock.

                         Page 74

6-16-04.TXT

         25              Same rules will apply.  Don't talk about

                                                          545

          1      the case, don't form any opinions or express any.

          2      And again, leave the pads face down.

          3              We'll stand adjourned until that time.

          4                  (Luncheon recess.)

          5                      - - -

          6      WEDNESDAY AFTERNOON SESSION - JUNE 16, 2004

          7              THE COURT:  I'll ask the jury to take

          8      their seats.  And I'll ask Mr. Moroney to continue

          9      the examination.

         10              Are your monitors on?

         11              JURORS:  No.

         12              THE COURT:  If you are ready to proceed,

         13      let's begin.

         14              MR. MORONEY:  Your Honor, at this time,

         15      the United States would like to play Exhibit 6-6

         16      which is the DVD version of the original tape 6-2.

         17              THE COURT:  Is yours on now?  It is now.

         18              Can you see anything on yours?

         19              JURORS:  No.

         20              THE COURT:  How about now?

         21              JURORS:  Yes.

         22              (At this point in the proceedings the tape

         23      was played in open court.)

         24      BY MR. MORONEY:

         25      Q    Mr. Levitt, you previously testified about Sheik

                                                          546

          1      Abdelaziz Odeh?

          2      A    Yes.

                              Page 75

MUB-00030869

6-16-04.TXT

3  Q    Now who is Bashir Nafi?

4  A    Bashir Nafi is one of the founders of the

5  Palestinian Islamic Jihad, and is a speaker at the event

6  that put on this video.

7  Q    And you also previously testified about Al-Arian?

8  A    Right.

9              MR. MORONEY:  Your Honor to move things

10        along, if we may, I would like to fast forward this

11        tape to a later point.

12              THE COURT:  There is no objection, I

13        assume.

14              MR. CLINE:  No objection.

15              THE COURT:  Go ahead.

16              (At this point in the proceedings the

17             tape was played in open court.)

18              MR. MORONEY:  Your Honor, at this time the

19        United States would like to play Government's

20        Exhibit 5-4, which is a DVD version of the original

21        tape 5-2.

22              (At this point in the proceedings the

23             tape was played in open court.)

24  BY MR. MORONEY:

25  Q    Mr. Levitt, can you identify the taller individual,

547

1  white shirt, tie, glasses, in this picture?

2  A    Yes.  That is Ramadan Abdullah Shallah, the current

3  Secretary General, worldwide leader of

4  Palestinian Islamic Jihad.

5              MS. HOLLANDER:  Objection.

6              THE COURT:  Sustained.  Disregard the last

7        question and his response.

Page 76

MUB-00030870

6-16-04.TXT

8   BY MR. MORONEY:

9   Q    Was it sit your testimony that Ramadan Abdullah

10  Shallah was involved with the PIJ before 1994?

11  A    He was.  He was involved with ICP, Sami Al-Arian,

12  and with the WISE institute as well.

13  Q    In Tampa, Florida?

14  A    In Tampa, Florida.

15              (At this point in the proceedings the

16              tape was played in open court.)

17              MR. MORONEY:  Your Honor, at this time the

18       United States would like to play Exhibit 9-5, which

19       is a DVD version of the original tape 9-1.

20              Your Honor, I would ask the technician to

21       fast forward through part of this.

22              (At this point in the proceedings, the

23              tape was played in open court.)

24  BY MR. MORONEY:

25  Q    Mr. Levitt, we've just gone through several posters

548

1   that appear on the tape --

2              MS. HOLLANDER:  Objection, your Honor.

3              THE COURT:  What grounds?

4              MS. HOLLANDER:  May we approach?

5              THE COURT:  You can approach but I'm not

6       sure I understand why.

7              (The following discussion was

8              conducted at the bench, between court and

9              counsel, and outside the hearing of the

10             jurors.)

11             THE COURT:  What's the objection?

12             MS. HOLLANDER:  It is my understanding the

Page 77

MUB-00030871

MUB-00030872

6-16-04.TXT

13      jury was not able to see what was going on.

14              THE COURT:  They were seeing.

15              MS. HOLLANDER:  They were seeing it.

16              THE COURT:  The tape will be offered a

17      evidence.  They can choose whatever portions they

18      want to play.  If the tape is admitted they can look

19      at whatever they want in the jury room.

20              MS. HOLLANDER:  They said they were fast

21      forwarding the tape.  I didn't know the jury was

22      watching.

23              THE COURT:  They can presumptively, if the

24      tape is admitted, they can look at the whole thing

25      back in the jury box.

                                                    549

1               MS. HOLLANDER:  That raises another issue.

2       There were parts of the tape that weren't admitted.

3               THE COURT:  We'll black that part out.

4               MS. KRIGSMAN:  And we are getting DVDs

5       made without the title to go back to the jury room.

6               (The following proceedings were

7               conducted in open court.)

8       BY MR. MORONEY:

9       Q     Mr. Levitt, one of the posters appearing on the

10      tape states the cry of Al Aqsa, no reconciliation, no

11      negotiation, no recognition, Israel to extinction.

12              Do you recognize that?

13      A     That, as we mentioned earlier, is the ideology of

14      Palestinian Islamic Jihad, fighting Israel.  It does not

15      see any place for Israel, not a two state resolution.

16      There is no room for negotiation.  It is relative

17      extinction.

                        Page 78

MUB-00030873

6-16-04.TXT
18  Q    And the poster description is up on the screen at
19  this point?
20  A    Yes.
21  Q    What is this in reference to?
22  A    Well, this is a poster of individuals who have been
23  killed in the --
24            MS. HOLLANDER:  I'm going to object, your
25        Honor.

                                                    550

1             THE COURT:  Let me ask the attorneys to
2         come quickly.
3             (The following discussion was conducted at
4         the bench, between court and counsel and out of the
5         hearing of the jurors.)
6             THE COURT:  I don't see what the question
7         is with the defendant.  That's the question I have.
8         They have got this tape, I haven't seen him
9         appearing in it or making statements in it, and even
10        if he later testifies in it, what's the relevance of
11        the earlier part, unless there is some showing that
12        he assembled it.
13            MS. KRIGSMAN:  Your Honor, these posters
14        are the posters that line the walls of the
15        auditorium.  And you are going to see Fawaz Damrah
16        walk into the auditorium.
17            THE COURT:  I still think this part is
18        more prejudicial than probative.
19            If I walk through a hallway with posters
20        on the wall --
21            MS. KRIGSMAN:  These are the posters that
22        are hanging along the walls of the auditorium where
                          Page 79

MUB-00030874

6-16-04.TXT
23    they are hosting the event.  Fawaz Damrah comes in
24    the auditory with Sheikh Odeh and Sami Al-Arian.
25    The three of them are the leaders.

551

1         THE COURT:  Do you have a foundation that
2    he put the posters on the wall or that he organized
3    the conference such that he had control over the
4    posters on the wall?
5         MS. KRIGSMAN:  No.  Just that he is one
6    the three leaders shown during the meeting.
7         THE COURT:  Okay.  Well, I think you need
8    to go and when the tape's admitted, I think you need
9    to get to the part where he's speaking or he's
10   physically present when somebody else is speaking.
11        I don't think the posters are helpful and
12   I think the testimony hasn't been helpful with
13   regard to, you know, whether he was joining or
14   contributing.
15        MS. KRIGSMAN:  If we can have a second to
16   fast forward to the part where he walks into the
17   auditorium.
18        THE COURT:  Okay.
19        (The following proceedings were conducted
20   in open court.)
21        THE COURT:  I'm going to instruct you to
22   disregard the testimony with regard to what the
23   posters dealt with.
24        (At this point in the proceedings the
25        tape was played in open court.)

552

1         THE COURT:  You want to stop that?  Is
Page 80

MUB-00030875

6-16-04.TXT

2       this the part?

3                   MS. KRIGSMAN:  We are just going to back

4       it up a little bit, your Honor.

5                   THE COURT:  It should be on that.

6                   (At this point in the proceedings the

7                   tape was played in open court.)

8   BY MR. MORONEY:

9   Q    Mr. Levitt, do you recognize the three individuals

10  who are proceeding in?

11  A    These are Sheikh Odeh, first in line; Sami Al-Arian

12  second; and Mr. Damrah.

13  Q    He's third in line?

14  A    Yes.

15                  (At this point in the proceedings the

16                  tape was played in open court.)

17                  MR. MORONEY:  Your Honor, if we could fast

18      forward at this point.

19                  THE COURT:  Yes.

20                  (At this point in the proceedings the

21                  tape was played in open court.)

22  BY MR. MORONEY:

23  Q    Mr. Levitt, there was a reference on that tape, if

24  you recall it, to the effect four years ago five freedom

25  fighters escaped.

                                          553

1                   Do you know what that was in reference to?

2   A    This is the prison escape we discussed earlier

3   orchestrated by --

4                   MS. HOLLANDER:  Your Honor, I'm going to

5       object.  This has been testified to earlier.

6                   THE COURT:  I think he's already testified

                            Page 81

6-16-04.TXT

7        to it.

8    BY MR. MORONEY:

9    Q    What was the date of that incident?

10   A    May 18th, 1987.

11   Q    And there was a reference in that tape to a Fathi

12   Ibrahim.  Who was that, if you know?

13   A    Fathi Ibrahim here is Fathi Shiqaqi, who is the

14   founder of Palestinian Islamic Jihad.

15   Q    Mr. Levitt, are you familiar with an organization

16   known as Maktab al-Khidmat?

17   A    I am.

18   Q    What is that organization?

19   A    Maktab al-Khidmat was an umbrella organization, it

20   was an umbrella organization established by Sheikh Azzam

21   and a partner of his to raise funds for and recruit

22   people for the effort to expel the Soviets from

23   Afghanistan.  The Soviets were expelled in 1989, and

24   Maktab al-Khidmat continued to function.

25            In the United States, it's affiliate was the

554

1    AlKifah Refugee Center, which was previously called the

2    Afghan Services Bureau, with some 30 offices throughout

3    the United States, and this one in Brooklyn.

4    Q    After the Soviets were expelled from Afghanistan,

5    if you know, did the AlKifah Afghan Refugee Services

6    offices continue to operate?

7    A    They did.

8            MR. MORONEY:  No further questions, your

9        Honor.

10            THE COURT:  Okay.  We'll take about ten

11       minutes before the cross examination.
                    Page 82

MUB-00030877

6-16-04.TXT

12          Same rules apply.  Leave the pads face

13     down, and we'll reconvene at 25 after.

14               (Brief recess.)

15          THE COURT:  Would the jury please take

16     your seats.

17          And I'll ask Miss Hollander to make cross

18     examination.

19               CROSS EXAMINATION

20     BY MS. HOLLANDER:

21     Q    Mr. Levitt, where did you go to college?

22     A    I'm sorry, I couldn't hear you.

23     Q    Where did you go to college?

24     A    I went to Yashiba University for my BA.  Fletcher

25     School of Law and Diplomacy for my masters, and soon

555

1     Ph.D.

2     Q    And Yasheiba is in New York, is that correct?

3     A    Correct.

4     Q    New York City, Manhattan?

5     A    Correct.

6     Q    Now, Yasheiba's associated with a religious

7     denomination, correct?

8     A    It's Jewish.

9     Q    It's a Jewish school?

10     A    Yes.

11     Q    And where did you go to high school?

12     A    Maimonides School.

13     Q    Is that also a Jewish school?

14     A    Yes.

15     Q    And what is that located?

16     A    Brookline, Massachusetts.

                    Page 83

6-16-04.TXT

17  Q    You also went to school as a child in Israel,

18  correct?

19  A    Yes.

20  Q    And how old were you when you lived in Israel?

21  A    I was 9, 10.

22  Q    Did you family move to Israel?

23  A    My father's job took him there.  We were there for

24  two and a half years.

25  Q    Is Yasheiba an orthodox Jewish institution?

556

1   A    It is.

2   Q    And that's the faith you were raised in, correct?

3   A    Correct.

4   Q    And in fact, until you, some time during the time

5   you worked, went to work for the FBI, you wore a specific

6   covering on your head, correct?

7   A    Yes.

8   Q    What is that called?

9   A    A yarmulke.

10  Q    Or a keepa?

11  A    Yes.

12  Q    They both mean the same thing?

13  A    Yes.

14  Q    The purpose of that is a religious purpose, isn't

15  that right?

16  A    Yes.

17  Q    Am I correct, it's supposed to be a separation of

18  you from God?

19       Is that too simplified?

20  A    Yes.

21  Q    What does it mean?

Page 84

MUB-00030879

6-16-04.TXT

22   A    In layman's terms, really, it has no real religious

23   significance.  It is an optional thing.  It is there to

24   remind you that there is a God above you.

25   Q    Other religions have similar head covers for

557

1    similar reasons, correct?

2    A    I honestly don't know the reasons.  I presume

3    they are similar to many other religions with head

4    coverings.

5    Q    So you don't know why Muslims wear head coverings,

6    do you?

7    A    No.

8    Q    Now, you stopped wearing this yarmulke some time

9    within the last several years, correct?

10   A    Yes.

11   Q    What year was that?

12   A    I don't recall.  It was probably around 1999.

13   Q    And you stopped wearing it, didn't you, you because

14   it identified you, and when you wore it you had to jump

15   over hurdles to demonstrate your lack of bias, correct?

16   A    I decided it was a private thing.  And yes, that

17   when people saw me wearing a yarmulke they identified me

18   with things that I did not want to be identified with;

19   with positions, with opinions.

20   Q    You wanted people to get to know you first and then

21   understand about your position, correct?

22   A    I wanted people to judge me in my positions on what

23   they were, not based on anything else.

24   Q    But you didn't stop being -- you didn't change your

25   faith, did you?

Page 85

MUB-00030880

6-16-04.TXT

558

1                    MR. MORONEY:  Objection.
2                    THE COURT:  Sustained.
3                    MS. HOLLANDER:  This goes to bias.
4                    THE COURT:  I'm not sure, I'm not sure
5          what faith has to do with it.
6                        If you want to talk about Zionism you can
7          ask questions about that, but I'm not sure the
8          Jewish faith is proper.
9                    MS. HOLLANDER:  I'm sorry.
10                   THE COURT:  Go ahead.
11    BY MS. HOLLANDER:
12    Q    You also consider yourself as a Zionist, don't you?
13    A    Well, it's a loaded term.  So, if what you mean by
14    Zionist is someone who believes that Israel has a right
15    to exists, then sure.  I believe the Palestinian state
16    has a right to exists, too.
17    Q    I want to ask you a bit about Israel, because we've
18    been talking about this area and I don't think we've ever
19    identified it.
20                       I'm going to show you what's been identified
21    as Defendant's Exhibit I, and ask you just to help us
22    understand this a little bit, for the jury.
23                       This is a -- you recognize this drawing,
24    don't you?  This map?
25    A    Yes.

559

1    Q    Now, the area here --
2                    THE COURT:  You have to hit it a little
3          bit harder.
4    BY MS. HOLLANDER:

Page 86

MUB-00030881

6-16-04.TXT

5   Q    This area here that's lighter, what is that area?

6   A    That is sovereign Israel.

7   Q    And we have referred, and you've heard reference to

8   Palestine, correct?

9   A    Correct.

10  Q    And when people refer to Palestine, am I correct

11  they are referring to this area down here called the Gaza

12  Strip, correct?

13  A    Well, no, not exactly. It depends on who's

14  speaking. Some people when they speak of Palestine refer

15  to the entire area, as some people when they speak of

16  Israel refer to the entire area.

17          The most correct way to identify it as the

18  Palestinian Territories or the occupied Palestinian

19  Territories, which territories, plural, is that, yes,

20  that area which is the Gaza Strip and the West Bank over

21  there, yes.

22  Q    I was going to get to that.

23          The West Bank and the Gaza Strip are

24  primarily populated by Palestinians, correct?

25  A    Correct.

                                                    560

1   Q    But there are many -- there are many Israelis who

2   also live in those areas, correct?

3   A    There are Israeli settlements in both those areas.

4   I'm not sure of the exact numbers. It is an extreme

5   minority compared to the Palestinian population.

6   Q    It's an extreme minority in terms of numbers but

7   not in terms of land, correct?

8   A    I am not an expect in how much land the settlements

9   actually take up.

                    Page 87

MUB-00030882

6-16-04.TXT

10          It's also a politically charged issue because

11  in the various stages of the Oslo peace process.  These

12  two areas were carved up into areas A, B, and C.  One

13  meaning Israeli control completely.  The other complete

14  Palestinian control.  And one Palestinian administrative

15  control, and Israeli security control.  And those do not

16  necessarily correspond to the settlements themselves.

17  Q    But there is no doubt, is there, that there are

18  Palestinians who believe that the settlements in the Gaza

19  Strip and West Bank is taken land that belongs to them?

20  A    Would you ask the question again?

21  Q    I will.

22          You would agree with me, would you not, that

23  there are Palestinians who believe that the land that

24  the -- the land occupied by the settlers in the Gaza

25  Strip and in the West Bank, is land that the Palestinians

561

1  believe belongs to them?

2  A    Yes.  Palestinians, Israelis, or many others, some

3  consider it occupied land, some disputed land.  Sure.

4  Q    And we heard on the tape, and you discussed, that

5  there are some Palestinians who believe that Palestine

6  should be from the river to the sea.  And by that you

7  meant, did you not, this river to this sea?

8  A    Yes.  The sea is clearly marked Mediterranean Sea.

9  It's haw to hard to see the river.  But that boundary

10  line between Israel, West Bank, Israel again, and Jordan,

11  that cuts to the Dead Sea, there is a river there.

12  Q    And that's what we were talking about, from the

13  river to the sea?

14  A    Yes.

Page 88

MUB-00030883

6-16-04.TXT
15    Q    And there are certainly Jews in Israeli, and in the
16    United States, who believe that Israel should be from the
17    sea to the river, correct?
18    A    There are some, yes.
19    Q    Now, during the time period that we were talking
20    about, we saw on the tapes, I believe you mentioned there
21    were large numbers of Palestinians who had been arrested
22    and detained by the Israeli military and by the Israeli
23    police, correct?  During the Intifada?
24    A    Yes.  And by the Palestinian authorities as well.
25    Q    But there were more who were detained by the

562

1    Israelis, correct?
2    A    That's logical, but I don't know the numbers.
3    Q    You don't know how many?
4    A    No.
5    Q    But there were not Israelis, large numbers, or even
6    any Israelis of any significance who were detained by the
7    Palestinian authority, were they?
8    A    I don't think so.  Certainly not in large numbers.
9    Q    The answer is no, correct?
10    A    Correct.
11    Q    And in these disputed areas, which are known
12    generally as the Occupied Territories or as Palestine,
13    depending on one's perspective, correct?
14    A    Yeah.  Usually they are referred to as Occupied
15    Territories or the Palestinian Authority.
16            Now, that is to say, in the wake of the Oslo
17    Accords, it created the Palestinian Authority.
18    Q    Unless you happen to be Palestinian, then you would
19    consider it as Palestine, correct?

Page 89

MUB-00030884

6-16-04.TXT

20  A    Yeah, that makes sense.

21  Q    That makes sense to you, doesn't it?

22  A    Um-hum.

23  Q    And these territories, these settlements, we talk

24  about settlements, even back -- and I want to stay in the

25  framework of up through mid-1994 -- some of these are

563

1   actual cities, isn't that correct?

2   A    Yes, a small number. Most of them are fairly

3   small, there are some that are rather large, yes.

4   Q    So for people who don't know much about this, the

5   concept settlement sounds like something small but in

6   fact they are whole cities with schools, correct?

7   A    A small number of them. You can probably count

8   them on one hand. Again, I'm not an expert on the number

9   of settlements and sizes, but there are a small number

10  that are fairly large. They tend to be less far into,

11  deep into the Territories, closer to the -- the line

12  between the West Bank and Israel, commonly referred to as

13  the green line.

14          Some of them do have schools. I don't know

15  how many. I really don't know.

16              THE COURT:  What was the source of the

17      line at the West Bank dividing Israel?

18              THE WITNESS:  It was the armistice line in

19      1967.

20              THE COURT:  So after the war that's what

21      the line was?

22              THE WITNESS:  Yes.

23  BY MS. HOLLANDER:

24  Q    Are you familiar with the City of Ariel in the West

Page 90

MUB-00030885

6-16-04.TXT
25    Bank?

564

1    A    I'm familiar with the name.  I've never been there.
2    Q    And that's a settlement, isn't it?
3    A    Yes.
4    Q    And it's a full blown city, correct?
5    A    I've never been there but I know it's one of the
6    larger settlements.
7                THE COURT:  How big?
8                THE WITNESS:  I don't know.
9                THE COURT:  5,000.
10                THE WITNESS:  I don't know.
11                Sometimes you will see maps that have dots
12          and circles that are larger population, and you can
13          see plain to the eye that's one of the larger
14          settlements.
15                THE COURT:  Do you know what large means?
16                THE WITNESS:  No.
17                THE COURT:  Is it 50, or 500, or 5,000.
18                THE WITNESS:  I don't know.  This is
19          defense counsel's question.  I'm not an expert or do
20          not pretend to be on the size of the settlements.
21    BY MS. HOLLANDER:
22    Q    You say you have studied and you've actually gone
23    on field trips into the Occupied Territories, correct?
24    A    Correct.
25    Q    But you haven't really studied their relationship

565

1    to the settlements at all, have you?
2    A    I don't know what you mean by the question.
3    Relationship between what?

Page 91

MUB-00030886

6-16-04.TXT

4    Q    Well, you haven't studied -- in other words, how

5    big the settlements are, how much land they take up

6    compared to how much land the Palestinians have?

7    A    No, I've never done such a study.

8    Q    And you haven't studied, for example, how the water

9    is distributed --

10            And this is a desert, isn't it?  This area?

11    Would you agree with me that this is a desert?

12    A    It is very dry.  Gaza I think is technically a

13    desert.  Some of the West Bank is green.  Most of it is

14    semi-arid.

15    Q    So water is a significant issue, isn't it?

16    A    Yes.

17    Q    And have you ever studied how much water the

18    settlers have compared to how much water the Palestinians

19    living in the Gaza Strip have?

20                MR. MORONEY:  Objection.

21                THE COURT:  It is somewhat knowledge, and

22        I'm curious myself.

23                THE WITNESS:  Studies have been done.  My

24        area of expertise has always been --

25                THE COURT:  Do you know?  Do you know

566

1        anything about that?

2                THE WITNESS:  No.  I've read about it,

3        nothing that I can recall at hand.  But I've done no

4        research on it myself.  It's beyond my area of

5        expertise.

6    BY MS. HOLLANDER:

7    Q    You said that it's important to have firsthand

8    knowledge?

Page 92

MUB-00030887

6-16-04.TXT

9   A    Yes.

10  Q    And I think the words you used were to drink the

11  coffee?

12  A    Yes.  Rubbing elbows and drinking coffee, meaning

13  spending time.

14  Q    But you don't speak Arabic, do you?

15  A    No.

16  Q    And you don't read or write Arabic?

17  A    No.

18  Q    So whenever you travel into Palestine, if you want

19  to talk to an Arabic speaker, you have to have a

20  translator, correct?

21  A    Either I have a translator or people speak to me in

22  English.

23  Q    But you do speak Hebrew, correct?

24  A    I speak Hebrew.

25  Q    Do you read and write Hebrew?

                                                    567

1   A    I do.  I learned that in grade school.

2   Q    So your study, as you told us, of various

3   organizations is really based more on literature than

4   anything else, isn't it?

5   A    There is a lot of literature, but I've spent a lot

6   of time and money travelling and speaking to people in

7   whatever language it is.  And so I'm very proud of the

8   field research I've done.  Much of it has been in

9   Palestinian refugee camps, for example.

10         I've really made an effort to reach out to

11  all kinds of communities and to talk to people.  So as

12  much as possible, like any scholar in the social

13  sciences, certainly I rely on the written word but I also

                           Page 93

MUB-00030888

6-16-04.TXT

14    go out and do field research.

15    Q    These refugee camps are in Gaza, correct?

16    A    And in the West Bank.

17    Q    And in the West Bank, correct?

18    A    Yes.

19    Q    And these are refugee camps where people have been

20    living, some of them, since 1948, correct?

21    A    Correct.

22    Q    And they are patrolled by the Israeli military,

23    isn't that correct?

24    A    Depends what time period you are asking about.

25    Q    I want to go back to 1995.  I don't want to go

568

1    beyond 1994.  But up until that time there -- at that

2    time, there were Israeli defense forces in those areas,

3    correct?

4    A    Yes.  Until the Oslo Peace Process was started in

5    1993, started taking hold, the Israeli defense forces

6    were in control of this area.  And there were Israeli

7    forces on the ground there, yes.

8    Q    And those were soldiers, right?

9    A    Yes.

10    Q    With guns?

11    A    I presume.

12    Q    And these were the people who arrested various

13    people who ended up in detention, correct?

14    A    Some Israeli authority, either the military or

15    their police, I don't know, but some Israeli authority,

16    yes.

17    Q    And the people who lived in these, in these refugee

18    camps, some of those people before 1948, lived in cities

Page 94

MUB-00030889

6-16-04.TXT

19    in Israel, isn't that right?

20    A    Yes.

21    Q    And they lost their homes, didn't they?

22    A    Yes.

23    Q    You know how many those were, don't you?

24    A    No, I don't know the numbers but it was a large

25    number.

569

1    Q    It wouldn't surprise you if it's somewhere between

2    700,000 and a million, would it?

3    A    I really don't know the numbers.  And the numbers

4    are also politically charged, what was the number then,

5    what is the number now, and back with their descendants.

6            But there is a large number of people who

7    were displaced.

8    Q    And they were displaced from homes and from jobs,

9    correct?

10    A    Yes.

11    Q    And homes that their families had lived in for

12    sometimes generations?

13    A    In many cases.

14    Q    ·And moved into these refugee camps?

15    A    Correct.

16    Q    Where many of them remain?

17    A    Yes.

18    Q    Now, you now work for something called the

19    Washington Institute for Near East Policy, is that

20    correct?

21    A    Correct.

22    Q    Are you familiar with a newspaper called the

23    Forward?

Page 95

MUB-00030890

6-16-04.TXT

24    A    It's a Jewish newspaper, yes.

25    Q    And it's a fairly reputable newspaper, is it not?

570

1    A    Yeah, as newspaper go.

2    Q    And would you dispute the Forward if it says that

3    the organization that you work for is considered a

4    pro-Israeli think tank?

5                    MR. MORONEY:  Objection.

6                    THE COURT:  Overruled.

7                    THE WITNESS:  I would.  It's a common --

8            and this is not just in the Forward, there are many

9            newspapers who have done stories of the various

10           think tanks in washington, and ours is frequently

11           referred to as pro-Israel, some are frequently

12           referred to as pro-Palestinian or pro-Arab.

13                   I always caution people to look at the

14           work all these institues do and judge them on their

15           merits.

16    BY MS. HOLLANDER:

17    Q    Now, if the Forward, which is -- the Forward is a

18    pro-Israeli newspaper, you would agree with that, would

19    you not?

20    A    It's a Jewish newspaper.

21    Q    And it's primarily pro-Israeli in it's editorial

22    policy, isn't it?

23    A    I don't know of its editorial policies.  I've never

24    read it.

25    Q    You've read its editorials?

571

1    A    No.

Page 96

MUB-00030891

6-16-04.TXT

2  Q      Are you familiar with the American Israeli Public

3  Affairs Committee which is commonly known as AIPAC?

4  A      I am.

5  Q      And that's a pro-Israeli body, correct?

6  A      It is.

7  Q      And your institute that you work for was founded by

8  the same gentlemen who founded AIPAC, Mr. Martin Indec,

9  correct?

10  A      I don't know if Mr. Indec subsequently served as a

11  senior state department official and he is now with the

12  Brookings Institution, actually founded AIPAC or not.  I

13  know that he was at AIPAC when he then founded the

14  Washington Institute many years before I got there.  We

15  have no affiliations with him today.

16  Q      But he was affiliated with both organizations,

17  correct?

18  A      Yes.  I don't know if he maintained that

19  association simultaneously, or if he was at AIPAC and

20  then founded the Institute.  But he was once at AIPAC and

21  then founded the Washington Institute.

22  Q      And you actually worked as an intern for the

23  Consulate General of Israel, did you not?

24  A      I did.  The summer between my first and second year

25  of graduate school in Boston.

572

1  Q      What did you do for the Consulate General?

2  A      I did research on the media coverage of the Bart

3  Goldstein attacks.  This Jewish terrorist attack that I

4  described earlier that I then subsequently used as a case

5  study in my dissertation.

6  Q      Did you travel to Israel on behalf of the

Page 97

MUB-00030892

6-16-04.TXT

7  government?

8  A    Of U.S. Government?

9  Q    Of the government of Israel?

10  A    No, no. This was -- I don't think I was paid.

11  This was in-between your first and second year of

12  graduate school you are encouraged to take some type of

13  internship. Most of my friends were single and able to

14  go to Washington, or what have you. I now have four but

15  already then had two children and we had jobs over the

16  summer. So I was much more tied down to Boston and so I

17  took something locally, and frankly this is what was

18  available.

19  Q    But you were pleased to work for the Government of

20  Israel, were you not?

21  A    I wouldn't say I was pleased or displeased. I was

22  pleased there was an opportunity where I could do some

23  research but then it was useful in my longer term

24  research. It was recommended to me by several professors

25  of the Fletcher School of Law and Diplomacy.

573

1  Q    You were recently a speaker, were you not, at the

2  Washington 14 Conference in Washington, on March 21st

3  2004?

4  A    Yes.

5  Q    And that's a conference that brings together young

6  Jewish leaders from around the country, correct?

7  A    I believe so. It is organized by the Jewish

8  federation. I don't have anything, you know, to do with

9  the conference itself.

10        They put together several panels on current

11  events. And I was honored to be on the panel with a

Page 98

MUB-00030893

6-16-04.TXT

12    former CIA official, former National Security Counsel

13    official, and an Israeli who I didn't know.

14              They have a lot of impressive people.  It was

15    a good panel.

16    Q    Steve Emerson was on your panel, wasn't he?

17    A    I don't recall if he was on that panel.  I've been

18    on panels with him several times.  He may well have been.

19    Q    And the name of the panel was the Growing Terrorism

20    Network at Home and Abroad.

21              Is that what you talked about?

22    A    That sounds right.

23              Again, I speak very frequently, so I don't

24    remember if it fits that assumption.

25    Q    They pay your way to go out there?

                                                        574

1    A    It was in Washington.

2    Q    It was in Washington.

3              So they didn't have to pay any of your

4    expenses?

5    A    I had no expenses, nor was I paid.

6    Q    So it was in Washington, D.C. not Seattle,

7    Washington?

8    A    Correct.

9    Q    But you shared a dais with these other people,

10    correct?

11    A    Correct.

12    Q    And you were introduced, I take it, by someone who

13    was one of the leaders of the Washington 14 Conference?

14    A    Yeah.  I don't know who it was, but one of their

15    people.

16    Q    But then you were introduced, not as being part of

                         Page 99

6-16-04.TXT
17  the Washington 14, right?  You were introduced as being

18  who you are?

19  A    Correct.

20  Q    And among the other places that you've spoken, you

21  also spoke for the American Israel Public Affairs

22  Committee, correct?

23  A    I have.

24  Q    And at least once they actually paid for you to go

25  to Seattle, Washington, correct?

575

1   A    That's correct.

2   Q    And you sat on a -- were you on a panel or did you

3   speak alone at that one?

4   A    I spoke alone.  It was at the University of

5   Washington.

6            It was not on the subject having to do with

7   Israel, actually, which was one of my conditions to them.

8   And it was heavily attended by Jewish students and Arab

9   students alike.

10  Q    But AIPAC is a, it's a fundraising organization, is

11  it not?  It is a lobbying organization, so they raise

12  money, correct?

13  A    They are a lobbying organization.  I don't know how

14  they consider themselves, and I really wouldn't know how

15  to describe them in terms of telling you whether they are

16  or not a fundraising organization per se.

17           You know, the Jewish Federation I would

18  categorize as a fundraising organization.  They run, you

19  know, children and family services, and stuff like that.

20  They raise money.

21  Q    And they have speakers also, don't they?

Page 100

MUB-00030895

6-16-04.TXT

22  A     Correct.  As this Washington 14 Conference you

23  talked about.

24  Q     And so you spoke there.  And at some point during

25  that conference did they ask for donations?

576

1  A     No.

2  Q     But they do sometimes, don't they?

3  A     I don't know.  I don't go to these things myself.

4  I attend sometimes as a speaker, I come, I give my talk,

5  I leave.

6  Q     Now, when you spoke at AIPAC, someone from AIPAC

7  introduced you?

8  A     No, students introduced me.  It was a university

9  event.

10  Q     You don't -- you are not affiliated with AIPAC, is

11  that right?

12  A     Correct.

13  Q     Even though you spoke for them and they paid for

14  you to come, correct?

15  A     Correct.

16  Q     Do you know if -- and I want to stay within the

17  time period back, again April, 1994 and before.

18          If someone the people who live in the West

19  Bank and the Gaza Strip who are not Israeli settlers,

20  they have to have permission from Israel to come and go

21  from their land?

22  A     To cross the border into Jordan, yes.

23          At different times there is greater or lesser

24  freedom of movement.  It really depends very specifically

25  on when you are talking about.

Page 101

577

MUB-00030896

6-16-04.TXT

1           There have been times where freedom of
2    movement was greatly curtailed in response to terrorist
3    attacks.  And there are other times when there's much
4    more freedom of movement.
5    Q    But even back at that time, there were border
6    crossings with very long lines for people who just wanted
7    to go to work in Israel, is that correct?
8    A    Yes.
9    Q    Or people who needed to go to a hospital in Israel,
10   correct?
11   A    Again, I don't know how, you know, I don't know
12   about lines or where the check points were.  But yes,
13   there were check points, there were delays.
14           And this I have to -- again this is not from
15   research but, you know, keeping up with events in the
16   newspaper.
17   Q    In fact, they even had different license plates on
18   the vehicles, correct?
19   A    Yes.
20   Q    To identify who lives in the Occupied Territories
21   and who are the Israeli citizens living in Israel proper,
22   right?
23   A    Much as we do here in the states.
24   Q    They have different papers, in fact; different
25   identification papers, correct?

0

                                                578

1    A    To distinguish people who are citizens of Israel,
2    which includes many Arabs.  And in fact, a fifth of the
3    population is not Jewish but is Arab.  And to make a
4    distinction between those who are Israeli citizens and
5    those who are not.

Page 102

MUB-00030897

6-16-04.TXT

6   Q      Now those Arabs you are talking about who are
7   Israeli citizens, there are not the people who we were
8   previously talking about who live in these camps, are
9   they?
10  A      No.  There are also Palestinians and ethnically
11  identify themselves as Palestinians.
12             There are people who in 1948 or later,
13  instead of leaving their homes, sometimes people were
14  forced out of their homes, sometimes they left
15  voluntarily, they chose to stay in Israel.
16             When Israel was created in 1948, the first
17  Prime Minister Ben Gurion invited some people to come
18  back some people did and some people did not.
19  Q      That's a matter of some political contention now,
20  isn't it?  That's a viewpoint that other people sitting
21  where you are sitting would have a different view of?
22  Would you agree with that?
23  A      There is no debate on whether or not the offer was
24  made.  The debate would be, you know, how sincere was the
25  offer?

                                                    579

1   Q      That's right.
2   A      Would people actually be given their actual houses
3   back.  That certainly, I think I would agree with those
4   who would say they probably wouldn't get their actual
5   houses back.  There is no question it was charged.
6             But there was an offer extended.
7   Q      Now, you also talked about, talked a little bit
8   about Afghanistan.  I want to shift you to Afghanistan.
9   A      Go ahead.
10  Q      You mentioned an organization that was started by a
                              Page 103

MUB-00030898

6-16-04.TXT

11    man named Azzam and others, correct?

12    A    Correct.

13    Q    And the name of that organization is AlKifah or the

14    Afghan Services Bureau?

15    A    Correct.  The Afghan Services Bureau was

16    subsequently renamed AlKifah Refugee Center.

17            These are part of the larger umbrella of

18    Maktab al-Khidmat.

19    Q    That was -- what are you most comfortable calling

20    it, AlKifah or the Afghan Refugee Center?

21    A    whatever you like.

22    Q    We'll call it the Afghan Refugee Center, because

23    that identifies it as really about what it was about,

24    correct?

25    A    Well, actually I think part of the reason why its

580

1    name was changed, as the Soviets were beginning to

2    withdraw, has a lot to do with how the organization was

3    reshaping itself.

4    Q    But I want to go back to when it started, okay?

5    we'll get there.

6            So it's the Afghan Refugee organization and

7    its purpose, it was started in 1984, correct?

8    A    The Afghan Services Bureau, yes.

9    Q    The Afghan Services Bureau.

10           And it was started in 1984, correct?

11   A    Yes.

12   Q    Now, at the time that it was started, it was known

13   as an NGO, correct?

14   A    Correct.

15   Q    And that means non-governmental organization,

Page 104

MUB-00030899

6-16-04.TXT

16  right?

17  A     Correct.

18  Q     And its purpose was to assist the resistance to the

19  Soviets in Afghanistan, correct?

20  A     Correct.

21  Q     Now, the resistance fighters were Muslims, right,

22  primarily?

23  A     Yes, primarily.

24  Q     And they, the people who were fighting the Soviet

25  Union, considered this a Jihad, did they not?

                                                      581

1   A     Yes, that is the term they used.  Now when we get

2   into defining what that means.

3   Q     That was the term they used, right?

4   A     Yes.

5   Q     And they were referred to as resistance fighters,

6   correct?

7   A     Resistance fighters, mujahideen.

8   Q     Sometimes they were referred to as the mujahideen,

9   right?  Sometimes as gorilla fighters, correct?

10  A     Correct.

11  Q     But whatever we call them, they were fighting the

12  Soviet Union that had invaded the country, correct?

13  A     Correct.

14  Q     And the United States Government was assisting

15  them, was it not?

16  A     Yes.  Indirectly via Pakistan, yes.

17  Q     Yes.  But there is no doubt that the United States

18  Government was assisting these resistance fighters?

19  A     No doubt.

20  Q     And the United States was providing arms, correct?

Page 105

MUB-00030900

6-16-04.TXT

21   Indirectly?

22   A    Yes.

23   Q    And was providing relief for Afghanies, correct?

24   Food and clothing, et cetera?

25   A    Yes.  This was part of the U.S. effort to battle

582

1    the Soviets in the cold war.  Our enemy then was our

2    friend.

3    Q    At the time that the Afghan Services Bureau was

4    created, it was created and doing exactly the same kind

5    of things that the U.S. Government was doing also, even

6    if the U.S. was doing it through Pakistan, correct?

7    A    Certainly very similar things.  I'm not expert

8    enough to testify whether it was identical.  It's rare

9    and uncommon for an NGO to be involved in supplying arms,

10   in any event, but they were very similar functions.

11   Q    Let's put it this way.  There wasn't a conflict.

12   This wasn't, this wasn't -- the Afghan Services Bureau

13   wasn't created to -- in conflict with the United States.

14   It wasn't opposing something the United States was doing

15   in 1984?

16   A    It was not opposing what the United States was

17   doing.

18         Not everybody in the United States was

19   comfortable working with them because this is usually

20   something done between states.

21   Q    Okay.  But their goal was to get rid of the

22   Soviets, right?

23   A    Correct.

24   Q    And that was the U.S. goal?

25   A    Correct.

Page 106

6-16-04.TXT

583

1  Q    Now, the Soviet Army marched out of Afghanistan in

2  approximately February of 1989, correct?

3  A      Correct.

4  Q      The Soviet influence and power in Afghanistan

5  didn't really end at that time, did it?

6              You know that it did not end at that time,

7  correct?

8  A    The Soviets had withdrawn.  The Soviet forces were

9  gone.

10              The first government that came to power in

11  Afghanistan by Afghanies was very, very close to the

12  Soviets, often referred to by some as a puppet

13  government.

14  Q    And the puppet Soviet government, was a man -- the

15  President was Nasi Bullah?

16  A    Nasi Bullah.

17  Q    Nasi Bullah.

18              And although he was not himself a Russian,

19  everyone pretty much considered him a puppet President at

20  that time, correct?

21  A    He was backed by the Russians.

22  Q    And so the U.S. continued to aid the rebels who

23  were fighting, even after the Soviet troops withdrew,

24  correct?

25  A    Actually, I don't know.

584

1  Q    Well, would you agree with statements -- would you

2  agree or not agree with statements from the New York

3  Times, for example, around that time, that describe the

Page 107

MUB-00030902

6-16-04.TXT

4   American role as still trying to assist the rebels?

5   A     I made it clear before, I don't take anything that

6   the newspapers say at face value, and I have not fact

7   checked this.  This really is beyond my area of

8   expertise.

9   Q     So you don't really know how long the United States

10  continued to assist the rebels in Afghanistan after 1989,

11  do you?

12  A     I don't know if there was continued assistance.

13  It's very clear that there was a sharp drop, at a

14  minimum, when the Soviets withdrew.

15  Q     But in fact, in Afghanistan they celebrate the

16  victory of their Jihad against the Soviet Union as

17  something called National Day on April 27th of each year.

18              Are you aware of that?

19  A     No, I'm not.

20  Q     And are you aware of the fact that the reason they

21  celebrate that is because President Nasi Bullah's

22  government fell on April 27th, 1992?

23              Would that make sense to you?

24  A     That sounds historically correct.

25              I'm really not in a position to give expert

585

1   testimony on that.

2   Q     And that was a communist government, wasn't it?

3   A     Yes.

4   Q     So it wouldn't surprise you to know that the United

5   States was providing some continued assistance, would it?

6              MR. MORONEY:  Objection.

7              THE COURT:  Sustained.  He says he doesn't

8   know.

Page 108

MUB-00030903

6-16-04.TXT
9   BY MS. HOLLANDER:

10   Q    So it's beyond your expertise then, Mr. Levitt, to

11   know what happened in Afghanistan, in terms of aid to the

12   resistance fighters after 1989, correct?

13   A    Using the term "resistance fighters after 1989" is

14   itself disputable.

15        The Soviets were gone.  There was a public

16   government.  There was infighting.  Resistance in

17   Afghanistan is different than resistance to the Soviets.

18        So it's difficult to answer that question the

19   way it was asked.

20   Q    But that's not an area of your expertise, is it?

21   A    That is correct.

22             MS. HOLLANDER:  I have nothing further

23        your Honor.

24             THE COURT:  Thank you.

25             Do you have any redirect?

586

1              MR. MORONEY:  No questions, your Honor.

2              THE COURT:  Okay.  Thank you.

3              You can step down.

4              And would the United States call your next

5         witness.

6              MS. KRIGSMAN:  Your Honor, the United

7         States calls William West.

8              THE COURT:  Would you raise your right

9         hand.

10             WILLIAM D. WEST

11        called as a witness by and on behalf of

12        of the Government, after being first duly

13        sworn, was examined and testified as

Page 109

MUB-00030904



1

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
UNITED STATES OF AMERICA,        )
                                 )
        Plaintiff,               )  CR. NO. 005-53
                                 )
    vs.                          )
                                 )
AHMED OMAR ABU ALI,              )
                                 )
            Defendant.           )
                                 )
```

MOTIONS HEARING

October 28, 2005

BEFORE:     THE HONORABLE GERALD BRUCE LEE
            UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT: OFFICE OF THE UNITED STATES ATTORNEY
                    BY:   DAVID LAUFMAN, ESQ.
                          STEPHEN CAMPBELL, ESQ.
                          ROBERT SPENCER, ESQ.
                          JERRY DEMAIO, ESQ.
                    2100 Jamieson Ave.
                    Alexandria, Virginia  22314

FOR THE DEFENDANT: THE NUBANI LAW FIRM
                   BY: ASHRAF NUBANI, ESQ.

|          |    |                                                         |
|----------|----|---------------------------------------------------------|
|          | 1  | (Thereupon, the following was heard in open             |
| 12:32:09 | 2  | court at 12:17 p.m.)                                     |
| 12:32:09 | 3  | THE CLERK: Criminal action 05-53, United                |
| 12:32:12 | 4  | States of America versus Mr. Abu Ali. Are counsel       |
| 12:32:14 | 5  | present and ready, please.                              |
| 12:32:16 | 6  | MR. LAUFMAN: Good afternoon, Your Honor.                |
| 12:32:20 | 7  | David Laufman for the United States with assistant      |
| 12:32:22 | 8  | United States Attorney Steve Campbell, Rob Spencer,     |
| 12:32:25 | 9  | Department of Justice trial attorney Jerry DeMaio and   |
| 12:32:29 | 10 | special United States Attorney Marla Tusk.              |
| 12:32:31 | 11 | THE COURT: Good afternoon.                              |
| 12:32:33 | 12 | MR. NUBANI: Good afternoon, Judge. Ashraf               |
| 12:32:36 | 13 | Nubani for Mr. Abu Ali who has waived his presence here |
| 12:32:39 | 14 | with permission of the Court.                           |
| 12:32:40 | 15 | THE COURT: Good afternoon, Mr. Nubani.                  |
| 12:32:41 | 16 | I've read your motion and I want to be clear on the     |
| 12:32:48 | 17 | issue that's presented.                                 |
| 12:32:55 | 18 | My first question is, is the existence of               |
| 12:33:01 | 19 | al-Qaeda an issue in this case, a contested issue from  |
| 12:33:04 | 20 | the defense?                                            |
| 12:33:09 | 21 | MR. NUBANI: That -- that -- that there's an             |
| 12:33:12 | 22 | organization called al-Qaeda?                           |
| 12:33:16 | 23 | THE COURT: No, that there's a terrorist                 |
| 12:33:19 | 24 | organization called al-Qaeda. It seems to me that some  |
| 12:33:22 | 25 | of these issues ought to be stipulated to. But if you   |

12:33:24  1   want to have a contest of whether al-Qaeda is a foreign

12:33:27  2   terrorist organization, I guess the government would

12:33:29  3   have to offer some evidence, wouldn't they?

12:33:31  4                MR. NUBANI:  Judge, we're willing to

12:33:33  5   stipulate to certain issues.  I didn't mention it in my

12:33:35  6   motion, but we certainly are willing to do that.

12:33:37  7                THE COURT:  Tell me what you're willing

12:33:39  8   to -- I'm trying to figure out what's at issue.  And the

12:33:41  9   government says they want to offer a witness concerning

12:33:43 10   the history and structure of al-Qaeda.

12:33:45 11                It seems to me that would be irrelevant if

12:33:48 12   everybody stipulates al-Qaeda is a designated terrorist

12:33:54 13   organization.

12:33:54 14                MR. NUBANI:  We would stipulate al-Qaeda is

12:33:57 15   a designated foreign terrorist organization.

12:34:00 16                THE COURT:  And is there a contest about a

12:34:03 17   terrorist cell called al-Faq'asi and the Sultan Jubran

12:34:12 18   cell?  Is there a contest that those were not al-Qaeda

12:34:16 19   cells from your side?

12:34:18 20                MR. NUBANI:  Judge, well, I think that there

12:34:20 21   is some question about that.  And I -- and I'll give the

12:34:25 22   reasons and I think through the Saudi witnesses, it

12:34:30 23   depends on how you -- how you interpret al-Qaeda.

12:34:34 24                Since September 11th, there have been

12:34:37 25   al-Qaeda affiliated organizations throughout the Muslim

12:34:41  1   world that have been created in the last four years.

12:34:44  2              And, their affiliation may be those who

12:34:48  3   actually give what is known as bayat (phonetic), which

12:34:50  4   is to give allegiance to Osama bin Laden and his

12:34:54  5   cohorts.

12:34:55  6              And there are people who have nothing to do

12:34:57  7   with them but espouse the same methods and means to

12:35:02  8   either reaching power if that's the case or in terms of

12:35:09  9   disrupting what they view as western interests in their

12:35:15 10   perspective countries.

12:35:17 11              So, whether the al-Faq'asi cell is, you

12:35:21 12   know, one that has given allegiance to bin Ladin or not,

12:35:29 13   we would even be willing to sit down with the government

12:35:31 14   after hearing what the government has to say and maybe

12:35:33 15   stipulate to some of those issues.

12:35:34 16              I'm not prepared to do that now, but we

12:35:37 17   certainly would be prepared to do that in order to

12:35:41 18   limit -- to either -- to exclude the testimony of -- the

12:35:44 19   proposed testimony of Mr. Kohlmann or at least limit it

12:35:47 20   so that we can get beyond those issues and then get to

12:35:50 21   the heart of the issue.

12:35:52 22              I do also want to just -- on that issue, as

12:35:56 23   I alluded to, indicated in the motion, that the Saudi --

12:36:02 24   the Saudi foreign witnesses have already testified to

12:36:07 25   that issue in particular.

12:36:09  1              And for Mr. Kohlmann to come to take that

12:36:13  2      out of the purview of the jury and make conclusions in

12:36:17  3      his factual representations about al-Qaeda and its

12:36:21  4      history in Saudi Arabia and so forth, I think would be

12:36:28  5      amphipathical to what we're trying to do and therefore

12:36:32  6      the government, you know, has other ways of doing that.

12:36:34  7              There are people that are within the

12:36:36  8      government that have the very same information that they

12:36:38  9      claim Mr. Kohlmann has, and so --

12:36:40 10              THE COURT:  Well, I'm not discounting your

12:36:42 11      claim that Mr. Kohlmann is not an expert.  I just wanted

12:36:46 12      to ask what was in issue because I wanted to focus us

12:36:50 13      this afternoon on just what -- what is really the issue

12:36:53 14      here and what the government's trying to do with this

12:36:57 15      witness.

12:36:57 16              So, to be clear, I understand your position

12:36:59 17      about first of all, this is not the proper subject

12:37:01 18      matter for expert testimony.  And even if it is, this

12:37:04 19      witness' reading on the Internet and writing pages and

12:37:08 20      in college may not be of sufficient basis to qualify as

12:37:11 21      an expert under Federal Rules of Evidence with this

12:37:14 22      judge.

12:37:15 23              But I was trying to figure out -- do you

12:37:16 24      have a copy of the superseding indictment with you?

12:37:18 25              MR. NUBANI:  Judge, I don't.

12:37:19  1            THE COURT:  Okay.  Well, I'm going to give

12:37:20  2    you -- get a copy for you and government counsel.

12:37:25  3            It seems to me that some of this is not in

12:37:28  4    issue.  And if it's not in issue, we may not have to

12:37:30  5    reach all these issues about Mr. Kohlmann.

12:37:32  6            I've now asked you the questions that I

12:37:34  7    have.  Is there more you want to say?  I've read your

12:37:37  8    submission.

12:37:37  9            I'm trying to figure out what is he an

12:37:39 10    expert in.  He's read books and things.  I don't know

12:37:43 11    that that makes him an expert about Saudi Arabia if he's

12:37:45 12    never been there.

12:37:45 13            MR. NUBANI:  Right, we have no indication

12:37:47 14    that he's been there.  I don't know if he has been

12:37:49 15    recently since we've gathered our information.

12:37:52 16            THE COURT:  Even if he has, if he hasn't

12:37:53 17    been meeting with terrorists, I don't know that it would

12:37:55 18    be of sufficient liability.

12:37:56 19            Let me hear from the government.

12:37:58 20            MR. NUBANI:  That is our position, Judge.

12:38:00 21            THE COURT:  Uh-huh.

12:38:05 22            MR. LAUFMAN:  Thank you, Your Honor.

12:38:08 23            THE COURT:  Mr. Laufman, what I have in

12:38:10 24    front of me is your October 24th letter, your

12:38:13 25    designation of what you say Mr. Kohlmann's going to say.

12:38:16  1          MR. LAUFMAN:  Can I hand up to the Court,

12:38:17  2  please, through the court security officer's assistance

12:38:21  3  a copy of Mr. Kohlmann's CV.

12:38:23  4          THE COURT:  That's attached to the letter.

12:38:25  5  He went to law school.  I got that part.

12:38:27  6          MR. LAUFMAN:  And this is an excerpt of the

12:38:31  7  transcript from the trial of Sabri Ben Kahla where Judge

12:38:38  8  Brinkema qualified him as an expert because of his

12:38:39  9  background.

12:38:39 10          THE COURT:  Did she qualify him as an expert

12:38:41 11  in al-Qaeda?  What did she qualify him as an expert to

12:38:43 12  do?

12:38:44 13          MR. LAUFMAN:  Yes, sir.  Let me go over

12:38:51 14  the -- I was going to address his prior qualifications

12:38:54 15  as an expert.

12:38:55 16          THE COURT:  Before you do, let me -- let's

12:38:56 17  go back to my first focus which is what the issue here

12:38:59 18  that is in controversy that the government believes you

12:39:04 19  have to offer evidence about?  It sounds like the

12:39:06 20  defense is willing to stipulate that al-Qaeda is a

12:39:09 21  designated foreign terrorist organization and there is

12:39:12 22  no fight about what al-Qaeda is.

12:39:14 23          MR. LAUFMAN:  Well, the fundamental issue

12:39:16 24  here, Your Honor, is not whether al-Qaeda is a

12:39:17 25  designated foreign terrorist organization.  The United

12:39:20  1   States government has designated them.

12:39:21  2              The Court can take judicial notice that the

12:39:23  3   President of the United States designated al-Qaeda as a

12:39:26  4   foreign terrorist organization.

12:39:27  5              The key issue in this case is whether this

12:39:30  6   cell that the defendant allegedly joined is an al-Qaeda

12:39:35  7   cell.

12:39:35  8              There are four counts in the indictment that

12:39:38  9   require the government to prove that the terrorist cell

12:39:41 10   the defendant joined was al-Qaeda.

12:39:44 11              Count I, conspiracy to provide material

12:39:46 12   support and resources to a designated terrorist

12:39:50 13   organization in violation of 18 U.S.C. 2339(B).  Count

12:39:55 14   II, actually providing material support to a designated

12:39:57 15   foreign terrorist organization also in violation of 18

12:40:00 16   U.S.C. 2339(B).  Count V, contributing services to

12:40:05 17   al-Qaeda in violation of the International Emergency

12:40:09 18   Economic Powers Act, and implementing regulations and

12:40:13 19   Count VI receiving funds and services from al-Qaeda.

12:40:16 20              In each of those cases, with respect to each

12:40:17 21   of those counts, the government has the burden of proof

12:40:19 22   of showing that this cell that the defendant joined is

12:40:22 23   an al-Qaeda cell.  And it will not be enough for the

12:40:25 24   defense to simply stipulate that al-Qaeda generically is

12:40:28 25   a foreign terrorist organization because --

12:40:30  1          THE COURT:  So, the evidence you have that
12:40:32  2    this is al-Qaeda cell is just through Mr. Kohlmann?
12:40:36  3          MR. LAUFMAN:  No, sir.  We are going to rely
12:40:38  4    on the confession evidence, if that comes in to
12:40:43  5    evidence, his own confessions that he knew and
12:40:46  6    understood that these individuals were al-Qaeda.
12:40:50  7          But, we don't take anything for granted with
12:40:53  8    this jury.  The defense --
12:40:55  9          THE COURT:  No, I guess if -- I'm not trying
12:40:57 10    to pry into your trial strategy.  But I'm trying to
12:41:00 11    understand why Mr. Kohlmann is necessary.
12:41:02 12          If I've read what has been submitted to me
12:41:04 13    correctly, he's never been to Saudi Arabia.  And even if
12:41:07 14    he has, he hasn't met with terrorists or been involved
12:41:11 15    with any al-Qaeda activities.
12:41:13 16          So the fact that he read about it in my
12:41:14 17    view, doesn't make him an expert on al-Qaeda, just that
12:41:17 18    he read about it.
12:41:18 19          MR. LAUFMAN:  Well, I would disagree with
12:41:19 20    the Court respectfully with respect to whether scholarly
12:41:22 21    work is a basis for qualifying an expert in the field of
12:41:27 22    assessing terrorist organizations.
12:41:29 23          But, setting aside his academic and
12:41:33 24    professional work that he now serves as a consultant
12:41:38 25    both to the FBI and to New Scotland Yard, he is widely

12:41:42  1    recognized, quoted by major news media organizations.

12:41:44  2    He has published a book in addition to publishing many

12:41:48  3    articles.

12:41:49  4              Whether or not he's been to Saudi Arabia, I

12:41:51  5    don't know.  But, travel to Saudi Arabia is not a sine

12:41:55  6    qua non of whether someone is an expert on affairs in

12:41:57  7    that country with respect.

12:41:59  8              And he has in fact, met with terrorists and

12:42:01  9    we will provide -- produce to the defense hopefully

12:42:04 10    later today a synopsis of what we propose him to testify

12:42:10 11    about as soon as it is available which will, among other

12:42:13 12    things, mention that he has met with people who are

12:42:17 13    terrorists and that contributed to his body of knowledge

12:42:20 14    and expertise about how al-Qaeda operates, how it's

12:42:23 15    organized.

12:42:23 16              There are -- may I continue, Your Honor?

12:42:31 17              THE COURT:  Yeah, I'm listening.

12:42:32 18              MR. LAUFMAN:  We expect him to elaborate on

12:42:35 19    what we put in the notice letter --

12:42:37 20              THE COURT:  Well, the notice letter to me is

12:42:39 21    only one paragraph.  It says, will testify as an expert

12:42:42 22    witness concerning the history and structure of

12:42:44 23    al-Qaeda.

12:42:44 24              MR. LAUFMAN:  Right.  So --

12:42:46 25              THE COURT:  I'm sorry.  I'm not finish.

12:42:47  1          MR. LAUFMAN:  Yes, sir.

12:42:48  2          THE COURT:  And the basis for concluding,

12:42:49  3  meaning his opinion that the terrorist cell headed by

12:42:53  4  al-Faq'asi and Al-Qahtani was an al-Qaeda cell.

12:42:58  5          So he is just going to make the leap based

12:43:00  6  upon what he's read.

12:43:01  7          MR. LAUFMAN:  Well, not just on what he's

12:43:04  8  read.  He has -- there is a great deal of information in

12:43:07  9  the public mainstream, including press releases by

12:43:12 10  al-Qaeda in the Arabian peninsular.  For example, when

12:43:19 11  Sultan Jubran was killed, there was a memorial notice

12:43:23 12  put on a website about his martyrdom.

12:43:24 13          There is a great deal of information --

12:43:24 14          THE COURT:  Are you saying to me that you're

12:43:25 15  going to rely upon things on the Internet?  That's it?

12:43:29 16          MR. LAUFMAN:  That's not just it, Your

12:43:30 17  Honor.  But the Internet is used widely by al-Qaeda --

12:43:34 18          THE COURT:  By all kinds of people who write

12:43:36 19  all kinds of things.

12:43:37 20          Let me do this because I think you see which

12:43:39 21  way this is headed.  If what you're -- if what you

12:43:43 22  presented to me is what you intend to present in terms

12:43:45 23  of offering this person, Mr. Kohlmann, as an expert on

12:43:49 24  the subject matter you're describing in this paragraph

12:43:54 25  two of this October 24th letter, I can give you a ruling

12:43:56  1    right now.

12:43:57  2                 If you would like to have an opportunity to

12:43:58  3    present some evidence, I'll be happy to do that perhaps

12:44:02  4    next Friday.  But I don't -- at this moment, there's no

12:44:04  5    way I'm going to let him come in and testify about what

12:44:07  6    he read about, what he wrote in his own -- his book that

12:44:10  7    he probably published himself and that he works for the

12:44:13  8    government and the government pays him to testify to do

12:44:16  9    things for them.

12:44:17 10                 That to me doesn't make him an expert in

12:44:20 11    al-Qaeda, no way.

12:44:21 12                 MR. LAUFMAN:  Your Honor -- pardon.  He's

12:44:23 13    been qualified by this Court as an expert on al-Qaeda.

12:44:25 14    I understand that Your Honor hasn't qualified him.

12:44:27 15                 THE COURT:  The judgment of a district judge

12:44:30 16    concerning expert witnesses is governed by Rule 702 of

12:44:35 17    the Federal Rules of Evidence.  And the judge has to

12:44:37 18    make a judgment whether a person is qualified by

12:44:39 19    experience, education or training to offer reliable

12:44:43 20    testimony about a subject matter that's beyond the kin

12:44:47 21    of the average juror.

12:44:48 22                 If what you've shown me -- if what you've

12:44:50 23    shown me is your proffer, I'm prepared to make a

12:44:53 24    judgment right now.

12:44:54 25                 I've invited you to present some evidence,

12:44:56   1   but I have difficulty with the idea that someone who has

12:45:00   2   never done any real law enforcement or intelligence work

12:45:05   3   where he has infiltrated terrorist cells or worked with

12:45:09   4   terrorists or had contact with them is going to come in

12:45:13   5   here and tell the jury that based upon what he's read on

12:45:16   6   the Internet and his own writings that he thinks that

12:45:21   7   this al-Faq'asi cell and Al-Qahtani cell belong to

12:45:25   8   al-Qaeda.

12:45:26   9               If that's all you have, it's not going to

12:45:28  10   happen in this courtroom. Maybe it happened in another

12:45:30  11   courtroom, but not in this one.

12:45:31  12               MR. LAUFMAN: May I continue, please.

12:45:32  13               THE COURT: Well, I'm asking you to make a

12:45:34  14   judgment now. Do you want me to rule or do you want to

12:45:37  15   have a chance to put on some testimony?

12:45:38  16               MR. LAUFMAN: Well, I would like to have a

12:45:40  17   chance to proffer to the Court some additional

12:45:42  18   information I plan to proffer.

12:45:43  19               THE COURT: Okay. I can go forward with the

12:45:44  20   proffer if you'd like.

12:45:45  21               MR. LAUFMAN: First of all, I want to make

12:45:47  22   clear for the record that Mr. Kohlmann has twice been

12:45:51  23   qualified as an expert in this court on --

12:45:53  24               THE COURT: An expert in what? Tell me --

12:45:55  25               MR. LAUFMAN: As an expert on al-Qaeda among

12:45:58  1    other subjects based on the same qualifications we

12:46:02  2    tendered to the Court now.  And, I -- with no disrespect

12:46:06  3    to Your Honor --

12:46:06  4              THE COURT:  Show me what Judge Brinkema says

12:46:09  5    she qualified him to do.

12:46:10  6              MR. LAUFMAN:  If I could -- the transcript I

12:46:12  7    gave you, Your Honor, is from the Ben Kahla trial, and

12:46:16  8    if you look at the last page, which is page 195.  Now --

12:46:23  9              THE COURT:  I'm tendering Mr. Kohlmann as an

12:46:27 10    expert in modern Afghanistan politics.  To you is that

12:46:33 11    the same as saying he's an expert in al-Qaeda?

12:46:36 12              MR. LAUFMAN:  I've looked at the --

12:46:36 13              THE COURT:  Judge Brinkema says, "All right,

12:46:38 14    I'm going to accept him".  He's tendered as an expert in

12:46:42 15    modern Afghanistan politics.  Is that the same to you as

12:46:46 16    being an expert in al-Qaeda?

12:46:48 17              MR. LAUFMAN:  I conferred with the trial

12:46:49 18    attorney in that case.  He confirmed to me he was

12:46:50 19    accepted.  He was proffered as an expert on al-Qaeda.

12:46:52 20              THE COURT:  Did I read the transcript

12:46:53 21    incorrectly?  I'm looking at page 195, line nine through

12:46:57 22    ten.  Did I read that incorrectly?

12:46:59 23              MR. LAUFMAN:  You did not read it

12:47:01 24    indirectly, Your Honor.  I'm simply pointing out to you,

12:47:03 25    respectfully, that he was offered as an expert on

12:47:05  1    al-Qaeda.  He did testify as an expert on al-Qaeda at

12:47:08  2    that trial, and he was proffered and accepted by Judge

12:47:12  3    Brinkema as an expert on al-Qaeda in the Al-Timimi case

12:47:16  4    as well.

12:47:16  5              So, I'm representing to the Court based on

12:47:18  6    my conversations with the trial attorney, he's been

12:47:21  7    twice qualified as an expert on al-Qaeda in this court.

12:47:26  8              To the extent the Court has concerns about

12:47:28  9    the reliability of Mr. Kohlmann's assessment of

12:47:34 10    materials that are in the public mainstream, and the

12:47:37 11    Internet is simply an enormous public library now.  The

12:47:41 12    fact that something is on the Internet --

12:47:42 13              THE COURT:  You call the Internet a library?

12:47:44 14              MR. LAUFMAN:  It is an immense resource of

12:47:46 15    information, Your Honor, just as a public library can

12:47:49 16    be.

12:47:49 17              Whether you attach weight or credibility to

12:47:51 18    it depends on the specific facts and circumstances of

12:47:54 19    the specific item of information.

12:47:55 20              THE COURT:  It does.  Let me make sure I'm

12:47:57 21    clear what you're telling me about this witness.  So,

12:48:02 22    you would summarize his knowledge, his body of knowledge

12:48:06 23    as being derived from classes he's taken in college and

12:48:11 24    his own self readings; is that right?

12:48:13 25              MR. LAUFMAN:  No, Your Honor, that's not the

16

12:48:15  1    extent of my summary.

12:48:16  2              THE COURT:  Well, that's part -- that's a

12:48:18  3    substantial part of it because as you said earlier, he's

12:48:21  4    never worked with al-Qaeda personally.  He's never meet

12:48:26  5    bin Ladin or anybody else who is in al-Qaeda who has

12:48:30  6    given him information about how al-Qaeda operates.  Is

12:48:33  7    that right?

12:48:34  8              MR. LAUFMAN:  That's not correct, Your

12:48:35  9    Honor.

12:48:35 10              THE COURT:  Then tell me what his personal

12:48:38 11    knowledge base would be.

12:48:38 12              MR. LAUFMAN:  He has not met with Osama bin

12:48:40 13    Laden.  I will stipulate to that.  But meeting Osama bin

12:48:44 14    Laden --

12:48:44 15              THE COURT:  I understand.  Has he met any

12:48:46 16    member of al-Qaeda?

12:48:47 17              MR. LAUFMAN:  He has met with and

12:48:49 18    interviewed terrorists -- I'd have to check the synopsis

12:48:55 19    he proposes to submit as to whether this particular

12:48:59 20    individual was associated with al-Qaeda.

12:49:00 21              THE COURT:  So, the answer right now is no.

12:49:02 22    As far as you know, he's never meet with anyone from

12:49:04 23    al-Qaeda?

12:49:05 24              MR. LAUFMAN:  I have to -- I don't want to

12:49:07 25    misspeak, Your Honor.  He has met with individuals who

12:49:09  1    are avowed terrorists, who have knowledge of al-Qaeda.

12:49:14  2              I also want to point out to the Court that

12:49:15  3    in the Embassy bombings case in New York, exhibits were

12:49:20  4    admitted into evidence including al-Qaeda training

12:49:23  5    manuals and other documents admitted into evidence in

12:49:28  6    that trial that Mr. Kohlmann has reviewed.  Some of

12:49:31  7    those documents continue to form a basis for the most

12:49:35  8    intricate understanding of how al-Qaeda operates, it's

12:49:38  9    organization, the manner in which it operates in a

12:49:42 10    clandestine manner.

12:49:44 11              This jury has to be educated about how

12:49:46 12    al-Qaeda operates.

12:49:47 13              THE COURT:  Can I ask you a question about

12:49:48 14    what you just said?

12:49:49 15              MR. LAUFMAN:  Yes, sir.

12:49:50 16              THE COURT:  In the case in New York that was

12:49:51 17    tried, what was the basis for the admissibility of the

12:49:54 18    documents supposedly authored by al-Qaeda?  What was the

12:49:58 19    basis for the submission of those documents?

12:50:00 20              MR. LAUFMAN:  I'm not certain, Your Honor.

12:50:02 21    I think some of them may have been -- pardon me.

12:50:21 22              Thank you, Your Honor.  I wanted to confer

12:50:22 23    with Mr. Spencer.

12:50:24 24              In the Embassy bombings case, an al-Qaeda

12:50:27 25    member by the last name of El-Fahd testified as a

18

12:50:31  1    government witness and testified to the authenticity of

12:50:34  2    the documents the government offered into evidence.

12:50:37  3                 Those are documents that more, than any

12:50:40  4    other source of information, detail the operations of

12:50:44  5    al-Qaeda, it's organization, it's structure, how it

12:50:47  6    operates at the cell level, how it engages in the

12:50:50  7    certain kinds of trade crafts and operational secrecy

12:50:54  8    that we see evident in this defendant's confession.

12:50:57  9                 THE COURT:  So, this was an al-Qaeda member

12:50:59 10    who offered the documents in evidence and offered a

12:51:02 11    basis to authenticate them?

12:51:03 12                 MR. LAUFMAN:  Yes, sir, through --

12:51:04 13                 THE COURT:  But in this case, you do not

12:51:06 14    have an al-Qaeda member who is going to testify?

12:51:08 15                 MR. LAUFMAN:  We do not have any al-Qaeda

12:51:10 16    member testifying, but the documents that Mr. Kohlmann

12:51:12 17    in part will base his assessment on with respect to

12:51:15 18    whether the al-Faq'asi cell was an al-Qaeda cell will

12:51:20 19    form in part the basis for his judgment that the

12:51:22 20    al-Faq'asi cell is an al-Qaeda cell.

12:51:26 21                 THE COURT:  All right.  Well, I understand

12:51:27 22    that experts can rely upon hearsay, but he has to pass

12:51:31 23    the test of being an expert first.

12:51:32 24                 Can I ask you another question?

12:51:33 25                 MR. LAUFMAN:  Yes, sir.

12:51:33  1             THE COURT:  In what way has Mr. Kohlmann's

12:51:36  2    opinions been tested to demonstrate that they're

12:51:40  3    reliable and what methods has he used to gather his

12:51:43  4    information?

12:51:44  5             MR. LAUFMAN:  Well, Your Honor, I don't know

12:51:46  6    whether it's been tested in the Daubert sense.  This is

12:51:50  7    not a -- this is not a type of science where there's

12:51:56  8    peer review.  He did not submit himself --

12:51:59  9             THE COURT:  Dissertations are typically peer

12:52:03 10    reviewed.  There are papers that are peer reviewed in

12:52:06 11    various symposiums by people who deliver papers on

12:52:12 12    historical issues.

12:52:13 13             What kinds of things like that has

12:52:14 14    Mr. Kohlmann does?

12:52:15 15             MR. LAUFMAN:  Your Honor, I'm not aware of

12:52:16 16    any testing in the context the Court is using it.  But I

12:52:19 17    believe the ultimate standard in Daubert is one of

12:52:22 18    reliability.  And he has twice been qualified as an

12:52:24 19    expert in this court.  He is going to be qualified next

12:52:27 20    week in another terrorism prosecution in New York.

12:52:30 21             The defense can cross examine him until the

12:52:33 22    cows come home to explore his bias, his qualifications.

12:52:37 23    If they think he's some callow youth who doesn't know

12:52:42 24    that of which he speaks, they can try to go down that

12:52:45 25    road.

12:52:45  1              The fact of the matter is he is prodigious

12:52:48  2    talent with demonstrated knowledge and expertise in the

12:52:50  3    field of terrorism.  He has been qualified as an expert.

12:52:53  4    He is recognized around the world as an expert.  And

12:52:55  5    what the defense is trying to do and what we ask you not

12:52:57  6    to let them do is to sanitize the government's case.

12:53:00  7    That is what they're trying to do.  They want to excise

12:53:02  8    the word al-Qaeda from this case, and that cannot be

12:53:05  9    permitted to happen.  We ask the Court not to permit

12:53:07 10    that to happen.

12:53:08 11              THE COURT:  All right.

12:53:16 12              MR. NUBANI:  Judge, if I may, the qualifying

12:53:20 13    of an expert witness, as the Court knows even though

12:53:22 14    it's done by other courts, this district court has --

12:53:28 15    has the power to independently qualify someone even

12:53:31 16    though they've been qualified by another Court even if

12:53:34 17    it's in the same courthouse.

12:53:36 18              I do want to alert the Court to the fact

12:53:39 19    or -- that in the Al-Timimi trial where he had been --

12:53:45 20    he had been qualified as an expert witness, that whole

12:53:52 21    trial, Judge, is currently on appeal in the Fourth

12:53:56 22    Circuit.  And one of the basis of the appeal is the use

12:53:59 23    of expert testimony --

12:54:03 24              THE COURT:  Were you in that trial,

12:54:04 25    Mr. Nubani?

12:54:05  1          MR. NUBANI:  No, Judge, I wasn't in the

12:54:07  2   trial.

12:54:07  3          THE COURT:  But you saw Mr. Kohlmann

12:54:09  4   testify, didn't you?

12:54:09  5          MR. NUBANI:  Oh, yes.  I was very involved.

12:54:12  6   I just meant I wasn't attorney of record in that trial.

12:54:14  7   But I'm very familiar with the circumstances, with the

12:54:18  8   trial.

12:54:18  9          I'm not as familiar with the process that

12:54:22 10   Judge Brinkema went through in terms of qualifying

12:54:26 11   Mr. Kohlmann, but -- because I was just given the

12:54:29 12   transcript of the direct testimony that qualified him.

12:54:32 13          But, my point is that he being who he is,

12:54:37 14   which I did not put in my motion what his motives are

12:54:40 15   and I'm not going to go -- I'm not going to trouble the

12:54:43 16   Court with that.  What I'm trying to say is that just

12:54:46 17   because he's been qualified once or twice, that whole

12:54:50 18   issue of what that type of expert testimony does in

12:54:56 19   these quote unquote "terrorism cases" is going to be a

12:54:59 20   defining issue that is currently upon -- is currently

12:55:03 21   upon -- in the appeals stage.

12:55:05 22          So, it -- I think that the Court needs to

12:55:08 23   make an -- their own independent -- the Court needs to

12:55:12 24   make it's own independent judgment of whether he is

12:55:14 25   qualified, whether it is appropriate in this case,

12:55:18   1    Judge.

12:55:18   2              THE COURT:  All right.

12:55:19   3              MR. NUBANI:  I just want to respond to some

12:55:21   4    of the things that the government said.  In terms of

12:55:23   5    peer review, that's the whole point.

12:55:25   6              Judge, after September 11th, the whole

12:55:30   7    academic community, people who wanted to benefit,

12:55:34   8    everyone is running to this area topic.

12:55:36   9              Of course, the academic community takes a

12:55:38  10    longer time to respond.  I mean, ten years from now,

12:55:40  11    there will be peer review of what really al-Qaeda was,

12:55:44  12    how it operated, what its goals were and by that time,

12:55:47  13    maybe the whole situation in the Middle East and

12:55:49  14    vis-a-vis the West will have changed anyway.

12:55:52  15              But the point is, it's inappropriate for

12:55:54  16    someone who just graduated from law school who I say has

12:55:57  17    motives which I'm not going to get into and has motives

12:56:00  18    to be the Dougie Howser of terrorism in these cases.

12:56:04  19              And just one more point, Judge, again, I

12:56:07  20    know that you didn't want to push the government and

12:56:09  21    appropriately so, on what their -- what their case in

12:56:12  22    chief is going to be in term of strategy.  But they did

12:56:14  23    say that through the confessions themselves, if the

12:56:16  24    confessions are admitted, then, there is evidence there.

12:56:19  25              The foreign witness testimony depositions,

12:56:23  1   there is evidence there.  The jury can make those

12:56:26  2   determinations without having to know what the history

12:56:28  3   of al-Qaeda is, how it operates and so forth.

12:56:31  4              Those are things that we can stipulate to

12:56:35  5   and things that we can -- we can develop through the

12:56:39  6   process of the trial.

12:56:40  7              But, to have the government bring Evan

12:56:44  8   Kohlmann as they want to do at the beginning of the

12:56:47  9   trial is totally inappropriate.

12:56:51 10              If it's later decided that that has to

12:56:53 11   change, that's fine.  But they can't bring him in to set

12:56:56 12   the stage of the way they want things to be.  And,

12:56:59 13   that's just inappropriate.

12:57:01 14              The other point I wanted to make is --

12:57:03 15              THE COURT:  Is it your view that the

12:57:04 16   Internet is a reliable source for making a judgment

12:57:10 17   about the credibility of information about how a

12:57:13 18   clandestine terrorist cell operates?

12:57:17 19              MR. NUBANI:  Not under the test of Daubert,

12:57:19 20   certainly not, because it's just -- it's not -- it's not

12:57:22 21   reliable.

12:57:23 22              I -- Judge, I can, you know, Muslims have an

12:57:27 23   ability to bring in more reliable evidence on how these

12:57:31 24   groups relate without being a part of those groups than

12:57:33 25   to get things on the Internet.

12:57:35   1            Of course, I don't think that it's reliable

12:57:37   2    at all.

12:57:37   3            THE COURT:  All right.  Mr. Nubani, I think

12:57:39   4    I have what I need to make a judgment now.

12:57:40   5            All right, this matter is before the Court

12:57:42   6    on the defense motion to exclude the testimony of

12:57:45   7    Mr. Evan Kohlmann, who has been proffered by the

12:57:48   8    government, and I'm reading from the October 24th letter

12:57:51   9    of the prosecutor to Mr. Nubani which says, "Evan F.

12:57:56  10    Kohlmann will testify as an expert witness concerning

12:57:58  11    the history and structure of al-Qaeda, its organization

12:58:02  12    and operations in the Arabian Peninsular and the basis

12:58:06  13    for concluding that the terrorist cell headed by Ali Abd

12:58:12  14    Al-Rahman al-Faq'asi al-Ghamdi and Sultan Jubran Sultan

12:58:19  15    Al-Qahtani was an al-Qaeda cell".  And I'll provide the

12:58:22  16    court reporter with a copy of the letter so she can

12:58:25  17    spell the names.

12:58:25  18            The Court has reviewed the resume' of

12:58:27  19    Mr. Kohlmann which has been proffered and the transcript

12:58:32  20    proffered by the government of the March 8, 2004 hearing

12:58:36  21    before Judge Brinkema in the Ben Kahla case.

12:58:38  22            And on page 195, she says at line nine, "Are

12:58:43  23    you tendering Mr. Kohlmann as an expert in modern Afghan

12:58:47  24    politics?  Mr. Kromberg:  Yes".  Answer -- line 12, "All

12:58:51  25    right, I'm going to accept him.  And, I've accepted him

12:58:54   1   as an expert in the other trial.  And clearly he has

12:58:56   2   written enough and studied enough on this.  I'm going to

12:58:59   3   accept him as an expert.  So you can get on with your

12:59:02   4   questions".  That's line 15.

12:59:03   5            I recognize that Judge Brinkema has tried

12:59:06   6   the Ben Kahla case and the Al-Timimi case.  What I'm

12:59:09   7   being asked to do today is to make a judgment about

12:59:12   8   whether or not Mr. Kohlmann is qualified to render an

12:59:15   9   opinion within the meaning of Federal Rule of Evidence

12:59:18  10   702.

12:59:19  11            I've also been provided with the cross

12:59:22  12   examination of Mr. Kohlmann's transcripts from pages 672

12:59:28  13   to 683.  And, what -- what strikes me in reviewing this

12:59:36  14   question is Federal Rule of Evidence 702 says that the

12:59:41  15   trial judge is to make a determination -- and I'm going

12:59:44  16   to read what the rule says.  "If scientific, technical

12:59:47  17   or other specialized knowledge will assist the trier of

12:59:52  18   fact to understand the evidence or to determine a fact

12:59:53  19   in issue, a witness qualified as an expert" and I'm

12:59:57  20   going to underline, "by knowledge, skill, experience,

13:00:00  21   training or education", and I underline all four of

13:00:03  22   those, "may testify thereto in the form of an opinion or

13:00:06  23   otherwise, if one, the testimony is based upon

13:00:10  24   sufficient facts or data, two, the testimony is the

13:00:13  25   product of reliable principles and methods, and three,

13:00:17  1     the witness has applied the principles and methods

13:00:20  2     reliably to the facts of the case".

13:00:22  3                This Judge is not persuaded that

13:00:26  4     Mr. Kohlmann's study of the subject matter of terrorism,

13:00:30  5     whatever that is in terms of it's a global subject

13:00:32  6     matter.  But I believe it has to do with groups that are

13:00:37  7     organized to carry out political acts of violence

13:00:40  8     against governments but that are not organized

13:00:44  9     governments or entities themselves.  That's what I think

13:00:46 10     a terrorist is and that there is a designated foreign

13:00:50 11     terrorist organization, al-Qaeda.  There's no contest in

13:00:54 12     this trial what al-Qaeda is.

13:00:56 13                The question is whether Mr. Kohlmann,

13:00:58 14     because he has a law agree from Pen, which he earned in

13:01:02 15     2004 and because he graduated from Georgetown in 2001

13:01:06 16     with a major in politics and international securities

13:01:09 17     studies and a minor in Islamic studies, in and of itself

13:01:13 18     makes him a person who could assist the jury with

13:01:17 19     reliable information about the operation of al-Qaeda.

13:01:20 20                I note that first of all, as far as we

13:01:23 21     can -- has been proffered here today, Mr. Kohlmann has

13:01:27 22     never met anyone from al-Qaeda, has not infiltrated

13:01:31 23     al-Qaeda, has not done any research where he's had

13:01:34 24     contact with someone who was in al-Qaeda to know just

13:01:37 25     what they do or did not do.

13:01:38  1          He's read about it on the Internet and in
13:01:40  2   scholarly books.  And certainly a person can qualify
13:01:43  3   based upon reading and education.
13:01:45  4          He's never been to Pakistan, never been to
13:01:48  5   Saudi Arabia, does not speak Arabic, does not speak
13:01:52  6   Urdu, can't read Urdu websites, can't read Arabic
13:02:00  7   websites and has to have them translated for him.
13:02:02  8          He has read many books about the subject
13:02:04  9   matter of terrorism, and he reads and has collected
13:02:07 10   many, many websites from the Internet.  And this is a
13:02:11 11   part of his basis for his conclusions about how al-Qaeda
13:02:14 12   and other terrorist groups operates.
13:02:16 13          The Court does not think that the Internet,
13:02:19 14   particularly the postings that he has described here, in
13:02:21 15   and of themselves have any -- there's no way to test the
13:02:26 16   reliability of them.  There's no way to know who posts
13:02:28 17   them.  There's no way to know who maintains them.  There
13:02:31 18   is no way to know whether the information there is
13:02:34 19   accurate or not.  And that he has published a book, a
13:02:38 20   self-published book, I note, in and of itself does not
13:02:41 21   make him an expert.
13:02:42 22          And, the fact that the government has hired
13:02:44 23   him to testify as an expert witness in cases including
13:02:49 24   U.S. versus Battleford, Ben Kahla, Randall, Royer,
13:02:56 25   Al-Timimi does not with this judge sit as a basis to

13:02:59  1   qualify him as an expert in al-Qaeda, particularly where

13:03:01  2   he has had no contact with someone from al-Qaeda.  All

13:03:05  3   he has done is to read about it.

13:03:06  4              My jury could do an Internet search on

13:03:09  5   Google and read about al-Qaeda.

13:03:12  6              I'm sure that Mr. Kohlmann could probably

13:03:14  7   summarize it for them in a way that would be very

13:03:17  8   helpful, but I'm not of the opinion that Mr. Kohlmann is

13:03:19  9   an expert because he is not qualified by training,

13:03:24 10   because he has none other than what he is self taught.

13:03:27 11              He has not qualified because the methods

13:03:30 12   that he's gathered his information are reading the

13:03:33 13   Internet and reading books.  That in and of itself may

13:03:35 14   be a way to learn engineering, but at some point, the

13:03:38 15   engineer has to actually handle a device.

13:03:41 16              Here we have a person who has just read

13:03:43 17   about these things and is being offered to tell the

13:03:45 18   Court about a cell, the Ali Abd Al-Rahman al-Faq'asi

13:03:52 19   cell and the Sultan Jubran cell.  He is going to make a

13:03:56 20   judgment that these cell were al-Qaeda cells.  He's

13:03:58 21   never been to Saudi Arabia, never interviewed anyone

13:04:01 22   from either of these cells, has no personal knowledge

13:04:04 23   about whether these cell are affiliated with al-Qaeda or

13:04:06 24   anyone else.

13:04:08 25              So for all those reasons, the motion to

29

13:04:08  1    exclude Mr. Kohlmann's testimony will be granted.

13:04:12  2    Exception's preserved.

13:04:13  3              I think that that covers what we have for

13:04:14  4    trial, so I'll see you all on Monday at 10 o'clock.

13:04:17  5    We're in recess.

13:04:18  6              Thank you.

          7              (Thereupon, the proceeding concluded at 1:04

          8    p.m.)

          9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

30

```
 1                    CERTIFICATE OF REPORTER
 2
 3               I, Renecia Wilson, an official court
 4    reporter for the United State District Court of
 5    Virginia, Alexandria Division, do hereby certify that I
 6    reported by machine shorthand, in my official capacity,
 7    the proceedings had upon the motions in the case of
 8    United States of America vs. Ahmed Omar Abu Ali.
 9               I further certify that I was authorized and
10    did report by stenotype the proceedings and evidence in
11    said motions, and that the foregoing pages, numbered 1
12    to 29, inclusive, constitute the official transcript of
13    said proceedings as taken from my shorthand notes.
14               IN WITNESS WHEREOF, I have hereto
15    subscribed my name this 9th day of  January, 2006.
16
17
                             Renecia Wilson, RMR/CM
18                           Official Court Reporter
19
20
21
22
23
24
25
```