UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
v. ) Crim. No. 05-40026-FDS
MUHAMED MUBAYYID, )
EMADEDDIN Z. MUNTASSER, and )
SAMIR AL-MONLA )
Defendants. )

**GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE*:**
**DOCUMENTARY EVIDENCE AND NON-EXPERT TESTIMONY**

The United States of America, by Michael J. Sullivan, United States Attorney, and Assistant United States Attorneys Donald L. Cabell, B. Stephanie Siegmann and Aloke S. Chakrvarty, hereby opposes the defendants' motion *in limine* seeking to exclude various items from being introduced into evidence at trial. As noted below, the evidence sought to be excluded is relevant and not unfairly prejudicial. In further support of its opposition, the government responds as follows, addressing each item in the order it appears in the defendants' motion.

1-2. References to Al Qaeda, Bin Laden, terrorism, terrorist attacks/plots, and Bin Laden's CNN interview

The defendants assert that "[t]his is a tax case, not a terrorism case," and that references to Al Qaeda, Bin Laden or terrorism, and/or evidence of Bin Laden's CNN interview are thus not relevant and, regardless, would be unfairly prejudicial. This argument is bootless. To begin, while it is true that this

case arises from statements and omissions made on certain tax forms, the case is chiefly about whether the defendants, in seeking tax exempt status for Care, made material misrepresentations and omissions on certain tax forms in order to conceal the fact that Care International was a successor or outgrowth to Al-Kifah, and, like Al-Kifah, solicited money to support jihad and the mujahideen. To prove that the defendants did so, the government necessarily must show, among other things, (1) a link between Al-Kifah and Care International, (2) what activities Al-Kifah supported and/or was involved in, and (3) what activities Care supported and/or was involved in.

Against this backdrop, some allusion to Al-Qaeda and Bin Laden is both relevant and necessary because the government expects the evidence to show that Bin-Laden was instrumental in the founding of Al-Kifah. More specifically, Bin-Laden and a man named Abdullah Azzam, a supporter of the mujahideen and violent jihad, jointly founded a charity front called Maktab al-Khidamat (MAK) in the 1980's, which means "services office." MAK subsequently came to be known as Al-Kifah, which means struggle. Care International, in turn, effectively acknowledged its relation to Al-Kifah and Azzam when it stated in a pamphlet that "Care is a non-profit organization founded by Imam Abdullah Azzam to provide services to war victims and refugees around the world."

Similarly, evidence that the defendants possessed a transcript of a CNN interview of Bin Laden is relevant because it tends to show that the defendants and Care supported Bin Laden and his concept of jihad as a violent struggle in which every Muslim had a duty to participate. The transcript was found along with other Care materials, including Al-Hussam newsletters, during a search of defendant Mubayyid's house in 2003. The jury reasonably could conclude from the transcript and its location that Care, in publishing or possessing documents espousing the obligation of Muslims to participate in jihad and support the mujahideen, supported such activities.

Further, evidence of or references to these items and terms would not be unfairly prejudicial because the government does not intend to make gratuitous use of the evidence, and the Court could in any event instruct the jury as to the purpose for the introduction of the evidence.[1]

---

[1]At the end of this argument, the defendants assert that references to terrorism and the Joint Terrorism Task Force (JTTF) should be stricken from the indictment. The assertion is curious because the defendants do not allude to this request in their subheading, and the thrust of requests 1 and 2 is for the exclusion of evidence from the trial, as opposed to the striking of wording in the indictment. Regardless, the cursory request should summarily be denied. The defendants do not contend that the use of the words or terms is incorrect or inaccurate, and it simply does not follow that a word or term should be stricken from an indictment simply because the word or term may not be used at trial. Moreover, the reference to the JTTF, which is a multi-agency task force headed by the FBI, is relevant because it helps to explain why so many different agencies were involved in the investigation.

3. Later designations of other organizations as terrorist organizations

The defendants contend, correctly, that the government intends to introduce evidence that Global relief Foundation (GRF) was designated as a Specially Designated Global Terrorist (SDGT) group on October 18, 2002.[2] The defendants contend that this evidence is irrelevant and unfairly prejudicial because there is no evidence that Care made any contributions to GRF after its designation. The defendants argue that allowing evidence of GRF's designation under these circumstances would do no more than amount to guilt by association.

This argument is fatally flawed because the defendants mistakenly focus on when GRF was specially designated as opposed to when it actually engaged in the unlawful activities that led to its special designation as a SDGT. In that vein, the evidence will show that Care was actively contributing large sums of money to GRF at the same time that GRF was involved in the activities that led to its special designation as a terrorist group. Indeed, the evidence will show that defendant Muntasser met with representative of GRF during this time period, and expressed

---

[2]Although the defendants refer only to GRF by name, they seek to exclude evidence of the later designation of any organization that Care contributed to. To be clear, the government intends to introduce evidence of the designation of the Benevolence International Foundation, the Holy Land Foundation, and MAK/Al-Kifah itself. For the same reasons noted above, evidence of the designation of these organizations is admissible.

support for GRF and its activities. As such, evidence that Muntasser and Care had dealings with GRF at the same time GRF was engaged in supporting terrorism, as evidenced by GRF's special designation, is probative of whether Care, through the defendants and its members, was sympathetic to GRF's goals, and engaged in pro-jihadist and pro-mujahideen activities which it failed to disclose to the IRS. The Court should accordingly deny this aspect of the defendants' motion.

4. <u>References to the 1993 World Trade Center Bombing and New York Times/Newsweek articles regarding the World Trade Center Bombing</u>

The defendants argue that references to the World Trade Center bombing (on February 26, 1993), and subsequent media articles of the bombing, should be excluded as irrelevant and unfairly prejudicial because (1) one anticipated government witness did not mention the bombing as a factor in the creation of Care, and (2) there is evidence that defendant Muntasser had begun working on what was to become Care by February 16, 1993, prior to the bombing. Accordingly, the defendants contend, the evidence does not support the contention that defendant Muntasser incorporated Care because of media reports linking Al-Kifah in New York to the bombing.

However, the government has never contended that defendant Muntasser formed Care solely because of media reports relating to the bombing. On the contrary, the government expects to show

that defendant Muntasser had multiple reasons for changing the name of the Al-Kifah Boston branch office to Care. The government expects to show, for example, that, some members of the Boston branch of Al-Kifah wished to distance themselves from the Al-Kifah office in New York in order to have greater control over how money collected by the Boston branch office was spent. That being said, the government expects to show that, regardless of when Muntasser began contemplating changing the name of the Boston branch of Al-Kifah, he did in fact formally change the name just two days after the New York Times published an article linking the WTC bombing to the Al-Kifah center in New York. Even assuming the articles were not the sole motivation for changing Al-Kifah's name to Care, the jury could reasonably conclude that the close proximity in time of the newspaper article and the incorporation of Care were related. Accordingly, the motion relating to this request should be denied.

5. Documents found by Steven Emerson in the basement of a building in Brooklyn

The government intends to introduce into evidence certain documents found at some point between the fall of 1993 and summer of 1994 in the basement of the Al-Kifah refugee Center at 552 Atlantic Avenue in Brooklyn, NY. The defendants do not dispute that the documents are relevant. Nor could they; the documents are highly relevant because they (1) directly link defendant Muntasser and the Boston branch of Al-Kifah to the Al-Kifah

Refugee Center in New York, (2) demonstrate that Al-Kifah supported jihad and the mujahideen, and show that (3) Care International participated in the same activities as Al-Kifah, including publishing the same Al-Hussam newsletter.

Among other things, for example, the documents found include (i) correspondence addressed to "Brother Emadeddin Muntasser" at the Al-Kifah Refugee center in New York, (ii)various pieces of postmarked correspondence from defendant Muntasser in Worcester to the NY Al-Kifah Refugee center, as well as correspondence from defendant Muntasser to Al-Kifah using its original name of Afghan Refugees Service, Inc., also at 552 Atlantic Avenue, NY, (iii) postmarked correspondence from the Alkifah Refugee Center in Boston to the NY Alkifah Refugee Center at 552 Atlantic Avenue, (iv) documents from Al-Kifah Boston, including a flyer soliciting funds from Muslims in order to provide the "Emerging Jihad Movement in Bosnia with more than Food and Shelter," and (v) another Al-Kifah Boston letter which explains that Al-Kifah was founded to serve the cause of "Jihad" and "actively supports the Mujahideen in the front," and contains a "Zakat" calculation guide identical to the Zakat guide Care subsequently published and distributed.

In addition, the documents found in the basement include at least three issues of the Al-Hussam newsletter. All of the issues were published in 1993 (2/5/93, 4/2/93, and 4/16/93), all

encourage and/or promote jihad, and all are virtually identical in terms of the banner and layout. Notably, though, whereas the first two issues were published by the Alkifah refugee Center in Boston, the third Al-Hussam was published by Care, showing or at a minimum strongly suggesting that Care was related to Alkifah, engaged in the same activities as Alkifah, and thus was an outgrowth of or successor to AlKifah. As such, the evidence as a whole is highly relevant and bears on one of the principal issues the jury will need to resolve.

The defendants argue that the evidence collected from the basement should be excluded because, among other things, there is no evidence the documents belonged to Care or to the defendants, and the government has not noticed any witness to testify about how and where the documents were found as a prerequisite to authenticating the documents under Fed. R. Evid. 901(a).[3] This claim must fail.

As an initial matter, the defendants filed this motion before learning that the government intends to call at least two chain-of-custody witnesses to authenticate the documents. Upon information and belief, Joseph Braude will testify that he was asked by an individual named Steven Emerson to obtain the

[3]Fed. R. Evid. 901(a) provides that: The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

documents from the basement and, as a result, directed another individual to go to the location and obtain the documents. Mr. Braude is expected to testify that he participated in an exercise over the course of four nights in which he received the documents from the individual who entered the basement, and assisted in delivering them to Emerson. The government also expects that Evan Kohlman will testify that he subsequently worked with Mr. Emerson and received the documents from him.

Against this backdrop, there is unquestionably sufficient evidence to support a finding that the documents are what they purport to be. First, there will be testimony that the documents were obtained from the Brooklyn Alkifah Refugee Center and the documents could be admitted based on that testimony alone. See e.g., United States v. Anderson, 452 F.3d 66, 80 (1st Cir. 2006)(noting that even though there may be gaps in the chain of custody for a certain piece of evidence, such gaps factor into the weight given to the evidence rather than its admissibility).

Moreover, the correspondence from defendant Muntasser to the Alkifah Refugee Center at 552 Atlantic Avenue, as well as correspondence from defendant Muntasser to the New York Alkifah Refugee Center at P.O. Box 294 in Brooklyn, New York, is postmarked from locations in Worcester known to have belonged to Muntasser, strongly suggesting that the correspondence was in fact mailed from Worcester by the defendant. See e.g., United

States v. Hanna, 191 Fed. Appx. 921, 924 (11th Cir. 2006)(letter purportedly written by defendant to clerk of court in which her case was to be tried was sufficiently authenticated for admission in prosecution for armed bank robbery, where return address of letter, its postmark, content of letter, and testimony that letter bore defendant's signature were evidence sufficient to support finding that defendant wrote letter).

In addition, the documents at issue bear "distinctive characteristics and the like" which, when "taken in conjunction with circumstances," easily provide sufficient evidence to conclude the documents are what they purport to be. See Fed. R. Evid. 901(a)(4); United States v. Thompson, 449 F.3d 267, 274 (1st Cir. 2006). For example, one of the pieces of correspondence to Muntasser, a December 17, 1991 letter, is written by an official from the Islamic Coordinating Committee (ICC), addressed to Muntasser at the Alkifah Refugee Center at P.O. Box 294 in Brooklyn. That address --the Alkifah Refugee center at P.O. Box 294, is notable because Muntasser himself sent at least two pieces of correspondence to that address from Worcester, MA. In context, the letter from the ICC suggests that the ICC official was sending a letter to defendant Muntasser in his capacity as a member of Alkifah, but sent it to Alkifah in New York rather than Boston. Similarly, the government expects to show that the Al-Hussam newsletters obtained from other

sources[4], e.g., individuals who were members of Al-Kifah or Care, or who donated money in response to solicitations from Care, are identical to the Al-Hussam newsletters found in the basement, suggesting if not outright demonstrating that those items are genuine. Further, the government expects to show that the Zakat calculation guide found in the basement was identical to a Zakat calculation guide independently obtained from a donor, as well as a draft Zakat calculation guide for Care dated January of 1994 that was seized from a storage unit in April of 2003.

In short, where the government will introduce evidence that the documents were found in the basement of the Brooklyn Alkifah Refugee Center at 552 Atlantic Avenue, and where the documents independently contain several distinct markings indicating they were sent by or to the defendant, or were published by Care or by Alkifah in Boston, the evidence is sufficient to support a finding that the documents are what they purport to be, and the defendant's motion relating to this issue should be denied.

6. Badr al Bosna and other tapes

The government intends to introduce evidence of a videotape known as Badr al Bosna, and three audiotapes found in Care's storage unit in April of 2003. Among other things, Care used, sold and distributed the Badr al Bosna video as a tool to educate

[4]Physically, these Al-Hussam newsletters also were found during the search of defendant Mubayyid's residence.

Muslims regarding the concept of violent jihad, as well as to raise funds and to encourage support for the mujahideen in Bosnia. Similarly, the audiotapes contained lectures and/or lessons regarding the meaning of jihad. Accordingly, the Badr al Bosna video and the audiotapes are relevant because they tend to show that Care supported such activities, explain what the term jihad meant to the defendants, and demonstrate that Care was engaged in activities which it failed to disclose to the IRS.

The defendants argue first that the video should be excluded because there is no evidence Care distributed it. The government expects to show the opposite, however. Among other things, the government will introduce portions of two intercepted 1996 telephone conversations involving defendant Al-Monla, each with a different person, in which he discussed arrangements in connection with Care's efforts to sell, show and distribute the video to others. And, although there may be no specific, direct evidence that Care distributed the specific three audiotapes, the tapes are nonetheless relevant because, as noted above, they show what activities Care was supporting, and explain what the term jihad meant to the defendants.

The defendants next argue that, even assuming Care distributed the Badr al Bosna video, the video does not mention Care, and "the dissemination is protected First Amendment activity." This argument misses the point entirely. As the

defendants are well aware from the arguments advanced in support of the failed motion to dismiss the indictment, the issue is not whether Care was legally entitled to distribute the Badr al Bosna video, about which there is no issue but, rather, whether Care was engaging in pro-jihad activities which it failed to disclose to the IRS. Because the video is directly probative on this critical issue, it is relevant and admissible.

7. Emails from Azzam Publications

The government intends to introduce an e-mail sent from Azzam Publications to Care at "CAREBOSTON@aol.com" on April 2, 1998.[5] The e-mail warns Care of an impending "large war" in Kosovo and seeks financial contributions from Muslims to support the "Kosovan-Mujahideen." The e-mail also specifically instructs Muslims on how to ensure that their money is not diverted to other groups and instead is given to "PRACTISING NON-NATIONALISTIC MUSLIMS, who will in turn pass the money onto the mujahideen fighting groups, not secular communist Kosovans." The defendants argue that the e-mail should be excluded because no names of individual senders or recipients appear on the e-mail, the contents of the e-mail do not refer to Care, and there is no evidence that the e-mail is part of a two-way correspondence. These assertions may be true, but they are irrelevant.

[5]The defendants refer to the evidence as consisting of two e-mails but the three page document is actually just one e-mail.

The e-mail is relevant for a number of reasons. First, the e-mail was sent by Azzam Publications, which was a primary source of pro-jihad publications and literature. The mere fact that such an organization was sending e-mail to Care is itself probative of who Care associated with, how Care was perceived by other pro-jihad groups, and what activities Care was engaged in at the time. In that regard, the inflammatory and urgent tone of the e-mail further suggests that it was being sent specifically to entities that shared the same beliefs and goals articulated in the e-mail, again suggesting that Care was engaged in supporting pro-jihad activities and the mujahideen at the time.

Moreover, officials at Care went to some length to preserve the e-mail and other pro-jihad materials, suggesting that Care accorded special importance to the e-mail and the activities it was encouraging. More specifically, the e-mail was first discovered along with other Care materials such as Al-Hussam newsletters by law enforcement officers during a search of a storage facility in October of 2001. Agents took note of the e-mail but did not take it. Subsequently, about two years later, law enforcement officers conducted a search of defendant Mubayyid's residence and found many of the very same documents that had been found during the 2001 search, suggesting the documents had been moved from the storage facility to defendant Mubayyid's home. Although it became apparent that some documents

from the 2001 search had been removed or destroyed, the Azzam Publications e-mail was found among the Care documents in defendant Mubayyid's home.

On these facts, a jury could reasonably conclude that Care's receipt of the e-mail, and its decision to preserve the e-mail (and the other pro-jihad materials found along with it) for several years, is probative on whether Care supported jihad and the mujahideen, and was engaged in such activities during the time it received and preserved the e-mail.

Finally, it would not be unfairly prejudicial to admit the e-mail because the government witness(es) through whom the e-mail (and other search materials) is introduced and discussed will be available for cross-examination on all aspects of the e-mail and it's discovery.

8. Markings on Government exhibits indicating designation as "Secret" or "Confidential" or similar designation

The government is amenable to discussing potential redactions on particular documents but objects to the blanket request to redact any exhibit with a designation of "secret" or "confidential." Such designations may help to explain the nature and significance of a particular exhibit and the defendants have not offered any reason nor cited to any case law in support of their broad request.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: /s/ Donald L. Cabell
Donald L. Cabell
B. Stephanie Siegmann
Aloke S. Chakravarty
Assistant U.S. Attorneys