UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff | ) |
| | ) |
| V. | ) |
| | )    CRIMINAL NO.  05-40026-FDS |
| MUHAMED MUBAYYID, | ) |
| EMADEDDIN Z. MUNTASSER and | ) |
| SAMIR AL-MONLA, | ) |
| Defendants | ) |

_____

**DEFENDANTS' OMNIBUS RESPONSE TO THE GOVERNMENT'S SEVERAL
MOTIONS *IN LIMINE* TO LIMIT OR EXCLUDE THE TESTIMONY OF THE
DEFENDANTS' EXPERT WITNESSES AND TO PRECLUDE THE DEFENDANTS
FROM  INTRODUCING  CERTAIN EVIDENCE**

The Government has filed five motions *in limine* in this case which, taken together, would do nothing less than deprive the defendants of their fundamental right to a trial by jury in which jurors, not government prosecutors, determine the key questions which underlie guilt or innocence. Despite their commonplace appearance, despite the almost total absence of citations to authority, these cursory, seemingly innocuous motions, barely a few pages each, amount to an unabashed and wholesale assault on the adversary system, the role of the jury, and the requirement that the government prove every element of its case beyond a reasonable doubt.

Under the government's approach, the only experts who are permitted to offer opinion testimony are those who agree with the government; no matter how stellar their qualifications, how well-established their methodology or how solid their experience, experts – including former senior government officials – are not permitted to testify as to how they did their own jobs, as relevant to the issues in this case, unless they agree with the position the government is taking now.  A former

1

IRS official who was responsible for considering applications from charitable organizations in the relevant period is not permitted to opine about how such applications were treated, or would have been, not because he is unqualified or his methodology is questionable, but because the prosecutors in this case say his opinion is wrong. A former U.S. Agency for International Development (AID) official who was responsible for actually carrying out American public policy in Afghanistan in the relevant period is not to be permitted to testify as to what that policy was, because his expertise is deemed irrelevant, but a former IRS official with no responsibility for such policy would be permitted to speculate as to what he remembers public policy to have been and how this might have affected his actions. Ignorance is bliss and admissible; real expertise is poison and must be stricken.

Relevance is defined not by the charges in the indictment but by the identity and affiliation of the witness, and the acceptability—to the prosecution—of the expert's theory. A recent law school graduate with no personal experience whatsoever in the area of the world at issue here, no peer-reviewed publications, no credits in graduate level courses as a student much less a professor, should be allowed to testify as to terrorist acts by individuals having absolutely nothing to do with this case; but distinguished full professors with decades of government experience and direct responsibility for the conduct of American policy in the very area of the world that Care's activities were focused on should be barred from testifying because such accurate, relevant information might "confuse" a jury, while the goings-on of totally irrelevant terrorist groups in Libya and Algeria, and the thoughts of Saddam Hussein and Ayatollah Khomeini would not. In the interests of protecting the reputations of the prosecutors and avoiding even the hint that they may have acted vindictively, defendants, in the Lewis Carroll world of the prosecutors here, would be deprived of their right to introduce evidence directly relevant to the question of the willfulness of the conduct charged in the

indictment, evidence that establishes their consciousness of innocence and contradicts the entire government theory of the case. But since that evidence might paint the prosecution in an unfavorable light, it should be excluded; as if the rule of law is intended to protect the prosecutors' reputation over the defendants' guilt or innocence.

Why have a trial if the only experts who are allowed to testify are those who agree with the government? Why call it an adversary system if only one side can be heard? Why bother with a jury when, in the name of avoiding confusion, its members can be given history lessons in terror and terrorism but left in the dark as to the details of the very humanitarian crises this charity was founded to address? Why pretend to enforce a *mens rea* requirement of willfulness when a defendant is precluded from introducing any evidence that would establish an utter lack of guilty intent.

As the Supreme Court recognized in *Washington v. Texas*, 388 U.S. 14, 19 (1967):

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.[1]

The government's case rests on quicksand: it has charged the defendants with tax offenses and seeks to convict them, by association, as terrorists. Its expert reports, which were the subject

---

[1] The Court continues: "Joseph Story, in his famous Commentaries on the Constitution of the United States, observed that the right to compulsory process was included in the Bill of Rights in reaction to the notorious common-law rule that in cases of treason or felony the accused was not allowed to introduce witnesses in his defense at all. Although the absolute prohibition of witnesses for the defense had been abolished in England by statute before 1787, the Framers of the Constitution felt it necessary specifically to provide that defendants in criminal cases should be provided the means of obtaining witnesses so that their own evidence, as well as the prosecution's, might be evaluated by the jury." *Id.* at 19–20 (footnotes omitted).

of the defendants' own motions *in limine*, made clear that the prosecution was seeking to win convictions on tax and false statement charges using evidence which would only be relevant in an international terrorism case. Now, in seeking to exclude the defense experts and limit the evidence which may be presented on behalf of the defendants', the prosecution seeks to shield its fragile case from the challenge that the adversary system requires. Under the government's view, anything bad that has ever been done by any Muslim in the world is relevant when it comes to convicting these defendants, but even the most knowledgeable American government officials with experience directly relevant to the very charges in the indictment should be precluded from testifying lest the jury find itself confused. With all due respect, it is the government that is confused here, dangerously so.

1.      **Document 304:  Government's Motion *in Limine* to Preclude any Allegation of Improper Motives in Initiating Prosecution.**

Defendants do not intend to ask the jury to acquit based on the motives of the government in seeking this indictment. They have never suggested, implied, or sought permission to do so, as the Government all but acknowledges, by citing only to the defendants' motion to dismiss the indictment in support of its own motion to limit defense argument and proof at trial relating to the prosecution of this case. Yes, defendants raised a claim of selective and vindictive prosecution in the motion to dismiss, which they had every right to do. But having lost the motion, the appropriate forum for review of that decision is, as both sides well know, an appellate court, not a jury.

Given that, and given the absence of any actions of the defense to suggest otherwise, the real question here is: what evidence is the government seeking to exclude by sleight of hand? What is the government seeking to accomplish in asking that the defense be barred from making an argument

we have no intention of making?  For want of any other possible explanation for what would otherwise be a useless and wasteful motion, it appears that what the government really seeks to accomplish here is to deny the defendants the right to introduce evidence of a legitimate defense in the guise of attacking an illegitimate one.

Selective prosecution is a legal issue for the court.  Willfulness, however, is a factual issue for the jury, and the evidence which the government is seeking to exclude as relevant only to selective prosecution is in fact highly relevant and admissible as it bears on willfulness.

In addressing the selective prosecution issue, it was certainly relevant for the court to know that defendant Muntasser filed an application for citizenship in which he fully and accurately disclosed his membership in Al Kifah and Care International, that the government repeatedly delayed its decision on that application, that defendant, acting under the authority of the statute, brought suit to compel a hearing, that Judge Zobel, of this district, denying the government's repeated requests for further delay, ordered a hearing and left little doubt that she intended to grant the defendant's application and that on the eve of the hearing on his naturalization as a United States citizen, the prosecution returned the indictment at issue here.

Such evidence was relevant to the selective prosecution issue, but that is not the only issue in this case to which it is relevant.   It is equally relevant in rebutting the government's contention that the defendants acted wilfully and with intent to deceive the government in applying for and maintaining tax exempt status for Care.  The defendants' intent and willfulness, or lack thereof, are critical trial issues and are solely within the province of the jury to determine.

The government's theory is that the defendants knowingly and wilfully concealed a supposed connection between Al Kifah and Care in government filings, because they believed any reference

5

to Al Kifah would doom their application for tax-exempt status.   More broadly, the government's theory is that the defendants knew that what they were doing, in terms of Care's activities and its publications, would cost them tax-exempt status and so they deliberately misled the government on these points.    In support of its theory about the alleged Al-Kifah connection, and the defendants' motives in not disclosing it, the prosecution proposes to introduce unverified "media reports," which it has no proof that the defendants ever even saw, of rumors that Al Kifah in New York was involved in the then-recent World Trade Center bombing; absent any proof that the defendants saw these reports, all they do is create prejudice in the jury's mind that would lead them to view Al Kifah as poison per se.  The government is also seeking to have its proposed expert, Dr. Levitt, describe the formation of Care as a typical effort by a terrorist organization to create a charitable front, even though Al Kifah Boston was not then, or ever, found to be a terrorist organization.

Yet the government would deny the defense's right to introduce evidence that defendant openly acknowledged his affiliation to Al Kifah, that he was sufficiently confident of his past as a law-abiding legal resident, including his tenure at Care, that not only did he apply for citizenship, but he sued the government when it did not act on his application, opening himself up to discovery by the government and assuring the very sort of investigation which a "guilty" applicant would most vigorously seek to avoid.  That the defendant instituted legal proceedings that put his relationship with Care and with Al Kifah under scrutiny, and with the government he was purportedly seeking to hoodwink as his adversary, demonstrates consciousness of innocence, not guilt, and an absence of knowledge or purpose to violate the law.  It further demonstrates the very sort of commitment to this country, and its values, that the government's experts call into question by repeatedly attempting to tie the defendants to the anti-Americanism of terrorists with whom defendants have no connection.

> Just as flight or other evidence of 'consciousness of guilt' may
> sometimes be relevant, on some occasions evidence of 'consciousness
> of innocence' may also be relevant to the central issue at trial. . . . In
> Dean Wigmore's view, both 'conduct' and 'utterances' may constitute
> factual evidence of a 'consciousness of innocence.' As the Second
> Circuit has held, when there is a serious factual dispute over the
> 'basic defense [that defendant] was unaware of any criminal
> wrongdoing,' evidence of his innocent state of mind is 'critical to a
> fair adjudication of criminal charges.'

*United States v. Scheffer*, 523 U.S. 303, 331–32 (1998) (Stevens, J., dissenting from the blanket exclusion under military law of polygraph evidence (citing *United States v. Biaggi*, 909 F.2d 662, 691–92 (2d Cir. 1990)). *See also United States v. Bucur*, 194 F.2d 297, 302 (7th Cir. 1952); *Herman v. United States*, 48 F.2d 479, 480 (5th Cir. 1931); 22 C. Wright & K. Graham, *Federal Practice and Procedure* § 5239 at 453 (1978) (Rule 404(b) "other acts" includes any conduct, *good or bad,* that tends to show the character of the person involved); J. Wigmore, *Wigmore on Evidence* § 56.1 at 1176 (Tillers rev. 1983) (this interpretation the majority view).

If it is relevant proof of "consciousness of innocence" that a defendant would reject an offer of immunity, as these courts have held, then it is all the more relevant that a defendant would openly admit the very affiliations the government has charged him with trying to hide, voluntarily initiate litigation against the government which he is allegedly seeking to hide them from, and do all of this in an effort to become a proud citizen of a country which the government has by inference, innuendo, and implication accused him of betraying.

The defendants understand that they may not argue to the jury the government's motive in bringing this prosecution, but the context in which it was brought, and the circumstances surrounding its having been brought, are highly pertinent to the jury's determination whether any crime was committed, and should be admitted for that purpose. The intent at issue here is not the

7

prosecutors' but the defendants', and evidence which goes to the absence of criminal intent on the part of the defendants must be admissible, even where it incidentally casts doubt on the intent of the prosecutors in initiating criminal charges.

**2.     Document 305: Government's Motion *in Limine* to Exclude or Limit Anticipated Testimony of Defendants' Expert Witnesses.**

In its second motion, the Government, citing not a single case in support of its argument, "moves to exclude or limit the anticipated testimony of the following identified expert witnesses [John Stuart Blackton, Professor Nazif Shahrani and Marcus Owens]."  (Mot. Exclude Def. Witnesses 1.)  Additionally, the government requests *Daubert* hearings regarding the qualifications of John Stuart Blackton and Professor Nazif Shahrani to render the opinions contained in the defense supplemental disclosures."  (Motion Exclude Def. Witnesses 1.)  The three experts who are the object of the government's exclusionary efforts are, when compared to the experts put forth by the government itself, in an entirely different league.  The government does not, in fact, dispute this. Unlike the usual *Daubert* motion, which includes at least some challenge to the qualifications and experience of a potential witness, or to the methodology he or she relies upon, the government does not offer the slightest reason why any of these three witnesses could be found less than superbly well-qualified.  (Mot. Exclude Def. Witnesses 4–5.)  Rather, the gist of the government's approach seems to be that since all three support the defense theory of the case rather than the prosecution's, they should be barred from testifying.  The problem with their testimony is not that they are unqualified, not that their methodology is lacking, but that they are wrong, in the government's view, "unquestionably" so.  The only acceptable expert evidence is that which supports the prosecution's view; the judge's role is to enforce that standard, and exclude any evidence which would contravene

it:  expecting the jury to be able to sift through conflicting opinions, far from being the essence of the adversary process,  would only confuse things.

    (a) **Marcus Owens**

    Marcus Owens spent twenty-five years as an IRS employee in the Exempt Organizations Division, and, during the last ten of these years (1990-2000), he served as the Director of that Division. As the Director of the Exempt Organizations Division, Mr. Owens was intimately familiar with the operations of the Division and established and implemented the policies governing, among other things, the evaluation of Forms 1023 and 990.  He is at least as qualified as any witness the government can advance to opine on the policies and procedures involved in evaluating applications for tax-exempt status and how the IRS treated different types of information in determining whether an applicant qualified for tax-exempt status.  No expert witness listed by the government has any experience in the National Office of the Exempt Organization Division or knowledge of the policies and procedures of that office.  Mr. Owens does.  The government does not, and cannot, challenge Mr. Owens' qualifications as an expert or the methodology upon which he relies.

    Nor does the government challenge Mr. Owens' expected testimony, based on disclosures to the government, that the "pro-jihad viewpoints" contained in Care International's publication constitute "free speech expressions protected by the courts."  In its motion, the government acknowledges that it "does not take issue with this assertion."  The government instead oversimplifies Mr. Owens' opinions and challenges the defendant's right to elicit testimony from Mr. Owens about the IRS's evaluation of publications in determining whether an organization qualifies as tax-exempt.[2] "  (Mot. Exclude Def. Witnesses 2.)

---

    [2]The government significantly distorts Mr. Owens' proposed testimony in its effort to build a weaker straw man to attack.  For purposes of this motion, however, what is relevant is that its only argument for

The government points out in its motion that "government witnesses will testify the IRS would *unquestionably* deem an organization's newsletter or publication to be potentially relevant." (*id*.) (emphasis added). This bald assertion is the government's only argument why Mr. Owens should be prevented from testifying about the significance of Care's newsletters to a determination of tax-exempt status and how the IRS would treat those newsletters in making that evaluation. The question of the IRS policy in 1993 is not a matter of law to be decided by the Court (or by the government's experts). It is a matter of historical fact for the jury, and it involves issues that are complex, obscure and technical; in other words, matters as to which expert testimony will be of great aid to the jury. *See United State v. Montas*, 41 F.3d 775, 783 (1st Cir. 1994). The government's expert testimony would be unchallenged if it prevails in this motion, effectively securing summary judgment or a directed verdict against the defendants *sub silentio*, by eliminating a legitimate issue of fact about which the parties disagree and which goes to an element of the offense.

In denying the motion to dismiss the indictment in this case, this Court concluded that the First Amendment does not, as a matter of law, prohibit the IRS from considering constitutionally protected activities in determining whether an organization qualifies for charitable status. That it may not be unconstitutional for the IRS to consider protected activities in reaching its tax determinations hardly translates into an irrebuttable presumption that the IRS was required to do so, had a policy to do so, or did, in fact, do so during the times relevant to this case, especially when there is persuasive evidence to the contrary to be offered. Moreover, to the extent that there was (and is) disagreement among senior IRS officials as to the significance of such activities in determining tax-exempt status, that disagreement has a direct bearing on whether any failure to disclose such

---

excluding Owens' testimony, however described, is that it conflicts with the government's own non-expert witness.

10

activities reflected the knowing and willful violation of a legal duty required to establish criminal liability. This is not, after all, a case in which the IRS is simply seeking back taxes on the ground that a party misunderstood what information to include in an IRS filing; rather the defendant is charged with a crime that requires both knowledge and willfulness. Whether the legal obligation involved was clear and well-established or whether it was subject to dispute or uncertainty is highly relevant to both the knowledge and willfulness inquiries.

The government is not entitled to a directed verdict on any element of the offense; the jury must be satisfied of the truth of each element beyond a reasonable doubt. "What the fact finder must determine to return a verdict of guilty is prescribed by the Due Process Clause. The prosecution bears the burden of proving all elements of the charged offense. *See, e.g., Patterson v. New York*, 432 U.S. 197, 210 (1977); *Leland v. Oregon*, 343 U.S. 790, 795 (1952). This entails persuading the fact finder "beyond a reasonable doubt" of the facts necessary to establish each of those elements. *See In re Winship*, 397 U.S. 358, 364 (1970); *Cool v. United States*, 409 U.S. 100, 104 (1972)(per curiam). "It is self-evident, we think, that the Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment requirement of a jury verdict are interrelated. It would not satisfy the Sixth Amendment to have a jury determine that the defendant is *probably* guilty, and then leave it up to the judge to determine (as *Winship* requires) whether he is guilty beyond a reasonable doubt. In other words, the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt." *Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993).

Materiality is an element of the offenses at issue in this case and is thus for the jury to decide. *United States v. Gaudin,* 515 U.S. 506, 510–512 (1995) squarely so holds, rejecting unequivocally a more straightforward effort by the government to treat materiality, at least in part, as a question for

the court rather than the jury to decide:

> Deciding whether a statement is "material" requires the determination of at least two subsidiary questions of purely historical fact: (a) 'what statement was made?' and (b) 'what decision was the agency trying to make?'" The ultimate question: (c) 'whether the statement was material to the decision,' requires applying the legal standard of materiality to these historical facts. What the Government apparently argues is that the Constitution requires only that (a) and (b) be determined by the jury, and that (c) may be determined by the judge. We see two difficulties with this. First, the application-of-legal-standard-to-fact sort of question posed by (c), commonly called a 'mixed question of law and fact,' has typically been resolved by juries. *See* J. Thayer, Preliminary Treatise on Evidence at Common Law 194, 249–250 (1898). Indeed, our cases have recognized in other contexts that the materiality inquiry, involving as it does 'delicate assessments of the inferences a 'reasonable [decision maker]' would draw from a given set of facts and the significance of those inferences to him . . . [is] peculiarly one for the trier of fact.' The second difficulty with the Government's position is that it has absolutely no historical support. 515 U.S. 506, 510–12 (1995) (citing *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450, (1976) (securities fraud); *McLanahan v. Universal Ins. Co.*, 1 Pet. 170, 188-189, 191 (1828) (materiality of false statements in insurance applications).

Thus, the Court concluded: "The Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged. The trial judge's refusal to allow the jury to pass on the "materiality" of [the defendant's] false statements infringed that right." *Gaudin*, 515 U.S. at 522–23.

Because materiality, knowledge, and willfulness are issues that the defendant is entitled to dispute, they are proper subjects for expert witness testimony. The determination of materiality in this case is particularly sensitive because of the likelihood that what might be material to an IRS determination today, where the term "jihad" is involved, is very different from what might have been material in 1993, when the application for tax exempt status was filed. As the district court

12

recognized in *United States v. Damrah*, 322 F. Supp. 2d 892, 893 (N.D. Ohio 2004)(in limiting expert testimony that post-dated the defendant's immigration filing), guilt or innocence must be determined not on the basis of what is known now but on the basis of what was known at the time relevant to the charges. If the government disagrees with Mr. Owens' expected testimony, the government's proper remedy is cross-examination of his testimony, not its exclusion. Because Mr. Owens has unmatched knowledge and expertise in this area regarding the time period in question, his testimony is critical for the jury to understand, *inter alia*, the nature of IRS review and the effect the newsletters might have had on that review.

### (b) Michael Sells

Professor Michael Sells is one of the nation's leading scholars and experts on the subject of Bosnia. He is the John Henry Barrows Professor of Islamic History and Literature at the University of Chicago; he is fluent in Arabic (classical, Modern Standard, Egyptian and Tunisian), as well as French, Latin, Greek, Italian, Spanish and German. He is the author of numerous articles, chapters, and peer reviewed publications, including the peer-reviewed book, The Bridge Betrayed: Religion and Genocide in Bosnia, published by the University of California Press in 1996.

By contrast, the government's Bosnia "expert," Evan Kohlmann, is a recent law school graduate who speaks only English, has written a single self-published book, has never taken, much less taught, a graduate level course in Islamic studies, and whose only consistent employment appears to be as a government expert. Yet the government proposes that its expert be allowed to testify about atrocities and battles in Bosnia, (as well as in Libya, Chechnya, Algeria, and Egypt) that there is no evidence that Care had anything to do with, whereas the defense should be precluded from presenting the testimony of a world-class scholar about the very conditions Care sought to

13

address through its charitable activities.

The government is proposing to introduce a mountain of documents showing that funds were transferred by Care to Bosnia; that evidence, coupled with its expert's account of the fighting and atrocities in Bosnia, obviously invites the jury to conclude that Care was somehow supporting the fighting, even though there is no proof that it was and no charge that it was. After all, why else send all that money to a war-torn land if not to support the war? The answer, of course, is to help the people who were its victims. What is irrelevant is not the evidence of humanitarian need, but the evidence of the fighting and atrocities that are the focus of the government expert's proposed testimony. Yet the prosecution asks this court to deny Care any opportunity to counter the government's case by informing the jury that in fact there was an extraordinary humanitarian crisis of massive proportions in Bosnia at the time that would provide another explanation for the financial transfers, an explanation that goes to the heart of Care's defense that it was engaged in precisely the sort of charitable activities for which it was established.

The evidence of a Muslim genocide and the enormous suffering brought about by Serbian and Croatian forces is directly relevant to this case not because it is the jury's job to adjudicate the wrongs of foreign parties, but because it is their job to determine whether Care was engaged in the mission described in its founding documents submitted to the IRS. It is directly relevant to rebut the inference from the government's proof that would have Care providing the funding for the fighting and atrocities described by Mr. Kohlmann. The prosecution wants to tell the story of the battle in Bosnia, leaving out the suffering to which Care addressed its efforts, and inviting the jury to convict Care for crimes it has not been charged with committing. That is wrong. What is unconstitutional is that it wants this court to preclude the defendants from presenting evidence to the jury that would

14

make plain that there is more than one explanation for how foreign funds could be spent in Bosnia and why they would be sent there. Contrary to the government's assertion, this evidence *does* "bear on [] the charges pending against [] the defendants" and it *is* "probative of whether the defendants made material misrepresentations and/or omissions in connections with Care's IRS submissions." It goes directly to the defense's right, secured by the Constitution, to present its defense: that Care's statement of mission disclosed to the IRS, and its follow up reports to the Service as to its charitable activities were, contrary to the charges in the indictment, true and accurate.

If any doubt remains, consider this: Had there not been a humanitarian crisis in Bosnia, were there no suffering for which charities might assume responsibility, is there any question that the government would be arguing strenuously that the absence of need was highly relevant to its case? Truth is not a one way ratchet that runs only in the government's favor. The existence of a humanitarian crisis for Bosnian Muslims, induced by genocidal attacks by Serb and Croat forces, is relevant to the truth of what Care was actually doing, and thus directly rebuts the government's charges and its evidence.

### ( c ) John Stuart Blackton

A veteran Foreign Service officer, full professor at the National War College, and the former United States AID official directly responsible for aid to Afghanistan at precisely the time when Care was established and providing charitable aid there, Professor Blackton understands as well as, or better than, anyone in this country the issues of public policy relating to jihad and the mujahideen in Afghanistan as well as the issues involved in providing charitable aid in that war-torn country. The government does not challenge Professor Blackton's stellar credentials, his long years of experience and service to our country, his intimate knowledge of the humanitarian crisis facing

15

Afghan refugees and of the difficulties of providing humanitarian assistance to the millions who were desperately in need.

The usual purpose of a *Daubert* hearing is to determine whether a witness is qualified to testify within his area of claimed expertise. Yet while "the government requests a *Daubert* hearing on the qualifications of Mr. Blackton," it does not offer even a summary challenge to his extraordinary qualifications. (Mot. Exclude Def. Witnesses 4.) A *Daubert* hearing is not a right available to the government simply for the asking; there must be some basis for putting the parties and the court to the time and expense of holding a hearing. The government has not provided one.

Nor does the government offer a basis to limit the scope of his testimony. According to the government, "Whether the United States government was supporting the mujahideen and whether public at large [*sic*] knew about such support is irrelevant to whether the defendant concealed information from, and made false statements to, the Internal Revenue Service, Immigration Naturalization Service, and Special Agents of the Federal Bureau of Investigation." (Mot. Exclude Def. Witnesses 4). In fact, Professor Blackton's proposed testimony on these issues bears directly on materiality and intent, both critical jury issues, as the government's own evidence makes clear.

The government's case that Care's supposed omission of information regarding its support for jihad and the mujahideen was "material" to the IRS appears to rest heavily on the assertion that granting charitable status to an organization that supported the mujahideen would have violated public policy. The government has provided the Jencks statements of a government witness, former IRS employee Robert Charnoff, who reviewed Care's form 1023 application in the National Office. Charnoff would testify, according to his statement, that "if the application had indicated that the fundraising mailings requested specific money for the support of mujahideen, Charnoff would have

made the determination not to grant CARE exempt status. . . . *The reason would have been based on the United States public policy aspect."* *(*Charnoff Int. ¶ 13*)* (emphasis added).  How can public policy be irrelevant if according to the government, it would have been the basis for the denial of tax exempt status?  How can that which is the gravamen of the prosecution's case, that which defines materiality according to the key government witness, become irrelevant when the defendant's far more qualified expert offers a contrary view on precisely the same subject?

The defendants' experts will provide the jury with an understanding of United States public policy at the time  which totally and completely undercuts this proposed testimony by Mr.  Charnoff (who is not offered as an expert on foreign policy) and further undercuts the materiality of the supposed omissions from Care's application.  Surely the man who had responsibility for executing U.S. policy in Afghanistan at the relevant time should be allowed to offer his expertise to the jury as to what that policy actually was in 1993—as opposed to what Mr. Charnoff might now, incorrectly, remember or assume it to have been.

Professor Blackton's first-hand knowledge of actual public policy, the workings of humanitarian aid, and the challenges posed by the enormous crisis in Afghanistan is not only relevant to the issue of materiality.  It is not only relevant to the truthfulness of Care's statement of its own mission, and to a fair evaluation of how it conducted its business, and whether its operations were consistent with its charitable purpose; it is also, as in the case of Professor Sells' testimony, directly relevant to the question of intent.

If Professor Blackton testifies, as the defense expects that he will, that the United States policy, up to and including the mid-1990's, was not only to support the mujahideen militarily but also to work through them in order to provide humanitarian assistance to the desperate Afghans, that

expressed policy undercuts the government's contention that the defendants intended to deceive or hide from the government  the views expressed in Al Hussam, and supports their contention that Care was providing relief to Afghans in dire need and saw nothing to hide in doing what the government was supporting.  Failing to tell the IRS that you are following United States policy and doing just what the government is doing leads to a totally different inference about your intent than does failing to disclose  plans to violate American public policy.  In the latter case, a criminal intent is far more easily inferred; in the former, the omission, if it is even considered that, is of little import.

In the detailed reports offered by the Government's experts, the defendants are portrayed as anti-American, unpatriotic, and closely associated with America's most-hated enemies.   The evidence to be offered by Professor Blackton, based on his enormous expertise and his extensive personal experience, entirely contradicts that picture and invites a totally different set of inferences about the defendants.   To deny the defendants the right to counter the unflattering, bordering on traitorous picture of them painted by the government, is to deny them their constitutional right to raise a defense.  The fact that the defense's expert is far better qualified to speak to the question of American public policy than any of the government's witnesses only further underscores the weakness of the government's case.

Here again, as in the case of Professor Sells, as in the case of Mr. Owens, public policy today is not necessarily the same as public policy in 1993.   The meaning of terms, including "jihad"  and "mujahideen," have changed in a decade and a half.  Defendants have an  absolute right to be judged, both on issues of materiality and intent, on the basis of contemporaneous policies and the defendants' understanding of those policies, not based on hindsight a decade in the making.  They have the right to present the  jury with an accurate picture of what was happening in Afghanistan and

18

what "public policy" towards the mujahideen in that country was, in order that the jury can make an assessment both on the materiality of what the government says the defendants withheld, and on the defendants' intent, or rather their lack of intent, to hide anything or distribute charitable funds in any way other than to relieve the enormous suffering of Muslims in war-torn areas.

### (d) Nazif Shahrani

Finally, the government requests, again without foundation, indeed almost in passing, a *Daubert* hearing with respect to the qualifications of Professor Nazif Shahrani to testify as an expert. (Mot. Exclude Def. Witnesses 5.)  Professor Shahrani, a native of Afghanistan, is one of the leading scholars in the United States on Afghan history and culture.  The government does not challenge, or even address, his qualifications, or claim that he lacks the requisite credentials or experience. Rather, it does no more than suggest in a footnote that since it did not receive the defense's supplemental report about Mr. Shahrani's testimony until the day it filed its motion, it needs more time to evaluate his proposed testimony.   But the government has known since last *February* of the defendants' intention to call Professor Shahrani as a witness, and the nature of his testimony.[3]  It has had nine months to develop its objections.  Its failure to do so in that time period should preclude the government from objecting to Professor Shahrani's testifying in this trial.

### 3.    Document 306: Government's Motion *in limine* to Exclude Evidence of IRS Filings of "Non-Similarly Situated" Organizations".

The government does not want the jury to know that there were many other organizations who were engaged in precisely the same activities as Care International, at exactly the same point in time, who enjoyed the very same tax exempt status that the government now claims Care had no

---

[3]The defendants noticed their intent to call Professor Shahrani and provided a summary of his expected testimony and his qualifications to the government by letter on February 16, 2007.

right to and would not have been granted had the government been aware of its activities.   The government asserts that evidence that the applications of these other organizations for tax-exempt status were not denied, although they disclosed the same activities Care is charged with hiding, is "not relevant, and would confuse and mislead the jury."  (Mot. Exclude Ev. IRS Filings 2.)  In fact, it is the government that seems determined to confuse and mislead the jury, by denying them any context in which to evaluate Care's operations, other than the context of unrelated acts of terrorism which the government would make the focus of this trial.  This motion, like the two that precede it, lays bare the government's strategy of trying to secure a conviction by defining away the defendants' constitutional right to present a defense that negates the prosecution's theory of the case.

"To begin," the government argues, "all of the IRS submissions referenced by the defendant are fundamentally inapposite to this case.  The issue here is whether the defendants concealed material information from the IRS in submitting form 1023.  By contrast, there is no suggestion from the records provided by the defendants that any of these organizations concealed material information from the IRS during the application process." (Mot. Exclude Ev. IRS Filings 2.)

Whether information is "material" depends upon the extent to which its inclusion might have influenced the agency's decision making process.  If other organizations engaged in precisely the activities which Care allegedly failed to describe in sufficient detail were granted tax exempt status, then Care's alleged omissions, whatever they were, were by definition ***not*** material.  The government cannot claim simultaneously that Care's omissions were material and that it is irrelevant, or "inapposite" that organizations that openly did precisely the same things as CARE did (such as publish a  newsletter that expressed support for the mujahideen) were granted the status it now claims it would have denied CARE.   What the government is doing, in this argument, is entirely

eliminating the materiality requirement.

"Moreover," the government continues, "the organizations cited by the defendant were ostensibly engaged in supporting non-violent relief efforts and there is no indication that any organization acknowledged that it was supporting violent jihad and/or soliciting funds to support the mujahideen. As such, none of the organizations listed is similarly situated to Care, and it is thus difficult to see how the putative evidence would bear on any issue at trial." (Mot. Exclude Ev. IRS Filings 2) The government's curious use of the alternative "and/or" underscores both the emptiness of its case against Care and the relevance of these other, successful submissions to the IRS for tax-exempt status. The government has acknowledged that it has, no evidence that Care's money went to support fighters, and there is substantial evidence that Care's money in fact went to relieve suffering. So, in order to prove that Care was engaged in non-charitable activities, the government apparently plans to rely almost exclusively on Care's publications, especially excerpts from its newsletter, Al Hussam, reporting on the activities of mujahideen abroad or addressing the obligations of Muslims to engage in jihad, as interpreted by its experts. Given that, how can the government dismiss as irrelevant evidence of the IRS action on the 1991 application for tax exempt status of the Afghan Mujahideen Information Bureau (AMIB), with that supposedly significant word in the *name*, no less? How can the defense be denied the right to draw parallels between Al Hussam, whose existence would supposedly have lead to the immediate denial of Care's application, and the AMIB newsletter, in which a report is made of Hekmatyar's visit to Qandahar by writers who describe themselves as present not "as reporters but as mujahid", which raised not an eyebrow at the IRS.

AMID's application for tax exempt status was referred to the National Office, *not* because the Mujahideen were involved, *not* because they published a newsletter supportive of mujahideen

leader Hekmatyar, but because of "possible sensitive issues involved with third World Countries and majority of activities to be conducted in foreign countries" – which is precisely how the IRS treated Care's application.  The referral language is virtually indistinguishable from that used for Care's application, as was the decision to refer.  The fact that AMIB used the word "mujahideen" and included its newsletter was dispositive of nothing, suggesting, rather starkly, that the fact that CARE did not do so was equally immaterial.  If including the information had no impact on the IRS's determination in one case, how could excluding it have affected its decision in the other?  If these two organizations are not similarly situated, for purposes of the issues in this case, no two ever could be.  If denying the defense the right to present such evidence is not tantamount to denial of the right to present a defense, nothing is.

The evidence of how other organizations such as AMIB, which openly supported the mujahideen and published newsletters with content similar to Al Hussam, were treated demonstrates that the defendants' failure to use the word "mujahideen" or to submit Al Hussam for IRS review had no bearing whatsoever on the grant or denial of its application.  It provides the strongest sort of evidentiary support for the opinions of defendants' experts; it proves that their definitions of public policy and IRS policy indeed reflect the way things were understood and done at the time, and that the governments' witnesses are rewriting history.   It directly undercuts the prosecution's argument that these omissions from Care's papers constituted  a  conspiracy to defraud the IRS and amount to a violation of the tax laws.  If organizations openly doing exactly what CARE did were engaged in lawful activity and entitled to tax exempt status, then the government will have a great deal of difficulty convincing any rational jury that CARE's leaders deserve to be punished for doing precisely the same thing.  Even more difficult will be convincing a rational jury that CARE's leaders

wilfully and intentionally mislead, or conspired to defraud, the government by omitting details that the IRS' National Office did not find significant in other cases.

Despite the proffers of opinions and tales of terror by the government's experts, the fact is that CARE is **not** charged with providing financial support to violent jihad, providing weapons or munitions to the mujahideen, or participating in any way in any acts of violence by the mujahideen. The prosecution's claim (see Mot. Exclude Ev. IRS Filings 3) that the analogy to similarly situated organizations fails because CARE was "engage[d] in... violent jihad" and "support for mujahideen fighters" amounts to rewriting the indictment to charge the defendants with wrongdoing that the government has acknowledged it cannot prove (*See* Complaint Aff. ¶ 29). If providing humanitarian aid to refugees, some of whom may have been mujahideen, and to their families is a crime, then it was a crime openly engaged in by dozens of other charities, as well as by the United States government. This is important information for the jury to know. It bears directly on both the questions of materiality and criminal intent. The government's failure to recognize this, while arguing the relevance of plots the defendants had nothing to do with, terrorists they never met, organizations engaged in totally different kinds of activities in totally different areas of the world, strains credulity, to put it kindly.

So, not surprisingly, does the government's conclusion to this section. "Because evidence that Care was supporting violent jihad was indisputably capable of influencing the outcome of their application, it does not matter if another organization for whatever reason was able to obtain tax exempt status after disclosing such information." (Mot. Exclude Ev. IRS Filings 3–4.) There are three problems with this so-called conclusion. First, the government has no evidence that Care was providing financial support to violent jihad. Second, how can it possibly be that such information,

if it existed, was "indisputably capable of influencing the outcome of their application" if it did not influence the outcome of applications from other organizations engaged in parallel work to Care's and, indeed, was not seen as a matter that raised any question?  Third, if publications supporting mujahideen were immaterial "for whatever reason" in the case of other organizations, such publications would perforce be immaterial for the same reason, whatever that might be, in the case of Care.  The government argues on the very same page that the other organizations the defendants refer to were not doing the same thing that Care was, and that if they were, it still doesn't matter because the government had chosen "for whatever reason" to treat them differently.  (Mot. Exclude Ev. IRS Filings 4.)  Arbitrariness is not an answer to a fact-based case establishing immateriality, much less to the related questions of defendants' intent.

**4.    Document 307: Government's Motion _in Limine_ to Preclude Questioning Which Requires a Response Involving Classified Information.**

The motion _in limine_ related to classified information is a study in self-contradiction, which is nearly impossible to respond to.  On page 2 of the motion, the government states: "there exists classified information accumulated during foreign intelligence and national security investigations conducted by the FBI separate from the declassified evidence gathered under the Foreign Intelligence Surveillance Act (FISA) which will be introduced at trial."  (Mot. Preclude Questioning 2.)  In other words, "classified information... will be introduced at trial."  Or will it?

In the very next paragraphs, the government writes: "the government is not seeking to introduce any classified information against the defendants in this case." (Mot. Preclude Questioning 2.)  Is the government planning to introduce classified information or isn't it?  Is it planning to introduce such information, but not "against the defendants in this case?"  If it's not being introduced

24

"against the defendants in this case," why is it being introduced at all?  Is there someone else on trial?

What is this classified information?  According to the government, "the precise information which may be classified is not known to the defense." (Mot. Preclude Questioning 2.)  If it's not known to the defense, how can the defendants avoid asking questions which, unknown to them, may relate to that which they don't know about?

The government's description of the "types of [unknown] information" which the defense should avoid without knowing what it is that it is avoiding are broad enough to tie the hands of defense lawyers on a whole range of matters relating to critical aspects of the defense in this case. (Mot. Preclude Questioning 2.)  According to the government, the defense should be precluded from asking any questions which might elicit a non-answer based on classified information "includ[ing] areas such as: that information presented to and issued from the FISA Court, those materials which the defendants do not possess which were derived from FISA-authorized techniques, any information about the basis of the initiation of the investigation of the defendants which has not been disclosed to the defense, and possible FBI investigations involving other individuals or entities."  (Mot. Preclude Questioning 2.)

The government's request, far from providing a basis for limiting questioning, indicates that there is much that may be relevant that the defense simply doesn't possess, doesn't know about, and hasn't been granted access to.  The notion that this unknown information should impose on the defense an obligation to limit questioning lest we stumble on something we don't know about turns logic on its head.  How are we to avoid what we don't know?  And why don't we know information which, by the government's own description of it, may be critical to the defense?

The government's answer to the suggestion of improper secrecy by its own hand is that "classified information in this case does not mitigate the evidence of guilt nor further any legal defense." (Mot. Preclude Questioning 2–3.) Such reassurances carry absolutely no weight in a case such as this, where the government is, in this very set of motions, going to extraordinary lengths to deny the defense a right to present any defense whatsoever. The government's assurances that the classified evidence it apparently may or may not rely on "does not mitigate the evidence of guilt nor further any legal defense" carries absolutely no weight given the approach the government has taken to what it considers to be "evidence of guilt" and what it is willing to recognize as a "legal defense."

It is simply impossible for the defense to avoid asking questions that may require responses referring to information it knows nothing about. If the government wishes to restrict the defense questioning, it must first provide adequate disclosure to the defense.

5. **Document 308: Government's Motion *in limine* to Preclude Argument and Evidence Relating to the United State's Government's Political Policies and Activities Abroad.**

In its final motion, the prosecution argues that the defense should be precluded from "arguing, eliciting testimony (including expert testimony) or presenting evidence regarding the United States government's political policies and references to its defense and intelligence service activities abroad." (Mot. Preclude Pol. Policies 1). Under the prosecution's view, only the government should be allowed to do that. This motion echoes the government's motions to limit the defendants' experts, and much of the argument above refutes the premise of this extraordinary request, which would require the defendants to listen to the government put on an implicit terrorism case and invoke public policy as the basis of materiality of the information supposedly hidden by the defendants, and then have their hands completely tied when they seek to refute it.

26

As noted above, the government will seek to show the materiality of information the defendants allegedly deliberately omitted from their submissions to the IRS by appeal to public policy, supposedly contravened by the defendants in conducting Care's affairs.  To the extent the "public policy" at issue is providing money for fighters, the government has no evidence of Care providing money to fighters.  To the extent the "public policy" at issue is *expressing* support for Islamic fighters, it is, as noted above, relevant both to the materiality of the information to the IRS and to the defendants' intent that the government expressed the same support, not only by words, but by providing charitable *and* military support to the mujahideen in Afghanistan, up to as late as 1995. The government would have these facts kept from the jury, and ask them to decide the case based on what evidence the government proposes to introduce as to public policy, and, *sotto voce*, the public policy of the government since September 11, 2001.[4]

---

[4]*United States v. Poindexter*, 725 F. Supp. 13, 15 (D.D.C. 1989) is not only mis-cited by the government (as 735 F. Supp.) but provides no support for any aspect of the government's argument; indeed, it is something of a mystery why the government would choose to invoke it, except for the fact that it has no other authority to support its claim.  In *Poindexter*, the defendant filed a motion to dismiss which claimed, inter alia, that the Congressional committees he was alleged to have lied to did not in fact rely on his false statements.   The court, in denying the motion, did no more than repeat the boilerplate rule that materiality depends upon the potential that the misstatement would have affected the agency's determination, a question to be determined by the jury.

> Defendant contends that the element of materiality is lacking here because the indictment does not allege that element and the government cannot prove actual reliance by the committees on his allegedly false statements. Neither claim is justified. . . The indictment alleges both in Count Four and in Count Five that defendant 'unlawfully, willfully, and knowingly made and caused to be made *material* false, fictitious, and fraudulent statements and representations . . .' *Poindexter*, 725 F. Supp. at 27.(emphasis added). Insofar as proof is concerned, defendant's formulation represents a mistaken view of the law. The Court of Appeals has plainly said that "proof of actual reliance is not required; the Government need only make a reasonable showing of its potential effects." *United States v. Hansen*, 772 F.2d 940, 949 (D.C. Cir. 1985).  *See also United States v. Diggs*, 613 F.2d 988, 999 (D.C. Cir. 1979). This formulation of the appropriate standard by the Court of Appeals does not include the element defendant claims to be critical: that of actual reliance. *See United States v. Quirk*, 167 F. Supp. 462, 464 (E.D. Pa.), *aff'd*, 266 F.2d 26 (3d Cir. 1959).  In any event, it will be for those who evaluate the trial evidence to decide whether the government has proved materiality.

Far from supporting the government's position, *Poindexter*, if it is relevant at all, supports the central role

There is a serious issue in this case of revisionist history.  What many officials believe US policy was, or should have been, fifteen years ago is simply wrong.  It is easier to be mistaken in the matter of memory than to admit mistakes in the actual policy.  But it would be fundamentally unfair for the defendants to be convicted on the basis of a conception of materiality that many would wish we had applied then, but in fact did not.  The government's own leading expert, Dr. Matthew Levitt, has written extensively of the failure of the United States government, and others, to appreciate the threats that existed fifteen years ago or to conform its policies to a reality it did not appreciate.  In previous trials, both Dr. Levitt and Mr. Kohlmann have testified at length about the failures of past policy.  It would be not only ironic but unconstitutional to allow the government's experts to opine both about what the policy was and what it should have been, but to deny the defense's experts, who were directly involved, the ability to testify on precisely the same topics.

Nor does the sentence quoted from one of Judge Fish's opinions in *Holy Land Foundation*, the recent Texas case which ended in a mistrial, support the government's position here.  (*See* Mot. Preclude Pol. Policies 3.)   In that trial, Judge Fish in fact allowed two former government officials to testify at length as to their understanding of the charity's legitimate purpose, and as to the failure of government intelligence agencies, even when asked, to tell them otherwise.[5]  Far from standing for the proposition that U.S. public policy is irrelevant, this ruling permitted defense witnesses, themselves former government officials to testify to their understanding of government public policy

---

of the jury in determining materiality, and directly conflicts with the prosecutions' efforts, reflected in these motions, to deny that vital role by effectively predetermining the materiality issue in the form of evidentiary exclusions which would undermine totally the ability of the defense to present evidence conflicting with the government's theory and the opinions of its witnesses.

[5]   *HLF Trial Summary Week 7*, HUNGARY FOR JUSTICE (Sept. 4, 2007), http://www.h4jusa.com/node/49.

towards the charitable activities of Holy Land Foundation.

The defendants in this case propose to put on a defense that, given the world as it existed in 1993, they did not believe that they were hiding anything from the government in failing to submit newsletters, nor were they conspiring to hide a position from the government that was, effectively, the government's own position.  The tax and foreign policies of the United States during the time periods covered by Care's formation and activities are directly relevant to this defense.  This proposed defense directly conflicts with the portrait of the defendants which the government's experts have gone to great lengths to portray in their reports, which are presumably a preview of what the government will attempt to do at trial.  The government's concluding argument that the "defendants' geo-political views are not on trial as being seditious and antithetical to American foreign policy" is simply impossible to square with the expert reports which seek to convict the defendants, by association, with the worst and most anti-American terrorists of our time.   (Mot. Preclude Pol. Policies 4.)  If the defendants' anti-Americanism is not on trial, why go to such lengths to paint them in that light, culling from Al Hussam and from other publications of Care every reference that can be remotely construed as supportive of violence against America, turning Osama bin Laden, who in fact has nothing to do with this case, into a central figure in its narrative, even finding ways to quote from *Saddam Hussein* and  *Ayatollah Khomeini*, as if they have any role in a tax case.  If the government is not trying to convict the defendants of anti-Americanism, it is impossible to discern what it is they are doing.  And regardless of their efforts or motives, the consistency between American policy and defendants' actions remains central to both the issue of materiality and the issue of intent, issues as to which the jury should at least be allowed to hear both sides.

For all of these reasons, the defendants respectfully request that the governments motions *in limine* to exclude or limit testimony, and to question in a Daubert hearing the credentials and methodology of defense witnesses as to whom the government raises not one specific objection in terms of competence, experience, or method, should be denied.

Respectfully submitted,
EMADEDDIN Z. MUNTASSER
By his attorneys,


/s/Susan R. Estrich
Susan R. Estrich
Robert Kingsley Professor of Law and Political Science
University of Southern California
Law School
University Park, MC-0071
Los Angeles, CA 90089-0071


/Norman S. Zalkind
Norman S. Zalkind (BBO#: 538880)
Elizabeth A. Lunt (BBO#: 307700)
David Duncan (BBO#: 546121)
Zalkind, Rodriguez, Lunt & Duncan, LLP
65a Atlantic Avenue
Boston, MA  02110
(617) 742-6020


Dated: November 2, 2007

MUHAMED MUBAYYID
By his attorney,


/s/ Michael C. Andrews
Michael C. Andrews (BBO#: 546470)
21 Custom House Street
Boston, MA 02110
(617) 951-0072


SAMIR AL-MONLA
By his attorney,


/s/ Charles P. McGinty
Charles P. McGinty (BBO # 333480)
Federal Defenders
408 Atlantic Avenue
Boston, MA 02110
(617) 223-8061

**Certificate of Service**

I hereby certify that a true copy of the foregoing document was served this day upon all counsel of record by electronic filing.


/s/ David Duncan

30