# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
)
v. ) Crim. No. 05-40026-FDS
)
MUHAMED MUBAYYID, )
EMADEDDIN Z. MUNTASSER, )
SAMIR AL-MONLA. )
)
Defendants. )

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO PRECLUDE TESTIMONY OF GOVERNMENT'S EXPERT WITNESSES

The United States of America, by and through its counsel, Michael J. Sullivan, United States Attorney for the District of Massachusetts, Assistant United States Attorneys Aloke Chakravarty, B. Stephanie Siegmann and Donald L. Cabell, hereby files this opposition to Defendants' motion seeking to preclude or limit the testimony of the Government's expert witnesses. The government's expert witnesses in this case are essential to assist the jury in understanding the import of the obscure activities which the defendants were engaged in which they did not disclose to the government. The government respectfully requests the court find: 1) the governments' expert witnesses are qualified under Fed. Rules of Evid. 702-704, to testify to the scope of their expected testimony (as detailed in their expert reports), 2) the scope of their testimony, as detailed, is properly admissible testimony under Rules 401 and 403, and 3) a Daubert hearing is unnecessary to determine the qualification of the experts to testify, but if the court is considering restriction of any part of an expert's testimony, then it should not do so without first hearing the qualification of the expert to render such opinion on that point, and why it is important for the jury to hear it. The government has attached 5 exhibits to assist the court,

A.) Dr. Levitt's *Curriculum Vitae*, B.) A list of recent publications/presentations by Dr. Levitt about international terrorism beyond the Middle East, C.) Mr. Kohlmann's *Curriculum Vitae*, D). A list of recent publications/activities of Mr. Kohlmann, E.) The Government's initial disclosure regarding these witnesses about the scope of their testimony which was later supplemented.

## I.    PRELIMINARY STATEMENT

Despite the defendants' hyperbolic simplification of the facts in this case, although the allegations are simple, the defendants' activities, and the evidence they left behind, are not.  The evidence in this case involves material which is wholly outside the realm of a juror's experience and education -- it involves esoteric evidence that the defendants solicited support for the mujahideen around the world over a ten year period.  The utility of broad expert testimony about this parlance is not only essential in this case, it is the operating presumption which led to the ordered disclosure of expert witnesses last year --- so the parties could prepare for the conclusions which may be drawn from the evidence in the case.  With this backdrop, the defendants now seek to preclude or limit the government's expert witnesses, arguing that this is not a "terrorism" case, the significance of the evidence is readily apparent to a layperson, that the government's expert witnesses have no expertise in what they will testify about, and that such testimony will prejudice the jury against them because they refer to others who were or supported fighters.  The defense arguments are meritless, and the government's experts should be permitted to testify about those areas which will assist the trier of fact to determine whether the defendants concealed material information about their activities from the IRS.

## II.    THE NEED FOR EXPERT TESTIMONY

As alleged in the Indictment, in the early 1990's, the defendants were involved in operating the Boston branch office of the Al-Kifah Refugee Center ("Al-Kifah"). Al-Kifah supported Muslim holy warriors ("mujahideen") engaged in violent, religiously-based military conflict overseas ("jihad").  Al-Kifah also published a pro-jihad newsletter called "Al-Hussam," an Arabic term meaning "the Sword", solicited donations through Zakat, and engaged in lectures and other activities consistent with these goals.  Al-Kifah was not a tax-exempt organization.

In April 1993, after a variety of events, including broad media exposure linking the New York office of Al-Kifah to the 1993 World Trade Center bombing, the murder of Al-Kifah branch director Mustafa Shalabi, and Omar Abdel Rahman, Muntasser founded and incorporated Care International, Inc. ("Care"), in Massachusetts.  Defendants Mubayyid and Al-Monla were familiar with and were involved with Al Kifah, and later Care, around this time.  In June 1993, Muntasser then filed an IRS Form 1023, Application for Recognition of Exemption under Section 501(c)(3) of the Internal Revenue Code ("1023 Application") with the Internal Revenue Service ("IRS") seeking to exempt Care from taxation on the grounds that it was exclusively a charitable organization.

Contrary to Muntasser's statements in that application, Care was, in fact, a successor to and outgrowth of Al-Kifah.  Like Al-Kifah, Care solicited and spent money to support and promote mujahideen engaged in numerous armed conflict overseas.  Specifically, Care supported fighters in Chechnya, Bosnia, Afghanistan, Pakistan, and other locations.  As evidenced through their intercepted conversations, Care's publications and their  internal records, Care also allied itself with specific foreign military and political groups, including, for example, designated foreign terrorist organizations,  Hizb-e-Islami and the Taliban, as well as

numerous, specially designated global terrorist organizations such as Global Relief Foundation ("GRF"), Benevolence International Foundation ("BIF") and Holy Land Foundation for Relief and Development ("HLFRD").  Indeed, Care itself continued to serve as a branch office for Maktab-al-Khidmat/Human Services Office, a global network of pro-jihad organizations which was the brainchild of a Palestinian man named Abdullah Azzam and Saudi Arabian man named Osama Bin Laden.  The pair joined forces during the Soviet occupation of Afghanistan, and catalyzed by the Muslim Brotherhood, they created a mechanism to move mujahideen from around the world, many from Arab countries, into Afghanistan.  With the establishment of this network, soon, Maktab al Khidmat was instrumental in the support structure and movement of mujahideen to areas of conflict in other parts of the world, including Bosnia, Chechnya, and other locations.

Maktab al Khidmat existed in the United States, and included offices in Brooklyn and in Boston, under the name Al-Kifah Refugee Center.  The Boston branch changed its name to Care International in April of 1993.  Among other adoptive activities, assets were moved from Al-Kifah to Care, Care was initially located at Al-Kifah's Boston office, continued to distribute pro-Jihad publications, held pro-jihad lectures, distributed pro-Jihad media, and assumed publication of Maktab al Khidmat's pro-Jihad newsletter, Al-Hussam ("The Sword").  Care, like the rest of Maktab al Khidmat, likely also provided some legitimate and needed humanitarian aid to Muslims where they were being persecuted and killed, in addition to the fighters who had taken up arms to fight back.  However, the defendants' failure to disclose in the Form 1023 all of the activities and goals of Care, such as its continuing intention to solicit and spend money to support and promote holy warriors engaged in armed conflict overseas, had a material effect on

4

the IRS' consideration of whether Care should obtain 501(c)(3) tax-exempt status.

After obtaining its tax-exempt status, and with the knowledge and under the leadership of the defendants, Care continued to publish articles about the military operations and activities of the mujahideen on its website and solicited tax-deductible donations to support the mujahideen. It also published and distributed pro-jihad literature and media such as "Join the Caravan," a pro-jihad book authored by Abdullah Azzam, conducted pro-jihad lectures, continued to distribute the Al-Hussam newsletter, solicited Zakat (one form of an annual obligatory tithe in the Islamic faith) money for the mujahideen, and other Al-Kifah activities.

Between 1993 and 2002, the defendants filed annual tax returns on IRS Forms 990 ("990 tax returns") in which they stated that Care distributed money for various charitable purposes, including assistance to orphans and widows, food distribution, and welfare assistance. They never disclosed in these reports that Care also continued Al-Kifah's activities, or that it solicited and spent money to support and promote holy warriors engaged in armed conflict overseas.

As this brief recitation demonstrates, appreciating Care's activities is not within the province of the average lay juror without a contextual education from someone who has expertise in the field. This is precisely the type of situation in which a knowledgable witness can explain to a jury what certain terms mean, who certain people are, the mujahideen's role, and the consistency between the defendants' activities and other organizations which they have studied. The fact that the defendants are not charged with a "Federal crime of terrorism" as described in 18 U.S.C. §2332b(g)(5) does not matter to any evidentiary issue in this case. To prove that the defendants are guilty of the tax fraud charges and engaging in a scheme to conceal, the government must demonstrate that (1) Care was an outgrowth or successor to Al-Kifah Refugee

5

Center, also known as Maktab al Khidmat, and (2) Care was engaged in non-charitable activities which included support of fighters. The expert testimony in this case will be completely relevant to proving these points. For example, the experts will describe (1) the mechanisms of how other organizations have consistently co-mingled funds in order to support fighters as Care did, (2) how the Islamic concept of Jihad extends to supporting fighters through financial donation "Economic Jihad", (3) who Abdullah Azzam and Gulbiddin Hekmatayr were and their significance, and (4) what Maktab al Khidmat was, its origins, structure, and evolution. See Attachment E (Government's initial disclosure re: experts). The experts will also describe the context of statements in Care's internal materials, and those which they distributed. This testimony is precisely the type of expert testimony which is routinely admitted in cases which involve not only various mujahideen groups, but also is routinely admitted in narcotics cases, organized crime cases and street gang cases. The government intends to present evidence of such activities from both lay and expert witnesses, with which the jury will best be equipped to decide whether the defendants committed the crimes alleged in the indictment.

The Government intends to call four expert witnesses in its case-in-chief, two of whom the defense vigorously challenge for different reasons. Dr. Matthew Levitt is acknowledged as an expert by the defense, however, the defense contends that his anticipated testimony will be beyond the ken of his expertise. This is false, and Dr. Levitt's testimony is wholly germane to the issues at trial. Mr. Evan Kohlmann is ridiculed as an expert by the defense, despite his stellar credentials and the acceptance of his testimony in numerous federal and international tribunals. In fact, as described below, Mr. Kohlmann is more suited to testify as an expert witness in this case than perhaps any of the other dozen or so cases in which he has testified. Both Levitt and

Kohlmann have prepared detailed expert reports, which the defense has attached to their motion, and which are incorporated for purposes of this opposition in their entirety. These expert reports are extremely detailed for purposes of providing the defense with the bases of any opinions which they will state at trial, but the experts' testimony is not expected to include all of the information contained therein.

Expert witnesses Dr. Edward Valla and Dawn Goldberg are not challenged but for their apparent lack of publication, which the defendants claim is the measure of one's relevance to testify. The defendants' argument essentially challenges the expertise of the government's 702 witnesses because they plan on offering prejudicial testimony. The defendants' protests notwithstanding, the objectives of 702 testimony are to assist the jury in assessing the import and significance of the evidence presented to them, insofar as that evidence is relevant to the crimes alleged, and the defenses thereto. Expert testimony is valuable to the jury in order to assess the meaning, weight and context of the evidence in a case, the criminal charges which are brought do not figure in that equation. The precise criminal charges only frame the types of facts which are relevant to the elements of the charged offenses, and in this prosecution as described above, the nature and mechanisms in which Care's solicitations and expenditures were to support fighters falls squarely within the parameters of relevant evidence. Indeed, that is the point of this trial.

### III.    APPLICATION OF RULES 701-705 IN THIS CASE

The admissibility of expert witness testimony is governed by Federal Rules of Evidence 702, 703 and 704. Before admitting the testimony of an expert witness, the trial judge is required to evaluate both the relevance and reliability of the proposed testimony. Daubert v.

Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). The Supreme Court stated that the relevance requirement is already embodied in Rule 702; "the evidence or testimony [is relevant when it] 'assist[s] the trier of fact to understand the evidence or to determine a fact in issue.'" Daubert, 509 U.S. at 591 citing Fed.R.Evid. 702. Reliability goes to the methodology used to reach the conclusion forming an expert witness's opinion. Id. At 595. In essence, in Daubert, the Supreme Court held that Fed. R. Evid. 702 superseded the "general acceptance" and that it [Rule 702] was the standard by which the admissibility of scientific testimony was to be measured. Id. at 587-588 (referring to Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923)). The Court also made clear, Rule 702 was intended to expand the universe of admissible expert testimony beyond that which the Frye test would have permitted. Daubert, 509 U.S. at 596

The First Circuit has clearly followed that the trial judge performs the gatekeeping function of the propriety of expert testimony, both in terms of qualification, as well as relevance of testimony under Rules 401 and 403. United States v. Diaz, 300 F.3d 66, 75-76 (1st Cir. 2002) (abuse of discretion standard in review of the admission of expert testimony).

### A.    Relevance of Expert Testimony in this case

The government respectfully submits that expert testimony pursuant to Fed. R. Evid. 702 is essential for the jury to understand the context and the significance of the evidence to be presented in this case, which spans two decades, and circumnavigates the globe involving words and concepts which are foreign, or at least poorly understood, by a layperson. The subject matter and the opinions being offered by the government's experts are relevant to the facts to be adduced at trial, which bear on the question of guilt of the defendants, and are therefore relevant under Fed. R. Evid. 401. The fact that the expert testimony is probative of the central issues in

this case means that the testimony by its nature is prejudicial to the defendants. However, far from confusing or distracting the jury, the government's experts' testimony is expected to assist the trier of fact to navigate the complicated references and history necessary to understand the evolution of terrorism financing over the past twenty years. Under Fed. R. Evid. 403, the probative value of such testimony far outweighs any unfairly prejudice.

At trial, the jury will determine, among other things, whether the defendant's knowingly concealed that Care International's activities were not exclusively charitable in nature. The context of what these activities in fact were, their history and inter-relationship, the reasons and the beneficiaries, is essential for the jury to know before they can make a reasoned assessment as to whether Care International was an exclusively charitable organization, and whether the defendants adequately disclosed their lineage and their activities to the IRS.

Federal Rule of Evidence 702, which governs the admission of expert testimony, authorizes expert testimony in the form of an opinion or otherwise when that testimony would assist the trier of fact to understand the evidence or to determine a fact in issue.[1] As in the other criminal contexts (discussed below) which involve interrelated individuals and organizations, terrorism is a relevant subject area for expert testimony in cases involving violent jihad and organizations which engage in combat and terrorism. Such testimony is essential to explain to a jury a blend of international history, political concepts, and the overall context of a world which is foreign to the average juror. Indeed, in a contemporary environment where the media may

---

[1] Federal Rule of Evidence 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

serve as the only conduit for information regarding global terrorism and violent jihad around the world, the greater danger of misapprehension by a jury lies in NOT presenting expert testimony. See United States v. Amuso, 21 F.3d 1251, 1263 (2d Cir. 1994)(warning the danger of presumptuous conclusions about La Cosa Nostra by the jury without expert testimony).  Indeed, when faced with highly specialized questions of fact, a jury is perhaps best assisted when both parties present relevant experts in the relevant fields, each providing the jury with the ability to reconcile the complex issue despite the varied backgrounds of a lay jury.  The key to this exercise, however, is matching the relevance of the expertise to the fact which the juror must decide, the so-called "fit" of the expert.

Experts who are qualified under Rule 702 have routinely been admitted and have been proven of valuable assistance to juries to understand issues related to violent jihad and terrorism. Despite the defendant's accusation that the prejudice of having someone explain the nature and activities of the mujahideen, such testimony is helpful.  See, e.g. United States v. Hammoud, 381 F.3d 316, 337 (4th Cir. 2004) (Dr. Levitt testified regarding the structure of Hizballah and identified its leaders as well as discussed the nature of its funding activities with specific reference to defendant's activities.)  The Fourth Circuit upheld the district court's admission of Dr. Levitt's testimony in these areas, concluding that "this testimony was critical in helping the jury understand the issues before it."  Id.  The Sixth Circuit upheld the district court's admission of Dr. Levitt's testimony in areas which included, among other things, testimony about "economic jihad", Al-Kifah Refugee Center, the use of U.S.-based NGOs to channel funds to the mujahideen, the process to designate a Specially Designated Global Terrorist entity, all in a case which involved discrete false statement concealing the defendant's relationship to pro-jihad

10

groups.  <u>See</u> Damrah transcript at 58-59, 71, 82, 104-106.

It should not be surprising that experts studying terrorist organizations must, and often do, rely on information other than first-hand perceptions.  There is no laboratory in which to empirically test the opinions offered by terrorism experts.   Dr. Levitt and Mr. Kohlmann have previously, and will again, if necessary, explain how they have applied the same degree of intellectual rigor in this case as they have throughout his professional experience in this field.  They will explain how terrorism experts gather and analyze information, and how they employed those methods in this case to reach their opinions.

Other courts have also permitted expert testimony on terrorist organizations in"material support" cases.  <u>See</u> <u>e.g.</u>, <u>United States v. Khan</u>, Crim. No. 03-296-A (N.D. Va. 2004) (material support of Al Qaeda; permitted expert testimony concerning relationships between Al Qaeda, the Taliban, Lashkar-e-Taiba, Lashkar Jihad and <i>jihad</i> fighters in Bosnia and Chechnya); <u>United States v. Al-Hussayen</u>, Crim. No. 03-48 (D. Idaho 2004) (permitted expert testimony concerning use of internet by terrorist organizations for recruitment and fund-raising).

Despite the defendants' exasperation in finding such cases, courts have permitted the use of such expert terrorism testimony in a variety of non-material support contexts, because the utility of expert testimony relates to the issues at trial, regardless of the criminal charge.  <u>See</u>, <u>e.g.</u>, <u>United States v. Alwan</u>, 279 F.3d 431, 439-440 (7th Cir. 2002) (finding proper government's use of Hamas expert to rebut defendant's coercion defense in a contempt case); <u>United States v. Damrah</u>, 334 F. Supp.2d 967, 982 (N.D. Ohio 2004) (in prosecution for unlawfully obtaining citizenship); <u>Peterson v. Islamic Republic of Iran</u>, 264 F. Supp.2d 46, 51-52 (D.D.C. 2003) (in wrongful death suit under Foreign Sovereign Immunities Act for terrorist bombing of U.S.

Marine barracks in Beirut, court permitted extensive expert testimony on nature of Hizballah and Hizballah's responsibility for the bombing) ; Barapind v. Enomoto, 360 F.3d 1061, 1065 (9th Cir. 2004) (in extradition proceeding, noting testimony of "expert on international violence and terrorism" that petitioner was "a folk hero who has great popular support among Sikh Separatists") ; Campazano v. Islamic Republic of Iran, 281 F. Supp.2d 258, 262 (D.D.C. 2003) (in civil damages action relating to Hamas suicide bombing, relying on expert testimony to establish that, inter alia, Iran's support of Hamas was $30,000,000 in 1995 and between $20,000,000 to $50,000,000 annually in the past); Boim v. Quranic Literacy Institute, No.00 Civ 2905 (N.D.Il. 2004) (civil case in which Dr. Levitt testified, assessing Civil liability for organizations which support terrorism); MacWade v. Kelly, 2005 WL 3338573 (S.D.N.Y. 2005)( civil rights lawsuit based on police actions in interest of public safety) and administrative immigration proceedings when applicant claim asylum. Kheireddine v. Gonzales, 427 F.3d 80 (1st Cir. 2005).   The commonality here is that they all involve facts which require expertise about terrorism and violent jihad in order to assist a jury to arrive at the truth.

Expert witnesses are routinely admitted and are helpful in other cases in which the nature of shadowy organizations and activities is not readily apparent to jurors.

### 1.    Organized Crime context

The admission of expert testimony on terrorism follows the same rationale as that for organized crime, which is routinely admitted.  See United States v. Amuso, 21 F.3d 1251, 1263 (2d Cir. 1994)(noting "[a]side from the probability that the depiction of organized crime in movies and television is misleading, the fact remains that the operational methods of organized crime families are still beyond the knowledge of the average citizen."); United States v.

Locascio, 6 F.3d 924, 938 (2d Cir. 1993); United States v. Daly, 842 F.2d 1380, 1388 (2d Cir.

1988); United States v. Lombardozzi, No. S1 02 Cr. 273 (PKL), 2003 WL 1907965, *4

(S.D.N.Y. April 17, 2003) (in loansharking case, permitting the expert witness to testify that trial

defendant was "made member of the Gambino Family" and to testify "regarding how disputes

between members of different LCN families are resolved").

       In the organized crime context, the courts have repeatedly upheld expert testimony

concerning: (1) nature and function of organized crime organizations; (2) structure of the

organizations; (3) rules; (4) interpretation of conversations, including the meaning of certain

jargon and code words;  (5) identification of specific members and associates of the organization

and their titles, ranks and functions; (6) identification of individuals by their voices; and (7) how

organized crime has infiltrated other entities, such as labor unions. United States v. Angiulo, 897

F.2d 1169, 1187-1190 (1st Cir. 1990);  United States v. Angiulo, 847 F.2d 956, 973-75 (1st Cir.

1988), cert. denied, 488 U.S. 852 (1988); United States v. Theodoropoulos, 866 F.2d 587, 591

(3d Cir.), mandamus denied, 109 S.Ct. 1179, 103 L.Ed.2d 246 (1989),  Locassio, 6 F.3d at 936-

37; Daly, 842 F.2d at 1388; see also United States v. Gotti, 2004 WL 2423799 (S.D.N.Y. Oct.

29, 2004) (permitting expert testimony in a number of areas, including structure of organized

crime families, rules of conduct, methods of controlling businesses and the identities of specific

members of organized crime families).  Expert testimony on these issues is helpful to the jury "to

provide background for the events alleged in the indictment" and to provide the jury with an

"understanding of the nature and structure of organized crime families," given that this

information "is outside the expectable realm of knowledge of the average juror."  Daly, 842 F.2d

at 1388.  The Second Circuit has observed:

> Despite the unfortunate fact that our society has become increasingly familiar with organized crime and its activities from [the media], it is still a reasonable assumption that jurors are not well versed in the structure and methods of organized crime families. Moreover, much of the information gleaned from such sources may be inaccurate.

Locasio, 6 F.3d at 937.

Just as expert testimony concerning the nature, structure, members and other aspects of organized crime families are relevant and admissible in organized crime cases, expert testimony concerning the nature, structure, members and other aspects of terrorist organizations is relevant and admissible in a case in which the nature and structure of mujahideen groups is relevant and helpful. For example, while some Al Qaeda figures have become more publicized in the United States since September 11, 2001 and the threat of terrorism as violent jihad around the world, like organized crime, jurors are fortunately still not well versed concerning these entities. Jurors are unaware of mujahideen supporting organizations, how they function, their history and origin or who the significant individuals within their umbrellas are. This information clearly is "outside the expectable realm of knowledge of the average juror," and is thus admissible as expert testimony. Daly, 842 F.2d at 1388.

Expert testimony in this case is relevant and will be helpful to the jury on several grounds. First, it is necessary to provide background for the events alleged in the indictment. Obviously, in a case alleging that the defendants concealed the lineage of and the non-charitable activities of Care, it is essential that the jury hear expert testimony on what Al-Kifah Refugee Center/Maktab al Khidmat was, who Abdullah Azzam was and what he said, and why some of the materials which Care distributed, money it solicited, and some of the activities of the organization were related to violent jihad, rather than exclusively humanitarian activities. The

14

concept of Zakat, eligible recipients of the same, how Islamic charitable organizations collect

and distribute funds, and how some of them intermingle funds and finance terrorist activities, use

money, recruit and train terrorists, carry out attacks and conceal their activities are necessary for

the jury to be equipped to objectively and reasonably appraise the evidence.  When a lay person

thinks of something as charitable, there is typically no reason to question that purpose.  The fact

that numerous organizations which have been designated as Specially Designated Terorrist

Organizations have used the vehicle of obligatory Islamic charitable giving to re-direct funds

toward violent goals is necessary context for a jury to appraise whether the defendants were

knowingly concealing non-charitable activities from the government.  Without such expert

testimony, the jury will be unable to understand the defendants' motives, methods and means of

operation, the concepts within the Islamic world, the history and morphology of violent jihadist

organizations and other essential issues.

  In addition, expert testimony is necessary to explain the meaning and significance of

references made by the defendants and their organization amongst the materials seized from

them, and the conversations in which they coordinate with other pro-jihad fundraisers.[2]  Through

the significance of these notations, conversations, publications and materials, a jury will be able

to decipher the true meaning of these materials, to divine the defendants', and Care's intent.   The

defendants refer to internationally renowed violent jihadists such as Abdullah Azzam, Usama

Bin Laden,  Sayyid Qutb, Abdul Majid Wal Zindani and Gulbuddin Hekmatayar.  They discuss

---

[2]Significantly, the First Circuit has found that the perception requirement of Rule 701 could be met by personal knowledge based on past experience or even experiences that occur later.  See United States v. Wilkerson, 411 F.3d 1, 7 (1 st Cir. 2005); United States v. Ayala-Pizarro, 407 F.3d at 28-29.

the operations of combatant mujahideen around the world in a variety of unique geo-political environments.  The evidence at trial will show that Care praised martyrdom by dying in combat in the defense of the faith, and discuss how the readers and donors to their activities can support the global mujahideen.  They develop relationships to Specially Designated Global Terrorist organizations such as their parent organization, Human Services Office/Maktab al Khidmat, as well as their sister organization Global Relief Foundation, and other designated charities such as Holy Land Foundation and Benevolence International Foundation.  These crucial and specialized concepts, are an example of the testimony which will be invaluable to a jury to make an accurate assessment to divine the true nature of the defendants' activities.  The identity and relevance of these individuals and entities is "outside the expectable realm of knowledge of the average juror," and expert testimony concerning who they are, what they do, their designations as Specially Designated Terrorists and the significance of the defendants' contacts with them is admissible and highly probative of the charges in this case.  Expert testimony is also necessary to explain the meaning of certain code words and jargon used in the meetings, such as "wedding," "martyrs," *jihad*, *mujahideen*, *bayat* and other words, phrases and concepts.  See United States v. Rahman, 189 F.3d 88, 137 (2d Cir. 1999) (expert testimony concerning meaning of Islamic words and phrases such as *jihad* and *fatwa* would be appropriate).  These are words or terms that either have no meaning, e.g., "*mujahideen*," or an altogether different and much more benign meaning, e.g., "wedding," to the average juror.  Without expert testimony, the jury will have no understanding or, worse yet, a misleading or confused understanding of what the defendants meant when they used these words in the contexts of this case.

Second, such testimony will assist the jury in determining another central issue in this

case, that of the defendants' intent.   The modus operandi of related and affiliated ostensible charitable organizations, is crucial to the jury's determination as to whether the defendants knew what they were doing as well.  For example, the fact that Al-Kifah, helped funnel money and fighters, among other support to the mujahideen for years, is important for the jury to know when considering that Care adopted Al-Kifah's publication, transferred assets from Al-Kifah, stood up in the same location, shared officers, maintained contacts with the same donors, and otherwise continued the same conduct.  The allegiance to Hekmatyar's faction in the Afghanistan civil war, and the Abdullah Azzam generally, is important to the jury's determination of whether the defendant's intentionally continued to solicit money and expend funds for violent jihad, or whether it was an unexpected consequence of their charitable activities.  The jury would not be able to evaluate this, however, without expert testimony about these entities, individuals and items of evidence.

**2.     The Narcotics Expert context**

Government expert witnesses also routinely testify as to the structure, mechanism, and distribution paraphernalia of narcotics distribution, the interpretation of specific terminology, and other aspects of the drug trade.  See e.g. United States v. Valle, 72 F.3d 210, 214 (1st Cir. 1995); United States v. Boney, 977 F.2d 624, 631 (D.C. Cir. 1995); United States v. Nobles, 69 F.3d 172, 183 (1995). Typically, such witnesses testify from their own experiences in doing such investigations, as well as through their research and discussion with others.  As the First Circuit has recognized in this context,"'the line between expert testimony under Fed. R. Evid. 702 . . . and lay opinion testimony under Fed. R. Evid. 701 . . . is not easy to draw.' (Citation omitted). Indeed, the same witness – for example, a law enforcement officer – may be qualified to 'provide

both lay and expert testimony in a single case.'" United States v. Ayala-Pizarro, 407 F.3d 25, 28-29 (1st Cir. 2005).

Drug dealers frequently use jargon and engage in activities which are specific to the industry or deliberately cryptic to avoid detection by law enforcement and others. Consequently, "[l]ay jurors cannot be expected to be familiar with the lexicon of the [drug] community." Hoffman, 832 F.2d at 1310. See also United States v. Echeverri, 982 F.2d 675, 680 (1st Cir. 1993) ("Laymen, on average, are not familiar with the praxis of the cocaine community.") The same holds for the violent jihadist community, including a variety of the interconnected organizations which support them.

### 3.    The Street Gang Expert Context

Expert testimony of the sort which is being offered in this case is also routinely admitted in cases involving street gangs within the United States. United States v. Padilla, 387 F.3d 1087, 1094 (9th Cir. 2004)(manifestations of gang membership); United States v. Hankey, 203 F.3d 1160 (9th Cir. 2000) (holding gang expert's qualifications sufficient under 702 and testimony about defendant's association with a gang relevant under Rules 401 and 403). The Ninth Circuit explained in its description of the highly-specialized, but non-scientific expert testimony such as gang affiliation, "The Daubert factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." Hankey, 203 F.3d at 1169. Although instead of localized street gangs, the enterprises of international terrorist organizations similarly have distinctive rituals, extensive histories, and prominent individuals and objectives. An expert can dramatically assist a jury in understanding the significance of

18

certain mannerisms, statements, and appearances so that they not only recognize that this

demonstrates affiliation with a certain group, but also how that affects ones motives and manner

of behavior.

In the type of testimony being offered here is similar. The experts will describe the

trappings and underpinnings of international mujahideen organizations, will describe the

structure and practices of specific types of international criminal organizations, and will describe

the methods and manner of how these organizations conduct their business.

In addition to these three categories, the government is frequently permitted to introduce

expert testimony to describe little-known tradecraft and *modus operandi* evidence about other

criminal enterprises which are not readily within the juror's experience. See e.g. United States v.

Burchfield, 719 F.2d 356, 358 (11th Cir. 1983)(counterfeiting); United States v. Scavo, 593 F.2d

837, 843-844 (8th Cir. 1979)(bookmaking); United States v. Jackson, 425 F.2d 574, 576-577

(D.C.Cir.1970) (Pickpocketing schemes); United States v. Alonso, 48 F.3d 1536, 1541 (9th Cir.

1995)(credit card scam); United States v. Hutchins, 757 F.2d 11, 13 (2nd Cir. 1985)(confidence

schemes); United States v. Anderson, 61 F.3d 1290, 1297-1298 (7th Cir. 1995)(operation of

clandestine PCP laboratory).

### B.    Reliability of Expert Testimony can be found without a Daubert hearing

Under Rule 702, trial judges retain a gatekeeping function with respect to expert

testimony, as they are charged with ensuring that such testimony is both relevant and reliable. In

Kuhmo Tire Co. V. Carmichael, 526 U.S. 1 (1999), the Court emphasized the broad leeway

afforded trial judges in determining the reliability of expert testimony and it made clear that the

factors cited in Daubert might be pertinent to that inquiry in some cases but not in others and that

still other identified factors may be considered on an ad hoc basis.  Id. at 1175-1176.

Daubert and Kuhmo Tire both involved novel expert testimony.  Nothing in those cases suggests that the Court intended to precipitate a reexamination of the reliability of expert testimony that has enjoyed acceptance by the courts. Put another way, those cases do not suggest that in their aftermath the government now bears the burden of proof in the first instance of establishing the reliability of expert testimony of that sort.

> The flexibility of this standard was pointed out in the Court's Kuhmo Tire opinion:
>   The trial court must have the same kind of latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that exert's testimony s reliable.
> . . . [A] court of appeals is to apply an abuse-of-discretion standard when it "review[s] a trial court's decision to admit or exclude expert testimony."  That standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion.  Otherwise, the trial judge would lack the discretionary authority needed both to avoid unnecessary "reliability" proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises.  Indeed, the Rules seek to avoid "unjustifiable expense and delay" as part of their search for "truth" and the "jus[t] determin[ation]" of proceedings.  Fed. R. Evid. 102.

Id. at 1176 (case citation omitted).  This passage too demonstrates the Court's recognition that there are types of expert testimony that are so well-established that their reliability may be presumed by the trial court, without resort to the needless delay and expense that a Daubert hearing would entail in instances where the expert testimony of the sort has been admitted on numerous occasions, as in this case.

The District Court for the District of Columbia put the matter succinctly in a case in which the defendant sought pretrial Daubert hearings on the admissibility of all of the government's proposed expert testimony, including that relating to ballistics and fingerprints (the defendant did not specify in what manner the testimony was alleged to be unreliable):

20

Although the Court must ensure that expert testimony is reliable and admissible, there is nothing in Kuhmo Tire or Daubert that requires the Court to conduct a pre-trial evidentiary hearing if the expert testimony is based on well-established principles. . . . When a principle is well-established,

the questions are simply whether the expert properly applied the established scientific principle to the facts and whether the expert's credibility is compromised for reasons such as bias. These are matters that a jury usually is competent to evaluate after cross-examination and presentation of competing expert testimony. Accordingly, where expert testimony is based on well-established science, the courts generally have concluded that reliability problems go to weight, not admissibility.

United States v. Cooper, 91 F. Supp.2d 79, 82, (D.D.C. 2000) (quoting Wright and Gold, Federal Practice and Procedure § 6266, at 265). See also United States v. Nichols, 169 F.3d 1255, 1262-1263 (10th Cir. 1999) (affirming trial court's denial of a motion for a Daubert hearing where the challenged evidence-- expert testimony regarding chemical testing of an object recovered from the site of the Oklahoma City federal building bombing-- did not involve any new scientific theory and the testing methodologies employed were well-known techniques routinely used by chemists). Because none of the expert testimony challenged by the defendants in this case involves a novelty, indeed, both Dr. Levitt and Mr. Kohlmann have been qualified as experts in the areas of their expected testimony on numerous occasions. Briefly put, a Daubert hearing is unnecessary, and the only purpose would seem to be to create fodder for cross-examination at trial. While the art of cross-examination is by nature liberal, it should not be so broad as to create an additional record under the guise of challenging the credentials of expert witnesses who have been qualified repeatedly before other courts. Consequently, Defendants' motion for such a hearing should be denied.

In other words, the defendants' challenge as to the scope of the experts' testimony is a separate analysis than whether the expert should again be so qualified. A Daubert hearing is neither appropriate nor necessary to limit the scope of an experts' testimony. The defendants

also misconstrue the experts' Expert Reports. These reports are designed to provide notice to the defendants of their opinions and their bases, but it is not a summary of their testimony. Rather, the detailed reports were prepared in an excess of disclosure, and to minimize trial issues, such as a claim of surprise to the defense which may delay the presentation of trial under Fed. R. Evid. 705. Indeed, at trial, the expert witnesses are expected to testify to only some of the voluminous details within their expert report.

Curiously, the defendant's motion does not argue for a <u>Daubert</u> hearing, it rather seeks to exclude or limit testimony. In fact, given the detailed disclosures and the repeated admissibility of Kohlmann and Levitt's testimony about similar matters in other cases, a Daubert hearing would amount to a thinly veiled discovery device. As the Southern District of Ohio has recently denied another defendant's request for a <u>Daubert</u> hearing of a government expert (Dr. Gunaratna) who has testified less frequently than either Levitt or Kohlmann. <u>United States v. Abdi</u>, 498 F.Supp.2d 1048, 1069-1070 (Marbley, D.J.)(S.D.Ohio July 26, 2007). Judge Marbley stated "[] despite Defendant's heavy allegations as to [the government expert's] credibility, [he] has previously testified as an expert on world terrorism[]" and found that the complexity of the subject matter was really what was at issue rather than the credibility of the expert testimony. <u>Id.</u> In this case, the defendants do not articulate an attack on the expert's credibility; rather their line of attack is that Levitt is qualified, in unrelated areas, and Kohlmann is not qualified at all. Aside from some empty name-calling, they do not challenge the veracity of the education/experience which led to their expertise. As described by the court in <u>Abdi</u>, it is unclear what the value of a <u>Daubert</u> hearing would be when the experts resumes are unchallenged. For all the reasons described herein, a <u>Daubert</u> hearing is not appropriate or

necessary in order to find that Kohlmann and Levitt, each of whom has prepared extensive over-inclusive expert reports, and have been qualified time and again by other courts. Additionally, the scope of Kohlmann's testimony is expected to be based on the wide breadth of the materials which the defendants possessed and distributed, and their association with other individuals. The duration of the defendants' activities (over a 10 year span), their prolific distribution of pro-jihad materials (on at least a bi-weekly and later monthly basis), and their interconnection with so many like-minded Specially Designated Global Terrorist organizations requires a far-ranging testimony from expert witnesses with regard to who these individuals and entities were, and what their significance as relates to activities of fighters or combatants was. Although the charge is simple in this case, the conduct which the defendants supported was complex - and it is that conduct, which Kohlmann and Levitt's testimony is pivotal to describe.

The government is aware that the use of such testimony is not without limits. For example, in terrorism cases, expert testimony concerning the defendants' beliefs, thoughts and intentions, and whether the defendants' conduct was "justified . . . within a framework of Islamic law," is improper. Rahman, 189 F.3d at 135, 137-38. In addition, expert testimony cannot be used to improperly bolster the testimony of fact witnesses. See United States v. Cruz, 981 F.2d 659, 663 (2d Cir. 1992) (prosecution should not attempt to bolster the credibility of fact witness by arguing that fact witness's version of events is consistent with expert's testimony). Further, while organized crime experts have been permitted to identify defendants as members of organized crime, such testimony must be evaluated carefully by the court. See United States v. Angiulo, 847 F.2d 956, 975 (1st Cir. 1988) (permitting expert witness to identify two defendants as "close associates" of the Patriarca family of LCN); United States v. Theodoropoulos, 866 F.2d

587, 589-92 (3d Cir. 1989) (permitting expert witness to testify regarding defendant's rank and function within conspiracy's hierarchy).   At trial, the risk that the expert testimony will be "too" helpful to a jury can easily be remedied when if "the trial court explicitly instructed the jury that it could accept or reject the expert testimony in whole or in part." <u>Angiulo</u>, 897 F.2d at 1190.

Consistent with these principles, the government intends to recommend certain limits on the use of the proposed expert's testimony and present the court with a proposed limiting instruction.  The government will not, for example, argue in its summation that fact witnesses should be credited because their testimony is consistent with that of the expert.  Moreover, during the experts' direct testimony, we will not ask the experts whether the defendants themselves are affiliated with Al Qaeda, or whether they had knowledge of specific terrorist activities before they occurred or contributed to the accomplishment of specific mujahideen operations.  These are determinations to be made by the jury.  Rather, the government will limit its expert testimony to the areas identified above that have been specifically approved by the courts.  The government's expert or experts will provide the jury with background to understand the import and implications of the materials possessed by the defendants, and the words spoken by the defendants and their co-conspirators, as well as other evidence offered by the government, so that it can properly evaluate whether the defendants had concealed the fact that Care also engaged in activities designed to support fighters.

### IV.   <u>GOVERNMENT EXPERTS</u>

A.   <u>DR. LEVITT IS QUALIFIED AND HAS IMPORTANT RELEVANT TESTIMONY</u>

Doctor Levitt's expert testimony about terrorist financing has been specifically upheld by appellate courts and has been introduced before several district courts in criminal and civil cases.

See e.g. United States v. Damrah, 334 F. Supp.2d 967, 982 (N.D. Ohio 2004)(discussed infra);

United States v. Hammoud, No.03-CR-4253 (W.D.N.C. 2004)(discussing Hizballah); United

States v. Al-Arian, No. 8:03-CR-77-T-30-TBM (M.D. Fla. 2006)(discussing Palestinian Islamic

Jihad); United States v. Al Moayad, et al, No. 03-1322 (S-1) (SJ) (E.D.N.Y.)(discussing Hamas

and al-Qaeda, Maktab al Khidmat, Abdullah Azzam, the first World Trade Center bombing);

United States v. Marzook, No. 03-CR-978 N.D. Ill.)(discussing Hamas); and United States v.

Holy Land Foundation for Relief and Development, 3:04-CR-240-G (N.D.Tx. 2007).  Courts

have allowed similar expert testimony from Levitt concerning the structure, organization, and

modus operandi of terrorist financing organizations.  For example, the Fourth Circuit has upheld

admission of expert testimony concerning the Hizballah terrorist organization from Levitt, an

expert on Middle Eastern terrorism.  See United States v. Hammoud, 381 F.3d 316, 337 (4th Cir.

2004) (en banc), vacated, 543 U.S. 1097 (2005), reinstated in relevant part, 405 F.3d 1034 (4th

Cir. 2005) (en banc).  There, the defendant was charged with providing material support to

Hizballah by soliciting donations at a weekly prayer service and forwarding the money to a

senior Hizballah military commander.  At trial, Levitt testified regarding the structure of

Hizballah and identified its leaders.  Levitt also explained the significance of the defendants

contact with those leaders.  And, Levitt discussed the nature of Hizballah's funding activities

with specific reference to defendant's activities. Id. at 337.  The Court upheld the admission of

the expert testimony in these areas, concluding that "this testimony was critical in helping the

jury understand the issues before it."  Id.  Similarly, in United States v. Damrah, 412 F.3d 618

(6th Cir. 2005), the Sixth Circuit held that Levitt's reliance on books, press releases, newspaper

articles, and the United States Government's annual "Patterns of Global Terrorism" publication

was entirely appropriate.  In finding no abuse of discretion, the court quoted the district court's

conclusion that "[g]iven the secretive nature of terrorists, the Court can think of few other

materials that experts in the field of terrorism would rely upon[]" and Dr. Levitt's methodology

was "the gold standard in the field of international terrorism" Id. at 625.   Despite the

defendants' suggestions, Dr. Levitt's testimony about other ostensible charitable organizations

which supported the mujahideen is probative in this case, and is not being offered for guilt by

association.  This testimony, like that of an organized crime or a gang expert, will help explain

the structure of these organizations, how they are financed, how these groups accomplish their

goals, and their methods of operation, and with whom they are associated.  All Islamic charities

are not corrupt, nor will Dr. Levitt testify that they are. Rather, he will explain that some of them

engage in behavior such as intermingling funds so that in addition to support for widows and

orphans and other legitimate beneficiaries of outpourings of support - they have intermingled

funds and/or freed up funds so other agencies can subsidize fighters.  Dr. Levitt's testimony

about how Care's activities were consistent with other organizations which did just this type of

behavior is critical for the jury to understand the mechanism by which Care's activities in the

United States, supported fighters overseas.  Without this understanding, the jury will be forced to

view in a vacuum discreet solicitations for humanitarian aid, versus discreet solicitations for the

mujahideen; in reality, this is not a binary proposition.  In fact, by looking at several other

Specially Designated Terrorist Organizations, which happen also to be corrupt Islamic NGOs,

Dr. Levitt has learned that the two are NOT mutually exclusive; rather, they are very much inter-

dependent insofar as the money obtained from one is either intermingled with, or frees up money

for the other.  Indeed, that the defendants ran a corrupt organization which defrauded the IRS is

apparent in the face of the indictment. Dr. Levitt will relate the evidence in this case, to his knowledge of how this organization's activities was consistent with others which he knows.

In addition to this important testimony, Dr. Levitt will elaborate on the concept of Economic Jihad, which also transcends merely Middle East-based Islamic non-governmental organizations. The concept of Jihad is Islamic in root, and the interpretation of Jihad as fighting is used in various walks across the Ummah (Muslim world). Regardless of geographic, sectarian or ethnic lines, there exist Islamic Jihadists who interpret Jihad to mean fighting. This truth compels the probative nature of Dr. Levitt's expected testimony about Economic Jihad, which in brief, refers to the idea that if one is unable to personally participate in fighting, that they can receive the reward by contributing financially to the cause. (Indeed, among materials seized from Care is evidence of exactly this concept. This concept is the fundamental mechanism through which the mujahideen around the world are/were funded, and is the core of the case -- that Care was soliciting money and distributing materials so that it too could fund fighters. Care was the vehicle for those who wished to engage in Economic Jihad. Dr. Levitt has testified about precisely this point in other cases.  See Damrah, supra (involving the defendant's false statements on immigration forms), Holy Land Foundation for Relief and Development, supra.

The defendants claim too that in Damrah, because there was some restriction of the scope of Dr. Levitt's testimony, that some subject matter limitations - were actually the sanitization of unnecessary potentially inflammatory name of Osama bin Laden and the names Hamas and Hizballah, which did not appear in any of the evidence and which name was not necessary to understand the import of the testimony (that Maktab al Khidmat evolved into part of al Qaeda

and that the Palestinian Islamic Jihad engaged in terrorist activities.)[3]  In this case, not only did the defendants discuss bin Laden (as evidenced by notations found in Care's belongings), but they also carefully preserved a transcript of an interview conducted with him by CNN, which was found accompanied by other pro-jihad materials.   Similarly, the defendants claim that Dr. Levitt's testimony was limited chronologically to only those activities which occurred prior to the commission of the defendant's crime.  This limitation is also inapposite in this case, as the defendants' criminal offense, as described in the indictment, lasted for a decade, from 1993-2003 -- it was the continued concealment of the very activities which the expert is going to contextualize for the jury.  Moreover, the defendants pro-mujahideen activities evolved at the same pace as the mujahideen evolved, including which organizations did what, who their leaders were, and where they were operating.  This is essential testimony to explain why a group which supported anti-Soviet fighters in 1990, would support an Afghan warlord in 1993, the Human Services Office in Bosnia in 1995, the Taliban in 1996, the Chechnyan resistance in 1998, et cetera.  Context is everything, and the average juror cannot be expected to know how the world was changing, nor how the mujahideen, and their financial backers adapted.  This is precisely the type of testimony which Dr. Levitt can elucidate.

The defendants also claim that Dr. Levitt's mastery of middle-eastern jihad networks means that he cannot know about related groups who operate elsewhere in the world geographically (or even ideologically).  This conclusion is pollyannish and simplistic.  It is a

---

[3] The defendants again entirely miscast an exchange from the <u>Damrah</u> case during which the District Judge makes a joke at the expense of print media for the benefit of the jury, and the defendants spin as a question about Dr. Levitt's methodology.  Nor do they point out that that court described it as the "gold standard".

truism that international mujahideen operations are a world-wide phenomenon, and their evolution and support structures, like economics in general, is fundamentally interlinked. This is precisely why the ambit and detail of such a broad arena of endeavor requires special expertise to winnow through to the relevant and significant interconnections which will shed light on exactly what the defendants were doing, and with whom they purported to do it. To simply conclude that Dr. Levitt has insufficient knowledge about Economic Jihad, or parallel NGOs who were engaging in the same mechanism of activity as the defendants because he does not spend most of his time focusing on Afghanistan and Bosnia ignores the scope his discipline, and the fact that regardless of the defendants' guilt in this case, there are mujahideen around the world who are supported from every corner of the globe.

The defendants' argument that Dr. Levitt has no expertise in realm of international terrorism which does not involve the Palestine-Israel conflict and the Middle East, is also fundamentally flawed. In addition to the history of mujahideen groups propagating from the Arabian Penninsula (including Abdullah Azzam, Osama Bin Laden, and the Muslim Brotherhood) into countries like Afghanistan and Bosnia, Dr. Levitt's expertise extends to aspects of Terrorism Financing and international terrorism regardless of geo-political boundary. For example, since Dr. Levitt's testimony in <u>Damrah</u>, in which he testified about Maktab al Khidmat, he had become Deputy Assistant Secretary of Treasury in which, among other duties, he figured prominently in the process to designate Global Terrorist Entities. Over his tenure, at least seven entities were designated for providing material support to al Qaeda, Abu Sayyaf Group, Libyan Islamic Fighting Group, Jemaah Islamiyya, and others. All of these organizations Sunni extremist groups whose primary purpose is not merely to terrorize Israel. Additionally,

Dr. Levitt has taught graduate-level courses at Johns Hopkins on Terrorism which span terrorist groups and discussed the evolution of global jihadists of many stripes. Dr. Levitt is also widely published with regard to generalist terrorism financing discussions and groups which also operate outside of the middle east such as al Qaeda. See Attachment B (List of citations to non-Middle East-specific articles and presentations).

The defendants also misunderstand the reason for the introduction of expert testimony to talk about other pro-jihad groups and figures. This is not a case, as the defendants' accuse, where the government is attempting to sneak in descriptions of the conduct of other pro-jihad groups and figures so that the jury will think less of the character of the defendants. Rather, as the indictment lays out, the defendants' concealment of these associations is the central issue in the case -- whether it was material to the government to have known from whence Care emerged, the types of literature that they distributed, the activities of the organization, and for whom they were soliciting and expending funds. This is not a ruse to introduce inflammatory evidence of unrelated crimes and activities. Rather, the description of other organizations and individuals is essential to explain to the jury how interrelated Care's activities were with others, and to explain the signficance of who those people were, a crucial fact without which a juror will be unequipped to make a determination of the facts.

B.    **MR. KOHLMANN IS QUALIFIED AND HAS IMPORTANT RELEVANT TESTIMONY IN THIS CASE**

Defendants contend that Mr. Kohlmann is unqualified to testify about any of the topics on which he will opine. That argument is meritless, and has been rejected in other cases where Mr. Kohlmann has testified as an expert in areas similar to those in this case. United States v. Sabir, 2007 WL 1373184 at *11 (S.D.N.Y. May 10, 2007);  United States v. Aref, 2007 U.S.

Dist. LEXIS 12228, at *48-49 (N.D.N.Y. Feb. 22, 2007); United States v. Chandia, No. 05 Cr.

401 (E.D.Va. 2006);  United States v. Paracha, 2006 WL 12768, at *20-22 (S.D.N.Y. Jan. 3,

2006)(citied at length in defendants' brief, and discussed below), United States v. Al Timini

(E.D.Va. 2005); and United States v. Benkhala (E.D.Va. 2004).  In this case particularly,

Kohlmann's expertise in the understanding of Maktab al Khidimat, and its relationship to Care,

pre-dated this prosecution.  Mr. Kohlmann will be able to testify that his research into Care and

Al-Kifah made him familiar with Care, and evidence in this case prior to even the Government's

discovery of this evidence.  Indeed, he will provide personal lay observations in addition to his

expert testimony.  More than any other expert in the world, Kohlmann is uniquely suited to

testify as an expert in this case.  Given the subtleties of what the jury is being asked to decide,

Kohlmann's expertise should be given a wide berth in order to sufficiently explain the

significance of the evidence collected from Al Kifah and Care, and their inter-relationship to

people who were fighting overseas.  This is what the defendants stand accused of concealing,

and the jury should learn what exactly those activities and relationships were.

   Contrary to the defendants' mischaracterization, Mr. Kohlmann's testimony is not "self-

styled" expertise; Rather, Mr. Kohlmann's expertise and his opinions, as reflected in his

curriculum vitae (a copy of which is attached to this opposition as Exhibit B),  are the product

of: (i) his graduate work in law, foreign service studies, and Islamic studies; (ii) his research and

authorship of numerous books and articles concerning al Qaeda and the conflicts in Bosnia and

Afghanistan; (iii) his prior experience as an expert witness in several federal court trials and

international tribunals; (iv) his full-time employment at two "think tanks" focusing on terrorism

and al Qaeda, namely Globalterroralert.com and The Investigative Project, and (v) his extensive

31

research into Maktab al Khidmat and Care International prior to this prosecution being contemplated. Despite the defendants' disdain, hiss background evinces a focused mind who spends his time doing naught but researching, discussing, and understanding the mechanics of violent jihad. His day job, in which he excels, is learning about terrorism and explaining to others what he has learned. The government's experts are not being shoe-horned in to expert witness roles, which is why they have testified in such capacity throughout the world.

Mr. Kohlmann's methodologies and opinions are sound and, in many cases, are based upon virtually incontrovertible sources. For example, Mr. Kohlmann draws on evidence that was deemed reliable enough to be admitted into evidence during numerous federal terrorism trials around the country, and in international courts. Consequently, Mr. Kohlmann's expertise has withstood cross-examination by motivated parties around the world. He also relies upon guilty pleas and confessions from admitted al Qaeda operatives and upon his own interviews with proponents of violent jihad, and he has been hired as a consultant for the Office of the High Representative in Bosnia. And, finally, he also relies upon some of the findings of the 9/11 Commission, which is without question the most authoritative and comprehensive publicly-available review of the facts and circumstances concerning the 9/11 attacks on this country. The law is clear that "expert witnesses can testify to opinions based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions." Locascio, 6 F.3d at 938. And, it is equally clear that Mr. Kohlmann's sources are exactly the type of sources relied upon by experts in his field, including Dr. Levitt.

Kohlmann's qualifications have been tried and tested. Kohlmann has conducted extensive academic and firsthand research into the subjects about which he will testify, and has

produced peer-reviewed literature and testimony establishing his expertise.  In addition to his academic research, Mr. Kohlmann has conducted significant field work including interviews with terrorists, cooperating defendants, their families, and supporters; review of original manuals, books, magazines, communiques, audio and video recordings authored or distributed by Al-Qaeda and its Arab-Afghan affiliate organizations; review of sworn court testimony, evidence submitted as exhibits in terrorism trials, judicial memoranda, and declassified intelligence reports; review of public government documents such as IRS 990 and 1023 forms; review of other "open" intelligence sources; consultations with international law enforcement agencies and recognized academic experts on Islamic terrorist groups; and participation at periodic academic forums organized by such entities as the Council on Foreign Relations and the NCTC.  As a terrorism expert specializing in the global jihad of the Arab-Afghans and Al Qaeda's Jihad in Europe, he has published, consulted and presented extensively in this field. Defendants' characterization of Mr. Kohlmann's experience and training is inaccurate.

Mr. Kohlmann has done extensive research on terrorism, in addition to extensive field contact with terrorists, participants and regions associated with violent jihad. Defendants' arguments that Mr. Kohlmann is unqualified because he is not a professor at a university is misguided and rooted in the insulated rhetoric of the Academy.   In any event, Mr. Kohlmann has interviewed mujahideen and terrorist operatives, recruiters, and financiers including Shaykh Omar Bakri Mohammed, Shaykh Abu Hamza al-Masri, Dr. Mohammed al-Massari, Randall Todd Royer (aka Ismail Royer) and Dr. Saad al-Faqih. Kohlmann has also personally visited Islamic charities and other centers of jihad in Bosnia, and in April 2005, was hired as a Consultant for the Office of the High Representative in Sarajevo.  And he has had extensive

contact with law enforcement worldwide in the fight against terrorism, and consults with law enforcement and intelligence agencies.

The immaturity of the defendants' critique of Kohlmann's qualifications is telling of their lack of legal ammunition.[4]  Indeed, Kohlmann's patent knowledge of international terrorist activity, singular dedication, and formidable prowess, has led him to rise to the heights of his field -- which has routinely been sanctioned as impressive and helpful to a federal jury.  The fact that Mr. Kohlmann runs a website devoted to terrorism issues is further ridiculed by the defense on the basis of the number of internet web "hits" which it receives.  Their rationale is quixotic - in one breath they criticize him because he appears on national network news, and the next they claim that his website does not receive much exposure.  If their point is that Kohlmann has a financial incentive to testify for the government, then the time-tested solution is a vigorous cross-examination on his motive to testify, not hyperbolic critique of a professional's veracity. Regardless, Mr. Kohlmann is compensated from a variety of sources, including as an expert witness.  He also is a consultant who works for a host of private clients doing things like research and forensic analysis relating to international terrorism, including law firms, financial corporations, and other major businesses.  Mr. Kohlmann additionally works for a non-profit foundation, the NEFA Foundation and consults with NBC News.

In attacking his credentials, defendants also ignore the fact that Mr. Kohlmann has already testified as an expert in numerous federal trials involving issues similar to those about which he will testify in this one. (Citations supra).  This is in contrast to the defendants'

---

[4]In a rhetorical flourish, the defendants pervert a flippant self-reference to a precocious television character (Doogie Howser) into an irresponsible and false accusation that Kohlmann has lied about his qualifications.

proposed experts, who appear never to have testified as expert witnesses in federal court about
the subject matter which they are being proffered as experts.   Regardless, the government's issue
with them is the Rule 401 and Rule 403 analysis which indicates that their testimony does
nothing to help a factfinder decide whether some of Care's activities were to support the
mujahideen.

In addition to his experiences as an expert witness in numerous federal courts, in June
2005, Mr. Kohlmann testified as an expert witness before the Supreme Court of
Bosnia-Herzegovina in the case of  International Prosecutors v. Abduladhim Maktouf regarding
the presence of foreign mujahideen in the Balkans, the leadership of the mujahideen, and the
history of their involvement in the Bosnian war.  His expert testimony was approved by a three
judge panel, including a Bosnian Muslim judge.  Moreover, Mr. Kohlmann is currently serving
as an expert witness and consultant to the International War Crimes Tribunal at the Hague in the
case of International Prosecutors v. Rasim Delic.[5]

Defendants also try to attack one of Mr. Kohlmann's publications, Al-Qaida's Jihad in
Europe, which was reviewed and published as an academic work by Berg Publishers (an imprint
of Oxford International Press), London, United Kingdom (not "self-published" as the defendants

_____

[5] The only instance where Mr. Kohlmann was not permitted to testify as an expert in
federal court was in United States v. Abu Ali (E.D. Va. 2005).  Despite the defendants'
characerization, in fact the issue in that case was not Mr. Kohlmann's methodology and
knowledge; rather, it was the lateness of the disclosure of the expert witness.  Consequently,
there was no Daubert hearing in that case. Neither was the testimony as important in that case.
The limited subject of Mr. Kohlmann's proposed testimony in that case, the spread of the Al
Qaeda network in Saudi Arabia after September 11, 2001, is not the same as here.  In that case,
Mr. Kohlmann's testimony was not necessary for the jury to understand the case (which was very
narrow in scope and included the defendants' confession).  By contrast, this case involves a
lexicon outside of the experience of the average juror, over 10 years of international history, and
one prone to misunderstanding without the benefit of such testimony.

misstate.)  Indeed, the book was also reviewed pursuant to the strict libel laws of the U.K., a concern for accuracy which apparently does not encumber the defendants.  Needless to say, the defendants' views of this work are not shared by the political and scholarly community.  The book was cited by the final report of the Congressional 9/11 Commission as a recommended source for information about Al-Qaida's forays in Bosnia-Herzegovina.  The book has also been positively reviewed by many respected scholars and Richard Clarke, the former counterterrorism chief to two United States Presidents has publicly described the book as "the definitive account of [Al Qaeda's] attempt to add Bosnia and Kosovo" and stated that "Kohlmann's mastery of this phase in the war on terror is complete."  More to the point, defendants' complaints are the stuff of advocacy and cross-examination, not a Rule 702 or Rule 703 challenge.

Defendants' claim that Mr. Kohlmann's work has not been subject to peer review and discussion is likewise wishful thinking.  Aside from the praise for his book, Mr. Kohlmann has authored numerous other publications and essays that have been reviewed and well-received in the scholarly community.[6]  In short, there is no question that Mr. Kohlmann is qualified as an expert in this case.

Defendants also attack the reliability of Mr. Kohlmann's opinions, asserting that his

---

[6] Recent peer-reviewed works include:  "The Bosnian Mujahideen: Origins, Training and Implications" (published as a chapter in The Making of a Terrorist, edited by Director of Terrorism Studies at the United States Military Academy Dr. James JF Forest, Praeger Security International, 2005); "The Role of Islamic Charities in International Terrorist Financing and Recruitment" (published by the Danish Institute for International Studies [DIIS], January 2006)"The Afghan-Bosnian Mujahideen Network in Europe" (published by the Swedish National Defence College Center for Assymetric Threats and Swedish Emergency Management Agency, May 2006); "The Real Online Terrorist Threat" (published in the Council on Foreign Relation's Foreign Affairs, September/October 2006); "The North African Mujahideen Network of the Western Balkans" (published as a chapter in Bosnian Security After Dayton, part of Routledge's Contemporary Security Studies Series – edited by Michael Innes, October 2006).

methodology is not sound.  That argument too is unconvincing.  In <u>Paracha</u>, the court rejected an

attack on his methodology, similar to the one mounted by the defendants in this case.  The

District Court found that Mr. Kohlmann's methodology, which it described as "gathering

multiple sources of information, including original and secondary sources, cross-checking and

juxtaposing new information against existing information and evaluating new information to

determine whether his conclusions remain consonant with the most reliable sources" is "similar

to that employed by his peers in his field."  <u>Paracha</u>, 2006 WL 12768 at *20-21.[7]

      Kohlmann's opinions and conclusions are subjected to various forms of peer review and

that the opinions he proposes to offer here regarding al Qaeda's origins, leaders and certain

tradecraft are generally accepted within the relevant community.   Kohlmann's methodology, as

he describes it, is similar to that employed by experts that have been permitted to testify in other

federal courts involving terrorist organizations.  <u>See</u> <u>Paracha</u>, 2006 WL 12768 at *20; <u>United</u>

<u>States v. Damrah</u>, 412 F.3d 618, 625 (6th Cir. 2005)(Dr. Levitt); <u>United States v. Hammoud</u>, 381

F.3d 316, 337 (4th Cir. 2004)(same).  Whatever the general pitfalls of the "vetting process" that

is employed by Kohlmann and others in his field, it is a sufficiently reliable methodology to meet

---

[7]The defendants point to Judge Stein's limitation of Kohlmann's testimony in
<u>Paracha</u> as helpful to their case.  2006 WL 12768 (S.D.N.Y. Jan. 3, 2006).  Contrary to
their description however, Kohlmann was not only allowed to testify about the
organization, structure and personalities of al Qaeda, but he was found more than
qualified to do so.  The concern there was to describe the defendant's and his associates'
precise role within al Qaeda.  On the scope of Mr. Kohlmann's testimony, the <u>Paracha</u>
court found that "expert testimony regarding al Qaeda's origin, leadership, and
operational structure . . . will aid the jury in understanding how al Qaeda came to be and
the manner in which it currently functions.  This area of testimony is analogous to the
type of expert testimony regularly permitted by the . . . Second Circuit in cases involving
organized crime families."  <u>Id.</u> at *21.

the requirements of Fed. R. Evid. 702.  Paracha, 2006 WL 12768 at *20 (some citations

omitted).  Moreover, Mr. Kohlmann's methodology includes more than relying on secondary

sources.  As noted above, despite the defendants' mischaracterizations, Kohlmann has conducted

interviews of mujahideen and others associated with radical, violent Islam, and has spent

extensive time on the ground in Bosnia.

 The final phase of defendants' attack on Mr. Kohlmann's testimony relates to the

relevance and alleged prejudicial effect of his testimony.  But these arguments are either

unconvincing in view of the indictment and facts, or entirely premature.  None of them support

exclusion of Kohlmann's testimony.

 Defendants contend that Mr. Kohlmann will talk in part about Bin Laden and Al Qaeda,

but that is an unconvincing ground to exclude his testimony under either Rule 401 or Rule 403.

As set forth in the government's disclosure, there are three basic purposes to Mr. Kohlmann's

testimony:  (1) To provide a dissertation or  exposition of the origin, ideology, organizational

structure, evolution and goals of Maktab al Khidimat, Al Kifah Refugee Cener, Al Qaeda and

other affiliated radical Islamic terrorist and guerilla groups and movements which are relevant to

the geo-political context in which Care operated or which are explicitly referenced in materials

maintained by Care.  This explanation would include the identification of leaders, members,

affiliates, supporters and the tactics and goals of certain radical Islamic terrorist groups or

movements as relevant to the evidence in this case. This explanation would also discuss how

groups whose purpose was to help fund mujahideen effectively penetrated Europe and North

America, establishing cells and networks across countries such as the United States for the

purpose of supporting violent jihad, as relevant to the evidence and the indictment in this case;

(2) to trace the spread and mobilization of the Arab-Afghan mujahideen from the jihad in Afghanistan to jihad conflicts in Bosnia, Chechnya and elsewhere where Care operated and sent funds. This explanation would include the development of support networks that provided money, supplies, personnel and other physical assets and guidance to the mujahideen, as well as publicizing the actions of the mujahideen; and (3) to analyze the contents of the evidence obtained during this investigation, including materials found in possession of Care, as well as intercepted communications and other evidence in this case; identify and explain terminology, concepts, people, and places found in the evidence that are relevant to the aforementioned description of purpose of testimony; and render an opinion as to whether evidence in this is consistent with an NGO which solicited money for and expended money to support the fighters in Afghanistan, Bosnia, Chechnya, and elsewhere. Needless to say, Bin Laden and Al Qaeda is not the entirety or sole focus of Mr. Kohlmann's anticipated testimony, but Maktab al Khidmat evolved into an element of al Qaeda, and the defendants themselves referred to Bin Laden, and maintained documents containing his views and beliefs about jihad. What the defendants meant when they used the word jihad, is fundamental to explaining to the jury why the money they solicited for the mujahideen was for fighters, and not some legitimate charitable purpose.

Defendants also argue that the mujahideen groups which Care purported support for, and accordingly Mr. Kohlmann's testimony about it, has nothing to do with this case. That is wishful thinking, and untrue. The indictment itself, and the nature of the evidence obtained in this case and provided in discovery specifically reference individuals and organizations such as Abdullah Azzam, Maktab al Khidmat, Human Services Office, Global Relief Foundation, Gulbuddin Hekmatayar, Usama Bin Laden, the meaning of Jihad, mujahideen, and others. The evidence at trial will show

that the defendants solicited money for violent jihad as these entities did and expended money to do so. The evidence shows that the defendants associated and allied themselves with these people, referred to them during intercepted conversations, and advocated the same goals. Defendants' reluctance to acknowledge the evidence of their ties to other mujahideen supporting entities may be understandable, but it was the defendants who chose to develop those ties, and must now confront the consequences at trial, regardless of any good works which they may have engaged in along the way. The touchstone of relevance in this case is whether the testimony will make it more or less likely that the defendants failed to disclose material information to the government. Mr. Kohlmann's testimony regarding international terrorist activities and individuals is premised upon the government's evidence linking these defendants, Care, to these individuals. This linkage is essential to the government's case, and to the jury's understanding of why this crime was committed, how it was committed, and whether the defendants' failed to disclose sufficent information about those activities.

Defendants' related argument that Mr. Kohlmann's testimony regarding terrorist groups will be unfairly prejudicial fails for the same reason. Care's own materials referenced these groups, and the jury has a right to know what these groups were. Evidence cannot be excluded under Rule 403 merely because it is prejudicial; it may only be excluded when the probative value of the evidence is "substantially outweighed" by the danger of unfair prejudice. United States v. Montas, 41 F.3d 775, 783 (1st Cir. 1994). All relevant evidence is by nature prejudicial, but in this case it is not gratuitously or unfairly being done. Indeed, the experts will testify to aspects of history which color the evidence which was actually seized in this case. The defendants' transparent attempt to prevent the jury from understanding the context for the defendants words and deeds, or worse, letting them

try to figure it out based on what they've heard in the press, boils down to this attempt to prevent the Government from connecting the dots for the jury.

The government did not chose to affiliate these defendants with ideology and descriptions of violent jihadists around the world– the defendants themselves did.  Rule 403 does not allow them to escape that fact, and certainly does not support the exclusion of expert testimony relating to the evidence of who the defendants' beneficiaries were purported to be.  In any event, by definition, Rule 403 requires the Court to consider the relative probative value of testimony in the context of the entire case, and then balance that degree of relevance against other considerations unfolding during trial.  That analysis should remonstrate that the essential value of the context of the government's experts, outweighs a risk of unfair association (the only potential prejudice) with other mujahideen supporters.  After all, these are the people who the defendants chose to associate, and they cannot now restrict the government's experts from describing to the jury who they happened to be.

In this case, Mr. Kohlmann's testimony is imperative to a proper jury determination of whether the defendants concealed the non-charitable activities of Care International.  As a threshold matter, it is fairly self-evident that, to make such a determination, the jury must have at least a working knowledge of what Maktab al Khidimat is, an analysis of the materials which Care distributed, and the significance of the individuals with whom Care associated.  Kohlmann's testimony is essential to provide the jury a basis to accurately conclude whether in fact Care's activities were exclusively charitable, or whether some of them in fact supported fighting or combat - a fact which was material to the IRS.  Without such testimony, the jury will be shielded from the truth.

41

## V.     **WHY THE CHALLENGED DEFENSE EXPERTS DO NOT "FIT"**

The defendants indignantly pronounce that the government is seeking to preclude the defendants from presenting a defense. This could not be more wrong. Indeed, the government has always agreed that Muslim populations in areas where the mujahideen were operating were in grave need of humanitarian aid from 1993-2003. In contrast to the violent jihad aspect of the activities in which Care engaged, the humanitarian activities in which they engaged are also part of arriving at the truth in this case. However, what is apparently lost on the defendants is the fact that Care engaged in humanitarian activities is not an issue at trial -- they disclosed that to the IRS, and it neither requires explication, nor specialized expertise to explain. The defendants have not offered their experts to explain that the government's interpretations of the defendants' pro-jihad activities are wrong, rather, they are only going to say that the humanitarian activities, which are not in dispute, were justified.

Indeed, the plain language of Care's orphan sponsorship program, or Udhyia project, or a variety of other projects, connote Humanitarian assistance. An expert on the plight of Muslims in a particular region of the world does nothing to permit a jury to understand what a donation of food or money means to a needy child. Rather, such testimony's only relevance could be to demonstrating that such a thing as charitable activity exists, and the defendants plain language of their materials indicates that they engaged in such activities. A Rule 702 witness is unnecessary to establish such universally understood concepts. Indeed, the real strategic import of the defendants' calling of experts whose only proffered testimony is that the defendants purported to give money to people in areas of the world which had legitimate humanitarian needs is to appeal to the sympathetic passions of the jury. It is a cry for jury nullification. It is not a legal defense to argue

a moral equation in which they claim that helping many non-fighters who were in need at the cost of funding a few mujahideen. Consequently, although highly-regarded and impressively credentialed, the defense expert witnesses' testimony is not relevant to a challenged issue of fact in this case. Moreover, the reason for which the defense expert witnesses are offered do not require Rule 702 testimony to comprehend. Finally, the nature of such testimony is bound to distract a jury and appeal to emotional assessment of the case, rather than an objective and reasonable assessment of the evidence.

## VI.    CONCLUSION

The anticipated testimony of the Government's expert witnesses including Dr. Matt Levitt, Evan Kohlmann, Dr. Ed Valla and Dawn Goldberg, is in compliance with Federal Rules of Evidence 401, 403, 702, 703 and 704 as well as meet Daubert standards. The proposed testimony is relevant to a fact at issue and therefore will assist the trier of fact. Their testimony is reliable in that it is based upon their respective education, training and extensive experience in their fields. In addition, the nature of the testimony offered has been accepted and proven relevant and reliable by other courts in similar circumstances. Based on the foregoing, the Government respectfully request this Honorable Court deny Defendant's motion in its entirety.

Respectfully submitted,
MICHAEL SULLIVAN
United States Attorney

By:    /s/ Aloke Chakravarty
       ALOKE CHAKRAVARTY
       B. STEPHANIE SIEGMANN
       DONALD L. CABELL
       Assistant U.S. Attorneys

Dated: November 5, 2007

# *Matthew Levitt, Ph.D.*

1828 L Street, NW, suite 1050, Washington, DC 20036 • mlevitt@washingtoninstitute.org

**Experience:**

**The Washington Institute for Near East Policy**  Washington, DC
*Senior Fellow and Director of the Stein Program on Terrorism, Intelligence and Policy*  Feb. 2007- present
• Write, lecture and consult on terrorism, intelligence, the Middle East and U.S. policy

**Johns Hopkins University, Paul H. Nitze School of Advanced International Studies (SAIS)**
*Professorial Lecturer in International Relations – Strategic Studies*  Washington, DC
• Teach graduate course entitled "Funding Transnational Threats"  2007 - present
• Teach graduate course entitled "Terrorism: Concepts and Problems"  2004 - 2005

**U.S. Department of the Treasury**  Washington, DC
*Deputy Assistant Secretary for Intelligence and Analysis*  2005- 2007
• Senior Executive Service (SES) manager within Terrorism and Financial Intelligence branch
• Deputy Chief of the Office of Intelligence and Analysis, one of the 16 US intelligence agencies

**The Washington Institute for Near East Policy**  Washington, DC
*Senior Fellow and Director of Terrorism Studies*  2001- 2005
• Direct Terrorism Studies Program; write, lecture and consult on terrorism, the Middle East and U.S. policy

**Johns Hopkins University, Zanvyl Krieger School of Arts and Sciences**
*Lecturer*  Washington, DC
• Teach graduate course on "Contemporary Terrorism and the American Response"  Summer 2005

**Federal Bureau of Investigation,** International Terrorism Intelligence Unit  Washington, DC
*Intelligence Research Specialist*  1998 - 2001
• Provided tactical and strategic analysis in support of FBI counterterrorism operations

**The Washington Institute for Near East Policy**  Washington, DC
*Soref Fellow*  1998
• Analyst focused on the Middle East peace process, terrorism and Palestinian politics and society

**The Program on Negotiation at Harvard Law School**  Cambridge, MA
*Graduate Research Fellow*  1997-1998
• Doctoral fellowship to pursue field research in the Middle East and commence writing of doctoral thesis

**Additional Affiliations:**
• Advisory Board Member, Institute for Counter-terrorism (ICT), Israel
• Advisory Board Member, International Centre for Political Violence & Terrorism Research (**ICPVTR**), Singapore
• CTC Fellow, Combating Terrorism Center (CTC) at U.S. Military Academy (West Point), USA
• Term Member, The Council on Foreign Relations
• Member, Crisis in Middle East Task Force, Saban Center at the Brookings Institution
• Member, Council on Foreign Relations Task Force on Terrorist Financing (2005)

**Education:**
**Tufts University, The Fletcher School of Law and Diplomacy**  Medford, MA
• Ph.D. in International Relations (Terrorism and Conflict Resolution)  May 2005
~ Passed Ph.D. Oral Exam with Distinction
• Master of Arts in Law and Diplomacy (M.A.L.D.)  May 1995

1

- *The Impact of Acute Security Crises on the Process of Ongoing Negotiations: Lessons from the Palestinian-Israeli Peace Process, 1993-1996* (Ph.D. dissertation. The Fletcher School of Law & Diplomacy at Tufts University, 2005)

- *Targeting Terror: US Policy Toward Middle Eastern Terrorist Groups and State Sponsors in the War on Terror* (Washington, DC: The Washington Institute for Near East Policy, 2002)

### Chapters:

- "Investigacion Y Persecution: Entrevista a Matthew Levitt," in *La Lucha Contra el Terrorismo y Sus Limites* (Madrid, Spain: Adhara Publicaciones, 2006)

- "Hizballah Finances: Funding the Party of God," in *Terrorism Financing and State Responses in Comparative Perspective* (Stanford CA:  Stanford University Press, 2006), available online at http://www.washingtoninstitute.org/templateC06.php?CID=772

- "Hamas Social Welfare: In the Service of Terror," in James JF Forest, editor, *The Making of a Terrorist: Recruitment, Training, and Root Causes* (New York: Praeger Publishers, 2005)

- "Iran and Syria: State Sponsorship in the Age of Terror Networks," in *Confronting Terrorism Financing* (Lanham, MD: University Press of America - American Foreign Policy Council, 2004)

- Several contributions to Peacewatch/Policywatch Anthology 2003: A Year of Victory and Challenge (Washington, DC: The Washington Institute for Near East Policy, 2004)

- "International Military Intervention and the Impact of Terrorism," in Robert B. Satloff, Ed., *International Military Intervention: A Detour on the Road to Israeli-Palestinian Peace* (Washington D.C.: The Washington Institute for Near East Policy, 2003)

- *Winning the Peace in the Middle East: A Bipartisan Blueprint for Postwar U.S. Policy*, coauthored with Patrick Clawson and David Makovsky and edited by Dennis Ross and Robert Satloff (Washington, DC: The Washington Institute for Near East Policy, 2003)

- Several contributions to Peacewatch/Policywatch Anthology 2002: America and the Middle East – Expanding Threat, Broadening Response (Washington, DC: The Washington Institute for Near East Policy, 2003)

- "Iranian State Sponsorship of Terrorism," *The Encyclopedia of World Terrorism, 1996-2002*, (Armonk, NY: Sharpe Reference, 2002), 379-382

- Several contributions to Peacewatch/Policywatch Anthology 2001: A Year of Terror (Washington, DC: The Washington Institute for Near East Policy, 2002), p. 174, 186, 423

- Several contributions to Peacewatch/Policywatch Anthology 1998: Inching Toward Peace, Inching Toward War (Washington, DC: The Washington Institute for Near East Policy, 1999), p. 78, 112

### Testimony/Lectures:

- Moderator, "Homegrown Radicalism in the United States," The Washington Institute for Near East Policy's annual Weinberg Founder's Conference, October 19-21, 2007, Leesburg, Virginia.

- "Combating the Financing of Transnational Threats," Anti-Terrorism Caucus, U.S. House of Representatives, Washington, D.C., October 23, 2007

3

- "Confronting the Iranian Threat," Anti-Defamation League Leadership Conference, Washington DC, April 30, 2007

- "Power of the Purse: Combating Terror Finance," seminar sponsored by Eden Intelligence at the Royal College of Defense Studies, Seaford House, Belford Square, London, England, April 26, 2007

- "Hamas: Politics, Charity and Jihad," Chatham House, Middle East Programme Roundtable Meeting, London, England, April 25, 2007, audio of lecture available online at

- "Can Sanctions and Financial Restrictions Avoid a Showdown with Iran?" Transatlantic Institute Roundtable Discussion at the Residence Palace, Brussels, Belgium, April 24, 2007

- "Hamas: Politics, Charity and Terrorism in the Service of Jihad," Transatlantic Institute Roundtable Discussion, Brussels, Belgium, April 23, 2007

- "Pulling Tehran's Purse Stings: Leveraging Sanctions and Market Forces to Alter Iranian Behavior," testimony before the House of Representatives Committee on Foreign Affairs Subcommittee on Terrorism, Nonproliferation and Trade and Subcommittee on the Middle East and Central Asia, March 15, 2007, available online at http://www.washingtoninstitute.org/templateC07.php?CID=333

- "Teaching Terror: How Hamas Radicalizes Palestinian Society," comments for a panel discussion on the topic of environments that enable terrorism at a conference titled, "The Roots of Terror: Understanding the Evolving Threat of Global Terrorism," sponsored by Women in International Security and the U.S. Army War College, February 12, 2007, available online at http://www.washingtoninstitute.org/templateC07.php?CID=331

- "Follow the Money: Challenges and Opportunities in the Campaign to Combat Terrorism Financing," Policy Forum at The Washington Institute for Near East Policy, February 23, 2007, available online at http://www.washingtoninstitute.org/templateC05.php?CID=2576

- "Iran's Pretensions and a Turbulent Middle East," lecture at a conference on "US-Iran Relations: Collision, Stand-Off, or Convergence?" sponsored by The New America Foundation and The National Iranian American Council, Washington, DC, February 14, 2007

- "Understanding the Terrorist Threat," Presentation via VTC for the George C. Marshall European Center for Security Studies in Garmisch, Germany, February 6, 2007

- "Advantages and Limits to Evidence-Based Analysis," commentary on a panel on "Future Directions: How Can We Determine Which Analytic Practices Work? Can Analytic Practices Become Evidence-Based?" at a conference sponsored by the Office of the Director of National Intelligence (ODNI) on Improving Intelligence Analysis, Chantilly, Virginia, January 10, 2007

- "Hezbollah Fundraising through Criminal Enterprises," Testimony before the Committee on Governmental Affairs, United States Senate, May 25, 2005, available online at http://www.washingtoninstitute.org/templateC07.php?CID=238

- "Islamic Extremism in Europe – Beyond al-Qaeda: Hamas and Hezbollah in Europe," Testimony before the Committee on International Relations, Subcommittee on Europe and Emerging Threats, United States House of Representatives, April 27, 2005, available online at http://www.washingtoninstitute.org/templateC07.php?CID=234

5

9/11 Attacks and the Scope of the Threat" Washington, D.C., September 27, 2002, available online at http://www.wmassociation.com/reports/spkers/levitt.html

- "Syrian Sponsorship of Global Terrorism: The Need for Accountability," Testimony on the Syrian Accountability Act before the Subcommittee on the Middle East and South Asia, Committee on International Relations, United States House of Representatives, September 18, 2002, available online at http://www.washingtoninstitute.org/templateC07.php?CID=14

- "Charitable and Humanitarian Organizations in the Network of International Terrorist Financing," Testimony before the Subcommittee on International Trade and Finance, Committee on Banking, Housing, and Urban Affairs, United States Senate (August 1, 2002), available online at http://www.washingtoninstitute.org/templateC07.php?CID=138

### *Journal Articles:*

- "Could Hamas Target the West?" *Studies in Conflict & Terrorism*, vol. 30, no. 11, 2007, available online at http://www.washingtoninstitute.org/templateC06.php?CID=1098

- "Countering the Theological Case for 'Economic Jihad' is Vital," *RUSI/Jane's Homeland Security and Resilience Monitor*, (July 1, 2005), available online at http://www.washingtoninstitute.org/opedsPDFs/42a8bf8bbf6a6.pdf

- "Hamas and Islamic Jihad Clash over 'Media Jihad'," *RUSI/Jane's Homeland Security and Resilience Monitor*, January 12, 2005, available online at http://www.washingtoninstitute.org/templateC06.php?CID=768

- "Zarqawi's Jordanian Agenda," (with Julie Sawyer), *Terrorism Monitor: In-Depth Analysis of the War on Terror*, Vol. II, Issue 24, The Jamestown Foundation (December 16, 2004), available online at http://www.jamestown.org/publications_details.php?volume_id=400&issue_id=3179&article_id=2369022

- "Untangling the Terror Web: Identifying and Counteracting the Phenomenon of Crossover between Terrorist Groups," *SAIS Review*, vol. XXIV, no. 1 (Winter-Spring 2004), available online at http://www.washingtoninstitute.org/templateC06.php?CID=786

- "USA Ties Terrorist Attacks in Iraq to Extensive Zarqawi Network," *Jane's Intelligence Review, Terrorism and Insurgency*, April 1, 2004 (posted online March 16, 2004), available online at http://www.washingtoninstitute.org/templateC06.php?CID=471

- "Hizbullah's African Activities Remain Undisrupted," *RUSI/Jane's Homeland Security and Resilience Monitor*, March 1, 2004 (posted online February 4, 2004), available online at http://www.washingtoninstitute.org/templateC06.php?CID=463

- "Hamas from Cradle to Grave," *Middle East Quarterly*, vol. 11, no. 1 (January 2004), available online at http://www.meforum.org/article/582

- "Hezbollah's West Bank Terror Network," *Middle East Intelligence Bulletin (MEIB)*, vol. 5, no. 8 (August 2003), available online at http://www.meib.org/articles/0308_l3.htm

- "Confronting Syrian Support for Terrorist Groups," *Middle East Intelligence Bulletin (MEIB)*, vol. 5, no. 5 (May 2003), available online at http://www.meib.org/articles/0305_s1.htm

- "Stemming the Flow of Terrorist Financing: Practical and Conceptual Challenges," *The Fletcher Forum of World Affairs*, vol. 27, no. 1, (Winter/Spring 2003), available online at http://fletcher.tufts.edu/forum/27-1pdfs/Levitt3.pdf

7

- "Blocking Terror Finances," UPI Outside View, May 3, 2007, available online at http://www.washingtoninstitute.org/templateC06.php?CID=1050

- "Putin's New Friends: Moscow Hosts Hamas," *The Weekly Standard*, March 19, 2007, available online at http://www.washingtoninstitute.org/templateC06.php?CID=1038

- "Target Iranian Forces," *The Washington Times*, February 16, 2007, available online at http://www.washingtoninstitute.org/templateC06.php?CID=1026

- "Hamas's Muddied Waters," *The Chronicle Review*, May 12, 2006, available online (by subscription) at http://chronicle.com/weekly/v52/i36/36b01201.htm

- "No Excuse," *The Wall Street Journal Europe*, July 28, 2005, available online at http://www.washingtoninstitute.org/templateC06.php?CID=856

- "A Major Blow to Al-Qaeda," *The National Post* (Canada). May 5, 2005, available online at http://www.washingtoninstitute.org/templateC06.php?CID=826

- "Ready, Aim, Ceasefire: How to Sustain the Spirit of Shem-el-Sheikh," *The Review*, Vol. 30, No. 3, March 2005

- "Injustice in Gaza," The Baltimore Sun, October 18, 2004, available online at http://www.washingtoninstitute.org/templateC06.php?CID=732

- "A Report Whose Tactical and Strategic Goals Don't Square," *The Daily Star*, August 30, 2004, available online at http://www.dailystar.com.lb/article.asp?edition_id=10&categ_id=5&article_id=7848#

- "The 9/11 Report and U.S. Middle East Strategy: Little Impact," *Bitterlemons-international.org*, August 27, 2004, available online at http://www.bitterlemons-international.org/inside.php?id=218

- "The Missing Link: Saddam and al Qaeda," *The Washington Post*, June 2. 2004, page C4, available online at http://www.washingtonpost.com/wp-dyn/articles/A8112-2004Jun1.html

- "Moderately Deadly: Yassin's Long History of Terror," *National Review Online*, March 26, 2004, available online at http://www.nationalreview.com/comment/levitt200403261126.asp

- "Who Did It?" *The Baltimore Sun*, March 14, 2004, available online at http://www.washingtoninstitute.org/templateC06.php?CID=468

- "Charity Begins in Riyadh," *The Weekly Standard*, vol. 9. no. 20, February 2. 2004, available online at http://www.washingtoninstitute.org/templateC06.php?CID=462

- "Shut Down Hamas," *The Baltimore Sun*, January 22. 2004, available online at http://www.washingtoninstitute.org/templateC06.php?CID=460

- "Turning a Blind Eye to Hamas in London," *The Wall Street Journal Europe*, October 24, 2003, available online at http://www.washingtoninstitute.org/templateC06.php?CID=490

- "Palestinian terrorists expand their reach, *The National Post*, October 18, 2002, available online at http://www.washingtoninstitute.org/templateC06.php?CID=489

- "PLO Penetrates Homeland Security," *The Jerusalem Post*, October 11, 2003, available online at http://www.washingtoninstitute.org/templateC06.php?CID=488

"Gaza: The Next Terrorist Safe Haven?" Matthew Levitt, PolicyWatch #1255, The Washington Institute, June 29, 2007, available at http://www.washingtoninstitute.org/templateC05.php?CID=2631.

Speaker on panel on "The Levant, Maghreb and Sub-Saharan Africa," International Terrorism and Intelligence 2007 (ITI 2007) Conference, hosted by the University of St. Andrews Centre for the Study of Terrorism and Political, Washington DC, June 13, 2007.

"Understanding the Threat: Contemporary Terrorism and the American Response," Anti Defamation League (ADL) Advanced Training School, June 11, 2007, Washington, D.C.

"Internationalizing the Financial Fight against Terrorism," George C. Marshall European Center for Security Studies in Garmisch, Germany, June 6, 2007

"State Sponsorship of Terrorism in the Age of Binladenism," National Security Management Course, Maxwell School of Citizenship and Public Affairs, Syracuse University, May 8, 2007

"Blocking Terror Finances," Matthew Levitt, United Press International, May 3, 2007, available at http://www.washingtoninstitute.org/templateC06.php?CID=1050

Contemporary Terrorism and the American Response, Summer 2005 Course # 406.666.51 at Johns Hopkins University's Zavyl Krieger School of Arts and Sciences

"A Major Blow to al-Qaeda," Matthew Levitt, National Post (Canada), May 5, 2005, available at http://www.washingtoninstitute.org/templateC06.php?CID=826

"A Report Whose Tactical and Strategic Goals Don't Square," Matthew Levitt, Daily Star (Beirut), August 30, 2004, available at http://www.washingtoninstitute.org/templateC06.php?CID=483

"Little Impact: The 9-11 Report and U.S. Middle East Strategy," Matthew Levitt, Bitterlemons-international.org, August 26, 2004, available at http://www.washingtoninstitute.org/templateC06.php?CID=765

"The Missing Link: Saddam Hussein and al-Qaeda," Matthew Levitt, Washington Post, June 2, 2004, Book Review, available at http://www.washingtoninstitute.org/templateC06.php?CID=476

"USA Ties Terrorist Attacks in Iraq to Extensive Zarqawi Network," Matthew Levitt, Jane's Intelligence Review, April 1, 2004, available at http://www.washingtoninstitute.org/templateC06.php?CID=471

"Who Did It?" Matthew Levitt, the Baltimore Sun, March 14, 2004, available at
http://www.washingtoninstitute.org/templateC06.php?CID=468

"Radical Islamist Groups in Germany: A Lesson in Prosecuting Terror in Court," Assaf
Moghadam and Matthew Levitt, PolicyWatch #834, The Washington Institute, February
19, 2004, available at
http://www.washingtoninstitute.org/templateC05.php?CID=1712

"Zarqawi's Jordanian Agenda," Matthew Levitt and Julie Sawyer, Terrorism Monitor,
December 16, 2004, available at
http://www.washingtoninstitute.org/templateC06.php?CID=750

"Untangling the Web: Crossovers among International Terrorist Groups,"Matthew Levitt,
Testimony for the Senate Committee on Banking, Housing, and Urban Affairs, published
as PolicyWatch #799, The Washington Institute October 24, 2003, available at
http://www.washingtoninstitute.org/print.php?template=C05&CID=1677

"Subversion from Within: Saudi Funding of Islamic Extremist Groups in the United
States," Matthew Levitt, Testimony for the Senate Judiciary Subcommittee on
Terrorism, Technology, and Homeland Security, published as PolicyWatch #790, The
Washington Institute, October 2, 2003, available at
http://www.washingtoninstitute.org/print.php?template=C05&CID=1668

"Tackling Terror in Iraq," Matthew Levitt, Baltimore Sun, September 3, 2003, available
at
http://www.washingtoninstitute.org/templateC06.php?CID=484

"The Two Faces of Saudi Arabia," Matthew Levitt, Weekly Standard, June 30, 2003,
available at
http://www.washingtoninstitute.org/templateC06.php?CID=479

"Heart of the Axis," Matthew Levitt, National Review Online, May 29, 2003, available at
http://www.washingtoninstitute.org/templateC06.php?CID=475

"U.S.-Saudi Counterterrorism Cooperation in the Wake of the Riyadh Bombing," Simon
Henderson and Matthew Levitt, PolicyWatch #759: Special Forum Report, The
Washington Institute, May 23, 2003, available at
http://www.washingtoninstitute.org/templateC05.php?CID=1637

"Drawing a Line in the Saudi Sand," Matthew Levitt, National Review Online, April 16,
2003, available at
http://www.washingtoninstitute.org/templateC06.php?CID=473

"KSM in Custody," Matthew Levitt, National Review Online, March 5, 2003, available at
http://www.washingtoninstitute.org/templateC06.php?CID=467

"To Win the Terror War," Matthew Levitt, New York Post, March 4, 2003, available at
http://www.washingtoninstitute.org/templateC06.php?CID=466

"Placing Iraq and Zarqawi in the Terror Web,"Matthew Levitt, PolicyWatch #710, The
Washington Institute, February 13, 2003, available at
http://www.washingtoninstitute.org/templateC05.php?CID=1588

"The Zarqawi Node in the Terror Matrix," Matthew Levitt, National Review Online,
February 6, 2003, available at
http://www.washingtoninstitute.org/templateC06.php?CID=464

"Stemming the Flow of Terrorist Financing: Practical and Conceptual
Challenges,"Matthew Levitt, Fletcher Forum of World Affairs, Winter-Spring 2003,
available at
http://www.washingtoninstitute.org/templateC06.php?CID=493

"Waging the War on Terror: Are the Saudis Starting to Turn the Corner?" Matthew Levitt
and Simon Henderson, PolicyWatch #822: Special Forum Report, The Washington
Institute, December 31, 2003, available at
http://www.washingtoninstitute.org/templateC05.php?CID=1700

"Combating Terrorist Financing, Despite the Saudis," Matthew Levitt, PolicyWatch
#673, The Washington Institute, November 1, 2002, available at
http://www.washingtoninstitute.org/templateC05.php?CID=1551

"The Network of Terrorist Financing,"Matthew Levitt, Testimony for the Senate
Subcommittee on International Finance, Committee on Banking, Housing, and Urban
Affairs, Published as PolicyWatch #646, The Washington Institute, August 6, 2002,
available at
http://www.washingtoninstitute.org/templateC05.php?CID=1524

"Target All Terror," Matthew Levitt, Baltimore Sun, May 8, 2002, available at
http://www.washingtoninstitute.org/templateC06.php?CID=458

"Next Steps in the War on Terrorism," Matthew Levitt, Dennis Ross, and Patrick
Clawson, PolicyWatch #610: Special Forum Report, The Washington Institute, March
12, 2002, available at
http://www.washingtoninstitute.org/templateC05.php?CID=1488

"Tackling the Financing of Terrorism in Saudi Arabia," Matthew Levitt, PolicyWatch
#609, The Washington Institute, March 11, 2002, available at
http://www.washingtoninstitute.org/templateC05.php?CID=1487

"Saudi Financial Counterterrorism Measures (Part II): Smokescreen or Substance?"
Matthew Levitt, PolicyWatch #687, The Washington Institute, December 10, 2002,
available at

http://www.washingtoninstitute.org/templateC05.php?CID=1565

"The Political Economy of Middle East Terrorism," Matthew Levitt, Middle East Review of International Affairs (MERIA), December 2002, available at http://www.washingtoninstitute.org/opedsPDFs/4225d91cc2842.pdf

"Navigating the U.S. Government's Terrorist Lists," Matthew Levitt, PolicyWatch #585, The Washington Institute, November 30, 2001, available at http://www.washingtoninstitute.org/templateC05.php?CID=1463

# Evan F. Kohlmann

(206)202-4911 – evan@globalterroralert.com – http://www.globalterroralert.com

## EDUCATION

**University of Pennsylvania Law School,** Philadelphia, Pennsylvania
 J.D. (Juris Doctor) 2004; James Wilson Scholarship Recipient.
**Georgetown University,** Washington, DC
 Edmund A. Walsh School of Foreign Service, BSFS 2001, *Magna Cum Laude*
- Major: International Politics, concentration in International Security Studies.
  - Minor: Islamic Studies (Center for Muslim Christian Understanding, Georgetown University)
- Honors & Awards: Honors in International Politics; Georgetown University Rhodes Scholar Nominee, 2000.
- Research assistant for Dr. Mamoun Fandy in the Center for Contemporary Arab Studies (CCAS) (Fall 2000).

## EXPERIENCE

- ***Senior Investigator***             August 2005 – present
  **Nine Eleven Finding Answers Foundation (NEFA),** New York, NY
  - The NEFA Foundation is a non-profit organization created after the attacks of September 11, 2001. The Foundation strives to help prevent future tragedies in the U.S. and abroad by independently tracking those responsible for planning, funding, and executing terrorist activities, with a particular emphasis on Islamic militant organizations. The Foundation plays a role in the fight against terror through cohesive and comprehensive efforts to research, analyze, and disseminate information pertaining to past and current terrorist activities.

- ***Consultant***              May 2005 – June 2005
  **Office of the High Representative (OHR),** Sarajevo, Bosnia-Herzegovina
  - The OHR is the chief civilian peace implementation agency in Bosnia-Herzegovina. I was hired as a short-term consultant by OHR to personally travel to Sarajevo and give briefings to intelligence analysts based at Camp Butmir on the status of foreign mujahideen veterans in the Balkans and the ongoing role of foreign charitable organizations.
  - Assisted in the analysis of confidential intelligence documents, and provided original documentation to add to their records. Gathered firsthand intelligence data in various regions of central Bosnia-Herzegovina concerning suspect corporate entities under criminal investigation by local authorities.

- ***On-Air Terrorism Analyst***         October 2004 – present
  **NBC News/MSNBC,** Washington, DC
  - NBC News is the news division of the U.S. television network NBC Universal. It has ranked as the top-rated broadcast news division in the United States for over ten years. MSNBC is NBC Universal's 24-hour cable news and information network.
  - Provided frequent on-air analysis and discussion regarding ongoing news stories relating to international terrorism. Assisted in the production of both evening news segments and full-length television documentaries relating to international terrorism.

- ***Founder, CEO***            February 2004 – present
  **Globalterroralert.com,** New York, NY
  - Globalterroralert.com was founded in early 2004 as an information clearinghouse on international terrorism. It is regularly cited as a source by respected media outlets—including NBC News, the BBC, the Washington Post, the Los Angeles Times, and the Associated Press.
  - Researched terrorist fundraising and recruitment networks using sources including declassified intelligence documents, exhibits submitted in terror-related legal cases, Lexis-Nexis, the World Wide Web, the Foreign Broadcast Information Service (FBIS), and other information retrieval sources. Interviewed alleged terrorist recruiters, terrorist facilitators, and cooperating defendants in criminal cases. Drafted public news articles and unclassified memoranda for both private clients and international law enforcement and intelligence agencies examining international terrorism, its sponsors, and its causes.

- ***Senior Terrorism Consultant***       February 1998 – January 2004
  **Investigative Project,** Washington, DC
  - The Investigative Project is an open source counterterrorism think-tank and policy group founded in 1995.
  - Researched terrorist fundraising and recruitment networks. Interviewed alleged terrorist recruiters and terrorist facilitators for Al-Qaida, Hamas, and other groups (including notorious UK-based clerics Abu Hamza Al-Masri and Shaykh Omar Bakri Mohammed). Briefed government officials on terrorist fundraising, recruitment, and communication networks in the U.S.

| INVOLVEMENT IN U.S. LEGAL CASES: | HIRED AS EXPERT CONSULTANT | TESTIFIED AS FACT WITNESS | TESTIFIED AS EXPERT |
|---|---|---|---|
| **U.S. v. JEFFREY BATTLE ET AL.** (DISTRICT OF OREGON, 2003) | X | | |
| **U.S. v. MASOUD KHAN ET AL.** (EASTERN DISTRICT OF VIRGINIA, 2004) | X | X | |
| **U.S. v. RANDALL ROYER** (EASTERN DISTRICT OF VIRGINIA, 2004) | X | | |
| **U.S. v. SABRI BENKHALA** (EASTERN DISTRICT OF VIRGINIA, 2004) | X | | X |
| **U.S. v. ALI TIMIMI** (EASTERN DISTRICT OF VIRGINIA, 2005) | X | | X |
| **U.S. v. UZAIR PARACHA** (SOUTHERN DISTRICT OF NEW YORK, 2005) | X | | X |
| **U.S. v. AHMED OMAR ABU ALI** (EASTERN DISTRICT OF VIRGINIA, 2005) | X | | |
| **U.S. v. HAMID HAYAT** (EASTERN DISTRICT OF CALIFORNIA, 2006) | X | | |
| **U.S. v. ALI ASAD CHANDIA** (EASTERN DISTRICT OF VIRGINIA, 2006) | X | | X |
| **U.S. v. YASSIN AREF ET AL.** (NORTHERN DISTRICT OF NEW YORK, 2006) | X | | X |
| **U.S. v. SABRI BENKHALA** (EASTERN DISTRICT OF VIRGINIA, 2007) | X | | X |
| **U.S. v. RAFIQ SABIR** (SOUTHERN DISTRICT OF NEW YORK, 2007) | X | | X |
| **U.S. v. JOSE PADILLA ET AL.** (SOUTHERN DISTRICT OF FLORIDA, 2007) | X | | |
| **U.S. v. EMADEDDINE MUNTASSER ET AL.** (DISTRICT OF MASSACHUSETTS, 2007) | X | *(UPCOMING)* | |
| **U.S. v. MOHAMMED AMAWI ET AL.** (NORTHERN DISTRICT OF OHIO, 2008) | X | *(UPCOMING)* | |

| INVOLVEMENT IN INTERNATIONAL LEGAL CASES: | HIRED AS EXPERT CONSULTANT | TESTIFIED AS FACT WITNESS | TESTIFIED AS EXPERT |
|---|---|---|---|
| **INTERNATIONAL PROSECUTORS v. ABDULADHIM MAKTOUF** (SUPREME COURT OF BOSNIA-HERZEGOVINA, 2005) | X | | X |
| **REGINA v. MOHAMMED AJMAL KHAN AND PALVINDER SINGH** (SNARESBROOK CROWN COURT, U.K., 2006) | X | | X |
| **REGINA v. AL BASHIR MOHAMMED AL-FAQIH** (WOOLWICH CROWN COURT, U.K., 2007) | X | | |
| **REGINA v. TSOULI, DAOUR, AND MUGHAL** (WOOLWICH CROWN COURT, U.K., 2007) | X | X | |
| **REGINA v. RAJA, MALIK, IQBAL, ZAFAR, AND BUTT** (OLD BAILEY, U.K., 2007) | X | | |
| **H.M.A. v. MOHAMMED ATIF SIDDIQUE** (GLASGOW HIGH COURT, SCOTLAND, 2007) | X | | X |
| **REGINA v. SAMINA MALIK** (OLD BAILEY, U.K., 2007) | X | | X |
| **REGINA v. HASSAN MUTEGOMBWA** (OLD BAILEY, U.K., 2007) | X | | X |
| **REGINA v. BILAL KHAZAAL** (SUPREME COURT OF NEW SOUTH WALES, AUSTRALIA, 2007) | X | *(UPCOMING)* | |
| **REGINA v. DITTA AND BILAL** (LEEDS CROWN COURT, U.K., 2008) | X | *(UPCOMING)* | |
| **REGINA v. KHAN, SULIEMAN, AND MUHAMMED** (OLD BAILEY, U.K., 2008) | X | *(UPCOMING)* | |
| **INTERNATIONAL PROSECUTORS v. RASIM DELIC** (INTERNATIONAL COURT OF JUSTICE AT THE HAGUE, 2008) | X | *(UPCOMING)* | |

**BOOKS AND PAPERS**

- Author - *Al-Qaida's Jihad in Europe: The Afghan-Bosnian Network*, (Berg Publishers, September 2004) (http://www.bergpublishers.com). [Cited as a source by the final report of the Congressional 9/11 Commission]
  - *[Dr. Marko Hoare*, History Faculty, University of Cambridge and author of *How Bosnia Armed*]: *"Written by a genuine expert in the subject...this is a lucid and informed account of the involvement of the mujahedin in Bosnia, one that lays the myths to rest... This excellent book is essential reading for anyone wishing to understand the truth about an episode of the Bosnian war that is so frequently misrepresented by those with a political motive for doing so."[1]*
  - *[Political Science Quarterly (PSQ)]: "About [Al-Qaida's] operations in Europe, Evan F. Kohlmann has written an illuminating book... Kohlmann is at his best in exhaustively reporting the details of such terrorist networks. He has compiled prodigious research about the perpetrators and their support networks. Moreover, he never loses sight of the strategy behind the individual attacks... [a] genuine historical analysis."[2]*
  - *[Studies in Conflict and Terrorism]: "This book is a pathbreaking piece of research... Kohlmann addresses the issue in unprecedented detail, exploiting a wide variety of available sources to piece together a largely neglected segment of contemporary Bosnian history ... [which] provide critical insights into terrorist preferences, motives, and interests... The book... is descriptive and empirically rich."*
  - *Al-Qaida's Jihad in Europe* has consistently been used as a required or recommended course text in numerous undergraduate and graduate courses in North America, Europe, and Australia, including the following courses:
    - (Spring 2005) - "Terrorism, Security, and Intelligence"
      - Graduate course taught by former NSC counterterrorism czar Richard Clarke and former White House Senior Director for Combating Terrorism Rand Beers at Harvard University's Kennedy School of Government.[3]
    - (Fall 2006) - "South Asia, Al Qaeda and the Rise of International Terrorism
      - Graduate course taught by Professor Peter Bergen at the Paul H. Nitze School of Advanced International Studies at Johns Hopkins University.[4]
    - (Spring 2007) – "Terrorism and Modern Society"
      - Course taught by Dr. Keith Hayward and Professor Frank Furedi at the School of Social Policy, Sociology, and Social Research at the University of Kent (Canterbury campus).[5]

- Major Papers:
  - *"The Legacy of the Arab-Afghans: A Case Study."* Georgetown University International Politics Honors Thesis, April 2001.
  - *"Arabian Gulf Financial Sponsorship of Al-Qaida via U.S.-Based Banks, Corporations, and Charities."* Testimony before the U.S. House Committee on Financial Services, Subcommittee on Oversight and Investigations. March 11, 2003.
  - *"The Bosnian Mujahideen: Origins, Training and Implications."* Published as a chapter in The Making of a Terrorist, edited by Director of Terrorism Studies at the United States Military Academy Dr. James JF Forest. Praeger Security International, 2005.
  - *"Al-Qaida in Saudi Arabia: 2002-2003."* Occasional Report published by the Nine Eleven Finding Answers (NEFA) Foundation. December 2005.
  - *"The Role of Islamic Charities in International Terrorist Recruitment and Financing."* Danish Institute for International Studies (DIIS) Working Paper 2006; January 2006.
  - *"The Afghan-Bosnian Mujahideen Network in Europe."* Paper presented before the Swedish National Defence College Center for Asymmetric Threats (CATS) Workshop; May 2006.
  - *"The Jihadists of Pakistan: Jaish-e-Muhammad (JEM), Harakat ul-Mujahideen (HUM), and Anjuman Sipah-e-Sahaba (SSP)."* Occasional Report published by the Nine Eleven Finding Answers (NEFA) Foundation. August 2006.
  - *"The Real Online Terrorist Threat."* Foreign Affairs. Vol. 85; No. 5. September/October 2006.
  - *"The North African Mujahideen Network of the Western Balkans."* Bosnian Security After Dayton: New Perspectives. Edited by Michael Innes. Routledge; October 2006.
  - *"Two Decades of Jihad in Algeria: the GIA, the GSPC, and Al-Qaida."* Occasional Report published by the Nine Eleven Finding Answers (NEFA) Foundation. May 2007.
  - *"State of the Sunni Insurgency in Iraq: August 2007."* Occasional Report published by the Nine Eleven Finding Answers (NEFA) Foundation. August 2007.
  - *"Dossier: The Libyan Islamic Fighting Group (LIFG)."* Occasional Report published by the Nine Eleven Finding Answers (NEFA) Foundation. October 2007.

---

[1] http://www-hjs.pet.cam.ac.uk/sections/balkans/document.2005-04-28.6595030101
[2] http://www.ciaonet.org/olj/psq/psq_fal05/
[3] http://ksgnotes1.harvard.edu/degreeprog/courses.nsf/webnumber/ISP213.
[4] http://eres.sais-jhu.edu/coursepage.asp?cid=165.
[5] http://library.kent.ac.uk/library/readinglists/displaylist?module=SO594.

- **Daubert qualifications**
  - See: http://www.globalterroralert.com/parachadaubert.pdf
    - (Daubert ruling from United States v. Uzair Paracha)

- **Field Experience**
  - Relevant interviews that I have personally conducted with terrorist operatives, recruiters, or financiers:
    - Shaykh Omar Bakri Mohammed (Al-Muhajiroun) – July 2002
    - Shaykh Abu Hamza al-Masri (Finsbury Park Mosque) – July 2002
    - Dr. Mohammed al-Massari (CDLR) – June 2002
    - Randall Todd Royer (a.k.a. Ismail Royer) – June 2004
    - Dr. Saad al-Faqih (MIRA) – February 2006

  - Experience in Bosnia-Herzegovina:
    - In April 2005, I was hired as a Consultant for the Office of the High Representative (OHR) in Sarajevo, Bosnia-Herzegovina. I personally briefed personnel at OHR at Camp Butmir in Sarajevo on the issue of foreign mujahideen, assisted in the analysis of confidential intelligence documents, and provided my own original documentation to add to their records.
    - I have personally visited the offices of Islamic charities in Bosnia-Herzegovina, and I have photos and video of those offices. I have also personally met former members of the foreign mujahideen, including Abu Hamza al-Masri, Randall Todd Royer, and Saudi national Ali Hamad.
    - In June 2005, I testified as an expert witness before the Supreme Court of Bosnia-Herzegovina (SUD-BIH) in the case of International Prosecutors v. Abduladhim Maktouf regarding the presence of foreign mujahideen in the Balkans, the leadership of the mujahideen, and the history of their involvement in the Bosnian war. My expert testimony was approved by a three judge panel, including a Bosnian Muslim judge.
    - I am currently serving as an expert witness and consultant to the International War Crimes Tribunal at the Hague in the case of International Prosecutors v. Rasim Delic. As part of my work as an expert witness for the War Crimes Tribunal, I have reviewed thousands of pages of original classified correspondence from the Muslim-led Army of Bosnia-Herzegovina (ARBiH), as well as original documents seized from members of the foreign mujahideen. At the request of international prosecutors, I have prepared almost two hundred pages of confidential analysis based primarily upon those documents.

- **Al-Qaida's Jihad in Europe**

- My book was not self-published as cited in the defense brief. To the contrary, it was published as an academic work by Berg Publishers (an imprint of Oxford International Press), London, U.K.
- My book was cited by the final report of the Congressional 9/11 Commission as a recommended source for information about Al-Qaida's forays in Bosnia-Herzegovina.
- My book has been positively reviewed by other respected scholars:
    - http://www.ciaonet.org/olj/psq/psq_fal05/ (Political Science Quarterly)
        - "Kohlmann is at his best in exhaustively reporting the details of such terrorist episodes. He has compiled prodigious research about the perpetrators and their support networks. Moreover, he never loses sight of the strategy behind the individual attacks."

    - http://www-hjs.pet.cam.ac.uk/sections/balkans/document.2005-04-28.6595030101 Henry Jackson Society Website, review by Dr. Marko Hoare, History Faculty, University of Cambridge and author of How Bosnia Armed
        - "Written by a genuine expert in the subject...this is a lucid and informed account of the involvement of the mujahedin in Bosnia, one that lays the myths to rest... This excellent book is essential reading for anyone wishing to understand the truth about an episode of the Bosnian war that is so frequently misrepresented by those with a political motive for doing so."

- My book has consistently been used as a required or recommended course text in numerous undergraduate and graduate courses in North America, Europe, and Australia, including the following courses:

    - (Spring 2005) - "Terrorism, Security, and Intelligence"
        - Graduate course taught by former NSC counterterrorism czar Richard Clarke and former White House Senior Director for Combating Terrorism Rand Beers at Harvard University's Kennedy School of Government.[1]

    - (Fall 2006) - "South Asia, Al Qaeda and the Rise of International Terrorism
        - Graduate course taught by Professor Peter Bergen at the Paul H. Nitze School of Advanced International Studies at Johns Hopkins University.[2]

    - (Fall 2006) - "Terrorism and 'The Clash of Civilizations.'"

---

[1] http://ksgnotes1.harvard.edu/degreeprog/courses.nsf/webnumber/ISP213.
[2] http://eres.sais-jhu.edu/coursepage.asp?cid=165.

- Course for both undergraduate and graduate students taught by Professor Robert L. Canfield at the Washington University in St. Louis[3]

- (Spring 2007) – "Terrorism and Modern Society"
  - Course taught by Dr. Keith Hayward and Professor Frank Furedi at the School of Social Policy, Sociology, and Social Research at the University of Kent (Canterbury campus) in the United Kingdom.[4]

- <u>See also:</u> "Thanks for writing 'Al-Qaida's Jihad in Europe', which is used as a reference text in Australian CT university classes."[5]

- **Question of Peer Review**
  - I have written the following recent papers that have been subject to peer discussion and review:
    - "The Bosnian Mujahideen: Origins, Training and Implications" (published as a chapter in <u>The Making of a Terrorist</u>, edited by Director of Terrorism Studies at the United States Military Academy Dr. James JF Forest, Praeger Security International, 2005)
      - http://www.teachingterror.com/Making/index.htm

    - "The Role of Islamic Charities in International Terrorist Financing and Recruitment" (published by the Danish Institute for International Studies [DIIS], January 2006)
      - http://www.diis.dk/sw19083.asp

    - "The Afghan-Bosnian Mujahideen Network in Europe" (published by the Swedish National Defence College Center for Assymetric Threats and Swedish Emergency Management Agency, May 2006)
      - http://www.fhs.se/upload/Webbadmin/Organisation/CATS/Kohlmann.doc

    - "The Real Online Terrorist Threat" (published in the Council on Foreign Relation's <u>Foreign Affairs</u>, September/October 2006)
      - http://www.foreignaffairs.org/20060901faessay85510/evan-f-kohlmann/the-real-online-terrorist-threat.html

    - "The North African Mujahideen Network of the Western Balkans" (published as a chapter in <u>Bosnian Security After Dayton</u>, part of

---

[3] http://artsci.wustl.edu/~canfrobt/AN4243svlabus.html.
[4] http://library.kent.ac.uk/library/readinglists/displaylist?module=SO594.
[5] http://www.washingtonpost.com/wp-dyn/content/discussion/2006/04/11/DI2006041100626.html.

Routledge's Contemporary Security Studies Series – edited by
Michael Innes, October 2006)

- http://www.routledge.com/shopping_cart/products/product
  _detail.asp?sku=&isbn=9780415399586&pc=

Rule 1101(d)(3) provides that the hearsay rule, along with the other rules of evidence does not apply in "granting or revoking probation."[

1. **FN101**] The Advisory Committee seems to think that the policy for admitting hearsay in such cases is the same as the policy that supports using hearsay in sentencing.[**FN102**] This may be true of the decision to grant probation, but the decision to revoke probation is one that most often turns on a question of historical fact;[**FN103**] that is, did or did not the defendant violate one or more of the conditions of probation? Hence, it seems probable that courts would find the sentencing rationale[**FN104**] weaker and wish to rely on the argument that since probation is an act of grace rather than a matter of right, the state can condition its grant on any terms it likes—including the implied condition that it can be revoked on the basis of hearsay.[**FN105**]

Be that as it may, federal courts have approved the use of hearsay in probation-revocation proceedings.[**FN106**] They have even extended this "exception" to the hearsay rule to proceedings not specified in Rule 1101(b)(3); namely, proceedings to revoke a supervised release.[**FN107**] Although the Confrontation Clause does not apply, courts have held that due process forbids courts to revoke based on hearsay unless the hearsay is "reliable."[**FN108**]

States have also held that hearsay is admissible in probation or parole-revocation proceedings—sometimes on the basis of state versions of Rule 1101,[**FN109**] sometimes because of other statutory provisions.[**FN110**] However, some states have gone farther than the federal courts in limiting reliance on hearsay.[**FN111**] For example, Florida does not allow hearsay to be used as the sole basis for revocation.[**FN112**] Texas rejected a weaker version of this rule; i.e., that "bad" hearsay will not support a revocation.[**FN113**] Maine has said that it may violate due process if "the hearsay evidence is unreasonably abundant" or its "reliability highly suspect."[**FN114**] However, other states have rejected such limitations on the use of hearsay in revocation proceedings.[**FN115**]



**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

January 3, 2007

*Via Hand Delivery*

Michael Andrews, Esq.
21 Custom House
Boston, MA 02110

Malick W. Ghachem, Esq.
Zalkind Rodriguez Lunt & Duncan
65A Atlantic Avenue
Boston, MA 02110

> Re:  United States v. Muhamed Mubayyid and Emadeddin Z.
>      Muntasser
>      <u>Criminal No. 05-40026-FDS</u>

Dear Counsel:

Pursuant to the Court's order of September 29, 2006 and Fed. R. Crim. P. 16(a)(1)(G), the United States hereby provides notice of the following experts that it may call in its case-in-chief: (1) Matthew Levitt, Ph.D; (2) Evan Kohlmann; (3) Edward Valla, Ph.D, Federal Bureau of Investigation; and (4) Dawn Goldberg, Internal Revenue Service.  Below is a summary of their anticipated testimony.  As indicated, the government anticipates that Dr. Levitt, Mr. Kohlmann, and/or Dr. Valla may review additional documents (some of which have not yet been verbatim translated) pertaining to Care International, Inc. ("Care"), Al-Kifah Refugee Center ("Al-Kifah"), and/or the defendants prior to trial.  Accordingly, these disclosures will likely be supplemented.  The government will make every effort to provide any supplemental disclosures not less than 60 days prior to trial.  Additionally, if any expert reports are made between now and the date of trial, they will be promptly disclosed.  We do expect that Dr. Valla will prepare an expert report, which will be produced in the next 30-45 days.

January 3, 2007
Page 2

1.  __Matthew Levitt__:  Dr. Levitt's qualifications are
described in his attached curriculum vitae.  If called as a
witness, the government anticipates that Dr. Levitt will testify,
without limitation, about the definition of the terms zakat,
jihad, mujahideen, shaheed, and martyr.  Dr. Levitt will describe
the formation, structure, and activities of Mahtab al-Khidamat
also known as the Human Service Office.  Dr. Levitt will provide
a description of individuals who were affiliated with Al-Kifah or
Care or whose name appear in records of Al-Kifah (Boston chapter)
and Care, including Sheikh Abdullah Azzam, Usama bin Laden, Omar
Abdel Rahman, Ahmad Alkattan, and Mohamad Siyam.

Dr. Levitt will testify about how Islamic charities, in
general, were used to support terrorism prior to September 2001
and the funding of jihad-related activities overseas.  Dr. Levitt
will explain how charities that supported jihad related
activities or front organizations for terrorist organizations
would outwardly espouse their support of legitimate charitable
activities such as assistance for refugees, widows, and orphans
while simultaneously, with or without the knowledge of its
donors, funneling money to the mujahideen or a terrorist related
organization.

Dr. Levitt will discuss the concept of "economic jihad," the
method by which radical leaders would call on their supporters to
engage in what they describe as a religious duty to engage in
jihad, if not by physically fighting Islam's enemies then by
funding those who do.  In Dr. Levitt's opinion, this theme of
participating in an "economic jihad" features prominently in
jihadist fundraising techniques and is standard fare in global
jihadist operandi.  Dr. Levitt will also provide an overview in
the area of terrorist financing networks and logistical support
used by terrorist groups such as Hamas, Hezbollah, and Al Qaeda.

Dr. Levitt will discuss how zakat programs and orphan
sponsorship programs were used by alleged charities to provide
money and services to individuals overseas, including family
members of fighters and martyrs (defined as individuals who die
while committing jihad) and how these activities benefitted the
mujahideen and terrorist organizations.  He will discuss
materials distributed by Care as part of its zakat fund-raising
and orphan sponsorship programs.

Finally, Dr. Levitt will opine on the significance of
certain bank records of Care or Al-Kifah, documents obtained from
the records of Care or Al-Kifah, documents distributed by Care or

January 3, 2007
Page 3

Al-Kifah, and/or other materials provided to the defense in
discovery.  The government expects that based upon his review of
these materials, Dr. Levitt will opine that the theme of economic
jihad was a prominent feature of Care's fund-raising activities
and publications and that Care's activities were consistent with
that of other purported charities that were used to funnel money
for non-charitable or illegal purposes, which promoted or
supported jihad related activities overseas.

        Dr. Levitt's testimony will be based on his academic and
professional training, professional expertise, research, and
review of documents produced in discovery to the defendants.  His
opinion will not be based upon any classified information.

        **2.    Evan Kohlmann:**  Mr. Kohlmann's qualifications are
described in his attached curriculum vitae.  If called as a
witness, the government anticipates that Mr. Kohlmann will
testify, without limitation, about the formation, structure, and
activities of Al-Kifah Refugee Center, Mahtab al-Khidamat ("MAK")
also known as the Human Service Office, Hizb e Islami, Afghan
Mujahidin Information Bureau, and Al-Gama`at al-Islamiyya.  He
may also discuss an organization/entity known as Azzam
Publications.  Mr. Kohlmann will provide a description of
individuals who were affiliated with Al-Kifah or Care or whose
name appear in records of Al-Kifah (Boston chapter) and Care,
including Sheikh Abdullah Azzam, Usama bin Laden, Omar Abdel
Rahman, Gulbuddin Hekmatyar, Saif Al-Rahman Haleemi, Ahmad Shah
Masood, Abdul Rasul Sayyaf, Ahmad Alkattan, Kifah Jayoussi,
Mohamed Zaky, Adham Hassoun, Kassem Daher, Sheik Hassan Katerji,
Mohamed Chehade.  Mr. Kohlman will also opine as to the
significance of Sheikh Azzam, in particular articles and books
authored by him, including Join the Caravan, which was
distributed by Care.

        Mr. Kohlmann will discuss the background of the Afghanistan
conflict, the impact of the withdrawal of Soviet troops, the
post-Afghan mujahideen, and the transformation of MAK from a
collaborative effort of Abdullah Azzam and Usama bin Laden that
supported jihad in Afghanistan to an organization under the
leadership of Usama bin Laden that supported and organized jihad
activities worldwide.  Mr. Kohlmann will opine on the
significance of the Soviet withdrawal of troops from Afghanistan
and the expansion of the jihad movement to other areas including,
but not limited to, Bosnia, Chechnya, Kashmir, Palestine,
Tajikistan, and Algeria.  Mr. Kohlmann will further describe, in
general, how Islamic charities in the United States during the

January 3, 2007
Page 4

1990s were used as major conduit for sending money, men, and
equipment to Afghanistan, Bosnia, Chechnya and other conflict
zones across the Muslim world.

Mr. Kohlmann will describe the Al-Hussam newsletters
distributed by Al-Kifah and Care, how they were distributed, and
the significance of their contents.  In particular, Mr. Kohlmann
will testify that Islamic charities such as Al-Kifah and Care
were used to promote jihad and recruit individuals to fight
overseas and that the Al-Hussam newsletter was a tool used for
this purpose.  He will also describe how Care's fundraising
activities glorified jihad and martydom and how Care used its
Al-Hussam newsletter, the internet, and the distribution of <u>Join
the Caravan</u> to promote, and solicit money for, the mujahideen.
Mr. Kohlmann will also describe audiotapes and videotapes
distributed by Al-Kifah and Care, including Badr Al Bosna.

Mr. Kohlmann will also discuss individuals who were retained
by Care to come to the United States or Boston area and speak at
various fund-raisers on their behalf.  Finally, Mr. Kohlmann will
opine on the significance of certain bank records of Care or Al-
Kifah, documents obtained from the records of Care or Al-Kifah,
documents distributed by Care or Al-Kifah, and/or other materials
produced to the defense in discovery.

Mr. Kohlmann's testimony will be based on his academic and
professional training, professional expertise, research, and
review of documents produced in discovery to the defendants.  His
opinion will not be based upon any classified information.

**3.    <u>Edward Valla</u>:**  Dr. Valla's qualifications are
described in his attached curriculum vitae. If called as a
witness, the government anticipates that Dr. Valla will testify,
without limitation, about the code words used in conversations or
documents including, but not limited to, the following: marriage;
getting married; tourism; and picking apples.  He will testify
about the formation, structure, and activities of Mahtab al-
Khidamat also known as the Human Service Office.  In particular,
Dr. Valla will testify about how MAK was used to channel recruits
into Afghanistan and after the Soviets withdrew from Afghanistan,
MAK was transformed as a general headquarters for future jihad.

Dr. Valla will provide a description of individuals whose
names appear in Al-Kifah's and Care's records, including Sheikh
Abdullah Azzam, Usama bin Laden, Omar Abdel Rahman, and Gulbuddin
Hekmatyar.  He may discuss an organization/entity named Azzam

January 3, 2007
Page 5

Publications.  Dr. Valla will describe the use of "abu" names and
identify the defendants and related individuals by their "abu"
name.  Largely consistent with paragraphs 19-28 of the Affidavit
of James Marinelli dated November 22, 2006, he will provide a
detailed description and significance of certain documents
obtained pursuant to the October 2001 search, including CIF 0307-
312, 323-329, 330-333, 339-340, 346-347.  Lastly, Dr. Valla will
discuss the Al-Hussam newsletters distributed by Al-Kifah and
Care, including their content and the purpose for which they were
distributed.

     Dr. Valla's testimony will be based on his academic and
professional training, professional expertise, research, and
review of documents produced in discovery to the defendants.  His
opinion will not be based upon any classified information.

     **4.    Dawn Goldberg**: Ms. Goldberg has not prepared a
curriculum vitae.  Ms. Goldberg has been employed by the Internal
Revenue Service since 1985.  While employed at the IRS, she has
held several positions, including, Tax Examiner, Tax Office
Auditor, Program Coordinator, and for the last five years she has
worked as an agent with the Exempt Organization section in
Austin, Texas.  If called as a witness, the government
anticipates that Ms. Goldberg will testify, without limitation,
about how organizations qualify for a tax exemption pursuant to
26 U.S.C. §501(c)(3); how organizations obtain a §501(c)(3) tax
exempt status; forms such §501(c)(3) organizations are required
to file during the application stage and to maintain their tax
exempt status, including IRS forms 1023 and 990; in particular,
she will explain the importance of the information sought by the
questions contained in the Form 990, including question number
76; and how a positive response to question number 76 would be
used by the IRS.  Ms. Goldberg will also opine that had Care
stated in its 1023 application or any of its Forms 990 that it
was planning to, or did engage, in activities involving the
solicitation of money for jihad (defined as armed conflict
overseas) or the mujahideen (defined as Muslim holy warriors), or
expenditure of funds to promote or support jihad or the
mujahideen, the IRS would have conducted a full inquiry of these
activities and likely denied its initial §501(c)(3) application,
or revoked its §501(c)(3) tax exempt status.  Ms. Goldberg will
further opine that question 5 of Part II of the Form 1023
(September 1990 edition), which seeks information regarding
whether the applicant organization is an outgrowth or successor
to another organization, is a critically important question to
the IRS' §501(c)(3) determination.

January 3, 2007
Page 6

    Ms. Goldberg's testimony will be based on her academic and professional training, professional expertise and experience, research, and review of Care's tax records.

    Additionally, the government anticipates that one or more Arabic language translators currently employed with the Federal Bureau of Investigation will testify as to the contents of (1) certain conversations, the actual recordings and verbatim translations of which have been produced or will be produced shortly, and (2) materials and documents that have already been produced.  Once the government has identified its trial exhibits, prompt notice of the identities of these translators will be provided.

    If you have any questions or comments, please feel free to contact me at (617) 748-3191 or Al Chakravarty at (617) 748-3658.

Very truly yours,

MICHAEL J. SULLIVAN
United States Attorney

By:

B. STEPHANIE SIEGMANN
ALOKE S. CHAKRAVARTY
Assistant U.S. Attorneys


Enclosures