UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. 05-40026-FDS |
| | ) | |
| MUHAMED MUBAYYID, and | ) | |
| EMADEDDIN Z. MUNTASSER, | ) | |
| and | ) | |
| SAMIR AL-MONLA a/k/a | ) | |
| SAMIR ALMONLA, | ) | |
| | ) | |
| Defendants. | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANTS'**
**MOTION *IN LIMINE* RE: HANDWRITTEN ARABIC NOTES**

The United States, by and through Michael J. Sullivan, and

B. Stephanie Siegmann, Aloke S. Chakravarty, and Donald L.

Cabell, Assistant United States Attorneys for the District of

Massachusetts, hereby opposes the defendants' motion to exclude

nine pages of handwritten arabic notes found in the storage unit

of Care, International, Inc. ("Care"), during the October 2001

search conducted pursuant to the Foreign Intelligence

Surveillance Act on the grounds that the government will

demonstrate at trial these documents are authentic under Fed. R.

Evid. 901 based upon two factors.  First, the circumstances in

which these documents were found and second, the content of the

documents themselves provide enough indicia of trustworthiness to

be authentic under Fed. R. Evid. 901(b)(4).

Rule 901 provides in pertinent part that:

[t]he requirement of authentication or identification
as a condition precedent to admissibility is satisfied

1

> by evidence sufficient to support a finding that the
> matter in question is what the proponent claims . . .
> By way of illustration only . . . the following are
> examples of authentication or identification
> conforming with the requirements of the rule: . . . (4)
> Distinctive characteristics and the like.  Appearance,
> contents, substance, internal patterns, or other
> distinctive characteristics, taken in conjunction with
> the circumstances.

Fed. R. Evid. 901.

In <u>United States v. Newton</u>, 891 F.2d 944 (1st Cir. 1989),
the Court of Appeals for the First Circuit affirmed the admission
of a three-page unsigned and undated typed document that provided
instructions on handling financials affairs and found it
sufficiently trustworthy to be authentic under Fed. R. Evid.
901(b)(4) and admissible as a statement of a party opponent under
Fed. R. Evid. 801(d)(2)(A).  Although the document was
confiscated in another country from someone other than the
defendant, the Court concluded that there were statements in the
document from which it could be inferred that the defendant
authored it.  Specifically, the document referred to the
defendant's wife and asked that in the event of the author's
death any money should be split between his family and her;
referred to various aliases proven to be used by the defendant;
and listed a telephone number that was registered to the co-
defendant's girlfriend.  In addition, the document identified the
author's lawyer, whose identity was corroborated by external
evidence admitted by the government, and listed a bank account

number that was also found on a piece of paper in a search of the
defendant's home.

In United States v. Paulino, 13 F.3d 20 (1st Cir. 1994), the
Court of Appeals for the First Circuit, in line with Newton,
affirmed the admission of a rental receipt found in what the
government asserted was the defendant's apartment.  The search
also revealed a plethora of drugs and drug paraphernalia.  The
Court found that the receipt itself furnished the indicia of
authenticity required under Fed. R. Evid. 901(b)(4): it bore the
defendant's name; it listed the correct apartment number; and it
referred to a time frame within which the drug distribution
center was in operation.  See also United States v. McMahon, 938
F.2d 1501, 1509 (1st Cir. 1991)(evidence of defendant passing a
note containing information defendant then repeated aloud
provided sufficient authentication for admissibility as
admission); United States v.Bello-Perez, 977 F.2d 664, 672 (1st
Cir. 1992) (anonymous letter not in defendant's handwriting was
sufficiently shown to have originated with defendant and found
admissible where name of addressor was similar to that of
defendant, return address was post office box of the state prison
where defendant incarcerated and personal information in letter
tied it to defendant).

At trial, the government anticipates that its witnesses will
testify that the five sets of handwritten arabic documents (two

sets of meeting minutes and three single page documents) the
defendants seek to exclude[1] were found in Care's locked storage
unit with thousands of other Care business records, including
financial ledgers, bills and invoices addressed to Care,
receipts, bank records, correspondence, corporate records,
donation solicitations and flyers, contributor lists, facsimiles,
a phone list, newsletters, books, and audiotapes.  The documents,
which were copied from Care's storage unit during the October
2001 search, were dated between 1993 and 2000 and contained, or
referred to, the names of the officers of Care that ran the
alleged charity between those dates, including defendants
Emadeddin Muntasser ("Muntasser") and Samir Al-Monla ("Al-
Monla").[2]  Accordingly, all the documents and materials in the
storage locker appeared to belong to Care or its predecessor, Al-
Kifah.

This conclusion is further corroborated by an intercepted
conversation dated October 2, 2001.  During that conversation,

_____

[1]These documents constitute nine of the ten documents the
government alleges Mubayyid destroyed between the first search in
October 2001 and the second search in April 2003.  The government
does not allege that any other documents that reference jihad
were destroyed evidencing a consciousness of guilt.

[2]Muntasser served as Care's President from 1993-1996 and Al-
Monla served as its President from 1996-1998.  During this
search, documents were also found containing Mubayyid's name, a
Care volunteer in or about 1993-1994 and later Care's treasurer
from 1997-2003.  Additionally, documents containing the names of
the unindicted co-conspirators, Mohammed Akra and Wassim Yassin
a/k/a Wassim abu Yassin were also found.

the then treasurer of Care, Muhamed Mubayyid ("Mubayyid"),
explained to Mohammad Chehade, the President of Global Relief
Foundation, that he (Mubayyid) had moved all of Care's "effects"
(books and things) from Care's old office to the storage unit.
On August 4, 2001, Mubayyid leased a storage unit at Storage USA
on behalf of Care.

Further, the challenged documents were found together in the
same drawer of a filing cabinet in the storage unit.  As
established above, the government can clearly make a showing at
trial that the circumstances surrounding how these arabic
documents were found and maintained demonstrate that they are
indeed authentic.

A review of the content of the documents also supports a
finding that they are authentic and contain statements of
party opponents and one unindicted co-conspirator.  First and
foremost, the content of each of these nine pages of documents
are related to the same general subject matter -- how Care, and
another closely connected organization, GRF, could support the
cause of jihad overseas.  More specifically, these notes record
meetings between members of Care and GRF that occurred in April
1995, during which the parties discussed: (1) coordination; (2) a
trip to Afghanistan and Peshawar, Pakistan; and (3) which Afghan
mujahideen leader to support.  These meetings appear to culminate
in the drafting of a pledge of support to Hekmatyar.  A rough

draft of this pledge without any named signatories was also found during the search.

Exhibit 66 (CIF 332) is handwritten Arabic letter that appears to be written by Muntasser to Hekmatyar and is translated as follows:

> To his eminence the virtuous brother and leader, engineer Qalb-Al-Din Hekmatyar, May Allah protect him.
>
> Peace and blessings and mercy of Allah be upon you:
>
> We, those who love you in the Boston Office, write to you asking for your direction and looking for explanation on what you see fit and appropriate for us in matters concerning serving Jihad for the sake of Allah.
>
> As you know we have vowed our allegiance to you through your deputy, brother Saif AL-RAHMAN HALEEMY, in New York, two years ago. And we have renewed this vow to you when I met you in Shihar Siab two months ago. After my return, the brothers from the battalion suggested that we rally under their banner and join under their standard and subject our policies and our media and financial programs to what they see fit. They told us. They told us this is what you would want and would prefer. If that is the case and you wish us to do so, then we would like you to write that at the bottom of this page. And we are prepared - Allah willing - to abide by your commands and we are forever in the fold of obedience and military service. And may Allah's peace, mercy and blessings be upon you,

Immediately beneath these words is written Muntasser's abu name,

Abu Abdul Rahman,[3] followed by the words "the Libyan."  The
government anticipates that the witnesses will testify that
Muntasser was the only person of Libyan descent that was an
officer or member of Care.  Underneath Muntasser's name is a list
of people on whose behalf Muntasser signed this document, which
included Mohammed Akra and Samir Al-Monla.

The references in the letter (Ex. 66) to a meeting with
Hekmatyar further identify the author of this letter as
Muntasser.  The author wrote when I met with you two months ago
in Shiar Siab.  "Shiar Siab" is a mountain pass on the road from
Kabul to Bamyan in Afghanistan.  The letter is believed to have
been written in April 1995, the same date as that appears on
other documents with which it was found.  Accordingly, the author
appears to have traveled to Afghanistan in early 1995, the same
time Muntasser made such a trip.  After lying to the Federal
Bureau of Investigation about whether or not he had traveled to
Afghanistan, Muntasser admitted to the Immigration Naturalization
Service (in his updated N-400 application for naturalization)
that he had traveled to Afghanistan in December 1994-January
1995, which closely corresponds with this document.

Exhibit 67 (CIF 323) is a rough draft of Exhibit 66 to

---

[3]During an interview by Special Agent James Marinelli and
Chris Peet, FBI, in April 2003, Muntasser admitted to using this
name.  Additionally, a phone list found in the storage locker
during this search identifies Emadeddin Muntasser as Abu Abdul
Rahman.

Hekmatyar.  It contains many of the same themes[4] as the finalized draft of support but does not contain any names or signatories at the bottom of the letter.  Both the final and draft pledge of support were found together in the same area of the same drawer.  Further, the handwriting in both these documents is similar.  The evidence will demonstrate at trial that both Exhibits 66 and 67 were written by Muntasser in or about April 1995 who was the President of Care at that time and were maintained with Care's business records by another officer of Care, Mubayyid.  Accordingly, this Court should find these letters authentic and admissible as admissions of a party opponent under Fed. R. Evid. 801(d)(2).

Exhibit 63 (CIF 307, CIF 309, CIF 311[5]) are minutes of a meeting that occurred on April 23, 1995 between members of Care and GRF regarding how to coordinate their efforts to support the jihad effort overseas.  The minutes identify the participants of the meeting as consisting of two Care representatives, Muntasser and Mohammed Akra (an unindicted co-conspirator), and three representatives of GRF.  Throughout these minutes, the speakers are frequently identified and conclusions are recorded.

---

[4]For instance, Muntasser seeks answers from Hekmatyar on matters of jihad and states that he "renewed his vow when [they] met in Shihar Siab two months ago."

[5]These documents were found together and copied consecutively but were produced with a translation of each page resulting in a one page gap between the three documents.

The government will present evidence that the participants in this meeting were:

> Abdullah Al-Libnani [a/k/a Rabih Haddad, a GRF leader based in Detroit];

> Abu Abdul Rahman [a/k/a Emadeddin Muntasser, a Care leader in Boston];

> Abu Idris [a/k/a Mohammed Akra, a Care member and according to Muntasser, a former member of Al-Kifah Refugee Center];

> Abu Ramadan [a/k/a Abu Abdallah Ramadan, a/k/a Hazem Rabab, founding member of GRF]; and

> Abu Fayez [a/k/a Mohamed Chehade, a GRF leader based in Chicago and according to Muntasser, a former member of Al-Kifah Refugee Center].

The first page of the minutes begins:

> AL-LIBNANI:

>> There is no need for us to stay separate.  One thought, from one source. I met with Emad and Mohammed and found acceptance.  We pray the Lord may unite us and remove hatred from within us.

This section of the 1995 Minutes appears to reflect a discussion involving Al-Libnani regarding combining the efforts of Care and GRF.  It appears that "Emad" is Muntasser and "Mohammed" is either Mohammed Akra or more likely, Chehade.

The minutes then identify Muntasser as the next speaker using his abu name:

>> After the latest developments - we sought a meeting with the brothers- how to [establish] the relationship and coordinating with the battalion - some brothers are nervous in Boston.  There can be more coordination among us if we agree on some of the issues.  Afghanistan has priority.  We see that one of the commanders is closer to truth than

any other commander.  Based on this, we see it is
necessary to support this truth therefore may not
retire from it or stop.

Akra then indicated that "Jihad must have a leader" and asks
who is your highest commander?"  The participants to the meeting
then discuss the options and what field commanders are still in
Afghanistan.  During this meeting, the participants also discuss
"changing the name of the Services Office"[6] and the establishment
of a Shura council, an advisory board on the matters involving
jihad and coordination between Care and GRF.  Four people are
named members of the Shura council, including Muntasser and Akra.
These minutes conclude with a organizational chart identifying
where Boston and Chicago fit within the structure of the jihad
effort.

These minutes are admissible as admissions of a party
opponent, Muntasser, and statements of a co-conspirator, Akra.
Additionally, the statements of others at the meeting provide
context to the statements of Muntasser and Akra.  Furthermore,
these notes are admissible for the non-hearsay purpose of
establishing the relationship between the parties and offices,
demonstrating the types of activities in which Care was engaging,
and the meaning of jihad to Muntasser.

---

[6] One of the government's experts is expected to testify
that this is a reference to Human Services Office ("HSO"), also
known as Makhtab al Khidamat ("the Services Office" in English).

10

To explain these minutes, the government anticipates presenting expert testimony that in 1995, there were two primary Islamist Afghan commanders, Abdul Rasul Sayyaf and Gulbuddin Hekmatyar.  It thus appears that the central issue of this discussion is how the participants will decide whether they remain neutral or takes sides with Hekmatyar.  It appears that the "latest developments" to which Muntasser refers is the sudden collapse of Hekmatyar's military forces.

The second set of minutes, Exhibit 64 (CIF 327, CIF 330-331), contain similar recordings of the same or a similar meeting believed to have been held in or about April 1995.  These notes were found with the other meeting minutes and letters to Hekmatyar.  In this set of notes, Imad (another name used by Muntasser) states:

> After looking at the situation we wanted to
> re-study our position.
> -How to deal with the new information
> -Coordination with the battalion
> -Position on Afghanistan
>
> The position on Afghanistan: the closest cause to
> realizing an Islamic case. [I]t has priority.
> The work: Afghanistan or Syria: a fundamental
> difference with Bin Laden [The government agrees to redact
> this reference]
> The battalion isn't neutral.  It took a stand after
> deliberation and discussion.  They believe that one of the
> leaders is closer to the truth, and that it is necessary to
> support one and we cannot retire or stop. . .
>
> In organization matters, the engineer [believed to be
> Heymatyar], a nation for Muslims not the Afghans, and
> supports all Jihad matters.

These notes then discuss whether the engineer wants a pledge of allegiance.  According to Care's own documents, Muntasser and Akra concluded that such a pledge was necessary.  See Ex. 66.

Lastly, the final challenged documents, Exhibit 65 was found with Exhibits 63-65 and 66-67.  Exhibit 65 are a single page of notes that appear to be related to Muntasser's trip to Peshawar, Pakistan.  The notes described "weakness" found in a "visit to schools and institutions" and queried "[w]here did the funds go? . . . The party declared bankruptcy, no car is available for the battle, and the Arab brothers' standards have been degraded and became at the same level as the Afghans."  The notes observed: "The golden days for tourism, we did not see it." Dr. Edward Valla, one of the government's witnesses will explain that the term "tourism" is used to refer to violent jihad.  The notes also commented that "[t]hrough his knowledge of military activity:  Work is very good in Peshawar."  The notes further observed that the "brothers on the front lines enjoy a better standard of living than the rest of the Afghans" and that "[b]rothers did a little work on the jeep and did fix it."  The notes concluded with "[t]he military work:  Planning is lacking - readiness is lacking - delay in the ability to start an attack - a delay in fixing the jeep till the last moment. . . . Unpreparedness brings disasters . . . preparedness should exist

12

continuously . . . The Arabs never participated in the military planning."

Exhibits 64-65 are admissible on the same grounds as the other exhibits as admissions of a party opponent, co-conspirator statements, and for proper non-hearsay purposes such as establishing the relationship between the parties and the scope of the conspiracy. Moreover, all of these challenged documents are clearly connected to Muntasser as Muntasser was the President when these documents were created. Muntasser was the person who made the initial decision to maintain these records with Care's business records. Care maintained them until Mubayyid took over as treasurer and eventually moved them to Care's storage unit in 2001. These documents are also admissible as business records under Fed. R. Evid. 803(6). See generally United States v. Moore, 923 F.2d 914-915 (1st Cir. 1991) (stating standard); see United States v. Skeddle, 981 F. Supp. 1069, 1072-1073 (handwritten notes of client meetings admissible as business records even though subject to more than one interpretation)(N.D. Ohio 1997).

WHEREFORE, the government respectfully requests that the Court deny the defendants' motion in limine to exclude nine pages of handwritten Arabic notes found in Care's storage unit in October 2001 on the grounds that the government will show that

the documents are what they purport to be.

                              Respectfully submitted,

                              MICHAEL J. SULLIVAN
                              United States Attorney

                         By: /s/ B. Stephanie Siegmann
                              B. STEPHANIE SIEGMANN
                              ALOKE S. CHAKRAVARTY
                              DONALD L. CABELL
                              Assistant U.S. Attorneys


Date: November 8, 2007

                       Certificate of Service

     I do hereby certify that a copy of foregoing was served upon
the counsel of record for the defendants by electronic notice on
this 8th day of November 2007.

                         /s/ B. Stephanie Siegmann
                         B. Stephanie Siegmann