UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA        )
                                )
            v.                  )    Crim. No. 05-40026-FDS
                                )
MUHAMED MUBAYYID, and           )
EMADEDDIN Z. MUNTASSER,         )
and                             )
SAMIR AL-MONLA a/k/a            )
SAMIR ALMONLA,                  )
                                )
            Defendants.         )

**GOVERNMENT'S MOTION FOR PRE-TRIAL ADMISSIBILITY OF CO-CONSPIRATOR STATEMENTS AND OPPOSITION TO MOTION TO EXCLUDE PORTIONS OF TRANSCRIPTS OF CERTAIN WIRETAPPED CONVERSATIONS**

The United States, by and through its attorney, Michael J. Sullivan, the United States Attorney for the District of Massachusetts, and Aloke Chakravarty, B. Stephanie Siegmann, and Donald Cabell, Assistant United States Attorneys, hereby moves for preliminary determination of admissibility of co-conspirator hearsay statements and opposes the defendants' motion to exclude relevant wiretapped conversations.  This memorandum provides support for the introduction of both the intercepted wiretap conversations, as well as any other documents/evidence which may be offered during the course of the trial which contain co-conspirator statements.

I.   **The offered wiretapped conversations are not-hearsay**

Each of the intercepted conversations being offered as evidence qualify as statements which are either not-hearsay by

1

operation of Fed. R. Evid. 801(d)(2).

The government's exhibits for these conversations include recordings and transcripts of conversations which were conducted by defendants or unindicted co-conspirators in furtherance of the conspiracy as laid out in the indictment and described herein. The conversations are admissible for a variety of reasons.

First, any statements or adoptions of others' statements made by the defendants are admissions, and admissible on that basis alone. <u>See</u> F.R.E. 801(d)(2)(A); <u>See</u> <u>United States v. Castro-Lara</u>, 970 F.2d 976, 981 (1st Cir. 1992); <u>see also</u> <u>United States v. Washington</u>, 434 F.3d 7, 13 (1st Cir. 2006)(holding statements of joint venturers in a criminal scheme, as charged here, are equivalent to statements of co-conspirators for purposes of application of Rule 801(d)(2)(E).)

II.  **Conversations of co-conspirators are not hearsay**

Second, subject to the requirements of F.R.E. 801(d)(2)(E), the out of court statements made by co-conspirators are not hearsay.[1]  Although defendant's statements will be admissible as admissions of a party opponent, see F.R.E. 801(d)(2)(A), the co-conspirator statement rule is the vehicle by which many of the statements involving co-conspirator agents of Care International, Inc. ("Care") (including officers Mohamed Akra, Wassim Yassin),

---

[1]    Although colloquially referred to as the "co-conspirator hearsay exception," F.R.E. 801(d)(2)(E) excludes co-conspirator statements from the definition of hearsay.

2

will be admitted.[2]  Many of the conversations which the
defendants and Akra and Yassin had on behalf of Care, involved on
the other end, Adham Hassoun, Kifah Jayoussi and Mohamed Chehade,
who are not designated as conspirators of the charged conspiracy;
rather, they were engaged in non-charitable activities of their
own.  The evidence will show, and the conversations themselves
demonstrate, that the proffered conversations which the Care
representatives (defendants and co-conspirators) had with
individuals who are not co-conspirators, were each made in
furtherance of the charged conspiracy.

The requirements for admitting statements under F.R.E.
801(d)(2)(E) are familiar:  the Court must find "by a
preponderance of the evidence that a conspiracy embracing both
the declarant and the defendant existed, and that the declarant
uttered the statement during and in furtherance of the
conspiracy."  United States v. Sepulveda, 15 F.3d 1161, 1180 (1st
Cir. 1993).  The requisite finding is known as a Petrozziello
determination.  See United States v. Petrozziello, 548 F.2d 20,
22-23 (1st Cir. 1977).

When the government offers a co-conspirator's statement, the
Court should admit it conditionally, subject to a final
determination at the close of the evidence.  See United States v.

---

[2]     "[I]t is well established that co-conspirators need not
be indicted, and a fortiori need not be named, for the
[801(d)(2)(E)] exception to be applicable."  United States v.
Zipperstein, 601 F.2d 281, 294 (7th Cir. 1979).  See also United
States v. Hurley, 63 F.3d 1, 10 (1st Cir. 1995).

Bradshaw, 281 F.3d 278, 283 (1st Cir. 2002); United States v. Perkins, 926 F.2d 1271, 1283 (1st Cir. 1991); United States v. Ciampaglia, 628 F.2d 632, 638 (1st Cir. 1980).

In making its Petrozziello determination, the Court may "consider any evidence whatsoever, bound only by the rules of privilege," including the proffered statements themselves. Bourjaily v. United States, 483 U.S. 171, 178 (1987); United States v. Isabel, 945 F.2d 1193, 1199 (1st Cir. 1991). Indeed, hearsay and other inadmissible evidence can be considered. See United States v. Drougas, 748 F.2d 8, 28-29 (1st Cir. 1984).

The "in furtherance of the conspiracy" requirement is not to be interpreted strictly. See United States v. James, 510 F.2d 546, 549 (5th Cir.), cert. denied, 423 U.S. 855 (1975). Statements are in furtherance of a conspiracy if they tend "to advance the objects of the conspiracy as opposed to thwarting its purpose." United States v. Fahey, 769 F.2d 829, 839 (1st Cir. 1985). The statements need not directly advance the conspiracy: it is enough if they facilitate it indirectly. See, e.g., United States v. Tarvers, 833 F.2d 1068, 1078 (1st Cir. 1987). Consequently any act which furthered the activities of Care, would also further the conspiracy, which included keeping Care viable. See United States v. Kaplan, 832 F.2d 676, 685 (1st Cir. 1987)(accurate medical records maintained by a personal injury attorney which enabled him to keep false bills and realize the fruits of the fraud through the bills.) All of the offered co-

4

conspirator statements in this case were made during and in furtherance of the conspiracy.

III. **Conversations by defendants or co-conspirators with non-conspirators are not hearsay**

Statements can be made in furtherance of the objects of the conspiracy, even if made to third parties who are not co-conspirators. See United States v. Tse, 135 F.3d 200, 209 (1st Cir. 1998)(citations omitted)(holding statements made to government informants by a co-conspirator are admissible under Rule 801(d)(2)(E).) For example, a conversation between a co-conspirator to a disinterested third-party is not hearsay if it is made in furtherance of the conspiracy between the co-conspirator and the defendant. See also United States v. Innamorati, 996 F.2d 456, 486 (1st Cir. 1993); United States v. Cintolo, 818 F.2d 980, 999 (1st Cir.1987) (out-of-court statements regarding conversation between FBI agents and a witness were admissible to provide context and background even though defendant did not ask for a limiting instruction). In this case, each of the statements by the conspirator to the third party are made in furtherance of the conspiracy because they further the activities of Care, and even more significantly, the non-charitable activities.

Conversely, the statements made from the third party to the conspirator in response to a defendant or conspirator's statement are not hearsay. In the first instance, they lead to adoptions by the conspirator, and are admissible under Rule 801(d)(2)(E).

Secondly, the response statements are essential to comprehending
the context and the import of the conspirator's statements.  The
First Circuit recognizes that an informant's (someone who cannot
be a conspirator) responses to a conspirator, are admissible as
"reciprocal and integrated utterances" which are not hearsay
under Rule 801(c).  <u>United States v. McDowell</u>, 918 F.2d 1004,
1007 (1st Cir. 1990).

Hence, statements made by the non-conspirator which are
recorded are admissible because they are not hearsay, and merely
provide relevant context or background to the other speakers'
comments.  <u>See</u> <u>United States v. Castro-Lara</u>, 970 F.2d 976, 981
(1st Cir. 1992), <u>cert. denied</u>, 113 S.Ct. 2935 (1993).  They are
sometimes characterized as not-hearsay because they are verbal
acts[3], because they are being offered to show the relevant
context of the defendant or co-conspirator's statements, and
because they're being offered to show the effect on the listener,
and the state of mind of the listener.

Finally, under Rule 807, the Residual Exception to hearsay,
all of the statements from the wiretap recordings, if more
probative than unfairly prejudicial, should come into evidence.
The reason for this is clear, the source of the statement is a
highly-reliable technical source, and the whole original

---

[3]The statements are "verbal acts" that are relevant because
they were made, they imparted material information, and provide
context for the responses of defendants and their co-
conspirators.  <u>See</u> <u>United States v. Southard</u>, 700 F.2d 1, 13 (1st
Cir. ), <u>cert. denied</u>, 464 U.S. 823 (1983).

conversation is available.  The guarantees of trustworthiness and reliability are at their zenith when a recorded wiretap conversation is provided to the jury.

IV.  **The related but uncharged conspiracy**

As the government began to state in court, communications of third-parties could also be admitted as co-conspirator hearsay statements if the government demonstrates that these individuals were engaged in a separate (but related) uncharged conspiracy with the defendants.  See United States v. Munson, 819 F.2d 337, 343 (1st Cir. 1987).

> It is well established that the applicability of the co-conspirator exception to the hearsay rule is not conditioned on the presence of a conspiracy count in the indictment. Rather, the out-of-court statements of one "partner in crime" will be admissible against a confederate when made in furtherance of a joint criminal venture and when there is sufficient evidence independent of these statements to indicate the existence of such a venture.

Ottomano v. United States, 468 F.2d 269, 273 (1st Cir. 1972).

Although this "other conspiracy" avenue need not be reached to admit these conversations in this case because of the reasons herein, a brief description of the separate (but related) conspiracy is laid out for the added comfort of the court.[4] Naturally, this conspiracy need only be proven by a preponderance of the evidence to merit admission under Petrozziello.

---

[4]The object of this conspiracy could include several violations, including providing material support to terrorists (18 U.S.C. §2339B), violations of the neutrality act (18 U.S.C. §960), conspiracy to injury persons in a foreign country (18 U.S.C. §956), and wire fraud (18 U.S.C. §1341).

As will be shown below, while not necessarily co-conspirators of the charged conspiracy, Hassoun, Jayoussi and Chehade, did conspire with Care to send money to the mujahideen. The content of the conversations themselves support this conclusion, but coupled with expert testimony as to who these individuals and their organizations were and evidence that they all three interacted with and had conversations regarding supporting fighters in overseas conflicts, exchanged funds, distributed pro-jihad documentation, organized pro-jihad lectures, and the like -- the <u>Petrozziello</u> standard is met with regard to this other conspiracy[5].   Additionally, the calls described below (and others not recapitulated herein) evidence a synergistic operation where the ultimate purported beneficiaries of the Hassoun, Jayoussi, Chehade, the defendants, Yassin and Akra were the same, the mujahideen which were fighting in countries abroad.

V.   **Legal Standard to Find Conspiracy**

The law of what constitutes a conspiracy is broad.   In this

---

[5]The fact that Hassoun and Jayoussi were recently convicted for conspiring to provide material support to terrorists evidences their object of the conspiracy, and the designation of Global Relief Foundation ("GRF")(as a Specially Designated Global Terrorist Entity corroborates the object of Chehade's discussions with Care. This is in addition to the evidence (from calls and faxes) that Hassoun held out his organization at least in some capacity as Care International - Florida, and the meeting minutes involving GRF and Care which describe that there will be various nodes of Maktab al Khidmat ("MAK") in the U.S. all corroborate that this separate conspiracy (which did not involve defrauding the government) also existed.

case, the government's evidence establishes that the defendants and their co-conspirators agreed to defraud the government by furthering Care's activities, while concealing the non-charitable activities and their lineage from the government. Consequently, given the agreement, any activities which a conspirator engaged in on behalf of Care is an overt-act in support of the conspiracy.

An agreement to conspire "need not be express so long as its existence can plausibly be inferred from the defendants' words and actions and the interdependence of activities and persons involved." United States v. Boylan, 898 F.2d 230, 241-242 (1st Cir. 1990), citing United States v. Glenn, 828 F.2d 855, 857 (1st Cir. 1987) and United States v. Flaherty, 668 F.2d 566, 580 (1st Cir. 1981). A tacit agreement will suffice. United States v. Woodward, 149 F.3d 46, 68 (1st Cir. 1998). A defendant need not intend to commit the underlying act himself to be found guilty of a conspiracy. United States v. Piper, 35 F.3d 611 (1st Cir. 1994). The agreement to conspire may be proved by either direct or circumstantial evidence. United States v. Rivera-Ruiz, 244 F.3d 263, 268 (1st Cir. 2001). "The question is merely whether the total evidence, including all reasonable inferences, when put together is sufficient to warrant the jury to conclude the defendant is [a member of the conspiracy]." United States v. Patterson, 644 F.2d 890, 893 (1st Cir. 1981); see also Boylan, 898 F.2d at 242. For Petrozziello purposes as to the existence

9

of such a conspiracy and whether the offered statements were made in furtherance of the conspiracy, the standard of proof need only be by a preponderance of the evidence.

VI. **Brief Summary of Evidence demonstrating existence of a conspiracy and Akra and Yassin's role in the Conspiracy**

Without restating the charged conspiracy (which is incorporated herein by reference to the indictment), the government anticipates that the evidence at trial will prove beyond a reasonable doubt, a conspiracy to defraud the government. The conspirators include the defendants and Akra and Yassin. A categorical description of the evidence which will be offered to substantiate this conspiracy, and as largely reflected on the government's exhibit list, include in a non-exhaustive summary:

a. Public filings with omitted material information which were submitted on various occasions by each of the conspirators;

b. Bank records revealing income and outflow of funds to organizations who engaged in non-charitable activities including to and from the conspirators;

c. Muntasser's statements to the INS and the FBI describing his and Akra's membership in Al Kifah and Care;

d. Publication of pro-jihad literature (including Al-Hussam and the Zakat Calculation Guide, both of which were legacies from Al-Kifah Refugee Center);

e. Distribution of pro-jihad media (including flyers, books such as "Join the Caravan", and audiotapes and videotapes);

10

f. Checks, receipts and records demonstrating transfer of funds back and forth to organizations which engaged in some non-charitable activities (and were later designated as Specially Designated Global Terrorist entities);

g. Maintenance of an internet website which distributed pro-jihad information and solicited funds therefor;

h. Documents soliciting for fundraising;

i. Audiotapes of lectures on behalf of care soliciting Jihad and support of the fighters;

j. Documents, checks and receipts indicating Care's expenditure of money on publishing, printing and distributing materials for non-charitable purposes, such as the Zakat Calculation Guide which solicited money for the mujahideen, and the Al-Hussam;

k. Care's outgrowth and succession to Al-Kifah as exemplified by their adoption of address, transfer of assets as demonstrated by bank records;

l. Care's adoption of Al-Kifah materials including media;

m. Hosting lectures by other pro-jihad speakers like Kifah Jayoussi;

n. Corresponding with and obtaining materials from Azzam Publications;

o. Meeting minutes between Muntasser, Akra and others including notes and correspondence describing discussion about changing names, associations which needed to be developed, and

the plan to pledge support to non-charitable entities, among other activities;

p. Numerous documents, books and pamphlets related to Abdullah Azzam, the founder of Maktab al Khidmat (MAK) or "The Services Office";

q. Money transfers to The Services Office (by whom);

r. Numerous Al-Hussam newsletters along with representative documents which are included in the newsletters;

s. Intercepted facsimiles of Al-Hussams and pro-mujahideen notes with other pro-jihad individuals;

t. Intercepted telephone calls of the sort described in detail below;

u. Expert testimony describing the behavior of Care International being consistent with that of other organizations which held themselves out as charitable, but engage in intermingled activity through similar method of operation;

v. Expert testimony explaining the non-charitable and pro-mujahideen nature of a variety of the organizations and individuals whose activities the defendants and conspirators promoted.

In this vein, the government's evidence at trial will show that Mohamad Akra and Emadeddin Muntasser, among others, figured in Al-Kifah Refugee Center and in Care International from its inception - and the commencement of the period in the indictment. Among other things, Muntasser told the FBI that he and Akra were

involved in both Al-Kifah, and that they became involved in Care. To begin, Muntasser filed articles of incorporation for Care which expressly identified himself as President and Akra as a director of Care.  That fact, coupled with Care's pedigree as Al-Kifah's successor or outgrowth and its involvement in jihad support, set the conspiracy in motion in or about April 1993. The evidence will show that Muntasser had previously been the director of the Boston Branch of Al-Kifah through flyers, correspondence, his own statements to the INS, and bank records. Al-Kifah was not a tax exempt organization, but despite this, the evidence will show that Muntasser solicited money stating that it was. Thereafter, the evidence shows that Care, and specifically, the defendants and treasurer Yassin and director Akra were involved in non-charitable activities, which they concealed from the IRS.

For example, on Care's Form 1023 application (in which the non-charitable activities were ommitted), Muntasser listed himself as President, and listed Akra and Yassin as Directors. For the 1993 Form 990, Akra was listed Director of Care in 1993, Muntasser was President, and Yassin was Secretary.  For that 990, Muntasser sent a letter to the IRS stating, among other things, "All officers and directors have worked very hard to collect donations and provide humanitarian aid to disaster victims and other services."

The evidence will also show that while the defendants were

directing and leading Care, Care engaged in a substantial project of publishing the Al-Hussam newsletter - the newsletter of Maktab Al Khidmat ("MAK") which they continued from Al-Kifah.  The evidence will show that each defendant and co-conspirator was involved in running Care consistently with the manner in which Muntasser and Akra did after its formation.  Although Muntasser acted as Care's president from 1993 to 1996, while Wassim Yassin was Treasurer, he remained involved in the administration of Care after that point.  The same is true for Al-Monla, who was inolved in Care as early as 1993, and acted as president from 1996 to 1998, but executed the 1998 Care Form 990 tax return in December, 2000.  Similarly, Akra acted as a director from 1993 to 1995 and served as its president from 1998 to in or about 2001.  Mubayyid acted as treasurer from 1997 to 2003, but also was involved with Care in 1993.

Intercepted communications (described below) between Akra and Yassin and others on behalf of Care further reveal that they were engaged in non-charitable activities on behalf of Care.

Documents and materials found in Care's storage locker likewise corroborate that the defendants' and Akra and Yassin played prominent roles in Care's activities.  For example, the evidence will show that Care bank checks were repeatedly sent out to and from the defendants and co-conspirators.  Checks were made out to Yassin for, among other things, storage and the Al-Hussam newsletter (which the government will show evidences non-

charitable activity of Care).  The evidence will show Yassin
played a role in publishing the Al-Hussam, and distributing
literature, like "Join the Caravan" (Abdullah Azzam's book).
Akra, in addition to being the director and later the President,
routinely held lectures and speeches, including speeches on the
subject of Jihad.  Speeches on the subject of Jihad were likewise
found in the Care storage locker, and refer to Yassin and writing
for the Al Hussam as a way to support the fighters.  Akra also
received sizeable payments from Care throughout his involvement
with Care, and all of the conspirators signed or received
payments for Care.

Further, there was a complete consistency in the goals of
the charged conspiracy – to use Care to support jihad and solicit
funds for its support – while at the same time concealing that
purpose from the IRS with consistently misleading and incomplete
statements regarding Care's history, purpose and function.  Based
on these facts, the evidence strongly supports the existence of a
Klein conspiracy and a scheme to conceal, and the participation
of the defendants and co-conspirators in it.  Each of the
conspirators knew and agreed to perpetuate the fraud upon the
government that Care was exclusively charitable.

VII. **The Co-Conspirator Statements**

The Government provides notice that in addition to any other
applicable rules of evidence (such as being offered under Fed. R.
Evid. 803(6), 801(c), and 807) it intends to utilize Fed. R.

Evid. 801(d)(2)(e) to introduce co-conspirator's hearsay
statements.

The statements sought to be introduced are described below
categorically, and all are being offered in furtherance of the
conspiracy[6].  Given the evidence described above, each
defendant's and co-conspirator's statements in furtherance of the
conspiracy, as well as the third party's statements for substance
and context are admissible under Fed. R. Evid. 801(d)(2)(A-E) :

A) Wiretap interceptions involving the Defendants, between
themselves. The particular communications it intends to
introduce which fall within this category are
Exhibits 513, 515, 542, 546

B) Wiretap interceptions involving a Defendant and a co-
conspirator.  The particular communications it intends
to introduce from this category are:
Exhibit 519

C) Wiretap interceptions involving a Defendant and a non-
conspirator. The particular communications it intends
to introduce from this category are:
Exhibits 510, 512, 515, 517, 518, 520, 521, 522, 523,
524, 525, 526, 527, 528, 529, 530, 531, 532, 534, 535,
536, 537, 538, 539, 540, 541, 543, 544, 545, 547, 548,
549, 550, 551, 552

D) Wiretap interceptions involving a co-conspirator and a
non-conspirator. The particular communications it
intends to introduce from this category are:
Exhibits 511, 514, 516, 533

E) In addition to the intercepted conversations, the
government will introduce a compilation from the
English-language audio-tapes found among items in the
defendants' control and custody which include

---

[6]Some conversations can fit into more than one of these
categories of relationships, all of which are not hearsay under
801(d)(2)(E), which can be explained on a case-by-case basis as
necessary.

801(d)(2)(e) statements, and may also be admissible
under other bases, including as non-hearsay act of
engaging in non-charitable activities by holding
functions which advocated violent jihad.

F)   Any nested hearsay statements contained on the
     documents obtained during the searches of the Care
     International storage locker, are admissible because
     they are not hearsay under Fed. R. Evid. 801(d)(2)(A-
     E).  Essentially, the documents constitute the records
     of Care and its agents.  These are the materials which
     evidence the actions of the organization.

     Consequently, the defendants and conspirators, who were
     officers of Care, made or adopted these statements
     which appear on the documents of Care (whose activities
     constitute the mechanism of their conspiracy).
     Morever, any statements made on behalf of Care (for
     which the defendants were officers) were made in an
     agency capacity, consequently any statements made by or
     on behalf of Care are legally attributable the
     defendants for purposes of showing state of mind,
     adoption, and as verbal acts.  <u>See</u> Fed. R. Evid.
     801(d)(2)(D).  A similar, and applicable rationale
     follows vis-a-vis 803(6) business records analysis.
     The Care Storage Locker was the repository for the
     business records of Care, and consequently should be
     admissible pursuant to 803(6).  These records bear the
     indicia of trustworthiness and reliability as records
     of Care.

     In addition, inasmuch as these records go the heart of
     Care's activities, any statements contained on them
     constitute non-hearsay verbal acts as the actions of
     the organization whose activities are the object of the
     charged conspiracy, and serve to reflect the state of
     mind of the defendants as they conducted the business
     of Care.  Finally, under 801(d)(2)(E) analysis, all
     statements made by a conspirator which are contained
     therein were in furtherance of the conspiracy.
     Finally, any statement which does not fit into one of
     the hearsay exceptions above should be admissible to
     demonstrate a non-hearsay purpose, such as to prove the
     state of mind and the understanding of the defendants
     with regard to the operations of Care.

H)   The rationale described above for the physical
     documents holds just as equally to the Emails and
     documents which were obtained from Electronic sources
     found during the Searches of the Storage locker, the

search of Mubayyid's residence, and the Search of Mubayyid's workplace.  The offered Emails are either to or from defendants, co-conspirators, or Care institutionally.

I)   Statements by Witness Kadri pertaining to what Akra or Wassem may have said about Care's activities and origins, including his overhearing Waseem Yassin's conversation with Bassam Kanj, regarding the reason for the establishment of Care.

J)   Such statements as the government supplements prior to their admission.

VIII.    **Specific Challenged Wiretapped Conversations**

The defendants' motion seeking to exclude as certain wiretap communications should be denied.  In lieu of attaching scores of pages of transcripts, a summary of the import of these calls are listed below.  These calls are hardly idle chatter, rather, among other activities, they make reference to the activities of the mujahideen, which are wholly probative of what the defendants and their co-conspirators understanding was and whether they made false statements about the nature of Care.  All of these calls involve defendants and/or co-conspirator's statements being made in furtherance of the conspiracy.

1.   Exhibit 512
     1/19/96, 19:57 Parties:  Defendant Muntasser
                              Adham Hassoun
                              Kassem Daher

This call is admissible under category C listed above. The government has no objection to redacting the lines of communication which do not involve Defendant Muntasser on page 1, and the lines of communication after Muntasser hangs up on page 18.

The government has no objection to a portion of pages 4-5 in which Muntasser describes his difficulties with customs on a previous occasion, although to demonstrate that Muntasser is a party to this aspect of the call as it segues into another conversation, and so that Kassem Daher's nickname (Abu Zur) is apparent, the end of the redaction should be 10 lines up on page 5, so that the conversation appears as seamless as possible.

This conversation involves Muntasser's discussion of the Al-Hussam in response to Hassoun and Daher's inquiries.  Muntasser describes, the problems and dangers of distributing it, they discuss Akra (the scrutiny in the location where he is), Yassin (who was no longer permitted to distribute the Al-Hussam at a certain mosque), and they discuss Rabih Haddad and Kifah Jayyoussi.


2.    Exhibit 514
      1/27/96, 14:06 Parties:  co-conspirator Yassin
                              Hassoun


This entire conversation is admissible under category D, and evidences Yassin's awareness that Care's common goal with Hassoun was to support violent jihad.

Hassoun requested a copy of the Al-Hussam and Join the Caravan from Yassin. Hassoun indicated that he had talked to Muntasser and Waseem previously about getting a copy of the Al Hussam via email.  Yassin responded that he had nothing to do with the past month's issue, and has given that job to someone else. Yassin agrees to send Hassoun copies of Join the Caravan but shipping COD because Care is having financial problems. Hassoun also asked Yassin to send him tapes: "Exchange of Prisoners and Liberating the Church and the like.  The handwriting of Abu Omar [Mohamad Zaky] is on it."  Yassin responded that he would look for it and would send it.  Yassin

told Hassoun that the printing costs for the Al Hussam is the
problem and that it will cost $1000 to print it.  Hassoun advised
Yassin to get the money for Muntasser.  Hassoun discussed with
Yassin his desire to buy a scope for an M-16, and then got
Yassin's address to send him a catalogue for same, which included
other things used by "tourists", which is directly relevant to
whether Care and its officers meant armed fighting when they
distributed materials about jihad and mujahideen.

3.    Exhibit 519
      8/26/96, 21:54 Parties:  Hassoun
                               Defendant Muntasser
                               Co-conspirator Akra

     This call is admissible under categories B and C above, and
relates to how Care, Muntasser and Akra, could facilitate
recruiting of people for the cause of violent jihad by falsely
sponsoring a person to come to the U.S..  This call also
evidences the interrelationship between Care International,
Hassoun's organization, and Mohamed Chehade, who Akra stated was
visiting Boston at the time.
     Initially, Hassoun complained that Muntasser did not return
his calls and asked to speak to Akra for a sensitive matter, a
hot issue, in order to "invite someone to the area", which is
believed to be reference to inviting a lecturer.  Hassoun
explained that he calls him "for the cause", which the government
alleges is the same violent cause which the defendants and
conspirators were involved in.  They then have a conversation
about how to invite a specific lecturer from Lebanon who was
seeking to collect funds.  Specifically, Hassoun and Akra discuss
what they should write on the invitation to this Sheikh so that
when they show the letter to the Immigration authorities, they
will permit him to stay in the U.S. for at least a month. Akra
even suggests writing that he will come for a reason "such as
supporting the recruiting in Lebanon."  The pair exchange email

addresses.

4.    Exhibit 529
      12/19/96, 17:16          Defendant Al-Monla
                               Hassoun
                               Jayoussi

       This call is admissible under Category D. This conversation
is crucial to lay out the structure and mechanism in which Care
was interconnected with its sister organizations, and what their
(as manifested through Al-Monla) understanding was about the
purpose and destination of their fundraising.

       The first portion of the conversation is between Al-Monla
and Hassoun and Jayoussi discussing Jayoussi's upcoming trip to
visit Care in Boston to give a lecture, for which Al-Monla is
making travel arrangments.

       Al-Monla told Hassoun that a man named Suleiman Al-Ahmar was
coming to Boston.  Hassoun began complaining.  In summary,
Hassoun explained that there Suleiman's group claims to support
the "tourists" (a reference to the mujahideen), but in fact they
are not part of the same "battalion" and that they say they are
going to support the tourists, but in fact they never give the
millions of dollars that they raise to the "tourists" in Bosnia
and Chechnya.  This conversation makes clear the mechanism and
vernacular which Care used and what their officer's understanding
was about their activities - the in which, their shared objective
with other non-conspirators was to get support to the mujahideen.
Hassoun also told Al-Monla that Yassin and Muntasser were aware
of the details.  Al-Monla acknowledged this and stated that he
didn't know about this issue, but that he knew that Suleiman was
going to Wayland (which is the site of the Islamic Center of
Boston); Hassoun stated that everyone in "the Council" knows
[about Suleiman's group](an apparent reference to the Shura
council discussed in the meeting minutes discussed in a separate
motion). Hassoun also said that last time Suleiman's group came,

they collected $120,000 for them and they said they were going to
buy tents for people after the Srebrenica massacre (in Bosnia)
and they responded that they had provided ambulances to the
"tourists". (Expert testimony will further elaborate on the use
of Ambulances to support the mujahideen during the Bosnian
combat.)

Al-Monla tells Jayoussi and Hassoun that they got Suleiman's
information from BIF (Benevolence International Foundation), and
said that he would speak with Mohamed Chehade to determine
whether they would still bring Suleiman to Boston. Al-Monla said
that he would coordinate with Hassoun and Care International. Al
Monla finally relents and says that he will cancel Suleiman's
trip, in favor of having Jayoussi lecture instead.


5.   Exhibit 532
     2/8/97, 12:12          Parties:    Hassoun
                                        Defendant Muntasser

This call is admissible under category C, and is a mildly coded
conversation discussing the mujahideen in Afghanistan, including
the Taliban and Hekmatayar. Hassoun and Muntasser start by
discussing problems with proper Islamic schools and Care's school
project. Hassoun discusses how much money his organization had
made, and Muntasser congratulates him. Hassoun tells Muntasser
that he brought a Sheikh who gave long soliloquy's to the flock
about the topic of "Tourism", the philosophy of "tourism", and
understanding it, and the translator only spoke for a minute and
did not mention "tourism" in his translation. Muntasser laughed
and repeatedly endorses Hassoun's statements during this
exchange. This call demonstrates that "tourism" is a euphemism
for traveling to fight in jihad. Muntasser inquires of Hassoun
whether there's anything big going on, and they discuss Chehade.
Hassoun tells Muntasser of news from the "First Area", which is a
euphemism for Afghanistan. Hassoun tells Muntassser that between
then and the Spring, *Mazar E Sharif* (a city in Afghanistan) will

be within range.   Muntasser asks within range of whom.   Hassoun
responds by saying that Students with Knowledge (The Taliban),
and Muntasser states "Yeah, it's possible, yeah, yeah."   The pair
then discuss the movements of the mujahideen.   Hassoun then
praises "the Engineer", which is a coded reference to Gulbuddin
Hekmatayar, and they agree to wait to hear news from him before
concluding anything.

6.    Exhibit 533
      2/18/97, 22:29                    Parties: Hassoun
                                        Co-conspirator Akra

     This call is admissible under category D above, and
discusses a mujahideen operation in Somalia where 58 people died
in jihad.   Akra calls Hassoun from overseas.   Hassoun tells Akra
he received an email from Jamil Nakhal regarding news.   Hassoun
states that the men were able to collect money when they stayed
with him.   Hassoun asked Akra what town he was in but Akra would
not disclose that information for "security reasons."
     Akra discusses whether Hassoun would be moving out of the
U.S. and they talk about how others stayed in the country for too
long and Akra says that they became "moldy."   Hassoun asks Akra
whether he will go to Somalia with him "because they need help
with food and all."   Refers to it as "the operation of hope."
     Hassoun states: "we are going over there to do the 'Flame of
Hope' for them.   There is good work there . . . During the last
party 58 brothers got "married" (a well-known coded reference to
martyred in pursuit of jihad), I mean. . . . 58, means it was a
very strong hit. . . . the dogs here are the ones who caused
that. . . . They attacked them from the sea."   Akra repeatedly
said "Yes".   This is coded reference to 58 mujahideen Hassoun
told Akra that he gave all the details to Muntasser.   Hassoun
continues "so Allah willing, we gonna take care of things.   Allah
willing.   Take care of business." Akra asked Hassoun to email him
with any news.

7.   Exhibit 537
         8/3/98, 18:45                    Parties: Jayyousi
                                                   Defendant Al-Monla

     This call is admissible under category C.  It evidences
Care's non-charitable and concealed activities such as providing
support for families of people convicted in national security
cases, and evidences that they created fictitious receipts in
order to log their activities.  Jayoussi complains to Almonla
that he thought Al-Monla was with Muntasser.  Almonla promised to
arrange a lecture program for Jayoussi in Florida, and beyond to
other states.  Documents found in Care's storage locker confirm
that Al-Monla organized this trip.  Almonla indicated that he
would send him a package in the next couple of days containing
pledge forms and some things about Care.

     Jayoussi talks to Almonla about sending money to the wife of
Mahmoud Abu Halima (who was convicted in relation to the first
World Trade Center bombing).  Al-Monla says that yes, he knows
him.  Jayoussi indicated that he tried to raise money for Abu
Halima's family in many regions.  Almonla asks Jayoussi if he has
an organization over there or any organization near to them which
may be able to help raise money.  Almonla instructs Jayoussi to
"tell the organization to send him [Almonla] a letter saying that
this is a request to help a family or some poor people or
anything like that."  Almonla further states that after receiving
that letter, he will write a check to the organization and when
they receive the check, the organization should send him
(Almonla) "a note in the mail that they received it to help a
family without mentioning any names at all.  For helping the poor
or the needy or an orphan or the sort."

8.   Exhibit 540
         10/2/01, 16:14                   Parties: Mohamed Chehade
                                                   Defedant Mubayyid

     This call is admissible under category C, and is the pivotal

24

communication which demonstrates that pro-jihad and non-
charitable documents kept in the Care storage locker were moved
and/or destroyed.  The call also demonstrates the
interrelationship between Care and Global Relief Foundation, and
is offered to show the effect that Chehade's conversations had on
Mubayyid, which the evidence shows, was to remove or destroy
documents.  During the call, Mubayyid told Chehade that 50
individuals came to the old location and so "we had moved our
effects to . . . storage."

　　　Chehade told Mubayyid to take his things out of storage.
Mubayyid responded "they were originally locked, in, in, in - uh,
in the uh office and we moved them to the storage."  Chehade
asked if the storage contained "books, books, and things" and
Mubayyid responded yes.  Chehade advised Mubayyid to "remove
them."  Mubayyid told Chehade that he had sent him $60,000 in
checks and indicated that he would like the money distributed as
soon as possible.  Chehade expressed concern about Mubayyid
sending him that much money at once at this time. The pair then
discuss the media exposure and the pressure that they have on
them.  Mubayyid tells Chehade that when 50 people came to them
because their names are on the Care account, that means that
their intention was evil.

9.　　Exhibit 545
　　　4/10/03, 21:30　　　　　　　　Parties: Defendant Samir Al-Monla
　　　　　　　　　　　　　　　　　　　　　　Ramez Al-Monla

　　　This call is admissible under category D, as an action which
Samir Al-Monla took to obstruct the investigation of himself and
Care.  Specifically, Al-Monla tells his brother not to discuss
anything about Care with authorities, and that he should get a
lawyer.  Al-Monla says, "It is very important that you don't talk
to them at all, at all, at all, at all.  Because, uh, there are
many, many things you should know now.  It would take only 5
minutes."  This call evidences Al-Monla's consciousness of guilt.

The preceding call referenced by the defendant has nothing to do with Al-Monla's admonition to his brother Ramez, who was not a party to the call days earlier between Al-Monla and Mubayyid. There is no privilege issue implicated here.

10.  Exhibit 546
     4/14/03, 19:21          Parties: Defendant Mubayyid
                                      Defendant al_Monla

     This call is admissible under category A, and involves two defendants discussing access and control of the Care storage locker.

11.  Exhibit 547
     7/19/03, 15:24          Parties: Defendant Mubayyid
                                      Mahmoud El-Asmar

     The government only intends to introduce the first five pages of this transcript.  The reference to 9/11 is not necessary to be included, and can be redacted.  This call is admissible as an admission of defendant, and non-hearsay as going to Defendant Mubayyid's state of mind and awareness of Bassam Kanj's death while engaging in violent jihad.

     Specifically, El-Asmar explains that he cannot go back to Lebanon because Bassam [Kanj's] case created "headaches for people there, because when he did his thing, [El-Asmar] was going for a visit."  Mubayyid asked where [El-Asmar] was when Kanj "did his thing", and El-Asmar responded that he was here in the U.S. Mubayyid summed upby saying "Bassam's story over there, messed things up the way 9/11 messed things up here."

     IX.  **Conclusion**

     Wherefore, the Government respectfully submits that all of the materials which contain potential co-conspirator statements should be admitted at trial, and the defendant's motion to

exclude certain wiretap calls be denied for the reasons stated
herein.

                              Respectfully submitted,
                              MICHAEL J. SULLIVAN
                              United States Attorney

                     By:    /s/ Aloke Chakravarty
                              ALOKE S. CHAKRAVARTY
                              B. STEPHANIE SIEGMANN
                              DONALD L. CABELL
                              Assistant U.S. Attorneys

Date: November 8, 2007

                    CERTIFICATE OF SERVICE

     I hereby certify that I have sent this document on this
date, November 9, 2007 via Electronic notice to counsel for the
Defendants in this case.
                               /s/ Aloke Chakravarty
                              ALOKE CHAKRAVARTY
                              ASSISTANT UNITED STATES ATTORNEY