UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff | ) ) ) ) | |
| V. | ) ) ) | CRIMINAL NO. 05-40026-FDS |
| MUHAMED MUBAYYID, EMADEDDIN Z. MUNTASSER and SAMIR AL-MONLA, Defendants | ) ) ) ) ) | |

**DEFENDANTS' SUPPLEMENTAL MEMORANDUM REGARDING
REFERENCES AT TRIAL TO THE 1993 WORLD TRADE CENTER BOMBING**

The defendants seek clarification as to whether the government will be allowed to make reference to the 1993 World Trade Center bombing ("WTC bombing") and herewith provide the court with further authority to insure that both the letter and the spirit of the court's limitations on reference to terrrorism, bin Laden and other highly prejudicial persons, organizations and actions, of which the WTC bombing is clearly one, are reflected in the statements to be made by counsel and the court to the jury next week. The defendants are concerned that the court's restrictions on references to terrorism, both in theory and in practice, be scrupulously observed, lest this Court's careful efforts to restrict the issues to be tried in this case and eliminate the danger of unfair prejudice be undermined, intentionally or not, by the parties or their witnesses.

In the hearings on November 6 and 7, this Court expressed grave concern as to the relevance and obvious prejudicial impact of newspaper articles which appeared in Newsweek and the New York Times in the spring on 1993 "linking" the New York office of Al Kifah, or certain of its members, to the WTC bombing. Those articles are mentioned in the indictment itself, in words

1

which parallel, almost verbatim, this court's concern with sloppy journalistic phrasing that implies connections when none have actually been proven. Thus, paragraph 3 of the indictment states:

> In 1993, media reports linked the New York office of Al-Kifah to the 1993 World Trade Center bombing. At or about the time of those media reports, MUNTASSER founded and incorporated in Massachusetts Care International, Inc. ("Care"), a purported Muslim charitable organization.

There is very little in either of these articles that proves anything about anything, much less anything having to do with this case. The Newsweek article, a classic of its genre, as the court has recognized, begins by suggesting that the Al Kifah office in Brooklyn was "more than an unassuming storefront, the center is a fixture in the matrix of fundamentalist passion, political rivalry and bloodshed that *may ultimately provide some answers to the Feb. 26 explosion*." Or not. the Newsweek article continues to describe the conflicts between Mustapha Shalabi, who ran the Al Kifah office until his death in 1991, and the blind sheik Rahmen, and the aquittal of an Al Kifah member El Sayyid Nossair who had been charged with the murder of Jewish extremist Meier Kahane, acknowledging, however, that *"[t]here is still no clear connection between this legacy of violence and the trade center bombing."* (Emphasis added.)

The New York Times articles are hardly more edifying. Two articles appeared in the April 11, 1993, edition of the Times. One, entitled "Slaying in Brooklyn Linked to Militants," and addressing the unsolved 1991 killing of Mustapha Shalabi, does not even mention Al Kifah. The import of the article is that "because of links between Mr. Shalabi and a man arrested in the bombing of the World Trade Center, officials are taking a renewed interest in the case. Law enforcement officials and friends of Mr. Shalabi, most of whom spoke on the condition that they not be named, said the key to one crime may help unlock the other." Tabor, <u>Slaying in Brooklyn Linked to</u>

2

Militant.  The other article, which starts on the front page of the Metro section and continues on the same Metro page as the Tabor article, focuses on the parallel efforts of the CIA in arming the Afghan rebels and the Brooklyn-based center in sending recruits to become foot soldiers in Afghanistan. "Now a year after the victorious rebel forces seized Kabul, the Afghan capital, the World Trade Center bombing has caused investigators to take a second look at the storefront office near downtown Brooklyn that quietly sent fighters to the far-off war. *For it was behind its doors that many of the people surrounding the bombing inquiry came together for the first time.*" (emphasis added.)  The word "Alkifah Refugee Center" appears only once in the article, in the sixth paragraph, as the organization that coordinated the Afghan aid effort.  Mitchell, *After Blast, New Interest in Holy War Recruits in Brooklyn*.

It is a stretch of language, itself highly speculative, to describe these articles as "linking" the Al Kifah Refugee Center to the 1993 World Trade Center bombing.  Yet the fact that a careful reading suggests more smoke than substance to the allegations hardly undercuts the potential prejudice that their introduction into this trial could create.  The evidence may be minuscule, but the danger of prejudice is enormous.

The World Trade Center bombing not only resulted in the deaths of innocent Americans but is associated, for obvious reasons, with the thousands of deaths eight years later in precisely the same location from the September 11, 2001 attack.  This court has rightly ruled that there should be no reference to the 9/11 WTC bombings in this case, or to Al Qaeda, or to Osama bin Laden.  Allowing the prosecution to evoke the image of the bombed twin towers by virtue of these speculative news stories regarding the earlier WTC bombing eviscerates the force of those well-reasoned holdings, and does so without any significant probative force to support it.

In *United States v. Damrah*, see transcript in Appendix to Defendants' Motion in limine, which involved one of the founders of the Brooklyn mosque which was located in the same building as Al Kifah New York, the government voluntarily dropped its request to offer any testimony related to the 1993 WTC bombing, even though Mr. Damrah – unlike any of the defendants here – was a close associate of Mr. Shalabi and knew many of the individuals referred to in the news accounts excerpted above; indeed, his own name is mentioned in one of the articles. How stunning that in a case set in Brooklyn, in the very building that housed the New York Al Kifah Refugee Center, the government would *voluntarily* agree to avoid the very sort of inflammatory evidence which it seeks to introduce here.

Similarly, in *United States v. Paracha*, see transcript in Appendix to Defendants Motion in Limine, which was a material aid to terrorism case involving Al Qaeda, again set in New York, Judge Stein specifically precluded the government from making any reference to the 1993 WTC bombing, or to 9/11, or to any specific terrorist plot. Judge Stein concluded, on facts far more compelling for allowing such references than those present in this false statement/tax case based in Boston, that "the probative value of the specific plots is substantially outweighed by the danger of unfair prejudice. Mr. Paracha is not alleged to have any connection to those plots . . . ." The government in this case does not allege any connection between the WTC bombing and any of Mr. Muntasser, Mr. Al-Monla, or Mr. Mubayyid.

At most, if the prosecution insists and this court orders, the government should only be allowed to tell the jury that two unflattering articles about Al Kifah New York appeared in the days prior to the filing of incorporation papers by Care in Boston. Even that is, in the defense view, uncalled for, in terms of its probative value or the presence of an adequate predicate, given that there

is no evidence that any of the defendants read, or heard about, either the article in Newsweek or the articles in the New York Time , given that it takes far longer than a few days and the filing of articles of incorporation to form a non-profit, and that the government itself is presenting evidence that Mr. Muntasser began the process of forming CARE well before these articles appeared; and especially because motives are in any event irrelevant to the tax law question of whether Care is a successor of Al Kifah.  But to go beyond such a limitation on this evidence, and allow the government to make specific reference to the WTC bombing would, in the defense's view, open the floodgates of unfair jury prejudice that the court has otherwise been so careful to forestall, in recognition that this case is NOT about terrorism, and would constitute clear and reversible error.

Repeatedly during the oral argument on these motions, counsel for the defendants have attempted to clarify what it is that the government alleges Care is the "successor or outgrowth" of. Is it Al Kifah New York, the corporate entity, which shared no officers or directors with Care?  Or is it the Boston branch, which was staffed by volunteers and had no separate corporate structure of its own?  The answer to that question is obviously vitally important in clarifying just exactly what it is  that Care supposedly did wrong; a criminal statute may be clear, a question on an IRS form may not be unconstitutionally vague, but if the government chooses to apply those provisions in an indictment in a way that leaves a defendant guessing as to exactly what he has been charged with doing wrong, the constitutional requirements of fair notice may nonetheless be violated.

The government's answer to defendant's repeated requests, raised most forcefully in oral argument by Mr. McGinty, was telling.  Al Kifah, says Mr. Cabell, "is a beast."  That is as far as the government will go to defining what they claim the "predecessor" organization is to Care.

It seems clear, especially in light of this deliberate ambiguity as to what "Al Kifah" is, that

5

the government's purpose in introducing these newspaper articles, seeking to mention the WTC bombing, and apparently seeking to include additional gratuitous references to such irrelevant figures as the blind sheikh[1] is to paint Al Kifah (indeterminately Al Kifah New York or Al Kifah Boston) in such a poisonously detrimental light that any connection between it and Care, in whatever formulation, even if insufficient to justify tax classification as a successor, would damn these defendatns in the eyes of the jury as associates of terrorists. That is fundamentally unfair, fundamentally prejudicial and unconstitutional, and precisely what the rules of evidence should be applied to exclude. This court should, consistent with its determination to avoid unfair prejudice in its rulings on November 7, exclude any reference to the WTC bombing from this case.

Respectfully submitted,

| | |
|---|---|
| EMADEDDIN Z. MUNTASSER<br>By his attorneys, | MUHAMED MUBAYYID<br>By his attorney, |
| | /s/ Michael C. Andrews |
| /s/Susan R. Estrich | Michael C. Andrews (BBO#: 546470) |
| Susan R. Estrich | 21 Custom House Street |
| Robert Kingsley Professor of Law and Political Science | Boston, MA 02110<br>(617) 951-0072 |
| University of Southern California Law School | SAMIR AL-MONLA |
| University Park, MC-0071 | By his attorney, |
| Los Angeles, CA 90089-0071 | |
| | /s/ Charles P. McGinty |
| /Norman S. Zalkind | Charles P. McGinty (BBO # 333480) |
| Norman S. Zalkind (BBO#: 538880) | Federal Defenders |
| Elizabeth A. Lunt (BBO#: 307700) | 408 Atlantic Avenue |

---

[1] See *Government Motion in Limine to Exclude Evidence Regarding Care's Irrelevant Activities*, at 3: "In April 1993, after a variety of events, including broad media exposure linking the New York office of Al-Kifah to the 1993 World Trade Center bombing, the murder of Al-Kifah branch director Mustafa Shalabi, and Omar Abdel Rahman, Muntasser founded and incorporated Care . . . ." Shalabi was, in fact, murdered in 1991, two years before the founding of Care.

David Duncan (BBO#: 546121)  Boston, MA 02110
Zalkind, Rodriguez, Lunt & Duncan, LLP  (617) 223-8061
65a Atlantic Avenue
Boston, MA  02110
(617) 742-6020

Dated: November 9, 2007

## Certificate of Service

    I hereby certify that a true copy of the foregoing document was served this day upon all counsel of record by electronic filing.

                           /s/ David Duncan