UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
UNITED STATES OF AMERICA,                 )
                          Plaintiff       )
                                          )
V.                                        )
                                          )      CRIMINAL NO.  05-40026-FDS
MUHAMED MUBAYYID,                         )
EMADEDDIN Z. MUNTASSER and                )
SAMIR AL-MONLA,                           )
                          Defendants      )
_____)

**DEFENDANTS' OPPOSITION TO GOVERNMENT'S MOTION *IN LIMINE*
TO EXCLUDE EVIDENCE OF IRS FILINGS
OF NON-SIMILARLY SITUATED ORGANIZATIONS**

The defendants submit this Memorandum regarding IRS filings of other organizations, pursuant to the court's suggestion at oral argument on Thursday, November 8, on the government's Motion to exclude such evidence.

The government seeks to exclude a number of proposed defense exhibits. Some of these are the IRS review files for organizations applying for tax-exempt status[1], and some are Forms 990 (exempt organization returns) filed by a number of tax-exempt organizations, together with Guidestar and/or IRS Publication 78 materials on tax-exempt organizations[2]. The two categories of exhibits are offered for different reasons, but both are relevant and are not unfairly prejudicial to the government – indeed, they are the government's own words and actions and the defendants seek to introduce them as such.

_____

[1]These are Defense Exhibits D-63 to D-74, D-154, D-157 to D-160 and D-162.

[2]These are Defense Exhibits D-140 to D-151.  The defendants will not seek to introduce Exhibit D-152 at trial.

1

First, the defendants seek to introduce the 990's and Guidestar/Publication 78 information with respect to organizations to which Care gave donations. This is relevant because, the defendants anticipate, their tax expert will testify that giving money to a domestic tax-exempt organization is sufficient due diligence on the part of Care, without more, to see that its moneys were spent for a charitable purpose. The government's theory, that Care was engaged in non-charitable activity and, indeed, that it was planned (by the defendants) from the beginning that Care would engage in non-charitable activity, is rebutted in part by showing that Care exercised appropriate due diligence to insure that its money went to legitimate, charitable purposes. These exhibits are highly relevant to this end. The government's Motion misses this point.

The remaining exhibits, contrary to the government's argument, are also extremely relevant to this case. The government correctly surmises that these exhibits bear on the issue of materiality, in particular materiality of the supposedly critical omission from Care's Form 1023 application of a copy of *Al Hussam*, the newsletter which is the government's "crown jewel" in this case. The defendants anticipate that their expert, Marcus Owens, will testify that, having reviewed the *Al Hussam*s that will be introduced by the government, the contents would not have been material to a determination whether Care was entitled to tax-exempt status, especially since, from reviewing Care's Form 1023 and subsequent Forms 990, it appears that Care treated the *Al Hussams* as fundraising expenditures rather than as program expenditures, and that Care did not include education as one of its proposed activities in its Form 1023. He will further opine that, even considering the *Al Hussams* as educational materials, the religious and expressive nature of the discussions contained in them entitle them to First Amendment protection and the IRS's policy, now and in the 1990's when Care submitted its application for recognition of exemption, would be to

disregard the content in reviewing the application.

The applications of other organizations that the defendant seeks to introduce both illustrate and comprise this policy. Mr. Owens was the head of the Exempt Organization Division of the IRS from 1990 to 2000, and the National Office was under his direct supervision. He will testify that the National Office was staffed by the most experienced, knowledgeable reviewers, many of them accountants and lawyers who were more familiar than field personnel (including reviewers at the Key District Office level) with written policies and legal memoranda that were only available in the National Office and with the practices of the EO Division in determining whether particular organizations should qualify for tax-exempt status. The goal of the EO Division was to apply those policies uniformly to all applicants, and to insure that this took place, the reviewers in District Offices were instructed to refer cases to the National Office if they did not have published precedent to guide them in determining whether the organization qualified for exemption. The reviewers in the National Office, with superior knowledge, access to unpublished memoranda and to staff attorneys, were charged with reviewing files and insuring uniform application of IRS precedent.

The files the defendants intend to offer, with two exceptions, were all initially reviewed at a District Office level, then sent to the National Office for further review.[3] These files demonstrate the utter lack of materiality of the content of the *Al Hussams*, as well as the fact that Care's charitable

---

[3]Exhibit D-63, a file on the Afghan Foundation, was not referred to the National Office. It is included because the District Office sent a form questionnaire (C.I. 002122) to the applicant regarding proposed specific activities, including publications. The questions on this form are illustrative of the concerns of the IRS with regard to publications, none of which have to do with the content of the publication. D-154, the application of the National Endowment for Democracy, is offered in conjunction with other materials establishing that the NED, under the auspices of Congress, funded other organizations which explicitly "supported" the mujahideen and jihad in Afghanistan, in that, like Care, they published materials supportive of the mujahideen in their struggle against the Soviet invaders and the puppet government after the Soviets withdrew from Afghanistan. Defendants will also offer D-64, D-65, D-66, D-68, D-69, but not the remaining applications listed in their initial exhibit list.

purpose was completely in conformity with IRS policy. In the file for Afghan Mujahideen Information Bureau (AMIB), Exhibit D-64, the organizers included copies of a sample edition of their newsletter, which included extensive discussion of the actions of Gulbudin Hekmatyar, one of the Afghan Mujahideen who were engaged, by that point, in a civil war. Notwithstanding the presence of this newsletter, indistinguishable from *Al Hussam* in its expressions of support for the mujahideen and for jihad, in the militaristic sense, the file was neither referred to the National Office based on the content of the newsletter, nor did the content of the newsletter play any role in the National Office's determination that the organization was entitled to tax-exempt status.[4] With a copy of the newsletter in hand, the District Officer reviewer asked follow-up questions regarding how, and to whom, it was to be distributed, what it would cost to publish, and whether the organization proposed to charge recipients for it. The District Office then referred the case to the National Office, not because of the publication, but because the organization proposed to conduct activities in foreign countries. The National Office raised no questions about the content of the bulletin, but granted exemption.

---

[4]The government argues that because AMIB was granted 501(c)(4) status (as an organization promoting social welfare) the defendants' argument fails, as Care applied for and received exemption under section 501(c)(3)(as a charitable organization). For purposes of determining whether the submission of *Al Hussam* would have been a material factor in the IRS's consideration of its application, this is a meaningless distinction, and the defendants' expert would so testify. See Internal Revenue Manual §7.25.4.6 (promotion of social welfare is a charitable purpose. "Therefore, there is considerable overlap between IRC 501(c)(4) and IRC 501(c)(3). Many organizations could qualify for exempt status under either Code section.") If there is a public policy reason to deny tax-exempt status for expression such as both AMIB and Care engaged in, that reason applies equally to exempting an organization from taxation as to exempting an organization both from taxation and also allowing donors to deduct donations to the organization. See 1994 Exempt Organization CPE Text, Chapter L, "Illegality and Public Policy Considerations, at p. 175 ("Because 501(c)(4) organizations promote social welfare, the illegality doctrine's application may not be very different from the case of 501(c)(3) organizations' illegal activity." (excerpted chapter attached as Exhibit A)); Revenue Ruling 75-384 (organization proposing to engage in illegal activity of promoting civil disobedience can neither qualify for exemption under 501(c)(3) nor 501(c)(4), as both sections require "the promotion of social welfare"(attached as Exhibit B)).

The government argues that this evidence should not be admitted because AMIB is not "similarly situated" to Care, in "there is no indication that any organization acknowledged that it was supporting violent jihad and/or soliciting funds to support the mujahideen." The problem with this argument is that it ignores the defendants' defense. They maintain that they did *not* solicit funds to support the mujahideen, in the sense the government has charged in the indictment. The deliberate ambiguity of the government's charge that Care "supported" the mujahideen is put to the test by this, and other, filings of other organizations. The AMIB newsletter "supports" the mujahideen and jihad in precisely the same way that *Al Hussam* "supports" the mujahideen and jihad. The defendants' expert will testify that this expressive form of support is irrelevant to a determination whether Care qualified for tax-exempt status, and the fact that the National Office, charged with uniform application of IRS policies and procedures, raised no question about AMIB's publication supports Mr. Owens' opinion. This file, and the others the defendants seek to introduce, are not merely "other instances" of action or inaction by the IRS: they are evidence of IRS internal policy, as implemented by the National Office reviewers. Others of the proposed exhibits, notably D-68, the Afghan Resistance Relief Center, contain memos by the reviewer, outlining their reasoning and the precedent they follow in concluding that exemption is justified. These exhibits are, in fact, demonstrative of the precedent within the National Office for the handling of Care's subsequent application. Each of them constitutes review of an organization that proposes to conduct charitable (or in AMIB's case, social welfare)[5] activities in foreign countries, triggering National Office review. Each of them was

---

[5]It appears from AMIB's statement of purposes in its 1024 application that in fact it could have applied for exemption under 501(c)(3), as it proposed to distribute "financial and informational assistance" to Afghan refugees, and in answer to IRS questions the organization said it intended to send clothing and medicine to refugees. See I.R.M. §7.25.4.6, quoted in note 4 *supra*.

reviewed and approved based on prior IRS policies and practices, and many of them contain an articulation of the basis of approval. As such, they constitute clear evidence of the Exempt Organization Division of the IRS's policies, which bears on the question whether Care's failure to submit the *Al Hussam* newsletter to the IRS was material to the determination of tax-exempt status.[6]

The relevance of D-63 (the Afghan Foundation), showing a form IRS questionnaire about proposed publications with no questions about content, and D-64 (AMIB), including a pro-mujahideen publication whose content played no role in the IRS' review, either at the District Office or at the National Office level. D-65, the application of the Afghan Support Team filed on October 28, 1986, proposed *inter alia,* to analyze and develop solutions to problems faced by the Afghan resistance (read: Mujahideen, engaged in jihad), sensitize the American public to the conflict in Afghanistan, and produce "timely" reports on the course of the war in Afghanistan for the public. The application included a supplemental submission that outlined their proposed activities in 1987, in which they proposed to tailor their educational programs for the 13-19 year old Mujahideen in Afghanistan, teaching them via comic books. Their submission compares the Mujahideen to the Greeks at Thermopylae, the Jews at Masada, the Texans at the Alamo and the Soviets at Leningrad. If it might have escaped the IRS' attention that the organization intended to "support" the mujahideen, the organization's letterhead used to transmit its application to the IRS contains a

---

[6]Defendants are aware that the government contends that they conspired to hide Care's relationship with the Al Kifah Refugee Center and failed to disclose a purpose to "support jihad and the mujahideen by soliciting contributions for, and distributing publications to promote, jihad and the mujahideen." (Superceding Ind. ¶9 – the indictment is laced with other, similar references). Because the distribution of *Al Hussam* is central to the government's contentions, evidence of the immateriality of *Al Hussam* to the IRS's determination goes to the heart of the government's contentions. The defendants will maintain that they neither solicited nor expended funds for any purpose outside of their stated, charitable purposes, and to date the government has not shown any evidence of funds spent for any other purpose.

prominent logo next to the organization's name, consisting of a hand holding a rifle inside the outline of Afghanistan, which was specifically noted in the Memorandum referring the matter to the National Office.

In response to a request for samples of lectures, the organization supplied lecture note outlines which included a section on "American and Afghan strategy" noting that they "still need stingers, arsenal needs to be rounded out, Afghans must master basic guerrilla warfare" and so on.[7] The National Office reviewer concluded that "the organization has engaged in educational activities in its lectures and conferences. . . . it has described its educational program in sufficient detail to grant exempt status." The lecture outline provided by this organization supporting the mujahideen and jihad did not spur the National Office reviewer, with knowledge of the IRS' policies and practices, to recommend denial of tax-exempt status, or to ask for more material or to conduct further investigation. This file, like the AMIB file, provides precedent that in Care's case made the failure to submit *Al Hussam* immaterial.

In D-68, the application of the Afghanistan Resistance Relief Center, filed April 1, 1986, there is a lengthy and learned review of the file and of IRS precedent by Mr. Bloom, the National Office reviewer, making reference to a then-pending National Office review of the United States Council for World Freedom, which furnished "humanitarian (i.e. non-lethal) assistance to the fighting units attempting to overthrow the Nicaraguan government – the Contras." The reviewer

---

[7]It is clear from the materials submitted that the organization was predicated on the need for the Mujahideen to prevail in Afghanistan and then make a transition to governing the country. The organization expressed unequivocal support for the Mujahideen's battle, and proposed to engage in education to allow them to successfully make the transition to government, by teaching the young Mujahideen warriors concepts in "health and hygiene, agriculture in the guerrilla mode, the administration of liberated zones and the evolution from guerrilla movement to local government." Ex. D-65, at C.I. 002200

distinguishes the Afghan Resistance Relief Center's proposed activities, also provision of "humanitarian" aid to Afghan refugees, some of which would end up helping fighters, on the grounds that the target class of recipients was refugees, not fighters, and fighters would only incidentally benefit from the humanitarian relief provided by the organization. The reviewer also analogized this case to one involving humanitarian aid to survivors of Nazi concentration camps who had been relocated to Palestine, though it "appeared to serve the political goals of the Zionist movement," but was allowed because the recipients were victims of war and were destitute. This long analysis is relevant to Care because it makes clear that the IRS does not – and did not at the time Care's application was submitted – consider incidental non-charitable benefits flowing from the organization's charitable activities to disqualify the organization as exempt. To the extent the government may argue that Care's provision of humanitarian aid to widows or orphans of Mujahideen fighters constitutes prohibited "support" of the Mujahideen and Jihad, the review in this file – setting forth IRS policy – nullifies the contention. Care distributed its money to widows and to orphans of whom there were millions in Afghanistan (and other countries in which Care distributed charity). Some were widows and orphans of fighters, many more were widows and orphans of civilians caught in the crossfire, killed by bombings or dead of disease or starvation. The government will have no evidence that Care selected its beneficiaries based on how their husbands or fathers died. IRS policy set forth in this exhibit is relevant to show the total legitimacy of Care's charitable dispensations to widows and orphans.

In Exhibit D-69, Free Afghanistan Alliance, the organization also proposes to send medical and other supplies to refugees and acknowledges that fighters will benefit when they are in the refugee camps, either resting or wounded. The organization also informs the IRS that all of the

refugee camps are controlled and administered by factions of the Afghan resistance fighters (read:

Mujahideen), requiring the organization to administer its charitable aid through the administering

faction. Once again, despite the incidental benefits accruing to the Mujahideen, the National Office

reviewer concludes that exemption is justified.

These reviews, implementing and creating the precedent for Care's application, establish the

immateriality to Care's application of the failure to submit *Al Hussam* with Care's application. They

further establish, as a matter of IRS policy, the legitimacy of Care's activities supporting widows and

orphans without regard to how the husband or father died and, further the legitimacy of Care's

provision of meat for Eid, a religious feast at the end of Ramadan, to Mujahideen as well as other

Afghans. They are, for these reasons, relevant and admissible. They will complement and

underscore the testimony of Mr. Owens, the defendants' expert. They should be admitted.

Respectfully submitted,

EMADEDDIN Z. MUNTASSER
By his attorneys,

/s/ David Duncan
Norman S. Zalkind (BBO#: 538880)
Elizabeth A. Lunt (BBO#: 307700)
David Duncan (BBO#: 546121)
Zalkind, Rodriguez, Lunt & Duncan, LLP
65a Atlantic Avenue
Boston, MA  02110
(617) 742-6020


/s/Susan R. Estrich
Susan R. Estrich
Robert Kingsley Professor of Law and
Political Science
University of Southern California

MUHAMED MUBAYYID
By his attorney,

/s/ Michael C. Andrews
Michael C. Andrews (BBO#: 546470)
21 Custom House Street
Boston, MA 02110
(617) 951-0072

SAMIR AL-MONLA
By his attorney,

/s/ Charles P. McGinty
Charles P. McGinty (BBO # 333480)
Federal Defenders
408 Atlantic Avenue
Boston, MA 02110
(617) 223-8061

Law School
University Park, MC-0071
Los Angeles, CA 90089-0071

Dated: November 12, 2007

## Certificate of Service

I hereby certify that a true copy of the foregoing document was served this day upon all counsel of record by electronic filing.

/s/ David Duncan

# L. ILLEGALITY AND PUBLIC POLICY CONSIDERATIONS[1]
### by
### Jean Wright and Jay H. Rotz

## 1. Overview

The recent increase in the use of gambling by exempt organizations to raise money, the release of GCM 39862 (November 22, 1991) discussing Medicare and Medicaid fraud, and other factors, have intensified interest among some commentators, practitioners and Service personnel in the possibility that organizations may be denied exemption under Internal Revenue Code 501 or have their exempt status revoked on the basis of illegal behavior. This article explains why tax exempt organizations may jeopardize their exempt status if they engage in illegal activity, and describes the implications of various types of illegal activity for different types of exempt organizations.

It is important to emphasize that, in most cases, if an organization has engaged in substantial illegal activity, it has also run afoul of other basic principles of tax exemption and may be subject to revocation on those grounds, independent of the illegality issues. For example, where a hospital violates the Medicare and Medicaid Anti-Fraud and Abuse statutes by giving kickbacks to staff doctors who refer patients to the hospital, it may have also violated the proscription against private inurement. In other situations, issues of substantial amounts of private benefit or insufficient community benefit may be raised.

However, where the conduct does not create inurement and the private benefit is not substantial enough to cause revocation when the benefit is weighed against the community benefit, illegality may be the only remaining revocation issue. Since an illegality question often raises difficult issues of proof, administrative jurisdiction, and substantiality as discussed below, any other issues present in the case such as inurement or private benefit should be thoroughly considered in addition to an illegality argument.

## 2. Historical Background

### A. Evolution from Trust Law

---

[1] The Exempt Organization Continuing Professional Education Technical Instruction Program for 1985 discusses illegal activity by exempt organizations in detail at pages 109-124.

All organizations seeking exemption under 501(c)(3) must conform to certain fundamental legal principles applicable to all charitable organizations. Treas. Reg. 1.501(c)(3)-1(d)(2); Rev. Rul. 67-325, 1967-2 C.B. 113, 116-7. See also Rev. Rul. 71-447, 1971-2 C.B. 230; Rev. Rul. 75-231, 1975-1 C.B. 158. One of these basic charitable principles is that charitable organizations may not engage in behavior that is illegal or violates public policy.

The illegality doctrine derives from English charitable trust law, the legal foundation on which 501(c)(3) was built. Under charitable trust law, trusts violating law or public policy cannot qualify for charitable status. Restatement Trusts (Second), 377, Comment c (1959); IVA A. Scott, The Law of Trusts, 377 (4th Ed. 1989). Thus, the "illegality doctrine" encompasses illegal activity as well as activity in violation of public policy. See, infra Section 4.A.

The Service views illegality as one of the criteria by which an organization's activities are evaluated. Rev. Rul. 80-278, 1980-2 C.B. 175, established a three-part test to determine whether an organization's activities will be considered permissible under 501(c)(3): (1) the purpose of the organization is charitable; (2) the activities are not illegal, contrary to a clearly defined and established public policy, or in conflict with express statutory restrictions; and (3) the activities are in furtherance of the organization's exempt purpose and are reasonably related to the accomplishment of the purpose.

B. Tax Policy Basis for Doctrine

Tax exemption for charitable organizations is often justified on the grounds that charitable organizations lessen the burdens of government by providing benefits to the public which would otherwise have to be furnished by the government. H.R. Rep. No. 1820, 75th Cong., 3d Sess. 19 (1930). Trinidad v. Sagrada Orden, 263 U.S. 578, 581 (1924); Jackson v. Statler Foundation, 496 F. 2d 623, 634 (2d Cir. 1974); St. Louis Union Trust Co. v. United States, 374 F. 2d 427, 432 (8th Cir. 1967); Duffy v. Birmingham, 190 F. 2d 738, 740 (8th Cir. 1951); Walz v. Tax Commission, 397 U.S. 664, 680, 687 (1970) (Brennan, J., concurring).

Because benefit to the public is an underlying justification for charitable tax benefits, organizations which increase governmental burdens cannot justify tax exemption. Organizations engaged in illegal activity increase the governmental burden of law enforcement, while activities that are inconsistent with public policy

obviously increase, rather than reduce, governmental costs and burdens, and are inconsistent with the basic requirement that exempt organizations serve a public purpose. The Supreme Court has said:

> ...[I]t would be anomalous for the Executive, Legislative and Judicial Branches to reach conclusions that add up to a firm public policy ..., and at the same time have the IRS blissfully ignore what all three branches of the Federal Government had declared.

Bob Jones University v. United States, 461 U.S. 574 (1983) at 598.

The illegality doctrine acts as a check to assure that the federal government does not support through tax exemption an organization engaged in behavior the government is charged with preventing. As a district court noted in an oft-quoted passage, if it were not for the limits of the illegality doctrine, "...Fagan's school for pickpockets would qualify for a charitable trust." Green v. Connally, 330 F. Supp. 1150 (D.C.D.C. 1971) (three judge panel), aff'd per curiam sub nom., Coit v. Green, 404 U.S. 997 (1971). The government has an interest in not subsidizing criminal activity. The Tax Court noted in Church of Scientology of California v. Commissioner, 83 T.C. 382, 506 (1984) that, "Were we to sustain petitioner's exemption, we would in effect be sanctioning petitioner's right to conspire to thwart the IRS at taxpayer's expense. We think such paradoxes are best left to Gilbert and Sullivan."

## C. Bob Jones and other Racial Discrimination Cases

The most celebrated application of the charitable trust law principle that organizations violating law or public policy are not charitable occurred in Bob Jones University v. United States, supra. Until 1970, the Service granted tax exempt status to private schools without regard to the schools' racial policies. In that year, a District Court issued a preliminary injunction prohibiting the Service from recognizing tax exempt status of private schools in Mississippi that discriminated as to admissions on the basis of race. Green v. Kennedy, 309 F. Supp. 1127, appeal dism'd sub nom., Cannon v. Green, 398 U.S. 956 (1970).

After that decision, the Service announced it would no longer allow tax exempt status for discriminatory schools. The Service's change in position was ratified in Green v. Connally, supra, which enjoined the Service from approving tax exempt status for any school in Mississippi that did not publicly maintain a policy of nondiscrimination.

The Service set out its new position in Rev. Rul. 71-447, 1971-2 C.B. 230, stating:

> Both the courts and the Internal Revenue Service have long recognized that the statutory requirement of being `organized and operated exclusively for religious, charitable,...or educational purposes' was intended to express the basic common law concept [of `charity']....All charitable trusts, educational or otherwise, are subject to the requirement that the purpose of the trust may not be illegal or contrary to public policy.

The national policy against racial discrimination was reflected in the Civil Rights Act of 1964, Brown v. Board of Education, 347 U.S. 483, 500 (1954), and other court cases.

The Service eventually revoked Bob Jones University's exempt status. After numerous appeals and remands, the University's case made its way to the Supreme Court, along with that of Goldsboro Christian Schools, Inc v. U.S., 436 F. Supp. 1314 (E.D. N.C., 1977), whose exempt status had also been revoked because of racial discrimination. The Supreme Court decided both cases in Bob Jones University, supra, citing charitable trust law and its application in over one hundred years of legal precedent and Congressional history to support the Court's position that charitable organizations may not violate the law or public policy.

While the Bob Jones case has prompted much discussion about whether the illegality doctrine could be applied to organizations involved in gender or other types of discrimination, it has so far not been applied beyond its original sphere of racial discrimination. See Section 4.A. infra.

D. Anti-war Protests and Confrontational Activity

Another area in which the illegality doctrine has been applied concerns organizations involved in protests. An organization whose primary activity is sponsoring protest demonstrations at which participants are urged to deliberately block vehicles and pedestrians, disrupt the work of government, and prevent the movement of supplies is not exempt under 501(c)(3). Rev. Rul. 75-384, 1975-2 C.B. 204. In that ruling, the organization's activities violated local ordinances and constituted "breaches of public order." They demonstrated an illegal purpose inconsistent with charitable ends, and increased the burdens of local government.

Compare Rev. Rul. 80-278, 1980-2 C.B. 175, in which the confrontations were accomplished through the courts and were clearly not illegal.

3. Substantiality Requirement

    A. Importance of Substantiality

       If an organization has an illegal purpose, it will not qualify for exemption. In Church of Scientology of California v. Commissioner, supra, the court did not need to address the issue of substantiality because it found that one of the organization's purposes was criminal tax fraud.

       However, assuming that an organization's purposes are legal, the substantiality of the illegal activities will determine whether the exempt status is jeopardized. An organization will not qualify for exempt status if it engages in substantial illegal activity.

       Substantiality must be considered quantitatively as well as qualitatively. The quantitative test focuses on the time and attention the organization gives to the illegal activity. No exempt organization may engage in a substantial amount of activity that does not further exempt purposes. Treas. Reg. 1.501(c)(3)-1(c). Therefore, substantial activity that does not further exempt purposes is inconsistent with exempt status, regardless of its illegality.

       The qualitative test focuses on the seriousness of the illegality involved, and the extent to which the activity can be attributed to the organization by virtue of the involvement of directors or officers or through clear ratification of the organization's governing body. See Section 6. The illegal activity may be so serious that even an isolated incident would outweigh the organization's other activities and be a basis for revocation or denial of exemption, regardless of the nature and extent of its exempt activities.

    B. Measuring Substantiality

       The Supreme Court has not considered the issue of how to weigh illegal activity against activity that does further exempt purposes. It concluded in Bob Jones that racially discriminatory private schools could not be said to confer a benefit on the public, so it did not need to address the issue of whether illegal activity per se, regardless of its substantiality, can justify revocation of a 501(c)(3) organization's exempt status. The Court expressly reserved judgment on the issue

of whether an organization providing a public benefit and otherwise meeting the requirements of 501(c)(3) could be denied exempt status if certain of its activities violated a law or public policy. <u>Bob Jones</u> at 596.

The question of substantiality of illegal activity was considered in GCM 34631 (October 4, 1971). That memorandum concerned an association alleged to be involved with organized crime, which was said to have used force and violence to silence a newspaper opposed to the organization.

The GCM states that it is insufficient to consider only the quantitative basis for determining substantiality. The nature of the acts is as important as the ratio that illegal activities bear to activities that further exempt purposes.

A great many violations of local pollution regulations relating to a sizable percentage of an organization's operations would be required to disqualify it from 501(c)(3) exemption. Yet, if only .01% of its activities were directed to robbing banks, it would not be exempt. This is an example of an act having a substantial non-exempt quality, while lacking substantiality of amount. A very little planned violence or terrorism would constitute `substantial' activities not in furtherance of exempt purposes.

GCM 39862, which addresses a hospital's sale of its net revenue stream, cited GCM 34631 in relation to the possibility that the arrangement at issue violated the anti-kickback rules of Medicare and Medicaid. GCM 39862 at 30. <u>See</u> .VII(B) <u>infra</u> for a detailed discussed of these laws. The memorandum did not attempt to resolve whether the possible violations of the fraud and abuse laws by the hospital at issue were substantial under the GCM 34631 standards.

GCM 39862 concluded that the substantiality of illegality varies according to the character and nonexempt quality of the activity, and notes several factors that it deemed important to a resolution of the substantiality issue in the case. The factors supporting a finding that the non-exempt conduct of financially inducing doctors to make referrals was substantial were: 1) the public policy violation was authorized by the tax-exempt organization's directors and most senior managers, who had knowledge of the risk that the organization's activity might violate public policy; 2) the public policy violation was central to the activities through which the organization accomplished its exempt purposes; and 3) the public policy violation was potentially harmful to the charitable class that the organization serves. GCM 39862 at 30, fn. 16.

The potential illegality of the activity made it more serious, and thus lent weight to the qualitative part of the substantiality analysis. It should be noted that GCM 34631's analysis assumes illegality. In most situations involving exempt organizations, including the one described in GCM 39862, no authority has determined that the specific alleged behavior was illegal. GCM 39862 did not have to resolve the issue of substantiality since the arrangement created private inurement and substantial private benefit.

C. <u>Violations Allegedly in Furtherance of Exempt Purposes</u>

GCM 34631 addressed the issue of whether violating the law could further exempt purposes, citing an example of a situation where illegally obtained funds are used to finance a charity. GCM 34631 at 6. The GCM flatly states that since exempt purposes may generally be equated with the public good, and violations of law are "the antithesis of public good," illegal activity does not further exempt purposes. It adds that since illegality increases the government's crime fighting burden, an organization engaged in such activity harms rather than promotes social welfare.

Recently, GCM 39862 reaffirmed this position and clarified that a hospital does not further its exempt purposes by inducing or rewarding patient referrals in violation of federal law. <u>Id.</u> at 34. The memorandum did allow for the possibility that a hospital's participation in a joint venture or other economic arrangement with physicians could seemingly benefit the community and further charitable purposes, while at the same time possibly have an intention to induce or reward referrals. <u>Id.</u> at 35, n. 16.

GCM 39862 suggests conditioning the hospital's ruling on the arrangement not violating the Medicare and Medicaid anti-kickback statute. Thus, even where the Service has approved of a hospital's proposed joint venture, a finding by HHS that the activity violated the anti-kickback statute would probably cause revocation of the ruling and possibly cause loss of exempt status for the period in which the violations occurred.

In the example posed by GCM 39862, the hospital's practice may or may not violate the Medicare and Medicaid Anti-Fraud and Abuse statutes. However, the safe-harbor regulations published in 1991 by the Department of Health and Human Services do not cover a hospital's purchase of a physician's practice which may be proscribed under the broad language of the Anti-kickback Statute. The

issue of activity that ostensibly furthers exempt purposes while possibly violating the fraud and abuse laws arises commonly in integrated delivery system rulings. In those cases, the Service conditions the ruling on the entity not violating the anti-kickback restrictions. See, "Integrated Delivery Systems," this volume, at Section 2(B).

Another example of activity that may violate the fraud and abuse statute even though it arguably otherwise furthers charitable purposes is a medical office building lease arrangement between a hospital and a doctor at fair market value. Rev. Rul. 69-463, 1969-2 C.B. 121. Having doctors nearby may be convenient for patients and improve access to doctors, but the lease may violate the Fraud and Abuse statutes unless it is an executed written agreement for a term of not less than one year, specifies the premises covered by the lease, and sets out the rent in advance at fair rental value without regard to the volume or value of any business generated between the lessor and lessee Fed. Reg. 35,952, 35,985 (July 29, 1991).

Caveating ruling letters partially resolves this dilemma since it puts the parties on notice that they should not rely on the ruling if a violation is found by the governmental body with the authority to do so. It follows that where an exempt organization has been found to violate a statute that reflects an important public policy, it should be aware that the violation is inconsistent with exempt status and may jeopardize exemption for the period in which the violations occurred.

4. Importance of the Underlying Public Policy

A. Public Policy Requirement

The illegality doctrine contains two distinct parts. According to the Supreme Court in Bob Jones, supra, it prohibits both illegal activities and those that, while not necessarily illegal, are contrary to a fundamental public policy. Bob Jones at 592 (emphasis added). Bob Jones is the only case to date in which an organization was alleged only to have violated public policy and not any specific law. In most situations, the activity in question has violated a law, so the underlying public policy simply lends weight to the illegality argument rather than having to stand alone.

The more important the public policy furthered by a particular law, the more likely that a violation of that law will be considered substantial enough to warrant revocation. For example, the public policy implications of hospitals giving kickbacks for patient referrals have been discussed at length in Congressional

hearings. See 7.A. infra. A number of statutes have been enacted and strengthened over the years. The Department of Health and Human Services has a special office charged with enforcing these statutes. Therefore, violations of the anti-kickback statute would probably weigh heavily in Service assessments of a hospital's charitability. See GCM 39862 at 29-36.

B. Sources of Public Policy

Deciding a case on the basis of public policy rather than a specific law is difficult because it requires discerning what the public policy involved really is. The Supreme Court in Bob Jones looked to federal legislation and executive orders to ascertain the public policy in that case. Bob Jones at 594-5. The Court emphasized that had Congress disagreed with the Service's interpretation of public policy in the Bob Jones case, it could have legislatively reversed the decision to revoke exemption. Because Congress had not done so in the 11 years between the initial decision to revoke the University's exemption and the time the case reached the Supreme Court, there was "an unusually strong case of legislative acquiescence" in the Service's interpretation of public policy. Bob Jones at 599. In those 11 years, there had been 13 bills introduced in Congress to overturn the Service's interpretation of 501(c)(3) as forbidding racial discrimination. All of them died in committee. More importantly, Congress enacted 501(i) forbidding racial discrimination by private social clubs on the same rationale the Service used in Rev. Rul. 71-447. Bob Jones at 601-2.

The focus on public policy in the illegality cases, particularly in the only Supreme Court case on the subject, Bob Jones, suggests the possibility that an organization's exempt status may change in response to changes in public policy. Just as the public policy changed over many years to prohibit racial discrimination which had previously been allowed, public policy could change in other areas as well.

For example, for many years, the Service had not taken notice of the possibility that hospitals were violating the Medicare and Medicaid anti-fraud and abuse laws, and the implications of those violations for exempt status. GCM 39862 changed that situation, at least in part because of the increasing importance the Congress and HHS have placed on the enforcement of the anti-fraud and abuse laws in the last several years. Just as the Service responded to public outrage over racial discrimination in education in Bob Jones and to possible kickbacks in GCM 39862, the Service can be expected to re-evaluate positions in other areas as the public policy considerations become more clearly focused because of

Congressional action, decisions of the Executive Branch, or court actions.

C. State or Federal Law

Several General Counsel Memoranda have considered alleged violations of state and local law and concluded that the Service must recognize any Constitutionally valid law, not merely federal ones. This question sometimes arises where an organization allegedly has violated state and local gambling laws.

GCM 34631 concerned an association said to be involved with organized crime. The organization's alleged acts of intimidation and violence allegedly violated state law. The memorandum stated that:

> ...violation of any constitutionally valid laws is inconsistent with exemption under section 501(c)(3)...[citing GCM 617795 (Aug. 14, 1959)]. That memorandum bases its conclusion upon the rationale that contravening state laws (1) is not in furtherance of exempt purposes, and (2) is contrary to public policy.

GCM 34631 at 6. See also Rev. Rul. 75-384, 1975-2 C.B. 204 (anti-war protest organization's violations of local law warranted revocation of 501(c)(3) status).

It is theoretically possible that a state or local law could contravene a fundamental federal policy. In that case, Service revocation of exempt status on the basis of a violation of that statute arguably would be inappropriate. To date, no such case has arisen.

5. When Should the Service Take Action?

A difficulty in applying the illegality doctrine is that it may not always be easy to determine whether the activity in question was actually illegal. This is particularly true where the statute in question is outside the Service's jurisdiction. Where the activity does not violate tax laws, the Service must either rely on another governmental body's determination of illegality or make its own. Each of these situations poses problems.

A. Uncontested Violations

In some situations the illegal activity is so blatant as to demand action by the Service. For example, agents often encounter gambling operations that clearly

violate state law, but which will not likely be aggressively prosecuted because the state does not have the resources to enforce the gambling laws. Sometimes, the organization may not even deny that its operations violate the law. In cases where the illegality is uncontested, the Service may pursue the possibility of revocation on the basis of those activities without a specific determination of illegality by state authorities.

B.    Where Agency with Enforcement Responsibility Has Not Taken Action

Generally, the Service should not rush to unilaterally declare activity illegal unless it is clearly within the Service's jurisdiction to do so. GCM 37111 (May 4, 1977) stated that an activity has to have been judicially determined to be in violation of a provision of law before the Service will revoke exemption on the basis of illegal activity. According to GCM 37111:

> The Internal Revenue Service is not in a position to make determinations as to the illegality of an act under a provision of law other than the Internal Revenue Code. The Constitution of the United States provides for separation of powers, and a determination of illegality in such cases is within the province of the judiciary. From an administrative standpoint alone, such a task would be impossible for the Internal Revenue Service to undertake. From a legal standpoint, moreover, the onus which attaches to a determination of illegality is such that it would be improper to delegate such a determination to an administrative body without the procedural and substantive due process protection provided through the judicial process.

GCM 37111 at 11.

An example of a situation in which the Service declined to declare activity illegal arose in GCM 37741 (Nov. 9, 1978). That GCM concerned the issue of whether an organization's activity of contacting and encouraging others to contact foreign government officials violated U.S. law governing contact between U.S. citizens and foreign governments. The memorandum concluded that the Treasury Department was not qualified to make the assessment, and recommended that the Treasury department coordinate with the State and Defense Departments to determine whether the activity was illegal.

GCM 39862 also made this point in connection with the Medicare and Medicaid Anti-Fraud and Abuse Statutes. Where the courts and the administrative agency responsible for administering a nontax statute have not found it applicable to a particular arrangement, the IRS should not rush to do so unnecessarily. GCM 39862 at 37.

It is important to note that all of these statements concern situations where the Service is evaluating the impact of illegality per se on the organization's exemption. If the Service determines on audit that an organization is not primarily engaged in activities that further its exempt purposes, its exemption may be revoked on that basis alone.

## C. Pre-conviction settlement

In some cases, an organization may enter into an agreement with a federal agency to halt the activity in question without ever having been found guilty of any improper behavior by a court. This is a common scenario in cases involving hospitals and the Anti-Fraud and Abuse statutes. While a conviction for illegal behavior virtually demands that the Service take the activity into account in considering qualification for exemption, a settlement prior to conviction may be slightly less compelling. Where the settlement takes into consideration such things as inadvertence, vagueness of the law, restitution, discontinuation of the practice, or other factors tending to indicate compliance for the future, the arguments for revocation or denial may be less compelling.

## 6. Attribution Issues

An exempt organization often engages in activity through its members or officers without documentation to clearly show whether the individual was acting for the organization or on his or her own. Thus, questions of attribution will often arise in connection with activity that may jeopardize exemption, particularly where those acts may also be illegal.

## A. Officers and Employees

Chief counsel has concluded that the Service will hold an organization responsible for its officers' and employees' actions when: 1) the organization's officials act under actual or purported authority to act for the organization; 2) agents for the organization act within their authority to act; or 3) acts are ratified by the organization. GCM 34631 at 10.

For example, if an officer of an organization encourages illegal activity in an organization's newsletter or at a conference, the statements will be attributable to the organization itself unless the organization provides sufficient evidence that the acts were unauthorized at the time and not later condoned or encouraged through the organization's inaction.

B. Members

An organization will not generally be held accountable for unauthorized activities of its members. Rev. Rul. 75-384, 1975-2 C.B. 204. If the illegal activity is minor in a quantitative sense, the Service will require clearer proof of authorization or ratification of the members' acts before attributing the activity to the organization. G.C.M. 32651 (Aug. 29, 1963)(organization exhorted members to follow their own consciences regarding military service, but did not knowingly counsel, aid or abet others to refuse or evade registration or service.)

In GCM 38415 (June 20, 1980), an environmental group used confrontational tactics against foreign commercial interests in an attempt to stop hunting of endangered animals. The U.S. government had condemned the hunting on a number of occasions. The organization did not advocate any illegal action, although there were "incidental brushes by [organization] members with the legal authorities in various jurisdictions... We found no evidence that any potentially illegal activity engaged in by ...[the organization's] members was authorized or condoned by ...[the organization]."

The organization itself was found not to have authorized or condoned illegal activity. Furthermore, there was evidence that the organization had removed from its Board of Directors and from membership in the organization a person who had been involved in several illegal acts at legal demonstrations sponsored by the organization.

Where an organization urges its members to commit illegal acts, the organization's exempt status will be affected by the members' actions. Rev. Rul. 75-384, 1975-2 C.B. 204, concerned an organization formed to promote world peace. It planned and sponsored a protest demonstration at which members were urged to commit acts of civil disobedience. The Service ruled that the organization did not qualify for section 501(c)(3) or (4) status because its members' activities were attributed to the organization that had encouraged the action.

7. Potential Applications of Illegality Doctrine in Health Care

    A. Medicare and Medicaid Fraud and Abuse

    Several federal statutes have been enacted to address fraud and abuse in the Medicare and Medicaid programs.

        1. Anti-kickback Statute

          a. Provisions of the Statute

    The anti-kickback statute, U.S.C. 1320a-7b(1) and (2), prohibits kickbacks for referring a person to a particular provider for any item or service or for purchasing or inducing the purchase of any good, facility, or item for which payment may be made under Medicare or Medicaid.

    Hospitals, clinics and other health care institutions may be on either side of a kickback: 1) making payments to doctors to induce referrals; or 2) requiring payments by hospital-based physicians to the hospital as a condition of using hospital facilities. Joint ventures to own and operate clinical diagnostic laboratory services, durable medical equipment, and other services are examples of arrangements that could violate the anti-kickback provisions, depending on the structure of the arrangement and the intent of the parties involved. See Office of the Inspector General, Department of Health and Human Services, FRAUD ALERT: Joint Venture Arrangements (1992).

    The anti-kickback statute is a criminal provision, punishable by fines of up to $25,000 or imprisonment for up to five years, or both. In addition, violators may be excluded from Medicare and Medicaid participation through a civil proceeding.

    The anti-kickback provision casts a very wide net, and has been interpreted to include payments in part for legitimate services and in part intended to induce referrals. In United States v. Greber, 760 F.2d 68 (3d Cir.), cert. den., 474 U.S. 988 (1985), the court held that if one purpose of a payment is to induce referrals, then the statute has been violated, even if the parties also had other permissible motives. Greber's broad reading of the statute has been adopted either wholly or partially by two other circuits. United States v. Kats, 871 F.2d 105 (9th Cir. 1989); United States v. Bay State Ambulance and Hosptial Rental Serv. Inc., 874 F.2d 20 (1st Cir. 1989).

In 1991, the Office of the Inspector General ("OIG") of the Department of Health and Human Services published regulations designed to define "safe harbors" for 10 commercial arrangements that are technically covered by the broad provisions of the Anti-kickback statute, but which will not be subject to criminal or civil sanctions. These include interests in certain investments, employment relationships, personal service and management contracts, medical practice sales, space and equipment rental agreements, discounts, group purchasing organizations, waivers of coinsurance and deductibles, referral services and warranties.

## b. Implications for Exemption

Hospitals, more than most exempt organizations, are subject to a wide variety of criminal and civil sanctions designed to require them to provide specific services in a particular manner. These requirements tend to overlap a hospital's stated charitable purpose. Therefore, failure to abide by the requirements often affects a hospital's exempt status, regardless of whether the hospital's activities are illegal per se. In those situations, the analysis of the activity's effect on the hospital's exempt status should proceed in basically the same manner as would the analysis of any other non-exempt activity.

GCM 39862 discusses at length the effect of a possible violation of the fraud and abuse laws on the participating hospital's exempt status. The memorandum cites many of the same sources to which this article refers for the proposition that illegal activity undermines exemption, e.g., Scott on Trusts and Rev. Rul. 75-384. GCM 39862 at 29-30.

This line of reasoning assumes an adjudication that the conduct in issue is, in fact, illegal. The memorandum notes, however, that it is impossible to determine whether the conduct is illegal in advance, and that the Departments of Justice and Health and Human Services, not the Service, are responsible for its enforcement.

The Service will normally confront potential fraud and abuse violations in an advance ruling situation or on audit. Usually, neither the Departments of Justice nor Health and Human Services will have taken any position on the conduct's illegality. Thus, the illegality of the conduct will not usually be the basis for adverse action.

However, even if the facts of a particular situation do not allow for the use of the illegality doctrine, the underlying conduct of paying doctors to induce

referrals undermines a hospital's charitable purposes and may be questioned under a community benefit analysis or possibly private benefit or inurement. The legislative history of the anti-fraud and abuse laws describes a number of the ways in which paying for referrals harms the community's health and society generally. Payments for referrals can increase governmental burdens by creating incentives for unnecessary use of hospital services at government expense. Patients could be subjected to unnecessary procedures, or the selection of their treatment facilities could be based upon monetary rather than medical concerns. Referral payments undercut honest competition among health care providers based on quality or price, and may lead to an increase in prices or a decrease in service quality. Finally, referral payments may divert resources that the hospital might otherwise use to further exempt purposes. H.R. Rep. No. 231, 92nd Cong., 1st Sess. 107, reprinted in 1972 U.S. Code Cong. and Ad. News 4989, 5093; H.R. Rep. No. 393 (II), 95th Cong. 1st Sess. 48, reprinted in 1977 U.S. Code Cong. and Ad. News 3039, 3050. For all of these reasons, payments to induce referrals may be inconsistent with exempt status even if they have not been declared illegal by a court.

2. <u>False Claims</u>

a. <u>Provisions of the Statute</u>

In addition to the anti-kickback statute, there are also federal laws prohibiting submission of a false claim to the Medicare program. Violators may be subject to criminal, civil, or administrative liability for making false statements and/or submitting false claims to the government. 18 U.S.C. 287 & 1001; 31 U.S.C. 3729; 42 U.S.C. 1320a-7a. Penalties can include imprisonment, criminal fines, civil damages and forfeitures, civil monetary penalties, and exclusion from Medicare and Medicaid.

An example of the misstatement of claims is the routine waiver of patients' deductibles and copayments by health care providers, practitioners, and suppliers of health care items and services paid on the basis of charges. <u>See</u> Office of Inspector General, Department of Health and Human Services, FRAUD ALERT: Routine Waiver of Copayments or Deductibles Under Medicare Part B (1992). The Fraud Alert contains numerous examples of indications of improper waiver of deductibles and copayments.

b. <u>Impact on Exempt Status</u>

Improper waiver of copayments and deductibles hurt the Medicare program by increasing unnecessary utilization. Studies show that requiring patients to pay even a small portion of the costs of their care causes them to select items or services because they are medically needed, rather than simply because they are free. Also, increasing Medicare costs for services or encouraging unnecessary services costs money that could be used to pay for needed care. Fraud Alert at 3.

The reasoning set forth above regarding anti-kickback violations applies here as well. If a hospital is found by a competent authority to have violated the law, the organization would be subject to revocation, depending on the substantiality of the activity. If the activity has not been determined to be illegal, it may still be grounds for revocation because the activity itself so undermines the hospital's exempt purposes.

### 3. State Statutes

Most state health care laws include anti-kickback statutes that may not be identical to the federal laws. As discussed in Section 4.C., the fact that a law is state or local is not determinative as to whether the Service should take its violation into account in determining exempt status. Therefore, the reasoning discussed above concerning federal anti-kickback statutes applies here.

### B. Patient Dumping

"Patient dumping", the practice of refusing to treat indigent patients or referring them to other hospitals in medically inappropriate situations, is an example of overlap between requirements imposed on hospitals by tax law and the Medicare and Medicaid statutes. The practice is proscribed at 42 U.S.C. 1395dd. It has also been addressed by the Service. If a hospital has turned indigent patients away from its emergency room on a regular basis, it will have a difficult time showing that it qualifies for exemption under Rev. Rul. 69-545, 1969-2 C.B 117. That ruling holds that a hospital generally must provide emergency room services to all persons requiring health care irrespective of their ability to pay, and that it must participate in the Medicaid and Medicare programs. The fact that the ruling was written in 1969, thus predating the anti-patient dumping statutes by 17 years, underscores the fact that the impact of the practice on exemption does not depend on its illegality.

It could be argued that the fact of illegality should be considered when determining the substantiality of the activity. If an activity is illegal or violates

public policy, GCM 39862 provides guidance as to how this fact affects the substantiality analysis. Although GCM 39862 concerned violations of the Medicare and Medicaid Anti-Fraud and Abuse statutes, its reasoning might apply to patient dumping as well.

C. Anti-trust

Tax exempt organizations may be charged with violations of anti-trust and fair trade legislation. For example, the Federal Trade Commission ("FTC") has been aggressively seeking injunctions against hospitals on grounds of alleged violations of the Clayton Antitrust Act and the Federal Trade Commission Act, which prohibit unfair methods of competition. Wherever a hospital that is dominant in a market, or would be dominant after the acquisition, attempts to buy out its competition, the hospital could be in violation of antitrust statutes. 15 U.S.C. Sec. 18 provides that acquisitions and mergers which "may... substantially... lessen competition" or which will "tend to create a monopoly" in any area of commerce and in any section of the country are illegal.

One case involving an exempt hospital concerns the acquisition of a California hospital by Catholic Healthcare West ("CHW") and Dominican Santa Cruz Hospital ("Dominican") in 1990. The FTC charged that the acquisition substantially reduced competition in acute-care hospital services in the Santa Cruz County, California area, disadvantaging patients, physicians and purchasers of health care coverage. News Release, Federal Trade Commission, March 10, 1993. The market share of CHW and Dominican, already the largest providers of acute-care hospital services in Santa Cruz County, increased from 62 percent to 76 percent due to the acquisition. As a result, charged the FTC, competition for acute care services has decreased; CHW and Dominican have obtained a dominant position in the market; the likelihood of collusion has increased; and the benefits of free and open competition based on price, quality and service may be denied to patients, physicians and purchasers of health care insurance.

The FTC and the hospital systems have signed an agreement to settle the charges that would require the hospital system to obtain FTC prior approval before acquiring all or any significant part of an acute care hospital in Santa Cruz County within the next ten years.

Another case concerning an exempt hospital is FTC v. University Health, 1991-2 Trade Cases para. 69,508 (11th Cir. 7/26/91). There, a proposed asset acquisition involving two nonprofit hospitals was covered by 7 of the Clayton Act,

despite the hospitals' charitable status. The transaction allegedly would lessen competition in the provision of inpatient services by acute-care hospitals in the area. The court noted that the hospitals did not show that greater efficiency would result. The market area concentration would be exacerbated by the proposed transaction.

Anti-trust violations pose some unique challenges in exempt organization law. An underlying principle of the anti-trust laws is that increased numbers of competitors are always good. Therefore, following the reasoning outlined in connection with the anti-kickback and false claims statutes, violation of the anti-trust laws harms society, and must be weighed against an organization's exempt status.

If the exempt organization has actually been found guilty of anti-trust violations by a court, the issue must be confronted, and would be weighed under a GCM 34631 substantiality analysis.

8. Church Illegality Issues

The principles involved in these cases do not differ from the general principles applicable to all 501(c)(3) cases discussed above. In Church of Scientology of California v. Commissioner, supra, the court rejected the organization's claim that Bob Jones did not apply to churches. The court in Scientology of California stated that the Bob Jones court limited its application to churches only on the issue of whether the particular fundamental interest in eradicating racial discrimination was applicable to them.

The organization in Scientology of California was involved in a conspiracy to commit tax fraud. In addition to Scientology of California, another case dealing with illegal acts committed by an organization purporting to be a church was Synanon Church v. U.S., 579 F. Supp. 967 (D.C.D.C. 1984). That organization was tied to a number of beatings and acts of physical violence, including putting a rattlesnake in the mailbox of two dissenting members' attorney.

9. Illegality Issues Involving Non- 501(c)(3) Organizations

A. Basis for Application of the Doctrine

Because these organizations' exempt status is not based on the common law concept of charitability, the prohibition against illegal activity must arise out of

some basis other than charitable trust law. The purpose of the particular exemption at issue and the nature of the illegal act must be considered in determining whether substantial illegal activity will lead to revocation.

Because 501(c)(4) organizations promote social welfare, the illegality doctrine's application may not be very different from the case of 501(c)(3) organizations' illegal activity. In Rev. Rul. 75-384, supra, an anti-war organization that could not qualify under 501(c)(3) due to illegal activity at protests also could not qualify under 501(c)(4) because the illegal activities were "contrary to the common good and the general welfare of the people." The basis for the application of the illegality doctrine to organizations not seeking exempt status under either 501(c)(3) or (4) must rest on some ground related to the purpose of the particular exemption provision at issue. Applications of the illegality doctrine to social clubs, veterans' organizations and business leagues are discussed below.

B. Gambling and 501(c)(7)

Gambling operations, while sometimes carried on by 501(c)(3) organizations, are also carried on extensively by non- 501(c)(3) organizations such as social clubs and veterans' organizations. The most important ruling in the non-501(c)(3) gambling area is Rev. Rul. 69-68, 1969-1 C.B. 153. This ruling held that a social club's exempt status was not threatened by illegal gambling operations. The ruling reasoned that the gambling for members furthered the organization's exempt recreational purposes. The ruling stated that:

> Although gambling on the part of the participants may be accompanied by a desire for financial gain, it also supplies those elements of diversion that are commonly accepted as pleasure and recreation. Maintenance of gaming devices for members and guests of a club is an activity for their pleasure and recreation within the meaning of 501(c)(7) of the Code.

Id. (citing Country Club, Inc. v. Commissioner, 21 T.C. 807 (1954), acquiescence, 1954-2 C.B. 3.

The ruling provides two explicit boundaries for the type and extent of illegal activity in which social clubs may engage, and one limitation that is somewhat more amorphous. The first explicit limitation is that the illegal activity must further the organization's exempt purpose. In this case, the gambling the particular organization was conducting was recreational for the members. The type of

gambling involved could affect a determination of whether the gambling was recreational such as an activity that requires no commingling. In any event, the rationale that the activity is recreational would not apply where an organization's exemption rests on some non-recreational purpose such as promoting the common business interest.

The second express limitation set out in the ruling is that the gambling must be limited to members. It is unclear how many non-members would have to participate before the organization was engaged in a substantial non-exempt activity, but a social club's receipts from nonmembers may not exceed 15% of total receipts. H. Rep. No. 94-1353, 94th Cong., 2d Sess. (1976) at 4; S. Rep. No. 94-1318, 94th Cong., 2d Sess. (1976) at 4.

An implicit limitation found in Rev. Rul. 69-68 is that its holding is limited to the particular facts of that case. It does not provide carte blanche approval for all illegal gambling. The ruling states that "... the operation of gaming devices under the circumstances described does not affect the status of the club..." (emphasis added). The ruling does not set any limits on the amount or type of illegal gambling permitted.

The ruling's lack of explicit limits on allowable illegal gambling is particularly important in light of the fact that the only precedent the ruling cites for allowing illegal gambling is Aviation Country Club, Inc. v. Commissioner, 21 T.C. 807. However, the facts of Aviation Country Club were very different from those in Rev. Rul. 69-68. In Aviation Country Club, the club leased its facilities from a for-profit club. The for-profit club had sought out a non-profit club to lease its space so that it could install slot machines. The machines were illegal, but operated in virtually all private clubs in the Denver area in the years at issue "with full knowledge and acquiescence of the law enforcement officials." Aviation Country Club at 813.

The Aviation Country Club itself was, according to the opinion, "not especially interested in slot machines." Id. It had numerous activities that had nothing to do with gambling, and it continued with all these activities, even after the slot machines were removed. The opinion does not discuss the issue of the slot machines, apparently because the club had so many other activities that their operation by the club's lessor was insignificant. The opinion focuses instead on whether there was undue private benefit to the members from the physical improvements made to the club.

The facts of <u>Aviation Club</u> appear to limit its applicability to clubs engaged in insignificant amounts of gambling activity. In <u>Aviation Club</u>, the club was not established to conduct gambling. The slot machines were owned by the lessor company. They were removed after two years of operation, and the club continued to have the same varied program of activities it had maintained since its inception. Because Rev. Rul. 69-68 was based on <u>Aviation Country Club</u>, it should be read narrowly.

C. <u>Antitrust and 501(c)(6)</u>

The anti-trust issues discussed above with 501(c)(3) organizations also arise in the non-(c)(3) context, particularly with business leagues. A business league will lose its exempt status for engaging in illegal antitrust activity if the following conditions are present: 1) the activity has been judicially determined to be in violation of a provision of law; 2) the unlawful activity is carried on to such an extent and in such magnitude that it can properly be said to be the <u>principal</u> activity, or one of the principal activities of the organization; 3) the illegal activity must be of such a nature that it can be said to be harmful to the general business of the organization; and 4) the unlawful activity must be imputable to the membership of the organization. GCM 37111 (May 4, 1977). The memorandum's rationale is based on <u>United States v. Omaha Live Stock Traders Exchange</u>, 366 F.2d 749 (8th Cir. 1966), which held that a business league may not lose its exemption merely on the ground that it has been convicted of having engaged in trade practices that are illegal, discriminatory and restrictive of free competition.

GCM 37111 concerns a section 501(c)(6) organization that had been convicted of Sherman Anti-trust Act pricing violations. It states that an organization that is primarily engaged in promoting the common business interest of its members and otherwise has and retains the essential characteristics of a business league within the meaning of 501(c)(6) should not be denied exemption solely because it engaged in an illegal act that has been judicially determined to be a violation of a substantive provision of federal, state or local law. GCM 37111 limited the <u>Omaha</u> decision by focusing on the organization's primary activity. The memorandum cautioned, however, that if illegal activity becomes the <u>principal</u> activity, or one of the principal activities, of an organization, the organization will no longer qualify under section 501(c)(6), because illegal activity does not further any exempt purposes. The association had been found guilty of preparing and distributing a suggested pricing list to its members.

The conclusions of the GCM are based in part on the need for consistency in

the Service's treatment of 501(c) organizations other than (c)(3) organizations. The GCM cites Rev. Rul. 69-68, supra, and several GCMs concerning labor unions and illegality, and suggests that the effect of illegality on exempt status of 501(c)(5) and (c)(6) organizations should be the same. See, e.g., GCM 31619 (June 6, 1960). While GCM 37111 states generally that non-(c)(3) exempt organizations should be treated similarly concerning illegal activity, it emphasizes that there is an important difference between social clubs and business leagues. Illegal activity such as the gambling in Rev. Rul. 69-68 could conceivably further a social club's exempt purposes. Illegal restraints on trade cannot be said to improve business conditions or promote common business interests. GCM 37111 at 14.

Internal Revenue Service
Revenue Ruling

Rev. Rul. 75-384

1975-2 C.B. 204

Sec. 501

IRS Headnote

Antiwar protest organization. A nonprofit organization formed to promote world peace and disarmament by nonviolent direct action and whose primary activity is the sponsoring of antiwar protest demonstrations in which demonstrators are urged to commit violations of local ordinances and breaches of public order does not qualify for exemption under section 501(c)(3) or (4) of the Code.

Full Text

Rev. Rul. 75-384

Advice has been requested whether a nonprofit organization formed to promote world peace and disarmament by nonviolent direct action including acts of civil disobedience qualifies for exemption from Federal income tax under section 501(c)(3) or 501(c)(4) of the Internal Revenue Code of 1954.

The purposes of the organization are to educate and inform the public on the principles of pacificism and nonviolent action including civil disobedience. Its primary activity is the sponsoring of protest demonstrations and nonviolent action projects in opposition to war and preparations for war.

Protest demonstrations are conducted at military establishments, Federal agencies, and industrial companies involved with military and defense operations. Other activities consist of peace marches and protests against the use of tax monies for war purposes. The protest demonstrations constitute the primary activity of the organization. They are designed to draw public attention to the views of the organization and to exert pressure on governmental authorities. To derive the maximum publicity of an event, demonstrators are urged to commit acts of civil disobedience. Participants deliberately block vehicular or pedestrian traffic, disrupt the work of government, and prevent the movement of supplies. These activities are violations of local ordinances and breaches of public order. Incidental to demonstrations, leaflets are dispersed presenting the views of the organization.

Section 501(c)(3) of the Code provides for the exemption from Federal income tax of organizations organized and operated exclusively for charitable purposes.

Section 1.501(c)(3)-1(d)(2) of the Income Tax Regulations provides that the term "charitable" is used in section 501(c)(3) of the Code in its generally accepted legal sense. The regulation further states that the term "charity" includes lessening the burdens of government and the promotion of social welfare by organizations designed (i) to lessen neighborhood tensions; (ii) to eliminate prejudice and discrimination; (iii) to defend human and civil rights secured by law; or (iv) to combat community deterioration and juvenile delinquency.

As a matter of trust law, one of the main sources of the general law of charity, no trust can be created for a purpose which is illegal. The purpose is illegal if the trust property is to be used for an object which is in violation of the criminal law, or if the trust tends to induce the commission of crime, or if the accomplishment of the purpose is otherwise against public policy. IV Scott on Trusts Sec. 377 (3d. ed. 1967). Thus, all charitable trusts (and by implication all charitable organizations, regardless of their form) are subject to the requirement that their purposes may not be illegal or contrary to public policy. See Rev. Rul. 71-447, 1971-2 C.B. 230; Restatement (Second), Trusts (1959) Sec. 377, Comment (c).

In this case the organization induces or encourages the commission of criminal acts by planning and sponsoring such events. The intentional nature of this encouragement precludes the possibility that the organization might unfairly fail to qualify for exemption due to an isolated or inadvertent violation of a regulatory statute. Its activities demonstrate an illegal purpose which is inconsistent with charitable ends. Moreover, the generation of criminal acts increases the burdens of government, thus frustrating a well recognized charitable goal, i.e., relief of the burdens of government. Accordingly, the organization is not operated exclusively for charitable purposes and does not qualify for exemption from Federal income tax under section 501(c)(3) of the Code.

Section 501(c)(4) of the Code describes civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare.

Section 1.501(c)(4)-1(a)(2)(i) of the regulations provides that an organization is operated exclusively for the promotion of social welfare if it is primarily engaged in promoting in some way the common good and general welfare of the people of the community. An organization embraced within this section is one which is operated primarily for the purpose of bringing about civic betterments and social improvements.

Illegal activities, which violate the minimum standards of acceptable conduct necessary to the preservation of an orderly society, are contrary to the common good and the general welfare of the people in a community and thus are not permissible means of promoting the social welfare for purposes of section 501(c)(4) of the Code. Accordingly, the organization in this case is not operated exclusively for the promotion of social welfare and does not qualify for exemption from Federal income tax under section 501(c)(4).