UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Crim. No. 05-40026-FDS |
| | ) | |
| MUHAMED MUBAYYID, and | ) | |
| EMADEDDIN Z. MUNTASSER, | ) | |
| and | ) | |
| SAMIR AL-MONLA a/k/a | ) | |
| SAMIR ALMONLA, | ) | |
| | ) | |
| Defendants. | ) | |

## GOVERNMENT'S REPLY TO DEFENDANT'S SUPPLEMENTAL MEMORANDUM REGARDING EXPERT WITNESS DR. EDWARD VALLA

The defendants seek to exclude Dr. Edward Valla from testifying, to conduct a Daubert hearing (a hearing pursuant to Fed. R. Evid. 702) regarding his qualifications, and seek additional discovery regarding Dr. Valla. By way of brief background, Dr. Valla is a long-time government employee, and has been an intelligence analyst at the FBI for several years. Dr. Valla's testimony is important and helpful to the jury's understanding of key aspects of this case which are not going to be discussed by the other government's experts, and the disclosures regarding his expert opinions and the bases for those opinions have been produced to the defendants. The fact that the defendants do not have as much access to prior statements or a professional expert report (as in the case of expert witnesses Kohlmann and Levitt), is not a basis to limit Dr. Valla's

1

testimony.  To the extent warranted, Dr. Valla is subject to a
<u>Daubert</u> hearing if the Court requires it just as the defendants'
experts who have not previously testified, and his background and
methodology should compel his qualification.  As currently
contemplated, Dr. Valla will be available for a <u>Daubert</u> hearing
before his expected testimony.

For the assistance of the court, the government summarizes
the key disclosures pertaining to Dr. Valla, as it has previously
to the defense.  First, in January 2007, the government disclosed
the expected scope and basis for Dr. Valla's testimony.  <u>See</u>
Attachment A, p. 4-5.  This disclosure referenced Dr. Valla's
resume.  <u>See</u> Attachment B.  In that disclosure, the government
disclosed that Dr. Valla would also testify consistently with the
paragraphs 19-28 of the Marinelli Affidavit dated November 22,
2006.[1] <u>See</u> Attachment C (relevant portion of Marinelli
Affidavit).  On September 14, 2007, the government supplemented
Dr. Valla's testimony in the interest of ensuring that Dr.
Valla's testimony about Bassam Kanj was included in its
disclosures.  That letter also mentioned that Dr. Valla was
expected to produce an expert report and it would be provided

---

[1]These paragraphs cite to a detailed analysis of the Arabic
notes which were obtained during the 2001 FISA search of the Care
Storage locker.

when created.[2]  Dr. Valla has not previously testified as an

expert witness, and has never previously prepared an expert

report.  He did, in fact create a brief document (entitled

"Expert Report")(Referenced in Defendant's Supplement to its

Motion and provided by the defendants to the Court on November

13, 2007) summarizing some of the resources which supplemented

his expert opinions which had been previously disclosed.  That

four-page document was provided to counsel on November 7, 2007.

In fact, the document, when contrasted with the expert reports of

Kohlmann and Levitt, is much less developed, but in light of the

scope of Dr. Valla's testimony, understandably so.  In fact, as

---

[2]In relevant part, that letter stated the following:
Dr. Valla's testimony is largely expected to rely upon multiple
open sources including, but not limited to: Gunaratna, Inside Al-
Qaeda; Anonymous/Scheuer, Through Our Enemies' Eyes; Coll, Ghost
Wars; "Al-Jazirah: Afghan leader Hekmatyar Pledges Allegiance to
Usama Bin Ladin," May 4, 2006; the evidence obtained from the
Care International Storage locker; the April 10, 2003 interview
of defendant Muntasser; Kepel; Fawaz Gerges; interview of Samir
Al-Monla; Al-Hayah newspaper, articles dated 9/18/01, 9/19/01,
9/20/01, 9/21/01, "The road of the Lebanese Afghans to Peshawar".
We anticipate supplementing these expert disclosures as required.
. . .

In addition to the subject matters previously disclosed in
the expert disclsoures, Messrs. Kohlmann, and Valla will be
prepared to testify about Bassam Kanj.  Specifically, they will
describe who Bassam Kanj was, his affiliation with various
extremist organizations associated with al-Qaeda, the
circumstances of his death, and the significance of his
associations with other individuals associated with United
States-based ostensible Islamic charities.  Messrs. Kohlmann,
Valla and Levitt will also discuss individuals, such as Bassam
Kanj, Mohamed Chehade, Enaam Arnaout, Kassem Daher, and will
identify who they are and describe their nicknames and
associations.

Dr. Valla began drafting his report, it was intended that the
prosecution team would be able to educate him on the type of
contents that should be included within the report so that its
form and substance would be more consistent with the expectations
of the parties.  Nevertheless, because of the lack of time, this
process was left incomplete, and consequently, the government
produced whatever it had regarding Dr. Valla's expected testimony
- including this expert report, much of which constitutes Jencks
material.

        A point of clarification - as Dr. Valla himself indicates in
this Report, he will not be testifying related to anything
attributable to BS-XXXX-OA, and Page 4 should not have been
included in the report. Indeed, the references to any internal
FBI numbers should not have been included in this report at all.
Consistent with the court's rulings, Dr. Valla will not refer to
Al Qaeda, or 9/11, or unnecessary references to terrorist
incidents.

        Dr. Valla's expert testimony is based on both scholarship as
well as first-hand experience obtained through government
service.  Moreover, his expected testimony is limited to a few
discrete areas, which are detailed in the expert disclosures
described above.  An expert report is not required to be produced
for every expert the government intends to call, and merely
because he did not prepare such a document until relatively

4

recently does not alter the propriety and admissibility of his testimony.  The fact is that the disclosures to the defendants dated January 3, 2007 and September 14, 2007 more than adequately satisfy the Rule 16 and Rule 702 requirements for expert testimony.

Wherefore, the defendants' motion to preclude Dr. Valla's testimony should be denied.

Respectfully submitted,
MICHAEL SULLIVAN
United States Attorney

By:  /s/ Aloke Chakravarty
ALOKE CHAKRAVARTY
B. STEPHANIE SIEGMANN
DONALD L. CABELL
Assistant U.S. Attorneys

Dated: November 16, 2007



**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*                    *John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

January 3, 2007

*Via Hand Delivery*

Michael Andrews, Esq.
21 Custom House
Boston, MA 02110

Malick W. Ghachem, Esq.
Zalkind Rodriguez Lunt & Duncan
65A Atlantic Avenue
Boston, MA 02110

> Re:  United States v. Muhamed Mubayyid and Emadeddin Z.
>      Muntasser
>      Criminal No. 05-40026-FDS

Dear Counsel:

    Pursuant to the Court's order of September 29, 2006 and Fed.
R. Crim. P. 16(a)(1)(G), the United States hereby provides notice
of the following experts that it may call in its case-in-chief:
(1) Matthew Levitt, Ph.D; (2) Evan Kohlmann; (3) Edward Valla,
Ph.D, Federal Bureau of Investigation; and (4) Dawn Goldberg,
Internal Revenue Service.  Below is a summary of their
anticipated testimony.  As indicated, the government anticipates
that Dr. Levitt, Mr. Kohlmann, and/or Dr. Valla may review
additional documents (some of which have not yet been verbatim
translated) pertaining to Care International, Inc. ("Care"), Al-
Kifah Refugee Center ("Al-Kifah"), and/or the defendants prior to
trial.  Accordingly, these disclosures will likely be
supplemented.  The government will make every effort to provide
any supplemental disclosures not less than 60 days prior to
trial.  Additionally, if any expert reports are made between now
and the date of trial, they will be promptly disclosed.  We do
expect that Dr. Valla will prepare an expert report, which will
be produced in the next 30-45 days.

January 3, 2007
Page 2

   **1.  <u>Matthew Levitt</u>**:  Dr. Levitt's qualifications are
described in his attached curriculum vitae.  If called as a
witness, the government anticipates that Dr. Levitt will testify,
without limitation, about the definition of the terms zakat,
jihad, mujahideen, shaheed, and martyr.  Dr. Levitt will describe
the formation, structure, and activities of Mahtab al-Khidamat
also known as the Human Service Office.  Dr. Levitt will provide
a description of individuals who were affiliated with Al-Kifah or
Care or whose name appear in records of Al-Kifah (Boston chapter)
and Care, including Sheikh Abdullah Azzam, Usama bin Laden, Omar
Abdel Rahman, Ahmad Alkattan, and Mohamad Siyam.

   Dr. Levitt will testify about how Islamic charities, in
general, were used to support terrorism prior to September 2001
and the funding of jihad-related activities overseas.  Dr. Levitt
will explain how charities that supported jihad related
activities or front organizations for terrorist organizations
would outwardly espouse their support of legitimate charitable
activities such as assistance for refugees, widows, and orphans
while simultaneously, with or without the knowledge of its
donors, funneling money to the mujahideen or a terrorist related
organization.

   Dr. Levitt will discuss the concept of "economic jihad," the
method by which radical leaders would call on their supporters to
engage in what they describe as a religious duty to engage in
jihad, if not by physically fighting Islam's enemies then by
funding those who do.  In Dr. Levitt's opinion, this theme of
participating in an "economic jihad" features prominently in
jihadist fundraising techniques and is standard fare in global
jihadist operandi.  Dr. Levitt will also provide an overview in
the area of terrorist financing networks and logistical support
used by terrorist groups such as Hamas, Hezbollah, and Al Qaeda.

   Dr. Levitt will discuss how zakat programs and orphan
sponsorship programs were used by alleged charities to provide
money and services to individuals overseas, including family
members of fighters and martyrs (defined as individuals who die
while committing jihad) and how these activities benefitted the
mujahideen and terrorist organizations.  He will discuss
materials distributed by Care as part of its zakat fund-raising
and orphan sponsorship programs.

   Finally, Dr. Levitt will opine on the significance of
certain bank records of Care or Al-Kifah, documents obtained from
the records of Care or Al-Kifah, documents distributed by Care or

January 3, 2007
Page 3

Al-Kifah, and/or other materials provided to the defense in
discovery.  The government expects that based upon his review of
these materials, Dr. Levitt will opine that the theme of economic
jihad was a prominent feature of Care's fund-raising activities
and publications and that Care's activities were consistent with
that of other purported charities that were used to funnel money
for non-charitable or illegal purposes, which promoted or
supported jihad related activities overseas.

    Dr. Levitt's testimony will be based on his academic and
professional training, professional expertise, research, and
review of documents produced in discovery to the defendants.  His
opinion will not be based upon any classified information.

    **2.    <u>Evan Kohlmann:</u>**  Mr. Kohlmann's qualifications are
described in his attached curriculum vitae.  If called as a
witness, the government anticipates that Mr. Kohlmann will
testify, without limitation, about the formation, structure, and
activities of Al-Kifah Refugee Center, Mahtab al-Khidamat ("MAK")
also known as the Human Service Office, Hizb e Islami, Afghan
Mujahidin Information Bureau, and Al-Gama`at al-Islamiyya.  He
may also discuss an organization/entity known as Azzam
Publications.  Mr. Kohlmann will provide a description of
individuals who were affiliated with Al-Kifah or Care or whose
name appear in records of Al-Kifah (Boston chapter) and Care,
including Sheikh Abdullah Azzam, Usama bin Laden, Omar Abdel
Rahman, Gulbuddin Hekmatyar, Saif Al-Rahman Haleemi, Ahmad Shah
Masood, Abdul Rasul Sayyaf, Ahmad Alkattan, Kifah Jayoussi,
Mohamed Zaky, Adham Hassoun, Kassem Daher, Sheik Hassan Katerji,
Mohamed Chehade.  Mr. Kohlman will also opine as to the
significance of Sheikh Azzam, in particular articles and books
authored by him, including <u>Join the Caravan</u>, which was
distributed by Care.

    Mr. Kohlmann will discuss the background of the Afghanistan
conflict, the impact of the withdrawal of Soviet troops, the
post-Afghan mujahideen, and the transformation of MAK from a
collaborative effort of Abdullah Azzam and Usama bin Laden that
supported jihad in Afghanistan to an organization under the
leadership of Usama bin Laden that supported and organized jihad
activities worldwide.  Mr. Kohlmann will opine on the
significance of the Soviet withdrawal of troops from Afghanistan
and the expansion of the jihad movement to other areas including,
but not limited to, Bosnia, Chechnya, Kashmir, Palestine,
Tajikistan, and Algeria.  Mr. Kohlmann will further describe, in
general, how Islamic charities in the United States during the

January 3, 2007
Page 4

1990s were used as major conduit for sending money, men, and
equipment to Afghanistan, Bosnia, Chechnya and other conflict
zones across the Muslim world.

Mr. Kohlmann will describe the Al-Hussam newsletters
distributed by Al-Kifah and Care, how they were distributed, and
the significance of their contents.  In particular, Mr. Kohlmann
will testify that Islamic charities such as Al-Kifah and Care
were used to promote jihad and recruit individuals to fight
overseas and that the Al-Hussam newsletter was a tool used for
this purpose.  He will also describe how Care's fundraising
activities glorified jihad and martydom and how Care used its
Al-Hussam newsletter, the internet, and the distribution of <u>Join
the Caravan</u> to promote, and solicit money for, the mujahideen.
Mr. Kohlmann will also describe audiotapes and videotapes
distributed by Al-Kifah and Care, including Badr Al Bosna.

Mr. Kohlmann will also discuss individuals who were retained
by Care to come to the United States or Boston area and speak at
various fund-raisers on their behalf.  Finally, Mr. Kohlmann will
opine on the significance of certain bank records of Care or Al-
Kifah, documents obtained from the records of Care or Al-Kifah,
documents distributed by Care or Al-Kifah, and/or other materials
produced to the defense in discovery.

Mr. Kohlmann's testimony will be based on his academic and
professional training, professional expertise, research, and
review of documents produced in discovery to the defendants.  His
opinion will not be based upon any classified information.

**3.    <u>Edward Valla</u>:**  Dr. Valla's qualifications are
described in his attached curriculum vitae. If called as a
witness, the government anticipates that Dr. Valla will testify,
without limitation, about the code words used in conversations or
documents including, but not limited to, the following: marriage;
getting married; tourism; and picking apples.  He will testify
about the formation, structure, and activities of Mahtab al-
Khidamat also known as the Human Service Office.  In particular,
Dr. Valla will testify about how MAK was used to channel recruits
into Afghanistan and after the Soviets withdrew from Afghanistan,
MAK was transformed as a general headquarters for future jihad.

Dr. Valla will provide a description of individuals whose
names appear in Al-Kifah's and Care's records, including Sheikh
Abdullah Azzam, Usama bin Laden, Omar Abdel Rahman, and Gulbuddin
Hekmatyar.  He may discuss an organization/entity named Azzam

January 3, 2007
Page 5

Publications. Dr. Valla will describe the use of "abu" names and
identify the defendants and related individuals by their "abu"
name. Largely consistent with paragraphs 19-28 of the Affidavit
of James Marinelli dated November 22, 2006, he will provide a
detailed description and significance of certain documents
obtained pursuant to the October 2001 search, including CIF 0307-
312, 323-329, 330-333, 339-340, 346-347. Lastly, Dr. Valla will
discuss the Al-Hussam newsletters distributed by Al-Kifah and
Care, including their content and the purpose for which they were
distributed.

     Dr. Valla's testimony will be based on his academic and
professional training, professional expertise, research, and
review of documents produced in discovery to the defendants. His
opinion will not be based upon any classified information.

     **4.    Dawn Goldberg**: Ms. Goldberg has not prepared a
curriculum vitae. Ms. Goldberg has been employed by the Internal
Revenue Service since 1985. While employed at the IRS, she has
held several positions, including, Tax Examiner, Tax Office
Auditor, Program Coordinator, and for the last five years she has
worked as an agent with the Exempt Organization section in
Austin, Texas. If called as a witness, the government
anticipates that Ms. Goldberg will testify, without limitation,
about how organizations qualify for a tax exemption pursuant to
26 U.S.C. $501(c)(3); how organizations obtain a $501(c)(3) tax
exempt status; forms such $501(c)(3) organizations are required
to file during the application stage and to maintain their tax
exempt status, including IRS forms 1023 and 990; in particular,
she will explain the importance of the information sought by the
questions contained in the Form 990, including question number
76; and how a positive response to question number 76 would be
used by the IRS. Ms. Goldberg will also opine that had Care
stated in its 1023 application or any of its Forms 990 that it
was planning to, or did engage, in activities involving the
solicitation of money for jihad (defined as armed conflict
overseas) or the mujahideen (defined as Muslim holy warriors), or
expenditure of funds to promote or support jihad or the
mujahideen, the IRS would have conducted a full inquiry of these
activities and likely denied its initial $501(c)(3) application,
or revoked its $501(c)(3) tax exempt status. Ms. Goldberg will
further opine that question 5 of Part II of the Form 1023
(September 1990 edition), which seeks information regarding
whether the applicant organization is an outgrowth or successor
to another organization, is a critically important question to
the IRS' $501(c)(3) determination.

January 3, 2007
Page 6

    Ms. Goldberg's testimony will be based on her academic and professional training, professional expertise and experience, research, and review of Care's tax records.

    Additionally, the government anticipates that one or more Arabic language translators currently employed with the Federal Bureau of Investigation will testify as to the contents of (1) certain conversations, the actual recordings and verbatim translations of which have been produced or will be produced shortly, and (2) materials and documents that have already been produced.  Once the government has identified its trial exhibits, prompt notice of the identities of these translators will be provided.

    If you have any questions or comments, please feel free to contact me at (617) 748-3191 or Al Chakravarty at (617) 748-3658.

                Very truly yours,

                MICHAEL J. SULLIVAN
                United States Attorney

By:

                B. STEPHANIE SIEGMANN
                ALOKE S. CHAKRAVARTY
                Assistant U.S. Attorneys

Enclosures

# CURRICULUM VITAE

# EDWARD J. VALLA

## EDUCATION

Ph.D., 1997.  University of Connecticut. Political Science.  Dissertation:  *The Catholic Church and the Re-emergence of Civil Society in Czechoslovakia: 1985-1990.*  Sub-fields: Comparative Politics, International Relations, and American Politics.

M.A., 1991.  University of Massachusetts. Political Science.  Thesis:  *The Czechoslovak Reaction to Perestroika.*

B.A., 1987.  Bridgewater State College. Political Science and History.

## ACADEMIC APPOINTMENTS

2001 to 2004 — National Defense Intelligence College, Defense Intelligence Agency.  Faculty member in the Post-Graduate Intelligence Program and Master of Science in Strategic Intelligence Program for Reserves.  Served on five teaching teams: Counterterrorism, Intelligence Analysis, Research and Analytic Methods, Intelligence and National Military Strategy, and the Middle-East Colloquium.  Lectured on a wide range of intelligence and national security topics, evaluated written and oral assignments, and assisted with curriculum development for all courses

Valla, p. 2.

| | |
|---|---|
| 2002 to 2003 | **National Defense Intelligence College, Defense Intelligence Agency. Course Director for Twenty-First Century Intelligence and National Security—a required course for all students. Duties included supervising a teaching team of six faculty, including senior officers. Thesis advisor for eight students.** |
| 1992 to 2007 | **Bridgewater State College, Department of Political Science, Visiting Associate Professor. Courses taught: Terrorism and National Security, International Relations, Comparative Government, Western Political Thought, Government and Politics of East-Central Europe, and Introduction to Politics.** |

RELATED
EXPERIENCE

| | |
|---|---|
| 1997 to 2004 | **U.S. Department of Justice/Federal Bureau of Investigation. Senior Intelligence Analyst with overall responsibility for Al-Qaeda and affiliated terrorist groups. Researched, analyzed and prepared intelligence and threat assessments used by FBI decision-makers in the Boston Field Office and FBI Headquarters. Managed the intelligence collection effort against targets of national security investigations. Served as a liaison with other federal, state, and local law enforcement agencies, as well as with foreign law** enforcement and intelligence services. **Coordinated the dissemination of raw and** finished intelligence to Boston's Joint **Terrorism Task Force and to other members of the Intelligence Community.** |
| 2004 to 2007 | U.S. Department of Justice/Federal Bureau of Investigation. Promoted to Supervisory Intelligence Analyst for the Boston Division. **Currently supervise nine intelligence analysts** who produce raw and finished intelligence on **terrorism matters.** |

Valla, p. 3.

| | |
|---|---|
| 1984 to<br>2004 | United States Army Reserve.<br>Major, Military Intelligence (Retired).<br>Numerous positions of responsibility, including<br>aide-de-camp, company commander, staff<br>intelligence officer, strategic analyst, faculty<br>member for the National Defense Intelligence<br>College. |

## Presentations/
## Briefings

"FBI Intelligence Capabilities." Briefing to
The President's Foreign Intelligence Advisory
Board, January, 2007: Boston, Massachusetts.

"The FBI and Intelligence Reform." Briefing to
Congressman Alcee L. Hastings, House Permanent
Select Committee on Intelligence, August, 2006:
Boston, Massachusetts.

"Changes in FBI Intelligence: The Role of Field
Intelligence Groups." Briefing for the
Massachusetts Anti-Terrorism Advisory Committee.
December, 2005: Boston, Massachusetts.

"International Terrorism Threat Assessment."
Briefing for Boston's Joint Terrorism Task
Force (JTTF) Executive Board, November, 2005:
Boston, Massachusetts.

"Overview of Boston's Field Intelligence Group."
Briefing for the Director of National
Intelligence, August, 2005: Boston,
Massachusetts.

"International Terrorism." Recurring lectures as
guest speaker at Bentley College, Bridgewater
State College, The Naval War College, Roger
Williams University, Suffolk University, 1997-
Present.

Valla, p. 4.

"Churches and Civil Society in Czechoslovakia, East Germany and Poland." Presented at the 18th World Conference of the Czechoslovak Society of Arts and Sciences, August, 1996: Brno, Czech Republic.

"Churches and the Emergence of Civil Society in Eastern Europe." Presented at the Northeastern Political Science and International Studies Association Meeting, November, 1996: Boston, Massachusetts.

## Seminars/Professional Development

Counterterrorism for Senior Managers, Joint Military Intelligence Training Center (JMITC), May 2006.

Analytical Cadre Education Strategy, (Counselor), FBI Academy, April 2006.

Executive Development Institute, FBI Academy, February 2006.

Instructor Development Course, FBI Academy, September 2005.

Navigating Strategic Change, Kellogg School of Management, Northwestern University, March 2005.

Combined Arms Services and Staff School, Fort Leavenworth, June 2000.

Advanced Counterterrorism Analysis Course, JMITC, September 2000.

Counterterrorism Analysis Course, JMITC, September 1998.

**Valla, p. 5.**

## <u>Publications</u>

**"Domestic Terrorism Since 9/11" Forthcoming Chapter in _Armed Groups:  Studies in National Security, Counterterrorism, and Counterinsurgency._**

"Yugoslavia's Demise," <u>The New England Journal of History</u> 51 (Spring 1994): 41-47.

## <u>Awards</u>

Defense Meritorious Service Medal
**Army Commendation Medal (2)**
Army Achievement Medal (2)
**Army Reserve Components Achievement Medal (4)**
Armed Forces Reserve Medal (2)

Cash Incentive Award, August 2006
Certificate of Achievement, March 2006
Time Off Award, April 2005
Certificate of Achievement, September 2002
Time Off Award, February 2001
Certificate of Achievement, August 2001

## <u>References</u>

Furnished upon request.

deductible donation that could be used for tax purposes. It is unclear what part, if any, of these donations went directly to the mujahideen. However, the defendants and other agents of Care did collect money that was specifically directed toward mujahideen. Several checks deposited by Care, like Al-Kifah, contained the words "jihad" or "mujahideen" in the memo section. Similarly, the defendants and other agents of Care transferred thousands of dollars overseas to non-governmental organizations in Pakistan, Bosnia, Chechnya, and Sudan. For instance, from August 1993 through June 1995, Muntasser in the name of Care or Al-Kifah wire transferred nearly $167,000 to the Human Service Office (or variations of that name, such as the Services Office) in Bosnia. The Human Service Office is believed to be the same organization as Makhtab al Khidamat ("the Services Office" in English).

**OCTOBER 2001 SEARCH OF CARE'S STORAGE UNIT**

18. In October 2001, pursuant to the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801 et seq., a clandestine, partial search (hereinafter, "the FISA search") was conducted of Unit 5033 at Storage USA, 160 Otis Street, Northboro, Massachusetts, Care's storage unit. Numerous documents were reviewed and copied during this search. Due to time and secrecy concerns, only a small number of the documents found at the storage site were copied. These items included notes, letters,

fax documents, donation solicitations, newsletters, contributor lists, financial ledgers, printed copies of electronic mail messages, and a computer and compact disks.

19.  The 1995 Minutes mentioned above were observed and copied during the FISA search.  The text of the notes, translated from Arabic to English, dated April 23, 1995, shows an exchange of ideas among five individuals, three from GRF and two from Care, and concerns a civil war then taking place in Afghanistan. The participants were believed to be:

> Abdullah Al-Libnani [a/k/a Rabih Haddad, a GRF leader based in Detroit];
>
> Abu Abdul Rahman [a/k/a Emadeddin Muntasser, a Care leader in Boston];
>
> Abu Idris [a/k/a Mohammed Akra, a Care leader who was at that time believed to be based in Sudan];
>
> Abu Ramadan [a/k/a Abu Abdallah Ramadan, a/k/a Hazem Rabab, founding member of GRF]; and
>
> Abu Fayez [a/k/a Mohamed Chehade, a GRF leader based in Chicago and believed to have been involved with the Boston office of Al-Kifah].

I have spoken with an FBI Intelligence Analyst assigned to the JTTF who has experience in the counter terrorism field and who reviewed the 1995 Minutes.

20.  A portion of the 1995 Minutes reads as follows:

AL-LIBNANI:

> There is no need for us to stay separate.  One thought, from one source. I met with Emad and Mohammed and found acceptance.  We pray the Lord may unite us and remove hatred from within us.

11

This section of the 1995 Minutes appears to reflect a discussion involving Al-Libnani regarding combining the efforts of Care and GRF. It appears that "Emad" is Muntasser and "Mohammed" is either Mohammed Akra or more likely, Chehade.

21. The 1995 Minutes continues:

Abu-Abdulrahman [believed to be Muntasser]:

> After the latest developments - we sought a meeting with the brothers- how to [establish] the relationship and coordinating with the battalion - some brothers are nervous in Boston. There can be more coordination among us if we agree on some of the issues. Afghanistan has priority. We see that one of the commanders is closer to truth than any other commander - based on this we see that is dutiful to uphold this truth and are; thereby, not allowed to retire from it or stop.

At that time, there were two Islamist Afghan commanders who were especially supportive of Arab participation during the Afghan civil war. They were Abdul Rasul Sayyaf and Gulbuddin Hekmatyar. It thus appears that the central issue of this discussion is how the participants will address the fact that the jihad has degenerated into civil war and to decide whether they remain neutral or takes sides with Hekmatyar. It appears that the "latest developments" to which Muntasser refers to the sudden collapse of Hekmatyar's military forces. The "Battalion" is probably the Arab Brigade (called "Al-Kateeba" in Arabic), a group of Arab jihadists then operating in Afghanistan.

22. The 1995 Minutes continues:

"Changing the name of the Services Office"

12

This appears to be a reference to the Human Services Office
("HSO"), also known as Makhtab al Khidamat ("the Services Office"
in English).  I have been informed that in the latter part of the
1980's, "the Services Office" maintained offices and facilities
in various parts of the world, including Afghanistan, Pakistan
and the United States.  The organization was principally operated
by Sheik Abdallah Azzam and Usama bin Laden for purposes of
providing logistical support to the mujahideen in Afghanistan.
The support included financial assistance for military training.
In or about 1988, bin Laden began directing resources to train
mujahideen for deployment outside of Afghanistan, and later
formed Al Qaeda for this purpose (Azzam was killed sometime in or
about 1989).

      23.  The 1995 minutes continues:

Imad (believed to be Muntasser):

After looking at the situation we wanted to
re-study our position.
-How to deal with the new information
-Coordination with the battalion
-Position on Afghanistan

The position on Afghanistan: the closest cause to
realizing an Islamic case. [I]t has priority.

The work: Afghanistan or Syria: a fundamental
difference with Bin Laden. . .

The engineer [believed to be Heymatyar], a nation for
Muslims not for the Afghans, and supports all the
Jihad matters.  The Arabs are a part, so if an Ameer
[leader/commander] emerges and calls on everyone's
support then we it [sic] would not be allowed to walk
out on him.

                              13

These notes conclude "[t]he Sheikh's opinion is that the work be done through the battalion."

24.    Among the other items observed and copied during the FISA search was an Arabic language working agenda, entitled "cooperate on piety and fidelity," which echoes the substance of the 1995 Minutes.  It includes an introduction explaining that the purpose of a meeting was to determine a clear position on the following areas:

    1.    Afghanistan.
    2.    The office of services in Pakistan.
    3.    The ideological and Organizational link.

    *Pragmatic steps to achieve coordination and unification of efforts:

    1.    The creation of a Shura council to specify the general provisions, draw various policies for the activity of America and Canada, in accordance with the directions of the higher counsel (Al-Kateebah – (Movement)).

    2.    Naming members of the council.
    .    .    .

    * The council's agenda:

    1.    Set up a policy for informational affairs.
    2.    Set up a policy for the Da'wa (Islamic indoctrination).
    3.    The programming of fund raisings and its disbursement.
    4.    The investment (project).
    5.    The Relief programs.
    6.    Putting in place an educational program locally.
    7.    Security affairs.

25.    A series of Arabic notes regarding the Afghan jihad, which I believe are similar in character to the 1995 Minutes,

14

were also observed, copied, and translated.  The notes described "weakness" found in a "visit to schools and institutions" and queried "[w]here did the funds go? . . . The party declared bankruptcy, no car is available for the battle, and the Arab brothers' standards have been degraded and became at the same level as the Afghans."  The notes observed: "The golden days for tourism, we did not see it."  I understand that the term "tourism" is used to refer to violent jihad.  The notes also commented that "[t]hrough his knowledge of military activity: Work is very good in Peshawar."  The notes further observed that the "brothers on the front lines enjoy a better standard of living than the rest of the Afghans" and that "[b]rothers did a little work on the jeep and did fix it."  The notes concluded with "[t]he military work:  Planning is lacking – readiness is lacking – delay in the ability to start an attack – a delay in fixing the jeep till the last moment. . . . Unpreparedness brings disasters . . . preparedness should exist continuously . . . The Arabs never participated in the military planning."

26.  An additional note appears to be a letter written by Muntasser to Hekmatyar and is translated as follows:

> To his presence the virtuous brother and prince, engineer Kalb Al-Deen HIKMATAR, May God protect him,
>
> May God's peace and blessings and mercy be upon you:
>
> We, those who love you, from the Boston

15

Office write to you asking for your direction
for us in matters concerning serving the
Jihad for the cause of Allah.

As you know we have vowed our support through
your deputy, brother Saif AL-RAHMAN HALEEMI,
in New York, two years ago.  And we have
renewed this vow to you when I met you in
Shihar Siab two months ago.  Upon my return
it was suggested that we fold under their
brigade and join under their banner and
subjugating our policies and our educational
and financial programs to how you see fit.
They told us this is what you would like and
want.  If this is the case and you wish us to
do so then we wish you to write about that at
the bottom of this page and we are then God
willing to abide by your commands and we are
for ever in the fold of obedience and
military.  And may God's peace, mercy and
blessings be upon you,

Abu-Abdulrahman the Libyan [believed to be Muntasser,
Boston]

signed for:
Abu-Abdullah the Lebanese [Rabih Haddad, Detroit]
Abu-Idrees [Mohammed Akra, Boston]
Abu-Al-Waleed [Samir Al-Monla, Boston]
Abu-Sayyaf from Tripoli [possibly Adham Hassoun, Miami]
Abu-Ali
Abu-Zaid
Abu-Afif/Hanan

I believe that Saif Al-Rahman Haleemi was the East Coast Director

for the Afghan Mujahidin Information Bureau (AMIB) in New York,

and that AMIB was a front organization for Hekmatyar's Hizb e

Islami.  I am informed that Hizb e Islami existed in Afghanistan

from the late 1980's to the 1990's for, among other purposes, to

engage in armed conflict in Afghanistan.  Hizb e Islami

maintained training camps in Afghanistan and had a working

16

relationship with bin Laden, Makhtab Al Khidamat and Al Qaeda.
"Shiar Siab" is a mountain pass on the road from Kabul to Bamyan
in Afghanistan.  Thus, it appears that this letter shows that
leaders of Care and GRF agreed to combine their efforts in
support of the Hekmatyar in the Afghan civil war.

27.  Also located and copied during the FISA search was an
e-mail dated April 2, 1998 from Azzam Publications in London,
United Kingdom (sent from email address
azzam@panther.netmania.co.uk (Azzam Publications) to
CAREBOSTON@aol.com.  The subject matter of this email was the
Kosovo situation.  The text of the e-mail states that the sender
has some "authentic" and "confirmed news" which they will be
releasing shortly.  The gist of the e-mail is that there is going
to be a large war in Kosovo and that there has already been a
daily exchange of gun fire.  The writer states that there are
Kosovan mujahideen there already fighting the Serbs.  A large
number of these mujahideen also fought alongside the Mujahideen
in Bosnia.  It states that hostilities are expected to increase
rapidly and are increasing by the hour, and that the war has gone
past the point of no return.  The email then asks Care:

> As an important footnote, please advise the
> people to be EXTREMELY CAREFUL when donating
> money to Albanian and Kosovan charities, as
> usually over 95% of the 'fighting groups' or
> 'Mujahideen' are not really fighting as
> Muslims, for Islam.  Please ask the people to
> verify that the people they are donating to
> are PRACTISING NON-NATIONALISTIC MUSLIMS who

will in turn pass the money onto the
Mujahideen fighting groups, not secular
communist Kosovans.

28.   The e-mail goes on to advise Care that to be safe,

we suggest that you hold onto any money that
is collected and then pass it onto the
foreign Mujahideen in Kosova, who had already
arrived in Kosova.  Someone should travel to
Tirana with the money, check into a hotel and
then ask someone to e-mail us [Azzam
Publications] with the hotel telephone/room
number.  Someone will then contact them
within 48 hours and collect the money from
them.  Our role is purely to pass on
information between parties: we are not
directly involved. . . . Western Muslims
should begin to prepare themselves to go and
defend Kosova. Our coming bulletins will
insha-Allah advise them on how best to do it.

The e-mail concludes with the Azzam Publications name and address

along with e-mail address.  The e-mail then states "[a]nd with

the remembrance of all these (the martyrs), nations are

established, convictions are brought to life, and ideologies are

made victorious".  The final line of the e-mail states "Shaheed

Sheik Dr. Abdullah Azzam (May Allah have Mercy on him)."

    29.   On the copy of the computer stored in the storage unit

made during the FISA search, several issues of Care's newsletter,

Al-Hussam were found.  Each issue follows essentially the same

format, with a "current events" section detailing the activities

and victories of mujahideen in places such as Bosnia, Algeria,

Libya and Chechnya, and criticizing anti-Islamic actions by the

governments of Saudi Arabia and Egypt.  Most space was reserved

18

EXPERT REPORT:

The presence and activity of non-Afghan mujahideen or holy warriors in Afghanistan did not end with the departure of Soviet forces in February 1989. Many "Arab-Afghans," as they are commonly referred to in academic and other literature, remained in Afghanistan throughout the 1990s. Some intended to help establish a true Islamic state which would be free of foreign influence and under Islamic law. As the 1990s progressed, others sought military training in various camps established by Usama Bin Laden.

(Multiple Open Sources: Gunaratna, Inside Al-Qaeda; Anonymous/Scheuer, Through Our Enemies' Eyes; Coll, Ghost Wars)

It is not surprising that members of Care International, as indicated in the meeting minutes of April 23, 1995, would offer support to Pashtun warlord Gulbuddin Hekmatyar. The Arab-Afghans generally had good relations with Hekmatyar and with Abdul Rasul Sayyaf. In an August 1997 interview, Ahmad Shah Masood, another of the most famous mujahideen commanders, complained that the Arab-Afghans had fought for Hekmatyar against Masood's forces in 1992. Hekmatyar, while being virulently anti-Communist, was and is anti-American. He accepted U.S. aid in order to combat the Soviets. After the Soviet withdrawal, Hekmatyar worked to eliminate his political rivals and he drew support, at least in part, from some Arab volunteers that had fought against the Soviets. His goal was to eliminate rivals and establish a Muslim Brotherhood--dominated Islamic Party as the most powerful national force in Afghanistan.

In May 2006, Hekmatyar expressed his desire to fight under the leadership of al-qa'ida--particularly Usama Bin Laden and Ayman al-Zawahiri. In a videotape, Hekmatyar accused the U.S. and its allies of igniting wars and trying to rule Islamic countries. He thanked "[a]ll Arab mujahidin, particularly Shaykh Usama Bin Laden...who helped us in our jihad against the Russians. We hope to take part with them in a battle which they will lead. We stand beside and support them."

(Coll, Ghost Wars);
"Al-Jazirah: Afghan leader Hekmatyar Pledges Allegiance to Usama Bin Ladin." May 4, 2006.

There are several significant elements contained in the April 23, 1995 minutes. The first makes reference to one of the commanders being closer to the truth than the other. In this case, the commander is Gulbuddin Hekmatyar and the "truth" his Muslim Brotherhood based ideology. Hekmatyar's views fell in line with Care International's leaders and they, therefore decided to give their support to Hekmatyar. This point is made explicit in a letter to Hekmatyar, where the Care members write: "We, those who love you, from the Boston Office write to you asking for your direction for us in matters concerning serving the jihad for the cause of Allah." I note here that jihad in this case refers to an armed struggle. The letter makes reference to an earlier vow of support to Hekmatyar via his deputy, brother Saif Al-Rahman Haleemy, in New York circa 1993, and also states that the vow of

support to Hekmatyar was renewed "when I (Muntasser) met you in Shihar Siab two months ago."
The letter is signed, Abu-Abdulrahmn the Libyan (aka Emad Muntasser), who apparently signed for
those listed below:

Abu-Abdullah the Lebanese (aka Rabih Haddad)
Abu-Idrees (aka Mohammed Akra)
Abu Al-Waleed (aka Samir Al-Monla)
Abu Sayaf from Tripoli (aka Adham Hassoun)
Abu-Ali
Abu-Zaid (aka Munther Baara)
Abu-Afif/Hanan


Another aspect of the meeting minutes illustrates the coordination between Care International and the
Global Relief Foundation. In the introduction, a speaker, Abdullah al-Libnani (aka Rabih Haddad,
Detroit-based GRF leader) states that "there is no need to stay separate. I met with Emad and
Mohammed and found acceptance." Haddad is likely referring to a meeting between himself, Emad
Muntasser and Mohammed Chehade on the topic of combining their efforts.

The meeting minutes show that the key members of Care International sought to implement Azzam's
philosophy of defensive jihad as a collective duty. The main area of operation was Afghanistan and the
primary support went to Gulbuddin Hekmatyar. Care International worked closely with the Global
Relief Foundation. This comes as no surprise given that the GRF leader, Mohamed Chehade, had
been deeply involved with al-Kifah, subsequently known as Care International, when he lived in the
Boston area. He re-located to Chicago and helped found the GRF. A review of financial documents
also shows direct interaction between the two organizations, with Care disbursing over $83,000 to
GRF between 1997-2000.



(4/10/03 interview of Emad Muntasser. ▇▇▇)


Abdullah Azzam (1941-1989) was a staunch advocate and proponent of the modern jihad movement.
To borrow from the noted scholar Gilles Kepel, Azzam may rightly be considered "the herald of jihad."
It is Azzam who conceptualizes what became al-qa'ida in 1987. He, along with Usama bin Laden, co-
found the Maktab al-Khidmat, or Afghan Service Bureau in Peshawar in 1984. The MAK
disseminated propaganda, raised money and recruited new recruits to fight against the Soviets. A
network of offices was established in the U.S. and over 30 other countries. He worked tirelessly to
recruit volunteers to fight against the Soviets in Afghanistan and key themes in his writings center upon
martyrdom and sacrifice. Azzam's writings, especially <u>Join the Caravan</u>, served to justify a clearly
defined jihad, attracting to it a host of volunteers. Care International published an English translation

version of Join the Caravan, and cited selections from it in the al-Hussam newsletters. The newsletters illustrated activity by mujahideen and were used to justify engaging in jihad by citing various Islamic scholars. They exhort people to participate in jihad. The main theme in another work, "Defending the Land of Muslims is Each Man's Most Important Duty," was that jihad in Afghanistan was an obligation for all good Muslims. It is Azzam, perhaps more than any other recent Islamic ideologue, who popularizes the concept of jihad. He envisioned an organization that would channel the energies of mujahideen into fighting on behalf of oppressed Muslims worldwide.

(Stamped on the front: Care International 510 Comm. Ave., #275, Boston, MA 02215, Tel: 617-492-2731. Front Matter: Published by Care International 510 Commonwealth Ave #275, Boston, MA 02215)

(See also Gunaratna, Kepel, and Fawaz Gerges regarding the evolution of the contemporary jihad movement.)

Azzam@panther.netmania.co.uk (Azzam Publications) routinely publicized news regarding mujahideen, or holy warriors. Moreover, in an e-mail to CAREBOSTON@aol.com (Care International) dated 98-04-02, Azzam Publications reported to Care International that there would be a war in Kosovo and that Kosovan mujahideen were already fighting the Serbs. The text of this e-mail advises the recipient to exercise caution when making donations as "95% of the Albanian and Kosovan charities are not fighting as Muslims." In another e-mail from Azzam Publications, recipients are advised to prepare to go and fight in Kosova to make up for the lack of manpower coming from Saudi Arabia.

(▬▬▬▬▬storage)

Bassam Kanj, aka Abu Ai'sha was killed in January 2000 while fighting against elements of the Lebanese Army. His objective was to establish an Islamic emirate, initially based in Northern Lebanon. Kanj supervised the organization of a small number of armed followers in the vicinity of Al-Dinniyah. The group raised funds and trained throughout the summer of 1999. In December 1999, armed members of the group occupied the Guidance and Charity Radio station and ambushed a small military detachment from the Lebanese Army. Kanj and several others fled, taking shelter in a private residence. He refused to surrender and was killed.

Kanj was involved with the activities of Care International and the Global Relief Foundation. In addition to being a friend of Samir Al-Monla, Kanj was identified in a July 7, 1995 GRF document as "the official representative authorized to conduct business for the GRF in Azerbaijan." The letter is signed by Rabih Haddad.

(▬▬▬▬▬▬▬▬ interview of Samir Al-Monla; ▬▬▬▬▬▬▬▬ summary of Kanj/Hijazi relationship; London-based Al-Hayah newspaper, series of 4 articles from 9/18/01, 9/19/01, 9/20/01, 9/21/01, "The road of the Lebanese Afghans to Peshawar."

NOTE: There is extensive reporting on Kanj from ██████████ that I have not included here.