UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.  ) | CRIMINAL NO. 05-40026-FDS |
| ) | |
| MUHAMED MUBAYYID, ) | |
| EMADEDDIN Z. MUNTASSER, ) | |
| SAMIR AL-MONLA ) | |

### DEFENDANTS' REQUEST FOR PRELIMINARY INSTRUCTION TO THE JURY ON THE FIRST AMENDMENT ISSUE

The government, at the hearing before this Court on November 7, 2007, divulged that the "crown jewel" of its case would be the Al Hussam newsletter.  Thus, the government proposes to use Care's newsletter from 1993-1997, in constitutional terms its "speech," as the core aspect of its proof.

For Care's speech to be, criminally speaking, meaningful, it must be outside the protection of the First Amendment.  That protection is very broad.  In Sweezy v. New Hampshire, 354 U.S. 234 (1957), the Court protected the right of a university professor Paul Sweezy, a self-styled "classical Marxist," to argue that the capitalist system would collapse when confronted by violence on the part of those seeking to create a "truly human society."  This protection was broadened and clarified in 1969 when the Court, in a case involving pro-violence rhetoric at a Klan rally, held that speech-restrictive legislation had to be limited to "advocacy [that] is directed to inciting or producing imminent lawless action and is likely to incite or produce such

action." Brandenburg v. Ohio, 395 U.S. 444, 447 (1969). Thus, the First Amendment protects speech that advocates violence, including violence against the very system of constitutional government that brings us the First Amendment.

In United States v. Sami Omar Al-Hussayen, Cr. 03-048-C-EJL (D.Idaho, Lodge, J.), a 34-year-old Muslim Saudi graduate student at the University of Idaho was indicted on charges that he provided "expert advice or assistance" to terrorist organizations by operating websites and e-mail discussion groups that advocated what the government termed "extreme jihad." The government contended that Al-Hussayen had assisted a terrorist conspiracy, citing several examples of inflammatory speech from Al-Hussayen's Muslim websites and discussion groups. These included his redistribution of four fatwas issued by radical clerics offering religious justifications for "martyrdom attacks" and his hyperlinks to a Hamas-affiliated website.

The presiding judge, U.S. District Judge Edward Lodge instructed the jury that the Constitution protects expression of beliefs "even if those beliefs advocate the use of force or violation of law, unless the speech is directed to inciting or producing imminent lawless action." A copy of his instruction is attached.

Here, the government unabashedly intends to rely on constitutionally protected speech, including Care's newsletters, its efforts to bring speakers to Massachusetts, as well as other forms of speech (its internet site), to garner convictions. In

proceeding in this fashion, it ignores its earlier concession, made to resist dismissal of the case, that "The defendants are not being prosecuted for their religious beliefs. <u>Nor are they being prosecuting (sic) for merely advocating for the mujahideen</u>." Government's Surreply to Defendant's Reply to Government's Opposition to Motion to Dismiss at 1 (emphasis added). Now it reverses field, claiming that advocating for the mujahideen is indeed "engaging in activities designed" to support the mujahideen. This claim was explicitly made during the course of the grand jury testimony of IRS's Lauren Youngquist, when the government asked:

> Q: How did the defendants in this case ... support or promote jihad and the mujahideen?
>
> A: They published a book called Join the Caravan, which is a pro-jihad book. They... had published newsletters and website, which solicited contributions for the mujahideen and, also, reported activities on, in the website and on the newsletters, the activities of the mujahideen.

Each of the activities cited by Agent Youngquist is an instance of protected speech. The claim is repeated in last night's filing that "[t]he government intends to introduce evidence that Care explicitly called for the fulfillment of economic jihad. For example, the government intends to introduce evidence that Al-Hussam newsletters, audio recordings taken from Care, the Zagat calculation guide, and intercepted communications all contain specific invitations to participate in economic jihad." Government's Reply to Defendant's Supplemental Memorandum Regarding Evidence as to the Activities of Other Muslim Charities, at 2. Even the language used by the government, that

Care "explicitly called" for economic jihad, betrays the problem, as does the "evidence" cited, namely newsletters, audio recordings (i.e., speeches by others kept in Care's storage), and intercepted conversations (where Care is arranging for speakers to come to Massachusetts to speak at mosques). The government proposes to followup with Dr. Levitt, who "cites to this proposed evidence as showing that Care advocated the concept of economic jihad and specifically called upon its supporters to fulfill their duty of supporting jihad through financial donations." Id. at 2-3. In proceeding in this fashion, highlighted by the assertion that Care's newsletters are the "crown jewels" of its proof, the government appears to be intent on securing a verdict on the character of the speech of the defendants, in violation of the First Amendment.

Presenting Care's newsletters and other forms of speech to the jury serves an additional purpose, to stir distaste for defendants, sentiment which would contribute to a conviction. This strategy is evident in the proposed testimony of the government's experts, who planned to walk the jury through the newsletters and through the other writings, to ensure that no content offensive to a western sensibility would be missed. In this context, a judicial caution to the jury that a conviction cannot rest on speech alone, that the government's acknowledgment that defendants cannot be "prosecut[ed] for merely advocating for the mujahideen" is exactly right. To dispel misuse of the writings, the jury needs to be told as soon as any writings are

entered, that under <u>Brandenburg</u>, even speech advocating violence is protected:

> "[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action. As we said in Noto v. United States, 367 U.S. 290, 297-298, . . . (1961), 'the mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action.' See also Herndon v. Lowry, 301 U.S. 242, 259-261, . . . (1937); Bond v. Floyd, 385 U.S. 116, 134, . . . (1966). A statute which fails to draw this distinction impermissibly intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments. It sweeps within its condemnation speech which our Constitution has immunized from governmental control."

<u>Brandenburg v. Ohio</u>, 395 U.S. 444, 447-48 (1969). The jury should be instructed in this vein <u>before</u> it hears any evidence relating to the texts here, that the newsletters, videos, and publications in and of themselves cannot constitute, or result in, a denial of charitable status. Nor, for that matter, can the government claim that defendants had an obligation to disclose their speech, as if any speech, short of the prescribed Brandenburg formula – "advocacy [that] is directed to inciting or producing imminent lawless actions and is likely to incite or produce such action"– was material. "[A] declaration that a given institution is not "charitable" should be made only where there can be no doubt that the activity involved is contrary to a fundamental public policy." <u>Bob Jones University v. United States</u>, 461 U.S. 574, 592 (1983). No such clear public policy existed in 1993 or thereafter. Indeed, such a policy if targeted at a Muslim charity would invite scrutiny whether the

discriminatory denial of tax exemption itself impermissibly infringed free speech. Speiser v. Randall, 357 U.S. 513, 518 (1958). The jury must be told that scrutiny of pure speech is constitutionally forbidden, in the words of Brandenburg "immunized from governmental control," and not the domain of the IRS.

To protect against a verdict grounded on speech, the Court should (1) preclude admission of any speech-related evidence until the government has established a predicate for its admissibility, and, in the event any of such evidence is admitted, (2) instruct the jurors that the First Amendment protects freedom of speech, freedom of religion, and freedom to associate, and that evidence relating to the First Amendment cannot be considered unless it is relevant to defendant's knowledge or intent.

MUHAMED MUBAYYID
By his attorney

/s/ Michael C. Andrews

Michael C. Andrews
   B.B.O. #546470
21 Custom House
Boston, MA 02110

EMADEDDIN Z. MUNTASSER
By his attorneys,

/s/ David Duncan

David Duncan
   B.B.O. #546121
Norman S. Zalkind
   B.B.O. #538880
Elizabeth A. Lunt
   B.B.O. #307700
Zalkind Rodriguez Lunt
 & Duncan
65a Atlantic Avenue
Boston, MA 02110


SAMIR AL-MONLA
By his attorney

/s/ Charles P. McGinty

```
                              Charles P. McGinty
                                B.B.O. #333480
                              Federal Defender Office
                              408 Atlantic Avenue, 3rd Floor
                              Boston, MA  02110
                              Tel: 617-223-8061
```

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 13, 2007.

```
                              /s/ Charles P. McGinty

                              Charles P. McGinty
```