UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　　　　Plaintiff<br><br>V.<br><br>MUHAMED MUBAYYID,<br>EMADEDDIN Z. MUNTASSER and<br>SAMIR AL-MONLA,<br>　　　　　　　　Defendants | CRIMINAL NO. 05-40026-FDS |

## DEFENDANTS' MEMORANDUM OPPOSING THE GOVERNMENT'S ORAL MOTION TO LIMIT THE TESTIMONY OF MARCUS OWENS

The government, for the first time, has raised an objection to the proposed testimony of the defendants' tax expert, Marcus Owens. The government contends that, because their expert, Dr. Levitt, is not to be allowed to opine whether Care was an "outgrowth or successor" of Al-Kifah, neither should Mr. Owens. The government further suggested that perhaps notice had not been given of Mr. Owens' proposed testimony regarding those terms. The first contention is preposterous, the second inaccurate.

First, whatever Dr. Levitt's qualifications may be, he has no expertise in tax affairs or tax-exempt organization law. He is thus not permitted, under Rule 702, to offer an opinion on a tax matter. Mr. Owens, in contrast, has spent his entire professional career in the field of tax-exempt organizations, including a quarter of a century working for the IRS and a decade as the highest-ranking IRS official with sole responsibility for tax-exempt organizations. He was involved in evaluating applications for exemption, with interpreting IRS rules and regulations, with interpreting cases in the area, and with the formulation and administration of IRS policy in this area. He is

1

eminently qualified to offer opinions as to the intendment of questions on the IRS forms, including the question regarding "outgrowth or successor."

Second, as the government acknowledged at a sidebar during Mr. Charnoff's testimony, the defendants did give notice that Mr. Owens would opine regarding the outgrowth/successor issue, on October 12, 2007, as a supplemental notice that the government requested and the Court required. The defendants in this regard notified the government:

> He will also testify that, based on the materials he has reviewed, it was reasonable for Care to report that it was not a successor to or outgrowth of Al Kifah on the 1023 application. Furthermore, he will testify that the terms "successor" and "outgrowth" are not clearly defined. The key issue in the IRS's determination of whether an organization is a successor or outgrowth, he will testify, is control. For instance, the IRS is interested in whether a predecessor organization caused new organization to be created. He will testify that the purpose of this question is to ascertain whether an applicant organization is assuming the assets or liabilities of another organization, and particularly the liabilities, thereby improperly sheltering taxable income. He will opine that no applicant is on notice that the question asks for more than what is provided by the specifics of the actual question or the examples given in the instructions, which refer to being controlled or controlling another organization, interlocking directorates, common officers and sharing of office space or employees.
> Mr. Owens will also testify that, even if a predecessor/successor relationship existed between Care and Al Kifah, it would not have been sufficient, on its own, to deny Care tax-exempt status. The activities of the predecessor would not be a basis to deny tax-exempt status to Care. Only if the financial relationship suggested improper sheltering of taxable income or transfer of debts of a taxable entity to Care would there have been a basis to deny Care tax-exempt status predicated on a successor relationship.

Notwithstanding this notice, the government, at this late hour, raises objections to Mr. Owens being allowed to testify in this area which is clearly within his expertise, because Dr. Levitt cannot testify to it though it is equally clearly outside his area of expertise.

The government offered a fall-back reason why Mr. Owens should not be allowed to testify as to his "personal opinion" about this question – that their witnesses, Charnoff and Sacks, were not

2

allowed to. Mr. Owens will not offer his "personal opinion" on any matter – he will offer his expert opinion, predicated on IRS law, policies and procedures and the purpose of the Forms at issue in this case. These are matters within the scope of his expertise. Second, as noted at a sidebar on this issue, the government chose not to designate an expert on the Form 1023, and instead sought to elicit, effectively expert testimony from their witness Charnoff. The questions regarding his personal opinion were excluded, but this very issue was put before the Court, and in response to the defendants' position that they would elicit expert testimony in this area, Charnoff was permitted to testify that in his experience no applicant had complained to him about the meaning of the terms "outgrowth or successor" (Tr. Day 12, at pp. 137-38 (sidebar discussion) & 142).[1] Further, Charnoff did in fact end up testifying to his understanding of the meaning of "outgrowth or successor:" when asked on cross examination whether there were other instructions or clues as to what the question means than the instructions given, Charnoff answered "we could always refer to the dictionary for the common meaning of words." (Tr. Day 13, at p. 115).

The government's decision not to call an expert on the Form 1023 was its trial decision. The government has access to the IRS and its employees and could have obtained an expert but chose not to. This is no ground to prevent the defendant from putting on its case, which includes an expert who was long ago designated, and the scope of whose testimony was disclosed. The defendant's constitutional right to put on a defense would be severely impaired by preventing Mr. Owens from testifying in the area of his expertise, which is both technical, and therefore outside of the general ken of lay jurors, and critical to the defendants' defense.

Respectfully submitted,

---

[1] Excerpts from the transcript are attached as Appendix A to this Memorandum.

| | |
|---|---|
| EMADEDDIN Z. MUNTASSER<br>By his attorneys,<br><br>/s/ David Duncan<br>Norman S. Zalkind (BBO#: 538880)<br>Elizabeth A. Lunt (BBO#: 307700)<br>David Duncan (BBO#: 546121)<br>Zalkind, Rodriguez, Lunt & Duncan, LLP<br>65a Atlantic Avenue<br>Boston, MA  02110<br>(617) 742-6020<br><br><br>/s/Susan R. Estrich<br>Susan R. Estrich<br>Robert Kingsley Professor of Law and Political Science<br>University of Southern California Law School<br>University Park, MC-0071<br>Los Angeles, CA 90089-0071 | MUHAMED MUBAYYID<br>By his attorney,<br><br>/s/ Michael C. Andrews<br>Michael C. Andrews (BBO#: 546470)<br>21 Custom House Street<br>Boston, MA 02110<br>(617) 951-0072<br><br>SAMIR AL-MONLA<br>By his attorney,<br><br>/s/ Charles P. McGinty<br>Charles P. McGinty (BBO # 333480)<br>Federal Defenders<br>408 Atlantic Avenue<br>Boston, MA 02110<br>(617) 223-8061 |

Dated: November 12, 2007

**Certificate of Service**

I hereby certify that a true copy of the foregoing document was served this day upon all counsel of record by electronic filing.

/s/ David Duncan

APPENDIX A

**SIDEBAR, DAY 12**

135

21      MS. SIEGMANN: Your Honor, the government would like
22  to know, when I've been asking questions about his
23  interpretation of the term "outgrowth" and "successor," whether
24  it's the Court's view whether no witness can testify about
25  that, or it's just that -- I'm just seeking guidance on this.

136

1       THE COURT: Well, it's, I guess the answer is, I
2   don't see why he is entitled to opine as to whether a statement
3   is clear or not clear. I mean, he worked with the forms for 30
4   years. The IRS didn't provide any instructions. The language
5   is what the language is, it seems to me. I guess it's not
6   clear to me that anyone could opine as to whether it's, you
7   know, clear or not clear.
8       You know, as to whether anyone has ever complained
9   about it, there's no foundation that he was, you know, received
10  taxpayer complaints or that any were forwarded to him. But I
11  -- I'm doing this without the benefit of any case law,
12  obviously, but I would be surprised if witnesses were able to
13  comment on questions on the tax code, you know, as a matter of
14  expert opinion or lay opinion, whether or not something is
15  clear or confusing.
16      MS. SIEGMANN: The reason why I asked this is in the
17  expert disclosure for Mr. Marcus Owens, he indicates that he
18  thinks that the question "outgrowth of" or "successor to" is
19  unclear. So my concern is that the expert, the defense is
20  going to opine on that issue and the government is -- can't
21  respond.
22      THE COURT: All right. Certainly sauce for the
23  goose will be sauce for the gander.
24      Mr. Duncan?
25      MR. DUNCAN: We don't have a gander, your Honor.

137

1   They didn't designate this gentleman as an expert. I asked
2   them several weeks ago if they intended to. I don't see why
3   the fact we have an expert then who's going to offer an opinion
4   means that they can make a fact witness into an expert witness
5   overnight.

6         THE COURT: What about a lay opinion?
7         MR. DUNCAN: Well, I mean, what's he going to say,
8  that it's seems clear to me? I mean --
9         THE COURT: Well, what's Owens going to say; it
10  seems clear to him?
11        MR. DUNCAN: Owens going to say in his opinion --
12  you have to remember that Owens, by the way, has now been on
13  the other side of the fence helping people fill these forms
14  out, as well as doing this for 20 years. I'm also going to go
15  into him, by the way, your Honor, that there are Website
16  filings, the IRS, about unclarity, the problems, mistakes, a
17  whole panoply of things that I'm going to ask this gentleman
18  about, whether he's aware of them.
19        You know, it seems to me that there is going to be a
20  foundation that it's not clear.
21        THE COURT: Well, it seems to me then that with a
22  proper foundation, and the foundation has to be laid, that
23  Charnoff can testify that in his experience, interacting with
24  taxpayers in the course of his business, that there were no
25  questions or complaints relayed to him, that the question was

138

1  unclear.
2        MR. DUNCAN: Assuming that he had such questions or
3  interactions with taxpayers, your Honor. I mean --
4        THE COURT: Or, I mean, whatever the foundation is,
5  is what the foundation is. I can't really guess as to what it
6  was. But I will permit that line of inquiry.

**TESTIMONY OF CHARNOFF, DAY 12**

141

9  BY MS. SIEGMANN:
10  Q. Mr. Charnoff, we were talking a few minutes ago about
11  Question 5 on this application. The second question,
12  specifically.
13  A. Right.
14  Q. During your 36 years at the IRS, did you interact with any
15  applicant organizations or representatives of applicant
16  representatives regarding the 1023 application?
17  A. Interact with -- I'm not -- I don't follow your question,
18  I'm sorry.
19  Q. Did you communicate either in writing or verbally with
20  individuals regarding this -- their forms 1023?
21  A. Yes.

22  Q.  On how often, would you say, during the course of your
23  week, would you interact with people regarding the Form 1023?
24         THE COURT:  Taxpayers or taxpayer representatives?
25         MS. SIEGMANN:  Yes.

                                142
1   A.  Talking about verbal contacts?
2   Q.  Verbal or written.
3   A.  In the course of a week, twenty times perhaps.  I mean --
4   Q.  And during this correspondence, were there questions raised
5   as to specific issues in the Form 1023?
6   A.  Wait a minute, when I say -- I'm thinking phone contacts.
7   In terms of actual correspondence, just a few letters a week
8   maybe.
9   Q.  And phone contacts, you said?
10  A.  Right.
11  Q.  And during this correspondence or phone contacts, did you
12  discuss the specific questions contained in the Form 1023?
13  A.  Maybe on occasion.  I mean, normally, normally, we have a
14  -- I have a specific information request, you know, on phone
15  contacts, or the -- an officer or the similar, power of
16  attorney, calls me with a question.
17  Q.  So on occasion they would call with questions as to the
18  specific contents of the Form 1023?
19  A.  They could, right.
20  Q.  That was over the 36 years you were at the IRS?
21  A.  Correct.
22  Q.  Did anyone ever call with questions concerning Question --
23  the second question of Question 5?
24  A.  No.
25  Q.  And I'm talking about these questions, "Is the organization

                                143
1   an outgrowth of or successor to"?
2   A.  I don't recall anyone ever making any comment about that.
3   Q.  Sir, how did you interpret the phrase or the question, "Is
4   the organization the outgrowth of or successor to"?
5          MR. DUNCAN:  Objection, your Honor.
6          THE COURT:  Sustained.

**CHARNOFF TESTIMONY, DAY 13**

                                115
15  Q.  Is it fair to say that with respect to outgrowth or

16  successor, there are no other instructions and no other clues
17  as to what that question means other than what I just read to
18  you in the instructions?
19  A.  Well, we could always refer to the dictionary for the
20  common meaning of words.
21  Q.  Oh, we could, could we?
22  A.  We could, yes.
23  Q.  Do you think people keep a dictionary handy when they're
24  filing out IRS forms?
25  A.  I think if they have a question as to meaning of the

                                    116
1  wording, they might consult with a dictionary, if they're not
2  sure what a word means.
3  Q.  What if they don't?
4  A.  If they don't what?
5  Q.  Have a question about the meaning of the words?
6  A.  Then they're not going to consult the dictionary.