UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. 05-40026-FDS |
| | ) | |
| MUHAMED MUBAYYID, and | ) | |
| EMADEDDIN Z. MUNTASSER, | ) | |
| and | ) | |
| SAMIR AL-MONLA a/k/a | ) | |
| SAMIR ALMONLA, | ) | |
| | ) | |
| Defendants. | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANTS' RENEWED RULE 29 MOTION**

The United States, by and through its attorney, Michael J. Sullivan, the United States Attorney for the District of Massachusetts, and Aloke Chakravarty, B. Stephanie Siegmann, and Donald Cabell, Assistant United States Attorneys, hereby supplements its response in court to the Defendants' Rule 29 motion.  The motion should be DENIED as to all remaining counts.

**I.   The Evidence is Sufficient to Sustain a Conviction pursuant to Rule 29**

    **A.   Rule 29 Standard**

A case should go to the jury unless there is insufficient evidence presented to sustain a conviction.  Fed. R. Crim. P. 29. Whether the evidence and the reasonable inferences drawn therefrom are sufficient to sustain a conviction is viewed in the light most favorable to the government.  <u>Glasser v. United States</u>, 315 U.S. 60 (1942); <u>United States v. Hall</u>, 434 F.3d 42 (1st Cir. 2006)(<u>citing</u> <u>United States v. Patel</u>, 370 F.3d 108, 111

(1st Cir. 2004)).  This standard requires that:

> [The Court] must determine whether the evidence, taken in
> the light most favorable to the government-a perspective
> that requires us to draw every reasonable inference and
> resolve credibility conflicts in a manner consistent with
> the verdict-would permit a rational trier of fact to find
> each element of the crime charged beyond a reasonable doubt.

Id.

A conspiracy is merely an agreement, express or implied,
under the terms of which the participants collude to accomplish
an unlawful objective, taking at least one overt step in
furtherance of that objective. See, e.g., United States v.
Latham, 874 F.2d 852, 863 (1st Cir.1989).

As the court of appeals explained in United States v.
Martinez-Medina, 279 F.3d 105, 113-14 (1st Cir. 2002), "The
touchstone of conspiracy is an agreement to do an unlawful act,
..., but each coconspirator need not know of or have contact with
all other members, nor must they know all of the details of the
conspiracy or participate in every act in furtherance of it. The
jury may infer an agreement circumstantially by evidence of,
inter alia, a common purpose (such as a purpose to [defraud the
IRS]), overlap of participants, and interdependence of various
elements in the overall plan." 279 F.3d at 113-14 (internal
citations and footnotes omitted).

"The question is merely whether the total evidence,
including all reasonable inferences, when put together is
sufficient to warrant the jury to conclude the defendant is [a

member of the conspiracy]." United States v. Patterson, 644 F.2d 890, 893 (1st Cir. 1981); see also Boylan, 898 F.2d at 242.  In the end, whether the charged conspiracy existed is ordinarily a factual matter for the jury to determine. United States v. Mena-Robles, 4 F.3d 1026, 1033 (1st Cir. 1993), cert. denied, 511 U.S. 1035 (1994); United States v. David, 940 F.2d 722, 724 (1st Cir. 1991).

**B.    The Charged Conspiracy**

The charged conspiracy in this case is essentially that the defendants conspired to defraud the IRS "in ascertainment, assessment, and determination of whether Care International, Inc. qualified and should be designated as a section 501(c)(3) organization in 1993 *and* should continue to be accorded status as section 501(c)(3) organization thereafter." Superseding Indictment(emphasis added).

The charged conspiracy starts just *prior to* the incorporation of Care International, and the actual filing of the Form 1023 and subsequent acts, are overt acts in furtherance of the conspiracy to create Care International to avail the tax benefit.  It is part of the government's theory of this case, as alleged in the indictment, that the establishment of Care (from Al-Kifah) was done to defraud the IRS by obtaining and maintaining a tax-exempt status.

The Supreme Court in Forman v. United States, 361 U.S. 416, 423-424 (1960), clarified that concealment objectives can be

3

intertwined with an underlying tax evasion scheme. <u>Compare with</u> <u>Grunewald v. United States</u>, 353 U.S. 391 (1957)(in which the *Grunewald* conspiracy did not include the concealment aspect as intertwined within the conspiracy, as existed in *Forman*). As in this case, in *Forman* the defendant sought first to evade tax liability, and then to conceal the way in which he had evaded it. <u>Id.</u> In this case, as in that, the original tax fraud, as well as the ongoing concealment thereof, are intertwined within the language of the indictment.

The filing of the Form 1023 is a significant, but not dispositive, overt act in this conspiracy, which had already begun at the time the decision is made to form a new organization from Al-Kifah. This agreement, and its motives, can be deduced from the reasonable inferences drawn from the evidence in the record, which include the filing of the Form 1023, but also everything else before and after. The function of the overt act requirement is to show that the conspiracy is at work and is simply not an agreement existing solely in the minds of the conspirators. <u>Yates v. United States</u>, 354 U.S. 298, 334 (1957); <u>United States v. Arboleda</u>, 929 F.2d 858, 865 (1st Cir. 1991). An overt act is any act done by a member of the conspiracy for the purpose of carrying out or accomplishing the object of the conspiracy. <u>United States v. Falcone</u>, 311 U.S. 205, 210 (1940).

The indictment alleges, and the government has presented sufficient evidence to prove, that the unlawful agreement began

around the time of the incorporation of Care International, the vehicle through which the conspirators agreed to defraud the IRS by falsely claiming to be eligible for tax-exempt status.  The conspiracy had a common purpose, had overlapping participants, and was interdependent on a variety of events, commencing with the creation and incorporation of a new organization called Care International, and extending throughout the time period that Care obtained and maintained its 501(c)(3) status.

The government, and the court, have articulated many pieces of evidence along with the corollary reasonable inferences, which allow for the jury to reasonably conclude that Defendant Muntasser, along with co-conspirator Waseem Yassin (and the government argues the other members of Care who were also involved in Al-Kifah), had agreed to the charged conspiracy prior to the filing of the Form 1023 application with the IRS, which constitutes a significant act in furtherance of that agreement. See Yates, 354 U.S. at 334("The function of the overt act in a conspiracy prosecution is ... to manifest 'that the conspiracy is at work.").  After the filing of the Form 1023, abundant evidence demonstrates that for the remainder of the conspiracy, the other defendants and co-conspirators conspired to continued to maintain the 501(c)(3) status, as charged in the indictment. See United States v. O'Campo, 973 F.2d 1015, 1022-1023 (1st Cir. 1992)(holding liability for acts of co-conspirators prior to defendant's involvement in conspiracy); United States v. Rea, 958

F.2d 1206, 1214 (2nd Cir. 1991)("A defendant need not have joined a conspiracy at its inception in order to incur liability for the unlawful acts of the conspiracy committed both before and after he or she became a member."). The overwhelming nature of the latter evidence is instructive to infer what the conspirators' knowledge and intent was at the beginning of the conspiracy, a time at which they were all aware that a new organization was being incorporated which would engage in the same basic mission as Al-Kifah, and that they would seek tax-exempt status to do it.

This is not a case where the tax fraud were merely a foreseeable collateral effect of the agreement.  If that were the case, then the subsequent tax-filings and interviews would have revealed the Al-Kifah connection and the non-charitable activities.  Rather, the evidence shows that there was good reason to incorporate Care, abandon Al-Kifah, and obtain a tax-exempt status, in order to 'clean' the purpose and the objectives of this node of Maktab al Khidmat.  This is further corroborated by the facts that Care continued to represent itself as Maktab, and the fact that shortly after filing the Form 1023, Care began to represent that it had tax-exempt status (as described in more detail below).  This falls in line with the *Goldberg* line of cases, in the context where the very benefit sought was tax-exemption.

In addition to the demonstration that the charged conspiracy was in motion at incorporation (prior to even the filing of the

Form 1023), the government takes this opportunity to supplement oral argument made at the close of the government's case, and the syllogism articulated by the Court.  The government has marshaled significant additional evidence of this conspiracy around the time of Care's inception, prior to the filing of the Form 1023, which will further be elaborated at closing argument.

The evidence shows that the charged conspiracy started just prior to the incorporation of Care International.  A jury can conclude that the directors of Care, specifically Muntasser, Akra and Yassin, had agreed to incorporate the new organization, for at least one purpose of defrauding the IRS by obtaining the 501(c)(3) status.  The directors included that intent in their incorporation documents.  A reasonable inference to be drawn from being a named director of a publicly available incorporation, in which your address appears, and another director's signature appears on the by-laws is that the directors were aware of the incorporation of the new organization.  Mr. Kadri's testimony about Akra telling the non-conspirator directors about the new organization also corroborates this reasonable interpretation of the evidence.  There is abundant evidence that over the next several years, these three, along with defendants Mubayyid and Al-Monla, were aware of and engaged in non-charitable activities, as well as filed tax forms concealing these activities and Care's connection to Al-Kifah.

Perhaps most telling, however, is direct evidence that the

publishers of the Al-Hussam, Care International, shared the
intent to defraud the IRS, *at the time* that Muntasser was filing
the Form 1023.  The evidence shows that the Al-Hussam was widely
distributed (including internationally), and was a substantial
activity requiring personnel and expense to distribute.  Exhibit
267A, the June 11, 1993 issue of Al-Hussam, the third Al-Hussam
published under the name Care International, contains a direct,
and fraudulent solicitation to "send your tax-deductible
donations to the Office of Services, address shown at the top of
page 1."  This solicitation evidences that the members of Care
affirmatively and openly were aware of and propagated the
fraudulent tax-benefit motivation.  Muntasser filed the Form 1023
that same week after seeking legal advice for what he called
"our" organization.  This evidence is particularly probative when
considering that Wassem Yassin was largely responsible for the
distribution of the Al-Hussam newsletter.  Mr. Kadri described
him as the guy who gets things done and Yassin himself described
his Al-Hussam publication activities.  In a January 1996
telephone call to Hassoun, Yassin explains that he is no longer
as involved in the Al-Hussam as he used to be, but then discusses
the expenses in publishing and mailing it. See Exhibit 514A("Al-
Hussam?  I told you, I almost do not have anything to do with it
anymore...[the Al-Hussam printing cost] is going to be like
1,000.").  The June 11, 1993 Al-Hussam which solicits tax-exempt
donations, published at the time of the filing for tax-exempt

status, is direct evidence that Muntasser conspired with the others in Care who helped publish the Al-Hussam, including, Wasseem Yassin to commit tax fraud.

It bears emphasizing the contextual significance of the close-knit intimate organization that was Care (an organization whose only official members were the officers and directors), makes plain that the director/members of Care were in on the conspiracy charged in the indictment - to defraud the IRS by obtaining *and maintaining* 501(c)(3) status.[1]  The members were all highly educated, all sharing a common purpose and mission, and all had been members of Al-Kifah.  The evidence and the reasonable inferences drawn therefrom demonstrate that the officers of Care shared a unity of purpose, consistency of action, an intent to achieve a common goal, worked together and delegated tasks and roles to accomplish that end.

> **C.**    **The remedy, even if there were insufficient evidence of the conspiracy at the time of the incorporation of Care, is not Rule 29, but rather to allow so much of the charged conspiracy which survives to go to the jury**

The government has met its burden for Rule 29 purposes that totality of the facts and circumstances presented in this case, along with the inferences to be drawn therefrom, permit a

---

[1]The intimacy of an organization can be probative of what people within it knew. United States v. Elashi, 440 F.Supp.2d 536 (N.D.Tex.2006); See United States v. Investment Enters., Inc., 10 F.3d 263, 267 n. 4 (5th Cir.1993) ( "Close relationships can be a part of the circumstantial evidence from which a jury may infer that the defendant knew of a conspiracy.") (citation omitted).

reasonable jury to convict the defendants on the conspiracy count, as written.  In the event that the Court determines that it cannot allow the jury to conclude that the conspiracy began before the filing of the Form 1023, then the Court should allow the balance of the conspiracy to go to the jury.  Although it has not drawn focus of the court or the defense, in this case, the charged conspiracy charges multiple objects.  That is, both the obtaining of the 501(c)(3) status fraudulently, as well as the maintenance of the 501(c)(3) status fraudulently.  Given that the indictment charges both of these objects, it is not a panacea if the conspiracy to obtain the 501(c)(3) status fraudulently differs from the proof that in fact it was fraudulently maintained.  The charged conspiracy remains the one that the government has proved.  See United States v. Decicco, 439 F.3d 36, 43 (1st Cir. 2006).  The government has merely charged these objects in the conjunctive, and even assuming that all reasonable inferences in favor of the government cannot lead to the reasonable conclusion that Muntasser had agreed with at least one other person to fraudulently obtain the 501(c)(3) status of Care, the remedy is to narrow the indictment to the remaining aspect of the conspiracy.  The evidence in support of the 'maintaining' prong of the conspiracy is replete in the record.  In this case, the defendants suffer no prejudice from a narrowing of the indictment to the charge that they conspired to fraudulently maintain the 501(c)(3) status, rather than they conspired to both obtain and maintain such status.

"Where the relevant statute lists alternative means of violation, '[t]he general rule is that when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive …the verdict stands if the evidence is sufficient with respect to any of the acts charged.' <u>Turner v. United States</u>, 936 U.S. 398, 90 S.Ct. 642, 654 … (1970). This rule obviously extends to a trial court's jury instructions in the disjunctive in the context of a conjunctively worded indictment."

<u>United States v. Cusamano</u>, 943 F.2d 305, 311 (3rd Cir. 1991) (citations omitted, except for <u>Turner</u>).

 The evidence presented to the jury does NOT create a variance issue, because there is sufficient evidence to conclude that the defendants conspired to both obtain *and* maintain the fraudulent tax-exempt status of Care.  However, if the Court were to discount the jury's ability to so find, then the proper remedy would be to allow the jury to find that the conspiracy involved the fraudulent maintenance of the Care's tax-exempt status, which is also charged in the indictment. When evidence of the charged conspiracy exists in the record, but the timing of the existence of that conspiracy differs from that alleged in the indictment, the result is a non-prejudicial variance.  <u>See</u> <u>Dunn v. United States</u>, 442 U.S. 100, 105 (1979); <u>Kotteakos v. United States</u>, 328 U.S. 750, 766 (1946).

**II.  The Court's concern with proving who was a member of the charged conspiracy at the time of its commencement.**
   **A. Legal Standard**

This case does not invite a jury to speculate.  Rather, it asks them to draw reasonable inferences from the evidence.  This is necessarily the scrutiny in conspiracy cases involving shadowy meetings of minds, the jury must be permitted to infer the intent

and agreements between people.

In the context of money laundering schemes charged under a *Klein* conspiracy theory, the First Circuit has held that an agreement to launder money derived from narcotics trafficking is evidence of an act of impeding the IRS in its collection of taxes. See, e.g., United States v. Goldberg, 105 F.3d 770, 773 (1st Cir. 1997)(on point and still the law of the Circuit); United States v. Tarvers, 833 F.2d 1068, 1076 (1st Cir. 1987). In this circuit, the act of "laundering" money itself constitutes impeding the IRS in its ability to collect taxes, regardless of an express agreement to defraud the IRS. See United States v. Hurley, 957 F.2d 1, 4-8 (1st Cir. 1992); United States v. Paiva, 892 F.2d 148, 162 (1st Cir. 1989); Cf. Dennis v. United States, 384 U.S. 855 (1966)(holding the tax fraud purpose cannot be merely a foreseeable consequence.) Thus, the court need not be concerned about other motives behind acts of concealment or in establishing independent proof of the tax motive.  When the activity at issue in this case is the filing and maintaining a tax-exemption without disclosing the activities which may jeopardize it, then the tax evasion aspect of the goal of the conspiracy is by definition, satisfied.  See Goldberg, 105 F.3d at 773-4; United States v. Cambara, 902 F.2d 144, 147 (1st Cir. 1990).  In order to establish the tax motive for the *Klein* conspiracy when the fraud is obtaining a tax-exemption, then, what the government must establish: is that (1) the conspirator

participated in or knew about the "origin or goal" laundering scheme; and (2) the conspirator knew the origin or goal being concealed and that tax-exempt status was being sought. <u>See</u> <u>Tarvers</u>, 833 F.2d at 1076.

The agreement in *Tarvers* also did not involve explicit evidence that the conspirator's motivation at the time of the acts of the conspiracy, was to defraud the IRS. This was left as a reasonable inference from the concealing of income. <u>See</u> <u>Tarvers</u>, 833 F.2d at 1076. In *Tarvers*, when the court held that money laundering inherently impedes the IRS' ability to collect taxes, it is a more direct deduction that falsely representing your organization in obtaining or maintaining tax-exempt status impedes the IRS' ability to collect taxes. There is copious evidence to demonstrate that the directors of Care knew that they were going to seek tax-exempt status, and that, being formerly associated with Al-Kifah, that they would conceal their origin and non-charitable activities.

**B.  Facts in Evidence which Support the Reasonable Inferences to Find the Existence of the Conspiracy at it's Formation**

The Court's concern as to the proof of who the conspirators were at the time of the filing of the 1023 is understandable when framed by the defendants in a vacuum. The Court should first step back a moment, and look at the evidence in totality to see that the conspiracy to defraud the IRS is inferable when the shared idea of starting a new tax-exempt organization, Care,

13

begins. Despite their refrain that Yassin did not state his agreement, the defendants are asking the court to disregard the evidence which is in the record, and the common sense experience and inference which a jury will exercise when viewing that evidence. The testimony and documentary evidence demonstrates that Yassin and Akra each were integral and intimately entrenched members of Muntasser's circle with regards to Al-Kifah and Care.[2]

---

[2]**WASSIM YASSIN/ABU ABDULLAH** - Was the Clerk/"go to person" of Al-Kifah. He was an Al-Kifah donor. He deposited money to Al-Kifah through automated clearing house even AFTER incorporation of Care. He was involved in the decision to change Al-kifah's name (as described to Kanj and Tiba). He was an original Director of Care, overlapping with being listed as Secretary (1993-95), and Vice President in 1994 & 1998. He was involved in the printing and distribution of Al-Hussam and Join the Caravan, as well as the Orphan (of Martyrs) Sponsorship Program, and he signed a pledge of support to Hekmatyar with Muntasser and others. He provided financial and tax data to Tax Preparers for Care's activities for 1993-1996, including providing a copy of the original Form 1023. The Form 990s ultimately were signed by Muntasser and Al-Monla. He signed Annual reports for 1993-1995 with the State of Massachusetts, and was a Shura council Member beginning in 1995. He was on the Care Executive Committee from 1996-1998. Telephone interceptions also indicate he was very close to Muntasser, including Muntasser going to visit him after the birth of his son, something which Muntasser told to their common colleague, Adham Hassoun, who had repeatedly asked for Al-Hussams and Join the Caravans from Muntasser, Yassin and Al-Monla.

**MOHAMAD AKRA** - Was the religious leader of Al-Kifah. He became the religious leader of Care after the name change. Akra summoned Al-Kifah volunteers to his apartment and told them that they were starting a new organization, and asked Nawra, Barra and Kadri if they would mind being listed as Directors (for the State filings). Akra was a director of Care from 1993-1995 and President in 1998. Shortly after Care's incorporation, Akra gave pro-jihad lectures and discussed the Al-Hussam newsletter, and Join the Caravan. He gave lectures where Care's publications and media were distributed. Akra wrote articles for the al-Hussam, and also signed the Pledge of Support to Hekmatyar. Akra was a member of the Shura Council from 1995, and a Member of the Executive Committee from 1996-1998. Telephone interceptions also reveal a very close connection to Muntasser, including the

It is sufficient from the close-knit nature of the small
group of people associated with both Al-Kifah and Care, the
uncanny similarity of activities, members, and manifested
purposes, along with the absence of the 501(c)(3) status of Al-
Kifah, and the application for 501(c)(3) status for Care -- that
a jury could reasonably infer that the people who created and
initially acted on behalf of the new organization, agreed to
sneak activities by the IRS.  This is especially the case in the
face of evidence that the tax-exempt status of a non-profit
organization is crucial to raising funds, and the directors of
Care themselves, as manifested in their articles of
incorporation, met and agreed to seek 501(c)(3) status, some two
months prior to the filing of the 501(c)(3) application.[3]  The
only reasonable inference that a jury would have to draw in that
circumstance is that members of a board of directors of this
small not-for-profit organization, knew the general purpose and
history of the organization; especially where the only

_____

conversations where both Akra and Muntasser discuss with Hassoun
Care's activities.

[3]The Articles of Incorporation explicitly state that the
organization intends to be "entitled to exemption from federal
income tax under Section 501(c)(3) of the Internal Revenue Code",
and states that it is organized and operated exclusively for
charitable purposes, and all purposes will be to maintain the tax
exemption.  See Exhibit 2 at p. 5-6.  The By-Laws of the
corporation also indicate that a meeting was held, and the
directors were duly elected.  From this, there is sufficient
evidence based on Muntasser's own representations, that those
listed as Directors were aware of and agreed to the information
provided in these documents.  This alone, could lead a jury to
find that the Directors were aware of the tax-fraud agreement.

significant difference in the organizations was the new name and the application for 501(c)(3) status.

Equally as important, however, is that the defendants refrain, and their twenty page attachment to their renewed motion, only cites to oral testimony of witnesses. The defendants disregard the documentary evidence, which in this case, tells the rest of the story.

Who agreed to the tax-defrauding purposes of the conspiracy at the inception of Care becomes clear upon a close inspection of the evidence (testimonial and documentary) at trial and the inferences to be reasonably drawn therefrom.[4] At core, based on what had been presented about the small, tight, secretive association of Care, that the Directors knew what was going on within the organization, that they worked together, communicated to each other about the activities and plans, and delegated substantial tasks among each other. This is particularly true for Muntasser, Akra and Yassin, all of whom had hailed form Al-Kifah, and who recruited or oversaw the actions of other directors, such as Kadri and Barra. Muntasser told the FBI that the purpose for the incorporation of Care was because he could not obtain certain tax records, and a jury can easily and reasonably infer that this was well-understood by the other

_____

[4]In addition to the government's oral argument on the Rule 29 and the Court's recitation of inferences and evidence at that hearing, the government incorporates its Memorandum on Pre-trial admissibility of Co-conspirator Hearsay statements, which the court has previously referenced.

officers of Care with whom Muntasser started Care, including
especially, Mr. Yassin.   It is an equally permissible inference,
that Yassin and Akra were aware that in order to obtain a tax-
exempt status as a charitable organization, that Care could not
disclose its non-charitable activities, or its prior incarnation
as a non-tax-exempt organization (Al-Kifah).   A more detailed
description of relevant facts which demonstrate that Muntasser
had openly conspired with others at the beginning of the
conspiracy are listed below.

> Relevant Evidence, absent reasonable inferences
> pertaining to the commencement of the charged
> conspiracy:
>
> Muntasser, Yassin, Akra, Al-Monla, Mubayyid and
> Chehade were all involved in Al-Kifah Refugee center,
> which the evidence shows engaged in the same activities
> as Care, and depended on donations. (Bank records,
> Testimony of Kadri, Al-Kifah Al-Hussams, Audiotapes,
> Zakat Calculation Guides) Al-Kifah was a relatively
> small organization, and Muntasser told the FBI that it
> included Akra, and described some of its activities.
>
> Muntasser falsely represented the tax-exempt
> status of Al-Kifah, which did not have 501(c)(3) status
> as evidenced by Exhibit 40.
>
> Muntasser, Akra, Yassin, Al-Monla, Kadri, Nawras,
> and Barra all authorize money transfers through direct
> deposit into Al-Kifah's bank accounts.  Muntasser uses
> a false Tax ID number when submitting the deposits to
> the bank.
>
> Muntasser engaged a tax lawyer to assist in the
> Form 1023 filing process.  Care obtains an undated fax
> copy of Global Relief Foundation's Form 1023 (which
> lists as a date of filing of 1992), which is found in
> the Care Storage locker in 2003. Muntasser describes
> his group as "our" organization to the tax lawyer.[5]

_____

[5]The defendant's use of the collective is itself
significant.  See United States v. Elashi, 440 F.Supp.2d 536
(N.D.Tex.,2006)("The Government contends that since the letter
was written in the form of the collective "we," it is evidence of

Mohamed Chehade, who Muntasser said had been a member of Al-Kifah, was the executive director of Global Relief Foundation.

Bank records show that another member of Al-Kifah Refugee Center paid the tax lawyer's fees.  From this evidence, the jury can infer that Muntasser had clearly and openly discussed the reasons for the formation and the tax aspect of the formation of a new organization with multiple individuals who were aware of the Al-Kifah connection and their pro-jihad activities at this point.

**April 1993, the charged conspiracy begins.**

A meeting occurs at Mohamad Akra's apartment at which Akra tells Kadri, Barra and Nawras, each of whom was involved in Al-Kifah, that they will be starting a new organization, and asks if they would agree to be directors, to which they all agree.

Mr. Sack testified that most new non-profit organizations require tax exempt status in order to solicit donations effectively.

Widespread extremely negative press reporting circulates about Al-Kifah.

On April 13, 1993, Muntasser files articles of incorporation with the Commonwealth of Massachusetts, listing a number of individuals as Directors of the new organization.  These individuals include, all the people from the dinner at Akra's apartment, as well as Yassin and Muntasser.  These individuals include Yassin, Akra, Barra, Nawras and Muntasser. The address of the organization is the same as Al-Kifah's, and all the officers were previously involved with Al-Kifah. Mr. Nawras, one of the Directors, signs the By-laws to the organization.  Mr. Muntasser asserts in the articles that the Directors of the organization have been duly elected.

The articles of Incorporation and By-laws which Muntasser signs contain express limitations on the scope of some activities in order to comply with the potential 501(c)(3) status of the new organization, and expresses intent to be such an organization.  The

---

a conspiracy attributable to all Defendants, including Ghassan. It asserts that a jury could reasonably infer that the letter reiterates the same position taken by Defendants in response to the July 1995 subpoena, and therefore evidences conduct in furtherance of a conspiracy. The court determines that a reasonable jury could make such inference.")

articles also list the address as a mail-box service, which is inadequate for state incorporation purposes. Yassin is listed on the articles of incorporation Board of Directors, which are public records.

The Jury can infer from the listing of names and addresses in a pubicly-filed incorporation document which includes By-laws signed by another director, that the Directors of this organization (who later participate in its activities) were aware of the filing of the articles and the seeking of the 501(c)(3) status.

Yassin deposits money into the Al-Kifah account around the time of the incorporation of Care.

Care International publishes the first Al-Hussam under the Care name on April 16, 1993, it makes no reference to the fact it's a new publication, nor the tax exempt status of the organization.  The subject matter of the Al-Hussam includes articles on the going out light and heavy to Jihad.

On June 6, 1993, Munther Barra, the Treasurer of Care, pays a second check to the tax attorney assisting on the tax filings for Care.

On June 10, 1993, Akra gives a recorded lecture on Jihad, and talks about going out light and heavy to Jihad.  In another recorded lecture, Akra tells the audience that they should contact Yassin for a copy of the "Join the Caravan", at the same time as he mentions the publication of the Al-Hussam.

Muntasser filed the Form 1023 in early June 1993, including the articles of incorporation and the by-laws.

**On June 11, 1993, Care International publishes the third Al-Hussam under the Care name, in which it specifically states that donations are tax-exempt** (despite the fact that tax exemption had not yet been granted by the IRS.)  This piece of evidence directly demonstrates that the charged conspiracy was in motion here, and that the rest of Care International, Yassin in particular, had agreed with Muntasser to start Care for the purpose of defrauding the IRS. See Exhibit 267A, p2.

**Wassem Yassin, among other things, shared responsibility for the publication of the Al-Hussam.** In exhibits 511A, a 1995 telephone call, and 514A, a 1996 telephone call, Yassin discusses the Al-Hussam. In the latter, a 1/29/96 conversation with Hassoun, Yassin says that is not as involved in the Al-Hussam as

he used to be, and that he is handing the reins over to someone else. They go on to discuss how much it costs to produce the Al-Hussam. Al-Monla also discusses with Hassoun that Yassin was going to send Hassoun Al-Hussam.

Care bank account checks bear out that Yassin was reimbursed for the Al-Hussam.

Kadri describes Yassin as the person at Care who makes things happen.

Care International is granted tax-exempt status at the end of October 1993.

**The maintenance prong of the charged conspiracy begins.**

Several months later, Kadri hears Yassin tell Kanj of one of the reasons for the formation of Care.

A couple of years later, Yassin tells Tiba that they changed the name from Al-Kifah to Care.

Kadri asks Yassin to be removed as an officer of Care at some time in 1994.

In 1995-1996, Yassin corresponds with Attorney Naseem regarding the 1993-1994 Form 990s. During this correspondence, **Yassin faxes a copy of the Form 1023 to Naseem**, and also provides Naseem with the details of Care's activities for purposes of filing the Form 990s. Yassin conceals the non-charitable activities, and expresses no surprise or disagreement at the contents of the Form 1023. Kadri remains listed as an officer in the next 3 Forms 990 filed by Yassin and Muntasser.

Muntasser files the 1993 and 1994 Forms 990. At the time, Muntasser writes a letter to the IRS asking for a waiver of penalties and says that the officers of Care have been working hard, and none of them are experienced in tax matters, the natural inference being that he has discussed it with them, and they have been unable to assist in the filing of the Forms 990.

Bookkeepers Ltd. corresponds with Care about additional tax filings. Muntasser files the 1995 Form 990.

For 1996, there's a fax from Yassin to Al-Monla and Al-Qadeeri providing them with the financial information necessary to file the Form 990.

Al-Monla tells the FBI that where money is disbursed was controlled by Yassin and Akra.

Other members of Care, including Al-Monla and Mubayyid file future Forms 990, and make false

statements during FBI interviews about Care's
activities – which continue to include solicitation and
expenditure of funds for the promotion and support of
jihad and the mujahideen.  These future activities in
furtherance of the conspiracy also color what these
individuals knew at that time they were involved in Al-
Kifah and Care in 1993.  Each of the co-conspirators
successfully concealed such information, and the
evidence shows that each of them knew about the Care's
non-charitable activities, and were charged with
knowing the information disclosed to the IRS about what
those activities were.  Each of the co-conspirators
filed Form 990s without correcting the
misrepresentations made at the commencement of the
conspiracy.

This litany demonstrates that at the commencement of the

charged conspiracy, the unlawful objective included tax fraud,

and it was shared by the other active members of Care.  The overt

acts which were taken in furtherance of that conspiracy include

many taken by Muntasser, including the filing of the Articles of

Incorporation and the Form 1023, but the agreement which preceded

those acts is manifest by what the other officers of Care knew at

the time (specifically Yassin and Akra), how Care operated

(including significantly the solicitation for tax-exempt

donations immediately after the filing of the 1023 form).  This

is something that a jury could reasonably conclude.

The future actions of officers further evidence that they

were both aware of the original tax filings, as well as their

role in the second prong of the charged conspiracy, falsely

*maintaining* the tax-exempt status prong. There is no indication

that any of the co-conspirators manifested any confusion,

surprise or disagreement with any of the tax filings, the

disclosures in the Form 1023, or the disclosures (or lack

thereof) to the government.[6]   Intercepted communications between
the conspirators further evidence that they were aware of and
participated in the non-charitable activities of Care while
Muntasser was still President of the organization as well as
afterward.   Those conversations also demonstrate the tight-knit
relationship between the conspirators and their dedication to the
mission of Care.   In fact, the weight of the evidence suggests
that each of the directors (members) of Care, knew the utility of
the 501(c)(3) status and sought to maintain it.   Care continued
to solicit donations citing to their tax-exempt status.   The
evidence shows that Muntasser was a acutely engaged President,
but that he also delegated tasks, and the other officers and
volunteers performed many of Care's activities, including
publication of the Al-Hussams, and preparation of the financial
statements and the tax-paperwork.

## III. The existence of other possible motives does not mitigate the existence of the charged conspiracy

A *Klein* conspiracy is appropriate under 18 U.S.C. section
371, if the defendant conspires to defraud the United States by
impeding, impairing, obstructing and defeating the lawful
functions of the IRS in the performance of their duties to assess
taxes.   See United States v. Cambara, 902 F.2d 144, 146 (1st Cir.

_____

[6]The evidence shows that the Form 1023 itself had been in
the possession of two other co-conspirators, Yassin and Mubayyid,
as well as was supposed to be consulted by every officer who
filed a Form 990.

1990)(citing <u>United States v. Klein</u>, 247 F.2d 908 (2d Cir. 1957)).

In order to prove a Section 371 conspiracy, the evidence must show that (1) there was an agreement, (2) to do an unlawful act, and (3) a coconspirator committed an overt act in furtherance of the agreement. <u>United Stats v. Barker Steel</u>, 985 F.2d 1123 (1st Cir.), <u>reh'q denied</u>, 985 F.2d 1136 (1st Cir. 1993). This includes a conspiracy to obstruct the lawful function of any department of the government. <u>Dennis v. United States</u>, 384 U.S. 855 (1966).

The government is not required to prove that the tax evasion motive was the primary or only motive behind the agreement, just that there was such an agreement. <u>See Goldberg</u>, 105 F.3d at 773. "If a tax evasion motive plays any part in a scheme, the offense can be made out even though the scheme may have other purposes." <u>Cambara</u>, 902 F.2d at 147; <u>Tarvers</u>, 833 F.2d at 1075.

To prove that the tax fraud agreement existed, the government need not show *direct* evidence of tax motivation. <u>United States v. Hurley</u>, 957 F.2d 1, 4 (1992)(<u>citing Glasser</u>, 315 U.S. at 80 ("[P]articipation in a criminal conspiracy need not be proved by direct evidence."); <u>United States v. Hilton</u>, 894 F.2d 485, 487 (1st Cir. 1990)("[T]he prosecution may prove its case by circumstantial evidence.")).

It is sufficient to show some motivation for tax evasion through inference, even absent direct evidence of same. <u>See</u>

Hurley, 957 F.2d at 6; United States v. Tarvers, 833 F.2d at 1075
("[T]he government need not prove that the defendants understood
the tax consequences of [their] activities.").

This means that the government need not prove all of the
elements of an underlying criminal offense (e.g., tax evasion)
and each member's intent to commit that offense (e.g.,
willfulness). Rather, all the government must show is that the
members agreed to interfere with or obstruct one of the
government's lawful functions "by deceit, craft, trickery, or at
least by means that are dishonest." Hammerschmidt, 265 U.S. at
188; United States v. Hurley, 957 F.2d 1, 4-5 (1st Cir. 1992).
In this case, this means that the jury should be able to infer
that there was an agreement to concealing the non-charitable
activities and the origin of Care from the government.

As described above, there is direct evidence that Muntasser,
Yassin, and Akra had considered the tax consequences, and agreed
that they provided an important motivation for incorporating Care
and obtaining and maintaining its tax-exempt status.  However,
given the Goldberg line of cases, this evidence exceeds the
minimum when, as exists here, a jury can fairly conclude that
given the nature of Al-Kifah and Care, and the relative
similarities, that the tax-fraud aspect of obtaining an official
tax-exemption was a driving factor for Muntasser, Yassin and
Akra. See Id; see generally, United States v. Hairston, 46 F.3d
361, 374 (4th Cir. 1995)(not even requiring any evidence of tax

evasion motivation, affirming conviction on the reasonable inference that the conspirators had concealed income).

The quantum of evidence necessary for a jury to find the existence of a conspiracy, especially when the ongoing conspiracy is firmly established by a later time, is slight. United States v. David, 940 F.2d 722, 724 (1st Cir. 1991)(a jury can infer from the actions as well as the words of the conspirators as to the nature of the agreement.)  A criminal jury, after all, "is free to choose among varying interpretations of the evidence, as long as the interpretation they choose is reasonable." United States v. Guerrero-Guerrero, 776 F.2d 1071, 1075 (1st Cir.1985).

**B.    The low quantum of proof necessary to prove circumstantial existence of a conspiracy**

Although the government must prove that a defendant was a member of a conspiracy, this requirement may be satisfied by a showing of only a "slight connection" to the conspiracy so long as the connection is proven beyond a reasonable doubt.  See United States v. Collazo-Aponte, 216 F.3d 163, 196-197 (1st Cir. 2000); United States v. Brandon, 17 F.3d 409, 428 (1st Cir. 1994).

A tacit agreement will suffice.  United States v. Woodward, 149 F.3d 46, 68 (1st Cir. 1998).  A conspirator need not intend to commit the underlying act himself to be found as a member of a conspiracy.  United States v. Piper, 35 F.3d 611 (1st Cir. 1994). The agreement to conspire may be proved by either direct or

circumstantial evidence.  United States v. Rivera-Ruiz, 244 F.3d 263, 268 (1st Cir. 2001).

Whether a conspiracy exists may rest wholly on circumstantial evidence. Indeed, "the government can prove the existence of both express and tacit agreements by pointing to the actions as well as the words of the defendant[]." See United States v. Glenn, 828 F.2d 855, 858 (1st Cir.1987)

When the government relies upon circumstantial evidence to establish a tax conspiracy, the circumstances must be such as to warrant a jury's finding that the alleged conspirators had some "*common design with unity of purpose"* to impede the IRS. Klein, 247 F.2d at 918.

Concerted action often demonstrates a conspiracy.  See United States v. Williams, 264 F.3d 561, 577 (5th Cir. 2001); United States v. Bell, 154 F.3d 1205, 1208 (10th Cir. 1998)(stating that despite no direct evidence of agreement, a jury may infer agreement "from the acts fo the parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose."); United States v. Gonzales, 121 F.3d 928, 935 (5th Cir. 1997)(conspiracy may be inferred from the 'development and collocation of circumstances'; from the presence, association, and concerted action of the defendant with others.)

The jury must view the conspirators' knowledge and intent objectively, rather than through the eyes of the potential

conspirators.  See United States v. Montgomery, 150 F.3d 983, 999 (9th Cir. 1998).  Stated differently, a jury can convict, if reasonable inferences drawn from the evidence would permit the jury to conclude that a conspiracy did in fact exist.  Moreover, a conspirator cannot remain willfully blind to the conspiracy while still acting in furtherance of it.  See United States v. Gabrielle, 63 F.3d 61, 66 (1st Cir. 1995); United States v. Richardson, 14 F.3d 666, 671-672 (1st Cir. 1994); United States v. Reyes, 302 F.3d 48, 54 (2nd Cir. 2002).

It is only necessary to show that the conspirators knew of the conspiracy's general scope, not that they knew exactly how the conspiracy was going to be set in motion, or how the objective was going to be achieved.  See Blumenthal v. United States, 332 U.S. 539, 557 (1947); United States v. Guerra-Garcia, 336 F.3d 19, 23 (1st Cir. 2003); Brandon, 17 F.3d at 409.  Nor does a conspirator need to know whether there are other objectives in the conspiracy.  United States v. Cassiere, 4 F.3d 1006, 1015 (1st Cir. 1993).

A jury is also permitted to presume that a conspirator is a knowing participant when he acts in furtherance of it.  See United States v. Pulido-Jacobo, 377 F.3d 1124, 1130 (10th Cir. 2004); Cassiere, 4 F.3d at 1015 (permitting inference from conspirator's actions).

Conspirators can also conspire through intermediaries or unknown individuals, including Chehade (who both provides a copy

of GRF's Form 1023 to Care prior to filing the Form 1023, and is later a party to a meeting with Yassin, Muntasser and Akra in 1995 discussing coordination of effort.)  United States v. Bicaksiz, 194 F.3d 390, 399 (2nd Cir. 1999); Rogers v. United States, 340 U.S. 367 (1951)(conspiracy can exist with unknown individuals).  As long as the evidence supports the existence of other people with whom the defendant conspired, a jury can find the existence of a conspiracy.  See United States v. Cepeda, 768 F.2d 1515, 1516 (2nd Cir. 1985).

In this case, Muntasser's own statements evidence that he had conspired with other(s) to obtain tax exempt status without disclosing the nature of Care's uncharitable activities, and without disclosing the relationship to Al-Kifah.  A defendant's representations that he is acting in concert with others is sufficient evidence from which a jury may find that a conspiracy existed.  The fact that Muntasser represented in the articles of incorporation that the directors shared his common purpose and that Care intended to obtain tax-exempt status is probative of the existence of a conspiracy.  At the time of the filing of the 1023 application, the directors had the shared intent to incorporate and file for tax exempt status for Care International.  Given that the officers of Care were all involved in Al-Kifah, it is a short inferential step for a jury to conclude that at the time of the incorporation of Care, the directors were in agreement with Muntasser that their

organization should obtain tax-exempt status without disclosing its non-charitable activities and connection to Al-Kifah.

The defendants' encourage a construction of conspiracy law which suggests that the conspirators must have had not only the shared agreement (to obtain and maintain tax exempt status while concealing their support for the mujahideen and relationship to Al-Kifah), but rather they must have shared the same intent as to HOW to achieve the object of the conspiracy.  That is the construction which requires a microscopic analysis of who had agreed to the filing of the Form 1023.  However, this analysis is myopic.  It ignores the fact that an overt act by a couple of co-conspirators, does not reduce the reasonable inference that all of the listed officers of Care international wanted to incorporate Care so that they could continue their non-charitable activities while obtaining a tax-exempt status, unlike Al-Kifah.

C.    **The Tax Fraud Purpose of the Conspiracy**

In the context of criminal tax conspiracies, the object of the crime is usually to conceal income and expenses from the IRS. Indeed, the very definition of an affirmative act of tax evasion is "any conduct, the likely effect of which would be to mislead or conceal." Spies v. United States, 317 U.S. 492, 499 (1943).

The crime of conspiracy requires the government to show that each member of the conspiracy had knowledge of the object of the conspiracy and joined the conspiracy intending achieve that

29

object. Ingram v. United States, 360 U.S. 672, 678 (1959); United States v. Flaherty, 668 F.2d 566, 580 (1st Cir. 1981). Further, the government need only show that the conspirators knew of the essential nature of the scheme -- the government need not show that a participant knew all of the details or the identity of all other members of the conspiracy. See, e.g., Blumenthal v. United States, 332 U.S. 539, 557 (1947).  In the context of a *Klein* conspiracy, this typically means that the government must show that each member knew that at least one of the objects of the scheme was to impede the functions of the IRS and intended to join in the scheme to achieve that object. See, e.g., United States v. Shermetaro, 625 F.2d 104, 109 (6th Cir. 1980). Similarly, a person may become a member of a conspiracy even if that person agrees to play a minor role in the conspiracy, so long as he or she understands the essential nature of the scheme and intentionally joins in it. United States v. Andrews, 953 F.2d 1312, 1318 (11th Cir. 1992).

It is not essential that the government establish that each conspirator knew of all the activities of the other conspirators, or that each conspirator participated in all of the activities of the conspiracy. United States v. Berger, 224 F.3d 107, 114-115 (2d Cir. 2000).

Once a conspiracy has been established, only slight evidence is needed to link a defendant to the conspiracy. Participation by a defendant in a single act may in fact demonstrate membership in

a conspiracy if the act itself will justify an inference of knowledge of the broader conspiracy. A defendant challenging the sufficiency of the evidence in a conspiracy case has a heavy burden. The government need only show that those involved operated pursuant to a common scheme or had a tacit understanding, rather than a formal agreement. Because the details of a conspiracy often are shrouded in secrecy, circumstantial evidence and inferences from the parties' actions may be used to establish the conspiracy's existence. Finally, evidence of the parties' association, although not in itself enough to establish a conspiracy, is a relevant factor. United States v. Mickelson, 378 F.3d 810 (8th Cir. 2004).

If the government demonstrates that the conspirators (1) knew of the non-charitable activities of Care or the association with Al-Kifah, and (2) knew that Care was going to or did apply for or obtain tax-exempt status, then the jury would have a circumstantial basis to infer that the conspirators were not disclosing the non-charitable activities to the government in order to maintain the tax-exempt status. See e.g. Hurley, 957 at 5 (in context of money-laundering scheme which included Klein conspiracy).

The Defendant overreads *Ingram*.  Indeed, as the Supreme Court in *Ingram* suggested, the inferable knowledge about the tax consequence is the central inference which will allow the *Klein* conspiracy to survive. 360 U.S. at 678.  In this case, as in

31

that, there are several individuals who actually file the fraudulent tax forms, thereby evidencing that they share the common objective to fail to disclose the information to the IRS which would jeopardize their tax status. This is buttressed by the fact that each of them had been involved with the previous non-tax-exempt incarnation of the organization. Each of these filings evidence the shared agreement to obtain and maintain the fraudulent 501(c)(3) status. It is for the same reason that there is sufficient evidence that the section 7206 charges go to the jury, because they can infer that Mubayyid knowingly filed false tax returns on those occasions. If there is such evidence, and if similar false returns were filed prior by others, it is a short inferential step to conclude that these individuals agreed to maintain the 501(c)(3) status by not disclosing the relationship to Al-Kifah or the non-charitable activities.

*Ingram* suggests that there must be some showing that the tax consequences composed one of potentially several different objects of a conspiracy to engage in an illicit activity. Ingram, 360 U.S. at 678. *Ingram* required a showing of scienter by the co-conspirators as to that shared objective. Id.  In this case, it is beyond dispute that at some time during the scope of the conspiracy, each of the co-conspirators engaged in acts to obtain or preserve the tax-exempt status, thereby comfortably meeting that criteria, and meeting the language stated explicitly in the indictment.

If the evidence shows that the people who filed the Forms 990 intended to conceal the non-charitable activities of Care, then the jury can find that they intended to be a part of the conspiracy to obtain, and to maintain the fraudulent tax-exempt status of Care.  The evidence does permit this conclusion. Indeed, each of the co-conspirators was aware of the non-charitable activities of Care.  Evidence of the Al-Hussams, the internet Website, distribution of 'Join the Caravan' and other pro-jihad books and tapes, and the various lectures supports the conclusion that the conspirators all knew what Care was doing, and that they intended to maintain its 501(c)(3) status.  Indeed, each of them had also been involved with Al-Kifah.  With this knowledge, each of the co-conspirators filed Forms 990 under pains and penalties of perjury that all of the activities of Care had been disclosed to the IRS.  These facts evidence that each of the conspirators had agreed with each other to defraud the IRS. Given the substantiation of each of the Conspirator's knowledge and intent to defraud the IRS, the jury can further infer that these same conspirators were not merely present at the time of the original obtaining of the 501(c)(3) status, but rather, that they were also in on it.

For example, if a look-out person is present guarding a door to a room during a drug deal, there must be some evidence that the person is performing in concert with the drug dealer in order to find that the person is a member of the conspiracy to distribute drugs.  If on drug-deal number one he is merely

33

present, that may not suffice.  If on drug-deal number two, he is
seen leaving with the drug-dealer, it is a closer question.  But,
if on drug-deal number three, the look-out actually consummates a
drug-deal himself (or, by analogy, files a later Form 990), there
is sufficient evidence for a jury to conclude that he was working
in concert with the other dealer from the beginning, given the
totality of the circumstances.  See United States v. Bermudez,
526 F.2d 89, 96 (2nd Cir. 1975)(citations omitted)(holding
evidence of narcotics paraphernalia *after* the conclusion of the
conspiracy is probative of the existence of the conspiracy.); see
also United States v. Crocker, 788 F.2d 802, 805-806 (1st Cir.
1986)(holding evidence of acts *before* the commencement of the
conspiracy is probative of the existence of the conspiracy);
United States v. Enright, 579 F.2d 980 (6th Cir. 1978)(same).
The fact that Akra, Yassin, Mubayyid and Al-Monla were involved
in Al-Kifah before the incorporation of Care, and that they each
file Forms 990 after the incorporation of Care and work as
officers of Care, permits a jury, together with the other
evidence presented in this case, to find the existence of and
their membership in the charged conspiracy.

## IV.  The Scheme to Conceal is a Continuing Offense, and properly should be submitted to the Jury

In Toussie v. United States, the Supreme Court held that an
offense is deemed "continuing" for statute of limitations
purposes only when (a) "the explicit language of the substantive
criminal statute compels such a conclusion," or (b) "the nature

of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." Toussie v. United States, 397 U.S. 112, 115 (1970). The Toussie court held that the criminal statute making it a crime to fail to register for the draft did not contemplate "a prolonged course of conduct" and furthermore, there was "also nothing inherent in the act of registration itself which [made] failure to do so a continuing offense." 397 U.S. at 120.

Here, however, unlike the crime charged in Toussie, section 1001 explicitly contemplates an extended course of conduct: "whoever . . . falsifies, conceals, or covers up by any trick, scheme, or device a material fact." Contrary to defendant's assertion that the language itself does not indicate that the statute is to be treated as continuing, the usage of the term "scheme" suggests otherwise. A "scheme" is readily understood as an event that occurs over a period of time, and is not one singular event in time. See United States v. Yashar, 166 F.3d 873, 897 (7th Cir. 1999)(finding that substantive criminal RICO violation was continuing offense under Toussie because RICO criminalizes "pattern" of activity). Here, where the defendants continued to conceal the fact that Care was an outgrowth of and successor to the Al-Kifah Refugee Center and was engaged in non-charitable activities involving the solicitation and expenditure of funds to support a promote mujahideen and jihad, by not affirmatively telling the IRS otherwise, Care continued to receive tax exempt status from the IRS and successfully

perpetuated its scheme.   The charged scheme includes the repetitive filing of Forms 990 with the IRS for the duration of Care's tax-exempt status (through 2003), as well as false statements made by the defendants in furtherance of that scheme, to the FBI and to DHS.   The continuing nature of the scheme is self-evident from the properly charged indictment.

Even absent this evidence of continued affirmative acts in furtherance of the scheme to conceal, the section 1001 count was properly cast as a continuing offense pursuant to Toussie.   In United States v. Smith, 373 F.3d 561 (4th Cir. 2004), the defendant held a joint bank account with his mother.   Once she died, he failed to report her death to the government and continued to receive her social security payments in the joint account for four more years.   The court found that the defendant "set into place and maintained an automatically recurring scheme whereby funds were electronically deposited in his account and retained for his own use without the need for any specific action on his part."   373 F.3d at 568.   The court found the defendant's lack of action to constitute a continuing offense under Tousie.

In this case, at least every year in the Forms 990, as well as in various interviews with the FBI and DHS, statements made by the defendants and others at Care perpetuated the scheme by concealing the origin of Care as Al-Kifah, and its non-charitable activities.

The defendant further submits United States v. Dunne, 324 F.3d 1158 (10th Cir. 2003) for the proposition that crimes under

36

section 1001 are not continuing offenses, although the defendant notes that Dunne did not distinguish between the two prongs of a Section 1001 prosecution, (a) false statements versus (b) schemes to conceal material facts. In a subsequent unpublished opinion, the Court of Appeals for the Tenth Circuit made that distinction. In United States v. Shaw, the Tenth Circuit held that a violation of the "scheme" provision of section 1001 was not complete until the "scheme" itself was completed. 150 Fed.Appx. 863, 875 (10th Cir. 2005). Shaw was charged with a scheme to conceal the presence of asbestos at a refinery. Shaw contended that the statute of limitation began to run in November 1993, when he submitted documentation denying the presence of asbestos at the refinery. Since he was not indicted until June 1999, he argued, then the five year statute of limitations had run out. However, the court found that the scheme continued, as explicitly charged in the indictment, to 1997 when Shaw made further representations that there was no asbestos on the property. It held that "the crime was not completed and the statute of limitations did not begin to run until this scheme was completed in 1997" and therefore the indictment was timely. The Court distinguished Dunne as inapplicable because the government, in Shaw, had charged under section 1001's scheme provision. 150 Fed.Appx. at 876, n. 27.

Similarly, Count One of the Indictment charges the defendants under the "scheme" provision of section 1001. Here, where Care continued its scheme of concealing the fact that it

37

was an outgrowth of and successor to the Al-Kifah Refugee Center
and was engaged in non-charitable activities involving the
solicitation and expenditure of funds to support a promote
mujahideen and jihad, Care continued to receive tax exempt status
from the IRS.  The statute of limitations began to run in April
2003, when defendants Al-Monla and Muntasser continued to lie to
the FBI about the true nature and scope of Care International's
link to Al-Kifah and its non-charitable activities.

It is well-settled that once the defendants began to answer
the government's questions, they had a duty to tell the truth,
and they were not permitted to lie.  See Bryson v. United States,
396 US. 64, 71 (1969); United States v. Barra, 149 F.2d 489 (2nd
Cir. 1945)(affirming §1001 conviction based on failure to
disclose membership in Nazi Party on a form which he claimed was
invalid); United States v. Holroyd, 732 F.2d 1122, 1127 (2nd Cir.
1984)(26 U.S.C. §7206 case); United States v. Parten, 462 F.2d
430, 432 (5th Cir. 1972)(affirming §1001 conviction even if
Customs service had no right to require defendants to execute
form on which they lied).  The mere asking of the question,
creates a duty to answer truthfully, if the person chooses to
answer the question.  The defendants have not cited one case
which holds otherwise.  To hold the contrary would render Section
1001 meaningless, effectively sanctioning permission to lie
without accountability if the interviewee has lied before.

In this case, when Muntasser and Al-Monla lied during FBI
interviews, the FBI Task Force agents were interested in their

38

relationship with Care (and it's connection with Al-Kifah)), to find out about Care's activities, and what and who it supported. The defendants chose to speak with the agents and they gave some answers, while concealing material facts. The Second Circuit Court of Appeals has squarely addressed this issue in <u>United States v. Stewart</u>, 433 F.3d 273 (2nd Cir. 2006), in which they stated:

> "The 'essential issue' is whether Defendant knowingly and willingly falsified, concealed, or covered up information relevant to the investigation. [citations ommitted] Defendant's legal duty to be truthful under section 1001 included a duty to disclose the information he had regarding the circumstances of [Martha] Stewart's December 27th trade, even though he voluntarily agreed to speak with investigators....As a result, it was plausible for the jury to conclude that the SEC's questioning had triggered Bacanovic's duty to disclose and that ample evidence existed that his concealment was material to the investigation." 433 F.3d at 318-319.

The Form 1023 and Forms 990, as well as previous interviews by the FBI, clearly put the defendants on notice as to the overall government interest in getting accurate information from the defendants. The fact that Al-Monla was then served with a subpoena furthers his awareness of the criminal investigation.

**V.    Conclusion**

Wherefore, the government respectfully submits that it has met its burden of proof of each of the elements of the charged offenses. There is sufficient evidence in the record, along with reasonable inferences drawn therefrom, for the jury to decide the facts of this case. This memorandum highlights

some of the direct and circumstantial evidence sufficient to

support that verdict, as well as provides a survey of law

which allows the submission of the conspiracy count to the

jury.  Wherefore the defendants' renewed motion should be

DENIED.


                              Respectfully submitted,
                              MICHAEL J. SULLIVAN
                              United States Attorney

                         By:   /s/ Aloke Chakravarty
                              ALOKE S. CHAKRAVARTY
                              B. STEPHANIE SIEGMANN
                              DONALD L. CABELL
                              Assistant U.S. Attorneys
Date: December 17, 2007

                     CERTIFICATE OF SERVICE

    I hereby certify that I have sent this document on this
date, December 17, 2007 via Electronic notice to counsel for
the Defendants in this case.
                          /s/ Aloke Chakravarty
                         ALOKE CHAKRAVARTY
                         ASSISTANT UNITED STATES ATTORNEY