1  (The Court entered the room at 2:30 p.m.)

 2      THE COURT:  All right.  Let's begin.  This is -- well,

 3  the government has rested.  Let's leave it there.  I assume

 4  there are -- I have a written defense motion from Mr.

 5  Muntasser.  Mr. McGinty, Mr. Andrews?

 6      MR. McGINTY:  We have not separately -- I should speak

 7  for myself.  I have not separately filed a Rule 29 motion.  I'm

 8  going to be joining in the issues raised by Mr. Muntasser.

 9      MR. ANDREWS:  As I am, your Honor.  I have an

02:33 10  additional issue that I'd like to argue orally.

11      THE COURT:  You are moving for judgment of acquittal,

12  both of you?

13      MR. ANDREWS:  I am.

14      MR. CABELL:  Your Honor, having really just had 30

15  minutes to review this, it struck us that some of the arguments

16  are pretty defendant-specific.  So for Mr. Al-Monla and Mr.

17  Mubayyid to join into these, I'm not quite sure how that will

18  be played out.

19      THE COURT:  I'll let them make their own arguments,

02:33 20  but I need to carve up the time here.  Miss Estrich, are you

21  taking the lead for --

22      MS. ESTRICH:  Yes, I am, sir.

23      THE COURT:  Let me hear first from Miss Estrich.  I

24  have read part of the 37-page filing of Mr. Muntasser but have

25  not gotten all the way through it.  It's my intention, because

1    I haven't had a chance to read it, to take this under

2    advisement and rule tomorrow morning because I don't know of

3    any other practical way to do this.

4         But Miss Estrich, why don't you start.  I'm going to

5    limit the arguments just to make sure we get everything in on

6    time.  I'll give you a half hour to start.  You don't need to

7    take the whole half hour.

8         MS. ESTRICH:  I will try not to, to leave time for

9    your questions.  And I understand that there's a great deal of

02:34 10   material in here, that we've tried to cite substantial

11   authority from this circuit.

12        What I will propose to do is simply go count by count

13   through the indictment and raise the questions where we feel

14   there has been a failure of proof by the government.

15        I think we're all familiar with the standards for

16   review on Rule 29.  Defendant understands that our burden is a

17   heavy one, that the evidence is viewed in the light most

18   favorable to the government.  But we believe that on certain

19   critical points there has simply been no proof.

02:35 20        Count No. 1 alleges a scheme to conceal material facts

21   and aiding and abetting.  It alleges that these three

22   defendants knowingly and willfully falsified, concealed and

23   cover up by trick, scheme and device material facts from the

24   Internal Revenue Service.  Those -- and the Treasury

25   Department, the FBI and the INS, now part of Homeland Security,

1    to wit:  1, that Care was an outgrowth and successor to

2    Al-Kifah and was engaged in non-charitable activity involving

3    the solicitation and expenditure of funds.

4         I'd like to raise four objections to Count 1.  Number

5    1, the authority is absolutely clear that where the government

6    charges a scheme to conceal material facts you need a scheme.

7    A mere failure to disclose information is not a scheme.

8    Affirmative steps.  I've quoted many pages of case law that

9    comes out of currency transaction reports where you've got

02:36 10   somebody who doesn't disclose that they're engaged in a

11   structured transaction.  Mere failure to disclose or even

12   intentional falsification, say, of billing records, is not a

13   scheme.

14        Here, what we have -- and I think it's been clear

15   throughout.  I cite your Honor at one point in making this

16   clear.  Even Doctor Levitt made this clear today.  The activity

17   that is supposed to constitute solicitation and expenditure of

18   funds to support and promote the mujahideen.  The activity that

19   was not disclosed to the IRS was the content of Care's

02:37 20   publications.  Very simply, Care put down on its 1023 that it

21   was doing publications as part of its fund-raising.  It did not

22   attach the publications themselves.

23        Now, we contend that it wasn't required to, that its

24   failure to do so wasn't willful, that it wouldn't have resulted

25   in any different impact in terms of the ultimate decision of

1    the IRS because under the Treasury regulations and the

2    Constitution the IRS can't deny tax-exempt status because of

3    the contents of protected speech.

4         But putting all that aside for the purposes of this

5    argument, where is the scheme?  What is the scheme?  A mere

6    failure to literally staple on the actual publications, under

7    the language of Saint Michael's Credit Union and the various

8    cases cited, which I know the Court has not had time to read,

9    obviously, and review.  But these cases all say there has to be

02:38 10   some affirmative scheme.  In fact, they point to 1001 and say,

11   look, there's two sections of 1001.  You can charge a mere

12   false statement.  The government could have done that.  But if

13   you choose to charge the scheme offense, you've got to come up

14   with the scheme.  What was the scheme represented by the

15   failure to attach the Al-Hussams?  And how do you tie these

16   three defendants together in that scheme?

17        Now, the government says scheme to conceal material

18   fact, aiding and abetting.  It doesn't say who the principal is

19   and who aided and abetted who and how.  But the fact of the

02:39 20   matter is, as the evidence to date has established, two of

21   these defendants had absolutely nothing to do with the filing

22   of the 1023.  So what scheme is it that we are now to infer

23   from what?

24        To conceal the non-charitable activities of Care.

25   What scheme was it to check the wrong box on the form?  Now,

1    the government's argument, as you know, is that the question

2    that asks, Are you the outgrowth or successor of another

3    organization, the answer should have been checked "yes" as

4    opposed to checking "no."  But merely checking the wrong box is

5    not a scheme.  It's not a scheme that these two defendants had

6    anything to do with and it's not a scheme, period.

7            Second point, even if there was a scheme, which there

8    wasn't, as opposed to mistakes, the statute very clearly

9    requires the highest level of mens rea, which is willfulness.

02:40 10   As you know, your Honor, from your own experience, the tax code

11   is not supposed to be a trap for people who make mistakes, to

12   find themselves subject to criminal punishment 15 years later.

13   So you need evidence, some evidence, some basis from which you

14   can infer that these three defendants knew when they filed that

15   1023 that they were supposed to attach the Al-Hussams and

16   didn't and that they knew that they were supposed to check the

17   box "yes" and, in fact, checked "no."

18           There's simply no evidence.  I've sat here for the

19   last three days.  I've read the last 18 days.  I challenge the

02:40 20   government to point to evidence showing that Mr. Muntasser had

21   any idea that these IRS regulations required him to actually

22   staple his publications as opposed to merely noting them on

23   pain of 15 years later being imprisoned for the failure to do

24   so.

25           It also requires that the facts be material.  The

1   scheme has to be knowing and willful, which we would submit it

2   wasn't.  As to these defendants, I don't even know how you get

3   them in the room for this scheme relating to the 1023.  And as

4   for the 990s that come later, Mr. Muntasser has nothing to do

5   with them and never sees them.  Another piece of the problem.

6        The facts have to be material, your Honor.  Material

7   facts are those which are likely to influence the decision of

8   the government agency.

9        Now, how can it be -- and I'll get into this argument

02:41 10   in greater detail.  But I've quoted in detail the Treasury

11   regulations here.  If Mr. Muntasser had, which he didn't,

12   decided to do an exhaustive study, it's not at all clear to me

13   that he would have come up with the conclusion that he was

14   required to detail the contents of protected activities on pain

15   of imprisonment or to reveal his relationship or lack thereof

16   with an organization he was trying to break free of.  Whether

17   it was Al-Kifah Boston or Al-Kifah New York, the government has

18   yet to tell us.  Because the Treasury regulations say very

19   specifically that advocacy and the content of your advocacy is

02:42 20   not to be considered in determining tax-exempt status.  The

21   fact that an organization, in carrying out its primary

22   purpose --

23        THE COURT:  It doesn't say exactly that.  It says such

24   advocacy does not preclude such an organization from

25   qualifying.

1          MS. ESTRICH:  That's right.  So that it certainly

2    doesn't say -- a normal person might read that to say, oh, it

3    doesn't matter what I say.  I cite that for the proposition

4    that it was hardly clearly established that this was so much at

5    the core of the application that we should assume Mr. Muntasser

6    understood that and intentionally failed to disclose it.  Where

7    is the basis for imputing intent here?

8          There is no showing that these three did anything

9    together, talked together, knew the law, understood the

02:43 10    requirements, recognized Al-Kifah's relationship to them was

11    somehow something that tax laws required them to disclose and

12    knowingly and willfully failed to do so.

13          There is, finally, as to Count 1, a Statute of

14    Limitations problem.  The government has strung together the

15    Treasury Department, the FBI, Immigration and Naturalization,

16    and now Homeland Security, as if mentioning all four of them

17    and mentioning all three defendants in an unstated scheme

18    addresses the fact that Mr. Muntasser's involvement with Care

19    ended in 1996.

02:44 20          The Statute of Limitations, at six years, requires

21    activity after 1999.  There are some cases, many cases, your

22    Honor, in which they charge multiple schemes, and maybe you

23    could have charged here that there were, like, four different

24    schemes, one for this group and one for that.  But because of

25    the way they wrote the indictment -- and they're stuck with

1    that -- you need one scheme that unites these three defendants

2    over all these years, and it doesn't exist.

3         Mr. Muntasser made absolutely clear his leaving of the

4    leadership of Care had nothing to do with the filing of 990

5    forms by Mr. Mubayyid.  His INS interviews had nothing to do

6    with the IRS.  And how you put that all together in a scheme in

7    which some unknown member of the defense is supposed to be the

8    principal and the others are somehow aiding and abetting in the

9    doing of what, I don't know.  But we would argue that on all

02:45 10    those bases, Count 1 fails.  No scheme, no proof of knowledge

11    and willfulness, facts not material, and bar of the Statute of

12    Limitations.

13         THE COURT:  I had understood -- and I haven't read

14    these cases so I'm just literally speaking off the top of my

15    head -- that a scheme was like a conspiracy, that it was a

16    continuing offense.

17         MS. ESTRICH:  The case law -- we quote it in some

18    detail.  There was an old D.C. circuit opinion of a guy, Mr.

19    Bramblett, who put somebody on his payroll for five months, and

02:45 20    that's the one your Honor is probably thinking about, where

21    they said, yes, a scheme is a continuing offense, where you do

22    something -- he put the guy on his payroll in month one, and

23    then every month they collected the check and then said, see,

24    it's a continuing offense at least for that period.

25         Subsequent to Bramblett, however, the United States

 1    Supreme Court decided Toussie.  In Toussie, they said you have

 2    to evaluate.  You can't just automatically say that because

 3    there's a scheme it's a continuing offense.  So we will submit

 4    -- I'll turn to the authority if I can find a complete copy of

 5    my voluminous memorandum here.  But the test articulated in

 6    Toussie says that continuing offense doctrine should only be

 7    applied in limited circumstances where the specific language of

 8    the substantive criminal statute compels such a conclusion or

 9    the nature of the crime involved is such that Congress must

02:47 10    assuredly have intended that it be treated as a continuing one.

11         In Toussie, the guy didn't register for the draft.  Of

12    course, you have a continuing obligation to register for the

13    draft.  And one could argue, that for the entire period you

14    haven't registered, you're in violation.  If he had done it

15    with somebody else and he was conspiring to avoid his selective

16    service obligations, you would have said continuing violation,

17    Statute of Limitations, no Statute of Limitations problem.

18         United States Supreme Court in Toussie reached the

19    opposite result; and since Toussie we've cited a number of

02:47 20    authorities suggesting that the language in Bramblett that said

21    that any scheme, no matter what it is so long as you call it a

22    scheme, is a continuing offense, can no longer be read -- and

23    that was a D.C. circuit opinion, obviously not a Supreme Court

24    opinion -- can no longer be read as applicable, and you have to

25    look at the individual crime.

1          I can't tell you what the scheme is here that ties

2     together an interview Mr. Muntasser gave to the INS in the

3     hopes of becoming a citizen with his filing of a 1023 for an

4     organization that, by the way, was no longer even in existence

5     at the time and which the IRS had investigated for many years

6     and come up with nothing on.  So there's a significant Statute

7     of Limitations problem.

8          I should add, however, that the Statute of Limitations

9     problem is even bigger on Count 8.  Count 2, obviously, is the

02:48 10    conspiracy; and depending on how you define the conspiracy, as

11    your Honor understands, continuing offense doctrine would

12    apply.  There's absolutely no basis on Count 8 for the

13    continuing offense.

14          THE COURT:  Remind me.  Is it six years?

15          MS. ESTRICH:  Six years.

16          THE COURT:  Even if it's a 371, conspiracy, if it's a

17    tax conspiracy, it's six years; it's not five?  That's the way

18    the statute reads?

19          MS. ESTRICH:  As I understand it, yes.  There's an

02:48 20    argument that we get a three-year one on the obstruction, but

21    I'm not going to ask -- that's a close question.  The

22    government -- I mean, I'm a pretty honest type.  The government

23    will stand up and say that it should be six, not three, on No.

24    8.  So Count 8, the issue is three versus three six.  Other

25    than that, I think we're pretty clear that it's a six-year

1    Statute of Limitations that we're dealing with, which takes us

2    to April of 1999, as I understand it.

3         And it doesn't mean that you did something.  It has to

4    mean you did something that was part of this scheme, whatever

5    the scheme was.  And if you no longer have anything to do with

6    the leadership of the charity and the scheme is the scheme

7    related to the IRS, then you've got a problem with Mr.

8    Muntasser.  The other defendants, obviously, may want to

9    address this separately.

02:49 10       I'm jumping, but Count 8 is obstruction, and, there,

11   there's no authority for treating it as a continuing offense

12   and a clear Statute of Limitations problem.  So if you're

13   looking here for the easiest problem in my 36 pages, the

14   easiest problem --

15        THE COURT:  Thirty-seven.

16        MS. ESTRICH:  Thirty-seven.  Printers.

17        The easiest problem is the Statute of Limitations

18   problem with respect to Count 8 because there you have an

19   effort to obstruct the processes of the IRS.

02:50 20       And in addition to my argument that there you have to

21   have a corrupt endeavor -- and I would argue, once again, you

22   see these problems of what was corrupt about people making a

23   mistake -- a lay mistake in filing forms in 1993?  And how do

24   you get Mr. Muntasser, who had nothing to do with Mr. Mubayyid

25   or Mr. Al-Monla, who he's trying to fire, into the continuing

1    role of leadership of an organization he's no longer a part of.

2    But no matter what you do, I don't know what you find post-1999

3    for Mr. Muntasser that has anything to do with obstructing the

4    IRS.

5         Let me go back, however, because I've only dealt with

6    one count so far and that's Count 1.

7         Count 2 of this indictment is, of course, the

8    conspiracy to defraud the United States.  And, as you know, a

9    conspiracy requires an agreement between the conspirators.  It

02:51 10   requires intent to agree and intent to further the underlying

11   goals of the conspiracy.

12        Your Honor, with all due respect, I do not see any

13   evidence -- that means, of course, no respect.  I do not see

14   any evidence of where these three defendants agreed to

15   anything, much less intentionally agreed, much less willfully

16   sought to defraud the IRS by making mistakes they didn't know

17   they were making at separate points in time.

18        There's no evidence that Mr. Muntasser had anything to

19   do with the 990s filed by Mr. Al-Monla and Mr. Mubayyid.  No

02:51 20   evidence that Mr. Mubayyid and Mr. Al-Monla had anything to do

21   with the 1023 filed by Mr. Muntasser.

22        It takes two at least to start a conspiracy.  We all

23   understand that you can join this conspiracy later, that you

24   don't have to know everybody, that this one can come in here

25   and this one can come in there.  But you need two to start.

 1    Who were the two on the 1023?  I count one.  Even if you reject

 2    everything else I say about the 1023 being not willful and not

 3    material and not wrong and checking of the box not being

 4    willful and material and wrong, Mr. Muntasser's the one who

 5    signed it, not these two.  Who did he conspire with?  You can't

 6    conspire with yourself.

 7           Second point I want to make on conspiracy -- and I

 8    don't want to use all my time now -- there is very clear

 9    language -- I cite to an opinion in the Nippon case from Judge

02:53 10   Gertner -- on withdrawals from conspiracy.  It is not required

11    in this circuit, very clearly, that you inform the world or the

12    authorities that you're withdrawing if you tell your

13    coconspirators and everybody else involved in the organization.

14           There was absolutely no evidence from anyone about Mr.

15    Muntasser's participation as a leader of Care past 1996.  He

16    tried to fire Mr. Al-Monla.  They decided to back up Samir

17    rather than Imad.  Imad was out.  The most the government has

18    been able to do is play a phone conversation in which Imad's

19    total discourse is uh-huh, uh-umm, uh-huh.  That is not

02:53 20   participation in the conspiracy.  You need something post-April

21    1999.

22           THE COURT:  Assuming that a conspiracy existed, of

23    course, doesn't withdrawal require an affirmative act to

24    disavow or defeat the purpose of the conspiracy?

25           MS. ESTRICH:  It requires you to take some affirmative

1    steps to communicate to the other coconspirators.  He quit the

2    organization.  He no longer served on its board.  We will be

3    introducing additional evidence that there was actually a

4    notarized letter.

5         But even at this stage of the evidence, there is no

6    doubt that he left.  You look at the forms.  No more Imad, no

7    more president, no more board of trustees, lots of evidence

8    that he left in disgust.  And they all knew he was out.  And

9    you got people calling from Chicago complaining where's Imad?

02:54 10   He's gone.  He's not -- he continues to be a Muslim.  He

11   continues to go to pray.  But he was no longer a leader of

12   Care.  And he communicated that.

13        And if you read Judge Gertner's opinion in the <u>Nippon</u>

14   case, you'll see, I would submit, that here just as much was

15   done.  Indeed, my brother, Mr. Zalkind, reminds me that they

16   actually filed a form with the State of Massachusetts saying,

17   Here are our new officers.  Those shlubs, they're out.  We've

18   got a new team.

19        So that in terms of the conspiracy, if there was one,

02:55 20   again, you have to find two people to start it.  You can't

21   start it with a 1023 and with the checking of the outgrowth box

22   because you can't get those two guys in there, not on the

23   evidence presented to date.  You only have him.  So when it

24   starts, I don't know.

25        But I can tell you from Mr. Muntasser's point of view

1    when it ends.  It ends when he affirmatively leaves the

2    organization.  They submit new names.  He's off the checking

3    account; he's off the forms; he's off the tax forms; he's off

4    everything.

5        I would like to also briefly address Count 8.  Count 8

6    refers to the effort to obstruct and impede the Internal

7    Revenue Service from in or about June, 1993, until in or about

8    April, 2003.  Now, unlike Counts 1 and 2, where you have at

9    least alleged some form of complicity liability in Count 1, aid

02:56 10   and abet; Count 2, conspiracy.

11       Count 8 charges each of these individuals separately;

12   and under Count 8, they're only responsible for what they did.

13   Mr. Muntasser did absolutely nothing with respect to Care and

14   the IRS after 1996, absolutely nothing.  There's no evidence

15   that he had anything to do with filling out the Form 990s, no

16   evidence that he had to do with directing the affairs of Care,

17   and certainly no evidence that somehow ties his effort to

18   secure citizenship and give interviews to the INS in an effort

19   to defraud the IRS, which had all of Care's records for 15

02:57 20   years and had chosen to do nothing with them.

21       So that in addition to the failure of Count 8 on

22   grounds of intent -- because the way Count 8 is worded and the

23   way the obstruction offense is written, you have to act

24   corruptly, which is very close to willfully.  It means engage

25   in knowing that what you're doing is wrong and trying to engage

1    in unlawful activity, which we would argue there's no evidence

2    that he ever knew that he was supposed to submit these

3    Al-Hussams because if he had he would have, and the IRS

4    wouldn't have done anything.  But in addition to that, even if

5    he did, all his activities predate 1999.

6           So that what we have, in short, is, on Count 1, Count

7    2 and Count 8, common problems of intent, common problems of

8    materiality, serious issues of the Statute of Limitations and

9    an overarching theme that the only thing that was done wrong in

02:58 10   this case -- as your Honor said over and over and most recently

11   to the jury today, there's no evidence that Care aided

12   fighters, no evidence that they provided money to fighters, no

13   evidence that they intended to help fighters.

14          To the extent they were supporting and promoting the

15   jihad and the mujahideen, it was solely and simply through

16   advocacy, which we would argue falls outside the realm of the

17   IRS to deny charitable status on that basis.

18          But even given that, before you're going to impose

19   criminal punishment based on advocacy, you bear a heavy burden

02:59 20   to show that in a free society an individual understands that

21   he can be punished for what he says.  You must be able to show

22   -- this is where mens rea and the First Amendment collapse

23   together because an individual has a right to believe that this

24   is a free society in which you can say what you want and not be

25   punished for it.  And if he's wrong about that, the government

1    should at least be required to show that he knew he wasn't

2    allowed to speak freely or that speaking freely could cost him

3    tax-exempt status and that he intentionally sought to mislead

4    the government in order to avoid the consequences of his

5    speech.

6        And we would submit that on this record there's just

7    simply no proof.  There's no scheme.  I don't know what the

8    conspiracy is.  I don't know how you get it to last to 2003.

9    And the Statute of Limitations clearly operates as a bar.

03:00 10   Thank you very much.

11        THE COURT:  Okay.  Mr. McGinty, Mr. Andrews.  Mr.

12   Andrews.

13        MR. ANDREWS:  Your Honor.

14        THE COURT:  Why don't -- I don't know how much you're

15   piggy-backing on that, but, again, just so I manage the time,

16   is 10 or 15 minutes enough for?

17        MR. ANDREWS:  That's fine, your Honor.  I will

18   piggyback on the cases cited and everything.  I just want the

19   Court to focus really on Mr. Mubayyid.  If I spoke for 10 or 15

03:00 20   minutes, we might have more evidence or conversation about Mr.

21   Mubayyid than we heard in the last 20 days.  You know, if I put

22   my opening and closing together, that's definitely going to be

23   the case.

24        There's absolutely no evidence that Mr. Mubayyid was

25   involved in the formation of Care.  I think everybody in this

1    room knows that.  He was not one of the officers.  There's no

2    evidence that he ever had a conversation regarding the

3    formation of Care, regarding whether or not to disclose

4    publication, whether or not to disclose that it was an

5    outgrowth or successor, that he had anything to do whatsoever

6    in the initial formation of Care.

7           The only evidence, I think, to look on -- what did the

8    government present?  It presented, I think, from one witness

9    that he might have been a volunteer in the early '90s, that

03:01 10   there was a check that he gave to, I think, either Al-Kifah or

11   to Care.  He was one of thousands or hundreds of contributors.

12   So there's absolutely no evidence whatsoever that he was

13   involved in the early formation of Care.

14          The evidence also shows that he then departed the

15   United States for several years and returned sometime in -- I

16   think the only evidence is in late 1997 -- and maybe became

17   involved -- he was back on the scene.

18          The evidence is extremely shaky as to when he became

19   treasurer of Care.  I don't think there's actually any date

03:02 20   that, in fact -- as when he became treasurer or started acting

21   as treasurer.  There are tax returns indicating, like, for the

22   year 1997 Mr. Al-Monla was the treasurer of Care.

23          There is absolutely -- so the focus as far as the

24   conspiracy goes -- and maybe the two schemes I'll argue

25   together.  But the focus on what he did, your Honor, was

1   apparently signed these 990s.  There's absolutely no evidence

2   whatsoever that he had a conversation with any other defendants

3   or any other person in the world except accountants on how to

4   file the 990s.

5       There is no evidence that he willfully, knowingly,

6   made a false statement on the 990s.  The 990s are false, as

7   alleged, in only one respect.  None of the figures set down,

8   none of the amounts of people who received aid, where the aid

9   went, the amounts of money donated, none of that has been

03:03 10  challenged whatsoever.

11      So the only issue, and the only issue charged in the

12  indictment, was Question 76 answered falsely.  And that

13  question was, had Care ever engaged -- did Care, as Care,

14  engage in activities not previously disclosed to the IRS?  It

15  is for the 1997 tax return.  It has to do with, in 1997, did

16  Care engage in activities not previously disclosed to the IRS.

17  He's also charged in 1999, 2000.

18      There's absolutely no evidence that he entered a

19  scheme with anybody to answer 76 falsely, that he was in a

03:03 20  conspiracy with anyone to answer Question 76 falsely.

21      I'm just going to keep repeating myself because

22  there's just so little there.

23      I might go back to it in second, but let me just talk

24  about Count 3, which is -- that is a good example -- the 1997

25  tax return.  The 1997 tax return is only mentioned a couple

1    times and only mentioned -- I spent a long time looking over

2    these transcripts last night.  No one ever says that --

3    identifies Mr. Mubayyid as having signed the 1997 tax return.

4    The tax return in 1997, it list as -- you'll recall, your

5    Honor, that for the 1997 tax return, that this is a tax return

6    that the CPA, Mr. Donahoe, reviewed and said, you know, there's

7    a minor problem here.  We're going to have to amend it.

8         This was amended in 2002.  And it's submitted and it's

9    submitted as -- Samir Al-Monla is listed as the president,

03:05 10   Nasir Al-Qadeeri is listed as the treasurer.  During our

11   examination of the witnesses, in asking Dawn Goldberg -- I'm

12   referring to Government Exhibit 9, which is the Form 990 for

13   Care for the year 1997.  "I'll put this up on the screen.  Once

14   again, I direct your attention to Part III, Program Services."

15   Program Services -- this is Page 64, your Honor.  And I'm

16   sorry, I don't have the volume.  It's when Dawn Goldberg was

17   testifying.  I'll get that to you, your Honor.  It goes -- it

18   goes through the Program Services a little bit and then it

19   says, "Once again, for the year 1997, who does Care indicated

03:05 20   its officers are?"

21        "ANSWER:  Samir Al-Monla for the president and Nasir

22   Al-Qadeeri for the treasurer.

23        "Does this form reflect whether Mr. Al-Monla was

24   compensated?

25        "ANSWER:  Yes, it does."  It says an amount.

1          Then it -- "I'm just going back for a moment to the

2     listing of the officers.  You see Mr. Al-Qadeeri as the

3     treasurer?

4          "Yes, sir.

5          "I'm going to direct your attention to -- I'm not

6     going to ask you to try to read it.  Do you see that it appears

7     to be signed by the treasurer?

8          "Yes, sir."  That's it.  So the only inference from

9     that is the 1997 is signed by Mr. Al-Qadeeri.  When you look at

03:06 10   the 1997 form, there's a scrawled signature, with a date,

11     6/7/02, and it says "treasurer."  There's no name.

12          The government has submitted a jury request saying

13     that a signed tax form carries -- I don't have the language

14     right in front of me, your Honor, but it's certainly -- when

15     it's presumed to be signed by the person filing the form.  But

16     when the form only says it's the treasurer, and the treasurer

17     is listed on the form as someone else, that presumption can't

18     carry.

19          I would say that the government hasn't met its burden

03:07 20   on Count 3, which is the 1997 tax returns, simply because it

21     hasn't shown that Mr. Mubayyid signed the form.

22          THE COURT:  Let me make sure I understand that.

23     There's a presumption that says that the signature is of the

24     person whose name appears as the filer or their corporate

25     officer?  What is the presumption?

1          MR. ANDREWS:  I can -- it's in the government's -- if

2     the Court will bear with me just a second.  Perhaps the

3     government has the cite, the presumption of regularity, your

4     Honor.  It's cited -- it's in one of their --

5          THE COURT:  The government's proposed jury

6     instruction, which is based on Section 6064 of Title 26, says,

7     "The fact that an individual's name is signed to a return shall

8     be prima facie evidence for all purposes that the return was

9     actually signed by him."  Play that out for me.  Then it has

03:08 10     the wrong treasurer's name?

11          MR. ANDREWS:  Nobody actually has ever identified --

12     my understanding -- and the government can point out -- I spent

13     a long time yesterday going through the transcripts that have

14     been prepared for us looking for the words "signed signature of

15     Mr. Mubayyid."  I don't believe anybody has ever identified the

16     signature on the document as Mr. Mubayyid's signature.  It has

17     attempted to do so a couple times and objections were

18     sustained.

19          But the -- it said -- there's a scrawl.  There's the

03:09 20     word "treasurer" next to it.  And then there's the word -- and

21     the treasurer is identified as Mr. Al-Qadeeri.  I could pass

22     this up to your Honor.

23          THE COURT:  All right.

24          MR. ANDREWS:  There would actually be a similar

25     argument to both the years 1999 and 2000.  The only issue on

1    that is that Mr. Muhamed Mubayyid is listed as treasurer in

2    both those documents.  There's a signature.  There's no name

3    under the signature.  However, it says, "Type or print title."

4    And it says "treasurer."  I would argue that to -- since this

5    is not really a formality but an element that has to be proven

6    beyond a reasonable doubt, that having no name that -- that

7    underneath the signature line for 1999 and 2000 doesn't carry

8    the government's burden, again, without any sort of indication

9    that it is Mr. Mubayyid's signature on the signature lines.

03:10 10            THE COURT:  Okay.

11            MR. ANDREWS:  As to Count 8, your Honor, it is a

12    similar argument, that there is absolutely no evidence

13    whatsoever that Mr. Mubayyid knowingly, willfully entered into

14    a scheme that he corruptly -- retract the language --

15    endeavored to impede the IRS or any other government agency.

16    There was supervised filing of the 990s.

17            I also just -- because it's the same for the

18    conspiracy for all three counts, there has to be a materiality

19    issue.  The Court will recall that the Al-Hussams seem -- the

03:11 20    last Al-Hussam was published in January of 1997.  Mr. Mubayyid

21    -- there's no evidence he was in the country in January, 1997.

22    Sometime later that year he returns to the United States.  The

23    government could argue that sometime late 1998 he becomes more

24    active in Care and becomes the treasurer of Care.

25            I believe that in late 1997 or early 1998 he had

1    discussions about the creation of a website for Care, although

2    that might be in 1998.  I have to check.  No later than that

3    date, when he was talking about the creation of the website --

4    when the gentleman testified about the creation of the

5    website -- was he involved in any way.

6         So the only way that this false statement on 76 -- the

7    Court would have to find that the maintenance of a website is

8    an activity that needed to be reported to the IRS, a website in

9    this day and age, your Honor.  Did Care have to report the fact

03:12 10   that it handed out BlackBerries to its employees?  Did it have

11   to report the fact that it had a storefront window and in that

12   storefront window it hung a banner saying whatever it wanted to

13   say, your Honor, because that's what a website is.

14        We went through that a little bit, your Honor, and it

15   cost $16.95 a month to maintain the website.  When asked by

16   Trooper Ball how much Care had collected in the year 2000, Mr.

17   Mubayyid said $248,000.  So you have a $254-a-year website bill

18   and an organization that collected 1,000 times that amount.

19   And it's the position of the government, I guess, that that is

03:13 20   a material activity that needed to be reported to the

21   government, the maintenance of that website.

22        On that website, your Honor, there was a single

23   article published -- well, that was -- apparently, when

24   everyone went to the website -- because it's not published like

25   a newspaper.  If one went to that website in that go-back

 1    machine in the year --

 2              THE COURT:  I think it's a Wayback Machine.

 3              MR. ANDREWS:  Wayback.

 4              THE COURT:  Peabody and Sherman, if you remember.

 5              MR. ANDREWS:  That's what I thought it was, the

 6    Wayback Machine -- for 1999 or for 2000.  It was all the same

 7    article -- or 2001, 2002.  It was all that same article.  I

 8    know I took everybody's time going over it, but it was just

 9    that same column of -- news from Chechnya from December 22,

03:13 10    1999, the first columns before that.  It was just that one

 11    column.  That's the only news that was posted.

 12              Then you had Suheil Laher's religious page, Suheil

 13    Laher, who's not even a coconspirator in this case.  He had his

 14    religious page.  We kept getting led to -- if you clicked on

 15    "jihad," he had articles about jihad, and he had republished an

 16    article that had been published in Al-Hussam.  At least that's

 17    what it says.  It gives an Al-Hussam copyright from 1995, 1994,

 18    1996.  But it's one of -- you know, things about dietary laws

 19    and marital relations and all sorts of stuff.

03:14 20              But the Court would have to find that the -- it was a

 21    material false statement that Mr. Mubayyid knowingly made and

 22    willfully made by failing to disclose the fact that, yes, in

 23    1999, we started this website.  And we sent out $248,000, minus

 24    some operating expenses, to charities across the world.  But we

 25    did spend $254 on a website.

1            And that just can't be, your Honor.  That cannot be

2    material.  It is not a significant activity.  It is not

3    something that the IRS wanted to know, I dare say, needed to

4    know, had a right to know.  But, more importantly, it is not

5    something that a court or a jury could reasonably think that

6    Mr. Mubayyid had reason to know that he should report it

7    because that's the issue.

8            So in -- when he filed the tax in 1999, did he know

9    that we set up a website in December of 1999?  Because no

03:15 10    Al-Hussams were out there, right?  So there's a website.  When

11    he's filed for 2000, do I have to put down that we had a

12    website?  And there's no evidence whatsoever that he knew what

13    had previously been disclosed to the IRS, which is another

14    point, your Honor.  There's no evidence that anybody sat down

15    and said this is where we're at.  This is what we have or have

16    not disclosed to the IRS previously.  This is a man who just

17    came in 1997, 1998, became treasurer.  And I think that's all I

18    have to say on that matter.

19            I think for him, especially for him, it ties up.  We

03:16 20    had all these wiretaps.  There's not a single conversation with

21    Mr. Muntasser.  With Al-Monla, there's no conversations

22    regarding taxes, regarding 990s.  The only conversation I think

23    when he even says the word "taxes" is when he talks to his

24    brothers and says, I've been going over this stuff.  I'm tired.

25    That's when he's working with Mr. Donahoe getting things ready

1    for the state.

2              THE COURT:  All right.  Mr. McGinty.

3              MR. McGINTY:  Your Honor, I join in Professor

4    Estrich's argument regarding the false statement, scheme,

5    except I would note that the limitations period as applies to

6    Mr. Al-Monla is even later.  He was indicted on March 8, 1997,

7    meaning that the six-year period for him for his substantive

8    participation in a substantive offense would have been March 8

9    of 2001.

03:17 10             With respect to the conspiracy, Count 2 and Count 8,

11   the charged conspiracy, your Honor, is that the defendants

12   confederated and agreed to essentially trick or deceive the

13   lawful functions of the IRS "in the ascertainment, assessment

14   and determination of whether Care International qualified and

15   should be designated as a 501(c)(3) organization in 1993 and

16   should continue to be accorded status as a 501(c)(3)

17   organization thereafter."

18             So the scope of the charged indictment is it exists

19   during the period that Care continued to be accorded status as

03:18 20   a 501(c)(3) organization.  The facts that were presented in the

21   government's case included the testimony of Marissa Soto Ortiz

22   of the Massachusetts Secretary of State's Office who testified

23   that Care was "dissolved" by "administrative dissolution, which

24   revoked their charter with the Secretary of State's Office."

25             She went on to say, "They will no longer be a

1    corporation under Massachusetts law which happened in February

2    of 2002."  And I refer the Court to the transcript.  It is

3    November 20, 2007, at Page 73.

4           Accordingly, the scope of the -- the time period of

5    the conspiracy -- and this language is reflected both in Count

6    2 and also in Count 8 -- is that it continues to exist as

7    charged through that period where it continued to be accorded

8    status as a 501(c)(3) organization which presumably is before

9    the dissolution.

03:19 10        There has to be an overt act -- as charged, an overt

11   act, which is within the period of limitations.  The

12   allegations that false statements -- and I'm looking now at

13   overt acts charged on Page 13 and 14.  The overt acts after

14   that period are -- or in that range of that period are between

15   2001 and 2003, referring now to Paragraphs 13 and 14, both

16   referring to between 2001 and 2003, that Muntasser and Al-Monla

17   made either incomplete, misleading or false statements to the

18   FBI in questioning.

19          Now, the questions that were put to Mr. Mubayyid --

03:20 20   I'm sorry, to Mr. Muntasser, as I understand it, were all after

21   2002.  With respect to Mr. Al-Monla, he was interviewed both in

22   2001, but he was also interviewed in 2003.  Now, the government

23   presumably wants the benefit from the ambiguity here about the

24   period between 2001 and 2003.  But the interview of Mr.

25   Al-Monla in April of 2003 was outside the period of the charged

1    conspiracy because it was outside the period where Care

2    continued to be accorded 501(c)(3) status.

3          The overt act has to be within -- the overt act has to

4    be within six years of indictment.  It has to be by 3/8/01.

5    And I respectfully submit, your Honor, there is no overt act

6    within that period that brings Mr. Al-Monla within that

7    limitations period.

8          I would also respectfully join in Professor Estrich's

9    argument with respect to withdrawal.  Mr. Al-Monla was fired at

03:21 10   the end of 1998.  He didn't take the step of leaving simply

11   because he was discharged, and he was discharged because he

12   wasn't able and because of differences within the office.

13   Basically, he was viewed as incompetent and fired.

14         And the last acts that Mr. Al-Monla is accused of are

15   acts consistent with his employment or his position at Care was

16   at the conclusion of 1998.

17         Finally, your Honor, with respect to Count 7, which is

18   the false statement count relating to Mr. Bassam Kanj, the

19   testimony yesterday was that the interview that was conducted

03:22 20   in April of 2003 was for the purpose of asking him about Care

21   and about its principals.  How from that testimony the

22   government gets the basis of a -- that there's facts sufficient

23   to support an inference of materiality when the agent said, I

24   didn't bring a photo, I didn't need to, and the focus -- the

25   purpose, as he put it, the purpose of the interview, was to

1    question about Care and its principals.  I would respectfully

2    submit the government doesn't have -- doesn't meet the required

3    standard for Rule 29.

4         Finally, your Honor -- and this is not the time

5    perhaps, but I would like to further argue the issue raised by

6    the testimony related to MAK.  I don't say that with the intent

7    of getting the Court's back up.  But I do think that the record

8    has to be abundantly clear about the consequences of the

9    testimony that was elicited by the government.

03:23 10         THE COURT:  All right.  I think the MAK issue is not

11   pertinent to this discussion, I don't think.  Why don't we give

12   the court reporter a chance here to stretch her fingers and

13   then I'll hear from the government.

14   (Short recess taken.)

15         THE COURT:  Let's reconvene.  Mr. Chakravarty.

16         MR. CHAKRAVARTY:  Thank you, your Honor.  I've been

17   nominated to take this, and I expect not to be too long.

18         In the first instance, just to reiterate for the

19   record, obviously, that we just received this voluminous

03:29 20   document.  We haven't prepared anything.  If necessary, we can

21   do so, but I think that based on your understanding of the

22   evidence that has come in, I think the government has met the

23   factual basis for each of the elements of each of the offenses.

24         Let me just start with a couple of the -- Mr.

25   McGinty's and Mr. Andrews' point, the most recent, and then get

1    to the bigger issues that involve all of the defendants.

2        With regards to the Bassam Kanj issue, I think there

3    is abundant evidence that as to the materiality of Bassam --

4    Mr. Al-Monla's omission -- in fact, deception, indicating that

5    he did not know who Bassam Kanj was.  There's evidence, in

6    fact, from Mr. Tiba that they knew each other intimately.

7    There's the wiretap evidence and other documentary evidence

8    that corroborates that relationship.

9        I believe even on redirect you sustained an objection

03:30 10   to my question as to why it was material, I presume on the

11   grounds of the cumulative nature because Agent Davis had

12   already testified as to some of the follow-up questions.

13       With regards to Mr. Mubayyid, admittedly, the least

14   amount of time has been spent by government witnesses talking

15   specifically about Mr. Mubayyid.  But that in no way detracts

16   from the volume of evidence which indicates that Mr. Mubayyid

17   was both aware of and continues to propagate his own scheme as

18   well as the broader conspiracy, which I'll talk about in a

19   moment.

03:30 20       I just point to some specific activities, by no means

21   conclusive or exhaustive.  In addition to Mr. Mubayyid's filing

22   of Form 990s explicitly -- and getting to the signature issue,

23   the form -- the 1997 Form 990 which Mr. Andrews points to,

24   does, in fact, have Mr. Mubayyid's signature on it.  Mr.

25   Mubayyid's name does not appear next to Mr. Mubayyid's

1   signature.  But that does not prevent -- both under Rule 901

2   or, certainly, your discretion, it doesn't prevent a jury from

3   being able to look at that signature along with the other

4   volumes of signatures of Mr. Mubayyid which are in evidence,

5   including other Form 990s, including forms submitted to the

6   State Attorney General's Office, including checks, to arrive at

7   the conclusion that, in fact, it is Mr. Mubayyid's signature

8   with regards to that substantive 7206 offense.

9        His filing of the Form 990s propagated both the scheme

03:31 10   as well as the ongoing conspiracy.  Evidence came in, which was

11   highlighted today, that showed that Mr. Mubayyid was well aware

12   of what Al-Kifah Refugee Center was back in 1993, that he --

13   the fact that he maintained a website some years later, and

14   certainly more recent in time, which both continued to publish

15   or republish Al-Hussam articles as well as other materials,

16   including the Zakat Calculation Guide, including the

17   battlefields of -- from the caucuses -- news from the caucuses,

18   and the orphan sponsorship program, other what we allege are

19   non-charitable activities, further demonstrates both his

03:32 20   awareness, going to the mens rea component, as well as specific

21   overt acts which he engaged in much more recent in time.

22        One of the checks which was highlighted today shows

23   that Mr. Mubayyid, in reference to Al-Kifah Refugee Center,

24   even conducted sales for Al-Kifah evidencing a scienter with

25   regards to the specific activities which Al-Kifah was doing

1    which, at core -- and I don't want to jump ahead but, at core,

2    both the scheme to conceal here and the conspiracy here are

3    scheme to conceal information from the government so that these

4    defendants, acting on behalf of Care, would be able to maintain

5    the 501(c)(3) status.

6            When you look at it in that context and not a slightly

7    microscopic perspective which has been advanced today -- if you

8    look at that broader context, that we don't want the

9    government, the IRS in particular, to rescind -- or we don't

03:33 10    want them to know about our non-charitable activities, our

11    connection to Al-Kifah Refugee Center, anything that is going

12    to jeopardize our tax exemption, because if we do -- and

13    there's been evidence of this as well.  If we do, then the

14    volume of donations that we are going to get is going to go

15    down dramatically.

16           With that cast upon all of these overt acts and all

17    the activities which have been highlighted for the jury, it

18    puts in perspective that each one of these seemingly innocuous

19    events by themselves was not a specifically charged false

03:33 20    statement.  However, they go to the scheme or this plan, which

21    each of the defendants had, to conceal this information from

22    the government, whether it be, in fact, the IRS, the FBI when

23    asked during interviews -- and in one case the Department of

24    Homeland Security, the INS, when Mr. Muntasser continues to

25    conceal the fact that he had traveled to Afghanistan, that he

1    had met Hekmatyar, which now, based on the evidence, it's clear

2    why that is relevant and germane to the Al-Kifah -- for the

3    Care International conspiracy involving what Care

4    International's non-charitable activities were.

5            Before I leave Mr. Mubayyid, as you know, there is

6    evidence that not only were Care International's materials

7    stored in a storage locker which Mr. Mubayyid maintained, but,

8    in fact, between 2001 and 2003, there is sufficient evidence to

9    draw the inference, if not more explicit, that he removed

03:34 10  and/or destroyed specific evidence from the Care storage

11   locker.

12           And the type of evidence which was missing on the

13   second search is specifically instructive, as the Al-Hussams,

14   Join the Caravans, the Azzam publications emails.  These were

15   things that were found in Mr. Mubayyid's home during the 2003

16   search, again, further evidencing both his scienter with

17   regards to the scheme to conceal and conspiracy as well as --

18   and Miss Siegmann reminds me, the very Form 1023 which started

19   the Kline (phon) conspiracy in motion was found in Mr.

03:35 20  Mubayyid's house.

21           The fact that when, in answering Question 76 on the

22   Form 990s -- somebody who's filing his -- is required to know

23   what the activities of the -- prior reported activities are of

24   the organization is also instructive because every time that

25   Mr. Mubayyid files a Form 990, and even the forms that he filed

1    with the State Attorney General's Office, it reasserts the

2    specific mens rea.  And if you get to that mens rea and you

3    find there is sufficient evidence of intent and willfulness in

4    this case, then it seems to me that this notion that a scheme

5    no longer exists or conspiracy no longer exists, that argument

6    goes by the wayside.

7         And then, finally, with regard to Mr. Mubayyid, he

8    also was interviewed by the FBI about Care's activities, and

9    he, again, chose not to disclose any non-charitable activities

03:36 10   that Care was involved in given this backdrop of all of the

11   specific steps and actions which he took as well as the

12   information which was imputed to him because of things that

13   were found in his possession and so on.  It's certainly

14   sufficient there to demonstrate that when he's making these

15   statements to the FBI, the jury is allowed to infer that he

16   intentionally chose not to disclose the non-charitable

17   activities in which he was involved.

18        And that brings me to the broader issues in the case.

19   And I'll try to follow Mrs. Estrich's argument with regards to

03:37 20   the shared issues.  With regards to the scheme to conceal, as I

21   just said, the scheme here is being conflated with a

22   conspiracy.  You don't need to have multiple people as a member

23   of a scheme.  A scheme is a plan.  A scheme is -- if the plan,

24   as in this case, to defraud the government, to defraud the IRS

25   by obtaining a tax-exemption status, then it continues

1   regardless of whether everybody sits down in a room and agrees

2   on how to do it.

3          In this case, there is abundant evidence as to motive,

4   as to why one would scheme to conceal.  The fact that Al-Kifah

5   Refugee Center had used a tax -- an exemption ID, which was

6   false, is certainly germane to that.  The 1993 press reporting

7   is certainly germane to that.  I think there's been additional

8   testimony by Mr. Kadri and Mr. Tiba which also evidenced

9   reasons for why one would want to conceal information about --

03:38 10   that would potentially jeopardize --

11          THE COURT:  What was that last name?

12          MR. CHAKRAVARTY:  There's information from Tiba and

13   Kadri about why -- going to motive, essentially, on why the

14   defendants would want to conceal information from the

15   government that would jeopardize their tax-exempt status or

16   their eligibility for tax exemption.

17          And I say that in the context that when they filed --

18   when Mr. Muntasser filed for his tax exemption in June of 1993,

19   the filing by itself, what we allege is a false statement in

03:38 20   that filing, certainly is evidence of this broader scheme to

21   conceal.  The scheme itself could have been hatched long before

22   that, and there's evidence that, in fact, it was.  The

23   communications with even Mr. Bade, I think, furthered that.

24          I think Mr. Muntasser's awareness of Al-Kifah's

25   tax-exempt status or lack thereof and his continuation to

1    propagate Al-Kifah Refugee Center's activities at the same time

2    he is filing forms seeking tax-exempt status for Care

3    International -- and as was shown today, actually overlapping

4    the two through finances during this whole time -- is further

5    evidence on the false nature and what his true intent there

6    was, which is, I don't want the government -- the government

7    alleges, I don't want the government to know the full extent of

8    why I'm doing this, the purposes of this incorporation.  I

9    don't want them to know the full nature of our activities.  And

03:39 10    I specifically don't want them to know anything about the

11    pro-jihad, pro-mujahideen activities which Care International

12    is going to engage in.

13         And I give -- cast that broad of a brush because not

14    only is that what's alleged in the indictment, but this isn't

15    just about the Al-Hussams, your Honor.  The Al-Hussams is one

16    vehicle which manifests the true purposes or the non-charitable

17    purposes and activities of Care International.  And they're

18    coupled with the lectures.  They're coupled with the

19    distribution of pro-mujahideen and jihad tapes.  In fact, the

03:40 20    tape that we heard today was Mohammed Akra.  Mr. Ahmed

21    identified his voice on that tape today.  He was one of the

22    originators of Care International.  He was one of the

23    participants in Al-Kifah Refugee Center, and he is one of the

24    coconspirators in this case, as is Waseem Abu Yassin, who's

25    also mentioned on that tape.

1           Mr. Baara is also mentioned on that tape, again, one

2      of the original officers of Care.  He's not charged as being an

3      unindicted coconspirator.  However, it further exemplifies the

4      fact that when Care incorporates, not only Mr. Muntasser but

5      others also knew why they were doing it and why they were going

6      to continue trying to continue these activities, many of which

7      were the same types of activities as Al-Kifah Refugee Center,

8      going down to the orphan sponsorship program and the qurbani

9      project.

03:41 10           The fact that Care International engages in those

11      activities as well as the non-charitable activities is also

12      evidence of the fact that when they correspond with the IRS

13      they only tell the IRS about the charitable activities.  When

14      they correspond to the FBI, they only tell the FBI about the

15      charitable activities.  That's all sufficient for a jury to

16      infer that there was a specific intent during this entire

17      period.

18           Getting back to the scheme to conceal, because there

19      is sufficient evidence of the intent requirement being met, the

03:41 20      willfulness issue which is raised is kind of subsumed within

21      that.  It's clearly a willful step to propagate the activities

22      of an organization which is trying to keep -- maintain its

23      tax-exemption status when, for example, Mr. Muntasser continues

24      to file Form 990s sometime later knowing the true origins of

25      the organization, knowing specifically what was disclosed in

1    the 1023 and what wasn't, and then in 1996, I think, he files a

2    series of Form 990s continuing to propagate -- while still

3    answering Question 76 in the negative, continuing to propagate

4    for the sole purpose of maintaining that tax-exemption status

5    going on forward.

6          There's been an argument forwarded -- and this leads

7    into the Statute of Limitations argument -- that he withdrew

8    from a conspiracy or that -- even if you accept all of that,

9    going up until 1996, that there's no evidence that brings him

03:42 10    within the Statute of Limitations.  Simply put, that ignores

11    not only his overt steps which are charged, including telling

12    the Immigration and Naturalization Service on his immigration

13    forms that he had not gone to Afghanistan, for not disclosing

14    his relationship in his citizenship application to both Care as

15    well as Al-Kifah.

16          But it also more squarely goes to the interview with

17    -- the interviews with the FBI which Agent Cleary told you --

18    former Agent Cleary -- told you -- in 1996 -- excuse me, 1997

19    he interviewed Mr. Muntasser.  Mr. Muntasser told him that he

03:43 20    was still involved with Care International just not as much as

21    he used to be because of his involvement in his furniture

22    business.

23          In 1999 he was again interviewed by Agent Cleary.

24    Again, he didn't disclose any of the non-charitable activities

25    of Care International.  He didn't disclose his trip to

 1    Afghanistan.  The scheme was continuing to be propagated.

 2            Finally, and most tellingly, when he's interviewed by

 3    Agent Peet and he's expressly asked exactly these questions,

 4    the Afghanistan trip, the relationship to Hekmatyar, the reason

 5    why that would be probative, the activities of Care

 6    International at the core, again -- you know, the argument is

 7    that he shouldn't be punished for something he did 15 years

 8    ago.  Well, he wasn't.  He's being punished -- or the

 9    government is seeking to hold him accountable for activities

03:44 10    that he engaged in during the past 15 years.  That is what a

 11    continuing scheme is, your Honor.

 12            And, certainly -- your Honor raised the point earlier

 13    as to whether a scheme can be a continuing offense.  The

 14    government's position is, of course, it can be a continuing

 15    offense.  We're not charging just a discrete lie on the 1023.

 16    This is the lies and the propagation of a plan along with all

 17    of its various moving parts for the last 10, 15 years.  Each

 18    one of these defendants had a different but related goal, and

 19    each of those were to ensure that Care International as an

03:45 20    entity, as a mission that it was propagating, that it was able

 21    to continue.

 22            And the only way that they were going to be able to do

 23    that was by maintaining that tax-exemption status.  They did

 24    several things in order to maintain it.  One of those was not

 25    to divulge information to the -- right.  One of those ways was

1    to not disclose any information to the FBI -- or to the IRS on

2    those forms, but it was also not to disclose the information to

3    the FBI.

4         Each of the defendants is also charged individually

5    with this scheme to conceal, so it's not just they all had to

6    agree at the same time.  The fact that Mr. Muntasser did not

7    speak to Mr. Mubayyid is immaterial to the question of whether

8    each of them had schemed to conceal the true nature of Care to

9    maintain the tax-exempt status for any portion of this time.

03:45 10      But getting to the conspiracy, as your Honor knows,

11   with conspiracy law, it doesn't require that each defendant

12   knows what every other coconspirator is doing in the

13   conspiracy.  The conspiracy continues until there is an

14   affirmative and unequivocal disavowment, as your Honor

15   suggested, where -- in this scenario, Mr. Muntasser --

16        THE COURT:  What is the precise standard?  I said that

17   off the top of my head.  What is the exact standard?

18        MR. CHAKRAVARTY:  Just a moment.  We put it in our

19   jury instructions.  According to the Nason case, a 1993 First

03:46 20   Circuit case, "The defendant is only entitled" -- this is on

21   Page 32 of our jury instructions.  "The defendant is only

22   entitled to a withdrawal instruction 'if he produces some

23   evidence to support all elements of his theory...'  This Court

24   has held that the mere cessation of activity in furtherance of

25   a conspiracy does not constitute withdrawal."  Pizarro-Berrios,

1    a First Circuit 2000 case, 448 F.3d, 1, at Page 10, continues,

2    "In order to withdraw from a conspiracy, a conspirator must act

3    affirmatively either to defeat or disavow the purposes of the

4    conspiracy.  Typically, that requires either a full confession

5    to authorities or a communication by the accused to his

6    coconspirators that he has abandoned the enterprise and its

7    goals."

8             Merely saying I no longer want to work with you or, as

9    the defendants couch -- although there hasn't been evidence of

03:47 10   this -- that there was a vote somehow and Mr. Al-Monla was

11   voted in and Mr. Muntasser was voted out.  That certainly does

12   not demonstrate a withdrawal from Mr. Muntasser's role within

13   this broader conspiracy.

14            Unless -- and the government's position is, unless Mr.

15   Muntasser went to the government and/or to each of these other

16   conspirators and said, not only do I think what we're doing is

17   wrong here, but I don't want any more part of it, and I'm going

18   to tell you and I'm going to tell the authorities that this is

19   what we were doing, that we were concealing the true nature of

03:47 20   Care so they can maintain its tax exemption.  Short of that,

21   there is no withdrawal from a conspiracy.  Certainly, that is a

22   high threshold even to get the instruction.

23            Further, as a factual matter, there has been evidence

24   already presented that, in fact, that wasn't true.  Number 1,

25   in 1997, Mr. Cleary was told by Mr. Muntasser that he was still

1    involved in the first instance.  And then Mr. Tiba testified

2    that he went to an executive meeting in -- I think it was 1996,

3    1997 time frame, where Mr. Muntasser was present for the

4    executive committee of Care as well as Mr. Al-Monla, Mr. Akra,

5    I believe, and some others.

6         Mr. Tiba -- Miss Siegmann reminds me that they were

7    actually weekly meetings.  So the fact that he was still

8    actively involved goes even further than that.

9         But your Honor need not reach that because there are

03:48 10   certainly activities which occur even in this century, for lack

11   of a better phrase, which also demonstrate that Mr. Muntasser,

12   when given the opportunity and specifically invited to disclose

13   the true nature of what Care had done during his tenure and

14   after, he not only declined to take that opportunity, in some

15   cases he actually gave misstatements which he then, at least in

16   the case of the Immigration paperwork, he then supplemented

17   later.

18        He was also specifically asked about the Al-Kifah

19   Refugee Center.  And when talking to Agent Peet, again, some 12

03:49 20   years after he had incorporated -- excuse me, not 12 years --

21   ten years after he had incorporated Care, he specifically told

22   Agent Peet that Al-Kifah Refugee Center had dissolved prior to

23   Care International even starting up.  Just the evidence today

24   demonstrates that that was false and why that was material to

25   this broader scheme to conceal.

1          So to the end, Mr. Muntasser was staying true to this

2    creature that he created back in 1993.  He set this plan in

3    motion.  It was his -- you know, amongst others, it was his

4    scheme.  It was his baby and he was protecting it up until, the

5    government alleges, through April of 2003 when he continued to

6    lie in order to protect it.

7          There is repeated evidence in this case that Al-Kifah

8    Refugee Center actually changed its name to Care.  This just

9    goes to show that actually Mr. Muntasser's scheme may have

03:50 10   actually predated what's charged in the indictment, that --

11   according to Mr. Tiba, Samir Al-Monla -- getting to another

12   defendant, getting to his knowledge of what Al-Kifah was doing,

13   Mr. Al-Monla had even told Mr. Tiba that Al-Kifah changed its

14   name to Care.

15         I talked briefly about Mr. Mubayyid's connection to

16   Al-Kifah.  Well, Mr. Al-Monla, as was evidenced today, was also

17   connected to Al-Kifah.  I say "connection."  I use that word in

18   an abstract.  But there's evidence that Mr. Al-Monla and Mr.

19   Mubayyid both knew what Al-Kifah was, its activity.  They were

03:51 20   involved with Al-Kifah's activities.  Just the orphan

21   sponsorship program alone, coupled with, you know, the evidence

22   about their activities with regards to Care going forward, I

23   think, is sufficient to demonstrate the scienter, not only of

24   the non-charitable activities of Care's activities that they

25   were trying to conceal from the IRS and others, but also about

1    the successor/outgrowth question, about whether they were, in

2    fact, related to another organization in this case,

3    specifically, the Al-Kifah Refugee Center.

4         I find myself repeating some of the things, so I

5    realize that I'm pretty much done.  I don't think -- there's

6    evidence of non-charitable activities which Care engaged in,

7    which they concealed, which the government alleges would have

8    been material to the decision-making process of the IRS.

9    Without indulging all of the First Amendment issues that were

03:52 10   raised in the motion to dismiss, I think there is testimony

11   both through all the tax experts as well as to the jury's

12   common sense that they have enough to infer or to decide that

13   concealing those activities would be material to the IRS.

14        But that goes beyond just the Al-Hussams and explicit

15   pleas for jihad.  It also goes to things like the orphan

16   sponsorship program for a narrow class of people, specifically

17   the martyrs.  You heard today one of the reasons why, the

18   government's theory of the case is, supporting the orphans of

19   the martyrs as this to remove a disincentive to engage in jihad

03:52 20   is also the type of activity which is non-charitable when given

21   this broader context because it shows that this is not what

22   Care disclosed to the IRS with regards to what its purpose was

23   and what its activities were.

24        Mr. Al-Monla also has raised the point that he was no

25   longer involved in Care after 1998, that there's some evidence

1    that he was explicitly fired.  I don't know where that evidence

2    is, but I do know in 2000 he files Form 990s which, you know,

3    if he was no longer involved, he's certainly taking actions in

4    support of Care's activities.  The Form 990 in 2000 he filed

5    was for the year 1998, in which Mr. McGinty alleges that he was

6    explicitly fired.

7            But Mr. Al-Monla also makes false statements to the

8    FBI, not only in 1996, again, to Agent Cleary, while he's still

9    firmly entrenched within the workings in Care, but, also, again

03:53 10    in 2001 and then in 2003 when Agent Davis goes in and

11    interviews him and asks him specifically about these things.

12           One other point I wanted to make on -- the final point

13    was this notion that somehow because Care was dissolved by the

14    Secretary of State's Office in 2002 that somehow that means

15    that that's when the conspiracy has to, by definition, end, and

16    any actions or any statements which any of the defendants make

17    after 2002 aren't in furtherance of the conspiracy.

18           Just to quickly dispense with that argument, at first

19    there was -- the fact that they were dissolved was never

03:54 20    reported to the IRS.  The government could argue that.  It's

21    helpful to our case.  Yet, we know there's another material

22    aspect of Care's activities or absence thereof which the

23    defendant didn't disclose.  But what the Secretary of State's

24    Office did with Care is not what's charged here.  You made that

25    clear to the jury.

1          It also doesn't negate the fact that the defendants

2     continued to scheme, continued to conspire, to defraud the IRS

3     about their tax-exempt status until at least -- and after that

4     2002 deadline, date, this witching hour apparently, they

5     continued to receive and solicit for donations which goes to

6     the core of what the case is about.

7          They wanted to get tax-exempt money because it's a

8     badge which they can advertise to people in the Muslim

9     community to demonstrate that they are a legitimate

03:55 10    organization.  They defrauded the government.  They also

11    defrauded, I'm sure, some members of the community by having

12    that badge.  That goal, that gauntlet, that they were holding

13    up is at the nub of what the case is about.

14          It's not about lying on one box on the Form 990.  It's

15    not about checking -- publishing an Al-Hussam and not attaching

16    to the 1023 form.  It's this broader scheme.  Each of those

17    acts are evidence of that broader scheme.  And it doesn't rise

18    or fall and nor does it -- the defense, in an advice-of-counsel

19    sense or anything else, to say that reliance on any one of

03:56 20    these little pieces does this house of cards fall.

21          It was a continuing scheme.  The scienter is evident

22    throughout.  They never disavowed.  They never withdrew.  The

23    government has met its burden of proof.  Certainly, the jury

24    should be permitted to ultimately hand back a verdict in this

25    case.

1          THE COURT:  Okay.  Miss Estrich, brief rebuttal.

2          MS. ESTRICH:  I'd like to be very brief, your Honor,

3    because I think there's a fundamental difference here between

4    the prosecution and the defense.  I have tried in the most

5    lawyerly way to take this indictment apart piece by piece and

6    ask whether the government has proven each element of the

7    indictment, to identify what it is they're charging and where

8    the proof is as regards each of the individual defendants.

9          My brother says that that's microscopic detail.  I

03:57 10   would argue that's our job.  That's what you're required to do

11    in this Rule 29.  That's why we produced a voluminous memo.

12    It's what the case law demands.  And that when you do that, to

13    borrow my brother's phrase, this house of cards collapses.  It

14    is a house of cards.

15          I started noting down the various words Al used, in

16    familiar terms, with great respect -- the various words Al used

17    to describe what the scheme was because I kept looking for the

18    scheme.  It's a broad cast.  It's a big plan.  There's three

19    schemes.  Maybe each of the defendants had their own scheme.

03:57 20   Yes.  A scheme is a plan.  A plan to do what?

21          The law doesn't say a scheme is a plan.  The law, if

22    you -- I know you will read the cases -- is very clear that you

23    need a ruse, an artifice.  You need a thing.  What's the thing?

24    What is the scheme to do?  Simply saying these three

25    defendants, over a broad period of time, were in a sense bad

1    guys is not sufficient.

2         The indictment says "did knowingly and willfully

3    falsify, conceal and cover up by trick, scheme and device

4    material facts."  The only material fact I heard with respect

5    to Mr. Muntasser that we didn't -- Al, with all due respect,

6    didn't address the Statute of Limitations issue as to Count 8.

7    And the instruction is set by reference to the statement about

8    Afghanistan.

9         I don't understand how Mr. Muntasser's comments on

03:58 10   Afghanistan, years after he has any role in the leadership of

11   an organization which repeatedly tells the world that it's

12   active in Afghanistan, has anything to do with the scheme to

13   conceal material facts about the tax-exempt status of Care, an

14   activity in which Mr. Muntasser had played no role in the

15   dealings with the IRS in seven years at that point.

16        So I would simply suggest to your Honor, most

17   respectfully, and honestly with respect to this point, that --

18   with not even saying with all due respect and then saying

19   meaning none -- that this indictment needs to be reviewed point

03:59 20   by point as to each defendant, as to the issue of intent, as to

21   the issue of knowledge.

22        If we are still debating amongst ourselves today at

23   this hour what public policy it was that made any of Care's

24   activities unlawful or uncharitable, which I submit we still

25   are and will continue to be, how can it be that Mr. Muntasser

1    will be found to have known and willfully intended to deceive

2    and conceal activities which most of us, or at least some of

3    us, think are constitutionally protected and clearly charitable

4    from the IRS?  Microscopic detail, I would argue, is precisely

5    what this Court and this case requires.  Thank you.

6            THE COURT:  Mr. Andrews, anything further?

7            MR. ANDREWS:  Just briefly, your Honor.  I don't think

8    the government's presented any evidence that the Court should

9    be able to infer or allow a jury to infer that Mr. Mubayyid

04:00 10   either removed or destroyed documents as from between the two

11   searches.  It's just not borne out by the evidence.  I objected

12   to sort of the phone call coming in at the beginning.  It

13   doesn't make any sense.  It doesn't certainly add anything to

14   the equation whatsoever for the Court.

15           I could go through the rubric again, but I guess the

16   government says that Mr. Mubayyid perhaps -- why Mr. Mubayyid,

17   as opposed to someone else, knows, but Mr. Mubayyid took two

18   documents, one the minute notes, for lack of a better term,

19   from the GRF meeting at which he was not there, when he was in

04:01 20   Australia.  He destroyed those documents, the government

21   alleges.  The publication note, he didn't destroy.  He took it

22   to his house.

23           So he is the signatory on the USA storage locker.  The

24   woman knows him by the first name.  He lives within a mile.  He

25   takes the publication and puts them on the porch.  Thinking

1    that the government searches Storage USA, they'll never come to

2    his house and look?  That one just -- I don't think the Court

3    can give any weight to that.

4         The government also says that Mr. Mubayyid was -- made

5    a false or misleading or statement to the FBI.  We didn't hear

6    from an FBI agent who actually took notes.  We did hear from

7    the state trooper.  The state trooper said Mr. Mubayyid brought

8    up Care, said it was a charitable organization, said how much

9    money they collected, $248,000, said we gave the money to

10   organizations in the U.S. and overseas, said one of the

11   organizations is GRF.  It's five days after 9/11.  He finally

12   said, Look, I'll give you all the documents.  I don't want to

13   talk to you anymore about where we send the money.

14        And that, the Court is supposed to infer something

15   negative, something that pushes the government's ball forward.

16   It's, again, I suggest, absurd.

17        Lastly, your Honor, I would just say that, arguendo,

18   evidence that Mr. Mubayyid had knowledge that Care at one time

19   had published Al-Hussams, that members of the community,

04:03 20  members that had been with Care, other members of the

21   community, were sympathetic to the Islamic insurgent groups

22   overseas, were sympathetic to the mujahideen, were sympathetic

23   to the cause of the refugees, the plight of the Muslim side in

24   Chechnya and the Muslim side in these conflicts.  It doesn't go

25   to -- what he's charged with is lying on these 990s.  His

1   beliefs and the fact that he has a box of papers, a box that

2   says "jihad," the neglect of duty on his porch, can't be

3   weighed on that scale that moves again the government's ball

4   forward.

5        The Court has to find, in fact that, Mr. Mubayyid

6   answered the question falsely, that there was -- that 76 was,

7   in fact, answered falsely, that there was a material

8   misstatement.  Then it has to find that he did so knowingly and

9   willingly.  I don't think the Court can get past the first one,

04:04 10   that the government has proved that 76 was falsely answered.

11   Then there's no evidence that he knowingly and willfully, that

12   he knew was false when he signed that document, because you

13   look at what happened before.

14        You know, there weren't any bake sales with tapes when

15   he was around.  They aren't publishing the Al-Hussams.  There

16   was the website.  You have to find that, first of all, it was a

17   material false statement; and, second, the government has

18   produced sufficient evidence that a reasonable jury could find

19   beyond a reasonable doubt that he made that statement knowing

04:04 20   it was false, willful, willfully.  That's all, your Honor.

21   Thank you.

22        THE COURT:  Okay.  Mr. McGinty.

23        MR. McGINTY:  Your Honor, I join my colleagues and

24   hope to save my time to argue the other issue.

25        THE COURT:  Meaning what?

1          MR. McGINTY:  Meaning the issue of MAK.

2          THE COURT:  What is it that you want to say now?

3          MR. McGINTY:  What I'd like to say, your Honor, is

4    that there's a simple syllogism, and the syllogism goes like

5    this:  Care gave money to MAK, and the government has put in

6    checks to MAK.  MAK supported fighters, the unequivocal

7    testimony that the Court permitted in this afternoon.

8    Therefore, Care supported fighters.  I don't know how that's

9    not a irresistible and very troubling syllogism but there it

04:05 10   is.

11         The government elicited that testimony.  It was our

12   understanding, I think shared, that there was going to be

13   limits on what was going to be elicited with respect to MAK.

14   There was a summary, which has been referred to the Court a

15   number of times, about MAK.  And in that summary, there was

16   reference to charitable or support activities that MAK did

17   other than support for fighters.  That was not elicited.

18         So on the testimony elicited from this witness, there

19   is that syllogism.  It's irresistible.  The government's

04:06 20   argument to you is that there are -- that the government's

21   argument with respect to what Care did goes beyond the

22   Al-Hussams.  It goes beyond the videotapes.  It now reaches

23   into the support for the survivors of persons killed in battle

24   as further argument of support for the mujahideen.

25         But that vague, indefinite proposition, littered

1    through the indictment, is going to be served to the jury so

2    the government can argue as elastically as it chooses what it

3    was that Care was doing way beyond the Al-Hussams.  And then

4    finally we add the little syllogism.  So this is tidy and neat.

5    This is a formula for conviction.  And nothing about the

6    Court's limiting instruction saved that.

7         So, your Honor, I move for a mistrial.  I ask the

8    Court to reconsider its ruling on that because I, frankly,

9    think that syllogism is there, on the record.  And there it is.

04:07 10        THE COURT:  All right.  That motion is denied.  The

11   defense keeps saying, well, it's only the Al-Hussams; it's only

12   the Al-Hussams.  Hasn't it been part of the case from day one

13   that it was -- that there were other activities?  Bringing in

14   people to speak, distributing tapes and literature, the Zakat

15   Calculation Guide.  And I thought the government's theory from

16   day one was that the orphan and widow program was itself part

17   of promoting and supporting jihad and the mujahideen because it

18   was focused on the orphans and widows of martyrs.

19        And so, at least viewing the evidence in the light

04:08 20   most favorable to the government, don't I need to conclude that

21   all of that is part of the case and it's not limited simply to

22   the Al-Hussams?

23        MR. McGINTY:  I can respectfully say that the Court's

24   comment at sidebar, that in your judgment there was an issue

25   relating to the orphan support program, that's what triggered

1    the government's embrace of this as a possible theory but it

2    was a late embrace.  But it was at a sidebar.

3          And the Court has listed a number of things that the

4    government has alleged, but the government has never said this

5    is it.  It never provided a specification of what exactly the

6    support was.  Is it the Al-Hussams?  Al-Hussams plus

7    videotapes?  Al-Hussams plus videotape plus speakers?

8          What is the finite set of things they're going to

9    allege are in support, whatever that means, of the mujahideen?

04:09 10    If I support the mujahideen by my voice, by my writings, at

11    what point is that permissible?  At what point does that need

12    to be disclosed?  Delicate issues.

13          That's not what the government has been driving at

14    here.  They've driven hard.  Did Mr. Al-Monla disclose to you

15    that he was supporting the mujahideen, that Care was supporting

16    the mujahideen?  Those are the questions that we objected to,

17    but they got it out there in front of the jury.  That's what

18    the case is about.  It's about support for the mujahideen.

19          Now we have MAK tied to Al-Kifah, tied to Care, tied

04:09 20    to Care support for MAK by check, and the failure to put in

21    that the character of MAK was anything other than a support of

22    fighters organization.

23          The case, your Honor, respectfully, unraveled today in

24    terms of what I thought the limits of the parameters were going

25    to be.  I've always worried about what the support for the

1    mujahideen was going to mean and whether the Court was going to

2    put a bit in the government's case to hold it back from doing

3    its energetic and fervent worst in terms of what it was

4    planning on arguing to the jury.  But today we've crossed the

5    line.  It's a great divide.  And as I said before, the jury

6    wrote it down because they didn't miss it.  And we didn't

7    either.

8              THE COURT:  Brief response from the government.

9              MS. SIEGMANN:  Yes, your Honor.  First of all, Mr.

04:10 10   Kohlmann was cross-examined on the -- whether MAK engaged in

11   any humanitarian activities.  This evidence was elicited by the

12   defense, and it came out in the cross-examination of Mr.

13   Kohlmann.

14             THE COURT:  Do you have the Q and A from the

15   transcript?

16             MS. SIEGMANN:  Sorry?

17             THE COURT:  Do you have a transcript reference?

18             MS. SIEGMANN:  I don't have a transcript reference,

19   but I can bring it to court tomorrow morning or I can email it

04:11 20   to somebody.  I have it upstairs.  I believe I gave -- we gave

21   you a copy when we asked you -- argued that they opened the

22   door to the whole list of activities that MAK was involved

23   with.  It was Miss Lunt's cross-examination of Mr. Kohlmann in

24   which she asked, well, MAK was engaged in humanitarian

25   activities, also.  And he said, yes, that they were.

1          This is not -- and today, after I had elicited the

2     testimony, it was clear from the sidebar that I was not going

3     to ask any further questions about MAK and that -- by the way,

4     it was consistent with the paragraph.  We did not go -- we had

5     a lot more information in that paragraph that we wanted to

6     elicit.  After your Honor indicated that -- gave us parameters,

7     we didn't ask any questions about recruiting fighters.  We

8     didn't ask any questions about mobilization of troops

9     throughout Afghanistan, Bosnia or Chechnya.  We didn't go

04:11 10     there.

11          The defense -- any of the defense counsel could have

12     on cross-examination asked Mr. -- Doctor Levitt whether, well,

13     MAK also engaged in charitable activities.  I believe his

14     answer would have been yes.  But they chose not to go there.

15          And the testimony today was what -- the understanding

16     was of the government is we were allowed to elicit the same

17     summary and support for the mujahideen.  Mujahideen, as Miss

18     Vallee testified, is fighters.  We did not cross the line.  We

19     didn't go any further than we were permitted to go.  And I did

04:12 20     not elicit any further testimony as to the specific nature of

21     their support.

22          The orphan sponsorship program, despite Mr. McGinty's

23     contentions, that was in the expert report.  That was produced

24     to the defense in August.  We actually elicited -- I believe

25     when we gave the expert disclosure in January, 2007, I believe

1    that was also in there, but I don't have it in front of me.   In

2    Doctor Levitt's report, he talks about the orphan sponsorship

3    program and how it promoted mujahideen and jihad.   That's

4    always been part of the government's case.

5         The defendants requested a Bill of Particulars back

6    when we began this case, and Judge Hillman ruled that the

7    indictment was specific enough and that we never were required

8    to detail, as the defendants wanted, each specific act that

9    included promoting and supporting the mujahideen.   And we've

04:13 10   never said that it was just merely a newsletter.

11         Lastly, just as to Question 76, in response to Mr.

12    Andrews' contention, that question says, "Has the organization

13    engaged in any activity not previously disclosed?"   It is not

14    limited by year.   It doesn't mean that if you file something in

15    1997.   Did you engage in any activity in that year that you

16    didn't have to disclose?   It's any activity that the

17    organization never disclosed to IRS.   Why?   To make sure that

18    they're still qualified to be a 501(c)(3) organization.

19         Therefore, the fact that Mr. Mubayyid had Al-Hussams

04:14 20   at his house, his activities with regard to the website where

21    the Al-Hussams were posted, he was in charge of that website.

22    He knew what was going on with regards to Care.   And then he

23    also was contributing to Al-Kifah, checks -- I didn't show them

24    all today, but they're in evidence showing sales that he was in

25    charge of for Al-Kifah.   He knew what Al-Kifah was, and that

1    can be inferred from the evidence.  Thank you, your Honor.

2         THE COURT:  It's 4:15.  I think we need to call it a

3    day.  I'll take the motions under advisement.  I'll give my

4    ruling tomorrow morning.  Obviously, the defense should assume

5    that everything is still in play until I say otherwise.  Mr.

6    Andrews, you have 15 seconds.

7         MR. ANDREWS:  The first I ever heard about sales that

8    Mr. Mubayyid was in charge of.  There is a check that says

9    something about holiday sales, Springfield.  But in sales --

04:14 10        THE COURT:  I thought that was a reference to the

11   Simpsons in Springfield.

12        MR. ANDREWS:  I'll take that.  I don't know anything

13   about sales he was in charge of.  There was no evidence

14   whatsoever.

15        THE COURT:  Okay.  I will see you tomorrow morning.

16        MR. CHAKRAVARTY:  One final issue.  We have just

17   rested.  The advice-of-counsel defense issue.

18        THE COURT:  All right.  Mr. -- counsel for Mr.

19   Muntasser, do you intend to waive the attorney-client

04:15 20   privilege?

21        MR. ZALKIND:  We have no intention of putting Mr.

22   Muntasser on.

23        THE COURT:  Pardon?

24        MR. ZALKIND:  We have no intention of putting Mr.

25   Muntasser on.

          1              I just want to make it clear for the record, we're

          2    doing this based on the Court's orders to us.  We're not

          3    waiving any objections that we have not to -- not to so inform

          4    the prosecution.

          5              THE COURT:  Okay.

          6              MS. SIEGMANN:  I don't understand that.

          7              MR. ZALKIND:  We were ordered to give you this

          8    decision.  We're doing it over our protest.

          9              MS. SIEGMANN:  I'm sorry.  I see.

04:16   10              THE COURT:  I'm inferring, therefore -- again, this is

         11    for planning purposes -- that it's not likely any of the three

         12    defendants will take the stand, is that right, Mr. McGinty, Mr.

         13    Andrews?

         14              MR. McGINTY:  That's right.

         15              MR. ANDREWS:  That's not likely, your Honor.

         16              MR. ZALKIND:  I think that we may have opened up

         17    Blackton, though, so that may extend it a lot longer.  We

         18    weren't sure.  We always told him that he could be a witness.

         19              THE COURT:  Does that mean our best guess is we've got

04:17   20    two or three days of defense testimony, depending on how that

         21    plays out?

         22              MR. ZALKIND:  Yes.  It depends on how long the

         23    cross-examination will be, but I would think --

         24              THE COURT:  Understood.

         25              MR. ZALKIND:  You know, and it depends on -- after

1    each witness, we may make a decision to stop.

2         THE COURT:  Of course, of course.  I'm just trying to

3    get a sense.  That's all.

4         MR. CHAKRAVARTY:  Your Honor, just for clarification

5    of the record, on that last comment, I don't think the Court

6    ever ordered that the defendants have to disclose whether the

7    defendant is going to testify.

8         THE COURT:  No.  It's whether or not the defendant

9    intends to waive the attorney-client privilege.  And the way I

04:17 10  had left it -- the way I had left it, is originally I had

11   required the defendants to give a 14-day notice.  I had

12   modified that after some ex parte communications, that if the

13   defendant was going to testify and waive attorney-client

14   privilege as opposed to bringing in the attorney, which was a

15   somewhat different issue, the Fifth Amendment not being

16   implicated, that my -- I said I -- I issued a tentative ruling

17   that that -- that the defendants would have to give notice at

18   the conclusion of the government's case.

19        My concern, as expressed then and as expressed now,

04:18 20  that the government would be sandbagged otherwise and not be

21   able to fairly respond given the parameters of the case.

22        MR. ZALKIND:  We gave an earlier notice, your Honor,

23   that we were not intending to use the attorney, Mr. Bade.  We,

24   as defendants, were not intending to put him on.  We had no

25   problem telling the Court that earlier.

1          THE COURT:  Okay.  Thank you.

2     (Whereupon, at 4:17 p.m. the trial recessed.)

1                          C E R T I F I C A T E

2

3

4          We, Marianne Kusa-Ryll, RDR, CRR, Kimberly A. Smith,

5     RDR, CRR, and Cheryl Dahlstrom, RMR, do hereby certify that the

6     foregoing transcript, from Page 20-1 to Page 20-^, constitutes,

7     to the best of our skills and abilities, a true and accurate

8     transcription of our stenotype notes taken in the matter of

9     CR No. 05-40026-FDS, The United States of America vs. Muhamed

10    Mubayyid, Emadeddin Z. Muntasser, and Samir Al-Monla, a/k/a

11    Samir Almonla.

12

13

14

15                          /s/ Marianne Kusa-Ryll

16                          Marianne Kusa-Ryll, RDR, CRR

17                          Official Court Reporter

18

19                          /s/ Kimberly A. Smith

20                          Kimberly A. Smith, RDR, CRR

21

22                          /s/ Cheryl Dahlstrom

23                          Cheryl Dahlstrom, RMR

24                          Official Court Reporter

25