1                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
2

3

4    United States of America,      )
                    Plaintiff,      )
5                                   )
                                    )
6    vs.                            )  Criminal No. 05-40026-FDS
                                    )
7                                   )
     Muhamed Mubayyid, Emadeddin Z.)
8    Muntasser, and Samir Al-Monla,)
     a/k/a Samir Almonla,           )
9                    Defendants.    )

10

11   BEFORE:  The Honorable F. Dennis Saylor, IV

12

13                   Jury Trial Day 14

14

15
                         United States District Court
16                       Courtroom No. 22
                         One Courthouse Way
17                       Boston, Massachusetts
                         December 4, 2007
18

19

20

21

22
                    Marianne Kusa-Ryll, RDR, CRR
23                    Official Court Reporter
                    Kimberly A. Smith, RDR, CRR
24                  United States District Court
                    595 Main Street, Room 514A
25                  Worcester, MA 01608-2093
               Mechanical Steno - Transcript by Computer

```
 1    APPEARANCES:

 2    B. Stephanie Siegmann, Assistant U.S. Attorney
      Aloke Chakravarty, Assistant U.S. Attorney
 3    Donald L. Cabell, Assistant U.S. Attorney
      United States Attorney's Office
 4    United States District Court
      One Courthouse Way, Suite 9200
 5    Boston, Massachusetts 02210
      for the Plaintiff
 6
      Law Offices of Michael C. Andrews
 7    Michael C. Andrews, Esquire
      21 Custom House Street
 8    Suite 920
      Boston, Massachusetts 02110
 9    for the Defendant, Muhamed Mubayyid

10    Norman S. Zalkind, Esquire
      Elizabeth A. Lunt, Esquire
11    David Duncan, Esquire
      Zalkind, Rodriguez, Lunt & Duncan, LLP
12    65a Atlantic Avenue
      Boston, Massachusetts 02110
13    for the Defendant, Emadeddin Z. Muntasser

14    Federal Defender's Office
      Charles P. McGinty, Esquire
15    408 Atlantic Avenue
      Third Floor
16    Boston, Massachusetts 02110
      for the Defendant Samir Al-Monla, a/k/a Samir Almonla

17

18

19

20

21

22

23

24

25
```

1                            I N D E X

2      Testimony of:          Direct    Cross   Redirect   Recross

3      EVAN F. KOHLMANN

4      by Mr. Chakravarty        18
       by Ms. Lunt                        105
5      by Mr. McGinty                     155
       by Mr. Chakravarty                           156
6      by Ms. Lunt                                             165

7      RICHARD BALL

8      by Mr. Cabell            169
       by Mr. Andrews                     175
9      by Mr. Cabell                                182
       by Mr. Andrews                                          183

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              E X H I B I T S

2
       No.              Description              Evidence      For ID
3
       484          Copy of DVD                     57
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At 8:46 a.m., the sealed lobby conference concluded.)

2              THE COURT:  Okay.  We're still missing a few jurors,

3      and we have a little bit of time.  Anything else anyone wants

4      to talk about?  I can talk about football, if that is what you

5      want to talk about, on the break.

6              MS. SIEGMANN:  Your Honor, there is one issue.

7              THE COURT:  Yes.

8              MS. SIEGMANN:  In reviewing the daily transcript, on

9      the Mr. Teba issue, you indicated that the -- I represented

10     that I didn't make any notes.  It was I represented the agent

11     didn't take any notes.  During the course of two prep sessions,

12     I made some scatter jottings to questions I wanted to ask him

13     during the course of the interview.  I also wrote words down

14     here and there as to what question I would ask him on the

15     witness stand.  I have reviewed those notes; and based on my

16     review, there is nothing inconsistent with what he testified

17     to, but if you wanted to do an in camera review of those notes,

18     I can make them available to you.

19             THE COURT:  All right.  Is there anyone -- anything

20     any defendant wants me to do in that respect, given that

21     additional information?

22             MR. McGINTY:  Well, your Honor, I think that's

23     minimally appropriate given the -- the failure to disclose the

24     2003 notes, but I think that's minimally appropriate.

25             THE COURT:  What is minimally appropriate?

1          MR. McGINTY:  That the government submitted the notes

2     for your review.

3          THE COURT:  All right.  I'll look at them.

4          MS. LUNT:  And, your Honor, with respect to that,

5     please, I would ask that the Court review those while looking

6     at the -- I think it was the 2007, April 2007, 302 and the

7     prior notes that have been disclosed to us from 2003, because

8     there was a remarkable discrepancy between what he testified to

9     and what was in the April of this year 302.

10         MS. SIEGMANN:  Well, your Honor, the -- again, the 302

11    from 2007 is a summary of what he said.  There were things that

12    he said that were in addition to that 2003 interview on the

13    witness stand.  Either we didn't ask him questions on that

14    subject.  There was additional information.  Every witness, as

15    you indicated, has additional information in the course of

16    asking questions.  I certainly did not ask him about the Global

17    Relief newsletters.  In fact, I think Ms. Lunt mentioned it

18    during a sidebar, and I should ask early on you just asked Mr.

19    Teba if he ever saw those things.  These are things that I

20    didn't think to ask him.  I don't think that it's inconsistent

21    or exculpatory in any nature or in any manner.

22         The 1995 trip, he indicated that he recalled a group

23    of them were going on a trip.  He wasn't asked is that all the

24    trips that you recall, or is there any trip that Mr. Muntasser

25    made in 1985.  That was just not put to the witness.  I was at

1    the 2007 meeting.  These things he said were in addition to and

2    not consistent with what he said earlier.

3            THE COURT:  Anyway, my understanding is you have

4    turned over the rough notes, but I don't think --

5            MS. SIEGMANN:  From 2003.

6            THE COURT:  Yes.

7            MS. SIEGMANN:  They were consistent with the 302 that

8    was produced from that 2003 interview.  There's nothing

9    additionally in those notes that was not otherwise disclosed in

10   the 302 from the 2003 interview.

11           THE COURT:  All right.  Mr. McGinty.

12           MR. McGINTY:  Your Honor --

13           THE COURT:  Yes.

14           MR. McGINTY:  -- we never got the 302 from the 2003

15   interview.  We had an interview from April of '07.  I believe

16   it was April of '07.  It was during his cross that we learned

17   that Mr. Teba had been interviewed earlier.  We asked for the

18   materials that related to that.  We were given the notes that

19   were related to that.  I do not have a 302 from the 2003

20   interview.

21           MS. SIEGMANN:  My understanding, the government

22   produced the 302 from the 2003 interview.  It was in discovery

23   that was produced.

24           MR. McGINTY:  I never saw it.

25           MS. LUNT:  Only April of 2007.

1              THE COURT:  Well, why don't you check your files and

2       see if you can figure it out --

3              MS. SIEGMANN:  Okay.

4              THE COURT:  -- whether or not it was produced.

5              Mr. Andrews.

6              MR. ANDREWS:  Yes, thank you, your Honor.  Good

7       morning.

8              We had filed a motion some time ago, and we had spoken

9       about parts of it.  It was a defendants' motion in limine re:

10      Wiretape, Incorporated's memoranda of law.  The Court might

11      recall that there was one wiretap that we discussed when

12      the -- those e-mails were coming in, and there was a question

13      about whether they were lost or not, and there was a earlier

14      wiretap, and remember Mr. Chehade, what he says on the wiretap

15      to Mr. Mubayyid, "Get rid of this, the materials in the storage

16      locker."  And Mr. Mubayyid says, I don't want to.  So

17      we -- that was one of the wiretaps that we -- I had asked to be

18      kept out.  And the Court, I think, in addressing it as far as

19      the e-mails were concerned, seemed to indicate that he was

20      going to allow that conversation in.

21             THE COURT:  Remind me.  Is Chehade an unindicted

22      coconspirator?

23             MR. ANDREWS:  No, he's not, your Honor.  He is not an

24      unindicted coconspirator.  He is the person, who is one of the

25      leaders, or managers, directors running GRF, but he is not an

1    unindicted coconspirator.  So there is that tape.

2           There is also a second tape that I fear might be

3    played here as well that we -- I addressed the motion, or we

4    addressed in the motion of 7/19/2003.  This is a conversation

5    between Muhamed Mubayyid and Mahmoud Al Asmar, and that's

6    Mahmoud Al Asmar, two words, three words, I guess.

7           Mr. Al Asmar is not an unindicted coconspirator

8    either.  The other cases, as I note, occurs in July 2003, and

9    apparently they're discussing events that occurred in Lebanon;

10   and the basis for my asking it be kept out, first of all, it's

11   really a -- it's not exculpatory, I don't think, in any way of

12   Mr. Mubayyid.  It is of marginal relevance, but there are a

13   couple of phrases in here about things that -- if I can just

14   catch it.  At one point Mr. Mubayyid says, "Listen, Bassam's

15   story over there messed things up the way 9/11 messed things up

16   here."  Mr. Al Asmar replied, "By Allah, and I don't know."

17   But Mubayyid says, "It took people by overflow, what do you

18   call it.  It mixed the good with the bad."  And then it goes on

19   to discuss how authorities in Lebanon rounded up people and

20   tortured some people.

21          There is one other reference to Bassam, if I can

22   just -- and I think the government is going to allege that Mr.

23   Al-Monla lied to the FBI when he said he didn't know Bassam

24   Kanj.  There's no such allegation regarding Mr. Mubayyid.  So,

25   all we have really is Mr. Mubayyid saying the word "Bassam" a

1    couple of times and saying that what Bassam did over there

2    messed things up in Lebanon the way 9/11 messed things up here.

3    It sort of simply, as an aggressive advocate, one would like to

4    have the word "9/11" come out of Mr. Mubayyid's mouth, but

5    other than that, it doesn't really go to any issue in the case.

6    It's actually -- it's July 2003.  So it's -- I'm not sure there

7    is anything that is part of the conspiracy is even going at

8    that point.

9         So, that's basically the reason, your Honor.  It's

10   just Mr. Mubayyid's discussion with Mr. Al Asmar has nothing to

11   do -- he does say the word "Bassam," but that, whether or not

12   Mr. Al-Monla knows Bassam Kanj isn't clarified one way or the

13   other by this conversation.

14        THE COURT:  Okay.

15        MR. ANDREWS:  But I can provide the court --

16        THE COURT:  Yeah, the transcripts would be helpful.

17        Mr. Chakravarty, let me hear -- let's take the second

18   conversation first, the July 19, '03, by Mr. Al Asmar.

19        MR. CHAKRAVARTY:  The government has redacted the

20   phrase "the way 9/11 messed things up here." The new

21   transcripts reflecting that redaction and similar redactions

22   throughout all the calls, and I'm providing those to counsel

23   now.  I have them.  I just got them, so I'm giving them now to

24   Mr. Andrews.

25        With regards to the probative nature of this call, Mr.

1    Andrews has it essentially right that Mr. Mubayyid is not

2    charged with knowing of somehow him lying about it, but Mr.

3    Al-Monla is.  This call is put in context to other calls.  One

4    of them in which Mubayyid speaks with Mohamed Chehade in

5    Chicago, and they refer to Bassam.  We have to prove that

6    Bassam is the Bassam Kanj, who -- who Mr. Al-Monla is alleged

7    to have lied about.

8            After the call between Mr. Mubayyid and Chehade about

9    Bassam, that is when an inculpatory call between Mr. Al-Monla

10   and Mr. Chehade about Bassam Kanj occurs.  So, what Mr.

11   Mubayyid's understanding was of who Bassam was, and Mr.

12   Chehade's understanding was, who Bassam was, is relevant to

13   putting in context the conversation that Mr. Al-Monla has with

14   Mr. Chehade.  The fact that it's sometime afterward does not

15   change the fact that Mr. Mubayyid knew that Bassam Kanj had

16   died.  Mr. Chehade knew that Bassam Kanj had died, and we

17   allege that the defendant, Mr. Al-Monla, also knew that Mr.

18   Kanj had died.

19           THE COURT:  So --

20           MR. ANDREWS:  If I may, your Honor.

21           THE COURT:  I'm not sure I have that right.  We

22   have -- is it three conversations:  Mubayyid and Chehade,

23   Mubayyid and Al Asmar, and Al-Monla and Chehade?

24           MR. CHAKRAVARTY:  Correct.

25           THE COURT:  Okay.  And the two Mubayyid conversations

1    are context for the Al-Monla conversation; is that right?

2           MR. CHAKRAVARTY:  Correct.  Correct.  And for the

3    state of mind of essentially -- I mean Mr. Chehade's

4    understanding when he's talking to Al-Monla that they are

5    talking about Bassam Kanj.  Mr. Al-Asmar is mentioned in that

6    conversation as well.  Collectively, it provides, you know,

7    provides clarity that Mr. Al-Monla is talking in addition to

8    other content itself, that they're talking about Bassam Kanj.

9           THE COURT:  All right.  Is it only going to be offered

10   against Al-Monla on the false statement charge?

11          MR. CHAKRAVARTY:  Yes, your Honor, the July 19th call,

12   yes.

13          THE COURT:  Yes.  At a bare minimum, a limiting

14   instruction would be required.

15          MR. CHAKRAVARTY:  Correct.

16          MR. McGINTY:  Your Honor, if I might --

17          THE COURT:  I think I need to look at these three

18   conversations.

19          I'm sorry.  Mr. McGinty.

20          MR. McGINTY:  Your Honor, just so it's clear.  There

21   is a conversation between Mr. Chehade and Mr. Mubayyid in

22   January of 2000.  That's the first of the calls that the

23   government is going to put in.

24          The second call is three months later between Mr.

25   Chehade and Mr. Al-Monla.  That's the one where the government

1     is alleging the subject of the conversation is -- is Mr. Kanj.

2     The tape the government is seeking to put in, the third of

3     them, to lend content to the conversation of April of '02 is

4     July of '0 -- I'm sorry -- of April of '00 is a conversation in

5     July of '03, three years later.

6          The government claims that a conversation between

7     Mubayyid and El Asmar about Kanj, unlinked to any acts, untied

8     to any knowledge of Al-Monla, somehow comes in as shedding

9     probative light on the identity of the subject of the

10    conversation of Al-Monla and Chehade in April of '00.  That's

11    the proposition.

12         THE COURT:  Okay.  I'm going to have to read the

13    transcripts again.  I can't do this without looking at them.

14    And then the Chehade conversation regarding the storage locker,

15    I think I probably need to look at that as well, but Mr.

16    Chakravarty, let me hear your quick response on that.

17         MR. CHAKRAVARTY:  That is a -- one of the pivotal

18    calls in the case.  It's a conversation between Mr. Mubayyid

19    and Mr. Chehade a couple of days prior to the execution of the

20    FISA search.  In that conversation, in broad terms, part of the

21    conversation is explicit discussion that law enforcement had

22    approached members of Care; and in response to that Chehade

23    says, "What do you have, and where is the stuff" essentially.

24    Mr. Mubayyid says that it's in storage.  And Mr. Chehade

25    instructs him to remove them; and you know, Mubayyid expresses

1   some concern with moving them, and an appearance of conscious

2   guilt.  Mr. Chehade insists that he should remove them.  That

3   is offered for what we have alleged and was the subject of a

4   motion in limine earlier on that Mr. Mubayyid then removed

5   them.  In fact, he took some of them to his house.  He

6   destroyed some of these documents essential to our spoilation,

7   or destruction of documents.

8        Later in that conversation, they discuss financial

9   transfers between GRF and Care.  Probative of the government's

10  theory that all of these receipts, the nature of their

11  business, the nature of their relationship with GRF may have

12  been doctored, your Honor, and they talk about, you know, doing

13  the accounting, and that can be argued both ways, but the

14  probative nature of the call is Mubayyid's statements and the

15  non-hearsay purpose for which Mr. Chehade's statements are

16  offered with those.

17       THE COURT:  Okay.

18       MR. CHAKRAVARTY:  And for the record, I have copies

19  for the Court for all of these.  If it would assist the Court,

20  I have highlighted portions, which I intend to use and are the

21  work product with all respect to my brothers and sisters, I

22  don't want to flag this to them, but so your Honor can focus in

23  on the areas I'm going.

24       THE COURT:  I think I need to see the transcripts of

25  these calls and take them.  And, again, just to circle back to

1  what we discussed earlier, I also need to review Ms. Siegmann's

2  notes in camera.  And the government is going to look and see

3  whether or not they were previously provided in the April of

4  '03 302 with regard to Mr. Teba.

5          Mr. Andrews.

6          MR. ANDREWS:  I will try to provide to the Court

7  copies of the transcripts.  I know we're getting down to the

8  last minute here.

9          Just quickly, the proposition is that several days

10  before a FISA search, Mr. Chehade, who is not an indicted

11  coconspirator, says, "Get rid of the -- remove them."

12          "MR. MUBAYYID:  It needs uh, one is afraid that they

13  may think there is something, I mean --

14          "CHEHADE:  No."

15          "MUBAYYID:  I don't want to touch anything, so that

16  there is no."

17          "CHEHADE:  No, no, no, remove them.  Remove them.

18  You -- I received -- I received checks today."

19          They start discussing the checks.  So, that is the

20  whole thing about removing them.

21          Frankly, Mr. Mubayyid says, "I don't want to touch

22  anything."  But what happens three or four days later is the

23  FISA search goes in, that's when, in fact, the Azzam

24  Publication email is discovered, and the notes with the little

25  circles, the Court will recall, are discovered.

1          The government's theory is that, I guess, Mr. Mubayyid

2    went in between that time and 18 months later when the search

3    in April of '03 occurs.  It's a very, very, very tenuous

4    proposition, your Honor, and simply a 403 weighing would say,

5    you know, this is -- it's not beyond hypothetical possibility

6    that Mr. Mubayyid responded to Chehade's statement to remove

7    these things sometime in the 18 months.

8          Now, again, when Mr. Chehade says, "remove the

9    records," I guess the government is alleging he removed two or

10   three pieces of paper and left the remaining thousands in the

11   locker for the next 16 months, or 18 months.

12         But if you balance that with Mr. Chehade being an

13   unindicted -- not an unindicted coconspirator, but who somebody

14   who Mr. Mubayyid had dealings with, the balance there is Mr.

15   Chehade's reaction is to see or to hide or to urge Mr. Mubayyid

16   to remove these items, the prejudice just flows over to Mr.

17   Mubayyid, because why is he dealing with a man of such low

18   scruples, or such instincts as to want to hide things from the

19   authorities.  So, it's simply on the balance of the testimony,

20   I think.

21         THE COURT:  Okay.  Okay.

22         MR. McGINTY:  Your Honor, one last thing.

23         THE COURT:  Yes.

24         MR. McGINTY:  The government has apparently provided

25   you with highlighted transcripts.  It has not provided us with

1    those highlights.  So the things they're saying are probative,

2    and they intend to play to the jury, or to read to the jury,

3    which apparently they have identified and are prepared to

4    proceed on.  They have not told us that they have given it to

5    you.

6              THE COURT:  I intend to read the whole thing, and --

7              MR. ANDREWS:  Just on that subject, your Honor.

8              THE COURT:  Presumably, if the highlights serve any

9    purpose at all, it shows what the government thinks is

10   important, and it -- it focuses my attention on what they care

11   about, which presumably helps the inquiry.  I don't see it as

12   doing any harm.  If you want to submit your own highlighted

13   conversations, that's fine.

14             MR. McGINTY:  I would like to know what they thought

15   was important.

16             THE COURT:  Well, I can hand this back and get

17   unhighlighted copies, but there's going to be a delay.  That's

18   what I'm concerned about.  I just don't think it's that big a

19   deal, and I don't mean any disrespect.  People are always

20   handing me cases with great big stars next to the language.

21   Really, I'm only focusing on the text.

22             Mr. Andrews.

23             MR. ANDREWS:  Just -- just on that topic so this case

24   moves along a little bit better, one of the problems is not

25   knowing what -- some of these transcripts are five pages long,

1    some are 20 pages long, and the government told us that they

2    are going to read in the good parts, quote/unquote.  Some of

3    the good parts for the government may be not be the good parts

4    for the defense, and by the rule of completeness, we may want

5    to have the person read them at the same time.  It's going to

6    delay matters, because we don't know what's being read in.

7          THE COURT:  Well, obviously, under the rule of

8    completeness, we'll let you have the full conversation; but in

9    the meantime I'm going to read the whole thing.

10         All right.  Let's bring the jurors in.

11         COURT OFFICER:  All rise.

12         (At 9:08 a.m., the jurors entered the courtroom.)

13         THE CLERK:  Court is now open.  You may be seated.

14         THE COURT:  All right.  Good morning, ladies and

15   gentlemen.  I'm sure you won't be surprised to hear that I, in

16   fact, stayed up to the bitter end last night.  So once again,

17   I'll try to keep from yawning.

18         Mr. Chakravarty.

19         MR. CHAKRAVARTY:  I hope not to be responsible for

20   that, your Honor.

21                   CONTINUED DIRECT EXAMINATION

22   BY MR. CHAKRAVARTY:

23   Q.   Good morning, Mr. Kohlmann.

24   A.   Good morning.

25   Q.   We were just introducing you to the jury when we broke on

1    Monday, and you were just describing your use of computer

2    databases in your work.

3            Would you just describe that.

4    A.    Sure.   In addition to my own database, which I maintain in

5    my own office, which consists of original data that I have

6    collected in the past decade, original videos, communiques and

7    whatnot, which are all searchable through what -- again is

8    called a Boolean Search Index where I can do and, if, nor, but.

9            In addition to that, I also have access to such

10   databases as LexisNexis, the Foreign Broadcast Information

11   Service and obviously other search indices that are available

12   on line.

13   Q.    And do you have an on-line presence yourself?

14   A.    Yes, I do.   In addition to, number one, obviously

15   monitoring a number of websites, which are on line, which

16   disseminate relevant secondhand information about terrorism and

17   about the mujahideen, I also maintain my own website, which

18   publishes some of this information translated, publishes

19   original charts, court documents, exhibits, anything that I

20   think is relevant to academics, policymakers, anyone with a

21   genuine interest in researching the subject.

22           MS. LUNT:   Your Honor, may we have the instruction?

23           MR. McGINTY:   Objection.   May we approach?

24           THE COURT:   All right.   I'll see you at sidebar.

25           (Sidebar as follows:

1          MS. LUNT:  Your Honor, this would be an appropriate

2     time for a strong limiting instruction.

3          THE COURT:  He hasn't said anything yet.

4          MS. LUNT:  Yes, he said that he was monitoring

5     terrorism websites.

6          THE COURT:  Okay.  I'm sorry.  I missed that.  Then I

7     will give the instruction.

8          MR. CHAKRAVARTY:  My next question, your Honor, is

9     what is the name of the website.

10         THE COURT:  Okay.  Why don't we get the name of the

11    website, and then I'll give instruction.

12         MR. McGINTY:  Note my objection.

13         ...end of sidebar.)

14    Q.   (By Mr. Chakravarty)  Mr. Kohlmann, what is the name of

15    your website?

16    A.   Sure.  The name of my website is globalterroralert.  It's

17    available at www.globalterroralert.com.

18         THE COURT:  Ladies and gentlemen, let me pause for a

19    moment and remind you, caution you.  The defendants in this

20    case are not accused of engaging in any terrorist activities,

21    or supporting terrorist activities, or providing money to

22    support terrorist activities, or anything of the sort, and you

23    are to draw no inference of any kind from the name of the

24    witness's website, or -- or of any work he may have done, or

25    any other things that he may have done that somehow the

1    defendants must necessarily have some terrorism connection, or

2    this witness would not be testifying.  I want to make that

3    absolutely clear.  It's not just you can't draw the connection

4    explicitly.  You can't do it implicitly either.  There is no

5    secret thing out there that you ought to be concerned about

6    that's being hidden from you.  This is a tax case, a false

7    statements case.  It has nothing to do with September 11th, or

8    with terrorism, or anything of that nature.

9         Let me give you another caution that goes back to the

10   day that we impaneled the jury.  There is some danger in this

11   day and age that people might draw an inference, because the

12   defendants are Muslims, or Arabs, or from certain countries,

13   again that there may be some kind of terrorism connection

14   there, or that you speculate about connections that are not

15   there.  Again, that has nothing to do with this case.  It's a

16   facts case and a false statements case, and you certainly

17   cannot draw any improper inference based on the defendant's

18   religion, nationality, or ethnicity.

19        Mr. Chakravarty.

20   Q.   Mr. Kohlmann, do you interact with other professionals in

21   your field?

22   A.   Yes, in addition to attending conferences with other

23   academics, private researchers, government officials, et

24   cetera, I also communicate on a daily basis with individuals

25   around the world at various research institutions,

1    universities, anyone who has an interest in researching

2    mujahideen movements; and again, in a variety of different

3    countries, I regularly attend conferences in Europe and in

4    North America and beyond.

5    Q.   Now, with regards to your work on line, do you do any

6    additional activities on line?

7    A.   Yes, I mean in addition to publishing information, I also

8    monitor a wide variety of different sources on line.  It

9    happens that because of the information revolution, a number of

10   organizations, a number of entities have put a lot of their

11   information on line, as opposed to mail order, or putting it in

12   libraries as they used to, or bookstores; and thus, the primary

13   way in which one would access secondhand information, secondary

14   sources about this particular subject about mujahideen

15   movements probably the best source these days is on line, is

16   the Internet, and it's not just for sources that -- material

17   that's coming out right now.  It's going back, archiving,

18   because as time goes on, people are taking information from the

19   past, and they're digitizing it, and they're putting it on

20   line, so we're now getting access to videos from 1992, 1993,

21   1994, where we never had access to them before.

22   Q.   And, in fact, have you testified in courts around the

23   world related to your on-line investigations?

24   A.   That's correct.  I have testified in courts both in the

25   United States, the United Kingdom and Bosnia-Herzegovina on the

1    subject, on various different subjects, including the presence

2    of various different mujahideen organizations on line, on

3    different conflicts around the world, in which I have done

4    field research, et cetera, et cetera.

5    Q.    And would you describe who you consult to now.

6    A.    Sure.  I work as a private consultant now.  First of all,

7    I work as an investigator on behalf of a foundation called the

8    NEFA Foundation, which specializes in providing original

9    research, again, to academics, policymakers and producing

10   analytical reports out of this information.  In addition, I

11   work as a private consultant on behalf of various different law

12   enforcement services, on behalf of foreign governments, the

13   United States Government, and private clients as well, in terms

14   of researching this material, providing expert witness reports,

15   providing expert reports in general, providing analysis,

16   providing raw data.

17          One of the most important things I do is I provide raw

18   data.  For instance, I also work for NBC News here in the

19   United States, and my primary task working for NBC is to

20   provide them with raw information from mujahideen

21   organizations, raw information that they can develop then into

22   stories.

23   Q.    Have you published books and articles?

24   A.    Yes, I have.

25   Q.    Would you describe what you published.

1    A.    Sure.  I've published a book about the conflict in

2    Boznia-Herzegovina, with the focus on the foreign mujahideen

3    brigade that was fighting there during the early 1990s and

4    subsequent aftermath and aftereffects of that brigade.  I have

5    also written numerous scholarly articles, editorials, blog

6    notes, analytical reports, which have been published in various

7    different outlets, foreign affairs, the Journal of

8    International Security Studies, et cetera, et cetera, on a

9    variety of different subjects; but again, focused primarily on

10   aspects of particular conflicts around the world in which the

11   mujahideen have been active and focusing on such aspects as

12   recruitment, financing, and hierarchy, how the infrastructure

13   of these organizations work.

14   Q.    With regards to your publications, have some of those been

15   peer reviewed?

16   A.    Yeah, my preference is to publish articles --

17           MS. LUNT:  Objection, your Honor.

18           THE COURT:  I think the question was:  Have your

19   publications been peer reviewed.

20           THE WITNESS:  Yes, your Honor, they have been peer

21   reviewed.  My preference is for --

22           MR. McGINTY:  Objection.

23           THE COURT:  Okay.  Let's put another question to the

24   witness.

25   Q.    With regards to your book, has that been reviewed by -- by

1    publishers?

2    A.   Yes, it has been reviewed several times by -- part of the

3    process of publishing a book like this, it's mandatory to have

4    it peer reviewed.  You don't select the peers --

5              MR. McGINTY:  Objection.

6              THE COURT:  Let's try to stick to the question --

7              THE WITNESS:  Excuse me, your Honor.

8              THE COURT:  -- that is actually being asked, okay.

9    Q.   Has your book been cited?

10   A.   Yes, it has.

11   Q.   Can you describe some of the prominent places where it has

12   been cited.

13   A.   Sure.  It has been cited by the final report of the

14   Bipartisan --

15             MS. LUNT:  Objection.  May we approach the sidebar?

16             THE COURT:  Overruled.  No.  Overruled.

17             THE WITNESS:  It has been cited in the final report of

18   the Bipartisan Congressional 9/11 Commission.  It has also been

19   cited in numerous different articles.  Recently it was cited by

20   Mike Scheuer in a piece that he wrote about renditions of

21   particular suspects, in which he cited particular facts that

22   had been published in it.  It's -- it's cited on a fairly

23   regular basis.

24             THE COURT:  Again, ladies and gentlemen, just to

25   remind you once again, the case has nothing whatsoever to do

1    with September 11th.

2    Q.    All right.  Do you work with a Mr. Richard Clarke?

3    A.    Yes, I do.

4    Q.    And who is he?

5    A.    Mr. Richard Clarke is the former director for the National

6    Security Council under President Clinton for terrorism.  He

7    currently works as a private consultant in this field.  I

8    have -- number one, he uses my book in the classes that he

9    teaches here in Boston at the Kennedy School of Government at

10   Harvard.

11        And as well, I just actually finished writing a piece

12   for him for an upcoming edition of the Annals of the American

13   Academy of Political Science on the subject of homegrown

14   extremists.

15   Q.    Are you familiar with Peter Bergen?

16   A.    Yes, I am.

17   Q.    And actually in what respect?

18        MS. LUNT:  Objection, your Honor.

19        THE COURT:  Overruled.

20   A.    Peter Bergen is another expert, such as myself who focuses

21   on researching mujahideen organizations.  One of the things

22   that he does, he actually teaches a class down in

23   Washington, D.C., at Johns Hopkins School of Advanced

24   International Studies.  In that class, Mr. Bergen has used my

25   book as a reference text.

1  Q.   All right.  And is your book used in other academic

2  institutions as well?

3  A.   Yeah, it's used as a reference text in universities in

4  North America, the United Kingdom and Australia.

5  Q.   You described an article appearing in Foreign Affairs.

6  Who publishes Foreign Affairs?

7  A.   It's published by the Council on Foreign Relations.

8  Q.   And the journal Counterterrorism Security and

9  International Studies?

10  A.   I can't -- I honestly at the top of my head, I can't tell

11  you exactly who published it, but it's a similar publication.

12  The idea is to publish journal articles about --

13         MR. McGINTY:  Objection.

14         THE COURT:  Overruled.

15         THE WITNESS:  The idea is to publish journal articles

16  about various aspects of international affairs, particularly

17  relating to international security studies.

18  Q.   Have you written about Afghanistan in the late 20th

19  century?

20  A.   Ah, yes, I have.

21  Q.   And describe where.

22  A.   Well, starting off in undergraduate, I wrote an honors

23  thesis on the subject of the Arab-Afghans, the mujahideen

24  fighting in Afghanistan, who had come from various different

25  countries, and basically tracing their roots after the conflict

1    in Afghanistan to four countries in particular, four regions in

2    particular, examining the infrastructure there, the leaders of

3    the moments there, how they related back to Afghanistan, and

4    essentially examining why they had either succeeded or failed

5    in the particular regions that they had gone to afterwards.

6            And in addition to that, I have written at least two

7    other research seminar papers, thesis papers on the subject of

8    Afghanistan particularly relating to the Afghan War of the

9    1980s, and the subsequent aftermath of that war.

10           I have also written papers subsequent to that in grad

11   school, in graduate-level classes on Afghanistan and Islamism,

12   particularly examining the relationship between Afghan

13   warlords, Gulbuddin Hekmatyar and Ahmad Shah Massoud, comparing

14   and contrasting their relationships, their modus operandi,

15   their history, their background.  I continue to write to this

16   day numerous pieces either touching on or dealing centrally

17   with Afghanistan.

18   Q.   How about with regards to the Bosnia conflict?

19   A.   Yeah.  In addition to my book, I've also published lengthy

20   scholarly articles about the conflict in Boznia-Herzegovina in

21   publications produced by the Combatting Terrorism Center at the

22   U.S. Military Academy at West Point.  I've also published

23   papers on the same subject for the Swedish National Defense

24   College, and I've also published a paper that dealt with

25   financing of extremist movements, which focused fairly

1   centrally on it for the Danish Institute for International

2   Studies.

3           I also contributed a chapter on the conflict in

4   Boznia-Herzegovina, and particularly the presence of North

5   African extremist groups in the Western Balkans for a book

6   edited by a formal NATO analyst published by Rutledge

7   also on the subject of Bosnia in general in the Balkans.  It's

8   a fairly regular subject.

9   Q.    How about with regards to the conflict in Chechnya, did

10  you write anything about that?

11  A.    Yeah.  In -- first, I -- this is a conflict that I've

12  studied for awhile.  It is something that, number one, it goes

13  back again to my undergraduate thesis, one of the four

14  countries that I had actually analyzed the past of the

15  Arab-Afghans after the Afghan War was the Caucasus, was

16  Chechnya, so a large part of my thesis was about Chechnya.  I

17  have authored numerous memorandum about this subject.  I have

18  reviewed dozens upon dozens of videotapes and audiotapes, of

19  which I created summaries and analysis, et cetera.  I have

20  testified about the subject in court before.

21  Q.    Have you also provided congressional testimony?

22  A.    That's correct.

23  Q.    Describe generally the subject matter.

24  A.    Sure.  I co-authored congressional testimony in 2003 on

25  the subject of how organizations were being used in order to

1    finance particular mujahideen organizations around the world.

2    Q.    And do you participate in speaking engagements?

3    A.    Yes, I do.

4    Q.    Describe what those are.

5    A.    Sure.  I participate on a regular basis on -- in

6    conferences and speaking engagements on behalf of the U.S.

7    Government, U.S. law enforcement, the Central Intelligence

8    Agency, on behalf of foreign institutions, foreign

9    universities, on behalf of the 9/11 -- the NIFA Foundation.

10   It's -- I would say it's fair to say that I participated and

11   speak on a regular basis at various academic government and

12   private functions.

13   Q.    Have you personally interviewed the mujahideen?

14   A.    Yes, I have.

15   Q.    Describe in what context.

16   A.    Sure.  In the context of my research one of the -- again,

17   one of the best ways of getting research --

18              MS. LUNT:  Objection, your Honor.

19              THE COURT:  I think the question was:  Have you

20   personally interviewed mujahideens.

21              THE WITNESS:  Excuse me, your Honor.  In order to get

22   this research, the best research you --

23              MS. LUNT:  Objection, your Honor.

24              THE COURT:  The question calls for a -- a description

25   of your personal interviews of mujahideen.

1   A.    Okay, your Honor.  I have interviewed such individuals as

2   Abu Hamza al-Masri, Mohammed al-Massari, Dr. Saad al-Faqih,

3   Shaykh Omar Bakri Mohammed, Randall Royer, and also several

4   other individuals, who have either been cooperating defendants,

5   or cooperating witnesses, in various different investigations

6   involving mujahideen organizations.

7   Q.   Okay.  Without going into detail, with regards to those

8   five people that you originally first mentioned, describe

9   generally what their role or what their capacity was.

10  A.    These individuals represent --

11         MS. LUNT:  Objection, your Honor.  May we approach the

12  sidebar on this?

13         THE COURT:  Yes.

14         (Sidebar as follows:

15         THE COURT:  Ms. Lunt.

16         MS. LUNT:  Yes, your Honor, my understanding was that

17  you were going to allow him to speak about the Arab-Afghan

18  movement in general.  He's naming all these people that have

19  absolutely nothing to do with this case, and I would object to

20  him going into any further detail about these interviews.

21         THE COURT:  Mr. Chakravarty, what's the tie in to the

22  case?

23         MR. CHAKRAVARTY:  The fact that his basis of knowledge

24  about the mujahideen is actually from people who work with

25  mujahideen.

1        THE COURT:  All right.  I -- I will allow him to get

2   into that.  He -- he has a tendency to talk, to be charitable

3   about it, and I know your ability to control him is limited,

4   but see what you can do, and I'll try to keep him in line as

5   well as best I can.

6        MS. LUNT:  I would object to any further discussions,

7   any further testimony about his discussions with these

8   individuals.

9        THE COURT:  Well, it's the -- the basis of his

10  knowledge, as I understand it, about the Arab-Afghan movement.

11  I think the fact is it's -- the fact of the interview is what

12  is significant in this context that he has obtained knowledge

13  therefrom.  I don't think the details are pretty lone from each

14  of these five people, which is really what matters.  It's the

15  fact that this is part of the methodology by which he has

16  acquired knowledge.  So, I will allow it to that extent.

17       MR. McGINTY:  I just want to make sure we have a

18  continuing objection to the entirety of his testimony

19  consistent with the grounds previously stated.

20       THE COURT:  Yes.

21       ...end of sidebar.)

22       THE COURT:  Okay.  Why don't you put a new question to

23  the witness.

24  Q.  Can you describe the subject matter of the testimony

25  without going into details -- excuse me -- the specific matter

1    of the conversations which you had with the people you just

2    described?

3              THE COURT:  In very general terms.

4    A.    Sure.  I've discussed various -- the history, background,

5    and hierarchy of various mujahideen organizations around the

6    world, what their goals are, what their aims are.  It's been a

7    fairly wide-ranging discussion.  I mean the --

8              MS. LUNT:  Objection, your Honor.

9              THE COURT:  Okay.  Let's put another question to the

10   witness.

11   Q.    In addition to your -- strike that.

12              Have you also -- you described that you consulted with

13   government agencies as well?

14   A.    That's correct.

15   Q.    Would you describe from what countries you have consulted.

16              MS. LUNT:  Asked and answered, your Honor.

17              THE COURT:  Overruled.

18   A.    In the United States, the United Kingdom,

19   Boznia-Herzegovina, Denmark, Australia, and elsewhere.

20   Q.    All right.  And with regards to the United States, what

21   agencies have you consulted with?

22   A.    I have been a paid consultant on behalf of the U.S.

23   Department of Justice, the Federal Bureau of Investigation.

24   I've also -- I've also spoken and been paid to speak at

25   conferences organized by the Central Intelligence Agency, the

1    Internal Revenue Service, the Department of Homeland Security,

2    and other agencies as well.

3    Q.   And have you been retained in relation to criminal

4    prosecutions previously?

5    A.   I'm sorry.  I did forget one.  The U.S. Department of

6    Defense.  Yes, I have been retained previously.

7    Q.   All right.  And in what capacity have you been previously

8    retained?

9    A.   I have been retained both as a fact witness and also as a

10   expert witness.

11   Q.   What types of activities have you done in relation to

12   criminal prosecutions?

13   A.   I have, number one, provided analysis of seized evidence,

14   forensic evidence, other evidence.  I've also provided expert

15   analysis in terms of providing reports, final reports based on

16   that evidence, and I've also provided expert and fact testimony

17   based upon that evidence.  I've also provided evidence in some

18   cases.

19   Q.   And you indicated that you had testified previously?

20   A.   Yes.  I've testified seven times previously in U.S.

21   federal courts as an expert witness; and I've testified four

22   times in the United Kingdom as an expert witness; and I've

23   testified once before the Supreme Court of Boznia-Herzegovina

24   as an expert witness.

25   Q.   Have you also worked for the ICTY, and can you just

1    explain what that acronym means.

2    A.    Excuse me.   The International Criminal Tribunal for the

3    former Yugoslavia.   I have been hired as a researcher, as an

4    expert and eventually with the idea of me testifying as an

5    expert witness before the ICTFY in the trial of individuals

6    alleged to have committed war crimes in Boznia-Herzegovina.

7    Q.    Now, the context of your testimony in these other cases,

8    what generally is the subject matter?

9    A.    Generally speaking, the subject matter is mujahideen

10   organizations around the world:   their hierarchy, their

11   history, their leadership, activities in which they have been

12   involved, what they have claimed.

13   Q.    And prior to your testimony in this case, were you

14   retained by the DOJ?

15   A.    Yes, I have.

16   Q.    And did you -- did -- in these other ones did you draft a

17   report as well?

18   A.    Typically, in every case in which I testify I'm asked --

19          MS. LUNT:   Objection, your Honor.   It goes beyond.

20          THE COURT:   Yes, let's confine ourself, Mr. Kohlmann,

21   to the question that's asked.   I think the question was:   Did

22   you draft reports in those cases.

23   A.    I'm sorry.   Was it this case?

24   Q.    In this case?

25   A.    Oh, in this case.   Excuse me, your Honor.   Yes.   Yes, I

1    have drafted expert reports in this case.

2    Q.   Describe the methodology which you employed in order to

3    analyze information.

4              MS. LUNT:  Objection, your Honor.

5              May we approach the sidebar?

6              THE COURT:   No.   I'm going to sustain it in that form.

7    Q.   With regards to your role in this case, have you had the

8    opportunity to review different pieces of evidence in this

9    case?

10   A.   Yes.

11             MS. LUNT:  Objection, your Honor.

12             THE COURT:  Overruled.

13   A.   Yes.

14   Q.   And in addition to that, have you provided information to

15   the government in this case?

16   A.   Yes.

17   Q.   I'm going to draw your attention now to Afghanistan.

18   Based on your experience, are you familiar with the modern

19   Arab-Afghan mujahideen in Afghanistan?

20   A.   Yes, I am.

21   Q.   Can you describe what the -- the origins of that

22   mujahideen.

23   A.    Yes.   In approximately 1979, the Soviet Union invaded

24   Afghanistan with the hopes of restoring communist rule in that

25   country.   Shortly after the Soviet invasion of Afghanistan,

1    there was a rebellion that broke out among Afghans against this

2    occupation, and it was led by groups that called themselves

3    "the mujahideen," "the holy warriors."  These individuals were

4    primarily based along the Afghan-Pakistani border, just inside

5    of Pakistani territory, and they came from various different

6    ethnic groups and religious groups inside of Afghanistan.

7              In the beginning, the mujahideen were -- some were

8    Shiite as well as Sunnis.  Sunnis are the majority in the Islam

9    world.  You had ethnic groups from different parts of

10   Afghanistan fighting.  You had Tajik.  You had Uzbek.  You had

11   Pashto, and these -- these different ethnic groups coalesced

12   into various different mujahideen factions, which together were

13   fighting against the Soviet occupation.

14   Q.   And how long did that Soviet occupation last?

15   A.   Sure.  The Soviet occupation lasted until approximately

16   January of 1989.  At that point, by 1989, the factions fighting

17   the field no longer were just limited to Afghan factions, but

18   also included foreigners, who had come from elsewhere

19   throughout the world, primarily the Muslim world to come fight

20   in Afghanistan alongside the mujahideen.

21   Q.   Are you familiar with a person name Abdullah Azzam?

22   A.   Yes, I am.

23   Q.   Describe who he is.

24   A.   Abdullah Azzam is a Palestinian or was a Palestinian

25   cleric, who was largely credited with having brought many --

1    MS. LUNT:  Objection, your Honor.

2    THE COURT:  Overruled.

3    A.   Abdulla Azzam is largely credited with having brought many

4    of the foreign fighters that eventually joined the mujahideen,

5    or fought alongside the mujahideen, to Afghanistan.  He

6    was -- his major focus was on the concept of jihad, or holy

7    struggle, and he encouraged many young men from around the

8    world that it was their duty to go to fight in Afghanistan

9    against enemies of the Afghan people of Islam and to join in

10   that battle.

11   Q.   Now, was Mr. Azzam himself an Afghani?

12   A.   No, he was a Palestinian.

13   Q.   Are you familiar with person named Abdul Majid Al-Zindani?

14   A.   Yes, I am.

15   Q.   Who is he?

16   A.   Abdul Majid Al-Zindani is one of the most powerful clerics

17   in the country of Yemen, which is just south of Saudi Arabia.

18   Mr. Zindani runs the political party, which is known as

19   Al-Islah, and he is also credited with having brought many,

20   many recruits from Yemen to Pakistan in order to come fight in

21   the Afghan War and in the Afghan jihad.

22        Obviously, the people that he was bringing from Yemen

23   and were not Afghans.  They were Yemens.

24   Q.   How would foreign fighters enter Afghanistan?

25   A.   Afghanistan is surrounded by countries, which at that time

1    were not necessarily friendly to the arrival of mujahideen

2    fighters, who came to fight the Soviet Union.  At that time

3    many of Afghan's neighbors were actually still partners of the

4    Soviet Union.  The only real country, which was in close

5    proximity to Afghanistan, which provided the ready access for

6    fighters seeking to cross over the border was Pakistan.  And so

7    many, many fighters came through Pakistan, particularly in

8    places such as Peshawar and Quetta.

9    Q.   Are you familiar with an organization known as

10   Maktab-al-Khidmat?

11   A.   Yes.

12   Q.   And in very general terms, without describing what they

13   did, can you describe what Maktab-al-Khidmat was.

14   A.   Yes, Maktab-al-Khidmat means "office of services."  This

15   was an organization which was intended to provide support to

16   the mujahideen.

17   Q.   And did it have offices around the world?

18   A.   Yes, it did.

19   Q.   Can you describe some of the places where it had offices?

20   A.   Yes, in addition to Peshawar, Pakistan, which was the main

21   gateway for fighters seeking to enter into Afghanistan into

22   Pakistan, Maktab-al-Khidmat also had offices in Europe, in

23   places like Zagreb, Croatia, and also in North America.

24   Q.   And in North America, what was the name of the

25   organization?

1   A.   In North America, Maktab-al-Khidmat was known as the

2   Al-Kifah Refugee Center.

3   Q.   When the Soviets pulled out of Afghanistan, describe what

4   the environment was that they left.

5   A.   When the Soviet Union withdrew from Afghanistan, they left

6   behind the remnants of an Afghan communist government, which

7   was still in control of places like Kabul, the Afghan capital,

8   and several other major cities in Afghanistan.

9        At that point, it became largely a battle between the

10  remnants of the Afghan government and various different

11  mujahideen factions, which were fighting both against the

12  Afghan communist government and in many cases also against each

13  other.  They were from different ethnic groups, and thus, they

14  didn't necessarily agree on who was going to be in charge after

15  the communist government was eventually overthrown.

16       So starting at approximately 1989, what you see is

17  both fighting against the remnants of the Afghan communist

18  government led by the former head of the Afghan Secret Police,

19  who was a guy named Najibullah, N-A-J-I-B-U-L-L-A-H.  And then

20  you also see particular mujahideen leaders, such as Ahmad Shah

21  Massoud and Gulbuddin Hekmatyar fighting each other for

22  dominance in particular regions of Afghanistan that are no

23  longer under the control of the communist government.

24  Q.   Do you recall when the communist government was overthrown

25  in Afghanistan?

1    A.    The communist government itself was removed in

2    approximately 1992; however, there were elements of the Afghan

3    communist government, which remained inside of Afghanistan

4    until approximately 1996.

5    Q.    Who was in charge of Afghanistan from 1992 on?

6    A.    At that point, following the removal of the Afghan

7    communist government, Afghanistan became divided into areas of

8    control by various different warlords, the mujahideen warlords.

9    Initially, the idea was that there was going to be a

10   power-sharing agreement whereby one individual would be named

11   prime minister, and one individual would be named minister of

12   defense, and thereby creating a coalition government; however,

13   the mujahideen ultimately were unable to agree on the terms of

14   sharing this power, so very quickly these arrangements as soon

15   as they would be developed, they would fall apart, and

16   Afghanistan evolved into some very dangerous internal fighting.

17   Q.    Okay.  Can you describe who the fighters were in that

18   internal fighting?

19   A.    Sure.  As I stated before, there are a number of different

20   mujahideen organizations.  They were supposed to be working

21   under something called Islamic Unity of Afghan Mujahideen;

22   however, as much as the idea was to unify them, many times they

23   weren't unified, especially after the Soviet withdrawal.  The

24   main players in this conflict were, number one, an individual

25   by the name of Gulbuddin Heckmatyar, G-U-L-B-U-D-D-I-N;

1    Hekmatyar, H-E-K-M-A-T-Y-A-R.  Gulbuddin Hekmatyar's mujahideen

2    faction was known as the Hizb-e-Islami, H-I-Z-B - E -

3    I-S-L-A-M-I, which means the Islamic party.

4         You also had others, who were competing with

5    Hekmatyar.  Hekmatyar is from an ethnic group that is known as

6    Pashtun, which is the majority ethnic group in Afghanistan.

7         You had another mujahideen leader by the name of Ahmad

8    Shah Massoud, A-H-M-A-D S-H-A-H M-A-S-S-O-U-D.  Mr. Massoud was

9    a Tajik.  He was from the Tajik ethnic group, and he led his

10   own mujahideen faction.  You also had individuals, such as

11   Burhanuddin Rabbani, R-A-B-B-A-N-I; and also Abdul Rasool

12   Sayyaf, S-A-Y-Y-A-F, who were both Pashto leaders, again

13   mujahideen leaders, who were competing with Gulbuddin Hekmatyar

14   to be the central formation, the central power behind the

15   Afghan mujahideen.

16   Q.   Are you familiar with someone named Dostum?

17   A.   Excuse me.  Yes, I forgot about Dostum.  Abdul Rashid

18   Dostum; A-B-D-U-L R-A-S-H-I-D D-O-S-T-U-M.  Abdul Rashid Dostum

19   is Uzbek.  Along the northern part of Afghanistan, there is a

20   region which is primarily ethnically Uzbek.  Dostum is a former

21   actually communist army general, who after the Soviets withdrew

22   eventually became his own mujahideen, the leader of his own

23   mujahideen faction, primarily Uzbeks, along the northern part

24   of Afghanistan.

25   Q.   Each of the individuals you just described, did they have

1   their own armies?

2   A.   Yes, each of these own individuals had their own armies,

3   had their own infrastructure, in some cases even had their own

4   cabinets.

5   Q.   When the Soviets left Afghanistan, describe the effects

6   that it had on the foreign fighters.

7   A.   The foreign fighters had only begun arriving in

8   Afghanistan in approximately 1984, 1985, a large majority of

9   them.  So they were only around for the latter part of this

10  conflict.  When the Soviets withdrew from Afghanistan, it

11  created problems for them, because these different fighters

12  were fighting alongside the Afghan mujahideen alongside

13  competing figures, such as Gulbuddin Hekmatyar and Ahmad Shah

14  Massoud.  What this meant was that these individuals were now

15  being forced to choose sides, either side with Hekmatyar,

16  Massoud, or somebody else; and by doing so, making themselves

17  enemies of others.  So essentially what happened was is that

18  post the Soviet invasion over approximately the next three

19  years the situation became increasingly dangerous and hazardous

20  for foreign fighters seeking to enter Afghanistan to the point

21  at which I was told by Abu Hamza Al --

22          MS. LUNT:  Objection, your Honor.

23          THE COURT:  Well, never mind the source of what was

24  just said.  Just to say to the point where you complete that

25  thought, and put another question to the witness.

1    A.    Of course, your Honor.  I was told that it would be

2    dangerous to enter Afghanistan with anything less than machine

3    guns and hand grenades.

4    Q.    And what time frame was that?

5    A.    This was --

6                MS. LUNT:  Objection, your Honor.  Move to strike.

7                THE COURT:  Overruled.

8    A.    This is in approximately 1992, 1993.

9    Q.    I'm going to ask you a little more about Mr. Hekmatyar.

10   Did he has -- was he known by any other names?

11   A.    Yes, Mr. Hekmatyar had a title by which he went by "the

12   engineer," which was a reference to a degree that he had

13   claimed he had achieved in the university.

14   Q.    And the Hizb-e-Islami that you described, did that have

15   other members in that organization?

16   A.    Yes.  Hizb-e-Islami was comprised not just of Gulbuddin

17   Hekmatyar, but of a host of other advisors and obviously

18   fighters, politicians.  The primary politician or ambassador on

19   behalf of Hekmatyar around the world was someone who had become

20   very closely associated with the Hizb-e-Islamli.  He was an

21   individual by the name of Saifur Rehman al-Halimi, S-A-I-F-U-R

22   R-E-H-M-A-N A-L H-A-L-I-M-I.

23   Q.    And who is he?

24   A.    Saifur Rehman al-Halimi was a member of Hizb-e-Islami, who

25   acted as Hekmatyar's official foreign ambassador, as a

1    diplomate traveling around the world and could speak in English

2    and could communicate Mr. Hekmatyar's message to a wide

3    audience of potential supporters, sympathizers and others.

4    Q.   And did Mr. Hekmatyar himself give interviews as well?

5    A.   Yes, Mr. Hekmatyar over the course of the 1980s and 1990s

6    traveled at least once to the United States and gave several

7    interviews, both in the United States and Pakistan and

8    elsewhere.

9    Q.   Are you familiar with a place called Chihar Asyab?

10   A.   Yes, I am.

11   Q.   And where is that?

12   A.   This is a place located inside of Afghanistan, and I know

13   it to be one of the primary headquarters of Gulbuddin

14   Hekmatyar.

15   Q.   Are you familiar with the place called Mazar-i-Sharif?

16   A.   Yes, I am.

17   Q.   And where is that?

18   A.   Mazar-i-Sharif is one of Afghanistan's largest cities.  It

19   is located in Northern Afghanistan, inside the region that is,

20   generally speaking, Uzbek dominated.

21   Q.   You were describing the internecine conflict in

22   Afghanistan in the '90s.

23        What was the ultimate resolution?

24   A.   Ultimately, the war continued in Afghanistan throughout

25   the 1990s, where you had Gulbuddin Hekmatyar waging open war

1    with Ahmad Shah Massoud.  The war that they fought eventually

2    resulted in the destruction of the capital Kabul, and

3    eventually both sides had weakened each other to the point

4    which they were susceptible to foreign or other parties

5    involved in this conflict.  Ultimately, Mr. Hekmatyar and Mr.

6    Massoud became victims of a new movement, which arose in

7    Afghanistan and also in neighboring Pakistan, which eventually

8    took over most, if not all, of Afghan territory, which this

9    movement went under the name of the students, or the Taliban.

10   Q.    And when did the Taliban take power?

11   A.    The Taliban's seizure of power in Afghanistan was gradual.

12   It wasn't overnight.  It began in approximately 1994, 1995.

13   The first major city that the Taliban took control of was

14   Qandahar in Southern Afghanistan.

15          Shortly thereafter, the Taliban began expanding their

16   reach.  They also found that many fighters, who had originally

17   been fighting alongside Pashto leaders such as Gulbuddin

18   Hekmatyar, had grown tired of all of the interfactional

19   fighting, and thus many of these fighters would defect to the

20   Taliban.

21   Q.    At one point did the Taliban take Kabul?

22   A.    Yes, they did.

23   Q.    Describe what happened on September 27th of 1996.

24   A.    On September 27, 1996, after an extended battle, the

25   Taliban finally managed to take control of the Afghan capital

1    of Kabul, at which point they marched into a compound, the

2    United Nations compound in Kabul.  They took custody of the

3    former dictator of Afghanistan, the former communist dictator,

4    Najibullah.

5    Q.    Let me stop you there.  You described earlier that

6    Najibullah was the communist dictator after the Soviets left.

7    You said that was in 1992?

8    A.    That's correct.

9    Q.    So this is in 1996?

10   A.    Yes, he was no longer in power at this point.  He

11   was -- he was essentially in the custody of what was supposed

12   to be the international -- an international organization.  He

13   was essentially hiding, and he was taken out and hung.

14   Q.    Okay.  Was that on -- did that occur on -- when did that

15   occur?

16   A.    That occurred on September 27, 1996.

17   Q.    And who did that?

18   A.    That was done by leaders of the Taliban.

19   Q.    Around this time, what was Hekmatyar's relationship with

20   the Taliban?

21   A.    Though Hekmatyar came from the same Pashto base, ethnic

22   base, as the Taliban and obviously came from the same religious

23   base of the Taliban, Hekmatyar did not agree with the Taliban

24   and fought bitterly with the Taliban.  He portrayed the Taliban

25   as being an anti-Islamic force, as being a force that was under

1    the thumb of the United States and the government of Pakistan;

2    and that the point of his movement was to drive out the

3    mujahideen, who had liberated Afghanistan.  So Hekmatyar fought

4    against the Taliban until he finally lost and was forced into

5    exile.

6    Q.   And where did he go?

7    A.   I believe he first went to Pakistan and then later to

8    Iran.

9    Q.   What was Hekmatyar's position on fighting in other

10   countries?

11            MS. LUNT:  Objection, your Honor.

12            THE COURT:  Overruled.

13   A.   Mr. Hekmatyar had stated repeatedly on public occasions

14   that the jihad in Afghanistan was just meant to be the

15   beginning of a larger struggle that would eventually liberate

16   all of the different regimes in Central Asia and would

17   eventually find its way through Asia to the land of Palestine

18   and would liberate the entire Muslim world; that the jihad in

19   Afghanistan was just the beginning.  In order to facilitate

20   this, Mr. Hekmatyar dispatched mujahideen fighters from

21   Afghanistan to other conflicts throughout Asia.  He also

22   established bases of operation in places like Baku Azerbaijan

23   in order to help finance and support these different conflicts

24   outside of Afghanistan.

25   Q.   And in relation to Mr. Hekmatyar going, where did the Arab

1    mujahideen go?

2    A.    Shortly after the Afghan War began drawing to a close in

3    early 1990s, and it became too dangerous for many mujahideen to

4    enter Afghanistan, a number of other conflicts began in various

5    different parts of the world in which the same mujahideen would

6    have been fighting in Afghanistan now saw these as attractive

7    second steps, the next rung in the ladder.

8         The primary conflicts, which they moved to immediately

9    after the Afghan War collapsed were:  Number one, a conflict in

10   neighboring Tajikistan, which is a region adjoining

11   Afghanistan; also places such as the Philippines,

12   Boznia-Herzegovina, and the Caucasus.

13   Q.    When you say "the Caucasus," what does that mean?

14   A.    The Caucasus is a region of Southern Russia, or Central

15   Asia, depending on how you see it.  It comprises various

16   different ethnic groups and different countries, such as

17   Chechnya, Ingushetia, Dagestan.  It is a fairly turbulent

18   region.

19   Q.    I draw your attention now to Boznia-Herzegovina.

20         Are you familiar with the conflict there in the '90s?

21   A.    Yes, I am.

22   Q.    Describe generally what that conflict was.

23   A.    In approximately April of 1992, a conflict broke out in

24   Boznia-Herzegovina over power sharing and over territorial

25   control.  When the former Yugoslavia broke up into pieces, you

1    now had different sections of this country, which were

2    organized by ethnic and religion lines, and these

3    different -- the leaders of these different factions could not

4    agree on how to share power and how to divide territory.  As a

5    result shortly thereafter, Bosnian Serbs, being one of the

6    ethnic groups inside of Bosnia, initiated a war against various

7    different other factions inside of Bosnia, including both

8    Bosnian Muslims and Bosnian Croats.  The goal of this was to

9    expand the region that was controlled by the Bosnian Serbs.

10   Q.   Was there a mujahideen presence in Bosnia around this

11   time?

12   A.   Starting in the sum -- summer of 1992, after witnessing

13   news reports regarding what was going on in Boznia-Herzegovina,

14   a number of mujahideen leaders, who were based in places such

15   as Pakistan and Afghanistan, decided that this conflict, though

16   outside of what was traditionally considered to be the Muslim

17   world, was indeed a legitimate holy struggle that would be a

18   proper base for the mujahideen.  It would be an attractive

19   conflict for the mujahideen to continue on what they had begun

20   in Afghanistan.

21   Q.   And were there, in fact, Muslims in Bosnia who were being

22   persecuted?

23   A.   Yes, there were.

24   Q.   Describe what happened in the war.

25   A.   Starting in the war in 1992, the Bosnian Muslims were

1  loosely allied with the Bosnian Croats against the Bosnian

2  Serbs.  The Bosnian Serbs were at that point the party, which

3  was most aggressive in terms of taking over territory.  The war

4  progressed at various different points.  At one point, the

5  Bosnian Croats and the Bosnian Muslims began fighting each

6  other in an open war with each other.  Shortly thereafter, they

7  patched up their differences and began working together again

8  and against the Serbs.  Once the Bosnian Croats and Bosnian

9  Muslims put aside their differences and began working together

10 against the Serbs, the tide of the war quickly changed.  And

11 eventually by the end of the war, in approximately 1995, the

12 Bosnian Muslims and the Bosnian Croats were actually winning

13 the military battles against the Bosnian Serbs and were pushing

14 them out of conquered territory.

15 Q.   And were there specific mujahideen elements in that

16 conflict?

17 A.   Initially, starting off, there were no Bosnian mujahideen,

18 because the main body of Bosnian Muslim fighters were fighting

19 under the Army of Boznia-Herzegovina, which was a nationalist

20 force; however, starting in the summer of 1992, as the foreign

21 mujahideen fighters began arriving in Bosnia, they decided that

22 they would need to form an official organization for

23 themselves, which they called the Kataeb al-mujahideen.

24 K-A-T-A-E-B al-mujahideen, AL-M-U-J-A -- excuse me.

25 M-U-J-A-H-I-D-E-E-N, the Mujahideen Brigade.  And the idea

1    behind the brigade was, number one, to formalize the reception

2    of foreign fighters arriving both from places such as

3    Afghanistan, also North Africa, Europe and beyond; and number

4    two, to encourage the recruitment of Bosnian Muslims, who had

5    previously been very nationalists to convince them to adopt a

6    new religious perspective, a new political perspective, and to

7    join the mujahideen fighting in the field; and, indeed that was

8    accomplished.

9    Q.    And how did the war end?

10   A.    Eventually in September of 1995, after there was a

11   major -- one last major battle between the Bosnian Muslims and

12   the Bosnian Serbs, the Bosnian Muslims more or less won that

13   battle.  At that point, international organizations, various

14   different foreign governments, including the United States,

15   encouraged these parties to come to the peace table to discuss

16   this and to negotiate a peace agreement.  The peace agreement

17   was reached in Dayton, Ohio, in November of 1995.  It has

18   became known as the Dayton Accord.  Within a month, the

19   conflict was over.

20   Q.    Are you familiar with a specific military operation during

21   the war called Operation Badr?

22   A.    Yes.

23   Q.    And what was that?

24   A.    Operation Badr was the very last battle that I just

25   referenced in the Bosnian War.  It took place in a region of

1    Central Bosnia known as Vuzuca, and the idea here was that the

2    Bosnian Muslim Army, alongside different foreign mujahideen

3    groups, units, from under the command of the former mujahideen

4    leadership would succeed in pushing the Serbs out of territory

5    that they considered genuinely part of the Bosnian Muslim

6    state.

7    Q.    And what's the time frame of that?

8    A.    The battle of Badr took place in approximately August and

9    September of 1995.  Primarily September 13th, 1995.

10   Q.    And was that battle memorialized?

11   A.    Yes.  As -- as several other -- as had happened with

12   several other battles during the Bosnian War, the Kataeb

13   al-mujahideen, the Mujahideen Brigade, commissioned a video

14   recording to memorialize this battle to spread word of this

15   battle around the world, and to show the martyrs that had been

16   fighting there to show catching prisoners, and the video was

17   appropriately titled "Operation Badr."

18   Q.    And have you seen that video?

19   A.    Yes.

20   Q.    And from where did you obtain that video?

21   A.    I've obtained this video from numerous sources.  Number

22   one, I purchased copies of this video from mujahideen

23   representatives based in Europe.  I've also obtained this video

24   from various different internet sites, which espouse support

25   for the mujahideen.  In addition, I have been given copies of

1    this video, the same video by the International Criminal

2    Tribunal for the former Yugoslavia.

3    Q.   Have you provided a copy of this video to the government?

4    A.   Yes, I did.

5    Q.   Does this video say "Badr Al Bosna?"

6    A.   Yes, it does.

7         MR. CHAKRAVARTY:  I'm approaching the witness with the

8    Court's permission.

9    Q.   Showing what is marked 484 for ID, do you recognize that?

10   A.   Yes, I do.

11   Q.   And what is that?

12   A.   This is a DVD, which I burned at the request of the U.S.

13   Attorney's Office in Boston, and it contains the video

14   "Operation Badr" produced, as it stated here, by the

15   al-mujahideen brigade.

16        MR. CHAKRAVARTY:  I ask this be introduced as an

17   exhibit.

18        MS. LUNT:  We've already objected to this, and we

19   renew our objection.

20        THE COURT:  All right.  Let me see you at sidebar.

21        (Sidebar as follows:

22        THE COURT:  Remind me.  How does the video tie to

23   these defendants?

24        MR. CHAKRAVARTY:  The defendants were distributing a

25   video "Badr Al Bosna," which is the video depicted on this.

1   This witness is not going to be describing the video.  A

2   linguist has reviewed it and will testify in summary fashion

3   what it describes.  Mr. Teba described the fact that there are

4   notes that describe that they distributed "Badr Al Bosna," I

5   think, on one of the occasions at least three times, and they

6   talk about it on the telephone intercepts on numerous

7   occasions.

8            THE COURT:  All right.  The -- this DVD was burned

9   from the video -- is the videotape itself, a copy of the

10  videotape in evidence?

11           MR. CHAKRAVARTY:  No, it's just a DVD.  They refer to

12  it.  The DVD itself -- the videotape itself was not found.

13  This is the videotape depicting what Mr. Teba described, and it

14  has the title that Mr. Teba described, and it's the writings

15  and the notes, which were used during Mr. Teba's examination,

16  and this is the video, which the defendants with others

17  describe that they were distributing and they needed to have

18  copies of.

19           MR. ANDREWS:  May I, your Honor?

20           THE COURT:  Yes.

21           MR. ANDREWS:  It's apparently titled "The Battle of

22  Badr Al Bosna."  This is not a copyrighted material.  This is

23  not like a movie like "Star Wars," for example, but you could

24  get bootleg copies, but it is, in fact, a single copy.  There

25  is no evidence that this is something that they witnessed

1    purchased someplace and burned a copy for the government.

2    There is no evidence that this is the actual copy of what the

3    defendants made, or are alleged have been distributed, or a

4    copy of what Mr. Teba may have seen or thought that defendants

5    or others were distributing.  It's not.  He says it was a

6    famous battle in that some films were taken, but this is not

7    necessarily the film that was an issue earlier on when Mr. Teba

8    was talking about in the '90s.

9         MS. LUNT:  That wasn't the objection I was going to

10   make.  I would like to reiterate that this is not -- we don't

11   know how this has been edited.  We don't know what additional

12   material it might have from the videotape that was referred to,

13   and the tapes -- no such videotape has been found, and it

14   should not be introduced into evidence.  There is evidence in

15   the case through witnesses that this videotape was -- I'm not

16   sure what the wiretaps -- what's going to be introduced from

17   the wiretaps, but accepting the proffer when we talk about a

18   videotape, but we don't know that it's this videotape, and this

19   should not be put into evidence.

20        Additionally, it has the name -- I believe the witness

21   just testified to the name of an organization that distributed

22   it.  Yes, it has a name in English.  The name underneath is --

23        MR. CHAKRAVARTY:  This doesn't have to go back to the

24   jury.

25        MS. LUNT:  Yeah, this says "Operation Badr," and it

1    says al-mujahideen Brigade, Bosnia.  We have no idea whether

2    this is the same version.

3            THE COURT:  All right.  I'm going to admit 484 de bene

4    without -- subject to being tied up and linked to the

5    defendants that this is -- there is a reasonable basis from it

6    so the jury could infer that this video that's displayed on the

7    DVD is the video that they distributed.

8            MR. CHAKRAVARTY:  This is the predicate for that,

9    which Mr. Teba's testimony was in describing the substance of

10   what was on there, which falls in line with what our witness is

11   going to say is the substance that is on there.

12           THE COURT:  That's what I -- and you also said you had

13   wiretap evidence.  I'll admit it de bene subject to being

14   stricken.  I don't think the link has been closed.

15           MS. LUNT:  I would like to add, your Honor, that the

16   description of how this is being disseminated around the world

17   in different ways is absolutely open that there could be many

18   difference versions of this material about the battle, and that

19   this particular videotape has no basis for allowing it into

20   evidence.

21           THE COURT:  I understand.  Okay.

22           ...end of sidebar.)

23           THE COURT:  All right.  Subject to the discussion at

24   sidebar, 484 will be admitted.

25           (Exhibit No. 484 admitted into evidence.)

1    Q.    Mr. Kohlmann, are you aware of any other versions of the

2    film "Badr Al Bosna?"

3    A.    I mean no, not that I can think of, no.

4    Q.    And you regularly surf the Internet looking for these type

5    of videos?

6    A.    Yeah, there's really the three main -- there is three main

7    videos from the conflict in Boznia-Herzegovina.  Anyone who is

8    familiar with the conflict --

9           MR. McGINTY:  Objection.

10          THE COURT:  Well, let's stick with what are the three

11   main videos --

12          THE WITNESS:  Sure.

13          THE COURT:  -- Just in general terms.

14          THE WITNESS:  Excuse me, your Honor.  The three main

15   videos would be, obviously, number one, Operation Badr, the

16   Martyrs of Bosnia, and Operation Miracle.  Excuse me.

17   Operation Black Lie is the other name for Operation Miracle.

18   These three videos are the primary videos associated with this

19   conflict.  Those are the primarily three videos associated with

20   the mujahideen.  There are no -- there is no second Operation

21   Badr Al Bosna.

22   Q.    All right.  And you obtained this video you described from

23   several different sources.

24          Are all those sources consistent with what you've

25   provided us?

1    A.    Yes.   To my recollection, yes.

2    Q.    In fact, did you write about these three battles in your

3    book?

4    A.    Yes, the -- the -- one of the chapters in my book

5    primarily deals with, number one, Operation Black Lion; number

6    two, Operation Badr; and number three, Operation Miracle; and

7    not to mention the fact that Martyrs in Bosnia is cited --

8              MS. LUNT:   Objection, your Honor.

9              THE COURT:   Let's put another question to the witness.

10   Q.    All right.   How many, to the best of your ability in this

11   environment, how many videos related to jihad have you watched?

12   A.    It's a large number.   I -- I really -- I couldn't quantify

13   it for you.

14             MS. LUNT:   Objection, your Honor.

15             THE COURT:   Overruled, but put another question to the

16   witness.

17   Q.    And are you familiar with the use of videos by the

18   mujahideen?

19   A.    Yes, that's one of the primary areas in which I base my

20   research on.

21   Q.    All right.   And what is, in your experience, the utility

22   of using a video by mujahideen?

23             MS. LUNT:   Objection, your Honor.

24             THE COURT:   Overruled.

25   A.    The primary purpose of producing these videos is, number

1    one, to spread word of the conflict to different various

2    different parts of the world in which people have never heard

3    of these conflicts going on; number two, to portray these

4    conflicts with a particular vent, the particular political and

5    religious vent; and number three, to encourage individuals, who

6    might be sympathetic to this cause to:  Number one, donate to

7    the cause financially, or provide materials for it; or number

8    three is to actually go there and personally join the fighters

9    there.  And in a number of these videos there are direct calls

10   to individuals saying, "you need to go to fight in these

11   conflicts, if you believe in the same things that we do."

12            THE COURT:  Just to clarify, ladies and gentlemen,

13   putting aside this video that is apparently displayed in

14   Exhibit 484, there is, I think, no testimony, or suggestion,

15   that the defendants had anything to do with any other videos.

16   At least concerning Bosnia.

17   Q.   Are you familiar with Zagreb, Croatia?

18   A.   Yes.

19   Q.   Explain what its significance was in the Bosnian conflict.

20   A.   As much as Peshawar, Pakistan, had been the main gateway

21   for foreign fighters entering Afghanistan during the 1980s, the

22   mujahideen now with the conflict opening up in

23   Boznia-Herzegovina likewise needed a place nearby Bosnia where

24   they could use as a base for operations to transfer individuals

25   into Boznia-Herzegovina.  Bosnia is landlocked.  So there is no

1    natural port.  Bosnia, much like Afghanistan, is surrounded by

2    countries which would not necessarily be considered sympathetic

3    to the aims of the mujahideen.  Thus, the main area in which

4    the Bosnians or -- rather, excuse me, the mujahideens found

5    access to Bosnia was through Zagreb, Croatia, which is a port

6    city.  Zagreb offered these individuals access into central

7    Bosnia, because for at least part of the conflict, the Bosnian

8    Croats were not really allied with the Bosnian Muslims.

9    Q.    Are you familiar with Istanbul, Turkey?

10   A.    Yes, I am.

11   Q.    Describe the significance of Istanbul to the rest of

12   Bosnia.

13   A.    For the conflict in Bosnia, many of the fighters, who

14   joined the mujahideen, the foreign fighters, who joined the

15   mujahideen in Bosnia came from Turkey.  And other than Zagreb,

16   the only Muslim country that was anywhere -- excuse me.  The

17   only, never mind Zagreb, which is not Muslim.  The only Muslim

18   country that was anywhere near Bosnia at that point is Turkey,

19   and thus Istanbul, like Zagreb, became an important through

20   stop for both men and material destined for the conflict in

21   Boznia-Herzegovina.

22   Q.    Were -- did each of these cities play a role in the

23   Chechnyan situation?

24   A.    Istanbul, which happens to be situated almost directly

25   between Bosnia and the Caucasus, actually it's relatively close

1   to Chechnya, and once again during the conflict in the

2   Caucasus, many of the foreign fighters went there to join the

3   mujahideen were from Turkey.  Thus, Istanbul much like for

4   Bosnia, even more so for Chechnya, became a major center of a

5   through stop for men and material and to the conflict.

6   Q.   Were there various organizations which operated vis-a-vis

7   the mujahideen in these two cities?

8   A.   Yes, there were.

9   Q.   Can you describe some of them?

10  A.   Sure.  There were ostensible charitable organizations,

11  which existed there which provided support for these different

12  mujahideen organizations.  These charities were both locally

13  based and also internationally based with local offices there.

14  Q.   With regards to specific organizations, can you name some

15  organizations?

16  A.   Sure.

17         MR. ANDREWS:  Objection, your Honor.  May I approach?

18         THE COURT:  No, I'm going to sustain the objection.

19  Q.   Mr. Kohlmann, I'm going to show you a binder of documents

20  and ask you if you recognize them?

21         MS. LUNT:  May we approach the sidebar, your Honor?

22         (Sidebar as follows:

23         MR. CHAKRAVARTY:  This is a binder of documents, which

24  were provided to us by the Investigative Project.  This witness

25  is familiar with these documents.  Some of them are in evidence

1    authenticated through other ways.  Some of them, I'm going to

2    try to introduce through Mr. Kohlmann; and at least with

3    regards to five of them, I believe that a sufficient foundation

4    will be made -- will be laid to be able to authenticate them,

5    specifically the envelopes, which are described with postmarks

6    and have other indicia that they purport are what they purport

7    to be; and then there is a -- another flyer in there, which

8    also is what it purports to be.  This witness is familiar with

9    all of them.  He knows them as being conjoined.  He is not

10   going to testify as to from where they originally came.

11           MS. LUNT:  Your Honor --

12           THE COURT:  Whoa.  Hold on a second.  Which -- which

13   of these exhibits are in evidence?

14           MR. CHAKRAVARTY:  These are (indicating).

15           THE COURT:  So 40, 43, 44 and 45 are in evidence.

16           MS. LUNT:  Excuse me.  Thank you.

17           THE COURT:  The other documents are not in evidence,

18   and he's going to testify -- you think he is going to -- are

19   these the documents that were found in the basement of the

20   mosque?

21           MR. CHAKRAVARTY:  Yes, your Honor.  That is what our

22   understanding is.

23           THE COURT:  All right.  I don't see how you are going

24   to lay that foundation with him.  I mean he can be part of the

25   foundation, perhaps, but I don't see how --

1          MS. LUNT:  Your Honor, I would like to just point out

2     that we have Judge Hillman ordered discovery as to the origin

3     of these documents.  That discovery has not been provided to

4     us.  And, furthermore, we keep talking about the basement of

5     the mosque.  The only thing we do know, which is not from the

6     government, but from Steven Emerson's book, he says that it was

7     found, not in the basement of the mosque, but in some other

8     building to which they had been moved.

9          THE COURT:  Whoa.  We'll get there, but in the

10    meantime, I don't see how an expert standing alone can

11    authenticate a document unless it's --

12         MR. CHAKRAVARTY:  It wouldn't just be business expert

13    testimony.  This is where his personal background is.  He first

14    saw these documents, and I think he will say back in the late

15    '90s when he began working at the Investigative Project.  He

16    doesn't know if they are of original origin.  He just remembers

17    them all being together.  He was very familiar with them.  He

18    published one of them.  A copy of the document actually appears

19    as a full page in his book.  It has the same indicia on the

20    four corners of the document, especially starting with the

21    postmarks, that there is a -- that leads to, I think, a

22    presumption for 901 purposes that this document was, at least

23    for the envelopes, that these were, in fact, mailed.

24         THE COURT:  But putting that aside, I mean let's

25    assume for the time being that you can't authenticate them

1    through someone, who found them in whatever building, and that

2    their building, their location, and content ties them

3    sufficiently to this case that they're authenticated.  The fact

4    that this witness later saw them, I don't see how that adds to

5    the authentication process.

6              MR. CHAKRAVARTY:  And he knows that this document

7    existed, and that's all he's going to be essentially saying.

8    This is an authentic document that exists in the world, and

9    that the four corners of the document says what the document

10   is.  It says who it's from.  It says, you know, it has content

11   on it.  The similarity between the name and the address, I

12   think it is sufficient by itself to be able to say that this

13   is --

14             THE COURT:  I don't think so.  I don't see it.  I'm

15   not going to allow it.  Sustained.

16             MS. LUNT:  Thank you.

17             ...end of sidebar.)

18             THE COURT:  Thank you for your patience, ladies and

19   gentlemen.

20   Q.   Mr. Kohlmann, I'm approaching with Exhibits 40, 43, 44 and

21   45.

22             Do you recognize these?

23   A.   Yes, I do.

24   Q.   And what do you recognize those to be?

25   A.   These are documents, which I was --

1          MR. McGINTY:  Objection.  Can we find out what those

2     are?

3          THE COURT:  They're in evidence, I believe, aren't

4     they?

5          MR. McGINTY:  Just before.

6          MR. CHAKRAVARTY:  They are.

7          MR. McGINTY:  Your Honor, may we approach?

8          THE COURT:  He can show him documents in evidence.

9     They're in evidence.

10         MR. McGINTY:  Right, but the Court made a ruling.

11    This is in violation.

12         THE COURT:  Well, overruled.  My ruling was with

13    regards to documents that are not in evidence.

14         MS. LUNT:  But, your Honor, we're referring to a prior

15    ruling.

16         THE COURT:  All right.  I'll see you.

17         (Sidebar as follows:

18         THE COURT:  This is a grossly inefficient way of

19    proceeding.

20         What's the objection?

21         MS. LUNT:  Your Honor, my understanding was that Mr.

22    Kohlmann was not going to be permitted to recite or to opine

23    upon Al-Hussams or other documents in evidence.

24         THE COURT:  No, he's not going to opine about them,

25    but he can identify names, places, or events, or something that

1    the jury might not otherwise -- no question has been put to him

2    yet.

3            MS. LUNT:  Your Honor, I apologize if I'm doing this

4    in an excess of caution, but as we know, this witness is hard

5    for Mr. Chakravarty to control, and I want to make sure that

6    the examination is very tight so that he does not run at the

7    mouth on this.

8            THE COURT:  Yes.

9            MR. McGINTY:  As I understood the Court's ruling, it

10   was that he would not be commenting on the affairs of Care or

11   of Al-Kifah.  What he would be doing is talking about persons,

12   places and things.  It appears as if the government is now

13   going to be showing the Al-Hussams, directing him to a specific

14   paragraph and saying --

15           THE COURT:  We don't even know what he is going to do,

16   all right.  He can ask about names, places.  He can -- he can

17   talk about relationships and in terms of the document bears a

18   particular date, and it ties to some other date.  What he can't

19   do is say, you know, that these documents put together means

20   that Care was a -- was -- was funding the mujahideen, but he

21   can explain terms in the documents or -- or he can presumably

22   explain if he -- well, let's see what the question is, okay.

23           ...end of sidebar.)

24   Q.   Mr. Kohlmann, these documents, which are in evidence,

25   where did you first see these?

1   A.    I was first given access to them while I working as a

2   researcher at the Investigative Project in Washington, D.C.

3   Q.    Approximately how long ago was this?

4   A.    The first time I saw them?

5   Q.    Yes.

6   A.    Oh, approximately early 1998.  February, March, 1998.

7   Q.    And do those all hail from a specific organization, based

8   on the four corners of the document?

9            MS. LUNT:  Objection.

10           THE COURT:  Sustained.

11  Q.    Is there a name of an organization on the document?

12  A.    The documents were all contained within notebooks.

13           MS. LUNT:  Objection.

14           THE COURT:  The question is:  Is there a name on all

15  four documents?

16           THE WITNESS:  Yes, your Honor, the Al-Kifah Refugee

17  Center.

18  Q.    With regards to the conflict in Chechnya, to get off the

19  documents for a little bit, would you describe what the

20  conflict was in Chechnya in the '90s.

21  A.    With the Soviet -- the break up of the Soviet Union in

22  1991, a number of regions, former regions of the Soviet Union

23  attempted to split and to become autonomous states.  One of

24  those regions was Chechnya, which under the lead of a former

25  Russian Air Force General, who was of Chechen descent declared

1   independence from Russia.  At that point, Russia in order to

2   prevent other states from breaking off invaded Chechnya and

3   attempted to put down the rebellion there.  In the beginning

4   part of the conflict, for the first several years, the main

5   part of the conflict was between nationalists, Chechen

6   nationalists versus the Russian military.  However, over time

7   much like what had happened in Boznia-Herzegovina, the conflict

8   became less nationalist and more religious in nature.

9           And by approximately 1995, the Russian Army agreed to

10  withdraw from the Caucasus, withdraw from Chechnya; however,

11  within only four years, they reinvaded after a number of

12  incidents had taken place by mujahideen organizations inside

13  Chechnya.

14  Q.   And so what was the mujahideen role of Chechnya during

15  this conflict?

16  A.   Starting in approximately 1993, foreign fighters begin

17  arriving in the Caucasus in order to provide aid to the

18  Chechens.  Again, much like in Bosnia in the beginning, the

19  majority of local fighters were not religious in nature.  It

20  was a nationalist battle; however, the mujahideen fighters, who

21  were arriving, who were arriving through religious and

22  political reasons that had nothing to do with the Chechens; and

23  thus their influence became the same as in Bosnia, they

24  established a brigade, the Mujahideen Brigade, under the lead

25  of a Saudi Arab-Afghan, Ibn-ul-Khattab, I-B-N U-L

1    K-H-A-T-T-A-B, whose real name was Samir al-Suwailem, S-A-M-I-R

2    S-U-W-A-I-L-E-M.

3         Under the lead of Ibn-ul-Khattab, and in partnership

4    with particular Chechen mujahideen leaders, such as an

5    individual that went by the name of Shamil Basayev,

6    S-H-A-M-I-L B-A-S-A-Y-E-V, these individuals are largely

7    credited with having forced the Russian Army to withdraw in

8    1995, and it was Ibn-ul-Khattab and Shamil Basayev who

9    restarted the Chechen War and --

10        MS. LUNT:  Objection.

11        THE COURT:  Overruled.

12   A.   It was Sahmil Basayev and Ibn-ul-Khattab who restarted the

13   Chechen War in 1999 when they launched an invasion of

14   neighboring Dagestan, which was still part of Russia.

15   Q.   All right.  Putting up on the screen now,

16   Exhibit 243 -- is that 243?

17        All right.  Can we have 259, please.  The next page.

18   The next page.  Strike that.  In the interest of time, I'm

19   going to move on.

20        With regards to Mr. Ibn-ul-Khattab, aside from his

21   role in the Chechnyan crisis, what other conflicts did he

22   participate in?

23   A.   Ibn-ul-Khattab first gained fame while fighting in

24   Afghanistan with the Arab-Afghans.  He became very famous sa a

25   result of his exploits there.  Shortly thereafter, when the

1    Afghan conflict evolved into chaos, Ibn-ul-Khattab traveled

2    with his colleagues to Tajikistan, the region neighboring

3    Afghanistan and were in large part responsible for parking a

4    mujahideen movement there.  Once their work in Tajikistan was

5    finished eventually in 1995, they began moving en masse into

6    Chechnya.

7    Q.   And with regards to Basayev, what was his -- what did he

8    actually do in the -- in the mujahideen conflict in Chechnya?

9    A.   Shamil Basayev was a Chechen mujahideen leader, who became

10   the major partner of Ibn-ul-Khattab.  In fact, he became the

11   Chechen counterpart of Ibn-ul-Khattab.  He was the main host

12   for foreign fightgers in the Caucasus, and he was also one of

13   the major leaders of the Chechen mujahideen, if not the top

14   leader of the Chechen mujahideen.

15   Q.   All right.  Before your testimony today, did you have an

16   opportunity to read the Al-Hussam newsletters that the

17   government is using as exhibits?

18   A.   Yes, I have.

19   Q.   And in addition to the conflict areas, which you described

20   for the jury today, I'm going to ask you about the role of

21   mujahideen in some of the other areas that are depicted in the

22   Al-Hussam.

23        What was the mujahideen role in Tajikistan in the

24   1990s?

25   A.   In Tajikistan, again, in the view of many, Tajikistan was

1    going to be the next phase beyond Afghanistan.  The idea was to

2    continue the jihad and to liberate all of the various regions

3    of Central Asia, which had been part of the Soviet Union, or

4    which had been under Soviet dominance.  Thus, immediately after

5    the Afghan War, there was a move into Tajikistan, a civil war,

6    between Islamist parties and between the Soviet backed central

7    government.  In that conflict, which actually didn't last all

8    that long, the mujahideen took the side of the Islamist party,

9    the Annahda Party, A-N-N-A-H-D-A.  Again, the Soviet backed

10   central government.

11   Q.   Was there also a conflict in Algeria in which the

12   mujahideen faced?

13   A.   Yes, there was.

14   Q.   Describe what that was.

15   A.   In approximately 1992, the Algerian government canceled

16   national elections in which an Islamist party was posed to win.

17   As a result, a conflict, a civil war broke out in Algeria

18   pitting the Algerians -- excuse me -- secular Algerian

19   government against various different mujahideen factions, which

20   were intent upon reversing the effects of that election.  The

21   primary party initially was a group called the Islamic

22   Salvation Front, ISF, which was the party that had won the

23   election.  However, in short time there were a number of

24   individuals, who had either been associated with the Afghan

25   war, or had been associated with ISF, who decided that ISF was

1   not doing enough to push forward the cause, and thus they

2   established an alternate organization, which had a more

3   explicit military agenda, which was known as the Armed Islamic

4   Group, or GIA.

5   Q.   All right.  With regards to the conflict in Libya, in the

6   '90s, what was the role of mujahideen in Libya?

7   A.   At approximately the same time that the conflict began in

8   Algeria, just elsewhere in North Africa, several other

9   conflicts had begun hitting mujahideen factions against

10  traditional dictators and leaders of these countries, including

11  Libya, where a group emerged calling itself the Libyan Islamic

12  Fighting Group, or LIFG.  Again, very similar to the GIA in

13  Algeria, and the idea was to overthrow Muammar Qadhafi and

14  establish an Islamic state in Libya.

15  Q.   All right.  There is a person in Exhibit 246 depicted in

16  the banner headline.  Can you describe who he is, in the

17  headline.

18  A.   Shaykh Abu Mundhir As-Saadi was the spiritual leader, and

19  you could also say a major political leader of the Libyan

20  Islamic Fighting Group, LIFG.

21  Q.   Was there -- were there mujahideen in the -- in Egypt in

22  the '90s?

23  A.   Yes, there were.

24  Q.   Describe what their role was.

25  A.   In Egypt, again, similar to Libya and Algeria, there was a

1    civil conflict going on between Islamist parties and a secular

2    regime.  The idea here again was to overthrow the regime and

3    establish an Islamic state of Egypt.  The primary two parties

4    in Egypt, which were associated with this movement:  Number

5    one, the Al-Jihad Movement; and number two, a group that called

6    itself Al-Gamaat, A-L G-A-M-A-A-T, Al-Islamiyya, A-L

7    I-S-L-A-M-I-Y-Y-A.

8    Q.    Are you familiar with the conflict in Kashmir?

9    A.    Yes, I am.

10    Q.    Describe the role of the mujahideen in Kashmir in the

11    1990s.

12    A.    Much like Tajikistan, Kashmir immediately after the Afghan

13    War began falling apart.  It was very close to Afghanistan.

14    Kashmir is a disputed region, disputed between India and

15    Pakistan, and it's a relatively short distance away from the

16    same regions of Afghanistan in which the mujahideen were

17    fighting.  Thus, after they were done, or after it was no

18    longer tolerable to them to be in Afghanistan, there were a

19    number of Pakistani mujahideen, who had fought in the Afghan

20    War, who believed that now was the right time to launch an

21    insurgency in Kashmir.  And thus, that's exactly what happened,

22    in 1989 a major insurgency broke out; and unlike previous

23    insurgencies, this was not necessarily just being led by

24    governments.  It involved private parties, mujahideen

25    organizations, who had gained experience and resources while

1    fighting in Afghanistan.

2    Q.    Were the mujahideen present in Somalia in the '90s?

3    A.    Yes.

4    Q.    Describe what their role was.

5    A.    Following the removal, or following the default of the

6    former government of Somalia in 1991, there was widespread

7    chaos throughout the country.  A number of different factions

8    arose trying to seize power out of this chaos.  One of those

9    parties was a group called itself Alitihadal-Islami,

10   A-L-I-T-I-H-A-D-A-L I-S-L-A-M-I.  Alitihadal-Islami was an

11   Islamic organization, again the same idea, it was a mujahideen

12   organization with fighters.  It had participated in other

13   conflicts, or had fighters that participated in other

14   conflicts, and it sought to establish an Islamic state in

15   Somalia.

16   Q.    Now, with regards to your review of Al-Hussam newsletters,

17   did you see descriptions of people and other activities in each

18   of these areas?

19   A.    Yes, I did.

20         MS. LUNT:  Objection, your Honor.

21         THE COURT:  I'm not sure I understand the question.

22   Why don't you put another question to the witness.

23   Q.    Have you reviewed a number of Al-Hussam newsletters?

24   A.    Yes.

25   Q.    And with regards to the conflicts that you just described,

1    did they appear in the Al-Hussam newsletters?

2              MS. LUNT:  Objection, your Honor.

3              THE COURT:  Overruled.

4    A.    There are regular news updates and other articles

5    regarding these various different conflicts, yes.

6    Q.    And with regards to, except for the obvious, were there

7    references to specific individuals, who you mentioned today?

8    A.    Yes, like Shaykh Abu Mundhir As-Saadi.  Many of the

9    individuals that were members of these organizations, leaders

10   of these organizations, spokesmen of these organizations were

11   profiled in the newsletter known as Al-Hussam.

12   Q.    Are you familiar with newsletters of other organizations

13   as well?

14   A.    Yes.

15   Q.    Are you familiar with a newsletter called Al-Thilal?

16   A.    Yes.

17             MR. McGINTY:  Objection.

18             MS. LUNT:  Objection, your Honor.

19             THE COURT:  Sustained.

20   Q.    Are you familiar with an organization called Global Relief

21   Foundation?

22   A.    Yes.

23   Q.    What is Global Relief Foundation?

24   A.    Global Relief Foundation, or GRF, is an ostensible

25   charitable organization.

1          MS. LUNT:  Objection, your Honor.

2          Mr. McGINTY:  Objection.

3          THE COURT:  Sustained.  And the answer will be

4     stricken.  Let's try that again.

5     Q.    With regards to -- can you describe what Global Relief

6     Foundation is.

7          MR. McGINTY:  The same objection.

8          THE COURT:  Overruled.

9     A.    It's a charitable organization, which is active in

10    providing various different material to --

11         MS. LUNT:  Objection, your Honor.

12         MR. McGINTY:  Objection.

13         THE COURT:  All right.  Let me see you at sidebar.

14         (Sidebar as follows:

15         THE COURT:  Let me start with what is the foundation

16    that he can testify about what GRF is.

17         MR. CHAKRAVARTY:  I can lay that.  He will say that he

18    is aware of it from his activities over in Bosnia, as well as

19    through public source information.  He has reviewed transcripts

20    and other materials from, you know, the existing prosecutions.

21    I can navigate this by leading him through to get to the core

22    of what we talked about.

23         THE COURT:  What are you trying to establish?

24         MR. CHAKRAVARTY:  GRF published the Al-Thilal

25    newsletter.

1          THE COURT:  And how is the Al-Thilal newsletter

2     relevant to this case?

3          MR. CHAKRAVARTY:  Because as Mr. Teba described, Care

4     distributed the Al-Thilal newsletter, as well as the Al-Hussam

5     newsletter.  It substantiates the further connection between

6     Care and GRF as putting in context those meetings minutes,

7     which we say is evidence of a, you know, a much more elaborate

8     interconnection between these two organizations.  He is not

9     going to characterize GRF.  He is just going to describe what

10    it was, in terms of it was based out of Chicago, and that they

11    published this newsletter.

12          MS. LUNT:  Your Honor, if I may.

13          THE COURT:  Yes.

14          MS. LUNT:  He was clearly about to characterize GRF,

15    and we had a discussion about this yesterday, and it was very

16    clear, and I thought the guidelines were completely clear to

17    everybody of what he was going to say:  It's a charitable

18    organization based in Chicago, not just in other parts of the

19    world; they published Al-Thilal.  We objected to the publishing

20    of Al-Thilal.  The Court ruled that that would be permissible,

21    and that was it.  Nothing about what he is about to say, you

22    know, distributing materials.  I don't know whether he was

23    going to say materials or --

24          MR. ANDREWS:  Material, which is a way of saying

25    weapons, or other military supplies.

1           MR. McGINTY:  Incidentally, with respect to Al-Thilal,

2    we have yet to see the 302 of Mr. Teba from the 2003 --

3           THE COURT:  I've already ruled on that.  One thing

4    that will make the trial go faster is if people don't repeat.

5    You have to repeat objections to preserve them, but to repeat

6    arguments, okay, so --

7           MR. McGINTY:  The reason that I'm raising it, your

8    Honor, is that I have not seen the '03 302.  I have seen the

9    notes.  I have also seen the interview notes in '07.  In none

10   of those prior interviews did Mr. Teba ever say such a thing as

11   Care distributing Al-Thilals.

12          MS. LUNT:  And even in his testimony, your Honor, he

13   said, rather incredibly, he said he saw four times Al-Thilals

14   in the office.  That it was.

15          MS. SIEGMANN:  Actually, his testimony is that he read

16   the Al-Thilals.  He didn't say he only saw four.

17          THE COURT:  What do you expect him to testify about,

18   if anything about the activities of GRF in Europe or Asia?

19          MR. CHAKRAVARTY:  Nothing at all.

20          THE COURT:  All right.  I will allow him to say in

21   substance GRF is a charitable organization, based in Chicago,

22   that distributed a newsletter called Al-Thilal, period.  And

23   why don't you take a moment.  I'm going to permit you to confer

24   with him so he knows about that.

25          MR. CHAKRAVARTY:  Can I lead him?

1          THE COURT:  Well, maybe that's a better way.  Why

2     don't you just lead him through it.  All right.

3          ...end of sidebar.)

4     Q.   Mr. Kohlmann, talking about Global Relief Foundation, was

5     Global Relief Foundation an organization based out of the

6     Chicago area?

7     A.   In Bridgeview, Illinois, that's right.

8     Q.   And did it publish a newsletter called the Al-Thilal?

9     A.   Yes.  It distributed such a newsletter, yes.

10    Q.   Are you familiar with a newsletter called The Islam

11    Report?

12    A.   Yes.

13    Q.   And without describing the contents of the newsletter, who

14    published the newsletter?

15    A.   The Islam Report was a publication of an organization

16    known as the American Islamic Group, or AIG.

17    Q.   Are you familiar with an organization called American

18    Worldwide Relief?

19    A.   Yes, I am.

20    Q.   And what was American Worldwide Relief's relationship to

21    AIG?

22          MR. McGINTY:  Objection.

23          THE COURT:  Do you know whether there was a

24    relationship?

25          THE WITNESS:  Yes, your Honor.

1          THE COURT:  And what's the basis of your knowledge?

2          THE WITNESS:  Explicit statements made by American

3     Islamic Group and American Worldwide Relief.

4          THE COURT:  All right.  Put the question to the

5     witness again.

6     Q.    All right.  Without characterizing the content of the

7     relationship, but what was the relationship between them?

8          MR. McGINTY:  Objection.

9          THE COURT:  Overruled.

10    A.    American Worldwide Relief, which is known as AWWR, was the

11    charitable arm of American Islamic Group.

12    Q.    Are you familiar with the use of the -- starting to talk

13    about this, the use of the Internet by various mujahideen

14    groups?

15    A.    Yes, I'm familiar with that.

16    Q.    And what do they use the Internet for?

17    A.    The Internet is used by mujahideen organizations for

18    various different purposes, involving everything from

19    fundraising, recruiting fighters, spreading the message of what

20    is going on, spreading news reports.  There is a tremendous

21    focus on getting information out there, because mujahideen

22    organizations don't have access to television stations.  They

23    don't have access to major media organizations.  The main way

24    in which they can reach their constituency is either by

25    producing video recordings, or by the Internet, or by both.

1    Q.    Are you familiar with an organization known as Azzam

2    Publications?

3    A.    Yes, I am.

4    Q.    In general terms, what do you know about Azzam

5    Publications?

6              MS. LUNT:  Objection, your Honor.

7              THE COURT:   In very general terms, I'll allow it.

8    A.    Azzam Publications is an organization founded in 1996 by

9    an individual in London by the name of Babar Ahmad, B-A-B-A-R,

10   A-H-M-A-D.  This organization was founded in order to provide

11   support to various different mujahideen organizations active in

12   certain frontlines around the world.

13   Q.    Have you personally traveled to the Azzam Publications

14   website?

15   A.    I have visited the website on a number of occasions, and I

16   also have saved copies of the websites from a number of

17   occasions.

18   Q.    And just put up Exhibit No. 72.  I ask to zoom in on the

19   email, the header information.  There is an email address in

20   the from line.

21              Are you familiar with that address?

22   A.    Yes.

23   Q.    And what is that address?

24   A.    I recognize that to be the email address used by Azzam

25   Publications from approximately 1997 to 1998.

1    Q.   I'm going to ask you about some specific people now and

2    ask you, in general terms, if you would just describe who they

3    are.

4         Mohamed Zaky.

5    A.   Mohamed Zaky is also known as Abu Omar Al-Masri, or Abu

6    Omar Al-Amriki.  A-B-U O-M-A-R.  Al-Masri is A-L M-A-S-R-I.

7    Al-Amriki is A-L A-M-R-I-K-I.

8         Mr. Zaky was an active advocate for various different

9    mujahideen organizations around the world and provided support

10   for mujahideen organizations in Afghanistan,

11   Boznia-Herzegovina, the Caucasus.  Mr. Zaky actually went to

12   several of these regions and actually participated in battle.

13   He was featured in the propaganda --

14        MS. LUNT:  Objection, your Honor.

15        THE COURT:  The word "propaganda" will be stricken,

16   and disregard it.

17        Why don't you put another question to the witness.

18   Q.   Have you seen video depictions of him as well?

19   A.   Yes, I have.

20   Q.   Are you familiar with a person named Kassem Daher?

21   A.   Yes, I am.

22   Q.   And who is he?

23   A.   He was an associate of Mr. Zaky active in Canada and was

24   providing information about various different mujahideen

25   organizations operating around the world.

1   Q.    Was he also known by an Abu name?

2   A.    Yes, he was.

3   Q.    And what was that?

4   A.    Abu Dhurr, spelled either A-B-U D-H-U-R-R, also

5   alternatively spelled A-B-U Z-U-R-R.

6   Q.    Are you familiar with a person named Sheik Hassan Katergi?

7   A.    Yes, I am.

8   Q.    And who is he?

9   A.    Sheik Hassan Katergi -- it's K-A-T-E-R-G-I -- Sheik Hassan

10  Katergi is a Sunni Muslim cleric.  Sunnis are the majority sect

11  of Muslims in the Muslim world, from the region of Tripoli,

12  Lebanon, in Northern Lebanon.  He is a cleric there.

13  Q.    Do you know who Mohamed Chehade is?

14  A.    Yes, I do.

15  Q.    Was he the executive director of Global Relief Foundation?

16  A.    That's what I understand to be the case, yes.

17  Q.    Do you know if he had an Abu name?

18  A.    Yes, but I can't recall off the top of my head right now.

19  Q.    Are you familiar with a person name Bassam Kanj?

20  A.    Yes.

21  Q.    What do you know about him?

22  A.    Mr. Kanj is a former resident of Boston, Massachusetts,

23  who was reported killed in a clash with Lebanese security

24  forces in the year 2000 in the region of Tripoli, Lebanon.

25  Q.    Are you familiar with a person named Mahmud Abou Halima?

1   A.   Yes, I am.

2   Q.   What is his relationship to the mujahideen?

3   A.   Mr. Abou Halima fought with the mujahideen in Afghanistan

4   during late 1980s.

5   Q.   Are you familiar with a person named Suleman Ahmer?

6   A.   Yes, I am.

7   Q.   Who is he?

8   A.   Mr. Suleman Ahmer also went by the name Suleman "The Red".

9   This was an individual, who was an active fundraiser on behalf

10  of various different charitable organizations active in regions

11  such as Chechnya, Afghanistan, and Boznia-Herzegovina.  He was

12  of Pakistani origin, so the primary areas in which he was

13  looking to recruit or to raise money was among the Pakistani

14  community here inside North America.

15  Q.   Was he affiliated with any specific organizations?

16  A.   Yes, he was.

17  Q.   Can you just name one or two?

18  A.   The primary two organizations he was affiliated with were,

19  number one, the World Assembly For Muslim Youth, or WAMY,

20  W-A-M-Y.  He also was closely affiliated with another

21  organization, which is a subrange of WAMY, known as the

22  Benevolence International Foundation, or BIF, B-I-F.

23  Q.   With regards to the next two individuals, I'm going to ask

24  for just a very general description, Mr. Kifah Jayyousi and

25  Adham Hassoun.  Describe what their -- what their relationship

 1   was to the mujahideen.

 2   A.    Mr. Jayyousi --

 3              MR. McGINTY:  Objection.

 4              THE COURT:  Overruled.

 5   A.    Mr. Jayyousi and Mr. Hassoun were supporters of mujahideen

 6   factions active in various different frontlines around the

 7   world.

 8   Q.    In the course of your study and experience, did you

 9   come -- have you become familiar with various phrases used by

10   the mujahideen?

11   A.    Yes.

12   Q.    Are you familiar with the use of the word "martyr"?

13   A.    Yes.

14   Q.    What does martyr signify?

15   A.    The concept of martyr to the mujahideen refers to --

16              MR. McGINTY:  Objection.

17              THE COURT:  Overruled.

18              MR. McGINTY:  Your Honor, if you might.

19              MS. LUNT:  This was the topic we discussed before,

20   your Honor.

21              THE COURT:  Let me see you quickly.

22              (Sidebar as follows:

23              THE COURT:  All right.  He's -- he's not an expert on

24   Islam or Islamic culture.  What do you expect the answer to be?

25              MR. CHAKRAVARTY:  I expect it to be that mujahideen

1    groups use the word to describe people, who have died

2    committing jihad.

3            THE COURT:  All right.  I'm going to permit it, that

4    sort of basic explanation, but I don't think he's qualified to

5    get into it in any religious detail.

6            MR. CHAKRAVARTY:  I agree.

7            MR. McGINTY:  Your Honor, if I might, the Court made a

8    ruling on page 30 of the transcript that he would not testify

9    as to Arab words.  He doesn't speak Arabic, and he's not an

10   expert on Islam.  So, I thought we had a specific ruling on

11   this subject.

12           MR. CHAKRAVARTY:  I asked him the English word

13   "martyr," and he said what it means.

14           MR. McGINTY:  The word "martyr" as used as an Arabic

15   word.  It's translated martyr.  His expert -- he's offering

16   expert testimony about the meaning of an Arabic word and the

17   usage in the Arabic world, and the Court has already made a

18   ruling that he doesn't speak the language, and he is not an

19   expert on Islam.  So he's -- I thought there was an explicit

20   ruling on this.

21           THE COURT:  I'm not going to let him testify about the

22   meaning of the word "shahid" or translations.  I think this one

23   basic fact, and no further, based on his review of the

24   materials, the word translated as "martyr" has been used by

25   mujahideen to describe people, who died in battle, period, end

1    of story.  I'll allow it to that extent.

2              MS. LUNT:  Objection, your Honor.

3              ...end of sidebar.)

4    Q.   In your experience very generally, Mr. Kohlmann, can you

5    describe the use of the word "martyr" by the mujahideen.

6    A.   Sure.  Martyr, or shahid, according to the mujahideen --

7              MR. McGINTY:  Objection, your Honor.

8              MR. ANDREWS:  Objection.

9              THE COURT:  Well, Mr. Kohlmann, you don't speak

10   Arabic, correct?

11             THE WITNESS:  Not fluently, no.

12             THE COURT:  All right.  I will allow you to testify

13   about your understanding of the word that is translated as

14   martyr, as used in the materials you've reviewed.

15             THE WITNESS:  Thank you, your Honor.  Martyr refers to

16   someone, at least in the views of the mujahideen, who is killed

17   in combat, someone who is killed while defending or fighting in

18   the cause of Islam.

19   Q.   Are you familiar with the use of advisory councils by the

20   mujahideen?

21   A.   Yes.

22   Q.   And how are you familiar with those?

23   A.   An advisory council, a mujahideen organization is headed,

24   number one, by an emir, or commander.  And then added to that

25   the emir has an advisory council, or Shura Council.

1          MR. McGINTY:  Objection, your Honor.

2          THE COURT:  Overruled.

3          THE WITNESS:  That this is a Shura Council, which

4    provides specific advice to the emir, or its commander.  You

5    might call it a cabinet, or a parliament of sorts.

6    Q.   Are you familiar with the phrase "tourism" vis-a-vis the

7    mujahideen?

8    A.   Yes.

9          MR. McGINTY:  Objection.

10         MR. ANDREWS:  Objection.

11         THE COURT:  I will allow a yes-or-no answer.

12   A.   Yes.

13   Q.   How do the mujahideens use the word "tourism?"

14         THE COURT:  I think we're going to need more

15   foundation.

16   Q.   Where have you seen or heard the phrase "tourism" with

17   relation to the mujahideen?

18   A.   I have seen that phrase used in video recordings of

19   mujahideen, representatives speaking about these conflicts.  I

20   have also seen it mentioned in various different conversations,

21   which were the subject of wiretaps.

22   Q.   And when you have seen it, has it had -- what meaning has

23   it had?

24         MR. McGINTY:  Objection.

25         THE COURT:  I'm going to sustain the objection.

1    Q.   All right.  And based on your review of materials, how do

2    you understand "tourism" to be used by the mujahideen?

3              MS. LUNT:  Objection, your Honor.

4              MR. McGINTY:  Objection.

5              THE COURT:  I am going to sustain that as well.  Let's

6    move to a different topic.

7    Q.   Are you familiar with the phrase "getting married?"

8    A.   Yes.

9    Q.   Where is your basis of knowing the phrase "getting

10   married?"

11   A.   This is a commonly used --

12             MS. LUNT:  Objection, your Honor.

13             MR. McGINTY:  Objection.

14             MR. ANDREWS:  Objection.

15             THE COURT:  I'm going to sustain that as well.  Let's

16   take this up -- let's go to the break, and we'll take this

17   topic up, and let's move on to another topic.

18             I'm sorry.  What I meant was continue questioning

19   until the break.  I know everyone is anxious to, but let's bear

20   with me for another seven minutes here.

21   Q.   I'm going to show you a few documents.

22             THE COURT:  Just so you know I'm not being completely

23   arbitrary.  We have to switch reporters, and we have to have

24   one in the courtroom to replace the reporter who is here.

25             (Counsel conferred.)

1          MS. SIEGMANN:  Your Honor, at the risk of scheduling,

2     there is going to be issues with these next couple of exhibits.

3     I can put a couple of questions.  I don't have much more

4     testimony.  It may make sense to take a break.

5          THE COURT:  All right.  I'll throw in the towel.

6     Let's take our break.

7          THE CLERK:  All rise.

8          (At 10:48 a.m., the jurors left the courtroom.)

9          THE COURT:  All right.  I'll see counsel at the

10    sidebar.

11         (Sidebar as follows:

12         THE COURT:  All right.  Let's -- let's take up first

13    the issue of the code words.  What are his qualifications to

14    speak on code words, and I haven't heard it from Mr. Valla, but

15    I thought that was more in the nature of what an intelligence

16    analyst would be testifying.

17         MR. CHAKRAVARTY:  It is.  If Mr. Kohlmann testifies to

18    it then Mr. Valla obviously will not testify to it.  Mr.

19    Kohlmann also has familiarity with it, because he has used, and

20    he has seen all these videos.  You know, I can -- I can

21    establish a further foundation that, you know, what occasions

22    has he heard it, and in those occasions what did it mean, and

23    then leave it at that, as opposed to characterizing specific,

24    you know, what a specific conversation related to this case is.

25    If he is able to do that then obviously Dr. Valla won't need to

1   do that.

2           THE COURT:  But Valla is an FBI intelligence analyst,

3   correct, who also doesn't speak Arabic; is that right?

4           MR. CHAKRAVARTY:  Correct.

5           THE COURT:  But he has reviewed translated documents

6   and wiretaps in this end of the case and other cases?

7           MR. CHAKRAVARTY:  Yes, although I would venture to

8   guess Mr. Kohlmann has done so more with regards to cases that

9   have gone to court.

10          THE COURT:  I'm struggling with the foundation.  I

11  mean obviously, there is no prohibition generally against code

12  word explanation that happens in drug cases constantly, among

13  other things, where the agents are permitted to talk about the

14  meanings of code words that they've learned in their

15  experience, or the fact that drug dealers use code words, and

16  the use of a particular code word is consistent with fact.  I'm

17  having my doubts here about whether this witness is competent

18  to testify about that.

19          Take it from the top and tell me why he is competent

20  to do that.

21          MR. CHAKRAVARTY:  He has seen and heard use of the

22  word in a variety of different media across different -- across

23  different conflicts, across different media, in different

24  environments; so, for example, wiretap transcripts, in the

25  context of a conversation, which have been presented to the

1    Court, and, you know, coupled with other evidence corroborating

2    that understanding.  In addition to that, he has had mujahideen

3    videos in which it's described as tourism to be the process of

4    having people come to those areas to fight.  I think speakers

5    on audiotapes invite people to engage in tourism.  I can ask

6    him a little more about that, but I think that, unrelated to

7    each other, the mujahideen have consistently used this word to

8    connote travelling in order to engage in jihad without any kind

9    of specific conspiracy with regards to a specific drug

10   organization, or terrorist group; but rather as a principle and

11   a general matter across time and across geography, this word is

12   used, excuse me, so it's more the argument is that not only it

13   can be construed as a code word, but I think it's more of a

14   commonly-accepted euphemism especially in his trade in his

15   parlance of dealing with, you know, the mujahideen analysis, or

16   terrorism analysis, what have you, amongst his own colleagues

17   they understand it to mean that.

18          THE COURT:  Let me hear from the defense.

19          MR. McGINTY:  Your Honor, if I might ask are there any

20   other code words that he's going to be testifying about?

21          THE COURT:  Yeah, I did cut it off.

22          MR. CHAKRAVARTY:  Just "getting married" and

23   "tourism."

24          THE COURT:  Okay.  And "getting married" will be a

25   euphemism or code word for?

1          MR. CHAKRAVARTY:  Somebody who is dying in the cause

2     of Allah.

3          MR. McGINTY:  Now, is Mr. Valla being withdrawn as an

4     expert because of this?

5          MR. CHAKRAVARTY:  No.  No.  It's just that he won't

6     opine on this stuff if this agent --

7          MS. SIEGMANN:  These two code words.

8          MR. CHAKRAVARTY:  These two code words.  I think there

9     may be some words that Dr. Valla will testify to.

10          MR. McGINTY:  It's -- it's plain that this witness

11     does not have the expertise to testify about this.  It was an

12     explicit ruling that the Court had made that he was not expert

13     in Arab words.  He was not expert in Arab usage, and that he

14     would be barred from testifying about this.  I, frankly, think

15     that the government has brought this out in front of the jury

16     in the face of what I thought was a clear ruling not to do that

17     from the Court.

18          MR. CHAKRAVARTY:  This is not an Islamic concept to

19     use the word "tourism," which I asked it in a English sense.

20     It has nothing to do with Arabic.  If has nothing to do with

21     Islam.  It has nothing to do with anything except how this term

22     is interpreted.  It's been published, you know, disseminated in

23     the mass media.  Clearly, in the 9/11 commission report, they

24     talked about the "big wedding."  These euphemisms are so

25     commonly accepted.  In fact, every agent that I've spoken to

1    about do you know what the meaning of getting married is,

2    people on the JTTF, they all understand what it means.

3         THE COURT:  All right.  I -- here's what I'm going to

4    do.  I'm going to give you an opportunity to lay a foundation

5    on those two concepts again, which has to be a pretty thorough

6    foundation, beginning with again that he doesn't speak Arabic;

7    that he is seeing these words only in translation; and I think

8    if he testifies, as you have represented, that he has seen

9    this -- these two phrases used commonly across geography,

10   across organizations throughout the Muslim/mujahideen world,

11   and it's not simply his interpretation of the transcripts in

12   this case, which is one of the things that I'm concerned

13   about --

14        MR. CHAKRAVARTY:  Sure.

15        THE COURT:  -- that it's a much more broader-based

16   foundation and limited to the understanding that he doesn't

17   speak Arabic; and this is his understanding of the English

18   translation of what are apparently Arabic words with the right

19   foundation, I might allow it.

20        What's the other issue?

21        MR. CHAKRAVARTY:  I was just going to show him a

22   couple of Al-Hussams that identify individuals and people, and

23   then I was going to show him parts of meeting minutes and

24   pledge of support and just ask him not to characterize

25   anything, but to ask him to confirm that one of the documents

1    is not in here; to ask him to confirm whether some of the

2    testimony he has already given is the names essentially that

3    are depicted in these forms.

4         MS. LUNT:  That is, your Honor, tantamount to his

5    commentary on these translations.

6         THE COURT:  All right.  I mean he has identified to

7    the people set forth in government Exhibit 63A, right, Dr.

8    Azzam.

9         MR. CHAKRAVARTY:  Some of them.

10         THE COURT:  Counsel, is there any name that --

11         MR. CABELL:  Hekmatyar.

12         MR. McGINTY:  Hekmatyar.

13         THE COURT:  The engineer.

14         MR. CHAKRAVARTY:  I believe he described a place

15    Chihar Asyab, which was Hekmatyar's headquarters at one point.

16    And, again, that one is not in front of you.

17         MS. SIEGMANN:  What was that?

18         MR. CHAKRAVARTY:  Sixty-six.

19         MS. SIEGMANN:  Do you want me to get it?

20         MR. CHAKRAVARTY:  If you would.  And the person, Mr.

21    Haleemi, who was kind of a travel diplomate, he is also

22    identified in that document.

23         THE COURT:  Well, I will allow this and this only.  If

24    you put it on the screen, and you answer you've identified Dr.

25    Azzam?  Yes.  Did he identify Sheer Alam?

 1            MR. CHAKRAVARTY:  I don't think so, no.  I can ask

 2    him.

 3            THE COURT:  Is that someone he can --

 4            MR. CHAKRAVARTY:  Yes.

 5            THE COURT:  -- again just describe who that person is.

 6    You know, he can go through the names, who is -- who are these

 7    people.  What I don't want is him to comment on this and

 8    interpret this.

 9            MR. CHAKRAVARTY:  Exactly.

10            THE COURT:  And I don't want it to be cumulative.

11            MS. LUNT:  Your Honor, it would be cumulative.

12            THE COURT:  In other words, you know, you can't ask

13    him, you know, the engineer referred to in there.  You've

14    already identified him as Hekmatyar.

15            MR. CHAKRAVARTY:  Right.  It's basically so the jury

16    can understand how to read this.

17            THE COURT:  Which is the only reason I would be

18    permitting it.

19            Ms. Lunt.

20            MS. LUNT:  I just want to make sure that they are not

21    going to repeat and venture of who Azzam is, to just refer to

22    him.

23            THE COURT:  Azzam has already been identified.

24            MS. LUNT:  I know.  That's what I am saying.

25            THE COURT:  There is no reason to identify him.

1          MR. CHAKRAVARTY:  The only question I neglected to ask

2   about is Azzam Publications, if he can identify that he wrote

3   "Join the Caravan".

4          THE COURT:  All right.  Well, that's already in

5   evidence.  I don't know that he needs to do that.

6          MR. CHAKRAVARTY:  This is the other document.

7          MS. LUNT:  And what is it you want to say?

8          MR. CHAKRAVARTY:  That is by Shihar Siab here and

9   Saifur al-Halimi.

10          THE COURT:  Okay.  Again, simple identifications

11   without characterizations and without interpreting what the

12   document means.

13          MR. CHAKRAVARTY:  He will probably say, this is

14   Hekmatyar, the person he was talking about.

15          THE COURT:  I will permit you just for orientation.

16   You've already identified Hekmatyar.  Let's go to the second

17   name.

18          MR. ANDREWS:  Can I just ask my brother a question.

19   Is "getting married" still on any of the tapes you are planning

20   on introducing?

21          MR. CHAKRAVARTY:  It is.

22          MR. ANDREWS:  I remember one that was on that I think

23   was withdrawn.  I want to make sure it's still actually an

24   issue.

25          MR. CHAKRAVARTY:  It is on one, the one with Mr.

1    McGinty's client, 4/6/2000.  Excuse me.  That is on another one

2    as well.

3             MR. ANDREWS:  Just as long as it's still relevant to

4    something.

5             THE COURT:  Yeah, that would be good.  That's

6    preferable.

7             MR. CABELL:  Okay.  Bathroom break?

8             THE COURT:  Yes, quickly.

9             ...end of sidebar.)

10            THE COURT OFFICER:  All rise.

11            (At 11:04 a.m., the jurors entered the courtroom.)

12            THE CLERK:  Court is now open.  You may be seated.

13            THE COURT:  Mr. Chakravarty.

14            MR. CHAKRAVARTY:  Thank you, your Honor.

15   Q.   Mr. Kohlmann, when we broke, you were talking about the

16   phrase "tourism."  Would you describe your basis of knowledge

17   of knowing what the phrase "tourism" means?

18   A.   Yes.  This is a euphemism that describes --

19            THE COURT:  No, no, no.  Just the sources -- the

20   reason that you say you know something about the --

21   A.   Yes, your Honor.  It is a phrase that is used in common

22   parlance in various different conversations that take place.

23   It is something that is used in the conversations that take

24   place online between individuals.  Throughout the course of my

25   research, that and similar phrases come up fairly frequently.

1    Q.    Is it used between yourself and other practitioners in

2    this field?

3    A.    Yes.

4    Q.    And have you seen it across a variety of different

5    conflicts and different groups?

6    A.    Yes.  It's not particular to one group, one individual,

7    one organization.  It is common to mujahideen organizations

8    around the world.

9    Q.    And you're not an expert in Islam; is that right?

10   A.    No.  I have training in Islam but I don't proffer myself

11   as an expert in Islam.

12   Q.    And with regard to your knowledge of Arabic, are you

13   fluent in Arabic?

14   A.    No.  Again, I have knowledge of Arabic from studying

15   Islam, but I'm not fluent.

16   Q.    Describe the types of media and sources in which you've

17   heard the word "tourism" used?

18   A.    Sure.  In discussions of what is going to happen in terms

19   of mujahideen recruits going to a frontline, there is a

20   discussion of this as, quote/unquote, tourism.

21   Q.    And based on your review of all of these materials, do you

22   have an impression of what -- how "tourism" is used by

23   mujahideen?

24            MR. McGINTY:  Objection.

25            THE COURT:  I'm going to sustain the objection with

1    the word "impression."  Why don't you rephrase the question.

2    Q.    What do you know "tourism" to mean?

3    A.    My understanding of the word "tourism" in this context is

4    to refer to again the provisions of mujahideen recruits to a

5    frontline, to an active frontline.

6    Q.    You also described -- you were asked the phrase "getting

7    married"?

8    A.    Yes.

9    Q.    Have you -- do you have a basis of knowledge for knowing

10   what that phrase means in regards to mujahideen?

11   A.    Yes.  This is very frequently used in conversations --

12         MR. McGINTY:  Objection.

13         THE COURT:  Well, again, just talk about the basis of

14   your knowledge, not what it means.

15   A.    I have seen this term arise in conversations that have

16   taken place online.  I have seen it arise in terms of

17   publications that are printed by various organizations.  I've

18   seen it in many places.

19   Q.    Have you also interacted with people in the -- in the

20   government and used this phrase?

21   A.    This is a phrase that is commonly used and understood by

22   individuals both in academia and government.

23   Q.    And you've used this with your colleagues in your own

24   field as well?

25   A.    Again, it is a very commonly used term.

1    Q.   And is this term specific to a specific group or

2    organization?

3    A.   No.  It is a term that is used by mujahideen organizations

4    and representatives around the world.

5    Q.   And based on that background, what do you understand that

6    phrase to mean?

7    A.   My understanding --

8              MR. McGINTY:  Objection.

9              THE COURT:  Overruled.

10   A.   My understanding of "getting married" in this context, the

11   term in this context, is to refer to someone achieving

12   martyrdom.

13   Q.   Drawing your attention now to just a few documents which

14   are in evidence.  Showing you from Exhibit No. 205, this box

15   down here, would you just describe who this person is?

16   A.   Yes.  That is Abdul Rasool Sayyaf.  That is the same

17   individual who I referenced earlier as one of the major leaders

18   of the Pashtun mujahideen in Afghanistan.

19   Q.   And Ahmad Shah?

20   A.   I believe that's a reference to Ahmad Shah Massoud,

21   another one of the major mujahideen leaders in Afghanistan,

22   although he is of Taji origin.

23   Q.   I draw your attention now to 63A.  This person here, is

24   that the same person you just described?

25   A.   Yes.  I believe that is also Abdul Rasool Sayyaf.

1    Q.   Are you familiar with this word?

2    A.   I believe -- I'm sorry -- I'm not, offhand, no.

3    Q.   How about this word?

4    A.   Yes.

5    Q.   And what is that?

6    A.   Jalalabad is one of the major cities of Afghanistan.

7    It is located in the east near the Kunar Province.

8    Q.   Are you familiar with this place?

9    A.   Baghman.  Yes, I am.

10   Q.   Where is that?

11   A.   That's in Pakistan.

12   Q.   Where is that vis-a-vis Afghanistan?

13   A.   I believe it's located near the Afghan border.

14   Q.   Showing you Exhibit 66A.  Would you described who

15   Hekmatyar is?  This name here, this is the same person you

16   described; is that correct?  Can you just read the name?

17   A.   Yes.  It's Saif Al-Rahman Haleemi.  This is the same

18   individual -- it's a different spelling, but it's the same

19   individual that I referenced before.

20   Q.   And in what facet did you reference him?

21   A.   I referenced him as being an ambassador or diplomat on

22   behalf of Gulbiddin Hekmatyar.

23   Q.   This word here, this phrase here, do you recognize that?

24   A.   Yes.  That's Chihar Asyab, that's also something I

25   referenced earlier, being one of the major bases of Gulbiddin

1   Hekmatyar inside of Afghanistan.

2   Q.   With regards to Mr. Haleemi, are you aware of him

3   traveling to the United States?

4   A.   Yes.  I have video recordings of Mr. Haleemi speaking in

5   the United States.

6   Q.   And do you recall the approximate time frame?

7   A.   Yes.  In approximately 1992.

8   Q.   I asked you about Abdullah Azzam.  Are you aware of

9   publications that he has written?

10  A.   Yes, I am.

11  Q.   Are you familiar with the book "Join the Caravan"?

12  A.   Yes, I am.

13  Q.   Are you familiar with the al-Jihad Magazine?

14  A.   Yes, I am.

15  Q.   What was that?

16          MR. McGINTY:  Objection.

17          THE COURT:  Overruled.

18  A.   The al-Jihad Magazine was one of the official publications

19  of Maktab al-Khidmat.  It was published in Peshawar, Pakistan.

20  The purpose of the publication --

21          MR. ANDREWS:  Objection, your Honor.

22          MR. McGINTY:  Objection.

23          THE COURT:  Sustained.  Put another question to the

24  witness.

25          MR. CHAKRAVARTY:  That's the last question.

1           THE COURT:  Okay.  Cross-examination?

2           MS. LUNT:  Thank you, your Honor.

3                        CROSS-EXAMINATION

4    BY MS. LUNT:

5    Q.   Good morning, Mr. Kohlmann.

6    A.   Good morning.

7    Q.   Now, Mr. Kohlmann, you have an undergraduate degree; is

8    that correct?

9    A.   I have an undergraduate degree from Georgetown, that's

10   correct.

11   Q.   And that was a major in international politics?

12   A.   It was a major in international politics/international

13   security studies.

14   Q.   And then you had a certificate also, which you've

15   described as being the equivalent of a minor or second major?

16   A.   That's correct.

17   Q.   And you also have a law degree?

18   A.   That's correct.

19   Q.   And that was from 2004?

20   A.   I graduated in 2004, that's correct.

21   Q.   Let me just get a glass of water.  And in law school, it's

22   fair to say, you pursued a normal law school fare in terms of

23   your curriculum: 30 courses; is that correct?

24   A.   Not normal, no.  I took the normal curriculum plus added

25   extra courses as well.

1   Q.    And let's just look then at your transcript.

2         May I approach, your Honor?

3         THE COURT:  Yes.

4   Q.    Mr. Kohlmann, I show you this document.  And would you

5   look at it and tell me if that's your transcript from the

6   University of Pennsylvania Law School?

7   A.    That's correct.

8   Q.    And is it fair to state, Mr. Kohlmann, that in your first

9   year of law school, you studied civil procedure, contracts,

10  torts, property, legal writing; and in the second semester

11  constitutional law, criminal law, legal writing, American legal

12  history, and administrative law?

13  A.    That's correct.

14        MR. CHAKRAVARTY:  Your Honor, objection to reading

15  from the transcript.  She can ask the question of the witness.

16        THE COURT:  Well, in this context I'll allow it.

17        MS. LUNT:  I believe I am asking him a question.  I'll

18  make it clearer.

19  Q.    Mr. Kohlmann, in your second year of law school, did you

20  study professional responsibility, evidence for trial lawyers,

21  federal income taxation, constitutional criminal procedure,

22  terrorism and democracy, copyright, corporations, evidence, law

23  and the Holocaust, and topics in defamation?

24  A.    That's correct.

25  Q.    And in your last year of law school, the third year, did

1    you study death penalty and habeas corpus, trial advocacy,

2    international human rights, advanced criminal law, cyber crime

3    seminar; and then in your last semester -- is that correct?

4    A.    That's correct.

5    Q.    And in your last semester of law school you studied

6    Afghanistan and Islamism, free speech, trial advocacy, First

7    Amendment in the Twenty-First Century, and an independent

8    study; is that correct?

9    A.    That's correct.

10   Q.    Thank you.  Now, Mr. Kohlmann, you have not pursued

11   graduate studies in history, have you?

12   A.    No.

13   Q.    And you're aware that a graduate program, a Ph.D. program

14   would include two or three years of course work?

15   A.    That's correct.

16   Q.    And that would include training in research methodology?

17   A.    That's correct.

18   Q.    And it would also include several years of research and

19   field work for a thesis?

20   A.    Typically speaking, yes.

21   Q.    And the thesis would be reviewed by a committee?

22   A.    Yes.

23   Q.    And you have not gone through a doctoral program?

24   A.    Not a doctoral program, no.

25   Q.    And you're not fluent in Arabic, are you?

1    A.    No, I'm not fluent.

2    Q.    And in fact, you rely on translators for reading documents

3    in Arabic?

4    A.    For reading documents, that's correct, yes.

5    Q.    And you've never actually engaged in the formal study of

6    Arabic, have you?

7    A.    Not formally, no.

8    Q.    And you do not speak or understand the languages of

9    Pakistan or Afghanistan?

10   A.    That's correct.

11   Q.    And those languages are Pashto --

12   A.    -- Urdu --

13   Q.    -- Dari --

14   A.    Yes.

15   Q.    -- Uzbek?

16   A.    Uzbek, yes.

17   Q.    Tajik?

18   A.    Yes.

19   Q.    And nor do you speak the language of Bosnia, do you?

20   A.    Serbo-Croatian, no, I don't.

21   Q.    And in fact, the languages you're fluent in are obviously

22   English?

23   A.    That's correct, yes.

24   Q.    And I believe French?

25   A.    That's correct.

1   Q.   And Mr. Kohlmann, you are not an expert on the religion of

2   Islam, are you?

3   A.   Again, I have training in Islam but I don't proffer myself

4   as an expert in Islam, no.

5   Q.   And you know that the Koran, the holy book of Islam, is

6   written in Arabic?

7   A.   The original version, that's correct, yes.

8   Q.   And so therefore, you have not read the original version

9   in Arabic?

10  A.   Well, I haven't read it in Arabic, no.

11  Q.   And to state the obvious, you're not a tax expert?

12  A.   I took federal income taxation in law school, but no, I

13  don't proffer myself as a taxation expert.

14  Q.   And you haven't been employed by the IRS as an agent, have

15  you?

16  A.   Not as an agent, no.

17  Q.   And you mentioned, I think yesterday, the importance of

18  field research?

19  A.   That's correct.

20  Q.   And have you ever conducted field research in Afghanistan?

21  A.   Not in Afghanistan, no.

22  Q.   Or in Pakistan?

23  A.   Not in Pakistan.

24  Q.   Or in Chechnya?

25  A.   Not in Chechnya, no.

1    Q.    In fact, you went to Bosnia but that was in 2005; is that

2    correct?

3    A.    That's correct.

4    Q.    And the events that we were talking about -- that you were

5    talking about, the war in Bosnia ended in 1995?

6    A.    Approximately -- Well, it depends which events you're

7    talking about.  But some of the events that I've discussed did

8    end in 1995.

9    Q.    The dates and accords that you mentioned were in 1995?

10   A.    Yes, November of 1995.

11   Q.    And have you ever even visited Afghanistan or Pakistan?

12   A.    No.

13   Q.    Have you ever visited Chechnya?

14   A.    No.

15   Q.    Now, Mr. Kohlmann, you mentioned that when you were an

16   undergraduate and while you were in law school, you worked

17   part-time for Steven Emerson?

18   A.    That's correct.

19   Q.    And that was at the Investigative Project?

20   A.    Yes.  I was actually in research at the Investigative

21   Project.

22   Q.    Right.  And that's an organization that Steven Emerson was

23   running by himself?

24   A.    It was being run by himself and an advisory board.

25   Q.    Well, he investigated Muslim groups, did he not?

1    A.   He investigated a number of groups, I think a majority of

2    which were probably of Islamic origins, sure.

3    Q.   And you worked for him for seven years?

4    A.   Yes.  I started -- Again, when I started, I worked

5    part-time initially as an intern.  Eventually I became --

6    Q.   I asked you, did you work for him for seven years?

7    A.   Yes.  I'm just trying to characterize what the -- the way

8    in which I was working for him.  I was a full-time student

9    during this time.

10   Q.   Right.

11   A.   So at the beginning I started as a part-time employee.

12   "Seven years" is a little bit disingenuous because it doesn't

13   exactly describe how I was working for him.  I was working

14   part-time initially, then I worked as an analyst, then I worked

15   as a senior analyst, then eventually as a consultant.

16   Throughout the time I was working for him, a lot of the work

17   that I was doing was based out of my own -- my own office, my

18   own home because I was located in another place.

19   Q.   I see.  Now, it's fair to say that Mr. Emerson is a

20   controversial character?

21   A.   You could say that, yes, sure.

22   Q.   And he has been accused of biased reporting?

23        MR. CHAKRAVARTY:  Objection, your Honor.

24        THE COURT:  Sustained.

25   Q.   You've described the work that you did for Emerson as,

1    quote, your passion for a long time?

2    A.    No.  I described the work that I did, period, on the

3    Arab-Afghan and mujahideen organizations as my passion for a

4    long time.  That --

5    Q.    I understand.  Thank you.  Now, Mr. Kohlmann, have you

6    ever had a teaching position in a university?

7    A.    No.

8    Q.    And have you ever been employed by the United States

9    Government as an official?

10   A.    No.  Only as a consultant.

11   Q.    And have you ever served in the United States Armed

12   Forces?

13   A.    No.

14   Q.    And in the three years since you graduated from law

15   school, you have been employed -- self-employed as a

16   consultant; is that right?

17   A.    Yes.  Self-employed in the sense that I run my own

18   consulting firm, but I am paid by clients obviously to --

19   Q.    Obviously.  Now, you mentioned on direct trials in which

20   you have testified?

21   A.    That's correct.

22   Q.    And I think you mentioned seven trials that you testified

23   in?

24   A.    As an expert.

25   Q.    And then a number, maybe it was 15, cases in which you

1    consulted for the government?

2    A.    Roughly about that.

3    Q.    Now, Mr. Kohlmann, it's true that in one case a Federal

4    District Court judge --

5              MR. CHAKRAVARTY:  Objection, your Honor.

6              THE COURT:  Sustained.

7              MS. LUNT:  May we approach the sidebar, your Honor?

8              THE COURT:  Yes.

9              (Sidebar as follows:

10             MS. LUNT:  We were going to introduce at the Daubert

11   evidence, and reluctantly he did agree that he was not accepted

12   as an expert witness in one case.  He's testified that he

13   testified seven times as an expert.  It's fair enough to point

14   out that in one case he was rejected as an expert.

15             THE COURT:  I thought he -- Well, the gatekeeping

16   issue of his qualifications is for me and other judges to

17   determine in the first instance.  And I thought he said he was

18   limited as an expert.

19             MR. CHAKRAVARTY:  He actually didn't testify at all in

20   that case.  What he said was that the late disclosure by the

21   government --

22             THE COURT:  That's what it was, the late disclosure

23   issue.

24             MS. LUNT:  And the court -- the transcript says that

25   the judge found him unqualified.

1          THE COURT:  What, to testify in what capacity?

2          MS. LUNT:  To testify in -- as an expert in a

3     terrorism case.

4          THE COURT:  I mean, the problem I have is we don't

5     know what he was being proffered for in that case, right?  I

6     mean, it's another potential side issue.  What was the extent

7     of his offer?  I mean, I could have accepted him or rejected

8     him depending upon what the testimony proffered was.  And not

9     knowing that --

10          MS. LUNT:  It was about Islamic extremist groups, but

11     I couldn't be more specific than that.  It wasn't a terrorism

12     case, which of course, I would want to avoid.

13          MR. CHAKRAVARTY:  And Judge, that hearing was several

14     years ago, you know, when he was just out of school --

15          MS. LUNT:  Two years ago.

16          MR. CHAKRAVARTY:  -- but he wasn't -- I mean, he was

17     asked in the Daubert what he knew about that.  He wasn't even

18     there for that discussion about him, so his ability to comment

19     on what a federal judge's opinion of him was is extremely

20     inflammatory with regards to mischaracterizing --

21          THE COURT:  Well, I'm not concerned about the

22     inflammatory part of it.

23          MS. LUNT:  I can simply ask him whether he's been

24     rejected as an expert witness by a federal judge in 2005.  And

25     this is a fair issue for the jury who's going to judge his

1    credibility.

2            MR. CHAKRAVARTY:  But he's going to say what he said

3    at the Daubert, which is that he wasn't rejected, but as an

4    expert, he wasn't allowed to be called because of late

5    disclosure.

6            THE COURT:  And do you have a transcript that I can

7    look at that will --

8            MS. LUNT:  Yes.  Do you want to leave this issue --

9            THE COURT:  How long is your cross-examination going

10   to be?

11           MS. LUNT:  I don't think it's going to be longer than

12   till the next break -- well, maybe past the break.  I don't

13   know how long it's going to go.

14           THE COURT:  Why don't you hand me the transcript and

15   keep going, and I'll look at the transcript while you keep

16   going.  Again, if you can put a Post-It note or flag on it so I

17   know what I'm looking at.

18           MR. CHAKRAVARTY:  I have a little bit of knowledge

19   about that case.  It was such a narrow issue about a specific

20   Al Qaeda cell in Saudi Arabia, which was unnecessary in a case

21   where the defendant confessed.  It probably played into Judge

22   Lee's decision-making process as to whether they should allow a

23   late disclosure of an expert.  Now, to give the appearance to

24   the jury that he's unqualified as an expert --

25           THE COURT:  Well, if I allow the testimony, the

1    explanation's going to come in.  My concern really is Rule 403,

2    that it's, you know, an apples-to-apples comparison.  And if it

3    isn't, then the government is entitled to get into what that

4    case is about and the specific grounds for why he was rejected.

5    But let me start with the transcript.

6              MS. LUNT:  The grounds are set forth in the

7    transcript, your Honor.

8              ...end of sidebar.)

9              MS. LUNT:  May I approach, your Honor?

10             THE COURT:  Yes.

11   Q.   Now, Mr. Kohlmann, it's fair to say that you now earn your

12   living as a consultant and as an expert witness?

13   A.   Well, I don't think to say I make my living as an expert

14   witness is exactly correct.  I think it's more correct to say

15   that I work as a consultant.  Expert witness -- what I do as an

16   expert witness, testimony is only a small part of what I do.

17   Q.   Are you compensated for your work as an expert witness?

18   A.   Yes.

19   Q.   And are you being compensated in this case?

20   A.   Yes.

21   Q.   And what is the hourly rate at which you are being

22   compensated in this case?

23   A.   Again, I'm not sure, off the top of my head, in this case,

24   but my typical hourly rate runs between $300 and $400 an hour.

25   Q.   And do you know how many hours you've put into this case

1    thus far?

2    A.    I'm sorry.  I really don't know, off the top of my head.

3    Q.    Can you give me an estimate?

4    A.    Well, I prepared an expert report, which was substantial

5    in length.  I reviewed several hundred documents.  It's -- I

6    would say it's a fairly sizable number of hours but I really --

7    I'd have to look at my tally at home, and I don't have it here.

8    Q.    Now, you've said that you have a website.  You've

9    described your website on which you have two terabytes of

10   information?

11   A.    No, no, you're confusing two different things.

12   Q.    Okay.

13   A.    I have --

14   Q.    Not a website.  You have a database?

15   A.    I have a server, a computer server which is filled with

16   two terabytes' worth of data, that's correct.

17   Q.    And these are documents you have amassed over the last

18   decade?

19   A.    They're documents, videos, audio recordings, every single

20   source document which I could get my hand on and then collate,

21   yes.

22   Q.    And because it's hard for me to understand what two

23   terabytes are, I'd just like to ask you, two years ago, I

24   believe, you had 20 million documents?

25   A.    Um --

1    Q.    Excuse me.

2    A.    Go ahead.

3    Q.    You had 20 million documents in this database; is that

4    right?

5    A.    That was an estimation that I gave.  I didn't actually say

6    I had 20 million documents.  What I said is that if you took

7    the amount of data that's on my drive and if you tried to

8    figure that out in terms of how many printed pages it would be,

9    it would be something like 20 million documents.  However, the

10   fact is that a number of files that I have on my database are

11   larger than others.  Some are video files.  Some are audio

12   files.  I think the best way to say it is that the data

13   consists of several million documents from all different

14   sources which are, again, sorted by various different subject

15   areas.

16   Q.    Thank you.  So it's several million documents?

17   A.    I would say that would be . . .

18   Q.    And obviously you have not read each one?

19   A.    No.

20   Q.    Now, you published one book; is that right?

21   A.    That's correct.

22   Q.    And you've described that book as being about foreign

23   fighters who fought in Afghanistan and later in Bosnia and

24   other places?

25   A.    It's primarily about the phase of their fighting in

1    Bosnia-Herzegovina, but it does trace their origins from

2    Afghanistan and then traces what they did afterwards as well.

3    Q.    And you call these people the Afghan -- Arab-Afghans?

4    A.    This is a common term used by not just myself --

5              MS. LUNT:  Your Honor, may he be instructed to answer

6    my question?

7              THE COURT:  And the question is whether you refer to

8    them as Arab-Afghan.

9    A.    I do, yes.

10   Q.    And this book is based in part on your undergraduate work;

11   is that right?

12   A.    It was based on a lot of things, but it was based

13   partially upon the thesis that I wrote at the end of my

14   undergraduate.  It was based partially on the research that I

15   had done in the Investigative Project.  It was based partially

16   upon research I had done on my own.  It was based upon a lot of

17   different things.  The process of writing this book took almost

18   two and a half years.

19   Q.    And this book was published, was it not, by Berg Press?

20   A.    That's correct.

21   Q.    And you have described Berg Press in earlier testimony as

22   a, quote, academic publisher?

23   A.    That's correct.

24   Q.    Now, it's not a university press, is it?

25   A.    No.

1    Q.    And you were aware that Berg describes itself -- and I

2    quote -- as an international independent publisher committed to

3    innovative ideas in visual and material culture, including

4    fashion and textiles, cultural media studies, film, art and

5    design, food, sport, and anthropology.  Is that how web -- how

6    Berg describes itself on its website?

7    A.    I would say yes.

8    Q.    And you also submitted the manuscript for this book to

9    Penn University Press and Yale University Press; is that right?

10   A.    Among others, yes.

11   Q.    Yes.  Among others.  And they did not accept it; is that

12   fair to say?

13   A.    No, they didn't.

14   Q.    Now, you haven't published any other books besides this?

15   A.    Not yet, no.

16   Q.    And the book that you published, it's not a history of the

17   events in Bosnia in the 1990s, is it?

18   A.    It's a history of the events of the mujahideen in Bosnia.

19   It's not a history of the general war per se.

20   Q.    And nor is it a history of the events in Afghanistan in

21   the 1990s and 1980s?

22   A.    Again, it's based upon Kataeb al-Mujahideen, which is

23   mujahideen organization.  It's not the history of individual

24   conflicts overall.

25   Q.    Now, you discussed at some length the history of

1    Afghanistan from 1979 to the Taliban taking over in 1996;

2    is that correct?

3    A.    Yes, approximately.

4    Q.    Now, as you said, you've never been to Afghanistan or

5    Pakistan?

6    A.    No.

7    Q.    And you haven't pursued graduate level courses -- studies

8    in history, have you?

9    A.    I have taken graduate level courses in Afghan history,

10   yes --

11   Q.    You took a course --

12   A.    -- but I have not pursued a full length of study focused

13   on graduate history, no.

14   Q.    And you would agree with me, would you not, that there was

15   a colossal humanitarian crisis in Afghanistan in the 1990s?

16   A.    Yes.

17   Q.    And there were at least four and a half million Afghani

18   refugees in Pakistan?

19   A.    Okay.  Probably, yes.  That sounds about right.

20   Q.    And another two million in Iran?

21   A.    That's correct.

22   Q.    And then there were many internally displaced people

23   within Afghanistan?

24   A.    Oh, yes.

25   Q.    And the term of art for those people is IDPs, right?

1   A.   That's one term that is used, yes.

2   Q.   Internally displaced persons, right?

3   A.   Well, I'm not expert on refugees but that is a term that

4   is used, yes.

5   Q.   But you're well aware of the extent of the refugee crisis

6   in Afghanistan in the 1990s?

7   A.   It was a crisis, yes.

8   Q.   And just -- this was as a result of continuous warfare

9   since 1979 when the Soviets invaded?

10   A.   It was the result of warfare, drought, famine, a lot of

11   things, yes.

12   Q.   A combination.  And among the factors, of course, is this

13   is a mountainous place which is exceedingly cold in winter?

14   A.   Well, parts of Afghanistan are.  Parts of Afghanistan are

15   desert.

16   Q.   I'm talking about the areas on the border of Pakistan is

17   mountainous?  It's not --

18   A.   Again, parts are desert; parts are mountainous.  It

19   depends which parts --

20   Q.   They're cold in winter whether desert or mountain?

21   A.   Again, I haven't been there so I couldn't tell you what

22   the temperature is like, but again it varies.  But the

23   geography along the Afghan-Pakistan border varies.  None of it

24   is terribly hospitable.

25   Q.   Now, you described the Afghan population as being of

1   different ethnic mix; is that correct?

2   A.   That's correct.

3   Q.   But they were all Muslims; fair enough?

4   A.   Yes.

5   Q.   Some Sunni, some Shiite?

6   A.   Some Shiite, correct.  Yes.

7   Q.   But all Muslims?

8   A.   Yes.  Well, there are some minorities in Afghanistan that

9   are non-Muslim.  I think what is fair to say is that the

10  majority of Afghans are Muslims.

11  Q.   The vast majority?

12  A.   The vast majority, yes, sure.

13  Q.   Now, to recap briefly on what you said, the Afghans

14  resisted invasion by the Soviet Union?

15  A.   That's correct.

16  Q.   And they did that for a decade?

17  A.   Yes.  From 1979 to approximately 1989.

18  Q.   And then after the Soviets withdrew, you described the

19  resistance of the Afghanis against the Soviet puppet

20  government?

21  A.   That's correct.

22  Q.   And the Soviet puppet government was led by Najibullah;

23  is that right?

24  A.   That's correct.

25  Q.   And you described that the resistance movement was not one

1   army, but rather --

2   A.   No.  It was fractionalized, yes.

3   Q.   Fractionalized.  And these were into different groups of

4   mujahideen?

5   A.   That's correct.

6   Q.   And that's the word that means holy warriors?

7   A.   That's correct.

8   Q.   So the Afghans who were fighting for their independence

9   from the Soviet Union were known as mujahideen; is that right?

10  A.   Yes.  They were all known as mujahideen.

11  Q.   And you mentioned the various groups and you mentioned in

12  particular Hekmatyar, Massoud, Rabbani, Sayyaf, and Dostum?

13  A.   That's correct.

14  Q.   And Dostum was pro Communist.  In fact he was --

15  A.   Former Communist general, correct.

16  Q.   And of course, you have never interviewed any of these

17  individuals, have you?

18  A.   Not personally, no.

19  Q.   Now, in the war against the Soviets, the Afghan fighters

20  were supported by foreign governments; is that correct?

21  A.   In the initial phases that's correct, yes.

22            MS. LUNT:  May we approach the sidebar, your Honor?

23            (Sidebar as follows:

24            THE COURT:  Yes, Ms. Lunt.

25            MS. LUNT:  He will testify that a huge amount of

1    American money went into Afghanistan up until '88 or '89.  He

2    will also say it's in his prior testimony -- or in his prior

3    writings that the mujahideen going to Afghanistan were, quote,

4    vigorously supported by the United States and Saudi Arabia.

5    It's totally fair game to get into these areas because we have

6    an expert now who will testify that there was both military and

7    humanitarian aid to Afghanistan until 1995.  Mr. Kohlmann

8    agrees at least until 1989 that the United States was funding

9    this war.  And that the fact that the United States was also

10   vigorously supporting the mujahideen groups is a critical part

11   of our case in terms of the intent and knowledge of our clients

12   when they were working to provide humanitarian aid to

13   Afghanistan.  And in fact, he's given a long description of the

14   war in Afghanistan.

15        And there are two huge gaps.  One is who was funding

16   it and the other is the humanitarian crisis, which I've gone

17   into already.  It's giving a totally distorted view of the war

18   in Afghanistan not to discuss who was funding it.  He went into

19   it at great length.

20        THE COURT:  I think -- There is -- you would ask the

21   jury to draw the inference between the fact that the U.S.

22   provided aid up until 1989 that that affected the defendants'

23   intent in 1993 in setting up this organization, and I don't --

24   and filling out a form with the IRS, and I don't see the link

25   there.

1            MS. LUNT:  Well, the link is that the United States

2   supported the mujahideen and went to fight in Afghanistan.  And

3   to give a complete picture and a proper context to that support

4   for the mujahideen, it has to be explained to the jury that the

5   United States was supporting this war.

6            THE COURT:  But the complete picture is only important

7   if it's relevant to some issue in the case.

8            MS. LUNT:  Well, he testified that the mujahideen came

9   late in the 1990s.  He's already testified to that.

10           MR. CHAKRAVARTY:  I believe in the 1980s.  He said

11  post 1984, that's when the mujahideen first started coming in.

12  But as far as what he has said thus far is as far as he should

13  be able to go.  And anything beyond this goes exactly to the

14  issue of American funding and support.  It opens the door to a

15  host of issues, not only confusion to the jury; but if the

16  defense is arguing that American support for the mujahideen at

17  any time, if that, fact, goes to the defendants' intent, then

18  certainly it would open the door as to what Maktab al-Khidmat,

19  what Al-Kifah, what all these other organizations were doing in

20  terms of funding the mujahideen.

21           THE COURT:  If the U.S. funding of mujahideen goes to

22  the defendants' intent, doesn't also Osama Bin Laden's support

23  of the mujahideen go to the defendants' intent?  Why are they

24  not equally fair game?  In other words, if it's common

25  knowledge and important to understand all of this, why is it

1    not equally important to understand that terrorists were

2    supporting the mujahideen, which I am struggling to keep out of

3    this trial?

4          MR. CHAKRAVARTY:  At the risk of tagging onto that,

5    your Honor, we have evidence that the defendants had Osama Bin

6    Laden's words post '90s connecting the defendants to --

7          THE COURT:  We've already --

8          MR. CHAKRAVARTY:  Right.  But my point is that there's

9    nothing to indicate that the defendants were relying on

10   governmental policy on expenditure of funds with regards to

11   establishing intent of trying to follow the fact that the

12   U.S. Government may have had some interaction with mujahideen

13   groups after 1989.

14         THE COURT:  Well, unless I have something else to

15   connect it to the defendants' intent, I'm not going to permit

16   it on the grounds that it shows the defendants' intent in this

17   case --

18         MS. LUNT:  Well, your Honor --

19         THE COURT:  -- unless you can connect it somehow.  And

20   again, I'm concerned.  The defendants' intent, it applies

21   equally to Osama Bin Laden and terrorist groups that are

22   supporting the various . . .

23         MS. LUNT:  There's no -- there will be evidence that

24   the defendants in this case were aware of United States'

25   support.  There's no evidence that they were aware of Osama Bin

1   Laden's support.  Obviously if you put me in the position where

2   if I open this up, I'm going to be in a position where the

3   government can come back with testimony about Osama Bin

4   Laden . . .

5          THE COURT:  I'm just posing a question.

6          MS. LUNT:  Well, the proffer I make on that is that it

7   is tied to -- will be tied through evidence in our case to the

8   intent of the defendants, but -- and there's no evidence

9   linking to Osama Bin Laden.  But if those questions are going

10  to be asked and the reference to Osama Bin Laden is going to be

11  put in, then I'm in a position where -- unfairly put in the

12  position --

13         THE COURT:  I haven't made that ruling.  I'm asking

14  you the question.  Why would one be fair and not the other?

15  In other words, if what you're saying is, well, to really

16  understand the defendants' intent, you have to have this

17  complete picture of events in Afghanistan, including the U.S.

18  was funneling money to that.  Why would it not be equally true

19  that to understand the full picture of what was happening in

20  Afghanistan, to have more information about terrorist groups or

21  terrorists who were involved in the same funding?

22         MR. ZALKIND:  Can I speak, your Honor?

23         THE COURT:  Yes.

24         MR. ZALKIND:  Your Honor, the defendant is charged

25  with a tax violation and he's -- they're basically charged with

1    hiding the ball from the government about where the money was

2    going, which is to the mujahideen, instead of for humanitarian

3    purposes.  And I -- I think that it's fair for us to show that

4    the money was going by the United States Government for

5    humanitarian purposes because, first of all, it affects the

6    intent of the defendant at that time period.  He's not charged

7    with a terrorism offense.  It's not an issue in this case about

8    funding for terrorism.  So I don't see why in defending our

9    case we can't show that there was intent consistent with the

10   United States policy, the defendants were doing the same thing,

11   which was providing humanitarian aid.  It's the same issue when

12   we show -- we try to get in all the documents on the offense

13   because I think that's part of our case.  Terrorism is not part

14   of our case.  It's not part of the government's charge.

15        THE COURT:  Mr. Andrews, did you want to say

16   something?

17        MR. ANDREWS:  I just wanted to recall that

18   Exhibit 231, which is the magazine, an Al Jihad magazine that

19   he testified to has an article on American aid to -- American

20   aid to the mujahideen.  He's already said -- the witness has

21   testified that he's familiar with that magazine, and has

22   reviewed that magazine.  In that magazine the translation

23   provided talked about past American funding and actually speaks

24   about Congress's aid to Afghanistan which I think is 1992 and

25   1993.  The magazine's in evidence.

1          MR. CHAKRAVARTY:  He didn't say that magazine.  He's

2    familiar with a magazine published by that name.  He has paged

3    through that magazine, but he hasn't read that magazine.  He

4    doesn't have a translation of that magazine.

5          MR. ANDREWS:  With all due respect, I'm sure that

6    Mr. Kohlmann is extremely familiar with that magazine.

7          THE COURT:  All right.  Behave yourself.

8          MS. LUNT:  There are two aspects to this, your Honor.

9    There's the military aid and there's the humanitarian aid.

10   And I wanted to be completely clear that if we talk about

11   humanitarian aid, that that does not open up the issue of

12   Al Qaeda or Osama Bin Laden.

13         THE COURT:  I'm going to permit the question that the

14   United States provided humanitarian aid in this area and

15   otherwise, until I see some -- without further explication --

16   in other words, not going down the path into military aid and

17   so forth.  And until I see a connection where -- a proffered

18   connection between intent of the defendants and this aid,

19   something that links it, then I think it's either irrelevant or

20   misleading or both.  But I will permit a question about

21   humanitarian aid.

22         MR. CHAKRAVARTY:  Two things.  What time frame

23   matters.

24         THE COURT:  I understand.

25         MR. CHAKRAVARTY:  And second, if the defendant -- I'm

1    just skipping ahead -- if the defendant is the person -- a

2    defendant is the person who is going to tie that up, then the

3    government will then say that the door is opened to explain

4    with the expert testimony and maybe others to explain why, you

5    know, as your Honor suggested, that there was another motive.

6              THE COURT:  If the defendant takes the stand and says,

7    "I expressly relied on this fact," then it's a whole other

8    ballgame, and we'll see what happens at that point.

9              MR. CHAKRAVARTY:  Okay.

10             ...end of sidebar.)

11   Q.   Now, we were talking earlier about the humanitarian crisis

12   in Afghanistan.  And you would agree that the United States

13   provided humanitarian aid to the Afghanis both in Pakistan and

14   in Afghanistan?

15   A.   It's my understanding that that did occur, yes.

16   Q.   And as we said before, there were millions of refugees.

17   And there were many -- in Pakistan, you're familiar with the

18   town of Peshawar?

19   A.   Yes.

20   Q.   And that's a border town; is that correct?

21   A.   It's part of the northwestern province.  It's separated

22   from Afghanistan by the Federally Administered Tribal Area, but

23   it is considered to be a border town because that's kind of no

24   man's land.

25   Q.   And during the 1980s and 1990s, are you aware that there

```
1    were hundreds of charities based in Peshawar providing
2    humanitarian support to the Afghani refugees?
3    A.   Well, I don't know if there were hundreds, but there were
4    charities there, sure.
5    Q.   And as you said, you haven't been there?
6    A.   No.
7    Q.   But you know there were a large number of charities?
8    A.   I don't even know if there's -- I don't know what "large
9    number" means.  There was a number of charities.  I can think
10   of at least between one and 20 different ostensible charitable
11   organizations that were active in Peshawar.
12   Q.   But you're not familiar with all of them?
13   A.   Not all of them, no.
14   Q.   And certainly the humanitarian crisis was not the focus of
15   your research or your study?
16   A.   No.  It's something that I studied as an adjunct to
17   studying the Afghan Civil War of the 1980s but because of the
18   fact that I'm focused on the mujahideen and not refugees, it's
19   not something I put the lion's share of my research into, no.
20   Q.   I understand.  Now, you referred to the fighting among the
21   mujahideen groups that occurred after Najibullah, the Soviet
22   puppet leader, fell in 1992; is that right?
23   A.   It began long before then.  But yes, I did refer to that,
24   yes.
25   Q.   And one of the -- Dostumus (phonetic), you said, was a
```

1  Communist leader?

2  A.   That's correct.

3  Q.   And the other mujahideen leaders were anti-Communist?

4  A.   I don't think you can really succinctly state their

5  ideology saying anti-Communist.  They were -- they were -- the

6  whole point was like, for instance, Hekmatyar's party was

7  Hizb-i-Islami.  It wasn't the anti-Communist party.  His party

8  was the Islamic party.  They had different agendas, most of

9  which went against the idea of Communist domination of

10 Afghanistan.

11 Q.   And you would agree with me, would you not, that both

12 Hekmatyar and Massoud were opposed to Communist domination of

13 Afghanistan?

14 A.   Among other things, yes.

15 Q.   And there were shifting alliances among the mujahideen

16 during the years 1992 to 1996; is that right?

17 A.   Long before then.  But then too.

18 Q.   We're now talking about the period after Najibullah has

19 been overthrown, the period between 1992 and 1996 when the

20 Taliban come in.

21 A.   There was shifting alliances then, yes.

22 Q.   And in fact, we talked about Hekmatyar.  He was prime

23 minister of -- on two occasions, right?

24 A.   Very, very briefly.

25 Q.   Well, he was prime minister in '92 to '93?

1    A.    He never actually took office but he was --

2    Q.    He was appointed; was he not?

3    A.    There was an agreement by which he was -- he was given

4    that title.  However, the agreement was actually never put into

5    force.  The agreement was never honored to the extent that the

6    only person who ever referred to himself as the prime minister

7    of Afghanistan was Hekmatyar himself.

8    Q.    And then as the Taliban were taking over the country in

9    1996, Massoud and Hekmatyar were both fighting the Taliban?

10   You testified to that; is that right?

11   A.    Not together.  But yes, they were fighting.

12   Q.    But their forces.  So let's go over this again.  These

13   different mujahideen leaders were based in different areas of

14   the country and had their support among different ethnic

15   groups; is that fair to say?

16   A.    Yes.  For the most part, yes.

17   Q.    And Massoud fought against the Taliban in 1996?

18   A.    For longer than that, but yes.

19   Q.    And Hekmatyar was also fighting against the Taliban in

20   1996, correct?

21   A.    And also against the Sunni.  Again, they were fighting the

22   Taliban but you have to be careful because they weren't

23   fighting together.  They were fighting separately and also

24   against each other.

25   Q.    And in 1996 shortly before the Taliban took over Kabul,

1    Hekmatyar was appointed prime minister again; is that right?

2    A.    At least technically so, yes, sure.

3    Q.    And we all know that the regime established by the Taliban

4    was an oppressive one?

5    A.    You could characterize it as that, sure.

6    Q.    And after the Taliban took over, Hekmatyar went into

7    exile?

8    A.    That's correct.

9    Q.    I think you said first in Pakistan, then in Iran?

10   A.    First he went to Pakistan, eventually to Iran.

11   Q.    And then Massoud retreated to the Panjshir Valley in the

12   east of Afghanistan; is that right?

13   A.    His tribal area, his particular area of influence is a

14   valley northeast of Kabul known as the Panjshir Valley.  He was

15   known as the Lion of Panjshir, an area that even the Taliban

16   couldn't conquer.  As a result he retreated into this valley,

17   yes, that's correct.

18   Q.    Now, we talked about the humanitarian aid provided by the

19   United States to Afghani refugees.  And you agree that there

20   were private charities doing the same work?

21   A.    Yes, sure.

22   Q.    And this was because the population of Afghanistan was

23   suffering both as refugees, millions of them in Pakistan, and

24   within Afghanistan?

25   A.    Sure.  Yes, that's correct.

1    Q.   And are you aware that the United States humanitarian aid

2    continued until 1995?

3              MR. CHAKRAVARTY:  Objection, your Honor.

4              THE COURT:  Overruled.

5    A.   I'm aware that humanitarian aid continued to flow from the

6    United States to these regions although I don't know who

7    exactly was responsible for either originating it, raising it,

8    or disseminating it.

9    Q.   And you're familiar with the United States agency called

10   AID?

11   A.   The Agency For International Development, yes, I am.

12   Q.   And you were not involved in that agency at the time, were

13   you?

14   A.   I've never worked for the U.S. AID, no.

15   Q.   Now, you testified that you testified about the Office of

16   Services, which you call Mak- -- which is Maktab al-Khidmat?

17   A.   Maktab al-Khidmat, yes.

18   Q.   And you testified it was founded by Abdullah Azzam?

19   A.   That's correct.

20   Q.   And based in Peshawar?

21   A.   The central was in Peshawar of Maktab.

22   Q.   And you agree, do you not, that the Office of Services

23   provided humanitarian aid?

24             MR. CHAKRAVARTY:  Objection, your Honor.

25             THE COURT:  Overruled.

1    A.    That was one of the things that they did.

2    Q.    Yes.

3    A.    Or I should say it's one of the things that they claimed

4    to have done.

5    Q.    Well, you have testified, have you not -- and let me just

6    refer to your prior testimony -- you were asked a few days ago,

7    "You are not denying that Maktab al-Khidmat, Office of

8    Services, also provided humanitarian relief to refugees in

9    Pakistan?"  And you said that they did, as well as --

10   A.    And I said I didn't deny it.  And again, I haven't been to

11   Pakistan, and I haven't seen them giving out aid to people

12   personally.  I have seen them claiming, among other things, to

13   have provided humanitarian aid to refugees.  But that's -- I've

14   only seen their claims to have done that.

15   Q.    Because you haven't been to Afghanistan?

16   A.    Correct.

17   Q.    Now, you talked about the events in Bosnia also?

18   A.    That's correct.

19   Q.    And again, your book focuses on the foreign fighters, not

20   on the history of Bosnia?

21   A.    That -- it's focused on the history of the foreign

22   fighters in Bosnia.  It takes the reader through the Bosnian

23   war, but again, the focus is on the role of the mujahideen, not

24   on the war at large.

25   Q.    And you mentioned very briefly, I think, that the Muslims

1    were persecuted in Bosnia?

2    A.   I didn't mention it briefly.  That's --

3    Q.   Well, in your testimony today, you said that the Muslims

4    were persecuted by the Serbs in Bosnia?

5    A.   That's correct.

6    Q.   And I'd like to ask you a little more about that.  In

7    fact, in your book, you described -- and I quote -- "the

8    horrific plight of Bosnian Muslims"?

9    A.   That's correct.

10   Q.   And in fact, what happened after Bosnia declared

11   independence in April of 1992 was that Serb militia attacked

12   Bosnian communities?

13   A.   That's one of the events that sparked the beginning of the

14   war, yes.

15   Q.   And in those attacks, they were supported by Slobodan

16   Milosevic and Serbia?

17   A.   That's correct.

18   Q.   And just so that the jury will recall, the Serbian state

19   is right next door to Bosnia, correct?

20   A.   That's correct.

21   Q.   And Slobodan Milosevic was --

22        MR. CHAKRAVARTY:  Objection, your Honor.

23        THE COURT:  Overruled.

24   Q.   Slobodan Milosevic was subsequently prosecuted for war

25   crimes at the Hague; is that right?

1    A.    That's correct.

2    Q.    And by the way, the president of Bosnia, independent

3    Bosnia, his name was Ali --

4    A.    Alija Izetbegovic.

5    Q.    Izetbegovic?

6    A.    Izetbegovic, yes.

7    Q.    Now, are you aware that in Bosnia by October of 1993,

8    200,000 Bosnians had died and 800,000 Bosnians were refugees

9    outside the country?

10   A.    I can't give you exact numbers, but it's fair to say that

11   there were a large number of Bosnians killed and there were a

12   large number of refugees, correct.

13   Q.    And there were refugees outside of Bosnia and there were

14   1.2 million displaced people inside Bosnia?

15   A.    That's correct.  From various different communities, yes.

16   From the Bosnian Muslim, Bosnian Croat, and Bosnian Serb

17   communities, that's correct, yes.

18   Q.    And there was a humanitarian crisis in Bosnia in the

19   1990s?

20   A.    That's correct.

21   Q.    And the Serb militia engaged in what they described as

22   ethnic cleansing of Muslim communities; is that correct?

23   A.    Many actors in the war did, yes.

24   Q.    And that included people being put into concentration

25   camps?

1          MR. CHAKRAVARTY:  Objection, your Honor.

2          THE COURT:  Overruled.

3    A.   There were camps that I think you could fairly describe as

4    concentration camps, sure.

5    Q.   Well, are you aware that in the summer of 1992 there was

6    widespread publicity in American media -- television and

7    newspapers -- about the concentration camps in Bosnia?

8    A.   Yes.  No, I mean -- I don't know if they were ever

9    officially labeled as that by any international organizations,

10   but I think you could characterize them as that, yes.

11   Q.   In fact, in July of 1995, you're aware of what happened at

12   Srebrenica?

13   A.   Yes.

14   Q.   And that was Serbs slaughtered Bosnian Muslims?

15   A.   Yes, that's correct.

16   Q.   And in fact the State Department has referred to that as

17   one of the worst single reported incidents of genocidal mass

18   murder -- mass killing of members of an ethnic or religious

19   group in Europe since 1945?

20   A.   That's correct.

21   Q.   And you're aware that this humanitarian crisis in Bosnia

22   didn't just end in 1995 because the war was over?

23   A.   No, it didn't.

24   Q.   It continued for many years?

25   A.   Suffice it to say that Bosnia is still a place that's --

1    we're still recovering from the scars of war.

2    Q.   And people in the United States, you just discussed, were

3    well aware through the media of the plight of the Bosnian

4    Muslims?

5         MR. CHAKRAVARTY:  Objection, your Honor.

6         THE COURT:  Well, I --

7         MS. LUNT:  I can rephrase it, your Honor.

8         THE COURT:  Yes.

9    Q.   You mentioned the widespread publicity about the plight of

10   the Bosnian Muslims.  Are you aware that there was an

11   outpouring of donations for humanitarian relief from both

12   Muslims and non-Muslims in the United States?

13   A.   There -- Yes, sure.  Yes.

14   Q.   Now, you spoke also of Chechnya?

15   A.   That's correct.

16   Q.   And again, Chechnya became an independent republic from

17   Russia?

18   A.   It declared independence, yes.

19   Q.   Declared independence.  And its president was a gentleman

20   called Dudayev?

21   A.   Dzhokhar Dudayev, yes.

22   Q.   And the population of Chechnya was Muslim?

23   A.   At least nominally so, yes.

24   Q.   Well, you yourself described it in a thesis that you wrote

25   that in the 1990s Chechnya remained a bastion of the Muslim

1    faith; did you not?

2    A.    When I was referring to that, I meant back in the '90s.

3    Starting off in 1991 the Chechen population was obviously

4    Muslim.  They were ethnically Muslim.  But because of the way

5    that the Soviet Union had ruled over Chechnya, there was an --

6    and same thing happened in Bosnia -- is that many, many people

7    had become secular so --

8    Q.    In fact -- I'm sorry.

9    A.    I was just going to say, I mean, over the process of the

10   1990s as the war went on, there was a greater focus on religion

11   and as opposed to nationalistic causes.

12   Q.    Well, in fact, what the Russians had done prior to Chechen

13   independence was to deploy anti-religious experts in Chechnya

14   to try to undermine the Muslim faith in Chechnya?

15   A.    Among other things, yes.

16   Q.    Then in December 1994 the Russians deployed military

17   force?

18   A.    That's correct, yes.

19   Q.    And that was a brutal military campaign by the Russians;

20   is that true?

21   A.    Yes.

22   Q.    And in fact, you referred to it in your undergraduate

23   thesis and said that the Russian Army behaved in a horrible

24   fashion.  It engaged in a repeated strategy of unabashedly

25   attempting to annihilate the Chechens?

1    A.    I did say that, yes.

2    Q.    And in fact, the State Department human rights reports of

3    that time confirm what you said?

4    A.    Yes.  I mean, I think what I wrote was based upon original

5    sources and also what the State Department was saying.

6    Q.    And so you're aware that the State Department reported

7    that Russians used indiscriminate and disproportionate use of

8    force against the people of Chechnya?

9    A.    That's correct.

10   Q.    And that was against civilians in the capital of Grozny?

11   A.    That was against everyone in the capital of Grozny.

12   Q.    And also out in the towns and villages of Chechnya?

13   A.    That's correct.

14   Q.    And this resulted in tens of thousands of civilians being

15   killed?

16   A.    I can't give you an exact number.  I don't even know if

17   there is an exact number.  But there's a large number of

18   civilians that were either displaced or killed, that's correct.

19   Q.    Well, if I told you that the State Department human rights

20   report from 1995 reported thousands to tens of thousands of

21   civilians killed, would that sound right to you?

22   A.    Again, the reason that they don't use specific numbers,

23   I don't know if there is a specific number.  But I think that

24   rough estimate is probably about right, yes.

25   Q.    And there were about half a million refugees inside and

1    outside Chechnya?

2    A.    I don't know the exact numbers of refugees.

3    Q.    Again, if I told you that the State Department report for

4    1995 reported 400 to 500,000 refugees, would that sound right

5    to you?

6    A.    It doesn't sound wrong.

7    Q.    And are you aware that the United States State Department

8    reported that the Russians tried to obstruct delivery of relief

9    supplies by humanitarian organizations into Chechnya?

10   A.    I believe that they did report that, yes.

11   Q.    And that they also prevented civilians from evacuated

12   areas of imminent danger?

13   A.    That was reported, yes.

14   Q.    And you're aware that humanitarian organizations from

15   different parts of the world participated in trying to get

16   relief to the people of Chechnya?

17   A.    That's correct, yes.

18   Q.    So Mr. Kohlmann, to go back to the 1990s, there were

19   refugee crises involving Muslims in Afghanistan; is that

20   correct?

21   A.    That's correct.

22   Q.    And in Bosnia?

23   A.    That's correct.

24   Q.    And in Chechnya?

25   A.    That's correct.

1   Q.   And there was a huge need for humanitarian relief in those

2   areas?

3   A.   That's correct.

4           THE COURT:  Is this a good place for a 12:00 o'clock

5   break?

6           MS. LUNT:  Yes, that's fine.

7           THE CLERK:  All rise.

8           (At 12:03 p.m., the jurors exited the courtroom.)

9           (Sidebar as follows:

10          THE COURT:  Two things.  First off, I understand

11  Ms. Lunt is not pursuing this issue of the ruling in the Ali

12  case, the judge's exclusion of the witness's testimony.  I note

13  with some irony that she gave me her highlighted copy, which

14  she used to direct me to the right --

15          MS. LUNT:  Well, it was my copy, your Honor.  If I had

16  a clean one for you, I'd have given it to you.

17          MS. SIEGMANN:  The government does object.

18          MR. McGINTY:  We have an altered version we'd like to

19  give you as well.

20          THE COURT:  At the risk of being strangled by all

21  counsel, I have been up there ruminating about the fact that we

22  have had a history lesson here on Afghanistan and Bosnia and

23  Chechnya with, I think, it's fair to say a hole missing.  And

24  my concern really takes the following standpoint.  I think if

25  you asked the average well-informed American in 1981 who were

1    the mujahideen, they would say they were freedom fighters.  And

2    we boycotted the Moscow Olympics in 1980 in their support.  And

3    if you ask the average American in 2003 who the mujahideen

4    were, they would say they were terrorists.  And there was a

5    substantial shift of attitude in the time period that can't be

6    quantified and unfortunately centers right on 1993 which is a

7    key period in this case.

8         But I think to be completely fair and somewhat

9    deferential to the defense, I'm going to permit testimony,

10   limited testimony that the United States provided military aid

11   to mujahideen, provided that the time frame is made clear and

12   that there was publicity, in the 1980s at least, concerning the

13   mujahideen as freedom fighters in the United States if the

14   witness is aware of it.  I would not, based on the state of the

15   evidence, I think, permit -- state of the evidence as it exists

16   today, permit argument that the defendants could not have had

17   the necessary intent.  And because in the 1980s the United

18   States was supporting the mujahideen militarily, that's an

19   issue we can revisit, but I don't think it's enough to draw the

20   inference.  But we can revisit that issue.  We don't need to

21   decide it now.

22        But I think very, very limited testimony along the

23   lines of it's true that the United States supplied military aid

24   to mujahideen during whatever the time period was and that at

25   least in the 1980s, early 1980s, there was favorable publicity

1    in the United States regarding the mujahideen, I will permit.

2              MR. CHAKRAVARTY:  Your Honor --

3              THE COURT:  I ask you not to strangle me.

4              MS. LUNT:  Your Honor, without opening up Al Qaeda and

5    Bin Laden.

6              THE COURT:  Well, again, that's my concern about

7    arguing intent from this.  Because when we get into arguing --

8    all of this evidence is to show intent and the Al-Hussams and

9    kind of the history and the background and context of this.  I

10   remain concerned that if you go to make the argument, that you

11   can infer a lack of intent merely from that fact of the support

12   without also saying that Osama Bin Laden was also involved,

13   that that would be unfair.  And that's precisely the principal

14   reason for my hesitation.

15             MS. SIEGMANN:  The very same article that you

16   excluded, the article from 1983 about the World Trade Center

17   bombing, talks about the support of the mujahideen that we once

18   supported, but these same people are no longer our friends

19   because they are terrorists.

20             THE COURT:  I understand the argument.  It's simply

21   context.  I don't want to get into the details of it having

22   this much historical context.  I am concerned that there is a

23   hole, and I will permit a broad-brush filling of the hole.  And

24   I'm thinking of, you know, this is going to be two or three

25   questions.

1          MR. CHAKRAVARTY:  First, I think generally we object

2     obviously --

3          THE COURT:  Yes.

4          MR. CHAKRAVARTY:  -- so that's recorded.  I think

5     regardless of that, I think Ms. Lunt has opened the door with

6     regard to the charitable organizations which were helping to

7     funnel support during the Afghanistan crises, during the

8     Bosnian crisis.  She's characterized those as being

9     humanitarian.  We have abundant evidence, and this witness in

10    particular is competent to know that they were also used to

11    help funnel money to fighters.

12         THE COURT:  So this is a separate issue.

13         MR. CHAKRAVARTY:  A separate issue.

14         THE COURT:  Which having elicited that there were

15    humanitarian charitable organizations funneling money for food

16    and clothing and medicine and so forth, that there were also

17    noncharitable organizations operating in the same --

18         MR. CHAKRAVARTY:  Or organizations that represented

19    themselves to be charitable, ostensibly charitable

20    organizations which were doing either both tasks or they were

21    just exclusively sending money to fighters.

22         THE COURT:  What's the defendants' response to that?

23         MS. LUNT:  Well, he said that he's no expert on

24    humanitarian aid so he can certainly -- I assume he's not going

25    to testify to that or will not testify that all charities in

1    Peshawar were involved in funding the mujahideen.

2              THE COURT:  No, I don't think --

3              MR. McGINTY:  If I might --

4              THE COURT:  Hold on.  I don't think that was the

5    proposed response.  The proposed response was there were

6    noncharitable organizations, some of them posing as charities,

7    operating alongside the humanitarian.

8              MS. SIEGMANN:  Well --

9              MR. CHAKRAVARTY:  Specifically, for example, the HSO

10   exam.  HSO served Bosnia during the crisis.  It served, we

11   allege -- and it came out during the Daubert that HSO was dual

12   purposed.  And in relation to the issue of how much description

13   of Maktab and HSO we can get into, but now they've clearly gone

14   down the road.  They've asked questions specifically about what

15   Maktab al-Khidmat was doing.  I mean, we're kind of handcuffed

16   because we don't want to stand up.

17             Mr. Levitt's testimony about -- a little bit more

18   about that paragraph about what they were doing, he's now been

19   impeached with regards to what his understanding was of what

20   HSO was doing, and the jury's left with the impression that

21   they were exclusively --

22             MS. LUNT:  No.

23             MR. CHAKRAVARTY:  -- a humanitarian organization.

24             MR. McGINTY:  If I might, your Honor, there was a

25   paragraph written about MAK, and in the paragraph it talked

1    about the humanitarian aspect of MAK, so that was part of what

2    the government drafted.  Secondly, Ms. Lunt asked the question

3    whether there were charities operating in Peshawar.  The

4    witness responded there were ostensible charities operating in

5    Peshawar.  The inquiry went no further than that.  So it was

6    point/counterpoint and the inquiry ended.  So in terms of

7    opening a door, there was no door opened there.  If anything,

8    the witness in the exchange got in the word "ostensible," which

9    he hadn't earlier, which frankly I was pained by, but that's

10   another story.

11              THE COURT:  Mr. Andrews?

12              MR. ANDREWS:  If you will recall, when discussing MAK,

13   the witness said they claimed -- you know, they claimed to be a

14   charity.  That's one of the things they claimed.  I mean, he

15   echoed that "ostensible" several times with MAK as well.

16              MR. CHAKRAVARTY:  She went one step further, your

17   Honor.  She said, "Did they provide humanitarian aid?"  And he

18   adopted that.  "Yes, amongst other things."  Those were his

19   words.

20              MS. LUNT:  Right.

21              MR. CHAKRAVARTY:  Now we need to be able to explain

22   what those other things are.

23              MS. LUNT:  You already did.  That was your -- I was

24   responding to you --

25              MR. CHAKRAVARTY:  No.  We expressly avoided that it

1    was charitable organizations as funneling support efforts for

2    mujahideen.

3            MS. LUNT:  This was in respect to the Office of

4    Services, and I direct you both out that the Office of Services

5    channeled money and men.

6            MS. SIEGMANN:  No, he didn't go into that.

7            MR. CHAKRAVARTY:  No, he never characterized the

8    activities of --

9            THE COURT:  Hold on.  There's two separate issues.

10   There's the general testimony and the specific testimony.  The

11   general testimony is, were there organizations doing this, or

12   could he explain what he meant by "among other things."

13   There's another layer which is, can he comment about specific

14   entities such as the Human Services Office.  I don't think he

15   has a sufficient foundation to say that a particular

16   organization, MAK or Human Service Organization, was performing

17   noncharitable activities.  And if he did, I'm going to exclude

18   it on 403 grounds.

19           But that begs the question of whether you can ask the

20   broader question of, were there organizations providing

21   nonhumanitarian relief under the guise of charitable --

22           MS. SIEGMANN:  It's the same organizations, your

23   Honor, that were doing both things.

24           THE COURT:  Again, whatever the testimony is, but in

25   general terms as opposed to time and specific organizations.

1              MR. McGINTY:  And your Honor, that's already in

2      because in their direct they put that Peshawar was a transient

3      city for material, the purposes of aiding the mujahideen and

4      the fight and they used the same exact testimony of --

5      regarding -- regarding Zagreb.  So they put that in.  So this

6      didn't open any door.  And they've already gotten the point in

7      that was a transient point for material for fighters that --

8              MR. CHAKRAVARTY:  The fact that charities were being

9      used to do that is the central issue in the case --

10             MS. SIEGMANN:  Um-hum.  Which there's been no

11     testimony --

12             MR. CHAKRAVARTY:  -- expressly based on --

13             MR. DUNCAN:  To prove what?

14             THE COURT:  Let's -- I want to -- let me talk to my

15     law clerks for a moment and we can do the remainder of this in

16     open court.  Just give me a moment.

17             ...end of sidebar.)

18             THE COURT:  What I'm going to do is I'm going to

19     permit them some generalized testimony along the lines we

20     discussed at sidebar, not tied to specific organizations, but

21     again, as with my other ruling, to provide a rounded picture

22     here of what's going on in this particular area of the world at

23     that point in time.

24             So let's bring the jury in.

25             THE COURT OFFICER:  All rise.

1          (At 12:23 p.m., the jurors entered the courtroom.)

2          THE CLERK:  Court is now open.  You may be seated.

3          THE COURT:  Ms. Lunt.

4   Q.   Just a couple more questions, Mr. Kohlmann.

5   A.   Yes.

6   Q.   We talked earlier about the Afghan fighters -- that is,

7   the Afghans who were positioning the Soviet Union -- being

8   provided with money -- military aid by foreign governments,

9   correct?  And you said that was correct?

10  A.   During the 1980s, that's correct.

11  Q.   During the 1980s.  And during that period the United

12  States provided billions of dollars to Afghan fighters; is that

13  correct?

14  A.   They provided billions of fighters [sic] to Afghanistan in

15  the form of humanitarian relief and I believe they also

16  probably helped support weapons shipments to Afghan fighters,

17  yes.

18  Q.   Well, are you aware that the United States provided

19  through Pakistani intelligence service money to fighters?

20  A.   I believe that's been reported although the amount and the

21  exact times and whatnot have never been exactly substantiated.

22  Q.   But the United States did provide support to fighters?

23  A.   Yes, sure, during the 1980s, sure.

24  Q.   In fact, this U.S. military aid was approved by Congress;

25  was it not?

1          MR. CHAKRAVARTY:  Objection, your Honor.

2          THE COURT:  The witness can testify as to what he

3     knows based on other than reported in the papers.

4     A.    I actually don't even know the answer to that question.

5     I don't know whether Congress approved it or not.

6     Q.    You don't know about that?

7     A.    No.

8     Q.    One second, Mr. Kohlmann.  Do you remember testifying in

9     the case of United States vs. Ali Timimi.

10    A.    Yes.

11    Q.    In 2005?

12    A.    Yes.

13    Q.    And you were asked in that case, were you not, "Did the

14    United States funnel billions of dollars to the Afghans?"  And

15    you were asked, "It was specifically approved publicly by the

16    United States Congress after the Soviet invasion of

17    Afghanistan, right?"  And you answered, "That's correct"?

18    A.    I -- Again, I understand that generally to be correct, but

19    I'm not -- I'm not an expert on what Congress did in reaction

20    to the Afghan war.

21    Q.    But you did testify previously that Congress approved

22    military aid?

23    A.    I -- Again, it's possible that I did.  But it's not the

24    area of my focus of my research.  If I did, it was in an

25    insulated manner related to other testimony.  It wasn't the

1    focus of my testimony.

2    Q.    Do you want me to show you your testimony?

3    A.    No.  I believe you.  I believe you.  I'm just saying it's

4    not the focus of my research.

5    Q.    I understand.  And are you also aware that in the United

6    States the mujahideen were lauded as freedom fighters in the

7    1980s?

8    A.    That's correct.

9              MR. CHAKRAVARTY:  Objection, your Honor.

10             THE COURT:  Overruled.

11             MS. LUNT:  No further questions.

12             THE COURT:  All right.  Redirect?  Oh, I'm sorry.

13   Mr. McGinty.

14             MR. McGINTY:  Thank you, your Honor.

15                        CROSS-EXAMINATION

16   BY MR. McGINTY:

17   Q.    Mr. Kohlmann, Bassam Kanj used an "Abu" name; did he not?

18   A.    I believe he did, although I can't think what it is, off

19   the top of my head.

20   Q.    Abu Aisha?

21   A.    Abu Aisha, that's possible, sure.

22             MR. McGINTY:  Thank you.  No further questions.

23             MR. ANDREWS:  No questions, your Honor.

24             THE COURT:  Redirect?

25             MR. CHAKRAVARTY:  Thank you, your Honor.

REDIRECT EXAMINATION

BY MR. CHAKRAVARTY:

Q.   Mr. Kohlmann, you were asked about humanitarian crises in several of these conflict areas.  Specifically with regards to the role of charitable organizations, you said that there were, "among other things" aside from humanitarian aid.  Without describing any specific organizations, can you describe what "among other things" means?

A.   Yes.

        MS. LUNT:  Objection, your Honor.  Form.

        THE COURT:  Overruled.

A.   Among other things -- I said "among other things" because charitable relief was only a small part of what they were doing.

        MS. LUNT:  Objection.

        MR. McGINTY:  Objection.

        THE COURT:  Mr. Kohlmann, why don't you confine your testimony and not have any characterizations.  Just, I want you to testify as to facts as you understand based on your research, okay?

A.   Of course, your Honor.

Q.   What were the other activities that these charitable organizations were doing?

        MS. LUNT:  Objection.

A.   They provided financing.

1          THE COURT:  Overruled.

2    A.    They provided financing for fighters involved in the

3    conflict.  They provided means by which recruits from other

4    countries, particularly countries that were not adjacent to

5    Pakistan or Afghanistan, could reach these various zones.  They

6    provided, I guess you could call it, vocal support advocacy on

7    behalf of these groups, suggesting that their causes were just

8    and were right, were -- should be supported.  They provided

9    many services not just to refugees but also to the fighters

10   themselves.

11         MR. McGINTY:  May we approach, your Honor?

12         THE COURT:  Is this something new?

13         MR. McGINTY:  Yes.

14         (Sidebar as follows:

15         MR. McGINTY:  I move for a mistrial.  The testimony

16   about "they" -- we don't know who "they" were.  The testimony

17   of this sort that categorically charities were involved in this

18   kind of activity sullies the case against my client.  It

19   sullies Care International as of the participants --

20         THE COURT:  Hold on.  Hold on.  Hold on.  We just

21   talked about this at sidebar.  The door was opened by the

22   question of what charitable organizations not identified were

23   doing in the area of Afghanistan.  The defense said, "What were

24   these charities doing?"  And the response was, "Well, among

25   other things, they were funding" -- you know, "they were

1    providing humanitarian aid to refugees."

2          MR. McGINTY:  Your Honor, I did not open the subject.

3    I disagree with the characterization of the transcript.  As I

4    recall the transcript, it was whether there were charities that

5    were operating, and the response of the witness was they were

6    ostensible charities.  So he answered that question

7    sufficiently at that point to counter the question -- any

8    thrust from the question.  The idea that this subject matter

9    now opens up a general conversation of a charity generally is

10   enormously prejudicial, and I move for a mistrial.

11         THE COURT:  Well, Mr. McGinty, we talked about this at

12   the break, okay?  This exact subject came up, okay?  And we

13   talked about it, and this is not a new objection.  It's the

14   same objection you had before.  The only difference is we now

15   have the witness's answer, which is precisely the door opened

16   by the defense, which is if you're asking about the activities

17   of charities in Peshawar, Pakistan, in that area during that

18   time period, and the witness testifies that they were

19   providing, among other things, humanitarian aid, the question

20   is, what else were they providing.

21         MR. McGINTY:  Well, your Honor, I objected to the

22   question.  The Court did not indicate that the breadth of the

23   rule -- did not indicate what the ruling was going to be after

24   the argument was made.  At minimum, I'm going to want a

25   limiting instruction to the fact that nothing about that answer

1   about the conduct of other charities in any way reflects on the

2   conduct of Care.

3           THE COURT:  I will give that limiting instruction.

4           MR. CHAKRAVARTY:  Your Honor, on that limiting

5   instruction, it shouldn't be conduct of other charities.  It

6   should be conduct of charities operating in these areas:

7   Peshawar, Zagreb, these areas.  The "other charities" connotes

8   that it is a charity not connected to charities with which --

9   to which the defendants sent money, and I think there is

10  evidence that the defendants sent money to charities in those

11  areas.

12          MR. ANDREWS:  Not necessarily charities involved for

13  other activities.

14          THE COURT:  I'm going to give a limiting instruction

15  to the extent that testimony generally about the operations of

16  charities in Pakistan and Afghanistan and other parts of the

17  world is not proof that Care International engaged in

18  activities of -- supporting arms or material or fighters sent

19  to those organizations, and I'm going to ignore the question of

20  promoting jihad.  But I will -- I think it's a fair instruction

21  that there's no evidence that Care provided military equipment

22  or fighters in these areas, and I think that's a fair

23  instruction.

24          ...end of sidebar.)

25          THE COURT:  Ladies and gentlemen, before we go any

1       further, the witness just gave some testimony about --

2       generalized testimony about the activities of organizations in

3       Afghanistan or Pakistan and other parts of the world.  That is

4       not evidence and cannot be considered by you as evidence that

5       Care International was engaged in the activities described.

6       There is no evidence -- and I don't understand that there will

7       be any evidence -- that Care International, for example,

8       supplied fighters or fighting groups or things of that nature

9       in Afghanistan or elsewhere in the world.

10              The testimony related generally to the activities of

11      charitable organizations or ostensibly charitable organizations

12      in that part of the world.  It's not testimony about Care

13      International.  All right.  And may not be considered by you as

14      such.

15      Q.   With regards to these charities, you were asked about

16      where they -- where they were located with regards to the

17      Afghanistan conflict.  Where were those charities located?

18      A.   You mean generally speaking?

19      Q.   Generally speaking.

20      A.   Actually many of the charities had their headquarters in

21      western countries, in countries such as the United States,

22      Canada, western Europe.  Their regional offices were opened up

23      in places like Peshawar or Zagreb.  But again, the main

24      headquarters for many of these charities were actually located

25      in North America.

1    Q.   With regards to the Bosnian crisis, was the role of these

2    charities the same during the Bosnian crisis?

3              MR. McGINTY:  Objection, your Honor.

4              THE COURT:  I think we've heard enough about this

5    subject.  Let's move on to another one.

6    Q.   You were asked about the situation in Chechnya with

7    regards to the humanitarian crisis with Muslims.  What year did

8    Chechnya declare independence?

9    A.   I believe in 1991.

10   Q.   When did the mujahideen -- the foreign mujahideen enter?

11   A.   The large majority of foreign mujahideen did not start

12   entering Chechnya until at least 1994-95, at least three years

13   into the conflict.

14   Q.   And how long did or have the mujahideen remained there in

15   Chechnya?

16   A.   They're still there now.  They were -- they were also

17   present and active in Chechnya during the period of 1995 to

18   1999 where there was no war going on.

19   Q.   With regards to Hekmatyar, you were asked a number of

20   questions about his political role.  What was -- what was

21   Hekmatyar -- Describe what Hekmatyar's activities were in

22   Afghanistan during the time period between 1992 and 1996.

23   A.   Hekmatyar, during the period of 1992 to 1996, was

24   primarily known for his role in destroying the city of Kabul by

25   launching rockets at it.  The city of Kabul at that time was

1    largely under the control of Ahmad Shah Massoud.  Hekmatyar

2    decided that he didn't want to share power with Massoud so he

3    began launching rocket barrages at the city, which destroyed a

4    large part of it.  He never actually took control of Kabul as

5    prime minister.

6    Q.   Just some housekeeping questions.  You were asked about

7    your book and how it was published.  Why did you choose Berg

8    Publishers?

9    A.   I chose it because I was looking for an academic press.  I

10   wasn't looking for a general -- necessarily a general interest

11   press because of the fact that the subject matter of my book is

12   fairly esoteric.  It's very, very detailed.  There are many

13   footnotes.  It's not really a general audience book.  I was

14   trying to market this mainly to university students,

15   professors, academics, and I felt that Berg was the appropriate

16   vehicle for that.

17          Also because of the fact that I published it through

18   Berg in the United Kingdom, I also felt that that also added a

19   greater degree of breadth in terms of not just having people in

20   the United States having access to it, but it being able to be

21   used in universities and by others around the world.

22   Q.   You were asked about whether you had been to Afghanistan.

23   What is the basis of your knowledge about mujahideen operating

24   in Afghanistan?

25   A.   The basis of my knowledge of the mujahideen in Afghanistan

1    is based upon, first of all, conversations and interviews I

2    have had with people who have fought there, spokesmen for the

3    mujahideen in Afghanistan, having studied -- having studied

4    original materials from the Afghan conflict including video

5    recordings, audio recordings, books, fliers, letters,

6    evidentiary documents submitted in court.

7          It's a wide variety of sources.  But again, it

8    includes interviews with people who have been on the ground

9    there.  And as well, I work closely with the foundation, NEFA

10   Foundation I work with now.  My ex-partner in the foundation is

11   actually in Pakistan and Afghanistan right now.  He is

12   returning shortly with evidence that we will then collate and

13   analyze.

14   Q.   Finally, you were asked a number of questions about the

15   Bosnian crisis, typically the persecution of Muslims there.

16   And I think you testified that it was a horrific Bosnian --

17   persecution on Muslims?

18   A.   Yes.

19   Q.   Showing you now what's Government Exhibit No. 267, do you

20   recognize what this is?

21   A.   Yes.  Do you want me to say what it is?

22   Q.   Yes.  What is it?

23   A.   I believe it's a copy of Al-Hussam.

24   Q.   Is that the newsletter?

25   A.   That's the newsletter, yes.  A newsletter, that's correct.

1    Q.   And 267A, just for reference, is an English translation of

2    this.  With regards to the language of 267, what language is

3    that in?

4    A.   That's written in Arabic.

5    Q.   I'm not going to ask you to read the Arabic, but I'm going

6    to ask you about this flier that appears in this magazine,

7    newsletter.

8    A.   Yes.

9    Q.   This graph in the upper -- this picture in the upper

10   left-hand corner --

11            MR. McGINTY:  Objection.

12            THE COURT:  Well, I guess I'll let him ask what the

13   map is.  Overruled for now.

14   Q.   And that is the question.  What does this figure

15   represent, to your understanding of geography?

16   A.   It's supposed to represent an Islamic state, Bosnia and

17   Herzegovina.

18   Q.   And is the shape of that space significant?

19   A.   Yes, because it's the entire territory of Bosnia and

20   Herzegovina, including regions inhabited almost exclusively by

21   Bosnian Croats and by Bosnian Serbs.

22   Q.   Can you show us here where it references the Srebrenica

23   massacre?

24            MR. McGINTY:  Objection.

25            THE COURT:  Sustained.

```
 1              MR. CHAKRAVARTY:  That's all the questions I have,
 2    your Honor.
 3              THE COURT:  Recross?
 4              MS. LUNT:  Your Honor, a few questions.
 5                         RECROSS-EXAMINATION
 6    BY MS. LUNT:
 7    Q.   You spoke about Hekmatyar.  You are aware that he came to
 8    the United States; are you not?
 9    A.   In the 1980s, yes.
10    Q.   And you spoke also about --
11              A JUROR:  I can't hear a word she's saying.
12              THE COURT:  Can you go and use the microphone.
13              MS. LUNT:  Let me go and use the microphone.
14    I apologize.
15    Q.   Hekmatyar came to the United States in the 1980s; did he
16    not?
17    A.   On, I believe, one occasion, yes.
18    Q.   And with respect to numbers of fighters, in Afghanistan
19    we're talking about a total population of what before --
20    A.   I really --
21    Q.   15 million?
22    A.   I couldn't give you a total.
23    Q.   You don't know what the total is?
24    A.   I don't know what the total population is.
25    Q.   But there were millions of Afghani fighters fighting
```

1    against the Russians?

2    A.    Millions?

3    Q.    At least a million?

4    A.    That sounds like a lot but I really don't know, to be

5    honest.  I would say it's probably less than that but I don't

6    really know.

7    Q.    You don't know the number of Afghanis who were fighting in

8    Afghanistan?

9    A.    I don't think anyone has ever had even a rough idea of the

10   total number of people that are fighting because of the fact

11   that we're talking about --

12   Q.    Excuse me.  Could you answer my question, please.  I said

13   you don't know how many Afghanis are fighting in Afghanistan?

14   That was my question.

15   A.    The total number?  No, no.

16   Q.    And relative to the number of Afghans fighting in

17   Afghanistan, the mujahideen were a small number of people?

18   A.    When you say "mujahideen," are you talking --

19   Q.    I'm sorry.  Of the Afghan mujahideen.  Quite right.  This

20   is the important thing here.  People who are fighting for

21   independence, the Afghans, refer to themselves and were known

22   as mujahideen?

23   A.    Okay.  But I don't know if all of them were fighting for

24   independence.  Let's just say that the Afghans --

25   Q.    Fighting the Soviets?

1   A.   -- were fighting against the Soviets and the Afghan

2   Communist government?  They called themselves mujahideen, sure.

3   Q.   And they were referred to in the United States as

4   mujahideen and also as freedom fighters?

5   A.   That's true, yes.

6   Q.   And when we're talking about numbers, we're talking about

7   at most a few thousand, less than 10,000, maybe less than 5,000

8   foreigners who came to fight?

9   A.   It's -- Again, there is no specific number, but it's a

10  much smaller percentage.  The vast majority of fighters were

11  either Afghan or Pakistani, yes.

12  Q.   Now, you were talking about charities in Afghanistan.

13  Now, you said that humanitarian disaster and humanitarian

14  relief is not the focus of your research?

15  A.   No, it's not.

16  Q.   And you've never been -- you were never in Peshawar?

17  A.   No.

18         MS. LUNT:  I have no other questions.

19         THE COURT:  Okay.  Before we conclude with this

20  witness, ladies and gentlemen, let me repeat my caution.

21  This testimony is coming into the trial because this trial

22  involves names and events and places that are most certainly

23  not familiar to you and this testimony is intended to assist

24  you in interpreting the evidence.  There is a danger here,

25  because the witness is painting with a broad brush about

1    complicated events, that you may take that broad brush or those

2    generalizations and apply them unfairly to the defendants.

3    I gave the example of the chair.

4         But the mere fact that some charities were doing some

5    things is not proof that this particular organization or these

6    defendants were doing something wrong.  At the end of the day,

7    you must assess the evidence as to these three defendants as to

8    the specific crimes with which they are being charged; that is,

9    tax offenses and false statement offenses.

10        And you must be exceedingly careful about applying

11   this generalized context evidence to the events that you're

12   assessing that the individual defendants are alleged to have

13   undertaken.  In other words, this is background.  It might be

14   less -- it could have been a lesson on the Vietnam War if that

15   was relevant.  That doesn't necessarily mean that a particular

16   person did a particular thing.  It's to give you a background,

17   an idea, a backdrop against which these events are taking

18   place.  It's, again, very general testimony.  And you have to

19   assess the evidence as to individuals carefully and

20   specifically as to each individual and each charge at the end

21   of the day.

22        All right.  Thank you, Mr. Kohlmann.  You are excused.

23        THE WITNESS:  Thank you very much, your Honor.

24        MR. CABELL:  Your Honor, the government calls Richard

25   Ball.

1           THE COURT OFFICER:  Again?

2           MR. CHAKRAVARTY:  Richard Ball.

3           THE COURT:  For some reason it's very dry in here.

4   I notice some of you are coughing, and people in the audience

5   as well.  I don't know what we can do about that, but you

6   should feel free to bring water with you or throat drops or

7   anything like that.

8           THE CLERK:  Please raise your right hand.

9                     RICHARD BALL, SWORN.

10          THE CLERK:  Please be seated.  Please state your name

11   and spell your last name for the record.

12          THE WITNESS:  My name is Richard Ball, B-a-l-l.

13                     DIRECT EXAMINATION

14   BY MR. CABELL:

15   Q.   Good afternoon.

16   A.   Good afternoon.

17   Q.   Would you begin by telling us who you work for?

18   A.   I'm a trooper with the Massachusetts State Police.

19   Q.   How long have you been with the state police?

20   A.   Fifteen years.

21   Q.   Just briefly would you summarize your present duties and

22   responsibilities with the state police?

23   A.   I'm assigned to the division of investigative services and

24   the gang unit.  I investigate both motorcycle and criminal

25   street gangs.

1    Q.   Do you work in the Boston area?

2    A.   I do.

3    Q.   Let me direct your attention -- and is it trooper?

4    A.   It is.

5    Q.   Let me direct your attention, Trooper Ball, to

6    September 16 of 2001, in that general time period.  At that

7    time were you working in conjunction with a task force at the

8    FBI?

9    A.   I was.

10   Q.   And as a result of working with that task force, did you

11   have occasion to interview any one of the defendants here

12   today?

13   A.   I did.

14   Q.   Who did you interview, sir?

15   A.   Muhamed Mubayyid.

16   Q.   Now, that was September 2001 or so.  Can you point him out

17   here in the courtroom?  Do you still --

18   A.   I can, yes.  He's the gentleman with the beard sitting at

19   this rear table on my end.

20           MR. CABELL:  Your Honor, may the record reflect --

21           THE COURT:  Yes.

22   Q.   Where did the interview take place?

23   A.   Outside of his residence in Westborough, I believe.

24   Q.   Westborough, Massachusetts?

25   A.   Yes.

1    Q.   Did you conduct the interview alone or with anybody else?

2    A.   I was there with Special Agent Victor Treadway from the

3    FBI.

4    Q.   Do you remember approximately what time of day the

5    interview took place?

6    A.   Early afternoon.

7    Q.   Was it announced or was it scheduled?

8    A.   It was -- I believe it was --

9    Q.   I'm sorry.  Unannounced or scheduled?

10   A.   It was unannounced.

11   Q.   And the place where you went to, what did you understand

12   that place to be?

13   A.   His residence.

14   Q.   Was he there?

15   A.   He was.

16   Q.   And did he agree to speak to you?

17   A.   He did.

18   Q.   How long did the interview last?

19   A.   Approximately 15 minutes.

20   Q.   In addition to yourself and Agent Treadway was anybody

21   else present?

22   A.   No.

23   Q.   Did you ask Mr. Mubayyid any questions about his

24   employment at the time?

25   A.   I did.

1    Q.    And did he tell you anything?

2    A.    He did.  He told me he was employed by P Tech in software

3    development in Boston, Massachusetts.

4    Q.    Did you ask Mr. Mubayyid any questions about Care

5    International?

6    A.    I did.

7    Q.    And did he answer you?

8    A.    He did.

9    Q.    What did you ask him?

10   A.    I asked him what the purpose of Care International was.

11   Q.    What did he tell you?

12   A.    He said that it was a charitable organization that aided

13   people of Islam in the United States and abroad.

14   Q.    Did you ask him at that time whether there were any other

15   purposes for Care International?

16   A.    I did.

17   Q.    And what did he tell you?

18   A.    He said there were none.

19   Q.    Did you ask him whether he -- if -- whether or not he

20   himself held an office or what role he played at Care

21   International?

22   A.    I did.  And he said that he was the treasurer.

23   Q.    Now, going back to the purpose that he described to you

24   for Care International, did you ask him how it was that they

25   went about providing aid to others?

1    A.    I did.

2    Q.    What did he tell you?

3    A.    He said that they raised funds.

4    Q.    Did he say how they raised funds?

5    A.    He said that once a year around the time of Ramadan, that

6    he would send out approximately 4,000 letters to various

7    individuals requesting money.

8    Q.    Now, did he make any statements to you about how much

9    money, if any, Care collected in the previous year, which would

10   have been the year 2000?

11   A.    I asked him that.  He did tell me.

12   Q.    What did he tell you?

13   A.    $248,000.

14   Q.    Did you ask him what they did with that $248,000?

15   A.    I did.

16   Q.    What did he tell you?

17   A.    He said that it went to -- it was sent out to

18   organizations both in the United States and oversees.

19   Q.    Did he identify any of the organizations in the United

20   States to whom they sent money?

21   A.    He said one organization: the Global Relief Foundation.

22   Q.    Did you ask him at that time to identify any other

23   organizations in the United States, or any other organizations

24   that Care International sent money to?

25   A.    I did.

1    Q.    How many times did you ask him?

2    A.    I'd say a half dozen times.

3    Q.    And what, if anything, did he tell you other than the

4    Global Relief Foundation as one of the entities to whom Care

5    gave money?

6    A.    He would name no other individuals or organizations that

7    the money went to.

8    Q.    Did you ask Mr. Mubayyid to provide you with any

9    documents, or whether he was willing to provide you with any

10   documents?

11   A.    I did.

12   Q.    And what did he tell you at the time?

13   A.    He said he would be happy to provide all of the financial

14   records from Care International to the FBI.

15   Q.    And following the completion of this interview, did

16   Mr. Mubayyid ever provide you with any documents?

17   A.    No.

18   Q.    As far as you know -- You went there with Agent Treadway

19   from the FBI.  Did Mr. Mubayyid ever provide him with any

20   documents?

21         MR. ANDREWS:  Objection.

22         THE COURT:  Sustained.

23   Q.    After this, did the interview end?

24   A.    It did.

25         MR. CABELL:  Thank you, Trooper Ball.

```
 1              No further questions, your Honor.

 2              MR. ZALKIND:  No questions, your Honor.

 3              THE COURT:  Mr. Andrews?

 4              MR. ANDREWS:  Thank you, your Honor.

 5                        CROSS-EXAMINATION

 6   BY MR. ANDREWS:

 7   Q.   Special -- Trooper Ball -- we've been speaking to special

 8   agents, Trooper Ball, but my name is Michael Andrews.

 9   I represent Mr. Mubayyid.  Good afternoon.

10   A.   Good afternoon.

11   Q.   So you testified you went on September 16, 2001, correct,

12   to Mr. Mubayyid's residence?

13   A.   Correct.

14   Q.   That was a Sunday?

15   A.   I don't recall.

16              MR. ANDREWS:  May I approach, your Honor?

17              THE COURT:  Yes.

18   Q.   Take a look at September in 2001.  I'm showing you a

19   calendar.  And see if that helps you remember what day

20   September 16, 2001 was?

21   A.   According to this it was a Sunday.

22   Q.   So you come to Mr. Mubayyid's residence unannounced on a

23   Sunday afternoon; is that right?

24   A.   Correct.

25   Q.   And you knock on his door; is that right?
```

1    A.    Correct.

2    Q.    It's an apartment building, right?

3    A.    It is.

4    Q.    Did you get buzzed in or did you just let yourselves in

5    and go up and knock on his door?

6    A.    I don't remember.

7    Q.    So you knock on his door, and he answers the door, right?

8    A.    He did.

9    Q.    And you tell him you want to ask him some questions,

10   right?

11   A.    Yes.  We asked if we could talk to him.

12   Q.    Did you show him some identification?

13   A.    We did.

14   Q.    And Special Agent Treadway showed him some identification?

15   A.    I believe he did.

16   Q.    So did you notice if his wife and family were home at the

17   time?

18   A.    I believe his wife was home, and he said that he wanted to

19   speak to us outside because of that.

20   Q.    So he asked, "Can we step outside, step downstairs,"

21   correct?

22   A.    Correct.

23   Q.    So you went down to the parking lot?

24   A.    Went down to the courtyard outside the building and sat at

25   a picnic table.

```
 1    Q.   And you began asking him questions, right?

 2    A.   Yes, just general interview.

 3    Q.   Well, did you ask him if he had identification at that

 4    time?

 5    A.   I did.

 6    Q.   And he showed you identification, right?

 7    A.   He did.

 8    Q.   And you asked him where he lived, got his address, right?

 9    A.   Correct.

10    Q.   And you asked him his date of birth?

11    A.   Yes.

12    Q.   You asked him his Social Security number?

13    A.   It was on his driver's license.

14    Q.   And you asked him his home phone number?

15    A.   I don't recall.

16    Q.   Did you write a report following your interview with

17    Mr. Mubayyid?

18    A.   I did.

19         MR. ANDREWS:  May I approach, your Honor?

20         THE COURT:  Yes.

21    Q.   Let me ask you another question.  Did you take notes

22    prior -- Let me show you this.  Is this a report?  Look at

23    that.  Is that a report?

24    A.   Yes.  That's a report that I wrote after this interview.

25    Q.   Now, did you take notes before -- at the time of the
```

1    interview?

2    A.    No.

3    Q.    So let me show you this.  Is that your handwriting?

4    A.    No.

5    Q.    So did you see if Special Agent Treadway was taking notes?

6    A.    I don't recall.

7    Q.    Well, your answer is that you don't recall.  Would you

8    look at these notes, just look at the beginning up here and

9    look at this paragraph and see if that refreshes your

10   recollection as to whether somebody was taking notes during the

11   interview?

12   A.    It has the same information.  It's possible Special Agent

13   Treadway took these notes.

14   Q.    But you didn't take any notes; is that right?

15   A.    No, I did not.

16   Q.    So it's possible that Special Agent Treadway took notes

17   but you wrote the report; is that right?

18   A.    It's possible.

19   Q.    Did you refer to his notes when you wrote the report?

20   A.    No.  No.

21   Q.    You didn't write the report that day; you wrote the report

22   the next day?

23   A.    The following morning.

24   Q.    Well, you asked him his telephone number, correct?

25   A.    I believe it was his work phone number.

1    Q.    That's in your report, right?

2    A.    Yes.  I don't remember asking him for his home phone

3    number.

4    Q.    Did you -- did you ask him when he came to the United

5    States?

6    A.    I did.

7    Q.    Did you ask him where he went to school in the United

8    States?

9    A.    I did.

10   Q.    Do you remember what he told you?

11   A.    Wentworth.

12   Q.    Did you ask him what kind of visa he had?

13   A.    I did.

14   Q.    Do you remember what he told you?

15   A.    H1, I believe.

16   Q.    You asked him what he did for a living, right?

17   A.    I did.

18   Q.    He told you he's a software engineer?

19   A.    Software development.

20   Q.    And you asked him where he worked and he told you he

21   worked at P Tech, correct?

22   A.    Correct.

23   Q.    Now, you asked him if he was involved -- Did you ask him

24   if he was involved in charities or involved in fund-raising,

25   or did he volunteer that information to you?

1    A.    I believe he volunteered it.  I believe we were just

2    asking him general questions about his time in the United

3    States and he volunteered that.

4    Q.    So he brought up the fact that he worked with Care

5    International, correct?

6    A.    I don't -- I guess -- I guess that's correct.

7    Q.    And he told you at some point that he was the treasurer of

8    Care, correct?

9    A.    Once he brought up the organization and that he was

10   involved in charities, we asked him questions specific to that.

11   I don't recall if I asked him if he was -- if he volunteered

12   that or if I asked him directly.

13   Q.    So once he told you about Care, you had some follow-up

14   questions to that, correct?

15   A.    Correct.

16   Q.    And he told you that Mr. Laher was the president of Care?

17   A.    He mentioned that.

18   Q.    And Mr. Laher lived in Quincy, right?

19   A.    He did.

20   Q.    And he volunteered -- you asked him about the

21   fund-raising, correct?

22   A.    Correct.  Well, once he mentioned Care International,

23   I asked him to describe it to me.

24   Q.    And he told you that Care had raised almost -- he

25   estimated that in the year 2000 they had received $248,000 from

1    donors, correct?

2    A.    Correct.

3    Q.    And he told you that the money was distributed in the

4    United States to organizations and to other places in the

5    world, right?

6    A.    Correct.

7    Q.    And that Global Relief Foundation was one of the

8    organizations that he sent -- that Care sent money to, right?

9    A.    Yes, that's right.

10   Q.    Now, you asked him if he had the specific names of

11   individuals who actually received the money, correct?

12   A.    Correct.

13   Q.    And that he -- he declined -- After providing the

14   information about Global Relief, he didn't get into who the

15   specific individuals receiving the money were; is that right?

16   A.    No.  He wouldn't get into any further specific

17   organizations or individuals who actually received money.

18   Q.    But he did tell you that he would provide copies of Care

19   documents, right?

20   A.    Yes, sir.

21   Q.    Did you ask him other questions about -- for instance, did

22   you ask him what mosque he went to?

23   A.    Yes, I believe we did.

24   Q.    Did you ask him how many people attended and where this

25   mosque was?

1    A.    Yes.

2    Q.    Do you remember him telling you that his father was a

3    policeman in Lebanon, had been for 20 years?

4    A.    I don't remember that.

5          MR. ANDREWS:  I have nothing further, your Honor.

6    Thank you.

7          THE COURT:  Mr. McGinty?

8          MR. McGINTY:  No questions, your Honor.

9          THE COURT:  Redirect?

10          MR. CABELL:  Just a couple questions, your Honor.

11                    REDIRECT EXAMINATION

12    BY MR. CABELL:

13    Q.    Trooper Ball, did Mr. Mubayyid explain or give any reasons

14    why he wouldn't give you any names of any recipients other than

15    the Global Relief Foundation?

16    A.    No.

17    Q.    And once again, to be clear, he told you he would provide

18    you with documents relating to Care?

19    A.    He did.

20    Q.    But he never did?

21    A.    Never did.

22          MR. CABELL:  Thank you.

23          THE COURT:  Mr. Andrews, anything further?

24          MR. ANDREWS:  One moment, your Honor.

25          THE COURT:  Yes.

1                        RECROSS EXAMINATION

2    BY MR. ANDREWS:

3    Q.   Did you ever have an occasion to speak with an attorney

4    for Mr. Mubayyid?

5    A.   Not that I recall.

6    Q.   And you don't -- and your testimony is that Mr. Mubayyid

7    never provided you personally with any documents; is that

8    right?

9    A.   Correct.

10             MR. ANDREWS:  Thank you.  No further questions.

11             THE COURT:  All right.  Thank you, sir.  You may step

12   down.

13             It's two minutes to one, and I think we probably ought

14   to break for the day.  Ladies and gentlemen, I'm sure we've

15   taxed your patience today more than usual with our sidebar

16   conferences.  But I apologize.  We're not doing it just to

17   frustrate you.

18             Again, let me remind you to ignore any media reports

19   that there may happen to be about the case.  Do not talk about

20   the case with each other or anyone else.  And we'll see you

21   again tomorrow morning.

22             THE CLERK:  All rise.

23             (At 1:00 p.m., the jurors exited the courtroom.)

24             THE COURT:  We are reconvening at 4:00; is that right,

25   for the Daubert hearing on Valla --

1           MR. CABELL:  Yes.

2           THE COURT:  -- is that correct?  I'm going into a

3    meeting that I can't leave early from, and there's no guarantee

4    that it will be done at 4:00.  But I'll do the best I can.  If

5    it spills over, I'm stuck.  So I'll see you as soon as we get

6    out of that.  How long do you expect this process to be?  Let

7    me ask the defense.

8           MR. McGINTY:  Can we ask -- can we ask whether the

9    government has narrowed what it is that's it's going to be

10   asking --

11          MR. CABELL:  Well, we're going to talk now.  There may

12   be some narrowing.  Probably.  But we need to talk.

13          THE COURT:  Probably what?

14          MR. CABELL:  There may be some narrowing.

15          THE COURT:  Why don't you talk amongst yourselves and

16   then report that to defense counsel, so at least you're on the

17   same page in terms of what you're likely to do.

18          How are we doing in terms of the timetable?  Are we on

19   track to where you indicated?

20          MR. CHAKRAVARTY:  We're still the middle of next week.

21   I think the 11th or the 12th is realistic.  I think the 12th is

22   Wednesday.  I think we're still on.

23          MS. SIEGMANN:  Well, it depends on how long the

24   cross-examination is going to take of other witnesses.

25          THE COURT:  I understand.  But --

1          MR. ZALKIND:  Your Honor, on that subject, you know

2     there is a motion in limine on Dr. Levitt, and now we've had

3     Mr. Kohlmann testify.  There is some duplicative --

4          THE COURT:  Quite a bit.  In fact, why don't you talk

5     among yourselves first about that.  I don't want cumulative

6     testimony.  We've been over a lot of this ground, and I don't

7     know if this can be cut out entirely, but if you can --

8          MS. SIEGMANN:  Well, we were going to request a

9     hearing on the scope of Dr. Levitt's testimony, if we could,

10    either on Wednesday or Thursday of this week, your Honor.

11         THE COURT:  Well, we can't do it Wednesday.  Why don't

12    you first figure out what it is you want to do in light of

13    Mr. Kohlmann's testimony.  I'm not going to allow cumulative

14    testimony.  And we can have a tiny bit of overlap for context

15    to set something up, but that's about it.  And then communicate

16    to the defense what areas you expect him to testify about.

17         What does the calendar on Thursday look like?

18    Tomorrow is not possible.

19         THE CLERK:  We're open.

20         THE COURT:  We're open for Thursday.  Do you want to

21    set it for, say, 2:30 on Thursday, just as a bookmark --

22         MR. ZALKIND:  This Thursday?

23         THE COURT:  Isn't that what you said?  You said you

24    wanted to talk about Levitt as soon as possible.

25         MR. ZALKIND:  I just want to know, you know, where

1    we're going.  I have not -- Because of so many other witnesses,

2    I haven't been focusing -- refocusing on him so --

3              THE COURT:  Okay.

4              MR. ZALKIND:  And we didn't plan a formal voir dire of

5    him.

6              THE COURT:  I think we were just going to have oral

7    argument, I think was the plan.  Why don't we -- let's just

8    have as a placeholder 2:30 on Thursday to talk about Levitt.

9    I think he's the last witness in the government's case.

10             MS. SIEGMANN:  Yes.  Well, depending on the order of

11   witnesses and how we are in that next week.

12             THE COURT:  We don't need to take it up on Thursday if

13   you want more time or if you just --

14             MR. ZALKIND:  It would be better for me if we took it

15   up a little later than that.

16             MS. SIEGMANN:  My problem is -- well, not my problem,

17   but Dr. Levitt's problem is that he needs to know what areas he

18   will be testifying about; and without getting the Court's

19   orders, as to what the scope of his testimony is, I can't

20   convey that to him.

21             THE COURT:  Let's -- For the time being, let's hold

22   Thursday.  Again, figure out what you want to offer him on in

23   light of how Kohlmann went, relay that to the defense.  You

24   know, if it's narrow, let them know, and then we'll take it

25   from there.

```
 1            MR. ZALKIND:  I bring your attention to the -- we

 2   filed quite a lengthy memorandum on that.  Professor Estrich

 3   really did the bulk of that.  And that's really the thrust.

 4   We didn't question that he was qualified as an expert.  We felt

 5   he wasn't testifying about things that he knew about, which is

 6   different, the subject matter.  But now with -- we have a new

 7   issue with --

 8            THE COURT:  Yes.  And it's -- I -- I thought the way

 9   we had left it, it was going to be oral argument, but part of

10   the issue was what is going to be left for Levitt to do after

11   Kohlmann testifies, if that's the order.

12            MR. ZALKIND:  Right.

13            THE COURT:  And we may be talking about a very narrow

14   slice of --

15            MR. ZALKIND:  That's what I want you to tell me.

16            THE COURT:  And I've directed the government to tell

17   that to the defense pronto.  And I will, like I say, get back

18   on the bench as soon as I am liberated.

19            (Recess at 1:05 p.m.)

20            (5:12 p.m.)

21            THE COURT:  All right.  I apologize profusely in light

22   of the hour.  I have control over many things in my life, but

23   the timing of this meeting is not one of them.  I recognize

24   that there is a cost of having you waiting around, both

25   financial and human.
```

1          So, let's proceed as expeditiously as we can.  This is

2     a Daubert Rule 702 hearing, I think, on Mr. Valla.

3          MR. CABELL:  Yeah, and I think we can speed it up.

4     The longer we waited, the more we reduced what we were going to

5     have him do.

6          THE COURT:  Good.  I'm going to do this every day then

7     in the trial.

8          MR. CABELL:  Such that at this point we do not intend

9     to call Dr. Valla.

10         THE COURT:  You reduced it all the way down to

11    nothing?

12         MR. CABELL:  Well, there is one -- just so the Court

13    is aware.  Part of that thought process is there was

14    one -- there was a May 7, 1997 telephone conversation that was

15    referred to that has been referred to a number of times about

16    we in the rear in finance, and we -- Dr. Levitt, in our expert

17    disclosure, we also talked about Dr. Levitt talking about that

18    meeting, as well as Dr. Valla.  I think at this point, we would

19    plan to have that as part of Dr. Levitt's direct examination,

20    as opposed to Dr. Valla's.

21         THE COURT:  All right.  And I just want to make sure I

22    follow that.  Are you reserving the right for some reason it

23    doesn't come in with Levitt to call Valla?

24         MR. CABELL:  No, I suppose out of an abundance, I

25    think we will have Dr. Levitt's Daubert as something --

1        MS. SIEGMANN:  Or argument.

2        MR. CABELL:  -- or we will have argument over the

3    scope of Dr. Levitt's examination.

4        THE COURT:  Okay.

5        MR. McGINTY:  Your Honor, in that event, since there

6    was going to be an issue about that ideom, then there ought to

7    be some testimony from Dr. Levitt about that.  The ideom is

8    hardly singular, and I notice that the -- well, sufficed to say

9    I believe we need some testimony on that.

10       THE COURT:  From Levitt?

11       MR. McGINTY:  Levitt may be an expert in a lot of

12   things, but the odd ideom strikes me to be something that he's

13   probably not terribly proficient in.

14       MR. CABELL:  But this was already in his expert

15   disclosure.  So I mean I think there was already an agreement

16   that based on what was in his expert disclosure, we didn't need

17   to actually have an evidentiary hearing, just argument.

18       THE COURT:  All right.  Let's do this.  This was about

19   Valla?  Valla is off?

20       MR. CABELL:  Yes.

21       THE COURT:  Maybe permanently.  We're going to take up

22   Levitt as a matter of argument at least on Thursday, unless we

23   push it off.  Why don't we hold to that timetable for the time

24   being; and if it looks like we need a brief voir dire of

25   Levitt, we can do that closer to the time he's going to

1    testify.  I understand he is more or less at the end of the

2    witnesses?

3              MR. CABELL:  Correct.

4              THE COURT:  Well, all right.  Good.  I apologize for

5    being late, but I'm certainly happy I do not have to do any

6    work.

7              MR. CABELL:  Your Honor, there is one additional

8    hopefully small issue to raise with the Court.  It's something

9    we just became aware of and are still trying to figure out the

10   exact details, but one of the witnesses was Mr. Teba, and we

11   had the sidebar with respect to notes.

12             THE COURT:  Yes.

13             MR. CABELL:  And apparently at least two of the

14   defendants have said they never received a copy of the 302 from

15   that 2003 interview --

16             THE COURT:  Yes.

17             MR. CABELL:  -- which really struck us by surprise,

18   because we took the whole sidebar to be a discussion about

19   trying to get the notes of that to compare to the 302 to see

20   whether there were any differences.

21             THE COURT:  Right.

22             MR. CABELL:  I haven't heard from Mr. Andrews whether

23   he does or does not.  In any event, we thought we had disclosed

24   the 302 of that 2003 interview to counsel.  It's possible we

25   did not.  I mean we turned over about 30,000 pages here.  If we

1   didn't, it was inadvertent.  We can represent to the Court

2   though that as far as we can tell, there is nothing that is

3   inconsistent either with the notes from that 2003 interview

4   which have been disclosed, or the 302 from the 2007 interview

5   of Mr. Teba, which have been disclosed with anything he said at

6   the trial, but --

7         THE COURT:  Well, step one is disclose it forthwith,

8   if it hasn't been disclosed.

9         MR. CABELL:  We have.

10        THE COURT:  Then I'll wait to see what remedy is

11  appropriate.  I would not hesitate to recall Mr. Teba, and I

12  don't know whether any other remedies are appropriate.  It's

13  really the defense counsel has to read it, digest it, and think

14  what is an appropriate remedy.  I can't answer that question

15  without hearing defense counsel's input; but if you think you

16  have haven't produced it, produce it forthwith.

17        MR. CABELL:  We, have.  We have, your Honor.

18        THE COURT:  Okay.  And is there anything defense

19  counsel wants to add at this point?

20        MR. McGINTY:  Not at this time.

21        MR. ZALKIND:  Not at this time, your Honor.

22        THE COURT:  Okay.  All right.  We'll see how that goes

23  as well.  I'm making no ruling on it.  All right then.  I will

24  see you tomorrow.

25        Mr. Andrews.

1          MR. ANDREWS:  Yes, your Honor.  If we were going to

2     meet in the morning, you remember that you have -- sorry --

3     like homework, or something, but the order of these

4     transcripts, and I think Mr. Chakravarty can correct me, but

5     we're going to get -- we're getting to the point where some of

6     these things are going to start to be read in; and the

7     transcripts I consider a significant part of the case, and I

8     don't want to slow things down, but I'm going to run up to

9     sidebar as often you'll let me, if I think there are problems

10    in there.

11         THE COURT:  All right.  I haven't -- well, I'm trying

12    to get the trial to move along, obviously.  I have a motion.  I

13    think it may be called a supplemental motion on the transcripts

14    and the government's response.

15         Was that the universal filings on that issue?  I

16    reread them.

17         MR. CHAKRAVARTY:  There is the original motion and the

18    original response.  At least for the government's part, I lay

19    out in more detail the law and the description of the cost.

20         THE COURT:  Let me reassemble that universe, and I'll

21    look at it again.

22         MR. ANDREWS:  I may have heard your Honor wrong.  I

23    know Ms. Lunt kind of did the lion's share, and we helped on an

24    initial motion that had to do -- that were some specific

25    wiretap issues, and I thought Mr. McGinty did a supplemental.

 1              MR. McGINTY:  Yeah.

 2              MR. ANDREWS:  So there are two defense, and

 3      one -- maybe one or two government replies.

 4              THE COURT:  Okay.  I'll make sure I have everything.

 5      I've lost track of what's in the stack of things.

 6              MR. McGINTY:  Our filing was on November 25th.  The

 7      government's filing before that was document 347, and there was

 8      a defense filing before that, but I don't have the number of

 9      that.

10              THE COURT:  Okay.  Well, there's four things, right,

11      original response and supplemental response, right?

12              MR. McGINTY:  No, there's no response.  There was no

13      response to the November 25th one.

14              MR. CHAKRAVARTY:  No, I think there was.  It was

15      relatively brief, but --

16              THE COURT:  I think there was.

17              MR. ANDREWS:  And lastly, your Honor, I -- I was

18      focusing, and I'm not sure if other counsel were, but I was

19      focusing to a certain extent to the conversation Mr. Mubayyid

20      was involved in.  There is sort this odd situation where we

21      have conversations being offered of people, who are neither

22      indicted.  There is Mr. Akra, who is an unindicted

23      coconspirator with a nonindicted noncoconspirator, Hassoun, for

24      instance, and as I focus on looking at some of these

25      conversations, I'm wondering:  A, if some of these

1    conversations are, in fact, in furtherance of the conspiracy;

2    and B, whether there is a 403, and I'll try to bring those

3    conversations to the Court's attention, as I have kind of gone

4    over all I can about focusing on what's directly in front of

5    me, but some of these -- there were a lot of conversations, but

6    I'm focusing on some of these earlier ones having to do with

7    Mr. Akra.

8            There is also Mr. Yassin, who is an unindicted

9    coconspirator, talking to either Jayyousi, or Hassoun, as well,

10   I believe.  Hassoun.  So it's the people that are not indicted,

11   not in the courtroom, having conversations with other people,

12   so --

13           THE COURT:  And then I think Mr. McGinty proposed to

14   have a conversation under -- admitted under Rule 806 that

15   doesn't even involve unindicted coconspirators, right?

16           MR. ANDREWS:  Yes, your Honor.

17           THE COURT:  Or discussed it with other people in

18   Boston that they're building a mosque, that conversation, which

19   is part of the mix as well.

20           Okay.  All right.  We have that then, and we have what

21   we discussed in camera this morning.

22           Mr. Chakravarty.

23           MR. CHAKRAVARTY:  I was just going to add, with regard

24   to the unindicted coconspirator issue, one, we addressed this

25   in there.  It was a pretty lengthy hearing on the Petroziello

 1   issue.  I think that all of that was aired with the exception

 2   of this 806 argument, which the government would obviously

 3   oppose.  We don't think 806 applies.

 4            THE COURT:  Right.  The -- I'm satisfied that things

 5   can come in as a general matter under Petroziello, but I think

 6   I reserved on specific conversations that for some reason might

 7   be deemed to be not in the presence and appears to present Rule

 8   403 issues, and I think that is appropriate to focus on that.

 9   I mean I have certainly made this overall Petroziello ruling,

10   and I thought and hoped that I made it clear that if there is

11   some specific issue as to a specific conversation that that

12   needs to be raised; in other words, that it presents some

13   unique issue specific to that conversation, it needs to be

14   raised.

15            MR. CHAKRAVARTY:  Just in terms of scheduling for

16   counsel, we expect to start with the handful of calls that we

17   provided to the Court.  I have a binder or a regular folder

18   with additional calls, which I will provide to you tomorrow for

19   some pleasant reading.

20            THE COURT:  Well, there being no football game

21   tonight, I'm happy to look through it not constrained by

22   half-time.

23            All right.  Okay.  Anything else?

24            All right.  Thank you all for waiting.  Again, I

25   apologize.

1              MR. ZALKIND:  Thank you.

2              MR. ANDREWS:  Thank you, your Honor.

3              (At 5:23 p.m., Court was recessed.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3

4          We, Marianne Kusa-Ryll, CRR, RDR, Official Court

5   Reporter of the United States District Court, and Kimberly A.

6   Smith, CSR, CRR, RDR, do hereby certify that the foregoing

7   transcript, from Page 14-1 to Page 14-196, constitutes, to the

8   best of our skills and abilities, a true and accurate

9   transcription of our stenotype notes taken in the matter of CR

10  No. 05-40026-FDS, The United States of America vs. Muhamed

11  Mubayyid, Emadeddin Z. Muntasser, and Samir Al-Monla, a/k/a

12  Samir Almonla.

13

14

15

16                       /s/ Marianne Kusa-Ryll
                         _____
17                       Marianne Kusa-Ryll, RDR, CRR

18                       Official Court Reporter

19

20

21

22                       /s/ Kimberly A. Smith
                         _____
23                       Kimberly A. Smith, CSR, CRR, RDR

24

25