1

2                          UNITED STATES DISTRICT COURT
                             DISTRICT OF MASSACHUSETTS
3

4

5     United States of America,      )
                     Plaintiff,      )
6                                    )
                                     )
7     vs.                            )    Criminal No. 05-40026-FDS
                                     )
8                                    )
      Muhamed Mubayyid, Emadeddin Z.)
9     Muntasser, and Samir Al-Monla,)
      a/k/a Samir Almonla,           )
10                   Defendants.     )

11

12    BEFORE:  The Honorable F. Dennis Saylor, IV

13

14                         Jury Trial Day 15

15

16                                   United States District Court
                                     Courtroom No. 22
17                                   One Courthouse Way
                                     Boston, Massachusetts
18                                   December 5, 2007

19

20

21

22

23                     Marianne Kusa-Ryll, RDR, CRR
                          Official Court Reporter
                        Kimberly A. Smith, RDR, CRR
24                     United States District Court
                        595 Main Street, Room 514A
25                       Worcester, MA 01608-2093
                    Mechanical Steno - Transcript by Computer

```
 1    APPEARANCES:

 2    B. Stephanie Siegmann, Assistant U.S. Attorney
      Aloke Chakravarty, Assistant U.S. Attorney
 3    Donald L. Cabell, Assistant U.S. Attorney
      United States Attorney's Office
 4    United States District Court
      One Courthouse Way, Suite 9200
 5    Boston, Massachusetts 02210
      for the Plaintiff
 6
      Law Offices of Michael C. Andrews
 7    Michael C. Andrews, Esquire
      21 Custom House Street
 8    Suite 920
      Boston, Massachusetts 02110
 9    for the Defendant, Muhamed Mubayyid

10    Norman S. Zalkind, Esquire
      Elizabeth A. Lunt, Esquire
11    David Duncan, Esquire
      Zalkind, Rodriguez, Lunt & Duncan, LLP
12    65a Atlantic Avenue
      Boston, Massachusetts 02110
13    for the Defendant, Emadeddin Z. Muntasser

14    Federal Defender's Office
      Charles P. McGinty, Esquire
15    408 Atlantic Avenue
      Third Floor
16    Boston, Massachusetts 02110
      for the Defendant Samir Al-Monla, a/k/a Samir Almonla

17

18

19

20

21

22

23

24

25
```

1                            I N D E X

2      Testimony of:          Direct   Cross   Redirect   Recross

3      ANNE MARIE DOURSOUNIAN

4      by Mr. Chakravarty          36

5
       BETSEY PRYOR
6
       by Mr. Chakravarty          40
7

8      GERALD SACK

9      by Ms. Siegmann             81
       by Mr. Duncan                        124
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           E X H I B I T S

2       No.            Description              Evidence    For ID

3       540-540A       Translations                44

4       538-538A       Translations                61

5       489            Document                    67

6       539-539A       Translations                70

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Lobby conference from 8:32 a.m. to 8:56 a.m.)

2        THE COURT:  Okay.  Very quickly, I want to talk about

3   first the issue of the -- of Mr. Teba.  I reviewed Ms.

4   Siegmann's notes in camera, which are notes of her interview of

5   him.  My memory is that he testified on a Thursday and that he

6   was interviewed on a Tuesday and a Wednesday by Ms. Siegmann.

7   We have two days worth of notes.  Those notes do reflect on

8   both the Tuesday and the Wednesday that he had discussed that

9   Mr. Al-Monla had referred to travel to Afghanistan, but I don't

10  see any reason to turn over the notes.  I think that's not a

11  matter in dispute that that came up during those interviews.

12       There was apparently a 302 from 2003 that was turned

13  over late.

14       Was there any issue any defendant wishes to raise with

15  regard to that?

16       MR. McGINTY:  Your Honor, I'm still reviewing that in

17  the context of his overall testimony.  I would note, your

18  Honor, that the issues relating to Mr. Teba goes beyond simply

19  the late testimony about Afghanistan.  One of the critical

20  components of his testimony was the association between Maktab

21  and Care; and if your Honor remembers, there was a sequence of

22  direct questions placed by Ms. Siegmann to Mr. Teba to the

23  effect that when you started working at Maktab/Care, or when

24  you were there at Maktab/Care --

25       THE COURT:  Questions that were not objected to, as I

1    recall, when they were asked, but --

2            MR. McGINTY:  They were --

3            THE COURT:  They were questions during

4    cross-examination, but I'm pretty confident they weren't

5    objected to when asked, and I think I would have sustained an

6    objection, but --

7            MR. McGINTY:  But the issue is whether -- who raised

8    the issue about the association between Maktab and Care, and

9    this is a theme, the absence of which is apparent in the '03

10   interview.  It emerges some time in the conversation with Ms.

11   Siegmann's pretrial, and those notes may bare on how that gets

12   shown.  So, it's not simply a matter of whether there's

13   something in the notes, which is flat out inconsistent, or flat

14   out Brady.  It's in the context of late disclosure of the '03

15   conversation, or interview.  Not only the notes of it, but also

16   the 302 relating to that.  And testimony that was entirely new

17   on the stand had not been prestaged by his interview in '07,

18   the entire context of Mr. Teba's interview sequence matters in

19   terms of consideration of whether we recall him and how we go

20   about impeaching him.

21           MS. SIEGMANN:  Your Honor, actually, this issue was in

22   the 2007 302 that was produced.  I indicated Teba knew of

23   Maktab-al-Khidmat.  On page 5 of the 2007 interview, Teba

24   indicated that he knew about Maktab-al-Khidmat; that he knew

25   about it from Afghanistan; that he then said individuals

1    associated with Care referred to Care as Maktab.  That most

2    people only used it by the first word.

3         THE COURT:  Okay.  I see no reason to require the

4    government to produce Ms. Siegmann's notes prepared during

5    the -- I don't have a calendar in front of me, but in late

6    November of '07, on Tuesday or Wednesday preparing Mr. Teba for

7    his testimony; and I'm going to leave open, and the ball is in

8    the defendants' court to seek a remedy, or a request for a

9    remedy for the late disclosure of the 2003 302.

10        The other issue, and it's nine o'clock, as apparently

11   we are going to play wiretaps today, and there are different

12   issues as to each conversation, and there may be some things

13   that I'm going to require to exclude on 403 grounds, bits and

14   pieces of conversations.

15        I don't have all the transcripts in front of me.

16   Well, I guess my question, in the first instance, is a

17   practical one as to how would we accomplish that?

18        MR. CHAKRAVARTY:  Well, the mechanism of actually

19   going through at least the first five, I think that we're down

20   to four now with the first witness this morning.  She would

21   read specific portions.  I have those portions highlighted, and

22   I have, you know, the page numbers, which we can go through

23   those.  She's not going to read the whole call, meaning the

24   jury doesn't get the whole calls.  If there is a particular

25   objection on a portion of that, I will certainly make that

1    available.  You know, I prefer not to disclose what my thought

2    process has been going forward, but if it comes up to what's

3    admissible and what's not, then of course we'll deal with that.

4         THE COURT:  All right.  I mean I guess we'll, you

5    know, we'll have to grind through these as best we can.  I'm

6    not sure we have a better alternative.  I will state as a

7    general proposition the mere fact that a coconspirator is

8    speaking with a nonconspirator does not take it out of the

9    801(B)(2) context.  It has to be in furtherance of the

10   conspiracy and so on, but the mere fact that it's a

11   conversation between a conspirator and a nonconspirator does

12   not take it off the table.

13        MR. CHAKRAVARTY:  All right.  As we go through are we

14   going to be going to sidebar?

15        THE COURT:  I'm afraid so.  I mean I'm reluctant to do

16   so, but I'm -- I'm not sure I have an alternative, if that's

17   what is up next.

18        Mr. Cabell.

19        MR. CABELL:  Your Honor, I popped up just to have the

20   last word on the Teba matter, which is to say, if we get to a

21   point where we are talking about some remedy for delayed

22   disclosure, I'm just saying we have always taken a position,

23   and we could argue that in the first instance we don't think

24   this was a document that ever had to be disclosed, so that we

25   don't think there is -- if we're talking about the late

1   disclosure of Jencks material on that narrow ground, our

2   argument is this is not Jencks, and didn't have to be

3   disclosed.  We regret it wasn't, but that we don't think there

4   is any legal violation.

5          THE COURT:  I'm taking no position whatsoever on this

6   issue in any direction.

7          MR. CABELL:  Okay.

8          THE COURT:  It was at least a little bit late --

9          MR. CABELL:  Yeah.

10          THE COURT:  -- if not a whole lot late --

11          MR. CABELL:  Yeah.

12          THE COURT:  -- and I'm going to leave it up to the

13   defense to raise an issue, and we will talk about it.

14          Mr. Andrews.

15          MR. ANDREWS:  Yes, your Honor, just on another matter

16   very briefly.  Yesterday, and I will say at the outset, it has

17   dispersion on Mr. Cabell's direct examination of the witness

18   that is involved, none whatsoever; however, you will recall at

19   the end --

20          THE COURT:  I think dispersions are about to be cast.

21          MR. ANDREWS:  No, no, no, no.  No, at the end --

22          THE COURT:  We'll see.

23          MR. ANDREWS:  -- again, Trooper Ball is asked about, I

24   guess -- Mr. Mubayyid is asked where the money goes into at

25   Global Relief, and then Trooper Ball says he asked him who are

1    the -- what other individuals, and I asked him repeatedly, and

2    he didn't want to answer.  This is the issue.  This wasn't in

3    furtherance of investigating Care.  This was five days after

4    9/11, and it's sort of a -- I think it's art of a random

5    investigation, or some sort of investigation of Muslim men in

6    the community.  In the police report, you can see that they

7    show in photographs certain individuals at the end of the

8    conversation.  I'm trying to play -- the Court has tried to

9    keep 9/11 and terrorist matters out of this case, and I think

10   it's incumbent upon the defense probably to play along, because

11   the obvious cross there would have been to say, look, you were

12   investigating Care, you're rousing Muslim men five days after

13   9/11.  You talk to him for a half hour, he gets nervous, he

14   doesn't want to talk to you anymore.  You explain that to jury;

15   however, you know, I felt it was sort of crossing the line:  A,

16   bringing up 9/11 which isn't good for the defense, but also

17   it's sort of crossing the line as far as the rules the Court

18   has established about, you know, keeping this stuff out.  So, I

19   was wondering if the Court would consider a brief cure of an

20   instruction saying that, you know, in general people have no

21   obligation to speak with the police and have a right to

22   terminate a conversation at any time.  I felt I was a little

23   bit hamstrung, because of the unique circumstances of this case

24   to explain why somebody, who -- an innocent person would want

25   to stop talking, because of the unique circumstances this

1    country was under five days under 9/11 when he's approached on

2    Sunday afternoon at his home by people who are not

3    investigating Care.  You will remember that he was the one that

4    brought Care up.

5          THE COURT:  Before I get to the question of a

6    cautionary instruction, notwithstanding my occasional

7    impatience with the number and length of the sidebars, I -- I

8    have -- I'm responding largely to objections.  I'm not

9    dictating the strategy or the course of the trial; and as to

10   whether September 11th is mentioned or not mentioned is at some

11   level a strategic call, and if you want to seek guidance about

12   what doors might be open, you can raise the issue.  In other

13   words, if you had said, can I talk about this without putting

14   September 11th back into every aspect of this case, we could

15   have talked about that, but I -- my job is -- is to respond to

16   objections, and I am -- I'm not making blanket rulings of any

17   kind September 11th may or may never be mentioned.  There may

18   be a good reason to mention it or not mention it in the

19   context.  I'm just trying to make sure to keep it out if it's

20   not necessary to be mentioned; and when it is mentioned, if

21   it's just to make sure --

22         MR. ANDREWS:  I understand.

23         THE COURT:  -- that the jury understands the context

24   in which it's arising.

25         MR. ANDREWS:  I understand, your Honor.  For instance,

1    Special Agent Toole gets on the stand and says "After 9/11, I

2    was fine."  I jump up.  I object.  Trooper Richard Ball says,

3    "I investigate gang activity," but for some reason he's

4    enlisted to talk with Mr. Mubayyid five days after 9/11, so we

5    know why this is happening, but, I -- I felt I might be

6    crossing the line.  That maybe -- maybe there's something I

7    should approach sidebar for had I said, it's okay for me to

8    bring up 9/11 when it looks like my client doesn't want to talk

9    to police, but if Special Agent Toole says he was reassigned

10   after 9/11, or Trooper Ball says, "I was assigned to something

11   after 9/11," then I'm going to ask for a mistrial.  I thought

12   I'm trying to play fair.

13        THE COURT:  Okay.  And I guess I'm -- I'm a little

14   reluctant to give the instruction, but -- well, let me hear

15   from the government quickly.

16        MR. CABELL:  Very briefly, your Honor.  We don't think

17   you should give one.  What I tried to do with Trooper Ball was

18   to establish that the interview occurred on a specific date, no

19   reference to 9/11.  I led him to 9/16.  I think the jury is

20   entitled to know where the interview took place.  I didn't

21   mention the Joint Terrorism Task Force.  Whatever the impetus

22   for the interview of Mr. Mubayyid, he said what he said.  He

23   said it voluntary.  It was clear from the direct and the

24   cross-examination that he was under no obligation to speak to

25   the officers.  The jury, I think, under those circumstances

1   whatever you said, whatever information he said, can take it

2   for what it's worth.

3          Mr. Andrews is correct.  He could have, if he had

4   wanted to, use 9/11 as an excuse to explain away what Mr.

5   Mubayyid did or did not say.  That was a strategic call.  We

6   should not be subject to a curative instruction for that

7   purpose.

8          THE COURT:  Well, I -- 9/11, putting aside whether

9   it's an excuse is a reference only --

10         MR. CABELL:  Well, even as that --

11         THE COURT:  -- and I'm not excluding it as a reference

12   point for all purposes in this case.  It may very well be

13   relevant; and if you have any doubt about what door you're

14   opening, you can see, but everything happens in a context.

15   Gratuitous reference to September 11th seems to me is

16   unnecessary, and we can keep it out.  A specific reference to

17   September 11, you know, we'll -- an Arab man, who's stopped for

18   questioning on September 12th, there might be a very good

19   reason to mention that it's September 11.  I can't -- I can't

20   answer the question in the abstract.

21         MR. McGINTY:  Your Honor.

22         THE COURT:  Yes.

23         MR. McGINTY:  With regard to the transcript just for a

24   moment.  The government proposes with the transcripts to read

25   snippets.  Apparently, the witness that is coming in is a

1    witness who is from out of town and is as unacquainted with the

2    case as she could possibly be, so the government is basically

3    putting a reader on the stand, who is going to be reading; and

4    the government, as I understand it, is going to be reading

5    snippets from conversations.  It's one thing if you're reading

6    a block.  The sequence of snippets goes something like this:

7    Pages 6, 7, 8, 11, 12, 14, 15, 16, 17, and not the 14, 15, 16,

8    17, 18 in an unbroken sequence, but three lines here, five

9    lines there, two lines there.

10           THE COURT:  Rule of completeness, is there something

11   you want designated that she's going to read?  The witness is

12   going to be reading but not --

13           MR. CHAKRAVARTY:  These are all Arabic.

14           THE COURT:  The rule of completeness will permit to

15   say other parts that need to be read, and we'll read them.

16           MR. McGINTY:  And one last thing, which is with

17   respect to the -- I don't know that we're going to get to it

18   today, and I don't expect that we are, but on the 9 /6/97

19   tapes, the ones that were the subject of the -- of the motions

20   that were discussed last night, yesterday the government

21   elicited testimony to the effect that Mr. Jayyousi and Mr.

22   Hassoun, quote, "had supported the mujahideen on the front

23   lines around the world."  In other words, when your Honor said

24   you elicit testimony with respect to Mr. Jayyousi and Mr.

25   Hassoun essentially at your own risk.  Be careful how you do

1    it.  Well, the government elected to go for the whole enchilada

2    here and elicited testimony that was placing them at center of

3    providing provision on the front lines around the world for the

4    mujahideen.

5           Now, they say that communications between various

6    people at Care with those individuals comes in as probative of

7    the shared mission of Care with Jayyousi and Hassoun in support

8    of the mujahideen and showing common knowledge with respect to

9    the mujahideen, knowledge presumably being not only what Care

10   was doing shared with Jayyousi and Hassoun, but also what

11   Jayyousi and Hassoun themselves were doing.

12          The proposition they're putting it in for are things

13   such as:  Tapes are being sent from Care to Jayyousi, or from

14   Jayyousi to Care, or Jayyousi is coming to Boston to speak for

15   relief for Chechnya.  Items which are already in evidence.  So

16   what the government has done yesterday is sort of upped the

17   ante a little bit here with respect to Mr. Jayyousi and Mr.

18   Hassoun, not permitting the conversations to be evaluated for

19   their own merits, such as they are, but to connect them to a

20   proposition elicited in direct testimony that those persons

21   were involved in supporting the mujahideen on the front lines.

22   So, there is an additional layer now of prejudicial fallout

23   from the alleged offer of so-called coconspirator statements in

24   that period as they were read to Mr. Jayyousi and Mr. Hassoun.

25          THE COURT:  All right.  And I'll -- there are 403

1    issues presented here, and I'll bear that in mind.  I don't

2    know what else to say.

3              Mr. Chakravarty.

4              MR. CHAKRAVARTY:  The only thing I'm going to add.

5    The fact that first the statement that Mr. Kohlmann made was as

6    sterile as it can be.  Support is not anything dissimilar to,

7    you know, what is alleged in the indictment, we're not saying,

8    and nor does he say that the provisioning material, material

9    and arms, and all that kind of thing.

10             But the whole reason why these calls are being offered

11   to show what the defendants' states of mind were are who they

12   were is relative, and I think as -- as cursory a fashion as

13   possible some testimony on that regard was appropriate and

14   doesn't open a new door.  Clearly, there is a level of we're

15   not trying to prove guilt by association here.  What we have to

16   prove is the intent of the defendants.  One of the ways to do

17   that is when they're dealing with distribution of tapes, and

18   when they are inviting lecturers up here to show that those are

19   for the noncharitable purpose of supporting the jihad and the

20   mujahideen, that relationship is relevant.

21             THE COURT:  All right.  Let's bring the jury in.  Oh,

22   we still have one person missing.  Okay.  He's apparently stuck

23   on a train, and he has called and may be until 9:30.  This may

24   be a blessing in disguise.  What are the first couple of

25   transcripts that you are going to start with?

1          MR. CHAKRAVARTY:  The first few, your Honor, are

2     starting with 540, the October 2nd call in which Mubayyid and

3     Chehade discuss removing -- Chehade encourages Mubayyid to

4     remove things from the storage.  They also talk about some of

5     the finances.

6          THE COURT:  Okay.  And what's up after that?

7          MR. CHAKRAVARTY:  After that 538 where Mubayyid and

8     Chehade discuss circumstances that fall out from Bassam Kanj's

9     death.

10         Then I'm going to do July 19, '03, where Mubayyid

11    again speaks about Bassam Kanj's death with Mamoud Al Asmar.

12         MS. LUNT:  Could you give us the exhibit numbers.

13         MR. CHAKRAVARTY:  547.  And then 539A, which is the

14    April 6, 2000, call between Al-Monla and Chehade, again

15    discussing Bassam Kanj's death.

16         THE COURT:  Okay.  Let me get organized on that.

17         (Short break from 9:18 a.m. to 9:28 a.m.)

18         THE COURT:  Mr. McGinty, on the first four transcripts

19    are there additional designations you wish to make under the

20    rule of completeness?

21         MR. McGINTY:  Yes.  The -- we do these in order.

22         Has the Court reviewed all of them, including No. 547?

23         THE COURT:  I have reviewed them all.  They're -- you

24    know, I find some of them to be a little bit on the opaque

25    side, but, yes, I have.  I have 547 in front of me.

1       MR. McGINTY:  Now, 547 is going to be played after

2   538, notwithstanding a -- a period in the interim; 547 being on

3   July 19, '03, and 538 being 1/10/00, a period of three and a

4   half years.  The conversation on July 19, '03, is a

5   conversation about the impact of Kanj's death.  It sheds no

6   probative light on the conversation in January of '00.

7       THE COURT:  Well, I think it would be certainly fair

8   to argue and, in fact, I'd be prepared to give a cautionary

9   instruction that these are going to be transcripts that are not

10  coming in in chronological order.  I think I will give that

11  instruction and let you cross-examine as to the

12  three-and-a-half-year gap between the conversations.

13      MR. McGINTY:  But, your Honor, the -- the agent, as I

14  understand it, who is going to be on the stand is a code

15  reader --

16      THE COURT:  Right.

17      MR. McGINTY:  -- from Chicago, brought in for

18  precisely for the purpose of reading these without any basis

19  and knowledge about anything other than she was handed the

20  transcript.

21      MR. CHAKRAVARTY:  Your Honor --

22      THE COURT:  She can say July 19th, '03 is three and a

23  half years after January 10th, 2000, right?

24      MR. CHAKRAVARTY:  Sure.

25      THE COURT:  And an awful lot of things might have

1    happened in that three-and-a-half-year period, right?  I think

2    that is fair examination.

3              MR. McGINTY:  That's the cross, I mean --

4              THE COURT:  What am I going to do, give her knowledge

5    that she doesn't have?

6              MR. McGINTY:  No, but if -- I guess the Court, as the

7    gatekeeper, has to decide whether inference is resting on

8    things that far apart are fair.

9              THE COURT:  I'm not going to let -- let this witness,

10   just a reader, to draw any inference between conversation 538

11   and conversation 547 that she's going to read.

12             MR. McGINTY:  Right, but in the reading is the

13   inference.  I mean the government is stacking these for a

14   reason, and the reason is that something about that sheds light

15   on -- on the conversation three and a half years earlier; and

16   you know, frankly, your Honor, I want to renew the objection

17   under the prior motions to dismiss that have been filed and ask

18   that that be a continuing objection.

19             THE COURT:  All right.

20             MR. McGINTY:  But one of the issues, your Honor,

21   raised in the motion was the use of intelligence intercepts for

22   purposes of bolstering a criminal, and we're now at the point

23   where we see where what the fruits were of that use of FISA for

24   that purpose.  Here, in the extraordinary circumstance, that a

25   criminal investigation is ongoing, a grand jury is ongoing, it

1    is a highly unusual circumstance, indeed a singular

2    circumstance, that the government is maintaining intercepts at

3    a time and a position to evaluate what witnesses in front of

4    the grand jury, who are subject to the grand jury are saying

5    between and among themselves.

6         Now, the conversation in -- in '03, the conversation

7    547, is not furtherance of the conspiracy.

8         THE COURT:  Let me -- let me stop for a second.  Mr.

9    Chakravarty, the alleged false statement by Al-Monla was made

10   in April of '03, right?

11        MR. CHAKRAVARTY:  Right, April of '03.

12        THE COURT:  And this is a date in July of '03.  Is it

13   being offered solely against Al-Monla on the false statement,

14   the Kanj false statement claim?

15        MR. CHAKRAVARTY:  547 and 719 of '03?

16        THE COURT:  Yes.

17        MR. CHAKRAVARTY:  Yes, your Honor, and it goes to --

18   because of the syllogism necessary to explain, to further

19   elaborate on the fact that Al-Monla is actually talking about

20   Bassam Kanj, the fact that --

21        THE COURT:  About three months after the false --

22   alleged false statement?

23        MR. CHAKRAVARTY:  In this conversation, it's one step

24   even removed from that, your Honor, the government believes.

25   This conversation is between Mr. Mubayyid and another --

1            THE COURT:  I'm sorry.  Yes, in this case Mubayyid.

2            MR. CHAKRAVARTY:  And in the July conversation, Mr.

3    Mubayyid's knowledge of Bassam Kanj's death.  And his prior

4    conversation with Mr. Chehade, shortly after Bassam Kanj's

5    death is important to show that when Chehade and Al-Monla are

6    talking about Kanj's death, without mentioning his name, as

7    Mubayyid and Chehade do, that they are, in fact, talking about

8    that same person.

9            THE COURT:  When are Chehade and Al-Monla supposedly

10   talking?

11           MR. CHAKRAVARTY:  January 10, 2000.  Excuse me.

12   Chehade and Al-Monla are talking April 6th of 2000.

13           THE COURT:  Right.  That's 539.

14           MR. CHAKRAVARTY:  Correct.

15           THE COURT:  And I'm having trouble with the syllogism

16   here.  Chehade and Al-Monla talk on April 6, 2000, and they're

17   talking about an unnamed person, but it's Al-Monla's words,

18   right, and --

19           MR. CHAKRAVARTY:  Well, it's the back and forth, from

20   the context it's clear that they're talking about Bassam Kanj,

21   but it's through us, that is --

22           THE COURT:  Okay?  But Bassam -- but he's not

23   identified?

24           MR. CHAKRAVARTY:  Correct.

25           THE COURT:  And the alleged false statement is April

1    '03?

2         MR. CHAKRAVARTY:  Right.

3         THE COURT:  And the July '03 conversation, No. 547 is

4    between Mubayyid and Al Asmar about Kanj, and I'm having

5    trouble seeing how it connects to --

6         MR. CHAKRAVARTY:  Because one of the ways that we're

7    going to show --

8         THE COURT:  -- the knowledge of Al-Monla.

9         MR. CHAKRAVARTY:  I understand.  One of the ways that

10   it shows on April 6th when Al-Monla is talking to Chehade is

11   that prior to that conversation, Chehade had a similar

12   conversation with Mr. Mubayyid about Bassam Kanj in which they

13   actually do say the name.

14        THE COURT:  Point me to a page reference on the

15   April 6, 2000, call.

16        MR. CHAKRAVARTY:  The April 6th call doesn't mention

17   the name.

18        THE COURT:  Right.

19        MR. CHAKRAVARTY:  It's the January -- sorry.  The page

20   reference insofar as -- the issue is -- the reason for the July

21   call is because we have to show that when Chehade, it's

22   essentially Chehade's state of mind when he's talking to

23   Al-Monla on that April 6th call.

24        THE COURT:  Okay.  Even -- even assuming that you can

25   do that, how do -- how does the conversation between Mubayyid

1    and Al Asmar reflect Chehade's state of mind?

2            MR. CHAKRAVARTY:  Because it shows that when Chehade

3    and Mubayyid talk about the same subject matter as -- as

4    Mubayyid and Al Asmar are talking about, it goes to the fact

5    that Mubayyid has a state of mind as to who they're talking

6    about.  He has that three months -- three years prior, he has a

7    similar conversation with -- with Chehade.  Consequently,

8    Chehade knows that who they are talking about is Bassam Kanj.

9    So, when -- if we can show that Chehade knows that we're

10   talking about Bassam Kanj, then when three months later he

11   talks with Al-Monla, it now puts in context why we

12   can unequivocally show that the person who got married is

13   Bassam Kanj.

14           THE COURT:  So, Chehade and Al-Monla in 2000 have a

15   conversation about an unidentified individual, which the

16   government says is Kanj?

17           MR. CHAKRAVARTY:  Yes, and I think in the four corners

18   leads to that inference, but without the name.

19           THE COURT:  All right.  Then you say that there is a

20   subsequent conversation between Chehade and Mubayyid?

21           MR. CHAKRAVARTY:  A prior conversation.

22           THE COURT:  A prior conversation.  What's the date on

23   that?

24           MR. CHAKRAVARTY:  January 10th, and that is 538.

25           THE COURT:  All right.  So, we turn to 538.  This is

1    Chehade and Mubayyid.

2         Okay.  And how does this show knowledge of Kanj?

3         MR. CHAKRAVARTY:  Correct.  On page 3 and page 6.

4    Page 3, they talk about the burial.  He had just passed way

5    four days prior.  On page 6, they discuss whether Bassam,

6    Bassam brother's, who is also over there, or whether Mamoud Al

7    Asmar's brother was also over there.

8         I also point out, as you are paging through to that,

9    your Honor, the agent from Chicago is not someone who has no

10   knowledge of this investigation.  In fact, she's very familiar

11   with the Global Relief Foundation investigation out there.  She

12   does know who these players are.  While she is not expected to

13   ask for inferences, or anything else, but she does have some

14   preexisting knowledge as to the case.

15        THE COURT:  I'm -- I'm concerned about this July '03

16   phone call, and I -- this is an incredibly tenuous connection,

17   it seems to me.  In July '03, Mubayyid knows about Kanj and is

18   talking about Kanj's death.  In January 2000, Mubayyid has a

19   conversation with Chehade, in which they're talking about

20   Kanj's then recent death and his funeral.  In April 2000,

21   Chehade and Al-Monla are talking about an unidentified

22   individual, who apparently died and left a widow and children.

23   I don't get the July 2003 piece of that, how it goes to

24   Al-Monla's intent.  I -- run that by me again.

25        MR. CHAKRAVARTY:  Sure.  The government sees that it's

1    more attenuated than it would prefer; however, the fact that

2    Mubayyid and Chehade are talking about -- about Kanj, we need

3    to demonstrate it and as quickly as possible in order of

4    context to the April 6, 2000, conversation between Al-Monla and

5    Chehade, and one of the ways that we say that Al-Monla and

6    Chehade knew who they were talking about is, because we know

7    Chehade knew who Kanj was.  We knew Chehade knew the

8    circumstances of Kanj's death; and one of the ways we're

9    showing that is because there is an explicit call in January of

10   2000 between Chehade and Mubayyid, which -- which develops

11   that.

12            THE COURT:  Okay.  The January call is fine.

13            MR. CHAKRAVARTY:  Right.

14            THE COURT:  I'm with you so far.  And July '03.

15            MR. CHAKRAVARTY:  And we argue that in that --

16            THE COURT:  And it's not Chehade's words in July '03.

17            MR. CHAKRAVARTY:  Correct.  Correct.  It's Mubayyid's

18   words, but just as the January 10th conversation involves two

19   people, Mubayyid and Chehade, who know they are both talking

20   about Bassam, Bassam Kanj, and concluding making reference to

21   Mamoud Al Asmar.  The '03 conversation further bolsters the

22   understanding of who that person is, and so it provides an

23   additional context retroactively to the January 10th

24   conversation.

25            THE COURT:  Okay.  I -- I -- I think it's too much,

1    and I'm going to exclude 547, if that is the grounds on which

2    it's offered.

3              MR. CHAKRAVARTY:  Very good, your Honor.

4              THE COURT:  All right.

5              MS. LUNT:  Your Honor.

6              THE COURT:  Yes.

7              MS. LUNT:  There is another issue about one of these

8    tapes.  In No. 539, which is April 6th, the context of this is

9    Chehade is talking with Al-Monla in this, and he's mentioning

10   coming to Boston, and he mentioned a social event.  He says,

11   that he had dinner at -- the top of page 6.  He said on the

12   second day of his visit "then Abu 'Abd-Al-Rahman-even Bos-,

13   even Abu 'Abd-Al-Rahman, even - I mean, 'Imad -"

14             "Hmm."

15             Then Mohamad Chehade: "-man he invited the men and

16   only two men showed up at his house-"

17             And he basically complains that Mr. Muntasser had some

18   social event for him, and people didn't show up to see him.

19             Now, this is not in furtherance of the conspiracy.

20   This is -- I cited some cases in the original memorandum as

21   sort of idle chatter, or casual conversation about past events,

22   and it's highly prejudicial and unfair to put this in when

23   there's no other evidence tying Mr. Muntasser to the activities

24   of Care in this time period.  And I cited in the original

25   memorandum the case law on statements for personal objectives

1    or part of idle conversation and not part of the conspiracy,

2    and I cite cases from the 9th and 6th circuits, 9th, 6th and

3    5th circuits; and the quotations from those are "idle chatter

4    or casual conversation about past events is not in furtherance

5    of the conspiracy."  That's in the Darwich (phonetic) case from

6    the 6th Circuit.

7             THE COURT:  I understand.  Your objections are

8    preserved in that regard, and I understand the case law.

9    My -- my understanding, at least I think I understand, my

10   understanding is that the communications don't have to move the

11   conspiracy forward, that is, it doesn't have to take it from a

12   point to a new point where it wasn't before necessarily, and I

13   think in this conversation they are discussing a -- a -- a

14   speaker or person, who has been brought in, and I think the

15   government would say brought in to promote and support jihad.

16   And they're discussing the fact that it wasn't as successful as

17   they thought, and only two people showed up.

18             Do I have that right, Mr. Chakravarty?

19             MR. CHAKRAVARTY:  That's right.

20             THE COURT:  And referring to Abu 'Abd-Al-Rahman?

21             MR. CHAKRAVARTY:  That's Mr. Muntasser, your Honor.

22   And if the Court gets back to Mr. Muntasser's role in Care and

23   Chehade's former role with Al-Kifah, these people have a

24   connection between Care and GRF.

25             MS. LUNT:  Your Honor.

1          THE COURT:  Now, I know.  Do we have our jury?

2          (The Court conferred with Mr. Castles.)

3          THE COURT:  Just quickly, Chehade himself is not a

4    conspirator, and so his statements are -- are really offered

5    only to show context and to have an integrated conversation.

6          MS. LUNT:  Your Honor, if I might.

7          THE COURT:  Yes.

8          MS. LUNT:  I would ask you to read this conversation

9    from the beginning, and it's quite clear in context that this

10   has -- this conversation relates to Chehade coming to Boston

11   and being dissatisfied with the social reception at Imad's

12   house.  There's absolutely nothing about a speaker or, you

13   know, the context of the speaker coming to Boston or other

14   conversations.  It's -- the reference to Mr. Munt -- and by the

15   way, your Honor, not every Abu 'Abd-Al-Rahman is Mr. Muntasser,

16   but here on page 6, Chehade mentions the name "Imad."  But in

17   this context, it's purely social.  It's purely casual

18   conversation about past events, and it is unfairly prejudicial,

19   because it puts Mr. Muntasser's name into the activities of

20   Care when there is absolutely no other evidence that he is

21   involved at this time in the activities of Care.

22         THE COURT:  Let me ask a different question.  We have

23   a nonconspirator, Chehade, offering a statement for its truth,

24   that is, that he invited the men, and only two men showed up at

25   his house.  It could come in to show context, but it can't be

1    offered for its truth, right?  He's not a conspirator?

2           MR. CHAKRAVARTY:  Correct, unless it's adopted by the

3    defendant or coconspirator.

4           THE COURT:  Right, and I don't see any adoption.

5           MR. CHAKRAVARTY:  Yeah.  The government isn't arguing

6    to adopt it, but Mr. Al-Monla's response to Chehade's

7    complaints about the failure to reconvene the young men the

8    government alleges are people involved in Care International

9    and Al-Kifah Refugee Center that the failure to do that and

10   Al -- Monla's response is: (as quoted) "I mean these things are

11   no longer done-all of them are no longer done," suggesting that

12   they're trying to sanitize the activities of Care International

13   as the time goes on.

14          THE COURT:  Well, at a bare minimum don't I need to

15   caution the jury that the statements of Chehade whenever

16   they're played can't be considered for the truth of the

17   statements contained therein?

18          MR. CHAKRAVARTY:  I think that is accurate, your

19   Honor, unless your Honor finds that there is a second

20   conspiracy.

21          THE COURT:  All right.

22          MS. LUNT:  Note our objection to that portion, your

23   Honor.

24          THE COURT:  Yes.  All right.  In terms of 540, which

25   is what we're starting with, I do find that these statements

1   are made in furtherance of a conspiracy, again putting aside

2   the statements that Chehade may have made that themselves

3   constitute statement of facts, or statements of fact, for

4   example, in one of these conversations, actually, I think it's

5   538, he says he has a bank account, which is offered or cannot

6   be considered for its truth, but I do think that 540 is

7   admissible; and if there is an issue concerning the

8   completeness of it, Mr. McGinty, we need to know that now so

9   that the government can read everything.

10          MR. McGINTY:  Your Honor, the concern about 540 is

11   that Chehade, not a -- not a conspirator here, is telling

12   Mubayyid "remove them."

13          THE COURT:  Okay.  I understand.

14          MR. McGINTY:  It's then not adopted.

15          THE COURT:  That's not an out-of-court statement.

16   "Remove them" is not a statement considered for its truth.

17   It's in the nature of an instruction or suggestion --

18          MR. McGINTY:  Right, and which --

19          THE COURT:  -- and which Mubayyid, you know, reacts to

20   or doesn't react to, as the case may be.

21          MR. McGINTY:  Right, and Mubayyid says, "It needs uh,

22   one is afraid that they may think there is something, I mean-"

23          Chehade then says, "No."

24          Mubayyid -- I'm referring now to page 4 of the

25   transcript.  I'm sorry.  So the fourth line, Chehade responds,

 1    and "SC" is apparently a simultaneous conversation.

 2             THE COURT:  Right.

 3             MR. McGINTY:  So there is an interruption here.

 4             Chehade said, "No."

 5             Mubayyid says:  "I don't want to touch anything, so

 6    that there is no."

 7             And then Chehade says, "No, no, no, remove them,

 8    remove them."

 9             THE COURT:  Right.

10             MR. McGINTY:  Now, there's no adoptive statement

11    by --

12             THE COURT:  But it's not an out-of-court statement

13    that's offered for its truth.  The next statement, "I received

14    checks today" is an out-of-court statement that -- that is

15    hearsay, but -- but "remove them" is not hearsay.

16             MR. McGINTY:  Right, but Mubayyid's response if he

17    embraces and said, "yes" --

18             THE COURT:  Right.

19             MR. McGINTY:  -- would be a statement in furtherance

20    of the conspiracy to conceal from the government.  If he says,

21    "I don't want to touch anything," it's not in furtherance of

22    anything.  So it's not during the conspiracy, because Chehade

23    is not a conspirator.  It's not in furtherance of it, because

24    it's not embracing the suggestion of Mr. Chehade.  So, this is

25    damaging, very damaging, because what it does is it creates an

1   inference from which Chehade did to what Mr. Mubayyid surely

2   must have done and in turn what Care people must have done;

3   thereby I'm spilling over all the defendants in the case.

4        THE COURT:  The objection is overruled.  I think that

5   the fact that the -- a coconspirator received the suggestion of

6   document destruction from a nonconspirator, coupled with the

7   fact that at least the government suggests that some documents

8   were removed or destroyed, and that that furthered the

9   conspiracy is -- is fair game under the circumstances, so the

10  objection is overruled.

11       MR. McGINTY:  Your Honor, one -- one other element of

12  this.  The government has not suggested any legal support for

13  the proposition that it was an obligation to preserve documents

14  for the year and a half, and the suggestion of document

15  destruction, your Honor, is a devastating accusation against

16  defendants in the case, and when it rests on a defendant saying

17  "no" --

18       THE COURT:  It rests on more than that.  It rests on

19  the government conducting two searches and documents

20  disappearing in between.

21       The objection is overruled.

22       MR. McGINTY:  Your Honor, one other thing, which is

23  that Ms. Pryor -- I -- I thought that this person was coming in

24  as a reader.  We're now told that she has information about

25  GRF.  We have -- or that she has some experience in the GRF

1    investigation.

2            THE COURT:  Let's wait for a question.  If you -- if

3    she testifies substantively, and you haven't received

4    appropriate Jencks material, we'll take it up.  I mean if they

5    attempt to ask her a substantive question, we'll take it up.

6            MR. McGINTY:  We've received no Jencks information and

7    no notice that she would be the substantive conveyer of

8    testimony.

9            THE COURT:  Let's see what happens.

10           Let's bring in the jury.

11           MR. ANDREWS:  Your Honor, you brought up the

12   October 2, 2001 call and its completeness.  I can do it on

13   cross.  I was planning on having most of that conversation read

14   in.

15           THE COURT:  It's up to you.  I don't want it read in

16   twice, okay; in other words, the government is not going to

17   read pages 2 and 3, and then the defense read 1, 2, 3, 4, and

18   5.  We're not going to do it twice.  It's going to be read all

19   at the same time.

20           MR. ANDREWS:  Are we going to read it all at the same

21   time?

22           THE COURT:  You want the entire conversation?

23           MR. ANDREWS:  I've got -- I think so, your Honor.

24           MR. CHAKRAVARTY:  Your Honor, I would object to

25   reading the whole thing.  The whole thing is going into

1    evidence, but not only for the waste of time, but as your Honor

2    can see, these -- these conversations are not linear.  There

3    is, as with any human conversation they're --

4         THE COURT:  We're not going to read every word of

5    every conversation, but I think virtually all of this

6    conversation the government has designated, right, or 80

7    percent of it may be?

8         MR. CHAKRAVARTY:  The pages, that's correct, and then

9    actually the vast majority.

10        THE COURT:  I have the benefit of your highlightings.

11        MR. CHAKRAVARTY:  The vast majority of this one we

12    are, your Honor.

13        THE COURT:  All right.  I think we will take it a

14    transcript at a time.  I think there is no harm in reading all

15    of 540 in terms of waste of time, but we're not going to read

16    every word of every transcript.

17        MR. ANDREWS:  Thank you, your Honor.

18        MS. LUNT:  Can we -- can we address this transcript by

19    transcript, because in a lot of the transcripts, you

20    can't -- you have to see the full scope of what they're talking

21    about.  If you just pick out, as Mr. Chakravarty said to me,

22    the good stuff, which you might see as the bad stuff, it's not

23    all fair.  I want to raise that generally, and we will be

24    raising it transcript by transcript.

25        THE COURT:  Yes, just pick your spots.

1          MS. LUNT:  I understand, your Honor.

2          THE COURT:  There is one of these that is incredibly

3     long.  I will be hard-pressed to read the whole thing.

4          MS. LUNT:  Ours are mostly short, and there is one

5     long one with our plans so we could benefit.

6          (Sneeze.)

7          THE COURT:  Bless you.

8          MR. CHAKRAVARTY:  Your Honor, I also handed up a

9     stipulation with regard to the authenticity of the transcripts.

10          THE COURT:  Do you want it read to the jury?  Are you

11    going to read it?

12          MR. CHAKRAVARTY:  Not today.  I think counsel may have

13    an issue with that.

14          THE COURT:  Okay.

15          COURT OFFICER:  Please rise.

16          (At 9:54 a.m., the jurors entered the courtroom.)

17          THE CLERK:  Court is now open.  You may be seated.

18          THE COURT:  All right.  Ladies and gentlemen, good

19    morning.  I understand one of you was stuck on a train.  I

20    guess I'm surprised that hasn't happened before this morning,

21    and thank goodness for cell phones.  We took the opportunity to

22    try to go through some issues with the lawyers, which is why

23    we're starting even a little bit later than that, to try to

24    minimize the number of sidebars.  So thank you for your

25    patience.

1            All right.  Mr. Chakravarty.

2            MR. CHAKRAVARTY:  The government calls Anne Marie

3    Doursounian.

4            THE CLERK:  Please raise your right hand.

5                   ANNE MARIE DOURSOUNIAN, SWORN

6            THE CLERK:  Please be seated.  Please state your name

7    and spell your last name for the record.

8            THE WITNESS:  Anne Marie Doursounian,

9    D-O-U-R-S-O-U-N-I-A-N.

10                      DIRECT EXAMINATION

11   BY MR. CHAKRAVARTY:

12   Q.   Good morning, Ms. Doursounian.  Excuse me.  Can you

13   pronounce your name again.

14   A.   Doursounian.

15   Q.   "Doursounian."  Miss Doursounian, where are you currently

16   employed?

17   A.   I am employed with the FBI.

18   Q.   Okay.  And what is your role there?

19   A.   I am an Arabic linguist.

20   Q.   And how long have a been a linguist?

21   A.   A little bit over two years.

22   Q.   And what -- are you fluent in both Arabic and in English?

23   A.   Yes.

24   Q.   And have you performed a number of translations both for

25   this case and for other cases?

1    A.   Yes.

2    Q.   With regards to your training and experience at the FBI,

3    were you given a battery of tests before you became qualified?

4    A.   Yes.

5    Q.   And you passed those?

6    A.   Correct.

7    Q.   With regards to this case, did you have an opportunity to

8    review some transcripts of recordings?

9    A.   Yes.

10   Q.   And were you, as well as fellow linguists in your group,

11   all involved with doing a -- reviewing a number of recordings

12   in this case?

13   A.   We are.

14   Q.   And in your -- based on what you know, are those

15   recordings, transcripts, the final transcripts that are here

16   today, are those fair and accurate?

17   A.   They are.

18   Q.   I am going to ask you just very briefly about a couple of

19   them.  I'm showing you a binder containing Exhibits 510 through

20   552.

21        Do you mind just going to 510A.

22   A.   Would you like me to take it out?

23   Q.   Yes.  I am just going to ask you do you recognize that?

24   A.   I do recognize it.

25   Q.   And did you listen to the audio recording on Exhibit 510?

1    A.    I did.

2    Q.    Is 510A a fair and accurate depiction of the English

3    version, English translation of the conversation depicted on

4    510?

5    A.    It is.

6    Q.    Did you also conduct that same review with Exhibit 540?

7          MR. ANDREWS:  In the interest of time, your Honor, Mr.

8    Mubayyid stipulates to the accuracy of 540 -- 540A.

9          THE COURT:  All right.  Is there any dispute as to the

10   accuracy of 540?

11         MR. ANDREWS:  No, there isn't, your Honor.  Hearing

12   none, I'll move on, your Honor.

13   Q.    Ma'am, were there other documents that you also reviewed

14   in this case?

15   A.    Yes, there were.

16   Q.    Okay.  And did you specifically review Al-Hussam magazines

17   or newsletters?

18   A.    I have.

19   Q.    All right.  Without going into detail, did you notice that

20   there were English, as well as Arabic, versions of some of the

21   same issues of Al-Hussam magazines, or newsletters?

22   A.    Could you repeat that, please.

23   Q.    Sure.  Were there English and Arabic versions of some of

24   the Al-Hussam newsletters?

25   A.    There were.

1    Q.    Okay.  And with regards to some of those issues in which

2    there was both an English and Arabic version, did you notice

3    any consistent differences between the English and the Arabic

4    version?

5    A.    Some differences, yes.

6    Q.    And was that on all of the -- those issues or on some of

7    those issues?

8    A.    Some of the issues.

9    Q.    Okay.  And describe what those categories or differences

10   are.

11   A.    One comes to mind, there is a seal on the top right-hand

12   side of the document, and the seal is on some Arabic versions

13   and not on the English ones.

14   Q.    When you say "seal," what does the seal depict?

15   A.    It's a seal in Arabic.  And would you like me to say what

16   is on it?

17   Q.    Sure.

18   A.    "Afghanistan" and "Services Office."  It says

19   "Afghanistan," the seal, and "Services Office."

20   Q.    Were there any other consistent differences?

21   A.    Some disclaimer boxes were in the English version, it said

22   "Care International," or "Care;" and in the Arabic version, it

23   says "Services Office."

24   Q.    And were there any other differences?

25   A.    And some of them, right under the Al-Hussam, the cover

1    page, it said "Care International" in the English version,

2    right under the title "Al-Hussam."

3    Q.   And what did they say on the Arabic?

4    A.   "Services, Maktab-al-Khidmat."

5         MR. CHAKRAVARTY:  Those are all the questions I have.

6         THE COURT:  Cross-examination?

7         MS. LUNT:  No questions, your Honor.

8         MR. ANDREWS:  No questions.

9         MR. McGINTY:  No questions.

10        THE COURT:  Okay.  Thank you.  You may step down.

11        MR. CHAKRAVARTY:  The government calls Betsey Pryor.

12        THE CLERK:  Please raise your right hand.

13                        BETSEY PRYOR, SWORN

14        THE CLERK:  Please be seated.  Please state your name

15   and spell your last name for the record.

16        THE WITNESS:  Betsey Pryor, P-R-Y-O-R.

17                        DIRECT EXAMINATION

18   BY MR. CHAKRAVARTY:

19   Q.   Good morning, Ms. Pryor.

20   A.   Good morning.

21   Q.   Would you please tell the jury where you work?

22   A.   I work at the Chicago division of the FBI.

23   Q.   Okay.  And are you an agent there?

24   A.   I am.

25   Q.   How long have you been an agent?

1    A.    Four years.

2    Q.    And in the course of your duties, have you become familiar

3    with an organization known as Global Relief Foundation?

4    A.    Yes.

5    Q.    Have you reviewed materials related to that organization?

6    A.    Yes.

7              MR. McGINTY:  Objection.

8              THE COURT:  Overruled.

9    Q.    Are you aware of who its executive director was?

10   A.    Yes.

11             MR. McGINTY:  Objection.

12             THE COURT:  Sustained.  The answer will be stricken.

13   Q.    How long have you been familiar with the Global Relief

14   Foundation?

15             MR. McGINTY:  Objection.

16             THE COURT:  Let me see you at the sidebar.

17             (Sidebar as follows:

18             THE COURT:  I'm not following this, Mr. Chakravarty.

19             MR. CHAKRAVARTY:  She's just going to say that Chehade

20   is the executive director, just to provide context for the

21   first call.  She is not going to get into substantive what they

22   were doing, the fact that they were based in Chicago; and that

23   Chehade was its executive director, I think it's important to

24   understanding and reminding the jury who this person is.

25             THE COURT:  All right.

1          MR. McGINTY:  Your Honor, there is a stipulation as to

2     the authenticity of the persons to whom the transcript

3     attributions are made, so there is no reason for this witness

4     to be doing that.  This witness was coming in as a reader.  We

5     got no Jencks whatsoever.

6          THE COURT:  Well, there may not be no Jencks.

7          MR. CHAKRAVARTY:  There is no Jencks.

8          MR. McGINTY:  Well, she was investigating GRF.  We've

9     gotten no indication of this; and frankly, with the first

10    question --

11         THE COURT:  Keep your voice down.

12         MR. McGINTY:  I'm sorry.  Frankly, with the first

13    question one began to suspect that the government was trying to

14    use a --

15         THE COURT:  Just spare me.  The objection is

16    sustained.  Let's just have her read the transcripts.

17         MR. CHAKRAVARTY:  Okay.

18              ...end of sidebar.)

19    Q.   Agent Pryor, what is your role in this, why you're here

20    today?  What did that involve?

21    A.   My role here?

22         MR. McGINTY:  Your Honor, objection.

23         THE COURT:  This is concerning the transcripts?

24         MR. CHAKRAVARTY:  Yes, your Honor.

25         THE COURT:  All right.  Overruled.

1          THE WITNESS:  My role has been to extract some calls

2     from Chicago as they relate to the case here in Boston.

3     Q.    All right.  And did you review transcripts of some of

4     those conversations?

5     A.    Yes, I did.

6     Q.    And were those English language transcripts, which were

7     translated from the original Arabic?

8     A.    That's correct.

9     Q.    Okay.  We're going to go through a handful of these calls

10    now.

11    A.    Okay.

12    Q.    I'm going to ask you to read from portions of them.

13    A.    Okay.

14    Q.    You have in front of you a binder of documents.  Are those

15    the transcripts, both the ones that you read, as well as

16    additional transcripts that are involved in this case?

17    A.    Yes.

18    Q.    I'm going to draw your attention to first -- to Exhibit

19    No. 540.  Can you find that.

20    A.    Uh-huh.  Okay.

21    Q.    Excuse me.  I'll put 540 up.

22          MR. CHAKRAVARTY:  At this point, I move to introduce

23    540, your Honor.

24          THE COURT:  All right.  540 may be admitted.

25          This is 540A, the translation?

1          MR. CHAKRAVARTY:  Correct.  I'm sorry.  540 and 540A,

2    I moving into evidence.

3          MS. LUNT:  Your Honor, we would like to preserve our

4    objection.

5          THE COURT:  Yes, with that reservation, they're

6    admitted.

7          (Exhibits 540 and 540A were admitted into evidence.)

8    Q.   Now, this cover sheet, can you explain what the different

9    notations are on the cover sheet for the jury.

10         MS. LUNT:  Objection, your Honor.

11         THE COURT:  Well, she can read them.  There is no

12   problem with that.  Overruled.

13   A.   You mean starting under "abbreviations" or "date?"

14   Q.   Why don't you start with "date" and "time."

15   A.   Okay.  "Date" is the date of the phone call, October 2,

16   2001.  The time is military time, so approximately 4:14 p.m.

17   "Language" is in Arabic.  The nature of the transcriber and the

18   reviewer are linguists, and the participants of the phone call

19   and then the abbreviations below are notations throughout the

20   transcript, whether it's in English or it's unintelligible or a

21   phonetic spelling, and so forth.

22   Q.   And are these the common renditions that you have seen in

23   translations?

24   A.   Yes.

25   Q.   So, "IA" means what?

1  A.    Inaudible.

2  Q.    Okay.  And "UI?"

3  A.    "UI" is unintelligible.  "SC," simultaneous conversation;

4  and "PH," phonetic; and in the brackets is some background

5  conversations.

6  Q.    All right.  And those common conventions that appear

7  throughout the transcripts?

8  A.    Yes.

9  Q.    With this particular call, I'm going to ask you to read

10  the whole call.

11  A.    Okay.

12  Q.    And with this call, I think if you just start from the

13  rear at the bottom --

14  A.    Yeah.

15  Q.    -- of the page.

16  A.    Okay.

17  Q.    It's a formatting problem.  Why don't you start that.  At

18  least at the beginning, please identify each of the parties of

19  the call.  Before you do it, I'm going to ask a couple more

20  questions.

21        Are the parties on here the participants to the

22  conversations?

23  A.    Yes.

24  Q.    All right.  And with regards to Mr. Chehade -- strike

25  that.

1           Showing you an exhibit marked government's Exhibit

2    No. 93.

3           MR. McGINTY:  Objection.

4           MR. CHAKRAVARTY:  I'm just reading a name, your Honor.

5           THE COURT:  I will permit him to show the witness a

6    document that's in evidence without further testimony about it.

7    I'll permit him to show the document and respond that she sees

8    it or acknowledges it.

9    Q.   All right.  Do you see the name under the signature on

10   that?

11   A.   Yes.

12   Q.   Now, with regards to this call please just read the first

13   page, and then I'll try to flip along with you.

14   A.   Okay.  It starts out at the bottom here with an automated

15   greeting, "Thank you for calling P-Tech.  If you know your

16   party's four-digit extension you can dial it at any time.  For

17   a -" and there is "[dialing an extension]."

18           "Please hold while your call is transferred."

19           And then it's --

20           MR. ANDREWS:  Your Honor.

21           THE COURT:  Yes.

22           MR. ANDREWS:  I would ask that these arrows, and if my

23   brother could perhaps use a -- just a clean version.

24           THE COURT:  All right.  Why don't you take the

25   stickers off there while you're using that, Mr. Chakravarty.

1          MR. CHAKRAVARTY:  Your Honor, the reason for -- I

2    think counsel is objecting to using the highlighted versions.

3    The government would ask that we be able to focus that to the

4    jury.

5          THE COURT:  Why don't, for this one anyway, why don't

6    we use a nonhighlighted version.  We're going to read the whole

7    thing.  Well -- actually, let me.  Both sides have highlighted

8    other items of evidence that they want to call witnesses'

9    attention to, and I don't see that this is any different.  So,

10   I will permit the use of the highlighted transcript.

11         MR. ANDREWS:  Note my objection, your Honor.

12         THE COURT:  Yes.

13   A.   All right?

14   Q.   Please continue.

15   A.   Okay.  "MM" meaning Muhamed Mubayyid.  "accounts-"

16         MC:  Mohamad Chehade.  "Peace be upon you."

17         (As quoted) "unintelligible."

18         "Chehade:  How are you?"

19         "Mubayyid:  Hello, Abu Fayez."

20         "Chehade:  What's new with you."

21         "Mubayyid:  Praise be to Allah, how are you?"

22         "Chehade:  Praise be to Allah.  How are - how are

23   things where you are?"

24         "Mubayyid:  By God I spoke with the man whom you told

25   me about."

1            "Chehade:  Yes."

2            "Mubayyid:  And we told him, man, we would like you to

3      be with us."

4            "Chehade:  Uhum."

5            "Mubayyid:  And he said that he has no objections, and

6      we reached a deal with him.  So he called them and told them

7      that I am-if you want to speak with him regarding any subject,

8      speak with me, and I don't know if they answered him yet or

9      not."

10           "Chehade:  No, no, they did not come to you later."

11           "Mubayyid:  They came to the old location-"

12           "Chehade:  Yes."

13           "Mubayyid:  -I don't know, around fifty individuals."

14           "Chehade:  Fifty individuals?"

15           Mubayyid:  Yes, by God."

16           "Chehade:  Oh my!"

17           "Mubayyid:  I mean, after we moved from there."

18           "Chehade:  Yes."

19           "Mubayyid:  I don't know why."

20           "Chehade:  Amazing."

21           "Mubayyid:  So, they couldn't get in, there was

22     [unintelligible] a new tenant."

23           "Chehade:  Yes."

24           "Mubayyid:  And they were to return later.  By God,

25     they returned, they came back two lays dater, maybe even the

1   following day, fifty individuals, they went in, I don't know

2   what they got, if they had the authority or the such."

3           "Chehade:  What did you have?  Did you have things?"

4           "Mubayyid:  Actually we had already moved, we were not

5   there."

6           "Yes."

7           "We had moved our effects to uh-what do you call it?

8   To storage."

9           "Yes."

10          "Mubayyid:  So, I don't know if they entered the

11  storage, however no one has come near me and threatened me, no

12  one has asked me for anything."

13          "Chehade:  Alright.  What do you have?  Storage?

14  What-what do you have for storage?  Take the things out of

15  storage."

16          "Mubayyid:  They were originally locked, in- in- in-

17  uh, in- the uh- in the office, and we moved them to the

18  storage."

19          "Chehade:  Books, books, and things."

20          "Mubayyid:  Yes, yes."

21          "Chehade:  Remove them."

22          "Mubayyid:  It needs uh, one is afraid that they may

23  think that there is something, I mean-"

24          "Chehade:  No."

25          "Mubayyid:  I don't want to touch anything, so that

1    there is no."

2              "Chehade:  No, no, no, remove them, remove them.  [He

3    inhales] you- I received- I received checks today."

4              THE COURT:  Let me stop you there.  Ladies and

5    gentlemen, let me caution you.  To the extent that Mr. Chehade

6    is speaking here, you may not take his statement for the truth

7    of the matter asserted, that is, this is not evidence that

8    Chehade received checks.  It's offered to show the complete

9    context of the conversation and the impact upon the defendant

10   Mubayyid, the listener, or the other participant of the

11   conversation.

12             You may continue.

13             THE WITNESS:  "Mubayyid:  They did not arrive until

14   today?"

15             "Chehade:  Yes."

16             "Mubayyid:  I have sent you many shipments."

17             "Chehade:  Three checks, weren't they three checks?"

18             "Mubayyid:  I sent you a number of letters."

19             "A number of letters?"

20             "Yeah."

21             "Chehade:  Three checks have arrived."

22             "Mubayyid:  That's it?"

23             "Chehade:  Yes, how many checks- how many checks have

24   you sent?"

25             "Mubayyid:  I sent you with the business supply,

1   around two, three, and inside each one there is also two,

2   three."

3           "Chehade:  By God?  What's this for?  Do you want to

4   ruin us?  [He laughs]."

5           "Mubayyid:  These were- each check was sent for an

6   individual country."

7           "Chehade:  Alright, good.  May Allah reward you.  Can

8   I ask you for one thing?"

9           "Mubayyid:  What is it?"

10          "Chehade:  That- I mean, uh- You are- All of us -- All

11  of you at the present time- We are under a tremendous amount of

12  pressure."

13          "Uhum."

14          "Chehade:  [Inhales, and exhales loudly].  Alright, so

15  do you think that we should deposit them?"

16          "Mubayyid:  Why, don't you mean?"  I don't know what

17  you mean, you don't want to deposit them?"

18          "Chehade:  Now, I don't know, uh- [makes some noises]

19  tif, tif, tif, tif, tif..You, they didn't, they didn't make

20  you, I mean, the situation, the situation is normal where you

21  are, correct?"

22          "Mubayyid:  Nothing has happened until now.  Are they

23  doing anything to you?"

24          "Chehade:  Alright, then why did they come?  Why did

25  they come?  The media, the media is killing us, the medial is

1    killing us, killing us, killing us.  Then why did the fifty-

2    the fifty individuals come to you like that?"

3              "Mubayyid:  How I should know [and he snickers]."

4              "Chehade:  Amazing.  Are you talking seriously?"

5              "Yes, by God."

6              "Who told you that fifty individuals came?"

7              "Mubayyid:  Well, the owner's brother there, in an

8    adjacent place."

9              "Yes."

10             "And he was the one who told uh, Samir, on that day."

11   And there is a call to prayer in the back.

12             "Chehade:  Amazing.  So, what-?"

13             "Mubayyid:  So you don't want to- to- to cash them, or

14   what?"

15             "Chehade:  By God, I don't know uh- well, I am-"

16             "Mubayyid:  But why have you received only three?  The

17   three that you received, did they arrive in a regular envelope?

18   Or in a, in a business?"

19             "Chehade:  By God, I don't know, the brother just

20   showed them to me, they were inside a regular envelope, I

21   think."

22             "Mubayyid:  You mean not in a business supply."

23             "No, I think one was for fifteen, one for four, and

24   one for a little over three."

25             "Mubayyid:  Alright, then these arrived in a regular

1    envelope."

2         Yes.  And there were things- Why, how much was the

3    total?"

4         "Mubayyid:  I had sent before it, two or three

5    business reply."

6         "Yes, how much?"

7         "And each with two or three inside it."

8         "Yes, how much was the total of all of them?  All of

9    it, all of it, all together."

10        "By God I do not remember, there were sixty thousand,

11   something like that."

12        "Chehade:  Are you serious?"

13        "Mubayyid:  Yes, by God."

14        "Chehade:  [Inhales] Aaahh."

15        "Mubayyid:  Do you want me to- Do you want me to send

16   them to someone else?  So that I know, if they are."

17        "Chehade:  No, that is not the issue.  Mmmmmmm By God,

18   I don't know uh-"

19        "Mubayyid:  I am finding it strange, where are the

20   checks?  Why haven't they arrived yet?"

21        "Chehade:  Yes, they have not arrived.  No, of course,

22   we, we, we have very, very, very tremendous pressure upon us.

23   And the media, and the world, and the ABC, and the Wall Street

24   Journal, and the Chicago Tribune, and the New York Times, and

25   they are exhausting us to the extreme, to the extreme."

1          "Mubayyid:  What do they want from you?"

2          "Chehade:  How should I know, I will send you an

3    article, via e-mail, an article that they published, a long and

4    detailed wide story."

5          "Uhum."

6          "A very detailed story.  What I see, is that it is

7    possible to- I don't know- Are you in a hurry for them now?"

8          "Mubayyid:  Our concern is that the money gets spent,

9    uh-"

10         "Chehade:  During Ramadan."

11         "Mubayyid:  That they reach the target people as soon

12   as possible, Allah willing."

13         "During Ramadan."

14         "Not during Ramadan, before Ramadan, because

15   they -- they just sent them to you.  Not during Ramadan."

16         "Chehade:  Alright, alright, can you send me a

17   letter-"

18         "Uhum."

19         "Uh, a letter that you will send to me- I mean,

20   directed from CARE to us, that we sent you this much, so and

21   so, and they should be spent as follows, one, two, three, four

22   five, six.  You see?"

23         "Mubayyid:  Actually, we had written on each check."

24         "Yes, I know, I know, but as a formal letter or the

25   like, as- as- as you want, do you think that this is enough?"

1    "Enough, of course, of course."

2    "Chehade:  Enough?"

3    "Mubayyid:  It is written on the check where it is

4    going."

5    "Hmm, hmm, hmm.  What- what- what is your e-mail?"

6    "Mubayyid:  I believe you, however, I want you to send

7    them quickly, I mean, as soon as possible, that is the

8    important thing."

9    "Chehade:  Okay, ah, alright, good, by God, one should

10   pray to God about the situation- How things are, by God-"

11   "Mubayyid:  If you feel that it is possible that you

12   will not cash them, let me know so that I can send them to

13   someone else, before they what you call it-"

14   "Hmm."

15   "You need to tell me now, I will send them, I will

16   send them now, I mean, don't make me wait."

17   (As quoted) "Chehade:  Why are you in such in a hurry

18   about them now?  Now, now."

19   (As quoted) "Mubayyid:  When, when the fifty

20   individuals came to us, we thought, may God ruin them, I mean

21   their intention is evil."

22   "Hmm."

23   "That's why, we began to- we don't want them to put

24   their hands on them, this is the money of Muslims, it is not

25   theirs."

1          "Chehade:  Of course, of course.  Approximately
2    sixty?"
3          "Huh?"
4          "They totaled approximately sixty?"
5          "Maybe it is more, brother, I don't know exactly how
6    much.  I mean the total of what you will receive."
7          "Chehade:  Hmm, alright.  Alright, let me pray to God
8    the Almighty, and I will see what the situation is like,
9    whether we put them-"
10          "Mubayyid:  Will you be able to cash them or not?"
11          "Chehade:  Now, let me pray to God, and see what the
12    situation is like.  Uh, because-"
13          "Why did your voice become weak like this?"
14          "Chehade:  What?  Now, with you?"
15          "Your voice became weak.  No, it is alright."
16          "Chehade:  Okay.  Let us pray to God and see, because
17    the situation is also- Uh, let us see, we will open eyes and
18    things- we don't want -- have anything wrong, however, they are
19    attacking us ferociously, and you as well, I mean, it seems
20    that there are many things that they are attacking.  So, who
21    is?- Now, now, I mean, uh, who is?-  Are you on the CARE
22    account?"
23          "Mubayyid:  It is I and Suhail now."
24          "Chehade:  And they came to you, isn't that right?"
25          "They came in a normal fashion, just as they came to

1    many other individuals, I mean, it was not-"

2            "Hmm."

3            "-On the basis that we work with this organization."

4            "Hmm, ah."

5            "Mubayyid:  I told you, then they requested they

6    wanted to see where-"

7            "Sh-"

8            (As quoted) "-We send money, so I told them, I am

9    ready to assist you, however when I spoke with an attorney, he

10   told me, don't speak with them, don't tell them anything, don't

11   speak with them at all."

12           "Chehade:  Did you tell them- did you tell them that

13   there are many foundations, among them Global Relief?"

14           "Mubayyid:  Yeah, I told them that we cooperate with

15   many foundations and among them these ones."

16           "Okay, alright, good.  [Inhales]  alright, let me by

17   God- let me pray to God, so that one prays and see how- Thus

18   far, we have received three, nothing else."

19           "Mubayyid:  Yes, I don't know why?  The rest did not

20   arrive?"

21           "Chehade:  No, they did not.  When did you send them?"

22           "I sent them first business reply.  I sent them before

23   the ones you have received now."

24           "Before these?"

25           "Yes."

1           "Amazing."

2           "Mubayyid:  Are you sure that you opened up all of the

3     checks?"

4           "Chehade:  Of course, of course, let me see, let me

5     ask the brother, okay?"

6           "Make sure."

7           "Yes, yes, yes, yes."

8           "Because there should be about nine checks, other than

9     these."

10          (As quoted) "Chehade:  Alright, good Allah willing.  I

11    told the attorney that another foundation may contact him-"

12          "Hmm."

13          "-Uh, and I spoke with him regarding us.  Uh, I mean,

14    the advice is that, although one does not have anything wrong,

15    and has not done something illegal and the like, that he does

16    not say even one word to them unless an attorney is present."

17          "Mubayyid:  That's it, that's why we hired him."

18          "Chehade:  Yes, yeah.  Never- I will speak with you

19    later, Allah willing."

20          "Alright-"

21          "Alright."

22          "-Let me know quickly-"

23          "Chehade:  Okay, alright, good.  Alright, good."

24          "Mubayyid:  In regards to India, do you have-?  Do you

25    want-?  We have money for India as well.  Is there a

1    possibility, is there a possibility, or not?"

2             "Uh, for India?  No, we do not have."

3             "Mubayyid:  You have nothing."

4             "Chehade:  Approximately how much do you have for

5    India?"

6             "Maybe around three thousand."

7             "Chehade:  Yes, good, good.  Good, good."

8             "Mubayyid:  Shall I send them to you?"

9             "Yes, yes, good."

10            "Alright."

11            "Alright, good."

12            "Alright, may Allah-"

13            "Peace be upon you."

14            "Peace be upon you."

15            End of the conversation.

16            THE COURT:  Ladies and gentlemen, before we proceed

17   any further, just so there's no confusion about it, you should

18   not infer anything from the fact that someone consulted with an

19   attorney, who told them not to say anything.  That's not proof

20   of guilt or a guilty conscience.  That is -- and you may not

21   infer anything of the sort from the mere fact of that

22   conversation.

23            All right.  Mr. Chakravarty.

24            MR. CHAKRAVARTY:  Thank you, your Honor.

25   Q.   Ms. Pryor, do you know what happened two days after the

1   receipt of that call?

2           MR. McGINTY:  Objection.

3           MS. LUNT:  Objection.

4           THE COURT:  Let me see you at sidebar.

5           (Sidebar as follows:

6           THE COURT:  What do you expect the answer to be?

7           MR. CHAKRAVARTY:  That the storage locker was searched

8   in Boston.

9           THE COURT:  I thought this witness was not going to

10  give any substance; and my only concern, I think, at least as

11  expressed is that there has been no Jencks production as to

12  this witness.

13          MR. CHAKRAVARTY:  I guess I didn't construe that as

14  substantive.  Rather just to situate the jury so I can go onto

15  the timing of this call.

16          THE COURT:  Well, I think I will permit you to show

17  the witness a document that's in evidence and have her note

18  something on that document, but I think that has got to be the

19  extent of it --

20          MR. CHAKRAVARTY:  Okay.

21          THE COURT:  -- without Jencks production given my

22  earlier order.

23          MR. CHAKRAVARTY:  Well, she has -- she has no Jencks.

24  She didn't write anything, and certainly even if that was, she

25  has certainly not written anything about that kind of thing.

1    All she was -- she is talking about the calls.  I asked her to

2    be able to put some of it in context so the jury understands

3    what the call is about.  So she didn't create a report.  She

4    wasn't even at the FBI at the time of the search.

5          THE COURT:  Well, I'll let you accomplish that through

6    showing her documents that are in evidence and just pointing

7    out what the documents say.

8          MR. CHAKRAVARTY:  Okay.

9          MR. McGINTY:  Might I ask Your Honor what document the

10   government is going to be using?

11         THE COURT:  They can use whatever they want, if it's

12   in evidence.  If it's in evidence.

13             ...end of sidebar.)

14   Q.   Agent Pryor, I'm going to move on to the next call.

15   A.   Okay.

16   Q.   And turn to Exhibit No. 538.

17   A.   538?

18   Q.   538, 538A, excuse me.

19         MR. CHAKRAVARTY:  Your Honor, I move to move into

20   evidence Exhibits 538 and 538A.

21         THE COURT:  All right.  Subject to previous

22   objections, it may be admitted.

23         (Documents were admitted into evidence.)

24         THE COURT:  Mr. Chakravarty, is this offered against

25   all defendants?

1       MR. CHAKRAVARTY:  This -- yes, your Honor, it is.

2       THE COURT:  All right.  Ladies and gentlemen, just

3  another caution before we go any further.  These conversations

4  are not in chronological sequence, so just so there is no

5  confusion on that point.  The previous conversation was October

6  2001, and this is January 2000, okay.

7       Mr. Chakravarty.

8  Q.   Can you just state the date and time of this call and the

9  parties to the conversation.

10  A.   The date is January 10, 2000, at approximately eight

11  o'clock.  The language is Arabic.  The transcriber is a

12  linguist, and the participants are Mohamed Chehade and Muhamed

13  Mubayyid and an unknown female.

14  Q.   And Ms. Pryor, this was a previous conversation?

15  A.   Of the same phone call, right.

16  Q.   And this one, I'm not going to ask you to read the whole

17  thing.  I draw your attention first to page 3, and at the risk

18  of straining your neck, is it possible for you to see the

19  highlighted version on the screen?

20  A.   Uh-huh.

21  Q.   Can you read directly from the screen?

22  A.   Sure.

23       THE COURT:  And speak into the microphone at the same

24  time if you move it.

25       THE WITNESS:  Okay.

 1              THE COURT:  Thank you.

 2              THE WITNESS:  It starts with Mohamad Chehade:  "How

 3     can we send, for example?"

 4              "Mubayyid:  We sent an amount to uh, to Al-Asmar down

 5     there."

 6              "Chehade:  Well, Al-As, Al-Asmar spoke with me."

 7              "Hmm."

 8              "And told me about the uh- I mean the, the, now, the

 9     burial and things and so on."

10              "Hmm."

11              "Chehade:  I told him, brother, help what you must

12     there, and we will give you here, in the personal account, you

13     know how?"

14              Down further, Mubayyid says, "He withdrew them there."

15              "Yes.  Meaning he withdrew from it, you mean."

16     Q.   The next page, page 4.

17     A.   "Mubayyid:  I was thinking, because we were supposed to

18     open up a branch of ours there, the arrangement would have been

19     very easy."

20              "Chehade:  Easy?"

21              "If we had a branch there."

22              "Chehade:  Well, this is the problem.  There is,

23     however the problem is that it is very, very sensitive, you

24     know how?"

25     Q.   Okay.  Page 5.

1    A.    "Chehade:  It is possible like that.  It is possible if,

2    if you have, we can send a check to you, with the foundation's

3    name, and there, I don't know how, like that, it is very

4    possible."

5            "Chehade" --

6            THE COURT:  Can you just make clear, for the record,

7    when you're --

8            THE WITNESS:  When I'm skipping?

9            THE COURT:  When there are gaps between different

10   parts of the conversation.

11           THE WITNESS:  Sure.  Sure.  Skipping down.

12           "Chehade:  Do you know that his brother is the same

13   thing, huh?"

14           "Mubayyid:  Who's brother, Al-Asmar's?"

15           Skipping down to "Chehade:  No, he went, he, he told

16   me."

17           "Mubayyid:  Are you serious?"

18           Flipping.  "Mubayyid:  Whose brother, Bassam's or

19   Al-Asmar's?"

20           Skipping down to "Chehade: This is, this is when I

21   spoke with him on the phone, and he sent me an e-mail and

22   things so uh, this is, ah, this is, brother, this is our duty,

23   of course, I mean our duty is never to abandon -- is to never

24   abandon, it is not an issue of one, two, or three days."

25           "Chehade:  Not speedily, we need to try, yes.  But we

1   need to see how the situation is, so that it is in a safe

2   manner, I mean."

3          "Mubayyid:  Alright."

4          Skipping to "Chehade:  Well, that's it, they, they

5   started arresting, and they started, I mean ah, like that uh,

6   harassing people and things, so."

7          "Chehade:  People aren't used to these things for a

8   long time, you know."

9          "Mubayyid:  Yeah, yeah."

10          Skipping to "Chehade:  May Allah bless, and another

11   thing, brother we have another source, do you understand?"

12          "Mubayyid:  Mhum."

13          "Chehade:  Ah well, we will talk about it later."

14          "Mubayyid:  Alright."

15          "Chehade:  I mean the, uh, uh, it is, regarding the

16   orphans and the fa, fa, families, etc, it's necessary to help

17   them."

18          "Mubayyid:  Yes, that's what we're doing; all we're

19   doing is helping the orphans and the-"

20          (As quoted) "Chehade:  Yes.  That's just, that's just

21   it, yes, that's it."

22          MR. CHAKRAVARTY:  Now, your Honor, at this point, I am

23   going to seek to introduce government's Exhibit 489, which is

24   self-authenticating.

25          THE COURT:  All right.  Is there any objection?

1          MR. McGINTY:  Your Honor, may we approach?

2          THE COURT:  All right.

3          (Sidebar as follows:

4          THE COURT:  All right.  What is the objection?

5          MR. McGINTY:  This is not an item in evidence.  I ask

6     the Court's direction to be that the government could have put

7     in things that were in evidence.  The government wishes to put

8     something that is not in evidence so they can have an

9     evidentiary connection immediately, immediately prior to

10    playing a tape of a call with my client where the subject of

11    the conversation is not mentioned with the name of the person,

12    who is not mentioned in the tape, so --

13         THE COURT:  They're -- they are allowed to introduce a

14    document that is self-authenticating at any time; and once, if

15    I admit the document, they're -- they will be permitted to show

16    it to the witness.  I don't see anything improper about that,

17    but the document itself appears to be a self-authenticating

18    public record.

19         And is there an objection as to the document itself?

20         MR. McGINTY:  There is not.  And show it to the

21    witness with what respect?

22         THE COURT:  Well, I'm showing it's marked as Exhibit

23    489.  What does it say here?  What does it say there?  She's

24    not going to interpret it, but she can read what it says.

25         The objection is overruled.

1          MR. ANDREWS:  Since we're here, your Honor.

2          THE COURT:  Yes.

3          MR. ANDREWS:  I would ask that the witness be

4     instructed to read in a more measured manner.  She is not

5     really -- she's starting to inflict a little bit of an

6     editorial enunciation on some of the words.  Some of things she

7     says are as if the speakers are sarcastic, or putting undue

8     emphasize on certain words.  She is just not in a position to

9     do that.  She didn't listen to the Arabic.  She's just reading

10    English.

11         THE COURT:  All right.  I didn't notice that, but what

12    I'm going to do is I'm going to give the jury yet another

13    caution that this is someone reading an English translation, or

14    any voice infliction, or whatever, obviously -- which is going

15    to be impossible to avoid is the reader's not -- and not the

16    originals, and if I think she's being unfair, I'll talk to her.

17         MR. ANDREWS:  Your Honor, she -- in the last thing she

18    sort of exaggerated "we're doing it for the families and

19    orphans."  She has the ability to read it flat, your Honor,

20    with all due respect.  She's a trained agent.

21         THE COURT:  All right.  The objection is noted.

22         ...end of sidebar.)

23         THE COURT:  All right.  Exhibit 489 may be admitted.

24         (Document was admitted into evidence.)

25         THE COURT:  And ladies and gentlemen, this is perhaps

1    stating the obvious, but again let me give you one more

2    caution.  This witness is reading the English translations, and

3    the originals obviously were in Arabic.  As she is reading, she

4    may have a voice inflection of some kind.  She's not really

5    permitted to interpret the documents; in other words, she is

6    supposed to be give us a straight reading of the document, and

7    you shouldn't infer anything at all from whatever inflection

8    she may have while she is reading the document.

9            Mr. Chakravarty.

10           MR. CHAKRAVARTY:  Thank you.

11   Q.    Ms. Pryor, turning your attention now to 489, and if you

12   could just read this line up here.

13   A.    "Social Security Administration, Baltimore, Maryland

14   21235."

15   Q.    And can you just read these last three lines here.

16   A.    The last three?

17   Q.    Yes, right there.

18   A.    "Section 405, and that the annexed are true and complete

19   copies as approved for disclosure of certain such documents in

20   my custody as aforesaid."

21   Q.    I draw your attention now to the fourth -- the second page

22   of this document.  Could you read just the name.  Can you read

23   that.

24   A.    Yes, "Bassam A. Kanj."

25   Q.    Can you read the birth.

1  A.    Date of birth is February 8, 1964.

2  Q.    Can you read from DOD.

3  A.    The DOD is January 6, 2000.

4  Q.    Can you read this.

5  A.    Lebanon.

6  Q.    All right.  And this part?

7  A.    The DTH, death in Lebanon.

8  Q.    And the date of the call you just read a second ago?

9  A.    Was January 10, 2000.

10  Q.    Let me show you Exhibit 191.  Can you read who this check

11  is paid out to.

12  A.    It's paid to "Marlene Kanj."

13  Q.    Can you read the memo section?

14  A.    "For orphans and widows sponsorship."

15  Q.    And that's signed and dated as well?

16  A.    Yes.

17  Q.    And the date?

18  A.    September 9, '00 -- 2000.

19  Q.    I'm going to draw your attention to Exhibit No. 539A.

20  Turn to that, please.  Now, Agent Pryor, can you tell the jury

21  the date and time of this call.

22  A.    The date is April 6th.

23  Q.    Strike that.

24         MR. CHAKRAVARTY:  Your Honor, I haven't moved these

25  into evidence yet.  539 and 539A, I'm moving into evidence.

1          THE COURT:  All right.  Subject to the earlier

2    standard objections, it may be admitted.

3          (Exhibits 539 and 539A were admitted into evidence.)

4    Q.    Now, Ms. Pryor, can you read date and time?

5    A.    Sure.  The date is April 6, 2000.  The time is about 6:56

6    p.m.  The language is in Arabic.  The transcriber and the

7    reviewer's name are there.  The participants are Mohamed

8    Chehade, Samir Al-Monla and an unknown female.

9    Q.    So, the commonality between the last three is Mr. Chehade?

10   A.    Yes.

11   Q.    All right.  Agent Pryor, I ask you to read a few select

12   pages of this document.

13         THE COURT:  Again, ladies and gentlemen, let me

14   caution you to the extent that Mr. Chehade is speaking on these

15   tapes, and he gives a statement of fact, you may not consider

16   it for its truth; for example, if he said, "I bought an

17   automobile today," it's not proof that he bought an automobile.

18   It's offered to show context and the impact on the speaker.

19   Okay.  Or on the listener.

20   Q.    Just one other question on the cover page, Agent Pryor.

21   When it's in italics, as it appears on the transcript, what

22   does that mean?

23   A.    That means that it was actually spoken in English.

24   Q.    And when it's underlined what does that mean?

25   A.    That it was spoken in a second foreign language.

1    Q.    And that's not Arabic or English?

2    A.    Not Arabic or English, right.

3    Q.    This is the front page.  I'm not asking you to read from

4    this.  Start with page -- starting at page 6, can you read the

5    highlighted portions.

6    A.    "Chehade: -You see?  I don't want to- by Allah - take us

7    here and there, so, I paged you, and no one answered.  On the

8    second day- then- then Abu 'Abd-Al-Rahaman- even Bos-, even Abu

9    'Abd-Al-Rahman, even- I mean, 'Imad-"

10           "Al-Monla:  Hmm."

11           "Chehade:  -man he invited the men and only two men

12   showed up at his house-"

13           "Hmm."

14           "He invited many men-"

15           "Al-Monla:  It is from before - I mean- all of these

16   things are no longer done- all of them are no longer done."

17   Q.    Turning to page 7.

18   A.    "Chehade:  But as for all of the brothers, no one came- I

19   mean, I was surprised that the men, he had invited all of them.

20   Then we went the second day- I mean- we went, we met like, they

21   wanted to meet at-"

22           "Al-Monla:  At the office."

23           "Chehade:  -Where?  At the office.  I told him,

24   brother, forget about the office, and the such, it is better

25   here.  So, we met once, we stayed up late one night, there was

1   around seven or eight of us, and this is-uh-this is the

2   guest- and as they say, this is the face of a guest.  I told

3   them, brothers, what is this?  I mean, by Allah- Boston- I hate

4   Boston.  Do you know why I hate it?  The men are far from each

5   other, far away, it is a trip between one and another, they are

6   busy, and the rush- I mean, Boston, to be honest, I told the

7   men, if someone wants stays in America temporarily it is not a

8   place to be.  Period-"

9           "Al-Monla:  Correct."

10  Q.    Page 8.

11  A.    "Chehade:  I mean- there were not many preparations.  I

12  mean, I just said, By Allah, there is nothing, just to see the

13  men, that's all, I mean, there were not any social

14  considerations, I mean, it's not a social matter- that, you

15  know-"

16          "Al-Monla:  Hmm."

17          "Chehade:  I mean, by Allah, I don't have a business

18  there-"

19          "I understand."

20          "Yes, and there was a deal, like that-uh-deal, I had

21  come for a certain quick thing, for our brother who- like- got

22  married and- uh-uh there was a deal, I mean on the airlines, it

23  was very cheap if two travel, you see?"

24  Q.    All right.  Now, page 11.

25  A.    "Al-Monla:  I was very hurt, I was very hurt for the

1  brother- I am very happy because- Allah the Great and Almighty

2  willed it that, I mean, I stand by him.  When I was there, I

3  stayed with him for about two or three weeks [small laugh], my

4  family would get on my case, 'are you here to see him or us?'"

5          "Chehade:  Who?  Who?  Who is the brother?"

6          "Al-Monla:  Yes."

7          "Chehade:  The one that got married?"

8          "Al-Monla:  Yes."

9          "Chehade:  By Allah?  Who."

10         "Al-Monla:  By Allah the Almighty, I can give you

11  details, I mean, I mean- he used to warn me, that one, our

12  friend-"

13         "Hmm."

14         "-he used to tell me, you are spending too- [he

15  laughs]."

16         "Chehade:  What?"

17         "Al-Monla:  You are spending too much time, you are

18  spending too much time-"

19  Q.   Okay.

20  A.   "Al-Monla:  Uh- I went an saw with my own eyes- I saw- I

21  mean, I went up, and we went, and we returned, and he

22  introduced me to many men-"

23         "Chehade:  Allah helps, Allah helps."

24         "Al-Monla:  Many, many, many- and what's going on and-

25  and I told him yes.  He told me, I am in need-"

1           "Chehade:   True."

2           "Al-Monla: -I mean, what did I tell you?  I mean- Why

3     did I give them to him?"

4           "Chehade:  Yes, yes, yes, yes."

5     Q.   Okay.  Now, page 14.

6     A.   "Al-Monla:  -Our brothers and our beloved that are there

7     - if anyone departs-"

8           "Chehade:  Yes."

9           "Al-Monla:  -we are -- res- responsible for him, by

10    Allah."

11    Q.   Page 15.

12    A.   "Chehade:  Of course."

13          "Al-Monla:  Do you understand me?"

14          "Of course, of course."

15          "Al-Monla:  And they got used to it and the children,

16    praise to Allah, memorized [the Qur'an] and they are speaking,

17    I mean, may Allah be praised- and what do we do bring them

18    here?  This is something I am not in agreement with-"

19          "Chehade:  Brother, look this matter-"

20          "This one, I am not in agreement with you-"

21          "Chehade:  -and I - this matter is dangerous and we do

22    not like it and it seems that the mother-"

23          "So you're agreeing with me?"

24          "Chehade:  Of course - the mother - of course - the -

25    uh - all of the- the people."

Q.    Page 16.

A.    "Al-Monla:  I told him- uh - brother why are you doing

this?  The man is gone.  He did his best.  Man, he did his

best-"

            "Chehade:  We are-"

            (As quoted) "Al-Monla:  He said, I want to do this and

that he did that and that's all."

            "Chehade:  The most important thing for us is-"

            "-you know more than him, help him out now-"

            Skipping down to "Al-Monla:  And with three

hundred- uh- thousand, he faced three hundred - I don't know

how many-"

            "Chehade:  The most important thing is that his family

does not come here, brother.  The childr- will be corrupted."

Q.    Page 17.

A.    "Al-Monla:  Yes.  Allah now has blessed him and his

children and this- because he is working like this- However,

this woman and her kids, she is living there.  Man, just give

her the money for the potatoes and the school and that's all."

            "Chehade:  This is not an issue.  The issue on the

contrary- it is already taken care of.  The more important- I

however, the truth is that I heard that there are problems

between her and the family of the man."

Q.    Page 18, on the bottom.

A.    "Chehade:  No, no, uh-no-I am in agreement with you,

1  however, these matters we are supposed to- I mean, we agreed

2  that this is a continuing sponsorship.  [There is a phone

3  ringing in the background.]  This is not a problem."

4          "Al-Monla:  Not at all."

5          "Chehade:  Alright, brother, in any case, we ask Allah

6  that He helps-"

7  Q.   And page 22.

8  A.   Al-Monla:  Do you understand what it means I owe the man a

9  favor?  And this is shameful?"

10          "Chehade:  Of course, of course."

11          "By Allah, this is shameful, shameful- not because he

12  took care of me and you, he takes care of everyone-"

13          "Chehade:  Of course, of course."

14          "-I went and saw with my own eyes, By Allah, this is

15  shameful.  I am not doing this for nothing.  By Allah, I'm

16  going to explode.  I can't find anyone to share my burden

17  with."

18          "Hmm."

19          "Al-Monla:  I mean that, I- you don't you know how

20  dear he is to me.  You don't know what we did over there."

21          "Chehade:  Of course, of course."

22          "Al-Monla:  He came during the first few days.  I,

23  with my own hands-"

24          "I know, I know, I know-"

25          "By Allah, by Allah, this is shameful, this is sad."

1          "Of course."

2          "I mean, you have forgotten him!  By Allah, I mean,

3     you have forgotten him!"

4          "Chehade:  No, no."

5          "Al-Monla:  I still remember when I was still- he fed

6     grains, fed me Mughli, fed me- fed me- uh- for a quarter of

7     Lebanese Pound, and for half a Lebanese Pound- uh-fed Sahlab

8     and Mahlab and the such."

9          "Chehade:  [Laughs]."

10         "Al-Monla:  I'm telling you, I mean- who did we stand

11    by?"

12         "Chehade:  Of course, of course."

13         "Al-Monla:  By Allah, by Allah the Almighty, the man

14    performed the fast, he prayed, he memorized the Qur'an.  By

15    Allah, he used to give lessons, bring the Sheikh, bring the

16    tapes, and gather the men, like this continuously-"

17         "Of course, of course."

18         "Al-Monla:  By Allah, my family did not see me because

19    of all the time I spent with this man.  By Allah, ask his

20    family."

21         "Hmm."

22         "By Allah, by Allah."

23         "Chehade:  Yes."

24         "Al-Monla:  I mean, he used to see his family by

25    accident- because he was- uh-"

1          "Chehade:  Of course - I know, I know."

2          "Al-Monla:  It was him- uh-"

3          "-and he waits till his family goes to school and

4     brings the men to his house."

5          "Al-Monla:  We go to people to get them their

6     sponsorships, their orphans - and aha-and we bring people to

7     sponsor them.  This one is one of us, brother."

8          MR. CHAKRAVARTY:  That is the last of this portion.

9          THE COURT:  Is this a good time to take the break?

10         MR. CHAKRAVARTY:  It is, your Honor.

11         THE COURT:  Okay.

12         THE CLERK:  All rise.

13         (At 10:52 a.m., the jurors left the courtroom.)

14         THE COURT:  Just quickly, before we switch reporters.

15    Do we have more transcripts?

16         MR. CHAKRAVARTY:  She's done, your Honor.

17         THE COURT:  Okay.

18         MR. CHAKRAVARTY:  So cross.

19         THE COURT:  All right.  We'll take our break.

20         (At 10:53 a.m., there was a break.)

21         THE COURT:  Okay.  Let's bring the jury in.

22         (At 11:01 a.m., the jurors entered the courtroom.)

23         THE CLERK:  Court is now open.  You may be seated.

24         THE COURT:  Mr. Chakravarty, anything further?

25         MR. CHAKRAVARTY:  No further questions.

```
1              THE COURT:  Cross-examination?

2              MS. LUNT:  No, your Honor.

3              MR. McGINTY:  I have no questions.

4              MR. ANDREWS:  Your Honor, I apologize but just at the

5    break I was trying to round up people.  I'd like to see the

6    Court just very, very briefly at sidebar.

7              (Sidebar as follows:

8              MR. ANDREWS:  I didn't want to surprise my brothers,

9    but the government had originally planned to offer

10   Exhibit 541A.  They've informed me right before the start of

11   business today that they weren't going to put that in.  There's

12   a portion of that I'd like to put in through this witness.

13             THE COURT:  Okay.

14             MR. ANDREWS:  But before I start having her read this

15   portion, I didn't want to have her start reading it and

16   then . . .

17             MR. CHAKRAVARTY:  There's no hearsay exception if a

18   defendant is offering the statements.  And it doesn't go to

19   context of any other call.  Clearly there are parts of this

20   call which the government has found favorable, however, we're

21   not going to introduce this call.

22             THE COURT:  All right.  And it's defendant offering

23   his own out-of-court words, so why does that fall within

24   801(d)(2)(e)?

25             MR. ANDREWS:  It's actually being offered for the
```

1   context of some of the prior testimony, and also the context of

2   Richard Donahue -- Donahoe, who is coming up next, talking

3   about preparation of tax materials for the state.  It has to go

4   with his prior testimony about pressure being put on the

5   organizations.  And this conversation again reflects pressure

6   being put on Care and these other organizations during this

7   time period in 2002.  And it shows the defendant's frame of

8   mind and his trying to provide Mr. Donahoe, the next witness,

9   with financial materials.  It confirms that the state is

10  inquiring, putting pressure on him to fill out certain

11  financial forms.

12          THE COURT:  Let's do this.  It looks to me like it's

13  being offered for the truth of the matter asserted, but I will

14  be prepared to revisit that issue if you can convince me that

15  it, in fact, is not offered for that purpose.  But since it's

16  just reading of a transcript, I think the translation is

17  stipulated to.  In other words, if I rule that it's admissible,

18  it doesn't have to come in through this witness; is that right?

19          MR. CHAKRAVARTY:  That's correct.  Now, that being

20  said, your Honor, I have reservations about this particular

21  transcript.  And they're not big reservations, but one of the

22  reasons I don't feel comfortable offering it as accurate.

23          THE COURT:  Let's take it up at another time.  My

24  ruling at this point is that it's an out-of-court statement

25  order by the defendant for its truth.  And if in a different

1    context you can convince me that some or all of it is not

2    offered for its truth, I'll be prepared to revisit that.

3              MR. ANDREWS:  A surreptitiously recorded call is

4    evidence of consciousness of innocence.

5              THE COURT:  All right.

6              ...end of sidebar.)

7              THE COURT:  Any cross-examination, Mr. Andrews?

8              MR. ANDREWS:  Yes, your Honor.

9              THE COURT:  Okay.

10             MR. ANDREWS:  One moment, please.

11             I have nothing for this witness.

12             THE COURT:  Thank you, ma'am.  You may step down.

13             Ms. Siegmann?

14             MS. SIEGMANN:  Yes, your Honor.  The government calls

15   Jerry Sack.

16             THE CLERK:  Please raise your right hand.

17                        GERALD SACK, SWORN

18             THE CLERK:  Please be seated.  Please state your name

19   and spell your last name for the record.

20             THE WITNESS:  My name is Gerald Sack, S-a-c-k.

21                        DIRECT EXAMINATION

22   BY MS. SIEGMANN:

23   Q.   Could you tell us, Mr. Sack, in what city and state you

24   live?

25   A.   Fairfax, Virginia.

1    Q.    Can you please describe your educational background?

2    A.    I have a bachelor's degree.  I have a law degree from

3    University of Cincinnati.  I passed the Ohio Bar.

4    Q.    When did you obtain your law degree?

5    A.    1970.

6    Q.    And sir, what is your occupation currently?

7    A.    I'm a maintenance worker for So Others Might Eat, SOME, in

8    Washington, D.C.

9    Q.    Before obtaining this job, where were you employed?

10   A.    Internal Revenue Service.

11   Q.    How long did you work at the Internal Revenue Service?

12   A.    Thirty-three years.

13   Q.    When did you begin working at the Internal Revenue

14   Service?

15   A.    1970, November 1970.

16   Q.    What office did you join?

17   A.    The exempt organizations office, or division.  My entire

18   33-year career with the IRS was dealing with exempt

19   organizations.

20   Q.    And when you first joined the IRS, what was your position?

21   A.    I was a tax law specialist.

22   Q.    At some point did your position change?

23   A.    I was a tax law specialist working on, generally,

24   application cases, other cases as an initiator for about three

25   years.

1  Q.    What is an initiator?

2  A.    They are the first people that touch the paper.  They're

3  the ones that initiate an action.  In the national office we've

4  had total review.  So it took two people to conclude on any

5  matter.

6  Q.    And after being a tax law specialist for a few years, what

7  happened?

8  A.    I was promoted to a reviewer and then moved into what we

9  call our conference and review section.  And that was not

10  really initiating work, but working on cases, most of which

11  were denials of exempt status and holding what we call the

12  conference of right.

13  Q.    What's a conference of right?

14  A.    In processing an application, 1023, 1024, if after our

15  processing the application we issue a proposed denial -- and

16  proposed denial letter would be an extensive letter citing the

17  facts, the law, and the rationale of why we proposed to deny

18  tax exemption.  And at the end of that letter it states that

19  you have a right to protest and you have a right to a

20  conference in the national office.  And when somebody would

21  protest and request one of those conferences, then the case

22  would come into the conference and review section.

23  Q.    You mentioned Forms 1023 and 1024.  Can you briefly

24  describe what those are?

25  A.    Form 1023 is the one, I think, the general public knows

1    most about because those are charitable organizations.  And

2    perhaps that universe is bigger than all the rest of them

3    combined.  The 501(c)(3) -- the Form 1024 provides the exempt

4    application for all the other subsections of the Code.  And

5    those subsections would go from 501(c)(1) and, in my last

6    count, 501(c)(26), I think.  So there was a variety of

7    organizations that would be exempt under that statute, and they

8    would file a 1024.

9    Q.   Now, after serving in the conference section, what did you

10   do next?

11   A.   I was promoted to a group supervisor and worked for

12   25 years as a group chief, technical group chief.

13   Q.   Was there -- How many branches was there between the

14   national office at that -- Well --

15   A.   This spans quite a time period.  And to the best of my --

16   we went from four to six to five.  You know, there was change

17   in that period of time of -- contraction, I would say.

18   Q.   So in the national office of exempt organizations, there

19   was these different branches; is that right?

20   A.   Branches and -- formally called groups, yes.  When I first

21   started as a group manager, my staff would consist of a group

22   secretary, two clerk typists, and anywhere from 10 to 12 tax

23   law specialists who would be initiators on the case.  And I'd

24   be the chief of that particular group.  Over time we went from

25   clerk typist to everybody doing their own processing on

1    Microsoft.

2    Q.   And did you supervise all the individuals, tax law

3    specialists in your group?

4    A.   In my group I was responsible for them, yes.

5    Q.   Over your 33 years at the IRS, approximately how many tax-

6    exempt applications did you review in any capacity?

7    A.   Well, as a group chief, you would be assigning the cases.

8    They would come from an assignment officer, and you would have

9    to assign them.  So in a month's period of time, I would be

10   assigning 30 to 60 cases to my tax law specialists.  As an

11   initiator, I was involved in hundreds of cases.  As a group

12   manager, I was involved in thousands of cases.  There were

13   occasions when I was sent to the field offices to do what we

14   call post review.  And then on those trips, I would literally

15   go through a couple hundred files in a few days.  So I had my

16   hands on at least 10,000 files in my career.

17   Q.   Now, in 1993, did Robert Charnoff work for you?

18   A.   Yes.

19   Q.   And as the chief of your -- of this branch -- or group,

20   what was your role in approving or denying applications?

21   A.   I also had a reviewer working for me, one or two through

22   periods of time, that would review many of the cases.  I would

23   review some of them.  So you know, it was a shared

24   responsibility in a way.  I had final authority.  My reviewer

25   would come to me maybe with problem cases.  So you know, we

1    were really working in the group as a group effort.

2    Q.    And in general, could you describe what materials you

3    reviewed in determining whether an organization should be

4    granted tax-exempt status under 501(c)(3)?

5    A.    As a group supervisor, okay -- as an initiator I would

6    probably be doing far more work than the manager does, but I

7    would be reviewing the work of the initiator.  Generally we

8    would have an extensive file memo.  We would have documents in

9    the file.  We would have any correspondence that went back and

10   forth with the organization.  And the file memo would have

11   citations to authority.  And I'd be looking at that.  I'd be

12   looking at what my initiator is recommending on the case, and

13   then I would take an independent review of the files.  Over a

14   period of time I felt that I could go through files fairly

15   quickly.  I knew what I was looking for.  I would get a sense

16   and a feel very quickly.

17   Q.    In determining whether to approve or deny an application,

18   did you ever rely on the ruling on another unrelated

19   application for tax-exempt status?

20   A.    No.  I would not rely.  I may be seeking information.

21   If I knew of another similar organization, I may want to pull

22   that file and see what was cited, what authority was cited,

23   that type of thing.  There were times when I would disagree.

24   Q.    And sir, did you ever in your career draft a development

25   letter?

1    A.    Many.

2    Q.    And why would you use development letters?

3    A.    To provide missing information, explanations of things

4    that we thought could be problematic.  To just maybe fill in

5    gaps.

6    Q.    Approximately how often during the course of your career

7    would you seek to get -- seek to use development letters?

8    A.    These cases that we had in the national office were

9    reviewed and sent to us from our various key district offices.

10   And accordingly, the district for some reason -- maybe it was a

11   mandatory reason to send all these type of cases to the

12   national office.  Maybe they ran into a problem.  It was

13   frequent that the key district would develop a case and all of

14   a sudden be in a situation where they would issue an adverse

15   ruling.  It was easier to send it to the national office than

16   to pursue locally.  So we -- we would develop these cases

17   extensively.

18   Q.    And did you ever recommend to one of your tax law

19   specialists to use a development letter?

20   A.    Oh, yes.  Many times.  I mean, we -- Working in a group

21   like that, there was a collegial effort, and you were free to

22   discuss things.  I know that when I first started, it was

23   remarkable.  Your lunch breaks and your breaks in the morning,

24   you learned more from the people who were in the same boat with

25   you than you did from the people who were instructing you.  So

1   you know, it was a collegial effort and we were free to discuss

2   and exchange.

3   Q.   What types of questions would be included in a development

4   letter?

5   A.   It would really be dependent upon the facts in the case

6   and how it was crafted.  Many of these organizations were

7   volunteer efforts and were incomplete.  Many of them we would

8   have problems with Articles of Incorporation, either bylaws,

9   basic things.  And we would seek to clarify or redirect on some

10   of those.

11   Q.   Did you ever employ a tool or a processing method called

12   technical screening?

13   A.   Yes.  It had various names.  Sometimes it's called merit

14   closings.  But I think the earliest name for this processing of

15   a case was called technical screening.

16   Q.   How did you determine whether to use this tool, or screen

17   process, on an individual application?

18   A.   Judgment.  It would just be our judgment to take the

19   application that is before you and decide that you had

20   sufficient information that you could proceed with just issuing

21   a favorable ruling.

22          When this first started, it --

23          MR. DUNCAN:  Objection, your Honor.

24          THE COURT:  Why don't you put another question to the

25   witness.

1          MS. SIEGMANN:  Yes, your Honor.

2    Q.   Can you just briefly describe what a technical screening

3    was?

4    A.   Technical screening simply is a fast track.  To take a

5    look at the application and decide not to develop it, decide

6    that this application was sufficient to issue a favorable

7    ruling.

8    Q.   Why was this technical screening process used in the first

9    place?

10   A.   This was developed because over time the number of

11   applications went up.  This caused the processing of the cases

12   to be delayed.  And we were being criticized for the delay in

13   reaching these applications.  Mind you, these are charitable

14   organizations mostly, and we were getting phone calls.  We were

15   getting letters from Congressmen.  Something had to be done.

16   And now at the working level, the initiators, their solution is

17   go hire more people.  And up in the management level was, let's

18   move them more quickly and let's take a look at these

19   applications; and those that we feel comfortable with, let's

20   issue the favorable ruling and move on.

21   Q.   During the processing of the applications, what, if

22   anything, would remove it from technical screening?

23   A.   An incomplete application would.  An application that was

24   problematical.  From time to time there were series of

25   applications that gave us trouble, okay?  And I could point to

1    any number of these series throughout my career.  I guess the

2    initial ones were -- when I first started in 1970 were public

3    interest law firms.

4             MR. DUNCAN:  Objection, your Honor.

5             THE COURT:  Let's try to confine ourselves to the

6    relevant time period, which I think is 1993.

7             MR. CHAKRAVARTY:  Yes, your Honor.

8    Q.   Let's change subjects.  To obtain tax-exempt status on

9    your 501(c)(3), how much of an applicant's activities can

10   involve the promotion or support for fighters?

11            MR. DUNCAN:  Objection, your Honor.

12            THE COURT:  Are you asking him to interpret the

13   Internal Revenue Code?  I'm not sure I understand.

14            MS. SIEGMANN:  No, I'm asking over the course of his

15   career how much of an applicant's activities can involve the

16   promotion or support for fighters.

17            THE COURT:  I think I'm going to sustain the

18   objection.

19   Q.   Sir, is fighting a charitable activity?

20            MR. DUNCAN:  Objection.

21            THE COURT:  Let me see counsel at sidebar.

22            (Sidebar as follows:

23            THE COURT:  It's not clear to me what you're doing

24   here.  It sounds like you're asking him to give a legal opinion

25   on what the Internal Revenue Code means.

1        MS. SIEGMANN:  I think he's testified that he's

2   reviewed thousands of applications.  He's going to be

3   testifying in a minute about the Care application, and his

4   interpretation of what "charitable" is would go to how he ended

5   up reviewing this application and how that would have affected

6   him if Care had disclosed all their activities as they're

7   required to do.

8        THE COURT:  Well, it seems to me that if you lay a

9   proper foundation that the Code and the regulations have

10  certain requirements in order to qualify for 501(c)(3) status,

11  that his job for 33 years was to determine whether or not

12  organizations qualified for that status according to his

13  understanding of the regulation and as he applied it, and take

14  it in that context --

15       MS. SIEGMANN:  Okay.

16       THE COURT:  -- I think I'll permit it.  But simply

17  this is what the law requires or doesn't require, I don't think

18  is going to be allowed.

19       MS. SIEGMANN:  Okay.

20       MR. DUNCAN:  Your Honor, can I also object on the

21  ground that there's no evidence in the case that fighting was

22  one of the activities that Care engaged in, so it's a question

23  based on a fact not in evidence.

24       THE COURT:  I'll just leave it that your words will

25  have to be chosen carefully.

1        MS. SIEGMANN:  Yes, your Honor.

2        ...end of sidebar.)

3   Q.   Sir, to obtain a tax-exempt status under 501(c)(3), what

4   does the applicant have to establish?

5   A.   I beg your pardon?

6   Q.   To obtain a tax-exempt status under 501(c)(3), what does

7   the applicant have to establish?  I mean, what --

8   A.   Establish?

9   Q.   Yes.  What are the categories for an exemption under

10  501(c)(3)?

11  A.   Well --

12  Q.   In general.

13  A.   In general?

14  Q.   Yes.

15  A.   Churches, schools, hospitals, educational organizations.

16  The list can almost be endless.  I mentioned earlier public

17  interest law firms.

18  Q.   But the common theme, however, sir, is there certain

19  categories under the Code that they have to meet?

20  A.   Religious, charitable, scientific, I think is the Code

21  language in the 501(c)(3).

22  Q.   So if they're not formed exclusively for those purposes,

23  what happens?  Is their application granted or denied?

24        MR. DUNCAN:  Objection, your Honor.

25        THE COURT:  I'll allow it.

1          You may answer.

2     A.    It would be denied.  Now, you said "purpose."  And there's

3     a difference between the purpose, which I equate to the

4     Articles of Incorporation and the bylaws statements and

5     activities.

6     Q.    Oh, I'm sorry.  The operational versus the organizational

7     test --

8     A.    Right.

9     Q.    -- is that what you're referring to?

10    A.    Yes.

11    Q.    Could you just briefly describe that for us?

12    A.    Well, it's an automatic that you have to have your

13    formation documents meet the Code requirements.  That enables

14    the State Attorney General to play a part too.  But then you

15    have to examine the activities, those activities that are

16    carrying out those purposes.  And there may be differences on

17    what activities would fit that and how you would classify the

18    activity.  So we would look at that in the application, and

19    that's what we would depend upon the organization, is to

20    describe and explain exactly what activities they are engaged

21    in, their day-to-day type of operations.

22    Q.    And what are you looking to determine based upon those

23    activities?

24    A.    What you're making -- you're trying to determine is if

25    the organization's correct in its judgment, that these are

1   charitable activities, or do you disagree and find that they're

2   not.

3   Q.   Sir, were you involved in the review of an application

4   filed by Care International?

5   A.   Yes, I was.

6   Q.   And did you personally examine this application?

7   A.   Yes.

8   Q.   At what stage of the review process did you look at the

9   file?

10  A.   I looked at the file, I believe, at the final review.

11  Q.   Who did you assign this case to?

12  A.   I assigned it to Robert Charnoff.

13  Q.   And based upon your review of the file, what did you

14  decide with regards to Care's application?

15  A.   Decided to move the case, or to issue the favorable ruling

16  under our technical screening or fast track process.

17  Q.   Why did you do that, sir?

18  A.   I did it based on my reading of the file.  I did it based

19  upon the reading of the tax law specialist Charnoff's memo, and

20  exercised my responsibility, my judgment to issue the favorable

21  ruling.

22  Q.   I'm going to show you what's been marked Government

23  Exhibit No. 558.  Do you see that, sir?

24  A.   Yes.

25  Q.   And is this the memo to the file that you were just

1  referring to a few minutes ago?

2  A.    I believe so.  It's what's in the administrative record.

3  Q.    Now, the conclusion that Mr. Charnoff reached, can you

4  read this, the sentence beginning with "Organization's relief

5  mission"?

6  A.    "Organization's relief mission may be affected by

7  political/military activities but is not a 'player' itself."

8  Q.    And the "is not a 'player' itself" language, do you see

9  that, sir?

10  A.    Yes.

11  Q.    When you read that memo, did you agree with that statement

12  or disagree with it?

13  A.    I saw nothing in the file to show that it was a player.

14  Q.    And what did you interpret "player" to be?

15  A.    Somebody who is, I would say, active in causing the

16  problems in those areas.

17  Q.    And did Mr. Charnoff recommend approval or denial of this

18  application?

19  A.    I think -- it states that he recommended approval of it

20  under the technical screening process, which would mean that he

21  saw no need to develop it further, to contest anything that was

22  in the application, and to close the case.

23  Q.    And again, did you agree with that assessment?

24  A.    Yes, I did.

25  Q.    Now, turning now to the actual application, Government

1    Exhibit No. 2.  Sir, sorry about that.  Let me show you now

2    page 2 of this application.  Do you recognize that?

3    A.    Yes.

4    Q.    And is that the activities section of the application you

5    reviewed for Care International?

6    A.    Yes.

7    Q.    Now, based upon your review of this application, what

8    types of activities did Care disclose that it would engage in?

9    A.    This description of five things is staged.  In other

10   words, if you go to No. 4, it says, "In the third year."

11           THE COURT:  Mr. Sack, can I get you to move the

12   microphone a little closer when your head is turned.  Thank

13   you.

14   A.    No. 4 says, "In the third year."  No. 5 says, "Within a

15   couple years."  So really you're focusing on 1 and 2, what they

16   are immediately planning to carry out.  So it, I think,

17   succinctly says what type of activities you're going to be

18   involved in.  These activities, in my mind, are classic

19   charitable activities, alms giving type activities.  There's no

20   indication of unrelated trader business.  There's no indication

21   in these activities that, you know, anything else is going on.

22   Q.    And sir, was there any disclosure in this activities

23   section that Care would be publishing or distributing a

24   newsletter?

25   A.    In this activities section?  No.

1    Q.    Well, was there any disclosure in any part of Care's

2    application that they would be distributing or publishing a

3    newsletter?

4    A.    No.

5    Q.    Would you consider the publication or distribution of a

6    newsletter as an activity that should have been disclosed?

7              MR. DUNCAN:  Objection.

8              THE COURT:  Overruled.

9    Q.    You can answer.

10   A.    I -- it -- frequently we would get applications where

11   organizations were issuing newsletters and other

12   communications.  And they were always in the file.

13             MR. DUNCAN:  Sorry?

14   A.    So I would expect them to be in the file.

15             MR. DUNCAN:  I'm sorry.  I didn't hear that answer.

16   A.    I would expect them to be in the file.

17   Q.    And how frequently, when an applicant indicated it was

18   publishing a newsletter, would they provide copies of that

19   newsletter to the IRS?

20             MR. DUNCAN:  Objection.

21             THE COURT:  Well, I'm not sure the activities of other

22   organizations is really the issue here.  It's what the question

23   requires is what matters.  Why don't we focus on that.

24             MS. SIEGMANN:  Yes, your Honor.

25   Q.    Well, turning to Question No. 3 on this form, can you just

1    read the instructions for us?

2    A.    On No. 3?

3    Q.    Yes.

4    A.    "Describe the organization's fund-raising program, both

5    actual and planned, and explain to what extent that has been

6    put into effect.  Include details of fund-raising activities

7    such as selective mailings, formation of fund-raising

8    committees, and" -- "use" -- excuse me.  I have a --

9    Q.    Let me provide you with a copy of that so you can read it

10   from the copy.

11   A.    Well, "use of volunteers or professional fund-raisers,

12   et cetera.  Attach representative copies of solicitations for

13   financial support."

14   Q.    Thank you, sir.  Did Mr. Muntasser provide representative

15   copies of any of Care's solicitations with its application?

16   A.    I'm not sure who the individual was.  We were dealing with

17   a power of attorney.  I'm not sure who actually made the

18   submission.  But they were not in the file.

19   Q.    On the first page of the form, do you see a signature line

20   at the bottom?

21   A.    Yes.

22   Q.    And does it appear to be Emadeddin Muntasser?

23   A.    I believe so.

24   Q.    Well, in the Block 1b, whose name do you see?

25   A.    Yes.  Emadeddin Muntasser.

1   Q.   Now, based upon your review of the application, what did

2   you consider Care's operational status to be?

3   A.   It was beginning.  In other words, it had no activities.

4   It had no operations to date.  This is frequent because the

5   Code requires an organization to file an application within

6   15 months of incorporation.  So frequently we would see

7   organizations that were really in the proposed planning stage.

8   Q.   Is that what you considered Care to be?

9   A.   Yes, I did.

10  Q.   If Care had indicated that it had published or planned to

11  publish a newsletter, what would you have done?

12  A.   We would have asked, if there were actual copies, for the

13  copies.  I mean, if they had done that.  If we took it out of

14  the technical screening process, we would probably develop that

15  aspect of it and ask for representative copies of what they

16  planned to publish.

17  Q.   Well, going back to what you said about taking it out of

18  the technical screening process, if you had to make calls for a

19  copy of a newsletter, would that have taken it out of the

20  technical screening process?

21  A.   Yes, generally it would.  If we would send a development

22  letter, clearly we would be out.  If, for instance, there was a

23  missing schedule or something that would immediately be

24  corrected, maybe a phone call would take care of it.

25  Q.   Now, how many copies of the newsletter would you have

1   requested?

2   A.   It would really depend upon the circumstances.  If we

3   knew, for instance, there were ten of them published, we might

4   ask for four or five of them.  You know, we're not asking for

5   huge files.  We want a representative copy of what they're

6   putting out.  And we would ask that be represented that way

7   too.

8   Q.   What, if any, inquiry would you have made if you found out

9   that Care published a newsletter?

10  A.   Well, we would want to know the frequency.  We would want

11  to know who it was directed to.  In other words, is this

12  something that you lay in the entrance of a grocery store or --

13  you know, how is it distributed, the frequency.  We would like

14  to know perhaps what -- we would definitely want to know what

15  the content was.

16  Q.   Why is that, sir?

17  A.   Well, you're telling us in your application who you are

18  and what you do.  We are also very much interested in what

19  you're telling the rest of the world who you are and what you

20  do.

21  Q.   And what if those two things don't match?

22  A.   Then we have subject matter for discussion clarification

23  and perhaps denial.

24  Q.   When you say "for clarification," would that be done in

25  the form of a development letter?

1    A.    Yes, it could be.

2    Q.    What other ways could that be done?

3    A.    Well, it would depend on where you are in the case, how

4    further down the line you are.  It was frequent that one

5    development letter was not enough; it would take a second.

6    Maybe you would ask for a conference.  But you would try to

7    resolve the issue.

8    Q.    Now, does the words -- or do the words "jihad" or

9    "mujahideen" actually appear in the activities section of this

10   application?

11   A.    No.

12   Q.    Did Care disclose that it would distribute or sell any

13   books or tapes in this application?

14   A.    No.

15   Q.    Did Care disclose that it was going to expend money to

16   promote jihad or the mujahideen?

17            MR. DUNCAN:  Objection, your Honor.

18            THE COURT:  Sustained.

19   Q.    If Care -- I'll use "Care" instead of "Mr. Muntasser"

20   because that's the applicant's name.  If Care had disclosed

21   that it planned to spend money to support jihad and the

22   mujahideen, how would that have influenced your evaluation of

23   the application?

24            MR. DUNCAN:  Objection.

25            THE COURT:  I'll allow it.  Overruled.

1    A.   We would certainly have an issue for discussion.   We would

2    have an issue for development and possibly, depending upon the

3    development and the answers, the responses, denial.

4    Q.   How would you have developed that information, when you

5    said "development"?

6    A.   Well, you're postulating that these words now appear in

7    this.   So if you're going to provide assistance to the victims,

8    how exactly are you going to do that, how exactly are you going

9    to select these victims.   You know, what is your criteria.   Who

10   are going to be the judges of this.   So that type of detailed

11   information off of the first phrase of that activity.   We would

12   continue with the same type of development with everything else

13   mentioned in here, okay?   We would like to know probably at

14   this point the background of all your board of -- members of

15   your board of directors, what their employment is and the

16   background.   So once we go down that road for development, you

17   know, we're going to try to cover the waterfront.

18   Q.   "Cover the waterfront."   What do you mean?   Be as thorough

19   as possible?

20   A.   Be as thorough as possible.   In other words, we generally

21   frowned upon second and third development letters.   Get the job

22   done the first time.

23   Q.   How many questions would typically be in these development

24   letters?

25   A.   I've seen development letters go 10 pages.   I've seen them

1   be one page.  It would really depend upon the facts and

2   circumstances.  Attachments could be made.

3   Q.   Sir, if Care had claimed that it planned to solicit money

4   for the mujahideen, would that have influenced your decision at

5   all?

6           MR. DUNCAN:  Objection, your Honor.

7           THE COURT:  I'll overrule the objection.  Again, it's

8   a hypothetical.

9           Go ahead.

10  A.   It would influence my decision to fast track the case and

11  to require further development.  And depending upon the facts

12  and circumstances, the possibility at the time.

13  Q.   So that would have taken it out of technical screening?

14  A.   (Nodding head.)

15  Q.   Now, in preparation for your testimony today, were you

16  provided a copy of the Al-Hussam newsletter that Care published

17  on April 16, 1993?

18  A.   Yes, I was.

19  Q.   I'm looking for Exhibit 45.  In a minute we're going to

20  have it up on the screen for you.  And looking at the screen

21  next to you, does that appear to be the issue that you

22  reviewed?

23  A.   I'm trying to look at the date.

24  Q.   Can you see the date now, sir?

25  A.   Yes.

1    Q.   Is that the issue that you reviewed?

2    A.   Yes, it is.

3    Q.   Now, if Care had submitted this newsletter to the IRS with

4    its initial application, how, if at all, would that have

5    affected your evaluation of Care's application?

6    A.   It, I believe, would have taken it out of the fast track.

7    Q.   Why is that, sir?

8    A.   Okay.  I examined this, and the language is entirely

9    different from what I see in the application.  Words appear in

10   this newsletter that are not in the application.

11        In addition, there is an absence in this newsletter of

12   any mention of those five activities that are in the 1023.

13   These, you know, are just different documents.  This

14   organization is totally different from the one I have before me

15   in an application, okay?

16   Q.   What words were you just referring to that you saw in this

17   document that you didn't see in the application?

18   A.   There's a reference to "infidel."  There's a reference to

19   "Allah," the Muslim faith.  There's -- you know, I -- you know,

20   I could go back and give you a list of, no doubt, 10 or 12

21   words in there that would have triggered my concern to explore

22   the application further.

23   Q.   It you turn now to the second page of that exhibit.  And

24   sir, did the picture in the newsletter have any effect on you?

25   A.   Once I understood what the picture was, because of the

1    copying here, yes.  This is not a picture of an orphan, all

2    right?  This is not a picture, as far as I can tell, of a

3    refugee.  You know, these are armed --

4            MR. DUNCAN:  Objection, your Honor.

5            THE COURT:  Well, he can describe what he thinks the

6    picture shows.

7    A.    I believe that they're armed individuals.

8    Q.    So based upon this newsletter, if you had received this

9    with the application, would you have sent a development letter

10   to Care?

11   A.    Yes.  Or I may take some other action too.  It's been

12   known for me to call the attorney and tell them the development

13   letter is coming and verbally convey concern.

14   Q.    What types of questions would you have asked Care, based

15   upon this newsletter?

16   A.    Well, first I would want additional copies.  I believe

17   that this indicated in the heading that there were other copies

18   available.  And I would like their explanation of how that fit

19   into their charitable program as described in the 1023.

20   Q.    I want to move now to the Question No. -- Part II,

21   Question 5 on the application.  Sir, can you just read the

22   second question, the first part of the second question for us

23   under Question 5?

24   A.    "Is the organization the outgrowth of (or successor to)

25   another organization, or does it have a special relationship

1    with another organization by reason of interlocking directories

2    [sic] or other factors?  If either of these questions is

3    answered 'yes,' explain."

4    Q.   How did Care answer that question?

5    A.   "No."

6    Q.   Now, if Care had answered "yes" to that question, what

7    types of information would you want to know?

8    A.   I would want to know -- Well, first of all, if they

9    answered "yes," I would expect there would be an explanation.

10   If there was no explanation, then in the development letter it

11   would state, "In your application you did not explain your

12   'yes' answer to this question.  Please explain in detail."

13   Q.   But what types of questions would you want to know if

14   there's an outgrowth or successor "yes" answer to?

15   A.   Well, I would want to know the activities of the

16   predecessor and exactly what the relationship was.  In other

17   words, it -- many times in my experience when an organization

18   is incorporated, they did informally do things before

19   incorporation.  And this is made known to us in these

20   applications.  Because why they have activities, they have --

21             MR. DUNCAN:  Objection, your Honor.  Move to strike.

22             THE COURT:  Well, I'll let the answer stand.  But

23   let's put another question to the witness.

24   Q.   Sir, let me ask you again, if -- because I don't think you

25   answered the question -- if where it says "the outgrowth of (or

1    successor to) another organization," would you have sent a

2    development letter?

3    A.   Yes.

4    Q.   What would you have asked in this development letter?

5    A.   We would have asked how that outgrowth came or what are

6    you talking about.  In other words, there are many, many

7    different situations where you are an outgrowth.

8    Q.   And so what types of questions would you ask?

9    A.   To explain what the predecessor did, who it was, whether

10   they were exempt, what activities they engaged in, how your

11   activities may be different than those prior activities.

12   Q.   Would you be interested in finding out who the founder of

13   the organizations were?

14           MR. DUNCAN:  Objection, your Honor.

15           THE COURT:  I'll allow it.

16   A.   Yes.

17   Q.   Is there any other questions that you would have asked?

18   A.   I think -- I think that series of questions would open the

19   door to a full discussion and an explanation of what is going

20   on.  Absent trying to conceal something at all, it usually is a

21   clear factual path of why it is an outgrowth.

22           MR. DUNCAN:  Move to strike, your Honor.

23           THE COURT:  Well, I -- Let me caution the witness, and

24   maybe more properly caution the jury, the activities of other

25   organizations, what some other organizations did, is not really

1    relevant here.  The witness is permitted to testify about how

2    he did his job and what sorts of information he would be

3    interested in.  But the fact that some other organization or

4    applicant did or didn't do something is not really relevant.

5                Let's put another question to the witness.

6                MS. SIEGMANN:  Yes, your Honor.

7    Q.   If Care had disclosed that it was an outgrowth of a

8    worldwide organization based in Peshawar, Pakistan, how would

9    that have influenced your decision?

10               MR. DUNCAN:  Objection, your Honor.

11               THE COURT:  I'm going to sustain the objection on that

12   one.

13               MS. SIEGMANN:  Your Honor, can we see you at sidebar?

14               THE COURT:  Yes.

15               (Sidebar as follows:

16               MS. SIEGMANN:  Your Honor, I believe there is facts in

17   evidence that based upon Care's flier, they say that they were

18   founded by Abdullah Azzam.  There is evidence that Care is

19   Maktab al-Khidmat --

20               THE COURT:  The theory of the indictment, I think, is

21   that it was -- they concealed that it was an outgrowth or a

22   successor to the Al-Kifah Refugee Center, not to Maktab -- I

23   keep struggling with the name -- MAK, and you're not allowed to

24   shift the theory midstream.  So that's the theory of the

25   indictment and the theory that proof should follow.

1          And the questions are, in addition, somewhat leading

2     and argumentative.  I think, you know, he's your witness and

3     the questions need to be nonleading.

4          Is there anything else --

5          MR. DUNCAN:  Well, while we're here and somewhat on

6     this subject on cross, there are two documents the government

7     had listed as exhibits, and they're the New York corporate

8     articles for Al-Kifah Refugee Center.  I intend to introduce

9     them.  They're self authenticating.  And I'll just raise it now

10    and see if anyone's going to object.

11         MS. SIEGMANN:  Can we have a moment?  I'm sorry.

12         MR. DUNCAN:  That way we don't need two sidebars.

13         MR. CABELL:  The issue for us is relevance.

14         MR. DUNCAN:  What?

15         MR. CABELL:  We don't disagree that they may be self

16    authenticating.  The issue is relevance.

17         THE COURT:  Well, if it's Articles of Incorporation of

18    Al-Kifah, they're relevant, given that one of the issues, as I

19    understand it, is commonality of officers and directors and so

20    forth.  So I'll admit it on relevance grounds.

21         MR. DUNCAN:  Thank you.

22         ...end of sidebar.)

23    Q.   Sir, when you're asking for development letters in

24    response to Question 5b, the outgrowth of or successor

25    question, why do you do that?

1    A.   We want a full description of the organization as full as

2    it can be.  And I think your ancestors or where you came from

3    or how you started is important.  And in my experience, there

4    are many reasons to -- for organizations to split and go two

5    different ways.  We've had wholesale corporate

6    reorganizations --

7            MR. DUNCAN:  Objection, your Honor.

8    A.   -- of hospitals that are outgrowths.

9            THE COURT:  Hold on.  Hold on.  I'm going to allow

10   this, but only as examples of why you might seek particular

11   types of information.  It's limited to that.

12           And again, you're to draw no inference because some

13   organization did or did not do something else that that somehow

14   controls it, okay?

15           You may continue.

16   Q.   You were talking about hospitals, I believe.

17   A.   There's been wholesale of corporate structures set up by

18   hospitals.  Where you had one hospital, now you've got 12.  And

19   that would be fully explained in the applications that we would

20   receive, that there are organizations that were 501(c)(4) and

21   now are applying for (c)(3).  So it's an outgrowth successor

22   type of situation.  There were private foundations where the

23   trustees got into such disagreements, they decided to split the

24   assets of the private foundation into two different

25   organizations.  So these explanations of where you came from

1    were important in getting a full understanding of the applicant

2    right in front of you.

3    Q.   And sir, prior to testifying today, did you have an

4    opportunity to review a newsletter of Care dated June 11, 1993?

5    A.   Yes.

6    Q.   That was Exhibit No. 267A.  What language was that

7    newsletter in?

8    A.   There was a translation, and I believe it was Arabic.

9    Q.   And did you read this newsletter?

10   A.   I read the translation.

11   Q.   How, if at all, would the review of this newsletter have

12   affected your evaluation of Care's application?

13   A.   I think it was quite similar to the prior letter that --

14   our newsletter that you have up there.  The language was very

15   much the same: what was there and what was not there.  And so I

16   think that it would have had the same issues that I mentioned

17   before.

18   Q.   Now, did you also review a newsletter of Al-Kifah Refugee

19   Center dated April 2, 1993?

20   A.   Yes, I did.

21   Q.   Exhibit No. 44.  How, if at all, would the review of that

22   newsletter have affected your evaluation of Care's application?

23               MR. DUNCAN:  Objection, your Honor.

24               THE COURT:  I -- I'm not sure I'm following the

25   sequence here.  How -- I think you need to lay a foundation how

1   he would have seen that in the Care application process.

2   Otherwise, it's not relevant.

3   Q.   Well, sir, in the development letter, if an applicant

4   answered "yes" to the outgrowth successor question, would you

5   request to see newsletters of the predecessor organization?

6           MR. DUNCAN:  Objection, your Honor.  Leading.

7           THE COURT:  That's leading.  Sustained.

8   Q.   What, if any, literature of the -- what, if any,

9   literature of the predecessor organization would you request in

10  a development letter?

11          MR. DUNCAN:  Objection.

12          THE COURT:  Let's start with what would you request --

13  what, if anything, would you request concerning the predecessor

14  organization.

15  A.   Premise is on the fact that I knew the current

16  organization was going to issue newsletters.

17          THE COURT:  That is, if you had known that?

18  A.   Had I known that in the 1023 I am looking at that they

19  intended to engage in issuing newsletters or any other

20  publication, had I known there was a predecessor, then I would

21  have asked the question, what, if any, newsletters or

22  publications the predecessor had issued and asked for copies of

23  those.

24          THE COURT:  With that foundation, I'll permit the

25  questioning on this newsletter.

1              MS. SIEGMANN:  Thank you, your Honor.

2    Q.   How, if at all, would the review of this newsletter have

3    affected your evaluation of Care's application?

4    A.   It would be similar to the other ones you just referred

5    to.  Again, the language content, the absence of language that

6    was in the application.  Now, this is taking it out of the fast

7    track.  Where we go ultimately would depend upon the

8    development, the responses, the modification of any plans and

9    programs that would occur.

10   Q.   Modification of any programs, services?  Can you explain

11   what you just said?

12   A.   Many organizations applying for exemptions or volunteers,

13   many of them do it pro bono -- without legal counsel.  And many

14   of them have footfalls, or step in traps.  And once we go

15   through the development and, if necessary, the protest stage,

16   changes are made.  But even to the point where we would grant

17   exemption prospective from a certain date when they abandon

18   certain activities.

19   Q.   Sir, if you had discovered that Care's predecessor

20   organization was engaged in the recruitment of fighters --

21              MR. DUNCAN:  Objection, your Honor.

22   Q.   -- what would you have done?

23              THE COURT:  Sustained.

24   Q.   Now, turning to page 8 of the application --

25              THE COURT:  Actually, are you changing subjects?  Are

1  you changing subjects?  Why don't we take our 12:00 o'clock

2  break.

3            MS. SIEGMANN:  Yes, your Honor.

4            THE CLERK:  All rise.

5            (At 12:01 p.m., the jurors exited the courtroom.)

6            (Short recess from 12:01 p.m. to 12:11 p.m.)

7            (Sidebar as follows:

8            THE COURT:  Who requested sidebar?  Mr. Cabell.

9            MR. CABELL:  I requested it.  It's a joint thing.

10  But your Honor, understanding that your concern is that the

11  questions to this witness need to be tied somewhat to the

12  theory of the government's case, you've correctly pointed out

13  it is a theory of the government's case that Care is connected

14  to the Al-Kifah Refugee Center.  And we believe there is

15  evidence in the record from which the jury can infer the

16  relationship and can also infer certain activities of Al-Kifah

17  Refugee Center, namely recruiting people to go abroad and

18  fight.

19            Under those circumstances, and especially considering

20  that Mr. Duncan is going to be seeking to introduce into

21  evidence documents of Al-Kifah through this witness, we ought

22  to be entitled to ask this witness how would knowledge of

23  Al-Kifah's activities -- and their relationship to Care -- how

24  might it have affected the consideration of Care's 1023

25  application.

1          THE COURT:  What is the evidence in the record about

2     Al-Kifah recruiting people to fight?

3          MS. SIEGMANN:  There's Exhibit 40, which is signed by

4     Mr. Muntasser, which asks -- says that Al-Kifah supports

5     mujahideen on the frontline.  And there's some -- the other

6     Al-Kifah issues of the newsletter that have been already

7     admitted in evidence that talk about how Boston offered

8     martyrs -- the Boston office of Al-Kifah offered martyrs.

9     Those are all in evidence, and the inference could be made, as

10    Mr. Cabell just said, that they could be recruiting fighters.

11         MR. CABELL:  And there's also the evidence of Evan

12    Kohlmann of Al-Kifah's connection to Maktab al-Khidmat and what

13    Al-Kifah along other branches and -- in the United States

14    reflected vis-a-vis Maktab.  So it's a logical extension to

15    simply ask this witness if the IRS knew or had an inkling of

16    this relationship, how might that have affected their review of

17    Care's application.

18         Ultimately this bears on the principal concern of the

19    IRS.  If you're engaged in a noncharitable activity, that

20    goes -- that is critical in court to the Form 1023 application

21    form as well as to the successor outgrowth.  But this really

22    goes more towards how knowledge of these activities would have

23    affected your consideration of the obligation.

24         MR. DUNCAN:  I don't think anything that they have in

25    evidence shows that.  That for instance, the business about --

1  there's nothing that says that Care or Al-Kifah provided men

2  from Boston.  I think there was a use in one of those things

3  about someone who did go and said something like this was the

4  fourth person from Boston who was killed in fighting.  It

5  doesn't say that Al-Kifah had anything to do with them going

6  and fighting.

7  　　　　THE COURT:  I think that proposed question goes too

8  far.  I mean, I would permit something along the lines of, you

9  know, "Assuming that there was a predecessor organization and

10  assuming that that predecessor organization engaged in

11  noncharitable activities, how would that affect your decision?"

12  I'll allow it in those terms but not in the form suggested.

13  　　　　MR. CABELL:  Your Honor, just for guidance -- and

14  that's fine.  But just for our own edification, you seem to be

15  concerned whenever a particular activity is asked of a witness

16  as to how the IRS might have viewed that.

17  　　　　THE COURT:  I have multiple -- there's multiple

18  layers.  I think maybe we're biting off too much in one

19  question.  I'm concerned about questions being leading, being

20  argumentative, not being phrased in terms of a hypothetical.

21  And really it is kind of a hypothetical, you have to assume,

22  because the witness is talking about a hypothetical world in

23  which different disclosures might have been made or he had

24  different information.

25  　　　　MR. CABELL:  Sure.

1          THE COURT:  And then it has to be -- the hypothetical

2     has to be supported by the evidence.  And it is, at least,

3     unclear enough in my mind as to whether there is evidence that

4     Al-Kifah was actually supporting fighters as opposed to engaged

5     in the same activities as Care, as to which there is certainly

6     evidence.  And given -- well, just given all the circumstances,

7     that's my discomfort, okay?

8          I think it might behoove everyone to take a little

9     more care in laying a foundation before getting into certain

10    areas and pointing to where you're going.  And it would make my

11    job easier.  Let's put it that way, okay?  Thank you.

12          ...end of sidebar.)

13          (At 12:17 p.m., the jurors entered the courtroom.)

14          THE CLERK:  Court is now open.  You may be seated.

15          THE COURT:  You may proceed.

16          MS. SIEGMANN:  Yes.  Thank you, your Honor.

17    Q.   Sir, assuming that Care disclosed that it had a

18    predecessor and assuming that the predecessor was engaged in

19    noncharitable activities, how would that have affected your

20    evaluation of Care's application?

21    A.   It would require on our part assurances that there was a

22    separation between the predecessor and the new organization and

23    what they planned to do.  As I indicated before, there were

24    instances wherein --

25          MR. McGINTY:  Objection.

1         THE COURT:  Yes.  Let's put another question to the

2    witness.

3    Q.    What types of assurances would you be looking for?

4    A.    It depended upon what the predecessor did.  And that if

5    there was something that they did that would not qualify for

6    exemption, we would want assurances and explanation as how I

7    would prevent that from occurring in the future.

8    Q.    Can you give us examples of what type of activities would

9    not qualify as charitable?

10         MR. DUNCAN:  Objection, your Honor.

11         THE COURT:  He may give this, yes, in general terms.

12   A.    What comes to mind is complete bar on political

13   activities.  When I first started with the Service, civil

14   disobedience --

15         THE COURT:  I think the questions called for examples.

16   You've given one: political activities.

17   A.    Civil disobedience, protesting, demonstrations.  Maybe

18   instructions on how to create bombs and use them.

19   Q.    Sir, I want to now turn to the fund-raising section of the

20   application.  Do you recognize this page, sir?

21   A.    Yes, I do.

22   Q.    And what is this?

23   A.    It's a statement of revenue and expenses.  The

24   instructions require the organization to give us data covering,

25   I believe, a three-year spread.

1   Q.   And can you read on top there next to (a) what it says?

2   A.   "From April to December 1993."

3   Q.   And now going down to No. 14, can you read --

4   A.   "Fund-raising expenses," 6,000, ten, and 15,000.

5   Q.   And how much is the $6,000 reflected for, what period of

6   time?

7   A.   I believe you were talking -- from April to December 1993.

8   Q.   Now, based upon that information, what, if anything, did

9   you do?

10  A.   When I looked at this, it was typical of an organization

11  that had no activities, was newly created.  We have all round

12  numbers.  We have projections.  And of course, that's what

13  we're asking for.  Projections in years out.  The first column

14  is the only one with any current months in it.  But again, I

15  would look at that as when it was filed as projections.

16  Q.   Sir, are you familiar with a person by the name of Marcus

17  Owen?

18  A.   Yes, I am.

19  Q.   Did he have any role in the evaluation of Care's

20  application?

21  A.   None.

22  Q.   Now, did you write any conclusions in your evaluation of

23  this application?

24  A.   Yes, I did.

25  Q.   Now turning to this page, do you recognize this page of

1    the file?

2    A.    Yes, I do.

3    Q.    What is this?

4    A.    It's a standard form that is attached in assigning any

5    case.

6    Q.    Do you see your handwriting on this document?

7    A.    Yes, I do.

8             THE COURT:  I'm sorry.  What exhibit is this?

9             MS. SIEGMANN:  This is part of Exhibit 2, your Honor.

10   I'm sorry.

11            THE COURT:  Okay.

12            MS. SIEGMANN:  Government Exhibit 2.

13   Q.    And can you read to us what you wrote down in this

14   document?

15   A.    "Signed ruling.  Organization appears to be organized by

16   individuals with concerns and allegiance with stricken areas

17   who have no sophisticated fund-raising skills that will provide

18   suspicion for abuse."

19   Q.    What did you mean by "lack sophisticated fund-raising

20   skills"?

21   A.    It's a new organization that has no track record.  With

22   the way they phrased the activities, all being prospective, the

23   way the financial information was provided, all round numbers

24   coming in, that it was brand new.

25   Q.    So if they had been an outgrowth or successor to another

1    organization, assuming that, would that have changed your

2    evaluation?

3              MR. DUNCAN:   Objection.

4              THE COURT:   Overruled.

5    A.   It could.

6    Q.   Now, sir, at the conclusion of this -- your evaluation,

7    was a letter sent to the applicant?

8    A.   This documents what I did, that I actually signed the

9    ruling letter and put it into the clerical process for mailing.

10   That concluded the case.

11   Q.   I'm showing you an exhibit -- a page of a document that

12   appears in Government Exhibit 177.   When you say "ruling

13   letter," sir, does this look familiar to you as a ruling

14   letter?

15   A.   Yes.  And the date is the same as indicated on the case

16   record form.

17   Q.   And it's a four-page document.  How many pages is it?

18   A.   I believe it's four pages.

19   Q.   Do you see your signature on this document?

20   A.   Yes, I do.

21   Q.   Is that the bottom of the page on page 4?

22   A.   I believe it's page 4, yes.

23   Q.   Now, can you just describe to us the first paragraph of

24   this letter?  Why don't you read it first and then describe it

25   to us.

1    A.    "Dear Applicant:   Based on information supplied, and

2    assuming your operations will be as stated in your application

3    for recognition of exemption, we have determined that you are

4    exempt from federal income tax under Section 501(a) of the

5    Internal Revenue Code as an organization described in

6    Section 501(c)(3)."

7    Q.    Is this the standard language that's contained in a ruling

8    letter?

9    A.    In a favorable ruling letter, it's standard.   There are

10   some deviations sometimes.

11   Q.    Now, also contained in the standard ruling letter -- Well,

12   can you tell us what, if anything, is disclosed in the standard

13   ruling letter about whether your activities change?

14   A.    If we were processing the case and there was an activity

15   that they would cease doing, we would probably note it, and it

16   would be, simply stated, based on information supplied,

17   including a reference maybe to your letter dated such-and-such,

18   what you said that you would cease this activity.   We can and

19   do make modifications there, depending upon the processing of

20   the case.

21   Q.    But after you send this letter to the applicant, what, if

22   anything, do you advise them in this letter about changes in

23   activities down the road?

24   A.    There is a paragraph later on that states that they should

25   apprise us of changes in activities.

1    Q.   Does that appear on page -- on this page of the document?

2    A.   I believe that paragraph, "If your sources of support, or

3    your purposes, character, or method of operation change, please

4    let your key district know so that office can consider the

5    effect of the change on your exempt status and foundation

6    status."

7    Q.   Assuming that in addition to the activities that Care

8    disclosed to you, that they were also engaged in activities

9    that promoted jihad or mujahideen, would that have changed your

10   evaluation of this application?

11            MR. DUNCAN:  Objection, your Honor.

12            THE COURT:  Overruled.

13   A.   Yes, it would.

14   Q.   Why, sir?

15   A.   Well, my experience began in the early '70s when we were

16   dealing with civil disobedience cases.  And it would be

17   unlawful conduct, violent conduct, and it would raise an issue.

18   And I know there are various meanings for the word "jihad."

19   I know that today.  Whether I knew it in '93, I don't know.

20   But we would ask for additional information and explore that as

21   an issue.

22   Q.   How would that factor in your determination as to whether

23   their activities were charitable?

24   A.   It would depend upon the facts and circumstances.

25   Just words alone, but exactly what activities, what your

1    participation was in it.  I mean, it's entirely possible to

2    educate maybe about jihad.  I don't know.  In other words,

3    there are many factors that you would have to go into.

4         What I do know is civil disobedience is not an exempt

5    activity.  And it would be a bar to exemption.

6    Q.   Well, would the promotion of fighting?

7    A.   Yes.

8         MR. DUNCAN:  Objection, your Honor.

9         THE COURT:  Overruled.

10   Q.   Would the promotion of fighting be a charitable activity?

11   A.   I believe that would just be counter opposed to what I

12   said before was classic alms giving to the poor and all.  No.

13   In no way.

14        MS. SIEGMANN:  Your Honor, if I could just have a

15   moment.

16        THE COURT:  Okay.

17        MS. SIEGMANN:  No further questions, your Honor.

18        THE COURT:  Mr. Duncan.

19        MR. DUNCAN:  Thank you, your Honor.

20                       CROSS-EXAMINATION

21   BY MR. DUNCAN:

22   Q.   Good morning -- good afternoon, Mr. Sack.  My name is

23   David Duncan.  I represent Mr. Muntasser, and I have a few

24   questions for you.

25        First of all, we've had a bunch of testimony about the

1    organization of a charity to operate exclusively for charitable

2    purposes, correct?

3    A.    I just know my testimony here, yes.

4    Q.    Well, let's talk about your testimony.  Your testimony is

5    that it has to be organized exclusively for charitable

6    purposes, correct?

7    A.    Organized and operated.

8    Q.    Well, operated actually is primarily and in not more than

9    an insubstantial part for charitable purposes, isn't it?

10   A.    I would suggest that that primary language would not

11   apply.  For instance --

12   Q.    Well, is there such language in the regulations, the

13   regulations that you operate under, the regulations governing

14   501(c)(3) status?

15   A.    Use the word "primary" in that context?

16   Q.    Yes.  Are you aware of regulations governing charitable

17   organizations that have been promulgated by the IRS?

18   A.    Yes, I am.

19   Q.    And are you aware that in those regulations, when it talks

20   about the operation of a charity, the activities of a charity,

21   that it -- the organization must be operated primarily for

22   charitable purposes and not more than an insubstantial part of

23   its operations must be noncharitable?  Now, isn't that correct?

24   A.    I believe that's the correct language.

25   Q.    So for instance, a charity can engage in for-profit

1    activity, correct?

2    A.   Yes, it can.  Under unrelated trader business.

3         THE COURT:  Can I just interject?  Was this true in

4    1993 as well?

5    A.   I beg your pardon?

6         THE COURT:  Did the reg you're talking about, was that

7    also true in 1993?

8    A.   I believe that's the correct citation of the reg.  I'm

9    four years retired, and I have no occasion really to go back

10   and look at the regs so . . .

11   Q.   But that's a pretty long-standing IRS regulation, correct?

12   A.   I agree.

13   Q.   Now, I just want to be clear.  You've reviewed a couple of

14   newsletters, correct?

15   A.   Yes, I did.

16   Q.   And is it your testimony that if you had seen those

17   newsletters, one of the things you might have done was told the

18   organization, "You can't talk about this"?

19   A.   No.  My testimony was that we would go into a development

20   mode.  We would seek additional information.  This was unknown

21   to us when we processed the application.  And we would have

22   taken an entirely different method of pursuing the case.

23   Q.   I'm asking you a question about whether you would have

24   told the organization, "You can't talk about these things.

25   You cannot say these things"?

1   A.   I -- I would have to look at the facts and circumstances.

2   I would have to look at more copies.

3   Q.   Well, you've looked --

4   A.   I'm not going to say where I would end up.

5   Q.   Well --

6   A.   You certainly can, with citations to authority to, expound

7   on things.  But this is not what was in the application.

8   Q.   There was a citation to Allah as an authority in this that

9   you looked at?  Didn't you say it referred to Allah?

10  A.   In the -- in the newsletters --

11  Q.   Yes.

12  A.   -- but I'm saying there was no mention in the application.

13  Q.   I understand there was no -- I'm not talking about the

14  application yet.

15  A.   Oh.

16  Q.   We'll get there.  I'm talking about the newsletter right

17  now.

18  A.   Um-hum.

19  Q.   There was -- there was appeal to Allah as authority in

20  that newsletter, correct?

21  A.   Yes.

22  Q.   Now, I know you don't know much about Islam, but doesn't

23  that suggest to you that this is a religious argument?

24  A.   I -- I don't know.  My testimony was that the language was

25  entirely different in those newsletters than from what it was

1    in the application.

2    Q.   I understand that.  What I'm asking you is, did you

3    understand from reading these newsletters today that there were

4    religiously based arguments made in them?

5    A.   Yes.

6    Q.   And you understand also that the IRS does not pass

7    judgment on religious beliefs, sincerely held religious

8    beliefs; is that correct?

9    A.   Absolutely, up to a point.

10   Q.   Up to a point where the sincerely held religious belief

11   contravenes a clearly established policy, public policy,

12   correct?

13   A.   Correct.

14   Q.   Clearly established, correct?

15   A.   What comes to mind is the Mormon Church and polygamy.

16   Q.   And polygamy.  Now, you mentioned Mr. Owen and said he had

17   no part in the review of this file; is that correct?

18   A.   Correct.

19   Q.   What was Mr. Owen?  In 1993, what was his position?

20   A.   I'm not certain what time frame he was selected as

21   director of exempt organizations.  Mr. Owen held a number of

22   positions.  I think at one point he was a technical advisor to

23   that office.  But I -- he was the director of the exempt

24   organizations for a period of time.  I'm not certain I could

25   recall what dates he took that office.

1    Q.   And as director, was he your supervisor when you were a

2    branch chief?

3    A.   I'm trying to think as to whether there was somebody in

4    between he and I.

5    Q.   But he was somewhere up there, correct?

6    A.   He was definitely up there, yes.

7    Q.   And you testified he had nothing to do with the review of

8    the Care file, correct?

9    A.   Correct.

10   Q.   But he did have something to do with the policies and

11   procedures by which the Care file was evaluated, correct?

12   A.   He, for instance, would have been fully aware and

13   supportive of the technical screening process.

14   Q.   He also would have been fully aware of what policies

15   should or should not be applied to particular files, correct?

16   A.   I believe so.

17   Q.   And in fact, if there were going to be any kind of a

18   denial of Care's status based on a newsletter, that would be

19   something that would have to be reviewed by more than just you,

20   correct?

21   A.   If it was a denial --

22   Q.   Right.

23   A.   -- there would -- Right now, there are two people in the

24   processing of the 1023 application on the technical screening

25   process where it is going favorably.  If a proposed denial is

1    issued, then that would involve one or more people, in

2    addition.

3    Q.    And if the denial was based on the contents of the

4    newsletter, that would be pretty important, wouldn't it?

5    Because that would be speech, correct?

6    A.    It -- It is certain speech, but whether it's protected

7    speech or not, I'm not sure.

8    Q.    Well, you've already testified that religiously based

9    arguments are protected speech, correct?

10   A.    I could --

11   Q.    As long as they are not -- Let me qualify that.  As long

12   as they are not arguing for something that is in violation of a

13   clearly established policy, correct?

14   A.    Or promoting civil disobedience or acts of fighting or

15   acts of violence.  If I said that God compelled me to take

16   every action against abortion clinics, would that protect me to

17   firebomb an abortion clinic?

18   Q.    Well, sir, I'm asking you --

19   A.    We review those cases.

20   Q.    I'm asking the questions here.

21            THE COURT:  Hold on.  Hold on, everyone.  The lawyer

22   gets to ask the questions.  I do think, as phrased, the

23   question -- Let me put it this way.  You need to be clear when

24   you're talking about free speech principles generally and

25   speech in the context of applying for an IRS charitable

1    exemption.

2    Q.   Well, let's try to be clear about that.  The IRS's

3    position is that it doesn't judge the contents of speech

4    generally, correct?

5    A.   I -- No, I would not say that.  I would say that we do not

6    judge beliefs, religious beliefs.

7    Q.   Are you familiar, sir, with Revenue Ruling 86-43?

8    A.   I would have to refresh my memory.

9          MR. DUNCAN:  Well, can I approach the witness, your

10   Honor?

11         THE COURT:  Yes.

12   Q.   I'd ask you to look at that and see if you recognize it?

13   A.   This has to do with advocacy, an organization putting

14   forth its belief.  It cites to a number of court cases.  And

15   you have highlighted --

16   Q.   Well, sir, do you recognize that as a revenue ruling?

17   A.   Yes.

18   Q.   And was that revenue ruling in effect when you worked at

19   the IRS?

20   A.   It's dated 1986.

21   Q.   And does that revenue ruling say that the IRS has a

22   long-standing position -- I'm sorry -- long-standing position

23   that the method used by an organization in advocating its

24   position rather than the position itself is the standard for

25   determining whether it has educational purpose; is that

1    correct?

2    A.    The method?

3    Q.    Rather than the content of the speech.

4    A.    (No response.)

5    Q.    Is this something that you don't know?

6    A.    No.  I am trying to recollect.  I am trying to, you know,

7    understand the full scope of that revenue ruling.

8              MS. SIEGMANN:  Your Honor, can he have a copy of that

9    so he can just look at it for a minute to help him remember?

10   It's been four years.

11   Q.    Just looking at that highlighted portion down there, would

12   you agree with me that what I just said to you is reflected in

13   the revenue ruling?

14   A.    It cites to the Big Mama Rag decision, which I was aware

15   of.  Before I would opine really on this provision, I would

16   like to research it further.

17   Q.    Sir, I'm asking you if I correctly cited what the revenue

18   ruling says the IRS's position is on how speech is judged for

19   an educational charity.  Is that correct?  Is the language

20   there?

21   A.    "The method used by the organization advocating its

22   position rather than the position itself is the standard for

23   determining whether an organization has educational purposes."

24   Q.    Is that what's there, sir?

25   A.    I'm having difficulty if an organization is promoting

1    civil disobedience --

2            THE COURT:  Let's take it a step at a time.  I think

3    the question was, do the words say that?

4    A.   Yes.  The words say that.

5            THE COURT:  Put another question to the witness.

6            MR. DUNCAN:  Yes, sir.

7    Q.   Now, you talked about an organization promoting civil

8    disobedience.

9            Did I put that into evidence?  I can't remember.  Do

10   you remember what number it is?

11           MS. PETRI:  Yes.

12           MR. DUNCAN:  What number is it?

13           MS. PETRI:  I think it's 1184.

14           MR. DUNCAN:  I'll never find it.

15           MR. CABELL:  I think it's in the boxes back there.

16           MR. DUNCAN:  Can you see if you can find it?

17   Q.   Let's see how far we can get without the revenue ruling

18   itself.  There was a revenue ruling in the 1970s regarding an

19   organization that promoted civil disobedience, correct?

20   A.   I believe there was.  I believe it was an outgrowth of the

21   Vietnam era.

22   Q.   Right.  And didn't that address whether an organization

23   whose primary purpose was to organize demonstrations and

24   encourage people to engage in civil disobedience during the

25   course of those organizations -- during the course of those

1   demonstrations could not obtain tax-exempt status?

2   A.   I believe that was the effect of the revenue ruling.

3   Q.   It didn't say that an organization that in the abstract

4   advocated civil disobedience in a newsletter would be denied

5   tax-exempt status, did it?

6   A.   The revenue rulings go on specific facts.  And I don't

7   recall what the specific facts were in that revenue ruling.

8           MR. DUNCAN:  May I approach the witness?

9           THE COURT:  Yes.

10  Q.   I'm going to show you what's been marked Defendants'

11  Exhibit 1185, and ask you if you recognize that to be the

12  revenue ruling we're talking about?

13  A.   I believe it is.

14  Q.   And so if you want to look at it and see if it refreshes

15  your memory about the facts and then tell me when you've had a

16  chance to look at it.

17  A.   Okay.

18  Q.   So this ruling is not a ruling about the speech of the

19  organization, is it?

20  A.   It does say "induce."

21  Q.   It does say "induce," that's correct.

22  A.   So if you induce, how do you do that?

23  Q.   It doesn't say that if the organization was engaged in

24  writing articles espousing civil disobedience and making

25  arguments for it in history; it says, does it not, that the

1    organization was organizing protest demonstrations in

2    Washington at the Pentagon and other places to derive the

3    maximum publicity of an event, demonstrators are urged to

4    commit acts of civil --

5    A.    Urged?

6    Q.    Yes.   Urged to commit acts of civil disobedience?

7              MS. SIEGMANN:   Objection, your Honor.   I am going to

8    object to the nature of the first part of Mr. Duncan's question

9    that occurred before Mr. Sack spoke on the grounds of

10   argumentative.

11             THE COURT:   Well, I think as phrased, it's

12   argumentative.   Why don't you just ask him whether the revenue

13   ruling says what it says.   You can read from it.   That's fine.

14   Q.    It says "In this case" -- and I'm going to read from the

15   exhibit -- "the organization induces or encourages the

16   commission of criminal acts by planning and sponsoring such

17   events.   The intentional nature of this encouragement precludes

18   the possibility that the organization might unfairly fail to

19   qualify for exemption due to an isolated or inadvertent

20   violation of a regulatory statute," correct?

21   A.    I'd have to reread that myself.   But I think that's the

22   tenor.

23   Q.    So it's basically consistent and planned violations of

24   statutes?

25   A.    I would disagree.

1    Q.    Well --

2    A.    I would disagree that on the point that urge, induce,

3    encourage.   If you urge, induce, and encourage, through a

4    newsletter, civil disobedience, you will not get exemption.

5    Q.    And you base that on this revenue ruling, sir?

6    A.    I would -- I would base it on that.   I would base it on

7    the law of charities.   I would base it on the Supreme Court

8    decision of Bob Jones University.

9    Q.    Bob Jones University.   That's where the language about

10   violation of a clear public policy, clearly established public

11   policy comes from, doesn't it?

12   A.    That's true -- In that particular case, yes.   But it also

13   acknowledges the clear, or even clearer public policy that an

14   objection should not engage and promote illegal activity.

15   Q.    Well, Bob Jones lost its tax-exempt status because it

16   refused to admit persons of color to its university, correct?

17   A.    Correct.

18   Q.    It had a policy against interracial marriage; it had a

19   policy against interracial dating; and therefore, it would not

20   let persons of color attend, correct?

21   A.    Correct.

22   Q.    Did it say anywhere in the Supreme Court case or, to your

23   knowledge, anywhere that Bob Jones University was prohibited

24   from espousing its views of racial separation so long as it did

25   not implement them at its university?

A.    What the Supreme Court stated and acknowledged was the clear public policy dating back to the law of charities in England that a charitable trust will not engage in illegal activities.

Q.    Engage in illegal activities.

A.    Or promote them.

Q.    Well, is that what Bob Jones says, sir?

A.    I think in their citations to authority, they assume that. They were going a further step in what is public policy.  When you're talking public policy and discrimination, you're not talking criminal activity.  You're not talking illegal activity.  And that has traditionally been in the law of charity.  But --

        THE COURT:  All right.  Let's put another question.

Q.    So it's your view that a charity is not entitled to speak out about matters such as civil disobedience and take a position that civil disobedience may be justified under certain circumstances and present arguments to that effect, that that would be an uncharitable activity?

A.    If they urge, promote, or sponsor in any way civil disobedience.  If you're going to have a learned seminar, you know, on history of this, that could be different.  But if you have a cause and you have an intent to encourage, urge, support civil disobedience, you are not exempt.

Q.    Doesn't that line fall just about where the line between

1    protected speech and unprotected speech falls, sir?

2          MS. SIEGMANN:  Objection, your Honor.

3          THE COURT:  Sustained.

4    Q.   Well, are you aware whether the IRS's position on this is

5    that the line between what is or is not content that the IRS

6    will examine is the line between protected speech and

7    unprotected speech under the First Amendment?

8          MS. SIEGMANN:  Objection.

9          THE COURT:  Sustained.

10   Q.   Let's go back, if we can, to the referral of this case to

11   your office.  First of all, the national office is the office

12   that is supposed to insure uniform application of IRS law

13   across exempt organizations, correct?

14   A.   We strive to.

15   Q.   That's your objective, right?

16   A.   Yes.

17   Q.   And that's your purpose, correct?

18   A.   (Nodding head.)

19   Q.   The district offices send you cases that they can't deal

20   with because they don't have published precedent; they don't

21   understand it; or it's some kind of a controversial case,

22   correct?

23   A.   Or additional reasons may also require cases to come to

24   the national office.

25   Q.   In this particular case, it was referred because of the

1    areas that the organization proposed to operate in, correct?

2    A.    Correct.

3    Q.    And they did say that there was no published precedent,

4    correct?

5    A.    They may have said that.  I don't know.

6    Q.    I'm showing you something -- it's a page from Exhibit 2,

7    which is the Care file.  Can you tell us what this is?

8    A.    It's a referral form, a standard referral form used at

9    that time to forward cases to the national office.

10   Q.    And they checked that the "application involved an issue

11   on which there is inadequate published precedent," correct?

12   A.    Correct.

13   Q.    And then they attached something.  And that said that

14   "this organization will provide financial, food, shelter, and

15   medical relief, education, support, reconstruction projects,

16   and to volunteer the services of individuals in the United

17   States and overseas to assist individuals in countries such as

18   Bosnia, Somalia, Sudan, Bangladesh, Afghanistan, Kashmir,

19   et cetera," correct?

20   A.    Correct.

21   Q.    "This organization will involve itself directly with

22   countries where the United States military is being employed

23   and fighting.  This is a political sensitive issue."  Correct?

24   A.    Correct.

25   Q.    So if somebody in Brooklyn thought it was a politically

 1   sensitive issue and didn't know what to do with it, then they'd

 2   send it to you, correct?

 3   A.   Correct.

 4   Q.   By the way, you said you reviewed the file after

 5   Mr. Charnoff recommended a technical screening, correct?

 6   A.   Correct.

 7   Q.   Did you review it before you assigned it to anybody?

 8   A.   I may have.  I certainly -- when I'm assigning cases, I

 9   would look through the files.  To what extent I looked through

10   that file, I can't recall.

11   Q.   And you've testified that you concluded from your

12   review -- and you've reviewed thousands of these forms, right?

13   A.   Right.

14   Q.   -- you've concluded that the applicants were

15   unsophisticated, correct?

16   A.   Correct.

17   Q.   And sympathetic to the victims in the areas they planned

18   to operate in, correct?

19   A.   Correct.

20   Q.   You saw their names and you could infer that they were

21   Muslims, correct?

22   A.   I could infer they were foreign.  But I -- I don't know if

23   I would make the other inference.

24   Q.   Well, did you know that the areas that they planned to

25   operate in were areas where there were significant conflicts

1    involving Muslims?

2    A.    Yes.

3    Q.    You knew that in those areas there were massive numbers of

4    refugees, Muslim refugees, correct?

5    A.    Yes.

6    Q.    Afghanistan and Bosnia?

7    A.    I certainly recognized those as countries where there are

8    needs of refuge.

9    Q.    Substantial needs, correct?

10   A.    Correct.

11   Q.    And the technical screening, by the way, that was a

12   process that you did not let a junior person in the office

13   handle?

14   A.    It was my practice to assign cases for technical

15   screening.  Many times I would assign them a note and suggest

16   that maybe we consider this particular case for technical

17   screening.  And I did assign them to the more senior people in

18   my group.

19   Q.    And that was so that you would have someone look the form

20   over to make sure that it satisfied the requirements without

21   more, correct?

22   A.    It would give me another level of confidence.  Certainly

23   the initiator, the tax law specialist would spend more time

24   handling that file than I would.

25   Q.    So you wanted to make sure it was someone who knew what

1    they were doing?

2    A.    Correct.

3    Q.    And that's why you gave it to Mr. Charnoff, correct?

4    A.    I believe so.

5    Q.    And Mr. Charnoff or you -- I don't know who it was who

6    decided -- that -- well, maybe you know.  Who decided that it

7    should be done by way of technical screening as opposed to a

8    full review?

9    A.    I can't really recall.  I looked through the file and

10   notations.  As I said earlier, we were a collegial group, and

11   there may have been discussions before anything was put to

12   writing.

13   Q.    But it was decided among you -- you, Mr. Charnoff.

14   Anybody else or just the two of you?

15   A.    The two of us.

16   Q.    -- that this case could be handled by technical screening,

17   correct?

18   A.    Correct.

19   Q.    The applicants didn't ask for that, did they?

20   A.    No.  They were unaware.

21   Q.    They didn't even know that it existed, did they?

22   A.    Not to my knowledge.

23   Q.    They were aware, were they not, that the case had been

24   sent to the national office for review, correct?

25   A.    Correct.

1    Q.    Because a letter was sent to them saying that, right?

2    A.    I believe there were probably two letters.  One, we had an

3    acknowledgment that we would send out for our group.

4    Q.    And the district office would send a letter?

5    A.    They would send a letter or memo noting that it was

6    referred and at that time -- and I believe the file indicates

7    we send out an acknowledgment.

8    Q.    And the decision to engage in technical screening, which

9    meant you weren't going to ask for any more materials, that was

10   a decision that you guys made having looked at the file,

11   correct?

12   A.    Yes.

13   Q.    You could have asked for more materials if you'd chosen

14   to, correct?

15   A.    We can always -- you can always develop a case.  You could

16   go on a fishing expedition if you would like.

17   Q.    You could have asked for newsletters, correct?

18   A.    If we had any indication, we could have asked for

19   newsletters.

20   Q.    Well --

21   A.    Two --

22         THE COURT:  Let's wait for the next question.

23   Q.    Did you have an indication, sir?

24   A.    No.

25   Q.    You're pretty experienced at reading these, aren't you?

1   A.   Quickly I go through it.

2   Q.   And you're experienced at that?  That's why you can do it

3   quickly, right?

4   A.   Yes.

5   Q.   You've done hundreds, thousands of them, right?

6   A.   Yes.

7   Q.   So an organization puts down that one of the things it

8   intends to do to raise funds is to send mailings, correct?

9   A.   Correct.

10   Q.   It gives you two other possibilities: fund-raising

11   committees and personal contacts and friends, right?

12   A.   Right.

13   Q.   Mailings usually mean mailing literature, correct?

14   A.   I would also point out that --

15   Q.   I'm asking a question that requires a "yes" or "no"

16   answer, sir.  Mailings imply that literature will be sent out,

17   doesn't it?

18   A.   Yes.

19   Q.   And Ms. Siegmann, I believe, showed you fund-raising

20   expenses of 6,000, 10,000, and 15,000 as projections, correct?

21   A.   Projections.  Rounded numbers.

22   Q.   So that applies -- because we only have three categories

23   that they say they intend to engage in of fund-raising, that

24   implies probably that the bulk of it's going to go into

25   mailing, doesn't it?

1    A.    I'm not certain --

2    Q.    Well --

3    A.    -- because those are projections.

4    Q.    -- I'm not asking about whether they're projections,

5    whether they would actually spend the money.  I'm asking if

6    they are giving you that amount of money of what they

7    anticipate to spend on fund-raising and they give you these

8    three categories of fund-raising methods, you would expect the

9    bulk of the money that they anticipate spending would go on

10   mailings, right?

11   A.    I think that's logical.

12   Q.    Right.  And you're a logical person, right?

13   A.    I am.

14   Q.    And you've been doing this a long time and you can look at

15   it and figure this out pretty quickly, right?

16   A.    I can.

17   Q.    So isn't it fair to say that there is an indication on

18   this form that they intended to produce and disseminate

19   literature?

20   A.    Intended.

21   Q.    Intended.  And what was the date on this application, sir,

22   if you recall?

23   A.    I don't recall exactly.  I know we had the April and June

24   up here before.

25   Q.    It was signed on June 1 of 1993, correct?

1    A.    That's correct.

2    Q.    And it hit your office somewhere in the neighborhood of

3    September or October, correct?

4    A.    I believe so.

5    Q.    So if they said in June, "In the next couple of months we

6    intend to engage in fund-raising," by the time you got it, they

7    probably were doing that if they were doing what they said they

8    were doing in the application, correct?

9    A.    That's logical.

10              THE COURT:  Is this a good place to break, Mr. Duncan?

11              MR. DUNCAN:  That's fine.  Can I ask one more

12   question?

13              THE COURT:  That's fine.

14              MR. DUNCAN:  Now if I can remember it.

15              I can't remember it.  I'll have to do it tomorrow.

16   I'm sorry.

17              THE COURT:  Ladies and gentlemen, remember my usual

18   admonitions not to discuss the case with anyone or look at any

19   media reports.  The lawyers indicated today that we're

20   basically on track so don't panic about that, and I'll see you

21   tomorrow morning.

22              THE CLERK:  All rise.

23              (At 1:02 p.m., the jurors exited the courtroom.)

24              THE COURT:  Before we break, is tomorrow going to

25   involve any more transcripts?

1          MR. CHAKRAVARTY:  I was just going to hand those to

2     the court.  I don't know whether we're going to get to the bulk

3     of these tomorrow or on Friday.  But --

4          THE COURT:  Are they in the order in which you expect

5     to introduce them?  I've got a -- The third event in my

6     triathlon of mock trials for my class is this evening.  And so

7     I will do my best to get to that, but it would also be good if

8     I knew what was coming up first.

9          MR. CHAKRAVARTY:  I will pare that down and get that

10    down to Mr. Castles later this afternoon.  I will say also for

11    the benefit of counsel, Mr. Einhaus from the FBI is expected to

12    read from a handful of these as well.  For some of them, I was

13    going to have him summarize the call as opposed to actually

14    play the call -- they're in English also -- which means that

15    the transcript isn't going back to the jury, but the call is.

16    I think --

17         MR. McGINTY:  I'm sorry?  I didn't understand that.

18         MR. CHAKRAVARTY:  So what I'm hoping is, depending

19    on -- just to flag my intent -- is to have him say what this

20    call is about in one sentence, and that will dispense with --

21         THE COURT:  Summaries are generally permissible.

22    But it has to be a fair summary.  Why don't you tell the

23    defense before you do that what you expect the summary to be so

24    we can flag any issues.

25         MR. ZALKIND:  I doubt if that's going to help, your

 1   Honor.  We want the words to go in.  We don't think these calls

 2   mean anything.  They have nothing to do with the conspiracy,

 3   and we're not going to go with the summary of the government.

 4        THE COURT:  I'm not going to rule it out.  If it's a

 5   call about getting his car repaired or something, maybe that

 6   can be summarized.

 7        I'll see you at 8:30 tomorrow.

 8        MR. DUNCAN:  Thank you, your Honor.

 9        (Whereupon, at 1:05 p.m., the trial recessed.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3

4              We, Marianne Kusa-Ryll, CRR, RDR, Official Court

5     Reporter of the United States District Court, and Kimberly A.

6     Smith, CRR, RDR, do hereby certify that the foregoing

7     transcript, from Page 15-1 to Page 15-148, constitutes, to the

8     best of our skills and abilities, a true and accurate

9     transcription of our stenotype notes taken in the matter of CR

10    No. 05-40026-FDS, The United States of America vs. Muhamed

11    Mubayyid, Emadeddin Z. Muntasser, and Samir Al-Monla, a/k/a

12    Samir Almonla.

13

14

15

16                              /s/ Marianne Kusa-Ryll

17                              Marianne Kusa-Ryll, RDR, CRR

18                              Official Court Reporter

19

20

21

22                              /s/ Kimberly A. Smith

23                              Kimberly A. Smith, CRR, RDR

24

25