1                 UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
2

3

4     United States of America,       )
                      Plaintiff,       )
5                                      )
                                       )
6     vs.                             )   Criminal No. 05-40026-FDS
                                       )
7                                      )
      Muhamed Mubayyid, Emadeddin Z.)
8     Muntasser, and Samir Al-Monla,)
      a/k/a Samir Almonla,            )
9                      Defendants.     )

10

11    BEFORE:  The Honorable F. Dennis Saylor, IV

12

13                 Daubert Hearing re: Evan Kohlmann

14

15
                            United States District Court
16                          Courtroom No. 22
                            One Courthouse Way
17                          Boston, Massachusetts
                            November 28, 2007
18

19

20

21

22

23                 Marianne Kusa-Ryll, RDR, CRR
                       Official Court Reporter
24                 United States District Court
                   595 Main Street, Room 514A
25                 Worcester, MA 01608-2093
             Mechanical Steno - Transcript by Computer

```
1    APPEARANCES:

2    B. Stephanie Siegmann, Assistant U.S. Attorney
     Aloke Chakravarty, Assistant U.S. Attorney
3    Donald L. Cabell, Assistant U.S. Attorney
     United States Attorney's Office
4    United States District Court
     One Courthouse Way, Suite 9200
5    Boston, Massachusetts 02210
     for the Plaintiff
6
     Law Offices of Michael C. Andrews
7    Michael C. Andrews, Esquire
     21 Custom House Street
8    Suite 920
     Boston, Massachusetts 02110
9    for the Defendant, Muhamed Mubayyid

10   Norman S. Zalkind, Esquire
     Elizabeth A. Lunt, Esquire
11   David Duncan, Esquire
     Zalkind, Rodriguez, Lunt & Duncan, LLP
12   65a Atlantic Avenue
     Boston, Massachusetts 02110
13   for the Defendant, Emadeddin Z. Muntasser

14   Federal Defender's Office
     Charles P. McGinty, Esquire
15   408 Atlantic Avenue
     Third Floor
16   Boston, Massachusetts 02110
     for the Defendant Samir Al-Monla, a/k/a Samir Almonla

17

18

19

20

21

22

23

24

25
```

1                         I N D E X

2    Testimony of:          Direct   Cross   Redirect   Recross

3      EVAN F. KOHLMANN
       by Ms. Lunt                     7
4      by Mr. Chakravarty                        51
       by Ms. Lunt                                          76
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

<u>E X H I B I T S</u>

2

| No. | Description | Evidence | For ID |
|-----|-------------|----------|--------|
| A | Document | 9 | |
| B | Document | 45 | |
| C | Document | 46 | |
| D | Document | 97 | |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

THE CLERK:  All rise.  Court is now open.  You may be seated.

THE COURT:  All right.  Good afternoon.  This is a Daubert hearing, or maybe more technically a Rule 702 hearing on Evan Kohlmann, who is a government expert.

What I -- well, we have a finite amount of time.  I have only until 4:30, and we need to end promptly at 4:30.

What I think makes sense is I have the defendants' expert report -- I'm sorry -- Mr. Kohlmann's expert report, which I've read, and is there a copy of the CV handy?  I don't know if he has one, and I don't think I have seen it.

MR. CHAKRAVARTY:  Your Honor, I may have uploaded that on Pacer, but --

THE COURT:  All right.  Let's see if we can't get it off the system.

MR. CHAKRAVARTY:  November 5th, 2007, I filed something on the experts.

THE COURT:  I may have printed it out and just --

But, in any event, what I think makes sense is if we are going to have live testimony to assume that the CV and the extra report are, in fact, the direct, and then proceed to cross.  I understand there is a challenge to his qualifications.

1          MS. LUNT:  Yes, your Honor, which is probably where we

2     ought to start.  So while we're doing that, why don't

3     we -- while we're looking for the CV, why don't we put -- is

4     Mr. Kohlmann present?

5          MR. CHAKRAVARTY:  Yes, he is.

6          THE COURT:  Okay.  Why don't we put him on the stand.

7          THE CLERK:  What date did he say?

8          THE COURT:  I'm sorry.  Al, what day did you say?

9          MR. CHAKRAVARTY:  November 5, 2007.  It was the

10    government's opposition to defendants' motion to preclude

11    testimony of the government's expert witnesses.  I believe it's

12    attachment C.

13         THE CLERK:  I think I've got it.

14         THE COURT:  Hold on a second.  I think I got it.  Oh,

15    I do have it.

16         THE CLERK:  Please raise your right hand.

17                    EVAN KOHLMANN, SWORN

18         THE CLERK:  Please be seated.

19         THE WITNESS:  Thank you.

20         THE CLERK:  Please state your name and spell your last

21    name for the record.

22         THE WITNESS:  My name is Evan F. Kohlmann,

23    K-O-H-L-M-A-N-N.

24

25

CROSS-EXAMINATION

BY MS. LUNT:

Q.   Good afternoon, Mr. Kohlmann.  My name is Elizabeth Lunt.
I represent Mr. Muntasser, seated in the front row.

     Now, Mr. Kohlmann, you describe yourself as an
international terrorism consultant; is that correct?

A.   That's correct.

Q.   And that's how you describe yourself in your website?

A.   That's correct.

Q.   And it's also how you describe yourself in the expert
report, which you have submitted in this case?

A.   That's correct.

Q.   And also on your website and the report you say that you
have spent a decade tracking Al Qaeda and other terrorists
groups?

A.   Yes, I've tracked Arab-Afghan movements around the world.

Q.   Okay.  Your Honor -- let me state the question I just
asked again.  If you could listen to it carefully, Mr.
Kohlmann, and answer it.

     Yes or no: did you say in your website and in your
report that you have spent a decade tracking Al Qaeda and other
terrorist groups?

A.   That's correct.

Q.   Also in your website and in your report, do you describe
yourself -- sorry -- also in your report, and on your website,

1    do you describe yourself as specializing in Al Qaeda and other

2    contemporary terrorists groups, correct?

3    A.    That's correct.

4    Q.    Okay.  Now, you have an undergraduate degree from

5    Georgetown University; is that right?

6    A.    That's correct.

7    Q.    And you obtained that in 2001?

8    A.    That's correct.

9    Q.    And then you proceeded directly to Penn. Law School; is

10   that right?

11   A.    Yeah, I actually have a second degree also from

12   Georgetown.

13   Q.    What's your second -- a second bachelor's degree; is that

14   right?

15   A.    No, it's a certificate for Islam.  Georgetown

16   University --

17   Q.    Excuse me.  This is cross-examination.

18          MS. LUNT:  Maybe you could explain, your Honor.

19          THE COURT:  All right.  But I'm not a jury, I don't

20   think you need to worry about interrupting to keep information

21   from me.  I think I can handle it.

22   Q.    As I understand it, you have a bachelor's degree and a

23   certificate from Georgetown University; is that correct?

24   A.    A certificate in Islam, that's correct, yes.

25   Q.    And -- you in law school, you took a regular three year

1    law school course; is that correct?

2    A.    Regular in the sense that I took a regular law school

3    curriculum; however, I also took classes outside of law school.

4    Q.    Let me just show your law school transcript, if I may.

5              MS. LUNT:  May I approach the witness, your Honor?

6              THE COURT:  Yes.

7    Q.    Mr. Kohlmann, I'm showing you records we obtained in

8    response to a subpoena from the University of Pennsylvania Law

9    School; is that correct?

10   A.    That's correct.

11   Q.    That is what this is.  And is this your transcript?

12   A.    That is correct, yeah.

13             MS. LUNT:  I would like this to be marked as an

14   exhibit to the hearing, your Honor.

15             THE COURT:  All right.  We'll mark it as Exhibit A.

16             (Document was marked Exhibit A for identification.)

17   Q.    Now, in your first year of law school, you took civil

18   procedure, contracts, torts, property, and legal writing; is

19   that right?

20   A.    That's correct, yes.

21   Q.    And also in the second semester: constitutional law,

22   criminal law, legal writing, American legal history,

23   administrative law?

24   A.    That's correct.

25   Q.    And in your second year of law school, you took

1   professional responsibility, evidence for trial lawyers,

2   federal income taxation, constitutional criminal procedure,

3   terrorism and democracy; is that correct?

4   A.   That's correct.

5   Q.   Now, the second semester, your second year of law school,

6   you took copyright, corporations, evidence for trial lawyers,

7   law and the Holocaust, and topics in defamation; is that

8   correct?

9   A.   That's correct.

10  Q.   And then in your final year of law school, the fall of

11  2003, you took death penalty and habeas corpus, trial advocacy,

12  international human rights, advanced criminal law, and

13  cybercrime seminar --

14  A.   That's correct.

15  Q.   -- is that right?

16       And then in your last semester of law school in the

17  spring of 2004, you took Afghanistan and Islamism, free speech,

18  trial advocacy, First Amendment, and independent study; is that

19  right?

20  A.   That's correct.

21  Q.   Let me place this in a special place for this hearing.

22       Now, so your -- you have a bachelor's degree, and you

23  have a JD degree?

24  A.   And I have a certificate.

25  Q.   And your certificate?

1   A.   That's correct.

2   Q.   Now, you do not have a Ph.D. in any field of study, do

3   you?

4   A.   No, I don't.

5   Q.   And you don't have a master's degree, do you?

6   A.   No, I don't.

7   Q.   And you haven't done Ph.D. studies in history, have you?

8   A.   I don't have any Ph.D.s.

9   Q.   Okay.  History, international relations, no subject you

10  have --

11  A.   I don't have any Ph.D.

12  Q.   -- post graduate work?

13       Now, you understand that a Ph.D. program involves two

14  or three years of course work?

15  A.   That's correct, yes.

16  Q.   And does that include training in research methodology?

17  A.   That's correct.

18  Q.   And also several years of research and fieldwork, which

19  culminates in the thesis?

20  A.   That's correct.

21  Q.   And that thesis, if you did a Ph.D., would be reviewed by

22  a thesis committee of academics in the relevant fields?

23  A.   That's correct.

24  Q.   And you don't have a Ph.D.?

25  A.   No.

1  Q.   Now, you've never taken any formal education in Arabic,

2  have you?

3  A.   Well, that's a difficult question to answer, simply

4  because of the fact that in order to study Islam, you have to

5  learn some Arabic.  One is consonant with the other.  The other

6  thing is I worked as a research assistant for Dr. Mamoun Fandy

7  in the Center for Contemporary Art Studies.  Again, in order to

8  perform that role, you had to understand at least some Arabic.

9  Have I had formal training?  Well, not really, but it depends

10  what you mean, because again at the Center for Muslim Christian

11  Understanding, as a part of studying Islam, I also had to study

12  Arabic vocabulary and Arabic verse.

13  Q.   This was when you were an undergraduate at Georgetown,

14  right?

15  A.   That's correct.

16  Q.   When you were taking a full load of courses as an

17  undergraduate at Georgetown?

18  A.   Well, yes, it was a full-year course.

19  Q.   Now, are you telling this court that you are fluent in

20  Arabic?

21  A.   Far from it.

22  Q.   In fact, to read Arabic documents, you need a translator;

23  is that right?

24  A.   Yeah, my proficiency in Arabic is more in terms of oral

25  from listening, listening to Arabic speakers, from watching

1    video conferences, from going to conferences.  I picked up a

2    lot orally; but in terms of reading, that's where my problem

3    is.

4    Q.    In short, you're not fluent in Arabic?

5    A.    No, no, no, I'm not.

6    Q.    And you don't speak or understand any of the languages of

7    Afghanistan or Pakistan, do you?

8    A.    Well, not if you're talking about Urdu and Pashto, no.

9    Q.    What about Dari?

10   A.    No.

11   Q.    What about Uzbek?

12   A.    No.

13   Q.    What about Tajik?

14   A.    No.

15   Q.    And what about the language of Bosnia, which is Serbo

16   Croat?  Do you speak Serbo Croat?

17   A.    Not fluently, no.

18   Q.    Have you had any courses of formal training in Serbo

19   Croat?

20   A.    No, it's purely in the profession.

21   Q.    And are you fluent in any language other than English?

22   A.    Yes.

23   Q.    And what's that language?

24   A.    French.

25   Q.    Now, you would not claim to be an expert in the religion

1    of Islam, would you?

2    A.   I have training in Islam.  Obviously, I have a certificate

3    in Islam, but I don't proffer myself as an expert in Islam.

4    Q.   In fact, you couldn't read the Koran in the original?

5    A.   In Arabic, no.

6    Q.   And the certificate you're mentioning, this was

7    undergraduate studies, correct, at Georgetown, part of your

8    undergraduate training at Georgetown?

9    A.   No, it is not part of undergraduate.  It's a separate

10   program that's offered for individuals that are looking --

11   Georgetown University, instead of having -- I was in the School

12   of Foreign Service, and instead of having a minor program,

13   instead of having multiple majors, what they do is they offer

14   certificates.  And the idea is that I'm not actually sure if

15   it's only to undergrads or to graduate students alone.  I'm not

16   sure, but the point of this is to offer, if you have a

17   particular interest in a particular field, to specialize at a

18   master's level in a shorter period of time and to get the

19   certificate.

20   Q.   Did you get a master's degree, Mr. Kohlmann?

21   A.   No.

22   Q.   Okay.  Now, in the course of your studies, or your

23   substantive work, have you ever conducted field research in

24   Afghanistan?

25   A.   In Afghanistan, no.

1    Q.    In Pakistan?

2    A.    No.

3    Q.    In Bosnia?

4    A.    Yes.

5    Q.    And when did you go to Bosnia?

6    A.    I went there in the -- mid-2005 actually.

7    Q.    Okay.  Were you in Bosnia in the 1990s?

8    A.    No, I wasn't.

9    Q.    And did you ever go to Kosovo?

10   A.    No, I did not.

11   Q.    Did you ever go to Chechnya?

12   A.    No, I did not.

13   Q.    Now, while you were an undergraduate, you were employed on

14   a part-time basis for someone called Steven Emerson; is that

15   right?

16   A.    That was not just when I was undergraduate.  That was when

17   I was an undergraduate, and also then halfway through law

18   school.

19   Q.    Okay.  So what years, inclusively, would that be?

20   A.    Sure.  I began working at the Investigative Project in

21   approximately February of 1998, and I worked there until late

22   2003, probably November, December, 2003.

23   Q.    So, that's from your first year as an undergraduate until

24   your last year of law school?

25   A.    It was the beginning of my last year of law school, yeah.

1  Q.   And you said this was an organization called the

2  Investigative Project?

3  A.   That's what was working for, yes.

4  Q.   And this is something that Steven Emerson at that time at

5  least ran by himself?

6  A.   I -- he may still run it by himself, yes.

7  Q.   Okay.  And you were an intern for him?

8  A.   Not just an intern.

9  Q.   You worked for him?

10 A.   Yeah, I began as an intern.  When I first started off, I

11 was a college intern, but because of the fact that I was

12 studying a field that was directly adjacent to what I was doing

13 in the office, I progressed forward, and by approximately my

14 third year of college, undergrad, or third or fourth year of

15 undergrad, I was a full analyst.

16 Q.   Well, it was you and Mr. Emerson, right?

17 A.   Oh, no.  No.

18 Q.   He had other assistants?

19 A.   There is an office full of people.

20 Q.   An office full of people.  This is his organization,

21 right, Mr. Emerson's?

22 A.   Well, it was started by him, but --

23 Q.   I'm talking about in the period when you were working for

24 him, you said that he ran this by himself; is that right?

25 A.   Yes, again, it was started by him, but the research is not

1   done by him.  The research is done by individuals, who are

2   hired to do the research there.

3   Q.   Okay.  And was he a mentor of yours?

4   A.   I -- I suppose what you define as a mentor.  He certainly

5   assisted me in finding research, and I worked with him for

6   awhile.  I don't necessarily share all the same views that he

7   does.

8   Q.   Well, you worked for him for seven years; is that right?

9   A.   Yes.

10  Q.   And you know it's fair to say that he is a controversial

11  character, fair enough?

12  A.   I would say he's controversial, sure.

13  Q.   And, in fact, he has been accused of biased reporting; is

14  that right?

15  A.   He has been accused of that, sure.

16  Q.   Well, he went on television after the Oklahoma bombing --

17          MR. CHAKRAVARTY:  Objection, your Honor.

18          MS. LUNT:  This is his mentor.

19          THE COURT:  Sustained.

20          MS. LUNT:  Okay.  I'll move on, your Honor.

21  Q.   Now, you've described in prior testimony the work you did

22  for Emerson as your, quote, passion for a long time?

23  A.   It's -- I wouldn't say it's my life passion, but, yes.

24  It's not so much the work that I did for Steve.  Again, when I

25  was working at the Investigative Project, I was also studying

1   the stuff in undergrad.  So, for me this was a unified effort.

2   What I did in -- in school, what I did at university was just

3   another part of what I was doing in the office.  My studies

4   were the same.  The groups that I was studying were the same.

5   The places that I was studying were the same.  The stuff I was

6   writing about were the same.  In fact, my undergraduate honors

7   thesis is based largely upon research that I had done over

8   three years both on my own and also the Investigative Project.

9   Q.   And when you're saying the stuff, the work you were doing,

10  you were focusing on terrorist groups; is that right?

11  A.   It was more specific than that.

12  Q.   Well, you focused your work particularly on a group of

13  individuals, who -- Arabs, who fought in Bosnia, some of whom

14  had fought previously in Afghanistan; is that correct?

15  A.   It was wider than that.  It was the focus of my work was

16  on the Arab-Afghan movement largely speaking.  So, in other

17  words, those individuals, who had gone to Afghanistan during

18  the 1980s to fight in the jihad there.  Their subsequent pasts,

19  different -- other conflicts around the world, where they had

20  migrated to, their financing mechanisms, their organizations,

21  their hierarchy, anything that we could learn about this

22  movement.  Again, this stretched across the Muslim world.

23  Q.   So, as I said, you were focusing your investigations into

24  a group, a number of Arab individuals, who went to fight in

25  Afghanistan, and what happened to some of these individuals

1    subsequently; is that fair to say?

2    A.    Yes, they weren't just Arabs, but, yes.

3    Q.    Well, you call them the Arab-Afghans, right?

4    A.    That's the generic term that we have come to refer to

5    those, who have gone to Afghanistan to fight, because they are

6    not Afghans, and the large cross section of them were from Arab

7    nations, but there were obviously individuals who were not

8    Arab.

9    Q.    Now, Mr. Kohlmann, you have never had a teaching position

10   at any university, have you?

11   A.    No.

12   Q.    And you have never been employed as a government official,

13   have you?

14   A.    Well, I have been employed --

15   Q.    Have you even been employed as an official of the United

16   States --

17   A.    Not in a official capacity.

18   Q.    You have to let me finish the question.

19   A.    Excuse me.

20   Q.    Have you ever been employed as an official of the United

21   States Government?

22   A.    No.

23   Q.    And in the three years since you graduated from law

24   school, and that was since the spring of 2004, you have been

25   employed -- a self-employed terrorism consultant; is that

1    correct?

2    A.    Self-employed in the sense that I had run my own business,

3    but I'm employed by -- by clients.

4    Q.    As a consultant; is that correct?

5    A.    That's correct.

6    Q.    And you are not on anybody's payroll?

7    A.    Well --

8    Q.    Oh, the television station?

9    A.    Not just that, no.  I work for a nonprofit foundation

10   called the Nine Eleven Finding Answers Foundation.  I am paid

11   by them on a regular salaried basis.  For that, I'm expected to

12   provide expert reports, commission various different documents,

13   provide exhibits, help them with their website.  I do a lot of

14   stuff for them.  I also --

15   Q.    And --

16         THE COURT:  Hold on.  You've probably interrupted two

17   dozen of his answers.  Really, I think it will save time rather

18   than giving the same answers on redirect to just listen as long

19   as his answer is reasonably responsive.  Okay.

20         MS. LUNT:  Okay.

21   Q.    Tell us about the Nine Eleven organization.

22   A.    The Nine Eleven Finding Answers Foundation?

23   Q.    Yes.

24   A.    The Nine Eleven Finding Answers Foundation was set up

25   after the events of 9/11 in order to help sponsor nonprofit

1    terrorism research in the hopes of educating people, generally

2    the public, academics, policy makers and also the government.

3    Q.    All right.  And you operate a website called

4    www.globalterrorismalert.com; is that correct?

5    A.    It's globalterroralert.com.

6    Q.    Terror alert?

7    A.    Yeah, that is a website that I have operated, although I

8    don't update it as much anymore now.  Most of the material that

9    I produce gets published on the Nine Eleven Finding Answers

10   Foundation website.

11   Q.    When did you start globalterroralert.com?

12   A.    That was started in January of 2004.

13   Q.    Now, you have been a paid expert in six cases in the

14   United States District Court; is that right?

15   A.    No, that's incorrect, seven.

16   Q.    How many?  Seven, okay.  And how many times have you

17   testified?

18   A.    I've -- excuse me.  How many times have I been hired as an

19   expert, or how many times I have testified?

20   Q.    You said seven times you've been hired?

21   A.    No, excuse me.  I testified as an exert seven times.  I

22   actually don't -- honestly, at the top of my head, I can't tell

23   you exactly how many times I've been hired, although it's

24   between 10 and 12, I believe.

25   Q.    And that was to give testimony as a terrorism expert; is

1    that right?

2    A.    That's correct.

3    Q.    And you've also been rejected as an expert by two courts;

4    is that right?

5    A.    No, that's incorrect.

6    Q.    Well, first of all, you were rejected as an expert in

7    United States versus Ali in the Eastern District of Virginia?

8    A.    That was not on the basis of my qualifications though.

9    That was on the basis -- the reason that I was rejected in that

10   court was because of the fact that the prosecution submitted my

11   paperwork late.  It had nothing to do with my qualifications,

12   nor was I ever sat down for a Daubert hearing in that case.

13   Q.    Okay.  You didn't go to a Daubert hearing, but did

14   you -- were you ever shown the transcript of what the judge

15   said in that case?

16   A.    Yeah, but again, my qualifications were never -- were

17   never actually put -- the reason that the judge gave for the

18   fact that I wasn't allowed to testify in that case was because

19   the paperwork was submitted late.  It had nothing to do with my

20   qualifications.

21   Q.    Are you aware that Judge Gerald Bruce Lee in the case of

22   United States versus Ali said with respect to -- to your being

23   called as a witness that you have no graduate degree; you have

24   no specialized skill or knowledge; and that he would not use

25   you as -- allow you to testify as an expert witness?

A.    Again, my understanding is -- and first of all, the judge

also said that in that case that my book was self-published,

which obviously was incorrect.  It was because I never had a

chance to actually offer any credentials.  My understanding

from conversations with multiple people in the Eastern District

of Virginia was that I was not rejected on the basis of my

qualifications.  The reason my testimony was rejected was

because of the fact that my paperwork was submitted late.  Now,

I understand you're reading from a transcript, but that's again

my understanding is from speaking with multiple people there

that that's not the reason that my testimony was not allowed.

          And again, I was not --

Q.    Okay.

A.    There was no Daubert hearing.  I was never present in

court.  I never offered my credentials.  And since the judge

didn't get my credentials right, I mean that's probably

indicative that I never -- it never reached that stage.

Q.    Did anybody tell you that Judge Lee stated on the record:

The question is whether Mr. Kohlman, because he has a law

degree from Penn., which he earned in 2004 -- and by the way,

this is in October of 2005, two years ago, which he earned in

2004, and because he graduated from Georgetown in 2001 with a

major in politics and international security studies and a

minor in Islamic studies, in and of itself makes him a person

to assist the jury with reliable information on the operation

1    of Al Qaeda.

2            Did anybody tell you that's what Judge Lee said?

3    A.    Again, I'm telling you --

4    Q.    Did anybody --

5    A.    I'm just telling you what I was told, and I'm telling you,

6    I haven't seen the ruling myself, but I am told this from

7    multiple people in the U.S. Attorney's office and others in the

8    Eastern District of Virginia that the reason why my testimony

9    was not allowed in that case has nothing to do with my

10   qualifications.  It has to do with the fact paperwork was

11   submitted late.

12           What's more is that I actually testified as an expert

13   a week afterwards in the Uzair Paracha case in which there was

14   a Daubert hearing, and there was no -- the attorneys in that

15   case had plenty of opportunity to go through that, and there

16   was nothing there.  Again, I'm telling you what I know.  If you

17   knew something else, feel free to present it, but that's my

18   understanding.

19   Q.    Did anybody tell you that in United States versus Khan,

20   you were rejected as an expert witness and permitted to testify

21   only as a fact witness with respect to documents that you had

22   found in your Internet research?

23   A.    I did testify as a fact witness in that case, but I'm not

24   aware that they have anything to do with my qualifications as

25   an expert.

1   Q.   And in your resume, you set yourself forth as somebody,

2   who has consulted to various government departments, and that's

3   on the subject of terrorism; is that correct?

4   A.   Well, that's a pretty broad stroke.  I testify -- I give

5   expert advice and assistance in a lot of matters relating to

6   terrorism, including financing, recruitment, hierarchy,

7   organization, some things that touch tangentially on terrorism

8   that sometimes have relevancy to other matters.  Particularly,

9   for instance, that I am right now working with the government

10  in Denmark on a financing case that has nothing to do with

11  terrorism explicitly, but it has to do with charities which

12  have been involved in terrorist financing in the past and which

13  are now providing -- or excuse me -- which are now on trial for

14  providing money to -- for illicit purposes that are not

15  directly related to terrorism.

16  Q.   We'll get to your publications shortly, Mr. Kohlmann.

17  A.   I'm working with the government.

18  Q.   You're still working with them?

19  A.   Yeah.

20  Q.   I see.  Now, you also work as a television commentator on

21  terrorism; is that right?

22  A.   That's correct.

23  Q.   And so you earn your living as an expert witness and

24  consultant on the subject of terrorism, correct?

25  A.   Primarily as a consultant.  The expert witness is really

1    just a side business, but I work with private clients.  I work

2    with educational institutions, and I work with government

3    agencies in order to try to provide them with raw information

4    about terrorism, with analysis about terrorism, and other

5    related subjects, including again, financing, recruitment,

6    various different aspects of this.

7    Q.   Now, are you being paid for your testimony here today?

8    A.   I hope so.

9    Q.   And what -- do you know how much you're being paid?  Have

10   you an understanding with the government?

11   A.   I -- honestly, I can't quote the exact hourly rate, but

12   it's -- my generally hourly rate varies between 300 and $400 an

13   hour.

14   Q.   Thank you.  Now, in your website, you state that you have

15   traveled overseas to interview prominent Al Qaeda members?

16   A.   That's correct.

17   Q.   Okay.  Now, who have you interviewed overseas?

18   A.   Sure.  I've interviewed Abu Hamza Al-Masri.

19   Q.   Maybe to make this go faster if you could tell me, very

20   briefly, who they are and where you interviewed them?

21   A.   Excuse me one second.  A-B-U H-A-M-Z-A A-L M-A-S-R-I.

22        I interviewed Sheik Abu Hamza in London at the

23   Finsbury Park Mosque, at his headquarters.  I have interviewed

24   Sheik Omar Bakri Mohammed, O-M-A-R B-A-K-R-I, M-O-H-A-M-M-E-D

25   at both at his headquarters in North London; and also as of a

1    result of my work with that, I attended several lectures he

2    gave, and I did subsequent interviews in and around the United

3    Kingdom with Sheik Omar Bakri and his followers.

4            I have interviewed Dr. Saad Al-Faqih, Dr. S-A-A-D A-L

5    F-A-Q-I-H.  Dr. Saad Al-Faqih, also in the United Kingdom.

6            Obviously, I've also attended other events beyond just

7    interviews.  I've attended rallies on behalf of both Omar Bakri

8    and Abu Hamza's organization in the United Kingdom.  I've also

9    sat down and spoken with a former Saudi mujahideen in Bosnia

10   currently being held in custody the Bosnian authorities.

11   Q.   That was in Bosnia?

12   A.   That was in Bosnia, yes.  I've also, in Bosnia, I've also

13   conducted fieldwork where I interviewed individuals working at

14   the United States National Intelligence Center, NIC, in Butmir.

15   I interviewed a bunch of people in Bosnia.

16   Q.   And that was --

17   A.   These were not Al Qaeda members.  I'm just saying these

18   were original interviews.

19   Q.   This is in two thousand and --

20   A.   This is in 2005.

21   Q.   2005.  Now, have you -- your proposed testimony in this

22   case is set forth in the report, which you have submitted in

23   this case.

24           Have you interviewed anybody with respect to the

25   preparation of that report?

1    A.    You mean specifically prepared this report?

2    Q.    Yes.

3    A.    Have I conducted original interviews?

4    Q.    Right.

5    A.    No, the interviews that are in the report, any excerpts

6    from the interviews in the report, I have done subsequently,

7    such as my interview with Abu Hamza, which is quoted in there.

8    Q.    Now, you also say on your web site that you have amassed

9    one of the largest databases in the world on terrorist

10   communiques and multimedia; is that correct?

11   A.    That's correct.

12   Q.    And is this something you started as an undergraduate?

13   A.    This is something I started a long time ago.  It was

14   started in approximately 1997 when I was an undergraduate, but

15   it comprised a long-standing effort on my part to gather open

16   source information, primarily first or second degree open

17   source information, and put it together inside of a database

18   whereby it would be very easily recoverable; and whereby, if

19   individuals were looking for that information, or looking for

20   particular pieces of information, that it would be easy for me

21   to identify where that was to give it to them, to show it to

22   them, and make use of it.

23   Q.    So if I understand this right, do you still put documents

24   into this database?

25   A.    It's -- on a given day, I add anywhere between 10 and 30

1    new communiques from terrorist groups and insurgent groups.  I

2    add, on average, two to three videos a day.  Obviously, the

3    rate at which I add material has been increasing over the

4    years, because of the fact that more and more of this material

5    is available.  It is a very large database.  It's stored in a

6    unit.  It's a two-terabyte storage unit.  Everything is

7    digitized, but it is many, many documents; and in order to

8    search through that material, I've had to hire a company, which

9    produces software, which is specialized in the same way that

10   LexusNexus works, only this is focused purely on the

11   information that I have in my own database.

12   Q.   And let's see, when you testified in the Paracha case, you

13   said you downloaded 20 million documents?

14   A.   "Paracha."

15   Q.   Paracha, thank you.  How many documents have you

16   downloaded in total as of now?

17   A.   It's impossible to estimate.  To give you an idea, two

18   terabytes, that's -- that is what -- I mean each megabyte, one

19   megabyte, is you have a thousand megabytes in a gigabyte.  You

20   have a thousand gigabytes in a terabytes, right.  One megabyte

21   can hold 500 to 600 written pages, so you're talking about

22   thousands and millions and millions of pages of documents.  I

23   mean some of this stuff I haven't even gone through all of it.

24   It's just so much material that I -- what I do is I perform

25   what I call information triage where I take the things that I

1    regard as the most important and most significant.  If it needs

2    to be translated, I have it translated.  If it needs to be

3    processed, I process it.  In the end, I take the most important

4    documents, the most important material, and I distill that down

5    into local reports.

6           Now, the reason that I keep the database is sometimes

7    you don't know in the future when something that's very

8    esoteric ten years ago would become very important now.  So, I

9    keep everything, and that way if something does come up later

10   on that I didn't recognize immediately, I can still go back to

11   it.

12   Q.    Because all the documents that you put in are searchable?

13   A.    Yes.

14   Q.    And you just said you -- you haven't read all the

15   documents that have gone in.  It would be humanly impossible,

16   right?

17   A.    Well, I've read most of the English documents, but keep in

18   mind that my database consists not just of English documents,

19   but also of Arabic documents, Urdo documents, Pashto documents,

20   Dari documents.  I mean I have things in every language from

21   every source you can imagine, every open source I can cull

22   material from; and thus with regards to the Arabic and the

23   other material, I -- I review it when I decide something is

24   important, or I decide something is significant.  I have it

25   translated.  I go through it.  If it is something significant

1    then I pass it on to people that might be interested.  Again, I

2    distill it down to analytical research, and I also -- I mean I

3    have translators, who work for me who go through this material

4    as well, and who will tell me you didn't notice this, or you

5    didn't notice this, or you should have taken notice of that, or

6    make sure you look at this.  So it's, again, it's a combined

7    effort.

8    Q.    Okay.  You have me a little dizzy, so let me make sure I

9    understanding this.  You say that there are now 2,000 gigabytes

10   of information in your database?

11   A.    That's correct.

12   Q.    And when you testified in Paracha --

13   A.    "Paracha."

14   Q.    -- what year was that?

15   A.    That was 2005.

16   Q.    Okay.  So two years ago, you testified you had 250

17   gigabytes?

18   A.    That's correct.

19   Q.    So it's increased exponentially?

20   A.    Yeah, it's because of the fact that the documents

21   themselves are getting longer; video recordings are getting

22   better quality, and I should add that the material I'm

23   collecting now, for instance, the material I'm collecting today

24   it's not necessarily things that happened today.  What happens

25   is that with -- as technology gets better and better, you have

1    video recordings from back in the early 1990s.  I mean I

2    collect sometimes videos of the early days of the Afghan jihad

3    where they have never been released before, but now because of

4    the fact that the technology is out there to digitize them and

5    put them on the Internet, people are doing that.  And so if you

6    have access to the right corners, the right sources, you can

7    actually get access to material that is referring to material

8    that happened years ago, but up until now, it's simply the

9    technology hasn't been available to broadcast it out to reach a

10   wide enough audience.

11   Q.   And when you are talking about open sources, these are

12   other things you find on the Internet?

13   A.   It's not just the Internet.  When I say "open sources," I

14   mean anything that's not a closed source, meaning anything that

15   is not a government report and it's not classified.  My focus

16   is on primary documents.  My focus is on primary information,

17   information that either I can get directly from an interview

18   with someone, if I can get a direct document, signed documents

19   from someone, a video recording of them saying something, an

20   audio recording, that's the material that I value the most,

21   because then you have someone saying something or showing

22   something in their own words, physically.

23        Naturally, I have to rely on other sources as well to

24   supplement that secondary and tertiary sources; however, if you

25   look at my database, the large part of my database is built

1    upon what I would consider the primary and secondary source

2    documents, which are not newspaper articles, which are, you

3    know, these are the original materials put out by these groups.

4    They're magazines; they are communiques; they're interviews

5    with their leaders, that kind of stuff.

6    Q.    Okay.  I don't think we should spend too long, because we

7    have limited time today, but I just want to understand.  When

8    you download a document in another language, like Arabic, do

9    you use an instant translation program to download that?

10   A.    Not download it, but again this is part of the information

11   triage process is that if I don't know what something says, if

12   I can't read the original language, what I will use is either a

13   computerized translation, or call my translators and have them

14   take a look at it.  We'll do again triage.  We'll do a brief,

15   kind of quick look, what is the nature of this, what is this

16   talking about, is this significant, is it important.  If it is

17   something important, you can translate the whole thing, or you

18   can hand it off to whoever might need it, other researchers,

19   other academics.  I keep in contact with a lot of people who do

20   this stuff at an educational level, a government level around

21   the world, so we share information.

22   Q.    Okay.  So just so that I've got it straight.  Back when

23   you testified in Paracha, it was 20 million documents, 250

24   gigabytes?

25   A.    This is an estimate.

1    Q.    Okay.  Now, are we talking about maybe one to 200 million

2    documents in your database?

3    A.    Again, it's -- you're talking about -- you're talking

4    about me trying to estimate the total number of documents,

5    where some documents are much larger than others, some are

6    smaller.  The point is that there is many, many, many, many

7    documents.  I mean in order to -- in order to file all this

8    stuff, I've had to create an entire filing system where I

9    have -- I mean upwards of 80 to 90 different folders for each

10   different tiny narrow little subject.  And then underneath that

11   in order to save things that they're identifiable, I have had

12   to create entire naming systems for these files.  If I did an

13   interview to someone, and it's done on a particular date, I do

14   year, date, month, source, subject.  I mean everything is done

15   in a very, very -- you know, it's done like a filing system.

16   Q.    It's done like a filing systems of millions and millions

17   of documents, most of which you haven't actually read, correct?

18   A.    I didn't say most of which.  I just said there is at least

19   a large quantity of Arabic documents where I haven't read the

20   originals.  Now, eventually a lot of this stuff does end up

21   getting translated; for instance back in 2003, I collected all

22   the magazines put out by Al Qaeda in Saudi Arabia.  At the

23   time, I didn't bother going through and translating all that

24   stuff, because there was dozens of them.  However, now as I

25   have an opportunity, I'm actually going back and sending all

1    this stuff to my translators and having them go through and

2    translate everything.  The same thing with the Al Jihad

3    magazines from Pakistan.  You know, two years ago, I didn't

4    necessarily have a chance to go through every single last bit.

5    Now, I'm having every single Al Jihad magazine that I can find

6    translated to English.

7    Q.    There are millions and millions of documents in your

8    database, right?

9    A.    There are -- let's just say that there's a lot.  I mean,

10   again, I don't want to give you an estimate, because it's in

11   the millions, but I don't know how many millions.

12   Q.    Well, in Paracha, you said you downloaded 20 million, and

13   it's a lot more than that now, fair enough?

14   A.    That's fair, sure.

15   Q.    Now, you prepared a draft report or draft notes for the

16   government in this case; is that right?

17   A.    That's correct.

18   Q.    And when you did that, did you use your computer database

19   to do it?

20   A.    That's part of what I used, yeah.

21   Q.    And I just want to have a look, draw your attention to a

22   couple of names that came up when you did this draft report in

23   this case, and I'm referring to MUB 29501, 501 and 502.

24        You came up with the name of William Graham, correct?

25   A.    In what context?

1   Q.   Well, you were talking about a notorious Stanley Cohen, a

2   notorious lawyer for terrorist groups around the world invited

3   to speak at the Harvard Divinity School conference in 2003.

4   A.   Can you show me the documents.  I'm not sure exactly what

5   you're looking at.

6           THE COURT:  What page are you on?

7           MS. LUNT:  It's MUB.  This is not an exhibit.

8           THE COURT:  Is this his report?

9           MS. LUNT:  This is his draft notes --

10          THE COURT:  Okay.

11          MS. LUNT:  -- for his expert report.

12          THE WITNESS:  This is not my document.

13  Q.   This is not your document.  Do you know whose document

14  this is?  This was given to us by the government as draft

15  notes.

16          It's not your document?

17  A.   It's not mine.

18  Q.   Okay.  You've never seen this before?

19  A.   (Nods.)

20  Q.   Okay.

21          MS. LUNT:  May I have a word with the government, your

22  Honor?

23          THE COURT:  Yes.

24          (Counsel conferred.)

25  Q.   Do these notes look -- I've just spoken with the

1    government.

2          Do these notes look familiar to you as work of the

3    Investigative Project?

4    A.   Oh, I mean, I haven't worked for the Investigative Project

5    now for -- for three years.  I don't know.  It's possible that

6    they're notes, but there is nothing on there that says the

7    Investigative Project.  I mean it's possible.

8    Q.   Okay.  Now, you've published one book; is that correct?

9    A.   That's correct.

10   Q.   And it's called "Al-Qaida's Jihad in Europe: The

11   Afghan-Bosnian Network"?

12   A.   That's correct.

13   Q.   And you published it in 2004?

14   A.   That's correct.

15   Q.   And --

16   A.   Yeah.

17   Q.   -- on your website, you describe that book as follows, and

18   I'm quoting, "The book relates the story of how a radical

19   terrorist group based in Afghanistan used the Balkans as a

20   jumping point to expand into North America and Western Europe

21   by training a clandestine army of sleeper cells."

22          Is that how you describe your book?

23   A.   That was language that was derived with the assistance of

24   my publisher as well as myself, so, yeah.

25   Q.   Well, this is language that you had put out on your

1    website?

2    A.    Again, this is marketing language that we came up with

3    together, yeah.

4    Q.    Fine.  But you've endorsed it; you put it on your website?

5    A.    Yeah, sure.

6    Q.    Okay.  Now, so that is what the subject of the book is,

7    correct?

8    A.    That's correct.

9    Q.    And you focused, as we've discussed, on groups of foreign

10   fighters in Afghanistan, and where some of them subsequently

11   went?

12   A.    That's correct.

13   Q.    Okay.  And was this book based in part on the work you

14   have done for your undergraduate thesis?

15   A.    It was based in part on my undergraduate thesis.  It was

16   based in part on the work I had done in the Investigative

17   Project.  It was based in part upon my own research done on

18   behalf of Dr. Mamoun Fandy when I worked at the Center for

19   Contemporary Art Studies.  It was based upon a lot of stuff.

20   Q.    Okay.  Now, in April of 2003, you submitted a manuscript

21   of this book to the University of Pennsylvania Press, did you

22   not?

23   A.    That's correct, I did.

24   Q.    And you submitted it to a gentleman by the name of

25   Peter Agree or "Agree"?

1  A.   I don't know what -- how to pronounce his name.  I'm

2  sorry.

3  Q.   Okay.  What was the name of the gentleman that you

4  submitted it to?

5  A.   A-G-R-E-E.  Peter Agree.  I don't know how to pronounce

6  it.

7  Q.   We will call him Peter Agree?

8  A.   Sure.  Sure.

9  Q.   We don't know how to pronounce it.

10 A.   I should add that in order to find a publisher, I mean I

11 had to go to several different publishers.

12 Q.   Fair enough.  Okay.  Well, the University of Pennsylvania

13 Press at the time you were a law student at the University of

14 Pennsylvania, correct?

15 A.   That's correct.

16 Q.   And so it makes sense you -- was that the first place you

17 submitted it to?

18 A.   No.  Actually, the current, the publisher that I have now

19 is the -- I believe I submitted to beforehand, before I

20 submitted it to the University of Pennsylvania, and they ended

21 up giving me a better deal.

22 Q.   Okay.  And how many other presses have you submitted it

23 to?

24 A.   Before I got my contract?

25 Q.   Right.

1    A.    Probably three, four.

2    Q.    And what presses were those?

3    A.    Free Press, Yale University Press.  I don't remember off

4    the top of my head.  I have to look at my records.

5    Q.    Well, let's talk about Yale University Press.

6          Did they accept your manuscript?

7    A.    They were interested in it, but they said it was too

8    narrowly tailored for something that they would be interested

9    in publishing.  They didn't know if there would be commercial

10   value publishing it.

11   Q.    And what about the University of Pennsylvania Press, did

12   they turn it down?

13   A.    Again, they had the same problem.  It wasn't that they

14   weren't interested in the material.  My understanding was is

15   that they didn't feel they were capable of marketing it and

16   making it commercially successful.

17   Q.    Okay.  And who told you that, Peter Agree?

18   A.    I believe so, yes.

19   Q.    Okay.  And do you know whether any of the presses that you

20   submitted your manuscript to sent it out for peer review?

21   A.    My publisher did.

22   Q.    Furthered it?

23   A.    Yeah.

24   Q.    Now, what is peer review?

25   A.    Peer review is the process of taking what amounts to a

1    rough draft of a document, a book or another academic paper,

2    and then submitting it to others in the field, who have

3    expertise, knowledge, experience, and who are in a position to

4    be able to take this, to read it, and then offer critical

5    commentary, advice, et cetera about this, and you know, take a

6    look at it and decide whether or not it's the caliber for a

7    publisher to publish it.  My publisher, Berg Press, is an

8    academic publisher.  It's being marketed to universities, to

9    undergrad and graduate classes.  In order to do that, it has to

10   be a certain caliber, and thus it had to be peer reviewed.

11   Q.    So, you say Berg is an academic publisher?

12   A.    That is correct.

13   Q.    We'll get back to that in a minute.  So all academic

14   presses require peer review before they decide to accept it?

15   A.    All the ones I know about anyway, yeah.

16   Q.    Okay.  And are you aware of anybody that -- any of the

17   publishing houses sent your document to -- your manuscript to?

18   A.    I am aware of one individual, but I can't remember his

19   name.  He had contacted me saying afterwards, after the process

20   was over, to tell me that he enjoyed reading the book.

21   Q.    Okay.  Which publishing house was that from?

22   A.    It's from Berg.

23   Q.    That's from Berg?

24   A.    The peer review process doesn't usually happen until

25   they've agreed to publish the book, or until they have had a

1    serious interest in publishing the book.  They're not going to

2    go through the whole process of peer review, if they've decided

3    that they're not in a position to be able to publish your book.

4    Q.   Do you know a person called Marc Sageman?

5    A.   Yeah, sure.

6    Q.   And is Marc Sageman, like yourself, an expert in

7    terrorism?

8    A.   Yeah, sure.

9    Q.   And do you know that he has both a M.D. and a Ph.D.

10   degree?

11   A.   Okay.  I believe it.  I mean I don't know what his

12   academic qualifications are.

13   Q.   Do you know he worked for the CIA from 1984 to 1991?

14   A.   I have heard as much.

15   Q.   And do you know that he was with the CIA in Pakistan in

16   the late '80s?

17   A.   I don't -- again, I don't know of his credentials.

18              MR. CHAKRAVARTY:  Objection.

19              THE COURT:  Pardon.

20              MR. CHAKRAVARTY:  I object to what he knows about some

21   other --

22              MS. LUNT:  It will be tied in, your Honor.  I promise

23   you.

24              THE COURT:  All right.

25   Q.   And you were aware that he is now the scholar in residence

1    on the subject of terrorism for the New York Police Department?

2    A.    Well, he's not the only one.

3    Q.    He is a scholar in residence there?

4    A.    He may be.  He does a lot of stuff, and we speak at

5    conferences sometimes together.

6    Q.    And are you aware that he is a senior fellow at the

7    Foreign Policy Research Institute?

8    A.    I -- again, I don't know Mr. Sageman's qualifications at

9    that level.

10   Q.    Okay.  I would like to show you some documents, which have

11   been subpoenaed from the University of Pennsylvania.

12            MS. LUNT:  May I approach, your Honor?

13            THE COURT:  Yes.

14   Q.    Now, Mr. Kohlmann, I would like to show you -- you can see

15   that this is from the Office of General Counsel of the

16   University of Pennsylvania from Helen Logan, paralegal, and

17   these are their documents in -- well, the University of

18   Pennsylvania Press documents in connection with your submission

19   of "The Martyrs of Bosnia: Al Qaeda's War of Terror in Europe".

20   A.    Sure.

21   Q.    Okay.  And that was the first name you had for your

22   publication; is that right?  That was the provisional name?

23   A.    It was a provisional name, yeah, sure.

24   Q.    And I'm going to show you first a series of e-mails.

25            Do these refresh your recollection about your

1   communications with Mr. Agree?

2   A.   Yes, it does appear that this is after I submitted my

3   actual application.

4   Q.   Okay.  And you had a series of e-mail correspondence with

5   Mr. Agree in April of 2003?

6   A.   Yeah, I met with him personally, too.

7   Q.   In fact, you met at a coffee shop; is that right?

8   A.   That's correct, yeah.

9   Q.   Did he ever provide to you a review of your manuscript

10   written by Marc Sageman?

11   A.   No, he did not.

12   Q.   You have never seen such a document?

13   A.   No.

14        MS. LUNT:  I would like to introduce the records of

15   the University of Pennsylvania Press.  I guess that will be

16   exhibit B for the hearing, your Honor.

17        THE COURT:  All right.

18        MS. LUNT:  And I will get to later introducing more

19   and reading that into the record.

20        MR. CHAKRAVARTY:  Your Honor, just obviously, for the

21   Daubert, you can look at whatever you need to.  For the record,

22   not only did we just receive this, Mr. Sageman is certainly not

23   here.  This is purely hearsay, and something this witness is

24   not competent to testify as to his conversations.

25        THE COURT:  All right.

1          MS. LUNT:  Thank you, your Honor.

2          (Document was marked Exhibit B for identification.)

3     Q.   Now, you said that you submitted your manuscript to Berg;

4     is that correct?

5     A.   That's correct, yeah.

6     Q.   And Berg actually did publish it?

7     A.   After the peer review process, yes.

8     Q.   Okay.  Now, you're not saying that Berg is the University

9     Press, are you?

10    A.   It's an academic publisher.  It's not affiliated with the

11    university, but the purpose -- Berg publishes books, which are

12    designed for -- mostly for university classes, and that's what

13    they market it to.  If you look at their -- if you look at

14    their catalog and whatnot, the subjects that they choose to

15    publish on are the kinds of subjects you would typically find

16    in a university library.

17    Q.   Okay.  Are you -- have you ever seen the webpage of Berg

18    Publishers?

19    A.   I haven't looked at in a while, but yeah, sure.

20    Q.   You are familiar with it?

21    A.   Yeah, sure.

22    Q.   I would like to show you, if I may approach, your Honor.

23    This is the webpage of Berg Publishers, and I would like you to

24    read the first sentence.

25    A.   Sure.  "Berg is an international independent publisher

1    committed to innovative ideas in visual and material culture,

2    including fashion and textiles, cultural/media studies, film,

3    art and design, foods, sport and anthropology."

4    Q.    Thank you.

5          MS. LUNT:  I would like to introduce this as Exhibit

6    C.

7          THE COURT:  All right.

8          (Document was marked Exhibit C for identification.)

9    Q.    Now, is Berg what's known as a subsidy press?

10   A.    It's under Oxford International Press, if that is what you

11   mean, yes.

12   Q.    I think it's Oxford International Publishers, Limited;

13   isn't that right?

14   A.    Sure.

15   Q.    Okay.  And not to be snobbish, but nothing -- it's not

16   connected with Oxford University Press?

17   A.    No, no, no, no, no, I don't mean to suggest that it is.

18   No.  No.

19   Q.    Now, Oxford International Publishers, Limited, is a

20   subsidy press, isn't it?

21   A.    I -- I don't know what you mean by that.  What exactly do

22   you mean?

23   Q.    Well, let's go at this a different way.  Did you pay Berg

24   to get you --

25   A.    Oh, no.  No.  No.  No.  No.  I did not pay, no, no.  Let

1   me be very clear.  This is not a self-published book.  The book

2   was -- I had a contract.  They paid me, as well as that in

3   order to publish the book, not only did I have to go through a

4   process of peer review, but as well because of the fact that

5   it's published in the United Kingdom it had to be reviewed by a

6   libel attorney in the United Kingdom, a libel attorney hired by

7   Berg Press, and paid for by me, but as far as the -- as the

8   date in the contract, and I can give you a copy of the

9   contract.  I did not pay any money to have that book published

10  period.

11  Q.   Okay.  You did pay for the consultation for the --

12  A.   The libel attorney?

13  Q.   Yes.

14  A.   It was only because I had no choice.

15  Q.   Okay.

16  A.   In order -- in order to publish something in the United

17  Kingdom and not get sued for libel, you have to have it

18  reviewed by a libel attorney first.  We split the -- the

19  publisher and I split the cost of the libel attorney, but

20  that -- I never actually paid money.  The -- the publisher paid

21  the attorney and simply deducted the costs, whatever the costs,

22  the share cost out of the amount they were going to pay me.

23  Q.   And again, your book focuses on fighters who went to

24  Bosnia; is that right?

25  A.   It's focuses on Arab mujahideen fighters from Afghanistan

1    and elsewhere who went to Bosnia.

2    Q.   And it's not a history of the events in Bosnia in the

3    1990s?

4    A.   It's a history of the events with respect to the Arab

5    mujahideen.  It's not a history of the Balkan War, no.

6    Q.   And again, you have never published a book that has been

7    peer reviewed by an academic publisher; is that right?

8    A.   Well, again, it was -- my book was peer reviewed by

9    academics.  The fact that Berg is not a university press is

10   true, but that doesn't mean -- I mean again they don't tell me

11   who the exact people are that they have peer review this, but

12   my understanding was that it was academics.

13   Q.   Okay.  So you don't know who reviewed your book?

14   A.   Well, that would defeat the purpose.  What they tell you

15   is that they're picking people generally in your field, who

16   have the knowledge and experience, expertise, either as

17   academics or as professional in reviewing this, but obviously

18   if they told me who it was that was reviewing it, that would

19   defeat the whole purpose of peer review.

20   Q.   And you haven't written any other books, have you?

21   A.   I am working on another one right now.

22   Q.   But not published yet?

23   A.   No.

24   Q.   Now, in this case, what documents have you reviewed?

25   A.   It's a long list.  I've reviewed --

1   Q.   Okay.  Let's talk about categories.

2        Have you reviewed Al-Hussams?

3   A.   That's correct.

4   Q.   Have you reviewed wiretap transcripts?

5   A.   That's correct.

6   Q.   Have you reviewed notes of a meeting?

7   A.   That's correct.

8   Q.   And by the way, when you reviewed the notes of the meeting

9   did you use your own translator, or did you rely on the

10  government's translators?

11  A.   No, I relied on the government's translations.

12  Q.   Okay.  And did you review materials relating to an orphan

13  sponsorship project?

14  A.   If you are talking about the original materials

15  from -- from -- yes.  Yes, I did.

16  Q.   The original materials from where?

17  A.   From Care International, yes.

18  Q.   Do we have the boxes in the courtroom?  I just strained my

19  back recently, so I'm not going to attempt to pick it up, but

20  my paralegal kindly will.

21       Did you review this box and the contents of it?  And

22  this is Exhibit 1045; is that right, Sonya?

23       MS. PETRI:  Uh-huh.

24       MR. CHAKRAVARTY:  Your Honor, it doesn't seem to go to

25  the qualifications of the methodology it's supposed to for

1     expert conclusions at trial.

2              THE COURT:  Well, yes.  And so to cut to the quick, I

3     mean it's -- part of his expert opinion is it purports to be a

4     summary of some of the government's evidence, which I'm not

5     sure I'm going to allow in any event, so --

6     Q.   All right.  You mentioned -- you mentioned the wiretap,

7     you mentioned the Al-Hussams.

8              Anything else?  Have you been shown checks?

9     A.   Yes.

10    Q.   And that is certain checks, not every check that the

11    government seized, correct?

12    A.   I only have seen what I have been sent, so I don't really

13    know.

14    Q.   Do you have a list of what you have been sent?

15    A.   I do, but not on me right now, no.

16    Q.   Okay.  Is that something that you could provide to us

17    prior to your testimony?

18    A.   I'm sure -- I'm sure the government probably has a list of

19    that as well.

20             MS. LUNT:  Okay.  I have no further questions right

21    now.

22             THE COURT:  Mr. McGinty or Mr. Andrews.

23             MR. McGINTY:  No questions.

24             THE COURT:  All right.  Any redirect?

25             MR. CHAKRAVARTY:  Just very briefly.

| | |
|---|---|
| 1 | REDIRECT EXAMINATION |
| 2 | BY MR. CHAKRAVARTY: |
| 3 | Q.   Mr. Kohlmann, with regards to your familiarity with the |
| 4 | Al-Kifah Refugee Center, please describe for the court when |
| 5 | that began and what it was based on, what we provided you to |
| 6 | provide a history. |
| 7 | A.   My knowledge of the Al-Kifah? |
| 8 | Q.   Sure. |
| 9 | A.   I have been studying the Al-Kifah Refugee Center since |
| 10 | approximately 1997.  A large part of my research on that has |
| 11 | been built upon my own review independently of this trial, on |
| 12 | original materials that were taken from the Al-Kifah Center in |
| 13 | approximately 1993, books and books and books of this material, |
| 14 | including quite a bit eventually ended up in my own book. |
| 15 | Separately, in addition to that, I've also reviewed |
| 16 | video recordings produced by the Al-Kifah Refugee Center.  And |
| 17 | in this case, I've reviewed documents, including checks, |
| 18 | including money orders, including financial documents, just |
| 19 | about any kind of document you can imagine relating to |
| 20 | Al-Kifah. |
| 21 | Q.   And your study of Al-Kifah, what was it related to in |
| 22 | terms of your -- what your -- |
| 23 | A.   It was an essential part of research, because my research |
| 24 | was focused on the Arab-Afghan movement, and how it was |
| 25 | recruiting and financing; and the primary vehicle behind the |

1   recruiting and financing in the Arab-Afghan movement was known

2   as Maktab-al-Khidmat mujahideen, and the Mujahideen Services

3   Office, which was their logistical arm; and outside of

4   Afghanistan, when you talk about MAK, you talk about

5   Maktab-al-Khidmat.  The foreign branch of Maktab-al-Khidmat is

6   Al-Kifah.  They are the same organization.  One is just the

7   foreign branch of the other.

8   Q.   And describe for the court some of the bases of that

9   conclusion and --

10  A.   Sure.

11  Q.   -- your methodology to arrive at that.

12  A.   My conclusion upon that was based upon almost entirely

13  original documents, which I reviewed which were taken, number

14  one, from the Al-Kifah Refugee Center in Brooklyn, which

15  included correspondence, original correspondence from the

16  Al-Kifah Refugee Center offices in Brooklyn, Boston, Zagreb,

17  Croatia, and even Afghanistan; and that in a number of cases,

18  this correspondence consisted of letters back and forth between

19  these various offices discussing their relationship, discussing

20  their activities, discussing what their intent is.  This

21  knowledge has been supplemented by reviewing government

22  reports, by reviewing other -- other reports written by other

23  academics, and by tertiary material, which concluded basically

24  the same thing.

25  Q.   And you testified that you've testified in other cases as

1    a terrorism expert.  Aside from that charged word, is there

2    another way to describe your expertise?

3    A.    Yeah, sure.  I mean my focus is on the Arab-Afghan

4    movement, the contemporary Arab-Afghan movement and various

5    different conflicts in which it has become involved, which

6    fighters from the Arab-Afghan have become involved.  It's

7    hierarchy.  It's financing.  It's recruitment.  Terrorism is

8    just a very kind of brush label, you know, a quick brush label,

9    but it's the Afghan-Arab movement really.

10   Q.    With regards to the very brief history of interconnection

11   of the Arab-Afghan movement, can you describe what that

12   entails.

13   A.    The Arab-Afghan movement?  The Arab-Afghan movement

14   entails not just the Arabs that initially went to Afghanistan

15   in the 1980s, but it pertains to those that went to

16   Bosnia-Herzegovina in 1992 and 1993.  It pertains to those who

17   went to Tajikistan in 1992 and 1993, because these individuals,

18   it's not just that they are linked by the same ideology; in

19   fact, a lot of times it's the same people.  For instance, given

20   Ibn-Ul-Khattab, who fought in Tajikistan and lead Arab-Afghan

21   forces in Tajikistan, shortly thereafter left Tajikistan and

22   went to the caucuses; and in Chechnya, Ibn-Ul-Khattab, which is

23   I-B-N U-L K-H-A-T-T-A-B, became the leader of the foreign

24   mujahideen in caucuses, so what you see is you see

25   commonalities where some guys are kind of treating this like a

1    safari, and they're going from conflict to conflict.  And by

2    tracing their apogees and by tracing their activities you learn

3    what the movement stands for and how it operates.

4    Q.   With regards to conflict in Afghanistan, what is your

5    basis of knowledge and the methodology you have gone through

6    there?

7    A.   Sure.  I've never been to Afghanistan, but that's because

8    I was told by Abu Hamza Al Masri that if I went there, and I

9    asked the questions I would be asking, I would be putting my

10   life in danger.

11        I do work with colleagues, who are down on the ground,

12   who gather original information; but aside from that, I also

13   gather a tremendous amount of information from video

14   recordings, audio recordings, interviews with people that

15   fought at the time.  I can't go back in time.  So, going back

16   to Afghanistan now doesn't really solve the problem of trying

17   to figure out what happened in 1991.  The best way to do that

18   is to speak with people who are there, to review their original

19   letters, their original correspondence, their video recordings,

20   their audio recordings, everything that I can put together.

21   Some of this stuff is gathered by me personally going to places

22   and speaking to people and purchasing this from them, or

23   gathering it from them.  Some of it involves Internet research,

24   some of it, and I get a lot of it through different methods,

25   but yeah.

1    Q.   And the, you know, your syntheses, you described how it's

2    stored?

3    A.   Sure.

4    Q.   How do you synthesize it, and for what purpose?  What do

5    you do on a daily basis?

6    A.   Sure.  I take these original documents, this original

7    information.  Really, it's the best of kind of information you

8    can get about some of these events, and I just pull these

9    documents together.  I just put these accounts together and

10   videos together, and again I try to find the commonalities

11   between them and eventually create a narration, a story line

12   for exactly what happened based upon these different original

13   documents, because I don't necessarily trust

14   newspapers -- newspaper accounts to be 100 percent accurate.  I

15   don't trust magazine articles to be 100 percent accurate.  And

16   I don't even trust necessarily materials that are coming

17   directly from a terrorist group to be 100 percent accurate.

18   Everything has to be judged with a very careful eye.

19          So what you do is you juxtapose these different

20   accounts together.  You find what matches up between them, and

21   that tends to be the truth.

22   Q.   And so, in addition to your consulting work, which you

23   described in your testimony, what other types of activities do

24   you do that -- well, let me say that first.

25   A.   Sure, most of my time is spent doing research and

1   analysis.  I mean most of my time is spent gathering

2   information and then taking this and distilling it down into

3   reports and to documents.  For instance, I recently published a

4   paper with foreign affairs, which requires a long process of

5   peer review, which is built upon my own personal research with

6   a particular terrorist plot on the Internet.  I'm currently

7   working on a chapter for Richard Clarke and a new -- for a new

8   edition of annals at the American Academy of Political

9   Sciences, specifically dealing with the phenomenon of home

10   grown terrorism, my work specifically having to do with North

11   Africans, North African fighters fighting in the Balkans.  I

12   recently wrote a chapter for a book by Michael Innes about the

13   Balkans, a very kind of thick and very academic kind of book,

14   but this is a very narrow area in which he asked me to write

15   this.  Mr. Innes is a colleague of mine.  He used to work at

16   NATO.  So, it's -- you know, it basically -- what I do is I

17   take all this research and as much as possible put it into

18   publishing scholarly papers.

19   Q.   And that -- that's what your current practice of

20   publishing is?

21   A.   Yeah, I mean, my preference is to publish things in

22   scholarly journals.  I -- as of right now, in fact, the only

23   place where I really publish stuff on a regular basis, aside

24   from a recognized scholarly journal, is either a quick kind of

25   blog post on the counterterrorism blog on the Internet, or I

1    also publish academic papers through the foundation I work for,

2    the Nine Eleven Finding Answers Foundation.  Now, that isn't a

3    typical academic outlet; however, in order to publish stuff

4    through there, again it has to be reviewed by all the other

5    analysts, who work for the NEFA Foundation, the people that run

6    the NEFA Foundation; and then on top on that because it's put

7    up on the Internet for everyone to see it's then subject to a

8    very vigorous process of peer review.  All those who have an

9    interest in this, whether they agree with me or disagree have

10   an opportunity to go on there and read this and make comment.

11   Q.   Have you been subject to cross-examination in a federal

12   court?

13   A.   I have been subject to cross-examination in U.S. Federal

14   Court.  I have been subject to cross-examination in

15   Bosnia-Herzegovina.  I have been subject to cross-examination

16   in the United Kingdom.  I mean everything that I do is very,

17   very carefully worked, because eventually in the event that it

18   would come up in a court, or in the event that it would come up

19   in the process of me testifying in front of Congress, or me

20   presenting, I -- I put a lot of time and thought into what I

21   do, and one of the things that I want to make sure about is

22   that the information that I present is 100 percent reliable,

23   and because my -- the whole reason I created the website

24   globalterroralert.com was I felt that a lot of the analysis

25   work that was being done in this field was being done on the

1    basis of the wrong information; that people weren't going to

2    the original sources.  They weren't studying the best sources

3    they could, and as a result they were getting the wrong

4    information and bad analysis.  So, by founding this website,

5    the purpose was to put this information out there so that in

6    the future, if someone does analysis, no matter what they

7    analyze, no matter what their conclusions are, at least the

8    basic facts are right.  At least the basic information is

9    right.  At least they're using sources, which are not magazine

10   articles, which are not newspaper articles, which are not

11   quoting hearsay, but it's quoting someone directly.  It is

12   showing that this is what this person put out in their video.

13   This is what this group said in their official communique.

14   Again, the most reliable sources that you can find in terrorism

15   is -- it's a difficult field to find sources like that.  No

16   doubt, but that's what I do.

17   Q.   And do you deal regularly with the other academic and

18   other so-called experts in this field?

19   A.   Yeah.  I mean last year, I went to Sweden, and I spoke at

20   the Swedish National Defense College.  I -- I regularly speak

21   at different events for government agencies, for academics.  I

22   am in contact with academics in the United Kingdom, Singapore,

23   Denmark, the United States, Canada, Switzerland, I mean all

24   across, and the thing is that this is how we do research,

25   because again terrorism is a very difficult field to get

1    information on, good information.  So, one of the things that

2    we do is we share information, and we pool this stuff together,

3    and we talk about these papers.  I -- you know, it's -- and it

4    happens that when we go to conferences, a lot of the

5    conferences that are organized either by government agencies or

6    by academic institutions, I mean you pretty much see a similar

7    group of people almost every single time there.  So anything

8    that you're saying you're presenting in a conference,

9    you -- it's been shared with other academics, it's been widely

10   debated, people have said their piece back and forth.  There is

11   no mystery to this.  I mean again it's a collective -- it's a

12   collective thing.  It's just too difficult to do on their own.

13   Q.   And given that background, have you received feedback in

14   terms of your utility in this panoply?

15   A.   Oh, sure.  And I have received feedback on particular

16   things I have written about.  I mean, you know, again, I mean

17   there is -- you know, there are a lot of people that rely on me

18   to provide them with original sources of information about

19   terrorism, including other academics in this field, because

20   they don't have access to the same sources that I do.  And it

21   happens that regardless of whether their analysis agrees with

22   mine or not, in some cases it doesn't, but they still come to

23   me for the raw information, because they know that I have

24   access to it.  I have a database full of it, and I'm happy to

25   share it with anyone who has interest in it.

1   Q.   You were asked about your book at some length.

2        Who was the target audience for that book?

3   A.   It was meant to be for a university audience.  The topic

4   of the book was far too esoteric for a general audience, and

5   what's more, I took -- I took the experience of the

6   Arab-Afghans in the Balkans, and I broke it down by time

7   periods, and it's a 300-page book, or something like that.  I

8   mean unless you have a very, very particular interest in terms

9   of an academic or professional interest, either the issues of

10  terrorist financing, in the issues of the present foreign

11  fighters in the Balkans, these are not common subjects.  I mean

12  you don't typically find people burning down the bookstore to

13  find these books.  I mean these are the kind of books you find

14  in university libraries.

15       If you look right now, if you Google, you do a Google

16  search on my book, you will find that most of the places are

17  university libraries in the United States, in the United

18  Kingdom, and in Australia.  It's used as reference text in

19  Australia for counterterrorism, graduate level counterterrorism

20  study.  It's used here in Boston at the Kennedy School of

21  Finance in graduate level terrorism studies.  This is what it's

22  used for.  It's really not a general interest book.  If you

23  have a general interest in this, you're probably a lot like me.

24  Q.   In fact, when you were in law school, when you were still

25  working at the Investigative Project?

1   A.   That's correct, yeah.

2   Q.   When, in addition to the -- the book being published, and

3   some of the articles that you mentioned, are there other

4   publications with your scholarly locations that you are working

5   on?

6   A.   Sure, again, I am working on something right now for the

7   Annals of the American Academy of Political Sciences.  I am

8   working on two different pieces for an upcoming journal

9   published by the U.S. Military Academy at West Point Combat and

10   Terrorism Center.  I've just published two different papers,

11   two new papers through my foundation that -- the foundation

12   that I work for, one about Algeria and one about Libya.

13   I -- you know, again, my preference is for publishing material.

14   I don't really -- I don't really, generally speaking,

15   especially in the last couple of years, I don't veer towards op

16   eds and stuff of that nature.  It's not really something I like

17   to.  My interest is in producing longer scholarly papers, 20 to

18   30 pages in length, which have footnotes, which are based upon

19   sources, and which are based upon peer review, because I'm -- I

20   am not just publishing opinions or analysis.  I'm publishing

21   facts.  And one of the things that I'm very interested in is

22   getting facts out there that haven't been already recorded.

23   Honestly, most op ed columns are not the proper place to be

24   publishing brand-new information out of particular

25   terrorist-funded groups, or a cell, or something like that.

1    This is the kind of thing that is much more suitable and fits

2    into a scholarly -- a scholarly environment.

3    Q.   How do you reconcile to the court with like an NBC News or

4    something like that?

5    A.   Well, to be honest with you, most of what I do with NBC

6    has nothing to doing with actually going on TV.  Most of what I

7    do for NBC is providing them with raw material about terrorist

8    cases and about terrorist groups.  If a new video comes out

9    from Osama bin Laden, like one is expected today, my job is to

10   provide that audio or video directly to them.  That is what

11   they hire me for is to provide them raw information about

12   terrorism.

13        The analysis work I do, I mean they don't really pay

14   me to that.  I mean I could go on a million times on TV, and I

15   used to go on other channels, CNN and Fox.  I was never paid

16   for that.  They -- the primary reason why NBC pays me is to

17   provide them with raw information about terrorist groups.

18   Q.   And with regards to the other literature in the field,

19   what is -- how does your methodology different from theirs?

20   A.   I mean it doesn't really, aside from the fact that some of

21   my colleagues are university, you know, university trained or

22   professors.  Aside from that, we do basically the same thing.

23   The difference is my actual sources.  I have access to

24   particular sources that they don't necessarily do.  I mean

25   you're going to be hard pressed to find a university professor,

1    who is willing to go to Finsbury Park Mosque and sit down with

2    Abu Hamza Masri.  The guy has no hands.  He has a hook, because

3    he blew his hand off playing with explosives, and you know,

4    most university professors are not going to sit down with

5    somebody like that.  I don't mind.  I like that.  I think it's

6    very interesting.  Me and Abu Hamza had a whole long

7    conversation.  We talked for hours.  People, not everyone, not

8    every university academic professor, I don't think most of

9    them, have access to the kind of insider places on the Internet

10   where I get my video and audio recordings from.  It happened

11   that I started doing this years ago.  So, I became accepted in

12   with a very kind of abysmal section of the Internet, which it's

13   dismal, but it's also very fruitful if you are looking for

14   information about terrorist groups.  Most people don't have

15   access.  These are password protected Internet sites.  You

16   can't log on to them straightaway.  You have to be someone like

17   me.

18        I also do work around the globe on different terrorism

19   cases.  I gather court documents.  I gather transcripts.  This

20   is the kind of material that most university professors don't

21   necessarily do.  And they certainly don't have enough time to

22   sit there, collate all this stuff together, juxtapose

23   everything together.  I mean if I had to teach classes, there

24   is no way I would have time to do all this.

25   Q.   In fact, you testified as a lay witness before?

1   A.   Yeah.  Sure, I have testified both in the United States

2   and the United Kingdom as a fact witness, because of the fact

3   that in those cases, the evidence I was presenting was actual

4   fact evidence that I myself had gathered personally, not being

5   told by the government to do it, but because it was valuable

6   research, and it turned out it also was valuable for the cases

7   that I testified in.  But that was why I testified as a fact

8   witness.  It was because I was a factual witness to things that

9   had happened in the case, or that were related to the case.

10   Q.   And have you acted undercover, so to speak?

11   A.   Yeah, sure.  As recently as last year.  I went to the

12   United Kingdom, and I recorded a protest in favor of suicide

13   bombings, in which I was part of the crowd.  I was with them.

14   I was right next to the organizers, and they thought I was with

15   them.  And sometimes you put yourself at risk by doing these

16   things, but again, these are very valuable sources of

17   information.  Nobody else is doing this.  If nobody else does

18   it, other than me, they get lost, and that is a travesty.  It's

19   a travesty not just for me, but it's travesty for academia, and

20   you know, there has to be someone to go and get the stuff.

21   Q.   In the cases where you consulted or testified as an expert

22   witness have you actually had access to the underlying

23   documents in those -- involved in those cases?

24   A.   I mean one of the big things I've done is that, first of

25   all, in the cases that I testify in, these are when I'm

1    reviewing original documents, this has been a learning process.

2    I'm looking at information people have never seen before, and

3    it is you learn a lot from looking at this stuff, because it

4    fills in parts of the blanks that you haven't been able to

5    match up.  What's more that even in cases where I haven't

6    testified as an expert, where I am simply interested in the

7    case, because it's material relating to what I do; for

8    instance, the United States vs. Enaam Arnaout, in the District

9    of Chicago, I mean, that case -- in that case, you had

10   evidentiary documents, original documents, regardless of who,

11   where they come from, who put them out there, they are original

12   documents, and they tell you a wealth about how the Arab-Afghan

13   movement works, about where it gets its financing from, about

14   whose responsible for sponsoring it, and these documents are

15   gold; and if they are used correctly, they -- they can be very,

16   very instructive.

17        Now, I'm not saying you want to go -- you want to run

18   out with legal documents and say this is the truth, but if you

19   have an evidentiary document, an original document that says,

20   point A, point B, point C, it's a very fair point to say in

21   this trial a document was submitted.  There was an original

22   document that says point A, point B, point C.  And that's what

23   I do.  If I cite a court document, if I cite something I have

24   come across through a trial, I mean it's very clearly marked

25   this is where it comes from, but that evidence also deserves to

1    be aired.

2    Q.    And with regards to that particular case, do you know what

3    group or association Mr. Arnaout was associated with?

4    A.    Sure, he was associated to be with Maktab-al-Khidmat and

5    Al Qaeda.

6    Q.    Are you familiar -- excuse me.  Have you ever provided

7    congressional testimony before?

8    A.    Yes, I co-authored congressional testimony.

9    Q.    What was the subject matter?

10   A.    The subject of the congressional testimony was on the

11   Arabian Gulf being used as a base for terror financing,

12   particularly in the conflicts of Bosnia and Chechnya and

13   Afghanistan.  I should say all three really.

14   Q.    And you've published in the Journal of International

15   Security Affairs?

16   A.    Yeah, that's correct.  Yes.

17   Q.    Do you recall what the -- what your subject matter was on?

18   A.    Yeah, I believe the subject matter was the Bosnian

19   mujahideen.

20   Q.    You were asked about some of the people that you have

21   personally interviewed as well.

22          Are you familiar with Mohammed Al Massari?

23   A.    Excuse me.  I knew I had forgotten one.

24   Q.    As well as Randall Todd Royer?

25   A.    Yes.  Excuse me.  I know I forgot a couple.  I've also

1   interviewed Dr. Mohammad Al Massari, who is a spokesman for

2   Osama bin Laden in the United Kingdom.  I spoke with him at

3   some length.  The reason I got to speak with him was because of

4   the fact that I told him I had studied under Dr. Mamoun Fandy

5   at Georgetown, who wrote a book all about Dr. Mohammad Al

6   Massari and Saudi dissident groups.  And what I said to him,

7   "I'm Dr. Mamoun Fandy's research assistant."  He said, "No

8   problem."  I said, "Let's sit down.  We'll talk."  The same

9   thing with Dr. Saad Al-Faqih, who is also mentioned in that

10  book.  In addition, I have also interviewed a number of

11  individuals, who are either being held in custody, or

12  cooperating with witnesses in terrorism cases, one of whom is

13  Randall Todd Royer, who I interviewed for hours in a jail in

14  Alexandria about his experience in fighting in

15  Bosnia-Herzegovina and a variety of other subjects, but

16  primarily it focused on Bosnia-Herzegovina and Chechnya.

17  Q.   You were asked about your expert report, and I just wanted

18  to provide clarification to the court with regards to the

19  purpose, scope and why you drafted this the way you did.

20  A.   Sure.  I tried to be as inclusive as possible when it

21  comes to expert reports.  I try to provide as much information

22  as possible, not necessarily that everything here will be

23  something I will testify on, but I want to provide a map to

24  both your Honor and also to the counsel as to what I could

25  testify, and if I was asked to, if a particular matter became

1    relevant, and what's more is that because a lot of the subjects

2    that are covered in my expert report are fairly esoteric, I

3    find it necessary to provide a bit of a degree of extra

4    background so that anyone who reads this report and doesn't

5    have the benefit of me being in court to ask questions of can

6    have all those questions answered, even if they are naturally

7    directly relevant to the case at hand.

8    Q.    Now, with regards to some of the subject matter areas that

9    are involved in this case, I am going to ask your -- what the

10   basis of what you now about them.

11   A.    Sure.

12   Q.    I think you described Maktab-al-Khidmat.   Abdullah Azzam

13   is connected, but describe the basis for that.

14   A.    Abdullah Azzam started everything that I have done.

15   Abdullah Azzam is the godfather of the Arab-Afghan movement.

16   He is a legend even today among many of these individuals.   He

17   is -- in order to understand anything about this, you must

18   study Abdullah Azzam.   I have read his books.   I've studied his

19   life.   I have watched numerous video recordings of him both

20   here in the United States, in Pakistan, and elsewhere.   I have

21   spoken to people that have met him.   I have read secondary

22   accounts written by those who followed him of what he had done.

23   Abdullah Azzam is where it is begins and where it ends.

24   Q.    And in addition to Abdullah Azzam, are you familiar with

25   several of the different factions that were extent in

1    Afghanistan, primarily in the '90s?

2    A.    Yes, as a result of my work at Georgetown, studying this

3    stuff, particularly writing research seminar papers about the

4    Afghan war of the 1980s, I had to learn about the

5    Afghan-Islamic unity of Afghan mujahideen.  I had to learn

6    about all the different parties, Hisb-e-Islami, you know, how

7    all these parties worked together, and also the degree to which

8    they didn't work together.

9    Q.    Okay.  And what you know about Afghanistan, you know,

10   during the Soviet occupation, post-Soviet occupation, the Civil

11   War and then post-Taliban, describe the scope of what you know

12   in terms of is it every aspect of Afghanistan.

13   A.    I wouldn't claim to know everything about Afghanistan, but

14   I have studied a fairly wide breadth of Afghanistan when I did

15   my certificate in Islam.  In order to get a certificate in

16   Islam from Georgetown University, I had to write a captive

17   thesis paper for my mentor, Dr. John Voll at CMCU, and the

18   paper was on very, specifically narrowly tailored, King

19   Amanullah Khan and religious development and modernization in

20   early 20th century Afghanistan.  So, I had an experience or an

21   exposure to a wide variety of different aspects of Afghan

22   history and culture; however, my focus has always been on the

23   Afghan Civil War of the 1980s, the subsequent civil war of

24   1990s, and the various different actors involved in that

25   conflict, both local and foreign.

1    Q.    And does that include figures such as Hekmatyar, Massoud,

2    Rabbani, Sayyaf and Dostum?

3    A.    These are the power players.  I mean if you don't know

4    these people, you don't know anything.  And these are the

5    people that are members of the Islamic Unity of Afghan

6    mujahideen.  They are the leaders of the Afghan mujahideen.

7    Some of them are dead.  Some of them are still alive.  The

8    point is is that regardless of what aspect you're studying, you

9    need to know who these people are.  And Ahmad Shah Massoud is

10   relevant for a lot of different reasons and so is Heckmatyar.

11   Q.    Are you familiar with people who are alive or part of an

12   organization involved with these individuals?

13   A.    Sure.

14   Q.    All right.  With regards to the Human Services Office,

15   describe what you know about that.

16   A.    Sure.  The Human Services Office is the Al-Kifah Refugee

17   Center.  It comes -- the Human Services Office is the name for

18   Maktab-al-Khidmat.  The idea is here they are providing human

19   services.  They are providing human beings to go to a

20   particular place and do something.  That is the difference

21   between Maktab and other quote/unquote charities is that other

22   charities were just providing money.  The purpose of Al-Kifah

23   and Maktab is to provide fighters, to provide actual people to

24   go there and do this.  Physically to -- this comes down back to

25   Abdullah Azzam's work "Join the Caravan".  "Join the Caravan"

1  says it all.  It's not sufficient enough to just give money.

2  It's not just sufficient enough to make dua, to pray, D-U-A.

3  You have to go there.  You have to physically commit yourself

4  to a particular cause; and if you are not willing to commit

5  yourself, then you're not a true Muslim.  And Human Services

6  Office and Maktab-al-Khidmat.

7  Q.   Although that might come up at trial, with regards to how

8  do you know that about the Human Services Office and

9  Maktab-al-Khidmat?

10 A.   Sure.  I have seen correspondence between the two of them,

11 and I have seen direct correspondence explaining that, you

12 know, in essence that money is going from Al-Kifah to Human

13 Services Office; that they are the same organization.  They are

14 not treated as separate organizations.  They are treated as

15 one.  They use different names, but they are -- I should say

16 there is no other organization that I know of that uses that

17 name, none.

18 Q.   Your familiarity with the mujahideen in Chechnya --

19 A.   Yeah.

20 Q.   -- can you describe not what you know about it, but how of

21 know of it.

22 A.   Sure.  I came across the mujahideen in Chechnya not by

23 design, but unfortunately I had no choice but to study them

24 because of the fact that as I began studying the Arab-Afghan

25 movement, I began kind of coming across first-hand information

1    about this, I realized that the caucuses was a very important

2    part of this.  The reason I did this was because again, the

3    first-hand information that I was gathering.  When I was

4    studying this stuff, the video recordings I was getting, half

5    of them were about Afghanistan, and the other half were about

6    Chechnya.  And the biographies of the foreign fighters that

7    were fighting there, half of them were from Afghanistan, and

8    half were from Chechnya.  And as a result when I wrote my

9    undergraduate honors thesis, I had to pick a number of

10   countries where I was going to analyze local Arab-Afghan

11   activity, you know, after the Afghan Civil War; what had they

12   done afterwards; where had they gone; what had they achieved;

13   what had they not achieved in different countries.  I had to

14   pick four.  One of them was Chechnya.  So, I went into along

15   extended discussion about why they had done the caucuses, what

16   was the purpose of going to the caucuses, what was the outcome,

17   who went, because that -- that one I thought was one of the

18   most interesting parts is that most people when they thought

19   about Chechnya, they thought about Chechans, and the people

20   that I was studying were not Chechans very much.  They were

21   mostly Arabs, and a few Chechans that were mixed in, but these

22   guys were all of the same ideology, and I noticed that they

23   were the same people.  Even Ul-Khattab, who had made himself

24   famous fighting with Abdullah Azzam back in the late 1980s in

25   Afghanistan, this is a guy, who became famous for fighting in

1   Afghanistan.  And all of a sudden he's popping up in

2   Tajikistan, and then Chechnya, and he's not just popping up.

3   He is the leader there.  And so it became that the massada

4   camp and the exposure of the people that were fighting with the

5   Arab-Afghans, they were the cream of the crop, and these guys

6   graduated on to new things afterwards.  And it's -- you have

7   to -- for me, you have to study these things, because it's

8   tremendously interesting to see where they graduated up to.

9   Q.    All right.  A couple more things.  Are you familiar,

10  without saying what you know about it, are you familiar with

11  Global Relief Foundation?

12  A.    Yes.

13  Q.    And how do you know about Global Relief?

14  A.    I have in my book, one of the subjects I discussed in my

15  chapter about the use of terror organizations is its financing

16  mechanisms.  One of the things I talked about is Global Relief

17  Foundation.  In fact, in my book I cited an original flyer

18  produced by the Global Relief Foundation under the name of the

19  newsletter called Al-Thilal, and in that newsletter, which is

20  in Arabic, which I had translated into English, it explains

21  that they're talking about a camp for the mujahideen in Bosnia.

22  What was so interesting about this from my perspective is that

23  they're talking about a training camp for the mujahideen in

24  Bosnia after the Bosnian war is already over.  This is now post

25  the date of war, and it didn't make any sense to me why these

1    guys would be still be interested in funding the mujahideen

2    camp when there's no more war.

3    Q.   Again, focusing in on the application in this case.  Were

4    you also retained by the Department of Justice with regards to

5    the prosecution of Adham Hassoun, Kifah Jayyousi, and Jose

6    Padilla?

7    A.   That's correct.

8    Q.   And in the course of your consultation there, you have

9    exposure to a number of pieces of evidence in that case?

10   A.   Yeah, in addition to research I did, analyzing all the

11   Islamic reports I could get my hands on publicly, their

12   e-mails, their news broadcasts, these letters, everything I

13   could get on these guys, in addition after working in that case

14   for the U.S. Justice Department, I was also exposed to a number

15   of other materials, including copies of their newsletters,

16   which I hadn't seen, including copies of videos which I hadn't

17   seen, including copies of wiretaps, which I hadn't seen; and

18   which again filled in part of the blanks of which I didn't

19   know.  That being said, you know, along with Maktab-al-Khidmat,

20   their organization, which was known as the American Islamic

21   Group, AIG, was one of the large focuses of my research,

22   because not only was I coming up with references here in this

23   country, but I was also coming up with references in the

24   Balkans where people were finding business cards with their

25   logo and their name on it from seized mujahideens, so, again,

1    it was coming from both angles, so but yeah, yeah.

2    Q.    Finally, with regards to Bassam Kanj.

3    A.    Sure.

4    Q.    What is your basis of knowledge about him?

5    A.    I am familiar about him with -- from, number one,

6    discussions that have taken place that I have been privy to,

7    involving different people involving academics, involving

8    government, people I've also read through secondary and

9    tertiary sources about him.  My understanding is that he is an

10   individual from Boston who was killed by Lebanese security

11   forces in Tripoli in 2000.  And I should add as well Mr. Kanj

12   was the subject of at least one, if not more wiretaps, which I

13   reviewed as part of my work in the Padilla case.

14   Q.    Is it also safe to say again each time that you, with

15   regards to the Al-Kifah Refugee Center, you have a lot more

16   that you could provide in terms of testimony about how much you

17   know about it?

18   A.    I could probably write a ten volume encyclopedia about the

19   Al-Kifah Refugee Center.  I have written numerous, numerous

20   memorandums over the years about this subject, about what it's

21   involve in, about various aspects of it, about various

22   documents.

23         On a regular basis, one of the very sad things to

24   admit is that one of things I enjoy doing is I go through the

25   collection of Al-Kifah material.  I have the original material,

1    and I pore through it just to see in the last six months if

2    there is something that I haven't come across, which is

3    suddenly become relevant now out of this document; and

4    amazingly enough, it does happen that every -- every so often,

5    I will go through it and see that name, that name just came up

6    now.  Look, it's relevant back to here.  Look at this document.

7    I mean the Al-Kifah documents are a treasure trove.  They are

8    one of the most useful.  They are one of the most useful caches

9    of documents I have ever seen.

10   Q.   And you had exposure to that well before?

11   A.   Since 1997.

12        MR. CHAKRAVARTY:  That is all I have.

13        THE COURT:  All right.  Any -- very brief.  It's four

14   o'clock, and I want to hear arguments.

15        Is there any recross.

16        MS. LUNT:  I have a few things.  I will try to make it

17   really quick, your Honor.

18        THE COURT:  Very quickly.

19                    RECROSS EXAMINATION

20    BY MS. LUNT:

21   Q.   First of all, you said these documents you had access to

22   since 1997.

23        How did you get access to these documents?

24   A.   First of all, I began collecting them on my own; second of

25   all, with the Al-Kifah documents to a large part is I got them

1    from access from contact with Steven and working in this case.

2    Q.   And what do you know about how Steven Emerson got

3    documents?

4              MR. CHAKRAVARTY:  Objection, your Honor.

5              THE COURT:  I'll allow it.

6    A.   I'm aware that he hired someone to make photocopies of

7    documents that were in the basement, abandoned in the basement

8    of the Al-Kifah Refugee Center.

9    Q.   Okay.  Are you aware that, in fact, it was not the

10   Al-Kifah Refugee Center?

11   A.   Excuse me.  Excuse me.  Sorry.  You're right.  Masjid al

12   Farouq.  Excuse me.

13   Q.   That's -- when you say when Masjid al Farouq, that's a

14   mosque in Brooklyn, right?

15   A.   Atlantic Avenue, that's correct.

16   Q.   Where was that in relation to Al-Kifah's offices?

17   A.   I couldn't give you a geographic representation.

18   Q.   Were you aware that the documents were actually moved from

19   that location to another location, and that's where Steve found

20   that?

21   A.   It's possible.  It's possible, but they were

22   originally -- they were originally located in the basement of

23   the Al Farouq mosque.

24   Q.   Who found them?

25             MR. CHAKRAVARTY:  Objection, your Honor.  There is

1   also a fact witness, which we anticipate calling who would be,

2   you know, subject to this.  This is perceived as a discovery

3   mission now for impeachment on that person.

4           THE COURT:  All right.  I -- I don't know that we need

5   to get into this.  I have some questions about whether I would

6   permit him to testify about some of the Al-Kifah issues anyway.

7           MS. LUNT:  Okay.  Well, your Honor, if you want me to

8   move on, I do want there to be time for argument.

9   Q.   You mentioned something you wrote for foreign affairs.

10  What was that?

11  A.   I forget the exact title, but it was focused on the use of

12  the Internet for terrorist group purposes, for other terrorist

13  groups.

14  Q.   And you talked a lot about these documents you find on the

15  Internet, and obviously you also said you haven't read them

16  all.  You cannot -- you know, there is no way that you can

17  validate their authenticity, because anybody can put anything

18  up on the Internet, right?

19  A.   That's not true.  There is a way you can validate.  In

20  some cases, they are accompanied by video recordings of the

21  people that authored them saying, "I did this," "or this is

22  me."  And in that case, it's a process of elimination.  If you

23  have a video recording of someone saying "I did this," and here

24  is the date, and you have that, and I mean it stands to reason

25  they did that.  I didn't -- I -- I mean I didn't have -- I

1   don't have a notarized copy, but I -- what I do, I mean that is

2   what I do.  My job is to take information and to determine what

3   is credible and what is not, and sometimes it's easier than

4   others.  But I will tell you that lately, as of late, there is

5   an official system by which terrorist organizations disseminate

6   their information; and that if it's not accurate, it's not

7   credible, they immediately issue a statement saying that is not

8   from us, and it's -- let me finish.  Again, it's supplemented

9   by the kind of information where it's simply undeniable.  A

10  video recording of someone saying "I did this," it's very

11  difficult to argue against that.

12  Q.   I am not talking about videos.  I am talking about

13  documents.  You said that you are interested in these documents

14  you found regardless of who put them out there.  These

15  documents that you find on the Internet, you find them, and

16  regardless of who put them out there --

17  A.   Maybe I didn't say that right.  What I meant is I collect

18  from a wide variety of sources, but I collect from a wide

19  variety of what I deem to be credible sources.  For instance,

20  there is plenty of stuff out on the Internet that I would never

21  use.  There is -- to give you an example.  Right now,

22  everything that is put out officially though through Al Qaeda

23  is put out by something called the Al --

24  Q.   Okay.  I can think we can cut this out, because what is

25  being put out by Al Qaeda right now is not something that is

1    relevant.

2    A.    You asked me --

3    Q.    You mentioned about the Hassoun case.  You were not called

4    as a witness by the government in that case, were you?

5    A.    I didn't testify as a witness in that case, because of the

6    fact that the subject of my testimony, which was going to be

7    about Bosnia-Herzegovina, never came up during the trial.

8    Q.    Okay.  Now, you talked about Maktab-al-Khidmat saying that

9    they provided -- they provided men.  You are not denying that

10   they also provided humanitarian relief to refugees in Peshawar?

11   A.    They provided both, but again the idea was that what do we

12   do that is different from everybody else.  You know,

13   unfortunately this is a very capitalistic system is that

14   how -- what is our edge on our competitors.  Our edge on

15   competitors is that our competitors are mostly providing

16   humanitarian relief.  What we do different is we provide

17   fighters.  We provide money to the mujahideen.  And, yeah, sure

18   we provide humanitarian relief as well, but I mean, for

19   instance, one document that I got from Al-Kifah in Zagreb sums

20   it up perfectly, which is that we are going to take this

21   ambulance and take it on a tour of the refugee camps; and then

22   once we are done, we are going to hand it over to the

23   mujahideen in the field.  That's what it was.  It was a dual

24   purpose, but what made them different and what made them

25   special was that they were connected with the mujahideen.

1          THE COURT:  Okay.  Let's wrap up.

2          MS. LUNT:  All right.  Well, one last question.

3    Q.   You talked about positive feedback.  Did anybody ever give

4    you the feedback on your book that your evidence is a series of

5    vignettes of people, who met their death in Bosnia, that I

6    believe are more sensationalist, and less academic press is the

7    best thing for this monograph and its uncompelling claims, and

8    that it's not a serious academic work, but rather a sloppy

9    journalistic one?

10         Did anybody ever give you that feedback?

11   A.   No.

12   Q.   And you never saw what Professor Sageman had to say?

13   A.   No.  No.

14         MS. LUNT:  Thank you.

15         THE COURT:  All right.  Let me, in the interest of

16   time, let me tell you, I guess, what my reaction is and what

17   the issues that I am concerned about or want counsel to focus

18   on.

19         MS. LUNT:  Your Honor.

20         THE COURT:  Yes.

21         MS. LUNT:  The witness should not be here.

22         THE COURT:  You may step down.

23         THE WITNESS:  Thank you, your Honor.

24         MS. LUNT:  Your Honor, will we have a brief

25   opportunity to argue?

1          THE COURT:  Yes.  Yes.

2          MS. LUNT:  Okay.  Fine.

3          THE COURT:  I'm trying to focus the argument, just in

4     the interest of time.  Because I say something doesn't mean I

5     can't be talked out of it, but I'm just giving you my quick

6     reaction to save time.

7          It seems to me that while there are certainly aspects

8     of this that are unorthodox by way of his training and the way

9     he acquired knowledge, I don't think that it reaches the stage

10    that he has no expertise at all to offer, but as I think I

11    indicated earlier, it -- the expertise is in the following

12    nature: the general history of certain conflicts, that is, a

13    rough outline of them with a focus on the role of mujahideen,

14    or foreign fighters; and the -- to use his phrase, the

15    Arab-Afghan movement and identifying certain persons or terms

16    or subgroups within those movements.

17         What I'm primarily concerned about -- well, I've got a

18    number of concerns.  Let me toss them out in no particular

19    order.  I am concerned given the tone of the report and the

20    tone of a little bit of the testimony that he is not someone

21    who understate things, and I think it would be important that

22    he -- that he give testimony that is measured, and not veering

23    into sensational or speculative.

24         I'm concerned about what, if anything, he can say

25    about the Al-Kifah Refugee Center.  I can't say that I thought

1   this through completely, but something about that doesn't feel

2   right to me.  It seems to me that he could identify Sheik Azzam

3   and talk about Sheik Azzam and his influence, or even that

4   Azzam founded MAK; but as a witness testifying about the -- the

5   activities of Al-Kifah Refugee Center, which are relevant here

6   really only to show the outgrowth and successor issue, I think

7   it seems to me is crossing over a line, and I can't quite put

8   my finger on what it is what bothers me about that, but it

9   doesn't sound right.  And, again, I'm just throwing out these

10  ideas, not necessarily in order of importance.

11      The fact that his background is -- contains multiple

12  references to the word "terror," I think at least needs to be

13  addressed.  My instinct is that we -- either we need to clean

14  that up a little bit, or if he -- if he needs to talk about,

15  you know, the fact that he works for organizations for terror

16  in their name, and he may need to to establish his credentials,

17  that I give the jury a limiting instruction.

18      And we had talked a few days ago about whether a

19  witness could testify about the role of Arab or Muslim

20  charities and funding terror or mujahideen, and some concern

21  was expressed about that.  I guess I'm coming around it to the

22  view that maybe that's best handled from the other end to say

23  that mujahideen was financed from foreign sources, principally

24  Muslims and other countries, and perhaps let the jury draw that

25  last link between charitable fund-raising here and the

1    newsletters and so forth, and the fact that the mujahideen

2    groups were funded by foreign sources.

3         With that as kind of a rambling introduction, again, I

4    think that he could testify as an expert under Rule 702 as to

5    primarily the conflicts in Afghanistan and to some extent

6    Bosnia and Chechnya, and the role of foreign fighters and

7    mujahideen in those conflicts, and who certain individuals

8    were.  I think I would probably permit it.  His expert report

9    contains a lengthy summary of the government's evidence, which

10   I don't think I will allow, and -- and obviously, I'm not going

11   to allow cumulative evidence, because he overlaps with Levitt

12   in many respects.

13        All right.  With that rambling, and I don't know if

14   it's helpful or not -- Ms. Lunt.

15        MS. LUNT:  Okay.  I'm somewhat dizzy.  Let me just

16   address the thing that you mentioned first, and I'll go back.

17   First of all, if the court is going to allow testimony that the

18   mujahideen were financed by Muslims in other countries --

19        THE COURT:  In part.  I mean that they were financed

20   in a variety of ways, one of which includes.

21        MS. LUNT:  Then we have to be allowed to bring out

22   they were funded by the United States.  In fact, Mr. Kohlmann

23   will agree that they were vigorously and enthusiastically

24   supported by the United States, so --

25        THE COURT:  I would need a -- we'd need to talk about

1    the time frame there again, because we are not talking about

2    1980.

3           MS. LUNT:  No, no.  I'll make the questions, you know,

4    specific, your Honor.  We have an expert, who will testify

5    about that, but -- and so I won't go arguing -- I -- I

6    understand your position on this, and that you're not going to

7    allow testimony about the role of charities, other charities,

8    and we did cite cases where counsel are putting in evidence of

9    what other Koreans do and what other sikhs do.

10          THE COURT:  Well, that's my concern.  Just again, it's

11   not clear to me.  There might be a way to cast some of this.

12   Again, it's -- I think it's fair for the jury to hear

13   testimony, fair testimony, nonprejudicial testimony, not

14   propensity testimony that this operates in a way that's

15   un -- may be unfamiliar to the jurors.

16          Again, we hear the word charity, and you think of Red

17   Cross, or the United Way, or something; but clearly, I wouldn't

18   allow a witness to testify that all Muslim charities are

19   corrupt, or, you know, this is how these people operate.  On

20   the other hand, I might allow something, and I'm not sure what

21   that something is, so that's where I'm starting.

22          MS. LUNT:  To go to the meat of this argument, Mr.

23   Kohlmann is not qualified to testify about conflicts in other

24   areas, or about these specific individuals.  He holds

25   himself -- and there is two aspects.  One is the tone and the

1    bias; and two is the substance part of his background.

2           In terms of the tone and bias, he is a consultant, an

3    expert on international terrorism.  I couldn't possibly count

4    the number of times he mentioned the word "terrorism".

5    Everything he researches, everything he writes, his upcoming

6    publication, his prior publications are all on the subject of

7    terrorism; and if he testifies, a specter of terrorism will be

8    cast over this entire case in a way that is completely unfair.

9           And it's -- you know, he is a man with a mission.  I'm

10   not saying there is anything wrong with that; but as an expert,

11   that is not appropriate.  And you've referred yourself, your

12   Honor, to what I have in capital letters in my notes here,

13   which is the tone of the report.  He cannot be sanitized.  We

14   heard him on the stand.  It is not possible to put him on as a

15   sanitized witness, who's going to testify in a limited fashion

16   about the history of the conflict in these areas, and about

17   particular individuals who were involved.  It's just not going

18   to be possible.  I think that's quite clear from how he

19   conducted himself on the stand today, and also in terms of the

20   tone of the report that he filed.

21          Now, going to his -- he is not an historian.  He does

22   not have a background in history, or the history of these

23   areas.  He agreed he is not an expert on the Bosnian War.  He's

24   not an expert on the Afghan war.

25          THE COURT:  Well, again, and I'm sorry to interrupt.

1    I don't think he's an historian on the Afghan war in the sense

2    that he can give you every in and out of it; but for example,

3    if he were testifying about that he were an expert on the role

4    of the SS in World War II, he might not be an expert on the

5    history of World War II, but he could give enough background so

6    you understood the role of the SS within the conflict, and

7    that's what I'm thinking of.

8         MS. LUNT:  Respectfully, your Honor, the SS, or the

9    Arab fighters, are not what is at issue in this case, and that

10   is the problem.  He sees these conflicts through the eyes of

11   the Afghan-Arab mujahideen.  And when we talk about the

12   mujahideen in Afghanistan, we're not talking about the

13   Arab-Afghans, who are a handful.  We are talking about millions

14   of Afghanis.  All these people, Hekmatyar, Dostum, Massoud,

15   they're all Afghanis.  They're not Arab-Afghans.

16        The Arab-Afghan connection is a narrow focus and one

17   that he has devoted his life's work to, but it totally distorts

18   the history of the wars in these countries, and I would like

19   to, you know, in terms of his qualifications even in that area,

20   I would ask that the court carefully read the report of Dr.

21   Sageman.  But what he said -- and there's not time to read the

22   whole thing -- I should just say it was he describes

23   particularly about cavalier handling of French terrorists.  Has

24   used cult material in my book.  Has a problem with reliability

25   and a one-sided presentation of the facts.  His treatment of

1    Sheik Abdullah Azzam as the guru of Bin Laden and the real

2    founder of the terrorist movement is very one-sided and

3    contradicted by a mountain of evidence that he does not cite.

4    I just don't understand why Kohlmann buys these are materials

5    that he gets off the Al Qaeda website, why he finds them not

6    critically -- uncritically.

7           He has not proven his case.  The Bosnians were a

8    springboard for Al Qaeda penetration in Europe and in the

9    United States.  On his excellence on jihad, he makes the point

10   that Muslim militants were never able to grasp the jihad in

11   Bosnia.  What happened in Bosnia was for the most part Bosnian,

12   for the Bosnian Army, which was a mixed army.  I mean it was

13   not just -- the Bosnian state was not a single-religion state

14   or Muslim dominated, and it was the Bosnian Army that resisted

15   the Serbian -- the Bosnian-Serbian Army, which was then

16   massively supported by Slobodan Milosevic, and the Arab-Afghans

17   are a sideline in these three conflicts; and to allow this

18   person to testify about that side line completely distorts what

19   was going on at the time and the humanitarian crisis that was

20   going on at the time in those countries.

21          He's not qualified as an expert on Islam.  He cannot

22   talk about jihad, zakat and so forth.  He does not have --

23          THE COURT:  I think that's right, at least based on

24   what I have heard and seen, and he is not an expert on Islam,

25   or Islamic culture, or Arab culture.

1          MS. LUNT:  And you know, when we talk about the

2     historical context, you have to look at his report.  He does

3     not lay out the historical context.  He does not lay out the

4     humanitarian disaster.  He talks only about extremist groups,

5     and he also warned us of his account with wildly -- wild

6     speculation, and it was quite clear from his testimony about

7     how he does research on his vast internet site, and he makes

8     connections, and then he thinks that if it pops up here, it

9     pops up there.  He bases in the report -- I think the court has

10    already ruled that you're not going to allow him to launch into

11    Egypt, Libya and Algeria, but, you know, he --

12         THE COURT:  I -- I think, you know, I might permit a

13    short description in general terms.  That has not been a focus

14    in this case, but it's all over the Al-Hussams, and it seems to

15    me --

16         MS. LUNT:  Right.  Your Honor, I've read what he has

17    to say about those countries, and he says that -- he says that

18    Al-Hussam -- Care through Al-Hussam, you know, supported

19    particular groups.  It's not -- it's unfounded.  You know, he

20    says that it supported LIFG, in Libya, right?   Yeah.  And on

21    the basis of one interview, one interview, which doesn't

22    endorse anybody.  There's lots of articles about Libya, and it

23    doesn't once mention LIFG.

24         Similarly, he tries to say that they are supportive of

25    the GIA in Algeria.  There are tons of articles about Algeria.

1    GIA is mentioned twice.  Once they publish a communique there.

2    Nothing -- that's not supporting the difficulties in that

3    communique; and in the other article, they simply refer to

4    a -- the groups that have gotten together and created a united

5    front.  Lots more articles about Algeria.  None of them on

6    site.

7            As for the Basayev, he wants to launch into -- and I

8    think Basayev, by the way, is a Chechan, not an Arab-Afghan.

9    He wants to go into -- I'm sure the court isn't going to allow

10   this -- the atrocities committed in 2002, 2003, but on -- on

11   the subject of Chechnya, there is lots of articles about

12   Chechnya.  One or two, I think, mention the same incident to do

13   with Basayev.  There is several mentions of Dudayev, who was

14   the President of Chechnya.  Several mentions of other members

15   of the Chechnyan government that's, you know, the break-away

16   state, breaking away from the Soviet Union.

17           He provides none of this historical background.  He

18   doesn't explain that, for instance, in Algeria, the fighting

19   broke out after the elections were canceled, because an Islamic

20   party was going to win.  He doesn't mention in Chechnya -- in

21   other writings in his article about Chechnya, he does, but in

22   his report here, what I anticipate he is going to testify, he's

23   not going to mention the true historic context.  He only sees

24   it through this narrow lens, and that is grossly unfair and

25   grossly distorts, you know, the cases -- this case.  This is

1    not a trial on terrorism, nor as the court has said --

2          THE COURT:  Well, you know, I have been working very

3    hard to keep references of terrorism out of the case; and, you

4    know, having done so, it's also fair to say that the government

5    charges that the defendants were promoting and supporting jihad

6    and the mujahideen, and certainly the Al-Hussam newsletters and

7    their news articles, I think it's a fair reading that they

8    glorify terror activities.  It's a little blood curdling at

9    times talking about the, you know, the suicide bombers, who

10    killed the crusaders in such and such a country, and, you know,

11    there's only -- I'm willing to sanitize things to be fair, but

12    only to be fair.

13          MS. LUNT:  But, I mean, your Honor, the articles that

14    you said speak for themselves, and --

15          THE COURT:  Well, that's the --

16          MS. LUNT: -- we don't need to regurgitate them.

17          THE COURT:  The question is are there things in there

18    that need to be explained for the jury to understand what these

19    things mean.  That's really that this is all about.

20          I'm sorry.  Just why don't you wrap up quickly just in

21    the interest of time.

22          MS. LUNT:  I understand.  There are page -- I would

23    ask the court to read very carefully pages 37 to the end of

24    this report.  The first chunk of his report is all about events

25    in the rest of the world, a sort of a tour of terrorism, which

1    we are not -- I think the court is not going to get into.  But

2    when you look at it, the report point by point, it's

3    all -- it's speculation.  It's -- and by the way, he talks

4    about this mountain of documents about -- and I think the court

5    is quite right on the Al-Kifah Refugee Center.  The issue is

6    are they an outgrowth.  To get into all the bad activities

7    about the Al-Kifah Refugee Center again would totally distort

8    the case.  The question is whether they were an outgrowth or

9    successor, not what Al-Kifah Refugee Center was doing

10   independent of Care.

11           He talks about, of course, the connection to the World

12   Trade Center.  In terms of the GRF minutes, he engages in

13   speculation: what it appears to be, what it seems to be.  You

14   know, that's the language of, you know, that he uses.  He says

15   that the corporate entity of Care seems to be little more than

16   a flimsy public cover.  He then moves on to -- this is now page

17   39 -- a summary of articles in Al-Hussam.

18           THE COURT:  He is not -- I can't imagine I'm going to

19   let him do that, but --

20           MS. LUNT:  But, my problem is, your Honor, that his

21   report, his testimony, you know, is replete with summarization,

22   speculation, and infelicitous adjectives, notorious, violent,

23   illicit throughout.  He then speculates.  Everything he says

24   about Al-Hussam is either speculation or repetition.  If there

25   were a witness, and the government has two other witnesses in

1   this case, who maybe could provide the historical context of

2   these conflicts in a way which is not going to risk

3   tremendously unfair prejudice from, you know, as I said, this

4   unsanitizable witness, who's just -- whose focus is terrorism.

5          THE COURT:  Okay.  Let me hear quickly from Mr.

6   Chakravarty.

7          MR. CHAKRAVARTY:  Thank you, your Honor.  Briefly.  To

8   address your concerns, your Honor, clearly the tone of the

9   report is -- is an issue.  I think that how he testified today,

10  with all due respect to Ms. Lunt's characterization, is very

11  different from the tone of the report, because the report is

12  not a deposition of what he's going to testify to.  It's the

13  breath of the subject matter.  The fact that he uses charged

14  language, or the parlance of his field in a report is hardly a

15  reason to suggest that that's how he's going to testify, you

16  know; and the fact that at a 702 hearing in front of your

17  Honor, where the risk of prejudice is nil, the fact that he may

18  also use words like "terrorism" or describe things in a perhaps

19  more inflammatory way, although --

20         THE COURT:  I think we're on the same page.  I'm not

21  going to allow the flowery and inflammatory language.

22         MR. CHAKRAVARTY:  And that's not the government's

23  intent to elicit that.

24         The substantive issues, and the first, and

25  particularly concerning one is the role of Islamic charities

1     with regards to funding mujahideen.  It's still a live issue.

2     We do expect that Dr. Levitt is going to be the primary

3     financing person, the person who is talking about how the

4     mujahideen were financed.  We don't want to, and we're not

5     expecting to go into that with Mr. Kohlmann; however, to the

6     extent that he talks about what the Human Services Office did,

7     in terms of their activity and how under that -- that same

8     organization, which is relevant here, how they, you know, give

9     an example of an ambulance, that is a specific activity, which

10    I think is relevant as a factual matter for the jury to be able

11    to consider while, wait a second, this organization, which is

12    associated with -- with Al-Kifah Refugee Center, and that goes

13    to the materiality of what the -- the concealment was to the

14    IRS.  If, in fact, they were partially doing this other

15    activity then you would expect that how Al-Kifah countenances

16    its solicitations and its activities would appear innocuous, or

17    would appear to be in a certain way.  Without the jury even

18    understanding that there is that possible perversion of how

19    money going over there in any -- under any manner can be used

20    for the mujahideen, and they're not even aware that is a

21    historical fact that's how mujahideen was funded for, you know,

22    ten plus years.  He wouldn't be going on at length about that.

23    He would probably give an anecdote or two like that based on

24    what he testified to was his first, you know, his reading of

25    the first primary source information.  It seems hardly to be

1    the extent of glorifying or launching into an expose that HSO

2    is a corrupt organization.  It's kind of somehow they

3    facilitated mujahideen, particularly with regards to the

4    Bosnian issue.

5              The related issue is generally how to talk about

6    Al-Kifah Refugee Center.  Our goal is not to dirty up and tar

7    and feather Al-Kifah Refugee Center ipso facto Care

8    International should be convicted, because of the -- all the

9    activities of Al-Kifah Refugee Center.  However, the reason why

10   the failure to disclose their outgrowth and their relationship

11   to Al-Kifah Refugee Center is important, and I mean that is the

12   central issue when our experts are going to say, yeah, that

13   would have mattered to me if I knew that they were associated

14   with Al-Kifah Refugee Center, because of a little bit of

15   digging in Al-Kifah Refugee Center's activities and their

16   association with, you know, these other organizations and, you

17   know, the association of funding the mujahideen, and being part

18   of this broader network that it all goes to the sophistication

19   of the organization.  It goes to whether it's a charitable

20   cause or not.  There, I think there is a way to balance that

21   without him going into this is all the stuff I found in the

22   basement, but rather saying I'm aware that Al-Kifah Refugee

23   Center is part of Maktab-al-Khidmat, which I think we've

24   discussed.  We have a paragraph essentially of substance, which

25   he can testify to about Maktab-al-Khidmat.  This is -- was a

1   note of Maktab-al-Khidmat, and it puts then in context why we

2   are bringing this case, why it matters that the defendants

3   failed to disclose their connection.

4        THE COURT:  Because the IRS witness would testify it

5   would have been material had I known, because -- because blank,

6   what?

7        MR. CHAKRAVARTY:  Well, there's more to that, but part

8   of it is, if you are related to another organization, any

9   organization, let's assume it was a completely clean

10  organization, for lack of a better phrase.  If you relate to

11  that organization, it bears on the sophistication of this

12  organization that's going on.  It bears on publications.  It

13  bears on the other types of activities.  So that should, as

14  they did with the Global Relief Foundation, that came out today

15  in court.  They would have asked follow-up questions.  They

16  would have had a different type of analysis.  It's not -- it

17  doesn't mean they would be precluded from 501(c), but it

18  changes the analysis when you know that you're associated with

19  a global organization with multiple branches, let alone one

20  that has falsely represented itself to be a tax-exempt

21  organization.

22       THE COURT:  All right.  Let's do this.  He's supposed

23  to go on Friday, if at all; is that right?

24       MR. CHAKRAVARTY:  Yes, in candor, and for every

25  reason, we are a day behind a day behind now because of the

1    length of Agent Lazarus.

2         THE COURT:  Another day behind or --

3         MR. CHAKRAVARTY:  We're probably one day behind, one

4    day behind the case.  He -- he can -- we would like for him to

5    testify on Friday, because he's here.

6         THE COURT:  All right.  Here's what I want to do.  I

7    want to pick up.  I want to hear more argument beginning

8    tomorrow morning at 8:30.  Let's do 20 minutes of argument

9    then.  The real issue is I don't need to decide it overnight.

10   I have at least a little bit of time.  I would like to think

11   about it some more, hear some more argument tomorrow morning,

12   and hopefully rule tomorrow morning.  Okay.  And you have

13   exhibits that I haven't seen.

14        MS. LUNT:  Yes, there is one more exhibit that I

15   didn't yet put in.  It's simply the -- I have given it to the

16   government.  It's marked Sageman's pocket CV.

17        THE COURT:  All right.  That will be marked as Exhibit

18   D, I think.

19        LAW CLERK:  Right.

20        THE COURT:  "D" as in dog.  Okay.  All right.

21        (Document was marked Exhibit D for identification.)

22        MS. LUNT:  Your Honor --

23        THE COURT:  I have a --

24        MS. LUNT:  -- the other thing I would like to raise is

25   I feel, based on what we've heard from Mr. Kohlmann, that he

1   does play pretty -- well, he's not entirely credible.

2   He's -- you know, the way that he distorted Berg Press, I would

3   ask you to look at that, distorting what Berg Press is.  Read

4   their website, what they really --

5           THE COURT:  I mean I understand, it's -- I do have a

6   gate keeper function, but it's limited.  The function is not do

7   I think he's a great witness; do I think he's a credible

8   witness; do I think he's a qualified witness on the subject on

9   which he is testifying, and it's -- it's a fine distinction

10  sometimes, but it's, you know --

11          MS. LUNT:  I understand that, your Honor, but --

12          THE COURT:  Physicians testify in front of me as

13  experts, and I don't agree with a single thing they say, you

14  know, but that's not the standard.  The standard is are they

15  qualified to give opinions.

16          MS. LUNT:  Well, I think it's tied in, because when

17  you're talking about having a witness talk about historical

18  context of events, somebody who distorts the sort of academic

19  standing of his own book, it is an issue.

20          THE COURT:  All right.  I will take a look at it.  If

21  you can all clear off this, because I'm doing a mock trial

22  beginning in negative two minutes.  So the students are going

23  to need the tables.

24          MR. DUNCAN:  I just ask that you look at the Claiborne

25  Hardware case before tomorrow morning in regard to the question

1    about whether testimony on funding of the mujahideen and some

2    inference from publications is allowed, because I think that

3    case is otherwise -- I would ask you to look at it carefully.

4              THE COURT:  Is that cited in your materials?

5              MR. DUNCAN:  That's -- Yes, it's NAACP versus

6    Claiborne.

7              THE COURT:  Oh, yes.  Okay.  Thank you.

8              (At 4:37 p.m., court was adjourned.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        C E R T I F I C A T E

3

4            I, Marianne Kusa-Ryll, Certified Realtime

5    Reporter, do hereby certify that the foregoing transcript,

6    consisting of 99 pages, is a true and accurate transcription of

7    my stenographic notes in Case No. 05-40026-FDS, United States

8    of America versus Emadeddin Muntasser and Muhamed Mubayyid,

9    before F. Dennis Saylor, IV, on November 28, 2007, to the best

10   of my skill, knowledge, and ability.

11

12                          _____

13                          Marianne Kusa-Ryll, RDR, CRR

14                          Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25