UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES | ) )  ) ) ) ) ) ) ) ) ) |
| v. | |
| MUHAMED MUBAYYID | |

Cr. No. 05-40026-FDS

## MEMORANDUM IN SUPPORT OF MUHAMED MUBAYID'S RULE 29 MOTION

I. Introduction

Mr. Mubayyid submits this memorandum in support of his renewed Rule 29 Motion. The Court should review the evidence presented at trial, taken in a light most favorable to the government, and drawing every reasonable inference consistent with the verdict. When it does so, the Court should reach the inescapable conclusion that the evidence presented was insufficient to sustain Mr. Mubayyid's conviction on any count. The verdict did not reflect the evidence, and an injustice was done here; an innocent man has been convicted by a jury bombarded with inflammatory and provocative testimony and documentary evidence, much of which had nothing to do with him, and which provided the jurors little, if any, substantive assistance in deciding his fate and the issues before it. An examination of the record reveals that the government's proof fell fatally short in several dispositive ways, and that allowance of this Motion is demanded by the record.

Mr. Mubayyid was convicted on Counts One, Two, Three through Five and Eight. Count One charged his participation in a scheme to conceal, in violation of 18 U.S.C. §1001(a)(1). Count Two charged him with conspiracy to defraud the United States and the Internal Revenue Service, in violation of 18 U.S.C. § 371, in what is known as a Klein conspiracy. Counts Three through Five charged him with the filing of false tax returns, in violation of 18 U.S.C. §7206(1). Count Eight charged him with corruptly endeavoring to obstruct and impede the due administration of the internal revenue laws, in violation of 26 U.S.C. §7212(a)

After over two years of pretrial litigation, and a six week trial, the Court is well familiarized with the charges and the general parameters of the government's allegations and the evidence actually presented. The focus of this memorandum will be on how the evidence presented at trial was insufficient as a matter of law to sustain Mr. Mubayyid's convictions. The briefest of summaries will set the stage for that discussion.

II. The Government's Theory of the Case

The thrust of the prosecution's case was as follows. In the late 1980's, a chapter of the Al-Kifah Refugee Center ("Al-Kifah") was established in Boston. Al-Kifah was a putative Muslim charity, engaged in the collection and distribution of money for Muslims in need, including Muslim refugees, widows and orphans, and publication of a newsletter, entitled Al-Hussam. Al-Hussam's editorial content was a mash of religious, political, current event writing with a fundamentalist Islamic, pro-Muslim insurgents bent. In early 1993, several of the local Al-Kifah volunteers established a new organization, and named it Care International, Inc. ("Care") Emadeddin Muntasser, as president of the new organization, filed Articles of Incorporation with the Massachusetts Secretary of State's

Office, and shortly thereafter sought recognition for tax exemption as a charity with the Internal Revenue Service ("IRS"), through the filing of IRS Form 1023. Said Form 1023 required the applicant to provide certain information, including a statement regarding the purposes of the new organization. Form 1023 also included a question inquiring as to whether the new organization was an outgrowth or successor to any other entity.

A central pillar of the government's case was that Mr. Muntasser, in order to gain Care charitable recognition and hence tax exemption, purposefully and knowingly falsely answered that question in the negative, failing to disclose that, in the government's view, Care was in fact an outgrowth of and/or a successor to the Al-Kifah Refugee Center. (See, Superseding Indictment, Introductory Allegations, ¶10; Count One expands on that theme, stating that as part of the scheme therein "the defendants" concealed that Care was an outgrowth of and successor to Al-Kifah)

A second prong of the government's theory was that the Form 1023 failed to disclose that Care was engaged in activities involving the solicitation and expenditure of funds to support and promote the mujahideen and jihad. The specific undeclared activity that was the focus of much of the government's case at trial was Care's publication of the Al-Hussam newsletter from 1993 to January 1997.(See, Superseding Indictment, Introductory Allegations, ¶9)

Within several months of the filing of the Form 1023, the Internal Revenue Service granted Care recognition as a tax exempt organization, under §501(c)(3) of the Internal Revenue Code. Once a recognized tax exempt organization, Care was obliged to file a yearly tax return, to wit, IRS Form 990. A completed Form 990 included, among other things, a declaration of the amount of money taken in by the organization, and an

3

itemization of the organizations expenditures, delineating operational expenses and money's expended by the organization for its charitable purposes. Form 990's were filed on behalf of Care for the years 1993 through 2002, albeit often late. The third prong of the prosecution's theory was that each of these filings was false in that each one failed to disclose that Care was engaged in activities involving the solicitation and expenditure of funds to support and promote the mujahideen and jihad, those referred to activities being primarily, according to the Superseding Indictment and the evidence presented, the publication of the Al-Hussam newsletter.

   III.  <u>Evidence presented relating to Counts Three through Five, the Filing of False Tax Returns</u>

Central to the government's case against Mr. Mubayyid were the charges of filing of false tax returns. Counts Three, Four, and Five of the Superseding Indictment charge Mr. Mubayyid with filing false tax returns for the years 1997, 1998, and 2000, respectively, in violation of 26 U.S.C.§7206(1). More specifically, the language of each count charges that Mr. Mubayyid:

[d]id willfully make and subscribe a Form 990, Return of Organization Exempt from Income tax, for Care International, Inc., for the [1997, 1999, or 2000] calendar year, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service ("IRS"), which said Form 990 defendant then and there knew and believed was not true and correct as to every material matter in that <u>Line 76 was falsely answered to wit: that Care had never previously disclosed to the IRS in any tax return or other filing that it was engaged in activities involving the solicitation and expenditure of funds to support and promote the mujahideen and jihad</u>.(emphasis added)

The prosecution introduced the IRS Form 990's for the years 1997 (Count Three, Exhibit 9), 1999 (Count Four, Exhibit 11) and 2000 (Count Five, Exhibit 12.). Each was

4

signed by Mr. Mubayyid under the penalties of perjury.[1] The 1997 return lists Samir Al-Monla as president and Nassser Al-Quederi as treasurer, however it was signed by Mr. Mubayyid as treasurer on June 7, 2002. (The 1998 return was prepared by Naseem Khaled, and lists Mohamed Akra as president and Samir Al-Monla as treasurer.) The 1999 and 2000 returns list Mohamed Akra as president, Muhamed Mubayyid as treasurer, and were signed by Mr. Mubayyid on November 4, 2000 and July 31, 2001, respectively.

Line 76 of Form 990 for each of the years in question is identical and reads: "Did the organization engage in any activity not previously reported to the IRS. If 'Yes,' attach a detailed description of each activity" (See Exhibits 9,11,12, Form 990 for years 1997,1999, 2000, respectively)

In order for Mr. Mubayyid's conviction to be sustained, the prosecution had to prove beyond a reasonable doubt that Mr. Mubayyid 1) made or caused to be made a Form 990 for each charged tax year that he verified as true; 2) that the Form 990 was false as to a material matter (the material matter identified as the answer to Line 76); 3) that Mr. Mubayyid signed each Form 990 willfully and knowing it was false; 4) that the Form 990's contained a written declaration that each was signed under the penalty of perjury. See, United States v. Boulerice 325 F.3d 75, 79-80 (1st cir. 2003).

For the purpose of this memorandum, Mr. Mubayyid assumes, *arguendo*, that the evidence was sufficient to prove beyond a reasonable doubt that Mr. Mubayyid made or caused to be made the Form 990's for the years in question, and that each contained a written declaration that it was made under the penalties of perjury. But what the government also was required to prove beyond a reasonable doubt, and which it failed to do, was that the answers to Line 76 of the 990's were false as to a material matter, and, in

---

[1] Mr. Mubayyid's name does not appear on the 1997 Form 990, and the signature is not legible.

even if they were, that Mr. Mubayyid knowingly and willfully answered the question falsely.

Line 76 asked "Did the organization engage in activities not previously reported to the IRS", and for each of the three years the question was answered no. Counts Three through Five of Superseding Indictment charge that the answers were false because "Care had never previously disclosed to the IRS that it was engaged in activities involving the solicitation and expenditure of funds to support and promote the mujahideen and jihad".

By logic, the negative answer can only be false if the organization, during the tax year in question, did in fact engage in "activities" not previously reported to the IRS. Furthermore, Mr. Mubayyid can only be found to have answered the question willfully and knowing it was false if it is shown that he <u>knew</u> Care engaged in "activities" not previously disclosed to the IRS during the tax year in question, knew that there was a duty to report them, and nevertheless answered the question in the negative. (According to the Form 990 instructions, <u>infra</u>, what was required to be reported were "significant changes in the kinds of activities the organization conducts [present tense] to further its exempt purpose. Lastly, therefore, there must also be sufficient evidence to prove that Mr. Mubayyid knew what had previously been disclosed to the IRS. Sufficient evidence was absent as to each requirements.

The IRS issued instructions for Form 990, and the instruction for Line 76, is entitled "Change in Activities" and reads

 Attach a statement explaining any <u>significant</u> changes in the kind of activities the organization conducts to further its exempt purpose.  Include new or modified activities <u>not listed</u> as current or planned in the organization's application for recognition of exemption or <u>not yet reported</u> to the IRS by letter to its key district director or by an attachment to the organization's return for any earlier year.   Also include any major program activities that are being discontinued." (Ex. 1123)(emphasis added)

6

Throughout the trial, despite attempts to be provided with a more definitive statement of particulars pre-trial, the defendants were left to guess what exactly the prosecution would seek to prove when it was alleged that Care was engaged in activities involving the solicitation and expenditure of funds to support and promote the mujahideen and jihad.

The Superseding Indictment indicated repeatedly that this "support and promotion" consisted of the publication of pro-jihad material.  See, Superseding Indictment, Introductory Allegations, ¶5, 13, Count Two, ¶¶2,3,and 4.  At trial the government introduced dozens of issues of Al-Hussam.  The evidence was sufficient to find that Care began publishing the Al-Hussam in early 1993, on or about the time it was first incorporated, and publishing continued through 1996.  A single issue dated January 1997 was latest issue introduced.

The government's sole witness on the subject of the Form 990 was Dawn Goldberg, an IRS employee, offered and admitted as an expert witness on the subject of IRS procedures and the Form 990.  She was questioned regarding the 990 Form in general and the purpose of the question on Line 76:

Q: You've talked generally about Part VI and the purpose for it.  In particular, what is the IRS seeking in response to Question 76?

A: We would like to know if they've changed -- or if they are doing [present tense] any activities that were not previously reported to us.

(Day 17 at 38)

      Ms. Goldberg testified that in her expert opinion the publication of an <u>ongoing</u> newsletter constituted an activity which she would have expected to be disclosed in the Form 990.

Q. Now, based on these instructions, as well as your training and experience, Miss Goldberg, can you tell us whether or not you would expect an organization to list the <u>ongoing</u> publication of a newsletter on the Form 990? (emphasis added)

A. Certainly.

Q. In particular, as what?

A. As program service.

Q. Why is that exactly?

A. Well, we just read the instructions that say it should be, but, also, it's an activity of the organization. They put information in their newsletter about what their organization's [sic] doing, their accomplishments. A lot of time they include educational stuff. By definition, a newsletter is just that.

(<u>Id</u>. at 46)

    This generalized opinion is narrowed, however, to reflect that Line 76 seeks disclosures of new, previously unreported activities.

Q: Now, Miss Goldberg, assuming that Care International did not list the publication of the Al-Hussam newsletter in their Form 1023, do you have an opinion as to whether or not Care would have been expected to subsequently list the publication of the Al-Hussam in any of its 990s?

A. Okay. Yes. I would expect it to be listed because, as we read in the directions, it falls in the category of "program services."

(Day 17 at 52) (See also Id. At 117)

Ms. Goldberg further testified that she reviewed the Form 990s' filed by Care, i.e., the Form 990 for the years 1993-1997 (Exhibits 5 through 9, respectively). For each year, she was asked if the Form 990 reflected the publication of a newsletter on an "ongoing" basis, and in each case she replied it did not. With respect to the 1993 Form 990, the following question was asked and answered:

Q: Now, did you see anywhere on this tax form anything reflecting the publication of an ongoing newsletter? (emphasis added)

A. No, sir.

(Day 17 at 56)

For the 1994 Form 990, the following exchange took place:

Q: With respect to the instructions stating the number of clients served and publications issued, from your review of this Form 990, was there anything at all to reflect that Care was publishing on an ongoing basis a newsletter? (emphasis added)

A. I did not see any indication of that.

(Day 17 at 59)

The same exchange was repeated for the 1995, 1996 and 1997 Form 990's, respectively:

Q: Once again, I ask you, from your review of this, did you see anything at all to reflect that Care was involved in the ongoing publication of a newsletter? (emphasis added)

A. No, sir.

(Day 17 at 61-62)

Q: Once again, did you see anything in this form to reflect the publication of an ongoing newsletter by Care International? (emphasis added)

9

16   A.   No, sir.

(Day 17 at 63)

Q.   Once again, I ask you, did you see anything in this Form 990 to reflect the publication of an <u>ongoing</u> newsletter? (emphasis added)

A.   No, sir.

(Day 17 at 66)

      As the above quoted testimony reveals, the thrust of the government's theory was that Line 76 was falsely answered because the <u>ongoing</u> publication of the Al-Hussam newsletter constituted an "activity" not previously disclosed to the IRS and should therefore have been reported.

      The government argued in closing that the sale of books and tapes (Day 24 at 41,47), the sponsorship of lectures (Id. at 41), the maintenance of a website (<u>Id</u>. at 47) or the solicitation of money for the widows or orphans of fighters (Id. at 24) all constituted undisclosed activities involving the solicitation and expenditure of funds to support and promote the mujahideen and jihad.

      For reasons unknown, the government completely disregarded those alternate theories when questioning its expert.  Ms. Goldberg never opined as to whether the sale of books or tapes, or the sponsorship of occasional lectures constituted an "activity" within the meaning of the Form 990, and whether as such it should be disclosed.  Perhaps she was never asked the question because, as she did testify, only "significant" new activities need be declared (Day 17 at 108). As to the issue of whether the solicitation of funds for the orphans and widows, including those of the combatants, constituted an activity required to be disclosed on the Form 990, she was equally silent.  One could

reasonably infer that the question went unasked because Care (an organization established by Muslims) had declared that assistance to victims (i.e., widows, orphans) of man-made disasters (i.e. armed conflict) in countries such as Afghanistan, Bosnia, and Kashmir (countries in which Muslims were involved in armed conflict) was one of its charitable goals in its original filings with the IRS in Form 1023. Gerald Sack of the IRS testified he inferred from Care's 1023 filing (which he signed off on for approval in 1993) that Care's founders were unsophisticated, foreign, that they were sympathetic to the victims in the areas they intended to operate, areas involving conflict involving Muslims, with large numbers of Muslim refugees, (Day 15 at 140-141).  Therefore, the IRS knew from the outset that Care intended to provide assistance to people in war torn countries, including widows and orphans.  It is no great inferential leap to conclude some of the widows and orphans became such because husbands and fathers died fighting. But the question was never asked, the expert opinion never solicited, and no testimony given as to whether such disclosure was required.

Ms. Goldberg was asked, almost as an aside, as to whether the Form 990's for the years 1996, 1997 and 1998 reflected the operation of a website. (Q: "By the way, from your review of any of the Form 990s in this case, did you see anything at all to reflect that Care was operating a website? A. No, sir.")  She wasn't asked if she had seen either of the Care websites or reviewed their contents, though the government introduced evidence of the same at trial.  Critically, she did not testify that operation of a website constituted the type of "significant changes in the kind of activities the organization conducts to further its exempt purpose" which would require an affirmative response to Line 76. Likely this was because the maintenance of a $16.95 a month website (See, Day 10 at

11

146, and Ex. 86) which solicits donations for the same charitable purposes the charity had always engaged in didn't constitute a "significant" change in activity. But again, the question was never asked, the expert opinion never given. In short, the government's own expert, its sole witness on the reporting requirements of the Form 990, provided <u>no evidence</u> and <u>no opinion</u> as to whether any of the more ephemeral, alternate "activities involving the solicitation and expenditure of funds to support and promote the mujahideen and jihad" should have been disclosed in response to the Line 76 inquiry or whether Mr. Mubayyid or anyone else had a duty to disclose any "activity" other than the publication of a newsletter.

As discussed, <u>supra</u>, Ms. Goldberg did opine that an <u>ongoing</u> newsletter, which had not been previously disclosed to the IRS, should have been disclosed in response to the Line 76 inquiry. It is clear from the trial record that a single, and final, issue of Al-Hussam was published in January, 1997 (Exhibit 250). The Superseding Indictment charged, and the prosecution repeatedly argued, that Mr. Mubayyid became the treasurer of Care, International in 1997. That "fact" was not supported by evidence. The Form 990's filed for the years 1996, 1997, and 1998 list Nasser Al-Quederi as treasurer for 1996 and 1997, and Samir Al-Monla as treasurer for 1998. No documentary, physical or testimonial evidence introduced at trial established that Mr. Mubayyid was the treasurer of Care in 1997. (Upon information and belief, the earliest document referring to Mr. Mubayyid as treasurer was Exhibit 69 which is dated September 26, 1998.)

Mr. Mubayyid signed Form 990, for the tax year 1999, on November 4, 2000, <u>forty-six months</u> after the last Al-Hussam was published. He signed the tax year 2000 Form 990 on July 31, 2001, some <u>fifty-three months</u> after the last issue. He signed the

12

1997 Form 1990 on June 7, 2002, some sixty-six months after the last issue.(See, Exhibits 11, 12 and 9 respectively)

Addressing Counts Four and Five first, did the government present sufficient evidence to prove that the publication of a single issue of Al-Hussam in January 1997 triggered a Form 990 reporting requirement for either tax year 1999 or tax year 2000? The answer is clearly no. The government's expert certainly did not testify that it did. Her expert testimony focused on the "ongoing" publication of a newsletter. And, as discussed, supra, she offered no opinion at all as to whether any other activity should have been reported. Nor did the government offer any evidence whatsoever that Mr. Mubayyid knew that the publication of a single issue of Al-Hussam in January 1997 issue triggered a reporting requirement for the 1999 and 2000 tax years.

There was insufficient evidence to prove that the publication of a single issue of the Al-Hussam newsletter in January 1997 triggered a duty to report it as an activity in the 1997 Form 990. Again, Ms. Goldberg testified that an "ongoing" newsletter should have been disclosed, and in reference to the 1997 Form 990 the following exchange took place; "A: Once again, I ask you, did you see anything in this Form 990 to reflect the publication of an ongoing newsletter? A. No, sir." (Day 17 at 66) (emphasis added) She never testified that publishing a newsletter constituted a "major program activity" that needed to be disclosed if discontinued.(See, Form 990 Instructions, Ex. 1123, supra).

The prosecution offered no evidence from which the trier of fact could reasonably and fairly infer that Mr. Mubayyid had knowledge of what had been disclosed to the IRS in previous filings, either through the Form 1023, prior 990's or other correspondence. There was no evidence introduced that Mr. Mubayyid played any role in the formation of

13

Care, or in the filing of Care's Form 1023 application for recognition as a tax exempt organization. Indeed, the government has conceded as much when it wrote in its recent filing with the United States Probation Office that "Mubayyid joined the conspiracy to defraud and began engaging in the scheme to conceal the United States government in 1997" (See, Government Statement of Facts Pertaining to Defendant Muhamed Mubayyid, at 36 submitted to the United States Probation Department, February 1, 2008)

That concession is demanded by record. The Court will recall the testimony Afif Kadri. Kadri testified that he was involved with the Al-Kifah Refugee Center in Boston in 1991 and 1992 (Day 7 at 41). He described his own role as the "social admin", who organized parties, and events, and he described the roles of others active in Al-Kifah as well: Mohamed Akra was the religious teacher, Mr. Muntasser (who he identified at trial) was involved in the day to day administration, Mr. Yassin, was the "go-around guy" (Id. at 44-45) He further testified regarding to the formation of Care in 1993, that he was one of the original directors of the new organization. At no point in his testimony did he mention or refer to Muhamed Mubayyid, or indicate in any way that Mr. Mubayyid was involved with Care during the time period he was. There was no indication he had ever met the man, knew his name, or had ever seen him before.

The government undoubtedly recognized that evidence of Mr. Mubayyid's knowledge of what had previously been disclosed to the IRS was critical to its proof. How else can someone be prosecuted for knowingly and willfully failing to disclose information "not previously disclosed"? Absent any evidence of his participation on the formation of Care, the government relies on one unsustainable inference and a failsafe "strict liability" theory, neither one of which withstand scrutiny.

14

First, the government sought to have the jury infer Mr. Mubayyid had knowledge of the contents of the Form 1023 (i.e., that Care had not previously disclosed the publication of a newsletter), because a copy of the 1023 Form filed in 1993 was found in a box on Mr. Mubayyid's porch (See, Day 7 at 67, Ex. 293).  The document was in one of two boxes found there during the search in April of 2003, boxes that contained thousands of other papers. (See, Testimony of IRS SA David Lazarus, Day 11 at 44-45).  There is no evidence that Mr. Mubayyid had ever read the Form 1023, had ever discussed it with anyone, had ever handled it, or ever relied on it.  No, the government's proof of Mr. Mubayyid's knowledge of what had been previously disclosed to the IRS rested solely on the fact that the document was one of thousands found in a box on his porch.

The second tack the government took was to create an obligation on the signers of the Form 1023, one not found on the form itself, in the instructions, or in any regulation or law, the obligation to review all past filings and correspondence with the IRS prior to signing the Form 990.  To this end the government elicited the following testimony:

Q.  Just assume as a hypothetical a person completing a Form 990 was not around when the organization was first formed and the 1023 was filed.  As far as you know, based on your  knowledge and experience and your work at EO, what obligation, if any, does the person signing the Form 990 have to accurately reflect past activities of the organization?
A.  Based on the way Question 76 is written, "Have the activities changed" -- or "Attach a statement explaining any  significant changes," in order to answer that question "yes" or "no," you have to know what the other activities were.  So you need to know what was on the application and on the Form 990s.
(Day 17 at 111)

The government merged the two arguments seamlessly in it closing:

" And you heard Ms. Goldberg tell you, you know, part of that means, yes, you've got to know what previously has been disclosed.  You've got to know what's in that Form 1023 that was filed back in 1993. And I think the evidence is even…stronger when you realize that Mr. Mubayyid, not only did he fill out several of these 990s, the forms to continue the tax-exempt status over a period of years, but he actually had the Form 1023 in his house."

15

(Day 24 at 139)

The problem with the argument is that the Form 990 is signed "to the best of my knowledge and belief it is true, correct and complete". There is no affirmative duty to investigate what had been previously disclosed. There is no directive in the instructions requiring such a review. Tellingly, Richard Donahoe, the certified public accountant of 24 years experience called by the government, did not testify that he reviewed the original Form 1023 prior to preparing Care's 2001 Form 990 or before preparing the amended 1997 Form 990[2], nor did he testify that there was any obligation to do so.[3]

To sustain a conviction for knowingly and willfully filing a false tax return, the government must prove the defendant did so willfully and knowingly. "Willfully" has been defined as "a voluntary, intentional violation of a known legal duty" United States v. Monteiro, 871 F.2d 204, 209 (1st Cir. 1989) citing United States v. Drape, 668 F.2d 22, 26 (1st cir. 1982)

In order to prove a defendant acted willfully, "…the government must show more than just that he acted in 'careless disregard for the truth'" United States v. Lavoie 433 F,3d 95, 98 (1st Cir. 2005), citing United States v. Pomponio 429 U.S. 10, 12, 97 S.Ct. 22 (1976)(noting that the mere underreporting of income does require a finding of willfulness, as it could be the result of inadvertence or negligence.) The government is certain to argue that a jury may infer willfulness if it finds that a defendant signed a

---

[2] The evidence was that the 1997 Form 990 was redone at Mr. Mubayyid's request after Mr. Donahoe alerted him to a minor discrepancy he found in the calculations in the original From 990. The focus of the amended return was the correction of the mistake discovered by Mr. Donahoe, and that the rest of the information on the form was simply copied over from the original 1997 Form 990 (See, Day 16 at 90, 92-93, 120-121)

[3] Mr. Donahoe did testify that he reviewed Care prior tax filings (Day 16 at 94-96) and used those in preparing Care's 2001 Form 990. He further testified that he knew Care had a website and, in fact, had visited the site (Id. at110), and yet he did not report the operation of the website as a previously undisclosed activity in response to Line 76 when he prepared the Care 2001 Form 990. See, Ex. 16 (2001 Form 990)

16

return which was not true and correct as to every material matter. United States v. Boulerice 325 F.3d 75, 80-81 (1st cir. 2003). The facts of Boulerice are worth reviewing, for the inference of willfulness in that case was supported by far more than merely a signature on the tax forms. Ms. Boulerice declared money received from her father's businesses as wages, though she testified that she knew wages were income received in exchange for work and she had never worked for the businesses. Other evidence included her discussion with an accountant that she was "uneasy" receiving the money in the form of wages, that she signed and back-dated phony job descriptions in connection with an audit, and falsely told a postal inspector she was an employee of one of the businesses.

Nothing like any such strong corroborative evidence was presented against Mr. Mubayyid's at trial. If inferences are to be drawn, they should be fair ones, based upon the evidence, logically connected, and not simply strung together to arrive at a predetermined destination. See United States v. Valerio 48 F.3d 58, 64 (1st Cir. 1995)("…[W]e are loath to stack inference upon inference to uphold the jury's verdict") In short, even if the Court should conclude that Line 76 responses on the Form 990's which Mr. Mubayyid signed were incorrect, a conclusion not supported by the evidence, there is no evidence to conclude Mr. Mubayyid signed the returns willfully and knowing they were not true as to a material matter. The publication of the newsletter was discontinued years before he signed the Form 990 returns, and that is the only "activity" the government's expert testified should have been disclosed was an ongoing newsletter.

Mr. Mubayyid moves to join the Rule 29 Motions filed by his codefendants, and adopts and incorporates those arguments files in support thereof. As to Counts One,

Two and Eight, without sufficient evidence that he willfully and knowingly filed false tax returns, the convictions on those counts cannot stand.

As to Count One, there was insufficient evidence to conclude Mr. Mubayyid played any part in the formation of Care or had any knowledge of or role in the filing of the Form 1023, or concealed in any manner at any time that Care was an outgrowth of Al-Kifah. Again, as noted supra, the government in its filing with the United States Probation Department has conceded that even in the government's view Mr. Mubayyid was neither part of the Count One scheme to conceal or the Count Two conspiracy until 1997. Moreover, there was no evidence presented that Mr. Mubayyid ever violated any other duty to disclose the non-charitable activities alleged in Count One except in the context of filing of the Form 990's. In addition to the arguments advanced in the codefendants filings, absent a finding that there is sufficient evidence that Mr. Mubayyid knowingly and willfully filed false tax returns, there is insufficient evidence to support his conviction on Count One.

Similarly, as to conspiracy charged in Count Two, absent sufficient proof that he knowingly and willfully filed false tax returns, there was simply no other evidence from which a reasonable jury could infer Mr. Mubayyid was a member of the charged conspiracy. The same is true for Count Eight, where again, absent sufficient evidence to find that he knowingly and willfully filed false tax returns, there is literally no evidence that he corruptly endeavored to obstruct or impede the due administration of the internal revenue laws.

The Court expressed grave reservations with the quantum of proof offered against Mr. Mubayyid and his codefendants. It did so with good reason. Undersigned

18

counsel expressed his fear that the emotional and inflammatory nature of the charges might trump reason, and the fear was well founded. An examination of the record, as discussed herein and in the filings of the codefendants, reveals that the government's proof was legally insufficient to support the verdicts, and that the law and justice require the Court allow Mr. Mubayyid's Rule 29 Motion.

Respectfully Submitted,
Muhamed Mubayyid
By his attorney

/s/ Michael C. Andrews

Michael C. Andrews
21 Custom House Street
Boston, Massachusetts 02110
(617) 951-0072
BBO# 546470