UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        )
                                        )
UNITED STATES                           )
                                        )          Cr. No. 05-40026-FDS
                                        )
v.                                      )
                                        )
MUHAMED MUBAYYID                        )
                                        )
_____)


## MUHAMED MUBAYYID'S MOTION FOR A NEW TRIAL


Now comes the defendant, Muhamed Mubayyid, and moves for a new trial on

Counts One, Two, Three through Five and Eight.  Federal Rule of Criminal Procedure 33

provides that "[u]pon the defendant's motion, the court may vacate any judgment and

grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).  In support

of this Motion, Mr. Mubayyid moves to join in the Motions for New Trial filed by

codefendants.

In addition to those grounds raised in the codefendants filings, Mr. Mubayyid should be

granted a new trial because 1) government counsel made a serious misstatement of fact

involving critical evidence in its closing argument, which was objected to in a timely

manner, and left uncorrected by the Court, and 2) the government at midtrial changed its

theory regarding the charitable activities of Care.

1.  The Government made a serious and extremely prejudicial misstatement of fact in its closing argument

The Court is directed to the following portion of the closing argument, where the government addresses the defendants' obligations when completing Question 76 of the Form 990:

MS. SIEGMANN: Question 76 asks:  Has your -- has your organization engaged in any activity not previously disclosed to the IRS? The answer was always "no."  That question was not limited to that tax year.  It was:  Has your organization --
 MR. McGINTY:  Objection.
MS. SIEGMANN:  -- ever engaged in.
THE COURT:  Sorry.  The objection?
 MR. McGINTY:  Not limited to that tax year.  Under the manual itself, it was limited to that tax year.  So it's an incorrect statement of fact and law.
THE COURT:  Overruled.
MS. SIEGMANN:  The question was:  "Has the organization ever engaged in any activity not disclosed to the IRS?"
MR. McGINTY:  Objection.
THE COURT:  Overruled.
MS. SIEGMANN:  The Al-Hussam was a substantial activity in 1993, based upon the December 17, 1993 issue….Mr. Al-Monla, he signs the tax return, a Form 990 for 1998.  He didn't disclose the fact that there was any activities not previously disclosed to the IRS either.  Mr. Mubayyid did the same for 1997, 1999, and 2000.

In fact, Line 76 of Form 990 for each tax year reads:

"Did the organization engage in any activity not previously reported to the IRS.  If 'Yes,' attach a detailed description of each activity" (See Exhibits 9,11,12, Form 990 for years 1997,1999, 2000, respectively)

The IRS issued instructions for Form 990, and the instruction for Line 76, entitled "Change in Activities" makes clear that Line 76 question seeks information about current activities:

 Attach a statement explaining any significant changes in the kind of activities the organization conducts [present tense] to further its exempt purpose.  Include new or modified activities not listed as current or planned in the organization's application for recognition of exemption or not yet reported to the IRS by letter to its key district director

2

or by an attachment to the organization's return for any earlier year.   Also include any major program activities that are being discontinued." (Ex. 1123)(emphasis added)

The misstatement was not supported by the government's own tax expert's testimony. The government's expert tax witness, Dawn Goldberg, testified as to the purpose of the question on Line 76:

Q:  You've talked generally about Part VI and the purpose for it.  In particular, what is the IRS seeking in response to Question 76?
A:  We would like to know if they've changed -- or if they are doing any activities that were not previously reported to us. (emphasis added)
(Day 17 at 38)

As the Court will recall, the last issue of Al-Hussam introduced at trial was dated January 1997, the Ramadan issue (Ex. 250).  After misstating the Line 76 question, the government goes on to argue that Mr. Mubayyid had failed to disclose the former publication of the Al-Hussam newsletter in the 1997, 1999 and 2000 Form 990 filings, (and that Mr. Al-Monla failed to disclose the same in the 1998 filing).[1]

The prejudice to the defendant was severe as the misstatement of fact went to the heart of Mr. Mubayyid's defense, which was in part that there was no obligation to disclose the publication of a newsletter in the 1997, 1999 and 2000 tax returns as only a single issue was published in January 1997. The prejudice was enhanced by  the Court's ruling on counsel's timely objection.  It is fair to surmise, that by the 24th day  of trial, the jury has figured out that an objection overruled by the Court means that the question or statement by the proponent was proper.

---

[1] The government repeatedly stated that the only falsehood contained within the Form 990 was the answer to Line 76.  (See, Day 7 at 21, Day 8 at 25-26)

A statement of fact that is mistaken or unsupported by any evidence constitutes misconduct, whether or not it was deliberately made. United States v. Azubike 504 F.3d 30, 38 (1st Cir. 2007) citing Berger v United States, 295 U.S. 78, 85, 55 S. Ct. 629 (1935); United States v. Joyner, 191 F.3d 47, 53-54 (1st Cir. 1999). Upon a finding that misconduct by the government occurred, the Court must determine whether the misconduct resulted in prejudice to the defendant. Azubike at 38-39, citing United States v. Giorgi, 840 F.2d 1022, 1037 (1st Cir. 1988). "The test is 'whether the prosecutor's misconduct 'so poisoned the well' that the trial's outcome was likely affected, thus warranting a new trial'." Azubike at 39, quoting Joyner, 191 F.3d at 54 Upon timely objection to the misstatement, the Court should review for harmless error, which in this context constitutes a three-part test. Id. The Court should determine "(1) whether the prosecutor's conduct was isolated and/or deliberate; (2) whether the trial court gave a strong and explicit cautionary instruction; (3) whether it is likely that any prejudice surviving the instruction could have affected the outcome of the case. " Azubike at 39, citing Joyner at 54, and United States v. Cormier, 468 F. 3d 63, 73 (1st Cir. 2006).

In the present case, counsel timely objected to the prosecutor's statement that Line 76 question was not limited to the tax year being reported in the Form 990, and that the Line 76 question read "Has your organization engaged". Counsel explained the basis of the objection "Not limited to that tax year. Under the manual itself, it was limited to that tax year. So it's an incorrect statement of fact and law." The Court overruled the objection. The prosecutor, given a second chance to correctly quote the Line 76 question, instead took the opposite tack (perhaps emboldened by the ruling on the defense objection) and stated: "The question was: 'Has the organization ever engaged in any

activity not disclosed to the IRS?"(emphasis added)  Again counsel objected, again the objection was overruled.

Whether or not the misstatement was intentional[2], it was a significant departure from the evidence.  As the Azubike Court noted, "[w]e have recognized that prejudicial statements made during the closing argument 'militate in favor of reversal' because they are 'the last words spoken to the jury by the trial attorneys'. " Azubike at 39, quoting United States v. Manning 23 F.3d 570, 575 (1st Cir. 1994).

The answer to the second prong of the test, whether the trial court gave a strong and explicit cautionary instruction, is, obviously, no.  In fact, as a result of the Court's rulings on the objections, it is likely that the jury, educated as to subtleties of trial practice after several weeks of trial, would have inferred the prosecutor's statement was permissible, proper and an accurate reflection of the evidence.

The third prong of the test asks "whether it is likely that any prejudice surviving the instruction could have affected the outcome of the case" Azubike at 39.  As there was no instruction given, the prejudice remained extant.  And the prejudice was extremely severe as the misstatement "went to the heart" of Mr. Mubayyid's (and Mr. Al-Monla's) defense. Id. at 40.  Mr. Mubayyid's defense, in brief, was that Line 76 questions of the Form 990's were not answered falsely, and if they were, they were not done so knowingly and willfully.

Recall that central to the government's case against Mr. Mubayyid are the charges

---

[2] There is reason to believe the misstatement was not a slip of the tongue.  In oral argument in opposition to Mr. Mubayyid's Rule 29 Motion, which took place some 7 days before closing argument, counsel for the government stated the following:
"Lastly, just as to Question 76, in response to Mr. Andrews' contention, that question says, 'Has the organization engaged in any activity not previously disclosed?'  It is not limited by tax year.  It doesn't mean that if you file something in 1997.  Did you engage in any activity in that year that you didn't disclose.  It's any activity that the organization never disclosed to the IRS." (Day 20, Rule 29 Hearing, at 60)

of filing of false tax returns[3]. Counts Three, Four, and Five of the Superseding Indictment

charge Mr. Mubayyid with filing false tax returns for the years 1997, 1999, and 2000,

respectively, in violation of 26 U.S.C.§7206(1).  More specifically, the language of each

count charges that Mr. Mubayyid:

[d]id willfully make and subscribe a Form 990, Return of Organization Exempt from
Income tax, for Care International, Inc., for the [1997, 1999, or 2000] calendar year,
which was verified by a written declaration that it was made under the penalties of
perjury and was filed with the Internal Revenue Service ("IRS"), which said Form 990
defendant then and there knew and believed was not true and correct as to every material
matter in that <u>Line 76 was falsely answered to wit: that Care had never previously</u>
<u>disclosed to the IRS in any tax return or other filing that it was engaged in activities</u>
<u>involving the solicitation and expenditure of funds to support and promote the</u>
<u>mujahideen and jihad</u>.(emphasis added)

As more fully discussed in the <u>Memorandum in Support Muhamed Mubayyid's</u>

<u>Rule 29 Motion</u>, at 7-12, the sole specific activity that the government tax expert testified

should have been disclosed on the Form 990 was an "ongoing newsletter".  She never

testified, nor did any other witness, that the Line 76 question meant "Has the organization

<u>ever</u> engaged in any activity not disclosed to the IRS?"

In his closing argument, counsel for Mr. Mubayyid argued the following:

"The last newsletter has been pointed out several times.  It was published in January
1997.  The 1997 return was signed in 2002. In 1999 there was no newsletter.  In 2000
there was no newsletter." (Day 24 at 123)

"Does he have to put down a website on Question 76 because the question in the
instructions say what activities the organization conducts, and he didn't mark
down that they published a newsletter five years before, I guess.  If it's 1999, you had the
last one 1997 and they're expecting him to say, "Well, in 1997 we published one
newsletter so I guess we'll mark it 'yes.'" (Day 24 at 129)

Counsel for Mr. Al-Monla argued in the same vein, and attempted to undo the

damage the misconduct would cause:

---

[3] It is also the alleged act of knowingly and willfully filing the false tax returns that form the basis for the
government's case against him in Counts One, Two and Eight.

"Now, I want you to remember an important fact. The Al-Hussams ended in January of 1997. That was a short time after Mr. Al-Monla became president. That issue in January of 1997 was a religious based specific to Ramadan issue. There were no other new issues of Al-Hussam. So, in 1998, or in connection with the 1998 tax year, Mr. Al-Monla signs the tax return. Now, this is the 990. Now, the question that is on the 990 -- I'm sorry. Yes, on the 990, question 76 is: "Did the organization engage in any activity not previously reported to the IRS?" The government when it recited that language a short time ago put in a very telling word "ever". Did it ever report. Well, that word is not in the question. It's not there. The question is: "Did the organization engage in any activity not previously reported to the IRS?" Not ever. In 1996, whatever may have been the obligation to divulge the existence of a newsletter, whatever that may be, in 1997, there was one, not exactly a reportable activity, irrespective of how you define activity. In 1998, zero, zero. What is the true answer in 1998 to the question: "Did the organization engage in activity not previously reported to the IRS?" The true answer is: No. No."

(Day 24 at 102-103)

Lastly, the evidence against Mr. Mubayyid was far from overwhelming. There was no direct evidence whatsoever that he willfully and knowingly filed false tax returns. In the close cases, where "a misstatement goes to a central issue in the case, an instruction to consider the evidence may not be enough." Azubike at 41. Here, the defendants didn't even get the questionable benefit of an instruction. In Azubike, the Court reversed the defendant's conviction where it found that there was "no such correction [to the misstatement], the evidence was close, and the misstatement went to the central issue and was repeated". It cannot be said that with any confidence that the jury in the present case did not consider the misstatement in reaching its verdict. As the government's expert identified only the publication of a newsletter as an activity she would have expected Care to have disclosed in response to the Line 76 inquiry, and as the newsletter was discontinued in January 1997, it seems probable the jury found question 76 to be answered falsely in the Form 990's because it accepted the government's statement that Line 76 imposed an obligation to disclose any activity the organization "ever" engaged in.

The misstatement was wholly unsupported by the evidence, was highly prejudicial and warrants the allowance of this Motion.

II.  The government at midtrial changed its theory regarding the charitable activities of Care.

At the outset of the case, the government acknowledged that Care's funding of widows and orphans was charitable.  However, after the defense pressed for admission of a comprehensive set of orphan sponsorship files as evidence of Care's charitable activity, indeed, even after the government had objected to the scope of the defendants' proffer regarding the orphan's program, the government claimed that supporting widows and orphans of those who died fighting  was itself non-charitable, a mid-course change deeply prejudicial to defendants.

In the indictment's introductory allegations, the government alleges defendants did not disclose on the Form 1023 application that "Care planned to support jihad and the mujahideen *by* soliciting contributions for, and distributing publications to promote, jihad and the mujahideen." Indictment, p. 4 (emphasis added).  The use of the word "by" narrowed the scope of proof regarding omissions to the 1023 to "soliciting contributions for, and distributing publications."  (In contrast, the allegation relating to the 990 read: "No tax return [form 990] disclosed that Care was engaged in activities involving the solicitation and expenditure of funds to support and promote the mujahideen and jihad, *including* the distribution of pro-jihad publications." Indictment at 5 (emphasis added).) No reference was made to widows and orphans in any context other than describing the planned charitable activities of Care. Nowhere in Count One did the Government

8

reference Care's widows and orphans program as part of the scheme to conceal material facts.

In Count Two, the government again lists donations to widows and orphans as a part of the charitable activities of Care that were disclosed to the IRS. The 1023 application "detailed Care's planned future charitable activities such as providing financial assistance to widows and orphans." Indictment at 11. The defendants reported on the Form 990 tax returns what activities they were involved in, including that "Care distributed money for various charitable purposes, among others, providing financial assistance to orphans and widows, food distribution, and providing grants to other welfare organizations." Indictment at 11. The government did not allege that the defendants withheld any information regarding donations to widows and orphans on either the form 1023 application or the form 990 tax returns. Nowhere in the indictment is the expenditure of funds on a program for widows and orphans alleged as an activity that the Government considers non-charitable, but is included in what the government discerned are charitable activities.

Prior to trial, defendants filed Motion in Limine to Preclude or, in the Alternative, Limit the Testimony of Government's Proposed Expert Witnesses (Docket 311).  By reply, dated November 5, 2007 (Docket 334), the government described the testimony of Dr. Matthew Levitt and Mr. Evan Kohlman: "The experts...will describe the methods and manner of how these organizations conduct their business."  Id. at 19.  Dr. Levitt would explain the structure of the organizations and how they "accomplish their goals."  Id. at 26.  Dr. Levitt will "explain that some of them [Islamic charities] engage in behavior such as intermingling of funds so that *in addition to support for widows and orphans and*

*other legitimate beneficiaries* of outpourings of support–they have intermingled funds

and/or freed up funds so other agencies can subsidize fighters." Id. at 26 (emphasis

added).  Widows and orphans, then, were "legitimate beneficiaries" of support.

According to the proffered testimony of Levitt, the problem lay in the "intermingling" of

funds aimed for humanitarian aid, not in pure support for widows and orphans.[1]

In its opening, the government continued in the vein of classifying donations to

widows and orphans as different from support of the mujahideen.  The government

referred to common activities of Al-Kifah and Care:  "the activities that MAK and the Al-

Kifah Refugee Center engaged in, as I've just alluded to, regarded support of the

mujahideen but, also, support for widows, refugees and orphans of the mujahideen." Tr.

November 15, 2007 at 26. The government similarly compared Al-Kifah and Care,

alleging that the two organizations had virtually identical programs.

> .... you're also going to hear that Care International engaged in many of the same
>
> activities that Al-Kifah Refugee Center did.  It published the same newsletter. A
>
> few moments ago I talked about that newsletter, the Al-Hussam...Like Al-Kifah
>
> Refugee Center, I expect you're going to see that Care supported widows and
>
> orphans of those who died fighting for jihad.  Like Al-Kifah Refugee Center, Care
>
> published the zakat Calculation Guide.

Tr. November 15, 2007 at 32-33. The examples were used primarily to show the link

between Al-Kifah and Care, not to show that all of these activities are non-charitable. In

---

[4]In contrast, the government earlier provided an expert disclosure on January 3, 2007 in which it allowed that Dr. Matthew Levitt "will discuss how zakat programs and orphan sponsorship programs were used by alleged charities to provide money and services to individuals overseas, including family members of fighters and martyrs (defined as individuals who die while committing jihad) and how these activities benefitted the mujahideen and terrorist organizations." at 2.

fact, just prior to this comparison of Al-Kifah and Care's activities, the government

acknowledged Care's role in raising funds for humanitarian crises.

> "I expect you're going to hear that Care engaged in some charitable activities. I
> want to stress a point here. We don't contend otherwise. I expect that you're going
> to hear that in areas around the world there were true humanitarian crises, places
> like Bosnia, Chechnya and Afghanistan. There were widows; there were orphans;
> there were the wounded, the maimed. People needed help. One of the things Care
> did was to solicit funds to help. That's fine."

Tr. Nov. 15, 2007 at 32. The activity of giving to orphans and widows was disclosed to

the IRS and was not argued by the government in their opening statement as a way to

promote and support jihad and the mujahideen. Indeed, help for the "wounded" was

expressed as charitable.

During the second week of trial, defendants sought to introduce files relating to

the Orphan Sponsorship program. The government protested:

> "the government itself has put in orphan sponsorship materials, a few of them.
> There's no dispute that Care was engaged in some orphan sponsorship activities.
> They had such programs. So did Al-Kifah."

Nov. 26, 2007 at 14-15. As mentioned above, the government was not claiming that the

orphan program was illegitimate or non-charitable. It resisted defendants' offer of proof

regarding the extent of the program contending that this was not at issue in the case.

> We don't allege that when they say in program service accomplishments that they
> gave them this much money to the orphans, or this much money to the widows
> that was false.

11

Tr. Nov. 21, 2007 at 22.  Again the government asserted:

> "the government ...in its opening statement that they were involved in legitimate
> activities.  We actually put in evidence as examples of the orphan sponsorship
> program already in this case, as did the defense.  They already are on notice that
> Care was engaged in an orphan sponsorship program.  We're not going to dispute
> that.  They do not need to see every picture of every orphan they solicited money
> for.

Nov 21 at 20.  Moreover,

> We do not dispute that they were engaged in some legitimate charitable activities.
> We don't -- and you can see that in the indictment.  In the 990, what we allege is
> false is question 76.  We don't allege that when they say in program service
> accomplishments that they gave them this much money to the orphans, or this
> much money to the widows that was false.

Tr. Nov. 26, 2007 at 25-26.  Accordingly, the government argued that the offer of
evidence of the orphan program was "cumulative, and it's unfairly prejudicial, and it's
going to be confusing to the jury, and the government does not believe that it's necessary
for the jurors to see this.  All they're going to see is -- and it will likely inflame the jurors
as to some of the pictures in those boxes –..."   Tr. Nov. 26, 2007 at 26.  Of course, if
part or all of the orphans program allegedly constituted support for martyrs and the
mujahideen, this would not be so.

The Court permitted some but not all of the orphan files, and even at one point
expressed some reservation under Rule 403 issues regarding the volume of the
documents. Nov 26 at 126 The Court stated:

"the government's theory is not that Care was a wholly illegitimate charity."

Accordingly, I think it would be fair to permit the defense in order to show

context and to make sure that there's no misapprehension on this score, to

demonstrate that Care did engage in legitimate charitable activities. It seems to

me question of degree. If the government isn't disputing that Care is a legitimate

charity to some extent, and I think that it's right, proof of a nondisputed fact to

show context is -- is -- is okay, but it's, like I say, it's all a question of degree; and

if you back up the forklift truck to begin putting in 30 tons of information about

their charitable activities, I'm going to have some concerns about that.

Nov. 21, 2007 at 13-14.

To this point, the government acknowledged that Care made donations to widows

and that this was a charitable activity of Care. This position was reversed first by the

testimony of Mr. Charnoff, on Day 12 of the trial, November 30, 2007. After testifying

about his experience as a tax law specialist with the IRS, and specifically his role in

Exempt Organizations, Mr. Charnoff was posed the question: "...if Care had disclosed

that their orphan sponsorship program would focus on children of martyrs, would you

have considered that a charitable activity?" Day 12 at 146. Over defense counsel's

objection, the Court allowed Mr. Charnoff to answer, citing that the witness "will be

permitted to testify as to how such a disclosure would have affected his decision-making

process." Day 12 at 147. Mr. Charnoff then proceeded to testify to, not only an idea

which had not been presented in a timely manner to the defense, but also something for

which no foundation for his knowledge was laid:

My decision-making process would definitely affect things because it's, in effect,
it's telling would-be fighters in foreign conflicts that if something happens to

13

> them, if they're killed, say, this organization will provide funds to their orphans.
> So the net effect is it's an inducement for them to go to these areas of conflict.

Id. at 147.  This characterization by Mr. Charnoff, over defense objection, came simply

by looking at the form 1023 application of Care. There was no basis presented for how

someone who had worked in the IRS for 36 years came to know the motivations of

"would-be fighters" in another part of the world. The idea that donations to widows and

orphans was non-charitable and would have resulted in a denial of 501(c)(3) status was

not alleged in the indictment as one of the activities of Care that was non-charitable.

> In its closing, the government stated:

> For instance, the orphan sponsor program, laudatory goals.  Mr. Charnoff and Mr.
>
> Sack said, you know, when you look at it on paper, it looks like it's pure
>
> charitable activity.  But recall what they didn't disclose.  Despite the Form 1023
>
> stating clearly "please describe all your activities," and when it then asks for a
>
> narrative of  the activity, a narrative that included the purpose of that activity, Mr.
>
> Muntasser didn't disclose the fact that the focus of that program was not on all
>
> orphans.  It was on a specific category of orphans.  That category were the
>
> orphans of the  martyrs.  And what did Dr. Levitt tell us that as a result of  that,
>
> that -- that type of activity would promote, encourage  people to go out and fight,
>
> because there is an incentive for someone to go fight if they have a family.  Who's
>
> going to take care of my family when I die?  But if they know that there is a
>
> charity out there that's focusing on helping the children of  the martyrs, that
>
> disincentive no longer exists.

Tr. Dec. 19, 2007 at 24-25.

There had been no expert testimony that Care's description in the 1023 of the orphan sponsorship program had been insufficient.  There had been no proof of the extent of the support for "martyr" families, as distinct from other types of orphan support.  And the government had argued against admission of the orphan files, even on Rule 403 grounds, only later to argue that the orphan program itself was non-charitable.

The Supreme Court has recognized the debility of allowing "the prosecution free to roam at large–to shift its theory of criminality so as to take advantage of each passing vicissitude of the trial and appeal." *Russell v. United States,* 369 U.S. 749, 768 (1962). The conviction cannot stand where the defendants were not put on adequate notice by the government at the outset of proceedings what the theory of the case would be.

<div style="margin-left: 50%;">

Respectfully Submitted,
Muhamed Mubayyid
By his attorney

/s/Michael C. Andrews
Michael C. Andrews
21 Custom House Street
Boston, Massachusetts 02110
(617) 951-0072
BBO# 546470

</div>

15