UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>MUHAMED MUBAYYID, EMADEDDIN Z. MUNTASSER, and SAMIR AL-MONLA,<br><br>Defendants. | Criminal No. 05-40026-FDS |

### DEFENDANTS' JOINT RESPONSE TO GOVERNMENT'S MOTION FOR AN EVIDENTIARY HEARING

Defendants Muhamed Mubayyid, Emadeddin Z. Muntasser, and Samir Al-Monla respectfully submit this joint response to the government's April 16, 2008 motion for an evidentiary hearing in connection with their sentencing. The government suggests that such a hearing is needed to "resolve any disputed factual issues with regards to the sentencing of the defendants in this case." Motion at 1. It is difficult to respond to the government's motion, as it nowhere specifies what such factual issues are or what witnesses it intends to call. The final Presentence Report has not issued, and the Probation Office therefore has not set its recommended Guidelines range. Defendants cannot adequately prepare for an evidentiary hearing on sentencing without knowledge of these important facts and prior notice of the subject matter the government intends to cover.

As discussed below, however, Defendants respectfully request that the Court (1) alter the sentencing schedule to allow for a single, joint session in advance of individual hearings in order to address, through argument and through testimony if needed, issues common to all three Defendants regarding appropriate Guideline levels, enhancements and departures; and (2) rule that terrorism will not be a permissible subject matter of such a hearing. Consistent with the Court's standard scheduling order, Defendants will inform the Court by May 9, 2008, of the subjects they intend to

1

address at the common hearing and any witnesses they intend to call. Defendants respectfully request that the government provide the same level of detail regarding its intentions at the common hearing by that date.

I.  **AN INITIAL SINGLE JOINT HEARING WOULD PROVIDE HELPFUL GUIDANCE ON GUIDELINE, ENHANCEMENT AND DEPARTURE ISSUES COMMON TO ALL THREE DEFENDANTS**

Defendants believe that it would be prudent to agree now upon one procedural change in the sentencing schedule. The Court has currently scheduled three separate sentencing hearings, one for each individual defendant, on May 13, May 14, and May 15, 2008. Defendants believe that it will be more efficient and just if the Court sets aside one day at the beginning of the sentencing hearings for all parties to present argument and possibly testimony regarding common Guidelines issues, including calculation of the base offense level, adjustments, and departures. Defendants anticipate that such a joint hearing would involve argument and possibly testimony, and would take no more than one-half to one full day.

Defendants therefore counter-propose that the Court alter the current sentencing schedule to set aside one full day for argument and possibly testimony on issues that are common to all Defendants, followed by separate sessions to rule on such issues with respect to any individual Defendant. Counsel for all Defendants are available from May 13, 2008 at 3 p.m. through the close of business on May 15, 2008.

Defendants believe, however, that, as the Court's standing scheduling order suggests, it will be most orderly to postpone decisions about the *content* of any evidentiary sentencing hearing until after they have had the chance to prepare and submit their sentencing memoranda, receive and review the government's sentencing memoranda, and receive and review the final Presentence Reports. Only then will Defendants be able to give the Court an accurate appraisal of their need to present additional evidence during the sentencing proceeding. Indeed, without the final Presentence

2

Reports, Defendants do not know the Probation Office's recommended Guidelines range, and therefore do not definitively know what provisions could be at issue in an evidentiary hearing. Defendants will be prepared to advise the Court by May 9, 2008, of their intended list of witnesses at such a hearing.

In sum, while Defendants are not now in a position to definitively propose a list of topics to be addressed at any common sentencing hearing, Defendants respectfully request that the Court modify the current sentencing schedule so that it begins with a hearing to address Guidelines issues that are common to all Defendants.

## II.   TESTIMONY AND EVIDENCE CONCERNING TERRORISM SHOULD BE EXCLUDED FROM ANY SENTENCING HEARING

While Defendants believe that a hearing on common issues that bear on the appropriate calculation of any sentences is warranted, a hearing on terrorism issues would be inappropriate. Defendants therefore respectfully request that the Court order now, in advance of the hearings and in order to enable the parties' orderly preparation, that no evidence concerning terrorism, outside of the evidence in the record, shall be presented at any sentencing hearing in this case. In particular, Defendants respectfully request that the Court issue an order now declaring evidence concerning terrorism, al Qaeda, Usama bin Laden, and any violent activities of radical Islamic groups outside the four corners of the record in this case off limits to any evidentiary hearing on sentencing. Whatever issues might be the subject of testimony at any evidentiary hearing, the general topic of terrorism cannot be one of them.  This case is a tax and false statement case, not a terrorism case.  It principally involves offenses relating to Defendants' omission to report certain publications and activities in connection with filings to receive and maintain a charitable tax exemption.

As this Court itself has repeatedly made clear, this case "has nothing to do with . . . terrorism or anything of that nature." (Tr. 12/04/07, at 21).  In the Court's own words, the government did not

3

allege or prove at trial "that Care supported or promoted terrorist activities" or "that money went directly from Care to purchase ammunition or other war or fighting material" (Tr. 12/10/07, at 8 ), and "[t]here is no evidence . . . that Care or the defendants provided or financed weapons, armaments, or lethal aid to any party." (Tr. 12/19/07, at 198). As the Court admonished the government at the post-trial bail hearing, although "the government in its press release suggested that this is a terrorism case," in fact "there has been no evidence offered to the effect that the defendants are terrorists or have materially supported terrorism." (Tr. 01/18/08, at 4).

Just as terrorism was irrelevant to the trial, it is irrelevant to sentencing. The government now apparently agrees with this assessment of the case, for in filing its objections to the Probation Office's draft Presentence Reports on April 22, 23, and 24, it nowhere claimed that it was seeking either a sentencing enhancement under U.S.S.G. § 3A1.4 ("Terrorism") or any upward departure based on terrorism. Since the government has given no notice of its intention to seek any adjustment or departure based on terrorism, it would make no sense to hear testimony on terrorism at the sentencing hearings.

Still, Defendants have reasonable grounds to fear that the government will try to bring general assertions about terrorism, no matter how irrelevant, into the evidentiary hearing it seeks at sentencing. The government has repeatedly ignored this Court's restriction of the case to the issues charged and tried and this Court's repeated admonitions that the case is not about terrorism. After the trial, the government issued an inflammatory press release conjuring connections between the case and terrorism and touting the convictions a victory for counterterrorism. The government spent countless pages in its Statement of Facts on irrelevant discussion of terrorism, occasioning Mr. Muntasser's motion to strike it as objectionable material, which the Court denied without foreclosing a decision to strike such material from the Presentence Reports at a later date. And in an improper

4

extrajudicial e-mail sent by Assistant U.S. Attorney Aloke Chakravarty to Deputy Clerk Martin Castles on April 14, 2008, the government again intimated its interest in bringing terrorism back into the case through the back door at sentencing, stating:

> The defendants have submitted alternative facts/objections to our statements of facts, and there is a possible need for an evidentiary hearing. My reading of the defendants' objections however, revolve mostly around the *relevancy* of the so-called terrorism connections to the defendants, rather than the veracity of the information about these violent jihadist groups/individuals which we say are relevant to the defendants' conduct of conviction. Consequently, it's not clear that the defendants are in fact disputing those underlying facts about who these groups/individuals are and what they have done. . . . If, however, the underlying historical reporting is in dispute, we would present a witness or two to help substantiate the evidentiary basis for our sentencing recommendations.

Exhibit 1 (attached).[1] Mr. Chakravarty further intimated that, in the event there were an evidentiary hearing, the government's likely witnesses would be Matthew Levitt and Evan Kohlmann, both of whom have repeatedly testified as terrorism experts for the government and both of whom already acknowledged when they testified at trial that they lacked any expertise whatsoever on the tax issues central to the sentencing here.

A revealing glimpse into the government's strategy is provided in a lead article in the current, April 28, 2008 issue of *The New Yorker* magazine, *see* Patrick Radden Keefe, "Annals of Surveillance: State Secrets," which details the government's shift from prosecuting Muslim charities for supporting terrorism—a strategy in which it was singularly unsuccessful—to "Al-Capone-ing" Muslim charities for lesser, unrelated tax and other crimes. The article specifically references this

---

[1] Defendants strongly object to this improper attempt by the government to discuss with the Court, outside of any formal process and without proper notice to Defendants, substantive issues going to the merits of the case. Mr. Chakravarty's unilateral communication with Deputy Clerk Castles plainly went far beyond the ministerial.

5

case in connection with this strategy. As Keefe recounts:

> Jeffrey Breinholt, a senior Justice Department official who is currently on leave at the International Assessment and Strategy Center, in Washington, observes that charging suspects with supporting terrorism might require disclosing secret information in court. [A case in Oregon] signifies a change in tactics for federal prosecutors, Breinholt told me, toward "Al Capone-ing" suspects— charging them on whatever will secure a conviction.
>
> If you charge them for things like we charged the guys in Oregon with, there's necessarily going to be less national-security disclosure of information," Breinholt said. "It's a calculated decision to go after them for smaller things." Breinholt and a Justice Department spokesman both noted the success of a case that was decided in Boston in January, in which officials from Care International, another Islamic charity accused of terrorism (and not affiliated with the well-known humanitarian organization of the same name), were convicted on tax charges.

*The New Yorker*, April 28, 2008, at 33 (attached as Exhibit 2).

The government should not be permitted to have it both ways. If it wants to charge terrorism or material support for terrorism and undergo the arduous proof required to make out such charges, with the attendant difficulties relating to the disclosure of classified surveillance data, then it may do so. But if it utterly fails to make such a case, as it has failed here, but nonetheless chooses to "Al-Capone" defendants with pure tax charges, it should not be permitted to bring uncharged, unfounded, and wholly unproven terrorism "evidence" in through the back door.

Thus, to the extent that the government would use an evidentiary hearing at sentencing for the purpose of introducing terrorism-related issues outside the record of this case, such evidence or testimony is plainly irrelevant to Defendants' sentences in this tax-form omission and false statement case. Such evidence therefore should be excluded under Fed. R. Crim. P. 32(i), which provides that a court "*may* permit the parties to introduce evidence on the objections" to the pre-sentence report, but states that a court need not resolve factual disputes that "will not affect sentencing" or that it "will not consider . . . in sentencing." (emphasis added). *Cf. United States v. Browne*, 318 F.3d 261,

265 (1st Cir. 2003) ("No matter how serious the general charge, an evidentiary hearing is warranted only if it has some prospect of being productive.").

This is especially so where testimony may have the tendency to veer into the "sensational and speculative," a concern the Court expressed at trial about Mr. Kohlmann's testimony in particular. (Tr. 11/28/07, at 82 (Daubert hearing)). Such testimony, bearing no relation to the facts of the case, will not aid the Court's determination of Defendants' sentences. Thus, should the Court schedule an evidentiary hearing on sentencing issues, Defendants respectfully request that the Court exercise its authority under Fed. R. Crim P. 32(i) to preclude all terrorism-related testimony or evidence from being presented at such hearing. It would be most efficient to make such a ruling now, so that neither the government nor Defendants need undertake time-consuming and costly efforts to line up witnesses whose knowledge will not be needed.

April 28, 2008

/s/ Charles P. McGinty

Charles P. McGinty
charles_mcginty@fd.org
Federal Defender's Office
408 Atlantic Avenue, 3d Floor
Boston, Massachusetts 02110
(617) 223-8061

*Attorney for Samir Al-Monla*


/s/ Michael C. Andrews

Michael C. Andrews
MCADMASS@aol.com
Law Offices of Michael C. Andrews
21 Custom House St., Suite 920
Boston, Massachusetts 02110
(617) 951-0072

*Attorney for Muhamed Mubayyid*

Respectfully submitted,

/s/ Kathleen M. Sullivan

Kathleen M. Sullivan
kathleensullivan@quinnemanuel.com
Faith E. Gay
faithgay@quinnemanuel.com
Susan R. Estrich
susanestrich@quinnemanuel.com
QUINN  EMANUEL  URQUHART
   OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010
(212) 849-7000

David Duncan
dduncan@zrld.com
ZALKIND, RODRIGUEZ,
   LUNT  &  DUNCAN, LLP
65a Atlantic Avenue
Boston, Massachusetts 02110
(617) 742-6040

*Attorneys for Emadeddin Z. Muntasser*

## Certificate of Service

I hereby certify that a true copy of the foregoing document was served this day upon all counsel of record by electronic filing.

/s/ Kathleen M. Sullivan

Evidentiary Hearing for Sentencing? Page 1 of 1

Case 4:05-cr-40026-FDS    Document 502-2    Filed 04/28/2008    Page 1 of 1

| | |
|---|---|
| **From:** | Chakravarty, Aloke (USAMA) [Aloke.Chakravarty@usdoj.gov] |
| **Sent:** | Monday, April 14, 2008 11:20 AM |
| **To:** | Martin_Castles@mad.uscourts.gov |
| **Cc:** | Adam Abensohn; charles_mcginty@fd.org; MCADMASS@aol.com; David Duncan; Cabell, Donald (USAMA); Siegmann, Stephanie (USAMA); kelly_foster@map.uscourts.gov |
| **Subject:** | Evidentiary Hearing for Sentencing? |

Marty –

As we get closer to sentencing on Muntasser/Mubayyid/Al-Monla (5/13-15), we were trying to anticipate scheduling issues that may arise. The defendants have submitted alternative facts/objections to our statements of facts, and there is a possible need for an evidentiary hearing. My reading of the defendants' objections however, revolve mostly around the *relevancy* of the so-called terrorism connections to the defendants, rather than the veracity of the information about these violent jihadist groups/individuals which we say are relevant to the defendants' conduct of conviction. Consequently, it's not clear that the defendants are in fact disputing those underlying facts about who these groups/individuals are and what they have done. If this is the case, and the defendants are contesting the relevance of those facts and the implication (or lack thereof) to the conduct of the defendants, then we may not require witness testimony at an evidentiary hearing. If, however, the underlying historical reporting is in dispute, we would present a witness or two to help substantiate the evidentiary basis for our sentencing recommendations. I don't know how long that would take, but if history is a guide, it would at least take an afternoon, perhaps longer.

Our witness(es), likely to be Levitt and Kohlmann, would come in from out of state, and their schedules make May 5th, 7th, May 9th or May 13th preferable.

It seems as though it's in everyone's interest to identify early whether there will be evidence which needs to be elicited (on either side), but given that the court has been able to assess these witnesses' credibility and expertise, and has been privy to the expert reports which reference (in different context) much of the information which would be elicited at a sentencing hearing, this exercise may not be necessary, and our sentencing hearings can focus on what information is relevant to an appropriate sentence. We wanted to preview the issue and solicit thoughts which may resolve it.

Al Chakravarty

Assistant United States Attorney

District of Massachusetts

1 Courthouse Way, Suite 9200

Boston, MA 02210

(617) 748-3658

ANNALS OF SURVEILLANCE

# STATE SECRETS

*A government misstep in a wiretapping case.*

## BY PATRICK RADDEN KEEFE

One Friday afternoon in August, 2004, a Washington, D.C., attorney named Lynne Bernabei received a package from the Department of the Treasury. The government was investigating one of her clients, the American branch of a Saudi charity called the Al Haramain Islamic Foundation, which had been active in fifty countries. Al Haramain had come under scrutiny, as had many other Islamic charities, after the attacks of September 11, 2001, and Treasury Department investigators believed that Al Haramain's American branch, which was based in Oregon, had connections to Al Qaeda. In response to a request from Bernabei for evidence against her client, the government had turned over two sets of documents, primarily media reports that referred to other branches of Al Haramain. None of the materials demonstrated a direct connection between the Oregon branch and Al Qaeda.

Bernabei asked for any classified evidence the government might have, arguing that it was impossible to rebut evidence that she couldn't see. When a third batch of evidence arrived, that August afternoon, the cover letter noted that the enclosed materials were "unclassified," so Bernabei didn't give much thought to the last item, a four-page document stamped "Top Secret." "My impression was that it might have been something that was declassified," she told me recently.

Bernabei photocopied the materials and forwarded them to the half-dozen clients and attorneys associated with the case. Several weeks later, the Treasury Department concluded its investigation, and declared the Oregon branch of Al Haramain a Specially Designated Global Terrorist entity, citing "direct links" with Osama bin Laden.

Soon afterward, two F.B.I. agents visited Bernabei's office and informed her that a classified document had accidentally been turned over to her. Bernabei told them that she had received only



*Was a classified document proof of warrantless surveillance?*

"unclassified" information, but she agreed to retrieve the document from her files. According to Bernabei, one of the agents suggested that as she looked for the document she should try not to think about what it contained. In the following weeks, F.B.I. agents tracked down the copies that she had distributed. One lawyer for Al Haramain had an electronic copy. The F.B.I. asked to purge it from his computers.

Bernabei said that she and her associates did not appreciate the significance of the document, and the government's efforts to recover it, until December, 2005, when the New York *Times* revealed that the Bush Administration had authorized the National Security Agency to employ wiretaps inside the United States without first getting a warrant. The document that the Treasury Department had turned over to Bernabei appears to have been a summary of intercepted telephone conversations between two of Al Haramain's American lawyers, in Washington, and one of the charity's officers, in Saudi Arabia. The government had evidently passed along proof of surveillance to the targets of that surveillance, and supplied the Oregon branch of Al Haramain—a suspected terrorist organization—with ammunition to challenge the constitutionality of the warrantless-wiretapping program.

Well before September 11th, U.S. intelligence agencies had suspicions about the connections between Islamic charities and terrorism. *Zakat*, or charitable tithing, is one of the five pillars of Islam, a duty for observant Muslims, and, by some estimates, Saudi charities raise four billion dollars a year. They establish mosques and community centers, distribute religious literature, and dispatch clerics to spread Wahhabism, the severe strain of fundamentalist Islam that is the official religion of the kingdom. "This is an element of Saudi foreign policy," Lee Wolosky, a member of the National Security Council in the Clinton and Bush Administrations, told me. "It's very well coördinated. It happens at the highest levels of the Saudi state." In 2004, David Aufhauser, who as the Treasury Department's general counsel oversaw its counterterrorism efforts after September 11th, estimated that in recent decades the kingdom had spent north of seventy-five billion dollars on Islamic evangelism.

Al Haramain was established, with help from the Saudi royal family, in 1991. Its headquarters were in Riyadh, with offices in foreign countries. Within a few years, the charity was suspected by the C.I.A. of involvement in terrorism. In 1996, a C.I.A. report suggested that a third of Islamic N.G.O.s "support terrorist groups or employ individuals who are suspected of having terrorist connections"; it named Al Haramain as an example. In 1997, a C.I.A. informant in Nairobi said that the local branch of Al Haramain planned to blow up the U.S. Embassy. According to the *Times*, a C.I.A. inquiry turned up no evidence of a plot, but after the bombings of the American Embassies in Tanzania and Kenya, the following year, Kenyan authorities ordered Al Haramain from the country. In a trial on the bombings in New York in 2001, prosecutors introduced a collection of business cards that had been seized from the Nairobi home of Wadih el-Hage, an Al Qaeda operative who was eventually convicted for his role. One belonged to Mansour al-Kadi, an Al Haramain official in Riyadh, who was the titular vice-president of the Oregon branch (though he never played an active role there, and no further connection was made between the charity and the bombings).

Aqeel al-Aqil, who was Al Haramain's director during the nineties, told me by e-mail that he could not control aid and donations once they arrived in areas of conflict, such as Bosnia and Chechnya. "If you give a sack of flour to a needy family," he said, "you cannot guarantee that some of their mujahideen sons will not eat some of the bread made of that flour." U.S. authorities, however, believed that the charities must be held accountable. "Historically, Al Qaeda and other terrorist groups have set up or exploited some charities," Stuart Levey, the Treasury Department's Under-Secretary for Terrorism and Financial Intelligence, told the Senate Finance Committee earlier this month. "Those who reach for their wallets to fund terrorism must be pursued and punished in the same way as those who reach for a bomb or a gun."

After September 11th, the F.B.I. assigned Dennis Lormel, a veteran financial investigator, to look into how Al Qaeda secured its funding. "We latched on to charities immediately," he told me. On September 23, 2001, President Bush signed an executive order authorizing the Treasury Department to "designate" individuals or entities believed to be supporting or "otherwise associated" with terrorism, in order to help shut down what Bush called "the financial foundation of the global terror network."

Designations amount to a kind of economic embargo: anyone who does business with a designated person risks criminal or civil penalties. The Treasury Department can act more quickly than the police or the F.B.I., who may take action only after an investigation. By preëmptively freezing a suspect's assets, "the government does not have to watch these dollars continue to flow over a period of months or years as it investigates whether it will pursue criminal charges," a department spokesman, Andrew DeSouza, told me.

Authorities also need less evidence for a designation than they would for prosecution, and they can rely on evidence that would not be admissible in a criminal trial. Matthew Levitt, who until last year was deputy assistant secretary for intelligence and analysis at the Treasury Department, says that designations involve "an extremely robust process. This is not something that can be done easily or willy-nilly." But Lormel, who retired from the F.B.I. in 2003, says he would have been "hard pressed" to act on some of the material that Treasury officials used. "Oftentimes, I think they base their evidence on media stories or public-source information, whereas we would never use only that," he told me.

In addition, the Treasury Department may use classified evidence that is never disclosed to the designated party, despite an established principle of the American legal system that the accused should have an opportunity to confront evidence against him. Designations can be challenged before a federal judge, but lawyers for the designated party are not shown all the government's evidence and cannot introduce their own. Nearly five hundred individuals and groups have been labelled Specially Designated Global Terrorists since 2001; there has never been a successful challenge in court. A designation "effectively denies people province over their own property in a largely unreviewable way," Aufhauser, the department's former general counsel, told me. "Such an extraordinary power needs to be exer-



**For Chocolat lovers everywhere...**

From *New York Times* bestselling author Joanne Harris comes the eagerly anticipated novel of secrets, seduction, and spell-binding suspense.

"A mouthwatering experience."
—*Sunday Times* (London)

"Fans of Harris' original fairy-tale novel will find a darker *Chocolat* here, but a far richer treat."
—*Entertainment Weekly*, A-

**Also available in paperback**



ALSO AVAILABLE  HarperAudio · HarperLuxe

cised with discretion, because it could be constitutionally suspect."

Al Haramain was an early target. Foreign branches—including those in Somalia and Bosnia, which, according to officials, had been directing funds to terrorist groups—were the first to be designated. Lormel dispatched F.B.I. agents to Ashland, Oregon, to investigate the American branch.

Situated in the Rogue Valley, and surrounded by the dramatic foothills of the Siskiyou and Cascade Mountains, Ashland is a semirural community of some twenty thousand people. Main Street is lined with organic restaurants, coffee shops, and independent bookstores, and locals describe the town as unusually liberal for conservative southern Oregon.

Al Haramain Oregon was run by a longtime Ashland resident named Pirouz Sedaghaty, who is known as Pete Seda. Now fifty years old, he grew up in a secular household in Iran, where his father was a general under the Shah. In 1976, when he was eighteen, Seda followed an older brother to Ashland. He enrolled at the local college, but struggled with reading and writing in English, and never graduated. He drifted into environmental activism, demonstrating against the spraying of herbicides in national forests.

In the nineteen-eighties, Seda went into business as the Arborist, transplanting trees and doing landscaping projects. He became more religious, and converted several friends to Islam, outdoorsmen who dressed like lumberjacks—one Ashland resident described them as "Muslim rednecks." He arranged places for Friday prayers, and established a nonprofit group, the Qur'an Foundation, which mailed religious literature to Muslims in prison.

Seda became a fixture at peace rallies and multicultural fairs in Ashland. "He was the go-to guy if you wanted to have an interreligious dialogue," the Reverend Caren Caldwell, a local Protestant minister who has known Seda for twenty years, said. "I'm not a Muslim minister," Seda told worshippers at a local synagogue, where the rabbi often invited him to speak. "I'm just a common brother in our community." He spoke of the importance of monotheism and prayer, and of how terrorism is inimical to the teachings of the Koran. He bought a camel, which he named Mandub ("emissary" in Arabic). He led it down Main Street in the Fourth of July parade.

In 1993, Seda met and married an Iranian woman named Laleh; he lived with her and another woman—whom he considered a second wife—in Ashland. (Seda has two sons, from an earlier marriage.) That woman eventually left, and a college student named Summer Rife moved in. "I met Pete at an academic presentation he was giving on Islam," Rife, who is now twenty-seven, said in an e-mail. (Seda's lawyer advised him against talking to me, but Rife agreed to respond to written questions.) She seems somewhat in thrall to Seda. "If Pete had the means and opportunity, he could really make a positive difference in the world," she wrote. "He is Nobel Prize material."

Soliman al-Buthi, a Saudi who worked for Al Haramain as its treasurer, and who was interested in establishing an American branch, visited Seda in Ashland in 1997. Seda, who was born a Shiite and wore a neatly trimmed beard and fleece jackets, seemed an unlikely partner for Buthi, a Sunni who wore long robes and kaffiyehs. Buthi told me recently that he had heard of Seda's Qur'an Foundation from a mutual friend, and that he chose the Rogue Valley, where there were only a few dozen Muslims, because he wanted to "start small." Buthi offered to turn Seda's shoestring operation into a well-financed arm of Al Haramain. "He told me that he had become a Sunni," Buthi said, adding, "I don't think there would be any coöperating with a Shia." (Rife told me that Seda "does not believe in sectarianism. We like to say we are Muslim.")

Al Haramain Oregon was incorporated in 1999. Aqeel al-Aqil, in Riyadh, was listed as the titular president, and Seda and Buthi as officers. With a hundred and eighty-eight thousand dollars from Riyadh, Seda bought a split-level house to serve as a prayer space for local Muslims and as a warehouse for literature. He hired a young Wake Forest graduate named Daveed Gartenstein-Ross, who had grown up Jewish in Ashland and converted to Islam in college, to assist him.

At times, Seda seemed to be adopting a more militant set of beliefs. "He said he'd like to go over and fight with the Chechens," Abdullah Cabral, a retired truck driver who in 1999 accompanied Seda on the hajj, told me. "I took it with a grain of salt. You want to leave your business, two young sons, a couple of wives?" But by all accounts Seda was devastated by the events of September 11th. He wrote to Al Haramain headquarters demanding a million dollars for outreach work, and offered to assist the F.B.I. in any way he could. He told a reporter that he was fearful that "all these years of helping with the education and understanding may have come down with the twin towers."

By the summer of 2004, the Treasury Department had designated eleven foreign branches of Al Haramain as supporters of terrorism, along with Aqil, the director, who still lives in Saudi Arabia. "It was under the cloak of charity that Aqeel al-Aqil used the Al Haramain organization to benefit himself and Al Qaeda," Juan Zarate, a deputy assistant secretary in the department, announced in June, 2004.

Three months later, the Treasury Department singled out the Oregon branch. A statement pointed to links with Al Qaeda, asserting that the charity had diverted funds to support "Chechen leaders affiliated with the al-Qaida network." Treasury officials would not elaborate, citing the classified nature of the evidence; Cari Stinebower, a lawyer who until 2005 worked on designations at the Treasury Department, told me that the process relied on information that was too sensitive to be revealed. "In the intelligence community, people love to collect, but they hate to disseminate," she said.

Buthi was labelled a Specially Designated Global Terrorist. (He was in Riyadh, where he still works as a municipal-government official.) Pete Seda was not designated; a year and a half earlier, he had left the country, ostensibly to go on the hajj, and had not returned.

Under normal circumstances, Seda, Buthi, and the lawyers representing Al Haramain would never have known that the Treasury Department, in its investigation, had relied on telephone conversations secretly intercepted by the N.S.A. Yet, according to court filings by attorneys who have seen it, the document that the department mistakenly sent Bernabei described intercepted conversations between Buthi, in Riyadh, and two of Al Haramain's attorneys, Asim Ghafoor and Wendell Belew, in Washington. The document

was dated May 24, 2004; the conversations took place in March and April—just as the Treasury Department was investigating the charity.

On February 28, 2006, Al Haramain filed suit against the Bush Administration in Oregon federal court, claiming that the government had violated the First, Fourth, and Sixth Amendments, along with the Foreign Intelligence Surveillance Act of 1978, which makes it illegal for the government to use wiretaps in the U.S. without a warrant. The warrantless-wiretapping program has been challenged in numerous lawsuits over the past two years, many brought on behalf of journalists and activists, who make sympathetic plaintiffs but struggle to demonstrate that the government actually listened to them. In 2006, a federal court in Michigan found warrantless surveillance unconstitutional, but an appeals court overturned the ruling, concluding that the plaintiff, the A.C.L.U., could not prove that any individual had been targeted by the program.

In the classified document, Al Haramain appeared to have the proof that the other cases lacked. Although the F.B.I. had retrieved the copies that Bernabei distributed to her fellow-lawyers, it made no effort to recover those which went to Seda and Buthi, who were both living in the Middle East. When Al Haramain's attorneys filed their lawsuit with the court, they included an envelope containing a copy of the document.

Justice Department lawyers objected that the document was too sensitive to be kept at the court. A classified document remains classified even if the government has inadvertently disclosed it, they argued, and the document turned over to Al Haramain was classified at the highest level; it contained Sensitive Compartmented Information, which must be kept in a special facility, called a SCIF. The government maintained that the document should be turned over to the F.B.I. "What if I say I will not deliver it to the F.B.I.?" the judge, Garr King, asked, according to a transcript of the proceedings. "We obviously don't want to have any kind of confrontation with you," a government lawyer, Anthony Coppolino, replied. "But it has to be secured in a proper fashion." Judge King eventually agreed to transfer the document to a nearby SCIF, at the U.S. Attorney's office in Seattle.

The Bush Administration then moved to dismiss Al Haramain's case, citing the "state-secrets privilege," a controversial legal doctrine that can be used to prevent the introduction of evidence that might jeopardize national security. Judges tend to show deference when the executive branch invokes state secrets; courts have rejected the privilege on fewer than six occasions since it was first recognized by the Supreme Court, in 1953. In that case, U.S. v. Reynolds, the widows of three civilian engineers who died in the crash of an Air Force B-29 sued for negligence. The government would not turn over the accident report, asserting that it contained information about the plane's secret electronic equipment. However, when the report was declassified, in the nineties, there was no mention of secret electronic equipment. It did reveal that the plane lacked standard safeguards to prevent the engine from overheating—the very negligence that the widows had alleged.

Nevertheless, government lawyers still cite Reynolds to argue that the courts should trust the executive on matters of national security. According to a 2005 study by William Weaver and Robert Pallitto, political scientists at the University of Texas at El Paso, the Bush Administration has claimed the state-secrets privilege in recent years with "offhanded abandon." By Weaver and Pallitto's count of reported instances, the privilege was invoked fifty-five times in the half century before 2001; it has been used more than two dozen times in the years since. Its heavy use has drawn criticism from members of Congress, including Senator Arlen Specter, the senior Republican on the Judiciary Committee. "We're going to look back at this period of time two decades from now and see a vast expansion of executive authority," Specter told me this month. "And a big part of it is done by the state-secrets doctrine. Do I think in some cases that the government uses it inappropriately? Absolutely."

In recent years, Justice Department lawyers have used the privilege not only to eliminate key pieces of evidence but also to dismiss potential legal challenges altogether. Last year, a federal appeals court ruled that a German citizen, Khaled el-Masri, who alleges that, in a case of mistaken identity, he was kidnapped and tortured by the C.I.A., cannot sue the United States, because the "very subject matter" of his lawsuit—America's extraordinary-rendition program—is secret. Some, like Senator Patrick Leahy, the chairman of the Senate Judiciary Committee, contend that the Administration is using the state-secrets doctrine to prevent the courts from assessing the legality of controversial programs. The White House "has taken a legal doctrine that was intended to protect sensitive national-security information and seems to be using it to evade accountability for its own misdeeds," Leahy said



"Last night, I tried out some new stuff, but tonight I'm only drinking the classics."



*"Do our rainbows and unicorns mean nothing to you, Renee?"*

• •

in February, during a Senate hearing on the privilege.

A senior Justice Department official who was authorized to comment told me that the Bush Administration is trying to protect national-security secrets, not to shield its activities from scrutiny. A challenge to the wiretapping program could proceed, he said, provided the surveillance was "sufficiently well disclosed." But a government document describing that surveillance, such as the one Al Haramain received, would not qualify as disclosure. Only a formal acknowledgment by the government would suffice.

Still, in September, 2006, Judge King refused to throw out Al Haramain's case on state-secrets grounds, noting that President Bush and other officials had already confirmed the existence of the surveillance program. King agreed to bar the classified document from the case, but proposed that the attorneys for Al Haramain file affidavits describing their memories of it, which could be used to prove that Al Haramain had been subjected to surveillance.

None of the lawyers for the charity who have seen the document would describe its contents. But Soliman al-Buthi and the two Washington lawyers, Asim Ghafoor and Wendell Belew, agreed to tell me what they were discussing on the telephone during March and April of 2004, when the surveillance appears to have taken place.

In 2002, scores of prominent Saudis, including Buthi, were named as defendants in a lawsuit brought on behalf of the victims of September 11th. Ghafoor had agreed to represent the Saudis, and Belew was lobbying in Washington on their behalf; the three men had several conversations about the payment of the lawyers' fees, which Buthi was helping to coördinate. I asked whether Buthi might have mentioned any defendants who could have been of interest to U.S. intelligence. Buthi, Belew, and Ghafoor all volunteered the same names: Safar al-Hawali and Salman al-Auda, two radical clerics who have been publicly praised by Osama bin Laden; and Mohammed Jamal Khalifa, a Jidda businessman who was bin Laden's brother-in-law and onetime best friend.

"There's an argument to be made that designating Al Haramain was a mistake," Jon Eisenberg, an appellate lawyer who is representing the charity in its wiretapping lawsuit, and who has seen the document, told me. Still, he said, "it is not my role to figure out if they are terrorists or not." In court filings, Al Haramain's lawyers have said that something in the document suggests that the surveillance was conducted without a warrant. In Eisenberg's view, the more suspicious Al Haramain seemed, the easier it should have been to obtain one.

When Judge King did not dismiss Al Haramain's case, the Bush Administration appealed. Along with public filings to the federal appeals court in San Francisco, government lawyers included a set of secret arguments that Eisenberg was not allowed to see. Based on his knowledge of the document, Eisenberg decided to guess at these arguments, and counter them.

Because the document was still classified, anything Eisenberg wrote about its contents would become "derivatively classified," so he was obliged to write his brief under supervision—not of the court but of the Litigation Security Section of the Justice Department, his adversary. A security officer, Erin Hogarty, explained the special procedures for the drafting: it must take place at the department's offices in San Francisco; Eisenberg could bring no notes with him, and must use a government computer. Hogarty also said that Steven Goldberg, one of Eisenberg's colleagues, could join him but that Tom Nelson, another lawyer for Al Haramain, could not. According to Eisenberg, Hogarty later told him that the order about Nelson came directly from one of the government lawyers working on the case.

The senior Justice Department official told me that Hogarty had never been explicitly instructed that Nelson could not participate. Rather, she was told that because Nelson had not allowed government technicians to purge his computer of classified information he raised "different security concerns." The Litigation Security Section is ostensibly neutral and independent, but Eisenberg contends that Hogarty, as a Justice Department employee taking orders from government lawyers working on the case, had a conflict of interest, and that allowing his opponents to determine who could contribute to a court filing undermines the fairness of the adversarial process. The official disagreed. "I don't think this episode even begins to raise a serious issue," he said.

Last June, Eisenberg and Goldberg met Hogarty at the Justice Department offices in San Francisco and were escorted to a windowless room. Hogarty took their cell phones and the battery from Eisenberg's laptop. She supplied them with a government computer. The drafting lasted three hours. Eisenberg got hungry, and Hogarty offered him a banana from her lunch. When the brief was completed, Eisenberg and Goldberg printed out copies for the judges and for the government

lawyers; because Al Haramain's lawyers did not have security clearance, they were not allowed to keep a copy of the brief they had just written. Hogarty assembled the preliminary drafts and said that she would shred them—and Eisenberg's banana peel, too.

After the drafting session, Hogarty and Eisenberg met once more, to wipe his computer of any classified information. As it happened, the laptop had died of its own accord; Eisenberg and Hogarty agreed to destroy the hard drive. Hogarty had brought a technician with her, and he extracted the hard drive and memory board from the laptop. Then he and Hogarty placed the hard drive on the floor and pounded it with a table leg.

Oral arguments before the Ninth Circuit Court of Appeals in Al Haramain Islamic Foundation, Inc. v. George W. Bush took place in August, 2007, and focussed almost exclusively on the document. Al Haramain's lawyers might think that the document was proof of surveillance, Thomas Bondy, the government's lawyer, argued, but they could be wrong. "Although they think or believe or claim they were surveilled," Bondy concluded, "it's possible that they weren't."

"Basically," Eisenberg told me later, the government is "saying that when it comes to matters of national security there is no truth. We will not confirm or deny. So it doesn't matter what you know."

The appeals-court judges ruled in November that, because of the "cascade of acknowledgments" of the wiretapping program, Al Haramain's case could not be thrown out on the ground that its subject matter was a secret. But, after inspecting the document themselves, they rejected Judge King's suggestion that affidavits describing it could be used in court, calling that solution a "back door around the privilege."

The judges sent the case to a district court to decide one final issue. Without the document or the affidavits describing it, Al Haramain will have trouble proving that it was subject to surveillance. But Eisenberg insisted that he was optimistic. "We're still alive," he said.

On August 15th, as Eisenberg was delivering his oral arguments in the appeals court in California, Pete Seda returned to Oregon. He had been a fugitive for two and a half years, travelling with his wives from Saudi Arabia to the United Arab Emirates, Iran, and Syria. In his absence, federal prosecutors had indicted him, along with Buthi, and when he arrived at the airport in Portland he was arrested. The indictment focussed on an incident in 2000, in which Buthi had converted a hundred-and-fifty-thousand-dollar donation to Al Haramain Oregon into cashier's and traveller's checks, and had carried the money to Riyadh without declaring it at the airport. The foundation allegedly lied on its tax return to hide the funds. Authorities implied that the donation was intended for the rebels in Chechnya. (Seda has pleaded not guilty; Al Haramain's lawyers say that the money did go to Chechnya, but in support of refugees.) There were no charges of terrorism or terrorist financing.

Ibrahim Warde, a professor at the Fletcher School of Law and Diplomacy, at Tufts, and the author of "The Price of Fear," a critique of the war on terrorist financing, said that the Al Haramain case is typical of the Administration's approach to Islamic charities. "It was a giant bait-and-switch game," he told me. The government "would initially tout the connection with Al Qaeda, and then in the end would nail them on some unrelated infraction having to do with tax evasion or immigration." But Matthew Levitt, the former Treasury Department official, told me that when a designation is followed by a criminal indictment without charges of terrorism defense attorneys are too quick to conclude that their clients are innocent. "The fact that someone is designated and then not charged for that activity means nothing," he said.

One consideration for prosecutors is that winning convictions on terrorism charges can be difficult. In October, 2007, a major case brought by the government against the Holy Land Foundation, which before it was designated, in 2001, was the largest Islamic charity in the U.S., concluded without a single conviction. Prosecutors had charged the group with providing "material support" for terrorism. One of the jurors described the government's evidence as "strung together with macaroni noodles."

Jeffrey Breinholt, a senior Justice Department official who is currently on leave at the International Assessment and Strategy Center, in Washington, observes that charging suspects with supporting terrorism might require disclosing secret information in court. Seda's case signifies a change in tactics for federal prosecutors, Breinholt told me, toward "Al Caponeing" suspects—charging them on whatever will secure a conviction.

"If you charge them for things like we charged the guys in Oregon with, there's necessarily going to be less national-security disclosure of information," Breinholt said. "It's a calculated decision to go after them for smaller things." Breinholt and a Justice Department spokesman both noted the success of a case that was decided in Boston in January, in which officials from Care International, another Islamic charity accused of terrorism (and not affiliated with the well-known humanitarian organization of the same name), were convicted on tax charges.

One flaw of this approach is that although it may bring convictions, it seldom results in substantial jail time. When Seda returned to Oregon, the U.S. Attorney's office argued that he should be kept behind bars pending his trial on tax charges. The prosecutor, Chris Cardani, insisted that Seda subscribed to a militant brand of Wahhabi Islam and represented a flight risk. "This is a case about radical forms of religion and the effects it has on people," he said in a detention hearing last summer.

To demonstrate that Seda was a threat, Cardani called on Daveed Gartenstein-Ross, the young Ashland convert who had worked for Seda in the late nineties. Gartenstein-Ross had since converted again, to Christianity. He began coöperating with authorities, supplying them with information on Al Haramain, and eventually wrote a book, "My Year Inside Radical Islam."

Gartenstein-Ross testified that Seda had been opposed to terrorism. But he also pointed to disturbing passages in the Islamic literature that Al Haramain distributed: an appendix in one edition of the Koran that featured a "Call to Jihad"; a book of Islamic guidelines, which declared, "The Last Hour will not appear unless the Muslims fight the Jews and kill

them." Still, it was not clear that Seda personally subscribed to these views. "He's a Koranic literalist," Gartenstein-Ross told me. "But if the question is how much he actually read the Koran, the answer is almost never. He didn't read Arabic, and he had trouble reading English. And all of our translations were English-Arabic."

In the hunt for terrorists and those who support them, intelligence analysts construct "link charts" to connect a suspicious individual to his known acquaintances, to their known acquaintances, and so on—an exercise in six degrees of separation. (In 2000, Army intelligence analysts trying to "map" Al Qaeda reportedly described the effort as "the Kevin Bacon game.") In designating Al Haramain Oregon, Treasury Department officials cited "direct links" with Al Qaeda, but have never revealed the precise nature of those links. Stinebower, the former Treasury lawyer, said she was unaware of any internal definition of "direct links." She wouldn't discuss the particulars of the Al Haramain designation, but did say, "It wouldn't have been sufficient that A picks up a phone and calls B, and B picks up a phone and talks to C, therefore A knows C. There would have to be more of a connection than that."

It seems inevitable that, in seeking to identify and disrupt possible terrorist threats, U.S. intelligence will rely on a suspect's circle of associates and his religious beliefs. But the First Amendment prevents authorities from prosecuting people solely on the basis of association or ideology, and espousing radical beliefs is not in itself a criminal act.

"We've put ourselves in a situation where the Department of Justice has jumped into this, saying, If they could be a terrorist, then they're guilty," Karen Greenberg, the executive director of the Center on Law and Security at New York University's law school, told me. "We don't have a body of law that says, If you could be, then you are. If we want to move to that, then we have to think very long and hard. Because the risks are immense."

On November 30th, the government lost its bid to keep Pete Seda detained. "I hope that I can again be a positive part of the community and continue working to bring peace through understanding," Seda said in a statement. He is now under house arrest; his trial will begin this fall.

Last August, the American Bar Association published a report calling for reform of the state-secrets privilege. "There will finally be an instance where you've cried 'state secrets' so many times that a court will not believe it anymore, and potentially something that *is* a state secret will get out," Carrie Newton Lyons, a former C.I.A. officer who chairs the national-security committee of the A.B.A.'s Section of International Law, told me. In January, Senators Ted Kennedy and Arlen Specter introduced a bill to curtail the Administration's use of state secrets by obliging judges to determine themselves whether evidence is too sensitive to be used in court, and requiring the government to submit classified evidence in redacted or summarized form, rather than barring it completely. Specter objects to the notion that judges must defer to the executive on matters of secret evidence. "It's beyond arrogant," he told me. "It's insulting."

In the meantime, Eisenberg is trying to figure out how Al Haramain can prove that it was wiretapped without reference to either the document or the affidavits describing it. This week, a district judge in San Francisco will consider the only remaining issue in the case, an abstruse legal question about the origins of the state-secrets privilege. The government has submitted a series of classified filings, leaving Eisenberg to guess at what they might contain.

"This is the difficulty with classified evidence," David Cole, a law professor at Georgetown who is assisting Lynne Bernabei in her efforts to have Al Haramain's designation lifted, told me. "At the end of the day, you're fighting shadows. How do you defend against what you can't see?"

In October, Bernabei wrote a letter to the Justice Department. The attorneys representing Al Haramain had been dealing with a novel quandary of legal ethics. If they had a reasonable belief that any telephone conversation with Seda or Buthi might be monitored by the N.S.A., could they talk to their clients without violating attorney-client confidentiality? Bernabei requested confirmation that the government was not intercepting her "written or oral communications" with her clients. Two weeks later, she received a response from the lawyers at the Justice Department. They wouldn't confirm or deny. ♦



# THE NEW YORKER CONFERENCE
## STORIES FROM THE NEAR FUTURE
### MAY 8 + 9, 2008
### NEW YORK CITY

The bold visionaries of today share the bright ideas of tomorrow at the second annual New Yorker Conference—newly expanded to two days of forward thinking and eye-opening innovation.

FEATURING:

**AMY SMITH**
Amy Smith is a mechanical engineer and inventor at M.I.T. who designs technologies for the developing world. Her inventions include a grain-grinding hammer mill, a water-purification device, and a phase-change incubator that works without electricity.

Tickets Still Available
Tickets are $2,000 and will include all programs, meals, receptions, and entertainment. To order, visit conference.newyorker.com or call 212.286.5753.

**CONFERENCE.NEWYORKER.COM**



PROUD SPONSORS OF THE NEW YORKER CONFERENCE

PRESENTED BY: **CIT** CAPITAL REDEFINED

SUPPORTED BY: **Dow**    **DUBAI**