UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Crim. No. 05-40026-FDS |
| ) | |
| MUHAMED MUBAYYID, and ) | |
| EMADEDDIN Z. MUNTASSER, ) | |
| and ) | |
| SAMIR AL-MONLA a/k/a ) | |
| SAMIR ALMONLA, ) | |
| ) | |
| Defendants. ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT MUHAMED MUBAYYID'S
<u>MOTION FOR A NEW TRIAL</u>**

The government hereby opposes defendant Mubayyid's motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. The defendant claims he is entitled to a new trial because: (1) the government made a serious misstatement of fact involving critical evidence in its closing argument; and (2) the government changed mid-trial its theory regarding the charitable activities of Care. For the reasons detailed below, the Court should deny this motion in its entirety as the defendant has failed to demonstrate, as the rule requires, that the interests of justice warrant a new trial under the circumstances.

Rule 33 only allows the court to grant the extraordinary remedy of a new trial where "the interest of justice so requires." Fed. R. Crim. P. 33(a). The majority of federal courts of appeal, including this circuit, have placed "definite

1

limits upon a district court's right to upset a jury verdict." United States v. Rothrock, 806 F.2d 318, 322 (1st Cir. 1986) ("we must ensure that the 'remedy of a new trial is sparingly used, and then only where there would be a miscarriage of justice'"). A district court can only upset a jury verdict and order a new trial in rare circumstances "'where there would be miscarriage of justice ... and where the evidence preponderates heavily against the verdict.'" United States v. Wilkerson, 251 F.3d 273, 278 (1st Cir. 2001) ; accord United States v. Sepulveda, 15 F.3d 1161, 1184 (1st Cir. 1993) ("Declaring a mistrial is a last resort, only to be implemented ... if the trial judge believes that the jury's exposure to the evidence is likely to prove beyond realistic hope of repair."). The defendant has failed to cite any adequate ground for this Court to disturb the jury's overwhelming and consistent verdicts in this case. See United States v. Freeman, 208 F.3d 332, 343 (1st Cir. 2000)("the judge is "not a thirteenth juror, much less [is] he a super-juror whose views of credibility could override the jury's verdict."). Because this case presents no demonstrable risk that a miscarriage of justice has occurred –- that is, that an innocent person has been convicted, there is no basis for a new trial and the defendant's motion should be summarily denied. See Wilkerson, 251 F.3d at 280 (vacating district court's order granting new trial where any error resulting from district

court's evidentiary rulings was harmless); United States v. Pettiford, 962 F.3d 74, 76 (1st Cir. 1992) (affirming denial of new trial in gun case based upon district court's evidentiary decision to exclude defense's requested jury view of crime scene).

**I.   THE GOVERNMENT'S CLOSING STATEMENTS REGARDING QUESTION 76 WERE NOT IMPROPER OR PREJUDICIAL AND DO NOT ENTITLE MUBAYYID TO A NEW TRIAL**

Mubayyid argues that the government "made a serious and extremely prejudicial misstatement of fact in its closing argument." (Mot. at 2).  As discussed below, however, the government's closing was entirely proper.  Mubayyid assumes, erroneously, that the government was purporting to read the text of Question 76 to the jury when it was in fact doing no more than arguing the interpretation it wanted the jury to adopt, namely that Question 76 is not limited to the immediate tax year.  Even assuming the government's statements were treated as misstatements, they surely did not prejudice the defendant where they amounted to no more than a few words in an approximate 90 minute closing, the Form 990 itself was in evidence, the defendants promptly read the text of the question to the jury and argued their favored interpretation, and the Court instructed the jury that counsels' closing statements are not evidence and that it was up to them to determine what Question 76 requires one to disclose.

**Relevant Facts**

    A.  Question 76 on the Form 990

Question 76 on the Form 990 provides, "**Did the organization engage in any activity not previously reported to the IRS?**" The Form 990 and corresponding instructions were admitted into evidence and available for the jury's review.

The parties offered competing interpretations as to whether Question 76 applies to activities outside of the present tax year. The government argued that Question 76 was open-ended and meant to require the disclosure of any activity from any previous tax filing that had not been reported.[1] Thus, the government

---

[1] There was ample evidence adduced at trial to support the government's position that Question 76 seeks the disclosure of activities outside of the immediate tax year. First, the question itself is not facially limited in time. Moreover, the instructions to Question 76, when parsed, provide a basis to believe the question is not time limited because it instructs the organization to "include new or modified activities...not listed by an attachment to the organizations's return for any earlier year." Because "returns for any earlier year" must be prior Form 990's, it is reasonable to interpret the instruction as requiring the organization to inform the IRS of any activity from a prior year that should have been reported in a Form 990, but was not. Dawn Goldberg testified based on Question 76, the Form 990 as a whole, and the instructions, that Care should have reported the publication of the Al-Hussam newsletters if they had not been listed on the Form 1023. [Tr. 12/7/07 at 52, 106, 111-112]. The defendants, who apparently deferred to Muntasser's counsel to conduct Goldberg's cross-examination, tried to get her to agree that the Al-Hussams may have been indirectly referenced on the Form 990's as fundraising, but *never* attempted to challenge the proposition that Question 76 is not limited to the immediate tax year, choosing instead to simply argue the point in closing. [Id. at 108-109]

argued that Mubayyid, who completed the Form 990's for the tax years 1997, 1999 and 2000, should have answered Question 76 affirmatively because Care had not previously ever disclosed that it was publishing the Al-Hussam newsletter, operating a website, or soliciting funds to support and promote jihad and the mujahideen. [Tr. 12/19/07 at 49].

      B.    The Government's Closing Statements on Question 76

During its closing, the government argued that the defendants answered Question 76 falsely when each failed to answer that question affirmatively and to disclose certain of Care's activities from prior years. In so doing, and well aware that the Form 990 and corresponding instructions were already in evidence, the government argued that the jury should interpret Question 76 as seeking the disclosure of any activities the organization had "ever" engaged in.

The statements at issue occurred within a span of what could not have been more than 20-30 seconds. First, the government stated that "Question 76 asks: "Has your -- has your organization engaged in any activity not previously disclosed to the IRS?" [Tr. 12/19/07 at 48]. Notably, although this statement closely tracked Question 76, it did not literally track it word for word, but neither Mubayyid nor any defendant objected to it. The government immediately followed by answering the question it posed, saying, "The answer was always "no."

The government immediately followed by arguing that Question 76 "was not limited to that tax year," and, to emphasize the interpretation it was urging upon the jury, stated, "It was: Has your organization **ever** engaged in**,**" before being stopped by an objection from Al-Monla's counsel, but not defendant Mubayyid. When the Court asked the basis for the objection, Al-Monla made it clear that he was not objecting to some supposed misstatement of the literal wording of the question but, rather, the government's preceding assertion that Question 76 is not limited to the present tax year: "Not limited to that tax year.  Under the manual itself, it was limited to that tax year.  So it's an incorrect statement of fact and law." [Tr. 12/19/07 at 48].  The Court overruled the objection.

Following this exchange, the government resumed its argument and stated, "The question was: Has the organization **ever** engaged in any activity not disclosed to the IRS?" [Id.] Counsel for Al-Monla objected but did not state the basis.  Mubayyid did not object.

### C.  Al-Monla's Closing

Following the government's closing, counsel for Muntasser closed but did not address this issue.  Counsel for Al-Monla went next and, among other things, argued that Question 76 is limited to the immediate tax year, and pointed out that the word "ever" does not appear in the text of the question itself:

> Now the question that is on the 990...question 76 is: "Did the organization engage in any activity not previously reported to the IRS?" The government when it recited that language a short time ago put in a very telling word "ever". Did it ever report. Well, that word is not in the question. It's not there. The question is: "Did the organization engage in any activity not previously reported to the IRS?" Not ever. In 1996, whatever may have been the obligation to divulge the existence of a newsletter, whatever that may be, in 1997 there was one, not exactly a reportable activity, irrespective of how you define activity. In 1998, zero, zero. What is the true answer in 1998 to the question: "Did the organization engage in activity not previously reported to the IRS?" The true answer is: No. No.

[Tr. 12/19/07 at 102].

### D. Mubayyid's Closing

Mubayyid also argued that Question 76 is limited to the immediate tax year, stating, for example, that "It's a tax form for 1997. You're supposed to tell them what happened in 1997." [Tr. 12/19/07 at 124]. Ironically, Mubayyid also did not track the literal wording of Question 76 in arguing his position to the jury, citing the question as asking, "**Has** the organization engage**[d]** in any activit**[ies]** not previously **disclosed** to the IRS?" [Id.](emphasis added).

### E. The Court's Relevant Instructions

The Court gave a number of cautionary and curative instructions which in the aggregate made it clear that counsels' statements were not evidence, and that it was up to the jury to determine whether Question 76 was or was not limited to the

7

immediate tax year, and whether the defendants answered it falsely as charged.

The Court instructed the jury that the evidence in the case consisted of the sworn testimony of the witnesses, both on direct and cross-examination, the exhibits admitted into evidence, and any stipulations.  By contrast, the Court admonished the jury that "[a]rguments and statements by lawyers are not evidence...What they say in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence." [Tr. 12/19/07 at 157-158]

The Court also instructed the jury that it was "not limited to the plain statements made by witnesses or contained in the documents," and was "permitted to draw reasonable inferences from the facts" if such "inferences are justified in light of common sense and personal experience." [Id. at 159].

Finally, with respect to the tax forms themselves, the Court instructed the jury that it was their responsibility to interpret what Question 76 required, but made it clear that the jury was required to acquit the defendants if the interpretation Mubayyid (and Al-Monla) urged upon the jury was a reasonable one:

> Several counts of the indictment concern questions asked and instructions provided by the IRS on tax forms.  You may consider whether any such questions or instructions are ambiguous --that is, whether a reasonable person, viewing the question or instruction objectively, would conclude that it was reasonably capable of more than one reasonable interpretation.  If you find a question or instruction to be ambiguous

   under that standard, you should consider whether a
   defendant's response was actually false under each
   reasonable interpretation of the question or
   instruction.  If the defendant's response was truthful
   as to one reasonable interpretation of the question or
   instruction, you may not conclude that he provided a
   false response.

[Id. at 187]

  **<u>Argument</u>**

  A. <u>Standard of Review and Relevant Legal Principles</u>

  As a threshold matter, the government notes that Mubayyid failed to object to the statements he now challenges.  Even assuming that one defendant's objection applied to all counsel in this case, which was not at all clear for purposes of the closing arguments, Al-Monla's two objections do not save Mubayyid here because those objections were to the government's argument about the temporal scope of Question 76 rather than any alleged misstatements.  Accordingly, Mubayyid bears the burden of establishing plain error.  Specifically, he must demonstrate that the alleged misstatements "so poisoned the well that the trial's outcome was likely affected."  <u>United States v. Taylor</u>, 54 F.3d 967, 977 (1st Cir. 1995)(internal quotations omitted); <u>United States v. Olano</u>, 507 U.S. 725, 732-37 (1993)(requiring a showing of error that was plain or obvious that affects substantial rights); Fed.R.Crim.P. 52(b); <u>United States v. Bey</u>, 188 F.3d 1, 6 (1st Cir. 1999)("[w]e cannot find that an error has affected the defendant's substantial rights unless it is clear that the error

affected the outcome of the proceedings.")

For a claim that the prosecutor inaccurately stated the evidence to the jury during closing arguments, the First Circuit has instructed that one must determine "(1) whether the prosecutor's conduct was isolated and/or deliberate; (2) whether the trial court gave a strong and explicit cautionary instruction; and (3) whether it is likely that any prejudice surviving the judge's instruction could have affected the outcome of the case. Bey, 188 F.3d at 8 (quoting United States v. Lowe, 145 F.3d 45, 50 (1st Cir. 1998).  Mubayyid has not met this burden.

    B.   <u>Analysis</u>

        1.   <u>The Government did not Misstate the Evidence</u>

Mubayyid has mistaken a portion of the government's argument for a verbatim recitation of Question 76.  He assumes, incorrectly, that the government purported to cite the actual text of Question 76 when in fact the government was arguing its interpretation of the scope of the question to the jury.  Nothing in the record supports this assumption.  There was no possibility, for example, the government could trick the jury into believing it was reciting the actual language of the question, especially where the Form 990 itself was in evidence and had been repeatedly shown and read to various witnesses throughout the trial.  Moreover, no defendant reacted in a manner

suggesting that the government's statements were being offered as a verbatim recitation of Question 76.  Mubayyid, as noted above, did not ever object, and Al-Monla objected to the government's proffered interpretation but nothing else.  As such, the Court might well conclude that the defendant's argument, while perhaps tendered in good faith, seeks to do no more than to create an issue where none ever existed.  At a minimum, the Court could and should conclude that the government did not misstate the evidence in its closing.

> 2. Even if Improper, the Statements did not Affect Mubayyid's Substantive Rights or Prejudice his Rights to a Fair Trial.

Even assuming one were to treat the government's comments as "misstatements," Mubayyid's argument still fails easily because the statements simply were not significant enough to have affected the outcome of the case against Mubayyid, and thus did not affect Mubayyid's substantial rights.  The statements consisted of no more than a handful of words in a forty-five page transcript of the closing which lasted approximately 90 minutes.  In addition, the government's closing was then followed by those of each defendant and the government's rebuttal, which did not address this issue.  As such, any misstatements were brief, isolated, and buried, and almost certainly had little to no lasting impact.

Moreover, Mubayyid and Al-Monla collectively availed

themselves of the opportunity during their respective closings to clarify that Question 76 does not contain the word "ever," and to argue that the question should be interpreted as applying only to the immediate tax year. Thus, even assuming that a juror might have initially thought the government was reciting the text of Question 76 rather than arguing what the government contended the question meant, any ambiguity was obliterated by the defendants' subsequent arguments.

Finally, and perhaps most importantly, the Court instructed the jury that what the lawyers said was not evidence, that it was up to them to determine what Question 76 required, and that it must acquit the defendants if the jury found their interpretation to be objectively reasonable. These instructions, which Mubayyid did not object to, surely sufficed to correct any mis-impression any juror may have had because juries are presumed to follow instructions. United States v. Gonzalez-Vazquez, 219 F.3d 37, 48 (1st Cir. 2000); Lowe, 145 F.3d at 50 (finding that the district court's curative instruction that a closing argument was not evidence, "adequately addressed" the defendant's concerns regarding any misstatement).

## II. THE GOVERNMENT DID NOT CHANGE ITS THEORY MID-TRIAL REGARDING CARE'S ORPHAN SPONSORSHIP PROGRAM.

The defendant claims that he had no notice that the government contended that Care's orphan sponsorship program was

used to support or promote the mujahideen and jihad. The government never claimed that Care's entire orphan program was a fraud or illegitimate. Nor did it make such an argument at trial. To the contrary, from the very first charging document in this case, the April 2005 Criminal Complaint Affidavit against defendant Muntasser, the government clearly enunciated its theory that the orphan program was used, in part, to support jihad. [See D.3 (Complaint Affidavit) at 9 ("In addition to the Zakat guide, other documents that were seized during this investigation showed that Care expressly solicited money to support orphans of those killed fighting jihad, thus supporting jihad.")]. It never changed its theory as to this activity.

The legal basis for a claim of switching theories at trial is rooted in whether the supposed surprise of the defendant amounted to a variance between the evidence at trial and the allegations in the indictment that amounted to substantial prejudice. See United States v. Sutherland, 929 F.2d 765, 772 (1st Cir. 1991)(standard). There was no variance in this case, as the defendant was repeatedly put on notice that one of the ways in which the government would demonstrate some of the non-charitable activities of Care was through some of the orphan sponsoring.

The government put all the defendants, including Mubayyid, on notice of its theory that one of the purposes of the orphan

13

sponsorship program was to support jihad. Each defendant was provided a copy of the complaint affidavit cited above in discovery. In responding to the defendants' motion for bill of particulars, the government referred to this affidavit as providing further details as to Care's pro-mujahideen and pro-jihad activities. Similarly, in responding to the defendants' motion to dismiss the indictment, the government again notified the defendants that Care's orphan sponsorship program was used to support jihad in the affidavit of James Marinelli. [See Sealed Affidavit of James Marinelli dated November 21, 2006 at ¶38]. Additionally, in the government's pre-trial filings it also put the defendants on notice of its theory that the orphan sponsorship program was not wholly legitimate in that it was, in part, intended to support the mujahideen. [See D.334, Ex. 6 (Government's Expert Disclosures dated January 3, 2007 at 2: "Dr. Levitt will discuss how zakat and orphan sponsorship programs were used by alleged charities to provide money and services to individuals overseas, including family members of fighters and martyrs ... and how these activities benefitted the mujahideen and terrorist organizations. He will discuss materials distributed by Care as part of its zakat fund-raising and orphan sponsorship programs."); D.311, Ex. B (Dr. Levitt Expert Report at 22: "those charities focused on providing funds to the families, orphans and widows of martyrs remove any existing

financial disincentives to prospective mujahideen and provide an incentive for participation in Jihad.  Knowing their families will be provided for after their 'martyrdom' enables mujahideen to focus on their violent Jihad activities with the peace of mind that their families will enjoy the benefits of what amounts to a life insurance policy for mujahideen.  Alkifah/Care actively solicited funds for families of mujahideen, and discussed the subject on intercepted telephone calls as well.  Consider, for example, an online solicitation for Orphans Sponsorship that opens with the statement: 'Do you known who I am? I am an orphan whose father died in defense of the faith.'  It continues 'Won't you sponsor me, and fulfill part of your obligation to my father?'"); Government Trial Exhibit List (identifying multiple orphan solicitation materials that solicit money for orphans of martyrs including a solicitation entitled "Orphan/Shaheed Family Sponsorship").

   Conversely, the defendants were demonstrably on notice that the issue of the widows and orphans of the martyrs was a live one for trial, as in their expert disclosures, they too intended to elicit testimony that donations to the same were legitimate charitable activities. [D.342 Exhibit 3 (Expert disclosure of Dr. Shahrani).] In response, the government was entitled to present contrary evidence.  Cf. United States v. Saverese, 649 F.2d 83, 87 (1st Cir. 1981)(finding that once a defendant advances a

theory of the case, this opens the door to an appropriate response by the prosecution, commenting on the "quality of his ... witnesses or ... attacking the weak evidentiary foundation on which the defendant's theory of the case rested.").

The testimony elicited at trial was consistent with the government's pre-trial disclosures.  The government could not identify specifically how much of the money solicited under the auspices of this program actually went to orphans of the martyrs.  Thus, it conceded in its opening that Care engaged in "some" legitimate activities and later in opposing the admission of certain evidence, the government conceded that some unknown portion of that program was legitimate.  Nothing is inconsistent with these positions and the government's introduction of testimony during its case-in-chief that the focus of this program was indeed the orphans of the martyrs.

Similarly, nothing alleged in the indictment is inconsistent with the government's argument at closing that one of the ways Care supported jihad was through its orphan sponsorship program in that the focus of this program was the orphans of the martyrs.  The indictment alleged that the defendants affirmatively concealed from the government that "Care was engaged in activities involving the solicitation and expenditure of funds to support and promote the mujahideen and jihad, including the printing and distribution of pro-jihad publications."  [Sup. Ind.

at 11 ¶2]. Despite the defendant's suggestion to the contrary, the indictment did not restrict the type of Care's "activities" that supported or promoted the mujahideen and jihad to "the distribution of pro-jihad publications." The indictment was written using inclusive rather than exclusive language. [See Sup. Ind. Intro. at ¶¶ 13, 16, 18, 21; see Sup. Ind. at 9, 11 ¶2, 12 ¶7, 14 ¶13, 15-17].

As a result of the charging documents and the government's multiple pre-trial disclosures, the defendant was clearly on notice as to the evidence and charge that Mubayyid had to defend against. See United States v. Dubon-Otero, 292 F.3d 1, 6 (1st Cir. 2002) (in challenge to embezzlement conviction, finding no constructive amendment of indictment where indictment put defendants on notice that "they would have to defend against exactly the type of evidence of entrustment of which they now complain."). Thus, Mubayyid cannot now claim that he did not have an opportunity to prepare a defense when he received specific notice that the orphan solicitation program was one of the ways Care supported jihad. The government's exhibit list clearly identified at least five orphan solicitations that demonstrated that the focus of Care's program was on the orphans of the martyrs, one of which identifies Care's orphan program as

the "Orphan/Martyr[2] Family Sponsorship Program."  The government provided this list to the defendant months prior to trial. Additionally, at trial, Dr. Levitt testified consistently with his expert report that Care's orphan program created an incentive for prospective mujahideen to commit jihad thereby supporting jihad.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny the defendant's motion for new trial in its entirety.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: /s/ Donald L. Cabell
B. STEPHANIE SIEGMANN
ALOKE S. CHAKRAVARTY
DONALD L. CABELL
Assistant U.S. Attorneys

Certificate of Service

I do hereby certify that a copy of foregoing was served upon the counsel of record for the defendant Muntasser by electronic notice on this 29th day of April 2008.

/s/ Donald L. Cabell
Donald L. Cabell

---

[2] Care's original orphan solicitation in fact uses the arabic word for martyr, shaheed.  [See Govt. Ex. 123].