UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA          )
                                  )
          v.                      )    Crim. No. 05-40026-FDS
                                  )
MUHAMED MUBAYYID, and             )
EMADEDDIN Z. MUNTASSER,           )
and                               )
SAMIR AL-MONLA a/k/a              )
SAMIR ALMONLA,                    )
                                  )
          Defendants.             )

**GOVERNMENT'S OPPOSITION TO DEFENDANT MUHAMED MUBAYYID'S
RULE 29 MOTION**

The government opposes defendant Mubayyid's motion for a
judgment of acquittal on all counts of conviction.[1]  Mubayyid
contends [Def. Mem. at 5-6, 17-18] that there was insufficient
evidence to support his conviction on the tax filing charges in
Counts Three through Five, and argues that the remaining counts
must be overturned because they were dependent on the tax
charges.  As discussed more fully below, Mubayyid's argument is
groundless.  Prior to explaining why that is so, however, the
government summarizes some of the evidence from the trial
relating to Care, and Mubayyid's related activities, in order to
refute Mubayyid's assertion that "an innocent man has been

---

[1]The jury found Mubayyid guilty on all counts of the
Superseding Indictment in which he was named, including Count One
(Scheme to Conceal Information from the Government), Count Two
(Conspiracy to Defraud the United States), Counts Three through
Five (Making False Tax Filings), and Count Eight (Obstructing and
Impeding the IRS).

1

convicted by a jury bombarded with inflammatory and provocative
testimony and documentary evidence, much of which had nothing to
do with him." [Def. Mem. at 1].

**Relevant Facts**[2]

In June 1993, as it resolved in its articles of
incorporation, Care through Muntasser submitted a Form 1023
application to obtain a §501(c)(3) tax exemption as a charitable
organization. Although instructed to describe <u>all</u> of Care's
past, present and planned activities, Muntasser concealed
material information. He falsely claimed, for example, that Care
was not yet operational, and also failed to disclose that Care
was promoting jihad through the distribution of the Al-Hussam.
Muntasser also did not disclose that Care had already begun
distribution of the Al-Hussam newsletter, nor did he indicate
that Care planned to engage in such activity in the future. [Tr.
12:120, 122 & 13:66, 69, 71-72, 134 (Charnoff - initial IRS
reviewer of Care's 1023 Application); Tr. 15:97, 99, 120, 143 &
16:29, 71 (Sack - IRS' final decisionmaker of Care's 1023
Application); <u>see</u> Tr. 17:52 (Goldberg: words "newsletter" and
"Al-Hussam" not mentioned in Care's 1023 Application)].

Care also failed to disclose that it intended to solicit

---

[2]The government sets forth certain salient facts here but
incorporates by reference the comprehensive statement of facts
contained in the government's opposition to defendant Muntasser's
Rule 29 motion.

2

money for jihad or the mujahideen, or to promote jihad and the
mujahideen, through the distribution of tapes, books, or
newsletters.  Furthermore, Muntasser concealed the true "purpose"
of one of Care disclosed activities ––its orphan sponsorship
program; the program was not intended to benefit all orphans but
rather was primarily intended to assist the orphans of the
martyrs, thus, promoting jihad. [Govt. Exs. 123 & 185; Tr.
20:137-139 (Levitt); <u>see</u> Tr. 12:147 (Charnoff: would not have
approved Care's 1023 Application if it had disclosed that the
focus of its orphan program was the children of martyrs because
such activity was an "inducement" to fight.)].

     Care also concealed its relationship to Al-Kifah when
Muntasser answered "no" to the question whether Care was "an
outgrowth of (or successor to) another organization . . ." [Govt.
Ex. 2, Part II, Question 5].  As the jury concluded, Care was in
fact the successor to and outgrowth of Al-Kifah.

     Although not a formal founding member of Al-Kifah or Care,
Mubayyid participated in both organizations in the early 1990's.
For example, Mubayyid introduced Al-Monla to Al-Kifah in 1990.
[Tr. 18:43].  And, in 1990 or 1991, Mubayyid, Al-Monla, Akra and
their respective spouses, and possibly Wasseem Yassin as well,
all traveled to Pakistan as part of a trip facilitated by Mohamed
Chehade of Global Relief. [Id.].  As the evidence showed, all of
these men were associated with Al-Kifah and became officers of

Care or GRF.  Further, beginning in 1992 and continuing through
1994, Mubayyid made monthly donations to Al-Kifah and continued
to make these monthly donations to Al-Kifah even after Al-Kifah
changed its name to Care International. [See Govt Exs. 408-431].
Further still, as demonstrated by other checks Mubayyid wrote to
Al-Kifah, he was conducting sales[3] for Al-Kifah in March 1993.
[Tr. 20:58-59 (Youngquist); Govt. Ex. 344].  With respect to
Care, Mubayyid was a Care volunteer in 1993-1994, during which
time he sold tapes and stored Care's records, promotional
materials, books, and/or tapes. [See Govt. Exs. 359, 370, 387
(demonstrating that Mubayyid was involved in selling hundreds
dollars of tapes for Care);[4] Govt. Ex. 136 (Muntasser wrote Care
checks to Mubayyid in 1994 for storage).

On October 28, 1993, Gerald Sack notified Care by letter
that the IRS had determined that Care was entitled to exemption
under Section 501(c)(3) based upon the information Muntasser
supplied and "assuming [its] operations [would] be as stated in
[its] application." [Govt Ex. 2].  The letter put Care on notice
that it was required to file IRS Form 990 returns on an annual

---

[3]Based upon his later involvement at Care beginning in April
1993, these sales most likely consisted of the sales of tapes or
the solicitations of donations.  Either way, Mubayyid was
directly involved with both Al-Kifah and Care International
during the transition period and was therefore well aware that
Al-Kifah morphed into Care International.

[4]Mubayyid wrote a similar check to Al-Kifah for sales in
March 1993.

basis if its donations exceeded $25,000, and was generally required to notify the IRS if Care's "sources of support" or its "purposes, character, or method of operation change[d]" from that previously disclosed its in application, so that the IRS could "consider the effect of the change on [its] exempt status." [Govt Ex. 2]. On June 11, 2000, the IRS sent a second, virtually identical letter to Care. [Govt. Ex. 293]. Notably, Mubayyid maintained copies of the October 1993 and June 11, 2000 IRS letters in his residence. These letters were all found in a single file folder on Mubayyid's porch that contained copies of Care's Bylaws, Articles of Incorporation and Form 1023 Application. [See Govt. Ex. 293; Govt. Ex. 290 (another copy of June 11, 2000 letter from IRS).].

However, Mubayyid and the other defendants never apprised the IRS of any such changes, whether by letter to the key District office or through the Form 990. More specifically, Part III of the Form 990, entitled "Statement of Program Service Accomplishments," required Care to list all of its program services or ongoing activities, and the instructions explicitly provided that a newsletter was a program service. [Tr. 17:43-46 (Goldberg); Def. Ex. 1123; accord Govt. Ex. 560 (1994 Instructions for Form 990)]. In addition, Question 76 of the Form 990 asked the organization whether it engaged "in any activity not previously reported to the IRS? If yes, attach a

detailed description of each activity." [Tr. 17:38-39 (Goldberg);
Govt. Exs. 5-14]. As the evidence showed, Care and the
defendants consistently answered Question 76 negatively.

In fact, Care engaged in many activities it never disclosed
to the IRS. From 1993 through 2003, Care directly solicited
money for the mujahideen, and expended money to support and
promote the mujahideen and jihad by distributing pro-jihad
newsletters and books, organizing and holding pro-jihad lectures,
organizing and soliciting money for the orphans of the martyrs,
and selling pro-mujahideen tapes and videos. With respect to
Mubayyid, he was, as noted above, a Care volunteer in 1993-1994?
and sold tapes and stored Care materials at his residence.
Subsequently, beginning in or around 1997 through 2003, Mubayyid
served as Care's Treasurer. While Treasurer, he organized and
stored Care's records at a storage facility and in his own
residence. [See, e.g., Govt. Ex. 552A (in telephone conversation
with another Care officer, Mubayyid explains how he organized all
of Care's financial records by calendar year)].

From 1993-1997, Care published the Al-Hussam newsletter
twice a month and later once a month. [Tr. 20:67-70
(Youngquist)]. After 1997, articles from the Al-Hussam were
republished on Care's websites. [Govt. Exs. 307 & 309]. Mubayyid
was in charge of the creation of the second website, www.care-
intl.org, in or about November 1998. [Tr. 11:165-174 (Wisam Ali

Ahmad: Mubayyid first approached him to assist Mubayyid in the creation of Care's new website in approximately 1997; see also Govt. Exs. 316-318]. Among other things, this website contained articles from the Al-Hussam and direct solicitations for financial support for the mujahideen. [See Govt. Ex. 309; Tr. 20:121 (Levitt)]. Levitt testified that the Al-Hussam newsletters promoted jihad by encouraging readers, whether male or female, to participate in fighting or to finance the fighters (a concept known as economic jihad). [Tr. 20:121, 126-127].

In approximately 1995, Care began publishing and selling English copies of Azzam's book entitled "Join the Caravan," which was originally written in Arabic, and instructed readers to engage in violent jihad. [Govt. Ex. 178; see also Govt. Exs. 466-468 (August and September 1995 issues of Al-Hussam describing "Join the Caravan" and indicating that Care was selling the book for $3.00); Tr. 20:128 (Levitt)]. Care continued to sell this book until approximately 2003 as 35 copies of the book were found at Mubayyid's residence at the time of the search. [Tr. 9:96 (Special Agent Lazarus); see, e.g., Tr. 11:74-76, 97 (Tiba describing how Care sold book during 1996-1997).

Like Al-Kifah, Care also had an orphan sponsorship program, which primarily focused on assisting the orphans of particular people -- the orphans of martyrs, thus promoting violent jihad. [Govt. Exs. 123 (Care solicitation form entitled "Orphan/Shaheed

Family Sponsorship"), 185, 309 (website); Tr. 11:96-97 (Tiba)].
Each defendant, including Mubayyid, was involved with this
program. For instance, the same flyers that Tiba recalled being
used to solicit money for the orphans of the martyrs under Al-
Monla's leadership were similarly found on Care's website in 2000
and 2001, which Mubayyid controlled. [Compare Govt. Ex. 185 with
Govt. Ex. 309; see also Govt. Exs. 445-446]. As explained by Dr.
Levitt, such a program encouraged prospective mujahideen to
participate in fighting by providing an incentive to engage in
violent jihad and removing financial disincentives or concerns
about the economic welfare of one's children/family. [Tr.
20:137-139].

      No defendant, including Mubayyid, ever reported these
previously undisclosed activities to the IRS when filing the
required annual Form 990. Specifically, during 1993-2002, the
defendants collectively signed, under the penalty of perjury,
false tax returns, on behalf of Care, in which they concealed
Care's pro-jihad and pro-mujahideen activities and the true
nature of its orphan sponsorship program from the IRS. For
instance, like its 1023 Application, none of Care's Forms 990
disclosed the publication of the Al-Hussam newsletter to the IRS
although it was legally obligated to provide such information.
[Govt. Exs. 5-14, 560; Def. Ex. 1123; Tr. 17:55-67; see Tr. 17:52
(Goldberg: "I would [have] expect[ed] it [Care's Al-Hussam

8

newsletter] to be listed [in its Forms 990] because, as we read
in the directions, it falls in the category of 'program
services.'"); see, e.g, Govt. Ex. 6 (Forms 990 for 1994-2002,
explicitly instruct filer to include in its description of
Program Services Accomplishments "the number of clients served,
publications issued, etc."].

Focusing on Mubayyid, he answered "no" to Question 76 on the
Forms 990 for the tax years 1997, 1999 and 2000.  Question 76 is
broadly worded and designed to obtain information regarding "any
change in activities" since the filing of the application for tax
exempt status.  Because the question necessarily required the
signer to be aware of information contained (or not) in prior tax
filings, Mubayyid was obliged to review the 1023 application and
all previously filed Form 990s to ensure that his answer to
question 76 is correct. [Tr. 17:111 (Goldberg)].  Accordingly,
Mubayyid represented that no activities other than those
reflected in the Forms 990 had occurred, and he thus made false
statements to the IRS and concealed Care's pro-jihad related
activities by virtue of his negative answers to Question 76.

The materiality of the concealed information is
indisputable.  If the IRS determined that Care was engaging or
had engaged in non-charitable activities such as the solicitation
of money for fighters or encouragement of people to travel
overseas to fight, the IRS would likely have revoked its tax

exempt status. [Tr. 17:112-113, 118 (Goldberg)].

In addition to concealing information from the IRS, Mubayyid also concealed information about Care from the FBI in 2001 and 2003, and destroyed evidence of Care's support for jihad. On September 16, 2001, Trooper Richard Ball, a member of a FBI task force, and FBI Special Agent Victor Treadway interviewed Mubayyid. [Tr. 14:170-171]. When asked, Mubayyid described Care's purpose as a purely charitable organization and he concealed its pro-jihad activities. [Id. at 172]. Mubayyid similarly failed to disclose that Care's orphan sponsorship program was focused on the orphans of the martyrs. Nor did he disclose that Care solicited money for the mujahideen and engaged in activities that supported and promoted mujahideen and jihad. [Id. at 172-174].

In addition, Trooper Ball asked Mubayyid about the recipients of Care donations in 2000. [Id. at 173-174, 181]. Mubayyid was only willing to reveal one beneficiary, GRF. Trooper Ball asked Mubayyid this question several times but Mubayyid refused to reveal any other recipients of Care donations in 2000. [Tr. 14:174 (Ball: "He would name no other individuals or organizations that the money went to.")]. By so doing, Mubayyid purposefully concealed his connection and that of Care to Bassam Kanj, a known jihadist who died while fighting Lebanese forces in January 2000. [Tr. 3:112-113 (Special Agent Peet); Tr.

10

14:84 (Kohlmann)].  On January 8, 2000, two days after Kanj's martyrdom, Mubayyid personally contributed money for the purpose of assisting Kanj's orphans.

Two weeks after this interview, on October 2, 2001, Mubayyid confided in Chehade, a former Al-Kifah member and GRF's President, that he suspected that the FBI had searched Care's "old location."  Chehade instructed defendant Mubayyid to "remove" evidence of Care's activities from its storage unit, which was under Mubayyid's control. [Govt. Ex. 540A].  The underlying reason for this instruction is clear -- Chehade was a party to at least one meeting about Care's pro-jihad activities and likely knew evidence of Al-Kifah's and Care's pro-jihad activities or notes of that meeting were kept and maintained with Care's effects.  During this conversation, Mubayyid and Chehade also discussed the perils of transferring money between Care and GRF in a time of such scrutiny, and Care's records reflect that tens of thousands of dollars were transferred to GRF from Care at the time.

On October 4-5, 2001, FBI agents conducted a covert search of Care's storage unit, which was rented and controlled by Mubayyid.  At the time of this search, agents copied hundreds of pages of documents, including nine pages of Arabic notes, a letter written in Arabic, a printout of an email sent from Azzam

publications to Care International,[5] and a picture of Sheik Azzam
with Arabic handwritten notes that described him as "the Prince
of the Arab Mujahideen."  These nine pages of notes memorialized
at least one meeting between members of Care and GRF, including
Chehade, in April 1995 and largely concerned how the
organizations could support violent jihad.  The arabic letter
contained a pledge of support to Hekmatyar, an Afghan Mujahideen
warlord, in the cause of jihad.

    Between the 2001 search and the criminal search of Care's
storage unit in April 2003, Care's storage unit remained under
Mubayyid's control. [See generally Tr. 5:61-69, 81-84 (Karen
White)].  At some point during this time period, Mubayyid
destroyed the Arabic notes and letter to Hekmatyar as Chehade had
instructed.  In April 2003, when Care's storage unit was
searched, neither the Arabic notes, letter to Hekmatyar, nor the
Azzam publications' email was found.  A document shredder was
also found in the storage unit.  No such equipment was observed
during the earlier search in October 2001. [Tr. 5:111 (Special
Agent Habich); Tr. 8:47, 51 (Special Agent Lazarus)].

    During a search of Mubayyid's residence that occurred on the
same day as the search of Care's storage unit, however, the same
exact email as that observed in the storage unit during the 2001

---

    [5]This email addressed the issue of how to get money to
legitimate "'fighting groups'" and the "'mujahideen'" in Kosova.

search was found.  The email was found amongst Al-Hussam?

newsletters of Care and Al-Kifah and other Care materials that

were moved from the storage unit to Mubayyid's apartment.  [Tr.

9:53, 134 (Special Agent Lazarus)]. Unlike the Azzam publications

email, the jihad related arabic notes and pledge of support to

Hekmatyar that were observed and copied during the 2001 covert

search were not found at either location, giving rise to the

wholly reasonable inference that they were destroyed by Mubayyid.

[Tr. 10:26-28 (Special Agent Lazarus: instructions provided to

agents; arabic documents not found); Tr. 7:143-146 (Special Agent

Toole); Tr. 7:169-171 (Special Agent O'Neil); 19:114 (Vallee)].

## Standard of Review

Under Rule 29, the court "must enter a judgment of acquittal

of any offense for which the evidence is insufficient to sustain

a conviction." Fed.R.Crim. 29(a).  The First Circuit has

elaborated in the standard for judicial review of evidentiary

sufficiency in a criminal case as follows:

> If the evidence presented, taken in the light most
> flattering to the prosecution, together with all
> reasonable inferences favorable to it, permits a
> rational jury to find each essential element of the
> crime charged beyond a reasonable doubt, then the
> evidence is legally sufficient. See Jackson v.
> Virginia, 443 U.S. 307, 319 (1979) [additional
> citations omitted].  In evaluating sufficiency, both
> direct and circumstantial evidence are accorded weight.
> See e.g., United States v. O'Brien, 14 F.3d 703, 706
> (1st Cir. 1994).  So long as the evidence, taken as a
> whole, warrants a judgment of conviction, "it need not
> rule out other hypotheses more congenial to a finding

13

of innocence." <u>United States v. Gifford</u>, 17 F.3d 462, 457 (1st Cir. 1994).

　　　When...a criminal defendant mounts a sufficiency challenge, all the evidence, direct and circumstantial, is to be viewed from the government's coign of vantage. Thus, the trial judge must resolve all evidentiary conflicts and credibility questions in the prosecution's favor; and, moreover, as among competing inferences, two or more of which are plausible, the judge must choose the inferences that best fit the prosecution's theory of guilt.  <u>See</u> <u>United States v. Taylor</u>, 54 F.3d 967, 974 (1st Cir. 1995); <u>United States v. Rothrock</u>, 806 F.2d 318, 320 (1st Cir. 1986).

<u>United States v. Olbres</u>, 61 F.3d 967, 970 (1st Cir. 1995).

Moreover, this Court must look at the whole of the evidence introduced at trial.  "[I]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it.  The sum of an evidentiary presentation may well be greater than its constituent parts." <u>Bourjaily v. United States</u>, 483 U.S. 171, 179-80 (1987).  <u>See also</u> <u>Huddleston v. United States</u>, 485 U.S. 681, 691 (1988)(same).

**Argument**

**THE EVIDENCE WAS SUFFICIENT TO CONVICT MUBAYYID OF KNOWINGLY SUBMITTING FALSE TAX FILINGS AS CHARGED IN COUNTS THREE THROUGH FIVE**

When viewed in the light most favorable to the government, as it must be, the evidence was easily sufficient for a rational jury to find Mubayyid guilty beyond a reasonable doubt on Counts Three through Five.  This Court properly charged the jury that in order to convict Mubayyid on a charge of violating 18 U.S.C. §

14

7206(1), it must find beyond a reasonable doubt that: (1) the defendant made and "subscribed" a federal tax return; (2) that the tax return contained a written declaration that it was being signed under the penalties of perjury; (3) that the defendant did not believe the return to be true and correct as to the material matter charged in the indictment; and (4) that the defendant acted willfully.  The Court also instructed the jury that willfully means to act voluntarily and intelligently and with the specific intent that the crime be committed.  See United States v. Boulerice, 325 F.3d 75, 80-81 (1st Cir. 2003); [Tr.24: 168, 180-182].

Mubayyid concedes for purposes of the motion that the evidence was sufficient to show he made the tax returns at issues and signed them under the penalties of perjury, but he contends that the evidence was insufficient for a rational jury to conclude that his answers to Question 76 were false or, assuming they were, that he acted willfully. [Def. Mem. at 5-6].  This argument simply has no force in light of the evidence adduced at trial.

To begin, Mubayyid's argument that he did not answer Question 76 incorrectly is based on the premise that Question 76 applies only to the immediate tax year, and did not require him to report any activities before then. [Def. Mem. at 6; ("the negative answer can only be false if the organization *during the*

15

*tax year* in question did in fact engage in 'activities' not previously reported to the IRS.")].  In support of this assertion, Mubayyid contends that the syntax and verb tenses used in Question 76 and the corresponding instructions suggest that Question 76 is to be limited in time to the immediate tax year. [Id.].  Mubayyid also deems it significant in this regard that Dawn Goldberg opined that she would expect the "ongoing" publication of the Al-Hussam newsletter to be acknowledged in the Form 990, but was not asked to opine that Care was required to report the publication of Al-Hussams from prior years. [Def. Mem. at 6-10].  However, Mubayyid ignores the fact that the jury was presented with evidence suggesting that Question 76 is not limited in time to the immediate tax year and necessarily resolved this issue in the government's favor.  The jury's conclusion was amply supported by the evidence.

First, Question 76 itself contains no explicit time limitations. ("Did the organization engage in any activities not previously reported to the IRS?")  Moreover, the instructions to Question 76, when parsed, provided the jury with a rational basis to conclude that Question 76 is not bounded by any time limitations because it instructs the organization to "include new or modified activities...not listed by an attachment to the organizations's return *for any earlier year*."  Because returns "for any earlier year" must be prior Forms 990, it would be

eminently reasonable to interpret the instruction as requiring the organization to inform the IRS of any activity from a prior year that should have been reported in a Form 990, but was not.

Dawn Goldberg's testimony was not inapposite and, indeed, supported this position.  She testified on direct that, assuming Care did not list the publication of the Al-Hussam newsletter in its Form 1023, she would have expected Care to list it in subsequent Forms 990. [Tr. 17:52].  And, when asked on cross-examination whether it was her testimony that Care, in 1997, should have reported publication of the Al-Hussam newsletter "if they hadn't reported it on the 1023" and had "never reported it before," Ms. Goldberg "That's correct." [Tr. 17:106].  The defendants were free to cross examine Ms. Goldberg on the temporal reach of Question 76 but did not do so.

Moreover, the defendant can hardly be heard to intimate that this issue was not squarely raised during the trial.  The meaning of the terms and language used in the various IRS forms, including question 76 and the Form 990, was one of the true live issues at trial and the Court explicitly instructed the jury that it was up to the jury (rather than any expert) to determine from all the evidence what the various forms required.[6]  As such, no

_____

[6]The Court instructed the jury as follows: "Several counts of the indictment concern questions asked and instructions provided by the IRS on tax forms.  You may consider whether any such questions or instructions are ambiguous --that is, whether a reasonable person, viewing the question or instruction

17

expert testimony was ever required to be elicited on this issue.

There was also ample evidence, notwithstanding Mubayyid's argument to the contrary, for a rational jury to conclude that Mubayyid was aware of Care's activities before he became its treasurer, and was equally aware of what Care had (and had not) previously disclosed to the IRS on its Form 1023 and prior Forms 990. As noted above, and omitting the record citations here, Mubayyid was a Care volunteer in 1993-1994 and sold tapes and stored Care's records, promotional materials, books, and/or tapes. He possessed at his residence IRS letters written in 1993 and 2000 informing Care of its ongoing obligation to inform the IRS of any changes in care's purpose or activities. He also had along with those letters a copy of Care's original 1023 application, articles of incorporation, and bylaws. While Treasurer, Mubayyid organized and stored Care's records at a storage facility and in his own residence. After Care stopped publishing the Al-Hussam newsletter around the beginning of 1997, articles from the Al-Hussam were republished on Care's websites

---

objectively, would conclude that it was reasonably capable of more than one reasonable interpretation. If you find a question or instruction to be ambiguous under that standard, you should consider whether a defendant's response was actually false under each reasonable interpretation of the question or instruction. If the defendant's response was truthful as to one reasonable interpretation of the question or instruction, you may not conclude that he provided a false response. [Tr. 24:187] There were, as near as the government can tell, no objections to the Court's instruction.

and Mubayyid was in charge of the creation of the second website,
which republished prior Al-Hussam articles and solicited
financial support for the mujahideen.  Mubayyid also had at his
residence at least 35 copies of "Join the Caravan," which Care
sold until at least 2003 and which instructed readers to engage
in violent jihad.  The jury rationally could have concluded from
all of this evidence that Mubayyid was familiar with Care's
activities prior to 1997, was familiar with its prior tax
filings, reviewed those filings prior to submitting the Forms 990
for 1997, 1999 and 2000, and accordingly knew his answer was
false when he answered in each instance that Care did not engage
in any activities not previously reported to the IRS.[7]

In short, there was more than sufficient evidence, taken in
the light most favorable to the government, for a rational jury
to find that Mubayyid submitted false tax filings in violation of
18 U.S.C. § 7206(1) as charged in Counts Three through Five.
And, because Mubayyid concedes that his challenge to the
remaining counts of conviction hinges on the outcome of a claim

---

[7]Mubayyid appears to argue that the jury could not properly
consider any evidence of Care's activities aside from the
publication of the Al-Hussam newsletter because the government
did not have Dawn Goldberg opine that any of these activities,
some of which occurred prior to as well as during Mubayyid's helm
as treasurer, should have been reported to the IRS.  As discussed
above, though, it was up to the jury to determine what the IRS
forms required, and while Goldberg's testimony was almost
certainly accorded some degree of importance, it was not required
in order for the issue to be argued before the jury.

that has been shown to have no merit, the entire Rule 29 motion should be denied.[8]

**Conclusion**

For the foregoing reasons, the government respectfully requests that the Court deny the defendant's Rule 29 motion.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  /s/ Donald L. Cabell
     B. STEPHANIE SIEGMANN
     ALOKE S. CHAKRAVARTY
     DONALD L. CABELL
     Assistant U.S. Attorneys

---

[8]The same arguments stated herein apply with equal force to defendant Al-Monla and the false, affirmative statements he made on the 1998 Form 1990.  Similarly, for the reasons noted above, all of the false statements made on the Forms 990 at issue constitute overt acts in furtherance of the conspiracy charged in Count Two.