UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA        )
                                )
            v.                  )    CRIMINAL NO. 05-40026-FDS
                                )
SAMIR AL-MONLA                  )

DEFENDANT AL-MONLA'S REPLY TO GOVERNMENT'S
OPPOSITION TO MOTIONS FOR ACQUITTAL AND FOR A NEW TRIAL

Defendant Al-Monla respectfully submits this reply to the government's opposition to his motions, pursuant to Fed. R. Crim. P. 29(a) and (c) and 33, for judgments of acquittal on count one and two, and for a new trial.  As he has done with all prior filings in this case, defendant joins the motions and petitions for relief set forth in co-defendants' filings.

I.    The Court's Instruction on "Material" Relating to Count One

The government resists characterizing count one as a "tax charge,"[1] Government's Opposition to Defendant Al-Monla's Motion for Judgment of Acquittal, docket 509 at 3, asserting that the charged scheme involved concealment of information "from the government."  It argues a broad notion of "materiality," asserting that "[t]he FBI and DHS were repetitively thwarted in

---

[1]A notable exception occurs where the government reverses field to argue that the statute of limitation for count 1 was six years, asserting that arises under the internal revenue laws and, alternatively, that "reading Count One to have a six year limitations period was reasonable under the circumstances." Government's Opposition to Defendant Al-Monla's Unsealed Grounds for a New Trial, docket 508 at 2-3.

doing their independent agency functions by the defendant's falsehoods." Government's Opposition to Defendant Muntasser's Motion for Judgment of Acquittal, docket 505 at 117. Its effort to slip the bounds of the indictment to assert a scheme broader than that charged must confront the Court's charge on "material" on count one:

> The second element that the government must prove beyond a reasonable doubt as to Count One is that the defendants concealed a fact that is "material." A fact is "material" if it has a natural tendency to influence or be capable of influencing the decision of the decision-maker to which it was addressed, regardless of whether the decision-maker actually relied upon it, or whether a different decision would have resulted.
>
> Here, the government alleges that the concealed facts would have had a natural tendency to influence, or be capable of influencing, the IRS in making its determination whether Care International qualified for tax-exempt status under Section 501(c)(3) of the Internal Revenue Code and should continue to be accorded that status thereafter. The government need not prove, however, that Care International would have been denied tax-exempt status, or had that status revoked, had those facts been disclosed.

Tr. Dec. 19, 2007 at 167. This instruction was faithful to the count one charge, and in any event, is the law of the case. See United States v. Dwinells, 2007 U.S. App. LEXIS 26809 (1st Cir. 2007), citing United States v. Gomes, 969 F.2d 1290, 1294 (1st Cir. 1992). Within the bounds set by this instruction, one can voice the same concerns expressed by the Court in connection with count eight, among them:

> As to Al-Monla, he's interviewed on September 17, 2001, and April 7, 2003, again by FBI agents. Brad Davis was

> the one who testified.  He's asked questions about
> finances and charitable activities of Care.  But again,
> no tax questions and no identification as -- that
> they're working as part of a joint task force.
>
> I'm having a great deal of difficulty seeing how any
> false statements made to the FBI can be attributed to
> Muntasser and Al-Monla as statements or acts impairing
> the due administration of the Internal Revenue Code.
> Certainly from the defendants' perspective, there's no
> IRS connection at all at that point in the interview as
> near as I can tell.

Tr. Dec. 13, 2007 at 31.  Or the Court's question: what was the

"separate nontax independent interest [of the FBI] in that

question" of outgrowth?  Tr. Dec. 13, 2007 at 23.  Or another:

"What's the evidence that there was an ongoing tax investigation

at the time [of the interviews]?  Just the fact that there was an

IRS agent working...."  Tr. Dec. 13, 2007 at 38.  Consistent with

these concerns, the Court ruled in connection with count eight:

> I think its simply too much of a stretch for the jury
> to find that a false statement made to an FBI agent or
> to Immigration Services long after the fact and
> concerning only the same generalized subject matters
> constitute the act of obstructing or interfering with
> the administration of the Internal Revenue laws.

Tr. Dec. 13, 2007 at 69.  If statements by Al-Monla (and

Muntasser, for that matter) did not "obstruct[] or interfer[e]

with the administration of the Internal Revenue laws," how were

they material to count one, where "material" was defined in the

jury charge as capable "of influencing[] the IRS in making its

determination whether Care International qualified for tax-exempt

... and should continue to be accorded that status thereafter"?

-3-

Alleged false statements which did not "obstruct[] or interfer[e] with the administration of the Internal Revenue laws" would presumably not "influenc[e] the IRS in making its determination whether Care International qualified for tax-exempt ... and should continue to be accorded that status thereafter."

The Court's instruction on the element of materiality was proper, and it forecloses the government's effort to argue a broader materiality for the count one scheme. Since the interview of Al-Monla in 2003 had, to use the Court's words, "no IRS connection at all," it is indeed "too much of a stretch" for a jury to treat the interview as a continuation of the count one scheme, and the relief ordered in connection with count 8, dismissal due to untimeliness of the charge, should be ordered here.

II. <u>Other Statute of Limitations Issues</u>

The government responds to other limitations challenges to counts 1 and 2 by repeating the content-free mantra that Care promoted and supported jihad and the mujahideen without identifying the continuing conduct which might bring Care's actions within the limitations period. For example, the government highlighted the newsletters, arguing that "the Form 990 ... singled out the publication of an <u>ongoing</u> newsletter as exactly the type of activity that needed to be listed on the Form 990," Government's Opposition to Defendant Muntasser's Motion for

-4-

New Trial, docket 506 at 12-13 [emphasis added], conspicuously
failing to address the significance of the discontinuance of the
"ongoing" newsletter in January 1997.  The government highlighted
lectures and the sale of books and tapes, but nowhere
acknowledged the absence of proof of lectures and tapes after
1996-97.

The conspicuous question – since the only claimed falsehood
on the 990 returns was Question 76[2] - was what "significant
changes in the kind of activities [Care] conduct_s_" (with emphasis
on the present tense) were concealed from IRS?  In 1998?  In
1999?  In 2000?  The simple answer was there were none.

The government's several oppositions are conspicuously light
in regard to Care's actions post-1997.  It mentions the website
($16 monthly), and approximately 35 copies of Join the Caravan
found in the 2003 search, Tr. Nov. 27, 2007 at 96 (with no
indication how long they had been in storage).  No sensible
argument can be made that these are "significant activities" or
significant changes in the kind of activities [Care]
conducts...."  So the question – what exactly were the
undisclosed matters on the 990's in 1998 and thereafter – went
unanswered.

---

[2]The government stated at trial:  "In the 990, what we
allege is false is question 76.  We don't allege that when they
say in program service accomplishments that they gave them this
much money to the orphans, or this much money to the widows that
was false."  Tr. Nov. 26, 2007 at 25-26.

III.  There Was No Testimony that Care's Orphan Program was
      Non-charitable

     The government repeatedly argued that Care's orphan program

supported jihad.  Among other things, it asserted:

     Muntasser concealed the true 'purpose' of one of Care
     disclosed activities – its orphan sponsorship program;
     the program was not intended to benefit all orphans but
     rather was primarily intended to assist the orphans of
     the martyrs, thus promoting jihad.

Government's Opposition to Defendant Muntasser's Motion for

Judgment of Acquittal, docket 505 at 21-22.  The government did

not acknowledge that, in its Government's Motion in Limine to

Exclude Evidence Regarding Care's Irrelevant Activities at 4

(docket 337), filed on November 5, 2007, it had renounced the

argument:

     The government has not criticized in the indictment nor
     will it argue that assistance to orphans or widows is
     not charitable. As alleged in the indictment, the only
     issue is whether Care engaged in other non-charitable
     activities that the defendants decided to conceal from
     the government.

Id. [emphasis added].[3]  One reason for the concession was that

aid to orphans has long (centuries long) been charitable and

there was no admissible trial testimony otherwise.  See infra.

_____

     [3]Over time, the government has changed its concession about
Care's charitable activities.  In its opening statement, it said
"There were widows; there were orphans; there were the wounded,
the maimed. People needed help. One of the things Care did was to
solicit funds to help.  That's fine." Tr. Nov. 15, 2007 at 32.
Now, its concession is that "Care did also engage in some
charitable activities such as the collection of money for food
sacrifices (religious) and the construction of schools and
mosques."  Government's Opposition at 126, n. 122.

-6-

Another reason emerged from the government's admission, only just made in its Government's Opposition to Defendant Mubayyid's Motion for a New Trial, docket 513 at 16, that it "could not identify specifically how much of the money solicited under the auspices of the program actually went to orphans of the martyrs." In a tax case where the amount of money devoted to an alleged non-charitable purpose mattered (since any non-exempt activities must be "more than an insubstantial part of its activities," see 26 C.F.R. § 1.501(c)(3)-1(c)(1)), the government was entirely unable to prove whether the alleged offending activity was or was not substantial. Small wonder that the government ditched the argument pretrial. Small wonder, too, that its volte-face at trial fell short of sufficient proof.

a.

First, there was no expert testimony that aid to orphans was uncharitable. The government asked Mr. Charnoff: "...if Care had disclosed that their orphan sponsorship program would focus on children of martyrs, would you have considered that a charitable activity?" Tr. Nov. 30, 2007 at 146. Over objection, Charnoff said:

> My decision-making process would definitely affect
> things because it's, in effect, it's telling would-be
> fighters in  foreign conflicts that if something
> happens to them, if they're killed, say, this
> organization will provide funds to their orphans.  So
> the net effect is it's an inducement for them to go to
> these areas of conflict.

-7-

<u>Id</u>. at 147.  The Court limited the testimony, cautioning that
"this is the witness' opinion, reaction, and should be taken in
that light only."  Tr. Nov. 30, 2007 at 147.  Charnoff's
testimony was not expert testimony, and, in any event, was
limited by the Court.

On cross, Charnoff acknowledged that "someone could be a
martyr if they died delivering medical supplies" and that there
was nothing wrong "with encouraging someone to deliver medical
supplies to people in need."  Id. at 154.  He also agreed that
"sponsor[ing] orphans of refugees" was "a charitable purpose",
"most definitely," and that "in Afghanistan and Bosnia there were
substantial numbers of refugees."  Id. at 159.

On the government's own evidence,[4] the meaning of "martyr"
and "martyrdom," according to Gvt. Exh. 553, included dying on
the battlefield as well as death from the plague, intestinal
disorders, drowning, being speared or stabbed, being crushed in a
house collapse, death because of an abscess in the leg,  fire, or
childbirth.  The government also read to the jury a story from an
Al-Hussam newsletter about a woman, who was raped and killed by
the Bosnians, and it referred to her as a martyr.  As noted by

---

[4]"[I]f the government introduces evidence contrary to the
inferences it wants the jury to draw, it must introduce other
direct or circumstantial evidence to relieve itself of the effect
flowing from the evidence introduced."  <u>United States v.
Pappathanasi</u>, 383 F.Supp.2d 289, 290 (D.Mass. 2005)(granting Rule
29 motion because proof of conspiratorial tax agreement was
inadequate).

the defense, "clearly that term ['martyr'] does not refer
exclusively to people killed on the battlefield."  A fund raising
flyer, Gvt. Exh. 445, began "Do you know who I am?  I am an
orphan whose father died in defense of the faith.... Won't you
sponsor me, take care of me and save me from begging?"   The
flyer continued: "Sponsor an orphan so that Allah may take care
of you.  Sponsor an old father, whose back is bent over with age.
Sponsor a mother, who has devoted her life to serving her
children, and whose source of livelihood has now ceased.  Sponsor
a student of religious knowledge, and elevate the faith."[5]

Charnoff knew that Care would provide relief to Muslims.

Q.   Is it fair to say that looking at this application, you
would expect this group of people to be looking to provide
relief and aid to the Bosnian Muslims?

A.   Yes.

Q.   Not to the Serbs and not to the Croats, correct?

A.   Correct, correct.

Q.   Similarly in Afghanistan, you were aware, were you not,
that at the time of this application, there had been, for a
long time, a war in Afghanistan between the native -- the
Afghanis and the Soviets?

A.   Yes.

Q.   And you were aware that that had created monumental

_____

[5]The government does not dispute that Care collected "money
for food sacrifices (religious)," Government Opposition at 126,
n. 122, and that this activity was charitable.  An Al Hussam of
June 11, 1993 stated that "The Services Bureau was successful in
distributing 3000 Udahi [sacrificed animals] to the brothers on
the front lines and to the Muslims of Bosnia."

humanitarian problems, correct?

A.   Yes.

Q.   And it created them for the Muslims, and the native
Afghans were Muslim, correct?

A.   Yes.

Q.   And there were a lot of refugee camps, correct?

A.   Okay.  Yes.

...

Q.   So you would expect, looking at this application, that
these applicants would be seeking to alleviate suffering of
Muslims, correct?

A.   Yes.

Q.   And that some of those Muslims were probably going to
be the children and wives of mujahideen, correct?

A.   That I was not aware of.  I mean, it's a possibility.
It didn't cross my mind at the time.  At that time it did
not cross my mind when I looked at the application.

Tr. Dec. 3, 2007 at 76-78.  The conspicuous reason it "didn't

cross my mind" was that care for war victims was and has always

been charitable, as discussed below.

Sack similarly testified that Care appeared to be

sympathetic to the victims in the areas they planned to operate

in," and knew "that the areas that they planned to operate in

were areas where there were significant conflicts involving

Muslims," with "massive numbers of refugees, Muslim refugees."

Tr. Dec 5, 2007 at 140-1.

At bottom, IRS <u>knew</u> that Care would favor Muslim victims,

-10-

and there was no admissible testimony that monies targeted directly to survivors of fighters was uncharitable.  Regarding the 990s, the government asked <u>no</u> questions of Ms. Goldberg relating to the orphan program.  There was, then, no failure of disclosure regarding the orphan program on the 1023 and no testimony regarding the orphan program relating to the 990s.

On this record, the Court ruled that Levitt could testify "as to how supporting the orphan or the widow of a martyr supports jihad."[6]  Tr. Dec. 10, 2007 at 16.  Levitt was not an expert on the law of public charities, and did not proffer an opinion on that ground.  His professed forte was public policy and tapping that vein the government, over objection, posed the following question:

> Now, do you have an opinion as to whether this activity, the orphan sponsorship program that focused on the children of the martyrs, whether that promotes or supports violent jihad or the mujahideen?

Tr. Dec. 12, 2007 at 138-39.  Over objection, Levitt testified:

> It does ....  In the context of encouraging people to go

---

[6]The government proffered Dr. Levitt's testimony immediately before trial as follows: Dr. Levitt will "explain that some of them [Islamic charities] engage in behavior such as intermingling of funds so that *in addition to support for widows and orphans and other legitimate beneficiaries* of outpourings of support-they have intermingled funds and/or freed up funds so other agencies can subsidize fighters."  See Government's Opposition to Defendant's Motion to Preclude Testimony of Government's Proposed Expert Witnesses (Docket 334) at 26 (emphasis added).  Widows and orphans, then, were "legitimate beneficiaries" of support.  Permitting Levitt to testify that aid for orphans of martyrs supported jihad exceeded the government's proffer.

> and participate in fighting, it's important to remove
> anything that may prevent them from doing so, to remove
> disincentives.  If a person who is inclined to go fight
> knows that if something should happen to him May 9,
> 2008 that his family would be taken care of, that
> removes the disincentive, and he's more likely to be
> able to go and fight.

This was not a tax opinion that support for survivors of fighters

was non-charitable.  Stunningly, Dr. Levitt also read an account

of a battle, and was asked "in your opinion, does this article

promote and support the mujahideen and jihad?"  He replied:

"Yes".  Tr. Dec. 12, 2007 at 130.  The relevant issue was whether

Care disclosed (or needed to disclose) its newsletters, not

whether the views were repugnant, disagreeable, or in fact

supported by the administration in Washington, D.C.

b.

Second, the government's repeated theme that support for

survivors of fighters was improper, apart from being unsupported

in the testimony, offends against long-standing public charity

law.

Orphans have been traditional beneficiaries of charity.[7]

"Benefactions for orphans [footnote omitted], foundlings

---

[7] "The form and history of the charitable exemption and
deduction sections of the various income tax Acts reveal that
Congress was guided by the common law of charitable trusts." Bob
Jones University v. United States, 461 U.S. 574, 588 n.12 (1983).
See also Marion Fremont-Smith, Foundations and Government,
Russell Sage Foundation at 13 (1965) ("There is no clear-cut body
of American law which can be called 'the law of (public)
charities.'  Relevant law is to be found primarily in the law of
trusts.")

[footnote omitted], ... refugees [footnote omitted] ... have thus been sustained as charitable...." E. Fisch, Charities and Charitable Foundations, Lord Publ. § 335 at 286 (1974). This principle traces back at least to the "Statute of Charitable Uses," 43 Eliz. I, c. 4 (1601), which included as charitable "some [dispositions] for education and preferment of orphans," as well as for the poor and for "maintenance of sick and maimed soldiers." See Restatement (Second) of Trusts, § 369. The government acknowledged these charitable purposes in its opening ("orphans, ... the wounded, the maimed"). Tr. Nov. 15, 2007 at 32. Charnoff acknowledged that "sponsor[ing] orphans of refugees" was "a charitable purpose", "most definitely." Tr. Nov. 30, 2007 at 159.

"Charitable benefits need not be made available to all persons and in the absence of constitutional or statutory limitations [footnote omitted] disposition for charitable purposes have been upheld even though they contain restrictions or preferences based on national origin, ancestry, ... religion...." Charities and Charitable Foundations, supra, § 411 at 325-6. See Restatement (Second) of Trusts, § 369 (A trust for the relief of poverty is charitable although the beneficiaries are limited to persons of a particular sex, age, religion, profession or trade or political affiliation."); Bob Jones University v. United States, 461 U.S. 574, 588 (1983) ("Tax

exemptions for certain institutions thought beneficial to the
social order of the country as a whole, or to a particular
community, are deeply rooted in our history, as in that of
England." [emphasis added]).  For example, a classification of
charitable beneficence to a particular community, namely Jewish
refugees "who have been subject to prosecution in Christian,
Muslim, Nazi, Fascist and Communist countries" has been ruled
proper.  In re Rose's Will, 48 Misc.2d 475, 265 N.Y.S.2d
91(1965), modified, 28 S.D.2d 815, 281 N.Y.S.2d 610 (1967).
Certainly, the proposition that charities do not have to be
neutral in the provision of aid, indeed the further proposition
that aid can even be lawfully provided to the families of
soldiers, are both apparent in any survey of current charities
which provide aid directly to soldiers and to their families.[8]

Defense witness Marcus Owens testified consistently with
this body of law:

> Q.   [I]f Care's relief efforts included soliciting and
> expending money for widows and orphans, or orphans of
> martyrs, would that change your opinion of Care's
> entitlement to recognition of exemption?
>
> A.   No, it would not.
>
> Q.   And why would it not?
>
> A.   It would not because widows and orphans are traditional

---

[8]See, e.g., USO ("Our Troops Need Your Help," www.uso.org):
"Operation Homefront provides emergency assistance and morale to
our troops, to the families they leave behind, and to wounded
warriors when they return home." www.operationhomefront.net.

objects of charity.  That is, they are traditionally
appropriate recipients of charitable aid.  It's not
significant for tax purposes how they became widows and
orphans.

Q.  So would it change your opinion if Care solicited money
for widows and orphans of persons killed in battle?

A.  No, it would not.

Q.  And is that for the same reason?

A.  Correct.

Tr. Dec. 17, 2007 at 98.

There was no expert tax testimony challenging Owens'
testimony.  Indeed, Charnoff's testimony as described by the
government was irrelevant: it "all boils down to this, what he
said is fighting is not a charitable activity.  It never is
considered a charitable activity."  In view of the Court's
finding that no lethal aid had been proven in the case,[9]
Charnoff's proposition was quite beside the point.

Both Charnoff and Sack knew that the orphan program would

_____

[9]The Court instructed the jury:
You have heard evidence concerning the activities of
Care International and the defendants in the course of
this trial.  There is no evidence, however, that Care
or the defendants provided or financed weapons,
armaments, or lethal aid to any party, and you may not
speculate or conjecture as to the possible existence of
such evidence.
Tr. Dec. 19, 2007 at 189.  The Court also stated:
The government does not allege that Care supported or
promoted terrorist activities.  They do not intend to
offer proof that money went directly from Care to
purchase ammunition or other war or fighting
material....
Tr. Dec. 10, 2007 at 8 [emphasis added].

-15-

benefit Muslim orphans.  Both knew that the United States had

been sympathetic to Afghan Muslims, indeed to the mujahideen, and

was sympathetic to the plight of the Bosnian Muslims, just as it

was deeply repelled by the atrocities committed by the Bosnian

Serbs.  At the time, according to the New York Times of May 1,

1993, the United States was considering "threatening air strikes

against the Bosnian Serbs."  Months earlier, on February 22,

1993, the Security Council of the United Nations, by unanimous

vote, decided that 'an international tribunal shall be

established for the prosecution of persons responsible for

serious violations of international humanitarian law committed in

the territory of the former Yugoslavia since 1991."  UN

Resolution 808  As regards Afghanistan, the United States' policy

favored the Mujahideen.[10]  The U.S. favored the Muslims in these

humanitarian disasters and would likely have disfavored aid to

the Serbs, against whom the U.S. was threatening NATO reprisal

for waging aggressive war against civilians, or to the puppet

successor to the Soviet regime in Afghanistan.

     Under Bob Jones University, supra, 461 U.S. at 588 n.12,

---

     [10]The April 21, 1993 New York Times reported that "[t]he
international community along with the new Clinton Administration
must not close their eyes to the continuing slaughter of
innocents in Kashmir... in India," a Muslim region in Hindu
India.  The Chechnya conflict began later, in December 1994 when
"Russia launched its military campaign in Chechnya and committed
gross human rights abuses, including the indiscriminate
bombardment of civilians." Aryeh Neier, War Crimes at 131 (1998).

"sensitive determinations [regarding whether a charity offends
public policy] should be made only where there is no doubt that
the organization's activities violate fundamental public policy."
Here, the public policy favored Care's support for orphans and
survivors.  And the aid given was, to use this Court's words,
non-lethal, meaning that it could even have gone, consistent with
the government concession in its opening, to the wounded,[11] that
is to those who may recover and return to the battle.  A
fortiori, and under clear principles of charity law, it may go to
their survivors.

c.

At bottom, there was no misrepresentation regarding the
orphan program on the 1023.  There was no testimony that support
for orphans of martyrs was non-charitable, nor that it was
substantial.  There was no showing how much money was actually
donated to "children of martyrs" (interpreted to mean dead
fighters) compared to that spent on "children of martyrs"
(interpreted to mean other dead war victims, such as woman raped
and killed by Bosnians).  Indeed, in the Bosnian conflict, it was
the very character of the conflict that its victims (martyrs)
were largely civilian.  A New York Times article of May 1, 1993

---

[11]The government, in its opening, stated: "There were
widows; there were orphans; there were the wounded, the maimed.
People needed help. One of the things Care did was to solicit
funds to help.  That's fine." Tr. Nov. 15, 2007 at 32.

-17-

reported about "Bosnian Serbs who have carried out a campaign that has included mass rapes and killings of civilians in Bosnia and Herzegovina."  A New York Times article of November 30, 1995 reported that "The United Nations issued an unequivocal report on Bosnia, which said that the Bosnian Serbs had been engaged in atrocities including summary executions, rape, and mass expulsions."

The testimony that support for orphans of martyrs served jihad was deeply prejudicial, as it offered an irrelevant but highly charged opinion, one sure to evoke strong jury response in a country still shuddering from 9/11.  The Court also permitted Levitt to opine that the newsletter served jihad, an opinion that Care's advocacy served the enemy, an inflammatory view irrelevant to the tax issues.

<u>CONCLUSION</u>

For the foregoing reasons, Mr. Al-Monla respectfully requests that the Court grant a motion for judgment of acquittal and, alternatively, a new trial as to Counts 1 and 2.

SAMIR AL-MONLA
By his attorney,

/s/ Charles P. McGinty

Charles P. McGinty
  B.B.O. #333480
Federal Defender Office
408 Atlantic Avenue, 3rd Floor
Boston, MA  02110
Tel: 617-223-8061

-18-

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 9, 2008.

/s/ Charles P. McGinty

Charles P. McGinty