1

1                   UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4    United States of America,      )
                    Plaintiff,      )
5                                   )
                                    )
6    vs.                            )  Criminal No. 05-40026-FDS
                                    )
7                                   )
     Muhamed Mubayyid, Emadeddin Z.)
8    Muntasser, and Samir Al-Monla,)
     a/k/a Samir Almonla,           )
9                   Defendants.     )

10

11   BEFORE:  The Honorable F. Dennis Saylor, IV

12

13          Motions for Judgment of Acquittal Under Rule 29
                 Motions for a New Trial Under Rule 33
14

15

16                            United States District Court
                              Courtroom No. 2
17                            595 Main Street
                              Worcester, Massachusetts
18                            May 15, 2008

19

20

21

22

23                  Marianne Kusa-Ryll, RDR, CRR
                        Official Court Reporter
24                  United States District Court
                     595 Main Street, Room 514A
25                    Worcester, MA 01608-2093
                Mechanical Steno - Transcript by Computer

```
1    APPEARANCES:

2    B. Stephanie Siegmann, Assistant U.S. Attorney
     Aloke Chakravarty, Assistant U.S. Attorney
3    Donald L. Cabell, Assistant U.S. Attorney
     United States Attorney's Office
4    United States District Court
     One Courthouse Way, Suite 9200
5    Boston, Massachusetts 02210
     for the Plaintiff
6
     Zalkind, Rodriquez, Lunt & Duncan, LLP
7    David Duncan, Esquire
     65a Atlantic Avenue
8    Boston, Massachusetts 02110
     for the Defendant Emadeddin Z. Muntasser
9
     Quinn Emanuel Urquhart Oliver & Hedges LLP
10   Kathleen M. Sullivan, Esquire
     Adam Abensohn, Esquire
11   51 Madison Avenue
     22nd Floor
12   New York, NY 10010
     for the Defendant, Emadeddin Z. Muntasser
13
     Law Offices of Michael C. Andrews
14   Michael C. Andrews, Esquire
     21 Custom House Street
15   Suite 920
     Boston, Massachusetts 02110
16   for the Defendant, Muhamed Mubayyid

17   Federal Defender's Office
     Charles P. McGinty, Esquire
18   Judy Mizner, Esquire
     408 Atlantic Avenue
19   Third Floor
     Boston, Massachusetts 02110
20   for the Defendant Samir Al-Monla, a/k/a Samir Almonla

21

22

23

24

25
```

1                    P R O C E E D I N G S

2

3              THE CLERK:  All rise.

4              Court is now open.  You may be seated.

5              Case No. 05-40026, United States versus Muhamed

6    Mubayyid, Emadeddin Muntasser and Samir Al-Monla.

7              Counsel, please note your appearance for the record.

8              MR. CABELL:  Good afternoon, your Honor.  Don Cabell

9    for the government.

10             MS. SIEGMANN:  Stephanie Siegmann for the United

11   States, your Honor.

12             MR. CHAKRAVARTY:  And Aloke Chakravarty.

13             THE COURT:  Good afternoon.

14             MR. CHAKRAVARTY:  Good afternoon.

15             MS. SIEGMANN:  Good afternoon.

16             MS. SULLIVAN:  Good afternoon, your Honor.  For Mr.

17   Muntasser, who is here with me in the courtroom today, Kathleen

18   Sullivan from Quinn Emanuel here with my colleague Adam

19   Abensohn from Quinn Emanuel; and David Duncan from the Zalkind

20   firm.

21             THE COURT:  Good afternoon.

22             MR. ABENSOHN:  Good afternoon.

23             MR. ANDREWS:  Good afternoon, your Honor, Michael

24   Andrews for Mr. Mubayyid.

25             THE COURT:  Good afternoon.

1          MR. McGINTY:  Your Honor, for Mr. Al-Monla, Charles

2    McGinty, from the Federal Defender Office.

3          MS. MIZNER:  And Judith Mizner from the Federal

4    Defender Office.

5          THE COURT:  All right.  Good afternoon, all.

6          This is a hearing on defendants' motions for judgment

7    of acquittal under Rule 29 and motions for a new trial under

8    Rule 33.

9          Essentially, all these three defendants have filed

10   both motions, so we have, in essence, six motions pending on

11   multiple grounds with overlapping and interlocking issues.

12         At the outset, let me state I was perhaps optimistic

13   when I indicated I thought we could reach everything in one

14   day, having reread the -- the pleadings, but let's see how far

15   we can go today.

16         I think that -- Marty, is tomorrow afternoon free?

17         THE CLERK:  Yeah.

18         THE COURT:  Good.  Tomorrow afternoon is free, and we

19   could spill over if need be.

20         In terms of how long we go today, I think probably

21   about 5:30 or so will be about my limit, if not the

22   stenographer's limit, but we can also see where we are at that

23   point.

24         Just to make something clear, which is probably

25   obvious to all, but I feel I want to state it anyway in light

1    of the heat generated by this case.  The purpose of this

2    exercise is a legal one.  It's to determine whether there is

3    evidence to support -- sufficient to support the conviction on

4    the counts charged and whether there were errors at the trial

5    sufficient to require a new trial.

6         I am not here to help or hurt either side.  Whether

7    the government or the defendants are good people or bad people

8    today is not my concern; and whatever larger interests may be

9    served by sustaining a conviction or harmed by an acquittal are

10   not my concern, and whatever issues may -- greater issues may

11   be lurking in this case concerning alleged terrorism or

12   religious-based violence, or anything of that nature, none of

13   that has anything to do with this exercise, which is strictly a

14   legal exercise, again, is there evidence to support the

15   convictions; and if so, were there errors sufficient to require

16   a new trial.

17        Let me also, I guess, get one issue out of the way,

18   because it's perhaps the only one that I can -- that I'm

19   confident that I can rule on quickly without argument, and that

20   is the motion for a new trial filed under seal by defendant

21   Al-Monla, which relates to the interview of the foreperson and

22   related issue during -- the issues during jury deliberations;

23   and I think it's captioned as a motion for a new trial, but I

24   think there is alternative relief that's sought.  While I am

25   confident that with the benefit of hindsight the issue was

1    handled with something less-than-absolute perfection, I have

2    concluded that there is no unfairness, fundamental or

3    otherwise, requiring further relief, or a new trial as to that

4    issue; and therefore, in that respect, I will deny the motion.

5        There is a dangling issue as to whether the matters

6    covered by that ought to remain under seal.  I've placed them

7    under seal in an excess of caution perhaps, because they

8    involve jury deliberation.  It's not at all clear to me that

9    they ought to remain under seal.  Obviously, criminal

10   proceedings are presumptively public, and I could either unseal

11   them or give the parties some period of time to address the

12   issue.

13       What's the government's position with that regard?

14       Mr. Chakravarty.

15       MR. CHAKRAVARTY:  Your Honor, I'm a little bit

16   handicapped in the sense that I wasn't there for the colloquy

17   with the jurors themselves, so we would have no objection to

18   delaying the ultimate decision on that.

19       THE COURT:  Why -- why don't I do this.  Why don't I

20   direct that those matters will be unsealed 21 days from today,

21   unless there is a motion from any party directing that they

22   remain sealed in which case we can take it up, but otherwise

23   they'll be unsealed.

24       Mr. McGinty.

25       MR. McGINTY:  Your Honor, I do intend to file a motion

1    seeking that it remain under seal.  It is focused on a

2    particular juror and inquiry made about the attitudes of a

3    particular juror, but it seems to me that at -- that at the

4    moment --

5            THE COURT:  Do you need to be heard at sidebar, or is

6    open court all right?

7            MR. McGINTY:  It is, but -- in other words, there is

8    no reason, I would submit, at this time, for that to be

9    unsealed, so I will be filing a motion.  My preference is it

10   remain under seal.  I want the court to be on notice that I do

11   intend to file a motion.

12           THE COURT:  Why don't I in light of everything that is

13   on our plate, why don't I make that 30 days then, Mr.

14   McGinty --

15           MR. McGINTY:  Thank you, your Honor.

16           THE COURT:  -- to file that motion.  Again, the mere

17   filing of the motion will keep it sealed, and we can take it up

18   at that point, and obviously any party can -- can file a

19   motion.

20           All right.  To try to get some structure on this, it

21   seems to me that logically the Rule 29 motions ought to come

22   before the Rule 33 motions; and taking matters perhaps out of

23   order, I would like to take up the conspiracy issue first.

24           I have read all of the pleadings, I think.  I'm saying

25   that facetiously.  There was a lot to read, and I'm pretty

1       confident that I've read it all.

2               And since Mr. Muntasser has effectively taken the lead

3       on this issue, I think I'll hear from Ms. Sullivan first.

4       There's no real need to repeat arguments that are made simply

5       for the sake of repeating them.  Obviously, you can focus me on

6       this, but I think what I would like to do is take this an issue

7       at a time and begin with Count Two and begin with Defendant

8       Muntasser, and then hear the government's response today.

9               Ms. Sullivan.

10              MS. SULLIVAN:  Good afternoon, your Honor.  May it

11      please the court.  Thank you very much.  I would like to

12      address your Honor when your Honor would like to later on

13      Count One.  We have some things that we would like to say to

14      your Honor.

15              THE COURT:  We will have lots of time on that.

16              MS. SULLIVAN:  On Count Two, the -- here our argument

17      on Count Two, and this goes for all three defendants, your

18      Honor is --

19              THE COURT:  Before I forget the thought, each

20      defendant, I think, has joined in each other defendant's motion

21      to the extent it's relevant.  Obviously, there is individual

22      counts that only apply to specific defendants.  You all don't

23      need to keep reminding me of that; and if I say Muntasser,

24      Mubayyid, or Al-Monla that has raised an issue, if it's an

25      issue joined in by the other two, you don't need to keep

1    putting that on the record, and I will assert that only for the

2    sake of convenience.

3          MS. SULLIVAN:  Thank you, your Honor.

4          I just do want to be sure I allow time for my

5    colleagues --

6          THE COURT:  Yes.

7          MS. SULLIVAN:  -- Mr. McGinty and Mr. Andrews to make

8    their own remarks to the Court on Count Two.

9          Your Honor, after three months, the government has

10   still not come up with evidence of a second conspirator in

11   1993.  Now, your Honor expressed extremely frank reservations

12   in allowing Count Two to go to the jury about whether there was

13   any second conspirator in 1993, and you allowed it to go based

14   on a string of possible inferences, and we submit that these

15   inferences do not amount to the showing of a second conspirator

16   in 1993.

17         Now, nobody disputes your Honor's conclusion that

18   we're not talking here about Mr. Mubayyid or Mr. Al-Monla.  The

19   only candidates are Mr. Akra and Mr. Yassin, and your Honor

20   doesn't think that there was much to hold Mr. Akra to.

21         Let's be clear on what the government has not shown.

22   It has not shown that the records support any finding any

23   direct evidence.  There's no direct evidence of an agreement

24   anyone getting together and saying, "let's defraud the IRS,

25   let's conceal information from the IRS."  That's undisputed.

1          And on the circumstantial evidence, there's no

2    evidence that the government has offered -- still it has 200

3    pages of briefing -- that Mr. Akra or Mr. Yassin ever saw or

4    reviewed or supervised the production of or participated in or

5    signed the filing of the Form 1023 that's alleged to have

6    withheld information about here successorship relationship to

7    Al-Kifah and about the supposed promotion of solicitation

8    of -- solicitation for -- of funds for mujahideen and jihad.

9          There is no evidence that they sought to provide to

10   either side the 1023; that they had any knowledge of the

11   contents of the 1023; that they had any discussion with Mr.

12   Muntasser about the 1023.  We have Mr. Muntasser acting from

13   this record entirely alone with respect to all actions

14   connected with the filing of the 1023.

15          Now, let's turn to what the government does say is the

16   basis for inferring that somehow Akra or Yassin had to be aware

17   of and therefore somehow impliedly complicit in.  They talk of

18   tacit agreements with the filing of the 1023, which is omitted

19   knowledge.  They say, first, what we can infer from the prior

20   involvement in Al-Kifah of Mr. Akra and Mr. Yassin that the

21   best evidence the government has on Mr. Akra or Yassin's

22   involvement with Boston Al-Kifah is that they were, quote,

23   involved.  That's the testimony of Agent Peet from the 2003

24   interview.  Well, involved with Al-Kifah, it doesn't show a

25   leadership relationship with Al-Kifah; it doesn't show any

1    involvement that would tend -- tend to be a basis for inference

2    of that knowledge of tax filings.

3            Second, let's look at Mr. Kadri, and I think, your

4    Honor, if I could just focus your Honor on the testimony of Mr.

5    Kadri.  This is the government's key witness with respect to

6    events in 1993.  Mr. Teba didn't come on the scene even until

7    1996.  Certain transactions or faxes by Mr. Yassin didn't occur

8    until 1996; but if we go back to 1993, the government does

9    state the testimony of Mr. Kadri.

10           Now, what does Mr. Kadri say about the inferences from

11   prior involvement in Al-Kifah of Mr. Akra or Mr. Yassin?  He

12   says, Well, I don't think that -- that Care was a continuation

13   of Al-Kifah.  He says -- he testifies, and this is on day 7,

14   pages 69 to 70.  He testifies Care was not a continuation of

15   Al-Kifah, but was an independent organization formed for

16   control -- by reason of controlled disputes with the New York

17   office.  So, Mr. Kadri's testimony cannot give any basis to

18   infer awareness on Akra's or Yassin's part of any successorship

19   relationship between Care and Al-Kifah Boston.

20           Your Honor, I want, if I could for a moment, step out

21   to a footnote.  Remember the -- Count One and Count Two each

22   charge the facts that were supposedly omitted in the

23   conjunctive, the fact that Care was an outgrowth or successor

24   of Al-Kifah, and -- and that there was going to be this

25   supposed solicitation and promotion of the fundraising and

1    expenditures for the mujahideen.  If either one of those is

2    missing, they can't prove the conspiracy.  So, what I just

3    suggest to your Honor is that there is not evidence

4    that -- from Kadri's testimony --

5            THE COURT:  Well, I -- I -- I may have forgotten.  Was

6    it a conspiracy with two objects, or was it -- how was it

7    framed?

8            MS. SULLIVAN:  I'm referring to page 11 of the

9    indictment, Count Two, your Honor, which states that in this

10    application, Muntasser did not disclose that Care was an

11    outgrowth or a successor to Al-Kifah.  Care's planned

12    activities included support for jihad and mujahideen, and Care

13    would engage in activities involving the solicitation of or

14    contribution for the distribution of the publications to

15    support jihad and mujahideen.  That's the same information

16    that's referred to in Count One as a single fact.  In Count One

17    on page 9 of the superseding indictment, the government refers

18    to the fact that defendants -- alleges that the defendants

19    concealed the fact that Care was an outgrowth of and a

20    successor to Al-Kifah and engaged in non-charitable activities

21    as well.  So what we are suggesting is if you can knock out any

22    part of those, you don't have a conspiracy.  But even if you

23    take them separately, your Honor, even if you take them

24    separate, the point here is no evidence in 1993 from the

25    Al-Kifa relationship is coming out of Kadri's testimony.

1        Next, your Honor, the government asks that -- asks you

2    to accept that the jury could have inferred from the fact that

3    Akra and Yassin were denominated directors of Care, that they

4    would know about Care's tax filings; that they would know that

5    certain information that was material to the IRS had been

6    omitted from the tax filing signed, reviewed, produced and

7    filed with the government solely by Mr. Muntasser.  But you

8    cannot possibly find that the jury could find beyond a

9    reasonable doubt that the directorship alone was a basis for

10   that inference, and let me refer back again to Mr. Kadri's

11   testimony.  Mr. Kadri testified on day seven at pages 44 to 45

12   that who was Mr. Akra.  He was a religious leader.  We look to

13   him as religious teacher.  Who was Mr. Yassin in relationship

14   to Care?  He was the go-around guy.  How were they different

15   from Mr. Muntasser?  He was the administrator.  He was, in

16   Kadri's terms, more admin.

17        Now, to say Muntasser is admin, Akra is religious,

18   Yassin is go around, does not suggest an equivalence in their

19   roles.  It's clearly Mr. Muntasser, who's running the

20   organization at that point, and Akra and Yassin have roles that

21   have no indication that they have anything to do with tax

22   filings.

23        Strikingly, Akra and Yassin were directors not

24   officers.  The filing of the Articles of Incorporation

25   denominates, distinguishes in the filing of the 1023 between

1    officers and directors.  Mr. Kadri was a director, just like

2    Akra and Yassin.  Mr. Kadri said, he testifies on day 7 at

3    pages 58 to 59, "I was a director, yes, but I had no control

4    over the organization."  And, in fact, it was unclear if he

5    ever even attended an annual meeting.  So, Kadri was a

6    director, but he had no control.  There's no reasonable basis

7    for the jury to infer that Akra or Yassin had control of

8    anything to do with Care, much less the specific filings of a

9    particular tax form.  And as to whether the directors of Care

10   would know that there was a concealment from the IRS of funds

11   being collected to go to the mujahideen and jihad, Kadri again

12   testifies just the opposite.

13           If your Honor has day 7.

14           THE COURT:  I don't have it with me, but --

15           MS. SULLIVAN:  Well, if I could just refer your

16   Honor --

17           THE COURT:  Yes.

18           MS. SULLIVAN:  -- to day 7, page 76.  This is the page

19   on which Mr. Kadri testified that he believed all of Care's

20   money that was being collected through donations was going to

21   provide for refugees, widows and orphans in Afghanistan and

22   Bosnia.  So Kadri's testimony -- this is the government's

23   witness.  This is the best evidence they have in 1993, and

24   there's no basis to infer knowledge about the 1023 filing or

25   any omission of information that can be attributed to the

1    directors about mujahideen and jihad.

2          Just two more, your Honor.  Bear with me.

3          The next ground on which the government says the jury

4    could have inferred an agreement or a tacit agreement, even

5    when there was none, is from Mr. Akra's lectures.  They say

6    Akra's lectures create a tacit -- an inference of a tacit

7    agreement.  Well, there's no evidence that Mr. Akra when he's

8    speaking about religious matters that he has any knowledge of

9    any tax aspects of Care's existence, no indication that he has

10   knowledge of any newsletters or publications being circulated

11   as lectures.  There's no evidence of that whatsoever.

12         And then the government says, well, Mr. Akra had this

13   dinner at his house.  And just to recall, your Honor, the

14   government paints quite an extraordinary scene.  Their theory

15   is that somehow in ten days, supposedly following adverse

16   publicity about Al-Kifah in New York, that somehow these

17   gentlemen got together, not only filed their Articles of

18   Incorporation, came up with a name change idea, had dinner at

19   Akra's house, went to the Secretary of State and filed the

20   Articles and then got ready to file the 1023.  Some of this

21   occurred before the New York Times' article even came out, the

22   New York Times' article supposedly denominating Al-Kifah New

23   York a terrorist danger.  That article comes out after the

24   letter from -- to Mr. Bade, the accountant at the time laying

25   out the basis for the new organization.  But even if you

1    indulge the government's extremely improbable scenario that all

2    of this activity takes place in these ten days, it's still got

3    a problem, and the problem again goes right back to Mr. Kadri's

4    testimony.  Mr. Kadri doesn't remember Muntasser or Yassin

5    being at the Akra dinner.  So, if Mr. Akra is the supposed

6    conspirator, he's not -- Muntasser and Yassin, the government

7    hasn't even placed Muntasser or Yassin at the Akra dinner.  Mr.

8    Kadri is very vague about the timing of this dinner to begin

9    with.  He thinks it might have been '92 or '93, but there's no

10   evidence that anyone -- there is no evidence that anyone at the

11   dinner, certainly not Mr. Muntasser, had read any of the

12   supposed bad publicity about Al-Kifah in New York.  So,

13   everything is missing in making this dinner the source of

14   agreement:  The presence of Mr. Muntasser and Mr. Yassin with

15   Akra; knowledge on their part that there was any reason to

16   respond to the publicity, and the timing is off.

17        The government goes so far to say that Mr. Akra gave

18   Mr. Muntasser an inscribed book.  Well, certainly that's no

19   evidence of conspiracy with Mr. Akra.  So, as your Honor

20   correctly observed at trial, there is no sound basis for

21   finding evidence sufficient to find Mr. Akra the second

22   conspirator, and that leaves us with Yassin.

23        Now, Mr. Yassin does do certain things that the

24   government showed.  He does them in 1996.  Now, remember Mr.

25   Yassin is not initially an officer at Care.  He's a director,

1    but he's not an officer in charge of the operational aspects of

2    Care.  He becomes an officer later, and one of the things that

3    he does is he faxes certain documents to the new accountant,

4    Mr. Naseem, in 1996, and there are a number of problems with

5    this argument.

6         First of all, the facts, if anything, one of the facts

7    is this -- this government Exhibit No. 166.  The government

8    derides it as a scrap of paper, but it's quite a lengthy

9    document that very clearly states in handwriting that Al-Hussam

10   and the Zakat Calculation Guide were some of the activities

11   Mr. Naseem was being informed about.  So, there can be no

12   intent to conceal from the government information about

13   supposed support of mujahideen and jihad from that document.

14   But even if we imagine that the government is entitled to an

15   inference about Naseem's -- sorry -- Yassin's knowledge in 1996

16   regarding these activities, it's got a tremendous chronological

17   problem.  You cannot backdate Yassin's knowledge in 1996, even

18   if you suppose he has it, and there's no reason to suppose he

19   has knowledge of concealment here, since he is sending this

20   information revealing this activity to the accountant.  But

21   even if he had some intent to conceal it, it is too late.  It's

22   1996.  It can't be back attributed to 1993.

23        Now, your Honor, those are our principal arguments

24   here why there can be no second conspirator.  We cannot place

25   Mr. Yassin or Mr. Akra either by role or by action in any

1    place, time, situation, or agreement by which they would have

2    come up with this scheme, supposed scheme, with Mr. Muntasser,

3    supposed conspiracy or agreement with Mr. Muntasser to conceal

4    this information from the IRS.  And I have given you what the

5    government's best evidence is.  Mr. Kadri is their witness,

6    and we submit that there's just nothing there.

7         Now, your Honor, I'll -- I'll leave it at that, unless

8    your Honor has questions.  I just have one more point.

9         THE COURT:  Go ahead.

10         MS. SULLIVAN:  Just one more point, your Honor.  You

11    might say, well, isn't it just common sense, and of course with

12    respect to the conspiracy count we hear a great deal from the

13    government about how we're entitled to string inference upon

14    inference.  The jury is entitled to look at the whole as more

15    than the sum of the parts.  Even if there's no one fact, they

16    say that shows that anyone was a second conspirator, they're

17    entitled to look at the whole.  Well -- and they evoke common

18    sense.  Common sense points the opposite way for the

19    government.  Common sense would say that if you're going to

20    hide publications like an Al-Hussam from the IRS, you wouldn't

21    publish them to the world and distribute them every Friday and

22    ultimately place them on an Internet side that is publicly

23    accessible for all to see; and common sense says that you

24    wouldn't conceal that information from the IRS when the

25    presumption arising from Treasury regulation

1    1.501(c)(3)-1(d)(2), right, that's the Big Mama Rag treasury

2    regulation, the one that says, we will not preclude tax-exempt

3    status based on ideological advocacy that might be

4    controversial.  One is entitled, based on that regulation by

5    the United States Government, to presume that you don't have to

6    tell the government what your publications say.  So, the

7    presumption should arise from common sense that openly

8    distributed flyers, that you have a right under the First

9    Amendment and the treasury regulations to distribute, are not

10   something from which you can infer this tenuous tortured chain

11   of inferences that they must have met to keep this from the

12   government.

13        That's all I have to say for Count Two, your Honor,

14   unless you have questions.

15        THE COURT:  No, I think let me hear from the

16   government again just as to Count Two and as to the issue of --

17        MS. SULLIVAN:  Do you want to hear first from --

18        THE COURT:  Well, I think I'm focused on Muntasser in

19   1993.  I think everyone agrees that Mubayyid and Al-Monla came

20   in at some later point.

21        And, actually, Ms. Siegmann, maybe we can -- well,

22   I'll let you structure your argument any way you want, but I

23   want to focus on Muntasser in 1993.

24        MS. SIEGMANN:  Yes, your Honor.  There is sufficient

25   evidence to find that Yassin, Waseem Yassin, and Akra conspired

1    with Muntasser in or about April 1993.  Now, despite any

2    argument by the defense there's nothing wrong with the court

3    and the jury considering inferences.  Indeed at this stage,

4    we're required to do so and to draw the inferences most

5    consistent with the verdict in the light most consistent with

6    the verdict using common sense.

7         Now, the court allowed the -- told the jury to

8    consider both Mr. Yassin and Mr. Akra in determining whether

9    they conspired with Mr. Muntasser, and they -- they concluded

10   that at least one of them did.

11        Now, all the government has to prove, and which it

12   did, was that a basic agreement to obtain tax-exempt status to

13   defraud the IRS by hiding Care's support of the mujahideen and

14   its relationship to Al-Kifah, not that each of the

15   coconspirators knew all the details.  The government met that

16   burden, your Honor.

17        There -- the argument of -- to respond to a few

18   arguments immersed in my own argument here, the -- Ms. Sullivan

19   indicates that there is no evidence that anyone ever saw or

20   viewed or participated in Form 1023 application.  That's not

21   required here.  The basic agreement is to defraud the IRS.

22        Now, Mr. Akra, just if you look through the

23   circumstantial evidence, and yes --

24        THE COURT:  Well, let's -- rather than labeling it

25   "circumstantial evidence," I think maybe it would be more

1    helpful to me if you would first identify the actual specific

2    evidence concerning Akra and then what inferences you think can

3    reasonably be drawn from that evidence, which is the

4    circumstantial evidence piece of it; in other words, Akra gave

5    a lecture; Akra gave a dinner; Akra did this; Akra did that,

6    and then what flows from that as a whole.

7         MS. SIEGMANN:  I'm -- I'm had happy to do that, your

8    Honor.

9         THE COURT:  All right.

10        MS. SIEGMANN:  We did detail this in our filing, but I

11   will go through it again and try to highlight the most

12   important points.  Mr. Akra, it is clear, there is no dispute,

13   that Akra, Yassin and Muntasser were all running Al-Kifah.  The

14   names, the religious leader name that Akra was given; Yassin is

15   labeled as the go-around guy, the person who got things done on

16   a day-to-day basis; and then Mr. Muntasser was an

17   administrator.  His name was -- he was acting chairman on the

18   bank records.

19        Now, there is many witnesses:  Rabah Ahmed; there was

20   also Kadri that talked about how these individuals were at Care

21   events -- I'm sorry -- at Al-Kifah events, at lectures that

22   Akra gave, several lectures for Al-Kifah, and -- and Yassin was

23   involved in the distribution of the Al-Hussam, based upon

24   intercepted conversations in 1995 and 1996, and that was when

25   he was -- he wasn't working so hard on the Al-Hussams at that

1    point, and you can infer from that that he was very involved in

2    the Al-Hussams before that.  Wissam Ali Ahmad testified that he

3    was -- was distributing Al-Hussams for Care.  Now, I was

4    jumping ahead to 1994, but just to show the involvement of

5    these three individuals.  Kadri said those were the people that

6    were involved with Al-Kifah.

7         He -- at one of -- one of Mr. Akra's lectures, you

8    recall Exhibit 40 that we saw at trial that was signed by Mr.

9    Muntasser that indicated that Al-Kifa was tax-exempt and what

10   Al-Kifah was all about, and it supported the mujahideen on the

11   front.  That was distributed at one of Mr. Akra's lectures.

12   Doctor Akra they refer to him as.  And he talked about how you

13   can support the mujahideen, how you have to commit jihad, how

14   you have to support the people committing jihad.  He did that

15   for Al-Kifah, and then he did it for Care.

16        Now, let's just look at the time frame of March

17   29th -- around March of 1993.  There was some indication that

18   there is that -- there is a letter to Bade in -- there's a

19   February 16, 1993 letter to Bade from Mr. Muntasser.  He talks

20   about essentially incorporating or obtaining tax-exempt status.

21   It's not very clear exactly what he's talking about.  What is

22   clear though is there's no name change mentioned in that

23   document; that he's talking about our organization, and from

24   that you can infer that he's talking about using Al-Kifah to

25   obtain tax-exempt -- to obtain tax-exempt status for Al-Kifah,

1    our organization.  No name change mentioned.  It's our

2    organization.  The only organization at that time is Al-Kifah.

3    Who's involved in our organization?  Muntasser, Akra, Yassin

4    and Kadri, obviously, because he is our witness.

5         Now, after the press, the negative -- highly negative

6    press, the March 29, 1993, Newsweek article, that connects

7    Al-Kifah New York to supporting fighters to violent activities;

8    and then the April 11 article in the New York Times that did

9    the same thing, very similar articles.

10        Well, in that time frame after those articles start

11   being published under the defense's perspective, no one really

12   knew about that.  You're using the name Al-Kifah, but yet you

13   don't know that in the Newsweek article.  It's a highly

14   unfavorable article.  Common sense says you do know about that,

15   and you know because you're being connected to violent activity

16   to fighters overseas and what impact that might have in your

17   collection efforts here.

18        So, what do they do?  Well, Mr. Akra summons people to

19   his house.  He -- that's a fair inference.  The way that Mr.

20   Kadri explained it was:  One day I was a volunteer at Al-Kifa,

21   and the next thing, I'm a volunteer at Care.  And why is that?

22   Well, because they were summonsed to this meeting.  We were

23   told nothing about why we were being summonsed.  We are not

24   told even the name of the organization.  We were summoned,

25   because that was -- that's the only thing that fits within that

1    scenario, your Honor.  It's the fair, the most reasonable

2    inference is that the highly negative publicity comes out all

3    of a sudden, and we've got to change the name.  Let's go as

4    fast as we can and change our name to another, something clean.

5         THE COURT:  Well, hold on though.  Who was present at

6    the dinner?

7         MS. SIEGMANN:  Sorry.

8         THE COURT:  Who was present at the dinner, the house

9    that --

10        MS. SIEGMANN:  Well, Mr. Akra, who actually was one of

11   the fundamental -- a person that was involved in Al-Kifa

12   before Mr. Muntasser even got involved, as he told Special

13   Agent Peet.  You had Mr. Kadri.  You had Akra.  You had Nawras

14   and Mr. Baara, all those individuals were involved in Al-Kifah.

15   They were all Al-Kifah volunteers.

16        THE COURT:  All right.  But -- but -- but Akra has

17   this meeting and neither Muntasser or Yassin, who again we have

18   the universe of three possible coconspirators, right?

19        MS. SIEGMANN:  Yes, your Honor.

20        THE COURT:  And neither Muntasser nor Yassin was

21   present at that meeting?

22        MS. SIEGMANN:  Mr. Kadri could not recall whether Mr.

23   Muntasser was there, that's correct.  That's the testimony.

24        THE COURT:  Well, you know, I don't think it's a fair

25   inference that he was there, because --

1          MS. SIEGMANN:  No, and just that's the testimony.

2          THE COURT:  And -- and what is the -- the evidence

3    that -- let's take Akra first -- that Akra knew that a

4    Form 1023 was going to be filed, or stated perhaps more

5    broadly, that Care would apply for charitable status with the

6    IRS --

7          MS. SIEGMANN:  Well, right after --

8          THE COURT:  -- for tax-exempt status?

9          MS. SIEGMANN:  You have this meeting.  He collects the

10   names, asks if the names can be used for this new organization,

11   and those names are in turn are on the 1023 -- I'm sorry -- the

12   Articles of Incorporation that are filed, and in that -- in

13   those articles --

14         THE COURT:  They're on the Articles of Incorporation?

15         MS. SIEGMANN:  Yes.

16         THE COURT:  Okay.

17         MS. SIEGMANN:  And so on those articles are those

18   names that Akra asked can we use your name.  He then, the

19   inference is that he then meets with Muntasser, gives him the

20   names.  He knows that they were used on the Articles of

21   Incorporation, and the Articles of Incorporation in turn says

22   specifically that the officers and directors agree that they're

23   going to apply for tax-exempt status; that Care would be

24   applied for that tax-exempt status, and that they will not

25   conduct any activities inconsistent with that status.

1          Additionally, in the introduction of language of the

2     articles, it says the organization is organized exclusively for

3     charitable, religious, scientific, and educational purposes.

4          I mean, additionally, there is --

5          THE COURT:  But Akra is not on the Articles of

6     Incorporation; is that right?

7          MS. SIEGMANN:  Yes, he is.

8          THE COURT:  All right.

9          MS. SIEGMANN:  Akra's name is on there as is --

10         THE COURT:  As a director?

11         MS. SIEGMANN:  As a director, and so is Yassin's name.

12         THE COURT:  And -- and again, tell me what evidence

13    supports the notion that Akra knew what was on the Articles of

14    Incorporation.

15         MS. SIEGMANN:  Well, the information that he gives to

16    Muntasser, based upon the fact that there's a meeting, and he

17    asks for names, then he goes, and in turn, as the most recent

18    inference is, that he goes in and talks to Muntasser about how

19    he used his name on the articles.  The articles then have the

20    names.  He knows about the articles, and they're filed.  It is

21    a public filing.  This is a very close-knit organization.  They

22    all know that they're soliciting donations; that they need

23    donations to survive as a charity, and then right within two

24    weeks -- well, not even -- before that, they're receiving

25    checks that say "tax deductible" in the memo section, and

1    there's a -- and that's cited in the government's brief that

2    they're already actually indicating claiming they are

3    tax-exempt.  Within two weeks of the filing, Akra is doing a

4    lecture.

5         THE COURT:  Hold on.  But the use of the pronoun

6    "they" is conclusory.

7         MS. SIEGMANN:  I'm sorry.

8         THE COURT:  You know, let's -- let's try to separate

9    facts from reasonable inferences from the facts, which is what

10   I'm struggling with.  You know, if you say "they," you're

11   assuming that there's an agreement, or that there's a group,

12   which is actually the question that we're trying to answer

13   here.

14        Again, focusing on Akra for the moment, what is the

15   evidence that Akra, who supposedly is this teacher, or an imam,

16   who's making speeches, knows that Care:  (A) is applying for

17   tax-exempt status; and (B) does not intend to operate in a

18   charitable way; and, therefore, is defrauding the IRS?

19        MS. SIEGMANN:  Going back to one issue I just want to

20   focus on for one second.

21        THE COURT:  Yes.

22        MS. SIEGMANN:  His title is religious leader.  I

23   understand that, you know, sometimes it has a connotation of

24   religion, but this is from what we know now, and not what they

25   said in their filing.  This was a religious organization.  The

1   fact he's a religious leader, he still has a leadership role, a
2   central religious role that is, because he's the one that's
3   actually soliciting the donations for the mujahideen.  He's the
4   one that is making the lectures on a weekly -- on a weekly
5   basis that is based on the evidence.  He is one of the most
6   integral players in this organization, and he continues to be
7   so even after it's -- it changes its name.  He is still
8   performing that same function of soliciting donations, and what
9   is happening after Care is -- its name is changed, he has
10  literature, Al-Hussams, that are being distributed at his
11  lectures that say -- that ask for tax-deductible donations
12  before they are even granted that status.  He knows that that
13  was the purpose that they're going to claim -- apply and claim
14  that they have tax-exempt status.
15          THE COURT:  All right.  Again, "he knows" is an
16  inference.
17          MS. SIEGMANN:  Akra.  I am talking about Akra, your
18  Honor.  I'm sorry.
19          THE COURT:  Yes, but the fact that literature is being
20  distributed at his lectures, you say it's therefore a
21  reasonable inference that he knew what the literature said?
22          MS. SIEGMANN:  Yes, your Honor.
23          THE COURT:  All right.
24          MS. SIEGMANN:  And again, he --
25          THE COURT:  Again, I think it's important to keep this

1  separate, because it's simply conclusory to say that he knew

2  some of these things without actually working your way through

3  it.

4        MS. SIEGMANN:  Your Honor, if I could just point you

5  to you one other fact.

6        THE COURT:  Yes.

7        MS. SIEGMANN:  There was two tapes that are introduced

8  in evidence that Doctor -- it was actually Doctor Akra's

9  lectures.  They refer to him as doctor.  I have no idea whether

10  he's a doctor or not, but -- and one of them is dated June 10,

11  1993.  The other one's undated; however, in that

12  lecture -- it's Sisters in Jihad, actually.  I believe it's

13  481A is the exhibit number.  And it says clearly, and you

14  listened to that excerpt at trial, that he says that one of the

15  ways that you can actually support jihad is by writing letters

16  in a jihadist magazine, the newsletters, Al-Hussam.  He

17  references that same literature that's being distributed at his

18  lectures.  There -- he's clearly -- again, this is a close-knit

19  organization.  Everyone knows that they're distributing this

20  Al-Hussam.  It's no secret to this organization.  It is one of

21  the most esteemful activities, the fact that they then say

22  they're tax exempt in that document, in June 1993, is

23  significant, I submit to you.

24        THE COURT:  Well, again "everyone knows" is a

25  conclusion.

1          Does everyone know because it's a small organization?

2     I mean let's -- let's start there.

3          MS. SIEGMANN:  Well, I certainly think that, your

4     Honor, you actually during the trial thought that that was

5     reasonable inference, and there is case law before that.

6          THE COURT:  The question is did I get it right?  I

7     mean, you know, if you'll recall the way this came up, after

8     the government rested there was a Rule 29 motion on this issue.

9     I asked the government to -- to respond, and the government

10    counsel -- it may have been you Ms. Siegmann -- said we wanted

11    four days to marshal the evidence, and I was attempting to put

12    it together myself, because if I take it away from the jury at

13    that point, there's no appeal, and thus final jeopardy has been

14    attached, and I wanted to be sure I knew what I was doing.  But

15    the question is did I get it right.  I'm not assuming I got it

16    right.  I may have, but I may not have.  That's the issue I

17    need to decide now.

18         Is it so clear that because it's a close organization,

19    because there are three or four or five people that everyone

20    knows everything else?  I mean is it a fair inference that a

21    religious leader or a religious lecturer knows about the, you

22    know, the filing of tax forms, and -- and intended to defraud

23    the FBI, or the United States or the IRS, because he has

24    to -- Yassin has to have that agreement, or there's no

25    conspiracy.

1          MS. SIEGMANN:  Yes, your Honor, I understand.

2          The other issue with regards to the small organization

3     issue, and there is case law on this that we cite in our brief

4     that says you can -- when there is a small organization, and

5     it's -- there is a -- you can infer that from the close working

6     relationship that knowledge as to certain -- especially

7     important facts like this.  This is -- this is a charity.  They

8     are -- and they say in their Articles of Organization that are

9     filed publicly, as their bylaws, that they are going to -- they

10    are going to seek tax-exempt status.

11         Certainly -- and there's also Munther Baara, who isn't

12    as involved as Akra, that is, or Yassin.  He actually writes a

13    check to Muntasser on June 6, 1993, to reimburse him for the

14    tax filing.  People at Care knew this was being done.  That is

15    one example.  The fact is this was not a secret to anyone that

16    they were doing this.

17         And the acts that occur after -- this is more -- do

18    you want me to go on to Yassin?

19         THE COURT:  Yes.

20         MS. SIEGMANN:  Okay.  And as to Mr. Yassin, again,

21    he -- there the evidence is clear that he was involved, and one

22    of his principal responsibilities was the Al-Hussam newsletter.

23    There is calls that yet although they are subsequent to the

24    1993 time frame, you can, despite any assertions to the

25    contrary, you can consider postconspiracy -- postconspiracy

1    acts to actually determine whether a conspiracy existed.  And I

2    would argue -- and -- and also whether an agreement ever was

3    formed, and that's a United States Supreme Court case, Anderson

4    versus United States, your Honor.

5        THE COURT:  Well, that's not a very remarkable

6    proposition.  You know, of course you can consider, you know,

7    evidence after the fact that -- you can drawn a reasonable

8    inference backwards that people are acting in a way consistent

9    with the fact that they have entered into an agreement.

10       MS. SIEGMANN:  And so if you look then at Yassin's

11   activities, he was a very important -- and played a very

12   important role at Care.  He was in charge of the Al-Hussams.

13   He said that in a phone call in 1995 to Zaky, one of the people

14   that actually was martyred, but they did discuss about the

15   distribution of the Al-Hussam in that conversation.

16       In 199 -- in a January 1996 call, he indicates that

17   he's not as involved in the Al-Hussam distribution any longer.

18       Additionally, you have Wissam Ali-Ahmad, who testified

19   in -- that in 1994, when he started going to these functions

20   that Yassin was giving out, distributing the Al-Hussams and

21   other literature for Care.

22       Also, you have Teba, who said even in 1996, at that

23   time frame, the person who was in the office on a daily basis

24   with him and Al-Monla was Yassin.  He was one of the people

25   that was serving on the executive committee.  He was integrally

1    involved.

2          But even more that than, you also have, your Honor,

3    in 1995, again, these acts do thereafter the fact, but your

4    Honor, they do show the -- the importance or the agreements

5    that were formed here.

6          In 1995, there's meetings.  There is the meeting

7    minutes, if you recall.  I believe they're Exhibits 63 to 65.

8    I don't have them in front of me, but 63A, 65A; and there

9    Yassin is at these meetings in which Muntasser's there, Akra's

10   there, Yassin's there.  The three principal people again from

11   Al-Kifah and Care are at this meeting.  And what are they

12   discussing?  They're discussing what Chehade, Mohammed Chehade,

13   from Global Relief, who actually was a member of Al-Kifah as

14   well.  They're talking about how they can support jihad, how

15   their charity, their respective charities, can support jihad,

16   and how -- those are very important facts.

17         Then in Exhibit 66A, again, in April '95, Yassin and

18   Akra, Al-Monla and Muntasser all pledging support to whom?  To

19   Hekmatyar, a mujahideen war lord.  Our office, it refers to our

20   office, as supporting this, how the people in Boston are

21   supporting this war lord.

22         THE COURT:  Tell mow how these events occurring in

23   '95, '96, or that time frame, how they support a reasonable

24   inference that the key participants, that is Yassin and Akra,

25   for these purposes, knew in 1983 -- or rather 1993, what was

1    going on and agreed to -- with one another to defraud the IRS?

2    I mean the fact that you're pledging fealty to a war load in

3    1995 or 1996 --

4         MS. SIEGMANN:  Well, it's early '95, when they're

5    actually having these meetings and pledge of support at the

6    same time.

7         THE COURT:  Regardless, it's well after the fact.  Why

8    does that support an inference that you entered into a

9    tax-related agreement in 1995?

10         MS. SIEGMANN:  It's talking about how to use the

11   charity.  The meetings were about the charity, the charity to

12   support these non-charitable purposes, the support of the

13   mujahideen.  It shows the close working relationship of these

14   individuals.  These are the people that were running Care.  You

15   can infer that from the facts.

16         Additionally in 1994, earlier in time, Mr. Kadri

17   overheard -- overhears Waseem Yassin telling Bassam Kanj, the

18   individual that died fighting overseas, the reason why

19   Care -- Al-Kifah changed its name.  He said Al-Kifah changed

20   its name to Care.  He was a person that was in the know, unlike

21   what, you know, Kadri and he didn't remain -- he actually

22   testified that he didn't know much about the money and where

23   everything was going.  This was somebody that was in the know.

24   He knew what was going on.  He was involved from Al-Kifah.  He

25   was more intimately involved than himself.

1          Now -- and there was some indication, I believe, in

2    the paper, in the defense papers that, well, no, you can't say

3    that Kadri -- Kadri said that Yassin was involved in a minor

4    way.  Well, what his testimony exactly was was that when he was

5    asked about who was involved in Care, he -- he listed Akra as

6    one of the first people.  Akra was involved, Nawras, Munther

7    Baara; and then to a lesser degree, he said Yassin and 'Imad,

8    so he put Yassin in the same category as 'Imad Muntasser, who

9    we all know was running -- was listed as the president.

10          Clearly, we're not relying on the directorship alone,

11   your Honor, but if you look at the totality of the

12   circumstance, then obviously you have the filing of the false

13   tax returns that Yassin was integrally involved in.

14          THE COURT:  Again, it's after the fact.  He's -- when

15   does Yassin -- '94, '95, when does he --

16          MS. SIEGMANN:  Well, actually, November is '95 is when

17   they start working on the taxes.  They are not ultimately filed

18   until '96; but in that document, one of the documents that

19   Muntasser files with the tax returns, and attached to both the

20   '93 tax return and '94, he indicates that all the officers are

21   volunteers at Care and that none of them had experience in tax

22   matters.  Presumably, from that, that fact there, you can infer

23   that he discussed the tax filings with those individuals.

24   That's fair inference.  He talked to them, because obviously

25   he -- they talked about who has experience in doing these types

1    of filings.  They say, ah, we don't have experience.  They then

2    obtain the services of Khalid Naseem.  There has been some

3    assertions that somehow Khalid Naseem knew about the

4    Al-Hussams.  His direct testimony, which was not cross-examined

5    at all, was that he did not know anything about Al-Hussams;

6    that no one at Care ever told him anything; that the word

7    "Al-Hussam" was never mentioned.

8            They look at this Exhibit 166, I think is, where they

9    said, that file is -- it's a sizeable file.  I think it's about

10   10, 15 pages in it, and it does contain a fax cover sheet.

11   There's no indication that certain things are stapled to the

12   fax cover sheets, as this one with this document.  There is

13   rough notes in there.  There is many financial statements that

14   are typed, and then there is these three or four pages of

15   handwritten jottings.  One of them has a couple numbers and

16   "Al-Hussam" on it.  And the fact that it was in that file, they

17   infer that that document was sent to -- faxed to Khalid Naseem,

18   which he on his direct testimony was never told about the

19   Al-Hussams.

20           Now, mind you what he did, and if look what Waseem

21   Yassin did in preparing those taxes is he concealed the exact

22   same information that Mr. Muntasser concealed in the 1023s.  He

23   was acting consistent with that agreement when he did so.  He

24   did not disclose anything about the Al-Hussams; yet in '93 and

25   '94, and then he helped in '95, but that was prepared by a

1    separate tax preparer, that was one of the most substantial

2    activities.  I believe that if you looked at the last issue for

3    the year, the '93 and '94, there was approximately 20 issues

4    that were at least distributed in those two years each.  So you

5    have 40 issues that he knew about.  That was something that he

6    was involved with integrally.

7         THE COURT:  All right.  Back up.  Tell me what facts

8    elicited at the trial, never mind the reasonable inferences

9    elicited from those facts in the time being, support the notion

10   that Yassin in 1993 was conspiring with Muntasser, and then

11   we'll work from there to the inferences.

12        Yassin, you know, he holds position X.  He does

13   activity Y.  He is at meetings.  Tell me facts.

14        MS. SIEGMANN:  Okay.  Well, he was -- in 1993, he was

15   serving as the director of Care and that his name is identified

16   on the Articles of Incorporation, as is Akra, the person who

17   assembled all the names and worked with Muntasser to get the

18   Articles of Incorporation filed and complete.

19        THE COURT:  All right.  So, let me stop you there.

20   So, you're saying that it's a reasonable inference being a

21   director of Care and being named on the Articles of

22   Organization that he knew what those Articles of Organization

23   said?

24        MS. SIEGMANN:  Yes, your Honor.  And there also -- and

25   he also did a filing.  He himself filed in the reports with the

1    state, the Secretary of Massachusetts, Secretary of the State

2    of Massachusetts, identifying himself as secretary.  So, he

3    knew the requirements of filing annual reports.  He knew that

4    they had Articles of Incorporation.  He filed actually annual

5    reports stating forth --

6                THE COURT:  When -- when was the first annual report

7    filed?

8                MS. SIEGMANN:  I don't -- I can't recall.  It might

9    have been in -- I think it was early '96 or '95, '96 time

10   frame.  I don't have that.

11               THE COURT:  All right.  Let's go back to facts in

12   1993.  He's a director.  He's on the Articles of Organization.

13               What else?

14               MS. SIEGMANN:  And he's involved in -- actively in the

15   distribution of their Al-Hussams, which identify it as a

16   tax-exempt organization.  There is testimony that he was

17   involved in those distributions with Al-Kifah, and the role, he

18   continued to do that after Care was formed.

19               THE COURT:  All right.  He distributes Al-Hussams that

20   say on them that Care is tax-exempt.

21               MS. SIEGMANN:  In June 1993, there is an Al-Hussam.  I

22   think it's either 251A or 261A.  I don't remember exactly.

23               THE COURT:  And this is the one that's before

24   the -- the tax-exempt status?

25               MS. SIEGMANN:  It's at the same time.  It's

1    approximately the same time, but it says -- and there is

2    actually a check from the May time frame that actually in the

3    memo section says it's tax-exempt.  So, it's reasonable to

4    infer from that that they are already distributing literature

5    that says they are tax-exempt at that time.

6            THE COURT:  And the evidence as to his role in

7    Al-Kifah is what?

8            MS. SIEGMANN:  That he was the go-around -- the

9    testimony was "go-around guy."  He was the one that got things

10   done on a day-to-day basis is what Kadri testified.

11           THE COURT:  All right.  What other evidence from 1993,

12   concerning Yassin's role, again with regard to the tax filings

13   with regard to this issue of tax-exempt status?

14           MS. SIEGMANN:  There is also as to the meeting that --

15   regarding Akra and Yassin and Muntasser in a letter to Bade

16   dated, I believe, in April of 1993, he -- it talks about the

17   name change and also to send the new meeting minutes to Bade,

18   which you can infer from that there was a meeting at which

19   these individuals met and discussed the Articles of

20   Incorporation.

21           Additionally, on the bylaws itself, it says

22   they -- that they were duly elected by -- duly elected to be

23   directors.

24           There's also the fact that Yassin was a donor

25   of -- I'm sorry -- he was a donor to Al-Kifah, and he

1    continued -- he actually was one of those people that actually

2    signed those orphan monthly deposits in which his money was

3    actually, even though it was Care, it was being deposited into

4    Al-Kifah's account.  Presumably, if you went on the bank

5    account statement, you would see that was -- and that was the

6    bank records that we have from the bank showed which accounts

7    it was being withdrawn from.

8            And lastly --

9            THE COURT:  Well, run that by me again.  So, he writes

10    a check, an orphan-sponsored check, that's deposited not to a

11    Care account, but to an Al-Kifah account; and you're saying

12    it's a reasonable inference that he got back the check back

13    from the bank and saw where it had been deposited?

14            MS. SIEGMANN:  No.  Let me be more specific, your

15    Honor.  At trial we had a number of automatic withdrawal

16    records, and on those his name was identified in Al-Kifah's

17    records as being someone that was continuing to give money to

18    Al-Kifah through March of 1994; and we also had in Care's

19    records and actually a document that showed that he was one of

20    the ones that signed up for a monthly automatic withdrawal from

21    his account for Care, yet that money was being deposited into

22    Al-Kifah's account.

23            Now, we also have bank account statements from Care, I

24    believe, and Al-Kifah showing actually whose account was being

25    debited.  From that you can infer that on the then Mr. Yassin's

1    bank account, it would actually indicate where -- who was

2    being -- into which account his money is being credited.  And

3    then that would show that it was being deposited into -- I'm

4    sorry -- into Al-Kifah's account.

5          And there was another fact.  I'm sorry.  I'm

6    having a -- I don't remember what it was.  There was something

7    else, and I forgot.

8          Oh, and there is checks that -- that Yassin is being

9    given in 1993 by Muntasser and Munther Baara for phone calls,

10   for storage, and there is also checks in '94 for an Al-Hussam,

11   for some Al-Hussam stuff.  Those are the -- just the facts for

12   the record.

13         But we did have multiple witnesses that testified

14   about how Yassin was one of the people that was being -- that

15   was involved with Al-Kifah and then in Care; Raba Ahmed and

16   Kadri, Wissam Ali-Ahmad started in 1994, because he didn't

17   start attending the lectures until then.  And then Teba that,

18   you know, he continued to have that same important role,

19   central role, in the organization throughout that whole time.

20         Now, Akra's role did not change at all.  He was the

21   religious leader, and he remained so, and he continued to

22   conduct the same letters -- lectures.  The literature was the

23   same.  He served a very integral role in this organization.  He

24   was the one soliciting donations for the mujahideen, for

25   support of the fighters, and yet he knew that they are claiming

1    to be tax-exempt and they were applying for that status.

2         And if you look back at the -- you know, sometimes the

3    defendants would say something about, well, you know, how can

4    you infer that they would have wanted to hide this information.

5    Why would they do this?  Well, it's clear.  I mean, this is

6    highly unfavorable publicity.  They knew this was

7    controversial.  If Al-Kifah was being targeted with the

8    publicity and highly negative publicity they were for

9    supporting fighters and supporting the mujahideen, then it's

10   reasonable to infer that they didn't want to say that they were

11   doing such activities in their own tax filing, because they

12   wouldn't be granted tax-exempt status.  Charnoff and Sack, both

13   IRS reviewers, came in here and testified that it was highly

14   likely that they would have denied them application, their

15   application, if they had known that they were supporting

16   fighters.

17        THE COURT:  Again, I'm focusing now on, and let's

18   assume for these purposes that, of course, that Muntasser had

19   the necessary criminal intent in 1993.  The question is did

20   Akra or did Yassin in 1993?  And, you know, what the IRS might

21   have done or might not have done is a question on a different

22   issue.

23        You're saying he -- he knows that it's tax-exempt,

24   because he distributes Al-Hussams that say it's tax-exempt, and

25   you know -- he knows that it's noncharitable, because what, the

1    content of the Al-Hussams?  How does he know that it's not

2    merely representing itself as a charity, but that, in fact,

3    it's not a charity, that is, it is not engaged in charitable

4    activities?

5         MS. SIEGMANN:  Well, your Honor, we never said they

6    are not engaged in some charitable activities.  The same --

7         THE COURT:  Well, just so I'm clear.  I mean, if

8    you're saying he -- you need to draw the inference that he knew

9    that the IRS was being defrauded.  Don't we need to draw the

10   inference that he -- he knew that it was being held out as a

11   charity; that it had applied for and received charitable status

12   from the IRS, but that, in fact, it was not a charity, so that

13   statement was then false?

14        MS. SIEGMANN:  Well, there -- there was the agreement

15   and the Articles of Incorporation, again a publicly-filed

16   document, which his name is on, as is Akra, as is Muntasser's,

17   in which they say is exclusively organized for

18   charitable -- religious, charitable, scientific, and

19   educational purposes.  Then they are holding themselves out to

20   be tax-exempt, because they're receiving checks under that

21   pretense.

22        THE COURT:  All right.

23        MS. SIEGMANN:  I mean it's in their Al-Hussam

24   literature that he is involved with distributing and --

25        THE COURT:  And my question is what is the evidence

1    that he knew that that was false, that it was not a charity?

2        MS. SIEGMANN:  Well, because they all are soliciting

3    money.  I mean he -- at Akra's lectures where people saw him

4    act, Akra is saying you need to solicit.  You need to commit

5    jihad.  You need to go fight.  You need to go spend money for

6    fighters if you're unable to fight.  There is also in the

7    second lecture, the Sisters in Jihad lectures, Akra comes out

8    and said, and one of the services you can provide is to provide

9    ammunition to people at camps.  These are not charitable works,

10   your Honor.  They're not talking about, you know, just go help

11   some orphans and widows.  You know, they're talking about going

12   out and killing people.  And for -- and they already know based

13   upon the highly unfavorable publicity that this is not

14   something -- this is very highly controversial, that this is

15   linked to violent activity, and that's why they have to hide

16   those -- that relationship to Al-Kifah from the IRS, and they

17   changed their name.  He was involved in that.  He told Bassam

18   Kanj in 1994, yeah, we changed our name from Al-Kifah.  Then

19   the Al-Hussam is changed immediately, and no longer -- it's

20   three days later they have an issue, and the name Al-Kifah is

21   no longer there.  It says Care instead.  And there is no

22   explanation as to why they're assuming this new publication.

23       THE COURT:  Okay.  The evidence you say "they did

24   this, and he was involved in it."  The evidence that he was

25   involved in the name change, presumably this is the successor

1    outgrowth issue is he was:  (A) He's involved in the activities

2    of Al-Kifah; (B) he's involved in the activities of Care --

3             MS. SIEGMANN:  Yes, your Honor --

4             THE COURT:  -- as a --

5             MS. SIEGMANN:  -- and the Al-Hussam is exactly the

6    same.  There's no change.  They are the same exact activities.

7    They are engaged in the exact same activities as Al-Kifah, yet

8    they changed their name to Care, and that is so they can apply

9    for tax-exempt status and get it.  They need to disassociate

10   themselves with this organization that now has been connected

11   to violent activities, fighting overseas.

12            THE COURT:  And what is the evidence that he knew that

13   there was a tax angle on that, that is, that it was a

14   requirement that the organization disclose to the IRS whether

15   or not it was a successor or outgrowth; in other words, you

16   might say that there's evidence that they wanted to disguise

17   the name of the organization, or to disassociate themselves

18   from Al-Kifah.  But what's the evidence that Yassin knew that

19   there was a tax angle for the successor or outgrowth issue?

20            MS. SIEGMANN:  Now, your Honor, again, going back to

21   the United States versus Raymond.  The government doesn't have

22   to prove that he knew every detail of this arrangement, only

23   the basic agreement, and that was to hide its relationship to

24   Al-Kifah by the fact that they changed their name.  They no

25   longer use the name on the Al-Hussams.  Yes, on the Internet

1   version of the Al-Hussam, they did actually say Office of

2   Services, which connected them to the parent organization,

3   Maktab-al-Khidmat, but he certainly knew about the

4   non-charitable activities that they was engaged in, because he

5   himself was involved in that.  He was at lectures in which

6   the -- Akra refers to Yassin at the lectures, if you want to

7   get a copy of Join the Caravan, you know, go see brother Yassin

8   at the Office of Services.  This was, again, these people were

9   integrally involved in this organization, and Kadri puts them

10  there.  He says that he was involved in both of these

11  organizations.  He is the one that actually tells somebody else

12  the reason why the name was changed.  He was someone that knew

13  what was going on.

14          THE COURT:  All right.  Let me --

15          MS. SIEGMANN:  And -- I'm sorry.  Obviously, Al-Kifah

16  had falsely stated that they were tax-exempt when, in fact,

17  they were not.

18          THE COURT:  What is the evidence that Yassin knew

19  that?  In other words, you know, suppose I -- I go to work for

20  some organization that's supposed to help widows and orphans of

21  impoverished judges, and people tell me it's tax-exempt.  How

22  am I charged with the knowledge that it is, in fact, tax

23  exempt?  How am I supposed to know that, whether or not -- in

24  other words, they say they are tax-exempt, and they are not,

25  why would I be charged with knowing that?

1          MS. SIEGMANN:  See, I think -- Al-Kifah was engaged in

2    non-charitable activities, clearly noncharitable.  They were

3    even a little more specific in their distributions saying we

4    support the mujahideen on the front is the Exhibit 40.

5    They -- the fact is they were engaged in very highly

6    non-charitable activities, and they claim to be tax-exempt, and

7    they were not.

8          THE COURT:  But -- but -- but Yassin -- presumably,

9    Yassin -- there's no evidence, even a reasonable inference from

10   the evidence, that Yassin knew that they were falsely claiming

11   that they had obtained a charitable exemption.  In other words,

12   Al-Kifah, unlike Care, never applied for charitable exemption.

13         MS. SIEGMANN:  No.  But there is indication from what

14   Muntasser told Special Agent Peet.  He said that he tried to

15   obtain tax records.  He never was able to obtain them, and then

16   he writes a letter, a 2/16/93 letter to Bade saying our

17   organization, referring to Al-Kifah, in trying to see -- pursue

18   what the government contends would be tax-exempt status for

19   Al-Kifah.  Certainly, when he says "our organization," he is

20   not doing this on his own.  He's doing this with the -- with

21   the support, and obviously this organization is working all

22   together on their activities.

23         THE COURT:  Again, that's a conclusion.  You know, you

24   can't just state the conclusion without pointing to the

25   evidence that supports it to say that they're all in this

1    together; they all know everything, and that's what we're

2    trying to figure out.  If that were true, there wouldn't be

3    anything to talk about, or if it was obviously true.  That's

4    what I'm struggling with.

5           MS. SIEGMANN:  There is, for an administrative point

6    of view, Mr. Yassin, based upon some of the defense exhibits,

7    although it's in 1994, but he's getting correspondence from the

8    landlord about where their office is going to be located.  He

9    was someone that those -- that the correspondence was directed

10   to him, not anybody else, but him.  He was integrally involved.

11   And I know, your Honor, you're having trouble.  I'm

12   trying -- this is the testimony.  There is -- it's, obviously,

13   circumstantial, but there is evidence of his involvement.

14   There is only a few of these individuals that were involved,

15   and it's a close-knit organization, and we believe that that is

16   based upon the totality of the circumstances sufficient to find

17   an agreement in April -- April to June, 1993, that the

18   agreement was formed.  Their names are all on this

19   publicly-filed document.  They were summoned -- now, Yassin

20   wasn't summoned, but Akra summoned people to his house in a

21   very rushed fashion to change the name not telling anybody why

22   or what the new organization is, and then he shares that

23   information with Muntasser for the completion of the Articles

24   of Incorporation.

25           THE COURT:  Okay.  Let me stop there and ask Ms.

1    Sullivan to respond.

2         MS. SULLIVAN:  Thank you, your Honor.  Just three

3    quick points.

4         First, your Honor is absolutely correct that the issue

5    is what was known in 1993.  I counted 20 minutes into Ms.

6    Siegmann's presentation you asking what happened in 1993.  We

7    heard about 1994, 1995, 1996.  We didn't hear about 1993, which

8    we finally came up with one fact from 1993.  What was it?  It

9    was a letter concerning the new organization with an notation

10   saying "send new meeting minutes" with no notation whatsoever

11   in that exhibit, the government's own exhibit, as to who was at

12   the meeting.  There were no names mentioned.

13        So, the first point is that your Honor quite correctly

14   focused on the question of what was known in 1993, and we got

15   facts about '94, '95, '96, and what we got in '93 did not prove

16   the conspiracy.

17        Then Ms. Siegmann says, well, you can look at later

18   events to prove an earlier conspiracy.  She cites Anderson,

19   which I don't believe was in her brief, but as to the two cases

20   that --

21        THE COURT:  The general proposition is true, if

22   someone in 1994 says, hey, back in 1993 I was in a

23   conspiratorial agreement.

24        MS. SIEGMANN:  Of course, but you need something to

25   refer back to in 1993.

1          THE COURT:  Well, or, you know, in -- stated sort of

2      in simpler terms, if you have one set of events in '92 and

3      another set of events in 1994, sometimes you can infer that

4      something happened in between.  I'm not saying that's this

5      case, but there is nothing remarkable about the proposition

6      that you can use after-the-fact evidence to look -- as evidence

7      to infer that something happened earlier.

8          MS. SULLIVAN:  Absolutely, your Honor, we don't

9      disagree with that at all.  It's just that the cases cited by

10     the government for that proposition, and these are referenced

11     in our reply brief at page 27, footnote 18.  They cite

12     Colon-Munoz and Fields.  These are cases in which the

13     subsequent events simply corroborate something.  You've got a

14     couple of bank robbers.  They've robbed a bank in one year.

15     They robbed a bank in another year, and they say we didn't have

16     a criminal association; and in that case, you're likely to say,

17     oh, excuse me, you robbed a bank in a prior year.  We're not

18     admitting it for the truth or for past acts, but we're saying

19     it to show that you don't have the defense of no prior

20     association.  But the predicate there must have been something

21     in the prior year that we're working with.  And what Ms.

22     Siegmann did not give you, despite her lengthy and articulate

23     presentation, was anything in 1993 that was the prior bank

24     robbery.  Why not?  Because Yassin wasn't an officer in '93.

25     He became an officer later.  He ascends to officer just as he

1    starts dealing with tax documents in 1996, but there is zero

2    evidence he was dealing with tax documents in 1993.

3          And Yassin was the go-around guy, according to the

4    evidence about the Al-Kifah; and go-around guy, again, Kadri

5    expressly distinguishes Mr. Muntasser as the more admin guy,

6    who's running things from the gopher, who gets -- brings

7    documents around and gets the mail.

8          So, there's no basis from either the 1993 title of

9    director.  And remember, Kadri's a director, too; and Kadri is

10   their -- one of their star witnesses.  And Kadri says, I was a

11   director, but I have no control over the organization.  I

12   didn't go to the annual meeting.  I don't remember.  So, you

13   cannot infer from the positions.

14         I would like to turn to the second point, your Honor.

15   Your Honor asked, well, could we infer.  Your Honor asked quite

16   correctly, can we infer from the small close-knit nature of the

17   organization that everybody knew.  And you quite rightly kept

18   asking Ms. Siegmann saying, well, do people just know things,

19   because they're there.  I don't think that you would know about

20   the tax filings of the Society for the Children of Impoverished

21   Judges.

22         THE COURT:  You would be shocked about how little I

23   know about what goes on in my own household or office, but

24   continue.

25         MS. SIEGMANN:  And Mr. Akra had to have known about

1    these tax filings.  I don't know think Cardinal O'Connor knows

2    about every tax filing made by the lawyers for the Archdiocese.

3         And just, your Honor, you said can you really base

4    criminal conspiracy liability on the inferences from position

5    in the company.  We cite in our -- we cite in our initial

6    brief, your Honor, several cases in which you can't even infer

7    under the rule trying for securities fraud that there is

8    knowledge based simply on position in the company.  You

9    certainly can't infer simply from position in the company what

10   knowledge is for purposes of a criminal conspiracy.  And that

11   brings me to my third point, your Honor.

12        Even if there had been enhancements about 1993, of

13   which there is none; even if there had been any evidence

14   regarding Yassin's knowledge of the tax filings -- sorry.  If

15   there had been any knowledge of Yassin.  Even if there had been

16   any knowledge in '93, it would have to have been knowledge

17   about the tax filings, not knowledge about Care's formation,

18   not knowledge about what publications were distributed, not

19   knowledge about the content of the publications, but as your

20   Honor very precisely said, the tax angle on those facts.

21        THE COURT:  I mean it doesn't have to be, you know,

22   that these people know it's a Form 1023, but they have to know

23   the essential goal of the conspiracy, right, which is to impair

24   and impede the IRS.

25        MS. SULLIVAN:  Exactly, your Honor.  So, we're

1    operating under Goldberg, in which, of course, Judge Boudine

2    together with Judge Lynch and the late Judge Bownes said in a

3    371 conspiracy --

4              THE COURT:  That's the Park 'N Fly case?

5              MS. SULLIVAN:  Yes, exactly.  Goldberg in the case has

6    said in a 371 client conspiracy there has to be, as your Honor

7    said, a tax angle.  There has to be a purpose.  It is not

8    sufficient to say they knew that organization was being formed;

9    that it was going to be tax exempt; that it had a goal of

10   soliciting funds.  It's only sufficient to make out the intent

11   and agreement, active agreement used for their conspiracy, if

12   they can show that Yassin intended and knew that the 1023 would

13   be devoid of required information.

14            Now, as we want to argue to your Honor on Count One

15   when we get there, there's no duty to disclose to the IRS

16   either of the charged facts about successorship or outgrowth or

17   the content of the publications, but even if you assume there

18   was such a clear duty, and it was known to Mr. Muntasser, we

19   dispute that vigorously.  There's nothing in the evidence to

20   suggest that Mr. Yassin had knowledge about that.  He's not

21   tied to the 1023 in any way as to seeing it, reading it,

22   understanding its content, or knowing what was required in

23   1993.  Just those three points.  There is everything that Ms.

24   Siegmann has mentioned virtually as post-1993, we can't

25   backdate later, and we can't attribute backwards later events,

1    unless we had something in '93.  We have nothing in '93.  If it

2    was in '93, there has to be a tax angle, and nothing in '93

3    gives us a tax angle, and you can't infer it from your position

4    at the company.

5         There it is.  Your Honor, I think it's important.  I

6    just want to refer you to the securities law, case law, because

7    I think this point is important.  The idea that you can infer

8    things just from the position in the company.

9         I'm sorry, your Honor.  Thank you for giving me just

10   that extra minute.  On page 68, we cite to your Honor cases

11   that suggest that it's not sufficient even for civil securities

12   fraud to infer that just because of a person's position within

13   the company they must have known a statement was false or

14   misleading.  That's precisely the type of inference, which

15   courts on numerous occasions have been determined to be

16   inadequate to withstand Rule 9(b) extremely.  We are in the

17   world of criminal liability, your Honor, in which beyond a

18   reasonable doubt is required, and to make such inferential

19   chain of inferences without a tie to facts that are tax related

20   at the time the conspiracy was allegedly formed would make

21   this, surely if you let it go forward, the most thinly

22   inferentially based Section 371 tax conspiracy case ever

23   allowed under U.S. law.

24        THE COURT:  All right.  Before we leave Count Two, and

25   we do need to move on to other topics, let me ask the

1    government if -- if I were to conclude that there was no

2    conspiracy formed in 1993, do you agree that the conspiracy

3    count falls; in other words, a particular conspiracy was

4    charged, and it can't be salvaged to include Mubayyid and

5    Al-Monla?

6            MS. SIEGMANN:  No, your Honor.  As we had argued

7    previously, the conspiracy has two objects, as you indicated

8    earlier, the obtaining and maintaining tax-exempt status, and

9    we would argue that if the -- and the case law is very clear on

10   this, and it's in our footnote in the government's brief that

11   as long as there's evidence to support one of the objects of

12   the conspiracy that is sufficient to sustain the verdict; and

13   we cite to a case, and I can't remember the name of it off the

14   top of my head, but it had a -- it was a three-object

15   conspiracy, and it is a First Circuit case, and the -- the

16   court said that because there was sufficient evidence as to one

17   of the objects that their verdict would be sustained on that

18   basis.

19           Additionally -- I'm sorry -- it's United States versus

20   Capozzi, which is 486 F.3d 711, and that's on page 144 of the

21   government's brief at footnote 129.

22           Additionally, I just want to mention two things that I

23   neglected to say before.  You recall that during the trial, I

24   think it's exhibit -- now I can't remember, but it's the

25   GRF -- there was a tax filing that was faxed and redacted by

1    somebody at Care.  That was found with Care's documents with

2    its tax filings; and if you compare it, and we had someone

3    compare that GRF filing, which was redacted to some degree with

4    the Care tax filing, the 1023, and they were slightly similar,

5    and inferring from that, that if it was used, the GRF filing

6    was actually filed first and used by people at Care to do the

7    1023 application for its -- for itself.  Now, what does that

8    mean.

9          Well, again it goes back to the Munther Baara signing

10   a check to Muntasser for the tax filing fee.  Again, this was

11   not something that was done in -- and behind closed doors.  It

12   was done with -- amongst the officers, directors of Care, to

13   get this done.  I mean the key officers.  I'm not talking -- I

14   mean there is -- implications that our star witness, our star

15   witness -- well, Kadri was a witness in the whole scheme of the

16   trial.  I wouldn't say that he was a star.  I wouldn't say that

17   of many witnesses; but nonetheless, and lastly on when it comes

18   to inferring a tax purpose, the First Circuit has held with

19   regards to client conspiracy, and a central case I believe is

20   United States versus Tavres that you can infer a tax purpose

21   from things like money laundering, drug trafficking and money

22   laundering.  Now, I'm not saying that this is money laundering;

23   however, again, amongst the circumstantial evidence that the

24   bad press, the meetings, et cetera, you can infer a tax

25   purpose, but you don't even have to, because it's already

 1   stated in their Articles of Incorporation that are publicly

 2   filed with these peoples' names on it, and then Yassin does do

 3   the annual report.  And mind you, on the annual report, who

 4   does Kadri seek out to tell I don't want my name on these

 5   records any more?  It wasn't Muntasser.  It wasn't Akra.  It

 6   was Yassin himself.  In 1995, he says, "I don't want my name on

 7   these records anymore," yet Yassin still used his name.

 8           THE COURT:  All right.  Let me hear either from Mr.

 9   Andrews or Mr. McGinty or both on this question of if I were to

10   find that there was no conspiracy or no agreement in 1993,

11   whether any part of Count Two can nonetheless stand.

12           Mr. McGinty.

13           MR. McGINTY:  Your Honor, we conferred, and Ms.

14   Sullivan is going to address that issue.

15           THE COURT:  Okay.  That's fine.

16           MS. SULLIVAN:  Thank you, Mr. McGinty.

17           Your Honor, you cannot allow the conspiracy to go

18   forward if one or the other aspect of it is time barred.

19   Mr. McGinty's renewed motion for judgment of acquittal on

20   behalf of Mr. Al-Monla makes this point with reference to the

21   Yates case on page 5.  Yates is from an older era in the law,

22   but on this point it remains good law, and that is that if one

23   object of a conspiracy fails for statute of -- one means of

24   proof of a conspiracy fails for a statute of limitations

25   reason, the other part must fail, too.  That was a case

1    involving supposedly completed action, an ongoing action, if

2    one fails, both have to fail.

3         But, your Honor, there's an even more basic reason why

4    you cannot now allow one piece of the conspiracy to go forward

5    on a two-conspiracy theory, and that is because on

6    December 19th, your Honor, before we closed, you stated that

7    you have concluded that the fairest interpretation is that it's

8    a single-object conspiracy.  You said, it's a 1993 conspiracy,

9    just to quote your Honor, this is on page 5 of the transcript

10   of December 19, 2007.  I believe that's day 24.  You said --

11        THE COURT:  Was I smarter then or not?

12        MS. SULLIVAN:  You were -- you were absolutely

13   brilliant then.  That was the day in which you stated, here it

14   appears there was one goal, which is pages 4 and 5, which is

15   achieving and maintaining tax-exempt status, which is sought to

16   be achieved in through two means, two principal means, the

17   false statements concerning successor or outgrowth and the

18   false statements concerning charitable purpose --

19        THE COURT REPORTER:  I'm sorry.  You're losing me.

20        MS. SULLIVAN:  I apologize.  My humble apologies to

21   the court reporter.  I'll speak more slowly.  It appears that

22   there was one goal, which was achieving and maintaining

23   tax-exempt status, which was sought to be achieved through two

24   means.  There are two means, the false statement concerning

25   successor or outgrowth, and the false statements concerning

1  charitable purpose.  And while the question is not free from

2  doubt, I have concluded that the fairest interpretation is that

3  it's a single-object conspiracy.

4       So, your Honor, once you said that the conspiracy is a

5  single-object conspiracy, and it's rooted in agreement in 1993,

6  we then closed on that basis.  Due process would require a new

7  trial if the government were now to resurrect the two-object

8  theory of the conspiracy.

9       We were entitled to be able to defend ourselves

10  against a charge of any conspiracy to maintain in later years.

11  Your Honor located the conspiracy in 1993.  We closed on that

12  basis, and at minimum it would require a new trial on

13  Count Two, were you to change your mind now.  So with respect,

14  we think you were correct about the single object, but in any

15  event, it doesn't matter whether it was or wasn't correct; it

16  was the basis on which we closed the case.

17       THE COURT:  All right.  Let's do this.  Let's give the

18  beleaguered stenographer a short break, and then we'll come

19  back, and I want to hear about Count One.

20       (Short break from 3:55 to 4:01 p.m.)

21       THE CLERK:  All rise.

22       Court is now open.  You may be seated.

23       THE COURT:  All right.  Let's take up then the motion

24  for judgment of acquittal as to Count One, which is the

25  Section 1001 claim.

1          Ms. Sullivan, are you taking the lead here as well?

2          MS. SULLIVAN:  Yes, your Honor, I am.  Thank you very

3     much.

4          THE COURT:  All right.

5          MS. SULLIVAN:  Your Honor, the argument on Count One

6     starts, of course, from Anzalone, as your Honor acknowledged in

7     charging the jury on trick or scheme.  This is a concealment

8     case, and the government is stuck with its charging here.

9     Count One is charged as a concealment case, and as is settled

10    law in the circuit under Anzalone in a concealment case,

11    quoting from Judge Torruella, in prosecuting a Section 1001

12    concealment violation, it is incumbent upon the government to

13    prove the defendant had a legal duty to disclose the material

14    facts at the same time he was alleged to have concealed them.

15         Now, the government struggles mightily in its motion

16    for acquittal papers to say that Anzalone doesn't say what it

17    says, but it says what it says; and your Honor correctly

18    charges the jury that it had to find the duty to disclose.

19         Now, we contend that there was no duty to disclose

20    even in 1993 under the 1023, or in 1996 on the 990s.  Your

21    Honor has heard this before, so just to summarize briefly, we

22    don't think -- remember, this is a very, very specific count.

23    It charges two very specific kinds of information were withheld

24    from the government:  In Count One, it references three

25    agencies, but they're both tax related pieces of information.

1    It charges that -- and the proof went to the question of

2    whether successor ever was concealed, whether solicitation from

3    mujahideen and jihad was concealed.  But there's no clear duty

4    in 1993 or 1996 to tell the IRS that, and we know that because

5    the government changed the instructions and changed the form.

6    We suggest to your Honor that the 1023 asked you to disclose

7    activities.  It didn't clearly say that fundraising

8    publications count as activities.  It gave you a chance to list

9    publications under fundraising.  Ms. Goldberg testified that it

10   was preferable to put fundraising material under like

11   publications under fundraising from the IRS perspective, and

12   the government later changes the form and tries to make it

13   clearer in the 1023s with respect to the outgrowth point.  It

14   eliminates the word "outgrowth" on the 1023, and it says in the

15   new form that when we talk about successor, we want you to tell

16   us whether you converted from profit to nonprofit and so forth.

17          Now, we supplied those to your Honor.  We supplied the

18   change in the 1023 form in appendix S, and the government says,

19   well, you can't pay any attention to that.  That's what was in

20   evidence.  But your Honor, of course you can take judicial

21   notice of that government change in the form.  In fact,

22   Anzalone did the very same thing.  I know, because I had the

23   privilege of litigating Anzalone with Judge Gertner, and we

24   submitted a Comptroller of Currency report, which was taken

25   notice of, and the -- the court and Mr. Trayelo (phonetic)

1    relied on it to say that, in fact, yes, the government changed

2    its mind afterwards.  It showed that the courtesy transaction

3    recording requirement must have been pretty vague as to

4    structuring at the time.

5         So, we submit, first of all, the 1023 wasn't clear

6    about successor or outgrowth in 1993, and we submit the

7    Form 990 wasn't clear about any duty to tell the government

8    about publications back in 1996 when the 990s were filed, when

9    Mr. Muntasser filed 990s.  The government's own witness said

10   that it was a judgment call whether to list publications as

11   activities or fundraising.  This is Mr. Charnoff, the

12   government's own witness, and you would think that the

13   defendants were entitled to reply on the idea that they didn't

14   have to attach all their publications from the treasury

15   regulation I mentioned before, IRS Regulation

16   1.501(c)(3)-1(d)(2).  It says the controversial advocacy will

17   not preclude a tax exemption.

18        So, there's no form, statute or regulation that tells

19   you, oh, you'd better attach your Al-Hussams to your 990s.

20   There was no form, statute or regulation that clearly says what

21   successor or outgrowth means, and we submit that there was no

22   clear duty even in the earlier time period.

23        Now, your Honor, as to the question 76 on the

24   Form 990s, we remind your Honor that that refers to the

25   instructions even in 1996, on question 76.  It said, report any

1    changes in activities, report any new or modified activities,

2    and it was reasonable for a taxpayer to suppose that if you

3    haven't changed your activities, there was nothing to report on

4    the 990.  Again, the form changed.  We've submitted it to you

5    in Appendix R.  Appendix R says that the Form 990 now has

6    eliminated the line on which the government relies.  Report any

7    activities not previously reported.  It now doesn't say that at

8    all.  It just says now explicitly in question 76 on the face of

9    the form, tell us about any change in activities.

10         Now, your Honor considered these arguments in

11   connection with the pretrial motion to dismiss and in

12   connection with the Rule 29 at trial.  We accept that your

13   Honor was not persuaded at the time that the forms lacked fair

14   notice.  We've tried to use these subsequent changes in the

15   government's own expression of form to indicate that the forms

16   must have been unclear in the first place in 1993 and 1996

17   insufficient to give rise to an Anzalone level of clear duty.

18   As Judge Torruella says, if the government wants you to report

19   something, it had better make clear through a plain statement

20   that you have a duty to disclose.  But even if your Honor were

21   to disagree with us about whether there was a duty in 1993,

22   there's clearly no duty in the statute of limitations period

23   that has been proved, and I have two arguments on that, your

24   Honor.

25         The first is that there was no duty proven of an

1    obligation to report these things to the IRS.  Now, let

2    me -- and second is even if you take this as a three-agency

3    count, there is no duty proven of an obligation to report to

4    the FBI or the INS these two specified facts, successor or

5    outgrowth solicitation for jihad or mujahideen.

6           Now, let's go back to the IRS one.  We argued, and you

7    found in dismissing Count Eight, that the scheme had to have a

8    tax-related, IRS-related purpose.  In dismissing Count Eight,

9    you said it's just -- let me back up, and let's remind us of

10   what we're talking about post '99.  Post '99, in your words,

11   the whole universe of statements to the government consist of

12   five statements as to Mr. Muntasser.  As to Mr. Muntasser,

13   there are two FBI interviews, the 1999 interview of Mr. Cleary

14   and the 2003 interview with Agent Peet.  There are three

15   communications with INS, DHS, the 2002 naturalization

16   application, the 2003 naturalization interview and the 2004

17   Customs interview with Agent Fernandez.

18          Now, our first argument is none of these agencies were

19   the IRS, and Count One depended upon misleading the IRS.  And

20   you said in dismissing Count Eight, it's simply too much of a

21   stretch for the jury to find that a false statement made to an

22   FBI agent or an INS agent long after the fact and concerning

23   only the same generalized subject matter constitutes the

24   activity instructing the IR -- the Internal Revenue laws.

25          THE COURT:  Count Eight was clearly directed to the

1    IRS.

2         MS. SULLIVAN:  Exactly so, your Honor, exactly so.

3         THE COURT:  Count One, at least on its face and as

4    indicted, does reference the FBI and INS.

5         MS. SULLIVAN:  Yes, your Honor, on its face it

6    references the INS and the FBI, but it was narrowed at trial.

7    It was narrowed at trial, your Honor, by two facts.  First is

8    the government narrowed it in its opening to the IRS.  In our

9    rule -- in Mr. Muntasser's reply brief on his Rule 33 motion,

10   you will see extensive excerpts that we copied verbatim.  If

11   you look at our Rule 33 reply brief, page 10, we show that the

12   government opened --

13        THE COURT:  Hold on.  Just let me pull it out.

14        MS. SULLIVAN:  So the defendant Muntasser's reply

15   memorandum proves --

16        THE COURT:  Yes.

17        MS. SULLIVAN:  -- support for Rule 33.  If you look at

18   page 10, your Honor, we've tried to replace all of the material

19   the government omitted with ellipses in its own quotations in

20   its opening.  And if you look at those two block quotes at the

21   top of page 10 and the middle of page 10, you will see a

22   repeated reference to misleading the IRS.  If you look at the

23   top of the page, the second line in of the indented block

24   quote, they lied.  Of course, this is not a lying case.  It's

25   not a false statement case.  It's not an (a)(2) case.  It's an

1    (a)(1) case, but they lied first in order to get tax-exempt

2    status for Care International, and then they lied thereafter to

3    keep tax-exempt status.  If you look down to the next block

4    quote in the middle of page 10, if you look at the center of

5    that block quote, we allege that the defendants lied.  Of

6    course, they didn't.  It's not a false statement case.  It's an

7    omission case, but quoting again, we allege that the defendants

8    lied in 1993.  They lied to the IRS about the true history of

9    Care.  Once again, you're going to hear that that is a benefit,

10   because if you get tax-exempt status, you don't have to pay

11   taxes, and people donate and can't deduct them.  The last line,

12   they then allege over the course of a decade they lied

13   again each year when they made annual filings to the IRS

14   regarding what activities Care was actually engaged in.

15        Now, your Honor, the government opened and narrowed

16   the case that way.  We were entitled by due process to try the

17   case on the government's theory as opened, but I have one more

18   fact to call your Honor's attention to, and we think this is

19   absolutely critical.

20        You instructed the jury at the government's request,

21   on their government's requested instruction number 11 that

22   materiality for Count One depends on IRS deception, deceiving

23   the IRS.

24        Now, if I could just call your Honor's attention to

25   this.  We've supplied it in the appendix -- I'm sorry -- the

1    declaration, my declaration of Kathleen M. Sullivan, that is

2    attached to our original motion for judgment of acquittal.  We

3    supplied this as Exhibit G.  The government's amended request

4    for a jury instruction on materiality under Count One said a

5    fact is material to general language; and then crucially down

6    toward the end of that requested instruction, the government

7    said, accordingly, if you find that had the IRS known that Care

8    was a successor or outgrowth, if the IRS was subjecting Care's

9    501(c)(3) application to closer scrutiny.

10            Its materiality request excluded any reference to the

11   FBI or the INS, and you instructed the jury that way.  You

12   adopted that instruction.  You improved its syntax and grammar,

13   but when you gave the instruction on materiality, and this is

14   at day 24, page 167, you limited the materiality case to the

15   IRS.  You charged the jury that the government must show that

16   to conceal under Count One, there must have been influence on

17   the IRS.  Here's your quote:  The government alleges that the

18   concealed facts would have had the tendency to influence the

19   IRS in making its determination whether Care qualified for

20   tax-exempt status under 501(c)(3) and should continue to be

21   afforded that status.

22            Now, your Honor, it's settled -- settled law in this

23   Circuit that when there's been an instruction to the jury

24   unobjected to by the government, or in this case, actually

25   affirmatively requested by the government, that narrows what

1  the grand jury has set forth in the indictment.  For Rule 29

2  purposes, the instruction controls.

3          I cite just as an example, your Honor, to United

4  States against D'Amico, 496, F.3d, 95, 2007, decision of the

5  First Circuit in which with respect to a Hobbs Act charge in

6  which you could have charged a corrupt taking more broadly or

7  more narrowly, it was indicted on the broader ground, but then

8  it's instructed on the more narrow ground.  And here is what

9  the court says.  The court says:  This narrower instruction

10  unobjected to by the government is the law of the case and

11  supplies the standard by which we measure the sufficiency of

12  the evidence, citing prior First Circuit case U.S. against

13  Zaghi.  So, we submit that whatever the indictment says on its

14  face about the FBI and the INS, your Honor, in fact, Count One,

15  like Count Eight, was narrowed at trial both through the

16  government's opening and crucially through your materiality

17  instruction on Count One to a purpose to conceal information

18  from the IRS as to which one had a duty to disclose to the IRS.

19          Now, if you accept that then we're done, because

20  Mr. -- for Mr. Muntasser, because Mr. Muntasser never speaks

21  again to the IRS in the limitations period.  In fact, he never

22  speaks again to the IRS, except for his personal taxes; but

23  with respect to the leadership of Care, he's out of Care by

24  1996.  He removes his name formally from the officership of the

25  organization.  He is gone by 1999.  He does nothing to file

1    Care's 990s in the statute of limitations period.  So under

2    this instruction, he could have done nothing, but he could have

3    failed to disclose nothing that he had the duty to disclose to

4    the IRS.  So, we're done.

5         THE COURT:  What about the argument that it's a

6    continuing offense; and therefore, the statute does not begin

7    to run?

8         MS. SULLIVAN:  Yes, your Honor.  Well, first, we

9    actually -- we don't think that 1001 (a)(1) is a continuing

10   offense under the Toussie decision.  There are a few First

11   Circuit cases that you referenced in your earlier Rule 29

12   hearing that refer to 1001 being a continuing offense for venue

13   purposes.  It can continue from one jurisdiction to another,

14   but those cases do not suggest that it's a continuing offense

15   for statute of limitations purpose.  So, there's no precedent

16   in the First Circuit.  You would be making new law in the First

17   Circuit if you said that 1001 (a)(1), an omission case, were a

18   continuing offense.  But even if it were -- even if there were

19   a continuing offense -- this brings me to my next point, your

20   Honor.  Even if you disagree with us about the limitation to

21   the IRS, we think that at a minimum you would have to give us a

22   new trial given that materiality instruction, because it was a

23   variance from the indictment, and we're entitled to a new

24   trial.  But even if you disagree with us about the narrowing of

25   the case to the IRS, it doesn't matter.  We'd still win,

1    because there's no duty to the FBI or the INS that Mr.

2    Muntasser violated that after 1999.  In other words, your

3    Honor, even if there's a continuing offense, there has to be an

4    affirmative act of concealment during the statute of

5    limitations period by the individual defendant.  Don't take

6    that from me, your Honor.  That's what you correctly charged

7    the jury.  On day 24, page 171, you charged the jury that as to

8    Count One, the government must prove an act committed by Mr.

9    Muntasser in furtherance of the scheme within the limitations

10    period.

11            So, let's forget about Toussie.  Let's imagine that

12    1001 (a)(1) could be a continuing offense.  Even if it could,

13    it -- it -- it can't be proved against Mr. Muntasser, unless he

14    committed an affirmative act of concealment furthering that

15    continuing offense within the limitation period.  And now let's

16    go back to what happened in the limitations period.

17            Nothing that Mr. Muntasser kept from the FBI or the

18    INS was proved to have been something he had a duty to

19    disclose.  Where could he have gotten the duty to disclose to

20    the FBI and the INS, assuming that they were in the game and

21    they weren't taken out of the game by the government's opening

22    and instruction 11, as you gave it to the jury.  If they're in

23    the game, there's supposed to be a duty to the FBI and a duty

24    to the INS.  Anzalone says there has to be preexisting duty.

25    This is not a false statements case.  It's an omissions case.

1    It's a concealment case.

2          Well, one source of that duty could be a statute,

3    regulation, or form.  But there is no statute, regulation, or

4    form telling Mr. Muntasser that he had to tell the FBI or the

5    INS about decades-old tax filings and any omission from the

6    1996 990s or from the 1993 1023.  It would be very odd if the

7    FBI or INS were deputized to collect information for the IRS.

8    So, of course, there's no statute, regulation, or form to rely

9    on for the FBI or the INS.

10          But the second source of the duty might have been

11   well, what if any of the INS or FBI officials had asked him a

12   question then would he have had a duty to disclose, but we

13   don't think so.  We think, you know, Anzalone rejects Martha

14   Stewart.  This is the full head, the notion that you can have

15   some kind of duty arising from a question.  It has to be a

16   preexisting duty, but the key thing here is there were no

17   questions ever asked by the FBI or the INS agents or customs

18   agents pertaining to the tax-related issues charged in Count

19   One as having been concealed.  But there was no question by

20   Agent Cleary or Agent Peet from the FBI about Care's tax

21   filings.  I'll give you everything that came up with Agent Peet

22   about taxes with -- the only thing that ever came up with Agent

23   Peet was he asked why Care was formed.  Why did -- and Mr.

24   Muntasser actually volunteered one piece of tax information.

25   He said, well, I tried to get tax records from Al-Kifah New

1   York, and I couldn't, and so I was troubled by that.  I wanted

2   to form my own organization where I could have a clean,

3   appropriate legal tax-exemption.  So, Peet doesn't ask any

4   questions about those forms, and there's no duty to answer

5   them.

6           And then crucially, your Honor, I want to focus you on

7   November 15, 2007, at page 147, where you had a very important

8   sidebar with counsel, trial counsel, in the case.  You stopped

9   the government from asking questions like:  Well, Mr. Agent

10  Peet did Mr. Muntasser tell you anything about how he was

11  soliciting, or Care was soliciting for mujahideen and jihad,

12  and there was a objection by Mr. Zalkind, and a sidebar was

13  called.  And at the sidebar you said to counsel for both sides:

14  "What I'm struggle with here is he hasn't concealed anything if

15  he isn't asked a question."  Well, that's exactly right.  There

16  were no questions asked by the FBI agents, and there were

17  certainly no questions asked by the INS interview, or the

18  Customs interview.  Agent Fernandez at the Customs interview

19  testified that he was only interested in the letters to allow

20  re-entry of this individual.  He was interested in border

21  questions, not IRS tax questions.

22          Once you said that, your Honor, it is absolutely

23  correct that there had to have been a question asked by the

24  government agents.  There was none.  There was none from the

25  FBI and none from the INS.  So, no duty arose to disclose

1    information accurately in answer to those questions.

2         By the way, what Mr. Muntasser did say in those

3    interviews was accurate.  Nobody has been able to -- if the

4    government could have said there was a false statement there,

5    presumably they would have charged under 10(a)(2) instead of

6    10(a)(1), but Mr. Muntasser volunteered a great deal of

7    information in his interview with Agent Peet about the

8    relationship between Al-Kifah and Care and of their shared and

9    similar operations; and, of course he said they shared the same

10   basic mission, but they have some different directions; and of

11   course, that was absolutely accurate, because it's undisputed

12   on the record that Care did something like reconstruction and

13   vocational training and rebuilding and work our lands,

14   educational activities, that weren't done by Al-Kifah.

15        So, in sum, your Honor, you really -- we think, first,

16   Count One has to be dismissed as to Mr. Muntasser, because

17   there was no duty in 1993 or 1996.  There was no -- even if

18   it's a continuing offense, there has to be a duty from 1999

19   forward.  There is no duty to the FBI and the INS.  That's what

20   you called, your Honor, the entire universe of the facts in the

21   limitations period of the FBI and INS.

22        THE COURT:  Every time you quote me, it makes me

23   nervous, but...

24        MS. SULLIVAN:  Your Honor, I'm quoting your very best

25   quotes here.

1           THE COURT:  All right.

2           MS. SULLIVAN:  But, your Honor, I really need you -- I

3    need to emphasize to you the importance of that narrowing

4    instruction, that really Count One properly viewed is just like

5    Count Eight, because it got narrowed in the materiality

6    instruction to an IRS count.  Obviously, Mr. Muntasser can't be

7    found guilty on Count One of having concealed information from

8    the IRS for Care, because he wasn't giving any information to

9    the IRS for Care after 1999.

10          But even if your Honor rejects that theory and rejects

11   D'Amico in this case, which we think you can't do, but even if

12   you did, go look at the FBI.  Go look at the INS.  And you will

13   not find in this record any source of the Anzalone duty to tell

14   the FBI or the INS about tax-related information more than a

15   decade old having nothing to do with omissions.

16          Now, Ms. Siegmann may get up and say, well, Agent Peet

17   was on a joint task force, and the IRS was also on that task

18   force, but it's undisputed on this record, and your Honor noted

19   this at trial, that Agent Peet never disclosed that he was on a

20   joint task force with the IRS.  He never gave Mr. Muntasser any

21   indication that his answers might bare on INS interests.  And,

22   certainly, the government never proved that the FBI or the INS

23   was likely to tell the IRS that they -- you know, they would

24   refer to themselves as sort of, you know, intake officers, or

25   the Internal Revenue Service.  So, there's no proof that this

1    information given to the FBI or the INS was subject to a duty

2    to disclose to the FBI and the INS, and there was no showing

3    that the FBI and the INS would have tended to tell the IRS

4    about the information they didn't ask about; and crucially,

5    they never asked the tax-related questions that are charged.

6          Now, it was the government's option, if it wanted to,

7    to charge a false statement.  It didn't.  This is not a false

8    statement case.  It's an omission case.  Anzalone applies.

9    There has to be a duty.  We say the duty had to run with the

10   IRS, and then there's this absolutely fatal statute of

11   limitations problem as to Mr. Muntasser, because he says

12   nothing to the IRS on Care's behalf in the limitations period;

13   and we believe there's also a fatal Anzalone problem with FBI

14   and INS statements in the limitations period, because:

15   (A) there's no form, statute, or regulation saying you have got

16   to tell the FBI and the INS tax-related information about

17   whether you should have been exempt.  Obviously not.  And

18   there's no question, and the government can point to none in

19   which there was a question about those particular tax-related

20   activities, and you yourself noted that in the sidebar I

21   referred to.

22          THE COURT:  All right.

23          MS. SULLIVAN:  Thank you, your Honor.  If you have no

24   further questions, that's our argument on Count One.

25          THE COURT:  All right.  I think what probably makes

1    sense is to hear the government's response to that and then

2    hear from counsel for Mubayyid and Al-Monla as appropriate.

3            Mr. Chakravarty.

4            MR. CHAKRAVARTY:  Thank you, your Honor.  Sorry to

5    disappoint Ms. Siegmann.

6            Your Honor, before I engage in why the defense

7    argument is based on a series of faulty premises, which don't

8    apply to this case -- they may apply to Anzalone, but before I

9    do that, even embracing their idea of materiality of what the

10   duty to disclose required in a strict omission case, and even

11   if the indictment was somehow narrowed by something said in the

12   opening statement in which it was not to the exclusion of

13   materiality to other agencies, but even if the indictment were

14   narrowed to exclusively implicate any scheme concealed with

15   regards to the IRS, assuming all of those presumptions, the

16   statements made to Agent Peet, Agent Davis in Mr. Al-Monla's

17   case, those were material, not only to the agents to whom they

18   were being told to, but also in light of the fact at the time

19   that they were being made, the -- the task force had already

20   been implemented; and for at least two years there had been

21   sharing of information beyond, but that would also have been

22   material to the IRS, and the record is replete with evidence,

23   and we'll get to that in a moment.

24           So, we fully embrace, even if there is a duty to

25   disclose in each of those -- for each of those to the 2003

1    statements.  The record demonstrates sufficient evidence for a

2    jury to conclude, as it did, that those statements would have

3    been material.

4         THE COURT:  Let me start at the beginning, because I

5    was confused by parts of your brief.  I mean, it was charged

6    under section (a)(1), right?

7         MR. CHAKRAVARTY:  Correct.

8         THE COURT:  And it's a concealment theory in

9    Count One, correct?

10        MR. CHAKRAVARTY:  The information was being concealed

11   by at least three separate means.  (A)(1) is not an omission

12   statute.  It's a concealment, a falsification for covering up.

13        THE COURT:  Well, I guess what I'm wrestling with

14   there is do you dispute that there is a duty to disclose?  I

15   mean we all conceal things all the time to one another or to

16   government agents.  I mean, you know, if a policeman pulls me

17   over for speeding, and I don't tell him what movie I saw, you

18   know, the night before, I've concealed that fact from him; but

19   putting aside its materiality, I have no duty to tell him what

20   movie I saw, and I didn't understand the argument that in a

21   scheme to conceal under section (a)(1) that there was no duty

22   to disclose.  I didn't follow that.

23        MR. CHAKRAVARTY:  I'll be happy to elaborate.  I don't

24   think your decision rests on that, but -- and then the briefing

25   was done, and to go linearly that before you embrace this

1    premise that the duty to disclose impacts each one of the

2    affirmative acts of concealment through the course of the

3    scheme, a duty to disclose does indeed, by Anzalone, the

4    teaching of Anzalone and St. Michael's, and counsel is part of

5    it, and they know that Anzalone, there was no specific

6    question.  There was no entree.  There was no solicitation of

7    information from Mr. Anzalone so that when he failed to say

8    something, and he omitted information completely, it wasn't in

9    response to any question.  That's why in order to demonstrate

10   how do you know that this person willfully violating this law

11   gets exactly to your point, your Honor.  In those circumstances

12   there has to be some way to manifest the fact that he was

13   intentionally deceiving, and that is captioned in this term

14   "duty to disclose."  When you're not saying anything and you

15   are just remaining silent, there is a duty to disclose.  The

16   only way you can be held criminally culpable is if there is

17   something compelling you to have to answer that.  However, if,

18   in fact, you give partial truth, you do an outright lie, or you

19   cover up some other omission then, your Honor, that in and of

20   itself takes us out of this duty to disclose inquiry, and it

21   takes us into, you know, Bryson and all the rest that talk

22   about --

23           THE COURT:  That's -- that's exactly the point at

24   which I get confused, because that is, of course, a crime to

25   make a false statement, but it's crime under (a)(2), not

1    (a)(1), and that crime was not charged.

2         MR. CHAKRAVARTY:  It's not exclusively under (a)(2),

3    your Honor.  An act of concealment under (a)(1) within the

4    scope of a scheme to conceal can be an act of concealment by

5    just merely omitting in the face of the duty to disclose, or it

6    can be the falsifying or covering up by means of an affirmative

7    misrepresentation.  The Hubbell case itself, your Honor, which

8    talks about the continuing nature of a scheme as well as a

9    couple of cases, which I did not cite previously, Safavian,

10   which is a Jack Ambramoff case.  I'm looking for the cite.

11   Just let me recite them, and I'll find the cite in a moment,

12   your Honor.  Safavian, Stephenson, Shaw.

13        Stephenson is a Second Circuit case, which also

14   involves all of these cases, and there's more.  They all

15   involve affirmative acts of perpetuating the scheme to conceal

16   through lies and misrepresentations.  As I suggested,

17   1001 (a)(1), even after all the amendments to 1001, never said

18   you can't charge a lie to scheme -- or under a scheme to

19   conceal.  All it said was that a scheme to conceal information

20   where the information being concealed is what must be material,

21   not that the person knew that by -- when they're speaking to a

22   government agent that this is going to impact that person's

23   duties, but rather they, through any falsification, or

24   omission, concealment, or through covering up, that they are

25   preventing from being communicated, or they are

1    miscommunicating doing that 1001 violation to the government

2    agent, that count constitutes an affirmative act in furtherance

3    of a scheme to conceal.  And that makes sense, your Honor.  You

4    should be able to hold somebody culpable not only when

5    they misdirect -- when they just don't say anything, but also

6    when they misdirect, when they suggest one alternative; for

7    example, if you are being pulled over, and you're asked

8    whether, you know, you had anything to drink, and all you

9    said -- and what you say is, "yes, I've had some cranberry

10   juice," when, in fact, you've, you know, you had alcohol.

11   Sure, you're omitting the fact that you had alcohol, but the

12   fact that you explicitly said that you had cranberry juice is a

13   misrepresentation falsifying what you were doing, expressing to

14   cover up the specific material information which the police

15   officer wants to know.  And that's, you know, the scheme under

16   (a)(1) cases suggests that that act of concealment need not

17   independently even be a criminal act at all.  It just needs to

18   demonstrate that what you are trying to conceal from the

19   government, that plan is essentially still in effect.

20        Even, I believe it's Anzalone itself, the court

21   suggests that there was a -- in the opinion, it lays out that

22   there were three events:  That the person deposited money of

23   $10,000 and then told the bank employees -- excuse me -- the

24   bank employee told the boss, who is a private actor, not a

25   government actor, that I've deposited this money.  That telling

1    of the -- of the bank boss -- excuse me -- that I filed a

2    obstructive currency transaction, but telling a bank boss,

3    which was a misrepresentation, but not to an executive branch

4    official, the First Circuit agreed that that was an affirmative

5    act.  They ultimately rested on the fact that, you know, there

6    is no duty to disclose imposed, but it wasn't because there was

7    no insufficient act of concealment.

8           Any time you have, not unlike the overt act analysis,

9    the point of demonstrating the affirmative act in concealment

10   or the affirmative act misrepresentation, is to demonstrate

11   that fact that what the scheme was, that the scheme in this

12   case was, you know, the information that Al-Kifa was a

13   successor -- was the predecessor to Care and the non-charitable

14   activities of Care.  So, let me give you those citations.

15          Safavian is a D.C. Circuit case decided 2006 -- excuse

16   me.  It must be District Court, 451 F.Supp.2d at 232.

17          Stephenson, just bear with me a moment, your Honor.

18   I'm sorry.  Your Honor, I'll give that to you in a moment when

19   I get a break.  I'm sorry.  I know how you despise being --

20          THE COURT:  All right.

21          MR. CHAKRAVARTY:  Shaw also is a Tenth Circuit case is

22   at 150 Fed.Appendix 863, your Honor.

23          It all stands for that proposition, and it's

24   important, because it reorients your Honor, and I think your

25   Honor consistently throughout the trial, and I suspect that's

1    why you gave that instruction pursuant to St. Michael's, viewed

2    this as strictly a concealment case.

3            THE COURT:  Well, you know, I didn't make that up, I

4    don't think.  I mean Count One says the defendants did

5    knowingly, willfully, falsify, conceal, and cover up by trick,

6    scheme, and device material facts from the IRS, FBI and INS, to

7    wit:  The defendants concealed the fact that -- and then it

8    also lists the two facts, outgrowth and successor and engaging

9    in non-charitable activities.  It's charged as a concealment

10   case.

11           MR. CHAKRAVARTY:  As to what is what they actually

12   concealed, covered up, or falsified, your Honor, but how they

13   did it, the fact that when you are communicating with a

14   government agent and the notion of whether you happen to be

15   telling the truth, the -- the defense argument is that it can

16   only be -- that it can only be held criminally liable if they

17   have actually a duty to disclose that information.

18           THE COURT:  Isn't that -- that seems to me just a

19   perfectly obvious proposition, that's why I'm struggling with

20   it.  I don't understand -- I just don't understand the

21   government's position.  If Mr. Muntasser goes in and applies

22   for a driver's license, and they ask him:  What is his date of

23   birth, what is his height and his hair color and so forth, is

24   he supposed to tell the government agent, oh, by the way, you

25   know, Care was an outgrowth or successor to Al-Kifah?  No, he

1    has no duty to disclose to the Department of Motor Vehicles, or

2    the Registry of Motor Vehicles, rather, that information,

3    and -- and it seems to me I -- I'm sure I am being dense and

4    missing something here, but that in a case charged under (a)(1)

5    as a concealment case, putting aside whatever a falsification

6    case might be, that the -- that there has to be a duty to

7    disclose; otherwise, there's nothing wrong with concealing.

8    All of us conceal things every day.

9         MR. CHAKRAVARTY:  True, true, your Honor; however, if

10   you actually lie about it to a government agent, which would

11   also -- which would be recognizably a 1001 (a)(2) affirmative

12   violation, even without a duty to disclose, if you lie to a

13   government agent, and if you start with that premise, lying to

14   a government agent that it's prosecutable.  It's material to a

15   government agency.

16        THE COURT:  Under (a)(2)?

17        MR. CHAKRAVARTY:  Under (a)(2), yes.  Under (a)(1),

18   the idea that lying to a government agent cannot in the same

19   breath be concealing some other information, which is material,

20   I mean otherwise you're reading out covering up, if you're

21   suggesting that an affirmative step to misdirect a government

22   agent by excluding the material information, which is charged

23   in the indictment, then you're reading out of the indictment

24   that that language has any meaning, that has any operation,

25   because that's how you cover up.  That's how you misdirect,

1    your Honor.

2         THE COURT:  But aren't you conflating the duty to

3    disclose or the means by which you're falsifying or covering

4    up?  Again, he goes into the Registry of Motor Vehicles, and he

5    says, oh, by the way, I operate a charity, with no duty to

6    disclose, even if it's a misdirection, to use your cranberry

7    juice analogy, because he didn't say it's not quite so

8    charitable, so what?  What difference does it make to the

9    Registry of Motor Vehicles?  He has no duty to disclose to

10   them.  On the other hand, if the Registry of Motor Vehicles

11   won't give you a license, unless you disclose, you know, what

12   kind of activities you're engaged in and so forth, that's a

13   different story.  But it seems to me that there must be a duty

14   to disclose in a concealment case.

15        MR. CHAKRAVARTY:  There must be an omission case, your

16   Honor, but an omission is not the same thing as concealment, or

17   at least that how it's being colloquially thrown around here,

18   and the cases doesn't support that, your Honor.  I mean there's

19   nothing that says that a concealment under (a)(1) can only

20   occur if there is some information omitted and which every

21   aspect that there has to be a duty to disclose if there is an

22   affirmative act.  There are conditions, but we are weak on

23   Westlaw and Lexis to show (a)(1) violations where it was a lie.

24        THE COURT:  Because that's the means of concealment

25   was a lie or a misdirection, but there nonetheless had to be a

1    duty to disclose.

2           Again, if you walk into the library to borrow a book,

3    it doesn't matter whether you're failing to disclose your

4    charitable activities.  You don't have any duty to disclose

5    them.  You could lie about them, but if you are checking -- I'm

6    checking out this book, because I am Mr. Charity, and I care

7    only about innocent orphans, it doesn't make any difference to

8    the library.

9           MR. CHAKRAVARTY:  Under that instruction, I'm back

10   into interpreting Bryson to not mean essentially what it says,

11   and going back to your motion -- your memorandum and motion to

12   dismiss.  If you're being asked a question, even if it's an

13   impermissible question --

14          THE COURT:  Right.

15          MR. CHAKRAVARTY:  -- you have brought an immateriality

16   of that.  It's an impermissible question, and your response is

17   a lie that you can be held accountable for it.

18          THE COURT:  Right, because the form, the question,

19   imposes upon you a duty to disclose, even a form that the

20   government asking a question the government had no right to ask

21   nonetheless imposes a duty.

22          Anyway, let's move off this point and talk about --

23          MR. CHAKRAVARTY:  All right.

24          THE COURT:  -- the other issues.

25          MR. CHAKRAVARTY:  All right.  So, getting back

1    to -- and there was lengthy briefing on this, your Honor, and

2    this dialogue we're having now is obviously an issue, but it's

3    because we never agreed with, you know, there was an omission,

4    but you don't need to go down that road.  You don't need to

5    resolve that, and if you can, that will resolve it all, but if

6    you choose not to then you can find in a more conservative

7    approach that just the evidence in the record is sufficient to

8    show that certainly the 1023 start before the form -- excuse

9    me -- the Articles of Incorporation, which say that they were

10   specifically going to obtain 501(c)(3) exempt status, and we

11   were going to begin to engage all the activities necessary to

12   maintain that status, rather than jeopardize it, that would be

13   sufficient to give rise to these both.  The Form 1023 expressly

14   mentions these questions that are -- are the topic of the

15   trial.  The 990s then kind of both re -- re-energizes the 1023,

16   as Mrs. Goldberg said, and if you look back at the 1023 when

17   preparing the Form 990, they have excelled that for whether

18   there's any new activities involved.  Once Care obtained its

19   provisional tax-exempt status, they were expressly put on

20   notice from the IRS that anything changes, you have to disclose

21   whether that -- was then changing with respect in October of

22   1993.

23        The duty to the IRS was -- arose from the tax

24   regulation, your Honor, and the questions that they ask and

25   consistent with those tax regulations, the fact that Care

1    itself filed forms recognizing that obligation meant that

2    certainly the people, who were the officers of Care, were

3    on -- who were managing this organization that they had

4    incorporated that they embraced that duty.

5         But at the time of the false statements, because that

6    is really what the issue is here, the false statements in '03

7    are being made to the FBI agent and to -- well, to two FBI

8    agents for Mr. Al-Monla and Mr. Muntasser respectively.

9         The testimony was that by then, this is April of '03,

10   the interviews were done on the same day as the execution of

11   the search warrant at the Care storage locker.

12        THE COURT:  Before I -- can you remind me the date of

13   indictment for Muntasser and Mubayyid and the superseding for

14   Al-Monla just so I have it straight in my mind.

15        MR. CHAKRAVARTY:  Yes, I believe May '05.  May.  May

16   2005.

17        THE COURT:  Was the original indictment?

18        MR. CHAKRAVARTY:  Correct.

19        THE COURT:  And the superseding was when?

20        MR. CHAKRAVARTY:  The superseding was March '07.

21        THE COURT:  March '07, okay.  Thank you.  I'm sorry.

22        MR. CHAKRAVARTY:  The Form 990s, question 76, they

23   expressly are asked to provide any information not previously

24   disclosed.  Again, re-energizing that duty to provide the

25   relevant information to the IRS, again all coming from the duty

1    to disclose perspective there was an abundant demonstration of

2    the duty to disclose, and each of the defendants at some point

3    had been privy to that, privy to the Form 990, because they all

4    executed them, the 1023s, at Mubayyid's house.  There is an

5    Articles of Incorporation with the notarized signature of

6    Mr. Al-Monla found in the Care lockers.  The fact that they

7    were both aware of the duty to disclose and they possessed the

8    duty to disclose, I think, is ample in the record, and the

9    jurors be so inclined that they were aware of that.

10          Come time for the interview in '03, and of course this

11   pertains back to the interviews that preceded it, but the '03

12   was the most recent time.  There's testimony from Mr. Lazarus,

13   from Agent Lazarus, from Agent O'Neill, from Agent Habich, that

14   by that time that there was a joint task force and that it

15   involved the IRS, that it involved the FBI.  As your Honor

16   knows in scheme cases, that 1001 cases generally, the defendant

17   need not know who's going to ultimately get this information,

18   and the IRS need never have gotten that information.  It's only

19   whether the materiality question is whether the IRS could have

20   been affected by it.

21          The fact that there was a task force involved, and

22   they were investigating Care was known to the defendants.  It

23   was known to the jury.  That's what matters, and they could

24   easily find that statement to Peet is going to go back to the

25   IRS.  Statements they made is going to go back to the IRS, but

1    they can also conclude it's a fair inference from the evidence

2    that both Agent Davis as well as Agent Peet said, I went to

3    conduct these interviews, because I was conducting an

4    investigation; and if they had answered correctly about what

5    the activities were of Care International, these non-charitable

6    activities, supporting the mujahideen so on and so forth, that

7    the connection to Al-Kifah, the accurate connection to

8    Al-Kifah, then the jury was permitted to infer that the

9    investigations by the FBI and by Immigration for the

10   immigration forms, which Mr. Muntasser submitted, and which he

11   completely neglected to include any reference to Al-Kifah or

12   Care, that those would have been material to those agencies.

13          THE COURT:  Was Immigration part of the joint task

14   force?

15          MR. CHAKRAVARTY:  There was testimony that Immigration

16   was part of the joint task force, and I know certainly by the

17   time that Agent Fernandez testified about the 2004 interview,

18   that was clear in the exhibit.  I don't have the document

19   exhibit number.  The -- the interview of Mr. Muntasser on -- on

20   his naturalization form, there are notes of the interview by

21   the interviewing agent -- interviewing CIS officer.  In that,

22   he captures information for purposes of providing to

23   Immigration -- providing to this task force.  I don't know off

24   the top of my head who testified to it, but I know it's in the

25   record.

1          And Fernandez was -- in fact, Fernandez testified.

2          What's most recent in time, obviously, is the 2003

3     interview, and that's why I'm focusing more on the FBI

4     connection.

5          THE COURT:  Remind me just again, so that I'm clear on

6     this.  Muntasser makes no statement to the IRS, whether orally

7     or by means of a filing within the limitations period; in other

8     words, it's the FBI or the INS or --

9          MR. CHAKRAVARTY:  Correct.

10          THE COURT:  -- or it's a continuing offense maybe, but

11     regardless, his last contact with the IRS is ninety -- ninety

12     something anyway.

13          When were Mubayyid and Al-Monla's last contacts with

14     the IRS?

15          MR. CHAKRAVARTY:  Mubayyid files a 2002 990, and

16     Al-Monla files a 1998 990 in the year 2000.  The 2000 filing is

17     outside the statute for Mr. Al-Monla.

18          THE COURT:  All right.  But the Mubayyid one is --

19          MR. CHAKRAVARTY:  Is in the statute for everybody.

20          THE COURT:  All right.  The 2002 990 was it filed in

21     '02 or in '03?

22          MR. CHAKRAVARTY:  It was filed in '02.

23          MS. SIEGMANN:  It's the 1997 filing.

24          THE COURT:  Okay.  That's right.

25          Mubayyid signs the '97 990, but it's filed late.

1          MS. SIEGMANN:  July 2002.

2          THE COURT:  July '02.  Okay.  Please continue.

3          MR. CHAKRAVARTY:  So, this -- again, even embracing

4     all of the duties disclosed to us now, the fact that it's

5     material to each of these, the duty comes -- excuse me.  Strike

6     that.

7          The duty whether it's viewed as a tax duty had started

8     and was never extinguished back in before the -- before the

9     filing of the 1023.  To the extent that they were giving a

10    miscommunication to the FBI agent that same duty still applied

11    to that conversation is -- well, even though it wasn't an IRS

12    agent, because at that point the information was going to get

13    back to the IRS.  In addition, the defendants particularly were

14    attuned to that; for example, Mr. Muntasser, and in the sense

15    they were treating the government monolithically, that's

16    essentially charged in the indictment.  Mr. Muntasser made

17    false statements to Agent Peet during his interview, and

18    shortly thereafter he attempts to correct his misstatements by

19    filing an addendum to the INS, one of the -- one of the

20    agencies that have been defrauded here.  He is suggesting he is

21    able to get out from underneath the culpability of his false

22    statement by correcting something.  The same should work the

23    other way around that if he -- if he is treating the government

24    monolithically, a statement that he's saying to the FBI, he can

25    reasonably, assuming evidence from which a jury can find

1   whether he was thinking that, oh, this is going to get back to

2   the IRS, and I should be telling them the truth about what

3   Care's activities are, when he expressly asking me about

4   Al-Kifah's connection to Care and what types of activities

5   they're doing, and what we suggest is the affirmative lies to

6   the FBI agent by misleading and covering up, what he was really

7   doing and he tells the FBI agent that they are engaging in

8   exclusively charitable activities, and that Al-Kifah was a

9   separate organization that Care had started at some point later

10  and coming up with a different explanation for that.  That was

11  information that was being responsive to Agent Peet's

12  questions.  It was material to the scheme charged, and it was

13  material information, which was being concealed from the IRS.

14  It meets all of those elements, even under this most

15  conservative construction of the indictment, your Honor.

16          I suggest to you, if you take our view of the

17  indictment, your Honor, where if he lies at all to the FBI

18  agent and that lie is imputed to either the FBI or the IRS,

19  then that in and of itself, and now regardless of whether there

20  was a duty imposed on through the tax forms, because 1001

21  itself, you know, false statements, thou shalt not lie, that is

22  a duty which why under case law we're talking about 1001(a)(2)

23  and (a)(3) it seldom comes up, because the issue of the duty to

24  disclose, because those are affirmative acts.  Those are

25  statements, which are false, which is obviously going to be

1    something, which you don't have to demonstrate an additional

2    duty to disclose.

3          THE COURT:  Well, again, the government presumably

4    could have charged under (a)(2) for a false statement, but it

5    didn't, so it's (a)(1) case and a false --

6          MR. CHAKRAVARTY:  By an (a)(1) case.  Please don't

7    leave this point and assume that because it's an (a)(1) case

8    that the falsification that lies are not considered -- cannot

9    be considered as affirmative acts in furtherance of the

10   information that's being concealed.  The scheme to conceal is

11   really a plan to withhold certain information from the

12   government through, as you suggest, through different means;

13   and if some of those means are affirmative acts of lying, then

14   those can be considered regardless of whether there's an

15   independent duty to disclose each of those lies.  I don't mean

16   to belabor, you know, that point, but it is an important frame

17   of reference.

18          I do cite an additional case for this notion that

19   lying to the FBI at that juncture would, in fact, perpetuate

20   the -- perpetuate a scheme, and this is U.S. v. Beaver, a

21   Seventh Circuit case, 515 F.3d 730, and in that case, it was

22   charged, I believe, under (a)(1), not under the scheme

23   provision, and the duty to disclose to the extent that there

24   was one, came wholly from the fact that the agent -- excuse

25   me -- the defendant lied to, in that case, an FBI agent.

1          The -- for moving-on purposes, right, the idea that we

2     narrowed the indictment somehow by Mr. Cabell's opening

3     statement where in order to frame the issues that the jury was

4     going to have to concentrate on by saying that this is -- the

5     issues in the case are going to involve the IRS is -- is

6     extending the substance of an opening statement to an actual

7     manipulation of the indictment.  I don't think there is any

8     case law for that proposition.  This is merely an introduction

9     of the case for the jury.

10          Moreover, the government never suggested, in fact, we

11     did just the contrary, that the materiality requirement only

12     should go to the IRS.  We -- we maintained in our November 5,

13     2007, proposed jury instructions that the -- that the impact on

14     the scheme was both to the IRS as well as to the FBI, and even

15     in the -- the later jury instructions, which Ms. Sullivan cited

16     to, the -- the transcript of that conversation on the jury

17     conference -- the charge conference made clear that we actually

18     believed that that was a scrivener's error.  We never intended

19     at this late stage, after we had been trying the case, and

20     certainly no prejudice to the defendant at that point, and we

21     had actually said that, you know, that shouldn't have been only

22     the IRS materiality, you know, proposed jury instruction on

23     that -- on that date.  In fact, it was a scrivener's error.

24     Your instruction, it did not take our instruction, but it

25     mirrored our instruction on that point, and it gave the

1    IRS -- the IRS -- in our proposed instruction, I will read it

2    since I have it.  The -- the phrase conceals or covers up by a

3    trick, scheme or device -- this is on our November 5th proposed

4    jury instruction, page 17, instruction number 10.  The phrase

5    conceals or covers up by any trick, scheme or device means any

6    affirmative act or deliberate plan or course of action to

7    prevent or delay the discovery of information.  Affirmative

8    action includes making false statements on, or omitting

9    material facts from forms filled with -- filed with the IRS

10   Internal Revenue Service, or making false statements during

11   interviews conducted by the Federal Bureau of Investigation.

12        Again, just to further corroborate our theory again,

13   that's before -- before the trial, before the trial began.

14        Moreover, both with regards to the idea of your giving

15   an instruction when materiality was more confined to the IRS,

16   just as I would add that once you -- in the context of the

17   conspiracy charge, Ms. Sullivan mentioned by charging the jury

18   of the -- of the conjunctive nature of what the object of the

19   conspiracy was, in both those cases, you actually asked the

20   jury to find more than they needed to find, more specific

21   information that they needed to find than what we think the law

22   required.  And you did it at a stage where it wasn't

23   prejudicing the defense.  They would have had to have defended

24   against those facts at any rate.  So, the First Circuit when

25   they see that will be able to decide that the jury, since they

1    necessarily had to fact find the fact of whether the conspiracy

2    was ongoing at the time and enjoined sometime later that the

3    jurors found that the -- the conspiracy that they had conspired

4    to illegally obtain and maintain the -- the tax exemptions

5    means that either of them falls, meaning the jury hasn't

6    necessarily found for the other.  Similarly, in this case,

7    since you had instructed the jury that the materiality had to

8    go to the IRS, although we suggest that you gave enough

9    materiality instructions throughout the charge that that's not

10   the exclusive basis, and it's not a necessary conclusion, but

11   if the First Circuit were to review that that way then there is

12   sufficient evidence in the record to show that it would have

13   defrauded -- it would have material -- excuse me -- not whether

14   it defrauded it, it would have been material to the IRS.

15        And it would have been material to the FBI.  So, again

16   it's a more restrictive construction.  I'm sorry.  I'm not

17   articulating as well as I want to, but the fact there was more

18   restrictive construction, and the jury had to have found that

19   that was actually to the defendants' benefit, your charge to

20   the defendants' benefit by asking us to prove more, more

21   specific than we had to, and now that we have proven that by

22   the defendants certainly, who didn't object to that charge in

23   the first place, so the question is whether they reserved that.

24   But having done that, they can certainly not be heard now to

25   say that they were somewhat prejudiced by that, their argument,

1    that the jury found.

2          It brings me to the related points of the -- your

3    finding on Count Eight and how that impacts Count One.

4          Section 12 on Count Eight is distinctly different from

5    Count One, as well as Count Two; but Count One, in the broadest

6    sense, because the fact that it was Judge Gertner, when issued

7    an opinion, I think, in Brennick, obviously a case out of our

8    district, 908 F.Supp, and I cite to page 1012, which drew a

9    distinction between 7212, which requires something more than

10   materiality.  I suggest, as you suggested, you have to show

11   that the purpose of the false statements to Agent Peet were to

12   impede the IRS.  They are very different and much higher

13   threshold of a mens rea than what was required under 1001 under

14   the scheme provision, which is that he was willfully making a

15   statement to Agent Peet, and the statement must have been

16   material, capable of influencing the IRS.  And by virtue of

17   that task force, your Honor, the jury was able to infer

18   reasonably that the statement was -- could be material to the

19   IRS, and I suggest to you they necessarily found that in light

20   of your charge.

21         So, the -- in short, the Count One satisfies each of

22   the -- each of the elements of the offense, under even -- even

23   the construction that if you're considering that the scheme,

24   you cannot consider an affirmative false statement as an

25   omission, unless you demonstrate duty to disclose.  We suggest

1    that duty to disclose comes from the tax forms, which the

2    defendant himself was well aware of at the time of the Peet

3    interview; but in addition to that, we find that -- we suggest

4    that the duties imposed on the defendants also stem from 1001

5    itself, and I understand we have an issue with that.

6              THE COURT:  All right.  Let me do this, because we

7    have to keep moving forward.  Let me hear -- Mr. McGinty or

8    Mr. Andrews, do you want to address any of these issues, or let

9    Ms. Sullivan respond?  Would you prefer that first?

10             All right.  Ms. Sullivan.

11             MS. SULLIVAN:  Your Honor, I've conferred with

12   codefendants counsel, and they are willing for me to respond

13   on --

14             THE COURT:  All right.

15             MS. SULLIVAN:  -- all of our behalf.  Two very key

16   points, your Honor.

17             I was as confused as your Honor what Mr.

18   Chakravarty --

19             THE COURT:  I doubt that's possible.

20             MS. SULLIVAN:  Your Honor, Mr. Chakravarty spoke for

21   some time about how somehow you can prove lying as part of a

22   concealment charge, but -- and if you have a lie then somehow

23   you can have a concealment.  Your Honor, that is absolutely

24   wrong, and there is a decisive First Circuit case that makes

25   that clear when the government tried this scam at another time,

1   and that's United States versus St. Michael's Credit Union,

2   which is one of the late Judge Bownes' decision.  It's cited

3   heavily in our brief.  It's 880 F.2d 579, and the government

4   tried this same gamut there in which it says, well, I'm sorry

5   we charged a concealment, but now we think we want to say that

6   actually the defendant lied.  Let me read from St. Michael's.

7       This is at page 589.  There is one additional argument

8   made by the government that requires a response.  The

9   government argues that the defendant's affirmative

10  misrepresentations -- this was an omission case.  It was an

11  (a)(1) case.  The government's misrepresentation to the agent

12  concerning the filing of such and such documents standing alone

13  would be enough to sustain the 1001 conviction.  This argument

14  is at best misguided.  Judge Bownes is being very polite.  He

15  goes on to remind the government in this case and, in fact,

16  there was a reversal on this point, citing Anzalone.

17  Section 1001 is written in the disjunctive.  It's separated by

18  the word "or".  It has a concealment section, and it has a

19  false statement section.

20      So, every time Mr. Chakravarty is trying to rescue the

21  complete absence of any duty to disclose as required by

22  Anzalone and St. Michael's by referring to lying in false

23  statements, he's was referring to some as -- first of all, that

24  wasn't true; and second of all, has no place in this

25  concealment case, this concealment count.  The government knows

1    how to charge (a)(2) when it wants to.  It charged against Mr.

2    Muntasser Count Six as a false statement case.  Count One was a

3    concealment case.  St. Michael's and Anzalone make anything

4    that they -- the government suggests is a lie wholly

5    irrelevant.  You can't resurrect a concealment case with a

6    supposed lie.  We don't think there were any lies, but you

7    can't resurrect it.

8         THE COURT:  I think I might frame it differently, and

9    I'm not sure that it matters.  I think we need to get off this

10   point, but I think you have -- you can have an (a)(1) case in

11   which the concealment is a half truth, or a falsification, but

12   there has to be a duty to disclose.

13        MS. SULLIVAN:  Absolutely, your Honor.

14        THE COURT:  That doesn't disappear in (a)(1).

15        MS. SULLIVAN:  Absolutely, your Honor, so had there

16   present for this case, the FBI and the INS in their interviews

17   with Mr. Muntasser is your Honor's DMV.  And it hasn't asked

18   please tell us about all your past leadership activities as

19   head of a charitable organization, and did you file all the

20   forms you had to file.  If the organization hasn't asked, there

21   is no duty to disclose.

22        And -- and as your Honor said, what you're struggling

23   with before that crucial sidebar in Agent Peet's colloquy, what

24   you're struggling with is he can't conceal if he wasn't asked.

25   He wasn't asked.  And that's point one.  You are absolutely

1   right there is a duty to disclose -- your instruction was

2   correct.  Also Mr. Chakravarty is ignoring it.  He tries to

3   resurrect the -- the instructions of materiality by saying,

4   well, they actually had some other instructions.

5         So, our second point is it doesn't matter whether they

6   would desired a instruction.  Your Honor, we believe, frankly,

7   charged the jury -- and this is on December 19th, page 167,

8   that the government must show for materiality that the IRS

9   would be influenced.

10         Now, nothing in Mr. Chakravarty's argument suggested

11   how Mr. Muntasser had a duty to disclose anything to the FBI

12   and the INS that might influence the IRS.  They didn't reveal

13   that the IRS was part of the joint task force.  He wasn't asked

14   any IRS or tax-related questions.  He didn't conceal anything

15   that was IRS related.

16         THE COURT:  Would the witness be capable of

17   influencing the IRS?

18         MS. SULLIVAN:  Yes, your Honor, but it's

19   truly -- it -- go back to your DMV case.  It might have been

20   that you didn't confess in applying for your driver's license

21   that you failed to file a proper 1023 form ten years ago.

22   You're not saying that might have been capable of influencing

23   the IRS.  That goes to materiality.  But the government also

24   has to prove intent.  They have to prove that Mr. Muntasser

25   intended to fail to disclose something material to the IRS, and

1    if he doesn't know that the FBI and the INS have any interest,

2    just as the DMV, you wouldn't know if the DMV had any interest

3    in your ten-year-old tax filings, he can't possibly be proved

4    that intentionally this was a specific intent crime to

5    intentionally withheld.  So everything Mr. Chakravarty said

6    that went to materiality, we think is foreclosed by D'Amico in

7    your instruction as to materiality.  But the government also

8    had to prove intent, and unless Mr. Muntasser knew that these

9    FBI and INS agents, who didn't identify anything to do with IRS

10   didn't ask anything about the Internal Revenue Code and

11   disclose any connection through the joint task force to the

12   IRS, he can't possibly be found on this record to have

13   intentionally failed to disclose IRS-related information.

14           But, finally, your Honor, just on the -- on the -- let

15   me just take a step back, if I could your Honor.  Obviously,

16   the government's effort to run away from Anzalone, the

17   government's effort to run away from your materiality

18   instruction, and ignore the narrowing of this case, and I'm not

19   just relying on Mr. Cabell's opening.  I'm relying on your

20   charge to the jury.  That's what gives rise to the narrow

21   indictment.  At a minimum, we would require a new trial if you

22   thought there was any doubt that the government had varied its

23   theme.

24           But if we take a step back and we say why is the

25   government stuck with this defective charging instrument, and

1    my friends from the government may not even be responsible for

2    it.  It may have come from their predecessors in the office,

3    but this defense of charging instrument Count One, which we

4    also argue it is facially defective, should have been

5    dismissed.  It's properly recognized that this is an omission

6    case, and we did preserve that argument within our pretrial

7    motion to dismiss, but the reason why the government comes up

8    with this defective charging instrument called Count One, and

9    it's desperately scrambling to find a duty to disclose

10   somewhere somehow in this picture is it's trying to marry two

11   sets of events completely disaggregated in time.  It's trying

12   to overcome a statute of limitations it has within the 1999

13   period by resurrecting time-barred acts from a prior year in

14   which there wasn't even a clear duty to disclose.  And I was

15   trying to do that so that the court can get in all that highly

16   inflammatory, highly prejudicial, irrelevant, cumulative

17   information from the Al-Hussams from the earlier period.  So,

18   it doesn't have duty to disclose within the statute period.  It

19   has to look for something that looks more like a duty and looks

20   like it has more lost revenue to the government; and has more

21   opportunity to poison the jury from the prior period, and it

22   puts things together into the indictment in Count One, but it

23   doesn't work, because there's no duty to disclose within the

24   statute of limitations period.

25              So, I just want to close by bringing your Honor back

1    to your own instructions.  You correctly charged them, we

2    think, with the exception of the two instructions we challenged

3    in our Rule 33 motion, willful blindness and the aiding and

4    abetting instruction.  We think your Honor did a superb job on

5    most of these instructions; they're correct.  When you sent

6    this case to the jury, you correctly charged that for Count One

7    there has to be an affirmative act of concealment by the

8    individual defendant within the statute of limitations period.

9    That's what the government cannot show.  That's what the

10   government has failed to show here.  Whether you conceive this

11   as an IRS concealment case or an FBI/INS concealment case,

12   because for present purposes, the FBI and the INS are no more

13   interested in tax data from a 1023 or tax data from a 990 than

14   is the DMV in your example.

15         So, we think you should dismiss this as facially

16   defective, and then we'll find that there was no proof of

17   Count One within the statute of limitations period.

18         And just one last point, your Honor.  A scheme is not

19   a conspiracy.  You can't take one defendant's conduct and

20   impute it to the others.  It would have to have been shown that

21   each of our individual clients had a duty to disclose within

22   the statute of limitations period in order to find any of them

23   guilty of Count One.

24         Thank you, your Honor.

25         THE COURT:  Okay.

1          MR. CHAKRAVARTY:  Your Honor, I'm not -- your Honor, I

2     know we're late.  Two very quick points:  One, the defendant

3     doesn't need to know the statement is material, and the idea of

4     conflating the intent part of the duty to disclose with

5     materiality, Ms. Sullivan, I think is saying that the intent at

6     the time of the statements to Agent Peet was to have to have to

7     go back to impeding the IRS.  That's not what the standard is.

8     That's the duty to disclose comes from the IRS's obligation,

9     but the materiality question is whether -- whether he knew it

10    or not, the information, was capable of going back to -- back

11    to the IRS.

12          And the duty to disclose to the FBI, obviously, when

13    the FBI asks specific questions as to what activities was Care

14    doing, and the information which he said was a lie, and he said

15    it was all charitable activities, that's clearly material

16    information, which was the duty, and an additional duty to

17    disclose was imposed not just from the IRS tax

18    information -- tax forms and the rest, but also from Agent

19    Peet's question itself.  And the duty -- the question itself

20    imposed the duty.  It was material to the agent, material to

21    the IRS.  The jury was capable of determining of whether that

22    was ultimately going to get back to the IRS and capable of

23    influencing their decision.  They made that conclusion.  The

24    juror verdict should stand.

25          THE COURT:  Okay.  All right.  Again, sticking with

1    the motions for judgment of acquittal, why don't we address the

2    other counts.

3              What -- who wants to take the lead here?

4              Ms. Sullivan.

5              MS. SULLIVAN:  I'm sorry, your Honor, are you

6    talking now about Counts Three, Four and Five?

7              THE COURT:  Well, no, I was --

8              MS. SULLIVAN:  Count Six?  Well, your Honor, I'm

9    eager --

10             THE COURT:  As I remember, Muntasser's was in one

11   substantive count, as I recall.

12             MS. SULLIVAN:  Yes.

13             THE COURT:  Count Six, I guess it is.  I don't care

14   what order you address it, but we do have, I think, motions as

15   to the remaining what I'll call the substantive counts, as

16   opposed to the scheme to defraud and conspiracy.

17             MS. SULLIVAN:  Your Honor, our argument for Mr.

18   Muntasser on Count Six is that there was no showing of

19   materiality that a false statement about travel to Afghanistan

20   in a long-ago regime that had changed many times was not under

21   the material of that influencing current FBI or government

22   security policy.  We are content to rest on our briefs, because

23   I'm concerned that you have been very generous in allowing me

24   to speak, but I'm very eager for the codefendants to have their

25   opportunity to speak to your Honor.  So, we'll rest on our

1    papers with respect to Count Six.

2          THE COURT:  All right.  Mr. Andrews, Mr. McGinty, who

3    wants to take the lead?

4          MR. ANDREWS:  I think I would, your Honor.

5          Your Honor, on Mr. Mubayyid's Rule 29 memorandum, it

6    goes to the sufficiency evidence as to Counts Three, Four and

7    Five, and I am somewhat in a position of arguing a negative,

8    because arguing is insufficient evidence to convict him of any

9    of those three counts.  So, I don't have to go on for a very

10   long time, but I want to kind of just point out why the

11   government and how it failed to present sufficient evidence,

12   and I'll -- first of all, the indictment specified that what

13   was false was the answer to line 76 in the Form 990s for the

14   years 1997, 1999 and 2000.  So, nothing else is alleged to have

15   been false.  It's simply the question -- the answer to the

16   question -- to line 76 in which the question is:  Did the

17   organization engage, present tense, in any activity not

18   previously reported to the IRS?

19         Now, when one is filling out, and there was testimony

20   regarding the fact that these people were amateurs.  There was

21   no testimony put that way Mr. Mubayyid was trained in

22   accounting, and there was testimony he was a software engineer.

23   There was testimony that he was volunteer, that he wasn't

24   compensated for any of his services.  In some of the forms

25   there is he worked five or ten hours a week on Care.

1            So, you can take as a layperson a common sense

2       approach to that.  It says, well, if you're filling out a tax

3       form, let's say for 1999, and you're filling it out after 1999,

4       so it's a 1999 Form 990, you are filling it out in the

5       year 2000, and you come across a question that says:  Did the

6       organization engage in any activity not previously disclosed to

7       the IRS?  Common sense would say:  Did the organization engage

8       in any activity in 1999.  That's the year we're filling out,

9       and then it says:  Well, if it did so, attach a statement

10      explaining the instructions.  Attach a statement explaining any

11      significant changes in the kinds of activity the organization

12      conducts, again, present tense, to further this exempt purpose.

13           It says, include new or modified activities not listed

14      as current or planned in the organization's application for

15      recognition of exemption or not yet reported to the IRS.  Now,

16      what we're talking about there are new or modified activities

17      not yet reported, activities the organization conducts.

18           So, your Honor, I think the taxpayer, the filer, the

19      volunteer in this organization could reasonably assume that

20      we're talking about is the organization doing something new

21      this year that you haven't previously disclosed.

22           Now, the government calls a tax expert.  It calls

23      someone, this Dawn Goldberg, who is solely qualified to talk

24      about these Form 990s.  The burden of proof, of course, is on

25      the government, and what is -- and what is so frustrating here,

1    your Honor, is from the get-go, the accusation has been that

2    Care has engaged in activities to support and promote the

3    mujahideen and jihad; and every time you try to get what

4    activity it is, they can't grab it.  It's smoke.  It's gas.  It

5    just keeps escaping.  And -- but these tax forms are precise.

6    So, you think you have an expert called, and she would talk

7    about what kinds of activities you're supposed to put down in

8    response to line 76, and you think that she having had made

9    herself looking at the Care filings and looking at the

10   activities Care was involved in, she would be prepared to

11   testify that in 19 -- on the 1999 form, or the 2000 form, Care

12   should have put down X, Y or Z, not did support and promote

13   mujahideen and jihad, but engaged in specific activities that

14   are being failed to disclose.  Mr. Mubayyid failed to put down

15   something in response to this question, but she never testified

16   saying that.

17          She's asked about a newsletter, and she -- and I said

18   all throughout the brief, your Honor, she testifies repeatedly

19   that she would expect to see the publication of an ongoing

20   newsletter put down on the Form 990.  She is asked about no

21   other activities.  She is not asked about lectures.  Would you

22   put down lectures on a 990.  She isn't asked about book

23   studies.  She isn't asked about orphan sponsorship programs.

24   The only one she's asked about is the newsletters.

25          And she qualifies it as saying ongoing newsletters.

1    She expects the publication for charity is involved in

2    publication of ongoing newsletters, I expect to be done on the

3    990.  Well, just to go back a little.

4        The Al-Hussam, the last issue is published in 1997,

5    one issue.  So, the taxpayer filing the Form 990 for the year

6    1999 and for the year 2000 looks at the instructions and says,

7    did the organization engage in any activity not previously

8    disclosed.  Tell us about significant activities the

9    organization conducts.  Dawn Goldberg at one point testifies

10   she wants to find out if the organization is doing anything

11   new.  Are they doing something new.  At that point, is the

12   taxpayer supposed to say, well, before I was the treasurer of

13   this organization.  I know that back a few years back, they

14   published a newsletter for a few years.  I don't know if they

15   disclosed it or not, but I'm under a duty to disclose it as a

16   new activity or a modification of an existing activity in 1999,

17   and those have been discontinued for the last two or three

18   years.

19       You know, the government in its response says that

20   there is no temporal boundary to this question.  It defies the

21   obvious language, as the question is written in the present

22   tense, as is tell us what the activities the organization

23   conducts, engages in presently.

24       But the government says there's no temporal boundary,

25   and if you wanted to you could have asked, you, the defense,

1    could have asked our expert is there a temporal boundary.  The

2    burden obviously isn't on the defendant to prove that he

3    answered the question correctly.  The burden is on the

4    government to prove beyond a reasonable doubt that Mr. Mubayyid

5    knowing and willfully answered the question falsely, and the

6    first thing you have to do is put the questions answered

7    falsely.

8            Your Honor --

9            THE COURT:  I'm sorry to interrupt.  Is this affected

10   in any way by the -- the testimony that they had a website with

11   back issues up on the website, which I think extended past '97

12   for some period of time?

13           MR. ANDREWS:  Well, this is what I say to that, your

14   Honor.  So, there is a website, go back to the language where

15   the language is is the organization engaged -- did the

16   organization engage in any activity not previously reported to

17   the IRS.  And it says, attach and explain significant changes

18   in the kinds of activities the organization conducts.

19           You'll recall the cross-examination of Dawn Goldberg,

20   and she talked about the activity has to be significant, okay.

21   So, on the website, we've learned that it costs $16.95 a month

22   to have this website; that some back issues of Al-Hussams are

23   published underneath the -- Suheil Laher's Islam page.  We find

24   some back printing of the Al-Hussams there, and you have

25   to -- at that point, I say, the expert would have had to

1    testify, well, yeah, this is a significant activity.  This is a

2    significant activity, despite the fact it only costs $16.95 a

3    month in an organization that is raising hundreds of thousands

4    of dollars a year.  We want to know about the $16.95 a month

5    website, and we want to know that it's publishing, if it's

6    republishing an old newsletter.

7          But they didn't get that testimony out, your Honor.

8    You know, they -- they had the expert there on the stand, ask

9    the expert, ask the expert about the website.  They asked the

10   expert about the website one time.  They said:  Now, in 1997,

11   '98 do you see anything about a website on the 990?  She said,

12   "no."  The next question was -- could have been.  Well, is the

13   website a significant activity that the IRS would expect to be

14   put down on the Form 990?  That question never came.  The

15   answer therefore never came.  The opinion from the expert never

16   came.

17         So, you know, your Honor's question is a legitimate

18   question, and the government had the opportunity to answer that

19   question when they had the expert on the stand, but you're left

20   guessing, just as Mr. Mubayyid is left guessing when he filled

21   out the form.

22         What does it mean?  Does it mean that if you have a

23   website that publishes the reprints of newsletter articles from

24   years ago that that's a significant change in the kinds of

25   activity an organization conducts?  I mean that's the problem.

1    There is no notice -- as far as that goes, there is no notice

2    to Mr. Mubayyid as to what this means.

3         The -- your Honor read an instruction to the jury.  It

4    said that if you find a question or instruction to be ambiguous

5    under a standard -- maybe I should read the whole thing to your

6    Honor.  It said several counts of the indictment concern

7    questions asked and instructions provided by the IRS on tax

8    laws.  You may consider whether any such questions or

9    instructions are ambiguous, that is, whether a reasonable

10   person viewing the question or instruction objectively would

11   conclude that it was reasonably capable of more than one

12   reasonable interpretation.  If you find that a question or

13   instruction to be ambiguous under that standard, you should

14   consider whether the defendant's response was actually false

15   under each reasonable interpretation of the question and

16   instruction.  If the defendant's response was truthful as to

17   one reasonable interpretation of the question or instruction,

18   you may not preclude provided a false response.

19        So, according to the instruction, and I submit it was

20   a reasonable interpretation of the question to ask:  (A) about

21   current activities.  And the problem with it, this conviction,

22   there are manyfold.  But first of all, is it a reasonable

23   interpretation that we are talking about current activities,

24   not past activities, not fund-raisers that occurred years ago,

25   sales of books that occurred years ago, discontinued

1   newsletters.  We're talking about current activities, the

2   recent information, if you read the language, you read the

3   instructions.

4        And as far as -- could I have just a moment, your

5   Honor.  The government's argument that their duty to -- their

6   argument the duty to disclose, like I said, has is no temporal.

7   It has a duty to disclose things that were discontinued years

8   ago.  Well, that's an interpretation.  I don't find it

9   reasonable.  I don't think the court, if you look at the

10  language, you'll find it reasonable.  It is interpretation, but

11  we have two interpretations.  The court's only instruction says

12  you can't disregard a reasonable instruction and find knowingly

13  false if it's open to a reasonable explanation.

14       That's all I have on that, your Honor.  Thank you.

15       THE COURT:  Okay.  Mr. McGinty.

16       MR. CABELL:  Your Honor --

17       THE COURT:  It probably makes sense to have Mr. Cabell

18  respond to that so we don't get too far afield.

19       It's a few minutes before 5:30.  Let me, I guess, take

20  this opportunity to suggest the following.  As I indicated, I

21  am free tomorrow afternoon.  I have a case in which I think

22  what's going to happen is closing arguments and jury

23  instruction, which will probably free me up about 11:30 or so,

24  and then the jury will deliberate.  And I need to leave at 4:15

25  tomorrow, because I have a commitment in Boston at 5:30, but

1    I'm otherwise generally free.

2         Does that work for counsel; in other words, to spill

3    over until tomorrow?  I know there's a lot of you, and you have

4    busy lives, but that would make the most sense from my

5    standpoint.

6         Mr. McGinty.

7         MR. McGINTY:  Your Honor, it's clear from two o'clock

8    until 4:00?

9         THE COURT:  Well, ideally, it would be more like say

10   1:30, and maybe cheat a little bit and get a little more time

11   in.  I do want to give counsel time to make your arguments.  At

12   some point, I'm going to have to stop, we and can't go any

13   further, but I think it makes more sense than reconvening next

14   week or say some other time.

15        MS. SULLIVAN:  That's fine, your Honor.

16        THE COURT:  Is there any objection to that?  Okay.

17        Mr. Cabell, let's finish up this argument then and

18   break for the day, and we'll take it up tomorrow.

19        MR. CABELL:  Thank you, your Honor, and I will be

20   brief.

21        At least as I listen to Mr. Andrews and read his

22   argument, the essence of it is that question 76 on the Form 990

23   is limited in time to the immediate tax year, and there are two

24   problems with that assertion.  The first is that it ignores the

25   fact, at least for purposes of it being raised on a Rule 29

1    motion that even if you focus on that, even if you accept that,

2    there are activities within the immediate tax year that were

3    not listed on the Form 990, so that the answer that Mr.

4    Mubayyid gave to -- on question 76 was still false.

5        THE COURT:  Well, that's true for '97, because there

6    was at least an Al-Hussam.

7        What were the activities, what were the other

8    activities and the activities in other years?

9        MR. CABELL:  Your Honor, there was evidence that

10   throughout that time period from 1997 on that Care was

11   operating the website, which was an activity that was not

12   previously disclosed, but which for our purposes was being

13   operated in 1997 and 1998.  That was not disclosed on the Form

14   990.

15       Through the website, Care was publishing the Zakat

16   Calculation Guide.  They were continuing to solicit donations

17   for support of the mujahideen; and Care, the organization

18   itself, was continuing to sell tapes and books, and none of

19   those activities were referenced on the Forms 990 for any of

20   the years that Mr. Mubayyid signed them.

21       But we think the question of the temporal scope of

22   question 76 is -- is not proper here, because this was -- this

23   was really, and I use the term in our opposition, the live

24   issue.  This was a live issue at trial.  What did that -- what

25   did that question ask for.  Both the wording on the question

1  itself, but also in conjunction with the instructions for

2  the -- for question 76.

3  　　　　We had Dawn Goldberg testify, and on cross-examination,

4  I would note, Mr. Duncan put the question to Ms. Goldberg and

5  asked whether it was her testimony from our direct examination

6  that Care in 1997 should have reported publication of the

7  Al-Hussam newsletter, if they hadn't reported it on the 1023,

8  and had never reported it before, and her answer was:  "That's

9  correct."

10  　　　　There was nothing in the question itself that limited

11  to the time period, and we would submit that -- that this was

12  an issue that all of the parties were consciously aware of.

13  Your last instruction about how to interpret the tax forms put

14  it squarely before the jury, and I would respectfully argue

15  that the defendants got the very best instruction they could,

16  because what in essence it said was the government is saying

17  one thing about what this question means and what this form

18  means.  You're saying another.  If you find that there are two

19  possible interpretations, and under one of them the question

20  would not be false, the question that the defendant provided,

21  then you must acquit.  That the jury came back with a verdict

22  of guilty necessarily means that they looked at question 76,

23  they looked at the Forms 990, they've analyzed them and

24  answered the question in the government's favor that it is not

25  constrained in time.  It did require defendants, all of the

1    defendants, to provide any information that hadn't previously

2    been reported.  And we think for that -- at least in my view,

3    although this is framed as a Rule 29, this is really a legal

4    argument.  It's really sort of a Rule 33 argument, which is, as

5    a matter of law, you should be concluding that -- that

6    question 76 is limited in time to the immediate tax year, but

7    again I would submit that this was an issue that was put

8    squarely before the jury.  The instructions are objected to,

9    and there is no basis now to revisit it further.

10          THE COURT:  And this is intertwined with Rule 33

11    issues, obviously, but what about this business of the -- the

12    person who has to fill out the form, say, in 2000 is somehow

13    charged with knowing what happened seven years or more years

14    before.

15          What's the government's response to that, because

16    that's, you know, at some level, at least, concerning?

17          MR. CABELL:  Well, there are two quick responses.  The

18    first is the linear form itself about the -- again, I'm talking

19    when I say the language on the form, I'm talking about the

20    Form 990, as well as the instructions that go along with it.

21    To make it clear that whomever is answering that question and

22    all the questions in that section, question 76 and all the

23    questions that follow, must answer based on an awareness of

24    what the organization previously reflected in either the 1023

25    or previous Forms 990, or if they were submitted previous

1    letters to the key district office reflecting any changes, as a

2    matter of logic; and the second point being that Dawn Goldberg,

3    as a matter of evidence, testified to this effect.  You cannot

4    make that representation.  You cannot sign under the pains and

5    penalty of perjury that you are answering that question

6    truthfully without actually knowing what was on those forms.

7    And so we think it's a wholly reasonable proposition for the

8    jury to conclude that whomever was signing this form on behalf

9    of Care, whoever was responsible for answering that question

10   had a duty or was -- was deemed to be aware of what the

11   organization had previously stated to the IRS.

12            THE COURT:  Okay.  All right.  Mr. Andrews.

13            MR. ANDREWS:  May I respond?

14            THE COURT:  Yes.

15            MR. ANDREWS:  I can do it tomorrow.

16            THE COURT:  If it's quick, why don't you do it now.

17   Mr. Cabell.

18            MR. CABELL:  Sorry.

19            MR. ANDREWS:  Thank you.  Your Honor, just as the last

20   point, first of all, this obligation to know what was filed

21   beforehand.  Now, we're talking about criminal liability here.

22   Now, certainly somebody who fills out the form and through

23   negligence, carelessness, laziness, let me go back and look at

24   all of them, or didn't catch all the stuff that had been done

25   before, it's a very different standard.  You can't impose

1    criminal liability and say, if you made a mistake, right, if

2    it's false, and it was not, you know, it wasn't declared

3    previously, and we can look back at these forms and somebody

4    declared previously, you then write down it wasn't previously

5    declared, that therefore you have committed a violation of law,

6    because it's more than that.

7            THE COURT:  Right, but --

8            MR. ANDREWS:  It can't be reckless.  It can't be

9    negligent.  It can't be grossly negligent when you file a tax

10   return.  It has to be knowing and willfully, your Honor.  So,

11   that's the problem with that standard that's off.

12           THE COURT:  Well, I mean this probably does in any tax

13   return, that is, you can't be criminally charged with making a

14   mistake if you forgot to include a couple 1099s on your tax

15   returns.  That's not a crime, but if you deliberately, you

16   know, don't include it, it is, which I guess circles back to

17   the issue of proof of intent here, that is, the government must

18   prove, as in any tax case, that this was knowing and willful;

19   that this was not an accident, mistake, neglect, and so forth.

20           What is -- what is your response to that?

21           MR. ANDREWS:  Well, your Honor, in the -- in the

22   Boulerice case, if I'm saying it right, the First Circuit case

23   that you got the instruction from, and it's -- yeah, it's

24   Boulerice at 325 F.3d 75, the First Circuit, 2003.  And that's

25   where you drew the instructions for the elements of the false

1    statement; and in that case, it's a false statement, and there

2    is a presumption that when one signs a return it's false that

3    they knowingly looked and signed it.  But if you look at the

4    facts of that case, it had to do with a young woman, who was

5    receiving income from companies that her father owned, and on

6    the stand they established that she knew that she was receiving

7    wages.  She had never worked for the company, and she knew that

8    wages are what you got in return for work.  She also filled

9    out, I think, false personnel forms.  She lied to the postal

10   inspector.  She told her accountant that she felt very uneasy

11   receiving the payments under the forms of wages, and was there

12   another way that she could get the money.  So, when the court

13   found the proposition that when you sign the -- when you sign

14   the form is a finding of knowing and voluntary simply because

15   you signed the form, and that in a lead case there's much, much

16   more there.  There is discussions with people.  There's active

17   acts of concealment.  There's testimony on the stand that

18   conflicts with her explanation of what happened, and so the

19   case frankly was -- my reading was -- seemed to be

20   overwhelmingly.  The Court had thought it was a closer call.

21          And comparatively, there's absolutely no other

22   evidence here with Mr. Mubayyid.  Now, apparently the activity

23   the government says that was not disclosed was the website.

24   Long last, we have it.

25          And your Honor, if you find against Mr. Mubayyid, you

1    tell him, his family, you tell me, you tell the public what

2    activity he did not put down on this Form 990, because this is

3    the first time that we've ever heard that it was the website.

4    Okay.  And the website, which we published the newsletter, I

5    would dispute the fact that only defendants have solicited

6    funds from the mujahideen.  I dispute the fact that it had

7    offered books and tapes for sales.  It did solicit donations.

8    It cost $16.95 a month, and there was no testimony from their

9    expert that this was a significant change in activity, because

10   it isn't simply anything new, a significant way, a significant

11   change in the kinds of activities the organization conducts for

12   a further exempt purpose.  It wasn't a significant change in

13   the kinds of activities.  It wasn't substantial.  It's $16.95 a

14   month, and I guess that's what the government is premising as

15   the false statement.  But now we know it's the website.

16        Thank you.

17        THE COURT:  All right.  Let's break for the day then.

18   We'll pick up tomorrow at, I think, probably 1:30 makes the

19   most sense.  I will have a jury out, and it's possible that

20   this schedule may have to move.

21        Let's assume tomorrow we're going from 1:30 to 4:00.

22   We'll need to wrap up the Rule 29, and we'll just go through

23   the Rule 33 motions.  There are more issues, but I think we

24   need to move through them more quickly.  I think they are more

25   discrete in their own way.

1          And let's assume that that is the timetable for

2    tomorrow.  I'll see you tomorrow at 1:30.

3          Thank you.

4          (At 5:39 p.m., court was adjourned.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         C E R T I F I C A T E

2

3              I, Marianne Kusa-Ryll, RDR, CRR, Official Court

4     Reporter, do hereby certify that the foregoing transcript,

5     consisting of 123 pages, is a true and accurate transcription

6     of my stenographic notes in Case No. 05cr-40026-FDS, United

7     States of America versus Muhamed Mubayyid, Emadeddin Z.

8     Muntasser, and Samir Al-Monla, a/k/a/ Samir Almonla, before

9     F. Dennis Saylor, IV, on May 15, 2008, to the best of my skill,

10    knowledge, and ability.

11

12                              /s/ Marianne Kusa-Ryll

13                              Marianne Kusa-Ryll, RDR, CRR

14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25