1                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
2

3

4    United States of America,      )
                   Plaintiff,       )
5                                   )
                                    )
6    vs.                            )   Criminal No. 05-40026-FDS
                                    )
7                                   )
     Muhamed Mubayyid, Emadeddin Z.)
8    Muntasser, and Samir Al-Monla,)
     a/k/a Samir Almonla,           )
9                  Defendants.      )

10

11   BEFORE:  The Honorable F. Dennis Saylor, IV

12

13      Continued Motions for Judgment of Acquittal Under Rule 29
            Continued Motions for a New Trial Under Rule 33
14                          Volume 2

15

16                              United States District Court
                                Courtroom No. 2
17                              595 Main Street
                                Worcester, Massachusetts
18                              May 16, 2008

19

20

21

22

23              Marianne Kusa-Ryll, RDR, CRR
                     Official Court Reporter
24              United States District Court
                  595 Main Street, Room 514A
25                Worcester, MA 01608-2093
            Mechanical Steno - Transcript by Computer

```
 1    APPEARANCES:

 2    B. Stephanie Siegmann, Assistant U.S. Attorney
      Aloke Chakravarty, Assistant U.S. Attorney
 3    Donald L. Cabell, Assistant U.S. Attorney
      United States Attorney's Office
 4    United States District Court
      One Courthouse Way, Suite 9200
 5    Boston, Massachusetts 02210
      for the Plaintiff
 6
      Zalkind, Rodriguez, Lunt & Duncan, LLP
 7    David Duncan, Esquire
      65a Atlantic Avenue
 8    Boston, Massachusetts 02110
      for the Defendant Emadeddin Z. Muntasser
 9
      Quinn Emanuel Urquhart Oliver & Hedges LLP
10    Kathleen M. Sullivan, Esquire
      Adam Abensohn, Esquire
11    51 Madison Avenue
      22nd Floor
12    New York, NY 10010
      for the Defendant, Emadeddin Z. Muntasser
13
      Law Offices of Michael C. Andrews
14    Michael C. Andrews, Esquire
      21 Custom House Street
15    Suite 920
      Boston, Massachusetts 02110
16    for the Defendant, Muhamed Mubayyid

17    Federal Defender's Office
      Charles P. McGinty, Esquire
18    408 Atlantic Avenue
      Third Floor
19    Boston, Massachusetts 02110
      for the Defendant Samir Al-Monla, a/k/a Samir Almonla
20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2

3            THE CLERK:  All rise.

4            Court is now open.  You may be seated.

5            Case No. 05-40026, United States versus Muhamed

6    Mubayyid, Emadeddin Muntasser, Samir Al-Monla.

7            Counsel, please note your appearance for the record.

8            MR. CABELL:  Good afternoon, your Honor.  Donald

9    Cabell, for the government.

10           MS. SIEGMANN:  Good afternoon, your Honor.  Stephanie

11   Siegmann for the United States.

12           MR. CHAKRAVARTY:  And also Aloke Chakravarty, your

13   Honor.

14           THE COURT:  Good afternoon.

15           MS. SULLIVAN:  Good afternoon, your Honor.  Kathleen

16   Sullivan for Mr. Muntasser, together with Adam Avensohn and

17   David Duncan.

18           THE COURT:  Good afternoon.

19           MR. ANDREWS:  Good afternoon, your Honor.  Michael

20   Andrews for Mr. Mubayyid.

21           THE COURT:  Good afternoon.

22           MR. McGINTY:  Your Honor, for Mr. Al-Monla, Charles

23   McGinty, from the Federal Defender's Office.

24           THE COURT:  All right.  Good afternoon.

25           This is a continuation of the hearing on the Rule 29

1    and Rule 33 motions.

2            I think probably, Mr. McGinty, you're up on Al-Monla.

3    I want to return to some issues on the -- the Count One

4    argument we were discussing earlier, but let me hear first from

5    counsel for Mr. Al-Monla.

6            Mr. McGinty.

7            MR. McGINTY:  Thank you, your Honor.

8            First, your Honor, I want to rest on the arguments

9    that were made by Professor Sullivan in connection with Count

10   One.

11           THE COURT:  And, again, no one needs to say that.

12   You're all deemed to have...

13           MR. McGINTY:  All right.  I just want to --

14           THE COURT:  Yes.

15           MR. McGINTY:  -- focus where I'm going here.  I'm

16   looking really at the conspiracy count as it relates to

17   Mr. Al-Monla.

18           Now, this court had ruled before the closing

19   arguments, the part is quoted, government has to prove a

20   conspiracy that includes the filing of a Form 1023 in June of

21   1993, unquote.  That was in the transcript of December 13th, at

22   43.

23           Consistent with that ruling, this court had instructed

24   the jury they have to find that a conspiracy existed, and

25   that's the conjunctive, that is, that it involved both the

1     aspect of the origin of Care and also its continuing conduct.

2          Now, that said, the issue with respect to Mr. Al-Monla

3     is how was Mr. Al-Monla shown by the government to have known

4     that the 1023, what information the 1023 called for and that,

5     as filed, that 1023 had omitted critical information.

6          Now the government doesn't claim, as I understand its

7     argument yesterday and its argument, wow, that it does not

8     claim that Mr. Al-Monla was the principal in the negotiations

9     and discussions or meetings or whatever it was that led up to

10    the preparations of the 1023.

11         His simple interaction with the IRS was in connection

12    with the 990 return filed five years later in 1998.  In

13    connection with that filing, there is nothing about the filing

14    of that return that suggests that Mr. Al-Monla had ever

15    reviewed the 1023, or had any obligation to review the 1023.

16    Even if that were not the case, and even if there was some

17    question, some issue about whether there was an obligation to

18    review the 1023 on the part of any subsequent filing, the

19    existence of the responsibility or even a duty to go back to

20    the 1023 does not satisfy the intent requirements of the

21    conspiracy.  It may be sufficient under a civil standard.  It

22    may involve negligence and the failure to do that, but in a

23    specific intent crime where the conspiracy intent requires that

24    one have the intent to join and the intent to effect the acts

25    that are charged in the conspiracy, the absence of performance,

6

1    if a duty existed for Mr. Al-Monla to review the 1023, doesn't

2    suffice to satisfy the government's proof requirement.

3         Now, here there was no duty apparent in examination of

4    the 990.  The question asked, quote, about significant changes

5    in the kind of activities the organization conducts.

6         As Mr. Andrew pointed out, significant in that

7    question is the use of the correct tense; also significant

8    there is the use of the word "kind," and "kind" suggests that

9    we're talking now about generic kind of activities.  We're not

10   talking about specifics things that an organization does.

11        The government claims that that question imports an in

12   perpetuity duty or responsibility on the part of the filer to

13   examine not only the 1023s, the 990s that were seen here, but

14   also the 1023.

15        The difficulty with that, your Honor, is first, the

16   government talks about the testimony of Ms. Goldberg.

17   Ms. Goldberg never testified to that proposition; but secondly,

18   and more importantly, the language of the question doesn't say

19   that.  Moreover, if one reviews the court's instruction, it was

20   as follows:  If a defendant's response was truthful as to one

21   reasonable interpretation of the question or instruction, you

22   may not conclude that he provided a false response.

23        So, if a fair reading of the question 76 was the

24   responsibility was with respect to the present tense of a

25   specific or namely that tax year, so long as that's a

1    reasonable interpretation of the question, quote, direction to

2    the jury, you may not conclude that he provided a false

3    response.

4         And -- and finally, your Honor, again, repeating the

5    point, that even if there was such a responsibility, that

6    doesn't suffice to establish the government's requirement of an

7    intent, the dual intent that's required to prove the

8    conspiracy.

9         Now, the government has argued in its papers and

10   argued several times, using the expression that a charity has

11   to have or be entirely operated exclusively for exempt

12   purposes.

13        I think it's important to address that issue.  Under

14   the C.F.R., the -- and I'm referring now to 26 C.F.R.,

15   1.501(c)(3)(C)-1, is the operational test for charity, and that

16   operational test is an organization regarded as operated

17   exclusively for one or more exempt purposes, only if it engages

18   primarily in activities, which accomplish one or more of such

19   exempt purposes specified in Section 501(c)(3).  An

20   organization will not be so regarded if more than an

21   insubstantial part of its activities is not in furtherance of

22   an exempt purpose.

23        What that establishes, your Honor, is that

24   insubstantial activities don't fete an exemption.  They are not

25   permitted.

1    Now, here, the government never proved year by year

2    sufficient to satisfy with respect to each charged years 990

3    that any of Care's putatively non-charitable activities were

4    substantial, not its video sales, not its book sales.

5    Referring to the book sales, there's an Al-Hussam in 1994 that

6    refers to Join the Caravan and establishes a price for an issue

7    of Join the Caravan.  The price is $3.

8    So, we're not talking about a profit center -- and

9    this is exactly what it is -- that the IRS in its charitable

10   regulations is getting at.  Is there a profit center within the

11   charity, which generates funds, which are used or applied for

12   purposes not consistent with the charitable purpose?

13   So, what are we talking about when we look to the

14   words more than substantial.  Is this a profit center?  No.

15   Does it generate a significant income?  No.  Is it among the

16   things that the IRS is concerned about when it frames that

17   question?  The answer:  No.

18   With respect to book sales, we note -- and referring

19   now to Exhibit 215A -- there was a visit by Mr. Jayyousi in

20   1996 -- I'm sorry -- in November of 1995.  There was a memo

21   reflecting the proceeds from his visit.  The net proceeds, your

22   Honor, were about $100.  Again, begging the question, how is

23   this more than insubstantial, and referring to the language on

24   the 990, any significant changes?

25   Now, the government yesterday in response to

1    Mr. Andrews' question about what exactly were the activities

2    that drew Care's non-charitable activities anywhere in the

3    range of the statute of limitations, and we're not talking now

4    about withdrawal.  We're not talking about anything beyond the

5    990 in 1998, which was the single 990 that was signed by Mr.

6    Al-Monla, or the 990s in '99, in 2000, and 2001.  The

7    government's answer was the website.

8         The website cost $16 monthly; however, if one parses

9    that, that can't be a substantial activity.  It is hardly a

10   significant change in the kind of activities that the

11   organization conducts.  If the -- if the government is arguing

12   that that website is significant, it -- it tends to beg the

13   Anzalone question, which is whether the language, a significant

14   change, operated exclusively, or an insubstantial part of its

15   activities, whether the absence of definition of those terms,

16   whether the absence of case law that there has been a single

17   prosecution resting on any of those terms suggests that those

18   are the premises for criminal prosecution.

19        THE COURT:  Well, the point may be a trivial one, but

20   obviously some prosecution has to be the first.  Is it worse

21   depending on what the form says or doesn't say, and whether

22   people are put on notice?  In other words, it may be that this

23   was the first prosecution in U.S. history involving a Form 990.

24   That itself doesn't say much.  Some case has to be first.

25   Really, shouldn't we be focused on what the form says?

1          MR. McGINTY:  Right.  And I do that only to accent the

2     imprecision of what the form says.  Now, is the government

3     contending here that there's a single charity in the United

4     States of America that doesn't have a website?  Is the

5     government arguing that any other charity of which there are

6     tens of thousands, any other charity that has been selected for

7     prosecution for the failure to disclose the existence of a

8     website, and taking a hypothetical here, because the past

9     issues of Al-Hussam were archived in the website of Care, if,

10    for example, a charity, let's say the United Way of New England

11    had a glossy magazine issued monthly, which magazine heralded

12    its many accomplishments, and then it decided to suspend that

13    activity and took that glossy magazine and took the contents of

14    it and put it on its website as archived historical material,

15    is the government contending that would have been a substantial

16    activity of United Way of New England, such that the failure to

17    disclose would be sufficient as a predicate for continuation of

18    a conspiracy, absent any other non-charitable activities during

19    that time period?

20          So, the question here is focusing now on the 990 filed

21    by Mr. Al-Monla in 1998.  Newsletters were ended.  The last

22    newsletter was January of '97.  The return is filed in '98.  A

23    fair reading of the return is that it addresses that tax year.

24          There is no significant change in activity; nor in

25    that year is there a termination of activity such that the

1    language that appears in the -- in the -- in the manual, either

2    question 76 itself or the language that appears in the -- in

3    the manual, outlining what line 76 calls for, that suggests

4    that it be disclosed.  There is no other indication of any

5    activity, which would either establish continuing conduct of a

6    significant or of a substantial nature, which is not

7    insubstantial, which would carry the activities of Care into

8    1998.

9         The absence of an omission, the absence of a false

10   statement, and we're talking now only about question 76,

11   because at trial the government narrowed its proof with respect

12   to the 990s to question 76, and did so explicitly, quote, In

13   the 990, what we allege is false is question 76.  We don't

14   allege that they say -- that what they say in programs, service

15   accomplishments, that they gave this much money to the orphans

16   or this much money to the widows.  That was false.  That's the

17   transcript of November 26, 2007, at 25 and 26.

18        So, looking solely to question 76, in the absence of

19   any proof of a misstatement on the 1998 return filed by

20   Mr. Al-Monla, meaning that his direct communication to the IRS

21   was not proof of being false, what is the proof either that he

22   embraced a tax purpose in '98, with respect to any conduct in

23   '98 that may be evasive of taxes in '98, let alone the much

24   more difficult proposition, which is how do you prove that

25   Mr. Al-Monla knew of omissions from the 1023?

1        Your Honor, under the circumstances, I join the prior

2   argument made by Professor Sullivan regarding Count Two and ask

3   for at least more specific reasons that the court enter a

4   ruling of -- a judgment of acquittal on Count Two for

5   Mr. Al-Monla.

6        THE COURT:  All right.  What about -- and I'll

7   confess, I may not have the instructions exactly right, because

8   they changed, but I'm looking at Exhibit 1123, which says in

9   the instructions to line 76, "Include new or modified

10  activities not listed as current or planned in the

11  organization's application for recognition of exemption or not

12  yet reported to the IRS."

13       MR. McGINTY:  And -- and what precedes that, your

14  Honor, is the operative question:  Did the organization engage

15  in any activity not previously reported to the IRS?  And then

16  the change in activities question or instruction is attach a

17  statement explaining any significant changes in the kind of

18  activities the organization conducts using the present tense.

19  That present tense then, fairly read, would suggest that any

20  statement after that is talking about that same focused period,

21  which is are there any activities that have been terminated?

22  When?  In the current period, referring now to the -- the use

23  of the word "conducts" in the present tense.

24       And, again, your Honor, there can be a dispute, and we

25  would argue that Ms. Goldberg did not put that dispute before

1    the jury, but even if there were plausible readings here, which

2    plausible readings would even support the government's

3    argument, the difficulty is that the court's instruction to the

4    jury was that so long as there's a fair reading, which permits

5    that conclusion, the jury has to find that the defendant did

6    not make a false statement in connection with that -- that

7    statement.

8             THE COURT:  All right.  Ms. Siegmann.

9             MS. SIEGMANN:  Your Honor, I'm going to address some

10   of the conspiracy issues, and the more specific issues as to

11   the Form 990.  Mr. Cabell has taken the lead on that, but first

12   there was, if I could beg the court's indulgence, on one issue

13   that was actually implicated by Mr. McGinty's arguments.

14   Yesterday, at the end of the conspiracy argument, you had asked

15   a question about whether there's a dual object of the

16   conspiracy, and I just wanted to reinforce and actually add

17   something, just for the record's sake.

18            For three reasons, there's actually two objects of

19   this conspiracy, the obtaining and maintaining, and it was

20   charged in the conjunctive, and the indictment clearly supports

21   such a finding, especially when you look at the manner and

22   means section of the indictment.

23            If you look under the manner and means section of the

24   indictment, the first paragraph solely talks about the

25   obtaining of the 1023 -- I mean the filing of the 1023, and

1    then the second paragraph refers to how they maintained it

2    between 1993 and 2002 by filing fraudulent Forms 990.

3          And, again, I refer the Court to the United States

4    versus Cappozi case, which was directly on point, a First

5    Circuit case from 2007, which charged -- the indictment charged

6    similarly three objects using the word "and," to kill and

7    attempt to kill and -- and influence witnesses, I think is

8    their language in that case, your Honor, and the court held

9    that as long as there was sufficient evidence to sustain one of

10   those objects, that that was sufficient to sustain the verdict

11   on the conspiracy.  That was a Hobbs Act conspiracy.

12         And, lastly, prejudice.  Your Honor, the defendants

13   were not prejudiced.  There was a blanket statement by

14   Ms. Sullivan that they would require a new trial, but how could

15   they be prejudiced when they would argue the same thing?  They

16   would be arguing to the jury that there was no agreement to

17   obtain or maintain, and that's what they did during the trial.

18   They aggressively defended this -- both of those issues, and

19   there would -- there'd be -- there's no difference.  They can't

20   point to a different way that they would be defending this

21   case.

22         And, lastly, the jury was instructed very

23   conservatively by your Honor that they had to find both

24   agreements; so, they actually -- the instruction was more

25   beneficial to the defense than required by the law.

1          I'm sorry.  I just wanted to make sure I put those out

2     there for the record, and I do thank you for, your Honor, not

3     interrupting me and letting me do that.

4          As to more specific --

5          MR. McGINTY:  Your Honor -- your Honor, could we

6     respond specifically to that to keep the sort of a linear

7     nature of the -- of the presentation?

8          THE COURT:  All right.  Sure.

9          MR. McGINTY:  Your Honor, just very briefly, the

10    government cites Capozzi.  Capozzi specifically acknowledges

11    the existence of Yates as an exception to Capozzi.  Under those

12    circumstances, your Honor, Capozzi provides that if one

13    argument of the conspiracy fails on a proof -- I don't recall

14    whether it's a footnote, a parenthetical, or what it was within

15    the case, with a specific exception of Yates' statement

16    continuing to be good Supreme Court law, that if one fails

17    because of the statute of limitations, that, under those

18    circumstances, the rule advocating or expressing Capozzi has an

19    exception and does not apply.  So Capozzi does not suffice to

20    establish the predicate that the government urges here.

21         THE COURT:  All right.

22         MS. SIEGMANN:  Your Honor, I actually disagree, and I

23    think you are -- if you are going to rule that way, you should

24    read that decision, because it does differentiate Yates, and it

25    refers to the United States versus Griffin.  I don't have the

1    case right in front of me though.

2          On just the conspiracy issues that Mr. McGinty raised,

3    with regards to Al-Monla and the obligation to review the 1023

4    that -- that the government didn't prove that he had seen it,

5    there was multiple copies of the Form 1023 that were actually

6    found in the storage locker as well as at Mr. Mubayyid's

7    residence.  That was proven.  He was president from 1996 to

8    1998.  He -- there was also in addition to the 1023, there was

9    letters that the IRS wrote, that they sent.  They corresponded

10   with Care, an October 1993 letter and a June 11, 2000 letter.

11   In that letter, which states clearly, you are getting this tax

12   exemption, assuming your activities are the same as you

13   previously disclosed on your 1023.

14          So -- and then it goes on to say that if you're going

15   to engage in any activities, other than those that you

16   previously disclosed, different in character, different in

17   object, different in method of operation, you are under a duty

18   to tell the IRS that, because, essentially, if you don't

19   provide all the information up front and be completely --

20   completely accurate, then you're not entitled to that tax

21   exemption.  It's fraudulent.

22          Now, those letters, as like the 1023, were found in

23   the storage locker, multiple copies, and at Mr. Mubayyid's

24   residence, and those -- all those records came from Care's

25   office.  There was a -- actually, a discussion, several

1    interceptions that talk about how things were put into storage;

2    that the agents went to the old location, but it's clear those

3    were all originally in the office, and Mr. Al-Monla, as

4    Mr. Tiba testified, he was working in the office on a daily

5    basis.

6         There's -- there -- there is certainly evidence you

7    will find that he knew about that 1023.  Additionally, and I

8    can't remember the exhibit number, but there's a certified copy

9    with Mr. Al-Monla's signature of the Articles of Incorporation,

10   in which they state they're organized exclusively for

11   charitable and religious -- religious, scientific and

12   educational purposes; and as your Honor knows from the

13   arguments yesterday, those articles clearly state that they're

14   going to obtain tax-exempt status by filing a 1023 application.

15   So, he was on -- clearly on notice by virtue of the fact that

16   his signature is on, certifying those -- that Articles of

17   Incorporation, that there was such an application, and then he

18   in turn then signs a Form 990 in 2000 for the 1998 year.

19        There's one other thing I want to point out to

20   the -- oh, and obviously, your Honor, as you recall from the

21   testimony, Mr. Al-Monla clearly knew that they were engaged in

22   non-charitable activities, and what -- what is the -- one of

23   the principal, key pieces of evidence that we know of that

24   knows this is if we look at Exhibit 535A, which is a call

25   between Mr. Jayyousi and Mr. Al-Monla, and he's talking about

1   what the office -- what Care's office is doing.  We're now on

2   the front lines.  We're not the ones that are attacking

3   people -- and I'm paraphrasing, because I don't have it right

4   in front of me -- but we are on the real lines.  We

5   support or -- I'm sorry -- we finance the people picking

6   apples, and Dr. Levitt testified that "picking apples" was

7   referring to mujahideen, the fighters.  And that call was on

8   5/7/97.

9           He knew what Care was doing.  There is other documents

10  in the record that show -- there was another key document.  I

11  think it's 213, but I can't remember exactly, but it's a

12  document that actually Naseem's name's on it, too, and

13  Al-Monla's, and I believe Akra's, and they're talking about how

14  if one charity closes, another one will open.  Clearly, you

15  know, he's knowing that this is a charity and that their

16  engaging activities are dangerous; and actually, they have

17  a -- there's a listing, and it talks about the conferences they

18  held and the Al-Hussams, and dangerous and security concerns

19  are all on that document.  They all -- those individuals on

20  that document clearly know what they're involved in, and that's

21  the reason why one charity might close -- and this is an

22  inference obviously, but the reason one charity might close is

23  because they are involved in these noncharitable staged

24  activities.

25          There was an argument made, I believe yesterday and

1    today, about significant.  What does significant mean?  There

2    was testimony on that, your Honor; and it's just a recitation

3    from the C.F.R., and it was from actually Mr. Sack, and I think

4    that I have a reference to it in the -- in our opposition, and

5    he says that -- I'll find it for you -- I'm sorry.  Essentially

6    to him -- it was on actually page 29 of the government's

7    opposition -- and he doesn't -- when he's talking about

8    significant -- and this is an IRS representative -- that he

9    would recommend denial of any application that disclosed the

10   organization engaged in any activities that were noncharitable,

11   irrespective of what percentage of time was spent on these

12   activities when it involved fighting.

13          I mean this is what we're talking about.  When you're

14   talking about significance, you're talking about quantitative

15   and qualitative.  If someone is engaged in 1997, 1998 in

16   supporting fighters -- and by the way, that is far beyond the

17   time that we withdrew from -- the United States stopped

18   supporting Afghanistan -- the Afghanistan mujahideen against

19   the Soviets.  This is a time when they're supporting fighters

20   in Bosnia and Chechnya.  That is of concern.  That is

21   significant to the IRS, and they were, in that time frame, from

22   1997 and 1998 involved in distributing zakat guides that asked

23   directly for money for the mujahideen.  The own -- their

24   website had a section of it called Battlefields of Chechnya,

25   again asking for support directly for the mujahideen.  They had

1    a couple -- three published newsletters on that website.  They

2    distributed videos.  They sold videos and books, 30-some-odd

3    Join the Caravan were found at Mr. Mubayyid's house in 2003,

4    and along with all -- a bunch of Al-Hussams.  They were selling

5    books, and obviously they also have the orphan support for the

6    orphans of martyrs.

7         And, again, your Honor, if you have any specific

8    questions about those facts, I'm going to refer you to the

9    specifics on the Form 990 to Mr. Cabell, since he has been

10   handling that.

11        THE COURT:  Let me go back to something that was

12   raised yesterday.  Suppose I were to conclude that there is

13   insufficient evidence to show that Muntasser conspired with

14   Yassin and Akra in 1993.  I asked the question:  Well, does

15   that mean the whole conspiracy count falls?  And I think the

16   response was based on the notion that it was a conspiracy to

17   obtain and maintain tax-exempt status.

18        What about the fact that the conspiracy is cast in

19   terms of a conspiracy that begins in 1993 and that these other

20   individuals are alleged to have joined it later?  The

21   government has to prove, I think, that events occurred

22   reasonably near the dates charged.  In other words --

23        MS. SIEGMANN:  Yes, your Honor.

24        THE COURT:  -- I don't think you can charge a

25   conspiracy that began in '93 and prove that it began in '96,

1  right?

2          MS. SIEGMANN:  Well, your Honor, the government would

3  dispute that, the fact that the conspiracy wouldn't be starting

4  until 1996.  Even if you don't have --

5          THE COURT:  Well, let -- let -- again, just play it

6  out for me, because I want to understand the implications of

7  the argument.  I'm just -- I'm curious.

8          Again, suppose -- suppose they say, okay, insufficient

9  evidence as to Muntasser in '93.  What then with the conspiracy

10  count?  I mean Al-Monla and Mubayyid arrive on the scene later,

11  right, '95, '96.  I don't have the dates in front of me.

12          MS. SIEGMANN:  Well, Al-Monla and Mubayyid were

13  involved to a lesser degree, but the papers actually

14  demonstrate they were involved in Al-Kifah, and then they

15  were -- actually, they have many checks in 1993 -- and I can't

16  remember which one -- that had sales on them, that they were

17  conducting sales of, we believe, to be tapes, because that's

18  what they're referring to, tape sales; so, they were involved.

19          Now, I'm not saying that -- suggesting that they were

20  conspiring, because there's no -- we don't have proof that they

21  were involved in the tax filings or the tax defrauding with the

22  IRS at that point; however, they were involved in that

23  organization, and I would actually, the evidence -- I'm

24  sorry -- the arguments we made yesterday based upon just

25  looking at Akra, the government believes is sufficient evidence

1    that there was a conspiracy that formed in 1993.

2          Even if you don't find that it started in early -- as

3    early as 1993, the evidence is that both Akra -- I'm

4    sorry -- with regard to Yassin, he was very involved in '94,

5    and '95 you have the meetings between GRF and -- the GRF

6    charity and the Care charity, talking about how their

7    respective charities are going to support the mujahideen

8    battalion; and clearly at that point, there is, again, evidence

9    of the conspiracy, but there is actually a case -- and I have

10   it not at the table with me, but United States versus Furkin

11   from the Seventh Circuit.  I believe it's a 1997 case, and it

12   actually talks about that issue of time frame.

13         In that case, it was a client conspiracy.  I don't

14   believe it's cited in the briefs, but it's a client conspiracy,

15   and in which the conspiracy charged that it started in 1985.

16   The court found that it didn't start -- they didn't find proof

17   that it started until 1991, and they found that that was not a

18   problem.  If that it would only -- if that only goes to

19   sentencing as to the tax loss, and that you could actually

20   obviously only be liable for that time frame from 1991 forward.

21   So, again, the government doesn't believe the fact that you

22   find -- the jury obviously found 1993 in ruling -- in their

23   verdict, their guilty verdict, but if you are concerned, as a

24   result of your question, that is not a reason to strike

25   the -- to Rule 29 the charge, your Honor.

1          THE COURT:  Okay.  All right.  Mr. Cabell, do you want

2     to address the Form 990?

3          MR. CABELL:  Yes, just briefly, your Honor, because I

4     think much of the response would mirror what the government

5     said in response to Mr. Andrews in his argument with respect to

6     Mr. Mubayyid.  So, I would just like to highlight just a few

7     points for the court.

8          First, factually, your Honor, there was evidence

9     adduced at trial that in 1998, Care was operating a website,

10    and not withstanding the cost of operating the website, the

11    website performed, the jury could find, a fairly important

12    function.  It contained the past issues of the Al-Hussam.  It

13    contained the Zakat Calculation Guide.  Through it they

14    solicited funds, and it contained photos.  So, in many ways, it

15    put Care out there for the public to see.  That was an activity

16    that even under the defendant's argument that question 76 was

17    limited to the immediate tax year, should have been referenced

18    somewhere on the Form 990, and it was not.  So, even putting

19    aside the -- the issue of the time limitations, if any, within

20    the Form 990, there was still evidence from which the jury

21    could find Mr. Al-Monla guilty.  The witness was, I believe,

22    Ali Ahmad that we called to give the evidence about the

23    website.

24          It was not necessary, as I think Mr. Andrews asserts

25    in his motion, for the government to go on and have Dawn

1    Goldberg render an opinion as to whether the website is

2    something that should have been referenced in the 990.  In the

3    government's view, this was not something that needed to be

4    supported by expert testimony.  It was a matter -- it was a

5    factual issue that was comfortably within the province of the

6    jury to decide.

7         I would remind the court that the defendants never

8    argued, prior to trial, that the meanings of any of the forms,

9    in particular question 76, question 5 on the 1023, were matters

10   that could be determined as a matter of law by the court, such

11   that the court would be instructing the jury as to what these

12   questions meant.

13        The court, instead, told the parties during the jury

14   charge that the meanings of the forms and these questions are

15   fair game.  Everybody was on notice that they could make their

16   best argument to the jury as to what these forms meant, and as

17   to what they required, both in terms of content, as well as the

18   time period that comes by the forms.

19        Dawn Goldberg did render an opinion that if an

20   activity had not been reported in the past, she would have

21   expected it to be on the Form 990.  As I pointed out yesterday,

22   on cross-examination, she specifically said in response to a

23   question by Mr. Duncan that if the publication of the Al-Hussam

24   had not previously been disclosed, she would have expected that

25   to be on the Form 990 in 1997.

1          The court gave an instruction that none of the

2   defendants objected to, and that instruction again squarely

3   framed it for the jury, this is something you actually have to

4   consider.  What do these forms mean?  What do these questions

5   mean?  There's no issue that these questions underlay the case.

6          The verdicts hung in the balance, depending on what

7   the jury decided; and the court went further to say, if you

8   think that the defendant's view, whatever they may be arguing

9   to you, or whatever they have argued to you is plausible, and

10  under their view, a statement would not be false, you have to

11  acquit; and as I argued yesterday and as I would say now in

12  closing, against that backdrop, there's no basis for the court

13  to now come in, and, in essence, say, you know, I should have

14  decided the meaning of these forms as a matter of law, rather

15  than as something for the jury to decide.  There's no basis for

16  you to do it, and none of the defendants have cited any cases

17  that would support, first, generally the proposition that this

18  would be something for the court to decide as a matter of law

19  prior to the trial; but that second, after the -- after the

20  jury has spoken and based on instructions that were not

21  objected to, that you should now come in and usurp their

22  finding.

23          THE COURT:  Okay.

24          MR. McGINTY:  Your Honor, if I might respond to that.

25          THE COURT:  Yes.

1          MR. McGINTY:  The government says that you have no

2     role to play here, and looking at that last line of the

3     instruction, quote, If the defendant's response was truthful as

4     to one reasonable interpretation of the question or

5     instruction, you may not conclude that he provided a false

6     response.  Not only is the government's interpretation contrary

7     to the language and itself not a not a reasonable

8     interpretation, but if, as a matter of law, there's a

9     reasonable interpretation that supports the reading of that as

10    an obligation for a filing with respect to that tax year's

11    conduct, then there must be a ruling by the court as a matter

12    of law that the government has not established that aspect of

13    its proof.

14          THE COURT:  I'm sorry.  Run that by me again.  I lost

15    the thread of that.

16          MR. McGINTY:  That if, as a matter of law, if there's

17    a reasonable interpretation that supports the interpretation

18    and the obligation in the present tense, then the court must

19    find that the jury should have so found, and there's no

20    evidence then that the defendant had provided a false response

21    to the question.  So, there is a role of the judge, of you, in

22    making a legal determination contrary to Mr. Cabell's argument

23    here.

24          With respect to Ms. Siegmann's argument --

25          THE COURT:  Just before we leave that point, are you

1    arguing in a sense it's like perjury if the question is

2    sufficiently vague, you can't -- as a matter of due process,

3    you can't be prosecuted for it?

4         MR. McGINTY:  Well, if the -- if there is -- if there

5    is a reading of the statute as a matter of law, a reading of

6    the question as a matter of law, which a defendant could rely

7    on, then the court, as a matter of law, has to so find.  What

8    the court did is gave -- didn't say to the jury, you've got to

9    decide what's reasonable, and that's that.  You say if you find

10   that there is a response that's based upon a reasonable

11   interpretation of the question or instruction, you may not

12   conclude that you provided a false statement.

13        So, if you find, your Honor, that there is a

14   reasonable interpretation that the reading here that this is in

15   the present tense a responsibility with respect to that tax

16   year, that that is a reasonable interpretation of the question,

17   then you must find that the government has not proven either

18   its interpretation, or the defendant made a false statement, as

19   a matter of law.

20        Well, why is that -- why is that not judicial

21   fact-finding, which I can't do in this context?

22        MR. McGINTY:  Well, your Honor, it's not, because the

23   determination of whether there's a reasonable interpretation

24   under the court's instruction is the court's domain.  You're

25   not throwing this up to grabs for the jury.  You're saying,

1    ladies and gentlemen of the jury, understand that if there's an

2    interpretation here of this question, which is reasonable, then

3    you cannot find, and I think it's the court's responsibility,

4    under those circumstances, that there is a reasonable

5    interpretation to find that the government hasn't proven their

6    interpretation.

7              THE COURT:  Mr. Cabell.

8              MR. CABELL:  Very brief.  First, your Honor, I think

9    you qualified the instruction by saying an objectively

10   reasonable interpretation, not just any reasonable, not

11   subjectively reasonable; but, secondly, the court's last

12   question, I think, echoes the concern of the government, which

13   is really this is nothing more than a rephrasing of the

14   suggestion that you should have decided this as a question of

15   law, rather than leaving it for the jury to decide, and my

16   guess is if there was -- if you had allowed them, as you did,

17   to consider this, and they decided it against the government,

18   and we were before the court on the part of the government

19   arguing, you should have decided as a matter of law, that there

20   was only one interpretation, and it was the government's

21   interpretation, the defendants would rightly be saying foul

22   ball.  You had your chance to make this argument.  This was

23   something for the jury to decide, and the jury's verdict should

24   stand.

25             THE COURT:  Mr. Andrews.

1          MR. ANDREWS:  Thank you, your Honor.

2          Simply, I think Mr. Cabell kind of drifted back, and

3     he dodged some of the things I had said yesterday, but as far

4     as the website goes, just if that's the new activity, I'd just

5     remind the court that the instructions say, Attach a statement

6     explaining significant changes in the kind of activities the

7     organization conducts.  So, what he's saying is this website

8     had a zakat guide.  Well, that's nothing new.  They've been

9     publishing a zakat guide for -- since 1993.

10         They did archive -- not all the Al-Hussams, but

11    certain ones were under Mr. -- under the religious page.  There

12    was no evidence whatsoever that any money was ever collected

13    through the website, donated through the website.  There was no

14    evidence that there were any sales made through the website.

15         And, lastly, just because it doesn't have to do with

16    the website, but they keep talking about that books were sold

17    up until 2003.  There's no evidence whatsoever that

18    Mr. Mubayyid ever sold any books.  There were some books found

19    in the search in 2001.  The same books were found in 2003 at

20    Mr. Mubayyid's house.  Despite extensive wiretapping of his

21    residence and workplace for years, there's never any indication

22    Mr. Mubayyid was ever involved in selling books.  These were

23    just remainders that had been hanging around for years and

24    years, so -- but the website didn't do anything new.

25         It was an inexpensive website.  It didn't collect

1    money.  It republished the zakat guide, the same one that was

2    always published.  It had -- it had pictures about the orphans,

3    which it's raising money for, which is what they had always

4    done.  There was nothing new and significant, any more than if

5    a charity operated behind on a store front, and they put in a

6    bay window, and everything they've done behind the -- inside

7    the store, all of a sudden they had a bay window, so people

8    walking by could see the pictures there, and see, you know, a

9    copy of the zakat guide there.  There was nothing new in the

10   kinds of activities they engaged in, and certainly the question

11   doesn't fairly put them on notice.

12        And I echo Mr. McGinty, your Honor, if you find that

13   there's a reasonable explanation -- this is why we're here for

14   the Rule 29 -- that there is a reasonable interpretation you

15   could take in reading the question and the instruction, then

16   it's incumbent upon the court to say he can't be convicted for

17   falsely answering it, because I find that an objective person

18   could read these instructions in this manner.

19        MR. McGINTY:  And, your Honor, just to add one more

20   thing, the clarity issue with respect to this instruction

21   implicates concerns about due process, whether there was

22   sufficient definiteness -- definiteness in the question, and

23   certainly here, where the government's -- where the dispute

24   between the parties is whether the language is of such

25   imprecision that it's unclear -- if I understand the

1    government's argument, it's unclear whether the obligation is

2    a -- for a single tax year or is in perpetuity.  Certainly,

3    there's a due process concern about using that language as a

4    predicate for the continuation of the conspiracy.

5          THE COURT:  All right.  I'd like to go back to

6    something on Count One.

7          Mr. Chakravarty, is that your bailiwick?

8          MR. CHAKRAVARTY:  It is, your Honor.

9          THE COURT:  I'm sure I'm not going to frame this issue

10   properly, but let me give it a try.

11         As charged, it's a false statements scheme under

12   (a)(1), a scheme to conceal material facts from the IRS, the

13   FBI, and Immigration.  I'm using Immigration as shorthand for

14   all the different iterations of this.

15         And the material facts that are said to be concealed

16   are that Care was the outgrowth and successor to Al-Kifah, and

17   that it engaged in non-charitable activities involving the

18   solicitation and expenditure of funds to promote and support

19   mujahideen and jihad.

20         One way to interpret that is that outgrowth and

21   successor is a narrow, technical question that is only of

22   concern to the IRS, the outgrowth and successor piece.  And to

23   whether Care was engaging in charitable or non-charitable

24   activities is a question under the tax code, whether you're

25   entitled to 501(c)(3) or other exempt status; or put another

1    way, this information is material only to the IRS.

2            That raises the question:  Well, why would it

3    be -- why are statements to the FBI or the INS material?  Why

4    is that -- or omissions, rather, concealment to the FBI or INS

5    material?

6            One way to approach it is, as I think was suggested

7    yesterday, is that the FBI is a conduit of sorts to the IRS,

8    because of the task force or otherwise, and the other is that

9    the information is independently of interest to the FBI; or,

10   you know, to put it simply, what difference does it make to the

11   FBI whether Care is the outgrowth or successor to Al-Kifah?

12   Why does the FBI care?  Why is it a material concealment?  Why

13   is there a duty to disclose the information to the FBI?  And

14   why is the failure to do so a material concealment?

15           MR. CHAKRAVARTY:  Squarely on that point, I think,

16   Agent Peet told us, told the jury, at the time he's talking to

17   Mr. Muntasser in 2003, he's investigating Care.  He asks him

18   specifically about Al-Kifah, allowing the jury to infer that he

19   had an interest in the connection between Al-Kifah and Care.

20           Remember, the jury has also heard that there has been

21   negative press reporting associating Al-Kifah with these

22   violent acts, which is sufficient anyway for the jury to infer

23   that Agent Dav -- Agent Peet and Agent Davis, for purposes of

24   Al-Monla, had an independent FBI investigative interest.

25           In addition to the fact that this was happening, these

1    interviews both occurred on the same day as Agent Lazarus, who

2    was a co-case agent at the IRS, was conducting a criminal

3    search warrant execution with several agents from a variety of

4    agencies on the Care storage locker that allows the jury to

5    infer both propositions that you just offered, that not only is

6    this material through -- to the IRS as a conduit -- the FBI

7    agent as a conduit, but also to the FBI, who both Agent Davis

8    as well as Agent Peet testified that the reason why he was

9    talking -- that they were talking to these -- the defendants

10   was because they were furthering this investigation.

11         The suggestion would then go why would they care?  The

12   jury doesn't need to know all of the scope of the investigation

13   to know that they were conducting an investigation, that the

14   questions that they would ask, the follow-up questions, what

15   other process they might issue, all of the commonsensical tools

16   at an FBI agent's disposal that they would be willing to

17   execute all those.  In fact, specifically, I think Peet was

18   asked, Where did Care come from?  Where did the

19   relationship -- what was the relationship between Care and

20   Al-Kifah?  What does Care support?  What is the position of

21   Care?  I'm sorry.  These are questions that Peet asked

22   to -- to -- and I'm citing to page -- day 3, pages 151 to 154.

23   Those are specifically the type of questions, which, as your

24   Honor suggests, if you read what is the object of the scheme to

25   be just the information, which is the suggestion of the

1    question and the non-charitable activities, for shorthand, then

2    that information is equally material to an FBI agent, who's

3    investigating, the jury can infer, the relationship with

4    Al-Kifah, which has been associated with something, which is

5    obviously violent, which with the replete testimony of both the

6    Al-Hussams and other activities, which Al-Kifah was engaging

7    in, which Care was also engaging in, which appear to be

8    supporting the mujahideen.  Those are reasonable inferences,

9    which a jury, I think, would be compelled to make when they're

10   wondering why they're sitting in the box, you know, assessing

11   this case; that they're attuned to the fact that the FBI was

12   doing its job in 2003, and this wasn't just about taxes;

13   otherwise, why would an FBI agent be involved at all.

14          Excuse me one moment.

15          Ms. Siegmann reminds me that it didn't start in that

16   2003 execution of the search warrant on April 7th.  Even David

17   Habich had testified that as early as 2001, during a covert

18   search, even then that there was -- a principal object was to

19   develop intelligence, your Honor.  It wasn't at the time to

20   develop the tax charges, suggesting that the FBI had an

21   independent, legitimate investigative interest in determining

22   what Care was doing, who the beneficiaries were, what its

23   history had been.  These are exactly the types of information,

24   which are implicated by the two precise objects of the scheme

25   to conceal, the successor relationship to Al-Kifah and the

1    non-charitable activity.

2            THE COURT:  What about the fact that the -- the

3    scheme -- the charity/noncharity piece of it, it's charged as a

4    scheme to conceal, but as the defendants argue, the -- Care is

5    proclaiming its non-charitable activities to the world, so to

6    speak, distributing Al-Hussams, putting them up on web sites,

7    and so forth.  A concealment from the IRS has a tax component

8    to it, but how were they concealing things from the FBI, or is

9    that not relevant, because all that matters is the scope of the

10   scheme.

11           I mean, one of the things I'm struggling with, again,

12   is it's cast as a concealment case, not as a false statement

13   case.  I went back last night and reread, I think, it's

14   55 pages of the government's brief on this subject; and, you

15   know, you say, well, it's a crime because it's making a false

16   statement to the FBI agent.  Of course, it is, but it's not

17   charged as a false statement.  It's charged as a concealment,

18   and, conceptually, I'm wrestling with this.

19           Of course, if the FBI agent says, are you doing "X,"

20   and he says, No, and it's false, he can be charged under (a)

21   (2), and it wasn't done that way.  It was done as (a)(1), and

22   I'm trying to figure out what that means.

23           MR. CHAKRAVARTY:  I am not going to revisit that,

24   obviously.  I wanted to clarify, your Honor, and I did hand up

25   today just some of the cases that I cited, because I also do

1    not expect to derail myself and -- and verbally joust with you

2    with regard to that issue.  Perhaps, it did not -- well, the

3    cases that I cited, I think I was talking about St. Michael's

4    Credit Union, when I described it as Anzalone in the sense of

5    telling the credit union boss, so I apologize for that; but in

6    going back, it was important, especially in light of how we

7    left that issue and how I would leave it now is that St.

8    Michael's was talking about the court's instruction being

9    insufficient to distinguish an act of concealment; whereas,

10   this court went above and beyond in specifically tracking the

11   language of St. Michael's in instructing the jury that they had

12   to find an act of concealment.

13          Saying all that, your Honor, the idea that Care was

14   open about its activities to the people it wanted it to be open

15   to, the coconspirators, the Hassouns and Jayyousis of the

16   world, who people engaged in criminal types of activities with

17   Mr. Chehade, some of its donors, does not, I think, highlight

18   the fact that none of those activities were ever disclosed to

19   any of the agencies.

20          Even some of the donors -- I think there was testimony

21   from -- from Mr. Squires, who testified that he was surprised,

22   because this is not what he thought that Care was all about.

23   In fact, he thought it was still Al-Kifah at that time, but he

24   didn't think that that's what it was all about, and that's why

25   he ultimately withdrew.  He withdrew donating.

1          The selective publications or the selective

2     distribution and exposure of their non-charitable purposes, of

3     the association with Al-Kifah, which I suggest to you just

4     publishing the Al-Hussam, the identical Al-Hussam that Al-Kifah

5     used to publish is no -- is much more than a wink and a nod to

6     the people, who are donating to Al-Kifah that we are the same

7     organization; and by publishing it to the same mailing list

8     that Al-Kifah was publishing it to suggests that this

9     was -- this obviously substantial activity, but it was an

10    activity which -- it's not a problem to let our friends know,

11    for lack of a better phrase, but let's not let the enemy know,

12    or as I think Mr. Muntasser on one of the calls describes that,

13    let the dogs knows, and that's the government; and these dogs,

14    so to speak, didn't learn all of that, what the full nature of

15    those activities or the broader scope of the Al-Kifah

16    connection and the non-charitable activities until they

17    actually obtained some of these records; and later when they

18    conducted interviews of the defendants, and they continued to

19    obfuscate and cover up that ongoing scheme that they had

20    to -- to not to disclose the -- the Al-Kifah connection and the

21    non-charitable activities.

22          THE COURT:  All right.  What -- and how is it material

23    to Immigration?  What does Immigration care, for example, about

24    outgrowth and succession?

25          MR. CHAKRAVARTY:  Outgrowth and succession of Care is

1   all a subset of what Care was and what Al-Kifah was; and what

2   was material, and the jury was permitted to infer what was

3   material to Immigration is what they asked for on their form,

4   and what they asked for is list your affiliations, list the

5   organizations that you belong to.

6           A jury is permitted to infer, just as it is in terms

7   of the tax law context, the jury is permitted to infer that

8   they're only asking questions that they want or they need

9   answers to, because it's going to impact how they do their job.

10  Whether it means asking follow-up questions at the interview or

11  in a subsequent letter, whether it means asking for a

12  supplement of information as, in fact, Mr. Muntasser did

13  unilaterally.

14          Of course, we allege he did it partially motivated by

15  the fact that he had just previously lied to Agent Peet about

16  those activities; but Mr. Muntasser, in filing his application

17  for citizenship, neglected to mention any mention of either

18  Al-Kifah and -- and ipso facto, the relationship between

19  Al-Kifah and Care or any reference to Care, which prevented the

20  IRS -- excuse me -- the INS from being able to ask what types

21  of organizations are these.

22          In fact, your Honor, by the time Mr. Muntasser was

23  interviewed on his citizenship -- and this is, of course, not

24  in the record, but it's not -- it wasn't before the jury, but

25  Al-Kifah had already been designated as a special designated

1    foreign terrorist organization suggesting that what that

2    organization was and the activities that that organization that

3    I am concealing from the INS is material.  That's the core of

4    what their job was.

5            And, your Honor, I think, had mentioned before, and

6    I -- that's why you're asking the question now, the agencies

7    themselves are also charged in the conduct, but they can be

8    proven in the disjunctive.  Clearly, all of the defendants are

9    not -- do not have to prove -- have defrauded the INS.  In

10   fact, there's no evidence that Mr. Al-Monla or Mr. Mubayyid had

11   any relationship with the INS at that point.  So -- but it

12   furthers the evidence of intending to defraud INS is probative

13   evidence for a jury and your Honor to be able to adduce what

14   his intent was, what his perceived duties were, when a few

15   months before and a few months later he's talking to agents of

16   the FBI about it.

17           THE COURT:  Okay.  All right.  Ms. Sullivan, do you

18   wish to respond?

19           MS. SULLIVAN:  Thank you, your Honor, and good

20   afternoon.

21           The answer to your Honor's question how is it material

22   to the FBI or the INS whether Care was an outgrowth or a

23   successor to Al-Kifah, a tax question under the Internal

24   Revenue Code, or whether Care was involved in non-charitable

25   activities through its solicitation, a tax-related question

1    under the Internal Revenue Code is zero.  Absolutely none

2    whatsoever.

3            There is no materiality under any form, statute, or

4    regulation pertaining to the FBI's mission or any form,

5    statute, or regulation pertaining to the INS mission that makes

6    those tax-related questions in the least bit material to the

7    mission of either of those agencies; but even if it were

8    material to those agencies, your Honor, it doesn't matter,

9    because for two reasons, your Honor, as we discussed yesterday,

10   your Honor charged the jury specifically that materiality

11   pertained to the IRS.  That's what we discussed yesterday from

12   day 24, page 167.  Your Honor charged, using the government's

13   own requested instruction that materiality is charged --

14           THE COURT:  Is this -- is this in your appendix, which

15   I -- which I managed to bring with me today?

16           MS. SULLIVAN:  Yes, your Honor.  The government's

17   request is at Exhibit G.

18           THE COURT:  "B" as in boy?

19           MS. SULLIVAN:  "G" as in George -- "G" as in Gordon.

20           THE COURT:  Okay.

21           MS. SULLIVAN:  The government's method of

22   request -- it's requested instruction or proposed instruction

23   No. 11.

24           The government requested a materiality instruction,

25   and this would be page 18 of the government's proposed

1    instructions.

2         THE COURT:  All right.

3         MS. SULLIVAN:  In their Exhibit G, your Honor, and as

4    you see, it's entirely Internal Revenue Code related.  The

5    government would need to find is that had the IRS, the Internal

6    Revenue Service, known that Care was a successor or outgrowth

7    or that Care was planning to solicit money, then the IRS would

8    have subjected the IRC 501(c)(3) application to closer

9    scrutiny.

10         And then, your Honor, on -- in your charge, also in

11    our appendix, your Honor, or in the transcript, on day 24,

12    page 167, it's in our appendix, your Honor, at Exhibit P, and

13    if you turn in Exhibit P to the excerpt at the bottom of the

14    page labeled page 167.  "P" as in Paul.

15         THE COURT:  Yes.  All right.

16         MS. SULLIVAN:  If you look, your Honor, at

17    line -- beginning at line 13, here the government alleges that

18    the concealed facts -- this is your charge to the jury.  Here

19    the government alleges that the concealed facts would have had

20    a natural tendency to influence or be capable of influencing

21    the Internal Revenue Service, the IRS, in making its

22    determination whether Care International qualified for

23    tax-exempt status under Section 501(c)(3) of the Internal

24    Revenue Code and should continue to be afforded that status

25    thereafter.

1          As we suggested to your Honor yesterday, settled law,

2    as I cited to your Honor in the D'Amico case, from the First

3    Circuit, as the most recent example, it says that when the

4    instructions to the jury has narrowed the charge, Rule 29

5    sufficiency must be judged in light of the instruction.  So, we

6    regard that instruction as -- we think there's no materiality

7    whatsoever to the FBI and the INS, as your Honor's question

8    suggested, but it doesn't matter if it were, because the

9    instruction was limited to material to the IRS.

10          Now, your Honor, there's a second reason why even if

11   it were material to the FBI and the INS there would be

12   insufficient evidence on Count 1, and that is because the

13   government proved no duty to disclose to the FBI or the INS.

14   This is your hypothetical from yesterday, your Honor.  If you

15   walk into the Department of Motor Vehicles or the public

16   library, neither of whom has any tax jurisdiction, you don't

17   have to treat them as a confessional in which to reveal past

18   tax-related information.  So, there's no duty to disclose.

19   There's no concealment of a fact as to which one had a duty to

20   disclose.  So, there's no act, and there's no intent to conceal

21   information one had a duty to disclose.  So, even if

22   you -- even if somehow Mr. Chakravarty's attempt to answer your

23   questions were to lead you to think there was materiality to

24   the FBI and INS, assuming that we can't see making any sense

25   whatsoever, but even if you thought so, we'd still be missing

1    the other elements.  We would be missing concealment, duty, and

2    intent.

3            And, finally, your Honor, there were no false

4    statements.  They keep referring to this idea that somehow

5    Mr. Muntasser in his 2003 interview with Mr. Peet concealed,

6    but Mr. Muntasser was very forthcoming with Agent Peet in his

7    interview in 2003.  He talked about having been a volunteer

8    with Al-Kifah.  He talked about some of Al-Kifah's activities.

9    He talked very much about -- he said -- he disclosed his

10   relationship with Care and Al-Kifah.  So, the notion that he

11   did anything in that interview to conceal is insufficient on

12   the facts.

13           So, at any one of those steps, your Honor, Count One

14   has to be dismissed against Mr. Muntasser.  It doesn't -- it

15   wasn't material to the FBI and the INS, because there was no

16   duty to disclose to those agencies.  It doesn't matter, because

17   your instruction narrowed the case to the IRS.  Even if it were

18   relevant to the INS or the FBI, it would not matter unless

19   there was a -- a duty to disclose to them.  Even if it was

20   material to them, there still has to be a duty to disclose, a

21   concealment of the fact that you had an obligation to disclose,

22   and intent to conceal, and there were none of those.

23           And, finally, there was no concealment on these facts.

24   So, your Honor, as narrowed, Count One cannot be sustained.

25           THE COURT:  And remind me from yesterday, your

1    argument is as to the FBI being a conduit -- they're on a task

2    force -- the government says, ah, that -- that -- that the

3    defendant doesn't need to know whether the statement is

4    material, because, in fact, here supposedly, the FBI and IRS

5    are working in concert with one another.  Your response, I

6    think -- well, make it again.  I don't wasn't to characterize

7    it.

8              MS. SULLIVAN:  Well, your Honor -- several answers,

9    your Honor.  First, as you noted at trial, Agent Peet did not

10   disclose to Mr. Muntasser in that interview that he was on a

11   joint task force with the Internal Revenue Service.  It might

12   have been a different case if he said, Hello, I'm Agent Peet

13   from the FBI.  You might think I'm interested in Care, because

14   the FBI looks at security matters, and we're interested in

15   material support issues, but I also work for the IRS; so, I'm

16   here in my second capacity to worry about question 76 on the

17   Form 990, filed in 1996, and the answer -- you see where I'm

18   going --

19             THE COURT:  Right.  But -- but -- but --

20             MS. SULLIVAN:  -- petty, petty disclosure but

21   different.

22             THE COURT:  In a garden variety (a)(2) case, a false

23   statement case, the person making the false statement to

24   federal law enforcement doesn't need to know that it's

25   material.  He doesn't need to know why the question's being

1    asked at all.  He can't -- simply can't give a false answer.

2    You know, were you in Senegal in 1976; and you say, No.  You

3    don't get to say why does that matter in your investigation?

4    If you have given a false response, and it's deemed to be

5    material, you're stuck with it, right?  So why is this any

6    different?

7         MS. SULLIVAN:  That's -- your Honor, that's the second

8    answer.  This is not an (a)(2) case.  This is not an (a)(2)

9    case.  The government didn't charge it as an (a)(2) case.  The

10   government can't rescue it as an (a)(2) case, a surrogate

11   (a)(2) case; that's St. Michael's that we discussed yesterday.

12   And under (a)(1), your Honor, the most central, crucial, single

13   fact about this entire charge in Count One is that Anzalone

14   requires a preexisting duty to disclose.  It makes it quite

15   different from an (a)(2) case where you can imply materiality.

16   You cannot imply the need to disclose.  The government must

17   have established one through a form, statute, or regulation;

18   and the government -- today, Mr. Chakravarty's extensive

19   colloquy with you, I still didn't hear a reference to a single

20   form, a single statute, or a single regulation under which the

21   FBI or the INS has provided a duty to disclose tax-related

22   information to their agents.

23        THE COURT:  Okay.

24        MS. SULLIVAN:  Thank you, your Honor.

25        THE COURT:  Mr. Chakravarty, any response?

1      MR. CHAKRAVARTY:  Just briefly.  I know we have quite

2  a few things on the list.  Number one, the -- you mentioned

3  yesterday briefly we had -- the government had asked for a

4  materiality instruction, which included all of the -- all of

5  these agencies.  I point to our -- I'm sorry -- in the

6  trickness -- the trick, scheme, or device element.  I'd point

7  now to our December 11, 2001 -- '7 proposed instructions.  We

8  did ask for all of that.  The idea that we somehow changed our

9  theory of the case is erroneous.  I think I had confessed that

10  it was a scrivener's error; and in the final -- in the final

11  one that went to -- that you used to consider before you

12  crafted the instruction on materiality, that it only included

13  the -- excuse me -- included IRS as an example of how a

14  statement can be material.

15      So -- but in terms of how the defendants were alleged

16  to have executed their trick, scheme, or plan, the government's

17  position has always been, and even without any scrivener's

18  errors, has always represented that any acts to any of these

19  different agencies were within the scope of the scheme,

20  constitute affirmative acts of concealment in furtherance of

21  that scheme, which is in this case.

22      THE COURT:  Well, in my defense, there may be a door

23  for mitigation.  I mean, I, you know, have my hands full as it

24  is, without having to detect scrivener's errors on either side

25  when one side asks for an instruction.

1          MR. CHAKRAVARTY:  Just -- we didn't confess before,

2    your Honor.  I'm certainly not casting blame on the court.

3    It's just trying to recreate what happened in the notion that

4    we never forfeited that claim; that this was always a -- a

5    contiguous scheme involving all three of these agencies.

6    That's the only reason I offer that.

7          With regards to the materiality question, and we've

8    talked in general.  With regard to the duty to disclose, the

9    disclose question, even construing that there has to be some

10   express statutory authority or rule or question posed under the

11   scheme, your Honor, because this is a continuing offense, that

12   duty arises from Mr. Muntasser's own awareness of what was

13   required by the IRS as he evidenced in his Articles of

14   Incorporation and the Form 1023, the Form 990, and so on and so

15   forth.  That was never extinguished.

16         The allegation was that the scheme was continuing at

17   the time that -- of the 2003 interview and any affirmative

18   acts, which he took to even conceal, not just -- not to conceal

19   the information that was the subject of the original scheme,

20   but also to conceal the fact that he was engaged in the scheme,

21   your Honor, should be considered or considerable by the jury to

22   determine whether, in fact, that was an affirmative gesture

23   expressly to avoid detection by the government by one of the

24   listed agencies of the fact that he was going to conceal these

25   two objects, that's eliciting the tax frame.

1          And as we argued before -- I'm not going to belabor

2     it, but we also think that there's an independent duty under

3     1001, aside from the 1001(a)(2) charging a rationale, but the

4     bottom line is when you talk to somebody as the government,

5     that you have to tell the truth.

6          THE COURT:  All right.  All right.  In light of the

7     time, why don't we -- unless there's anything further, why

8     don't we go to the Rule 33 motions, which have multiple parts.

9     I'll let counsel do your own triage in terms of emphasizing

10    what it is you want me to focus on.

11         Ms. Sullivan, are you going to take the lead again?

12         MS. SULLIVAN:  Yes, your Honor.  Thank you very much.

13         Just to begin where we left off, your Honor, what I'd

14    like to focus on is the aiding and abetting instruction with

15    respect to Count Two, which your Honor issued in response to

16    two juror notes that came at the very end of jury deliberations

17    and shortly before the verdict, and then the spillover effects

18    on Count One and Count Six of the decision that we think you

19    have to make to order a new trial on Count Two.  That's what

20    I'll focus on.  I'll address willful blindness and Rule 403

21    very briefly at the end.

22         But, your Honor, let me try to explain why we believe

23    the aiding and abetting instruction was both incorrect as a

24    legal matter and requires a new trial -- it was prejudicial and

25    requires a new trial, and it really does allow us to begin

1    where we left off just now.

2          Count Two is -- if you remember, the government

3    charged this case and opened this case and prosecuted this case

4    as a tax case, as a tax-related offense.  The only time they

5    scrambled and started talking about the INS and the FBI was

6    after your Honor dismissed Count Eight and during the colloquy

7    in connection with the dismissal of Count Eight; and so, your

8    Honor, absolutely, it was understandable that you issued their

9    charge on materiality to the IRS, because the entire case had

10   been handled as an IRS case until they realized that there was

11   a problem.

12         Now, when you dismissed Count Eight, let's recall what

13   the problem as you saw it.  Remember, Count Eight --

14         THE COURT:  Just a moment.

15         All right.  Just to let you know, my jury has reached

16   a verdict, and I'm going to have Mr. Castles locate counsel, so

17   probably in about 10 minutes or so, I'll take the verdict, and

18   we'll take a short break, but why don't you keep going.

19         MS. SULLIVAN:  Would you like me to continue?

20         THE COURT:  Yes, please.

21         MS. SULLIVAN:  Okay.  Thank you, your Honor.

22         When you dismissed Count Eight, you said -- this is on

23   Day 21, page 69 -- you said that it's simply too much of a

24   stretch for the jury to find that a false statement made to an

25   FBI agent or to Immigration services long after the fact and

1    concerning only the same generalized subject matters constitute

2    the act of obstructing or interfering with the administration

3    of the Internal Revenue Laws, as would have been required for

4    Count Eight.

5           Now, Count Two is materially identical to Count Eight

6    with respect to tax-related purpose.  Count Two charges -- and

7    here I quote from the superseding indictment at page

8    10 -- Count Two charges that defendants herein did agree to

9    defraud the United States for the purpose of impeding,

10   impairing, interfering, obstructing, and defeating the lawful

11   functions of the Internal Revenue Service, IRS, of the Treasury

12   Department.

13          So, in Count Eight, you dismiss, saying FBI and INS

14   interviews can't be a basis for finding purpose to obstruct or

15   interfere with the administration of the Internal Revenue Laws,

16   and Count Two requires, as charged, the same finding.

17          So, our position is that once you dismissed

18   Count Eight correctly, as insufficiently based on FBI and INS

19   interviews within the statute of limitations period, it really

20   also becomes impossible to show that Mr. Muntasser could have

21   aided and abetted a tax conspiracy under Count Two.

22          Just to recall, Count Two is a tax conspiracy count.

23   It's a crime conspiracy count.  It requires specific

24   tax-related purpose, or as your Honor called it yesterday, a

25   tax angle.  Under Goldberg, Judge Boudin's decision for the

1    court, and Chief Judge Boudin's decision for the First Circuit

2    in Goldberg, there has to be a tax-related purpose to prove a

3    client conspiracy.

4         Now, our -- in answer to the jury's question, well,

5    what if a defendant withdraws from the conspiracy, so they're

6    no longer under the conspiracy count, could they still aid and

7    abet the conspiracy?

8         Now, if an individual is going to aid and abet a

9    conspiracy, they would have to have had the purpose to aid and

10   abet, specific intent, and the purpose to aid and bet, a

11   Goldberg conspiracy, meaning specific tax-related purpose; so,

12   again, it's a double specific intent charge.  And as to any

13   individual to show specific tax-related purpose, in the statute

14   of limitations period, there would have to be an act of aiding

15   and abetting in the statute of limitations period with the

16   purpose of aiding and abetting within the statute of

17   limitations period.

18        Now, Mr. Muntasser is gone from Care in 1996.  The

19   statutory period begins, if we accept the six-year statute -- I

20   know one of my colleagues will contest it, but if we accept the

21   six-year statute, that begins in 1999.  Mr. Muntasser does

22   nothing, as your Honor observed.  The whole universe of

23   Mr. Muntasser's activities from '99 forward relate not to the

24   IRS, but only to the FBI and the INS.

25        He countered that tax-related purpose for purposes of

1    Count Two, with respect to the FBI and the INS if he didn't

2    have a tax-related purpose with respect to Count Eight with

3    respect to the FBI and the INS.  The dismissal of Count Eight,

4    as a matter of law, requires the dismissal of the -- of

5    Count Two on the possibility that the jury convicted for aiding

6    and abetting.

7            Now --

8            THE COURT:  It requires a new trial on Count Two.

9            MS. SULLIVAN:  I'm so sorry.  It requires a new trial,

10    exactly, your Honor.

11            Now, I just want to highlight how identical the

12    Count Two problem is on an aiding and abetting theory to the

13    Count Eight problem where your Honor correctly dismissed; and

14    the government's brief, on this point, it's really, as

15    Yogi Berra once put it, it's deja vu all over again.  On the

16    Count Eight colloquy, and I'll just refresh -- returning to

17    December 13th, this is when the colloquy over Count Eight takes

18    place.

19            On December 13th, page 31, beginning at line 12, your

20    Honor says, "I'm having a great deal of difficulty seeing how

21    any false statements made to the FBI can be attributed to

22    Muntasser and Al-Monla as statements or acts impairing the due

23    administration of the Internal Revenue Code.  Certainly from

24    the defendant's perspective, there's no IRS connection at all

25    at that point in the interview, as near as I can tell."

1          On page 35, Mr. Chakravarty tries to redeem that

2     problem, and he says, I agree, your Honor.  I suggest that the

3     ten years of other activities that the defendants specifically

4     were engaging in, statements they made both to the FBI, as well

5     as to the INS -- IRS on the 990s, as well as on the 1023 form

6     are evidence of what their scienter, what their knowledge was

7     about what the effect of a statement that they were going to

8     make to an FBI agent or to a task force agent or anybody else

9     in 2003 about a subject matter, which they were explicitly on

10     notice as germane to the administration of the tax laws.

11          Now, that's almost in exact wording what

12     Mr. Chakravarty just said again.  He said, somehow you can talk

13     to the FBI, and you could have had some other kind of carryover

14     duty from the 1023, 13 years before, but here's what your Honor

15     said in response to that attempted argument on that day.

16          Your Honor concluded, at page 69 of December 13th, "I

17     think it's simply too much of a stretch for the jury to find

18     that a false statement made to an FBI agent or to Immigration

19     services long after the fact and concerning only the same

20     generalized subject matters constitutes the act of obstructing

21     or interfering with the administration of the Internal Revenue

22     Laws."  That was absolutely correct.  But having made that

23     decision and rejecting the government's argument on Count

24     Eight, the government made the exact same argument in its brief

25     for today, you have to reject it again for aiding and abetting,

1    because aiding and abetting requires specific intent to aid and

2    abet the tax conspiracy under Count Two.

3          THE COURT:  Okay.  Let me just -- I don't mean to cut

4    you off, but just in light of the time, let me hear the

5    government's response.

6          MR. CABELL:  Thank you, your Honor.

7          (The court conferred with the clerk.)

8          THE COURT:  Okay.  Mr. Cabell.

9          MR. CABELL:  Your Honor, we think that there are a

10   number of problems with this argument that the defendants would

11   have to overcome before you could even get to some

12   consideration of the relationship, if any, or the similarities

13   or dissimilarities between Counts Two and Count Eight.

14         And the first thing I would note is if this issue were

15   before the First Circuit, it would be reviewed for plain error,

16   at best, if they didn't deem it waived, because this is an

17   argument that the defendants failed to raise below; and we

18   would contend, of course, that the instruction that the court

19   gave was entirely appropriate, because it responded to a clear

20   and discrete and unambiguous question to the jury, and it was

21   legally correct as a statement of the law.

22         Just briefly, to set the stage on this, your Honor,

23   this is not an issue that was self-evident.  It's not anything

24   that any of the defendants recognized below at any of the

25   crucial stages.

1          Following the Rule 29 hearing that we're talking

2     about, there was no objection to the court's vanilla aiding and

3     abetting instruction that the court said it was going to give.

4     That instruction applied to all three defendants, and it

5     related to both Count One and Count Two.

6          There was no objection on the part of the defendants

7     to the withdrawal instruction that the court indicated it would

8     give.  The government objected, but none of the defendants did.

9          THE COURT:  Okay.  Let me -- I'm sorry to interrupt

10    you.  Counsel and the defendant on the other case are here, so

11    why don't we make room for the jury.  I think probably the

12    marshals are going to want to have the defendants -- can we

13    keep them on this floor?  Can we do that?

14         MARSHAL:  Yes.

15         THE COURT:  Let's not take them all the way down in

16    the elevator, and I'll stand in recess for about 10 minutes.

17    And you can leave your things on the table, but just clear the

18    people away from the table.

19         (Recess from 3:00 p.m., until 3:25 p.m.)

20         THE CLERK:  All rise.

21         Court is now open.  You may be seated.

22         THE COURT:  All right.  Mr. Cabell.

23         MR. CABELL:  Thank you, your Honor.

24         Your Honor, before I continue, let me clarify one

25    thing, please.  I had indicated that -- that none of the

1    defendants objected to the court's aiding and abetting

2    instruction, and I want to be clear what I mean by that is at

3    least as it relates to Count Two, the conspiracy count, it is

4    my read of the record that none of the defendants objected.  I

5    think there was some discussion about whether it should be

6    applied to Count One; and even if I am corrected, even if

7    somebody points out that there was an objection along the way

8    to it being given as to Count Two, it was not on this ground.

9        And I understand I'm being referred to page 26, a

10   suggestion that it was being objected to, but, again, I would

11   submit not on the ground that it's being advanced to the court

12   now.

13       As I'd argued before, there was no objection to the

14   court giving a generic withdrawal instruction, not just to

15   Mr. Muntasser or Mr. Al-Monla, but it applied to all three

16   defendants, and that's notable, because there was no request

17   from Mr. Muntasser or Mr. Al-Monla that the -- that the court

18   somehow infused into these instructions its dismissal of Count

19   Eight.

20       To instruct the jury that while it could go on perhaps

21   to convict Mr. Mubayyid of conspiracy under an aiding and

22   abetting theory, that it could not do so for Mr. Al-Monla or

23   for Mr. Muntasser.  It's hard to imagine how the court could

24   have crafted a workable instruction in any event, but I would

25   note that nobody asked for it.

1        There was also no similar request of any sort put

2   before the court following the jury's first question relating

3   to whether somebody could withdraw or what the effect would be

4   if somebody withdrew from the conspiracy.

5        There was no request made by any of the defendants

6   even after the second question was posed specifically asking

7   about aiding and abetting the conspiracy following withdrawal.

8   There was no discussion or no request from the defendants to

9   find out what defendant, which of the two defendants, or which

10  of the three defendants, the jury was talking about, and there

11  was no assertion by any of the defendants at that time that

12  perhaps Count Eight at this point now should be considered

13  because that dismissal may affect the continued deliberations

14  of the jury as it related to any of the defendants on

15  Count Two.

16        And in addition to the defendants' silence at these

17  crucial moments, your Honor, I would note that there was no

18  claim then or now that the question posed by the jury was

19  vague; that it reflected some fundamental confusion with any of

20  the court's instructions, or any of the elements, or for any of

21  the defenses, and there was no claim then or now that the

22  instruction that the court gave, that the response that the

23  court gave was incorrect as a matter of law.

24        There was also no request that the jury form be

25  revised to have the jurors, number one, reflect whether you

1    have actually concluded that a defendant has withdrawn,

2    identify who that person is, and then if you have, do the

3    following based on the defendant.

4         In the absence of all of that, your Honor, all we have

5    here is a jury that after considering all of the evidence in

6    this case returned a verdict of guilty on Count Two as it

7    relates to all of the defendants.  That's what we have and

8    nothing more; and as I stated at the outset, if this were

9    before the court, the First Circuit, it would be reviewed for

10   plain error, and I think the issue there would be did you, the

11   court, plainly err when you gave a legally correct answer to

12   the jury's clear question.  I would note that the defendants in

13   their briefs have cited no case law to say that that would be a

14   claim or otherwise.

15        Now, I understand that their argument is framed in the

16   context of Count Eight and that somehow this affects it, and

17   so, a related issue would be where there was no request made by

18   any defendant and no argument to the court that Count Eight's

19   dismissal somehow affected Count Two, as it related to

20   Mr. Muntasser and Al-Monla, did the court plainly err when it

21   did not sua sponte, based on the jury's question, assume that

22   the question meant that the jury had concluded the defendant

23   had withdrawn, as opposed to the equally plausible

24   interpretation that the jury was musing some consideration and

25   wanted to know the answer, or perhaps were placating and

1    accommodating one particular juror, as opposed to having

2    reached some conclusion, and then fail sua sponte to voir dire

3    the jurors, to divine to determine exactly what it was they

4    were thinking.

5         The question would also be did the court err in not on

6    its own going beyond the question that was posed by the jury

7    and fashioning an instruction that not only answered the

8    question the jury posed, but then contemplated every possible

9    scenario, every permutation, assuming whether the jury

10   concluded that a withdrawal had occurred and which particular

11   defendant, or concluding that no withdrawal had occurred, and

12   then giving an additional set of instructions to account for

13   all of those possibilities.

14        THE COURT:  Let me sort of cut to the chase here.

15   What evidence supports aiding and abetting after withdrawal

16   from a conspiracy as to Muntasser or Al-Monla?

17        Is it -- is it the FBI and -- and Immigration

18   statements?  Is there anything else, or is it -- or again, is

19   that the universe?

20        MR. CABELL:  It was those same acts that we were

21   referring to, your Honor.  And I will turn to that very

22   shortly, but one point I do want to stress here is one of the

23   reasons that we have this dilemma now and this issue now is the

24   defendants never come out and say what you should have done.

25   This is being framed as an error by the court, but nobody is

1    saying what you should have done at that moment, given that

2    there was no issue before you and no claim by the defendants

3    that there was some problem.

4         Now, we would contend that the way to analyze this,

5    your Honor, and I'll be very quick on this, is to proceed in a

6    very linear fashion.  The defendants were charged with

7    conspiracy.  You charged them correctly on conspiracy and

8    aiding and abetting and withdrawal.

9         They had questions that suggested they were

10   contemplating withdrawal.  You gave them an answer to that

11   question that everybody agrees was legally correct.

12        They had a second question that married all of these

13   different concepts of conspiracy, aiding and abetting, and

14   withdrawal, and you answered that question correctly.  And then

15   they convicted each defendant of conspiracy without

16   elaboration, and we say that should end it.

17        Now, the defendants say you should bypass that

18   complete process, that straight linear process, leading to

19   the -- to the verdict and proceed directly to entertaining the

20   possibility that the jury concluded that Mr. Muntasser or

21   Mr. Al-Monla had withdrawn, and that they then necessarily

22   aided and abetted based on facts that you previously ruled

23   could not be relied on for purposes of Count Eight.

24        We would say, first, you can't do that.  First, as I

25   pointed out, we don't know what the jury was thinking, your

1    Honor, and you can't conclude what is implicit in their

2    argument, which is that the jury concluded that Mr. Muntasser

3    or Mr. Al-Monla withdrew, but the fact of the matter is, and as

4    the case law demonstrates, there's no basis for the court to

5    divine what the jury was thinking at that time.  And if you

6    agree with that, I would suggest respectfully, it ends; but

7    even if you were to say, well, I don't necessarily go along

8    with that, there is no case -- the government was under no

9    case, and the defendants have not cited a case that says that

10   the court is somehow required to wrest from the jury a matter

11   that's before the jury simply because it may be inconsistent

12   with a matter that was previously ruled on by the court, which

13   is to say, the fact that you dismissed Count Eight reflects an

14   understanding by your Honor as to what was at issue in Count

15   Eight, and we understand the argument to be the same mens rea

16   or intent as involved in Count Two, and this should have been

17   taken to the jury, but the defendants don't say cite any law

18   that say, as a legal matter, you had a duty to take this from

19   the jury.  You had a duty to do this analysis yourself.

20   Moreover, especially after the jury has returned its verdict

21   where -- and this issue had not been before the court -- there

22   is no case that we could find that would say you have an

23   obligation to either order a new trial or vacate the

24   conviction, because their finding may -- not did -- may reflect

25   a -- a thought process that is inconsistent with the court's

1     view of the evidence.

2          THE COURT:  Well, I'm not sure I'd frame it that way.

3     I think it's -- putting aside whether I have a duty or not, if

4     nothing else, it's a matter of logic.  I think the argument is

5     if the evidence is insufficient as to Count Eight, the evidence

6     necessarily as a matter of logic, if not of law, is -- is

7     insufficient to constitute aiding and abetting under Count Two.

8          MR. CABELL:  Well, let me turn to that, your Honor.

9          THE COURT:  Go ahead.

10         MR. CABELL:  I'm sorry.

11         THE COURT:  Yes.

12         MR. CABELL:  Okay.  And first, for the record, I

13    should state we, of course, contend that you should not have

14    dismissed Count Eight; so, just so we do not waive that claim.

15         But here is our view, your Honor.  Here is what we

16    would contend we alleged to the jury and sought to prove at

17    trial, and that is that Count Two, the conspiracy charge, is

18    broader than Count Eight, both in terms of time, and in terms

19    of scope.

20         Count Two charged the conspiracy to defraud the United

21    States, by conspiracy.  We don't disagree with that, and at its

22    core, it therefore necessarily involved the Internal Revenue

23    Service.  It involved the Internal Revenue Service principally,

24    because Care needed to deal with the IRS in order to get its

25    tax-exempt status, and it needed to deal with the IRS each year

1    thereafter in order to keep its tax-exempt status; and for that

2    reason, we contend it began in April of 1993, before the filing

3    of the Form 1023, with the transition of Al-Kifah into Care and

4    the effort by Mr. Muntasser to organize other people to form

5    Care.

6            But the conspiracy, your Honor, was more than just

7    Care, and it was more than just the IRS.  It also involved a

8    conspiracy to conceal and falsify information about Care and

9    its history and its activities from other government agencies

10   as well.  This involved concealing information not only about

11   Care, the organization, but about particular individuals, that

12   is, in terms of what they were willing to tell government

13   officials about themselves and about the activities in which

14   they engaged, and their relationship to Care.

15           We argued that this was all necessary to keep Care

16   under the radar screen, not just to the IRS, but from the

17   government generally.  Now, obviously, the inference is that in

18   keeping Care under the radar screen and keeping Care's

19   activities concealed from other government agencies, it had, in

20   effect, also a furthering of that general goal and certainly

21   the -- the intent that is at issue in Count Eight of

22   interfering with the IRS; but in Count Two, it's broader than

23   that, and we would presume, your Honor, and contend, that the

24   court meant as much when it dismissed Count Eight, but at the

25   same time allowed Count Eight to go forward on Mr. Mubayyid,

 1    which is to say, dismissing it against Mr. Muntasser and

 2    Al-Monla, but allowing the jury to consider not only Mr.

 3    Mubayyid's filings of the Forms 990 for the year at issue, but

 4    the court's instruction to the jury explicitly said that they

 5    could consider also the statements that Mr. Mubayyid made to

 6    the FBI Joint Task Force, in 2001, in determining whether he

 7    interfered directly or endeavored to interfere corruptly with

 8    the IRS, alleged in Count Eight; and what we would take from

 9    that is that it reflected the court's assessment that

10    Mr. Mubayyid gave -- giving statements in 2001 that were more

11    closely related in time to the real nub of events that we're

12    concerned with in this case, at a time when he is more closely

13    connected to Care, could be considered by the jury, even if

14    it's not to an IRS official, and even if it's not ostensibly

15    about successor or outgrowth, because that could be perceived

16    by the jury to be interfering with the IRS, and we presumed

17    that what the court was saying in dismissing it with respect to

18    Mr. Muntasser and Mr. Al-Monla was the statements at issue

19    there are too attenuated in time, number one; and the

20    defendant -- those defendants themselves were perhaps on the

21    waning end of their participation in Care in terms of when the

22    heyday of their time with Care was, such that with respect to

23    Mr. Mubayyid, we assume that what the court was saying is the

24    jury could consider his statements to Trooper Ball as part of

25    the FBI task force and say that those statements interfered

1    directly with the IRS, as well they interfered or they helped

2    to further the broader conspiracy in Count Two of keeping Care

3    under the radar screen, of keeping Care and the full nature of

4    its activities concealed from the government generally to

5    achieve that larger result of keeping the tax-exempt status

6    year after year after year.

7         THE COURT:  Okay.  Just in light of the time, let's

8    wrap up, because we do have other --

9         MR. CABELL:  Okay.  I would just simply ask the court

10   to take note of its own statements.

11        Now, the jury -- not the jury charge.  Your Honor, we

12   had a very protracted discussion, you recall, after the second

13   jury question came back.  It spans about 20 pages.  I think it

14   goes roughly from pages 9 to 29.  I think it's Jury Trial

15   Day 31, January 10th.  I would simply ask the court to look at

16   the statements of the court at -- both at page 16, which I'll

17   just read very, very quickly, and in talking about this and

18   whether somebody could aid and abet a conspiracy after

19   withdrawing, you said, Why is it if there's a conspiracy to

20   obtain charitable status through false statements and so forth

21   and you withdraw from the conspiracy, and you say, I want no

22   further part of this, and you communicate it to your

23   coconspirators, five years later somebody interviews you, and

24   you give a false statement about the conspiracy or about the

25   acts or conceal it under circumstances where you have a duty to

1    reveal it, why could that not be aiding and abetting?

2           And then later on page 24, towards the bottom, at

3    the -- as we were winding down this discussion, you made it

4    clear that, well, the government would have to prove aiding and

5    abetting beyond a reasonable doubt; in other words, they would

6    have to prove you formulated a new intent to aid and abet after

7    having withdrawn from the conspiracy.  There would be no doubt

8    about that.

9           Now, I know though, because it seems to us that if the

10   court is entertaining this hypothetical at this point, the

11   whole protracted discussion makes sense only if everyone is

12   assuming that what is at issue in Count Two is different than

13   what is at issue in Count Eight.

14          Again, none of the defendants during this whole

15   protracted discussion, and there are many grounds that they

16   could advance as to why you should not give the aiding and

17   abetting instruction, not one said the intent in Count Two is

18   the same as Count Eight and, therefore, you can't give it.  The

19   closest we get, it's either Mr. Andrews or Mr. McGinty says,

20   the intent in Count One is the same as Count Eight.  Nobody

21   ever raises it with respect to Count Two.  And again,

22   respectfully, I'm not going to deign to tell you what was in

23   your head, but I would agree that --

24          THE COURT:  I wouldn't go there.

25          MR. CABELL:  -- is that the court agreed with the

1   government's position.

2          Thank you, your Honor.

3          THE COURT:  Okay.  All right.  Let's have this as

4   quickly as we can.

5          Ms. Sullivan.

6          MS. SULLIVAN:  Your Honor, you correctly dismissed

7   Count Eight.  It's absurd to say that there was IRS intent in

8   speaking to the FBI and the INS.  Once you decided that, that

9   was the law of the case.  Thus, when you erroneously

10  and -- once you --

11         THE COURT:  You can say erroneously.

12         MS. SULLIVAN:  I say it with great caution, your

13  Honor, because you --

14         THE COURT:  All right.

15         MS. SULLIVAN:  There was so much care that went into

16  the instructions, so much care that went into all the way you

17  handled this.  This is the one place where we think that it

18  went off the tracks in addition to willful blindness.

19         THE COURT:  I've noticed that when people agree with

20  me, I'm thoughtful, careful, and wonderful; and when they

21  disagree, that I'm utterly foolish and idiotic --

22         MS. SULLIVAN:  Not in the least, your Honor.

23         THE COURT:  -- the nature of -- that's why I never

24  look at the appellate briefs of anything that I've decided.

25         MS. SULLIVAN:  Your Honor, the -- here's -- here's why

1  there is error.  The jury sends a note, and says what if

2  someone's withdrawn, can they aid and abet?  We object.

3  Mr. Cabell read to you from the transcript of December -- Trial

4  Day 31, through page 24.  If you turn to page 26, we object.

5  Mr. Duncan says:  I'm -- or if you want to refer to that

6  transcript, it's page 26 -- Day 31, page 26.  Mr. Duncan, says,

7  beginning at page 19, They're asking could they find aiding and

8  abetting?  And I think in the facts of this case they could

9  not, not on the basis of the acts of concealment of someone who

10  by hypothesis has withdrawn.  There is the objection.  You

11  can't have been found on these facts to have aided and abetted

12  once someone has withdrawn.  There's the objection.  It's

13  plainly preserved.

14       Now, the reason for that is if someone has withdrawn

15  from the conspiracy, and we have now implying acts of others to

16  the defendant in question someone has withdrawn, then you have

17  to find that they intended to further a tax conspiracy; and you

18  found, as a matter of law, in Rule 29, that you cannot find

19  that there was an intent to defraud the Internal Revenue

20  Service based on interviews with the FBI and the INS.  Mr.

21  Cabell just conceded that's the universe of facts we're talking

22  about here with respect to Mr. Muntasser.

23       And, your Honor, just one more brief point.  Mr.

24  Cabell said we didn't cite any cases for the standard of

25  review.  Well, we certainly did.  We cited Stark on page 12 of

1    our initial brief on our Rule 33 motion.  And the standard of
2    course is after an objection to an instruction, the decision to
3    give an instruction over an objection, the question is did we
4    adversely affect the objecting parties' substantial rights.  Of
5    course, we adversely affected the objecting parties'
6    substantial rights here.  The jurors asked this question.  It
7    was the key to their -- it may have been key to their
8    determination.  We don't know.  But it invited error to allow
9    them to convict on aiding and abetting when they couldn't have
10   convicted on conspiracy had they found a withdrawal; and, your
11   Honor, the key cases here are the cases about clarifying
12   supplemental instructions, clarifying in response to a juror
13   question.  This is a special world, your Honor, we cite to you
14   Bollenbach versus United States.  It's in with our opening
15   brief and our reply brief at page 4; and in the First Circuit,
16   the same principle, Testa versus Wal-Mart.
17        The Supreme Court in the First Circuit have said the
18   judges last words to the jury is apt to be the decisive words.
19   There's heightened scrutiny for supplemental instructions.  So,
20   here we have two reasons for heightened review of this.  This
21   isn't just a factual question.  There's heightened review here,
22   because the instruction was legally erroneous, once you Rule 29
23   Count Eight, because the law of the case was you couldn't, as a
24   matter of law, find IRS intent in the FBI and the INS
25   interviews.  You need IRS intent for a Goldberg client

1     conspiracy.  That's Count Two.

2          And, second, there's heightened review of erroneous

3     instructions in response to a juror question.  While there is

4     nothing wrong with the a priori with the aiding and abetting

5     the conspiracy instruction -- there is colloquy about

6     that -- it was legally erroneous in this case on these facts

7     once you Rule 29 Count Eight.

8          The last point, your Honor, the government says, well,

9     don't look behind the juror veil, but with respect, when the

10    juror has asked a specific question and comes back the day

11    later under the heightened scrutiny of Bollenbach and Testa,

12    you have reason to think that the erroneous instruction in

13    response to the question could have invited erroneous

14    decision -- invited an invalid decision by the jury.

15         In the cases the government cites, like Lopez and

16    Espinoza, those are cases where there was not a supplemental

17    instruction, and the defendant comes along and says, Well, I

18    don't know if maybe I was the aider or abettor or I was the

19    principal, and I'm entitled to a new trial.  That's not this

20    case.  They didn't involve supplemental instructions.

21         Here the problem is under Bollenbach and Testa.  This

22    was potentially the key to the decision.  It was legally

23    erroneous after the Count Eight dismissal, and we did object.

24    We did preserve it, and we think, your Honor, that there's just

25    no question, you have to grant a new trial on Count Two.  Now,

1    of course, we think the better course is to dismiss Count Two.

2           And if I could just ask for a moment to respond to

3    Ms. Siegmann's out-of-order presentation of the conspiracy

4    argument, if I could just take a minute.

5           THE COURT:  Quickly, yes.

6           MS. SULLIVAN:  Ms. Siegmann got up and said, well,

7    maybe, going back to yesterday, there is no unitary conspiracy

8    here.  Maybe we can go back to having a double-object

9    conspiracy, and we can win if we prove either one.

10           Your Honor, you cannot go back on that.  You simply

11    cannot.  You are locked into that by, first, the language of

12    the indictment.  The indictment is in the conjunctive.  The

13    indictment speaks of a conspiracy to qualify and designate Care

14    as a 501(c)(3) and continue that status.  The indictment is in

15    the conjunctive.  You know, your Honor, this was not a trivial

16    sidebar.  This was the source of hours of arguments in this

17    case, whether it was a unitary conspiracy; and on December 19th,

18    on pages 4 and 5 of the transcript, you decided it was a

19    unitary conspiracy.  You say on page 4, I think I have

20    concluded that the indictment charges a single conspiracy and a

21    single scheme.  That is not with multiple parts.

22           Later on page 5, you say, I've concluded that the

23    fairest interpretation is that it's a single-object conspiracy.

24    That's how the case was framed.  That's how -- it would be a

25    prejudicial variance from the indictment to change conspiracy

1    theories now, but it would certainly be a prejudicial variance

2    from law of the case to change the theory now, because that's

3    the theory we went to the jury with.  That's the theory on

4    which the case was tried.

5         So, there can be -- there's no going back on this.  If

6    there's any doubt about that, if I could just -- sorry.  I'll

7    pick that up in a minute -- how you charged the jury, your

8    Honor.

9         When you charged the jury on December 19th, on

10   page 172, you charged the jury, Count -- I'm on December 19th,

11   page 172, line 17.  Count Two charges that from a date unknown,

12   but from at least in or about April 1993, to in or about

13   April 2003, defendants Mubayyid, Muntasser, and Al-Monla

14   willfully conspired and agreed with each other for purposes of

15   et cetera, the IRS; and then you said on page 173, beginning at

16   line 6, You must find, first, that the agreement specified in

17   the indictment, and not some other agreement or agreements,

18   existed between at least two of the alleged conspirators.

19        So, your Honor, there's no going back on unitary

20   conspiracy in this case.  We think the best course is for you

21   to dismiss Count Two for the reasons we've given.

22        Your Honor, the government's all but conceded in its

23   inability to answer your Honor's very cogent questions that

24   they can't come up with a conspiracy in 1993 that holds any

25   water.  If they can't come up with the conspiracy that holds

1    water in 1993, it's no wonder they want you to go back and then

2    call this a double edge object conspiracy, but there is no

3    going back.

4         If the indictment is conjunctive, your decision was

5    conjunctive, that's the law of the case.  That's how we went to

6    the jury.  That's how we closed our case, and the charge to the

7    jury was a single indictment, a unitary indictment, and you

8    said don't find it on some other indictment.  Find it on this

9    one.  The evidence is insufficient on a unitary indictment, and

10   we think that you can save -- the aiding and abetting

11   instruction at a minimum requires a new trial on Count Two.

12        THE COURT:  Okay.  It's --

13        MS. SULLIVAN:  Thank you.

14        THE COURT:  I understand.  Let's go on to the next

15   topic.  Was it -- I'm sorry -- willful blindness?  What did you

16   want to address next?

17        MR. ANDREWS:  I didn't hear, your Honor.

18        THE COURT:  I'm sorry.  Was it willful blindness?

19   Ms. Sullivan said three were three or four things that you

20   would --

21        MS. SULLIVAN:  I'm sorry, your Honor.

22        THE COURT:  The next topic.

23        MS. SULLIVAN:  I'm sorry, your Honor.  I can be very

24   brief on willful blindness and Rule 403.

25        THE COURT:  All right.

1          MS. SULLIVAN:  There are similar problems with each,

2    your Honor.  The willful blindness instruction, we believe, is

3    in error, because there was no predicate in the record of a red

4    flag or other clue, which put Mr. Muntasser on notice that he

5    should have inquired more about his tax obligations.

6          This is quite unlike cases that are typical willful

7    blindness cases in which there's some percipient fact that

8    should put you on notice that something is wrong.  You went to

9    get this document, and you went to a funny part of town, and

10   you didn't get it the way you used to, and there were strange

11   people that asked you for $300.  You didn't even know perhaps

12   it was an illegal form.  There was no percipient fact that put

13   him on notice that he was supposed to inquire further.

14         THE COURT:  But willful blindness is a little

15   different, isn't it, in a tax case.  Let's take a tax protester

16   case, you know, the people who say that the IRS, you know,

17   because we went off the gold standard, or West Virginia isn't

18   properly a state or whatever, you know, there's no right to

19   impose an income tax.  Isn't it relatively common to give

20   willful blindness instructions in those kinds of cases, that

21   is, you can't be willfully blind to your tax obligations?

22         MS. SULLIVAN:  Actually not, your Honor.  I checked.

23   In the government's brief, it doesn't cite a single willful

24   blindness case from the tax context, and the reason for that is

25   that the United States against Cheek and a lot of other cases,

1    says tax laws are so complicated, that's why there has got to

2    be clear notice.  We're not going to be -- it's not a -- it's

3    not a fertile ground for willful blindness instructions,

4    because you -- it's -- assume that the government is going to

5    confuse you enough with your tax obligations that failing to

6    inquire is not something we impose on taxpayers the way we

7    impose it on drug runners.

8            So, your Honor, with respect to willful blindness

9    here, it was prejudicial, because the predicate here was so

10   thin to begin with, that willful blindness could have put a

11   juror over the edge to say, oh, well, I can't figure out what

12   they're saying about taxes, and maybe he just didn't do enough

13   inquiry.

14           In fact, the evidence all -- I don't want to argue

15   about the weight of the evidence, but Mr. Muntasser began down

16   this road by trying to get accurate tax information from

17   Al-Kifah New York.  The evidence supports the conclusion that

18   he founded Care in trying to get the tax-exemption law right.

19   So this is a case where a person did inquire.  It's undisputed

20   that, from the government's own witnesses, that these were

21   amateurs, not professionals.  So, the notion that we would hold

22   them to this heightened standard on inquiring into law that

23   we've argued is so unclear that it requires under Rule of

24   Lenity that you dismiss these charges on its face, under

25   Anzalone, this is not the appropriate place for a willful

1    blindness instruction, but your Honor --

2         THE COURT:  Just thin that out for me.  For

3    example -- and this may not be properly directed to you, but

4    the Form 990 issue where the government says that the question

5    in the instructions essentially charge you if you're going to

6    sign the return with knowing what --

7         MS. SULLIVAN:  Yes.

8         THE COURT:  -- the organization had done to that

9    point, and at least one way to interpret that is to say that

10   the person signing, or an attorney can't say, well, I don't

11   want to learn what the organization had done up to that point.

12   I want to make myself willfully blind to its activities to

13   avoid, you know, learning this critical fact that the law

14   requires.  What about in that context?  Is such an instruction

15   improper?  I mean, are you saying per se in tax cases, because

16   of Cheek and so forth, that a willful blindness instruction can

17   never be appropriate?

18        MS. SULLIVAN:  No, your Honor.  I wouldn't go that

19   far.  I would just say that there's a higher burden on the

20   factual predicate.  The factual predicate has got to be -- it's

21   not just that you didn't inquire.  It's that there was a strong

22   clue, and you ignored it.  There was a red flag, and you

23   ignored it.

24        So, of course, if somebody had said note to file, I

25   think there's a problem with the 1023 signed in 1993, and it's

1     sitting in the file, and you didn't look at it when you're

2     filing the 990, maybe that would give rise to a willful

3     blindness instruction, but it's painfully lacking.  Any such

4     evidence is painfully lacking in this case.

5          There's no connection between the officers of Care in

6     1996 forward and Mr. Muntasser back as the officer of Care in

7     1993.  There's no evidence that the 1996 guys were -- this is

8     our argument yesterday on Count Two -- had anything to do with

9     Mr. Muntasser's filing of the 1023.  So, there is no note to

10    file or other red flag saying, hey, you better look back at

11    that 1023.

12         We've also argued, your Honor, that as the U.S.

13    Government itself has conceded that the Form 1023 was unclear.

14    The Form 1023 was unclear as to successor and outgrowth.  They

15    got rid of outgrowth, and the 990 got changed as well.  Of

16    course, it dropped the previously not reported language, and it

17    now just says report changes in activities.

18         Anzalone, footnote 12 of Anzalone says, when the

19    United States Government itself says that its prior law was

20    pretty vague, it's probably too vague to put people on notice

21    that they had an obligation to conform to it; so, that's really

22    our argument on willful blindness, your Honor.  It's not that

23    it's inconceivable in a proper case.  It's that this case

24    doesn't have the factual record that should have triggered a

25    red flag or an affirmative clue.

1          It's not good enough to just say you didn't inquire.

2     You have to say something put you on notice, and you didn't

3     follow up, and that's what's missing here.

4          Your Honor, on Rule 403, and let me just briefly

5     conclude.  This is the rare case that should be viewed through

6     the lens of 403, because it's a technical tax-related case

7     involving a set of publications that the undisputed record and

8     the 990 suggests this was 5 percent of Care's activities, the

9     Al-Hussams.  Instead of hearing a few days about tax law, the

10    jury heard over a month of evidence that included the

11    Al-Hussams, expert testimony about terrorism, and all the other

12    things that went into the case that were so graphic and

13    inflammatory that your Honor twice on the record referred to it

14    as blood curdling.

15          THE COURT:  At sidebar, I believe, right?

16          MS. SULLIVAN:  Exactly, your Honor.  I'm just

17    suggesting that if you could say that at sidebar then it's

18    perhaps appropriate to assume that the jurors might have had

19    some similar reactions.

20          THE COURT:  Well, let me stop you there with the

21    Al-Hussams.  Again, if the theory of the case, I mean, suppose

22    I committed no other error, and this were the only issue, the

23    theory is is that they tell the IRS they're a charity.  In

24    fact, they're not.  They're doing this promoting and supporting

25    the jihad and the mujahideen, and one of the principal vehicles

1    by which they do that are the Al-Hussams; in other words,

2    it's -- it's -- it's -- it's either their words or words that

3    they adopt by publishing and promoting the publication.  How

4    does that information get before the jury unless we give the

5    jury the information?  These are their activities.  This is

6    what they said.  This is how they were promoting and supporting

7    jihad.  Here's what they said, and, you know, if -- if the

8    Al-Hussams are promoting violence, as I think it's fair to say

9    that they were, and quotes mothers praising the death of their

10   sons, you know, so be it.  The defendants elected to promote

11   that publication, so to speak --

12            MS. SULLIVAN:  Sure.

13            THE COURT:  -- to publish it, distribute it, and so

14   forth.

15            MS. SULLIVAN:  I understand, your Honor, and I

16   understand that your Honor also gave many limiting instructions

17   about First Amendment rights.

18            THE COURT:  Well, I did, and I was obviously trying to

19   be cautioned -- cautious.  They do have First Amendment rights,

20   and I was trying to strike the balance, obviously, but it seems

21   to me there's a point below which you can't sanitize.

22            MS. SULLIVAN:  I understand, your Honor, and the

23   limiting instructions were appropriate.  We just contend they

24   didn't go far enough, and let me say why.

25            THE COURT:  All right.

1          MS. SULLIVAN:  It's a very precise argument.  The

2     Al-Hussams were never proved to be more than a piddling portion

3     of -- of Care's activities.  The government conceded in the

4     opening that Care was a charitable organization.  We were

5     stopped from introducing pictures of the orphans, who actually

6     benefitted.

7          THE COURT:  Let me say this.  I mean, I do want to

8     clarify something, because I think it's important.  The

9     proposal that had been made was that an entire box, multiple

10    boxes -- I can't remember -- of records be introduced, and I

11    proposed as an alternative that a witness be called to -- to

12    give a summary with sampling from the box, rather than having

13    literally thousands of exhibits as a way of simply balancing

14    the volume.  I did not cut off that testimony.

15         My memory is Mr. Zalkind got exasperated with me, did

16    some sampling, never called a summary witness.  I had permitted

17    much more than was done by the defense, and that was the

18    defendants' strategic choice, for whatever reason, not to

19    introduce more of that evidence, which I think I pretty clearly

20    would have permitted.  I mean the discussion was call a

21    paralegal to do a 1006 summary of the contents.  You know,

22    there's 750 orphans involving "X" amount of dollars and so

23    forth, and here are samples, including photographs and all the

24    rest of it.  So, that argument doesn't move me, particularly,

25    but...

1        MS. SULLIVAN:  Your Honor, we also objected to the

2   Al-Hussams as cumulative, and those could have been summarized

3   in a much shorter effort than 55 pages of transcripts, and the

4   argument here really goes to the whole sum of evidence.  It's

5   not just the Al-Hussams.  It's also Levitt and Kohlmann.  It's

6   the evidence about the Newsweek and the New York Times articles

7   about Al-Kifah New York, which we contend had nothing to do

8   with Al-Kifah Boston.  It's the sum total of that, and it's the

9   sum total of that, of course, in a technical tax case.  If you

10  put jurors -- if you put Rule 76 on one -- line 76 of a

11  Form 990 on one side and the question of successor outgrowth

12  and the shift of the meaning of the 1023 form on the one side,

13  and you put graphic, inflammatory, repeated, cumulative

14  evidence referring to blood-curdling activities on the other

15  side, that's the classic 403 case where there's a danger that

16  prejudice will outweigh probative value; and the probative

17  value I'm suggesting, your Honor, it's not that the Al-Hussams

18  were entirely relevant.  It's just that they were 5 percent of

19  Care's activities, if looked at as a matter of expenditure.

20  They were a fundraising device.  The government never proved

21  that any of the money went to fighters, the mujahideen, or for

22  the cause of jihad.  If they had, we wouldn't be here right

23  now.  They would have charged material support.  They couldn't.

24  They didn't.

25        What they charged instead and what they sought to

1    prove was this technical tax violation, and yet they brought in

2    all of this other evidence that overwhelmed in the jury's

3    minds, and the jury could have easily thought that Al-Hussam

4    was what the whole organization was about.  They could have

5    thought that Care was like Al-Kifah.  They could have thought

6    that what Care was doing was not saving widows and orphans,

7    which is the only place that the money was ever proved to go.

8    The government never proved otherwise, but was an organization

9    devoted to doing those things, rather than talking about those

10   things.  There's a big difference between being a member of

11   Cosa Nostra and writing Good Fellows.  There's a big difference

12   between Al Capone and somebody in a fiction, played by -- it's

13   different between speech and action is all I'm trying to say,

14   your Honor.  And the danger here is that the jury could easily

15   have been confused by the wealth of testimony on the

16   irrelevant -- the evidence you, yourself, your Honor, said was

17   irrelevant.  This is not a case about terrorism or anything of

18   that nature.  It could easily have become confused about the

19   mission of Care, in a way that led them to ignore all our

20   technical arguments about the tax issues, and that's really the

21   issue here.  Was this sufficiently relevant to any actual issue

22   in the tax case as to justify that wealth of information?

23        We absolutely respect your Honor's decision to give

24   all the cautionary instructions you did.  They were thoughtful.

25   It was an obvious attempt to balance.  We just think that in

1   this case, there was a danger that it wasn't good enough in

2   light of the nature of the tax charges in relation to the

3   evidence, and that's our point on Rule 403.

4           Thank you.

5           THE COURT:  Let me hear from the government.  Let's

6   start with willful blindness.

7           Mr. Cabell.

8           MR. CABELL:  Thank you, your Honor.

9           And I'm assuming you're still adhering generally to

10  your time schedule, your Honor.

11          THE COURT:  I'm going to turn into a pumpkin at 4:15.

12  I'm obviously not going to rule from the bench today.  I'm -- I

13  want to allow as much time for argument as possible.  I -- as

14  long as I'm on the topic, let me tell you what I expect to do.

15          I'm not going to wait for a written opinion, because

16  it will take too long given the timetable we have.  I'm going

17  to let this percolate over the weekend, and then

18  I'll -- probably what I'll do is pick some afternoon next week

19  to announce what my decisions are.  Parties can participate by

20  telephone.  I would not expect it to be particularly

21  interactive, but I would simply give my decision, and that will

22  give me some more time to think about and react to this.  I

23  think I'm maybe just not smart enough to process all this

24  information this quickly; but in any event, it's more helpful

25  for me to hear the oral argument at this stage than anything

1   else, so --

2           MR. CABELL:  And I will --

3           THE COURT:  But at 4:15, I've got to stop.

4           MR. CABELL:  Okay.  I'll -- I'm comfortable I can get

5   all this in before that.

6           THE COURT:  All right.

7           MR. CABELL:  Two things at the outset, your Honor.

8   Ms. Sullivan said that the government hadn't cited any cases in

9   its brief, willful blindness tax-related cases.  That may or

10  may not be.  I did find a case last night, as I was looking at

11  this issue again.  It was a case that was just decided by the

12  First Circuit three weeks ago.  I have made copies.  It only

13  has a Westlaw cite.  There's no F.3d cite yet.  It's United

14  States versus Griffin, and it is a case -- the opinion is by

15  Judge Howard, but I do have copies that I'll give to counsel

16  and to the court.

17          THE COURT:  All right.

18          MS. SULLIVAN:  Thank you, Don.

19          MR. CABELL:  You're welcome.

20          And, your Honor, I think just to -- to frame the issue

21  here, one of the things that Ms. Sullivan said to your Honor

22  was that the problem with giving a willful blindness

23  instruction was that the forms here, that the predicate was

24  thin, because the tax forms at issue were so complex, and there

25  was an allusion to language in other cases talking about how

1  tax forms are so complex that there should be some heightened

2  standard.

3          Number one, there's no law to support it; and number

4  two, whatever language may be contained in other cases doesn't

5  bear on whether the language in the forms at issue here was

6  clear or not.

7          Even if people still want to persist in arguing one

8  way or the other as to how clear the language in these forms

9  were, this is an issue again that was presented to the jury,

10  and the jury necessarily decided there was but one

11  interpretation to be given to the pertinent language at issue

12  in this case.

13          But, very briefly, your Honor, the issue in this case

14  was not whether Mr. Muntasser was involved in Care.  He was.

15  The issue was not whether it's his signature that appeared on

16  forms that contained false information.  It was his signature.

17  The question was whether he knew that the information that was

18  contained on the forms was false.

19          There was no direct evidence as to that.  Nobody came

20  forward to say, he spoke to me on a certain day.  He told me

21  that he was going to lie, and I'm here to tell you about that.

22          All we had was the circumstantial evidence and the

23  evidence about Mr. Muntasser and about his history, his history

24  with Al-Kifah, and the forms themselves to zero in on these red

25  flags that one talks about.

1          In this case, first and foremost, the forms
2    themselves, your Honor, we contend that the language in the
3    Form 1023 was crystal clear, which is to say in asking is the
4    organiza -- is the organization a successor or outgrowth to
5    some other entity, that is very easy to comprehend; and if it
6    was not, one could ask questions.
7          Mr. Muntasser had a lawyer, and the jury could infer
8    that from that simple question, if Mr. Muntasser did not know,
9    given his relationship with Al-Kifah, and I won't belabor all
10   of the facts that show that Al-Kifah and Care were -- well,
11   that Care was conducting activities on which it was still
12   depositing thousands of dollars into Al-Kifah's account, in
13   which they were using the same individuals, the same
14   individuals in Al-Kifah, who were involved in Care, using the
15   same address, if that question did not put him on notice that
16   he was required to disclose his relationship to Al-Kifah, it's
17   only because he didn't follow up and ask the simple questions,
18   whether that was asking an attorney who he had or asking the
19   IRS.
20         There was evidence before the jury that Mr. Muntasser
21   had an attorney, Mr. Bade, and that in May of 1993,
22   Mr. Muntasser wrote Mr. Bade a letter in which he provides him
23   with the activities, the list of activities that are to be
24   included in the Form 20 -- 1023, as those activities in which
25   Care is going to engage.

1        My recollection -- recollection is correct, there were

2    five activities or so that are listed.  Publication of the

3    Al-Hussams is not.  Now, at that time Care had already put out

4    two issues of the Al-Hussam and Al-Kifah.  Of course, had put

5    out several before it.  So, the Al-Hussam newsletter was

6    already an ongoing part of the organization at that time.  The

7    jury could infer that if Mr. Muntasser knew enough to know that

8    the Form 1023 required him to list the activities that Care was

9    going to engage in and that he provided those activities to

10   Mr. Bade, but didn't provide any information about the

11   Al-Hussams, again under a willful blindness paradigm, the jury

12   could infer that there was a high probability that he knew that

13   was required; and if he didn't, it's only because he

14   consciously chose to be ignorant of it, or didn't ask any

15   questions.  He surely didn't ask Mr. Bade whether the Al-Hussam

16   needed to be referenced.

17        THE COURT:  All right.  Let -- let -- let me stop you

18   there.  Tell me all of the evidence supporting the conscious

19   course of deliberate ignorance.  It's -- he hires an attorney,

20   doesn't ask the attorney questions, or at least no evidence

21   that he asks the attorney questions.

22        MR. CABELL:  I'm sorry, your Honor.

23        THE COURT:  Just what else?

24        MR. CABELL:  Okay.  In addition to that after the 1023

25   was approved, and they had tax-exempt status, there was a

1    letter in October of 1993, from Sack, to Mr. Muntasser and to

2    Care, notifying them of the need to notify the IRS of any

3    change in purpose or method or activities that Care was

4    conducting, because those changes could affect Care's status.

5         And once again, given that the defendants were aware

6    that the Al-Hussam was being published at the time that Care

7    was not only conducting an orphan sponsorship program, but that

8    that program was targeted specifically towards orphans of

9    martyrs.  That should have put them on notice that if there

10   was -- that they had to disclose those activities to the IRS;

11   and again, given the letter and its clarity, the only way they

12   could remain ignorant of that was to choose consciously to

13   remain ignorant of that.

14        Following the October 1993 letter, we then have the

15   annual filing requirements on the Forms 990.  We've obviously

16   talked about those at length; but I will simply note that once

17   again like the 1023, Question 76 is clearly worded.  The

18   instructions to the Form 990 are very clear; and in particular

19   as it relates to the Al-Hussam, they define an ongoing -- the

20   ongoing publication of a newsletter, as it -- as the -- exactly

21   the type of activity that would need to be disclosed by the

22   organization to the IRS.

23        If Mr. Muntasser, who signed that form, had that

24   information in front of him, and still wasn't aware that this

25   would have required Care to disclose these activities to the

1    IRS, it could only be because he chose to remain ignorant.

2         Now, I should say in the same breath, we believe that

3    the jury could have taken all of this evidence and determined

4    he knew, which is to say anybody reading this would know what

5    was required.  That doesn't preclude the giving of the willful

6    blindness instruction; and as Griffin holds, which I've just

7    given to your Honor, the same evidence can be used to support

8    an inference of actual knowledge, as well as a willful

9    blindness instruction and evidence of a conscious,

10   deliberate -- conscious ignorance -- conscious course of

11   ignorance.

12        So, we would contend, your Honor, if you take all of

13   these events now with the Form 990, of course, it happens year

14   after year after year.  So, the fact is that Care is regularly

15   being put on notice of these obligations, and if -- and if they

16   did not actually know, the jury could infer that the only way

17   they could not know was to fail to take the basic investigatory

18   steps to determine what their obligations were.

19        MS. SULLIVAN:  Your Honor, could I respond on Griffin?

20   The government has --

21        THE COURT:  Yes, but -- yes, just in light of the time

22   quickly, yes.

23        MS. SULLIVAN:  On Griffin, your Honor, the

24   facts -- let me save you the trouble.  The government likes to

25   bring in cases at the last minute.  They did so yesterday, and

1    did so today, but we had found Griffin, and I can tell you what

2    it's about.  It's about receiving sales income.  A woman

3    receives income.  She's held to be willfully blind.  It's

4    alleged that the jury found that she was willfully blind in

5    failing to talk to the source of the income about the income in

6    order not to report it.

7           Had there been a fact like reported income where legal

8    duty is obvious, you report your income.  It's the most basic

9    thing about the tax laws.  That might have led to a willful

10   blindness case.  But we have nonprofit professors lined up to

11   say it's hardly clear that recording something as an outgrowth

12   or a successor or recording on the 990 everything you did in

13   the past, it got so unclear the tax professors can't agree on

14   criminalizing the 990.  We're not in a situation of not

15   reporting your own income, so Griffin is an entirely different

16   case.

17          MR. CABELL:  But, your Honor, that's exactly the

18   evidence that you excluded at the trial.

19          Your Honor, I think I would rest on our cases, except

20   to note that I submitted Griffin to the court and would cite

21   other cases in our brief for the proposition that if you

22   shouldn't have given the instruction, we think what you did was

23   no -- simply no problem with giving the willful blindness

24   instruction.  It was harmless error, and Griffin supports that.

25          I would also note Littlefield, which is a 1988 case

1    that's also cited by the defense, supports a proposition that

2    this would be harmless error; and, in particular, in

3    Littlefield -- Littlefield, they said in a case like this where

4    the issue is not whether the defendant is the person who signed

5    the form, but whether by signing the form it shows that the

6    defendant was aware of certain obligations or information that

7    was in the form, giving an instruction like a willful blindness

8    instruction in a way makes the government's job harder; it

9    makes it easier for the defendant, because what it does is it

10   stresses to the jury you can't convict this person simply

11   because their signature is on the form; and as your Honor

12   instructed the jury here, you can't convict them for negligence

13   or even for gross negligence.  You still have to find that he

14   knowingly committed the act; and as the court said in

15   Littlefield, this has the affect really of -- of allowing

16   the -- of forcing the government to prove that this was simply

17   much more than somebody signing a form on which there was clear

18   language, which should have put them on notice as to what it

19   meant.

20          Before I sit down, your Honor, one thing I did mean to

21   alert the court to in our argument on Count Two, as it relates

22   to Count Eight, we did allege, your Honor, the first 23

23   paragraphs, which are incorporated by reference in each of the

24   counts, including Count Two.  Those paragraphs do recite all of

25   the overt acts that we contend are part of the conspiracy.

1    They include the acts at issue with respect to Mr. Muntasser

2    and the statements to Agent Peet and to others.  None of the

3    defendants asked the court to strike those overt acts before

4    the case went to the jury.

5            THE COURT:  All right.

6            All right.  Mr. Andrews.

7            MS. SIEGMANN:  Your Honor, the government didn't

8    respond to the unfair prejudice argument.

9            Did you want us to respond at all?

10           THE COURT:  I -- I -- I think I understand those

11   issues.

12           MS. SIEGMANN:  Okay.

13           THE COURT:  I don't think I need to devote the next

14   90 seconds to it.

15           Mr. Andrews.

16           MR. ANDREWS:  We may be at the court's limit.  I filed

17   a motion for a new trial in two parts.  The first part has to

18   do with the government's closing argument.  There's a case

19   cited in there and discussed in there.  I think I've made it

20   clear.  It's not long.  There's a case Azubike.  It's right on

21   point.  Azubike basically involves the prosecutor misstating

22   what happened in a conversation in the tape recordings that

23   were admitted into evidence.  So, as here, the prosecutor

24   misstates what the question says, even though the statement,

25   the actual document, is in evidence.

1        I'd ask the court to review my motion and the Azubike

2     case.  It's very clear that the misstatement, whether

3     intentional or not, is misconduct; and in a closing argument

4     scenario, I remind the court that Mr. Mubayyid was the subject

5     of four minutes of closing argument, and that went to the heart

6     of his defense to this statement.  So I -- I tried to make the

7     argument as succinct as possible, but I urge the court to look

8     at it.  It is -- just because I didn't have to argue it today

9     doesn't mean that it's not a very serious matter.

10        THE COURT:  Let me make clear, and I -- it seems

11     strange to say that five or six hours of oral argument isn't

12     enough, but I do have to cut it short.

13        The Rule 33 motions, I -- I think I understand in all

14     respects.  I think they are all clear.  I want to go back and

15     reread them, but oral argument is less necessary.

16        The Rule 29 motions I have struggled with

17     considerably, as you can tell from my questions, and that's why

18     I chose to balance this argument time.  It's not that I'm not

19     considering the Rule 33 arguments.  It's just that I think I

20     understand them; so, I think I have enough at this stage.  I'm

21     taking all the motions under advisement.

22        I will have Mr. Castles contact you all.  I suppose

23     it's not outside the realm of possibility I might want further

24     argument.  I'll see how that goes.  I'm hoping not to, but if I

25     think I need it, I'll ask for it, and I will rule as promptly

1    as I can to keep us on this schedule that we have or at

2    least -- Ms. Sullivan.

3         MS. SULLIVAN:  Your Honor, just for the record, we

4    didn't get to spill over, and, of course, your Honor raised the

5    issue, so if you dismiss Count Two or offer a new trial on

6    Count Two, we respectfully request a new trial on Count One and

7    Count Six as well.  Count Six is a slam dunk.  Mr. Muntasser,

8    it would have been a half-day trial with one witness.  Instead,

9    there was a mountain of prejudicial evidence that influences

10   the finding under Count Six.  We also would request for reasons

11   that are in our papers that Count One would be re-tried if

12   Count Two is retried, but it is in our papers.

13        Thank you, your Honor.

14        THE COURT:  Okay.

15        MS. SIEGMANN:  Your Honor, if I could just have

16   30 seconds.

17        THE COURT:  Yeah.

18        MS. SIEGMANN:  The Furkin citation that I referred to

19   before was 119 F.3d, 1276; and additionally, Anzalone was

20   quoted yesterday by Ms. Sullivan as standing for the

21   proposition that you could take judicial notice of the forms,

22   the changes in the Forms 1023 and 990.  That case does not

23   stand for that proposition.  The facts were clearly different.

24   Those were -- actually, it was looking at the legislative

25   history as to the Bank Secrecy Act, and it involved a report to

1    Congress.  So, I just want to make sure that before you take

2    judicial notice of these forms, I don't think that Anzalone

3    allows you to do that.  They're more than ten years after the

4    fact.

5          THE COURT:  Remind me.  Did -- did I admit evidence of

6    changes in the form or not?

7          MS. SIEGMANN:  No, your Honor, you did not, not at

8    trial.

9          THE COURT:  All right.

10         MR. CHAKRAVARTY:  Your Honor --

11         THE COURT:  Yes.

12         MR. CHAKRAVARTY:  -- 10 seconds, please.  Just an

13   argument that -- regarding the spillover, which wasn't raised

14   below in light of the -- your -- your consideration of the

15   multiple objects of the conspiracy.  As your Honor knows, a

16   Petroziello finding -- finding doesn't require that the

17   conspiracy that was charged in Count Two be found for the

18   admission of those -- of efforts.  Clearly, if you found part

19   of that then that is also a conspiracy under Petroziello.

20         THE COURT:  Well, again, maybe I'm being unduly

21   simplistic.  If I do, for example, dismiss Count Two and leave

22   everything else intact, I'm going to consider the fact that

23   we -- that 801(d)(3), coconspirator hearsay statements were

24   admitted.

25         Mr. McGinty, 10 seconds.

1          MR. McGINTY:  Your Honor, before you pressed me on the

2     question of what the judicial role was in evaluating the

3     instruction related to what was a reasonable interpretation of

4     the Question 76 form.  I guess the form of the question that

5     the judge would look -- the court would look at is whether any

6     reasonable juror would have failed to find that a reasonable

7     interpretation of Question 76 was that it related to the

8     current tax year, and the difficulty with this is that there is

9     so much imprecision in the form of the question.

10         Would any reasonable juror have failed to find that

11    the interpretation was not of the current tax year?

12    That's -- that's the issue here, I think.  That's the

13    one -- that's the judge's role in evaluating that

14    interpretation of Question 76.  So, in trying to answer your

15    question, that's the answer.

16         THE COURT:  Okay.  Thank you, all.

17         MS. SIEGMANN:  Thank you, your Honor.

18         THE COURT:  And have a good weekend, everyone.

19         MR. CABELL:  Thank you, your Honor.

20         MS. SIEGMANN:  Marty, we're not -- all three of us are

21    in South Carolina Monday and Tuesday of next week.

22         THE COURT:  Monday and Tuesday of next week, yes.

23         MS. SIEGMANN:  Yes, we're doing a presentation down

24    there.

25         MS. SULLIVAN:  I'm also unavailable Monday through

1    Thursday next week.

2             THE COURT:  All right.  Again --

3             MS. SULLIVAN:  I can be available by phone at any

4    time.

5             THE COURT:  In light -- I will permit people to appear

6    by telephone.  In an ideal world, all counsel will be present,

7    but I expect to announce the decision without a whole lot more;

8    if more than that, I will make sure we contact you.

9             MS. SULLIVAN:  Thank you, your Honor.

10            MS. SIEGMANN:  Thank you, your Honor.

11

12            (At 4:21 p.m., court was adjourned.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3           I, Marianne Kusa-Ryll, RDR, CRR, Official Court

4    Reporter, do hereby certify that the foregoing transcript,

5    consisting of 97 pages, is a true and accurate transcription of

6    my stenographic notes in Case No. 05cr-40026-FDS, United States

7    of America versus Muhamed Mubayyid, Emadeddin Z. Muntasser, and

8    Samir Al-Monla, a/k/a/ Samir Almonla, before F. Dennis Saylor,

9    IV, on May 16, 2008, to the best of my skill, knowledge, and

10   ability.

11

12                           /s/ Marianne Kusa-Ryll

13                           Marianne Kusa-Ryll, RDR, CRR

14                           Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25