UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                                 )
        v.              )    Crim. No. 05-40026-FDS
                                 )
MUHAMED MUBAYYID, and    )
EMADEDDIN Z. MUNTASSER,    )
and                      )
SAMIR AL-MONLA a/k/a    )
SAMIR ALMONLA,        )
                                 )
        Defendants.    )

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by Michael J. Sullivan, United States Attorney, and Assistant United States Attorneys B. Stephanie Siegmann, Aloke S. Chakravarty, and Donald L. Cabell, hereby submits this sentencing memorandum.  For the reasons set forth below and the factual basis contained in the government's statement of offense and relevant conduct in the defendants' Final Pre-Sentence Reports, the United States urges the Court to sentence the defendants to a term of imprisonment within the applicable guideline range, that is, level 30 for defendant Emadeddin Muntasser ("Muntasser"), level 27 for defendant Samir Al-Monla ("Al-Monla"), and level 26 for defendant Muhamed Mubayyid ("Mubayyid").

**I.   Introduction**

The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and

promote respect for the tax laws.  Here, the defendants abused this nation's charity laws over a period of ten years.  As a result, the United States and its citizens unwittingly subsidized non-charitable activities that promoted and supported fighting and armed conflict overseas.

Further, the defendants' conduct was not limited to the Internal Revenue Service ("IRS").  The jury convicted the defendants of engaging in a broad scheme to conceal material facts from, and engaging in a conspiracy to defraud, the United States Government, over a ten year period beginning in or about April 1993, through on or about April 2003, regarding facts pertaining to the activities and history of Care International, Inc., ("Care").  After Muntasser, with the assistance of others, fraudulently obtained tax exempt status under 26 U.S.C. §501(c)(3) for Care, he and his co-defendants, Al-Monla and Mubayyid, fraudulently used Care to solicit and obtain tax deductible donations for the purpose of supporting and promoting the mujahideen (Muslim fighters) and jihad (violent armed conflict).  In subsequent tax filings made by the defendants on behalf of Care and statements the defendants made to the FBI, they hid the fact that Care was the successor to and outgrowth of Al-Kifah Refugee Center ("Al-Kifah") and was engaged in non-charitable activities involving the solicitation and expenditure of funds to support and promote the mujahideen.  Indeed, the

2

evidence at trial proved that the defendants and their unindicted co-conspirators used the Care office to support mujahideen fighters such as Gulbuddin Hekmatyar, a person who was designated a Specially Designated Global Terrorist, and to promote violent jihad overseas.

## II.  UPWARD ENHANCEMENTS FOR ROLES IN OFFENSE

With one exception, the government agrees with the Sentencing Guidelines calculation contained in the defendants' Pre-Sentence Reports ("PSRs").  In addition to the offense characteristics identified by Probation, the Court should also increase each defendant's total offense level as a result of the aggravating role each played in the commission of the offenses pursuant to U.S.S.G. §3B1.1.[1]

A leadership role enhancement is appropriate when a defendant (1) has acted as an organizer or leader of a criminal activity and (2) that activity involved five or more participants or was otherwise extensive.  See United States v. Diaz, 433 F.3d 128, 138 (1st Cir. 2005).  The Guideline comments provide a list of relevant factors in differentiating between a leadership and organizational role from one of mere management: "the exercise of decision making authority, the nature of the participation in the commission of the offense, the recruitment of accomplices, ...

---

[1] Any references to the Sentencing Guidelines herein is to the November 1, 2002 version of the Guidelines consistent with the PSR.

the degree of participation in planning or organizing the
offense, the nature and scope of the illegal activity, and the
degree of control and authority exercised over others." U.S.S.G.
§3B1.1 cmt. n.4. Based upon these factors, the Court should find
that both Muntasser and Al-Monla were leaders in the criminal
activity while Mubayyid was a manager.

Each of the defendants played a management role at Care and
engaged in criminal activity that was extensive or involved five
or more people. Muntasser founded Care as an outgrowth to Al-
Kifah. One purpose of founding Care was to avoid being linked to
the February 26, 1993 World Trade Center bombing as Al-Kifah had
been. Despite being the successor to Al-Kifah, Muntasser, with
the assistance of Akra and Yassin, implemented a plan to
disassociate Care with Al-Kifah in order to obtain and maintain
tax exempt status. Indeed, at the same time Muntasser signed
Care's Form 1023 application for tax exempt status, his close
friend and associate, Akra gave a lecture about the importance of
fighting and financially supporting fighters at one of Care's
weekly lectures. Irrespective of Muntasser's representations in
Care's Form 1023, Care engaged in the same exact activities and
shared the same primary goal as Al-Kifah -- to help the
mujahideen, that is, fighters.

In 1996, Al-Monla took over for Muntasser as President.
During his tenure as President, Al-Monla supervised numerous pro-

jihad activities.  For instance, during weekly lectures he
organized, money was solicited for the mujahideen and pro-
mujahideen videos and books were sold.  Yet none of these
activities were disclosed to the IRS in the tax filings made by
Care while he served as President, including the 1998 tax return
he himself signed.  Additionally, Al-Monla confessed to Kifah
Jayoussi that they, presumably using Care, financially supported
fighters. [See Ex. 535A.]

     Mubayyid became Care's Treasurer in or about 1997.  While he
was Treasurer, Care continued to engage in the same activities.
For instance, on Care's website, which Mubayyid managed, Care
solicited money for the mujahideen.  Care also solicited money
for the orphans and widows of martyrs through its orphan
sponsorship program and for the mujahideen through its zakat
program.  None of the activities was disclosed to the IRS on any
of the tax forms Mubayyid signed and/or filed.

     At a minimum, each of the defendants should receive a two-
level enhancement pursuant to U.S.S.G. §3B1.1(c) because each
played a management role at Care and supervised Care's
participation in non-charitable activities and filing of
fraudulent tax forms.  See United States v. Goldberg, 105 F.3d
770, 777 (1st Cir. 1997) ("a defendant need not be at the top of
the criminal scheme to be manager or supervisor" to impose two-
level enhancement under 3B1.1(c)).  Probation's rationale for not

applying the §3B1.1 enhancement is that no defendant assumed a
leadership role.  See, e.g., Muntasser PSR at 45.  For the
reasons set forth below, the government disputes this contention.

**Muntasser**: Beginning in or about 1992, Muntasser was an
organizer and leader in extensive fraudulent activity, which
involved five or more participants.  While the Chairman of Al-
Kifah, he falsely represented that Al-Kifah was a tax exempt
organization when it in fact was never granted such status.
After Al-Kifah was linked to the first World Trade Center
bombing, Muntasser, with the assistance of Mohammad Akra and
Wassim Yassin, changed Al-Kifah's name to Care, incorporated Care
as a new organization but continued to perform the same exact
activities, including the distribution of a newsletter that
promoted violent jihad, as they had while operating Al-Kifah.
Within two days of Care being incorporated, under Muntasser's
leadership, it published its first Al-Hussam newsletter.  This
newsletter was identical to Al-Kifah's Al-Hussam newsletter with
the exception of the name that appeared underneath the title was
changed to Care International.  The distribution of the Al-Hussam
newsletter was a substantial activity in that it was published
twice a month, contained news about the mujahideen activities
around the world, and was distributed to hundreds of Muslims, but
never to the government.  At trial, the government demonstrated
that Yassin was one of the persons responsible for the Al-Hussam

in addition to Muntasser.  An activity as labor-intensive as the Al-Hussam necessarily involved the assistance of numerous Care/Al-Kifah volunteers, as reflected by the data retrieved from Care's computer, recorded conversations, and other documents introduced at trial.

In June 1993, Muntasser filed a fraudulent Form 1023 application to obtain tax exempt status for Care.  Like Al-Kifah, even before Care was granted tax exempt status, which was based upon false and incomplete information, under Muntasser's leadership, Care held itself out to be a tax exempt organization.

In addition to the process to incorporate and seek tax exempt status for Care, while Muntasser was president of Care, he obtained the services of other individuals to perpetuate the fraud.  During 1993-1994, with the assistance of Munther Baara, an Al-Kifah and later Care volunteer, Muntasser intermingled monies received under the name Care with that collected under the name Al-Kifah.  Subsequently, Muntasser with the assistance of Wassim Yassin filed fraudulent Forms 990 annual tax returns with the IRS for 1993-1995.  During Muntasser's tenure as President of Care (1993-1996), Care had at least five volunteers in addition to Muntasser.  Even after Muntasser resigned as President, he continued to remain involved as a member of Care's Executive Committee, which met behind closed doors on a weekly basis to decide how Care's money would be distributed.  According to the

testimony of Mohamad Tiba, Care's Executive Committee in 1996-
1997 consisted of Muntasser, Akra, Yassin, Al-Monla, and Mohamad
Chehade, the founder and President of Global Relief Foundation.
Finally, as pertains to each of the defendants, numerous named
and unnamed individuals and volunteers acted under the leadership
of the officers and directors of Care to solicit funds and
distribute Care's materials.  For these reasons, in addition to
those contained in the Government's Statement of Offense and
Relevant Conduct, this Court should increase Muntasser's offense
level by four levels pursuant to U.S.S.G. §3B1.1(a).

**Al-Monla:** Like Muntasser, Al-Monla was organizer of Care's
criminal activity.  When Care was originally created, however,
Al-Monla was not as involved as Muntasser, Akra, Yassin and
others.  Al-Monla served as Care's President from 1996-1998.
During that time period, as described in detail in the
Government's Statement of Offense and Relevant Conduct, Al-Monla
fraudulently used Care to solicit donations for fighters, sent
money to fighters (demonstrated by Al-Monla's own admission to
Kifah Jayoussi that they financed fighters (Ex. 535A)), sold pro-
mujahideen videotapes, and distributed pro-mujahideen
newsletters.  While Al-Monla was Care's President, at least four
people assisted him in Care's pro-mujahideen activities, Mohamad
Tiba, Akra, Yassin, and Kifah Jayoussi.  At trial, the government
proved that Al-Monla directed the activities of Tiba and Yassin.

Tiba was Al-Monla's assistant.  Further, according to Tiba's testimony, Yassin assisted Al-Monla in distributing Care's pro-jihad materials.  For these reasons, in addition to those contained in the Government's Statement of Offense and Relevant Conduct, this Court should increase Al-Monla's offense level by three levels pursuant to U.S.S.G. §3B1.1(b).

**Mubayyid:** Although Mubayyid was less involved than Muntasser and Al-Monla, he was a supervisor in the criminal activities of Care.  He served as Care's treasurer from 1997-2003.  During that time period, he hid Care's non-charitable activities from the IRS and the FBI.  Mubayyid also directed and assisted others at Care to decide how to solicit funds, sending out mailings, setting up the website, transferring money to Global Relief Foundation, and other aspects of Care's activities. [See, e.g., Exs. 311-318 (electronic mails to Akra, Wissam Ali-Ahmad, Ghassan Tabarra, Marwan Haddad of GRF, and referencing others who were also participating in Care's activities)].  For these reasons, in addition to those contained in the Government's Statement of Offense and Relevant Conduct, this Court should increase Mubayyid's offense level by two levels pursuant to U.S.S.G. §3B1.1(c).

## III. CALCULATION OF LOSS

The defendants obtained and maintained Care's tax exempt status fraudulently.  The loss under such circumstances should

9

include the applicable tax loss incurred by the government as a result of the ten years of fraudulent activity perpetuated by the defendants.  Because of the defendants' fraud, Care was granted, and was allowed to keep, its tax exempt status under 26 U.S.C. §501(c)(3).  Such an exemption provides a double tax benefit. The exempt organization does not pay any tax on their income or donations.  Correspondingly, donors may deduct the amount of their donations to these organizations from their income taxes.

Fraudulently obtaining and maintaining a tax-exemption created an open-ended financial harm – that is, the fraud was intended to solicit as much money as possible, all of which would be tax exempt.  Using Care's fraudulently obtained tax exemption, the defendants, and others on behalf of Care, solicited $1,730,789 in tax deductible donations from 1993-2003.[2]  Because Care was a corporation, the tax loss is determined by using 34% of total contributions it received using its improperly obtained

---

[2] Care's total tax deductible contributions by tax year according to Forms 990 filed with IRS:

| | | |
|---|---|---|
| 1993 – $ | 401,439 |
| 1994 – $ | 150,021 |
| 1995 – $ | 118,604 |
| 1996 – $ | 88,779 |
| 1997 – $ | 141,810 |
| 1998 – $ | 188,816 |
| 1999 – $ | 214,431 |
| 2000 – $ | 248,041 |
| 2001 – $ | 108,875 |
| 2002 – $ | 54,357 |
| 2003 – $ | 15,616 |
| **Total** =$1,730,789 |

tax exemption.  See U.S.S.G. §2T1.1; §2B1.1 cmt. n.3(C) ("court need only make a reasonable estimate of the loss.").  This tax loss is a reasonable estimate of the financial harm created by the crime.

Muntasser joined the conspiracy to defraud and began engaging in the scheme to conceal the United States government in 1993. Accordingly, the applicable tax loss for Muntasser is $588,488.26 (34% of $1,730,789).  Al-Monla joined the conspiracy and began engaging in the scheme to conceal by no later than 1995.  As a result, the applicable tax loss for Al-Monla is $400,971.86 (34% of $1,179,329).  Mubayyid joined the conspiracy and began engaging in the scheme to conceal by no later than 1997.  Accordingly, the applicable tax loss for Mubayyid is $330,461.64 (34% of $971,946.00).

## A.  Muntasser Fraudulently Obtains Tax Exemption for Care.

Muntasser, a highly educated and sophisticated businessman,[3] executed, under the penalties of perjury, an IRS Form 1023 Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code ("1023 Application"). [Govt. Ex. 2].

Question 1 of Part II of the 1023 Application instructed Muntasser to:

Provide a detailed narrative description of all

---

[3]Muntasser had obtained a Bachelor's Degree and Master's Degree in Electrical Engineering from Worcester Polytechnic Institute. [Tr. 3:102].

11

the activities of the organization - past, present and planned. **Do not merely repeat the language in your organizational document.** Describe each activity separately in the order of importance. Each description should include at a minimum, the following: (a) a detailed description of the activity including its purpose; (b) when the activity was or will be initiated; and (c) where and by whom the activity will be conducted.

[Govt. Ex. 2].[4]  Although instructed to describe <u>all</u> of Care's

past, present and planned activities, Muntasser falsely claimed

that Care was not yet operational and concealed from the IRS

Care's current activities involving the promotion of jihad

through the distribution of the Al-Hussam.[5]  Muntasser did not

provide any notice to the IRS in Care's 1023 Application that

--------

[4]Two sets of instructions were introduced at trial regarding the completion of this application, Govt. Ex. 1 (IRS Form Package 1023 dated September 1990 with instructions) and Def. Ex. 1138 (Publication 557).  These instructions contain similar language as that contained in the 1023 application putting the applicant on clear notice that he is required to fully describe all the activities of his organization.  [<u>See</u>, <u>e.g.</u>, Govt. Ex. 1 ("It is important that you report all activities carried on by the organization to enable the IRS to make a proper determination of the organization's exempt status."); Def. Ex. 1138 (application should contain "full description of the purposes and activities of your organization"); <u>accord</u> Tr. 16:29 (Sack: Section II seeks information about all the activities of an applicant organization, not merely those an organization deems charitable)].

[5]By June 1, 1993, the date Muntasser signed the 1023 Application, Care had published under its own name at least two issues of the Al-Hussam. [<u>See</u> Govt. Exs. 45, 267 & 267A].  Furthermore, on June 11, 1993, Care issued its third issue of Al-Hussam, which indicated that Care was already a tax exempt organization when in fact Care had not yet been recognized as such by the IRS. [Govt. Ex. 267A].  That recognition was not granted until October 1993. [Govt Ex. 2].

12

Care had already begun distribution of a newsletter nor did he
indicate that Care planned to engage in such activity in the
future. [Tr. 12:120, 122 & 13:66, 69, 71-72, 134 (Charnoff -
initial IRS reviewer of Care's 1023 Application); Tr. 15:97, 99,
120, 143 & 16:29, 71 (Sack - IRS' final decision-maker of Care's
1023 Application); see Tr. 17:52 (Goldberg: words "newsletter"
and "Al-Hussam" not mentioned in Care's 1023 Application)].  The
IRS considered the distribution of a bimonthly newsletter as a
substantial activity that should have been disclosed in response
to Question 1 of Section II of Care's 1023 Application.  [Tr.
12:120, 126 (Charnoff); 15:97 (Sack)].

     Muntasser also failed to disclose that Care intended to
solicit money for jihad or the mujahideen or to promote jihad and
the mujahideen through the distribution of tapes, books, or
newsletters.  Furthermore, Muntasser concealed the true "purpose"
of one of Care's disclosed activities --its orphan sponsorship
program; the program was not intended to benefit all orphans but
rather was primarily intended to assist the orphans of the
martyrs, thus promoting jihad. [Govt. Exs. 123 & 185; Tr. 20:137-
139 (Levitt); see Tr. 12:147 (Charnoff: would not have approved
Care's 1023 Application if it had disclosed that the focus of its
orphan program was the children of martyrs because such activity
was an "inducement" to fight.)].

     Additionally, in the 1023 Application, Muntasser lied and

concealed from the IRS Care's relationship to Al-Kifah when he answered "no" to the question whether Care was "an outgrowth of (or successor to) another organization . . . ." [Govt. Ex. 2, Part II, Question 5]. As the jury necessarily concluded, Care was in fact the successor to and outgrowth of Al-Kifah. [See jury instructions at Tr. 24:166-167].

Care immediately assumed the publication of Al-Kifah's pro-jihad newsletter, publishing its first issue on April 16, 1993, three days after its incorporation. Muntasser and other Care officers (including Munther Baara, Care's treasurer, and a signatory on some Al-Kifah checks)[6] intermingled the monies collected by Care with that collected under the name Al-Kifah and transferred $21,000 from Al-Kifah to Care. [Tr. 20:41-44, 48-49 (Special Agent Youngquist); compare Govt. Exs. 414-431 with Def. Ex. 1036; Govt. Exs. 349, 351-352, 379, 388, 392].[7] Similarly,

---

[6]Beginning in January 1993, Baara faxed Al-Kifah monthly direct deposit records to Baybank presumably at the behest of Muntasser, who signed these documents on behalf of Al-Kifah. Muntasser was the only signatory on the Al-Kifah account. After Care was incorporated and while serving as Care's treasurer, Baara continued to perform this function. [See Govt. Exs. 411-431]. By faxing these records to the bank, Baara was ensuring that the appropriate donor bank accounts were debited and the Al-Kifah account was credited for that month. The operations and activities of Al-Kifah, like Care, depended on donations. Through these monthly direct deposit records, Al-Kifah collected between $1,000 and $2,400 from January 1993 through March 1994.

[7]Al-Monla's bank records reveal that he was aware that donations were being intermingled between the accounts of Al-Kifah and Care and that both Al-Kifah and Care were soliciting money to support the mujahideen. In September 1993,

Muntasser distributed money raised under the names Al-Kifah and
Care to the same or similar beneficiaries.  For example, using
the bank accounts of Al-Kifah and Care International, Muntasser
transferred money to the Services Office (sometimes referred to
as Human Service Office).  The Services Office and Human Service
Office are both aliases for Maktab al Khidamat ("MAK"), the pro-
mujahideen organization of Sheik Abdullah Azzam and Usama bin
Laden.  Between October 1993 through June 1995, Muntasser, using
Care's bank account, authorized the transfer of over $120,000 to
the Services Office in Zagreb, Croatia. [Tr. 20:51-54
(Youngquist); Govt. Exs. 496 (chart), 158-161, 163].  MAK had
offices in Zagreb at that time. [Tr. 14:39 (Kohlmann)].

       In addition, Care, like Al-Kifah, was also known by the name
Maktab al Khidamat. [Tr. 11:62-67 (Tiba)].  Muntasser himself
referred to Care as Maktab al Khidamat. [Govt. Ex. 510A; Vallee
Tr. 19:111-112 (Vallee)].  Care referred to itself by this name
on every Arabic issue of the Al-Hussam with the exception of one.
Care published this newsletter until on or after 1997. [Govt. Ex.
250 & 250A (January 1997 issue of Al-Hussam); see 450A (3/5/97
letter of Al-Monla to donor describing "[o]ne of our [Care's]
projects" as the distribution of "Al-Hussam newsletter" and

---

Al-Monla wrote a check "For the mujahideen in Bosnia."  Al-Monla
left the payee blank on this check from which a jury could infer
so that he knew that it would be deposited into either the
account of Al-Kifah or Care.  Al-Monla's check was ultimately
deposited into Care's Baybank account. [Govt. Exs. 375 & 556].

requesting assistance in distributing Al-Hussam in California)].

**B.    Care Granted Tax Exempt Status Based upon False and Incomplete Information in 1023 Application.**

On October 28, 1993, Gerald Sack, a Branch Chief of one of the Four Ruling Branches of IRS Exempt Organizations, notified Care by letter that the IRS had determined that it was entitled to exemption under Section 501(c)(3) based upon the information Muntasser supplied and "assuming [its] operations [would] be as stated in [its] application." [Ex. 2].  In this letter, Sack also notified Care of its obligation to file IRS Form 990 returns on an annual basis if its donations exceeded $25,000.  Sack further advised Care that if its "sources of support" or its "purposes, character, or method of operation change" from that previously disclosed by Muntasser in its application, Care was required to notify the key district "so that office can consider the effect of the change on [its] exempt status." [Ex. 2].

**C.    Had Muntasser Fully Completed Form 1023 Application Truthfully, Care's Application Would Have Likely Been Denied.**

As a result of Muntasser's false and misleading representations, the IRS recognized Care as a tax exempt Section 501(c)(3) organization.  In all likelihood, the IRS' reviewers, both of whom had over twenty-years experience at the time Care's application was filed, agreed at trial that they would have denied Care's application had they known that Care engaged in

16

activities that solicited money for fighters or promoted fighting overseas. [Tr. 12:151-152 (Charnoff: "I would have recommended -- I would have prepared a proposed denial letter."); Tr. 16:36, 49, 74-75 (Sack: solicitation of money for fighters or inducement to engage in fighting do not constitute charitable activities; would recommend denial of any application that disclosed that organization engaged in such activities irrespective of percentage of time spent on these non-charitable activities compared with charitable activities); see Tr. 20: 120-121, 126-127 (Levitt: Care's Al-Hussam newsletters promoted violent jihad and the mujahideen and employed concept of economic jihad)]. Because of the fraud perpetrated by Muntasser, however, Charnoff and Sack were unable to properly assess (through the use of detailed information letters, etc.) whether Care was entitled to a Section 501(c)(3) exemption.  Similarly, despite Care's obligations to disclose the nature of all of its activities to the IRS, which were not previously disclosed (see, e.g., IRS letters of October 28, 1993 and June 11, 2000 and Forms 990 for 1993-2003), none of the defendants ever notified the IRS of Care's non-charitable activities involving the solicitation of money for fighters and expenditure of money to support and promote fighting.  As a result of the defendants' fraudulent activity, Care would not have continued to have accorded tax exempt status.  If the IRS had determined that Care was engaging

17

in non-charitable activities such as the solicitation of money
for fighters or encouragement of people to travel overseas to
fight, the IRS would likely have revoked its tax exempt status.
[Tr. 17:112-113, 118 (Goldberg)].

    **D.    Proper Calculation of Loss**

    The defendants should not be rewarded for their deception to
the IRS.  The government has proven by at least a preponderance
of the evidence that Care would not have received a tax exemption
under Section 501(c)(3) if Muntasser had truthfully and
completely answered every question in the Form 1023 Application.
Further, the government has also demonstrated that Care's
exemption would likely have been revoked if the defendants had
ever disclosed the Care's purposes, character, and activities to
the IRS as required.

    Under these circumstances, the determination of loss is the
greater of the "actual loss" or "intended loss."  U.S.S.G. §2B1.1
cmt. n. 2(A).  The First Circuit has recently explained that
"intended loss" means "the loss the defendant reasonably expected
to occur at the time he perpetrated the fraud.  In other words,
... the Guidelines anticipate that the defendant will be punished
commensurate with the degree of loss he reasonably expected to
occur as long as this amount is greater than the victims' actual
loss including where the victim actually incurred no loss at
all."  United States v. Innarelli, 524 F.3d 286, 290 (1st Cir.

18

2008).  The First Circuit further clarified that despite the use
of the word "intended" to modify loss, the subjective intentions
or hopes of the defendant are not the focus of the loss inquiry.
Id. at 291.  To the contrary, when determining the appropriate
offense level, the courts should consider the "objectively
reasonable expectation of a person in the [defendant's] position
at the time he perpetrated the fraud."  Id.

    Here, the reasonable estimate of loss should be based upon
the entire amount of the contributions Care obtained as a result
of its fraudulently obtained and maintained exemption.  See
U.S.S.G. §2B1.1 cmt. n.3(C) ("court need only make a reasonable
estimate of the loss.").  Because the crime here was intended to
obtain as much money as possible, the intended loss extends to
all contributions which Care intended to solicit and receive
after becoming tax exempt.  Additionally, had the defendants not
lied and concealed information from the IRS, it is more likely
than not that they would not have qualified for a tax exemption.
The testimony at trial was that fighting is not a charitable
activity.  Thus, Care's activities designed to finance, support,
and promote fighting would render it ineligible for such an
exemption.

    The calculation of 34% of Care's contributions is a
reasonable determination of loss.  It reflects both the tax loss
for Care to pay taxes on its income and the deductions made from

19

individuals taxpayers.

## IV. Serious Nature of Offense and Relevant § 3553 Factors Demand a Sentence of Imprisonment Commensurate with Sentencing Guidelines

The Section 3553(a) factors weigh in favor of imposing a strict punishment here to fit the crimes.  18 U.S.C. §3553(a).  As the defendants have repeatedly contended, this was an unique prosecution.  The "nature and circumstances of the offense[s]" are very serious and strike at the heart of the tax laws of this Country.  18 U.S.C. §3553(a)(1); see U.S.S.G. 2T1.1 Background ("[t]ax offenses, in and of themselves, are serious offense").  Further, the Court has a significant opportunity to deter charity fraud in the future using this case.  See id. at §3553(a)(B) (sentence imposed should "afford adequate deterrence to criminal conduct").

As established in the Government's Statement of Offense and Relevant and its submission on the relevance of evidence regarding Care's connection to terrorists and terrorist organizations, the criminal conduct at issue here is serious and involved a complex scheme to defraud the government as a whole.  Through their deception, the defendants took advantage of the United States and its tax laws designed to assist organizations in efforts to help purely peaceful, humanitarian causes.  The defendants diverted money collected through Care to promote and support fighting overseas.  As a result of their fraudulently

20

obtained tax exemption, United States citizens were forced to
subsidize, among other things, the recruitment of fighters
through a newsletter that glorified suicide bombings, donations
to fighters in excess of $135,000 to the mujahideen in Bosnia
through MAK, and an orphan program that focused on the children
of martyrs thereby providing a form of life insurance to martyrs
and encouraging individuals to commit die in the name of jihad.

Deterrence plays an extremely important role in criminal tax
prosecutions as articulated by the Sentencing Commission.  The
Commission stated that:

> The criminal tax laws are designed to protect the
> public interest in preserving the integrity of the
> nation's tax system.  Criminal tax prosecutions serve
> to punish the violator and promote respect for the tax
> laws.  Because of the limited number of criminal tax
> prosecutions relative to the estimated incidence of
> such violations, deterring others from violating the
> tax laws is a primary consideration underlying these
> guidelines.  Recognition that the sentence for a
> criminal tax case will be commensurate with the gravity
> of the offense should act as a deterrent to would-be
> violators.

U.S.S.G. §2T1.1 intro. cmt.; see United States v. Cutler, 520
F.3d 136, 163 (2d Cir. 2008) (citing to introductory comment to
Section 2T1.1 in finding sentence imposed on tax fraud defendant
substantively unreasonable).  The defendants' offenses resulted
in losses to the government ranging from $330,000 to $588,000.
Consequently, as a result of the defendants' crimes, they
received a large benefit for which they should be punished.  The

21

sanction should correspond to the tax loss incurred by the treasury.  Similarly, this Court should impose a sentence that also deters the making of false statements to the FBI, especially where that information relates to an investigation involving national security.

<div style="margin-left: 40%;">

Respectfully submitted,
MICHAEL J. SULLIVAN
United States Attorney

By: <u>/s/ B. Stephanie Siegmann</u>
B. STEPHANIE SIEGMANN
ALOKE S. CHAKRAVARTY
DONALD L. CABELL
Assistant U.S. Attorneys

</div>

Date: June 2, 2008

<div style="text-align: center;"><u>Certificate of Service</u></div>

    I do hereby certify that a copy of foregoing was served upon the counsel of record for the defendants by electronic notice on this 2nd day of June 2008.

<div style="margin-left: 40%;">

<u>/s/ Aloke Chakravarty</u>
Aloke Chakravarty

</div>