1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4    United States of America,      )
                      Plaintiff,    )
5                                   )
                                    )
6    vs.                            )   Criminal No. 05-40026-FDS
                                    )
7                                   )
     Muhamed Mubayyid, Emadeddin Z.)
8    Muntasser, and Samir Al-Monla,)
     a/k/a Samir Almonla,           )
9                      Defendants.  )

10

11   BEFORE:  The Honorable F. Dennis Saylor, IV

12

13                         Rulings re:
                  Judgment of Acquittal Under Rule 29
14                    New Trial Under Rule 33

15

16                              United States District Court
                                Courtroom No. 3
17                              One Courthouse Way
                                Boston, Massachusetts
18                              June 3, 2008

19

20

21

22

23                    Marianne Kusa-Ryll, RDR, CRR
                          Official Court Reporter
24                    United States District Court
                       595 Main Street, Room 514A
25                     Worcester, MA 01608-2093
                  Mechanical Steno - Transcript by Computer

```
 1   APPEARANCES:

 2   Aloke Chakravarty, Assistant U.S. Attorney
     Donald L. Cabell, Assistant U.S. Attorney
 3   United States Attorney's Office
     United States District Court
 4   One Courthouse Way, Suite 9200
     Boston, Massachusetts 02210
 5   for the Plaintiff

 6   Zalkind, Rodriquez, Lunt & Duncan, LLP
     David Duncan, Esquire
 7   65a Atlantic Avenue
     Boston, Massachusetts 02110
 8   for the Defendant Emadeddin Z. Muntasser

 9   Quinn Emanuel Urquhart Oliver & Hedges LLP
     Kathleen M. Sullivan, Esquire
10   Adam Abensohn, Esquire
     51 Madison Avenue
11   22nd Floor
     New York, NY 10010
12   for the Defendant, Emadeddin Z. Muntasser

13   Quinn Emanuel Urquhart Oliver & Hedges LLP
     Susan Estrich, Esquire
14   865 South Figueroa Street, 20th Floor
     Los Angeles, California 90017-2543
15   for the Defendant, Emadeddin Z. Muntasser

16   Law Offices of Michael C. Andrews
     Michael C. Andrews, Esquire
17   21 Custom House Street
     Suite 920
18   Boston, Massachusetts 02110
     for the Defendant, Muhamed Mubayyid
19
     Federal Defender's Office
20   Charles P. McGinty, Esquire
     Judy Mizner, Esquire
21   408 Atlantic Avenue
     Third Floor
22   Boston, Massachusetts 02110
     for the Defendant Samir Al-Monla, a/k/a Samir Almonla
23

24

25
```

<pre>
 1                    P R O C E E D I N G S

 2

 3          THE CLERK:  All rise.

 4          Court is in session.  Please be seated.

 5          This is criminal action 05-40026, United States versus

 6   Muntasser, et al.

 7          Counsel, please state your name for the record.

 8          MR. CABELL:  Good morning, your Honor.  Donald Cabell

 9   and Aloke Chakravarty for the government.

10          THE COURT:  Good morning.

11          MS. SULLIVAN:  Good morning, your Honor, Kathleen

12   Sullivan, along with Susan Estrich, David Duncan, and Adam

13   Abensohn for Mr. Muntasser.

14          THE COURT:  Good morning.

15          MR. ABRAMSON:  Good morning, your Honor.

16          MS. ESTRICH:  Good morning, your Honor.

17          MR. ANDREWS:  Good morning, your Honor.  Michael

18   Andrews for Muhamed Mubayyid.

19          THE COURT:  Good morning.

20          MR. McGINTY:  For Mr. Al-Monla, Charles McGinty, from

21   the Federal Defender Office.  Good morning, your Honor.

22          THE COURT:  Good morning.

23          MS. MIZNER:  Judith Mizner, from the Federal Defender

24   Office.

25          THE COURT:  Good morning, Ms. Mizner.
</pre>

1          All right.  This proceeding today is to announce my

2    rulings on the motions for rule -- for judgment of acquittal

3    under Rule 29 and for a new trial pursuant to Rule 33.

4          To start at the beginning, this is a prosecution for

5    various tax-related offenses and related conspiracy false

6    statement offenses.

7          There are three defendants:  Muhamed Mubayyid,

8    Emadeddin Muntasser, and Samir Al-Monla.  They were convicted

9    after a jury trial of various offenses.  All three defendants

10   have moved for judgment of acquittal as to all counts pursuant

11   to Rule 29, under the Federal Rules of Criminal Procedure, as

12   well as for a new trial pursuant to Rule 33.

13         For reasons that I will explain, the motions for

14   judgment of acquittal will be granted in part and denied in

15   part; and the motions for a new trial will be denied either on

16   the merits or as moot.

17         Essentially, I am granting the motions for judgment of

18   acquittal as to Count One as to defendants Muntasser and

19   Al-Monla on the grounds that there is not sufficient evidence

20   that they committed a relevant act of concealment within the

21   statute of limitations period; and I'm denying that motion as

22   to Count One as to Defendant Mubayyid.

23         I am likewise granting the motions for judgment of

24   acquittal as to Count Two as to all three defendants on the

25   grounds that there is insufficient evidence that the conspiracy

1    charged in the indictment was entered into between Defendant

2    Muntasser and unindicted coconspirators, Mohamed Akra and

3    Waseem Yassin, in 1993 when Care International was formed and

4    applied for charitable status.

5          I'm otherwise denying the motions under Rule 29 as to

6    Count Six as to Defendant Muntasser, that is, his conviction

7    for making a false statement to the FBI about travel to

8    Afghanistan; and as to Counts Three, Four and Five as to

9    Mubayyid, which were his convictions for filing false

10   Forms 990.  And as I indicated, I'm denying the motions for a

11   new trial.

12         At the outset let me make several points.  There was

13   substantial evidence at the trial that all three defendants

14   supported and promoted jihad and the mujahideen, that is,

15   religious-based violence and people who engage in it, through

16   newsletters, financial donations, lectures and otherwise;

17   although in fairness, there was no evidence that they provided

18   lethal aid or similar support to any fighters.  Our legal

19   system provides equal protection of the laws to all persons,

20   even Islamic militants.  I have evaluated the evidence and the

21   arguments according to exactly the same standard as I would in

22   any other prosecution, and the nature of the defendants, the

23   nature of their activities, and the time and effort and

24   resources devoted to this prosecution does not change the legal

25   standard.

1          As I've stated before, the role of the court at least

2     in this context is not to help or hinder the law enforcement

3     priorities of the United States.  It is not to help or hinder

4     the foreign policy goals of the United States.  The court's

5     role is not to make a broad or symbolic statements or words

6     involving victories or defeats.  In this context, the role of

7     the court is to make a relatively narrow and focused inquiry:

8     Was the evidence presented at the trial taken in the light most

9     favorable to the government sufficient to support a conviction

10     as to each defendant and as to each count?  That evidence must

11     be examined, so to speak, with a cold eye, according to the

12     law.

13          The government began this prosecution with significant

14     disadvantage.  The theory of the case is and was that Care was

15     improperly granted charitable status by the IRS and that it

16     improperly maintained that status over the years, and that it

17     used its status to obtain donations and to promote and support

18     noncharitable activities, specifically jihad and the

19     mujahideen.

20          The disadvantage that the government faced was that

21     Care was granted that status in 1993, and that most of Care's

22     noncharitable activities occurred during the years up to 1997

23     and 1998.  The statute of limitations on tax crimes is six

24     years; on other crimes, it's five years.  This case was not

25     indicted until 2005; and as to Al-Monla, not until 2007.  As a

1   result, the government could not charge at least as to those

2   activities that occurred in the early 1990s.  They could not

3   charge the case in a straightforward way.  They took a somewhat

4   creative approach, which they were entitled to do within

5   reason, but the government's charging decisions forced on it

6   perhaps by the passage of time have created problems, some of

7   which cannot be resolved in the government's favor.

8         This case has presented many significant challenges

9   for the parties and the court and the jury.  I'm going to note

10  one such challenge here, because it is relevant.  The

11  government has had substantial difficulty articulating a clear

12  theory of the case and explaining why the evidence and the law

13  supports their theory.

14        At the conclusion of the government's evidence, the

15  defendants moved for a directed verdict of acquittal.  The

16  great majority of those motions in criminal cases, as counsel

17  is well aware, are denied summarily.  The government's initial

18  response was to ask for four days in which to respond in the

19  middle of the trial.  I sent the jury home and gave the

20  government, in essence, a few hours, and eventually I permitted

21  the case to go to the jury on all counts with some misgivings.

22  I then have given the parties an extraordinary amount of time

23  and an extraordinary amount of latitude in their briefings in

24  which to respond to these same issues for this trial.  The

25  government has submitted nearly 275 pages of briefs.  Its

1    opposition to the Muntasser motion for judgment of acquittal

2    alone was 147 pages long, 55 of which were devoted to legal

3    arguments for upholding Count One.  The government's briefs

4    were discursive, sometimes hard to follow.  I do not say that

5    simply to pass editorial judgment; and my decision, of course,

6    does not turn on the length or nature of the briefs, but I

7    simply note that the government itself, which bears the burden

8    of proving the defendants guilty beyond a reasonable doubt has

9    struggled to explain and defend its position, and this court's

10   ruling, therefore, is not -- does not come out of the blue sky,

11   but is the product of lengthy consideration and ample briefing

12   by all parties.

13        Let me turn first to the motion for judgment of

14   acquittal under Rule 29.  Each defendant has so moved on the

15   ground that the evidence was insufficient as a matter of law.

16   In making its evaluation, I am required to consider the

17   evidence and any reasonable inferences that may be drawn from

18   it in the light most favorable to the government.

19        I'll turn first to Count One.  Count One charges

20   concealment of material facts in violation of 18 United States

21   Code, Section 1001(a)(1).  Section 1001 sets forth different

22   types of crimes.  Notably, Section 1001 (a)(2) makes it a crime

23   to make a false statement to a government agency.  That is not

24   the crime charged in Count One.  Section 1001(a)(1) makes it a

25   crime to falsify, conceal, or cover up a material fact by

1   trick, scheme, or device.  That is the relevant crime.  The

2   concealment crime has at least two significant differences from

3   the false statement crime.  The first is that there must be a

4   trick, scheme, or device, which has been interpreted to mean

5   that there must be an affirmative act or concealment, not

6   simply a passive failure to reveal.

7           The second difference is that the concealment must

8   take place under circumstances where there is a duty to

9   disclose.  All persons conceal matters from the government

10  virtually all of the time.  A person can only be prosecuted

11  where the person has a duty to disclose a particular matter to

12  the government and failed to do so.

13          The government has argued at great length that

14  Section 1001 (a)(1) does not require a duty to disclose.  In my

15  view, that is clearly incorrect.  The First Circuit has

16  expressly stated in United States versus Anzalone that the

17  government must prove a duty to disclose to sustain a

18  conviction under Section 1001 (a)(1).

19          Count One was narrowed in the course of the trial.

20  The indictment charged a scheme to conceal material facts in

21  violation of Section 1001 (a)(1).  The agencies from whom the

22  facts were alleged to have been concealed were the IRS, the

23  FBI, and the former Immigration and Naturalization Services,

24  now the Department of Homeland Security.  The facts concealed,

25  according to the indictment, were that Care International was

1    an outgrowth of and successor to the Al-Kifah Refugee Center

2    and was engaged in noncharitable activities involving the

3    solicitation and expenditure of funds to support and promote

4    jihad.

5            As charged, the indictment was not necessarily limited

6    to tax issues.  For example, the FBI might well find it

7    material whether charitable funds were used to support jihad;

8    but as the trial developed, and specifically the government

9    submitted a proposed jury instruction, the prosecution was

10   narrowed so that Count One only charges a tax-related offense.

11   Specifically, the government requested the following

12   instruction: "The government need not prove that the disclosure

13   of the concealed fact would have resulted in a denial of

14   government benefit, but rather the disclosure of the fact would

15   have influenced the IRS's investigation, handling, or

16   consideration of Care's eligibility for tax-exempt status under

17   Section 501(c)(3).  Accordingly, if you find that the -- that

18   had the IRS known that Care was a successor or outgrowth of

19   Al-Kifah, or Care was planning to solicit money for armed

20   fighters engaged in activities involving the expenditure of

21   money to support or promote fighting, if the IRS were to

22   subject to Care's 501(c)(3) application to closer scrutiny you

23   should conclude that those facts were material."  I gave a

24   modified version of that instruction and charged the jury as

25   follows:  I charged that here the government alleges that the

1    concealed facts would have had a natural tendency to influence

2    or be capable of influencing the IRS in making its

3    determination of whether Care International qualified for

4    tax-exempt status.  Under Section 501(c)(3) of the Internal

5    Revenue Code, it should be continued -- it should continue to

6    be afforded that status thereafter.  The government need not

7    prove, however, that Care International would have been denied

8    tax-exempt status, or had that status revoked had those facts

9    been disclosed."

10           In substance, the effect of the government's requested

11   instruction and my acceptance of that instruction was to narrow

12   the indictment.  A concealed fact in this case could only be

13   material and, therefore, only be the basis of the criminal

14   prosecution if it had a natural tendency to influence or be

15   capable of influencing the IRS in making its determination

16   whether Care qualified for tax-exempt status.

17           That is significant in at least this respect:  If a

18   statement here was made to another federal agency, not the IRS,

19   the evidence must in some way establish that the statement

20   influenced or could have influenced the IRS in making its

21   charitable determination.  To put it another way, the question

22   is not simply whether the defendant concealed facts or

23   concealed facts from the government, but whether they concealed

24   them from the IRS.

25           Turning first to Defendant Muntasser on Count One, the

1    principal issue is whether he committed any act within the

2    statute of limitations.  Again, he filed the Form 1023 seeking

3    charitable status for Care in 1993.  In 1996, he signed and

4    filed Forms 990 covering the years 1993 through 1995.  He was

5    replaced as Care's president in approximately 1996, and he had

6    some involvement with the organization for at least some period

7    thereafter.  He was indicted on May 11, 2005.

8         Again, the statute of limitations for tax crimes is

9    six years.  Section 1001 properly requires a five year statute

10   of limitations.  There is an issue.  The defendants requested,

11   and I erroneously gave, in response to their requests, an

12   instruction applying a six year statute of limitation.  I have

13   concluded that the difference is not meaningful based on the

14   way that I have ruled in this case, and I will apply the

15   correct statute of limitations, that is the five year statute

16   of limitations.  That means that the government must prove

17   that Mr. Muntasser committed the crime charged under

18   Section 1001 (a)(1) within the limitations period, or after

19   May 11, 2000.

20        The calculation of the limitations period in

21   concealment cases under Section 1001 (a)(1) is not as clear as

22   one might expect.  Normally, a limitations period in a criminal

23   case runs from the time the crime is complete, whether or not

24   the government has discovered the existence of the crime.  In a

25   concealment case, arguably, the crime continues as long as the

1  matter remains concealed.  The government takes that position

2  here, at least in the alternative, that the crime charged is a

3  continuing offense that remains ongoing as long as the

4  concealment continued.

5       More precisely, the government argues that because

6  Muntasser concealed material facts in 1993, he continued to

7  reap the benefit of these acts of concealment through at least

8  2003 in two principal ways:  The first is that Care continued

9  to keep its tax-exemption; and the second is Mr. Muntasser

10 avoided prosecution for having concealed the earlier fact.

11      The government has specifically argued that the scheme

12 to conceal continues to this day; in other words, that the

13 statute of limitations has never begun to run.  And again,

14 alternatively, as long as he has avoided prosecution, or as

15 long as Care kept its tax-exemption, he reaped the benefit of

16 this concealment scheme.

17      The key case is Toussie versus United States, 397 U.S.

18 112, 1970.  The Supreme Court held in that case that whether a

19 crime is continuing for statute of limitations purposes is a

20 matter of statutory construction.  A crime will be continuing

21 or deemed continuing only when the explicit language of the

22 substantive criminal statute compels such a conclusion, or the

23 nature of the crime involved is such that Congress must

24 assuredly have intended that it be treated as a continuing one.

25      Again, the issue is one of statutory construction.

1 Unquestionably, there is no explicit language making

2 Section 1001 (a)(2) a continuing crime so the question is

3 whether the nature of the crime is such that Congress must have

4 assuredly intended that it be treated as continuing.

5    The government's argument turns principally on the

6 word "scheme."  As I indicated, Section 1001 (a)(1) requires a

7 trick, device, or scheme.  The government says in substance

8 that the word "scheme" implies an ongoing course of conduct.

9 That is true to a point, but there are at least several

10 problems with that theory.  The first is that it would mean

11 that a different statute of limitations were to apply whether

12 the concealment involved a trick or device, which would be a

13 relatively finite set of facts, or a scheme, which would be

14 relatively open-ended.  There is no indication Congress

15 intended such a result.  They have different limitations

16 periods under different words of the same statute.

17    The second problem is that it's difficult to say when

18 a limitation -- the statute of limitations would accrue under

19 that theory.  Indeed, it might never accrue.  In many cases,

20 the government says it has not accrued here.  Again, there's no

21 indication that Congress intended that extraordinary result in

22 effect providing no statute of limitations for concealing a

23 crime.

24    Third, and the broader sense, continuing to reap the

25 benefit of a criminal act is not normally a continuing crime.

1    Toussie itself stands for that proposition, and Toussie was a

2    draft dodger, who failed to register for the draft.  The

3    argument was made that each day that he avoided the draft was

4    an ongoing or a continuing crime.  The Supreme Court rejected

5    that argument saying that a greater indication through

6    statutory language was required; that Congress intended such a

7    result.  That's true for a broad class of crimes:  Theft,

8    fraud, tax evasion.  Those crimes are not deemed continuing as

9    long as the perpetrator involves some ben -- enjoys some

10   benefit, financial or otherwise.

11        The government relies principally on the United States

12   versus Hubbell, 177 F.3d 11, D.C. Circuit, 1999, which involved

13   a dismissal of an indictment for vagueness, not for statute of

14   limitations issues.  The court there cited the Bramblett case

15   from the District of Columbia Circuit in 1956, the case that

16   preceded Toussie.  In Bramblett, the defendant set in motion a

17   scheme involving a phantom employee, who continued to collect

18   checks.  The defendant argued that the crime was complete when

19   the falsification was made, which was outside the statute of

20   limitations period.  The court held that the receipt of checks

21   by taking of fruits of the scheme within the limitations period

22   was sufficient.  Bramblett preceded Toussie.  Its validity is

23   somewhat unclear.  Again, Toussie itself involved a crime where

24   the defendant continued to reap the benefit of not being

25   registered for the draft long after the crime had occurred.

1    The case law under Section 1001(a)(1) after Toussie supports

2    the defendant's position in large part, specifically United

3    States versus Dunne, 324 F.3d, 1158, the Tenth Circuit 2003;

4    United States versus Grenier, 513 F.3d, 632, the Sixth Circuit,

5    2008; and United States versus Gremilion-Stoval 397 at Supp.

6    2nd 798, the Eastern District of Louisiana, 2005.

7          I conclude based on that authority and based on

8    Toussie that under Section 1001(a)(1), the crime is complete

9    when the case could be brought and proved by the government; in

10    other words, as soon as the defendant has committed the act of

11    concealment, the limitation of that period begins to run in

12    this context where the essence of the crime is one or more

13    affirmative acts of concealment.  Each new affirmative act of

14    concealment is a new criminal act.

15          Again, mere silence is not enough.  Mere continuation

16    or acceptance of an illegally-obtained benefit is not enough.

17    Mere avoidance of prosecution is not enough.  I charged the

18    jury under the statute of limitations purposes at the trial,

19    and I continue to believe that that ruling is correct.

20          The question then becomes what if any affirmative act

21    of concealment occurred within the limitations period.  The

22    government points, in essence, to three events occurring after

23    May 11, 2000.  In October, 2002, Mr. Muntasser submitted a

24    naturalization application to the INS.  He was asked whether he

25    had ever been a member or associated with any organization,

1    association, et cetera, in the United States or any other

2    place.  He did not answer the question and -- and left blank

3    the space requiring him to list the name of each group or

4    organization.  He filed an amended application in November of

5    2003, providing a list of organizations with which he had been

6    associated, which included both Care and Al-Kifah.

7            In April of 2003, Defendant Muntasser was interviewed

8    by Special Agent Peet of the FBI.  Agent Peet testified that

9    the purpose of the interview was to inquire of Mr. Muntasser

10   what his relationship was with Care International and what that

11   relationship was with Al-Kifah.  Mr. Muntasser was asked about

12   Al-Kifah.  He said that he became involved in the organization

13   through Mr. Chehade, who later left Boston to work with Global

14   Relief Foundation.  Mr. -- or Agent Peet did not testify as to

15   the specific forms of the questions asked, but stated in

16   general terms that the types of questions he was asking

17   concerned the relationship between Care and Al-Kifah.

18           According to Agent Peet, Muntasser stated that Care

19   was created approximately six or seven years prior to the date

20   of the interview after Al-Kifah was dissolved; that Al-Kifah

21   and Care had the same basic mission; that they may have had a

22   slightly different focus, but they had the same basic mission.

23   They had the same office space on Commonwealth Avenue.  Some of

24   the officers who served in Care also served in Al-Kifah, and

25   that the purpose of Care was essentially the same purposes of

1    Al-Kifah.

2         Agent Peet also testified that Muntasser stated that

3    Care was formed as a result of he, Muntasser, attempting to

4    obtain tax records from Al-Kifah New York, and that he was

5    unable to obtain those records after having sent a registered

6    letter to Al-Kifah, and that he described Care as a charitable

7    organization that raised money through direct mailings after

8    prayers at local mosques and through solicitation on the

9    Internet website.

10         He also testified that Care was involved in orphan

11   sponsorships, supporting vocational schools in several

12   countries, and providing training to veterans as to how to make

13   shoes.

14         The third then act that the government points to after

15   May 2000 was an interview with John Fernandez of the United

16   States Custom and Border Protection Agency.  Mr. Fernandez

17   interviewed Mr. Muntasser after his arrival in the United

18   States after a trip to Libya in April of 2004.  Mr. Fernandez

19   said that the focus of the interview was to explore Mr.

20   Muntasser's amended responses on his naturalization application

21   and to consider whether in light of his foreign travel there

22   were any grounds for sustaining abandonment of residency

23   charge.  Mr. Muntasser was asked why he visited Afghanistan and

24   Pakistan in 1984 -- 1994, and he explained that when he was

25   with Care they were doing humanitarian work.  He visited

1    orphanages, schools, and places where they make handcrafts.  He

2    did not reveal that he had met with Hekmatyar on the Afghan

3    border.

4         None of those three interviews or acts of concealment

5    were made to the Internal Revenue Service.  Again, the

6    government's theory the way they asked me to charge the case,

7    and I did, was that a concealed fact was material only if it

8    had a natural tendency to influence or to be capable of

9    influencing the IRS and making its determination about whether

10   Care qualified for tax-exempt status under Section 501(c)(3) of

11   the Internal Revenue Code.  The question then is how can an act

12   of concealment to Immigration, or to Customs and Border

13   Protection, or to the FBI influence the IRS in a Section

14   501(c)(3) determination.

15        The government's principal response to that question

16   is to argue at some length that it is unlawful to make a false

17   statement to the FBI.  That is, of course, true in Count One.

18   That's not what the defendants are charged with.  They're

19   charged with concealing tax-related information.  The

20   government, of course, could have charged false statements

21   under 1001 (a)(2); and, in fact, they did as to Count Six where

22   they charged Mr. Muntasser with falsely denying having been in

23   Afghanistan.

24        So, if you conceal a material fact from the FBI, or

25   from Immigration, or from Customs and Border Protection that

1   relates to tax status, is that impairing and impeding the

2   Internal Revenue Service?  That issue could be framed in at

3   least three different ways.

4           The first is -- which I think is the least

5   satisfactory is framing it as a duty to disclose, that is, did

6   the defendants have a duty to disclose tax-related facts to the

7   FBI.

8           The second is framing it as a materiality question.

9   Could an act of concealment directed to the FBI be material to

10  the IRS's tax return issue?

11          And the third way of framing it is a jurisdictional

12  issue:  Was a concealment of tax information from the FBI a

13  concealment of a matter within the IRS's jurisdiction?

14          The law here is murky, to say the least, but my

15  conclusion is that no matter what the theory is, there has to

16  be some nexus or connection between the act of concealment and

17  the impairment of IRS functions.

18          Turning first to the duty to disclose theory, clearly

19  the defendants had a duty to make disclosure to the IRS at the

20  time the Form 1023 was filed and each Form 990 thereafter.

21  Clearly, defendants had a duty to answer questions truthfully

22  when asked questions by the FBI, or by Customs, or in an INS

23  forum.  If the defendants were not asked questions, they had no

24  obligation to volunteer information in that context.  It's also

25  true, of course, an affirmative act of concealment can be

1    derived from a half-truth as well as a lie, and whether

2    something is a half-truth depends on context in the nature of

3    the questions asked.  I will begin by visiting the issue of

4    whether the defendants were asked the right questions, so to

5    speak, and whether the responses given were false, or

6    incomplete, or in both half-truths.

7    　　　　　Defendant Muntasser's interview with Agent Peet, it is

8    not at all clear that he concealed anything material as to the

9    successor and outgrowth issue.  He told Special Agent Peet that

10   Al-Kifah and Care had the same basic mission, essentially the

11   same purpose, shared the same office space, or used the same

12   office space, and had some of the same officers.

13   　　　　　Viewing the evidence in the light most favorable to

14   the government, Muntasser misstated the date that Care was

15   formed.  He said it was six to seven years ago, when the truth

16   was, I think, ten years ago, and he misstated the reasons that

17   Care was formed.  There is at least some doubt in my mind as to

18   whether these misstatements were material, but I will assume

19   for these purposes that they were.

20   　　　　　As to the charitable issue, the concealment consisted

21   of stating simply that Care was a charitable organization.  The

22   government says that Muntasser should have said not that it was

23   a charitable organization, which it is an organization that

24   engages in both charitable and noncharitable activities, which

25   include supporting and promoting jihad and the mujahideen.

1    Again, although the issue is far from clear, I'm going to

2    discern and assume for these purposes that these were

3    affirmative acts of concealment.

4           In terms of the application form to the INS, there was

5    simply nothing in it that asked about successor or outgrowth

6    issues or charitable activities.  In the 2004 Customs

7    interview, it is again viewing the evidence in the light most

8    favorable to the government.  It is true that he did not

9    conceal all of the purposes for his trip to Afghanistan and

10   Pakistan, and indicated he was doing humanitarian work.  A

11   truthful response would have been, in substance, that I visited

12   Afghanistan and Pakistan to conduct humanitarian work and

13   nonhumanitarian work supporting jihad and Care including

14   meeting with an Afghan war lord.  Again, I'm going to assume

15   that this was, in fact, an affirmative act of concealment.

16          Even assuming, however, that the statements were

17   half-truths made under the circumstances where the defendants

18   had an obligation to provide more complete information, the

19   statements must have been material, that is, they must have

20   been capable of influencing the IRS in its determination of the

21   tax status of Care.  If those statements were made to the IRS,

22   of course they were capable of influencing the IRS.  The IRS

23   would want to know if Care was being operated for noncharitable

24   purposes, but false information is capable of influencing an

25   agency only if the agency did receive that information, or

1    could have received that information in the ordinary course,

2    was likely to receive the information, if it was reasonably

3    foreseeable to the maker of the statement that the agency would

4    receive the information.  Again, there must be some nexus or

5    connection between the false statement and the impairment of

6    the agency functions.

7          There is no evidence that the IRS did receive any

8    information from INS or -- or Customs and Border Protection

9    concerning the defendants, or that they would have in the

10   normal course of events, or that it was reasonably foreseeable.

11   The only evidence of a connection or nexus between the FBI and

12   the IRS is evidence that the FBI and the IRS criminal

13   investigation division were members of an interagency tax force

14   from about 2002 onward.  Although I'll return to that issue in

15   a moment and turn next to the jurisdictional question.

16         The case law is most developed under the jurisdiction

17   prong of Section 1001.  Section 1001 prohibits affirmative

18   concealments of any matter within the jurisdiction of any

19   department or agency of the United States.  For jurisdictional

20   purposes, a concealment or misrepresentation need not be made

21   directly to a federal agency or department to sustain a 1001

22   conviction.  The government, however, must prove a nexus -- a

23   necessary link between the deception of the nonfederal agency

24   and the function of the federal agency.  The link may be

25   established by showing that the concealment or false statements

1    result in the perversion of the authorized functions of the

2    federal department or agency.  All of those are quotes from the

3    United States versus St. Michael's Credit Union, 880 F.2d

4    579 to 591, the First Circuit, 1989.

5           This case comes up -- this issue has come up in the

6    context of statements made to state agencies or to private

7    parties, as opposed to other federal agencies, but I think the

8    principal applies for their analogy, that is, the affirmative

9    acts of concealment may not necessarily take place within the

10   jurisdiction of the agency whose functions are impaired by the

11   concealment.  In St. Michael's Credit Union, the affirmative

12   acts of evasion, which were a credit union employee showing

13   copies of currency transaction reports, misstate bank examiners

14   and stating falsely that they had been filed with the IRS, were

15   made to the state agency and not to the IRS.  The Petullo case,

16   709 F.2d 1178, Seventh Circuit, 1983, involved false work

17   vouchers for snow removal submitted to the City of Chicago,

18   which was using federal funds to pay for the work.  U.S. versus

19   Notarantonio 758 F.2d 777, the First Circuit, 1985, which

20   involved false invoices and certificates for construction work

21   submitted to a bank to release construction funds where the

22   loan was guaranteed by the Small Business Administration; or

23   United States versus Baker, 626 F.2d 512, the Fifth Circuit,

24   1980 for false time sheets for work hours that were submitted

25   to the City of Dallas, which paid for services under the

1    federal grant.  In each of those cases there was a causative

2    link between the falsehood of the concealment and the

3    impairment or possible impairment of the federal agency.  In

4    St. Michael's Credit Union, for example, the state bank

5    examiner was auditing the credit union to ensure its compliance

6    with state and federal laws and regulations and, in fact, had

7    been specifically instructed by the government to enforce the

8    CTR laws against state institutions; and in Notarantonio, the

9    false statements to the bank clearly endangered the safety and

10   security of the SBA guarantee.

11        Again, that raises the question of what is the

12   causative link here.  What is the nexus or connection between

13   the FBI or Immigration or Customs and Border Protection and the

14   IRS?  Again, I see no link or connection of any kind between

15   Immigration and Customs and Border Protection.  The government

16   offered no real evidence of any connection, no evidence that

17   the information was relayed to the IRS, could have been shared,

18   would have been shared in the normal course, or anything of the

19   sort.

20        Again, the -- the evidence as to the nexus between the

21   FBI and the IRS depends on a single piece of evidence, and that

22   is that after 2002, the FBI in the Criminal Investigation

23   Division of the IRS referred to a joint task force.  There was

24   no evidence that Agent Peet spoke to the IRS beforehand or

25   afterward; that he contemplated sharing information with the

1    IRS; that the FBI routinely shared information with the IRS;

2    that it expected or intended to, or for that matter, that IRS

3    shared information with its charitable division.  There might

4    easily have been such evidence, but there was not.  So the

5    prosecution depends upon the inference.  Does the existence of

6    the joint task force support the reasonable inference that if

7    complete information had been provided to the FBI, the FBI

8    would have shared it with the IRS criminal investigation

9    division, which would have passed it onto the charitable

10   division, which would have reevaluated Care's 501(c)(3) status;

11   or put another way, the entire superstructure of Count One as

12   to Muntasser rests on that single point.

13        My conclusion is that the inference is not reasonable.

14   It is simply too thin to sustain a conviction.  Proof of a

15   felony beyond a reasonable doubt may rest not merely on

16   evidence, but reasonable inferences from the evidence, but at

17   some point the inferences are simply too great to sustain a

18   conviction.

19        The FBI and the IRS are highly-structured agencies.

20   They have reasonable clear jurisdictional boundaries.  The FBI

21   does not determine the charitable status of corporations.  In

22   the ordinary course, it does not enforce the tax laws of the

23   United States; and in the absence of any evidence, other than

24   the existence of a joint tax force, I think the jury could not

25   fairly infer the necessary nexus between the FBI and the IRS.

1          A similar analysis applies as to Al-Monla on Count

2     One.  He -- he was not indicted until March 8, 2007.  He signed

3     a Form 990 on February 16, 2000, but that act was outside the

4     limitations period.  The affirmative acts of concealment, if

5     any, took place within two FBI interviews:  One on April 7,

6     2003 and one on September 17, 2001, outside the five year

7     statute of limitations, but inside the six.

8          He was interviewed on April 7th by Special Agent Davis

9     of the FBI.  Davis asked Al-Monla about Care.  Al-Monla

10    described it as a charitable organization.  On his behalf, he

11    solicited donations in support of widows, orphans and mosques.

12    He said Care raised an average of 30 to $40,000 a year.  He

13    said that there was an association between Global Relief

14    Foundation and Care and that Care sometimes provided funds to

15    GRF to distribute.  He was asked whether Care had any

16    association with Benevolence International Foundation, Holy

17    Land Foundation, to help the needy.  Al-Monla said that they

18    did not work with those organizations.  He said that no one at

19    Care received a salary.  He was asked about a trip to Pakistan

20    in 1990 and '91, whether he had ever been to Afghanistan and

21    whether had he knew Bassam Kanj.  The government says that

22    Al-Monla's response as to each of those questions was either

23    affirmatively false or misleading.  The alleged false statement

24    as to Bassam Kanj was the subject of a separate count of the

25    indictment, and he was acquitted as to that count.

1        There did not appear to have been any questions

2   regarding whether Care was an outgrowth or successor or any

3   questions concerning Al-Kifah.  The government says that

4   because Al-Monla said he was introduced to Care by Mubayyid in

5   1990.  Because Care did not exist in 1990, but Al-Kifah did,

6   that this triggered a duty to disclose information about

7   Al-Kifah.  There was no testimony, at least none pointed to the

8   government, especially as to Agent Davis, who was interviewing

9   Al-Monla as part of a joint task force, including the IRS,

10  although there was evidence that there was a joint task force

11  in place as of 2002, and the Al-Monla and Muntasser interviews

12  took place the same day as the searches were executed.

13        Again, without going through the analysis, I conclude

14  that there is not sufficient evidence of a nexus or connection

15  between the FBI interview on April 7, 2003 or the earlier

16  interview on September 17, 2001, in which Agent Davis

17  interviewed Al-Monla and asked him about Care's activities to

18  sustain a finding that the lawful functions of the IRS were

19  impaired and impeded by those affirmative acts of concealment.

20        The analysis as to Mubayyid is different.  He was

21  indicted on May 11, 2005.  He was interviewed in September 2001

22  by Trooper Ball of the Massachusetts State Police and Special

23  Agent Treadway of the FBI and is alleged to have made false

24  statements or to conceal material facts, but he also

25  formed -- filed Forms 990 with the IRS in November 2000,

1    July 2001, and June 2002.  Those were statements made directly

2    to the IRS relating to the charitable status of Care.  They

3    were all made within the limitations period.  And unless

4    Form 990 itself cannot be the basis for a prosecution, which is

5    an issue that I will address momentarily, there is sufficient

6    evidence to sustain the conviction that Mubayyid made an

7    affirmative act of concealment within the limitations period as

8    to a tax-related matter.

9         In conclusion, therefore, as to Count One, I find that

10   the evidence is not sufficient to sustain the conviction as to

11   defendants Muntasser and Al-Monla, but it is sufficient to

12   sustain the conviction as to Defendant Mubayyid.

13        I'll turn then to Count Two, which is the conspiracy

14   count.  To sustain a conviction, there must be sufficient

15   evidence of the conspiracy charged in the indictment.  It must

16   be that conspiracy and not some other conspiracy.  A conspiracy

17   requires at least two people.  A person cannot conspire by

18   himself.  If one person engages in a course of criminal conduct

19   and others later joined him and agree to continue that conduct,

20   the conspiracy does not begin until two or more persons have

21   entered into an agreement.

22        Of course, proof by circumstantial evidence is

23   perfectly permissible, and the use of reasonable inferences is

24   perfectly permissible.  In this context, those inferences must

25   be taken in the light most favorable to the government;

1    however, the court must exercise caution if it is stacking

2    inferences upon inferences.

3         The conspiracy charged in the indictment is a

4    so-called Klein conspiracy, a conspiracy to defraud the United

5    States by impairing and impeding the lawful functions of the

6    IRS.  Specifically, the conspiracy charged was a conspiracy

7    with a single object.  The purpose or the impairment of the IRS

8    was as to whether Care International, Inc. qualified and should

9    be designated as a Section 501(c)(3) organization in 1993 and

10   should continue to be accorded status as a Section 501(c)(3)

11   organization thereafter.

12        Again, it's a single-object conspiracy, a conspiracy

13   both to obtain and to maintain charitable status for Care.

14   There were three named conspirators:  Muntasser, Mubayyid, and

15   Al-Monla.  The government identified two unindicted

16   coconspirators, Mohammed Akra and Yassin Waseem.  The

17   conspiracy is alleged to have begun in or about April 1993 and

18   continuing until in or about -- or in or about April 2003.

19        Muntasser applied for charitable status for Care in

20   June 1993, and the IRS granted that status in October 1993.

21        The government acknowledges that Al-Monla and Mubayyid

22   were not involved in the obtaining of charitable status for

23   Care.  The government contends that they did not join the

24   conspiracy until sometime thereafter.  Accordingly, if a

25   conspiracy existed in 1993, it had to have involved Muntasser,

1    Akra, or Yassin, or some combination of those persons.

2         It is not sufficient for the government to prove that

3    Muntasser, Mubayyid, and Al-Monla conspired to maintain the

4    charitable status of Care beginning in, say, 1995.  That may

5    well have been a crime, but it is not the crime charged in the

6    indictment.  To sustain the conviction under Count Two, there

7    must be sufficient evidence that at least two identified

8    coconspirators shared an intent to conceal material information

9    from the IRS in order to obtain and maintain charitable status.

10        Again, Muntasser applied to the IRS to obtain

11   charitable status on behalf of Care.  The IRS requested

12   information from Care as to whether it was a successor or

13   outgrowth of another organization or whether it engaged in

14   noncharitable activities.  The IRS would have subjected that

15   application to closer scrutiny, or might not have approved it

16   if Muntasser had supplied truthful and complete answers.  The

17   question is whether Yassin or Akra agreed with Muntasser to

18   defraud the government to impair and impede the IRS by

19   withholding that information.  In other words, Yassin and/or

20   Akra must have agreed as to an unlawful tax purpose.  It is not

21   enough to prove that they worked for Care, that they were

22   active in Care, that they were formerly active in Al-Kifah, or

23   that they supported and promoted jihad and the mujahideen.

24   Again, there must be evidence of a tax-related agreement.

25        Again, I make this comment not for purposes of

1   editorial comment, but the government's brief on this issue is

2   replete with conclusory statements, often without records to

3   support it.  For example, the government argued that all

4   individuals were well aware of the jihad activities of Al-Kifah

5   and successor Care; that Yassin was clearly aware and part of

6   the decision to obtain tax-exempt status.  Again, the fact that

7   the government had difficulty stating the evidence and the

8   reasonable inferences from the evidence in a direct and

9   straightforward manner highlights the nature of the problem.

10          It is necessary to go through the facts.  I'm going to

11  outline them first as to Mohammed Akra.  The facts adduced at

12  trial were as follows:  Akra was Al-Kifah's religious leader;

13  he gave lectures; in June 1990, he, Akra, gave Muntasser a book

14  on martyrdom, called "Join the Caravan."  In 1992, Akra gave a

15  lecture in Boston.  A flyer was distributed at that lecture.

16  The flyer stated that Al-Kifah was a tax-exempt organization,

17  which it was not.  Al-Kifah tapes and materials were

18  distributed at Akra's lectures.  Al-Hussam newsletters,

19  published by Al-Kifah, were distributed at Akra's lectures.

20          In 1993, Akra invited Kadri and two other persons to a

21  meeting at his house.  There was no evidence that either

22  Muntasser or Yassin was present.  At the meeting, Akra asked

23  his guests whether he could use their names in forming the

24  organization.  That organization was formed.  The Articles of

25  Organization for Care listed Muntasser as president and Akra

1   and Yassin as directors.  The Articles of Organization stated

2   that Care intended to apply for tax-exempt status.

3         On June 10, 1993, less than two weeks after the

4   formation of Care, Akra gave a lecture espousing the importance

5   of jihad, and the lecture was organized by Care.

6         There was evidence after 1993 of Mr. Akra's

7   involvement.  Akra visited Care's office in 1996 and 1997 and

8   participated in closed-door meetings with Muntasser, Al-Monla,

9   and Yassin.  Akra continued to give lectures on or behalf of

10  Care on the same or similar topics.  He became the president of

11  Care in 1998 and 2000 -- between 1998 and 2000 and signed

12  annual reports for Care in 1997, 1998, and 1999, all of which

13  were submitted in 2000.

14        The evidence as to Waseem Yassin is as follows:

15  Yassin was Al-Kifah's "go-around guy," who took care of

16  "anything that needs to be done."

17        Again, the Articles of Organization for Care list

18  Yassin as a director and state that Care intended to apply for

19  tax-exempt status.  In late 1993, or 1994, Kadri heard Yassin

20  explain why Al-Kifah changed its name to Care.  Yassin stated

21  that there had been a control issue or a conflict between New

22  York and Boston.  Yassin was present when materials prepared by

23  Care were distributed.  Those materials indicated that Care was

24  tax-exempt.  Yassin signed Care's annual reports for the years

25  1993 to 1995 as secretary.  And Yassin sent Mr. Naseem various

1    information concerning Care's tax filings, including a copy of

2    the Form 1023, but he did so in approximately 1996.

3         There was other potentially relevant evidence as well.

4    Care was certainly a small organization.  According to expert

5    testimony that was given at the trial, it is difficult for

6    nonprofits to raise money, unless their donors know it was

7    tax-exempt.  There was evidence that the activities of Al-Kifah

8    and Care were the same or identical.  They operated from the

9    same location.  They claimed the same founder in Sheik Azzam.

10   They published the same newsletter in Al-Hussam.  They

11   published the same zakat guide.  They involved the same people

12   at least in the Boston office.  And there is a substantial

13   identity of the purpose and operation between Al-Kifah and

14   Care.

15        There were also handwritten notes, apparently of

16   Attorney Abdullah Bade that state particularly mail and new

17   meeting minutes, which the government says infers that some

18   sort of meeting had occurred.

19        There is no evidence that Muntasser spoke to Yassin or

20   Akra about obtaining charitable status or about any tax

21   matters.  There is no evidence that he corresponded with them

22   on the topics.  Muntasser signed the Form 1023.  He used the

23   services of Attorney Abdullah Bade to assist him in that

24   process.  There's no evidence that Yassin or Akra were involved

25   in that process.  Neither Yassin nor Akra signed the Articles

1    of Organization.  There is no evidence that they read them, or

2    saw them, or had them in their files; and there is no evidence

3    that Yassin or Akra discussed any tax issues with anyone in

4    1993, or in that time frame.

5         The government argues essentially that the case is

6    circumstantial, again, which it's entitled to do, and there are

7    reasonable inferences supporting a finding of a tax-related

8    agreement.  The government argues that Care was a small

9    organization; that Akra and Yassin were directors; that Care

10   engaged in noncharitable activities, which they must have been

11   aware of; that by virtue of the size of the organization and

12   the roles they played in it, Akra and Yassin must have known

13   about the IRS application and must have known that Care would

14   have to hide its noncharitable purposes in order to obtain

15   charitable status.

16        They argued that Akra and Yassin's names were in the

17   Articles of Organization.  The articles specifically states

18   that Care intends to apply for 501(c)(3) status.  Because Akra

19   and Yassin knew Care was engaged in noncharitable activities,

20   they must have known and agreed that the IRS would have to be

21   defrauded to obtain that tax-exempt status.

22        When I denied the motion at the close of the

23   government's case, I stated at the time that the jury could

24   reasonably infer that Yassin at least knew and agreed that Care

25   would necessarily apply for or achieve tax-exempt status, and

1    it would necessarily hide its noncharitable activities in doing

2    so.  I have concluded that the evidence, in fact, will not

3    support those inferences.  A person's role in an organization,

4    even a small organization, is not standing alone sufficient to

5    infer knowledge of the activities of others.  Obviously,

6    someone's role can be a relevant fact, but it cannot be the

7    only fact.  One can infer knowledge of the basic purposes of an

8    organization from one's organizational position, but certainly

9    not the details of its operation, or the activities specific of

10   the corporate officers.

11          Again, there's no evidence that Akra or Yassin ever

12   saw the Articles of Organization, and you cannot infer they had

13   knowledge of the existence of that document or its contents

14   merely from the fact that their names appear on it.

15          There is simply no evidence that Akra or Yassin had a

16   tax motive or a tax purpose that they were aware of the

17   application for charitable status.  Even if they were aware

18   that Muntasser had made an application to the IRS, there is no

19   reasonable basis to infer that they had knowledge or awareness

20   that a false statement was made, or a material fact was

21   concealed.

22          The IRS itself acknowledged that it might have

23   approved Care's application had accurate information been

24   provided to it, although it would have scrutinized that

25   application more carefully.  So even if Akra or Yassin knew

1    that the application had been filed, it's not reasonable to

2    infer knowledge of falsity merely from the fact of application

3    or approval; in other words, one may not draw the inference

4    that Yassin or Akra must have known that Care would have to

5    make a false statement in its application in order to gain

6    approval.

7         In short, the chain of inferences based on the facts

8    solicited at trial is simply too long, or to shift the metaphor

9    slightly, they are stacked too high and upon one another.

10   There is no evidence or insufficient evidence that Muntasser

11   agreed with Akra or Yassin or both to obtain charitable status

12   for Care by falsely concealing noncharitable activities.  There

13   is therefore no evidence of a tax conspiracy beginning in or

14   about April or June or November, 1993.  The government charged

15   a single unitary conspiracy to obtain and maintain tax-exempt

16   status.  There was no evidence that there was a conspiracy to

17   obtain that status.  Rather, it appears that Defendant

18   Muntasser was acting without the agreement of Akra or Yassin.

19   Whether Mubayyid or Al-Monla or both later agreed with

20   Muntasser to maintain charitable status or to commit another

21   offense cannot save the conspiracy count under the

22   circumstances; and accordingly, the evidence does not support a

23   conviction under Count Two, and a judgment of acquittal will be

24   entered as to all three defendants on Count Two.

25         Counts Three, Four, and Five are solely against

1    Defendant Mubayyid.   They are based on submission of Forms 990.

2    As I indicated, the charge against Mubayyid on Count One is

3    also based in large part on the Forms 990.   The Form 990 is an

4    annual report filed by the IRS -- filed with the IRS or

5    required to be filed with the IRS by 501(c)(3) organizations

6    and others.   Line 76 of the form during the relevant time asked

7    whether -- asked the following question:   Did the organization

8    engage in any activity not previously reported to the IRS?   And

9    it went on to say, if yes, attach a detailed description of

10   each activity.

11          Defendant Mubayyid contends that that question applies

12   only to the relevant tax year; that is, for example, the 1997

13   Form 990 asks only about activities that took place in or

14   changes that occurred in 1997.   There are different iterations

15   of that argument based on the instructions or the testimony of

16   IRS witness Dawn Goldberg, but the thrust of it is the same.   I

17   agree that the question on line 76 supported an ambiguity

18   instruction.   I gave that instruction to the jury.   The thrust

19   of which was that if the jury found that the question was

20   ambiguous and that if the defendant did not give a false

21   statement under any reasonable construction of the question

22   they should acquit.   The jury did vote to convict, even with

23   that instruction.   There is evidence that Mubayyid had

24   knowledge of the falsity of that statement.   And without

25   elaborating on the arguments made earlier in the trial, I

1    conclude that the evidence is sufficient to sustain a

2    conviction based on the filing of false Form 990s in Counts

3    Three, Four and Five; and therefore as to Count One, as to

4    Mubayyid, to that extent, the motion is denied.

5         Count Six as to Muntasser involved the false statement

6    involving a denial of travel to Afghanistan.  There was no

7    statute of limitations issue, and the evidence is sufficient to

8    support the conviction.  Under the circumstances, it was a

9    statement made to Agent Peet in April of 2003.  Again, the

10   inferences must be drawn in the light most favorable to the

11   government; and under that standard, clearly Count Six

12   survives.

13        So, to conclude, the Rule 29 ruling, I grant the

14   motion as to defendants -- or there are three motions.  I grant

15   them as to Count One as to defendants Muntasser and Al-Monla

16   and deny it as to Defendant Mubayyid, as to Count One.

17        I grant the motion as to all three defendants as to

18   Count Two.

19        I deny the motion as to Defendant Mubayyid as to

20   Counts Three, Four, and Five and deny it as to Defendant

21   Muntasser as to Count One and Six.

22        I turn next briefly to the motions for a new trial.

23   The standard under Rule 33 is that I may grant a new trial

24   where the interest of justice so requires.  I have substantial

25   discretion in that regard, but the motion for a new trial is an

1   extraordinary remedy to be used in relatively rare

2   circumstances and to avoid the miscarriage of justice.

3        Each defendant has moved for a new trial.  To the

4   extent that those motions are based on the -- in one form or

5   another the alleged -- allegedly improper submission of

6   evidence under Rule 403 that was deemed to be unduly

7   inflammatory, that is, the contents of the Al-Hussam

8   newsletters, testimony concerning economic jihad, the sanitized

9   version of the press accounts of the link of Al-Kifah to the

10  World Trade Center bombing and so forth, those motions are

11  denied.  I will allow my rulings at the court to speak for

12  themselves.  The -- I note only that the tax issues and false

13  statement issues raised in this case could not be completely

14  divorced from their factual context.  I made substantial

15  limitations or placed substantial limitations on that evidence.

16  The cautionary instructions were, I thought, appropriate to

17  ensure that the jury was considering that evidence

18  appropriately and to the extent again a rule for -- a motion

19  for new trial is based on Rule 403, or the introduction of

20  allegedly inflammatory evidence is denied.

21       The motion for a new trial filed by Muntasser alleged

22  four grounds to the extent that he alleges that I improperly

23  gave an instruction of willful blindness and aiding and

24  abetting a conspiracy is denied as moot.  To the extent that

25  the motion is based on the government's changing its theory as

1    to Count One in the middle of the trial, it's denied as moot.

2    The motion concerning Rule 403, I have denied for reasons

3    indicated.

4            The fourth ground concerns the possible prejudicial

5    spill-over effect from the admission of coconspirator hearsay

6    evidence.  I did admit coconspirator statements at the trial

7    over defense objection.  Having now concluded that there was

8    insufficient evidence to support a conspiracy conviction, I

9    must consider whether a new trial is warranted.  The standard

10   under which I judge that issue has three components.  I'm to

11   consider whether the evidence was inflammatory, intended to

12   incite or arouse the jury to convict the defendant of the

13   remaining counts, whether that evidence was similar to or

14   distinct from that required to prove the remaining counts, and

15   the strength of the government's case as to the remaining

16   counts.

17           First, as to the -- whether the evidence was

18   inflammatory, the defendant points primarily to two pieces of

19   evidence:  The conversation between Al-Monla and Jayyousi

20   concerning picking apples; and second, the suggestion from

21   Mr. Chehade to Mubayyid that he destroy documents.  I conclude

22   that neither is sufficiently inflammatory in context to warrant

23   a new trial as to Muntasser as to Count Six.

24           In terms of whether or not the evidence was similar,

25   the conspiracy evidence was essentially not similar to the

1    evidence concerning travel to Afghanistan, and I have

2    confidence the jury was able to keep that evidence straight.

3    In terms of the strength of the case while obviously there are

4    issues that were raised concerning credibility, the evidence as

5    to Count Six was reasonably strong and on balance as not

6    sufficient to require a new trial; and therefore, to that

7    extent, the motion will be denied.

8         Defendant Mubayyid has made a motion for a new trial

9    based on alleged misstatement of fact in closing argument

10   concerning Form 990, that is, in essence whether the form was

11   limited to the relevant tax year or not.  I'm going to deny the

12   motion on that ground.  I think that the argument was fair

13   under the circumstances; and to the extent that it was not, it

14   was a minor error that was responded to in due course and did

15   not create undue prejudice.

16        Defendant Mubayyid also has moved for a new trial

17   based on the theory that the government changed its theory as

18   to the importance of widow and orphan sponsorship.  The

19   defendant was on notice of that theory.  It was submitted

20   partly in response to the defense argument concerning Care's

21   charitable activities, and I do not conclude that the admission

22   of that evidence was erroneous such that a new trial is

23   warranted.

24        To the extent that Mubayyid has adopted Muntasser's

25   motions for a new trial, or has adopted Muntasser's motion as

1    to willful blindness, I deny it as to Mubayyid.  Mubayyid

2    specifically argued in substance that in filling out the

3    Form 990s, he had no duty to make himself aware of prior Care

4    filings or facts prior to his involvement with the

5    organization.  The argument of the government changed its

6    theory from a -- a narrow tax scheme to be a broader theory, I

7    will deny.  I did, in fact, instruct the jury on the narrower

8    theory and considered the Rule 29 motions on that basis.

9         In terms of the prejudicial spill-over effect, the

10   conversation between Chehade and Mubayyid applies obviously to

11   Defendant Mubayyid himself.  The "picking apples" comment again

12   was not sufficiently inflammatory to warrant a new trial.  The

13   Form 990 claim was sufficiently distinct from the conspiracy

14   claim that I do not think there was a danger of infection from

15   the admission of the evidence.  And while certainly the claim

16   as to Forms 990 is by no means frivolous, I do not think that

17   the strength of the government's case is sufficiently

18   inadequate that a new trial is required on that ground.

19        Defendant Al-Monla's motion for a new trial is moot as

20   to himself.  He has now been acquitted on all counts.  I have

21   previously denied his motion concerning the court's voir dire

22   of the jury foreperson that has been adopted by other

23   defendants; and again, I affirm the denial of that motion.

24        So, all three Rule 33 motions for a new trial are

25   denied either on the merits or as moot.  The motions for

1    judgment of acquittal are granted in part and denied in part.

2    The motions for a new trial are denied.

3              Defendant Al-Monla, based on my rulings stands

4    acquited of all charges, and my previous order of detention as

5    to Samir Al-Monla is hereby revoked.

6              Is there anything further that we need to address

7    today?  I think I am seeing you all on Friday, if I recall.

8              Ms. Sullivan.

9              MS. SULLIVAN:  Your Honor, thank you very much.

10             Your Honor, we would like to respectfully request that

11   you grant release on bail for Mr. Muntasser.  The only count

12   that you left standing, your Honor, is Count Six.  The

13   guidelines sentence, the maximum guidelines sentence, on Count

14   Six for a single false statement would be six months.  There's

15   no tax loss associated with that count.  Mr. Muntasser was

16   taken into custody on January 11, 2008, so he has been

17   incarcerated just eight days shy of six months at this point,

18   your Honor.  We have pending before your Honor a renewed motion

19   for presentence bail, and on the ground that there is no

20   statutory basis to maintain detention of Mr. Muntasser on any

21   danger of flight or risk to the community, we respectfully

22   request that since he has, in essence, served the six month

23   maximum sentence that could be attached to Count Six that he be

24   released on bail immediately.

25             THE COURT:  Am I seeing you on Friday; is that right?

 1          MS. SULLIVAN:  We do have a conference scheduled, your
 2     Honor, on Friday, the 6th.
 3          THE COURT:  All right.  What I'm going to do is take
 4     that motion under advisement and take it up on Friday, and I'll
 5     hear the government's response.
 6          MS. SULLIVAN:  Thank you, your Honor.
 7          Would you like briefing, your Honor?
 8          THE COURT:  I'll leave it up to you.
 9          MS. SULLIVAN:  Okay.  Thank you.
10          THE COURT:  Have mercy on the court.
11          Mr. Chakravarty.
12          MR. CHAKRAVARTY:  Could we have a delay of responding
13     to that until Friday?
14          THE COURT:  Yes.
15          MR. CHAKRAVARTY:  With regards to, obviously, the
16     other motions, which you just allowed, the government would
17     object on all grounds based on each of the motions for
18     acquittal basically.
19          THE COURT:  And just so that it's clear, the
20     government has the right to appeal my decision.  Had I made
21     that ruling it's -- perhaps I should have in part on Rule 29
22     at the conclusion of the government's case, the jeopardy
23     having attached, the government could not have appealed.  Under
24     these circumstances, my decision is subject to full appellate
25     review.

1          Mr. Andrews.

2          MR. ANDREWS:  Yes, your Honor.  If the court is taking

3     the matter of bail under advisement for Mr. Muntasser, I'll be

4     be free to argue that for Mr. Mubayyid as well on Friday?

5          THE COURT:  Yes.  Yes.

6          MR. ANDREWS:  I could file something?

7          THE COURT:  Yes.

8          MR. ANDREWS:  Thank you.

9          THE COURT:  All right.  Is there anything further?

10         MS. SULLIVAN:  Your Honor, if I can --

11         THE COURT:  Yes.

12         MS. SULLIVAN:  Thank you, your Honor.

13         Could we just clarify what your Honor would like to do

14    at the Friday status conference.  Should we proceed on the

15    government's motion to bring certain evidence that we object to

16    into the sentencing hearing, or should we --

17         THE COURT:  It's sufficiently unclear to me at this

18    point that I think we should assume that everything is on the

19    table, and I will try to sort that out over the next couple of

20    days.  I will confess that I haven't thought through the

21    consequ -- the implications of this decision as to the

22    proceedings on Friday at this point.  We need to sort that

23    out.

24         MS. SULLIVAN:  Thank you, your Honor.

25         THE COURT:  All right then.  And if there is nothing

1    further, we'll stand in recess.

2              Thank you.

3              THE CLERK:  All rise.

4              (At 11:29 a.m., court was adjourned.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3              I, Marianne Kusa-Ryll, RDR, CRR, Official Court

4     Reporter, do hereby certify that the foregoing transcript,

5     consisting of 47 pages, is a true and accurate transcription of

6     my stenographic notes in Case No. 05cr-40026-FDS, United States

7     of America versus Muhamed Mubayyid, Emadeddin Z. Muntasser, and

8     Samir Al-Monla, a/k/a/ Samir Almonla, before F. Dennis Saylor,

9     IV, on June 3, 2008, to the best of my skill, knowledge, and

10    ability.

11

12                              /s/ Marianne Kusa-Ryll

13                              Marianne Kusa-Ryll, RDR, CRR

14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25