UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA          )
                                  )
          v.                      )     Crim. No. 05-40026-FDS
                                  )
MUHAMED MUBAYYID, and             )
EMADEDDIN Z. MUNTASSER,           )
                                  )
          Defendants.             )

### GOVERNMENT'S PROFFER OF ADDITIONAL EVIDENCE TO DEMONSTRATE SIGNIFICANCE OF THE PARTICULAR MUJAHIDEEN GROUPS AND INDIVIDUALS WHICH THE DEFENDANTS SUPPORTED AND PROMOTED

The government hereby files additional evidence for purposes of sentencing which explicates the significance of the pro-violent groups and individuals who were among the intended beneficiaries of Care International's (Care) fraudulent solicitation and expenditure of tax-exempt funds.

**I.**          **INTRODUCTION**

Because the Court is obligated to craft the appropriate sentence pursuant to the Section 3553(a) factors, this information puts in context the reasons for and broader affects of the defendants' crimes, as well as sheds important light on the nature and characteristics of the defendants themselves.  In general, the evidence puts in context that the defendants lied to the government in order to best be able to support and promote groups and individuals who have supported terrorism or have since been designated as terrorist entities by the United States. Although this case has repeatedly been characterized as a tax

1

case, as if personal inurement was the goal of the defendants'
fraud and deceit, in fact, the actual motives were much more
invidious.[1]  In essence, the defendants fraudulently ran a
subsidized propaganda and financial support conduit for certain
violent organizations around the world.  That the defendants were
not charged with terrorism-related crimes under the United States
Code, does not neuter those underlying facts from consideration
as to the defendants' characteristics, or the seriousness of the
fraud for which the defendants stand convicted.  During the time
frame that the defendants ran Care, the terrorist groups for
which they espoused support killed and maimed throughout the
world.  After the designation of these terrorist groups, and
after Al-Kifah Refugee Center's connection to terrorist acts were
publicized, the defendants repeatedly lied to the IRS and to the
FBI, who were interested in and were investigating Care's
connections.

The relevance of this information to Defendant Muntasser's
remaining conviction has only become more clear since the Court
chose to allow his Rule 29 motions on Counts One and Two.[2]   The

---

[1]To the extent that the defendants were personally
motivated, it was for purposes of this corrupt interpretation of
waging economic jihad. [Tr. 21:120-121 (Levitt)].  Some of the
more infamous beneficiaries of the defendants' conduct are listed
below.

[2]In so doing, the Court did not discount the facts which the
jury found that Muntasser did conceal the successor relationship
between Care and Al-Kifah, Care's non-charitable activities.  The

2

defendant's lies on April 7, 2003, while clearly material to the
FBI, served also to shield his pledged support and meeting with
Gulbuddin Hekmatyar as well as his propagation of Al-Kifah
Refugee Center (Al Kifah)/Makhtab al-Khidamat (MAK).  These
facts, if he had disclosed the truth instead of lied, could have
assisted the U.S. Government in its ongoing anti-terrorism
activities, and was certainly material to the FBI's
investigation. [See Tr. 3:114-138 (Peet)].  It does not take more
than a reasonable inference to conclude that his lies also served
to impede the government's search for meaningful information
which would be helpful in combating the global scourge of
terrorism, let alone from detecting the true nature and history
of Care.

## II.  Additional Evidence not introduced at trial

A. *Maktab al Khidamat (MAK)* / Services Office / Al-Kifah
Refugee Center - The trial evidence was replete with references
to MAK, and Al-Kifah, and among other things, the government
proved that Care International was a successor or outgrowth to
this organization.  Care even transferred tens of thousands of
dollars to the organization under MAK's English translation,

---

evidence was uncontroverted that Muntasser founded and led Care
during its most successful period of solicitation and expenditure
of funds, during which much of the pro-mujahideen and pro-jihad
activities were being funded by Care.  Consequently, who those
mujahideen groups were is relevant to Muntasser's Section 3553(a)
analysis in addition to MAK and Hekmatyar.

Human Services Office. [Ex. 496]. The added significance of this affiliation, or as Defendant Muntasser described them, the fact that they were the same thing, was not made clear to the jury. (See Ex. 510A (Muntasser: "Care International, *Maktab*, *Maktab al Khidamat*"). MAK and its alias, Al-Kifah, were designated as Specially Designated Global Terrorist Entities on September 25, 2001. [See Sentencing Exhibit A (Executive Order 13224 Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism, Federal Register Vol. 66, No. 186, pp. 49077-49083 (September 25, 2001)]. The same day, the Office of the President issued a statement explaining why. [See Sentencing Exhibit B (White House Fact Sheet)]. Care operated as a Specially Designated Terrorist entity from September 2001 through its dissolution in 2003.

B. Gulbuddin Hekmatyar / Hizb e Islami - The trial evidence was replete with references to Hekmatyar, including the fact that Care pledged its support to Hekmatyar, and that Muntasser lied about his meeting with Hekmatyar. [See Exs. 66, 67; Tr. 3:114-116, 124-126 (Peet)]. While he headed Care, Defendant Muntasser discussed Hekmatyar, and his progress commanding the mujahideen in Afghanistan. [Exs. 522A, 523A (Conversations between Muntasser and Adham Hassoun discussing, among other things, how worried Muntasser was "about the brothers over there".]. Similarly, the Al-Hussam newsletter gave updates as to Hekmatyar and his

4

organization, Hizb e Islami. [See e.g. Exs. 235, 237, 239, 244, 246, 247]. While trial exposed that Hekmatyar was an Afghan warlord, in fact, Hekmatyar was designated as a Specially Designated Global Terrorist on February 18, 2003, some six weeks prior to Agent Peet's interview of the Defendant. [See Sentencing Exhibit C (Hekmatyar Designation, Federal Register Vol. 68, No. 125, p. 38910 (June 30, 2003). The Department of Treasury released an issuing statement with the designation. [See Sentencing Exhibit D (Treasury designation statement).] Hekmatyar's designation, and the fact that the U.S. government was actively hunting him, was widely publicized just prior to the April 7, 2003 interview. See e.g. Id., Sentencing Exhibit E (BBC Article).

C. Global Relief Foundation (GRF) – The connection between GRF and Care as demonstrated at trial was intimate, including a shared lineage, purpose, finances, and activities. [See e.g. 64A, 68A, 74, 88, 93, 102, 116, 117, 156, 172, 197, 213A, 380, 485, 515A, 525A, 530A, 538A-540A]. GRF's assets were blocked pending investigation on December 14, 2001, and GRF was finally designated a Specially Designated Terrorist Organization on October 27, 2002. [See Sentencing Exhibit F (Treasury statement Blocking GRF and BIF); Sentencing Exhibit G (GRF Designation, Federal Register Vol. 68, No. 2, p. 400 (January 3, 2003))]. The Department of Treasury issued statements in October 2002 and

January 2003 reflecting the change. [See Sentencing Exhibit H
(Designation notice and release)]

D. Benevolence International Foundation (BIF) - Care also
donated to BIF and solicited speakers who represented BIF. [See
e.g. Exs. 92, 103, 104, 194, 221, 228, 244, 528A].  GRF's assets
were blocked pending investigation on December 14, 2001, and BIF
was finally designated a Specially Designated Terrorist
Organization on November 18, 2002. [See Sentencing Exhibit F
(Treasury statement Blocking GRF and BIF); Sentencing Exhibit G
(BIF Designation, Federal Register Vol. 68, No. 2, p. 399
(January 3, 2003))]. The Department of Treasury issued a
statements in December 2001 and again in January 2003 reflecting
the status. [See Sentencing Exhibit I (Designation release)].

E. Holy Land Foundation for Relief and Development (HLFRD)-
Care also donated to HLFRD and intended to coordinate its
activities with HLFRD. [Ex. 89, 213A].  HLFRD was designated as a
Specially Designated Global Terrorist on December 14, 2001. [See
Sentencing Exhibit J(HLFRD Designation, Federal Register Vol. 67,
No. 53, p. 12646 (March 19, 2002)]. The Department of Treasury
issued a statement in December 2001 and reflecting the status.
[See Sentencing Exhibit K (Designation notice)].

F. Al Qaeda / Osama Bin Laden - Although the trial was
sanitized of any reference to Al Qaeda or Osama bin Laden - the
evidence bears out that the defendants were acutely abreast of

6

bin Laden's pre-September 11, 2001 pronouncements.  For example,
in the Arabic meeting minutes found in the Care Storage locker at
the time of the 2001 search (and which were not found during the
2003 search), the notes expressly make mention of Bin Laden as
figuring in the calculus as to what region the Battalion will
coordinate for (Afghanistan or Syria). [Ex. 64A p.2].  The notes
reference a disagreement with Bin Laden (and the Battalion).
Imad [Muntasser] states that the situation in Afghanistan has
priority.

Muntasser and Hassoun discussed bin Laden's positive speech
in support of the mujahideen by reference to "Abu Abdullah" in
the context of the situation in Afghanistan and the status since
the Taliban took over.  Ex. 532A. Abu Abdallah is the "Abu name",
or nickname of Usama bin Laden, as referenced in the Bin Laden
indictment in the Southern District of New York. [See United
States v. Bin Laden, 93 F.Supp.2d 484 (S.D.N.Y. 2000).

During the 2003 search of Mubayyid's residence, accompanying
other materials of Care International, some of which had
previously been located in the Care storage locker, Agents found
a printed-out copy of a transcript of Bin Laden's 1998 interview
with Peter Arnett of CNN. [See Government's proposed Exhibit 232,
CICR 7856-7864].  Naturally, Bin Laden and Al Qaeda are
designated Foreign Terrorist Organizations and Specially
Designated Global Terrorists. [See Sentencing Exhibits A and B;

7

<u>See also</u> Sentencing Exhibit M (State Department list of Foreign Terrorist Organizations).]

G. Libyan Islamic Fighting Group (LIFG).  Care published Al-Hussams which promoted and supported the LIFG, glorifying its killings and "exclusively" interviewing its spiritual leader. [<u>See e.g.</u> Exs. 245, 246, 469]. The LIFG was designated as a Specially Designated Global Terrorist organization contemporaneously to Al Qaeda, MAK, and GIA. [<u>See</u> Sentencing Exhibits A,B & M.]

H. *Groupe Islamique Armé* - the Armed Islamic Group (GIA). Care published Al-Hussams which promoted and supported the GIA, glorifying its combat and assassinations. [See e.g. Exs. 240, 241, 246, 248, 248A]. The GIA was designated as a Specially Designated Global Terrorist organization contemporaneously to Al Qaeda, MAK, and LIFG. [<u>See</u> Sentencing Exhibits A, B and M.].

I. *Al Gamaa al Islamiyya* - Islamic Group (AGAI or IG) - Care published Al-Hussams which promoted and supported the AGAI, glorifying its combat operations and expressing support for its leader, Sheikh Omar Abdel Rahman (discussed below). [See e.g. Exs. 243, 247, 248, 248A]. The AGAI was designated as a Foreign Terrorist Organization in 1999. [<u>See</u> Sentencing Exhibit M (FTO List); <u>see also</u> Federal Register Vol. 64, No. 195 (October 8, 1999)(AGAI designation)].

Specific individuals referenced at trial but not elaborated

upon:

A. Sheikh Omar Abdel Rahman

Audio cassettes including sermons by Rahman were obtained from members of Al-Kifah Refugee Center in Boston, and were referenced, in sanitized form, at trial. [See Ex. 53; Tr. 5:6-13 (Ahmed testimony). Rahman was the spiritual leader of AGAI. See Sentencing Exhibit M at p.5. Rahman himself stands convicted of conspiracy to commit terrorist acts, and was the spiritual head of the Al-Kifah Refugee Center in New York. See United States v. Rahman, 189 F.3d 89 (2nd Cir. 1999).

B. Mahmoud Abu Halima

One of the individuals who Care intended to support through fraudulent exploitation of the tax laws was Mahmoud Abu Halima. [Tr. Ex. 537A]. Abu Halima was described as a member of the "skyscraper" group, which was redacted from the final trial exhibit. [See Sentencing Exhibit O p. 9 (unredacted page of Tr. Ex. 537A)]. Abu Halima, who also conspired with Sheikh Omar Abdel Rahman, was convicted for his role in the conspiracy to blow up New York City landmarks, including the 1993 World Trade Center bombing which was much-publicized in the days before Defendant Muntasser filed Articles of Incorporation of Care. [See United States v. Salameh, et al., 152 F.3d 88 (2nd Cir. 1998); Tr. 5:97]].

C. Aafia Siddiqui - One of Muntasser's contemporaries, an

individual who also participated in Al Kifah/Care's orphan sponsorship program, is currently one of the most sought people in the world. [Ex. 286 p.8 (Automatic Withdrawal records of Care International entitled Al-Kifah Refugee Center November 23, 1993); Sentencing Exhibit P (FBI Seeking Information Notice)].

D. Adham Hassoun and Kifah Jayoussi - Care coordinated its non-charitable activities with these two individuals as evidenced at trial through voluminous documentary evidence and intercepted communications.  Hassoun and Jayoussi were recently convicted of conspiring to provide material support to terrorists.  <u>See United States v. Hassoun, et al.</u>, 2007 WL 4180844, *5 (S.D.Fl. Nov. 20, 2007)(expressly pointing out that Hassoun identified himself as a member of MAK and citing approval of Osama bin Laden's CNN Interview).  Defendant Muntasser specifically spoke to Hassoun about their shared activities during the time he led Care, and also declared that Care was MAK during the phone call. [<u>See</u> Ex. 510A].

## Conclusion

Wherefore, the defendants' activities promoting and supporting the groups and individuals described above should be considered by the Court in assessing the Section 3553(a) factors to determine especially the nature and characteristics of the defendant, the seriousness of the crime, and the deterrent impact of a sentence in this matter.

10

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  /s/ Aloke Chakravarty
ALOKE S. CHAKRAVARTY
B. STEPHANIE SIEGMANN
DONALD L. CABELL
Assistant U.S. Attorneys


<u>Certificate of Service</u>

I do hereby certify that a copy of foregoing opposition was served upon the counsel of record for the defendant by electronic notice on this 11th day of June 2008.

/s/ Aloke Chakravarty
Aloke Chakravarty
Assistant U.S. Attorney



**Tuesday,**
**September 25, 2001**

**Part IV**

# The President

**Executive Order 13224—Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism**

**Notice of September 24, 2001— Continuation of Emergency With Respect to UNITA**

Federal Register

Vol. 66, No. 186

Tuesday, September 25, 2001

# Presidential Documents

---

Title 3—

The President

Executive Order 13224 of September 23, 2001

## Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*)(IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*), section 5 of the United Nations Participation Act of 1945, as amended (22 U.S.C. 287c) (UNPA), and section 301 of title 3, United States Code, and in view of United Nations Security Council Resolution (UNSCR) 1214 of December 8, 1998, UNSCR 1267 of October 15, 1999, UNSCR 1333 of December 19, 2000, and the multilateral sanctions contained therein, and UNSCR 1363 of July 30, 2001, establishing a mechanism to monitor the implementation of UNSCR 1333,

I, GEORGE W. BUSH, President of the United States of America, find that grave acts of terrorism and threats of terrorism committed by foreign terrorists, including the terrorist attacks in New York, Pennsylvania, and the Pentagon committed on September 11, 2001, acts recognized and condemned in UNSCR 1368 of September 12, 2001, and UNSCR 1269 of October 19, 1999, and the continuing and immediate threat of further attacks on United States nationals or the United States constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and in furtherance of my proclamation of September 14, 2001, Declaration of National Emergency by Reason of Certain Terrorist Attacks, hereby declare a national emergency to deal with that threat. I also find that because of the pervasiveness and expansiveness of the financial foundation of foreign terrorists, financial sanctions may be appropriate for those foreign persons that support or otherwise associate with these foreign terrorists. I also find that a need exists for further consultation and cooperation with, and sharing of information by, United States and foreign financial institutions as an additional tool to enable the United States to combat the financing of terrorism.

I hereby order:

**Section 1.** Except to the extent required by section 203(b) of IEEPA (50 U.S.C. 1702(b)), or provided in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order, all property and interests in property of the following persons that are in the United States or that hereafter come within the United States, or that hereafter come within the possession or control of United States persons are blocked:

(a) foreign persons listed in the Annex to this order;

(b) foreign persons determined by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, to have committed, or to pose a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States;

(c) persons determined by the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, to be owned or controlled by, or to act for or on behalf of those persons listed in the Annex to this order or those persons determined to be subject to subsection 1(b), 1(c), or 1(d)(i) of this order;

(d) except as provided in section 5 of this order and after such consultation, if any, with foreign authorities as the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, deems appropriate in the exercise of his discretion, persons determined by the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General;

(i) to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, such acts of terrorism or those persons listed in the Annex to this order or determined to be subject to this order; or

(ii) to be otherwise associated with those persons listed in the Annex to this order or those persons determined to be subject to subsection 1(b), 1(c), or 1(d)(i) of this order.

**Sec. 2.** Except to the extent required by section 203(b) of IEEPA (50 U.S.C. 1702(b)), or provided in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date:

(a) any transaction or dealing by United States persons or within the United States in property or interests in property blocked pursuant to this order is prohibited, including but not limited to the making or receiving of any contribution of funds, goods, or services to or for the benefit of those persons listed in the Annex to this order or determined to be subject to this order;

(b) any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in this order is prohibited; and

(c) any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

**Sec. 3.** For purposes of this order:

(a) the term ''person'' means an individual or entity;

(b) the term ''entity'' means a partnership, association, corporation, or other organization, group, or subgroup;

(c) the term ''United States person'' means any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States; and

(d) the term ''terrorism'' means an activity that—

(i) involves a violent act or an act dangerous to human life, property, or infrastructure; and

(ii) appears to be intended—

(A) to intimidate or coerce a civilian population;

(B) to influence the policy of a government by intimidation or coercion; or

(C) to affect the conduct of a government by mass destruction, assassination, kidnapping, or hostage-taking.

**Sec. 4.** I hereby determine that the making of donations of the type specified in section 203(b)(2) of IEEPA (50 U.S.C. 1702(b)(2)) by United States persons to persons determined to be subject to this order would seriously impair my ability to deal with the national emergency declared in this order, and would endanger Armed Forces of the United States that are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances, and hereby prohibit such donations as provided by section 1 of this order. Furthermore, I hereby determine that the Trade Sanctions Reform and Export Enhancement Act of 2000 (title IX, Public Law 106–387) shall not affect the imposition or the continuation of the imposition of any unilateral agricultural sanction or unilateral medical sanction on

any person determined to be subject to this order because imminent involvement of the Armed Forces of the United States in hostilities is clearly indicated by the circumstances.

**Sec. 5.** With respect to those persons designated pursuant to subsection 1(d) of this order, the Secretary of the Treasury, in the exercise of his discretion and in consultation with the Secretary of State and the Attorney General, may take such other actions than the complete blocking of property or interests in property as the President is authorized to take under IEEPA and UNPA if the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, deems such other actions to be consistent with the national interests of the United States, considering such factors as he deems appropriate.

**Sec. 6.** The Secretary of State, the Secretary of the Treasury, and other appropriate agencies shall make all relevant efforts to cooperate and coordinate with other countries, including through technical assistance, as well as bilateral and multilateral agreements and arrangements, to achieve the objectives of this order, including the prevention and suppression of acts of terrorism, the denial of financing and financial services to terrorists and terrorist organizations, and the sharing of intelligence about funding activities in support of terrorism.

**Sec. 7.** The Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA and UNPA as may be necessary to carry out the purposes of this order. The Secretary of the Treasury may redelegate any of these functions to other officers and agencies of the United States Government. All agencies of the United States Government are hereby directed to take all appropriate measures within their authority to carry out the provisions of this order.

**Sec. 8.** Nothing in this order is intended to affect the continued effectiveness of any rules, regulations, orders, licenses, or other forms of administrative action issued, taken, or continued in effect heretofore or hereafter under 31 C.F.R. chapter V, except as expressly terminated, modified, or suspended by or pursuant to this order.

**Sec. 9.** Nothing contained in this order is intended to create, nor does it create, any right, benefit, or privilege, substantive or procedural, enforceable at law by a party against the United States, its agencies, officers, employees or any other person.

**Sec. 10.** For those persons listed in the Annex to this order or determined to be subject to this order who might have a constitutional presence in the United States, I find that because of the ability to transfer funds or assets instantaneously, prior notice to such persons of measures to be taken pursuant to this order would render these measures ineffectual. I therefore determine that for these measures to be effective in addressing the national emergency declared in this order, there need be no prior notice of a listing or determination made pursuant to this order.

**Sec. 11.** (a) This order is effective at 12:01 a.m. eastern daylight time on September 24, 2001.

**49082**    **Federal Register** / Vol. 66, No. 186 / Tuesday, September 25, 2001 / Presidential Documents

(b) This order shall be transmitted to the Congress and published in the **Federal Register**.

THE WHITE HOUSE,
*September 23, 2001.*

Billing code 3195–01–P

**Federal Register** / Vol. 66, No. 186 / Tuesday, September 25, 2001 / Presidential Documents    **49083**

ANNEX

Al Qaida/Islamic Army

Abu Sayyaf Group

Armed Islamic Group (GIA)

Harakat ul-Mujahidin (HUM)

Al-Jihad (Egyptian Islamic Jihad)

Islamic Movement of Uzbekistan (IMU)

Asbat al-Ansar

Salafist Group for Call and Combat (GSPC)

Libyan Islamic Fighting Group

Al-Itihaad al-Islamiya (AIAI)

Islamic Army of Aden

Usama bin Laden

Muhammad Atif (aka, Subhi Abu Sitta,
    Abu Hafs Al Masri)

Sayf al-Adl

Shaykh Sai'id (aka, Mustafa Muhammad Ahmad)

Abu Hafs the Mauritanian (aka, Mahfouz Ould al-Walid, Khalid Al-
    Shanqiti)

Ibn Al-Shaykh al-Libi

Abu Zubaydah (aka, Zayn al-Abidin Muhammad Husayn, Tariq)

Abd al-Hadi al-Iraqi (aka, Abu Abdallah)

Ayman al-Zawahiri

Thirwat Salah Shihata

Tariq Anwar al-Sayyid Ahmad (aka, Fathi, Amr al-Fatih)

Muhammad Salah (aka, Nasr Fahmi Nasr Hasanayn)

Makhtab Al-Khidamat/Al Kifah

Wafa Humanitarian Organization

Al Rashid Trust

Mamoun Darkazanli Import-Export Company

[FR Doc. 01–24205

Filed 9–24–01; 1:05 pm]

Billing code 4810–25–C



Home > News & Policies > September 2001

For Immediate Release
Office of the Press Secretary
September 24, 2001

## Fact Sheet on Terrorist Financing Executive Order

September 24, 2001

▶ **More on attack response**

"We will starve terrorists of funding, turn them against each other, rout them out of their safe hiding places, and bring them to justice."

President George W. Bush
September 24, 2001

The President has directed the first strike on the global terror network today by issuing an Executive Order to starve terrorists of their support funds. The Order expands the Treasury Department's power to target the support structure of terrorist organizations, freeze the U.S. assets and block the U.S. transactions of terrorists and those that support them, and increases our ability to block U.S. assets of, and deny access to U.S. markets to, foreign banks who refuse to cooperate with U.S. authorities to identify and freeze terrorist assets abroad.

### Disrupting the Financial Infrastructure of Terrorism

- Targets all individuals and institutions linked to global terrorism.
- Allows the Treasury Department to freeze U.S. assets and block U.S. transactions of any person or institution associated with terrorists or terrorist organizations.
- Names specific individuals and organizations whose assets and transactions are to be blocked.
- Identifies charitable organizations that secretly funnel money to al-Qaeda.
- Provides donors information about charitable groups who fund terrorist organizations.
- States the President's intent to punish those financial institutions at home and abroad that continue to provide resources and/or services to terrorist organizations.

### Authorities Broadened

The new Executive order broadens existing authority in three principal ways:

- It expands the coverage of existing Executive orders from terrorism in the Middle East to global terrorism;
- The Order expands the class of targeted groups to include all those who are "associated with" designated terrorist groups; and
- Establishes our ability to block the U.S. assets of, and deny access to U.S. markets to, those foreign banks that refuse to freeze terrorist assets.

### Blocking Terrorist Assets

- The Order prohibits U.S. transactions with those terrorist organizations, leaders, and corporate and charitable fronts listed in the Annex.
- Eleven terrorist organizations are listed in the Order, including organizations that make up the al-Qaeda network.
- A dozen terrorist leaders are listed, including Osama bin Ladin and his chief lieutenants, three charitable organizations, and one corporate front organization are identified as well.
- The Order authorizes the Secretary of State and the Secretary of the Treasury to make additional terrorist designations in the coming weeks and months.

**<u>Other Actions in War on Terrorist Financing</u>**

This Executive Order is part of a broader strategy that we have developed for suppressing terrorist financing:

- A Foreign Terrorist Asset Tracking Center (FTAT) is up and running. The FTAT is a multi-agency task force that will identify the network of terrorist funding and freeze assets before new acts of terrorism take place.
- The President, the Secretary of the Treasury, the Secretary of State and others are working with our allies around the world to tackle the financial underpinnings of terrorism. We are working through the G-8 and the United Nations. Already, several of our allies, including Switzerland and Britain, have frozen accounts of suspected terrorists.



**Monday,**
**June 30, 2003**

**Part III**

# Department of the Treasury

**Office of Foreign Assets Control**

**31 CFR Chapter V**
**Alphabetical Listing of Blocked Persons, Specially Designated Nationals, Specially Designated Terrorists, Specially Designated Global Terrorists, Foreign Terrorist Organizations, Specially Designated Narcotics Traffickers; Final Rule**

a.k.a. HAMIAEH, Jamil; a.k.a. HAMIAH, Jamiel; a.k.a. HAMIE, Jamil Abdulkarim; a.k.a. HAMIE, Jamil; a.k.a. HAMIE, Jamile; a.k.a. HAMIEAH, Jamiel; a.k.a. HAMIEAH, Jamil; a.k.a. HAMIEH, Jamal; a.k.a. HAMIEH, Jamiel; a.k.a. HAMIEH, Jamil; a.k.a. HAMIEH, Mamil; a.k.a. HAMIEL, Jamil; a.k.a. HAMIEYE, Jamil; a.k.a. HAMIEYYEH, Jamil; a.k.a. HAMIL, Jamil; a.k.a. HAMIYA, Abdul Jamil; a.k.a. HAMIYE, Jamil; a.k.a. HAMIYYAH, Jamil; a.k.a. HAMYH, Jamil; a.k.a. KARIM, Jamil Abdul; a.k.a. NAZIM, Abou; a.k.a. NEZAM, Abu; a.k.a. NIZAM, Abou); DOB Sep 1938 (individual) [SDNTK]

HAMYH, Jamil (a.k.a. HAMEIAH, Jamel; a.k.a. HAMEIAH, Jamil; a.k.a. HAMEIAH, Mamil; a.k.a. HAMEIEH, Jamil; a.k.a. HAMEIH, Jamil; a.k.a. HAMER, Jamil; a.k.a. HAMIAEH, Jamil; a.k.a. HAMIAH, Jamiel; a.k.a. HAMIE, Jamil Abdulkarim; a.k.a. HAMIE, Jamil; a.k.a. HAMIE, Jamile; a.k.a. HAMIEAH, Jamiel; a.k.a. HAMIEAH, Jamil; a.k.a. HAMIEH, Jamal; a.k.a. HAMIEH, Jamiel; a.k.a. HAMIEH, Jamil; a.k.a. HAMIEH, Mamil; a.k.a. HAMIEL, Jamil; a.k.a. HAMIEYE, Jamil; a.k.a. HAMIEYYEH, Jamil; a.k.a. HAMIL, Jamil; a.k.a. HAMIYA, Abdul Jamil; a.k.a. HAMIYE, Jamil; a.k.a. HAMIYYAH, Jamil; a.k.a. HAMIYYEH, Jamil; a.k.a. KARIM, Jamil Abdul; a.k.a. NAZIM, Abou; a.k.a. NEZAM, Abu; a.k.a. NIZAM, Abou); DOB Sep 1938 (individual) [SDNTK]

HAPPY DAYS (a.k.a. M C M Y CIA. LTDA.), Calle 25 Norte No. 3AN–39, Cali, Colombia; Calle 22 Norte No. 5A–75, Cali, Colombia; NIT # 800204288–2 (Colombia) [SDNT]

HAPPY DAYS S. de H., Calle 78 No. 53–70, Locales 315 y 316, Barranquilla, Colombia; NIT # 802003826–1 (Colombia) [SDNT]

HARADINAJ, Daut; DOB 6 Apr 1978; POB Glodjane, Serbia and Montenegro (individual) [BALKANS]

HARAKAT AL-MUQAWAMA AL-ISLAMIYA (a.k.a. ISLAMIC RESISTANCE MOVEMENT; a.k.a. HAMAS; a.k.a. STUDENTS OF AYYASH; a.k.a. STUDENTS OF THE ENGINEER; a.k.a. YAHYA AYYASH UNITS; a.k.a. IZZ AL-DIN AL-QASSIM BRIGADES; a.k.a. IZZ AL-DIN AL-QASSIM FORCES; a.k.a. IZZ AL-DIN AL-QASSIM BATTALIONS; a.k.a. IZZ AL-DIN AL QASSAM BRIGADES; a.k.a. IZZ AL-DIN AL QASSAM FORCES; a.k.a. IZZ AL-DIN AL QASSAM BATTALIONS) [SDT][FTO][SDGT]

HARAKAT UL-ANSAR (a.k.a. HARAKAT UL-MUJAHIDEEN; a.k.a. HARAKAT UL-MUJAHIDIN; a.k.a. HUA; a.k.a. HUM) [FTO] [SDGT]

HARAKAT UL-MUJAHIDEEN (a.k.a. HARAKAT UL-ANSAR; a.k.a. HARAKAT UL-MUJAHIDIN; a.k.a. HUA; a.k.a. HUM) [FTO] [SDGT]

HARAKAT UL-MUJAHIDIN (a.k.a. HARAKAT UL-MUJAHIDEEN; a.k.a. HARAKAT UL-ANSAR; a.k.a. HUA; a.k.a. HUM) [FTO] [SDGT]

HAROON (a.k.a. MOHAMMED, Fazul Abdullah; a.k.a. ABDALLA, Fazul; a.k.a. ADBALLAH, Fazul; a.k.a. AISHA, Abu; a.k.a. AL SUDANI, Abu Seif; a.k.a. ALI, Fadel Abdallah Mohammed; a.k.a. FAZUL, Abdalla; a.k.a. FAZUL, Abdallah; a.k.a.

FAZUL, Abdallah Mohammed; a.k.a. FAZUL, Haroon; a.k.a. FAZUL, Harun; a.k.a.

HAROUN, Fadhil; a.k.a. HARUN; a.k.a. LUQMAN, Abu; a.k.a. MOHAMMED, Fazul; a.k.a. MOHAMMED, Fazul Abdilahi; a.k.a. MOHAMMED, Fouad; a.k.a. MUHAMAD, Fadil Abdallah]; DOB 25 Aug 1972; alt. DOB 25 Dec 1974; alt. DOB 25 Feb 1974; POB Moroni, Comoros Islands; citizen Comoros; alt. citizen Kenya (individual) [SDGT]

HAROUN, Fadhil (a.k.a. MOHAMMED, Fazul Abdullah; a.k.a. ABDALLA, Fazul; a.k.a. ADBALLAH, Fazul; a.k.a. AISHA, Abu; a.k.a. AL SUDANI, Abu Seif; a.k.a. ALI, Fadel Abdallah Mohammed; a.k.a. FAZUL, Abdalla; a.k.a. FAZUL, Abdallah; a.k.a. FAZUL, Abdallah Mohammed; a.k.a. FAZUL, Haroon; a.k.a. FAZUL, Harun; a.k.a. HAROON; a.k.a. HARUN; a.k.a. LUQMAN, Abu; a.k.a. MOHAMMED, Fazul; a.k.a. MOHAMMED, Fazul Abdilahi; a.k.a. MOHAMMED, Fouad; a.k.a. MUHAMAD, Fadil Abdallah]; DOB 25 Aug 1972; alt. DOB 25 Dec 1974; alt. DOB 25 Feb 1974; POB Moroni, Comoros Islands; citizen Comoros; alt. citizen Kenya (individual) [SDGT]

HARUN (a.k.a. MOHAMMED, Fazul Abdullah; a.k.a. ABDALLA, Fazul; a.k.a. ADBALLAH, Fazul; a.k.a. AISHA, Abu; a.k.a. AL SUDANI, Abu Seif; a.k.a. ALI, Fadel Abdallah Mohammed; a.k.a. FAZUL, Abdalla; a.k.a. FAZUL, Abdallah; a.k.a. FAZUL, Abdallah Mohammed; a.k.a. FAZUL, Haroon; a.k.a. FAZUL, Harun; a.k.a. HAROON; a.k.a. HAROUN, Fadhil; a.k.a. LUQMAN, Abu; a.k.a. MOHAMMED, Fazul; a.k.a. MOHAMMED, Fazul Abdilahi; a.k.a. MOHAMMED, Fouad; a.k.a. MUHAMAD, Fadil Abdallah]; DOB 25 Aug 1972; alt. DOB 25 Dec 1974; alt. DOB 25 Feb 1974; POB Moroni, Comoros Islands; citizen Comoros; alt. citizen Kenya (individual) [SDGT]

HASANAYN, Nasr Fahmi Nasr (a.k.a. SALAH, Muhammad) (individual) [SDGT]

HASANI, Zhavit; DOB 5 May 1957; POB Tanusevci, Macedonia (individual) [BALKANS]

HASSAN, Mohamed (a.k.a. "Abu Thale;" a.k.a. AMDOUNI, Mehrez; a.k.a. FUSCO, Fabio) DOB 18 Dec 1969; POB Tunis, Tunisia (individual) [SDGT]

HAVANA INTERNATIONAL BANK, LTD., 20 Ironmonger Lane, London EC2V 8EY, England [CUBA]

HAVANATUR, 54 Rue Richelieu, Paris, France [CUBA]

HAVANATUR, S.A., Hialeah, Florida, U.S.A. [CUBA]

HAVANATUR, S.A., Panama City, Panama [CUBA]

HAVINPEX, S.A. (a.k.a. TRANSOVER, S.A.) Panama City, Panama [CUBA]

HAWATMA, Nayif (a.k.a. HAWATMEH, Nayif; a.k.a. HAWATMAH, Nayif; a.k.a. KHALID, Abu); Secretary General of DEMOCRATIC FRONT FOR THE LIBERATION OF PALESTINE—HAWATMEH FACTION; DOB 1933 (individual) [SDT]

HAWATMAH, Nayif (a.k.a. HAWATMA, Nayif; a.k.a. HAWATMEH, Nayif; a.k.a. KHALID, Abu); Secretary General of

DEMOCRATIC FRONT FOR THE LIBERATION OF PALESTINE—HAWATMEH FACTION; DOB 1933 (individual) [SDT]

HAWATMEH, Nayif (a.k.a. HAWATMA, Nayif; a.k.a. HAWATMAH, Nayif; a.k.a. KHALID, Abu); Secretary General of DEMOCRATIC FRONT FOR THE LIBERATION OF PALESTINE—HAWATMEH FACTION; DOB 1933 (individual) [SDT]

HAXHIREXHA, Kastriot; DOB 9 May 1961; POB Debar, Macedonia (individual) [BALKANS]

HAYA, Francisco, Panama (individual) [CUBA]

HAYDEE DE MUNOZ Y CIA. S. EN C., Avenida 6N No. 23DN–16, Cali, Colombia; Avenida 4N No. 5N–20, Cali, Colombia [SDNT]

HEATH, Noel Timothy (a.k.a. ZAMBA, Noel Heath; a.k.a. ZAMBO, Noel Heath), Cardin Avenue, St. Kitts; DOB 16 Dec 1949; POB St. Kitts and Nevis; Passport 03574 (Great Britain) (individual) [SDNTK]

HEKHMARTYAR, Gulbuddin (a.k.a. HEKMATIAR, Gulbuddin; a.k.a. HEKMATYAR, Gulabudin; a.k.a. HEKMATYAR, Gulbuddin; a.k.a. HEKMETYAR, Gulbudin; a.k.a. HIKMETYAR, Golboddin; a.k.a. KHEKMATIYAR, Gulbuddin), last known address, Iran; DOB 1 Aug 1949; POB Konduz Province, Afghanistan (individual) [SDGT]

HEKMATIAR, Gulbuddin (a.k.a. HEKHMARTYAR, Gulbuddin; a.k.a. HEKMATYAR, Gulabudin; a.k.a. HEKMATYAR, Gulbuddin; a.k.a. HEKMETYAR, Gulbudin; a.k.a. HIKMETYAR, Golboddin; a.k.a. KHEKMATIYAR, Gulbuddin), last known address, Iran; DOB 1 Aug 1949; POB Konduz Province, Afghanistan (individual) [SDGT]

HEKMATYAR, Gulabudin (a.k.a. HEKHMARTYAR, Gulbuddin; a.k.a. HEKMATIAR, Gulbuddin; a.k.a. HEKMATYAR, Gulbuddin; a.k.a. HEKMETYAR, Gulbudin; a.k.a. HIKMETYAR, Golboddin; a.k.a. KHEKMATIYAR, Gulbuddin), last known address, Iran; DOB 1 Aug 1949; POB Konduz Province, Afghanistan (individual) [SDGT]

HEKMATYAR, Gulbuddin (a.k.a. HEKHMARTYAR, Gulbuddin; a.k.a. HEKMATIAR, Gulbuddin; a.k.a. HEKMATYAR, Gulabudin; a.k.a. HEKMETYAR, Gulbudin; a.k.a. HIKMETYAR, Golboddin; a.k.a. KHEKMATIYAR, Gulbuddin), last known address, Iran; DOB 1 Aug 1949; POB Konduz Province, Afghanistan (individual) [SDGT]

HEKMETYAR, Gulbudin (a.k.a. HEKHMARTYAR, Gulbuddin; a.k.a. HEKMATIAR, Gulbuddin; a.k.a. HEKMATYAR, Gulabudin; a.k.a. HEKMATYAR, Gulbuddin; a.k.a. HIKMETYAR, Golboddin; a.k.a. KHEKMATIYAR, Gulbuddin), last known address, Iran; DOB 1 Aug 1949; POB Konduz Province, Afghanistan (individual) [SDGT]

HELFORD DIRECTORS LIMITED, Haven Court, 5 Library Ramp, Gibraltar [IRAQ]





OFFICE OF FOREIGN ASSETS CONTROL

search [ SEARCH ]

**News**
**Direct Links**
**Key Topics**
**Press Room**
**About Treasury**
**Offices**
 Domestic Finance
 Economic Policy
 General Counsel
 International Affairs
 Management
 Public Affairs
 Tax Policy
 Terrorism and Financial
 Intelligence
 ▸ Office of Foreign Assets
 Control
 Designation Lists & Financial
 Advisories
 Publications and Legislation
 Programs and Initiatives
 Treasurer
**Bureaus**
**Education**
**Site Policies and Notices**

## Office of Foreign Assets Control
### RECENT OFAC ACTIONS

Full List | Previous | Next

*To view or print the PDF content on this page, download the free Adobe® Acrobat® Reader®.*

**02/19/2003**

Effective at 11:59pm on February 18, 2003, the following individual has been added to OFAC's SDN list as a Specially Designated Global Terrorist (without the "a.k.a."s listed as separate entries in this Bulletin):

HEKMATYAR, Gulbuddin (a.k.a. HEKHMARTYAR, Gulbuddin; a.k.a. HEKMATIAR, Gulbuddin; a.k.a. HEKMATYAR, Gulabudin; a.k.a. HEKMETYAR, Gulbudin; a.k.a. HIKMETYAR, Golboddin; a.k.a. KHEKMATIYAR, Gulbuddin), last known address, Iran; DOB 1 Aug 1949; POB Konduz Province, Afghanistan (individual) [SDGT]

All of OFAC's SDN material has been updated accordingly, as has OFAC's program brochure on Terrorism 📄, including a separate entry for each "a.k.a." listing as appropriate.



BBC  CATEGORIES  TV  RADIO  COMMUNICATE  WHERE I LIVE  INDEX  SEARCH [        ] Go

News Front Page
World

Africa
Americas
Asia-Pacific
Europe
Middle East
South Asia
--------------
From Our Own
Correspondent
--------------
Letter From
America
UK
England
N Ireland
Scotland
Wales
Politics
Business
Entertainment
Science/Nature
Technology
Health
Education
--------------
Talking Point
--------------
Country Profiles
In Depth
--------------
Programmes
--------------

BBC SPORT
BBC WEATHER
CBBC news

SERVICES
Daily E-mail
News Ticker
Mobile/PDAs
--------------
Text Only
Feedback
Help

LANGUAGES
عربي
فارسى
پښتو

TÜRKÇE
FRANÇAIS

EDITIONS

You are in: World: Middle East
Tuesday, 28 January, 2003, 11:34 GMT

# Profile: Gulbuddin Hekmatyar



Hekmatyar was an embarrassment to his Iranian hosts

**The latest fighting in Afghanistan has again thrown the spotlight on the warlord Gulbuddin Hekmatyar, reported to be allied to the men battling against US forces.**

Gulbuddin Hekmatyar's Mujahideen faction, the Hezb-e-Islami, was one of the groups which helped end the Soviet occupation of Afghanistan.

But in the free-for-all that followed in the early 1990s, his group of fundamentalist Sunni Muslim Pashtuns clashed violently with other Mujahideen factions in the struggle for control of the capital, Kabul.

The Hezb-e-Islami was blamed for much of the terrible death and destruction of that period, which led many ordinary Afghans to welcome the emergence of the Taleban.

> **Hezb-e-Islami will fight our jihad until foreign troops are gone from Afghanistan and Afghans have set up an Islamic government**
>
> Message from Gulbuddin Hekmatyar

For some time, Mr Hekmatyar himself enjoyed considerable support from Pakistan and Saudi Arabia. But eventually Islamabad turned against him, preferring to give full support to the Taleban instead.

So like the other Mujahideen factions, Mr Hekmatyar and his men were forced to flee Kabul when the Taleban swept into power



## Rebuilding
Uneasy peace
Afghan army test
Looking ahead
Aid shortfall
Unfulfilled dreams

## Political uncertainty
Karzai's shaky rule
Al-Qaeda threat?
Qadir's assassination
Loya jirga assessed

## Profiles
Hamid Karzai
Ex-king's dilemmas
Masood: Slain hero
Warlord Ismail Khan
Gulbuddin Hekmatyar

## Issues
Wedding bomb error
Warlords re-emerge
Threats to aid
agencies
Refugee return halted

**FACT FILE**
Afghan powerbrokers

**IN DEPTH**
War on al-Qaeda

**FORUM**
Hamid Karzai
answered your
questions

**TALKING POINT**
Have promises been
kept?

**See also:**
25 Dec 02 | South Asia
Afghan warlord
threatens foreigners
30 Oct 02 | South Asia
Afghan warlord's
relative 'arrested'
10 May 02 | South Asia
CIA 'tried to kill Afghan
warlord'
04 Apr 02 | South Asia

Change to World      in 1996.

## Wild card

He ended up being given refuge in Tehran, where he lived a quiet life, waiting for his fortunes to change.



The Iranians may have regarded him as a potentially useful Pashtun card to have up their sleeve, but he turned out to be too much of a wild card for them.

Mr Karzai wants to try Mr Hekmatyar for war crimes

His vocal opposition both to the Americans and to the new regime of President Hamid Karzai was an embarrassment to the Iranian Government, which threw its official weight behind Mr Karzai.

In February last year, the Iranian authorities expelled Mr Hekmatyar and closed down the offices of his Hezb-e-Islami in Tehran.

They accused him of abusing Iranian hospitality with his comments vowing to fight the Karzai administration.

He returned to an undisclosed location in Afghanistan following threats by the Afghan Government to arrest him and try him for war crimes.

In March last year he offered an olive branch to Mr Karzai.

A spokesman for Hezb-e-Islami in Pakistan said Mr Hekmatyar was now giving full support to the Karzai administration, although the warlord's whereabouts remained a mystery.

## Missile attack

Soon after, however, the Afghan administration arrested 160 people in Kabul in a suspected anti-government plot.

The government said _____  AP

Mass arrests of Kabul 'plotters'
11 Mar 02 | Middle East
Afghan warlord 'pledges support'
26 Feb 02 | Middle East
Iran 'expels' Afghan warlord
10 Feb 02 | Middle East
Iran's unlikely bedfellow

**Internet links:**

Iranian Presidency
Afghanistan Online

The BBC is not responsible for the content of external internet sites

**Top Middle East stories now:**

US draws up second Iraq resolution
Mid-East peace moves urged
Saudis launch first al-Qaeda trial
Palestinian gas mask appeal dismissed
Kuwait protests over Iraq statement
Polio campaign launched in Iraq
Iran academic sent back to death court
Jerusalem gets ultra-Orthodox mayor

**Links to more Middle East stories are at the foot of the page.**

the detainees had
been conspiring to plant bombs in Kabul
and that most were members of
Hezb-e-Islami.

Mr Hekmatyar remained elusive. Last May,
the CIA reportedly spotted him in the
Shegal Gorge, near Kabul, and tried to kill
him with a missile from an unmanned spy
plane. It missed.

The US continued to tighten the screw and
was reportedly behind the arrest in
Islamabad in October of Mr Hekmatyar's
son Ghairat Baheer.

Mr Hekmatyar's response was defiance. In
December, he warned that a holy war
would be stepped up against international
troops in Afghanistan.

His message was distributed along the
Afghan-Pakistan border to drum up
recruits.

The message read: "Hezb-e-Islami will fight
our jihad until foreign troops are gone from
Afghanistan and Afghans have set up an
Islamic government."

✉ **E-mail this story to a friend**

**Links to more Middle East stories**

| In This Section | | Go |

© **BBC**   ^^ **Back to top**

**News Front Page | World | UK | England | N Ireland | Scotland | Wales |
Politics | Business | Entertainment | Science/Nature | Technology |
Health | Education | Talking Point | Country Profiles | In Depth |
Programmes**

-------------------------------------------------------------------------------
**To BBC Sport>> | To BBC Weather>> | To BBC World Service>>**
-------------------------------------------------------------------------------
**© MMIII | News Sources | Privacy**



HOME   CONTACT US   SITE INDEX   FAQ   FOIA   ESPAÑOL   ACCESSIBILITY   PRIV

OFFICE OF FOREIGN ASSETS CONTROL

## Office of Foreign Assets Control

### RECENT OFAC ACTIONS

search   SEARCH

**News**
**Direct Links**
**Key Topics**
**Press Room**
**About Treasury**
**Offices**
  Domestic Finance
  Economic Policy
  General Counsel
  International Affairs
  Management
  Public Affairs
  Tax Policy
  Terrorism and Financial
  Intelligence
  ▶ Office of Foreign Assets
    Control
  Designation Lists & Financial
  Advisories
  Publications and Legislation
  Programs and Initiatives
  Treasurer
**Bureaus**
**Education**
**Site Policies and Notices**

Full List | Pre

*To view or print the PDF content on this page, download the free* Adobe® Acrobat® Reader

**12/14/2001 4:30 p.m.**

All financial assets and all records of BENEVOLENCE INTERNATIONAL FOUND/
INC. and GLOBAL RELIEF FOUNDATION, INC. wherever located are blocked pe
investigation pursuant to Section 106 of the U.S.A. Patriot Act of 2001, 107 Public
(October 26, 2001). BENEVOLENCE is known to have offices in Illinois and New J
Global is known to have offices in Illinois. Their names have been integrated into th
field and delimited versions of OFAC's SDN list with the descriptor "[BPI-PA]" and
the rest of OFAC's informational material on Terrorism and SDNs. They will be full
integrated into the *.PDF and ASCII versions of the SDN list as soon as possible:

BENEVOLENCE INTERNATIONAL FOUNDATION, INC., 20-24 Branford Place, S
Newark, NJ 07102, U.S.A.; 9838 S. Roberts Road, Suite 1-W, Palos Hills, IL 6046
P.O. Box 548, Worth, IL 60482, U.S.A.; U.S. FEIN: 36-3823186 (all financial asset
records are blocked) [BPI-PA]

GLOBAL RELIEF FOUNDATION, INC., 9935 S. 76th Avenue, #1, Bridgeview, IL 6
U.S.A.; P.O. Box 1406, Bridgeview, IL 60455, U.S.A.; U.S. FEIN: 36-3804626 (all f
assets and all records are blocked) [BPI-PA]

person whose property and interests in property has been blocked pursuant to Executive Order 13224 of September 23, 2001, pertaining to persons who commit, threaten to commit, or support terrorism.

**DATES:** The designation by the Office of Foreign Assets Control of one additional person identified in this notice whose property and interests in property have been blocked pursuant to Executive Order 13224 is effective on October 17, 2002.

**FOR FURTHER INFORMATION CONTACT:** Office of Foreign Assets Control, Department of the Treasury, Washington, DC 20220, tel.: 202/622–2520.

**SUPPLEMENTARY INFORMATION:**

### Electronic and Facsimile Availability

This document is available as an electronic file on The Federal Bulletin Board the day of publication in the **Federal Register**. By modem, dial 202/512–1387 and type "/GO FAC," or call 202/512–1530 for disk or paper copies. This file is available for downloading without charge in ASCII and Adobe Acrobat ® readable (*.PDF) formats. For Internet access, the address for use with the World Wide Web (Home Page), Telnet, or FTP protocol is: *fedbbs.access.gpo.gov.* This document and additional information concerning the programs of the Office of Foreign Assets Control are available for downloading from the Office's Internet Home Page: *http://www.treas.gov/ofac,* or in fax form through the Office's 24-hour fax-on-demand service: call 202/622–0077 using a fax machine, fax modem, or (within the United States) a touch-tone telephone.

### Background

On September 23, 2001, President Bush issued Executive Order 13224 (the "Order") imposing economic sanctions on persons who commit, threaten to commit, or support certain acts of terrorism. In an annex to the Order, President Bush identified 12 individuals and 15 entities whose assets are blocked pursuant to the Order (66 FR 49079, September 25, 2001). Additional persons have been blocked pursuant to authorities set forth in the Order since that date and notices of these additional blockings have been published in the **Federal Register**.

*Additional Designation.* On October 17, 2002, the Office of Foreign Assets Control, acting pursuant to authorities set forth in the Order, designated one additional person whose property and interests in property are blocked. The name of this additional person is set

forth in the list below. Persons, and their known aliases, will be added to appendix A to 31 CFR chapter V, through a separate **Federal Register** notice, as "specially designated global terrorists" identified by the initials "[SDGT]". Appendix A lists the names of persons with respect to whom transactions are subject to the various economic sanctions programs administered by the Office of Foreign Assets Control.

The designation by the Office of Foreign Assets Control pursuant to Executive Order 13224 of this additional person listed below is effective on October 17, 2002. All property and interests in property of any designated person, including but not limited to all accounts, that are or come within the United States or that are or come within the possession or control of United States persons, including their overseas branches, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in, and all transactions or dealings by U.S. persons or within the United States in property or interests in property of any designated person are prohibited, unless licensed by the Office of Foreign Assets Control or exempted by statute.

The additional designation follows:

Global Relief Foundation, Inc., (a.k.a. Fondation Secours Mondial, A.S.B.L; a.k.a. Fondation Secours Mondial—Belgique A.S.B.L.; a.k.a. Fondation Secours Mondial VZW; a.k.a. FSM; a.k.a. Stichting Wereldhulp—Belgie, V.Z.W.; a.k.a. Fondation Secours Mondial—Kosova; a.k.a. Fondation Secours Mondial "World Relief"; a.k.a. Secours Mondial de France), Rruga e Kavajes, Building No. 3, Apartment No. 61, P.O. Box 2892, Tirana, Albania; Vaatjesstraat, 29, 2580 Putte, Belgium; Rue des Batavas 69, 1040 Etterbeek, Brussels, Belgium; P.O. Box 6, 1040 Etterbeek 2, Brussels, Belgium; Mula Mustafe Baseskije Street No. 72, Sarajevo, Bosnia; Put Mladih Muslimana Street 30/A, Sarajevo, Bosnia; 49 Rue du Lazaret, 67100 Strasbourg, France; Rr. Skenderbeu 76, Lagjja Sefa, Gjakova, Kosovo; Ylli Morina Road, Djakovica, Kosovo; House 267 Street No. 54, Sector F—11/4, Islamabad, Pakistan; Saray Cad. No. 37 B Blok, Yesilyurt Apt. 2/4, Sirinevler, Turkey; P.O. Box 1406, Bridgeview, Illinois 60455, U.S.A.; Afghanistan; Azerbaijan; Bangladesh; Chechnya, Russia; China; Eritrea; Ethiopia; Georgia; India; Ingushetia, Russia; Iraq; Jordan; Kashmir; Lebanon; Sierra Leone; Somalia; Syria; West Bank and Gaza; V.A.T. Number: BE 454,419,759; Federal Employer Identification Number: 36–3804626. (entity).

Dated: December, 2, 2002.

**R. Richard Newcomb,**

*Director, Office of Foreign Assets Control.*

**Kenneth Lawson,**

*Assistant Secretary (Enforcement), Department of the Treasury.*

[FR Doc. 03–13 Filed 1–2–03; 8:45 am]

**BILLING CODE 4810–25–P**

---

## UTAH RECLAMATION MITIGATION AND CONSERVATION COMMISSION

### Notice of Availability of the Draft Environmental Assessment for the Rehabilitation or Replacement of Diversion Dams on the Duchesne and Strawberry Rivers in UT

**AGENCY:** Utah Reclamation Mitigation and Conservation Commission.

**ACTION:** Notice of Availability of the Draft Environmental Assessment for the Rehabilitation or Replacement of Diversion Dams on the Duchesne and Strawberry Rivers in Utah.

---

**SUMMARY:** The Central Utah Project Completion Act (Pub. L. 102–575) authorized federal funds to rehabilitate diversion dams on the Duchesne and Strawberry Rivers in Utah. The project is needed to reduce adverse affects on fish and wildlife resources.

The Draft Environmental Assessment (DEA) was prepared as a Programmatic document. It discusses potential environmental impacts associated with reconstructing and operating an unspecified diversion dam on the Duchesne or Strawberry River. The new diversion dam could serve single or multiple diversion rights. Potential environmental impacts addressed in the document are those impacts that would be expected regardless of which diversion dam is rehabilitated. Potential impacts to wetlands, threatened and endangered species, and cultural resources are generally site specific and/or require special permits. Potential impacts to these environmental disciplines would be addressed in a Supplemental Environmental Assessment, if needed.

The DEA provides the public and decision makers information to understand and evaluate potential environmental consequences. The DEA was developed with the public in accordance with the Commissions National Environmental Policy Act (NEPA) Rule (43 CFR part 10010.20).

The DEA is related to other potential future actions, specifically the detailed design and implementation of diversion dam replacements or rehabilitation. The programmatic perspective has been considered in the document. Future

construction projects may require separate or supplemental NEPA compliance.

**DATES:** Written comments on the Draft Environmental Assessment are invited until January 31, 2003.

**ADDRESSES:** Address all comments and/or requests for further information to Mark Holden, Projects Manager, Utah Reclamation Mitigation and Conservation Commission, 102 West 500 South, Suite 315, Salt Lake City, UT, 84101.

**FOR FURTHER INFORMATION CONTACT:** Mark Holden, Projects Manager, 801–524–3146. *mholden@uc.usbr.gov.*

Dated: December 23, 2002.

**Michael C. Weland,**
*Executive Director.*
[FR Doc. 03–75 Filed 1–2–03; 8:45 am]
**BILLING CODE 4310–05–P**





HOME   CONTACT US   SITE INDEX   FAQ   FOIA   ESPAÑOL   ACCESSIBILITY   PRIV

OFFICE OF FOREIGN ASSETS CONTROL

search   [SEARCH]

**News**
**Direct Links**
**Key Topics**
**Press Room**
**About Treasury**
**Offices**
  Domestic Finance
  Economic Policy
  General Counsel
  International Affairs
  Management
  Public Affairs
  Tax Policy
  Terrorism and Financial
  Intelligence
  ▶ Office of Foreign Assets
    Control
  Designation Lists & Financial
  Advisories
  Publications and Legislation
  Programs and Initiatives
  Treasurer
**Bureaus**
**Education**
**Site Policies and Notices**

## Office of Foreign Assets Control

### RECENT OFAC ACTIONS

Full List | Pre

*To view or print the PDF content on this page, download the free Adobe® Acrobat® Reader®*

**10/18/2002**

Global Relief Foundation, Inc. has now been officially listed as a "Specially Design
Global Terrorist" [SDGT].

The following entry has therefore been changed:

GLOBAL RELIEF FOUNDATION, INC., 9935 S. 76th Avenue, #1, Bridgeview, IL 6
U.S.A.; P.O. Box 1406, Bridgeview, IL 60455, U.S.A.; U.S. FEIN: 36-3804626 (all f
assets and all records are blocked) [BPI-PA]

with the additional descriptor information below incorporated into the new GLOBAL
FOUNDATION, INC. [SDGT] designation:

Offices in the United States:

1) P.O. Box 1406, Bridgeview, IL 60455, U.S.A.

Foreign Offices:

FONDATION SECOURS MONDIAL A.S.B.L.
(a.k.a. FONDATION SECOURS MONDIAL - BELGIQUE A.S.B.L.;
a.k.a. FONDATION SECOURS MONDIAL VZW;
a.k.a. FSM;
a.k.a. SECOURS MONDIAL DE FRANCE;
a.k.a. STICHTING WERELDHULP - BELGIE, V.Z.W.;
a.k.a. FONDATION SECOURS MONDIAL - KOSOVA;
a.k.a. FONDATION SECOURS MONDIAL "WORLD RELIEF")

2) Vaatjesstraat, 29, 2580 Putte, Belgium

3) Rue des Bataves 69, 1040 Etterbeek, Brussels, Belgium

4) P.O. Box 6, 1040 Etterbeek 2, Brussels, Belgium

5) Mula Mustafe Baseskije Street No. 72, Sarajevo, Bosnia

6) Put Mladih Muslimana Street 30/A, Sarajevo, Bosnia

7) 49 rue du Lazaret, 67100 Strasbourg, France

8) Rr. Skenderbeu 76, Lagjja Sefa, Gjakova, Kosovo

9) Ylli Morina Road, Djakovica, Kosovo

10) Rruga e Kavajes, Building No. 3, Apartment No. 61, P.O. Box 2892, Tirana, All

11) House 267 Street No. 54, Sector F - 11/4, Islamabad, Pakistan

12) Saray Cad. No. 37 B Blok, Yesilyurt Apt. 2/4, Sirinevler, Turkey

Other Foreign Locations:

13) Afghanistan

14) Azerbaijan

15) Bangladesh

16) Chechnya (Russia)

17) China

18) Eritrea

19) Ethiopia

20) Georgia

21) India

22) Ingushetia (Russia)

23) Iraq

24) Jordan

25) Kashmir

26) Lebanon

27) Sierra Leone

28) Somalia

29) Syria

30) West Bank and Gaza

Federal Employer Identification Number: 36-3804626
V.A.T. Number: BE 454,419,759

All of OFAC's informational material has been updated accordingly. For complete
OFAC's usual format see the various versions of OFAC's SDN list and SDNEW file
Terrorism brochure has also been updated.

# PRESS ROOM
## U.S. DEPARTMENT OF THE TREASURY

**FROM THE OFFICE OF PUBLIC AFFAIRS**

October 18, 2002
PO-3553

**Treasury Department Statement Regarding the Designation of the Global Relief Foundation**

We continue to wage our relentless war on terror – both here in the U.S. and overseas.   We are harvesting information, coordinating with our allies, and taking action against terrorist networks.   We are seeing progress.   We have frozen dollars and the assets of organizations, deterred donors and supporters, and forced terrorist backers to use riskier, more vulnerable methods of raising and moving money.

Our efforts are having real-world effects. Al-Qaida and other terrorist organizations are suffering financially as a result of our actions. Potential donors are being more cautious about giving money to organizations where they fear that the money might wind up in the hands of terrorists. In addition, greater regulatory scrutiny in financial systems around the world is further marginalizing those who would support terrorist groups and activities.

The war on terrorism is only beginning, and it is certain to demand constant vigilance.  In the year since that terrible day, we have hit them hard. Our goal is to bankrupt their institutions and beggar their bombers. This war - the financial war against terrorism – is complicated and much more remains to be done. We are off to a good start, but this is a long-term war of attrition that we are waging. We will not relent.

As part of this campaign, today the Treasury Department designated the Global Relief Foundation under the authority of Executive Order 13224.

The Global Relief Foundation (GRF), has connections to, has provided support for, and has provided assistance to Usama Bin Ladin, the al Qaida Network, and other known terrorist groups.

One of the founders of GRF was previously a member of the Makhtab Al-Khidamat, the precursor organization to al Qaida.  The GRF has received funding from individuals associated with al Qaida.  GRF officials have had extensive contacts with a close associate of Usama Bin Ladin, who has been convicted in a U.S. court for his role in the 1998 bombings of the U.S. embassies in Kenya and Tanzania.

GRF members have dealt with officials of the Taliban, while the Taliban was subject to
international sanctions.
 PO-3553
The GRF has connections with known terrorist organizations and with known supporters of terrorist organizations, including the shipment of materiel to a terrorist organization operating in the Kashmir region and through financial transactions with a Texas-based charitable organization.

The United States today submitted this group's name to the UN sanctions committee for inclusion in its' consolidated list of entities and individuals whose assets UN member states are obligated to freeze pursuant to UN security council resolutions 1267 and 1390.

TREASURY DEPARTMENT FACT SHEET ON THE GLOBAL RELIEF

FOUNDATION

The Global Relief Foundation (GRF), also known as Fondation Secours Mondial (FSM), and its officers and directors have connections to, and have provided support for and assistance to, Usama bin Ladin (UBL), al Qaida, and other known terrorist groups.  These include groups previously designated by the United States under President Bush's September 2001 Executive Order 13224 regarding terrorism and included on the United Nations 1267 Sanctions Committee's consolidated list of individuals and entities whose assets are required to be frozen pursuant to UN Security Council Resolutions (UNSCRs) 1267 and 1390.

Links to UBL and al Qaida:

Rabih Haddad, a senior GRF official who co-founded GRF and served as its president throughout the 1990s and in the year 2000, worked for Makhtab al-Khidamat (MAK) in Pakistan in the early 1990s.  MAK was co-founded by Sheikh Abdullah Azzam and UBL in the 1980s and served as the precursor organization to al Qaida.  MAK was designated by President Bush in E.O. 13224 and was subsequently included on the UN 1267 Sanctions Committee's consolidated list.  The organization has helped funnel fighters and money to the Afghan resistance in Peshawar, Pakistan, and established recruitment centers worldwide to fight the Soviets.  Azzam, who served as a mentor to UBL, was killed in 1989.  He is also regarded as a historical leader of HAMAS, which was designated under E.O. 13224. At a recent immigration hearing, Haddad conceded that he met Azzam in Pakistan and characterized him as a "hero."

In addition, GRF has provided financial and other assistance to, and received funding from, individuals associated with al Qaida.  Mohammed Galeb Kalaje Zouaydi, a suspected financier of al Qaida's worldwide terrorist efforts, was arrested in Europe in April 2002. GRF has admitted receiving funds from Zouaydi.

GRF and FSM personnel had multiple contacts with Wadih El-Hage, UBL's personal secretary when UBL was in Sudan.  El-Hage was convicted in a U.S. district court in May 2001, for his role in the UBL-directed 1998 bombings of the U.S. embassies in Kenya and Tanzania.  At the time that El-Hage was playing an active role in an al Qaida terrorist cell in Kenya, he was in contact with GRF.  For example, documents recovered from a search in Kenya indicated that El-Hage was in contact with GRF after he returned from visiting al Qaida leadership in Afghanistan in February 1997.  GRF has acknowledged that El-Hage and Nabil Sayadi, FSM's Director in Belgium, were in contact during this period.

Links to Taliban and Other Entities and Background:

A GRF employee also dealt with officials of the Taliban, which at the time was an entity subject to U.S. sanctions pursuant to United States E.O. 13129 (prohibiting trade and most transactions with the Taliban because it provided a safe haven and base of operations for UBL and al Qaida) and subject to international sanctions pursuant to UNSCRs 1267 and 1333.  In November 2001, during the airstrikes in Afghanistan, a GRF medical relief coordinator traveled to Kabul, against the advice of the U.S. Department of State, and engaged in dealings and negotiations with Taliban officials until the collapse of the Taliban regime.

A set of photographs and negatives discovered in 1997 in a trash dumpster outside of GRF's office in Illinois depict large shipping boxes displayed under a GRF banner.  The boxes were full of sophisticated communications equipment, including approximately 200 handheld radio transceivers, long-range radio antennas, and portable power packs, with an estimated total value of $120,000. Other photographs depict fighters armed with automatic rifles, a sand bagged bunker with a radio antenna mounted outside, and mutilated corpses with the name "KPI" (Kashmir Press International) printed alongside.  Yet another photograph displays two dead men with the caption "Hizbul Mujahideen," a known terrorist organization operating in the Kashmir region.  On the reverse side of the photograph was handwritten in Arabic, "two martyrs killed by the Indian government."

GRF has stocked and promoted audio tapes and books authored by Sheikh Abdullah Azzam, discussed above, which glorify armed jihad, including "The international conspiracy against Jihad" and "The Jihad in its present stage." Despite Azzam's terrorist background, GRF has enthusiastically promoted Azzam's materials to the public: "His [Azzam's] theology is a sea, his words are jewels, and his thoughts are a light for those who are holding the smoldering embers. He lived the Jihad experiences of the 20th century in Afghanistan . . . and Palestine, and produced a new theory for saving the [Islamic] Nation from disgrace, shame, weakness, and submission to others."

GRF has published several Arabic newsletters and pamphlets that advocate armed action through jihad against groups perceived to be un-Islamic. For example, one 1995 GRF pamphlet reads "God equated martyrdom through JIHAD with supplying funds for the JIHAD effort. All contributions should be mailed to: GRF." Another GRF newsletter requested donations "for God's cause – they [the Zakat funds] are disbursed for equipping the raiders, for the purchase of ammunition and food, and for their [the Mujahideen's] transportation so that they can raise God the Almighty's word . . . it is likely that the most important of disbursement of Zakat in our times is on the jihad for God's cause . . . ."

GRF received $18,521 from the Holy Land Foundation for Relief and Development (HLF) in 2000. HLF, a Dallas, Texas based Islamic charitable organization, was designated under E.O. 13224 on December 4, 2001, and under the European Union's Regulation (EC) No. 2580/2001 on June 17, 2002, for its ties to terrorism. HLF's designation was upheld in a recent decision by a U.S. district court.

Gurule Statement

**PRESS ROOM**
U.S. DEPARTMENT OF THE TREASURY

### FROM THE OFFICE OF PUBLIC AFFAIRS

November 19, 2002
PO-3632

### Treasury Designates Benevolence International Foundation and Related Entities as Financiers of Terrorism

Today the US Treasury designated three entities as financiers of terrorism under Executive Order 13224 and will ask the United Nations to add these names to the list of those whose assets must be blocked by all member nations under UNSCR 1390. The financial accounts of the principal entity, Benevolence International Foundation, were blocked pending investigation in December 2001. The three closely linked but separately incorporated entities designated today are Benevolence International Foundation, Benevolence International Fund (Canada), Bosanska Idealna Futura (Bosnia), and their branch offices.

"UN designation of these financiers of terror will cut off their access to the global financial system and strip them of their ability to fund evil," said Treasury Secretary Paul O'Neill.

Benevolence International Foundation ("BIF") is a U.S. tax-exempt not-for-profit organization whose stated purpose is to conduct humanitarian relief projects throughout the world. BIF was incorporated in the State of Illinois on March 30, 1992. Although BIF is incorporated in the United States, it operates around the world, in Bosnia, Chechnya, Pakistan, China, Ingushetia, Russia, and other nations. BIF operates as Benevolence International Fund in Canada and as Bosanska Idealna Futura in Bosnia.

Enaam Arnaout, BIF's Chief Executive Officer and a member of the Board of Directors, recently was indicted in the United States for operating BIF as a racketeering enterprise and providing material support to organizations, including al Qaida, that are engaged in violent activities.

Substantial evidence documents the close relationship between Arnaout and Usama bin Laden, dating from the mid-1980s. An article in the Arab News from 1988, reporting on bin Laden's activities at the "al Masada" mujahideen camp in Afghanistan, included a photograph of Arnaout and bin Laden walking together. In a March 2002 search of BIF's offices, Bosnian law enforcement authorities discovered a host of evidence linking Arnaout to bin Laden and al Qaida. Among the files were scanned letters between Arnaout and bin Laden, under their aliases.

In one handwritten letter, bin Laden indicates that Arnaout is authorized to sign on bin Laden's behalf.

Various documents also established that Arnaout worked with others -- including members of al Qaida -- to purchase rockets, mortars, rifles, and offensive and defensive bombs, and to distribute them to various mujahideen camps, including camps operated by al Qaida.

Arnaout claimed to the Chicago Tribune last winter that he did not know bin Laden personally, that he had never been to the "al Masada" camp (at which he had been photographed walking with bin Laden), and that he was working in a restaurant in the Persian Gulf area during the relevant time frame. BIF's counsel later acknowledged in court that "it would appear that the nature of [Arnaout's] contacts [with bin Laden] may have been of a deeper nature than what he described to the Tribune."

BIF also has provided additional support for and has been linked in other ways to al Qaida and its operatives.  First, BIF lent direct logistical support in 1998 to Mamdouh Mahmud Salim, a bin Laden lieutenant present at the founding of al Qaida. Salim was indicted for conspiring to kill U.S. nationals.  Testimony at the 2001 trial of United States v. Bin Laden, et al, implicated Salim in efforts to develop chemical weapons on behalf of al Qaeda in the 1990s.  As early as 1992, Salim and bin Laden made efforts to develop conventional weapons and to obtain nuclear weapons components.  BIF is also linked to Mohamed Loay Bayazid, who was implicated in the U.S. embassy bombings trial for his efforts, approved by Salim, to obtain weapons components on behalf of bin Laden in 1993-1994. Bayazid's driver's license application, dated September 12, 1994, identifies his address as the address of BIF's Illinois office.  In the late 1990s, Saif al Islam el Masry, a member of al Qaida's majlis al shura (consultation council), served as an officer in BIF's Chechnya office.



```
Federal Register: March 19, 2002 (Volume 67, Number 53)
Notices
Page 12644-12646


-----------------------------------------------------------------------

DEPARTMENT OF THE TREASURY

Office of Foreign Assets Control


Additional Designations of Terrorism-Related Blocked Persons

AGENCY: Office of Foreign Assets Control, Treasury.

ACTION: Notice.

-----------------------------------------------------------------------

SUMMARY: Notice is hereby given of the designation of additional
persons whose property and interests in property have been blocked
pursuant to Executive Order 13224 of September 23, 2001, pertaining to
persons who commit, threaten to commit, or support terrorism.

DATES: The designations by the Secretary of the Treasury of additional
persons whose property and interests in property have been blocked
pursuant to Executive Order 13224 were variously effective on November
7, 2001, December 4, 2001, December 20, 2001, or January 9, 2002, as
reflected in the separate lists set forth in this notice.

FOR FURTHER INFORMATION CONTACT: Office of Foreign Assets Control,
Department of the Treasury, Washington, D.C. 20220, tel.: 202/622-2520.

SUPPLEMENTARY INFORMATION:

Electronic and Facsimile Availability

     This document is available as an electronic file on The Federal
Bulletin Board the day of publication in the Federal Register. By
```

modem, dial 202/512-1387 and type ``/GO FAC,'' or call 202/512-1530 for
disk or paper copies. This file is available for downloading without
charge in ASCII and Adobe Acrobat readable (*.PDF) formats.
For Internet access, the address for use with the World Wide Web (Home
Page), Telnet, or FTP protocol is: fedbbs.access.gpo.gov. This document
and additional information concerning the programs of the Office of
Foreign Assets Control are available for downloading from the Office's
Internet Home Page: http://www.treas.gov/ofac, or in fax form through
the Office's 24-hour fax-on-demand service: call 202/622-0077 using a
fax machine, fax modem, or (within the United States) a touch-tone
telephone.

Background

    On September 23, 2001, President Bush issued Executive Order 13224
(the ``Order'') imposing economic sanctions on persons who commit,
threaten to commit, or support certain acts of terrorism. In an annex
to the Order, President Bush identified 12 individuals and 15 entities
whose assets are blocked pursuant to the Order (66 FR 49079, September
25, 2001). The property and interests in property of an additional 33
individuals and 6 entities were blocked pursuant to determinations by
the Secretary of State and the Secretary of the Treasury effective
October 12, 2001, referenced in a Federal Register document published
by the Office of Foreign Assets Control, Department of the Treasury (66
FR 54404, October 26, 2001).
    Further Additional Determinations. Pursuant to subsections 1(c) and
1(d) of the Order, further additional persons have been determined by
the Secretary of the Treasury, in consultation with the Secretary of
State and the Attorney General: to be owned or controlled by, or to act
for or on behalf of, persons listed in the annex to the Order or
designated pursuant to subsection 1(b), 1(c), or 1(d)(i) of the Order;
to assist in, sponsor, or provide financial, material, or technological
support for, or financial or other services to or in support of, acts
of terrorism or persons listed on the annex or designated pursuant to
the Order; or to be otherwise associated with persons listed on the
annex to the Order or designated pursuant to subsection 1(b), 1(c), or
(1)(d)(i) of the Order. These additional determinations are set forth
in the lists below. In addition, further determinations made on October
31, 2001, December 18, 2001, and December 31, 2001, by the Secretary of
State, in consultation with the Secretary of the Treasury and the
Attorney General, under subsection 1(b) of the Order, are addressed in
a separate notice published elsewhere in this issue of the Federal
Register.
    All property and interests in property of any listed person that
are in the United States, that come within the United States, or that
are or come within the possession or control of United States persons,
including their overseas branches, are blocked, and may not be
transferred, paid, exported, withdrawn or otherwise dealt in, and all
transactions by U.S. persons or within the United States in property or
interests in property of any listed person are prohibited unless
otherwise authorized by the Office of Foreign Assets Control or
exempted by statute.
    The designations by the Secretary of the Treasury of further
additional persons whose property and interests in property have been
blocked pursuant to Executive Order 13224 were variously effective on
the relevant date of determination (November 7, 2001, December 4, 2001,
December 20, 2001 or January 9, 2002), as reflected under separate
headings in the lists below.
    In Section 10 of the Order, the President determined that because
of the ability to transfer funds or assets instantaneously, prior

notice to persons listed in the Annex to, or determined to be subject
to, the Order who might have a constitutional presence in the United
States, would render ineffectual the blocking and other measures
authorized in the Order. The President further determined that no prior
notification of a determination need be provided to any person who
might have a constitutional presence in the United States. In
furtherance of the objectives of the Order, the Secretary of the
Treasury has determined that no prior notice should be afforded to the
subjects of the determinations reflected in this notice because to do
so would give the subjects that opportunity to evade the measures
described in the Order and, consequently, render those measures
ineffectual toward addressing the national emergency declared in the
Order.

    The lists of additional designations follow:

[[Page 12645]]

Designations of November 7, 2001 (Entities)

    AARAN MONEY WIRE SERVICE INC., 1806 Riverside Avenue, 2nd Floor,
Minneapolis, Minnesota.
    AL BARAKA EXCHANGE L.L.C., P.O. Box 3313, Deira, Dubai, United Arab
Emirates; P.O. Box 20066, Dubai, United Arab Emirates.
    AL-BARAKAAT, Mogadishu, Somalia; Dubai, United Arab Emirates.
    AL-BARAKAAT BANK, Mogadishu, Somalia.
    AL-BARAKAAT BANK OF SOMALIA (BBS) (a.k.a. BARAKAAT BANK OF
SOMALIA), Mogadishu, Somalia; Bossaso, Somalia.
    AL-BARAKAAT GROUP OF COMPANIES SOMALIA LIMITED (a.k.a. AL-BARAKAT
FINANCIAL COMPANY), P.O. Box 3313, Dubai, United Arab Emirates;
Mogadishu, Somalia.
    AL-BARAKAAT WIRING SERVICE, 2940 Pillsbury Avenue, Suite 4,
Minneapolis, Minnesota 55408.
    AL-BARAKAT FINANCE GROUP, Dubai, United Arab Emirates; Mogadishu,
Somalia.
    AL-BARAKAT FINANCIAL HOLDING COMPANY, Dubai, United Arab Emirates;
Mogadishu, Somalia.
    AL-BARAKAT GLOBAL TELECOMMUNICATIONS (a.k.a. BARAKAAT
GLOBETELCOMPANY), P.O. Box 3313, Dubai, United Arab Emirates;
Mogadishu, Somalia; Hargeysa, Somalia.
    AL-BARAKAT INTERNATIONAL (a.k.a. BARACO CO.), Box 2923, Dubai,
United Arab Emirates.
    AL-BARAKAT INVESTMENTS, P.O. Box 3313, Deira, Dubai, United Arab
Emirates.
    AL TAQWA TRADE, PROPERTY AND INDUSTRY COMPANY LIMITED (f.k.a. AL
TAQWA TRADE, PROPERTY AND INDUSTRY) (f.k.a. AL TAQWA TRADE, PROPERTY
AND INDUSTRY ESTABLISHMENT) (f.k.a. HIMMAT ESTABLISHMENT), c/o Asat
Trust Reg., Altenbach 8, 9490 Vaduz FL, Liechtenstein.
    ASAT TRUST REG., Altenbach 8, 9490 Vaduz FL, Liechtenstein.
    BANK AL TAQWA LIMITED (a.k.a. AL TAQWA BANK) (a.k.a. BANK AL
TAQWA), P.O. Box N-4877, Nassau, Bahamas; c/o Arthur D. Hanna &
Company, 10 Deveaux Street, Nassau, Bahamas.
    BARAKA TRADING COMPANY, P.O. Box 3313, Dubai, United Arab Emirates.
    BARAKAAT BOSTON, 266 Neponset Avenue, Apt 43, Dorchester,
Massachusetts 02122-3224.
    BARAKAAT CONSTRUCTION COMPANY, P.O. Box 3313, Dubai, United Arab
Emirates.
    BARAKAAT ENTERPRISE, 1762 Huy Road, Columbus, Ohio 43224-3550.
    BARAKAAT GROUP OF COMPANIES, P.O. Box 3313, Dubai, United Arab
Emirates; Mogadishu, Somalia.
    BARAKAAT INTERNATIONAL, Hallbybacken 15, 70 Spanga, Sweden.

BARAKAAT INTERNATIONAL COMPANIES (BICO), Mogadishu, Somalia; Dubai, United Arab Emirates.

BARAKAAT INTERNATIONAL FOUNDATION, Box 4036, Spanga, Stockholm, Sweden; Rinkebytorget 1, 04 Spanga, Sweden.

BARAKAAT INTERNATIONAL, INC., 1929 South 5th Street, Suite 205, Minneapolis, Minnesota, U.S.A.

BARAKAAT NORTH AMERICA, INC., 925 Washington Street, Dorchester, Massachusetts; 2019 Bank Street, Ottawa, Ontario, Canada.

BARAKAAT RED SEA TELECOMMUNICATIONS, Bossaso, Somalia; Nakhiil, Somalia; Huruuse, Somalia; Raxmo, Somalia; Ticis, Somalia; Kowthar, Somalia; Noobir, Somalia; Bubaarag, Somalia; Gufure, Somalia; Xuuxuule, Somalia; Ala Aamin, Somalia; Guureeye, Somalia; Najax, Somalia; Carafaat, Somalia.

BARAKAAT TELECOMMUNICATIONS COMPANY LIMITED (a.k.a. BTELCO), Bakara Market, Dar Salaam Buildings, Mogadishu, Somalia; Kievitlaan 16, T'veld, Noord-Holland, The Netherlands.

BARAKAAT TELECOMMUNICATIONS COMPANY SOMALIA, LIMITED, P.O. Box 3313, Dubai, United Arab Emirates.

BARAKAT BANKS AND REMITTANCES, Mogadishu, Somalia; Dubai, United Arab Emirates.

BARAKAT COMPUTER CONSULTING (BCC), Mogadishu, Somalia.

BARAKAT CONSULTING GROUP (BCG), Mogadishu, Somalia.

BARAKAT GLOBAL TELEPHONE COMPANY, Mogadishu, Somalia; Dubai, United Arab Emirates.

BARAKAT POST EXPRESS (BPE), Mogadishu, Somalia.

BARAKAT REFRESHMENT COMPANY, Mogadishu, Somalia; Dubai, United Arab Emirates.

BARAKAT WIRE TRANSFER COMPANY, 4419 South Brandon Street, Seattle, Washington.

BARAKO TRADING COMPANY LLC, P.O. Box 3313, Dubai, United Arab Emirates.

GLOBAL SERVICE INTERNATIONAL, 1929 5th Street, Suite 204, Minneapolis, Minnesota.

HEYATUL ULYA, Mogadishu, Somalia.

NADA MANAGEMENT ORGANIZATION SA (f.k.a. AL TAQWA MANAGEMENT ORGANIZATION SA), Viale Stefano Franscini 22, CH-6900 Lugano TI, Switzerland.

PARKA TRADING COMPANY, P.O. Box 3313, Deira, Dubai, United Arab Emirates.

RED SEA BARAKAT COMPANY LIMITED, Mogadishu, Somalia; Dubai, United Arab Emirates.

SOMALI INTERNATIONAL RELIEF ORGANIZATION, 1806 Riverside Avenue, 2nd Floor, Minneapolis, Minnesota.

SOMALI INTERNET COMPANY, Mogadishu, Somalia.

SOMALI NETWORK AB (a.k.a. SOM NET AB), Hallybybacken 15, 70 Spanga, Sweden.

YOUSSEF M. NADA, Via Riasc 4, CH-6911 Campione d'Italia I, Switzerland.

YOUSSEF M. NADA & CO. GESELLSCHAFT M.B.H., Kaerntner Ring 2/2/5/22, 1010 Vienna, Austria.

Designations of November 7, 2001 (Individuals)

ABDULLKADIR, Hussein Mahamud, Florence, Italy.

ADEN, Abdirisak; Skaftingebacken 8, 163 67 Spanga, Sweden; DOB 01 June 1968.

ALI, Abbas Abdi, Mogadishu, Somalia.

ALI, Abdi Abdulaziz, Drabantvagen 21, 177 50 Spanga, Sweden; DOB 01 January 1955.

ALI, Yusaf Ahmed, Hallbybacken 15, 70 Spanga, Sweden; DOB: 20

November 1974.
AWEYS, Dahir Ubeidullahi, Via Cipriano Facchinetti 84, Rome, Italy.
AWEYS, Hassan Dahir (a.k.a. ALI, Sheikh Hassan Dahir Aweys) (a.k.a. AWES, Shaykh Hassan Dahir), DOB: 1935; Citizen: Somalia.
HIMMAT, Ali Ghaleb, Via Posero 2, CH-6911 Campione d'Italia, Switzerland; DOB: 16 June 1938; POB: Damascus, Syria; Citizen: Switzerland and Tunisia.
HUBER, Albert Friedrich Armand (a.k.a. HUBER, Ahmed), Mettmenstetten, Switzerland; DOB: 1927.
HUSSEIN, Liban, 925 Washington Street, Dorchester, Massachusetts; 2019 Bank Street, Ottawa, Ontario, Canada.
JAMA, Garad (a.k.a. NOR, Garad K.) (a.k.a. WASRSAME, Fartune Ahmed), 2100 Bloomington Avenue, Minneapolis, Minnesota; 1806 Riverside Avenue, 2nd Floor, Minneapolis, Minnesota; DOB: 26 June 1974.
JIM'ALE, Ahmed Nur Ali (a.k.a. JIMALE, Ahmad Ali) (a.k.a. JIM'ALE, Ahmad Nur Ali) (a.k.a. JUMALE,

[[Page 12646]]

Ahmed Nur) (a.k.a. JUMALI, Ahmed Ali), P.O. Box 3312, Dubai, United Arab Emirates; Mogadishu, Somalia.
KAHIE, Abdullahi Hussein, Bakara Market, Dar Salaam Buildings, Mogadishu, Somalia.
MANSOUR, Mohamed, (a.k.a. AL-MANSOUR, Dr. Mohamed), Ob. Heslibachstr. 20, Kusnacht, Switzerland; Zurich, Switzerland; DOB: 1928; POB: Egypt or United Arab Emirates.
MANSOUR-FATTOUH, Zeinab, Zurich, Switzerland.
NADA, Youssef, (a.k.a. NADA, Youssef M.) (a.k.a. NADA, Youssef Mustafa), Via Arogno 32, 6911 Campione d'Italia, Italy; Via Per Arogno 32, CH-6911 Campione d'Italia, Switzerland; Via Riasc 4, CH-6911 Campione d'Italia I, Switzerland; DOB: 17 May 1931 or 17 May 1937; POB: Alexandria, Egypt; Citizen: Tunisia.

Designations of December 4, 2001

AL-AQSA ISLAMIC BANK (a.k.a. AL-AQSA AL-ISLAMI BANK), P.O. Box 3753 al-Beireh, West Bank; Ramallah II 970, West Bank.
BEIT EL-MAL HOLDINGS (a.k.a. ARAB PALESTINIAN BEIT EL-MAL COMPANY; a.k.a. BEIT AL MAL HOLDINGS; a.k.a. BEIT EL MAL AL-PHALASTINI AL-ARABI AL-MUSHIMA AL-AAMA AL-MAHADUDA LTD.; a.k.a. PALESTINIAN ARAB BEIT EL MAL CORPORATION, LTD.), P.O. Box 662, Ramallah, West Bank.
HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT (f.k.a. OCCUPIED LAND FUND), 525 International Parkway, Suite 509, Richardson, Texas 75081, U.S.A.; P.O. Box 832390, Richardson, Texas 75083, U.S.A.; 9250 S. Harlem Avenue, Bridgeview, Illinois, U.S.A.; 345 E. Railway Avenue, Paterson, New Jersey 07503, U.S.A.; 12798 Rancho Penasquitos Blvd., Suite F, San Diego, California 92128 U.S.A.; Hebron, West Bank; Gaza; and other locations within the United States; U.S. FEIN: 95-4227517.

Designations of December 20, 2001 (Entity)

UMMAH TAMEER E-NAU (UTN), (a.k.a. Ummah Tameer I-Nau; a.k.a. Ummah Tamir I-Nau; a.k.a. Ummah Tamir E-Nau; a.k.a. Reconstruction of the Muslim Ummah; a.k.a. Reconstruction of the Islamic Community; a.k.a. Foundation for Construction; a.k.a. Reconstruction Foundation; a.k.a. Nation Building; a.k.a. Ummat Tamir-I-Pau; a.k.a. Ummat Tamir E-Nau), Street 13, Wazir Akbar Khan, Kabul, Afghanistan; 60-C, Nazim Ud Din Road, F 8/4 Islamabad, Pakistan.

Designations of December 20, 2001 (Individuals)

MAHMOOD, Sultan Bashir-Ud-Din (a.k.a. MAHMOOD, Sultan Bashiruddin; a.k.a. MEHMOOD, Dr. Bashir Uddin; a.k.a. MEKMUD, Sultan Baishiruddin), Street 13, Wazir Akbar Khan, Kabul, Afghanistan; alt. DOB 1937; alt. DOB 1938; alt. DOB 1939; alt. DOB 1940; alt. DOB 1941; alt. DOB 1942; alt. DOB 1943; alt. DOB 1944; alt. DOB 1945; nationality Pakistani.

MAJEED, Abdul (a.k.a. MAJEED, Chaudhry Abdul; a.k.a. MAJID, Abdul); DOB 15 April 1939; alt. DOB 1938; nationality Pakistani.

TUFAIL, Mohammed (a.k.a. TUFAIL, S.M.; a.k.a. TUFAIL, Sheik Mohammed); nationality Pakistani.

Designations of January 9, 2002 (Entities)

AFGHAN SUPPORT COMMITTEE (ASC) (a.k.a. AHYA UL TURAS; a.k.a. JAMIAT AYAT-UR-RHAS AL ISLAMIA; a.k.a. JAMIAT IHYA UL TURATH AL ISLAMIA; a.k.a. LAJNAT UL MASA EIDATUL AFGHANIA) Grand Trunk Road, near Pushtoon Garhi Pabbi, Peshawar, Pakistan; Cheprahar Hadda, Mia Omar Sabaqah School, Jalalabad, Afghanistan.

REVIVAL OF ISLAMIC HERITAGE SOCIETY (RIHS) (a.k.a. JAMIA IHYA UL TURATH; a.k.a. JAMIAT IHIA AL-TURATH AL-ISLAMIYA; a.k.a. REVIVAL OF ISLAMIC SOCIETY HERITAGE ON THE AFRICAN CONTINENT) Pakistan office; Afghanistan office; (office in Kuwait is NOT designated).

Designations of January 9, 2002 (Individuals)

AL-JAZIRI, Abu Bakr; Peshawar, Pakistan; nationality Algerian (individual).

AL-LIBI, Abd al-Mushin (a.k.a. ABU BAKR, Ibrahim Ali Muhammad) (individual).

Dated: January 15, 2002.
Loren L. Dohm,
Acting Director, Office of Foreign Assets Control.

Approved: January 23, 2002.
Jimmy Gurule,
Under Secretary (Enforcement), Department of the Treasury.
[FR Doc. 02-3291 Filed 3-14-02; 3:48 pm]
BILLING CODE 4810-25-P



HOME   CONTACT US   SITE INDEX   FAQ   FOIA   ESPAÑOL   ACCESSIBILITY   PRIV

OFFICE OF FOREIGN ASSETS CONTROL

## Office of Foreign Assets Control

### RECENT OFAC ACTIONS

Full List | Pre

search   SEARCH

**News**
**Direct Links**
**Key Topics**
**Press Room**
**About Treasury**
**Offices**
  Domestic Finance
  Economic Policy
  General Counsel
  International Affairs
  Management
  Public Affairs
  Tax Policy
  Terrorism and Financial
  Intelligence
  ▸ Office of Foreign Assets
    Control
  Designation Lists & Financial
  Advisories
  Publications and Legislation
  Programs and Initiatives
  Treasurer
**Bureaus**
**Education**
**Site Policies and Notices**

**12/04/2001**

OFAC has designated the following three entities as Specially Designated Global T
[SDGT]. Their names have been integrated into all versions of OFAC's SDN list as
OFAC's brochure on Terrorism and their assets must be blocked immediately:

AL-AQSA ISLAMIC BANK (a.k.a. AL-AQSA AL-ISLAMI BANK), P.O. Box 3753 al-I
West Bank; Ramallah II 970, West Bank [SDGT]

BEIT EL-MAL HOLDINGS (a.k.a. ARAB PALESTINIAN BEIT EL-MAL COMPANY;
BEIT AL MAL HOLDINGS; a.k.a. BEIT EL MAL AL-PHALASTINI AL-ARABI AL-MU
AL-AAMA AL-MAHADUDA LTD.; a.k.a. PALESTINIAN ARAB BEIT EL MAL
CORPORATION, LTD.), P.O. Box 662, Ramallah, West Bank [SDGT]

HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT (f.k.a. OCCUPIE
FUND), 525 International Parkway, Suite 509, Richardson, Texas 75081, U.S.A.; F
832390, Richardson, Texas 75083, U.S.A.; 9250 S. Harlem Avenue, Bridgeview, I
U.S.A.; 345 E. Railway Avenue, Patterson, New Jersey 07503, U.S.A.; 12798 Ran
Penasquitos Blvd., Suite F, San Diego, California 92128, U.S.A.; Hebron, West Ba
and other locations within the United States; U.S. FEIN: 95-4227517 [SDGT]



**Country Reports on Terrorism**   -Report Home Page
Released by the Office of the Coordinator for Counterterrorism
April 30, 2008

**Chapter 6 -- Terrorist Organizations**

**Terrorist Organizations**

Foreign Terrorist Organization (FTO) aliases cited are consistent with and drawn from the Specially Designated Nationals list maintained by the Department of Treasury. The full list can be found at the following website: http://www.treasury.gov/offices/enforcement/ofac/sdn/sdnlist.txt

On October 15, 1999, pursuant to UNSCR 1267, the "al-Qa'ida and Taliban Sanctions Committee" was established. The 1267 sanctions regime has been modified and strengthened by subsequent resolutions so that the sanctions now cover individuals and entities associated with al-Qa'ida, Usama bin Ladin, and the Taliban. The targeted individuals and entities are placed on the Consolidated List. The full list can be found at the following website: http://www.un.org/sc/committees/1267/consolist.shtml.

**U.S. Government Designated Foreign Terrorist Organizations**

**Abu Nidal Organization (ANO)**
**Abu Sayyaf Group**
**Al-Aqsa Martyrs Brigade**
**Ansar al-Sunnah**
**Armed Islamic Group (GIA)**
**Asbat al-Ansar**
**Aum Shinrikyo**
**Basque Fatherland and Liberty (ETA)**
**Communist Party of Philippines/New People's Army (CPP/NPA)**
**Continuity Irish Republican Army (CIRA)**
**Gama'a al-Islamiyya (IG)**
**HAMAS**
**Harakat ul-Mujahadin (HUM)**
**Hizballah**
**Islamic Jihad Group (IJG)**
**Islamic Movement of Uzbekistan (IMU)**
**Jaish-e-Mohammed (JEM)**
**Jemaah Islamiya Organization (JI)**
**Al-Jihad**
**Kahane Chai (Kach)**
**Kongra-Gel (formerly Kurdistan Worker's Party (PKK))**
**Lashkar e-Tayyiba**
**Lashkar i Jhangvi (LJ)**
**Liberation Tigers of Tamil Eelam (LTTE)**
**Libyan Islamic Fighting Group (LIFG)**
**Moroccan Islamic Combatant Group (GICM)**
**Mujahadin-e Khalq Organization (MEK)**
**National Liberation Army (ELN)**
**Palestine Liberation Front (PLF)**
**Palestinian Islamic Jihad (PIJ)**
**Popular Front for the Liberation of Palestine (PFLP)**
**Popular Front for the Liberation of Palestine-General Command (PFLP-GC)**
**Al-Qa'ida**
**Al-Qa'ida in Iraq**
**Al-Qa'ida in the Islamic Maghreb (AQIM) [Formerly Salafist Group for Call and Combat (GSPC)]**
**Real IRA (RIRA)**
**Revolutionary Armed Forces of Colombia (FARC)**
**Revolutionary Nuclei (RN)**
**Revolutionary Organization 17 November (17N)**
**Revolutionary People's Liberation Party/Front (DHKP/C)**
**Shining Path (SL)**
**United Self-Defense Forces of Colombia (AUC)**

---

**Abu Nidal Organization (ANO)**
a.k.a. Arab Revolutionary Brigades; Arab Revolutionary Council; Black September; Fatah Revolutionary Council; Revolutionary Organization of Socialist Muslims

**Description:** The Abu Nidal Organization (ANO), an international terrorist organization, was founded by Sabri al-Banna (a.k.a. Abu Nidal) after splitting from the Palestine Liberation Organization (PLO) in 1974. The group's previous known structure consisted of various functional committees, including political, military, and financial. In August 2002, Abu Nidal died in Baghdad, probably at the hands of Iraqi security officials; the new leadership of the organization remains unclear.

**Activities:** The ANO has carried out terrorist attacks in 20 countries, killing or injuring almost 900 persons. The group has not staged a major attack against Western targets since the late 1980s. Major attacks included the Rome and Vienna airports in 1985, the Neve Shalom synagogue in Istanbul, the hijacking of Pan Am Flight 73 in Karachi in 1986, and the City of Poros day-excursion ship attack in Greece in 1988. The ANO is suspected of assassinating PLO deputy chief Abu Iyad and PLO security Chief Abu Hul in Tunis in 1991. The ANO conducted no attacks in 2007.

**Strength:** Current strength is unknown.

**Location/Area of Operation:** The group is largely considered inactive, although former and possibly current ANO associates might be in Iraq and Lebanon.

**External Aid:** The ANO's current access to resources is unclear, but it is likely that the decline in state support has had a severe impact on its capabilities.

**Abu Sayyaf Group**
a.k.a. Al Harakat al Islamiyya

**Description:** The Abu Sayyaf Group (ASG) is an Islamic terrorist group operating in the southern Philippines. Some ASG leaders allegedly fought in Afghanistan during the Soviet invasion and are students and proponents of radical Islamic teachings. The group split from the much larger Moro National Liberation Front in the early 1990s under the leadership of Abdurajak Abubakar Janjalani, who was killed in a clash with Philippine police in December 1998. His younger brother, Khadaffy Janjalani, replaced him as the nominal leader of the group. In September 2006, Janjalani was killed in a gun battle with the Armed Forces of the Philippines. Radullah Sahiron is assumed to be the new ASG leader.

**Activities:** The ASG engages in kidnappings for ransom, bombings, beheadings, assassinations, and extortion. The group's stated goal is to promote an independent Islamic state in western Mindanao and the Sulu Archipelago, areas in the southern Philippines heavily populated by Muslims, but the ASG primarily has used terror for financial profit. Recent bombings may herald a return to a more radical, politicized agenda, at least among certain factions. In August 2006, the Armed Forces of the Philippines began "Operation Ultimatum," a sustained campaign that disrupted ASG forces in safe havens on Jolo Island in the Sulu archipelago, and resulted in the killing of ASG leader Khadaffy Janjalani in September 2006 and his deputy, Abu Solaiman in January 2007. In July 2007, the ASG, and Moro Islamic Liberation Front (MILF) engaged a force of Philippine marines on Basilan Island, killing fourteen, of which ten were beheaded.

The group's first large-scale action was a raid on the town of Ipil in Mindanao in April 1995. In April 2000, an ASG faction kidnapped 21 persons, including ten Western tourists, from a resort in Malaysia. In May 2001, the ASG kidnapped three U.S. citizens and 17 Filipinos from a tourist resort in Palawan, Philippines. Several of the hostages, including U.S. citizen Guillermo Sobero, were murdered. A Philippine military hostage rescue operation in June 2002 freed U.S. hostage Gracia Burnham, but her husband Martin Burnham and Filipina Deborah Yap were killed.

U.S. and Philippine authorities blamed the ASG for a bomb near a Philippine military base in Zamboanga in October 2002 that killed a U.S. serviceman. In February 2004, Khadaffy Janjalani's faction bombed SuperFerry 14 in Manila Bay, killing 132. In March 2004, Philippine authorities arrested an ASG cell whose bombing targets included the U.S. Embassy in Manila. The ASG also claimed responsibility for the 2005 Valentine's Day bombings in Manila, Davao City, and General Santos City, which killed eight and injured more than 150. In November 2007, a motorcycle bomb exploded outside the Philippines Congress, killing a congressman and three staff members. While there was no definitive claim of responsibility, three suspected ASG members were arrested during a subsequent raid on a safe house.

**Strength:** ASG is estimated to have 200 to 500 members.

**Location/Area of Operation:** The ASG was founded in Basilan Province and operates primarily in the provinces of the Sulu Archipelago, namely Basilan, Sulu, and Tawi-Tawi. The group also operates on the Zamboanga peninsula, and members occasionally travel to Manila. In mid-2003, the group started operating in Mindanao's city of Cotobato and on the provincial coast of Sultan Kudarat, Mindanao. The ASG was expelled from Mindanao proper by the Moro Islamic Liberation Front in mid-2005. The group expanded its operational reach to Malaysia in 2000 with the abduction of foreigners from a tourist resort there.

**External Aid:** The ASG is funded through acts of ransom and extortion, and receives funding from both regional terrorist groups such as Jemaah Islamiya (JI), which is based mainly in Indonesia, and from Middle Eastern Islamic extremists. In October, the ASG appealed for funds and recruits on YouTube by featuring a video of the Janjalani brothers before they were killed.

**Al-Aqsa Martyrs Brigade**
a.k.a. al-Aqsa Martyrs Battalion

**Description:** The al-Aqsa Martyrs Brigade consists of loose cells of Palestinian militants loyal to, but not under the direct control of the secular-nationalist Fatah movement. Al-Aqsa emerged at the outset of the 2000 Palestinian al-Aqsa intifada as a militant offshoot of the Fatah party to attack Israeli military targets and settlers with the aim of driving Israel from the West Bank and Gaza and establishing a Palestinian state. Al-Aqsa has no central leadership; the cells operate with autonomy, although they remained ideologically loyal to Palestinian Authority (PA) President and Fatah party head Yassir Arafat until his death in November 2004.

**Activities:** Al-Aqsa initially focused on small arms attacks against Israeli military personnel and settlers in the West Bank. In 2002, however, the group began to conduct suicide bombings against Israeli civilians. Al-Aqsa suspended most anti-Israel attacks as part of the broader unilateral Palestinian ceasefire agreement during 2004 but resumed them following HAMAS's victory in January 2006 Palestinian Legislative Council elections. Al-Aqsa members continued the anti-Israeli and intra-Palestinian violence that contributes to the overall chaotic security environment in the Palestinian territories. In 2007, the majority of al-Aqsa attacks were rocket and mortar attacks into southern Israel from HAMAS-ruled Gaza. Israel agreed to extend a conditional pardon to 178 West Bank al-Aqsa members, but did not expand the program to the rest of the organization. Al-Aqsa has not targeted U.S. interests as a policy, although its anti-Israeli attacks have killed some dual U.S.-Israeli citizens.

**Strength:** Current strength is unknown, but most likely numbers a few hundred.

**Location/Area of Operation:** Al-Aqsa operates mainly in the West Bank but has conducted attacks inside Israel and Gaza. The group also has members in Palestinian refugee camps in

**External Aid:** Iran has exploited al-Aqsa's lack of resources and formal leadership by providing funds and other aid, mostly through Hizballah facilitators.

**Ansar al-Islam**
a.k.a. Ansar al-Sunna; Ansar Al-Sunnah Army; Devotees of Islam; Followers of Islam in Kurdistan; Helpers of Islam; Jaish Ansar Al-Sunnah; Jund Al-Islam; Kurdish Taliban; Kurdistan Supporters of Islam; Partisans of Islam; Soldiers of God; Soldiers of Islam; Supporters of Islam in Kurdistan

**Description:** Ansar al-Sunnah (AS) is a Salafi terrorist group whose goals include expelling the U.S.-led Coalition from Iraq and establishing an independent Iraqi state based on Sharia law. In 2003, AS announced its creation by posting a statement on the Internet calling all extremists in Iraq to unite under the new name. The bid to become an extremist umbrella organization failed, but the name AS remained in use until November, when it changed its name back to Ansar al-Islam (AI). AI has ties to the al-Qa'ida (AQ) central leadership and to al-Qa'ida in Iraq (AQI), although it has a competitive relationship with AQI and did not join the AQI-dominated "Islamic State of Iraq." Some members of AI trained in AQ camps in Afghanistan, and the group provided safe haven to affiliated terrorists before Operation Iraqi Freedom (OIF). Since OIF, AI has become the second-most prominent group engaged in anti-Coalition attacks in Iraq behind AQI and has maintained a strong propaganda campaign. Despite AI's ties to AQ, the group does not seem to be interested in attacking targets outside Iraq.

**Activities:** AI continued to conduct attacks against a wide range of targets including Coalition Forces, the Iraqi government and security forces, and Kurdish and Shia figures. AI has claimed responsibility for many high profile attacks, including the execution-style killing of nearly two dozen Yazidi civilians in Mosul in reprisal for the stoning death of a Muslim convert in April, the car-bombing of a police convoy in Kirkuk in July, the suicide bombing of Kurdistan Democratic Party offices in Khursbat in October, and numerous kidnappings, executions, and assassinations.

**Strength:** Precise numbers are unknown. AI is one of the largest Sunni terrorist groups in Iraq.

**Location/Area of Operation:** Primarily central, western, and northern Iraq.

**External Aid:** AI receives assistance from a

**Armed Islamic Group (GIA)**
a.k.a. Al-Jama'ah al-Islamiyah al-Musallah, Groupement Islamique Arme

**Description:** The Armed Islamic Group (GIA) aims to overthrow the Algerian regime and replace it with a state governed by Sharia law. The GIA began its violent activity in 1992 after the military government suspended legislative elections in anticipation of an overwhelming victory by the Islamic Salvation Front, the largest Algerian Islamic opposition party.

**Activities:** The GIA engaged in attacks against civilians and government workers. The group began conducting a terrorist campaign of civilian massacres in 1992, sometimes wiping out entire villages and killing tens of thousands of Algerians, alienating itself from the Algerian populace. Since announcing its campaign against foreigners living in Algeria in 1992, the GIA killed more than 100 expatriate men and women, mostly Europeans, in the country. Many of the GIA's members joined other Islamist groups or have been killed or captured by the Algerian government. The government's September 2005 reconciliation program led to an increase in the number of GIA terrorist suspects who surrendered to security forces. The GIA's most recent significant attacks occurred in August 2001. After the arrest of the GIA's last known emir and subsequent counterterrorism operations, the Algerian government declared that the GIA network was almost entirely broken up. The last terror attack attributed to the GIA occurred in 2006.

**Strength:** Precise numbers are unknown, but the group continues to decline and probably numbers fewer than 40. The last known emir was Nourredine Boudiafi, who was arrested by Algerian authorities in November 2005.

**Location/Area of Operation:** Algeria, the Sahel, and Europe.

**External Aid:** GIA members in Europe provide funding, but most funding comes from the group members' criminal activity.

**Asbat al-Ansar**

**Description:** Asbat al-Ansar is a Lebanon-based Sunni extremist group composed primarily of Palestinians with links to the al-Qa'ida (AQ) organization and other Sunni extremist groups. The group follows an extremist interpretation of Islam that justifies violence against civilian targets to achieve political ends. Some of the group's goals include thwarting perceived anti-Islamic and pro-Western influences in the country.

**Activities:** Asbat al-Ansar maintains close ties with the AQ network, with its base of operations in the Ain al-Hilwah Palestinian refugee camp near Sidon. Lebanese authorities detained a cell of al-Qa'ida in Iraq (AQI) extremists in June in the Bekaa Valley that had trained with Asbat al-Ansar and was possibly planning terrorist attacks throughout Lebanon against United Nations Interim Forces in Lebanon (UNIFIL) or other Western targets. Asbat al-Ansar has recently been reluctant to involve itself in operations in Lebanon due in part to concerns over losing its safe haven in Ain al-Hilwah. Various extremist web forums criticized Asbat al-Ansar for its failure to support fellow Sunni extremist group Fatah al-Islam (FAI) during the Lebanese Armed Forces campaign in summer 2007 that forced FAI out of Nahr al-Barid refugee camp in northern Lebanon, and severely damaged the group.

Members of Asbat al-Ansar were believed responsible for a Katyusha rocket attack on the Galilee region of Israel in December 2005. Asbat al-Ansar operatives have been involved in fighting Coalition Forces in Iraq since at least 2005 and several members of the group have been killed in anti-Coalition operations. Al-Sa'di was working in cooperation with Abu Muhammad al-Masri, the head of al-Qa'ida at the 'Ayn al-Hilwah refugee camp, where fighting has occurred between Asbat al-Ansar and Fatah elements. In 2007, Asbat al-Ansar remained focused on supporting jihad in Iraq and planning attacks against UNIFIL, Lebanese security forces, and U.S. and Western interests. Asbat al-Ansar-associated elements were implicated in the June 17 Katyusha rocket attack against northern Israel.

Asbat al-Ansar first emerged in the early 1990s. In the mid-1990s the group assassinated Lebanese religious leaders and bombed nightclubs, theaters, and liquor stores. It was involved in clashes in northern Lebanon in December 1999, and carried out a rocket-propelled grenade attack on the Russian Embassy in Beirut in January 2000. Asbat al-Ansar's leader, Ahmad Abd al-Karim al-Sa'di, a.k.a. Abu Muhjin, remains at large despite being sentenced to death in absentia for the 1994 murder of a Muslim cleric. In September 2004, operatives with links to the group were allegedly involved in planning terrorist operations targeting the Italian Embassy, the Ukrainian Consulate General, and Lebanese government offices. In October 2004, Mahir al-Sa'di, a member of Asbat al-Ansar, was sentenced in absentia to life imprisonment for plotting to assassinate then U.S. Ambassador to Lebanon, David Satterfield, in 2000.

**Strength:** The group commands between 100 and 300 fighters in Lebanon. Its named leader is Ahmed Abd al-Karim al-Saadi.

**Location/Area of Operation:** The group's primary base of operations is the Ayn al-Hilwah Palestinian refugee camp near Sidon in southern Lebanon.

**External Aid:** It is likely the group receives money through international Sunni extremist networks.

**Aum Shinrikyo**
a.k.a. A.I.C. Comprehensive Research Institute; A.I.C. Sogo Kenkyusho; Aleph; Aum Supreme Truth

**Description:** Shoko Asahara established Aum Shinrikyo (Aum) in 1987, and the cult received legal status as a religious entity in 1989. Initially, Aum aimed to take over Japan and then the world, but over time it began to emphasize the imminence of the end of the world. Asahara predicted 1996, and 1999 to 2003, as likely dates and said that the United States would initiate Armageddon by starting World War III with Japan. The Japanese government revoked its recognition of Aum as a religious organization following Aum's deadly sarin gas attack in Tokyo in March 1995. In 1997, however, a government panel decided not to invoke the Operations Control Law to outlaw the group. A 1999 law authorized the Japanese government to maintain police surveillance over the group because of concerns Aum might launch future terrorist attacks. Under the leadership of Fumihiro Joyu, the chief of Aum's once thriving Moscow operation, Aum changed its name to Aleph in January 2000 and tried to distance itself from the violent and apocalyptic teachings of its founder. In late 2003, however, Joyu stepped down under pressure from members who wanted to return fully to the worship of Asahara. A growing divide between members supporting Joyu and Asahara emerged. In 2007, Joyu officially split and in May, established a splinter group called Hikari No Wa. Hikari No Wa is translated as 'Circle of Light' or 'Ring of Light.' Japanese authorities continued to monitor both Aum (now called Aleph) and Hikari No Wa.

**Activities:** In March 1995, Aum members simultaneously released the chemical nerve agent sarin on several Tokyo subway trains, killing 12 persons and causing up to 6,000 to seek medical treatment. Subsequent investigations by the Japanese government revealed the group was responsible for other mysterious chemical incidents in Japan in 1994, including a sarin gas attack on a residential neighborhood in Matsumoto that killed seven and hospitalized approximately 500. Japanese police arrested Asahara in May 1995, and in February 2004 authorities sentenced him to death for his role in the 1995 attacks. In September 2006, Asahara lost his final appeal against the death penalty.

Since 1997, the cult has recruited new members, engaged in commercial enterprises, and acquired property, although it scaled back these activities significantly in 2001 in response to a public outcry. In July 2001, Russian authorities arrested a group of Russian Aum followers who had planned to set off bombs near the Imperial Palace in Tokyo as part of an operation to free Asahara from jail and smuggle him to Russia.

**Strength:** Aum's current membership in Japan is estimated to be about 1,500 persons, according to a study by the Japanese government issued in December. At the time of the Tokyo subway attack, the group claimed to have as many as 40,000 members worldwide, including 9,000 in Japan and 30,000 members in Russia.

**Location/Area of Operation:** Aum's principal membership is located in Japan, while a residual branch of about 300 followers live in Russia.

**External Aid:** None.

**Basque Fatherland and Liberty (ETA)**
a.k.a. Askatasuna; Batasuna; Ekin; Euskal Herritarrok; Euzkadi Ta Askatasuna; Herri Batasuna; Jarrai-Haika-Segi; K.A.S.; XAKI

**Description:** Basque Fatherland and Liberty (ETA) was founded in 1959 with the aim of establishing an independent homeland based on Marxist principles encompassing the Spanish Basque provinces of Vizcaya, Guipuzcoa, and Alava, the autonomous region of Navarra, and the southwestern French territories of Labourd, Basse-Navarre, and Soule. Spain and the EU both have listed ETA as a terrorist organization; in 2002 the Spanish Parliament banned the political party Batasuna, ETA's political wing, charging its members with providing material support to the terrorist group. In 2004, Spain and France formed a joint counterterrorism and judicial unit to combat ETA and Islamic terrorist groups. During 2005 and 2006, police in both countries together arrested around 100 individuals associated with ETA, dismantled several of the group's cells, and dealt a significant blow to its operational capability. Spanish and French prisons are estimated to hold a total of more than 500 ETA members. In March 2006, days after claiming responsibility for a spate of roadside blasts in northern Spain that caused no injuries, ETA announced that it would implement a "permanent" cease-fire. However, on December 30, 2006, ETA exploded a massive car-bomb that destroyed much of the covered parking garage outside

the new Terminal 4 of Madrid's Barajas International Airport. Two individuals killed in the blast became ETA's first fatalities in more than three years. The Spanish Government suspended talks with ETA, and government officials later said political negotiations with the group had ended.

**Activities:** Since the beginning of 2007, the group has been suspected of conducting numerous arson and incendiary attacks against government, financial, and civilian targets using various youth organizations as a proxy. ETA claimed several bombings: one in late July, on a road targeting the Tour de France that caused no damage; a car bombing in late August targeting a police station that wounded two police officers and damaged the building; a bombing in early September on a road that caused no damage; an attempted car-bombing on a Defense Ministry building in early September that failed due to a technical fault; and a bombing in late September at another police station that damaged the building but caused no injuries. ETA was also suspected of a car bombing in early October that wounded the bodyguard of a local government official, although the group has not yet claimed responsibility.

ETA formally renounced its "permanent" cease-fire in June, and in early September threatened a wave of attacks throughout Spain. Following indications in mid-2007 that the group may have expanded into Portugal its logistical operations, such as renting vehicles, Madrid and Lisbon agreed, in October, to intensify their cooperation against ETA by establishing a joint antiterrorism team based in Lisbon. In December, ETA murdered two Civil Guard officials in southern France, the first ETA killings in France since 1976. Several days later, the group threatened to open a new front in France against Spanish authorities. Also in December, Spanish and French authorities agreed to create a permanent joint police investigation team to fight ETA.

ETA primarily conducts bombings and assassinations; targets are typically Spanish government officials, security and military forces, politicians, and judicial figures, but the group also has targeted journalists and tourist areas. The group is responsible for killing more than 800 and injuring thousands more since it began its lethal attacks in the late 1960s. Security service scrutiny and a public outcry after the Islamic extremist train bombings in Madrid in March 2004, have limited ETA's capability and willingness to inflict casualties. In February 2005, ETA detonated a car bomb in Madrid at a convention center where Spanish King Juan Carlos and then Mexican President Vicente Fox were scheduled to appear, wounding more than 20 people. ETA also detonated an explosive device at a stadium constructed as part of Madrid's bid to host the 2012 Olympic Games; there were no injuries in that attack. ETA's late 2006 attack at Madrid's airport is the group's first fatal attack since March 2003.

**Strength:** According to Spanish security forces quoted in the press in mid-2007, ETA has about 100 active members; this number was reduced in 2007 as a result of the number of arrested by Spanish and French authorities.

**Location/Area of Operation:** ETA operates primarily in the Basque autonomous regions of northern Spain and southwestern France, but also has attacked Spanish and French interests elsewhere.

**External Aid:** ETA finances its activities primarily through bribery and extortion of Basque businesses. It has received training at various times in the past in Libya, Lebanon, and Nicaragua. Some ETA members allegedly fled to Cuba and Mexico, while others reside in South America. ETA members have operated and been arrested in other European countries, including France, Belgium, the Netherlands, the UK, Germany, and Portugal.

**Communist Party of Philippines/New People's Army (CPP/NPA)**
a.k.a. Communist Party of the Philippines; CPP; New People's Army; NPA

**Description:** The military wing of the Communist Party of the Philippines (CPP), the New People's Army (NPA), is a Maoist group formed in March 1969 with the aim of overthrowing the government through protracted guerrilla warfare. Jose Maria Sison, the chairman of the CPP's Central Committee and the NPA's founder, reportedly directs CPP and NPA activity from the Netherlands, where he lives in self-imposed exile. Luis Jalandoni, a fellow Central Committee member and director of the CPP's overt political wing, the National Democratic Front (NDF), also lives in the Netherlands and has become a Dutch citizen. Although primarily a rural-based guerrilla group, the NPA has an active urban infrastructure to support its terrorist activities and at times uses city-based assassination squads.

In September, Sison was briefly arrested in the Netherlands but was released on a judge's order a few days later. In November, the Armed Forces of the Philippines announced the capture of Elizabeth Principe, a suspected member of the Central Committee of the Communist Party of the Philippines.

**Activities:** The NPA primarily targets Philippine security forces, government officials, local infrastructure, and businesses that refuse to pay extortion, or "revolutionary taxes." The NPA charges politicians running for office in NPA-influenced areas for "campaign permits." The group opposes any U.S. military presence in the Philippines and has attacked U.S. military interests; it killed several U.S. service personnel before the U.S. base closures in 1992. The NPA claimed responsibility for the assassination of two congressmen, one from Quezon in May 2001 and one from Cagayan in June 2001, among other killings. Periodic peace talks with the Philippine government stalled after these incidents. In December 2005, the NPA publicly expressed its intent to target U.S. personnel if they were discovered in NPA operating areas.

**Strength**: Estimated at less than 9,000, a number significantly lower than its peak strength of approximately 25,000 in the 1980s.

**Location/Area of Operations:** Operates in rural Luzon, Visayas, and parts of northern and eastern Mindanao. There are cells in Manila and other metropolitan centers.

**External Aid:** Unknown.

**Continuity Irish Republican Army (CIRA)**
a.k.a. Continuity Army Council; Continuity IRA; Republican Sinn Fein

**Description:** The Continuity Irish Republican Army (CIRA) is a splinter group formed in 1994 as the clandestine armed wing of Republican Sinn Fein, which split from Sinn Fein in 1986. "Continuity" refers to the group's belief that it is carrying on the original Irish Republican Army's (IRA) goal of forcing the British out of Northern Ireland. CIRA cooperates with the larger Real IRA (RIRA).

**Activities:** CIRA has been active in Belfast and the border areas of Northern Ireland, where it has carried out bombings, assassinations, kidnappings, hijackings, extortion, and robberies. On occasion, it has provided advance warning to police of its attacks. Targets have included the British military, Northern Ireland security forces, and Loyalist paramilitary groups. CIRA did not join the Provisional IRA in its September 2005 decommissioning and remained capable of effective, if sporadic, terrorist attacks. In late 2006, CIRA members issued a list of up to 20 individuals they were targeting for paramilitary attacks, several of whom were wounded in subsequent shootings. In early 2006, the Independent Monitoring Commission reported that two splinter organizations, Óglaigh na hÉireann and Saoirse na hÉireann, were formed due to internal disputes within CIRA. In mid-October 2006, CIRA claimed the firebomb attacks of B&Q home-supply stores. CIRA activity has largely decreased from previous levels seen in 2005 and by 2007, the group had become increasingly active in criminal activity. In April, following the discovery of an improvised mortar adjacent to the railway line in Lurgan, three cira members were arrested and charged with conspiracy to murder, possession of explosives with intent to endanger life, and possession of articles for use in terrorism.

**Strength:** Membership is small, with possibly fewer than 50 hard-core activists. Police counterterrorist operations have reduced the group's strength.

**Location/Area of Operation:** Northern Ireland and the Irish Republic. CIRA does not have an established presence in Great Britain.

**External Aid:** Suspected of receiving funds and arms from sympathizers in the United States. CIRA may have acquired arms and materiel from the Balkans in cooperation with the Real IRA.

**Gama'a al-Islamiyya (IG)**
a.k.a. Al-Gama'at; Egyptian al-Gama'at al-Islamiyya; GI, Islamic Gama'at, IG; Islamic Group

**Description:** Gama'a al-Islamiyya (IG), Egypt's largest militant group, has been active since the late 1970s, but is now a loosely organized network. The external wing, composed of mainly exiled members in several countries, maintains its primary goal is to overthrow the Egyptian government and replace it with an Islamic state. The IG announced a cease-fire in 1997 that led to a split into two factions: one, led by Mustafa Hamza, supported the cease-fire; the other, led by Rifa'i Taha Musa, called for a return to armed operations. The IG announced another ceasefire in March 1999, but its spiritual leader, Shaykh Umar Abd al-Rahman, sentenced to life in prison in

January 1996 for his involvement in the 1993 World Trade Center bombing and incarcerated in the United States, rescinded his support for the cease-fire in June 2000. IG has not conducted an attack inside Egypt since the 1997 Luxor attack, which killed 58 tourists and four Egyptians, and wounded dozens more. In February 1998, a senior member signed Usama bin Ladin's fatwa calling for attacks against the United States.

In early 2001, Taha Musa published a book in which he attempted to justify terrorist attacks that cause mass casualties. Musa disappeared several months afterward, and we have no information about his whereabouts. In March 2002, members of the group's historic leadership in Egypt declared the use of violence misguided and renounced its future use, prompting denunciations by much of the leadership abroad. The Egyptian government continued to release IG members from prison; approximately 900 were released in 2003, and most of the 700 persons released in 2004 at the end of the Muslim holy month of Ramadan were IG members. In August 2006, Ayman al-Zawahiri announced that IG had merged with al-Qa'ida, but the group's Egypt-based leadership quickly denied this claim.

**Activities:** Before the 1997 cease-fire, IG conducted armed attacks against Egyptian security and other government officials, Coptic Christians, and Egyptian opponents of Islamic extremism. After the cease-fire, the faction led by Taha Musa launched attacks on tourists in Egypt, most notably the 1997 Luxor attack. IG claimed responsibility for the June 1995 assassination attempt on Egyptian President Hosni Mubarak in Addis Ababa, Ethiopia. IG was dormant in 2007.

**Strength:** Unknown. At its peak IG probably commanded several thousand hardcore members and a like number of supporters. Security crackdowns following the 1997 attack in Luxor, the 1999 cease-fire, and post-September 11 security measures have probably resulted in a substantial decrease in the group's membership and extremist activities.

**Location/Area of Operation:** IG operates mainly in the Al-Minya, Asyut, Qina, and Sohaj Governorates of southern Egypt. It also appears to have support in Cairo, Alexandria, and other urban locations, particularly among unemployed graduates and students. The IG maintains an external presence in Afghanistan, Yemen, the United Kingdom, and other locations in Europe.

**External Aid:** Al-Qa'ida and Afghan militant groups support the organization. IG also may obtain some funding through various Islamic non-governmental organizations.

### The Islamic Resistance Movement (HAMAS)
a.k.a. Harakat al-Muqawama al-Islamiya; Izz al-Din al Qassam Battalions; Izz al-Din al Qassam Brigades; Students of Ayyash; Student of the Engineer; Yahya Ayyash Units ; Izz al-Din al-Qassim Brigades; Izz al-Din al-Qassim Forces; Izz al-Din al-Qassim Battalions; Izz al-Din al Qassam Forces

**Description:** HAMAS, which includes military and political wings, was formed at the onset of the first Palestinian uprising or Intifada in late 1987, as an outgrowth of the Palestinian branch of the Muslim Brotherhood. The armed element, called the Izz al-Din al-Qassam Brigades, conducts anti-Israeli attacks, including suicide bombings against civilian targets inside Israel. HAMAS also manages a broad, mostly Gaza-based network of "Dawa" or ministry activities that include charities, schools, clinics, youth camps, fund-raising, and political activities. A Shura council based in Damascus, Syria, sets overall policy. After winning Palestinian Legislative Council elections in January 2006, HAMAS took control of significant Palestinian Authority (PA) ministries, including the Ministry of Interior. HAMAS subsequently formed an expanded, overt militia called the Executive Force, subordinate to the Ministry. This force and other HAMAS cadres took control of Gaza in a military-style coup in June 2007, forcing Fatah forces to either leave Gaza or go underground there.

**Activities:** Prior to 2005, HAMAS conducted numerous anti-Israeli attacks, including suicide bombings, rocket launches, improvised explosive device (IED) attacks, and shootings. HAMAS, however, has not directly targeted U.S. interests, although the group makes little or no effort to avoid soft targets frequented by foreigners. The group curtailed terrorist attacks in February 2005, after agreeing to a temporary period of calm brokered by the PA, and ceased most violence after winning control of the PA legislature and cabinet in January 2006. After HAMAS staged a June 2006 attack on IDF soldiers near Kerem Shalom that resulted in two deaths and the abduction of Corporal Gilad Shalit, Israel took steps that severely limited the operation of the Rafah crossing. HAMAS maintained and expanded its military capabilities in 2007. In June 2007, HAMAS took control of Gaza from the PA and Fatah in a military-style coup, leading to an international boycott and closure of Gaza borders. HAMAS has since dedicated the majority of its activity in Gaza to solidifying its control, hardening its defenses, tightening security, and conducting limited operations against Israeli military forces.

HAMAS fired rockets from Gaza into Israel in 2007 but focused more mortar on attacks targeting Israeli incursions. Additionally, other terrorist groups in Gaza fired rockets into Israel, most, presumably, with HAMAS support or acquiescence. HAMAS internal security efforts have centered on confronting threats to the group's hold on power, including arrest operations against Fatah. In June 2007, HAMAS took control of Gaza, leading to a drawn-out struggle between HAMAS and supporters of Fatah. The majority of HAMAS activity in Gaza is directed at solidifying their control over Gaza and weakening Fatah through kidnappings, torture, and the use of the "Executive Force" as a de-facto security apparatus. The continued international boycott and perceived efforts to destroy HAMAS have increased anti-U.S. sentiment on the Palestinian street, a development that could lead cells affiliated with HAMAS to launch attacks, including suicide bombings, without the sanction of HAMAS' senior leadership.

**Strength:** HAMAS probably has several hundred operatives in its armed wing, the al-Qassam Brigades, along with its reported 9,000-man Executive Force and tens of thousands of supporters and sympathizers.

**Location/Area of Operation:** HAMAS has an operational presence in every major city in the Palestinian territories and currently focuses its anti-Israeli attacks on targets in the West Bank and within Israel. HAMAS could potentially activate operations in Lebanon or resume terrorist operations in Israel. The group retains a cadre of leaders and facilitators that conducts diplomatic, fundraising, and arms smuggling activities in Lebanon, Syria, and other states. HAMAS is also increasing its presence in the Palestinian refugee camps in Lebanon, probably with the goal of eclipsing Fatah's long-time dominance of the camps.

**External Aid:** HAMAS receives some funding, weapons, and training from Iran. In addition, fundraising takes place in the Gulf countries, but the group also receives donations from Palestinian expatriates around the world and private benefactors in Arab states. Some fundraising and propaganda activity takes place in Western Europe and North America.

### Harakat ul-Mujahadin (HUM)
a.k.a. Al-Faran; Al-Hadid; Al-Hadith; Harakat ul-Ansar; Harakat ul-Mujahideen; HUA; Jamiat ul-Ansar

**Description:** Harakat ul-Mujahadin (HUM), an Islamic militant group based in Pakistan, is politically aligned with the radical political party Jamiat Ulema-i-Islam's Fazlur Rehman faction (JUI-F), and operates primarily in Kashmir. Reportedly under pressure from the Government of Pakistan, HUM's long time leader Fazlur Rehman Khalil stepped down and was replaced by Dr. Badr Munir as the head of HUM in January 2005. Khalil has been linked to Usama bin Ladin, and his signature was found on bin Ladin's fatwa in February 1998, calling for attacks on U.S. and Western interests. HUM operated terrorist training camps in eastern Afghanistan until Coalition air strikes destroyed them in autumn 2001. Khalil was detained by Pakistani authorities in mid-2004 and subsequently released in late December. In 2003, HUM began using the name Jamiat ul-Ansar (JUA). Pakistan banned JUA in November 2003.

**Activities:** HUM has conducted a number of operations against Indian troops and civilian targets in Kashmir. It is linked to the Kashmiri militant group al-Faran that kidnapped five Western tourists in Kashmir in July 1995; one was killed in August, and the other four reportedly were killed in December of the same year. HUM was responsible for the hijacking of an Indian airliner in December 1999 that resulted in the release of Masood Azhar, an important leader in the former Harakat ul-Ansar, who was imprisoned by India in 1994 and then founded Jaish-e-Mohammed (JEM) after his release. Ahmed Omar Sheik also was released in 1999, and was later convicted of the abduction and murder in 2002 of U.S. journalist Daniel Pearl.

**Strength:** HUM has several hundred armed supporters located in Azad Kashmir, Pakistan, India's southern Kashmir and Doda regions, and in the Kashmir valley. Supporters are mostly Pakistanis and Kashmiris, but also include Afghans and Arab veterans of the Afghan war. HUM uses light and heavy machine guns, assault rifles, mortars, explosives, and rockets. In 2000, HUM lost a significant share of its membership in defections to the JEM.

**Location/Area of Operation:** Based in Muzaffarabad, Rawalpindi, and several other towns in Pakistan, HUM conducts insurgent and terrorist operations primarily in Kashmir, but members have also been found operating in Afghanistan. HUM trains its militants in Afghanistan and Pakistan.

**External Aid:** HUM collects donations from wealthy and grassroots donors in Pakistan, Kashmir, Saudi Arabia, and other Gulf and Islamic states. HUM's financial

collection methods include soliciting donations in magazine ads and pamphlets. The sources and amount of HUM's military funding are unknown. Its overt fundraising in Pakistan has been constrained since the government clampdown on extremist groups and the freezing of terrorist assets.

**Hizballah**
a.k.a. Party of God; Islamic Jihad; Islamic Jihad Organization; Revolutionary Justice Organization; Organization of the Oppressed on Earth; Islamic Jihad for the Liberation of Palestine; Organization of Right Against Wrong; Ansar alla; Followers of the Prophet Muhammed

**Description:** Formed in 1982, in response to the Israeli invasion of Lebanon, this Lebanese-based radical Shia group takes its ideological inspiration from the Iranian revolution and the teachings of the late Ayatollah Khomeini. The group generally follows the religious guidance of Khomeini's successor, Iranian Supreme Leader Ali Khamenei. Hizballah is closely allied with Iran and often acts at its behest, though it also acts independently. Although Hizballah does not share the Syrian regime's secular orientation, the group has helped Syria advance its political objectives in the region. The Majlis al-Shura, or Consultative Council, is the group's highest governing body and has been led by Secretary General Hasan Nasrallah since 1992.

Hizballah remains the most technically capable terrorist group in the world. It has strong influence in Lebanon's Shia community, which comprises about one-third of Lebanon's population. The Lebanese government and the majority of the Arab world, still recognize Hizballah as a legitimate "resistance group" and political party. Hizballah claimed 14 elected officials in the 128-seat Lebanese National Assembly and was represented in the Cabinet for the first time, by the Minister of Water and Electricity Mohammed Fneish, until his resignation, along with other Shia ministers and Hizballah members of Parliament on November 11, 2006.

Hizballah has reduced its overt military presence in southern Lebanon in accordance with UNSCR 1701, although it likely maintains weapons caches in southern Lebanon. It justifies its continued armed status by claiming to act in defense of Lebanon against acts of Israeli aggression. Hizballah alleges that Israel has not withdrawn completely from Lebanese territory because, in its view, the Shebaa Farms and other areas belong to Lebanon. Hizballah provides support to several Palestinian terrorist organizations that reject peace between Israel and its neighbors. This support includes the covert provision of weapons, explosives, training, funding, and guidance, as well as overt political support.

**Activities:** Hizballah is known to have been involved in numerous anti-U.S. and anti-Israeli terrorist attacks and prior to September 11, 2001, was responsible for more American deaths than any other terrorist group. In July 2006, Hizballah attacked an Israeli Army patrol, kidnapping two soldiers and killing three, starting the conflict with Israel that lasted into August. Since at least 2004, Hizballah has provided training to select Iraqi Shia militants, including the construction and use of shaped charge improvised explosive devices (IEDs) that can penetrate heavily armored vehicles, which it developed in southern Lebanon in the late 1990s. A senior Hizballah operative, Ali Mussa Daqduq, was captured in Iraq in 2007 while facilitating Hizballah training of Iraqi Shia militants.

Hizballah's terrorist attacks have included the suicide truck bombings of the U.S. Embassy and U.S. Marine barracks in Beirut in 1983, and the U.S. Embassy annex in Beirut in 1984, and the 1985 hijacking of TWA flight 847, during which a U.S. Navy diver was murdered. Elements of the group were responsible for the kidnapping, detention, and murder of Americans and other Westerners in Lebanon in the 1980s. Hizballah also was implicated in the attacks on the Israeli Embassy in Argentina in 1992 and the Argentine-Israeli Mutual Association (AMIA) in Buenos Aires in 1994. In 2000, Hizballah operatives captured three Israeli soldiers in the Sheba'a Farms area and kidnapped an Israeli non-combatant.

**Strength:** Thousands of supporters, several thousand members, and a few hundred terrorist operatives.

**Location/Area of Operation:** Operates in the southern suburbs of Beirut, the Bekaa Valley, and southern Lebanon. Has established support cells in Europe, Africa, South America, North America, and Asia.

**External Aid:** Receives training, weapons, and explosives, as well as political, diplomatic, and organizational aid from Iran, and diplomatic, political, and logistical support from Syria. Hizballah also receives funding from private donations, and profits from legal and illegal businesses.

**Islamic Jihad Group (IJG)**
a.k.a. Al-Djihad al-Islami; Dzhamaat Modzhakhedov; Islamic Jihad Group of Uzbekistan;
Jama'at al-Jihad; Jamiat al-Jihad al-Islami; Jamiyat; The Jamaat Mojahadin; The Kazakh Jama'at; The Libyan Society

**Description:** The Islamic Jihad Group (IJG) is an extremist organization that splintered from the Islamic Movement of Uzbekistan (IMU). They oppose secular rule in Uzbekistan and seek to replace it with a government based on Islamic law. They adhere to an anti-Western global agenda.

**Activities:** In September, German authorities disrupted an IJG plot by detaining three IJG operatives involved in the operation. Two of the three had attended IJG run terrorist training camps in Pakistan and maintained communications with their Pakistani contacts after returning to Germany. The operatives had acquired large amounts of hydrogen peroxide and an explosives precursor that they stockpiled in a garage in southern Germany. The group had acquired large amounts of hydrogen peroxide for possible use in multiple car bomb attacks. The IJG subsequently claimed responsibility for the foiled attacks.

The IJG issued a statement in May 2005, fully supporting the armed attacks on Uzbek police and military personnel in Andijon, Uzbekistan, and called for the overthrow of the regime in Uzbekistan. The group first conducted attacks in March-April 2004 targeting police at several roadway checkpoints and a popular bazaar. These attacks killed approximately 47 people, including 33 terrorists, some of whom were suicide bombers. The IJG's claim of responsibility, which was posted to multiple militant Islamic websites, denounced the leadership of Uzbekistan. These attacks marked the first use of suicide bombers in Central Asia.

In July 2004, the group carried out near-simultaneous suicide bombings in Tashkent of the U.S. and Israeli Embassies, and the Uzbekistani Prosecutor General's office. The IJG again claimed responsibility via an Islamic website and stated that martyrdom operations by the group would continue. The statement also indicated that the attacks were done in support of IJG's Palestinian, Iraqi, and Afghan brothers in the global insurgency. The date of the July attack corresponded with the trial of individuals arrested for their alleged participation in the March-April attacks.

**Strength:** Unknown.

**Location/Area of Operation:** IJG members are scattered throughout Central Asia, South Asia, and Europe.

**External Aid:** Unknown.

**Islamic Movement of Uzbekistan (IMU)**

**Description:** The Islamic Movement of Uzbekistan (IMU) is a group of Islamic militants from Uzbekistan and other Central Asian states. The IMU's goal is to overthrow Uzbekistani President Islam Karimov and to establish an Islamic state in Uzbekistan. The IMU is affiliated with al-Qa'ida (AQ) and under the leadership of Tohir Yoldashev, has embraced Usama bin Ladin's anti-Western global terrorist ideology.

**Activities:** Since Operation Enduring Freedom, the IMU has been predominantly occupied with attacks on U.S. and Coalition soldiers in Afghanistan. The IMU also was active in terrorist operations in Central Asia. Government authorities in Tajikistan arrested several IMU members in 2005. In November 2004, the IMU was blamed for an explosion in the southern Kyrgyz city of Osh that killed one police officer and one terrorist. In May 2003, Kyrgyz security forces disrupted an IMU cell that was seeking to bomb the U.S. Embassy and a nearby hotel in Bishkek, Kyrgyzstan. The IMU was also responsible for explosions in Bishkek in December 2002, and Osh in May 2003, that killed eight people. The IMU primarily targeted Uzbekistani interests before October 2001, and is believed to have been responsible for several explosions in Tashkent in February 1999. In August 1999, IMU militants took four Japanese geologists and eight Kyrgyz soldiers hostage, and in August 2000, they took four U.S. mountain climbers hostage.

**Strength:** Approximately 500 members.

**Location/Area of Operation:** IMU militants are located in South Asia, Central Asia, and Iran. Their area of operation includes Afghanistan, Iran, Kyrgyzstan, Pakistan,

Tajikistan, Kazakhstan, and Uzbekistan.

**External Aid:** The IMU receives support from a large Uzbek Diaspora, Islamic extremist groups, and patrons in the Middle East, Central Asia, and South Asia.

### Jaish-e-Mohammed (JEM)

a.k.a. Army of Mohammed; Jaish-i-Mohammed; Khudamul Islam; Khuddam-ul-Islam; Kuddam e Islami; Mohammed's Army; Tehrik ul-Furqaan

**Description:** Jaish-e-Mohammed (JEM) is an Islamic extremist group based in Pakistan that was founded in early 2000 by Masood Azhar, a former senior leader of Harakat ul-Ansar, upon his release from prison in India. The group's aim is to unite Kashmir with Pakistan, and it has openly declared war against the United States. It is politically aligned with the radical political party Jamiat Ulema-i-Islam's Fazlur Rehman faction (JUI-F). Pakistan outlawed JEM in 2002. By 2003, JEM had splintered into Khuddam ul-Islam (KUI), headed by Azhar, and Jamaat ul-Furqan (JUF), led by Abdul Jabbar, who was released from Pakistani custody in August 2004. Pakistan banned KUI and JUF in November 2003.

**Activities:** JEM continued to operate openly in parts of Pakistan despite President Musharraf's 2002 ban on its activities. The group was well-funded, and was said to have tens of thousands of followers who supported attacks against Indian targets, the Pakistani government, and sectarian minorities. Since Masood Azhar's 2000 release from Indian custody in exchange for 155 hijacked Indian Airlines hostages, JEM has conducted many fatal terrorist attacks in the area. JEM continued to claim responsibility for several suicide car bombings in Kashmir, including an October 2001 suicide attack on the Jammu and Kashmir legislative assembly building in Srinagar that killed more than 30 people. The Indian government has publicly implicated the JEM, along with Lashkar-e-Tayyiba (LT), for the December 2001 attack on the Indian Parliament that killed nine and injured 18. Pakistani authorities suspect that JEM members may have been involved in the 2002 anti-Christian attacks in Islamabad, Murree, and Taxila that killed two Americans. In December 2003, Pakistan implicated elements of JEM in the two assassination attempts against President Musharraf. In July 2004, Pakistani authorities arrested a JEM member wanted in connection with the 2002 abduction and murder of U.S. journalist Daniel Pearl. In 2006, JEM claimed responsibility for a number of attacks, including the killing of several Indian police officials in the Indian-administered Kashmir capital of Srinagar.

**Strength:** JEM has at least several hundred armed supporters, including a large cadre of former HUM members, located in Pakistan, in India's southern Kashmir and Doda regions, and in the Kashmir Valley. Supporters are mostly Pakistanis and Kashmiris, but also include Afghans and Arab veterans of the Afghan war. The group uses light and heavy machine guns, assault rifles, mortars, improvised explosive devices, and rocket-propelled grenades.

**Location/Area of Operation:** Pakistan and Kashmir. Prior to autumn 2001, JEM maintained training camps in Afghanistan.

**External Aid:** Most of JEM's cadre and material resources have been drawn from the Pakistani militant groups Harakat ul-Jihad-i-Islami (HUJI-B) and the Harakat ul-Mujahadin (HUM). In anticipation of asset seizures by the Pakistani government, JEM withdrew funds from bank accounts and invested in legal businesses, such as commodity trading, real estate, and production of consumer goods. In addition, JEM collects funds through donation requests in magazines and pamphlets, and allegedly from AQ.

### Jemaah Islamiya (JI)

**Description:** Southeast Asia-based Jemaah Islamiya (JI) is a terrorist group that seeks the establishment of an Islamic caliphate spanning Indonesia, Malaysia, southern Thailand, Singapore, Brunei, and the southern Philippines. More than 300 JI operatives, including operations chief Hambali, have been captured since 2002, although many are free after serving short sentences, including former JI emir Abu Bakar Bashir. Abu Bakar was released from prison in 2006 after serving a 25-month sentence for his involvement in the 2002 Bali bombings. Indonesia's Supreme Court later that year acquitted him of the charges. The death of top JI bomb maker Azahari bin Husin in November 2005, the arrests of several close associates of senior JI operative Noordin Mat Top in 2006, and the 2007 arrests of former acting JI emir Muhammad Naim (a.k.a. Zarkasih), JI military commander Abu Dujana, and several of their associates, coupled with additional efforts by the Government of Indonesia, likely disrupted JI's anti-Western attacks that had occurred annually from 2002-2005.

**Activities:** The group's most recent high-profile attack occurred in Bali on October 1, 2005, which left 26 persons dead, including the three suicide bombers. Other major JI attacks include the September 2004 bombing outside the Australian Embassy in Jakarta, the August 2003 bombing of the J. W. Marriott Hotel in Jakarta, and the October 2002 Bali bombing. The 2002 Bali attack, which killed more than 200, was one of the deadliest terrorist attacks since 9/11. In December 2001, Singaporean authorities uncovered a JI plot to attack the U.S. and Israeli Embassies, and British and Australian diplomatic buildings in Singapore. In December 2000, JI coordinated bombings of numerous Christian churches in Indonesia and was involved in the bombings of several targets in Manila. In February 2004, JI facilitated attacks in Manila, Davao, and General Santos City. In 2007, the group staged an improvised explosive device (IED) attack in Sultan Kudarat that killed two civilians and injured thirty others. JI associates in the Philippines provide operational support and training for indigenous Philippine Muslim violent extremists.

**Strength:** Exact numbers currently are unknown. Estimates of total JI members vary from the hundreds to one thousand.

**Location/Area of Operation:** JI is based in Indonesia and is believed to have cells in Indonesia, Malaysia, and the Philippines.

**External Aid:** Investigations indicate that JI is fully capable of its own fundraising, although it also receives financial, ideological, and logistical support from Middle Eastern contacts and non-governmental organizations.

### Al-Jihad

Egyptian Islamic Jihad; Egyptian al-Jihad; New Jihad; Jihad Group

**Description:** In 2001, this Egyptian Islamic extremist group merged with al-Qa'ida (AQ). Usama bin Ladin's deputy, Ayman al-Zawahiri, was the former head of Al-Jihad (AJ). Active since the 1970s, AJ's primary goal has been the overthrow of the Egyptian government and the establishment of an Islamic state. The group's targets, historically, have been high-level Egyptian government officials as well as U.S. and Israeli interests in Egypt and abroad. Regular Egyptian crackdowns on extremists and Cairo's deradicalization measures aimed at imprisoned AJ members have greatly reduced AJ's capabilities in Egypt.

**Activities:** The original AJ was responsible for the 1981 assassination of Egyptian President Anwar Sadat. It claimed responsibility for the attempted assassinations in 1993 of Interior Minister Hassan al-Alfi and Prime Minister Atef Sedky. AJ has not conducted an attack inside Egypt since 1993 and has never successfully targeted foreign tourists there. The group was responsible for the Egyptian Embassy bombing in Islamabad in 1995, and a disrupted plot against the U.S. Embassy in Albania in 1998. AJ was dormant in 2007.

**Strength:** Believed to have several hundred hard-core members inside and outside Egypt.

**Location/Area of Operation:** Most AJ members today are outside Egypt in countries such as Afghanistan, Pakistan, Lebanon, the United Kingdom, and Yemen. AJ activities have been centered outside Egypt for several years under the auspices of AQ.

**External Aid:** Since 1998, AJ has received most of its funding from AQ; these close ties culminated in the eventual merger of the groups in June 2001. Some funding may come from various Islamic non-governmental organizations, cover businesses, and criminal acts.

### Kahane Chai (Kach)

a.k.a. American Friends of the United Yeshiva; American Friends of Yeshivat Rav Meir; Committee for the Safety of the Roads; Dikuy Bogdim; DOV; Forefront of the Idea; Friends of the Jewish Idea Yeshiva; Jewish Legion; Judea Police; Judean Congress; Kach; Kahane; Kahane Lives; Kahane Tzadak; Kahane.org; Kahanetzadak.com; Kfar Tapuah Fund; Koach; Meir's Youth; New Kach Movement; Newkach.org; No'ar Meir; Repression of Traitors; State of Judea; Sword of David; The Committee Against Racism and Discrimination (CARD); The Hatikva Jewish Identity Center; The International Kahane Movement; The Jewish Idea Yeshiva; The Judean Legion; The Judean Voice; The Qomemiyut Movement; The Rabbi Meir David Kahane Memorial Fund; The Voice of Judea; The Way of the Torah; The Yeshiva of the Jewish Idea; Yeshivat Harav Meir

**Description:** Kahane Chai's (Kach) stated goal was to restore the biblical state of Israel. The group disbanded in 2005. Kach was founded by radical Israeli-American

rabbi Meir Kahane. Its offshoot, Kahane Chai, (translation: "Kahane Lives") was founded by Meir Kahane's son Binyamin following his father's 1990 assassination in the United States. Both Kach and Kahane Chai were declared terrorist organizations in 1994 by the Israeli Cabinet under its 1948 Terrorism Law. This designation followed the groups' statements in support of Dr. Baruch Goldstein's attack in February 1994 on the Ibrahimi Mosque and their verbal attacks on the Israeli government. Palestinian gunmen killed Binyamin Kahane and his wife in a drive-by shooting in December 2000 in the West Bank. The group has attempted to gain seats in the Israeli Knesset over the past several decades, but has won only one seat, in 1984.

**Activities:** Kach has harassed and threatened Arabs, Palestinians, and Israeli government officials, and has vowed revenge for the death of Binyamin Kahane and his wife. Kach is suspected of involvement in a number of low-level attacks since the start of the al-Aqsa Intifada in 2000.

**Strength:** Unknown.

**Location/Area of Operation:** Israel and West Bank settlements, particularly Qiryat Arba' in Hebron.

**External Aid:** Receives support from sympathizers in the United States and Europe.

### Kongra-Gel
Kurdistan Workers' Party (PKK); Freedom and Democracy Congress of Kurdistan (KADEK); Halu Mesru Savunma Kuvveti (HSK); Kurdistan Freedom and Democracy Congress; Kurdistan People's Congress (KHK); Partiya Karkeran Kurdistan; People's Congress of Kurdistan; The People's Defense Force
(**Note**: Despite name changes, the group is still most commonly referred to as the PKK; for the purposes of this  report we use the name Kongra-Gel/Kurdistan Workers Party or KGK/PKK.)

**Description:** The Kongra-Gel/Kurdistan Worker's Party was founded by Abdullah Ocalan in 1978 as a Marxist-Leninist separatist organization. The group, composed primarily of Turkish Kurds, launched a campaign of violence in 1984. The KGK/PKK aspired to establish an independent Kurdish state in southeastern Turkey, but in recent years has spoken more often about autonomy within a Turkish state that guaranteed Kurdish cultural and linguistic rights.

In the early 1990s, the KGK/PKK moved beyond rural-based insurgent activities to include urban terrorism. In the 1990s, southeastern Anatolia was the scene of significant violence; some estimates place casualties at approximately 30,000 persons. Following his capture in 1999, Ocalan announced a "peace initiative," ordering members to refrain from violence and requesting dialogue with Ankara on Kurdish issues. Ocalan's death-sentence was commuted to life-imprisonment; he remains the symbolic leader of the group. The group foreswore violence until June 2004, when the group's hard-line militant wing took control and renounced the self-imposed cease-fire of the previous five years. Striking over the border from bases within Iraq the KGK/PKK engaged in terrorist attacks in eastern and western Turkey.

**Activities:** Primary targets have been Turkish government security forces, local Turkish officials, and villagers who oppose the organization in Turkey. KGK/PKK's reputed military-wing, the People's Defense Force (HPG), has been responsible mainly for attacks against military and paramilitary targets in the southeastern area of Turkey. The group conducted attacks on Turkish diplomatic and commercial facilities in West European cities in 1993 and again in spring 1995.

In an attempt to damage Turkey's tourist industry, the KGK/PKK bombed tourist sites and hotels and kidnapped foreign tourists in the early-to-mid-1990s. KGK/PKK-initiated attacks rose from just five in 2000 to more than 70 in 2007. Last year was the most violent year for Turkish security forces since the 1990s, with more than 140 deaths attributed to counterterrorism related operations in eastern Turkey.

**Strength:** Approximately 4,000 to 5,000; 3,000 to 3,500 are currently located in northern Iraq.

**Location/Area of Operation:** Operates primarily in Turkey, Iraq, Europe, and the Middle East.

**External Aid:** In the past, KGK/PKK has received safe haven and modest aid from Syria, Iraq, and Iran. Since 1999, Syria and Iran have cooperated in a limited fashion with Turkey against the KGK/PKK. The group maintains a large extortion, fundraising, and propaganda network in Europe.

### Lashkar e-Tayyiba (LT)
a.k.a. Al Mansooreen; Al Mansoorian; Army of the Pure; Army of the Pure and Righteous; Army of the Righteous; Lashkar e-Toiba; Lashkar-i-Taiba; Paasban-e-Ahle-Hadis; Paasban-e-Kashmir; Paasban-i-Ahle-Hadith; Pasban-e-Ahle-Hadith; Pasban-e-Kashmir

**Description:** Lashkar e-Tayyiba (LT) is one of the largest and most proficient of the Kashmiri-focused militant groups. LT formed in the late 1980s or early 1990s as the militant wing of the Islamic extremist organization Markaz Dawa ul-Irshad (MDI), a Pakistan-based Islamic fundamentalist mission organization and charity founded to oppose the Soviet presence in Afghanistan. LT, which is not connected to any political party, is led by Hafiz Muhammad Saeed. Elements of LT and Jaish-e-Muhammad combined with other groups to mount attacks as "The Save Kashmir Movement. LT, which is not connected to any political party, is led by Hafiz Muhammad Saeed. Elements of LT and Jaish-e-Muhammad (JEM) combined with other groups to mount attacks as "The Save Kashmir Movement." The Pakistani government banned the group and froze its assets in January 2002. LT and its leader, Hafiz Muhammad Saeed, continue to spread ideology advocating terrorism, as well as virulent rhetoric condemning the United States, India, Israel, and other perceived enemies.

**Activities:** LT has conducted a number of operations against Indian troops and civilian targets in Jammu and Kashmir since 1993, as well as several high profile attacks inside India itself. LT claimed responsibility for numerous attacks in 2001, including an attack in January on Srinagar airport that killed five Indians; an attack on a police station in Srinagar that killed at least eight officers and wounded several others; and an attack in April against Indian border security forces that left at least four dead. The Indian government publicly implicated LT, along with JEM, for the December 2001 attack on the Indian Parliament building, although concrete evidence is lacking. LT is also suspected of involvement in May 2002 attack on an Indian Army base in Kaluchak that left 36 dead. India blamed LT for an October 2005 attack in New Delhi and a December 2005 Bangalore attack. Senior al-Qa'ida (AQ) lieutenant Abu Zubaydah was captured at an LT safe house in Faisalabad in March 2002, which suggested that some members were facilitating the movement of AQ members in Pakistan. Indian governmental officials hold LT responsible for the July 11, 2006 train attack in Mumbai and several attacks since then in Hyderabad.

**Strength:** The actual size of the group is unknown but LT has several thousand members in Azad Kashmir, Pakistan, in the southern Jammu and Kashmir and Doda regions, and in the Kashmir Valley. Most LT members are Pakistanis from madrassas across Pakistan or Afghan and/or veterans of the Afghan wars, though the group is alleged to augment its strength through collaboration with terrorist groups comprised of non-Pakistanis. The group uses assault rifles, light and heavy machine guns, mortars, explosives, and rocket-propelled grenades.

**Location/Area of Operation:** Based in Muridke (near Lahore) and Muzaffarabad, Pakistan; maintains a number of facilities, including training camps, schools, and medical clinics.

**External Aid:** Collects donations from the Pakistani expatriate communities in the Middle East and the United Kingdom, Islamic NGOs, and Pakistani and other Kashmiri business people. LT coordinates its charitable activities through its front organization Jamaat ud-Daawa (JUD), which spearheaded humanitarian relief to the victims of the October 2005 earthquake in Kashmir. The precise amount of LT funding is unknown.

### Lashkar i Jhangvi (LJ)

**Description:** Lashkar i Jhangvi (LJ) is the militant offshoot of the Sunni Deobandi sectarian group Sipah-i-Sahaba Pakistan. LJ focuses primarily on anti-Shia attacks and was banned by Pakistani President Musharraf in August 2001 as part of an effort to rein in sectarian violence. Many of its members then sought refuge in Afghanistan with the Taliban, with whom they had existing ties. After the collapse of the Taliban, LJ members became active in aiding other terrorists with safe houses, false identities, and protection in Pakistani cities, including Karachi, Peshawar, and Rawalpindi.

**Activities:** LJ specializes in armed attacks and bombings and has admitted responsibility for numerous killings of Shia religious and community leaders in Pakistan. In January, the Interior Ministry ordered the arrest of three LJ militants suspected of being involved in a suicide bombing at a Shia religious procession in Peshawar that killed 15 people. In February, police arrested 20 LJ militants who were wanted for various terrorism attacks in the Punjab and Sindh provinces. In June, Sindh authorities

issued a statement attributing the April 2006 Mishtar Parking bombing in Karachi to a militant with ties to LJ. The government claimed that the group was involved in the April 2006 assassination attempt and the July 2006 assassination of Allama Turabi, an influential Shia leader. In October, Afghan security forces claimed to have arrested four Pakistani suicide bombers in Kandahar who asserted that they belonged to LJ.

In May 2006, Pakistani police arrested two LJ militants suspected of involvement in the March bombing outside the U.S. Consulate in Karachi that killed one U.S. official. Pakistani authorities have publicly linked LJ members to the 2002 abduction and murder of U.S. journalist Daniel Pearl. Media reports linked LJ to attacks on Christian targets in Pakistan, including a March 2002 grenade assault on the Protestant International Church in Islamabad that killed two U.S. citizens, but no formal charges were filed. Pakistani authorities believe LJ was responsible for the July 2003 bombing of a Shia mosque in Quetta, Pakistan. Authorities also implicated LJ in several sectarian incidents in 2004, including the May and June bombings of two Shia mosques in Karachi that killed more than 40 people. In January 1999, the group attempted to assassinate former Prime Minister Nawaz Sharif and his brother Shabaz Sharif, Chief Minister of Punjab Province.

**Strength:** Probably fewer than 100.

**Location/Area of Operations:** LJ is active primarily in Punjab and Karachi. Some members travel between Pakistan and Afghanistan.

**External Aid:** Unknown.

**Liberation Tigers of Tamil Eelam (LTTE)**
a.k.a. Ellalan Force; Tamil Tigers

**Description:** Founded in 1976, the Liberation Tigers of Tamil Eelam (LTTE) is a powerful Tamil secessionist group in Sri Lanka. The LTTE wants to establish an independent Tamil state in the island's north and east. Since the beginning of its insurgency against the Sri Lankan government in 1983, it has evolved its capability from terrorist and guerilla tactics to conventional warfare. Although the LTTE nominally committed to a 2002 cease-fire agreement with the Sri Lankan government, it continued terrorist attacks against government leaders and dissident Tamils.

**Activities:** LTTE has integrated a battlefield insurgent strategy with a terrorist program that targets key personnel in the countryside and senior Sri Lankan political and military leaders in Colombo and other urban centers. It has conducted a sustained campaign targeting rival Tamil groups and figures, and assassinated Prime Minister Rajiv Gandhi of India in 1991, and President Ranasinghe Premadasa of Sri Lanka in 1993. Although most notorious for its cadre of suicide bombers, the Black Tigers, the organization also features an amphibious force, the Sea Tigers; and a nascent air wing, the Air Tigers. Fighting between the LTTE and the Sri Lanka government escalated in 2006 and continued through 2007. Political assassinations and bombings were commonplace tactics prior to the cease-fire and have increased again since mid-2005. After a period of targeting Sri Lankan military and official personnel throughout 2007, the LTTE appears to have recently resumed its targeting of civilians.

**Strength:** Exact strength is unknown, but LTTE is estimated to have 8,000 to 10,000 armed combatants in Sri Lanka, with an elite cadre of 5,000 to 7,000. LTTE also has a significant overseas support structure for fundraising, weapons procurement, and propaganda activities.

**Location/Area of Operations:** LTTE controls portions of the northern areas of Sri Lanka, where it has set up a de facto administrative structure, but over the past year, the LTTE has lost control of its eastern bases to the Sri Lankan military. LTTE also has conducted operations throughout the island and has established an extensive network of checkpoints and informants to keep track of any outsiders who enter the group's area of control.

**External Aid:** The LTTE uses its international contacts and the large Tamil Diaspora in North America, Europe, and Asia to procure weapons, communications, funding, and other needed supplies. The group employs charities as fronts to collect and divert funds for their activities. In May 2007, Australian police arrested two individuals with ties to LTTE. The two were also accused of collecting money for tsunami relief and sending the funds to the LTTE in Sri Lanka instead. In November, the United States designated the Tamils Rehabilitation Organization (TRO) — a charitable organization with offices in seventeen countries worldwide —as an LTTE front organization that facilitates fundraising and procurement for the group.

**Libyan Islamic Fighting Group (LIFG)**

**Description:** In the early 1990s, the Libyan Islamic Fighting Group (LIFG) emerged from the group of Libyans who had fought Soviet forces in Afghanistan and the Qadhafi regime in Libya. The LIFG declared Libyan President Muammar Qadhafi un-Islamic and pledged to overthrow him. In the years following, some members maintained a strictly anti-Qadhafi focus and targeted Libyan government interests. Others, such as Abu al-Faraj al-Libi, who in 2005 was arrested in Pakistan, aligned with Usama bin Ladin and are believed to be part of the al-Qa'ida (AQ) leadership structure or active in the international terrorist network. On November 3, 2007, senior AQ leaders announced that LIFG had officially joined AQ.

**Activities:** Libyans associated with the LIFG are part of the broader international terrorist movement. The LIFG is one of the groups believed to have planned the Casablanca suicide bombings in May 2003. Spanish media in August 2005 linked Ziyad Hashem, an alleged member of the LIFG's media committee, as well as the imprisoned amir Abdallah al-Sadeq, with Tunisian Islamist Serhane Ben Abdelmajid Fakhet, the suspected ringleader in the 2004 Madrid attacks. The LIFG continued to target Libyan interests, and attempted to assassinate Qadhafi four times; the last attempt was in 1998. The LIFG engaged Libyan security forces in armed clashes during the 1990s. However, the LIFG has been largely operationally inactive in Libya since the late 1990s when members fled predominately to Europe and the Middle East because of tightened Libyan security measures. To date, the November 3 merger with AQ has not resulted in a significant increase in LIFG activities within Libya.

**Strength:** The LIFG probably has several hundred active members or supporters, mostly in the Middle East or Europe.

**Location/Area of Operation:** Since the late 1990s, many members have fled to various Asian, Arabian Gulf, African, and European countries, particularly the UK. It is likely that LIFG maintained a limited presence in eastern Libya.

**External Aid:** Unknown. The LIFG has used Islamic charitable organizations as cover for fundraising and transferring money and documents; it may have also financed operations with criminal activity.

**Moroccan Islamic Combatant Group (GICM)**
a.k.a. Groupe Islamique Combattant Marocain

**Description: :** The Moroccan Islamic Combatant Group (GICM) has disintegrated, and it is likely that the few remaining former members no longer operate on behalf of any single group. Much of the leadership in Morocco and Europe have been killed, imprisoned, or are awaiting trial. There is no indication that new leaders have emerged or additional members have been recruited to fill the ranks of arrested cell members, although individual extremists still pose a threat.

The Moroccan Islamic Combatant Group (GICM) was a clandestine transnational terrorist group centered in the Moroccan Diaspora communities of Western Europe. Its goals included establishing an Islamic state in Morocco and supporting al-Qa'ida's (AQ 's) war against the West by assisting in the assimilation of AQ operatives into Moroccan and European society. The group emerged in the 1990s and was comprised of Moroccan recruits who trained in armed camps in Afghanistan, including some who fought in the Soviet Afghan war. GICM members interact with other North African extremists, particularly in Europe.

**Activities:** GICM members were among those responsible for the 2004 Madrid bombing, and Moroccans associated with the GICM are part of the broader international terrorist movement. GICM members were implicated in the recruitment network of individuals for Iraq, and at least one GICM member carried out a suicide attack against Coalition Forces in Iraq. GICM individuals are believed to have been involved in the 2003 Casablanca attacks.

**Strength:** Much of the GICM's leadership in Morocco and Europe have been killed, imprisoned, or are awaiting trial. Alleged leader Mohamed al-Guerbouzi was convicted in absentia by the Moroccan government for his role in the Casablanca attacks but remained free in exile in the UK.

**Location/Area of Operation:** Morocco, Western Europe, Afghanistan, and Canada.

**External Aid:** The GICM was involved in narcotics trafficking in North Africa and Europe to fund its operations. Moroccan security officials believe money from drug trafficking largely financed the 2003 Casablanca attacks. The Madrid attacks were financed mainly by the narcotics trafficking of Moroccan terrorist Jamal Ahmidan.

**Mujahadin-e Khalq Organization (MEK)**

a.k.a. MKO; Mujahadin-e Khalq (Iranian government name for group); Muslim Iranian Students' Society; National Council of Resistance (NCR); Organization of the People's Holy Warriors of Iran; The National Liberation Army of Iran (NLA); The People's Mujahadin Organization of Iran (PMOI); National Council of Resistance of Iran (NCRI); Sazeman-e Mujahadin-e Khalq-e Iran

**Description:** The Mujahadin-e Khalq Organization (MEK) advocates the violent overthrow of the Iranian regime and was responsible for the assassination of several U.S. military personnel and civilians in the 1970s. The MEK's armed wing is known as the National Liberation Army of Iran (NLA). In December 2006, the European Court of Justice ruled to overturn the designation of the MEK as a terrorist organization but was not supported by the Council of the European Union (EU).

The MEK emerged in the 1960s as one of the more violent political movements opposed to the Pahlavi dynasty and its close relationship with the United States. MEK ideology has gone through several iterations and blends elements of Marxism, Islam, and feminism. The group has planned and executed terrorist operations against the Iranian regime for nearly three decades from its European and Iraqi bases of operations. Additionally, it has expanded its fundraising base, further developed its paramilitary skills, and aggressively worked to expand its European ranks. In addition to its terrorist credentials, the MEK has also displayed cult-like characteristics.

Upon entry into the group, new members are indoctrinated in MEK ideology and revisionist Iranian history. Members are also required to undertake a vow of "eternal divorce" and participate in weekly "ideological cleansings." Additionally, children are reportedly separated from parents at a young age. MEK leader Maryam Rajavi has established a "cult of personality." She claims to emulate the Prophet Muhammad and is viewed by members as the "Iranian President in exile."

**Activities:** The group's worldwide campaign against the Iranian government uses propaganda and terrorism to achieve its objectives and has been supported by reprehensible regimes, including that of Saddam Hussein. During the 1970s, the MEK assassinated several U.S. military personnel and U.S. civilians working on defense projects in Tehran and supported the violent takeover in 1979 of the U.S. Embassy in Tehran.

In 1981, MEK leadership attempted to overthrow the newly installed Islamic regime; Iranian security forces subsequently initiated a crackdown on the group. The MEK instigated a bombing campaign, including an attack against the head office of the Islamic Republic Party and the Prime Minister's office, which killed some 70 high-ranking Iranian officials, including Chief Justice Ayatollah Mohammad Beheshti, President Mohammad-Ali Rajaei, and Prime Minister Mohammad-Javad Bahonar. These attacks resulted in a popular uprising against the MEK and an expanded Iranian government crackdown which forced MEK leaders to flee to France. For five years, the MEK continued to wage its terrorist campaign from its Paris headquarters. Expelled by France in 1986, MEK leaders turned to Saddam Hussein's regime for basing, financial support, and training. Near the end of the 1980-1988 Iran-Iraq War, Baghdad armed the MEK with heavy military equipment and deployed thousands of MEK fighters in suicidal, mass wave attacks against Iranian forces.

The MEK's relationship with the former Iraqi regime continued through the 1990s. In 1991, the group reportedly assisted the Iraqi Republican Guard's bloody crackdown on Iraqi Shia and Kurds who rose up against Saddam Hussein's regime. In April 1992, the MEK conducted near-simultaneous attacks on Iranian embassies and installations in 13 countries, demonstrating the group's ability to mount large-scale operations overseas. In April 1999, the MEK targeted key Iranian military officers and assassinated the deputy chief of the Iranian Armed Forces General Staff, Brigadier General Ali Sayyaad Shirazi.

In April 2000, the MEK attempted to assassinate the commander of the Nasr Headquarters, Tehran's interagency board responsible for coordinating policies on Iraq. The pace of anti-Iranian operations increased during "Operation Great Bahman" in February 2000, when the group launched a dozen attacks against Iran. One attack included a mortar attack against a major Iranian leadership complex in Tehran that housed the offices of the Supreme Leader and the President. In 2000 and 2001, the MEK was involved in regular mortar attacks and hit-and-run raids against Iranian military and law enforcement personnel, as well as government buildings near the Iran-Iraq border. Also in 2001, the FBI arrested seven Iranians in the United States who funneled $400,000 to an MEK-affiliated organization in the UAE, which used the funds to purchase weapons. Following an initial Coalition bombardment of the MEK's facilities in Iraq at the outset of Operation Iraqi Freedom, MEK leadership negotiated a cease-fire with Coalition Forces and voluntarily surrendered their heavy-arms to Coalition control. Since 2003, roughly 3,400 MEK members have been encamped at Ashraf in Iraq, under the protection of Coalition Forces.

In 2003, French authorities arrested 160 MEK members at operational bases they believed the MEK was using to coordinate financing and planning for terrorist attacks. Upon the arrest of MEK leader Maryam Rajavi, MEK members took to Paris' streets and engaged in self-immolation. French authorities eventually released Rajavi. Although currently in hiding, Rajavi has made "motivational" appearances via video-satellite to MEK-sponsored conferences across the globe.

According to evidence which became available after the fall of Saddam Hussein, the MEK received millions of dollars in Oil-for-Food program subsidies from Saddam Hussein from 1999 through 2003. In addition to discovering 13 lists of recipients of such vouchers on which the MEK appeared, evidence linking the MEK to the former Iraqi regime includes lists, as well as video footage of Saddam Hussein handing over suitcases of money to known MEK leaders, and video of MEK operatives receiving training from the Iraqi military.

**Strength:** Estimates place MEK's worldwide membership at between 5,000 and 10,000 members, with large pockets in Paris and other major European capitals. In Iraq, roughly 3,400 MEK members are gathered under Coalition protection at Camp Ashraf, the MEK's main compound north of Baghdad, where they have been treated as "protected persons" consistent with provisions of the Fourth Geneva Convention. This status does not affect the group's members outside of Camp Ashraf or the MEK's designation as a Foreign Terrorist Organization.

As a condition of the 2003 cease-fire agreement, the MEK relinquished more than 2,000 tanks, armored personnel carriers, and heavy artillery. A significant number of MEK personnel have voluntarily left Ashraf, and an additional several hundred individuals have renounced ties to the MEK and been voluntarily repatriated to Iran.

**Location/Area of Operation:** The MEK maintains its main headquarters in Paris and has concentrations of members across Europe, in addition to the large concentration of MEK located at Camp Ashraf in Iraq. The MEK's global support structure remains in place, with associates and supporters scattered throughout Europe and North America. Operations target Iranian regime elements across the globe, including in Europe and Iran. MEK's political arm, the National Council of Resistance of Iran (NCRI), has a global support network with active lobbying and propaganda efforts in major Western capitals. NCRI also has a well-developed media communications strategy.

**External Aid:** Before Operation Iraqi Freedom began in 2003, the MEK received all of its military assistance and most of its financial support from Saddam Hussein. The fall of Saddam's regime has led MEK increasingly to rely on front organizations to solicit contributions from expatriate Iranian communities.

**National Liberation Army (ELN)**

a.k.a. Ejercito de Liberacion Nacional

**Description:** The National Liberation Army (ELN) is a Colombian Marxist-Leninist terrorist group formed in 1964 by urban intellectuals inspired by Fidel Castro and Che Guevara. It is primarily rural-based, although it possesses several urban units. Peace talks between the ELN and the Colombian government began in Cuba in December 2005 and continued as recently as August 2007. To date, Bogota and the ELN have yet to agree on a formal framework for peace negotiations.

**Activities:** The ELN engages in kidnappings, hijackings, bombings, drug trafficking, and extortion activities. It has minimal conventional military capabilities. The group conducts kidnappings for ransom, often targeting foreign employees of large corporations, especially in the petroleum industry. In August, ELN leadership discussed the possibility of ending kidnapping as a means of financing insurgent operations as a government-proposed precondition for formal peace talks. However, the organization has yet to renounce kidnapping. ELN derives some revenue from taxation of the illegal narcotics industry, and its involvement may be increasing. It attacks energy infrastructure and has inflicted major damage on oil and natural gas pipelines and the electrical distribution network, but has lost much of its capacity to carry out these types of attacks in recent years.

**Strength:** Approximately 3,000 armed combatants and an unknown number of active supporters.

**Location/Area of Operation:** Mostly in rural and mountainous areas of northern, northeastern, and southwestern Colombia, and Venezuelan border regions.

**External Aid:** Cuba provides some medical care and political consultation.

**Palestine Liberation Front (PLF)**
a.k.a. PLF-Abu Abbas; Palestine Liberation Front – Abu Abbas Faction

**Description:** In the late 1970s the Palestine Liberation Front (PLF) splintered from the Popular Front for the Liberation of Palestine-General Command (PFLP-GC), and later split into pro-PLO, pro-Syrian, and pro-Libyan factions. The pro-PLO faction was led by Muhammad Zaydan (a.k.a. Abu Abbas) and was based in Baghdad prior to Operation Iraqi Freedom.

**Activities:** Abbas's group was responsible for the 1985 attack on the Italian cruise ship *Achille Lauro* and the murder of U.S. citizen Leon Klinghoffer. In 1993, the PLF officially renounced terrorism when it acknowledged the Oslo accords, although it was suspected of supporting terrorism against Israel by other Palestinian groups into the 1990s. In April 2004, Abu Abbas died of natural causes while in U.S. custody in Iraq. Current leadership and membership of the relatively small PLF appears to be based in Lebanon and the Palestinian territories. The PLF took part in the 2006 Palestinian parliamentary elections but did not win a seat.

**Strength:** Estimates have placed membership between 50 and 500.

**Location/Area of Operation:** Based in Iraq from 1990 until 2003. The group currently is based in Lebanon and Syria.

**External Aid:** Unknown.

**Palestine Islamic Jihad (PIJ)**
a.k.a. Palestine Islamic Jihad-Shaqaqi Faction; PIJ-Shaqaqi Faction; PIJ-Shallah Faction; Islamic Jihad of Palestine; Islamic Jihad in Palestine; Abu Ghunaym Squad of the Hizballah Bayt Al-Maqdis; Al-Quds Squads; Al-Quds Brigades; Saraya Al-Quds; Al-Awdah Brigades

**Description:** Formed by militant Palestinians in Gaza during the 1970s, Palestine Islamic Jihad (PIJ) is committed to both the creation of an Islamic state in all of historic Palestine, including present day Israel, and the destruction of Israel through attacks against Israeli military and civilian targets.

**Activities:** PIJ terrorists have conducted numerous attacks, including large-scale suicide bombings against Israeli civilian and military targets. In 2006, the group conducted two suicide bombings and launched numerous homemade rockets from Gaza into neighboring Israeli towns. PIJ continues to plan and direct attacks against Israelis both inside Israel and in the Palestinian territories. Although U.S. citizens have died in PIJ mounted attacks, the group has not directly targeted U.S. interests. All but one of PIJ's attacks in 2007 consisted of rocket attacks aimed at southern Israeli cities.

**Strength:** Unknown.

**Location/Area of Operation:** Primarily Israel, the West Bank, and Gaza. The group's senior leadership resides in Syria. Other leadership elements reside in Lebanon and official representatives are scattered throughout the Middle East.

**External Aid:** Receives financial assistance and training primarily from Iran. Syria provides the group with safe haven.

**Popular Front for the Liberation of Palestine (PFLP)**
a.k.a. Halhul Gang; Halhul Squad; Palestinian Popular Resistance Forces; PPRF; Red Eagle Gang; Red Eagle Group; Red Eagles

**Description:** The Popular Front for the Liberation of Palestine (PFLP), a Marxist-Leninist group founded by George Habash, broke away from the Arab Nationalist Movement in 1967. The PFLP does not view the Palestinian struggle as religious, seeing it instead as a broader revolution against Western imperialism. The group earned a reputation for spectacular international attacks in the 1960s and 1970s, including airline hijackings that killed at least 20 U.S. citizens. A leading faction within the PLO, the PFLP has long accepted the concept of a two-state solution but has opposed specific provisions of various peace initiatives.

**Activities:** The PFLP stepped up its operational activity during the al-Aqsa intifada. This was highlighted by at least two suicide bombings since 2003, multiple joint operations with other Palestinian terrorist groups, and the assassination of Israeli Tourism Minister Rehavam Ze'evi in 2001 to avenge Israel's killing of the PFLP Secretary General earlier that year. In March 2006, the PFLP's current Secretary General, Ahmed Sa'adat, who had been imprisoned by the Palestinian Authority for his involvement in the Ze'evi assassination, was seized from the Jericho prison compound by Israeli forces and is now awaiting trial. The PFLP-GC is suspected in several rocket attacks against Israel in 2007.

**Strength:** Unknown.

**Location/Area of Operation:** Syria, Lebanon, Israel, the West Bank, and Gaza.

**External Aid:** Receives safe haven and some logistical assistance from Syria.

**Popular Front for the Liberation of Palestine-General Command (PFLP-GC)**

**Description:** The Popular Front for the Liberation of Palestine-General Command (PFLP-GC) split from the PFLP in 1968, claiming it wanted to focus more on resistance and less on politics. Originally, the group was violently opposed to the Arafat-led PLO. Ahmad Jibril, a former captain in the Syrian Army, whose son Jihad was killed by a car bomb in May 2002, has led the PFLP-GC since its founding. The PFLP-GC is closely tied to both Syria and Iran.

**Activities:** The PFLP-GC carried out dozens of attacks in Europe and the Middle East during the 1970s and 1980s. The organization was known for cross-border terrorist attacks into Israel using unusual means, such as hot-air balloons and motorized hang gliders. The group's primary focus now is on supporting Hizballah's attacks against Israel, training members of other Palestinian terrorist groups, and weapons smuggling. The PFLP-GC maintains an armed presence in several Palestinian refugee camps and its own military bases in Lebanon. The PFLP-GC has been implicated by Lebanese security officials in several rocket attacks against Israel in 2007.

**Strength:** Several hundred to several thousand.

**Location/Area of Operation:** Headquartered in Damascus with bases in southern Lebanon and a presence in the Palestinian refugee camps in Lebanon and Syria.

**External Aid:** Receives logistical and military support from Syria and financial support from Iran.

**Al Qa'ida**
a.k.a. al Qaeda; International Front for Fighting Jews and Crusaders; Islamic Army; Islamic Army for the Liberation of Holy Sites; Islamic Salvation Foundation; The Base; The Group for the Preservation of the Holy Sites; The Islamic Army for the Liberation of the Holy Places; The World Islamic Front for Jihad Against Jews and Crusaders; Usama bin Ladin Network; Usama bin Ladin Organization; al-Jihad; the Jihad Group; Egyptian al-Jihad; Egyptian Islamic Jihad; New Jihad

**Description:** Al-Qa'ida (AQ) was established by Usama bin Ladin in 1988 with Arabs who fought in Afghanistan against the Soviet Union. The group helped finance, recruit, transport, and train Sunni Islamic extremists for the Afghan resistance. AQ's near-term goal is uniting Muslims to fight the United States and its allies, overthrowing regimes it deems "non-Islamic," and expelling Westerners and non-Muslims from Muslim countries. Its ultimate goal is the establishment of a pan-Islamic caliphate throughout the world. AQ leaders issued a statement in February 1998 under the banner of "The World Islamic Front for Jihad against the Jews and Crusaders" saying it was the duty of all Muslims to kill U.S. citizens, civilian and military, and their allies everywhere. AQ merged with al-Jihad (Egyptian Islamic Jihad) in June 2001.

**Activities:** Even as AQ's top leaders continue to plot and direct terror attacks worldwide, terrorists affiliated with but not necessarily controlled by AQ have increasingly

carried out high-profile attacks. AQ, its affiliates, and those inspired by the group were involved in anti-U.S. and anti-Coalition attacks in Africa, Europe, the Middle East, Afghanistan, Pakistan, and Iraq, including suicide bombings and vehicle-borne improvised explosive devices.

AQ has reconstituted some of its pre-9/11 operational capabilities through the reestablishment of a safe haven in the Federally Administered Tribal Areas (FATA) of Pakistan, replacement of captured or killed operational lieutenants, and the restoration of some central control by its top leadership, in particular Ayman al-Zawahiri. Although bin Ladin remains the group's ideological figurehead, Zawahiri has emerged as AQ's strategic and operational planner.

AQ is assessed to be the top terrorist threat to the United States and is developing stronger operational relationships with affiliates in the Middle East, North Africa, and Europe. It is through these "franchises" that AQ has conducted its recent attacks. AQ remains committed to attacking the United States and focuses its planning on targets that would produce mass casualties, dramatic visual destruction, and economic dislocation. In a 1999 interview with the press, bin Ladin's response to a question about chemical and nuclear weapons was, "Acquiring weapons for the defense of Muslims is a religious duty."

The Government of Pakistan accused AQ, along with the Taliban, of being responsible for the October suicide bombing attempt against former Pakistani Prime Minister Benazir Bhutto that killed at least 144 people in Karachi, Pakistan. On December 27, the Government of Pakistan stated that Baitullah Mahsud, a leading Pakistani Taliban commander with close ties to AQ, was responsible for the assassination of Benazir Bhutto.

In 2006, AQ and affiliated organizations continued major efforts to attack the West and its interests. For example, in mid-August, UK and U.S. authorities foiled a plot to blow up several aircraft. AQ may have been complicit in the plot but the group has made no public statement claiming its involvement. Additionally, al-Qa'ida in the Arabian Peninsula claimed responsibility for the February 24, 2006 attack on the Abqaiq petroleum processing facility, the largest such facility in the world, in Saudi Arabia. The Salafist Group for Preaching and Combat (GSPC) officially merged with al-Qa'ida in September 2006, subsequently changed its name to al-Qa'ida in the Islamic Maghreb (AQIM), and attacked a U.S. contractor bus in December 2006 in greater Algiers, marking its first attack against a U.S. entity. On December 11, 2007, AQIM conducted a near-simultaneous double suicide bombing that hit both the Algerian Court building and a UN office building. The Libyan Islamic Fighting Group (LIFG) also officially merged with AQ in November 2007, although no significant LIFG activities have occurred since the merger.

Bin Ladin's deputy Ayman al-Zawahiri claimed responsibility on behalf of AQ for multiple attacks on July 7, 2005 against the London public transportation system. The extent of senior leadership involvement in planning the July 2005 attacks was unclear. Some suspects in the attacks included homegrown United Kingdom-based extremists who were "inspired" by AQ.

In 2003 and 2004, Saudi-based AQ operatives and associated extremists launched more than a dozen attacks, killing at least 90 people, including 14 Americans in Saudi Arabia. AQ may have been connected to the suicide bombers and planners of the November 2003 attacks in Istanbul that targeted two synagogues, the British Consulate, and the HSBC Bank, and resulted in the deaths of more than 60 people. Pakistani President Musharraf blames AQ for two attempts on his life in December 2003.

In October 2002, AQ directed a suicide attack on the French tanker MV Limburg off the coast of Yemen that killed one and injured four. The group also carried out the November 2002 suicide bombing of a hotel in Mombasa, Kenya that killed 15. AQ probably provided financing for the October 2002 Bali bombings by Jemaah Islamiya that killed more than 200.

On September 11, 2001, 19 AQ members hijacked and crashed four U.S. commercial jets – two into the World Trade Center in New York City, one into the Pentagon near Washington, DC, and a fourth into a field in Shanksville, Pennsylvania – leaving nearly 3,000 individuals dead or missing. In October 2000, AQ conducted a suicide attack on the USS Cole in the port of Aden, Yemen, with an explosive-laden boat, killing 17 U.S. Navy sailors and injuring 39. AQ also carried out the August 1998 bombings of the U.S. Embassies in Nairobi and Dar es Salaam killing at least 301 individuals and injuring more than 5,000 others. AQ and its supporters claim to have shot down U.S. helicopters and killed U.S. servicemen in Somalia in 1993, and to have conducted three bombings that targeted U.S. troops in Aden in December 1992.

**Strength:** AQ's organizational strength is difficult to determine in the aftermath of extensive counterterrorist efforts since 9/11, but several thousand members and associates comprise the AQ-associated movement. The arrests and deaths of mid-level and senior AQ operatives have disrupted some communication, financial, and facilitation nodes and disrupted some terrorist plots. Additionally, supporters and associates worldwide who are "inspired" by the group's ideology may be operating without direction from AQ central leadership; it is impossible to estimate their numbers. AQ also serves as a focal point of "inspiration" for a worldwide network that is comprised of many Sunni Islamic extremist groups, including some members of the Gama'at al-Islamiyya, the Islamic Movement of Uzbekistan, the Islamic Jihad Group, Lashkar i Jhangvi, Harakat ul-Mujahidin, Ansar al-Sunnah, the Taliban, and Jemaah Islamiya.

**Location/Area of Operation:** AQ worldwide networks are augmented by ties to local Sunni extremists. The group was based in Afghanistan until Coalition forces removed the Taliban from power in late 2001. While the largest concentration of senior AQ members now resides in Pakistan's Federally Administered Tribal Areas, the network incorporates members of al-Qa'ida in Iraq and other associates throughout the Middle East, Southeast Asia, Africa, Europe, and Central Asia who are working to carry out future attacks against U.S. and Western interests.

**External Aid:** Al-Qa'ida primarily depends on donations from like-minded supporters and individuals who believe that their money is supporting a humanitarian or other cause. Some funds are diverted from Islamic charitable organizations. In addition, parts of the organization raise funds through criminal activities; for example, al-Qa'ida in Iraq raises funds through hostage-taking for ransom, and members in Europe have engaged in credit card fraud. U.S. and international efforts to block al-Qa'ida funding have hampered the group's ability to raise money.

### Al-Qa'ida in Iraq

a.k.a. al-Qa'ida Group of Jihad in the Land of the Two Rivers; al-Qa'ida Group of Jihad in the Land of the Two Rivers;
al-Qa'ida in Mesopotamia; al-Qa'ida in the Land of the Two Rivers; al-Qa'ida of Jihad in Iraq; Al-Qa'ida of Jihad Organization in the Land of The Two Rivers; Al-Qa'ida of the Jihad in the Land of the Two Rivers; Al-Tawhid; Jam'at al-Tawhid Wa'al-Jihad; Tanzeem Qa'idat al Jihad/Bilad al Raafidaini; Tanzim Qa'idat al-Jihad fi Bilad al-Rafidayn; The Monotheism and Jihad Group; The Organization Base of Jihad/Country of the Two Rivers; The Organization Base of Jihad/Mesopotamia; The Organization of al-Jihad's Base in Iraq; The Organization of al-Jihad's Base in the Land of the Two Rivers; The Organization of al-Jihad's Base of Operations in Iraq; The Organization of al-Jihad's Base of Operations in the Land of the Two Rivers; The Organization of Jihad's Base in the Country of the Two Rivers; the Zarqawi Network

**Description:** In January 2006, in an attempt to unify Sunni extremists in Iraq, al-Qa'ida in Iraq (AQI) created the Mujahidin Shura Council (MSC), an umbrella organization meant to encompass the various Sunni terrorist groups in Iraq. AQI claimed its attacks under the MSC until mid-October, when Abu Mus'ab al-Zarqawi's successor, Abu Ayyub al-Masri, took the first step toward al-Qa'ida's goal of establishing a caliphate in the region by declaring the "Islamic State of Iraq" (ISI), under which AQI now claims its attacks. Although Iraqis compose 90 percent of the group's membership, it is probable that the majority of AQI's leadership is foreign-born. In an attempt to give AQI a more Iraqi persona, the Islamic State of Iraq umbrella organization was created and headed by "Abu Omar al-Baghdadi."

Abu Ayyub al-Masri, Zarqawi's successor, issued a statement pledging to continue what Zarqawi began, and AQI has continued its strategy of targeting Coalition Forces, Iraqi government groups, and Shia civilians to provoke sectarian violence and undermine perceptions that the Iraqi central government can defend them.

AQI has claimed joint attacks with both Ansar Al-Sunnah (AS) and the Islamic Army in Iraq (IAI); however, ideological differences have prevented these groups from merging. More recently, IAI and the 1920 Revolution Brigades cooperated with Coalition Forces in targeting AQI. *(See Chapter 2, Country Reports, Middle East and North Africa, for further information on U.S. efforts to counter AQI.)*

**Activities:** High-profile attacks in 2007 included the suicide car-bombing attack of a mosque in Al Habbaniyah in February, the multiple suicide bombing attack of Shia pilgrims in Al Hillah in March, several chlorine gas canister bombings from January through June, an orchestrated bridge bombing campaign throughout Iraq aimed at isolating Baghdad Shia population concentrations and disrupting ground transportation from January through October, the suicide truck bombing of a market in Tall 'Afar in March, the suicide truck bombings of a market and Patriotic Union of Kurdistan (PUK) party offices in Amurli and Kirkuk in July, and the single deadliest attack of the Iraq war, the multiple suicide bombings of two Yazidi villages near Sinjar in August.

In August 2003, Zarqawi's group carried out major terrorist attacks in Iraq when it bombed the Jordanian Embassy in Baghdad, which was followed 12 days later by a suicide vehicle-borne improvised explosive device (VBIED) attack against the UN Headquarters in Baghdad that killed 23, including the Secretary-General's Special

Representative for Iraq, Sergio Vieira de Mello. That same month the group conducted a VBIED attack against Shia worshippers outside the Imam Ali Mosque in al Najaf, killing 85, including the leader of the Supreme Council for the Islamic Revolution in Iraq (SCIRI). The group kept up its attack pace throughout 2003, striking numerous Iraqi, Coalition, and relief agency targets such as the Red Cross. Zarqawi's group conducted VBIED attacks against U.S. military personnel and Iraqi infrastructure throughout 2004, including suicide attacks inside the Green Zone perimeter in Baghdad. The group successfully penetrated the Green Zone in the October 2004 bombing of a popular café and market. It also claimed responsibility for the videotaped execution by beheading of Americans Nicholas Berg (May 11, 2004), Jack Armstrong (September 22, 2004), and Jack Hensley (September 21, 2004). AQI was likely involved in other hostage incidents as well. In 2005, AQI largely focused on conducting multiple high-profile, coordinated suicide attacks. AQI claimed numerous attacks primarily aimed against civilians, the Iraqi government, and security forces, such as the coordinated attacks against polling sites during the January elections and the coordinated VBIED attacks outside the Sheraton and Palestine hotels in Baghdad on October 24. The group also continued assassinations against Shia leaders and members of the Shia militia groups Jaysh al-Mahdi and Badr Corps.

AQI increased its external operations in 2005 by claiming credit for three attacks: suicide bomber attacks against hotels in Amman on November 9; a rocket attack against U.S. Navy ships in the port of Aqaba in August, which resulted in limited damage in Jordan and in Eilat, Israel; and the firing of several rockets into Israel from Lebanon in December. In August 2005, an AQI operative was arrested in Turkey while planning an operation targeting Israeli cruise ships. Prior to 2005, Zarqawi planned and conducted limited attacks in Jordan, including the assassination of USAID official Laurence Foley in 2002. In October 2006, AQI declared the ISI would become a platform from which AQI would launch terrorist attacks throughout the world. Following the announcement, AQI members marched through cities they considered to be part of their new state as a show of force. AQI attack claims, which the group released under the auspices of the Mujahidin Shura Council and now the ISI, increased in 2006 but decreased significantly in 2007.

AQI was implicated in the February 2006 Samarra' al-Askari Mosque bombing that precipitated the escalation in sectarian violence.

AQI senior leaders in Iraq may have had advance knowledge of terrorist attacks in Iraq that incorporated chlorine into vehicle-borne improvised explosive devices (VBIEDs). However, the use of chlorine in suicide attacks probably represents an opportunistic evolution of conventional VBIED attacks.

**Strength:** Membership is estimated at 5,000 to 10,000, making it the largest Sunni extremist group in Iraq. AQI perpetrates the majority of suicide and mass casualty bombings in Iraq with foreign operatives constituting the majority of these bombers. The selection of civilian targets, particularly in Baghdad, generates widespread media coverage.

**Location/Area of Operation:** AQI's operations are predominately Iraq-based, but it has perpetrated attacks in Jordan. The group maintains an extensive logistical network throughout the Middle East, North Africa, Iran, South Asia, and Europe. In Iraq, AQI currently conducts the majority of its operations in Ninawa, Diyala, Salah ad Din, and Baghdad provinces and to a lesser extent Al Anbar.

**External Aid:** AQI probably receives funds from donors in the Middle East and Europe, local sympathizers in Iraq, from a variety of businesses and criminal activities, and other international extremists throughout the world. In many cases, AQI's donors are probably motivated to support terrorism rather than an attachment to any specific terrorist group.

### Al-Qa'ida in the Islamic Maghreb (AQIM)

a.k.a. Tanzim al-Qa'ida fi Bilad al-Maghrib al-Islamiya; Le Groupe Salafiste pour la Predication et le Combat; Salafist Group for Call and Combat; Salafist Group for Preaching and Combat

**Description:** The Salafist Group for Preaching and Combat (GSPC) officially merged with al-Qa'ida (AQ) in September 2006 and subsequently changed its name to al-Qa'ida in the Islamic Maghreb (AQIM). The GSPC formed in 1998 when its members left the Armed Islamic Group (GIA) over disagreements about leadership, tactics, and indiscriminate targeting of Algerian civilians. In contrast to the GIA, it has pledged to avoid attacks on civilians inside Algeria, but civilians have died in numerous GSCP/AQIM attacks. The GSPC retained GIA's mission of overthrowing the Algerian government and installing an Islamic regime. AQIM is the most effective and largest armed group inside Algeria. AQIM and AQ have used the merger extensively in their propaganda.

**Activities:** On April 11, 2007, AQIM for the first time employed suicide tactics. The attacks on that date, near-simultaneous bombings of multiple targets inside Algiers including the office of Algeria's prime minister, claimed more than 30 lives. Shortly thereafter, AQIM vowed to continue to use suicide tactics, and the organization carried out five further suicide attacks in Algeria during 2007. On December 11, AQIM carried out two near-simultaneous suicide vehicle-borne improvised explosive device (VBIED) attacks that struck two UN offices and the headquarters of Algeria's Constitutional Council, killing 41 people, (including 17 UN employees), and wounding at least 170 others. AQIM had previously attacked vehicles belonging to foreign corporations several times during the year, beginning in December 2006 with an attack in Algiers on a bus belonging to a U.S.-Algeria joint venture and carrying several expatriate workers.

Outside Algeria, in December 2007, multiple AQIM-linked attacks in Mauritania were the first terrorist incidents since 2005, when the GSPC had claimed responsibility for an attack on a remote Mauritanian military outpost that killed 15; this appeared to indicate an AQIM shift towards a more regional terrorist campaign. Also during 2007, police in France, Italy, and Spain arrested several individuals from Algeria and other Maghreb countries suspected of providing support to AQIM. French officials announced that AQIM had issued an Internet call-to-action against France, declaring France "public enemy number one."

**Strength:** AQIM has several hundred fighters operating in Algeria and the Sahel. Abdelmalek Droukdel, a.k.a. Abu Mus'ab Abd al-Wadoud is the leader of the group.

**Location/Area of Operation:** Algeria and the Sahel, with affiliates and logistics/fundraisers in Western Europe.

**External Aid:** Algerian expatriates and AQIM members abroad, many residing in Western Europe, provide financial and logistical support. AQIM members also engage in criminal activity to finance their operations.

### Real IRA (RIRA)

a.k.a. 32 County Sovereignty Committee; 32 County Sovereignty Movement; Irish Republican Prisoners Welfare Association; Real Irish Republican Army; Real Oglaigh Na Heireann

**Description:** Like the Continuity IRA, the Real IRA (RIRA) did not participate in the September 2005 weapons decommissioning. RIRA was formed in 1997 as the clandestine armed wing of the 32 County Sovereignty Movement, a "political pressure group" dedicated to removing British forces from Northern Ireland and unifying Ireland. RIRA also seeks to disrupt the Northern Ireland peace process. The 32 County Sovereignty Movement opposed Sinn Fein's September 1997 adoption of the Mitchell principles of democracy and non-violence; it also opposed the amendment in December 1999 of Articles 2 and 3 of the Irish Constitution that laid claim to Northern Ireland. Despite internal rifts and calls by some jailed members, including the group's founder Michael "Mickey" McKevitt, for a cease-fire and disbandment, RIRA pledged additional violence and continued to conduct attacks.

**Activities:** Many RIRA members are former Provisional Irish Republican Army members who left that organization after it renewed its cease-fire in 1997. These members brought a wealth of experience in terrorist tactics and bomb-making to RIRA. Targets have included civilians (most notoriously in the Omagh bombing in August 1998), British security forces, police in Northern Ireland, and local Protestant communities. RIRA's most recent fatal attack was in August 2002 at a London army base, killing a construction worker. The organization seeks to improve its intelligence-gathering ability, engineering capacity, and access to weaponry; it also trains members in the use of guns and explosives. RIRA continues to attract new members, and its senior members are committed to launching attacks on security forces. Three suspected RIRA members that engaged in cigarette smuggling were arrested in Spain in 2006. From 2006 to November 2007, terrorist activity in the form of successful and attempted attacks by RIRA slightly decreased. Notably, between August and November 2006, throughout Northern Ireland, RIRA targeted B&Q home-supply stores and other retail businesses in successful and attempted firebombings, although a handful of these attacks were also claimed by the Continuity Irish Republican Army (CIRA). In November 2007, RIRA claimed two armed attacks that wounded two Police Service of Northern Ireland (PSNI) officers.

**Strength:** According to the Irish government, RIRA has approximately 100 active members. The organization may receive limited support from IRA hardliners and Republican sympathizers dissatisfied with the IRA's continuing cease-fire and with Sinn Fein's involvement in the peace process. Approximately 40 RIRA members are in Irish jails.

**Location/Area of Operation:** Northern Ireland, Great Britain, and the Irish Republic.

**External Aid:** RIRA is suspected of receiving funds from sympathizers in the United States and of attempting to buy weapons from U.S. gun dealers. RIRA also is reported to have purchased weapons from the Balkans.

### Revolutionary Armed Forces of Colombia (FARC)
a.k.a. Fuerzas Armadas Revolucionarias de Colombia

**Description:** The Revolutionary Armed Forces of Colombia (FARC) is Latin America's oldest, largest, most capable, and best-equipped insurgency. It began in the early sixties as an outgrowth of the Liberal Party-based peasant self-defense leagues, but took on Marxist ideology, although it only nominally fights in support of Marxist goals today. The FARC is governed by a general secretariat led by co-founder Antonio Marin (a.k.a. "Manuel Marulanda" or "Tirofijo") and six others, including senior military commander Victor Suarez (a.k.a. Jorge Briceno or "Mono Jojoy"). The FARC is organized along military lines and includes some specialized urban fighting units. A Colombian military offensive targeting FARC fighters in southern Colombia has experienced some success, with a number of FARC mid-level leaders killed or captured. Colombian military operations in September and October resulted in the deaths of Thomas Median Caracas (a.k.a. "Negro Acacio") and Gustavo Rueda (a.k.a. "Martin Caberllero"), two senior FARC military commanders, respectively.

**Activities:** The FARC has carried out bombings, murder, mortar attacks, kidnapping, extortion, and hijacking, as well as guerrilla and conventional military action against Colombian political, military, and economic targets. In February 2003, when a U.S. plane crashed in a FARC-held area, the FARC murdered a U.S. citizen and a Colombian; it continues to hold hostage the three other U.S. citizens that were on the plane. In late 2007, the Colombian government granted Venezuelan President Hugo Chavez permission to negotiate with the FARC to secure the release of the three U.S. citizens and 42 more so-called "political" hostages, some held as long as a decade. Colombia ended Chavez' role after he repeatedly ignored Colombian positions, however, the FARC did release two hostages. Foreign citizens were often targets of abductions that the FARC carried out to obtain ransom and political leverage. The FARC has well-documented ties to the full range of narcotics trafficking activities, including taxation, cultivation, and distribution.

**Strength:** Approximately 9,000 to 12,000 combatants and several thousand more supporters.

**Location/Area of Operation:** Primarily in Colombia with some activities such as extortion, kidnapping, weapons sourcing, and logistics in neighboring countries.

**External Aid:** Cuba provided some medical care, safe haven, and political consultation. Venezuela supplied some lethal aid to the FARC, although this may be a result of individual corruption rather than official policy; available information is not conclusive. The FARC often used the Colombia/Venezuela and Colombia/Ecuador border areas for incursions into Colombia and also used Venezuelan and Ecuadorian territory for safe haven, although the degree of government acquiescence was not clear and may vary depending on cross-border relations.

### Revolutionary Nuclei
a.k.a. Revolutionary Cells; ELA; Epanastatiki Pirines; Epanastatikos Laikos Agonas; June 78; Liberation Struggle; Organization of Revolutionary Internationalist Solidarity; Popular Revolutionary Struggle; Revolutionary People's Struggle; Revolutionary Popular Struggle

**Description:** Revolutionary Nuclei (RN) emerged from a broad range of anti-establishment and anti-U.S./NATO/EU leftist groups active in Greece between 1995 and 1998. The group is believed to be the successor to or offshoot of Greece's most prolific terrorist group, Revolutionary People's Struggle (ELA), which has not claimed an attack since January 1995. Indeed, RN appeared to fill the void left by ELA, particularly as lesser groups faded from the scene. RN's few communiqués show strong similarities in rhetoric, tone, and theme to ELA proclamations.

**Activities:** Since it began operations in January 1995, the group has claimed responsibility for some two dozen arson attacks and low-level bombings against a range of U.S., Greek, and other European targets in Greece. In its most infamous and lethal attack to date, the group claimed responsibility for a bomb it detonated at the Intercontinental Hotel in April 1999 that resulted in the death of a Greek woman and injury of a Greek man. RN's modus operandi includes warning calls of impending attacks, attacks targeting property instead of individuals, use of rudimentary timing devices, and strikes during the late evening to early morning hours. RN may have been responsible for two attacks in July 2003 against a U.S. insurance company and a local bank in Athens. RN's last confirmed attacks against U.S. interests in Greece came in November 2000, with two separate bombings against the Athens offices of Citigroup and the studio of a Greek-American sculptor. Greek targets have included judicial and other government office buildings, private vehicles, and the offices of Greek firms involved in NATO-related defense contracts in Greece. Similarly, the group has attacked European interests in Athens.

**Strength:** Group membership is believed to be small, probably drawing from the Greek militant leftist or anarchist milieu.

**Location/Area of Operation:** Primary area of operation is the Athens metropolitan area.

**External Aid:** Unknown but believed to be self-sustaining.

### Revolutionary Organization 17 November
a.k.a. Epanastatiki Organosi 17 Noemvri; 17 November

**Description:** Revolutionary Organization 17 November (17N) is a radical leftist group established in 1975 and named for the student uprising in Greece in November 1973 that protested the ruling military junta. 17N is an anti-Greek, anti-U.S., anti-Turkey, and anti-NATO group that seeks the ouster of U.S. bases from Greece, the removal of Turkish military forces from Cyprus, and the severing of Greece's ties to NATO and the European Union (EU).

**Activities:** Initial attacks were assassinations of senior U.S. officials and Greek public figures. Five U.S. Embassy employees have been murdered since 17N began its terrorist activities in 1975. The group began using bombings in the 1980s. In 1990, 17N expanded its targets to include Turkish diplomats, EU facilities, and foreign firms investing in Greece, and added improvised rocket attacks to its methods. The group supported itself largely through bank robberies. A failed 17N bombing attempt in June 2002 at the port of Piraeus in Athens, coupled with robust detective work, led to the arrest of 19 members, the first 17N operatives ever arrested, including a key leader of the organization. In December 2003, a Greek court convicted 15 members, five of whom were given multiple life terms. Four other alleged members were acquitted for lack of evidence. In December 2005, against the backdrop of a sympathetic press, a group appeals trial opened for the 15 convicted members and two of the previously acquitted members. The appeals trial essentially represents a new trial for the convicts because new evidence and facts can be introduced under Greek law. At the conclusion of the appeals trial in May 2007, 13 of the 17 members of 17N were found guilty of terrorism. Two members already released from prison for medical reasons in July 2006 and 2005 were cleared of their charges since the crimes they were suspected of committing were outside of the Greek twenty-year statute of limitations. Two others were also acquitted due to doubts surrounding the charges against them. The last suspected attack by 17N occurred in May 2004, at a courthouse in Larissa, Greece, wounding one civilian and causing minor damage to the facility. Although no group claimed responsibility for the attack, authorities believed 17N was responsible.

**Strength:** Unknown but presumed to be small.

**Location/Area of Operation:** Athens, Greece.

**External Aid:** Unknown.

### Revolutionary People's Liberation Party/Front (DHKP/C)
a.k.a. Dev Sol; Dev Sol Armed Revolutionary Units; Dev Sol Silahli Devrimci Birlikleri; Dev Sol SDB; Devrimci Halk Kurtulus Partisi-Cephesi; Devrimci Sol; Revolutionary Left

**Description:** The Revolutionary People's Liberation Party/Front (DHKP/C) originally formed in 1978 as Devrimci Sol, or Dev Sol, a splinter faction of Dev Genc (Revolutionary Youth). It was renamed in 1994, after factional infighting. "Party" refers to the group's political activities, while "Front" is a reference to the group's militant

operations. The group espouses a Marxist-Leninist ideology and is vehemently anti-U.S., anti-NATO, and anti-Turkish establishment. Its goals are the establishment of a socialist state and the abolition of F-type prisons, which contain one to three-man prison cells. DHKP/C finances its activities chiefly through donations and extortion.

**Activities:** Since the late 1980s, the group has targeted primarily current and retired Turkish security and military officials. It began a new campaign against foreign interests in 1990, which included attacks against U.S. military and diplomatic personnel and facilities. To protest perceived U.S. imperialism during the Gulf War, Dev Sol assassinated two U.S. military contractors, wounded an Air Force officer, and bombed more than 20 U.S. and NATO military, commercial, and cultural facilities. In its first significant terrorist act as DHKP/C in 1996, the group assassinated a prominent Turkish businessman and two others; the perpetrators fled to Belgium, where legal cases continue. DHKP/C added suicide bombings to its repertoire in 2001, with successful attacks against Turkish police in January and September. Since the end of 2001, DHKP/C has typically used improvised explosive devices against official Turkish targets and soft U.S. targets of opportunity. Attacks against U.S. targets beginning in 2003 probably came in response to Operation Iraqi Freedom.

Operations and arrests against the group have weakened its capabilities. In late June 2004, the group was suspected of a bus bombing at Istanbul University, which killed four civilians and 21 other people. In July 2005, in Ankara, police intercepted and killed a suicide bomber who attempted to attack the Ministry of Justice. In June 2006, in Istanbul, the group fired upon and killed a police officer; four members of the group were arrested the next month for the attack.

In January 2007, authorities raided DHKP/C safe-houses in Duinbergen, Belgium, and in Istanbul, Turkey, resulting in the confiscation of weapons, bomb-making material, documents, and propaganda material, and in the arrest of several members of DHKP/C. In the spring of 2007, the Belgian Supreme Court overturned, on procedural grounds, the conviction of several DHKP/C operatives, including the DHKP/C spokesman in Belgium, Bahar Kimyougur, and key figure Musa Asoglu, who had been convicted of membership in a terrorist organization, arms possession, and using forged documents.

**Strength:** Probably several dozen terrorist operatives inside Turkey, with a large support network throughout Europe.

**Location/Area of Operation:** Turkey, primarily Istanbul, Ankara, Izmir, and Adana.

**External Aid:** Widely believed to have training facilities or offices in Lebanon and Syria. DHKP/C raises funds in Europe.

**Shining Path (SL)**
a.k.a. Sendero Luminoso; Ejercito Guerrillero Popular (People's Guerrilla Army); EGP; Ejercito Popular de Liberacion (People's Liberation Army); EPL; Partido Comunista del Peru (Communist Party of Peru); PCP; Partido Comunista del Peru en el Sendero Luminoso de Jose Carlos Mariategui (Communist Party of Peru on the Shining Path of Jose Carlos Mariategui); Socorro Popular del Peru (People's Aid of Peru); SPP

**Description:** Former university professor Abimael Guzman formed the Shining Path (SL) in Peru in the late 1960s, and his teachings created the foundation of SL's militant Maoist doctrine. In the 1980s, SL became one of the most ruthless terrorist groups in the Western Hemisphere. The Peruvian government made dramatic gains against SL during the 1990s, but recent SL attacks against Peruvian counternarcotics police underscore that SL continues to be a threat. In response to SL's bloody attacks in late 2005, Peruvian authorities stepped up counterterrorism efforts against the group. SL's stated goal is to destroy existing Peruvian institutions and replace them with a communist peasant revolutionary regime. It also opposes any influence by foreign governments. More recently, SL members have attempted to influence the local populace through indoctrination versus violence.

**Activities:** In the past, SL has conducted indiscriminate bombing campaigns, ambushes, and selective assassinations. Remnants of SL now focus on drug-trafficking activities to obtain funds to carry out attacks.

**Strength:** Unknown but estimated to be between 200 and 300 armed militants.

**Location/Area of Operation:** Peru, with most activity in rural areas, specifically the Huallaga Valley, the Ene River, and the Apurimac Valley of central Peru.

**External Aid:** None.

**United Self-Defense Forces of Colombia (AUC)**
a.k.a. Autodefensas Unidas de Colombia

**Description:** The United Self-Defense Forces of Colombia (AUC), commonly referred to as the paramilitaries, was an umbrella group formed in April 1997 to organize loosely affiliated illegal paramilitary groups that had emerged to retaliate against leftist guerillas fighting the Colombian government and the landed establishment. The AUC increasingly discarded its counterguerilla activities, electing instead to involve itself in the illegal drug trade. By 2007, as the result of a large demobilization process, most of the AUC's centralized military structure had been dismantled, and all of the top paramilitary chiefs had stepped down with the majority being held in a maximum security facility. More than 31,000 paramilitary members and support personnel demobilized bloc by bloc from 2003 to 2006. Colombia now faces criminal gangs formed by demobilized paramilitaries and other individuals, and one minor paramilitary group that refused to disarm. Unlike the AUC, the new criminal groups make little claim to fighting insurgents and are more clearly criminal enterprises focused primarily on drug trafficking, other lucrative illicit activities, and influencing local politics to facilitate their criminal ventures. These new criminal groups are not a reconstituted AUC, but they recruit heavily from the pool of former AUC members. A large part of their leadership appears to be former mid-level paramilitary commanders who did not participate in demobilization.

**Activities:** Paramilitary operations varied from assassinating suspected insurgent supporters to engaging insurgent combat units. As much as 70 percent of the paramilitary operational costs were financed with drug-related earnings, with the rest coming from "donations" from sponsors and government corruption. These groups generally avoided actions against U.S. personnel or interests. Traditional paramilitary operations are largely nonexistent as a result of the demobilization of all AUC groups, although some individuals are violating their demobilization commitments by continued participation in criminal activities.

**Strength:** The Colombian government has determined that the AUC no longer exists. The Colombian government and Organization of American States estimate that 22 new criminal groups have emerged in the wake of AUC demobilization. According to Colombian government figures, approximately 10 to 15 percent of the 3,000 to 4,000 members of these groups are former members of paramilitary groups, including the AUC.

**Location/Areas of Operation:** Paramilitary forces were strongest in northwest Colombia in Antioquia, Cordoba, Sucre, Atlantico, Magdelena, Cesar, La Guajira, and Bolivar Departments, with affiliate groups in the coffee region, Valle del Cauca, and Meta Department.

**External Aid:** None.

[Report Home Page](#)


BACK TO TOP

Published by the U.S. Department of State Website at http://www.state.gov maintained by the Bureau of Public Affairs.

# FEDERAL BUREAU OF INVESTIGATION
# UNITED STATES DEPARTMENT OF JUSTICE



## One Center Plaza, Suite 600
## Boston, Massachusetts 02108

**Target Number:**   (313) 297-7816
**Call:**   Unknown
**Date:**   8/3/1998
**Time:**   18:45
**Language:**   Arabic
**Transcriber:**   CL Elie Khoury

**Participants:**

      Samir Al-Monla (Abu Al-Walid)      SA
      Kifah Jayoussi (Abu Mohammad)      KJ

**Abbreviations:**

| | |
|---|---|
| *Italics* | Spoken in English |
| **UI** | Unintelligible |
| **[ ]** | Background conversation / Noise |
| **SC** | Simultaneous Conversation |
| - | Interruption |

Date:         8/3/1998
Time:         18:45

KJ:     Hello

SA:     One moment please. Hello, peace and the mercy of Allah be upon you

KJ:     Peace and the mercy and blessings of Allah be upon you too

SA:     Oh my Allah

KJ:     Hello Abu Al-Walid

SA:     Hello

KJ:     Where have you been man?

SA:     [UI]

KJ:     What's new with you

SA:     Brother I don't know, should I come and work as a servant to you?

KJ:     No man, why are you talking like that?

SA:     I am very, very sorry

KJ:     There is no strength or power except in Allah

SA:     I did not forget, you know-

KJ:     No brother, I called, let me tell you what happened, I called

SA:     True

KJ:     They told me you were with brother Abu 'Abd Al-Rahman,

SA:     u-huh

KJ:     I said this is good, the brother-

SA:     Yes

KJ:     - has done a lot for us, Allah willing this is good

SA:     So, you are not upset?

KJ:     No man, don't talk like that

SA:     Ok fine, I-

KJ:     *Yeah*

SA:     I will arrange a program for you in *Florida*, that's ok

KJ:     [laugh]

SA:     When would you want it?

KJ:     No problem

SA:     Allah bless you

2

Date:        8/3/1998
Time:          18:45

KJ:        Excellent

SA:        Since it's like this, since you are patient with me

KJ:        [laugh]

SA:        Do you have a *calendar* in front of you?

KJ:        *Calendar?* One moment please

SA:        Ah, go ahead yes. Ok praise be to Allah, praise be to Allah

KJ:        What's new with you?

SA:        Asking Allah's approval, then yours

KJ:        May Allah bless you

SA:        May Allah bless you, just give me- In the name of Allah most gracious most merciful, give the days in *August* and I will call you later today or tomorrow, with Allah's permission

           Give the days in *August* that you might be able to take *off*. And what *week-end*

KJ:        Yes, uh, [child] yes brother, uh, In the name of Allah most gracious most merciful. How was the visit of the brother?

SA:        All good

KJ:        Praise be to Allah

SA:        All good

KJ:        Praise be to Allah

SA:        Abu- Abu Mohammad, things, with Allah's permission require continuous follow-up

KJ:        Yes, yes

SA:        Forgive me

KJ:        May Allah bless you

SA:        May Allah bless you too

KJ:        Uh, in the name of Allah most gracious most merciful [UI]

SA:        I say, Allah knows-

KJ:        Yes

SA:        That- *shoot for at least for the 20 for the 25th* for example. Because we are in the first week already

KJ:        What do you think of *September?*

3

Date:         8/3/1998
Time:          18:45

SA:     Ah, in *September* right off the bat?

KJ:     Yes

SA:     Not at the end of *August?*

KJ:     Uh, if at the end of *August*, it would be *29, 30*

SA:     28, 30- 29

KJ:     Yes, sorry, *28 Friday*, yes

SA:     Ah, ok this is good

KJ:     This is it if it's convenient brother?

SA:     Ok

KJ:     You know brother, I just remembered one thing. Uh-

SA:     Tell me

KJ:     At that time, This will be the most *busy* at work for me

SA:     Yes, on the *28, 30*

KJ:     Yes

SA:     On the *28, 29*

KJ:     Yes

        So secondly, we can go to *September*

SA:     Ok

KJ:     I have no objection at all

SA:     Any

KJ:     Any *week-end*

SA:     Ok, let me tell you one thing

KJ:     Go ahead

SA:     Say the *21st* , because *September,* with Allah's permission, it would be outside *Massachusetts* , but the *21* I can arrange for places over here that you have not been to

KJ:     *21 August?*

SA:     Yes

KJ:     The problem is- you know that I work at school now.

SA:     [UI]

4

Date:        8/3/1998
Time:        18:45

KJ:     In- in the *public school*

SA:     Yes

KJ:     So, I have-

SA:     [UI]

KJ:     [laugh]

SA:     What is it that you teach them?

KJ:     What did you say?

SA:     What is it that you teach them? [laughing]

KJ:     I am in *facilities* not in teaching

SA:     Not in the teaching staff?

KJ:     No, in the buildings staff

SA:     Ah, ok brother, I see that deep inside you feel that *September* is good

KJ:     In reality, the problem is that now we are-

SA:     Give me a few days in September, come on give me a few

KJ:     Any *week-end* in *September*

SA:     Any *week-end?*

KJ:     Any week-end

SA:     Let's start with the *4th*

KJ:     The *4th* is excellent

SA:     We'll start with the *4th* and the *18th*

KJ:     Yes

SA:     Ok fine. Count on it and take it, if it is not any other state, it would be over here, with me

KJ:     No problem brother

SA:     Because right away, *I am gonna get on the phone and hook you up either with Michigan or Florida*

KJ:     Yes

SA:     I am absolutely sure that you will go. Like I told you, even if you feel like coming next week, I have a program for you over here, at places that you have not been to

5

Date:        8/3/1998
Time:        18:45

KJ:     Yes. What I was going to say brother. There are a lot of states around us, I can drive to them

SA:     Really?

KJ:     Yes, a lot. *Indiana* is near me, *Wisconsin* is near me, what you call it *Chicago* is near me, uh *Ohio*, the whole state of *Ohio* is near me, *Pennsylvania* is near me, you know *Detroit* is in the middle

SA:     u-huh

KJ:     So my *radius*, uh 4 – 5 hours will cover about 6 – 7 states besides *Canada*

SA:     Excellent

KJ:     So-

SA:     Fine

KJ:     - Instead of spending money

SA:     The Halaqa is in front of me, I have a paper just for you

KJ:     Yes

SA:     It is *Indiana* and *Wisconsin* and *Ohio*

KJ:     [SC] *Indiana*

SA:     And *Canada*

KJ:     Exactly. *Indiana, Ohio, Pennsylvania,* even *New York* which is *West of the state*

SA:     This is wonderful

KJ:     So *Buffalo* is about 4 hours from here

SA:     Yes

KJ:     Via *Canada*

SA:     *Buffalo New York?*

KJ:     Yes. *Cleveland* is about 4 hours away, *Toledo Ohio* is about 1 hour

SA:     What?

KJ:     *Toledo*

SA:     Yes

KJ:     1 hour to *Toledo*. *Chicago* is 4 hours [pause] so my *radius* is very easily, 4 hours by car [kids yelling].

SA:     Yes [UI]. Ok, good. I just want to tell you not to worry, if for example you wanted to get out in *August* for one reason or another,

Date:          8/3/1998
Time:          18:45

KJ:     Yes

SA:     At least, even if it is the *25th* or *28*  or even on the *14,* I am ready to put together a program for you, as if it would be new

KJ:     Good

SA:     Take care of your work and schedule and I will plan something for 2 weeks from now, *either one- two weeks*, *either the 4th and the 18th* or *the 11* or *the 25th*. Meaning *every other week,* meaning you do not have to come up *every week-end,* right?

KJ:     Yes, yes, yes

SA:     So I will take the liberty *on the 4th and the 18th* or *the 11th and the 25th*

KJ:     Yes

SA:     *Every other week*

KJ:     Allah willing

SA:     Thank you very much

KJ:     May Allah bless you. Is everything ok with you brother?

SA:     What?

KJ:     Thank Allah, there are no problems?

SA:     What?

KJ:     I mean, there are no problems?

SA:     Praise be to Allah

KJ:     Praise be to Allah

SA:     Praise be to Allah. In the next couple of days, I will send you, in the name of Allah, the merciful the compassionate- a *package*. It contains the *pledge forms* and some things about *CARE* and so on and so forth.

KJ:     Excellent

SA:     You know what I mean?

KJ:     Yes

SA:     In the next couple of days. I am traveling on *Wednesday* and returning *Monday*. I am going to this *conference,* for the first time in my life.

KJ:     *No problem*

SA:     The one for *Unity,* for the Sufiism, for the Sufiism in *Washington DC*

KJ:     Yes, yes

Date:           8/3/1998
Time:           18:45

SA:    I am going to see. We will just propose our *project,* we will not *participate in anything else.* You know what I mean?

KJ:    Of course brother

SA:    Meaning, just *Marketing,* You know what I mean?

KJ:    Yes

SA:    So, as soon as I return, I will send you these things. How far did you tell me you are from *Chicago?*

KJ:    4 hours

SA:    4 hours only?

KJ:    Yes

SA:    Oh my Allah, 4 hours

KJ:    [UI]

SA:    [SC] closer than *New York,* man

KJ:    *New York* is 10 hours

SA:    Yes, but I am saying like from here-

KJ:    Yes

SA:    *Worcester* and *New York*

KJ:    Exactly

SA:    Fine. I would like you to keep your heart with me in regards to- this region has places that you have not been to

KJ:    No problem

SA:    Fine, good. So since it is very easy for me to arrange things for you in my regions

KJ:    Yes

SA:    Do you know what I mean? I believe that you came over here twice or three times? And we did not cover all the places

KJ:    True

SA:    So one time I will pick from the far away areas that you gave me and one time around me here. I will get to see you again brother and-

KJ:    May Allah bless you

Date:        8/3/1998
Time:        18:45

| | |
|---|---|
| SA: | -I will- I mean honestly, [pause] glory be to Allah, after you left me and encouraged me, *I think* things got a lot better than it was. Right now, I do not have any problem thanks to Allah |
| KJ: | Praise be to Allah |
| SA: | Thanks to Allah and to you brother |
| KJ: | Praise be to Allah |
| SA: | [UI] I speak clearly and there are many thinks that are new to the people. This is good. Meaning- |
| KJ: | Praise be to Allah |
| SA: | [UI] |
| KJ: | Brother, there is one thing that I wanted to call you about |
| SA: | Go right ahead |
| KJ: | Do you remember- [pause] –do you remember a brother called Mahmoud Abu Halima that was put in prison. Ah- |
| SA: | Yes, I know him, I do, I do |
| KJ: | Yes. Brother Mahmoud's wife is German. She speaks Arabic fluently |
| SA: | He was on TV and so on regarding Sheikh so and so, right? |
| KJ: | Brother Mahmoud Abu Halima is one of the first brothers that were put in prison. He was put in prison because he was the chairman of the defense panel for brother Sayyed Nasir |
| SA: | Ah |
| KJ: | For the Kahana case |
| SA: | Yes |
| KJ: | Then he joined the group of the skyscraper in *New York* |
| SA: | The trial cases, so on and so forth |
| KJ: | Yes |
| SA: | Yes |
| KJ: | So the brother is in prison for life. Ah, so his wife- he has around 5 children |
| SA: | Yes |
| KJ: | His wife now- 4 children- his wife wants to go to Egypt now |
| SA: | Yes |

9

Date:         8/3/1998
Time:         18:45

| | |
|---|---|
| KJ: | They want to stay there permanently. His wife is German, but glory be to Allah brother, she does not speak German with her kids, she is always carrying with her, Fiqh Al-Sunna book and the Qur'an |
| SA: | Yes, oh my Allah |
| KJ: | This women is- very- |
| SA: | Let us call him Abu Al-Habayeb from now on, continue |
| KJ: | [laugh] |
| SA: | I am being serious |
| KJ: | What I am mentioning- I was mentioning the this sister needs help |
| SA: | Yes |
| KJ: | In regards to the airline tickets |
| SA: | Ah |
| KJ: | So I spoke with many brothers in many regions to try to raise any amount, any amount at all |
| SA: | Yes |
| KJ: | But if we can help her? |
| SA: | Ok |
| KJ: | With the tickets. I don't know how you can- |
| SA: | Do you have an organization over there? |
| KJ: | I do not have an organization |
| SA: | But is there any organization- |
| KJ: | But there is- |
| SA: | -them |
| KJ: | huh? |
| SA: | Is there any organization near to them? |
| KJ: | Yes there is one organization. I can contact the brothers in *New York,* and I will get you her number, she is well known |
| SA: | What is her name? |
| KJ: | I should get you the correct name |
| SA: | Dear, listen to me |
| KJ: | Go ahead |

Date:         8/3/1998
Time:         18:45

SA:     How much is required? Is $1,000 good enough?

KJ:     That would be excellent brother

SA:     Really?

KJ:     It would be excellent. I tell you any amount-

SA:     Is 1,000 good or not?

KJ:     Brother they are-

SA:     How many are they?

KJ:     They will need about 8,000 dollars

SA:     Oh my Allah

KJ:     But as I told you, I spoke-

SA:     u-huh

KJ:     -With 7 states

SA:     Yes

KJ:     Meaning the brothers in *New York* and *New Je*rsey and *San Diego*-

SA:     Listen to me, listen to me

KJ:     Go right ahead

SA:     May Allah safeguard you Abu Mohammad, may Allah safeguard you, let me tell you one thing. Uh, if you tell the organization that you know to send me a letter saying that this is a request to help a family or some poor people or something like that

KJ:     Excellent

SA:     Is it ok?

KJ:     I will send it to you by Fax

SA:     Yes send it to me and I will write a check to the organization. Is there- is there a problem?

KJ:     No, there is no problem brother

SA:     Ok, I will be waiting for it. When they receive it, they should send me a note in the mail that they received it to help a family, without mentioning any names at all. For helping the poor or the needy or an orphan or the sort

KJ:     Yes, I understand

SA:     Fine

KJ:     May Allah reward you brother

11

Date:        8/3/1998
Time:        18:45

| | |
|---|---|
| SA: | 1,000 is ok right? It will help Allah willing |
| KJ: | Of course, of course brother |
| SA: | Ok |
| KJ: | May Allah reward you |
| SA: | It's a small amount but it will help |
| KJ: | Brother, may Allah reward you, the important thing is that we stand together |
| SA: | With Allah's permission |
| KJ: | Ok? |
| SA: | I am very glad that you are not upset with me, I am- |
| KJ: | [laugh] There is no strength or power- why do you think like this every time? |
| SA: | I am not doing enough for you- [UI] |
| KJ: | May Allah bless you brother. May Allah reward you |
| SA: | Good, Allah willing. May Allah safeguard you dear Abu Mohammad |
| KJ: | Brother, Allah willing I will send you- |
| SA: | Yes |
| KJ: | -I will send you- let me take your fax # quickly |
| SA: | *789* |
| KJ: | Yes |
| SA: | *4488* [pause] Walid! |
| KJ: | [pause] yes |
| SA: | *617* |
| KJ: | Yes |
| SA: | *789* |
| KJ: | u-huh |
| SA: | *4488* |
| KJ: | Excellent. Right away brother Allah willing |
| SA: | If you send me a fax in the name of this organization and with its address, I will immediately write a check and put in the mail to the organization, and all you have to do is tell them to call the brothers as soon as they can saying you know what |
| KJ: | Yes, yes |

12

Date:        8/3/1998
Time:        18:45

SA:        For a specific assistance and that's all

KJ:        Allah willing brother. May Allah bless you

SA:        May Allah give you strength

KJ:        Allah willing, I will keep in touch with you

SA:        Yes

KJ:        Peace be upon you

SA:        Peace, the blessings and the mercy of Allah be upon you. Hello, hello, Abu Mohammad-

[End of conversation]



# Aafia Siddiqui

 

## DESCRIPTION

**Date of Birth Used:**  March 2, 1972
**Place of Birth:**  Pakistan
**Sex:**  Female
**Remarks:**  Aafia Siddiqui's current whereabouts are unknown.

## DETAILS

Although the FBI has no information indicating this individual is connected to specific terrorist activities, the FBI would like to locate and question this individual.

**IF YOU HAVE ANY INFORMATION CONCERNING THIS PERSON, PLEASE CONTACT YOUR LOCAL FBI OFFICE OR THE NEAREST AMERICAN EMBASSY OR CONSULATE.**

*Robert S. Mueller III*

ROBERT S. MUELLER, III
DIRECTOR
FEDERAL BUREAU OF INVESTIGATION
UNITED STATES DEPARTMENT OF JUSTICE
WASHINGTON, D.C. 20535
TELEPHONE: (202) 324-3000

---

EXHIBITS L and N Intentionally Omitted