UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>MUHAMED MUBAYYID | )<br>)<br>)<br>)   Cr. No. 05-40026-FDS<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT MUHAMED MUBAYYID'S SUPPLEMENTAL MEMORANDUM IN
SUPPORT OF MOTION FOR JUDGEMENT OF ACQUITTAL**

This Memorandum responds to the portion of the Court's ruling of June 3, 2008, and respectfully suggests that the Court's ruling misapprehended controlling law.

Mr. Mubayyid stands convicted of three false tax return counts, each premised on an alleged false answer to Question 76 of IRS form 990. In its ruling on defendants' motions for judgments of acquittal, the Court resolved that Question 76 was ambiguous and that it was appropriately a jury question, not a legal question, whether Question 76 applied to a single tax year or encompassed earlier years. Tr. June 3, 2008 at 38. As the Court put it in a question at the Rule 29 hearing, asking whether the Court had a role in assessing the sufficiency of evidence regarding different readings of Question 76: "Why is that not judicial fact-finding, which I can't do in this context?" Tr. May 16, 2008 at 27. The Court's query, and its ruling which left the issue entirely to the jury, misapprehended the Court's responsibility in evaluating the sufficiency

1

of evidence in a false statement case and to hold the government to its burden of proof.

I.

Where there is, as a matter of law, a reading upon which a statement is literally true, the Court must prevent a false statement charge from reaching a jury. See Bronston v. United States, 409 U.S. 352 (1973). In Bronston, the defendant's response to a question in a bankruptcy proceeding was unresponsive but literally true. The Supreme Court ruled that the government must refute the literal truth of the statement to uphold a charge of perjury. "A jury should not be permitted to engage in conjecture whether an unresponsive answer, true and complete on its face, was intended to mislead or divert the examiner." 409 U.S. at 359. Furthermore, when a question contains some ambiguity, "it is incumbent upon the government to negative any reasonable interpretation that would make the defendant's statement factually accurate." United States v. Diogo, 320 F.2d 898, 907 (2d Cir. 1963). A host of cases have recognized the Bronston defense of literal truth when the government failed to negative a reasonable interpretation of the question which was the foundation for charges of perjury or false statements.[1]

In order to prove beyond a reasonable doubt the falsity of Mubayyid's response to Question 76, the government bore the burden of "first demonstrating the unreasonableness of the contrary understanding" under which the defendant's statement was literally true. See United States v. Bradstreet, 135 F.3d 46, 52 (1st Cir. 1998). In United States v. Watts, 72 F.Supp.2d

---

[1] The defense of literal truth applies generally to false statement allegations. See United States v. Poutre, 646 F.2d 685 (1st Cir. 1980); United States v. Attick, 649 F.2d 61 (1st Cir. 1981) ("[Defendant] correctly points out that one cannot be convicted under 18 U.S.C. § 1014 if the statement claimed to be false is, in fact, literally true." (citing U.S. v. Diogo, 230 F.2d 898 (2nd Cir. 1963)); United States v. Good, 326 F.3d 589, 592 (4th Cir. 2003) ("The principle articulated in Bronston holds true for convictions under Section 1001 and in this case today."); United States v. Moses, 94 F.3d 182, 188-89 (5th Cir. 1996) ("We cannot uphold a conviction . . where the alleged statement forming the basis of a violation of section 1001 is true on its face."); United States v. Vesaas, 586 F.2d 101, 104 (8th Cir. 1978) ("[A] prosecution for a false statement under § 1001 or under the perjury statutes cannot be

106 (E.D.N.Y. 1999), the defendant indicated on a residential loan application that the funds would be used for improvements both already "made" and "to be made." The government alleged a false statement to a bank, arguing that the funds had been invested in a business and no prospective intention to make improvements existed. The Court ruled that "the burden was squarely on the government to prove" that no improvement was made or intended to be made and held that "the government must prove beyond a reasonable doubt the falsity of any reasonable interpretation that . . . 'would make the defendant's statement factually correct.'" Id., at 114, quoting Diogo, 320 F.2d at 907. Since this burden was not met, dismissal of the count entered. This analysis is replicated in cases from this Circuit such as United States v. Rowe, 144 F.3d 15, 21 (1st Cir. 1998) ("in a false statement prosecution, an answer to a question is not fraudulent if there is an objectively reasonable interpretation of the question under which the answer is not even false.") and United States v. Prigmore, 243 F.3d 1, 18 (1st Cir. 2001) ("there has been no crime if the statements were not false (or if there was no duty to divulge) under an objectively reasonable interpretation of the law imposing the duty.").

II.

The Court resolved that there was ambiguity as to whether Question 76 addressed more than the current tax year.[2] The Court specifically recognized Mubayyid's interpretation that Question 76 pertained to the relevant tax reporting year:

---

based on an ambiguous question where the response may be literally and factually correct.").

[2] The government's argument that Question 76 should be read to include the word "ever" was unsupported by the factual record. Ms. Goldberg's testimony served only to support a claim that Question 76 imposed a disclosure duty for continuing (not terminated) activities. Tr. Dec. 7, 2007 at 52, 106. To this extent there was no need for the jury to decide any ambiguity with respect to Question 76, as the record only supported the conclusion that Mubayyid's interpretation of Form 990 was correct. The government argued a much broader predicate to the jury over objection: "The question was: 'Has the organization ever engaged in any activity not disclosed to the IRS?'" Tr. Dec. 19, 2007 at 49. To the extent that Form 990 requested information pertaining to more than the reported tax

3

"Defendant Mubayyid contends that that question applies only to the relevant tax year; that is, for example, the 1997 Form 990 asks only about activities that took place in or changes that occurred in 1997.... I agree that the question on line 76 supported an ambiguity instruction." Tr. June 3, 2008 at 38.

Having given an ambiguity instruction, the Court effectively found that defendant's interpretation was reasonable. The remaining issue was whether the government demonstrated the falsity of defendant's statement when confined to the individual tax year, not as the Court concluded, that despite the obvious ambiguity the " jury did vote to convict, even with that instruction" Id. , and hence the inquiry ends.

With regard to tax year 1997 (Count 3), the government failed to demonstrate that publication of a single newsletter (in January 1997) constituted a significant program activity. If it did not, then his answer to question 76 is literally true under the interpretation that Line 76 applied only to the current tax year. As Ms. Goldberg testified, reading from the instructions for Form 990, "A program service is a major (usually ongoing) objective of an organization . . . ." Tr. Dec. 12, 2007 at 44. Publication of the newsletter was effectively terminated in 1996, with only a single issue, which pertained to the observance of Ramadhan, published in January 1997. There was also no evidence to support an inference that Mubayyid knew that any newsletter was disseminated in 1997 or what year it had been terminated.

Further, Mubayyid signed amended the 1997 return in June 2002, only when Care's accountant, Richard Donahoe, determined that there had been a small accounting error. Tr. Dec 6, 2007 at 93. It cannot be inferred from the mere filing of an amended return that Mubayyid

---

year, it used specific language. For example, in Question 89b it added, "or . . . from a prior year."

had any awareness regarding the accuracy of the answer to Question 76 insofar as it concerned Care's alleged activities in 1997 which predated his return from Australia. The testimony of Mr. Donahue makes clear that Mubayyid was not involved in the preparation of the 1997 amended return:

> Q: "...[Y]ou looked over '97 and you noticed that there was a small discrepancy, correct?
>
> A: "Yes."
>
> Q: "And you told Mr. Mubayyid . . . 'To be prudent, to be safe, what we should do is file an amended return,' correct?"
>
> A: "Yes."
>
> Q: "And Mr. Mubayyid said, 'Fine. Please go ahead. File the amended return. We'll pay you for your services,' correct?"
>
> A: "Yes."
>
> [. . .]
>
> Q: "So you took the information from the 1997 that had been originally filed; you made the correction?"
>
> A: "Yes."
>
> Q: "And you filled out the rest of the information as it was originally, and you provided it to Mr. Mubayyid, correct?"
>
> A: "Yes."

Tr. Dec. 6, 2007 at 120, 121. There is no evidence that Mubayyid was apprised of any other discrepancies regarding the 990 for 1997, and there is no evidence from which it can be inferred

that Mubayyid was aware of the activities of Care which would require reporting on a 1997 amended return.

With respect to Counts 4 and 5, the Court itself questioned the government regarding alleged activities of Care in the years following 1997, and the government responded as follows:

"Your Honor, there was evidence that throughout that time period from 1997 on that Care was operating the website, which was an activity that was not previously disclosed, but which for our purposes was being operated in 1997 and 1998. That was not disclosed on the Form 990. Through the website, Care was publishing the Zakat Calclation Guide. They were continuing to solicit donations for support of the mujahideen; and Care, the organization itself, was continuing to sell tapes and books, and none of those activities were referenced on the Forms 990 for any of the years that Mr. Mubayyid signed them."

Tr. May 15, 2008 at 116.

Addressing these seriatim, there was no testimony that a website needed to be disclosed as an activity. The government asked Dawn Goldberg if she saw "anything to reflect the operation of a website" in 990s for 1995-98, and her reply in each instance was "No." Tr. Dec. 7, 2007 at 63, 66, 67. The tell-tale question, whether the Care website should have been disclosed as an activity, was never asked, perhaps because no charity extant is without one. The website in existence at the time Mr. Mubayyid was treasurer, the one created in late 1998- early 1999 by Mr. Ali Ahmad (Tr.V.11 at 17) cost was a mere $16.95 per month. No reasonable interpretation of "program activity" permits the conclusion that the website was more "than an insubstantial part of its activities." See 26 CFR 1-501(c)(3)-1(c)(1).

Nor was the Zakat calculation guide an activity. It was a fund raising device. Included in the Guide was the statement: "According to the Qur'an . . . The following may be given zakat money: poor Muslims, needy Muslims, Muslims in debt, Mujahideen, new Muslims, slaves, zakat workers and wayfarers." This was a recitation of Muslim religious teachings, unchallenged

and uncontradicted by the government at trial, not a statement of the financial activities of Care. Moreover, the government has acknowledged repeatedly that "Care did also engage in some charitable activities such as the collection of money for food sacrifices (religious) . . . ." Government's Opposition at 126, n. 122. In any event, the Court correctly concluded and so instructed the jury that "There is no evidence . . . that Care or the defendants provided or financed weapons, armaments, or lethal aid to any party. . . ." Tr. Dec. 12, 2007 at 189. To the extent that the government claims that Care's activities included solicitation for the mujahideen, the claim was undeveloped at trial and not supported in any government pleading by appropriate time frames and record references.

Finally, there was no proof whatsoever of publication or sale of books and tapes in any year after 1997, and there was a surfeit of proof for any year that proceeds from books, tapes and lectures was a significant source of revenue. Again, the government did not offer record reference to support this claim. Even as to 1996, the government's proof was insubstantial: Exhibit 215A showed that the receipts for one lecture on November 15, 1996 was a meager net sum of $79 after $32 was spent on lunch. The Court has already noted that the government's claims were frequently "conclusory . . . often without records to support it," Tr. June 3, 2008 at 32.

Because the government has failed to meet its burden of proof to negative the reasonable interpretation of Form 990 as pertaining to the reported tax year and because, in this context, there is no evidence that Care was involved in ongoing program services that would make Mubayyid's response literally false or demonstrate his willful intention to make false statements to the IRS, the Court should rule that the government has not provided sufficient evidence to

prove beyond a reasonable doubt that Mubayyid's responses on Form 990 were knowingly false.

III.

The Court found fatally wanting the government's proof that Waseem Yassin and Mohammed Akra possessed guilty knowledge of the contents of Form 1023, and this reasoning has force in assessing the knowledge of Mubayyid. An analogy to Yassin and Akra is supported by the Court's statement that "A person's role in an organization . . . is not standing alone sufficient to infer knowledge of the activities of others." Tr. June 3, 2008 at 36. As an illustration of this parallel, it is useful to add Mubayyid's name in parenthetical to consider this application of the Court's reasoning: "There is no evidence that Muntasser spoke to Yassin or Akra [or Mubayyid] about obtaining charitable status or about any tax matters. There is no evidence that he corresponded with them on the [sic] topics." The evidence cannot support the inference that Mubayyid was aware of any underlying motivation regarding obtaining charitable tax status or that he possessed any more culpable knowledge than Yassin or Akra.

The Court rejected the government's inferences regarding knowledge proffered as inherent to Yassin and Akra's roles within Care. Those same inferences should also be rejected as to Mubayyid. The court found that, "Obviously, someone's role can be a relevant fact, but it cannot be the only fact. One can infer knowledge of the basic purposes of an organization from one's organizational position, but certainly not the details of its operation, or the activities specific of the corporate officers." Tr. June 3, 2008 at 36. The Court rejected the inference of knowledge by association, stating that:

"[T]here is simply no evidence that Akra or Yassin [or, by analogy, Mubayyid] had a tax motive or a tax purpose that they were aware of the application for charitable status. Even if they were aware that Muntasser had made an application to the IRS, there is no reasonable basis to infer that they had knowledge or awareness that a false statement was made, or a material fact was

concealed." Id.

The Court further concluded that there was "no evidence that Akra or Yassin ever saw the Articles of Organization, and you cannot infer they had knowledge of the existence of that document or its contents merely from the fact that their names appear on it." Tr. June 3, 2008 at 36. Similarly, there was no evidence that Mr. Mubayyid was aware of the contents of the form 1023 at the time he filed the 990 returns. During the search of his apartment in April 2003 (10 months after the 1997 form 990 was filed), a copy of the form 1023 was found in a box containing thousands of documents. Tr. V. 11 at 44-45. There was no evidence that he was in possession of that document at the time he filed the 990 forms (all filed long before the April 2003 search), much less that he was ever aware of its contents.

Unlike Akra or Yassin, Mubayyid was not even an officer of Care when the application to the IRS was submitted and there is no evidence that there was ever any communication between Muntasser and Mubayyid regarding this application. The Court's reasoning is directly applicable to Mubayyid because, despite his administration of the organization's taxes from 1999 to 2002, no evidence was ever introduced to support knowledge of a material concealment of fact, or a false statement in any year during or before his tenure, or that any activities that should have been disclosed on the form 1023 were not.

## CONCLUSION

It was incumbent upon the government to negative any reasonable interpretation that would have made the defendant's statement factually accurate. All charges against Mubayyid should be dismissed for failure by the government to provide sufficient evidence to prove beyond a reasonable doubt that Mubayyid's responses to Question 76 were literally false, given the

reasonable interpretation that IRS Form 990 applied only to the reported tax year, or that he possessed culpable knowledge of a concealment or fraud.

                                    Respectfully Submitted,
                                    Muhamed Mubayyid
                                    By his attorney

                                    <u>/s/ Michael C. Andrews</u>

                                    Michael C. Andrews
                                    21 Custom House Street
                                    Boston, Massachusetts 02110
                                    (617) 951-0072
                                    BBO# 546470