UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                )
                                )
UNITED STATES                   )
                                )          Cr. No. 05-40026-FDS
                                )
v.                              )
                                )
MUHAMED MUBAYYID                )
                                )
_____)

## MUHAMED MUBAYYID'S SENTENCING MEMORANDUM

## INTRODUCTION

Mr. Mubayyid respectfully submits this memorandum, and letters filed herewith, in order to assist the Court in fashioning a sentence "sufficient, but not greater than necessary" to achieve the statutory purposes of punishment, as required by 18 U.S.C. § 3553(a) in light of United States v. Booker, 125 S. Ct. 738 (2005) and progeny.  Mr. Mubayyid is a forty-three year old software engineer, married with three children, with no prior criminal record.  As the letters filed herewith demonstrate, Muhamed Mubayyid is greatly respected and deeply cared for by his family and the members of his community; he is known for his generosity, intelligence, and gentleness of spirit, honesty, and politeness.  The letters are striking in their sincerity of tone, and a genuine respect and affection shown of Mr. Mubayyid.

Subsequent to the Court's ruling on June 3, 2008, at which time the Court dismissed his conspiracy conviction, he stands convicted on Count One, a scheme to

conceal information from the IRS, Counts Three through Five, the filing of false tax returns, and Count Eight, obstruction of the lawful functions of the Internal Revenue Service.  Mr. Mubayyid's crimes of conviction all stem from his having filed Care's tax returns while serving as its part-time unpaid treasurer from 1998 until 2002.  The jury must have found that a single ambiguous question on each of the tax returns was answered falsely, and the return failed to disclose activities of Care that to this day have gone unspecified, activities that may have ceased long before he became treasurer or signed the returns. There was no evidence that any of the funds received or disbursed by Care were not properly accounted for, or that Mr. Mubayyid ever personally profited or diverted money to himself.  There was no evidence that Mr. Mubayyid knowingly ever sent money to any person or group engaged in illegal or violent activity. There was no evidence that any of the thousands of persons who contributed to Care were ever deceived.

There was substantial evidence that while Mr. Mubayyid was treasurer, Care distributed money to many people in need, including victims of war, poverty and natural disasters.  There was substantial evidence Mr. Mubayyid was careful accounting for the money received from donors and allocating it responsibly. There was evidence that he conscientiously responded to requests from state and federal authorities for information regarding Care, both before and after becoming aware of Care's investigation by law enforcement, including appearing before the grand jury and responding to document requests.  For the more than two and one half years from the time of his indictment to the day of his trial, he was subject to electronic monitoring and a curfew, and he abided at all times with the conditions of his release.  He appeared in Court in a timely manner every

time required, and he demonstrated unqualified respect for the process and the proceedings.

Following his conviction at trial on the above-referenced tax charges, the Probation Department prepared a Presentence Report (hereinafter the "Report') in which it reprinted, practically *verbatim*, the government's voluminous, digressive and hyperbolic "version of the offense".   Upon reading that narrative, with its repeated references to terrorists, someone unfamiliar with the trial evidence would believe the defendant had been charged and convicted of providing material support, or worse[1].   The Presentence Report calculated a tax loss of $330,461.64, (34% of the $971, 946.00 that was donated to Care from 1997 to 2003), ignoring the fact that the donations constituted gifts to Care under applicable tax law, and that practically the entire amount collected was distributed to charitable causes.   That tax loss figure provides for base offense level of 20, pursuant to U.S.S.G. §2B1.1 (the <u>fraud</u> provision, not the tax provision, despite the "loss" being a theoretical <u>tax</u> loss).   The Report then adds two points pursuant to U.S.S.G. §2B1.1 (b)(7)(A) (2001), as "the offense involved the misrepresentation that the defendant was acting on behalf of a charitable, educational, religious or political organization, or a governmental organization"; two additional points, pursuant to Guideline § 3B1.3, for abuse of "a position of public or private trust"; and two additional points, pursuant to U.S.S.G. 3C1.1 for obstruction of justice.   With the enhancements, the total offense level is 24, providing for a guideline sentencing range of 51 to 63 months.[2]

---

[1] For instance, the term "terrorist(s)" is used 39 times in the PSR, and "Jihad", or "Jihadist", is used 105 times.

[2] The government filed a single objection to the Presentence Report, wherein it seeks an additional two point enhancement pursuant to U.S.S.G. §3B1.1, on the theory that Mr. Mubayyid was a leader/manager of the criminal activity, despite that fact that there was virtually no evidence at trial that Mr. Mubayyid lead, directed or managed any other person.  In response to the Objection, the Probation Department note that "[t]he government provided no rationale in support of their position as to an adjustment for role", and

It is Mr. Mubayyid's position, one fully supported by the law and the facts of this case, that the correctly calculated sentencing guideline range is much lower. First, the government has not proved, nor can it, that the United States suffered the tax loss set forth in the Report. Secondly, the sentencing enhancements are misplaced in the present case. The Probation Department mistakenly employs the fraud guideline instead of the tax guideline, even though the Mr. Mubayyid's convictions directly relate to the filing of tax returns, which makes the first enhancement (misrepresentation/charity) inapplicable. The second two enhancements, for abuse of a position of trust and obstruction of justice, are simply not supported by the present facts or the law.

## ARGUMENT

### A. THE PSR APPLIED AN INCORRECT GUIDELINE, AND INCORRECTLY CONCLUDED THAT THE GOVERNMENT SUSTAINED A TAX LOSS

#### 1. The PSR Incorrectly Applied the Fraud Guideline Instead of the Tax Guideline to Count One.

Despite the government's occasional efforts to make this case something it was not, it was and remains a tax case. The government recognized as much in its opening argument when it stated that "this is a case about the Internal Revenue Service at its core" Tr. Nov. 11, 2007 at 23. The essence of the charges was that the defendants withheld material information from the IRS. Count One charged a scheme to defraud the IRS by concealing tax information from the IRS in its filings, to wit, that Care was an outgrowth and successor to the Al-Kifah Refugee Center and that it was engaged in unreported activities. The Court found, in denying Mr. Mubayyid's Rule 29 Motion, that it was his filing of the IRS Form 990's (described by the Court as "an affirmative act of

---

maintained that Mr. Mubayyid should not be assigned a role in the offense adjustment. See Addendum to the Presentence Report (hereinafter the "Addendum")

concealment within the limitations period as to a tax-related matter", June 3, 2008 Tr. at 29) which provided the factual basis to sustain his conviction.

The fraud guideline itself directs that if… "the defendant was convicted under a statute proscribing false, fictitious or fraudulent statements, or representations generally (e.g., 18 U.S.C. §1001…), and…the conduct set forth in the count of conviction established as offense specifically covered by another guideline in Chapter Two (Offense Conduct), apply that other guideline."   U.S.S.G. 2B1.1(c)(3)[3].  Indeed, the government itself adopted the tax guidelines as the appropriate basis for guideline sentencing range calculation in its Offense Conduct submission to the Probation Department. (Government Statement of Facts at 37)

Several courts have found that the tax guidelines are applicable in cases involving tax-related frauds.  See United States v. Brisson, 448 F.3d 989, 992 (7th Cir. 2006); United States v. Barnes, 324 F.3d 135, 140 (3rd Cir. 2003); United States v. Aragbaye, 234 F.3d 1101, 1105 (9th Cir. 2000).  The courts in these cases relied on §2B1.1(c)(3) to apply the tax fraud guidelines where the defendants were charged with general fraud offenses involving the submission of tax forms.  So should the Court do so here, where the offense, charged in a general fraud statute, clearly and directly involved conduct covered by a more specific guideline, the tax fraud guideline.

## 2.   The Government Never Proved Any Tax Loss

Without a finding that Care would have been denied charitable status "but for" the omissions in its IRS Form 1023, there can be no finding that the government ever

---

[3] "Subsection (c)(3) provides a cross reference to another guideline in Chapter Two (Offense Conduct) in cases in which the defendant is convicted of a general fraud statute, and the count of conviction establishes an offense involving fraudulent conduct that is more aptly covered by another guideline" U.S.S.G. 2B1.1, Application note 15.

sustained a tax loss. The government has never proved that had Mr. Muntasser fully disclosed Care's activities and provenance, Care would have been denied charitable recognition status[4]. On the contrary the trial testimony was that Care's review process would have been slowed, not denied. (See, e.g., Tr. November 30, 2007 at 124-25; December 5, 2007 at 126-27) The government's trial witnesses wisely resisted claiming that Care would have been denied charitable recognition status, because controversial, unpopular and even offensive advocacy is protected by the First Amendment and Treasury's own regulations. See Big Mama Rag Inc. v. United States, 631 F.2d 1030, 1035 (D.C. Cir. 1980); 26 C.F.R.§1.501(c)(3)-1(d)(2) ("The fact that an organization, in carrying out its primary purpose, advocates social or civic changes or presents opinions on controversial issues with the intention of molding public opinion or creating public sentiment to an acceptance of its views does not preclude such organization form qualifying under Section 501(c)(3) so long as it is not an action organization of any one of the types described in paragraph (c)(3) of this section." Care's publications, however obnoxious viewed from current perspective, constituted protected advocacy. See Brandenberg v. Ohio, 395 U.S. 444, (1969)(advocacy of violence protected unless it constitutes incitement to imminent harm); NAACP v. Clairborne Hardware Co., 458 U.S. 886 (1982) (mere advocacy of use of force or violence does not render speech unprotected by Forth Amendment). The conclusion that Care would have been denied tax exempt recognition status had the IRS been told of the publication of the newsletter

---

[4] The Court found that there was no evidence that Mr. Mubayyid was involved in the filing of the documents associated with the application for charitable status recognition or conspired to obtain that recognition by concealing information from the IRS. (Tr. June 3, 2008, at 30-31).

and Care's advocacy in support of the mujahedeen is unsupported by the evidence and the law[5]; the theory that the government suffered a tax loss as a result fares no better.

The PSR holds Mr. Mubayyid accountable for a "tax loss" incurred from years 1997-2003 (Report at ¶¶69, 91), though the evidence showed that he did not become treasurer until the end of 1998, and only gained check writing authority in 1999.  In his role as treasurer, he signed and submitted 990 forms for the years 1999 and 2000 (in November 2000, and July 2001, respectively (Report at ¶68)).  When accountant Richard Donahoe discovered a minor accounting discrepancy in the previously filed 1997 return, he signed and filed the amended 1997 return prepared by Mr. Donahoe in June of 2002. Id.

Just as the government failed to prove that Care would have been denied charitable recognition status at its formation, the government has completely failed to prove that had Mr. Mubayyid disclosed all of Care's activities it would have lost its charitable recognition status.  There is no evidence that had Mr. Mubayyid disclosed on the 1997, 1999, or 2000 return that Care had once published a newsletter (which had been discontinued) Care would have lost its charitable recognition status.  The same is true with respect to the disclosure the lectures or sales of books or tapes, activities which were insubstantial when extant, and which had been discontinued by the time Mr. Mubayyid filed the returns.

---

[5] The PSR states that  the "Probation Office does not take the position that CARE would not have been granted tax exempt status if the IRS was aware of all their activities…" but still "concludes that there are two positions which could be reached may have been no tax loss as "the government failed to prove that Care would have been denied tax exempt status; or that the tax loss is accurate  because the organization was based on incomplete disclosure on behalf of Care." )See Probation Officer's Response to Objection #23, PSR at 57.

The government's tax expert Dawn Goldberg testified that revocation was a relatively rare occurrence, and that of the 150 audits she had conducted she had only <u>recommended</u> revocation of exemption of recognition 5 times, (Tr. December 7, 2007 at 77). Even if revocation was recommended, she had earlier acknowledged there was an appeal process, "and a lot of steps in between" (<u>Id</u>. at 40) so that even her recommendation didn't automatically result in revocation. When asked why she would want to look at an ongoing newsletter, she answered that it could affect the organization's tax exempt status. <u>Id</u>. at 68. Asked to elaborate, she said, "If they were doing any activities that was [*sic*] not in…not related to their tax exempt purpose, if they were doing any <u>political</u> activity, anything <u>illegal</u>, we would want to know that because we could <u>possibly</u> get excise taxes or revoke them" <u>Id</u>. (emphasis added). So, even if the organization was involved in political activities, which are prohibited, or illegal activities, which Care was not, one possible remedy was the levying of excise taxes, though from the answer, even that seems far from a certainty. The reason that revocation was a seldom used last resort was plain, as Ms. Goldberg explained: "most organizations are trying to do good. So most organizations are not going to be revoked" <u>Id</u>. at 76. While Mr. Mubayyid was treasurer of Care, and when he signed the returns, Care was sending thousands of dollars to needy people around the world, i.e., "doing good". The government own witness, given the opportunity, was not prepared to say that Care's exempt status would have been revoked or that she would have recommended that it be. The Court should not conclude, on the record before it, that Care only maintained its tax exempt status as a result of the representations made in the tax returns filed by Mr. Mubayyid.

Even if the IRS deemed that Care was engaged in certain non-charitable activity, the result is not loss of tax exempt recognition or a retroactive tax bill from the IRS. "An organization qualifies for exempt status where it engages "primarily" in activities that have charitable purpose" 26 C.F.R. §1.510(c)(3)-1(c)(1). See also Living Faith, Inc. v. C.I.R., 950 f. 2d 365, 370 (7th Cir. 1991) ( "Courts recognize that a non-exempt purpose, even 'somewhat beyond a de minims level,' may be permitted without a loss of exemption.")(citing Copyright Clearinghouse Center, Inc. v. Commissioner, 79 T.C. 793, 805 (1982)).

The government has never proven that Care's undisclosed activities ever amounted to anything more than insubstantial expenditures when compared to the hundreds of thousands of dollars it donated for the benefit of needy individuals throughout the world[6].

### 3.  Donations Made To Care Do Not Constitute Taxable Income Under The Internal Revenue Code

The government has taken the position that if an organization received donations, and it was not a properly recognized tax exempt organization, than the donations constitute taxable income. That view is contrary to the Internal Revenue Code.

Gifts are not income to the recipient. Section 102(a) of the Internal Revenue Code states that "[g]ross income does not include the value of property acquired by gift, bequest, devise, or inheritance." Characterization of the amount received is based on the intent of the transferor or contributor, not on the use of the recipient. Robertson v. United States, 343 U.S.711 (1952); Bogardus v. Commissioner, 302 U.S.. 34 (1937). In Commissioner v. Duberstein, 363 U.S. 278 (1960), the Court reaffirmed that characterization as a gift was appropriate if the transfer of value resulted from a

---

[6] During the period Mr. Mubayyid was treasurer, the only extant "activity" the government complains was not properly disclosed was Care website which costs $16.95 per month.

"detached and disinterested generosity" on the part of the transferor, motivated by "affection, respect, admiration, charity or like impulses". Id. at 285

The precise issue arose in the case of Branch Ministries v. Rossotti, 211 F. 3d 137 (D.C. Cir. 2000). Four days before the presidential election, Branch Ministries, a tax-exempt church, placed full page newspaper advertisements urging Christians not to vote for Bill Clinton, in clear violation of prohibitions placed on tax exempt organizations from promoting or opposing specific political candidates. Id. at 139

In response, the IRS revoked the church's tax exempt status. Branch Ministries sued, alleging, in part, that revocation posed an undue burden on its First Amendment rights, and that its very survival would be threatened if it had to pay taxes on the donations it had received. Id. at 142 Rejecting the church's argument, the Court stated the following:

> "Nor does the revocation necessarily make the Church liable for the payment of taxes. As the IRS explicitly represented in its brief and reiterated at oral argument, the revocation of the exemption does not convert bona fide donations into income taxable to the Church. See 26 U.S.C. §102 ("Gross income does not include the value of property acquired by gift…."). Furthermore, we know of no authority, and counsel provided none, to prevent the Church from reapplying for a prospective determination of its tax-exempt status and regaining the advance assurance of deductibility--provided, of course, that it renounces future involvement in political campaigns."

Branch Ministries v. Rossotti, 211 F. 3d at 142

Similarly, Care would not be liable for taxes on the bona fide donations it had received. In fact, there is no evidence that the IRS has ever conducted an audit of Care, ever made a formal determination that Care owed taxes on donations received, or ever made a demand on Care or any of its officers for taxes owed. The "tax loss" is entirely a construct of the prosecution's making.

**B.  THE PSR INCORRECTLY APPLIES UNWARRANTED SENTENCE ENHANCEMENTS**

**1.  No Enhancement Pursuant To U.S.S.G. §2B1.1(b)(7)(A) Is Warranted**

The PSR increases Mr. Mubayyid's guideline offense level by 2 points, pursuant to U.S.S.G. §2B1.1(b)(7)(A) (2001), as "the offense involved the misrepresentation that the defendant was acting on behalf of a charitable, educational, religious or political organization, or a governmental organization".(See Paragraph 92 of the Report)  As set forth in Mr. Mubayyid's Objections to the Presentence Report (See Objection #23) as the applicable Guideline should be §2T1.1, not §2B1.1, this enhancement is inapplicable. Should the Court use the §2B1.1 guideline, the enhancement should not be applied in this case because Mr. Mubayyid did not <u>misrepresent</u> that he was acting on behalf of a charitable organization.  The record is in fact devoid of any evidence that Mr. Mubayyid personally "represented" himself to any donor as acting on behalf of Care.  When Mr. Mubayyid became treasurer in late 1998, Care had been a recognized charity for 5 years. The Court has found that there was no evidence that Mr. Mubayyid participated in the initial filings for charitable recognition.  Care collected from donors, and tens of thousands of dollars were distributed in support of charitable activities, including relief for victims of war, famine, earthquakes, and other disasters.  Thousands of dollars were distributed to provide the poor with food for religious holidays, and for schools, clinics and orphanages.  The government repeatedly conceded, at trial and in its filings, that Care engaged in charitable activity. The government has never offered, much less proved, a dollar amount that Care expended on what the government has characterized on non-charitable activities.  Much of the trial evidence focused on the publication of the Al-

Hussam newsletter, the cost of which amounted at most to a few thousand dollars, according to the figures set forth in Care's tax filings, the accuracy of which the government has never disputed.

Application note §2B1.1(b)(7)(A) (2001) [now renumbered as § 2B1.1 (b)(8)(A) (2006)]  provides additional explanation and examples of the type of conduct which warrants the instant enhancement.   The enhancement applies where "the defendant represented that the defendant was acting to obtain a benefit on behalf of a charitable…. organization (regardless of whether the defendant was actually associated with the organization…) when, in fact, the defendant <u>intended to divert all or part of that benefit</u> (<u>e.g.</u>, <u>for the defendant's personal gain</u>)." (emphasis added)   The Application Note provides of examples of situations in which the enhancement applies:

> (i)    A defendant who solicited contributions for a non-existent famine relief organization.
> (ii)   A defendant who solicited donations from the church members by falsely claiming to be a fundraiser for a religiously affiliated school.
> (iii)  A defendant, chief of a local fire department, who conducted a public fundraiser representing that the purpose of the fundraiser was to procure sufficient funds for a new fire engine when , in fact, the defendant intended to divert some of the funds for the defendant's personal benefit.

There has never been even the suggestion that Mr. Mubayyid misappropriated money for his personal gain.  Nor has there ever been any evidence that any of Care's donors were mislead by Care in its fund raising appeals.  In fact, the government has consistently argued that the opposite is true.  Its complaint has been that Care openly promoted and supported the mujahedeen and jihad through a newsletter, through lectures, through the sales of books and tapes, through a website.  While Mr. Mubayyid rejects the

government's theory and the alleged "facts" which support it, if, *arguendo*, Care was engaged in such activities, it was obviously with the full knowledge of its donors.

As finally flushed out in the hearings on the defendants post trial motions, it is the government's position that Mr. Mubayyid's fraudulently answered Line 76 of the Form 990 by failing to disclose the existence of a website that cost Care $16.95 per month. (The Court, in denying Mr. Mubayyid's Rule 29 Motion, declined to articulate what activity should have been disclosed in response the Line 76 question). In contrast, the trial evidence showed that Care distributed hundreds of thousands of dollars to various charitable causes during Mr. Mubayyid's tenure as treasurer.

The Probation Department, in response to the defendant's objection to the enhancement, stated the following:  "The Probation Department recognizes that Care provided a great deal of money to those in need.  However, donors depended on the accuracy of the tax exempt status in meeting their religious financial obligations".  If the "religious financial obligations" referred to can be assumed to be the Islamic obligation to give to charity, including through zakat, there is no evidence that such religious financial obligations were required to be directed towards tax exempt organizations.

The purpose of the enhancement is to provide additional punishment to those who steal from their victims by exploiting their charitable instincts.  "Use of false pretenses involving charitable causes…enhances the sentence of defendants who take advantage…of the generosity and charitable motives of victims…[D]efendants who exploit victims' charitable impulses…create particular social harm".§2B1.1 Commentary, bckgr'nd.  In such situations, the evil done is two-fold: such conduct both facilitates the theft (because people are more apt to believe someone acting on behalf of a charity is not

going to keep the money for themselves and believe that donating to charity is a social good), and the perpetration of such crimes discourages people from giving to other (legitimate) charities in the future because they fear the money will just line some miscreants pocket. Neither factor is present in this case, and the mechanical application of the enhancement because the case involves a charity would be an error.

### 2.    No Enhancement Pursuant To U.S.S.G. §B1.3 Is Warranted

The PSR summarily increases Mr. Mubayyid's offense level by two points pursuant to Guideline § 3B1.3 "as the defendant abused his position of public or private trust in that he was Treasurer for a period of time and the other persons involved with the organization trusted him to comply with the regulations governing Care".

The First Circuit has established a two-pronged test for determining the applicability of the abuse of trust enhancement:

> "The sentencing court must first answer the status question:  Did the defendant occupy a position of trust?  If not, the inquiry ends.  If, however, the status question produces an affirmative response, the Court must then answer the conduct question:  Did the defendant use that position to facilitate significantly the commission of the offense?"

United States v Parilla Roman, 485 F.3d 185, 190 (1st Cir. 2007)

The fact that Mr. Mubayyid acted as volunteer treasurer of Care for several years does not answer the question as to whether he occupied a "position of trust".  It is not the title that is important but the relationship between the defendant and the victim.  Here, if there was a "victim", it was United States Treasury and the IRS.  Mr. Mubayyid certainly occupied no position of trust vis-à-vis the United States government.  While the First Circuit has not directly addressed the issue, sister Circuits have required that a relationship of trust exist between the perpetrator of the crime and its victim.  See, e.g.,

United States v. Guidry 199 F. 3d 1150 (10th Cir. 1999)(the abuse of position of trust enhancement in error where the defendant filed false tax returns (false for failure to declare as income money she embezzled), but held no position of trust with respect to the victim, the United States.), United States v. Barakat, 130 F.3d 1448, 1454-56 (11th Cir. 1997); United States v. Jolly, 102 F.3d 46, 48-50 (2d Cir. 1996).  Here, Mr. Mubayyid did not occupy a position of trust within the meaning of §3B1.3, and, as Parilla Roman instructs, "the inquiry ends".

Should the analysis continue, it is clear that Mr. Mubayyid never abused the trust of any person or entity.  He never deceived anyone within Care or any of its donors. It is incontrovertible that Mr. Mubayyid never diverted monies to his own gain.   The government's theory of the case was that he failed to disclose certain of Care's activities to the IRS in tax filings he signed in his capacity as treasurer, including activities that ceased before he was treasurer (i.e. the publication of the Al-Hussam newsletter).  The government further alleged that Care as an organization engaged in non-charitable activities; there was no evidence that Mr. Mubayyid diverted monies to any activity unknown to other Care officers, volunteers or donors.

The theory of the government's case was that Care deceived the IRS in order to gain and maintain tax exempt status, collect donations more easily, and carry out a variety of non-charitable activities.   If this is true, arguendo, Mr. Mubayyid cannot be said to have abused the trust of fellow Care volunteers by submitting tax filings that allowed Care to maintain its tax exempt recognition.

Lastly, the Court must ask did Mr. Mubayyid "use that position to facilitate significantly the commission of the offense"?  In light of the facts of this case, it is clear

the question really is somewhat nonsensical. While acting as volunteer treasurer placed him in the position to commit the offense, it didn't make the act of signing the return "easier"; one of his duties as treasurer was to sign and file the returns. This is not the type of "facilitation" contemplated by the Guidelines.("This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as guardian, a bank executive's fraudulent loan scheme, or a criminal sexual abuse of a patient by a physician under the guise of an examination" U.S.S.G. §3B1.3 app. note 1)

Finally, if the Court applies the charitable-misrepresentation enhancement pursuant to U.S.S.G. §2B1.1(b)(7)(A), it may not also apply the §3B1.1 enhancement (abuse of a position of trust). Application note 5 (E) to U.S.S.G. §2B1.1(b)(7) states that if " the conduct that forms the basis for an adjustment under §3B1.3 (Abuse of a Position of Trust or Use of Special Skill), do not apply that adjustment under §3B1.3". The only conduct which would form the basis of either enhancement is Mr. Mubayyid's signing and filing the form 990's for the years 1997, 1999 and 2000. The Guidelines expressly prohibit application of both enhancements for the same conduct.

### 3. No Enhancement Pursuant To U.S.S.G. §3C1.1 Is Warranted

Based on the government's offense conduct submission, the PSR provides a further enhancement for Obstruction of Justice, pursuant to U.S.S.G. §3C1.1. In response to the defense objection to the enhancement, (See Objection #26 of the Addendum), the Probation Department wrote that "any defendant who destroys pertinent information, upon learning of an investigation, has obstructed justice", and references paragraphs 72-75 of the Report.

The paragraphs in question, 72-75, describe, in a highly subjective and selective narrative, how in a telephone call between Mohamed Chehade and Mr. Mubayyid, Chehade tells Mr. Mubayyid to remove the material stored in the Care storage locker, after Mr. Mubayyid tells him that police had visited Care's former office.  Completely without any support in the record, the Report then states that " [t]he underlying reason for this instruction is clear – Chehade was a party to at least one meeting about Care's pro-jihad activities [five years earlier, a thousand miles from Massachusetts] and likely knew notes of that meeting were kept and maintained with Care's effect's".  The government's narrative fails to disclose Mr. Mubayyid's response: "It needs , uh, one is afraid that they might think that there is something, I mean…I don't want to touch anything so that there is no."  The Court will recall that this conversation occurs several days before the first search of the Care storage locker on October 4, 2001.  Some 600 documents were photographed, including the notes of a meeting that took place in Chicago 5 years earlier (while Mr. Mubayyid was living in Australia).  Photographs taken at the time of the initial search showed a storage locker in great disarray (Exhibits 473, 475).  IRS Special Agent Lazarus testified he returned to that locker in April 2003, and pursuant to a search warrant, removed some 18 boxes containing thousands of documents and other evidence from the locker (Tr. V10 at 138).  He testified that the locker looked different that it did in the photographs taken at the time of the initial search, that it had been organized and cleaned up. Id. at 136-137.  The evidence at trial was that the notes of the Chicago meeting were not found in the subsequent search.  Based on that fact alone, the Report concludes that Mr. Mubayyid "destroyed the Arabic notes as Chehade had instructed".

The government has the burden of proving by a preponderance of the evidence that the obstruction occurred. <u>United States v. Rodriguez</u>, 336 F.3d 67, 71 (1st Cir. 2003) It cannot do so here; only by stacking unfair inference upon unfair inference, and ignoring all contrary indicators, could one conclude that Mr. Mubayyid, with the requisite intent, destroyed a single document that did not pertain to him, but kept thousands of others, in the storage locker and the his home, (and produced additional documents in response to grand jury subpoena), documents that would be the basis of his prosecution in this matter. The government has not and cannot meet its burden and the enhancement should not be applied.

### C. <u>THE CORRECT GUIDELINE CALCULATION</u>

As set forth, supra, the government proved no tax loss, and none was, in fact, sustained. The government failed to prove Care would not have been given an exemption in due course, or, had Mr. Mubayyid answered the Line 76 question differently, Care would have had its tax exempt status revoked. And, notwithstanding even a lack of tax exempt status, gifts to an organization or an individual are not taxable income. Therefore, pursuant to §2T1.1, the base offense level of 6 applies where there is no tax loss. No enhancements are supportable or warranted, so the total offense level is 6. As Mr. Mubayyid has no prior criminal record, his criminal history category is I, rendering a guideline sentencing range of 0-6 months, of which he will have served 6 months as of this writing.

D. **THE COURT SHOULD DEPART DOWNWARD FROM THE GUIDELINE RANGE**

1.  **The Present Case Is Outside The Heartland Of Tax Prosecutions**

Should the Court conclude that the guideline range is higher than the one calculated above, the Court should depart downward so that the sentence may reflect the unique aspects and circumstances of this case and this defendant.  In researching and preparing for this case, undersigned counsel never discovered a case where someone was prosecuted for allegedly falsely answering Line 76 of the Form 990.  Cases involving the making false statements on a tax return invariably involve individuals lying to enrich themselves, and to avoid paying taxes which are indisputably due and owing.  The motives are varied, but commonly base.  Such was not the case here.  Mr. Mubayyid became the part-time, unpaid treasurer of Care in order to help out in an organization that gave money the poor, the needy, the victims of war and natural catastrophe.  The records he kept reflect that Care donated thousands of dollars to needy Muslims around the world, not a penny of which was diverted to his own use.

U.S.S.G. §5K2.0 reflects the Sentencing Commission's understanding that there will be cases so outside the "heartland", that the putative guideline sentence is not appropriate.  The Court may depart where "the defendant's actions were outside the heartland of offenses typically occurring under the principal statute of conviction." United States v. Shinderman, 515 F.3d 5, 18 (1st Cir. 2008);  United States v. Brennick, 134 F.3d 10, 14 (1st Cir. 1998) (affirming downward departure in tax evasion case where defendant intended to delay payment briefly, noting that "the taxpayer is usually attempting to deprive the government permanently of taxes owed to it") United States v.

Goldberg, 105 F.3d 770, 777 (1st Cir. 1997)(Court departed downward where Klein conspiracy guideline failed to reflect actual conduct.)

Unlike the defendants in vast majority of tax prosecutions, Mr. Mubayyid did not enrich himself at the expense of the public treasury or his fellow taxpayers. In fact, as discussed, supra, according to the Internal Revenue Code and the IRS's own arguments in Branch Ministries v. Rossotti, 211 F. 3d 137, 142 (D.C. Cir. 2000) it is extremely doubtful that there was any tax loss at all in the present case. Despite having been convicted on five counts, the only criminal conduct identified is his false answer to a single obscure and, according to the Court's jury instructions and rulings, possibly ambiguous question on Care's tax returns, failing to disclose activities that were legal, and likely constitutionally protected. In short, this case falls so far outside the "heartland" of the typical tax prosecution as to be beyond peradventure, and a downward departure to so reflect that reality is entirely warranted.

### E. The Court Should Sentence Mr. Mubayyid In Consideration Of The Factor's Identified In 18 U.S.C. § 3553

The United States Supreme Court, in United States v. Booker, 125 S. Ct. 738 (2005) and the more recent decisions of Gall v. United States 128 S.Ct. 586 (2007) , and United States v. Kimbrough, 128 S.Ct 558 (2007), restored the district courts' historic function and ability to fashion a sentence tailored to the individual circumstances of the case, and defendant before it, by requiring courts to consider factors other than the sentencing range prescribed by the United States Sentencing Guidelines[7]. While Guideline Sentencing Range is the sentencing court's "starting point", "the sentencing

---

[7] As the government succinctly stated recently "Every defendant now, pursuant to Gall and Kimbrough and Rita, you have to actually look at as an individual and sentence them based upon their history and characteristics. " Tr. June 12, 2008 at 24

court may not mechanically assume that the GSR [guideline sentencing range] frames the boundaries of a reasonable sentence in every case". <u>United States v. Martin</u>, 520 F.3d 87, 91 citing <u>Gall</u> at 596-97.    The <u>Martin</u> Court further explained:

> "In the last analysis, a sentencing court should not consider itself constrained by the guidelines to the extent there are sound, case-specific reasons for deviating from them.  Nor should a sentencing court operate in the belief that substantial variances from the guidelines are always beyond the pale. Rather, the court should "consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue".

<u>United States v Martin</u> 520 F.3d at 91, quoting <u>Gall</u> 128 S.Ct. at 598.

In imposing sentence, the Court must consider all of the factors set forth in § 3553(a)(1)-(7), <u>United States v. Smith</u>,  445 F.3d 1, 5-6 (1st Cir. 2006).  An examination of the each of these factors as they pertain to Mr. Mubayyid and the facts of this case reveals that a sentence of six months is a sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing set forth in § 3553(a)(2).  <u>Booker</u> 125 S.Ct. at 764-65.

### 1.  **Mr. Mubayyid's Personal History And Characteristics, And The Nature And Circumstances Of The Offense. (§ 3553(a)(1))**

a) <u>Mr. Mubayyid's  personal history and characteristics</u>

The Court has the benefit of the Presentence Report, which provides a biographical sketch of Mr. Mubayyid, his extended family, his education and employment history, and health.  Briefly, Mr. Mubayyid is 43 years old, and is married to Jumana Munla, who he met while a student in Boston.  He came to Boston from his native Lebanon, the recipient of a scholarship sponsored by the Hariri Foundation.  He grew up in very modest circumstances in the outskirts of Tripoli.  He was a good student, as were several of his brothers and sisters, motivated by a mother who stressed the

importance and value of education and the possibilities it held for personal advancement and fulfillment.  He attended the Wentworth Institute of Technology, and graduated with a B.S. in engineering in 1989.  That year, he also met and married Ms. Munlla, and began his graduate studies at Boston University.  In 1990, their first son, Abdurrahman was born, and the next year brought their daughter, Rayaan.  Mr. Mubayyid completed obtained his Master's degree in 1993, and soon obtained employment with Associate Design Technology, a software design firm.

In 1994, Mr. Mubayyid and his wife travelled to Australia, where Mr. Mubayyid obtained Australian citizenship, and assisted his parents in their emigration from Lebanon.  In 1997, he and his wife and their three children (now with the newborn son Abdullaah born in Australia in tow) returned to Massachusetts, and he resumed his employment in the software field.

Mr. Mubayyid's life is focused on his family, his community and his religion.  He is a devout Muslim, who observes the tenants and practices of his religion.  A principle pillar of the Muslim religion is the obligation to perform charitable work and to care for the needy, and, as a devout Muslim, Mr. Mubayyid has consistently sought to fulfill that obligation.

As noted in the introductory section of this memorandum, a review of the letters written on his behalf, and submitted herewith, reflect a man deeply loved and respected by his family and his community[8]. Several of the letters come from members of the Alhuda Academy community.  Alhuda Academy is a small Islamic school, "a small private school that runs on a shoestring budget" writes Nabila Mohammed.  She

---

[8] Certain of the letters were submitted to undersigned counsel by e-mail, and hence do not bear a handwritten signature.  In addition, a on-line petition in support of Mr. Mubayyid is attached hereto.

continues "Mr. Mubayyid is one of the few parent volunteers who always made himself available to help out." This view is repeated throughout the letters. As Nana Abdelkader writes "when we needed volunteers to help out at the school at various events, Mr. Mubayyid was among the first to step up and take an active and positive role…[a]t the community level, people knew that they can count on Muhammed's [*sic*] help whenever it was needed." The school's principal, Amina El-Alami writes "I have heard many people recalling the many different ways he supported our small non-profit private school and its community…He has helped with events and used his personal means to get the work done. Never has Mr. Mubayyid benefited from his charitable acts toward the school, nor was he recognized for them."

Dr. Ashraf Elkerm, past president and current chairman of the Board of Trustees of the Islamic Society of Greater Worcester writes that throughout the years he has known him, Mr. Mubayyid "exhibited a true gentleman's attitude with genuine kindness and politeness. He is a humble person. His respect and consideration of the young and elderly was apparent". These sentiments are echoed by Ihab Dabbagh, a past president of both the Islamic Society of Greater Worcester and the Islamic Council of New England; he writes that he has known Mr. Mubayyid for almost 15 years. "He is a very humble polite soft spoken and down to earth person. He is a good member of our community; he is a generous sincere person that helps anybody who is in need."

Dr. Farrag writes that Muhamed is "a man of excellent moral character. He is honest, hardworking, polite…" He writes of his qualities as a father: "the upbringing of our children is a reflection on our own character as parents, in this regard Mr. Muhamed Mubayyid and his wife are quite distinguished…The Mubayyid children are bright,

polite, helpful and demonstrate respect to others and self restraint that is generally lacking in children of similar age." He also notes that both Muhamed and his wife Jummana are active in the children's school community, volunteering constantly.

Appreciation of Mr. Mubayyid is not limited to members of the Muslim community. His eighty year old neighbor, Rose DiTerlizzi, writes that she and her husband have known Mohamed as a very caring neighbor since he moved next door three years ago, who "has been extremely kind and helpful to us in so many ways" including shoveling snow and doing yard work for her and her husband. A former colleague at P-Tech writes that he found Mohamed to be "an asset to the community" and "very personable and trusting. He adored his family and spoke many times of his love for this country due to the opportunities he received".

Lastly, his family wrote to the Court on his behalf, and those letters are attached for the Court's review, as well. Both his brothers Mahmud and Hatem, and his sister Souad write of their brother's desire to help people in need since his childhood in Lebanon, and his appreciation for his life in the United States. His eldest son, Abdurrahman, writes of the difficulties the family has faced since his father's detention, and how his father is "irreplaceable". The letter of his youngest son Abdullah reflects the strong love he feels for his father, and his desire to be reunited with him.

Muhamed's 16 year old daughter, Rayaan, and his wife Jumana each wrote letters to the Court, letters which would be diminished by quoting excepts of herein. Each letter is a testament to the beloved man, father and husband Muhamed Mubayyid is.

In short, the letters reflect what kind of man Muhamed Mubayyid is: someone deeply respected and appreciated for his good works in the community, for his kindness and manner, and deeply loved by his family as a son, brother, father and husband.

b) The nature and circumstance of the offense

The nature and circumstances of the offense have been discussed, supra.  Mr. Mubayyid was not involved in the formation of Care, and only became its treasurer after the most the activities the government claimed were concealed had been discontinued. His prosecution for a making a false statement in response to Line 76 is without precedent.  No money was ever diverted for his personal benefit, hundreds of thousands of dollars were distributed to needy people, and the government sustained no tax loss.  As the letters written to the Court on his behalf reflect, Mr. Mubayyid is an individual who volunteers his services, tries to help others, and is of a generous spirit.  His involvement with Care was a result of those altruistic characteristics.

**2.  The Need For The Sentence  a)"To Reflect The Seriousness Of The Offense, To Promote Respect For The Law, And To Provide Just Punishment For The Offense", b) "To Afford Adequate Deterrence To Criminal Conduct", c)  "To Protect The Public From Further Crimes Of The Defendant", And d) "To Provide The Defendant With Needed Educational Or Vocational Training, Medical Care, Or Other Correctional Treatment In The Most Effective Manner" (§ 3553(a)(2)(A-D))**

The sentence Mr. Mubayyid has already served reflects the seriousness of the offense, and provided sufficient punishment.  He is a first time offender, and a man who very rarely spent a night away from his wife and children.  The months spent in the Wyatt Detention Facility have been very difficult for him, aside from the expected deprivations of prison life, knowing his family is having to get by without his help and presence.  Any additional punishment would likely not engender respect for the law, as from any perspective this was novel prosecution, and Mr. Mubayyid's culpability appears to be the

*de minimis*.  No additional prison time is necessary to protect the public from further crimes of Mr. Mubayyid, nor is additional incarceration necessary to provide him with rehabilitational opportunities.

## CONCLUSION

Mr. Mubayyid respectfully urges the Court to sentence him to the six months he has served.  It is the only fair sentence available to the Court, and it is a sentence warranted by the facts of the case and by justice.

Respectfully Submitted,
Muhamed Mubayyid
By his attorney

/s/ Michael C. Andrews

Michael C. Andrews
21 Custom House Street
Boston, Massachusetts 02110
(617) 951-0072
BBO# 546470

To: The Honorable Judge Saylor:
From: Nabila Mohammed,
      27 Sylvan Lane, Boylston, MA 01505
      A concerned citizen

Dear Sir:

I am writing in support of Mr. Mohamed Mubayyid. I have known the Mubayyid family since 1999. Our children attended the same school and we were neighbors for one year. Mr. Mubayyid was someone who always had a smile and a pleasant greeting for everyone. During school PTO meetings whenever there was a heated discussion, Mr. Mubayyid always seemed to be among the calm voices of reason and practicality. I say this even though we did not always agree on all the issues.

I often volunteer at our children's school. It is a small private school that runs on a shoestring budget. Mr. Mubayyid was among the very few parent volunteers who always made himself available to help out. When the school re-located to a new building he came with his eldest son Abderahman, and helped move furniture and heavy boxes full of books in his own minivan. He helped unpack, clean up and even install new lockers.

Volunteering at the school also gave me ample time to observe the Mubayyid children. Until this ordeal began, they were happy, healthy, well-adjusted children. They, like their father and mother, always seized the opportunity to be of help to the school and to the community. They have suffered so much during this crisis. Throughout their hardships, they have continued to persevere with a positive attitude. The strength of character they have exhibited can only be attributed to the upbringing Mr. Mubayyid has given them. I pray that they are able to continue with the grace and patience that their father has instilled in them.

Mr. Mubayyid is a good person. Everything we know about him, his conduct, and his family proves it. I cannot say enough in his support. I urge you to give him every consideration and leniency. Thank you.

Sincerely,

Nabila Mohammed
4/11/08

To: Honorable Judge Saylor
From: Nana Abdelkader
        Concerned citizen from Shrewsbury


April 10, 2008


Dear Sir,

        I write to you on behalf of Mr. Mohammed Mubayyid. I have known Mr. Mubayyid and his family for at least twelve years in several capacities. I have known them as friends, parents of students whom I have taught, and members of the community mosque which I attend. Every interaction I have had with Mr. Mubayyid and his family has been a very positive and productive one. As a friend, he was always helping in whatever way he could, even without being asked. When we were moving, he came, helped to load the truck, and helped us unpack. When we needed volunteers to help out at school at various events, Mr. Mubayyid was among the first to step up and take an active and positive role. I remember the night before school started and he was helping us put lockers together, as well as desks. He stayed till late at night to help us finish up. At the community level, people knew that they can count on Mohammed's help whenever it was needed. Whenever I think of him, the image of a very quiet, yet active family man comes to mind. In addition to trying to provide for his family during very difficult times, he remained very involved in his children's lives too. I feel that his family is in disarray without his presence.

        I beseech you to consider the human, the father, the husband, the friend and the community member as you come to what, I am sure, will be a very fair decision at the close of this case.

Thank you for your consideration.

Sincerely,

Nana Abdelkader

To: The Honorable Judge Saylor:
From: Khaled Abdelkader, MD
        30 Latura St, Shrewsbury, MA 01545

April 11, 2008

Dear Sir:

I am writing this letter regarding Mr. Mohamed Mubayyid whom I have known for many years through many interactions through our mosque and as a parent of students at Alhuda Academy. He has been a very dedicated, sincere person who is always trying to help others. He volunteered his time and effort to help the school on several occasions. His wife and children are going through an enormous hardship trying to survive in his absence. His son is supposed to start college this year and is apprehensive about leaving his mother and siblings during this crisis.

On behalf of Alhuda Academy and the Muslim Community of Greater Worcester area, I urge you to have the utmost consideration and leniency regarding his sentence. Thank you.

Sincerely,

*K. M. Abdelkader, M.D.*

Khaled Abdelkader
Vice President
Alhuda Academy Board of Directors

April 18, 2008
Dr. Ashraf Elkerm
Summit Elder Care
Fallon Community Health Plan
55 Cinema Blvd
Leominster, MA 01453


Respectful Judge Saylor


I am a Physician in Geriatric Medicine covering Leominster and Worcester
County of Central Massachusetts.  I am an Assistant Professor in the
Department of Medicine at the University of Massachusetts.

I knew  Mr. Muhamed Mubayyid for over fourteen years.  I am the past
president and currently chairman of the Board of Trustees of the Islamic
Society of Greater Worcester.

I came to know Mr. Mubayyid through the Islamic center social and
religious activities as well as in and outside social gatherings.  I knew him
personally as well as his brothers in law and his mother in law.  I testify to
the best of my ability from observing him in many situations and gatherings,
that he exhibited a true gentleman's attitude with genuine kindness and
politeness.  He is a humble person.  His respect and consideration for the
young and elderly was apparent.  He never showed any sign of out of
character or anger gesture in any conversation even with differing in
opinions.


Sincerely

Dr. Ashraf Elkerm

April 18, 2008
Ihab Dabbagh DMD
9 Millbrook Street
Worcester, MA.01606


Respectful Judge Saylor


I am the Past President of Islamic Society of Greater Worcester and Past President of
Islamic Council of New England.


I have known Mr. Muhamed Mubayyid and his family for almost 15 years.  He is very
humble polite soft spoken and down to earth person.
He is a good member of our community; he is a generous sincere person that helps
anybody who is in need.
Simply I know him as a loving father and young decent man.


Sincerely
Ihab Dabbagh

# Baystate ⚏ Newborn Medicine

### A Baystate Children's Hospital Practice

759 Chestnut Street     Springfield, MA 01199     baystatehealth.com
Tel: (413) 794-2400     Fax: (413) 794-5100

**Bhavesh Shah, MD**
Director

**Gary Rockwell, MD**
Assistant Director

**Thomas Campfield, MD**

**Hussien Farrag, MD**

**Barbara Kelly, MD**

**Kathleen Meyer, MD**

**Robert Rothstein, MD**

**Rachana Singh, MD**

April 10, 2008

The Honorable Judge Saylor:

My name is Hussien M Farrag; I am an Assistant Professor of Pediatrics at Tufts University and a Staff Neonatologist at Baystate Medical Center in Springfield Massachusetts. I have been a member of the Muslim community of Greater Worcester since 1999. I participate in the activities of the Islamic center and am actively involved with Alhuda Academy, a Full time Islamic School that serves Pre-K through 8th Grade, and I have been a member of its Board of Trustees since its inception in 2001. I am writing in support of Mr. Muhamed Mubayyid.

I have known Mr. Muhamed Mubayyid and his family since 1999. My children and the Mubayyid's children went to the same school. Our school is a community funded and supported school. I have had ample opportunities to interact with all members of the Mubayyid's family including Mr. Muhamed Mubayyid himself. He is, without a doubt, a man of an excellent moral character. He is honest, hardworking, polite, offer his help whenever needed in a discreet manner. He is not someone who looks for recognition for his effort.

Mr. Muhamed Mubayyid is an honorable man and I came to know this first hand. In one occasion, probably 5 or more years ago, during the Holy month of Ramadan, our Muslim Holiest month of the year, Mr. Mubayyid was laid off from his work. I approached him in confidence with a $3,000:00 check as a loan or a gift to him and his family during this holy month, I made it as clear as I can that I was not expecting him to pay it back or if he insists I do not have any expectation for when he should pay it back. As much as he expressed his gratitude for my offer he gracefully

declined it. He said: "we have a little saving that we can get by at this time but now I know that if things get tough who I may ask for help". Since then things have gotten much tougher than any of us can imagine for him and his family. However his dignity and pride prevented him from asking for help at any time during his calamity. No one knows about this incident except for my wife.

In my opinion, the upbringing of our children is a reflection on our own character as parents, in this regard Mr. Muhamed Mubayyid and his wife are quite distinguished. I taught their children in the school on multiple occasions, I was an adult supervisor to many of the children and youth activities in our Islamic Center. I was also their scout master for a period of time and closely interacted with them in many different settings. We had scout meetings and activities, hiking trips, and Day as well as Overnight camping trips together. The Mubayyid children are bright, polite, helpful and demonstrate respect to others and self restraint that is generally lacking in children of similar age. They are active, playful, enthusiastic and funny. I had a great deal of pleasure being their scout master at that time. The Mubayyid children are simply a living testimony to the character of Mr. Mubayyid and his wife.

His wife is a very modest, soft spoken and polite woman. She, like him, volunteered in our school whenever possible. She baby-sat for our teachers' children, she drove the children to out-of-site school activities in her own car, she taught Arabic as a substitute teacher and volunteered for many PTO functions and activities as well. All of our teachers, Parents, staff and administration have the utmost respect for Mr. Muhamed Mubayyid and his wife "Jummana", we value and appreciate their contribution to our school and community. This is a family that all of us feel very safe to leave our children in their care.

I have nothing but good things to say about Mr. Muhamed Mubayyid and his family. It saddens me as a person and us a community to see a decent person like him and a beautiful family like his suffering as much as they do. I hope that you will exercise everything in your power to minimize their suffering.

I would be happy to discuss any further concerns you may have in person or by phone; (413) 794-3703. Please let me know if I can be of any further help.

Respectfully,

Hussien M Farrag, MD

Assistant Professor of Pediatrics, TUFTS University School of Medicine.
Staff Neonatologist, Baystate Medical Center.
759 Chestnut Street, Springfield, Massachusetts. 01199.

Dear Sir,

April 7th, 2008

Respected Judge Saylor,

I have known Muhammad Mubayyid for the past 16 years in a variety of capacities. He has been my brother-in-law and a resident of Shrewsbury for the past several years. In addition he has been a volunteer in the community, helping every needy American.

I once happened to visit Muhammad at his house and met his next door neighbor, a retired Veteran. His words were "I couldn't ask for a better neighbor".

This is the kind of person he is: he has a few pets which he took care of like his children. He loved his family and was an asset to all of his relatives.  Muhammad was kind in his heart, actions and words. It would be a great loss to society if he were to be taken away.

Muhammad is organized, efficient, extremely competent, and has an excellent rapport with people of all ages. His communication skills, both written and verbal are an excellent asset to any place of work.

In summary, I highly recommend Muhammed to be a free man in this society and to be given a chance to seek any position that he may desire to pursue.

He would be valuable to any community, society and nation at large.

I sincerely give my full support to take a new look at his situation and his intentions and your approval to this process would serve your share to the society and justice at large.  I believe you will add credibility to this system while ensuring Justice.

Sincerely

Hussain M Iftakher

23w 548 North Av,

Carol Stream, Il 60188.

April 15, 2008

To: Judge Saylor
From: Dr. Abdulkeni A. Zekeria
Re: Testomony on the Character of Mr. Mohamed Mubbayad

Dear the honorable Judge Saylor, It is my pleasure to write this memo testifying on the good character of Mr. Mubbayad.

I have known Mr. Mubbayed for over 15 years. He is gentle, hardworking good Muslim.

He is a good father and husband. He has brought his children to me for tutoring, like their father they are quite, decent good students.

His mother-in-law is a good friend of my wife.

I hope you will consider his good manner and beautiful character when you sentence him this May.

Thank you

Abdulkeni A. Zekeria
Professor of Mathematics
Fitchburg State College.

April 9, 2008

Dear Judge Saylor,

I am writing in reference to Mohamed Mubayyid.
My name is Rose DiTerlizzi, I live at 50 Plainfield Ave, Shrewsbury, MA.

Mohamed and his family moved to 54 Plainfield Ave, next door, approximately 3 years ago.   My late husband and I are elderly, in our 80's. Mohammed has been extremely kind and helpful to us in so many ways.  He always helped my husband shovel when it was difficult for us to get our car out of the garage.  He always assisted us with yard work and other tasks difficult for us to handle at our age.  Mohamed's kindness has always been appreciated. He has been a very caring neighbor.

Sincerely,

Rose DiTerlizzi

April 29, 2008

The Honorable Dennis Saylor
United States District Court for the District of Mass.
Donahue Federal Building
595 Main Street
Worcester, Ma 01608

Re:    Mr. Mubayyid

Dear Judge Saylor,

I am writing this letter to pass along my knowledge of Mr. Mubayyid.

I knew Mr. Mubayyid while I was working with him at Ptech, Inc. I worked with him for over 2 years. My position was the Controller for Ptech. I had to work with him intimately during this timeframe.

He was responsible for some business transactions that directly affected me so I have direct personal experience working and talking with about many subjects both business and personal. We had many conversations at length about many topics. During this time I feel I attained a sense of what type of person Mohammed is.

He is very personable and trusting. He adored his family and spoke many times of his love of this country due to the opportunities he received. I can speak highly of him and hope this process has not changed him. He is an asset to our community based on my experience.

Sincerely yours,

Jeffrey S Bennett
12 Bayberry Lane
Beverly, Ma 01915
978-922-0238

Mahmud Moubayed
Electrical Engineer
1 Carroll Street, Beverley Park NSW
Australia 2217

*15th April 2008*

**The Honorable Judge J. Saylor**
**District Judge**

*On behalf of myself and family I take this opportunity to express our deepest concern about my brother Muhammad and his case.*

*I am aware that as much as I do not have the qualification to have a say in the matter, I feel obliged to brief somebody about the real brother I have known and the person he is.*

*Muhammad, my younger brother, was raised as perfectionist. He has been always admired by everyone and was a genuine person by all means. He has been a top student through all of his academic life. As such he had chosen to move to the United States to complete his higher education and become a Software Engineer. He was committed to get better education and graduated to work for a small company and strived to promote its products.*

*Muhammad praised his life in the US because he loved to work and live there. It was a mutual decision with his wife to raise his family in the US. As a man of faith, he believed that being there he is able to help in many humanitarian causes. He was able to devote his spare time to help others with heartily enthusiasm and respect.*

*Muhammad grew up during the civil war in Lebanon. On many occasions he suffered injuries to his body while helping injured people in the neighborhood after each round of fighting or unexpected explosion. He willingly volunteered to help others and never complained.*

*We admired him so much for being a successful person and well organized worker. He took pride in all his tasks and performs to his best, but here I can only quote the following verse:*

*"For Your name's sake, O LORD, Pardon my iniquity, for it is great...Look on my affliction and my pain, and forgive all my sins." (Psalm 25:11-18).*

*Yes, in today's running events, matter seems to be lost in translation.*

*Muhammad may have taken things for granted but never believed in wrong doing. By the end of each day he sat down to judge himself and always rectified a bad situation.*

*Muhammad is a living example of righteous and good human being. He believed in the needs of orphans and displaced people in war torn countries and tried his best to help. He would never attempt any misleading act such as he is being tried for.*

*Today it is very unfortunate to see how some people are living with clear mind whilst another human is dying of hunger, act of war or a crime. This is not the true message of any religion including Islam.*
*Muhammad set a very good example for his family as well as to all others.*

*He always observed his work as a Muslim and such he always put guidelines to his live. He used to remind me of the following:*

*"Fear the day wherein ye shall return to God: then shall every soul be rewarded according to its desert, and none shall have injustice done to them." (Sura 2:281).*

*Based on what I mentioned so far, I believe that we all want justice and fair go to bring the best in all of us. Understanding each other without prejudice is the way.*

*Finally, with all respect, I plead to you: honorable Judge Saylor not only to evaluate Muhammad based on hand picked up events that will incriminate him, but consider the real person Muhammad is.*

*Please consider the fact is that he would never ever consider any sort of cheating where he would have chosen to work and raise his family.*

*Thank you again for your time, May the LORD (GOD) Guides you to express what is right to all.*

*Yours truly,*

*Mahmud Moubayed*

Attention of: Your Excellency the Honorable Judge Saylor.

My name is Hatem Mubayyed. Iam Mohamed's brother. I am 38 years old. I am Lebanese.I work as a member in a syndicate. I live in Naji Street, Abi Samra, Tripoli, Lebanon.

Your honor,

"In God, we trust. This is a motto that honorable men in America adopt in making their judgments. We are addressing an honorable person who believes in God, mercy, and in freedom. Freemen in America call for trust in God, patriotism, and for the unity of the family as we do.

My brother Mohamed is a religious person. In spite of all the propaganda concerning our religion nowadays, our religion calls for mercy and love between human beings. Mohamed knows this well. When he was in Lebanon, he was always compassionate and merciful to others. Although he was a teenager, he had a mature mind. Nothing differs when he traveled to America. He has not done but all good to American citizens, despite the difference in religion and concept.

In America they call for patriotism. Mohamed had left Lebanon 20 years ago and went to America. He did and will not do any harm to the country that accepted him to live in its freedom and fair justice. All of his neighbors know him for his truthful, compassionate, and respectful personality. He always helps anyone in need regardless of his religion. He loved that country in which he lived twenty years, raised his children, and trusted its justice.

Americans call for the unity of the family. And as you represent the conscience of the American nation that holds this great motto, your honor is aware of the loss that can happen to this family as a result of the separation of the father. Mohamed was separated from his big family twenty years ago. He is one of ten brothers and sisters who were raised by our great mother and father. They raised and educated us all. And now he may leave his family, his kind wife and his children especially his eldest son, a teenager who is in need for his father to advice. He needs his family as much as his family needs him.

Your honor,
We know that you believe in god, country, and family. So we hope that your judgment will be merciful to our pious, patriotic, and family man brother Mohamed. He believes in what we all believe in "in God we trust".

Hatem M

Attention of : Your Excellency the Honorable Judge Saylor.
Subject: innocence of an oppressed person.
Applicant: His sister Souad Mubayyed. I was born in Lebanon in 1962. I have two diplomas, one in Arabic literature and another in Islamic studies. I worked as a teacher, but I am now a house wife. I have two nationalities, Lebanese and Australian. I live in 35 Pomona Street, Greenacre 2190, Sydney NSW, Australia.

Your honor,

I am writing to a respectable person who fought to make justice among people. The great just and fair is our God. And the one who judges among people is the judge. I give my following testimony and God knows that this is the truth:
My brother was raised on honesty and not to harm anybody. He helps and respects everyone. To him, there is no difference between religions, and he considers all religions from God. All the family likes him for his morals and mature mind.

His first dream, when he was eighteen years old, was to immigrate to America to build himself an honest future that his family will be proud of. He loved America and its citizens, where he found justice and equality among people, and they all detest the oppression.
He made a family and raised his children on honesty and devotion to all people. He built dreams to see a great future in America. He would not do what is being judged for. He can't hurt anybody. His only intention was to help poor and weak people. Everybody makes mistakes, but the mature is the one who takes consultation before doing something he doesn't know the result of.

I was in grief over my brother, as he is imprisonment, as well as on his family, at the fact that he is oppressed will affect them too. Actually, everybody knew him will be affected, because they knew him for his truthful and faithful personality.

I plead with your honor for innocence to a man lived most of his life in America and never wanted evil to anyone, neither when he was a student, nor when he reached his present status where he works with honesty and lawfulness.
At the end, I present my respects and estimations to your honor despite the distances between us. I plead your mercy and justice with my brother.

His sad sister Souad

Attention of your Excellency the Honorable Judge Saylor.
We are Mohamed's parents. Ahmad Mubayyed 85 years old and Samira Mubayyed 71 years old. Ahmad worked in past in a governmental institution. Samira is a house wife. We are Lebanese and Australian. We live in 108- Alcoomie Street, Villawood,NSW Sydney 2163.

Many respects to your Excellency and to the respectable members of the court.

From where should I start my letter? From the continual suffering, that I lived with my husband, for fifty years in raising our ten children on the best morals, and love of others whatever their belief and religions and on not harming anybody. We distributed them in many countries to continue their education. Our son Mohamed had the opportunity to be in your country, we cried so much for our separation for he has very high morals and always asks for our satisfaction.

When he got married in America, we were very happy that he became a family supporter and will do his duties as he has been raised here with us.

Suddenly, we heard the shocking sinister news about his imprisonment for an accusation he hasn't done.

Imagine the case of his 85 years old father as well as his 71 years old mother, who haven't seen him for ten years. We only heard his voice and wish seeing him before we die. His father's health is getting worse day after another. Our tears do not stop crying on our son. By God's sake don't be hard in your judgment.

Justice is the base of world. May God remove the anxiety and distress away from you. We wished to visit and see him but our weak medical case prevented us from traveling.

You, honorable judge, have parents and noble family and you suffer if they have distress. We implore you to pardon our son and all innocents, and we wish to see him free.

Accept from us all our respect.

To the Honorable Judge Saylor:

I am Abdurrahman Mubayyid. I am the eldest of three children, and it has been much too long since I have felt like a child.

My father, Muhamed Mubayyid, has undergone many obstacles in his forty years of age. Not only did he care for our family, but he also helped raise his own brothers and sisters. Being one among ten, he was not able to receive many opportunities in life. Honest to God, my father came to America with nothing but the clothes on his back, and one hundred dollars in his pocket. From his minute savings, he built a loving family.

Being the eldest son in our family, most of the responsibility fell to me after the detainment of my father. I had not realized how much my father did for us without complaint. Even after sharing the responsibilities with my mother and sister, we still found ourselves lacking in all that my father did. It did not take us long to realize that my father was irreplaceable.

As my graduation day approaches, I feel more and more lost. I have yet to choose a college but the task has proved to be difficult, due to our financial issue. I cannot decide whether to attend a better college, or one closer to home. I consider it a sin for someone to ask me to choose between my family and my future, because I hope that my family, all of it, will be with me in the future.

I beseech you to reconsider the future of my father.

-Abdurrahman Mubayyid

Dear Mr. Judge Saylor,

My name is Abdullah Mubayyid, and I'm turning 12 on May 4th. My favoritest cousin is coming to visit me for my birthday, but I hope even more that my dad will be there.

My dad always used to watch my soccer games, and he would even practice with me. Now I am playing baseball and its my first time, but my dad hasn't been able to watch me yet. I really miss him.

My dad always took us to the theaters, and made jokes. My mom is funny, but she is not as funny as my dad. He also made sure we prayed on time and I miss his voice.

Please Mr. Judge, give me my dad back.

-Abdullah Mubayyid

April 8, 2008

Dear Judge Saylor,

I am writing to you on behalf of my father, Muhamed Mubayyid. My name is Rayaan and I turned sixteen in February. I am the second of three children and have been harbored by a loving mother and father for my entire life. For years I believed that all children lived the perfect life I had. Although we weren't rich, we had love and respect and that is all we needed to be happy.

Over the years, my father taught me things like how to ride a bike, but unfortunately he will never teach me how to drive. He taught me how to multiply, but as I go into my junior year, he will not be there to watch me struggle through calculus. My father was different from many, he has never spent a night away from us, he doesn't drink or gamble or even swear. My father does however, enjoy going to the Blackstone cinemas. He likes seafood, barbecues and bugs.

I remember that when we were small he would read stories to us from his childhood and we would sit there for hours on end just listening. Now that I look back on my perfect childhood and see how troubling it was for my father, I'm astounded. I cannot imagine how he was able to carry the weight and responsibility of a hard life and still have time to help me study for my science tests.

I have never known a more honest and responsible person. My father has acted as a role model for me, someone to look up to and care for. I could never imagine losing my father, even now as I write this letter, he is not lost to me. My father is still here, sitting on the couch and working in his study. He is too strong to be lost.

— Rayaan Mubayyid

April 20, 2008

The Honorable Judge Saylor,

My name is Jumana Munlla; I am Muhamed Mubayyid's wife. We have been married for about twenty years, and they have been the most wonderful twenty years of my life. Within this short period of time, I learned that Muhamed's love and passion for us would never stop burning. I am having a very hard time writing this letter because it is difficult to know a person when you haven't lived with them.

Where should I begin? Should I tell you about my first son's graduation, and how it pains me to think that my husband might not be sitting beside me on the twenty-ninth of May. You cannot fathom the misery of my husband as he sits, helpless in his jail cell. He has been waiting for this day, watching our son plunge into his schoolwork, and now, he cannot even witness the prize at the end of the road. Muhamed might not get a chance to see our son walk across the stage, and it is awful for a person to have to accept that all his money and work will have to go to waste, and that his first son will have to undertake the hardships and obstacles of this world on his own.

Allow me to relate to you the story of my daughter, whom has just recently turned sixteen. She has looked forward to that date for so long, and yet she has had no pleasure in receiving her permit, because she has not gone. Her father walked our first son through his permit and his license, and her father had taught our son to drive. Now she wonders whether she will miss out on such an important part of her life, whether she will have to move on to the next stepping-stone without her father by her side.

Next, there is my youngest son, Abdullah. As his twelfth birthday approaches, he expects his father to walk through the front door on the fourth of May. He is still young and his hopes are high, he has yet to experience the throbbing pain of a lost dream or a crushed hope. He has yet to become an adult.

Without the strong reliability of my husband, I feel as though I cannot go on. Over the years, Muhamed and I have merged into a single being. A single loving and caring person, both dependant on the strength of the other. Every time I think that I might have to rise every morning with no one at my side, I burst into tears. Every time I look across at the smiling picture of my husband, a piece of my heart is lost. Every time I visit my husband and look into his eyes through inch thick glass, I grow more and more miserable knowing that he is within my grasp, and there is nothing I can do. I love my husband, not only because he cares for us, but also because he goes beyond the definition of a devout husband or a loving father. Muhamed would gladly give his life up for me, or anyone of our beautiful children.

As we stress over Muhamed's health and well being in the Detention Center, he overwhelms himself with guilt for leaving his family with no support. Rather than pity himself and his situation, he worries about us, and the pain he is inducing on his family. Along with piety, humbleness, love and humor, selflessness acts as a major quality of my husband.

Sincerely,

The loving wife of Muhamed,

Jumana Munlla

Powered by iPetitions - start your online petition now

## In Support of Mr. Muhamed Mubayyid

petition text  **signatures**  email friends

The petition

To the Honorable Judge F. Dennis Saylor IV,

We, the undersigned, are writing in support of Mr. Muhamed Mubayyid. We have known Mr. Mubayyid to be kind, generous, hard-working, and respectful. A tireless volunteer in our community, he has never been one to seek recognition.

Mr. Mubayyid and his family have been exemplary members of our community. Whether it's Mr. Mubayyid moving furniture or making repairs to our facilities, or his wife baby-sitting our children, the Mubayyids have always been a source of support to the community. For this reason, we stand behind Mr. Mubayyid, his wife and their children during this very difficult time.

We ask that you show leniency to Mr. Mubayyid as he and his family are most deserving.

Sincerely,

Sign the petition

Fields marked * are required.

  **\* Name:**

  **\* Email:**

**City, State or ZIP:**

**Comments:**

☐ Display my name as *anonymous* on the signatures list

☑ Yes, I want iPetitions to contact me on similar campaigns or petitions.

Sign petition >>

**Petition sponsor**

Worcester Islamic Center

Links

www.wicmasjid.org

Ads by Google

**Broker Negligence**
Find Broker Negligence
Legal Help. Search In
Your Local Area Now.

**Civil Litigation Firm-NY**
**Guararra & Zaitz**
**Business Law**
**Specialists.**

The views expressed in this petition are solely those of the petition's sponsor and do not in any way reflect the views of iPetitions. iPetitions is solely a provider of technical services to the petition sponsor and cannot be held liable for any damages or injury or other harm arising from this petition. In the event no adequate sponsor is named, iPetitions will consider the individual account holder with which the petition was created as the lawful sponsor.

iPetitions is owned and operated by Angle Three Associates, LLC - All material © Copyright Angle Three Associates, LLC. 1998-2006 - terms of use

Powered by iPetitions - start your online petition now

In Support of Mr. Muhamed Mubayyid

petition text     signatures     email friends

Tampa Personal Injury
Aggressive Injury Attorneys. Speak with an attorney for free.   www.bdlawgroup.com
                                                        Ads by Google

Signatures | Total: 98                    Page  << first | < prev | 1 | 2 | next > | last >>

| # | Name | City, State or ZIP | Comments |
|---|------|--------------------|----------|
| 1 | Hussien M Farrag | | |
| 2 | Daoud Ali | Worcester, MA | |
| 3 | Quesiyah Ali, Esq. | Worcester, MA 01608 | |
| 4 | Nabila Mohammed | Boylston, MA 01505 | Please show Mr. Mubayyid mercy if not for his sake, then for his family's sake. |
| 5 | Sombat Jitmoud | lexington, Ky 40517 | We ask that you show leniency to Mr. Mubayid as he and his family are most deserving. Thank you for your consideration. |
| 6 | Anonymous | Worcester, MA | |
| 7 | reem | | |
| 8 | Marwa Alnaal | 01581 | |
| 9 | Asma Kayal | 01604 | |
| 10 | Anonymous | 01545 | |
| 11 | Omar Abdelkader | | Mr. Mubayyid is the father of one of my best friends. I can tell you right now that he is a very hard working person and that the accusations being held against him are nonsense. Whatever he did, he did it with good intentions. The fact that he was found guilty of this nonsense shows weakness in our justice system. Because of this weakness, Mr. Mubayyid and his family have to suffer, and that is the true injustice of all of this. If you believe in justice, then you will see that Mr. Mubayyid is released from prison and brought back home to his family that needs him. |
| 12 | Anonymous | 01581 | |
| 13 | Mohammed Roufuddin Alhassan | westborough, MA 01581 | |
| 14 | Osman Alnaal | 01581 | "Life,Liberty and the Pursuit of Happiness" |
| 15 | Salam Elsakka | 01545 | |
| 16 | Anonymous | | |
| 17 | Anonymous | | I'm an individual who was born and raised in Massachusetts. I've spent my entire life in this state and have not known anywhere else as home. Having grown up as a Muslim, I have come across a lot of people as I grew up who left a bad |

Ads by Google

Peace Corps Photo Exhibit
Submit photos of your Peace Corps experience
www.cfhep.org

US Supreme Court Briefs
Supreme Court Brief Prep & Printing Fast, Accurate, Dependable, Timely.
www.Cocklelee.com

Do NOT Pay Overdraft Fees
Get Free Overdraft Checking and you'll never pay one again.
www.Free-Overdraft.com

School of Int'l Studies
Visit OSU's School of Int'l Studies Webpage
osuunresch.ststate.edu

Samaritans
You can make a difference. Help Us, Help Others, Volunteer.
www.samaritanshope.org

| | | | |
|---|---|---|---|
| 18 | Mazen Ramadan | 01532 | impression about this religion on my life. I am still Muslim to this day, because although people may not always live up to the best expectations - the people do not speak for the religion. The religion speaks for itself. In my years growing up, I have come across a handful or two of individuals who have really earned my respect and who have set a wonderful example about what it is to be a good Muslim and what it is to be a good person in general. One of these people is Muhamed Mubayyid. I have not known him to be anything except an upstanding member of society and a real asset and benefit to our community. He's kind, caring, considerate and always willing to work hard to spread goodness and give people advice on how to deal with various problems. He's one of the better men that I have met in the course of my life and I urge and ask you to have leniency with him and to give him a fair and just ruling. I've believed that people in this country get justice more than anywhere else in the world and I ask and plead with you for justice, mercy, and compassion which are the foundations this nation was built on. Sincerely, Mazen |
| 19 | Rasha Boura | 01532 | |
| 20 | Irtiza Balaparya | | |
| 21 | Wajida Syed | 01545 | |
| 22 | Anonymous | | |
| 23 | Anonymous | | he is a kind and nice person who did nothing wrong |
| 24 | Saousan Ramadan | 01532 | |
| 25 | Ahmed Mohamed Abuelatta | | |
| 26 | Nana Abdelkader | 01545 | |
| 27 | Amjad Bahnassi MD. | Worcester,MA 01609 | |
| 28 | Hagar Aboubakr | 20878 | |
| 29 | Khaled M Abdelkader | Shrewsbury,MA,01545 | |
| 30 | Anonymous | | |
| 31 | Salman Shazeeb | 01606 | |
| 32 | Ron Rosernberg | 02139 | |
| 33 | Amina El-Alami | | |
| 34 | Anonymous | shrewsbury mas,01545 | |
| 35 | Muzzamil m. sAEED | WORCESTER,ma 01606 | |
| 36 | Elimam Sanousi | Roslindale, MA, 02131 | |
| 37 | Alaa Alnaal | 01581 | |
| 38 | Yusuf Abdelkader | Shrewsbury | |
| 39 | Mohammad | | |

| 40 | Cathy Zouval | Shrewsbury, Ma 01545 | We ask that you show leniency to Mr. Mubayyid as he and his family are most deserving. |
| 41 | Cathy Zouval | Shrewsbury, Ma 01545 | We ask that you show leniency to Mr. Mubayyid as he and his family are most deserving. |
| 42 | Ghaith Hammouri | | |
| 43 | Anonymous | | |
| 44 | H and N Hussein | 01602 | |
| 45 | Suhail Amroze | | |
| 46 | Mohammed M Hassan | Westborough,MA 01581 | He is a good and kind,hard worker and taking care his family. |
| 47 | Mariam Khan | | |
| 48 | Kareem Abdelkader | 01545 | |
| 49 | Rwida Alnaal | 01581 | |
| 50 | Zinah Alnaal | 01581 | |

Signatures | Total: 98          Page  << first | < prev | 1 | 2 | next > | last >>