UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
UNITED STATES of AMERICA                )
                                        )
        v.                              )       Criminal No.
                                        )       05-40026-FDS
MUHAMED MUBAYYID,                       )
EMADEDDIN Z. MUNTASSER, and             )
SAMIR AL-MONLA,                         )
                                        )
        Defendants.                     )
                                        )
_____

MEMORANDUM AND ORDER ON DEFENDANTS'
MOTIONS FOR JUDGMENT OF ACQUITTAL UNDER RULE 29 AND
GOVERNMENT'S MOTION FOR RECONSIDERATION

SAYLOR, J.

        This is a criminal prosecution under 18 U.S.C. § 371 (conspiracy to defraud the United

States), 18 U.S.C. § 1001 (false statements), and 26 U.S.C. § 7206(1) (false statements on tax

returns).  In essence, the indictment charged that defendants Muhamed Mubayyid, Emadeddin Z.

Muntasser, and Samir Al-Monla fraudulently obtained a charitable exemption under § 501(c)(3)

of the Internal Revenue Code for an entity known as Care International, Inc.  According to the

indictment, defendants concealed the fact that Care International solicited and distributed funds

for, and issued publications supporting and promoting, Islamic holy war ("jihad") and holy

warriors ("mujahideen").

        After a jury trial that began on November 13, 2007, and concluded on January 11, 2008,

defendants were convicted on multiple counts.  All three defendants moved for judgment of

acquittal as to all counts at the close of the government's evidence, pursuant to Fed. R. Crim. P.

29, which the Court granted as to part of Count Eight and otherwise denied.  All three defendants

renewed those motions after the trial.  The Court issued its ruling from the bench as to those

motions on June 3, 2008, granting those motions in part and denying them in part.  This

memorandum and order sets forth the reasons for that decision in greater detail.  The government

also filed a motion for reconsideration, which will be denied for the reasons set forth below.

## I.    <u>Introduction</u>

This case was indicted, and tried, on the theory that the defendants committed various tax

and false statement offenses.  The government has consistently taken the position, however, that

this is "more than just an ordinary tax case," and that the defendants are guilty of "solicitation and

expenditure of tax-exempt money to engage in violent jihad over an extensive and crucial period

in history."  Thus, it argues, the defendants' "promotion of violence, . . . affiliation with terrorist-

related individuals and organizations, and promotion of other terrorist organizations cannot be

ignored."[1]

From the standpoint of the exercise of prosecutorial discretion in selecting criminal

charges to prosecute, that assertion is undeniably true.  The United States Attorney's Office is

free to select its targets, and to select charges for prosecution, as it sees fit, subject only to the

limits imposed by the Constitution.

From the standpoint of the proof at trial, however, the situation is entirely different.  If the

government is to convict a defendant of a particular offense, the government must prove him

guilty of that offense, and not some other.  The fact that he may have committed other criminal or

undesirable acts is not generally relevant to prove that he committed the charged crime.  And it

certainly does not change the standard of proof:  if insufficient evidence of a charged crime is

---

[1] Gov't Mem. Regarding Relevancy of Sentencing Information (5/30/2008) at 1-2.

presented at the trial, he is entitled to a verdict of acquittal, no matter what his other conduct might be.

Similarly, the fact that the government was apparently forced to charge this case in a less-than-straightforward way does not entitle it to any additional latitude from the Court. This case was complicated by the fact that the principal acts of the defendants that lie at the core of the indictment occurred well outside any applicable statute of limitations period. The original indictment was not returned until 2005; defendant Muntasser signed and filed the application to obtain charitable status for Care in June 1993, nearly twelve years earlier, and the bulk of Care's non-charitable activities occurred before 1997. Again, those facts do not change the standard of proof; the charges must be considered as they exist, not as they might have been under different circumstances.

In short, the Court has evaluated the evidence and the arguments according to exactly the same standard as it would in any other prosecution. The nature and character of the defendants, and the nature and character of their activities, do not change the relevant legal standard or the quantum of proof required to convict beyond a reasonable doubt.

A further point should be emphasized. The struggle against religious and political extremism in general, and terrorism in particular, is likely to be the principal challenge facing this nation, and the rest of the world, for many years to come. At its core, that struggle is to protect and defend the most basic values of our society—indeed, of civilization itself. The difficulty and magnitude of that conflict can hardly be understated. But it is nonetheless important to bear in mind the proper place of the trial court in the American constitutional system. The role of this court, at least in this context, is necessarily narrow. It is not to help—or, for that matter, to

hinder—American foreign policy.  It is not to help or hinder American law enforcement priorities.  It is not to make broad "statements," send "messages," or bestow symbolic "victories" or "defeats."  Instead, the role of the court is to make a relatively narrow and focused inquiry: whether the evidence presented at the trial, taken in the light most favorable to the government, was sufficient to support a conviction as to each defendant and as to each count.  And it is to examine that evidence with a cold eye, not with inflamed passion—and without regard to any greater cause that this case may be deemed to represent, no matter how worthy that cause may be.

## II.    **Procedural Background**

On May 11, 2005, a grand jury returned an indictment charging defendants Muhamed Mubayyid and Emadeddin Muntasser with one count of scheming to conceal material facts in violation of 18 U.S.C. § 1001(a)(1) and one count of conspiring to defraud the United States in violation of 18 U.S.C. § 371.  The indictment also charged Mubayyid with three counts of filing a false tax return in violation of 26 U.S.C. § 7206(1) and Muntasser with one count of making a false statement in violation of 18 U.S.C. § 1001(a)(2).

On March 8, 2007, a grand jury returned a superseding indictment charging defendants Mubayyid, Muntasser, and Samir Al-Monla with one count of scheming to conceal material facts in violation of 18 U.S.C. § 1001(a)(1), one count of conspiring to defraud the United States in violation of 18 U.S.C. § 371, and one count of obstructing and impeding the Internal Revenue Service in violation of 26 U.S.C. § 7212(a).  The indictment also charged Mubayyid with three counts of filing a false tax return in violation of 26 U.S.C. § 7206(1), and charged Muntasser and Al-Monla with one count each of making false statements in violation of 18 U.S.C. § 1001(a)(2).

The trial of this matter began on November 13, 2007. At the close of the government's evidence, all defendants moved for directed verdicts of acquittal as to all counts. The Court denied those motions except as to Count Eight, which charged all three defendants with obstructing and impeding the IRS in violation of 26 U.S.C. § 7212(a); it granted the motion as to that count as to defendants Muntasser and Al-Monla only. At the time, the Court expressed certain reservations about the sufficiency of the evidence, but permitted the case to go to the jury nonetheless. On January 11, 2008, after nine days of deliberation, the jury rendered a verdict of guilty as to all defendants on all counts but one. The jury acquitted defendant Al-Monla on Count Seven, which charged him with making a false statement to the FBI in violation of 18 U.S.C. § 1001(a)(2).

All defendants renewed their motions after the conclusion of the trial. Although Fed. R. Crim. P. 29(c)(1) normally requires that such a motion be brought within seven days of the verdict, in light of the complexity and importance of the matters raised, the Court granted defendants substantially additional time in which to file their memoranda, and granted the government substantially additional time in which to respond. The briefing was completed on May 9, 2008, and oral argument occurred over two days on May 15 and 16, 2008. The Court rendered its decision from the bench on June 3, 2008. The government moved for reconsideration of that opinion on July 2, 2008.

## III.    **Factual Background**

The evidence at the trial, viewed in the light most favorable to the government, was as follows.

A.     __The Al-Kifah Refugee Center__

Emadeddin Muntasser is a citizen of Libya who has lived in the United States since 1981 and as a permanent resident alien since 1992. In the early 1990's, Muntasser operated the Boston branch office of the Al-Kifah Refugee Center, an organization that supported jihad and mujahideen.[2] The Boston office of Al-Kifah published a pro-jihad newsletter entitled "Al-Hussam," which is an Arabic term meaning "the Sword."

Al-Kifah also engaged in other activities to promote and support jihad and mujahideen. Among other things, it solicited and collected donations for Muslim widows and orphans, including widows and orphans of those who had died in the course of jihad. It distributed a "Zakat Calculation Guide" that was intended to assist devout Muslims in complying with their religious obligations to devote money to charity, which Al-Kifah interpreted to include support for Muslim fighters. Al-Kifah distributed and sold audiotapes, books, and other materials that exhorted Muslims to support jihad, and promoted sermons or lectures by religious figures on similar topics. Some of Al-Kifah's materials stated that the organization was tax-exempt, which was untrue; it was never granted § 501(c)(3) status by the IRS.

The mailing address of the Boston office of Al-Kifah was at 1085 Commonwealth Avenue in Boston.[3] Among the persons who were active in Al-Kifah were Mohamad Akra and Waseem Yassin. Akra was a religious leader who lectured on jihad and other topics; Yassin was described as a "go-around guy" who took care of "anything that needs to be done."

___

[2] The indictment defines "jihad" to mean "violent, religiously-based [*sic*] military conflict overseas." Indictment, ¶ 1. Defendants dispute this definition, contending that "jihad" in fact means "utmost effort" or "struggle" and refers to the obligation of all Muslims to promote and defend Islam.

[3] The address appears to have been the location of a private mailbox provider.

B.    <u>The Incorporation of Care International, Inc.</u>

In 1993, media reports linked Al-Kifah's New York office to the bombing of the World Trade Center.[4]  At some point in 1993, Akra held a meeting at his house with at least three other men:  Afif Kadri (a volunteer who served as the "social person" for Al-Kifah, and who made arrangements for speakers, visitors, or functions), Munther Baara, and Ahmad Nawras. Muntasser was not present at that meeting; neither was Mubayyid, Al-Monla, or Yassin.  Akra asked his guests whether he could use their names in forming a new organization.  The organization's name and purpose were not identified.

On April 13, 1993, Muntasser incorporated Care International, Inc., in Massachusetts. According to its articles of incorporation, Care was "organized exclusively for charitable, religious, educational, and scientific purposes including, but not limited to, engage in, establish, promote, contribute and carry out human welfare, charitable and relief activities, programs, projects, organizations, institutions and funds."  In the articles, Muntasser listed himself as president; Baara as treasurer; Nawras as secretary; and Kadri, Akra, and Yassin as directors. Mubayyid and Al-Monla were not listed.  Muntasser signed and filed the articles; no other person signed them.[5]

_____

[4] The articles were published in Newsweek magazine on March 29, 1993, and in the New York Times on April 11, 1993.  The World Trade Center was the subject of a bombing attack on February 26, 1993, more than eight years prior to the attacks of September 11, 2001, that destroyed the buildings.

[5] Attorney Abdullah Bade, who later assisted Muntasser in the filing of Care's Form 1023, sent a letter to Care (not addressed to any person specifically) around the time of its incorporation.  In that letter, Bade requested that Care send him a copy of the organization's new by-laws.  The letter also contained a handwritten note at the bottom, stating "mail him new meeting minutes."  Care's by-laws, which were signed by Muntasser and Nawras, suggest that a meeting was held at some unspecified point to elect directors.  The government contends that such an organizational meeting was held and (without further citation to the evidence) that Muntasser, Akra, and Yassin attended the meeting.

The activities of the Boston office of Al-Kifah and the activities of Care were essentially the same. Care, like Al-Kifah, was engaged in activities involving the solicitation and expenditure of funds to support and promote jihad and mujahideen. Care had the same mailing address as Al-Kifah's former Boston office and assumed publication of the Al-Hussam newsletter. The same persons who were involved in the operation of the Boston office of Al-Kifah, including Muntasser, Akra, and Yassin, were involved in the operation of Care.

### C.     Misrepresentations on IRS Form 1023

On June 1, 1993, Muntasser filed an application with the Internal Revenue Service seeking tax-exempt status for Care pursuant to 26 U.S.C. § 501(c)(3) on the grounds that it was a charitable organization. An organization seeking such an exemption must submit an IRS Form 1023 (Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code). Form 1023 requires the organization to demonstrate that it is organized and operated exclusively for charitable purposes, and that any non-exempt purpose is incidental and not substantial to its operation.[6] The IRS's initial determination as to whether an organization qualifies for tax-exempt status is based upon the information provided in Form 1023.

The Form 1023 filed by Muntasser stated that Care was recently incorporated; that it would become operational shortly; and that it would provide charitable services, such as "provid[ing] assistance to victims of natural and man-made disasters . . . primarily in Bosnia and

---

[6] At the time, Form 1023 instructed applicants:

Provide a detailed narrative description of all the activities of the organization—past, present, and planned. Do not merely refer to or repeat the language in your organizational document. Describe each activity separately in the order of importance. Each description should include, at a minimum, the following: (a) a detailed description of the activity including its purpose; (b) when the activity was or will be initiated; and (c) where and by whom the activity will be conducted.

8

later in African countries. . . . [and] develop[ing] a program for orphan sponsorships."  Copies of Care's articles of incorporation and by-laws were attached to the Form 1023.

Among other things, the Form 1023 asked whether "the organization [is] the outgrowth of (or successor to) another organization, or does it have a special relationship with another organization by reason of interlocking directorates or other factors," and required the applicant to "explain" if the answer was "yes."  Muntasser answered "no" to this question.

Muntasser filed the Form 1023 on behalf of Care in June 1993.  He signed the form under the pains and penalties of perjury, affirming that the "application, including the accompanying schedules and attachments, . . . to the best of my knowledge . . . is true, correct, and complete."

Muntasser did not disclose to the IRS that Care planned to solicit and distribute contributions for, and issue publications supporting and promoting, jihad and mujahideen. Muntasser likewise did not disclose that Care was an outgrowth of, and successor to, Al-Kifah.

An attorney named Abdullah Bade assisted Muntasser in preparing the application for § 501(c)(3) status.  Muntasser did not disclose all of Care's intended activities to Bade, such as the fact that Care intended to publish the Al-Hussam newsletter.[7]

There was no evidence that Akra or Yassin assisted Muntasser with the application, discussed it with him, or were aware of its existence or filing.  There was no evidence that Akra or Yassin ever discussed tax matters with Muntasser or anyone else, or that they were present when such matters were discussed.

---

[7] On May 12, 1993, Muntasser wrote a letter to Bade describing Care's "proposed activities and budget." He identified five activities:  (1) "assistance to victims of natural or man-made disasters," (2) development of "rehabilitation programs for refugees," (3) development of an orphan sponsorship program, (4) assistance to "reconstruction projects in war-affected areas," and (5) development of an educational assistance program for "inner-city and poor neighborhood schools."

The IRS granted Care tax-exempt status in October 1993. The letter notifying Muntasser of this decision instructed him to report any changes in Care's "purposes, character, or method of operation" to the IRS.

According to the government's witnesses, the IRS would have subjected that application to closer scrutiny, or might not have approved it at all, if Muntasser had supplied truthful and complete answers on the Form 1023.[8]

### D.    The Activities of Care

Care published its first issue of Al-Hussam on April 16, 1993, three days after Muntasser filed the Articles of Organization, and continued to publish it until early 1997.[9] The name, format, typography, and content of the newsletters were essentially identical to the newsletters published by Al-Kifah. The newsletters, which were usually distributed in both English and Arabic, encouraged individuals to support jihad, to join mujahideen on the battlefield, and to donate money to support mujahideen in Bosnia and other areas of conflict. On every Arabic issue of Al-Hussam except one, Care referred to itself as Maktab al-Khidamat ("MAK").[10]

For some period of time, Muntasser and Baara intermingled funds collected by Al-Kifah

---

[8] If the IRS grants an organization tax-exempt status under § 501(c)(3), any donations made to that organization are tax-deductible. The government alleges that between 1993 and 2003, Care collected approximately $1.7 million in donations. Disallowance of tax-exempt status does not necessarily mean that the organization is subject to income tax on the donations received. *See Branch Ministries v. Rossotti*, 211 F.3d 137, 143 (D.C. Cir. 2000).

[9] The last issue was published in January 1997. For some period thereafter, articles from the newsletter were accessible through Care's website.

[10] The phrase "Maktab al-Khidamat" means "Human Services Office." MAK is an organization believed to have been founded in 1984 by Sheik Abdullah Azzam and Osama bin Laden to raise funds and recruit foreign mujahideen for the then-ongoing Soviet-Afghan war. MAK established recruitment and fundraising offices in many Western countries, including the United States, by the late 1980s. The Al-Kifah Refugee Center was, or at one time was, part of MAK.

10

with funds collected by Care. Shortly after filing Care's Articles of Organization, Muntasser and Baara transferred $21,000 from Al-Kifah to Care. Care distributed money raised under both Al-Kifah and Care to many of the same organizations that had received money from Al-Kifah. For example, between October 1993 and June 1995, Muntasser authorized the transfer of more than $120,000 to the "Services Office" in Zagreb, Croatia.

Care also engaged in other activities that were similar (or identical) to the activities of Al-Kifah. Care solicited money for mujahideen through its Al-Hussam newsletters, annual Zakat Calculation Guides, flyers, websites, and lectures.[11] Beginning in 1995, Care published and sold English-language copies of a book entitled "Join the Caravan," authored by Sheik Abdullah Azzam. This book exhorted readers to engage in violent jihad. Beginning in 1996, Care sold pro-mujahideen videotapes. One such videotape was entitled "Badr el Bosna" ("Moon over Bosnia") and displayed cheering mujahideen and the dead bodies of Serbian soldiers. Care also solicited money for an orphan sponsorship program. The program primarily focused on assisting the orphans of jihadist "martyrs." Care further organized pro-jihad lectures during the period 1993 through at least 1996-1997.[12]

---

[11] The government did not charge any of the defendants with material support for terrorism or any other terrorism-based crime. The written jury instructions submitted to the jury prior to deliberations specifically stated "There is no evidence . . . that Care or the defendants provided or financed weapons, armaments, or lethal aid to any party, and you may not speculate or conjecture as to the possible existence of such evidence."

[12] In April 1995, various members of Care held a meeting with Mohammad Chehade and other members of the Global Relief Foundation ("GRF"), an Illinois-based Islamic organization. Translations of Arabic-language notes from this meeting indicate that Care and GRF agreed to coordinate their fund-raising efforts. Additionally, a shura ("advisory") council was created that consisted of Muntasser, Akra, Yassin, and Chehade. The council was to operate "according to the direction and the recommendations of the higher council (the battalion)," and its immediate agenda included scheduling fundraisings, relief programs, and "security affairs." During the same month, Muntasser wrote an Arabic-language letter pledging support in the cause of jihad to Gulbuddin Hekmatyar, an Afghan mujahideen warlord. This letter was signed by Muntasser, Akra, Al-Monla, and Yassin, among others.

Care also engaged in legitimate charitable activities, such as providing support for orphans and widows and providing funds to poor Muslims for animals for religious sacrifices. At least some of the orphans were children of "martyrs," which included Muslims who died committing jihad.

E.     **The Role of Akra in Care**

Shortly after Care was formed, on June 10, 1993, Akra gave a lecture exhorting his listeners to support jihad. Care organized that lecture, and similar lectures over the following years.

Akra was a director of Care for some period after its formation. There was no evidence that he attended any board of directors meetings, or had any role in the day-to-day operations of the enterprise. There was likewise no evidence that he saw, prepared, or signed any tax returns.

In 1996-1997, Akra visited Care's office multiple times and occasionally held lectures (on behalf of Care) on the topic of jihad. During that same time period, Akra participated in several closed-door meetings with Muntasser, Al-Monla, and Yassin. Akra became president of Care in 1998 and remained in that position through 2000. He signed Care's annual reports for 1997, 1998 and 1999, all of which were filed in 2000.

F.     **The Role of Yassin in Care**

Yassin played the same role in Care that he had played in the Boston branch of Al-Kifah—that of a "go-around guy." He was a director of Care for some period of time, and signed annual reports to the Secretary of State on behalf of Care for the years 1993 to 1995. Yassin had some role in the distribution of the Al-Hussam newsletters, at least until 1996. He was also present at lectures and functions where Care solicitation materials were distributed; those

12

materials stated that Care was a "tax-exempt organization."[13]

Two witnesses testified that they heard statements by Yassin that Al-Kifah had changed its name to Care; one of those conversations occurred in 1993, and one in 1996. There was no evidence that Yassin discussed or was involved in the tax affairs of Care, either in 1993 or thereafter.[14]

### G.     The Roles of Muntasser, Mubayyid, and Al-Monla in Care

As noted, Muntasser filed the Articles of Organization for Care, and obtained charitable status for the organization from the IRS, in 1993. He served as Care's president from its founding until 1996. At some point, beginning in approximately 1996, he began to have substantially less involvement in the affairs of Care. He continued to serve on the Executive Committee of Care through 1997, but his role, if any, beyond that time is unclear.

Muhamed Mubayyid is a citizen of Lebanon. He has lived in the United States from 1987 to 1994 and again from 1997 to the present, either as a student or under a work permit. Mubayyid occasionally performed volunteer work for Care during the period from mid-1993 to 1994. He then moved to Australia for approximately three years. He returned in 1997 and became active in Care, serving as its treasurer from 1998 to 2003. As noted below, Mubayyid also signed tax forms on behalf of Care. In 2001, he rented space for Care's records at a storage facility in Westborough, Massachusetts; at some point, he also began to store records at his home.

---

[13] Some of the Al-Hussam newsletters contained solicitations indicating that any donations would be tax-deductible.

[14] The government's brief states that "Yassin was involved in the preparation of fraudulent tax forms for Care for tax years 1993-1995." No citation to the record is given for that statement, and it appears to be unsupported by the evidence.

Samir Al-Monla is a citizen of Kuwait and the United States. He began attending Care meetings in 1995.[15] From 1996 to 1998, he served as the president of Care. Al-Monla also signed tax forms on behalf of Care, as set forth below. Although Al-Monla signed at least one document (Care's 1998 Form 990) on behalf of Care as late as February 2000, his involvement in the organization after 1998 is unclear.

### H.    Misrepresentations on IRS Form 990

An organization that has been granted tax-exempt status pursuant to § 501(c)(3) is required to file an IRS Form 990 (Return of Organization Exempt from Income Tax) for each year in which its contributions received exceed $25,000. The information provided in Form 990 is used by the IRS to determine, among other things, whether an organization that has been granted tax-exempt status remains so qualified. If the IRS determines that an organization is no longer operating consistently with its tax-exempt status, that status will be revoked.

From 1993 to 2003, Care—acting through Muntasser, Mubayyid, and others—filed various Form 990 returns with the IRS, usually on an untimely basis. The 1993 and 1994 Forms 990 were signed and filed by Muntasser in February 1996; the 1995 form, by Muntasser in September 1996; the 1997 form, by Mubayyid in June 2002; the 1998 form, by Al-Monla in March 2000; the 1999 form, by Mubayyid in November 2000; and the 2000 form, by Mubayyid in July 2001.[16]

---

[15] Al-Monla had some involvement with selling books or tapes for Care and soliciting donations as early as 1993.

[16] The 1996 Form 990 was signed by Nasir Al-Qadeeri at some point after 1997.

Question 76 on each Form 990 asked the following question:

Did the organization engage in any activity not previously reported to the IRS?  If yes, attach a detailed description of each activity.

None of the returns reported any changes in Care's activities from the Form 1023, or otherwise disclosed that Care was engaged in activities involving the solicitation and expenditure of funds to support and promote jihad and mujahideen, including the distribution of pro-jihad publications.

## I.    Interviews of Muntasser by FBI

Muntasser was interviewed by the FBI in April 1999 and April 2003.  At both interviews, Muntasser stated that Care was a charitable organization and did not disclose that it was engaged in activities supporting jihad and mujahideen.

During the April 1999 interview, Muntasser disclosed that he had traveled to Pakistan in late 1994 or early 1995.  He did not disclose the fact, however, that during the same trip he also traveled to Afghanistan in furtherance of Care's activities and to meet with Gulbuddin Hekmatyar, an Afghan mujahideen warlord.  Muntasser told the FBI that he was a "director" of Care from 1994-1995, and that while a director he spent much of his time determining to whom Care should direct its fundraising efforts.  He further stated that he personally investigated overseas charitable organizations that could provide food and shelter to war victims.

Special Agent Christopher Peet of the FBI and another agent interviewed Muntasser again on April 7, 2003.   At the time of the interview, Peet was a member of a joint terrorism task force that included, among others, representatives of the FBI and the Criminal Investigation Division of the IRS.[17]

---

[17] In order to avoid undue prejudice, the Court did not permit the government at trial to refer to the task force as a "terrorism" task force.

Peet testified that the "purpose of the interview was to inquire of Muntasser what his relationship with -- was with Care International and, again, what that relationship was with Al-Kifah." Muntasser told the agents that he became involved in Al-Kifah through Mohammad Chehade, who later became affiliated with GRF.

According to Peet, "the types of questions that we were asking were -- we wanted to establish what the relationship was between Care and Al-Kifah." Muntasser stated that Care was created approximately six or seven years prior to the date of the interview, after Al-Kifah was dissolved. Muntasser also said that he had been Care's president for its "first couple of years." Muntasser also said that Al-Kifah and Care "had the same basic mission. They may have had a slightly different focus, but they had the same basic mission. In fact, they had the same office space on Commonwealth Avenue. Additionally, some of the officers that served in Care also served in Al-Kifah." Muntasser also stated that the purpose of Care was essentially the same as that of Al-Kifah.

Muntasser also stated that Care was formed after he had attempted to obtain tax records from Al-Kifah, and that he had been unable to obtain those records after having sent a registered letter to the organization in New York. Muntasser described Care as "a charitable organization" that raised money through direct mailings, after prayers at local mosques, and through solicitation on their internet website. Muntasser would approve "wherever the funds were going to be dispersed." Muntasser also stated that Care "sponsored a program which provided training in alternative means of employment for those who had been injured in the Soviet-Afghan war."

Peet testified that Muntasser acknowledged a trip to Pakistan in 1994, but repeatedly

denied having traveled to Afghanistan.[18]  Muntasser also denied ever meeting Gulbuddin

Hekmatyar.  Peet testified that he would have asked additional questions, such as inquiring about

the location of safe houses, had Muntasser acknowledged traveling to Afghanistan.  "It would

have drastically changed the scope of the interview . . . we would have been much more focused

on the Afghan part and probably less on the Care part."

### J.    Muntasser's Application for Citizenship and CBP Interview

In October 2002, Muntasser submitted an Application for Naturalization to the former

Immigration and Naturalization Service.[19]   Question C in Part 7 asked that the applicant "list

below all trips of 24 hours or more that you have taken outside of the United States since

becoming a Lawful Permanent Resident."  Muntasser only listed trips for the previous five years,

and thus did not include his trip to Afghanistan in 1994 or 1995.  Question 8 in Part 10 asked,

"have you ever been a member of or associated with any organization, association, fund,

foundation, party, club, society or similar group in the United States or any other place?"  In

addition, the question also required that the applicant "list the name of each group below."

Muntasser left the form blank.

Muntasser submitted an amended Naturalization Application in November 2003.  In

response to Question C in Part 7, Mr. Muntasser listed multiple additional trips, including his trip

to Afghanistan.  Muntasser also provided a list of organizations with which he had been

associated, including both Care and Al-Kifah.

---

[18] Peet testified that Muntasser requested an attorney after the agents pressed him as to whether he had traveled to Afghanistan.

[19] The relevant functions of the former Immigration and Naturalization Service have since been transferred to the Department of Homeland Security.

John Fernandez, an officer with the Customs and Border Protection agency, interviewed Muntasser after his arrival in the United States following a trip to Libya in April 2004. The interview was part of a "deferred inspection" to determine whether Muntasser was eligible to remain in the United States. Fernandez testified that the "focus" of the interview was to explore Muntasser's amended responses on the Naturalization Application, and to consider whether, in light of Muntasser's travel outside the United States, there were any grounds for sustaining an abandonment of residency charge.

Fernandez asked Muntasser which countries he had visited since becoming a permanent resident, and he responded that he had traveled to Afghanistan, among others. Fernandez asked why he filed an incomplete Naturalization application in October 2002; he responded that his previous counsel had advised him to go back only five years. Fernandez asked why he had visited Afghanistan and Pakistan in 2004; he responded that it was in connection with his "humanitarian work" with Care. He did not disclose his meeting with Hekmatyar. Fernandez permitted Muntasser to remain in the United States.

### K.    Interview of Mubayyid by Massachusetts State Police and FBI

On September 16, 2001, Massachusetts Trooper Richard Ball, a member of a FBI task force, and FBI Special Agent Victor Treadway interviewed Mubayyid. The interview was relatively brief, and took place not long after the September 11 attacks. Mubayyid described Care as a charitable organization, and did not mention Care's support for jihad or mujahideen. Ball asked Mubayyid about the recipients of Care donations in 2000. Mubayyid identified one beneficiary, GRF, but no others. Mubayyid did not reveal to Ball that Care contributed $3,500 in 2000 to the widow and orphans of Bassam Kanj, a radical Islamist who died while fighting

Lebanese forces in January 2000.

### L.    The Destruction of Documents

As noted, Mubayyid was interviewed on September 16, 2001, by Trooper Ball and Agent Treadway.  Two weeks later, On October 2, Mubayyid told Mohammad Chehade, a former Al-Kifah member and GRF's president, that he suspected the FBI had searched Care's "old location."  Chehade instructed Mubayyid to remove evidence of Care's activities from the storage unit.

On October 4 and 5, 2001, the FBI conducted a FISA search of the storage unit rented by Mubayyid.  The search uncovered the pledge of support to Hekmatyar, the notes of the Care/GRF meeting, a printout of an e-mail sent from Azzam Publications to Care, and hundreds of other documents.[20]  The FBI made copies of certain documents and put the originals back in the storage unit.

The storage unit remained under Mubayyid's control between October 2001 and April 2003.  In April 2003, the FBI (in conjunction with the IRS and state police) searched it again.  During the search, the Care/GRF meeting notes, the pledge of support to Hekmatyar, and the Azzam Publications e-mail were not found.  A document shredder was observed in the unit that had not been observed in October 2001.[21]

### M.    Interview of Al-Monla by FBI

In January 1996, Special Agent Brendan Cleary of the FBI interviewed Al-Monla.  Al-

---

[20]  The e-mail addressed the issue of how to transfer money to "fighting groups" and mujahideen in Kosovo.

[21]  During a search of Mubayyid's residence that occurred on the same day as the search of Care's storage unit, the Azzam Publications e-mail was found among Al-Kifah and Care Al-Hussam newsletters.  The meeting notes and pledge of support to Hekmatyar, however, were not.

Monla described Care as an organization whose main objective was to raise funds for widows and orphans in Bosnia. Al-Monla did not tell Cleary that Care's orphan sponsorship program included support of the orphans of martyrs. Cleary asked Al-Monla about Care's activities; Al-Monla responded that "it was a social organization" that invites scholars and clerics to give speeches. Al-Monla did not tell Cleary that Care distributed the Al-Hussam newsletter.

On September 17, 2001, FBI Special Agent Bradley Davis and three other investigators interviewed Al-Monla again.[22] Among other things, Davis asked Al-Monla about Care's activities. Al-Monla responded that Care solicited donations in support of refugees, widows, and other needy Muslims who were affected by fighting in the countries of Bosnia, Chechnya, and Afghanistan. Al-Monla also said that he solicited and received donations for Care and transferred that money to other charitable organizations. Al-Monla said that as president of Care, he was responsible for ensuring that the money was distributed appropriately. Al-Monla denied ever supporting activities related to jihad.

On April 7, 2003, Davis again interviewed Al-Monla. Davis again asked Al-Monla about Care. Al-Monla described Care as a charitable organization on whose behalf he solicited donations in support of widows, orphans, and mosques. Al-Monla stated that Care raised an average of $30,000 – $40,000 per year.[23] He further stated that Care sometimes would provide funds to the Global Relief Foundation to distribute. He was asked whether Care had any association with Benevolence International Foundation, Holy Land Foundation, or Help the

---

[22] There was no evidence presented that Davis, or anyone else present, was a member of the joint terrorism task force.

[23] The true figure, as reflected on the Forms 990, was much higher.

Needy; he denied that Care worked with those organizations.

Al-Monla stated that 85-90% of the donations went to charitable organizations. He said that no one at Care had received a salary, and that they were all volunteers.[24] Al-Monla also described a trip he took to Pakistan in 1990-91.

After Al-Monla had made a number of statements concerning Care, the agents advised him that they did not feel he was being truthful. Davis then asked him whether he knew Bassam Kanj. Al-Monla denied knowing Kanj. Davis asked Al-Monla again whether he knew Kanj, describing him as a man who had died while fighting in Lebanon who may have been known by other names. Al-Monla again denied knowing Kanj or anyone who had fought in Lebanon.[25] Finally, Al-Monla was asked whether he had ever been to Afghanistan, which he denied. Davis did not ask Al-Monla any questions concerning Care's status as a charitable organization, or any other matter concerning the tax laws.

## IV.    Analysis

Each defendant has moved for judgment of acquittal under Fed. R. Crim. P. 29 on the ground that the evidence was insufficient as a matter of law to sustain the conviction. In making its evaluation, the Court is required to consider the evidence and any reasonable inferences that may be drawn from it in the light most favorable to the government. *E.g., United States v. Duclos*, 214 F.3d 27, 32 (1st Cir. 2000); *United States v. Pappathanasi*, 383 F. Supp. 2d 289,

---

[24] There was evidence that Al-Monla received a salary of approximately $3,300.

[25] In a telephone conversation on April 6, 2000, Al-Monla told Chehade about how much Kanj had meant to him, and how generous Kanj had been toward Al-Monla when he had last traveled to Lebanon and visited Kanj and his men. Al-Monla also told Chehade how Kanj lived there, and how he and his hundreds of men had resisted a much larger force. Al-Monla and Chehade also discussed their shared obligation to support Kanj's widow, Marlene.

290 (D. Mass. 2005).

## A.     Count One – Concealment of Fact – 18 U.S.C. § 1001(a)(1)

Count One charges concealment of material facts in violation of 18 U.S.C. § 1001(a)(1).

That statute generally makes it a criminal offense to knowingly and willfully make a false

statement "in any matter within the jurisdiction of the executive, legislative, or judicial branch of

the Government of the United States." Defendants were charged in Count One under

§ 1001(a)(1), which makes it a crime to falsify, conceal, or cover up "by any trick, scheme, or

device a material fact." By contrast, Counts Three, Four, and Five charged defendant Mubayyid,

and Count Six charged defendant Munstasser, under § 1001(a)(2), which makes it a crime to

make "any materially false, fictitious, or fraudulent statement or representation."[26]

The "concealment" form of the crime has at least two significant differences from the

"false statement" form of the crime. The first difference is that the concealment must occur by a

"trick, scheme, or device," which has been interpreted to mean that there must be an affirmative

act or concealment, not simply a passive failure to reveal a material fact. *United States v. St.*

*Michael's Credit Union*, 880 F.2d 579, 589 (1st Cir. 1989). The second difference is that the

concealment must take place under circumstances where there is a duty to disclose. *United States*

*v. Anzalone*, 766 F.2d 676, 683 (1st Cir. 1985).[27]

### 1.     The Charge to the Jury on Count One

---

[26] As noted, Count Seven, as to which the jury rendered a verdict of acquittal, charged Al-Monla with the making of a false statement under § 1001(a)(2).

[27] The government has argued at great length that it did not need to prove, in a prosecution under § 1001(a)(1), that the defendant had a legal duty to disclose the material facts alleged to have been concealed. That assertion is clearly incorrect. *See Anzalone*, 766 F.2d at 683 (". . . in prosecuting a § 1001 concealment violation, it is incumbent upon the government to prove that the defendant had a *legal duty to disclose* the material facts at the time he was alleged to have concealed them.") (emphasis in original).

Count One specifically charged the following:  "defendants . . . did knowingly and willfully falsify, conceal and cover up by trick, scheme and device material facts from the Internal Revenue Service ("IRS"), the Federal Bureau of Investigation ("FBI"), and the Immigration and Naturalization Service, now part of the Department of Homeland Security, ("INS/DHS") . . . ."  Thus, the agencies from whom the facts were alleged to have been concealed were the IRS, the FBI, and the INS.  The facts that were alleged to have been concealed were that Care International was an "outgrowth of and successor to" the Al-Kifah Refugee Center and was "engaged in non-charitable activities involving the solicitation and expenditure of funds to support and promote mujahideen and jihad."

As charged, Count One was not necessarily limited to tax issues.  The FBI, for example, might well consider the use of ostensibly charitable funds to support jihad and mujahideen to be material to an investigation within its jurisdiction.  The government, however, submitted a proposed jury instruction at the close of the evidence that effectively narrowed the prosecution to a tax-related offense.  Specifically, the government requested the following instruction:

> The government need not prove that the disclosure of the concealed fact would have resulted in a denial of government benefit, but rather that the disclosure of the fact would have influenced *the IRS's* investigation, handling, or consideration of Care's eligibility for tax-exempt status under Section 501(c)(3).  Accordingly, if you find that had *the IRS* known that Care was a successor or outgrowth of Al-Kifah, or Care was planning to solicit money for armed fighters engaged in activities involving the expenditure of money to support or promote fighting, if *the IRS* were to subject to Care's 501(c)(3) application to closer scrutiny, you should conclude that those facts were material.

(Gov't. Prop. Jury Instr. 11) (emphasis added).  The government did not propose a similar instruction concerning the impact of a concealed fact on the FBI or any other agency.

During the Rule 29 argument at the close of the evidence—that is, the argument

concerning defendants' motions for judgments of acquittal—counsel for Muntasser noted that the government's proposed jury instruction "acknowledge[d]" that the scheme charged in Count One was "a scheme based on the duty to disclose to the IRS that was owed to the IRS." (Tr. 23:108).[28] Counsel for the government responded by arguing that Count One was not so limited. (Tr. 23:114-15). Defense counsel then pointed out that the government's proposed jury instruction in fact "limits materiality on Count 1 to the IRS." (Tr. 23:116). Counsel for the government responded that the instruction contained "a scrivener's error, nothing else." *Id*. Counsel did not, however, seek to withdraw or correct the instruction.

At the charge conference—that is, the conference with counsel to discuss the proposed jury charge—the topic was not raised again, either by the defense or by the government. Again, the government did not formally withdraw its proposed jury instruction, and did not propose a different instruction.

When it charged the jury, the Court gave the following instruction, which was a modified version of the government's request:

> Here, the government alleges that the concealed facts would have had a natural tendency to influence or be capable of influencing *the IRS* in making *its* determination of whether Care International qualified for tax-exempt status under Section 501(c)(3) of the Internal Revenue Code, and should continue to be afforded that status thereafter. The government need not prove, however, that Care International would have been denied tax-exempt status, or had that status revoked, had those facts been disclosed.

(emphasis added). At the close of the instructions, the Court gave all counsel an opportunity to object to the instructions as given; again, the government did not object, and did not propose any

---

[28] Counsel for Muntasser went on to argue that "if in a conversation with the INS, or with the FBI, in which the defendant has no intent related to the IRS and no duty to disclose to the IRS, he can't be involved in a scheme, whether continuing or otherwise, related to a duty grounded in IRS law." (Tr. 23:109).

addition or correction to the instruction.

The government now argues that the Court's instruction was erroneous, and that it did not intend to narrow the charge. If, however, that instruction was unfair to the government, the government is hardly blameless. It requested a narrowing instruction, never withdrew it, and never raised any objection to the Court's instruction, either during the charge conference (when the Court was specifically addressing the issue of the instructions before they were delivered) or at the close of the jury charge (when the Court was asked to, and did, give a number of clarifying or supplemental instructions).[29] Under the circumstances, the Court cannot simply ignore the government's actions, and act as if the instruction had never been given. Furthermore—and more fundamentally—the Court cannot uphold a jury verdict on a theory as to which the jury was never instructed.

Accordingly, a fact concealed by the defendants could only be material—and, therefore, form the basis of a conviction under Count One—if it had a natural tendency to influence or be capable of influencing the IRS in making its determination whether Care qualified for tax-exempt status. To put it another way, the question is not simply whether the defendants concealed facts or concealed facts from the government; the question is whether they concealed specific tax-related facts from the IRS within the statute of limitations period.

### 2.    The Accrual of the Limitations Period

The relevant limitations period for prosecutions under 18 U.S.C. § 1001 is five years. 18

---

[29] It is true that the government referred to the instruction as containing a "scrivener's error" during the Rule 29 conference. The government apparently contends that the Court should have picked up on that passing reference (at a conference on a different topic) and that it need not have made any further effort to offer a substitute instruction or to make an objection at the appropriate time. The Court respectfully disagrees.

U.S.C. § 3282(a).[30]  Specifically, the statute of limitations provides that no person may be

"prosecuted, tried, or punished" for such an offense unless the indictment has been returned

"within five years next after such offense shall have been committed."  *Id.*

      The dates on which any concealment crime under § 1001(a)(1) was "committed" for

statute of limitations purposes is disputed in this case.  Normally, a limitations period in a criminal

case begins to run "when the crime is complete," whether or not the government has discovered

the existence of the crime.  *See Toussie v. United States*, 397 U.S. 112, 115 (1970), (*quoting*

*Pendergast v. United States*, 317 U.S. 412, 418 (1943)).[31]  Defendants contend that the

concealment crime was last "committed" when the last affirmative act of concealment occurred,

and that the limitations period began to run at that point.  The government contends, however,

that § 1001(a)(1) is a "continuing offense" that remains ongoing as long as the material fact at

issue remains concealed.

      In essence, the government argues that because the perpetrator of a concealment crime

continues to reap the benefit of the crime as long as the concealment continues, the crime is not

complete (and thus continues to be "committed") until the crime is discovered.  Thus, for

example, the government argues that although Muntasser first concealed material facts in 1993 by

---

[30] The general federal criminal statute of limitations period is five years.  *Id.*  For tax prosecutions brought under Title 26, and for certain conspiracies to defraud the United States under 18 U.S.C. § 371, the period is six years.  26 U.S.C. § 6531.  The defense, without objection from the government, erroneously requested an instruction to the jury indicating that the limitations period as to Count One was six years.  Because the difference is not material to its ruling, the Court will apply the correct statute of limitations, that is, the five-year limitations period.

[31] In this context, at least, it is not helpful to analyze the matter by ascertaining when the crime was "complete."  Arguably, the charged offense was "complete"—that is, all of its elements had been satisfied—in 1993 when Muntasser submitted the Form 1023 to the IRS.  The issue is more properly framed as determining when the crime was last "committed"—which was either at the time of the last affirmative act of concealment (as defendants maintain) or as long as the matter remained concealed (as the government maintains).

the filing of a false Form 1023, he continued to reap the benefit of that act of concealment, and subsequent acts, for more than a decade thereafter.  The benefits that the government contends that Muntasser continued to enjoy were (1) he continued to avoid prosecution, (2) he enjoyed "immigration benefits" (presumably, his continued status as a non-resident alien), and (3) the organization he founded (Care) continued to keep its tax exemption.  Indeed, the government argues that the scheme to conceal "continues to this day"—in other words, that the limitations period has never begun to run.  (Gov't Mem. at 112).

The leading case on the question of what constitutes a "continuing offense" is *Toussie v. United States*, 397 U.S. 112 (1970).  In *Toussie*, the Supreme Court held that whether a crime is "continuing" for statute of limitations purposes is essentially a matter of statutory construction.  *Id*. at 115.[32]  A crime will not be deemed a "continuing" offense "unless the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one."  *Id.*

There is no explicit language making § 1001(a)(1) a continuing offense.[33]  The question, therefore, is whether the nature of the crime is such that Congress must have "assuredly intended" that it be treated as continuing.

The government's argument turns principally on the meaning of the word "scheme" in

---

[32] *Toussie* involved a criminal prosecution of an individual who had failed to register for the draft.  The government argued that the crime continued to be committed every day that Toussie did not register.  397 U.S. at 114.  The Supreme Court disagreed, and held that the crime was committed at the time he was required to register and failed to do so, which was eight years prior to the prosecution.  *Id.*

[33] *Compare, e.g.,* 18 U.S.C. § 3284 ("The concealment of assets of a [bankruptcy] debtor . . . shall be deemed to be a continuing offense" until discharge); 50 U.S.C. § 856 ("Failure to file a registration statement . . . is a continuing offense for as long as such failure exists, notwithstanding any statute of limitation or other statute to the contrary.").

§ 1001(a)(1). As noted, it is not a crime merely to conceal a material matter; it must be done by a "trick, scheme, or device." The government argues, in substance, that the word "scheme" is "readily understood as an event that occurs over a period of time," and that therefore Congress must have intended that the crime be treated as a continuing offense. There are at least several problems with that theory.

First, there is nothing about the nature of the crime itself to indicate that Congress "assuredly intended" to make the "scheme" component of § 1001 a continuing offense. *United States v. Dunne*, 324 F.3d 1158, 1164-65 (10th Cir. 2003); *cf. United States v. Bailey*, 444 U.S. 394, 413-14 (1980) (escape from federal custody under 18 U.S.C. § 751(a) is a continuing offense). Unlike the escape of a prisoner, there is nothing inherent in the crime of making a false statement that produces a "continuing threat to society." *Id.* at 413. And the fact that a perpetrator of a concealment scheme might enjoy a substantial benefit long after the crime has been completed is hardly unique. Many federal crimes—for example, mail fraud, wire fraud, tax evasion, and theft—are likely to produce benefits to the perpetrator after the crime has been committed, but have not been held to be continuing offenses for statute of limitations purposes.

Second, the substantial weight of authority is against the government. At least two courts have held that § 1001 does not create a "continuing offense" for statute of limitations purposes. *See Dunne*, 324 F.3d at 1164-67; *United States v. Gremillion-Stoval*, 397 F. Supp. 2d 798, 801-02 (M.D. La. 2005); *see also United States v. Grenier*, 513 F.3d 632, 639 (6th Cir. 2008) (noting that government had conceded that § 1001 was not a continuing offense).[34] Similarly,

---

[34] *But see United States v. Shaw*, 150 Fed. Appx. 863, 876 n. 27 (10th Cir. 2005) (unpublished). The *Shaw* court held that a "scheme" offense under § 1001 was a continuing offense, and distinguished *Dunne* on the ground that the offense there was not charged under the "scheme" provision. However, the defendant in *Shaw* in

other courts have concluded that the mail fraud statute, 18 U.S.C. § 1341, the wire fraud statute, 18 U.S.C. § 1343, and the Major Fraud Act, 18 U.S.C. § 1031(a), all of which use the word "scheme," are not continuing offenses for statute of limitations purposes. *See, e.g., United States v. Barger*, 178 F.3d 844, 847 (7th Cir. 1999) (mail fraud); *United States v. St. Gelais*, 952 F.2d 90, 96-97 (5th Cir. 1992) (wire fraud); *United States v. Reitmeyer*, 356 F.3d 1313, 1321-25 (10th Cir. 2004) (Major Fraud Act).

Third, the government's theory that the "scheme" continued as long as the defendant continued to reap the benefits from his crime runs directly to the reasoning of *Toussie*. The defendant in *Toussie* had failed to register for the draft, and clearly enjoyed the very substantial benefit of avoiding military service long after he initially failed to register; the Supreme Court nonetheless held the crime was not a continuing offense.

Finally, it is well-settled that criminal limitations statutes are "to be liberally interpreted in favor of repose." *Toussie*, 397 U.S. at 115 (*quoting United States v. Scharton*, 285 U.S. 518, 522 (1932)). But under the government's theory, the limitations period generally would not begin to run until the defendant confessed and disclaimed any and all right to the benefits of his crime. It would be difficult to say when the limitations period would accrue under such a theory. Indeed, it would never accrue in most cases; the government contends that it never accrued here. Such a result is plainly contrary to the general principle favoring repose, and should not be lightly inferred.

The government relies principally on *United States v. Hubbell*, 177 F.3d 11 (D.C. Cir.

---

fact committed multiple affirmative acts of concealment within the limitations period, and therefore the ruling was entirely unnecessary. Furthermore, the Court appears to have misunderstood the distinction between when a crime is "complete" and when it was last "committed." *See id.* at 875-76.

1999), in support of its claim. *Hubbell* involved a dismissal of an indictment brought under

§ 1001 on grounds of vagueness. The Court of Appeals reversed, noting that § 1001 permits the

charging of a concealment by scheme; it made no reference to the statute of limitations. In its

opinion, it quoted its 1956 decision in *Bramblett v. United States*, 231 F.2d 489 (D.C. Cir. 1956),

in which the defendant had committed an offense by "falsifying a material fact, and . . . leaving it

on file, thereby continuing the falsification in order repeatedly to partake of the fruits of the

scheme," in the form of receiving and cashing checks to which he was not entitled. *Hubbell*, 177

F.3d at 13 (internal quotations omitted). The *Hubbell* court then referred to the offense in

*Bramblett* as a "continuing crime of falsification."

     As noted, *Hubbell* is not a statute of limitations case, and does not purport to be.

Furthermore, *Bramblett* was decided long before the Supreme Court's decision in *Toussie*, and is

hardly persuasive authority as to the interpretation of § 1001 under that case.[35] In any event, to

the extent that *Hubbell* purports to stand for the proposition that "scheme" crimes under § 1001

are "continuing offenses," this Court finds it unpersuasive and declines to follow it.

     Accordingly, the Court concludes that the crime described in § 1001(a)(1) is not a

"continuing offense" for statute of limitations purposes. That crime is "committed," within the

meaning of 18 U.S.C. § 3282(a), when the defendant commits an affirmative act of concealment

in furtherance of the scheme. Each new affirmative act of concealment is a new criminal act,

triggering a new limitations period. Mere continuation or acceptance of an illegally-obtained

benefit, however, is not enough to extend the accrual of the limitations period.

---

[35] The Court also notes that the defendant in *Bramblett* undertook a series of continuing affirmative acts within the limitations period (such as cashing checks); he did not simply passively maintain his silence.

### 3.    The Evidence as to Defendant Muntasser

The next question is whether defendant Muntasser concealed tax-related matters from the IRS within the five-year limitations period.  Muntasser was indicted on May 11, 2005.  Accordingly, the government must prove that Muntasser committed the crime charged under § 1001(a)(1) at some point after May 11, 2000.

As noted, Muntasser filed a Form 1023 seeking charitable status for Care in 1993.  In 1996, he signed and filed three Forms 990, covering the years 1993 through 1995.  All of those acts, however, occurred between nine and twelve years prior to the indictment.  Only three potential affirmative acts of concealment were committed by Muntasser within the limitations period.

First, in October, 2002, Muntasser submitted a naturalization application to the INS.  The application form asked whether he had ever been a member or associated with any organization or group; he did not answer the question and left the space blank that required him to list the name of each such organization or group.[36]

Second, in April 2003, Muntasser was interviewed by Special Agent Peet of the FBI.  Among other things, Muntasser described Care as a "charitable" organization and described certain aspects of its relationship to Al-Kifah.

Third, in April, 2004, Muntasser was interviewed by Agent Fernandez of the CBP.  Muntasser was asked why he visited Afghanistan and Pakistan in 1994, and he responded that the purpose of the trip was to do humanitarian work.  He did not reveal that he had met with

---

[36] Muntasser filed an amended application in November 2003, providing a list of organizations with which he had been associated that included both Care and Al-Kifah.

Hekmatyar, an Afghan mujahideen warlord, during the course of that trip.

None of those affirmative acts of concealment were made to the Internal Revenue Service. Again, the case was submitted to the jury on the theory that a concealed fact could be material only if it had a natural tendency to influence or to be capable of influencing the IRS in making its determination whether Care qualified for tax-exempt status under § 501(c)(3) of the Internal Revenue Code. The question, then, is whether an act of concealment of tax-related information to the FBI, the INS, or the CBP could influence the IRS in making a tax-status determination.[37]

### a.      Whether Muntasser Concealed Material Facts

As an initial matter, Muntasser clearly had a duty to answer truthfully (or to decline to answer) any questions posed by the government, whether asked in person by the FBI or the CBP or in writing on an INS application form. *See Bryson v. United States*, 396 U.S. 64, 72 (1969). Conversely, Muntasser had no general obligation to answer a question that was not asked or otherwise to volunteer information. *Cf. United States v. Lopez*, 482 F.3d 1067, 1078 n.13 (9th Cir. 2007) ("[A] person detained by police has no general obligation to answer questions or volunteer information" (*citing Davis v. Mississippi*, 394 U.S. 721, 727 n.6 (1969)).

Viewing the evidence in the light most favorable to the government, the Court concludes there is sufficient evidence to establish that Muntasser concealed information from the FBI (and at least the CBP) that would have been material to the IRS—if it had been communicated to the IRS.

First, Muntasser concealed the fact that Care engaged in non-charitable activities. He did

---

[37] The government, of course, could have simply charged Muntasser with making false statements to the FBI in violation of § 1001(a)(2); in fact, he was charged under that prong of the statute in Count Six.

so, in large part, simply by telling the FBI that Care was a "charitable" organization. Muntasser told the FBI that Care raised money for charitable purposes through direct mailings after prayers at local mosques and through solicitation on an internet website. He also said that Care was involved in orphan sponsorships, supporting vocational schools in several countries, and providing training to veterans. Although true as far as it goes, an accurate response would have been to state that Care also engaged in various non-charitable activities, including supporting and promoting jihad and mujahideen. While far from overwhelming, that evidence is sufficient to show willful concealment under the statute.[38]

It is less clear that Muntasser concealed anything material as to the "successor and outgrowth" issue. He told the FBI that Al-Kifah and Care had the same basic mission, had the same essential purpose, used the same office space, and had some of the same personnel, all of which was true.[39] He did, however, misstate the reasons Care was formed; he told the FBI that he had formed it because he had attempted to obtain tax records from Al-Kifah New York, and that he was unable to do so, even after having sent a registered letter to Al-Kifah.

Muntasser also gave a false response on the INS application form by failing to name any organization or group to which he belonged. The form did not, however, ask about "successor or outgrowth" issues or charitable activities.

Finally, in the 2004 CBP interview, Muntasser did not reveal all of the purposes for his trip to Afghanistan and Pakistan, and instead indicated only that he was doing humanitarian work.

---

[38] Muntasser also misstated the date that Care was formed, stating that it had been formed six to seven years previously, when in fact the period was approximately ten years.

[39] Agent Peet of the FBI testified that the purpose of the interview was to ask Muntasser what his relationship was with Care International and what that organization's relationship was with Al-Kifah.

A truthful response would have been, in substance, that he had visited Afghanistan and Pakistan to conduct both humanitarian work and non-humanitarian work supporting jihad and mujahideen, including meeting with Hekmatyar.

It is not enough that the matters concealed be false; they must also have been material—that is, they must have been capable of influencing the IRS in its determination of the tax status of Care. *United States v. Arcadipane*, 41 F.3d 1, 7 (1st Cir. 1994). At the very least, there was evidence that Muntasser concealed the fact that Care was engaged in non-charitable activity. It seems clear, therefore, that if the information concealed from the FBI and the CBP had been communicated to the IRS, it would have been capable of influencing the agency in its determination of Care's charitable status, and was therefore material. The question then becomes whether the information concealed from the FBI or the CBP impaired, or was reasonably capable of impairing, the functions of the IRS.

### b.    Whether the Concealed Information Impaired the IRS

As a starting point for that analysis, it is well-established that a person may violate § 1001 even if the false statement in question was not made directly to a federal agency. Section 1001 prohibits false statements concerning "any matter within the jurisdiction of the executive, legislative, or judicial branch of the United States." For jurisdictional purposes,

> . . . a concealment or misrepresentation need not be made directly to a federal agency or department to sustain a § 1001 conviction. The government, however, must prove a nexus, a necessary link, between the deception of the nonfederal agency and the function of the federal agency. The link may be established by showing that the concealment or false statements result in the perversion of the authorized functions of the federal department or agency.

*St. Michael's Credit Union*, 880 F.2d at 591 (citations and internal quotations omitted).

Thus, false statements made to state agencies or to private parties may qualify as false statements to a federal agency. *See, e.g., id.* at 590-91 (false statements made to a state bank examiner, who was instructed by IRS to enforce currency transaction reporting laws); *United States v. Petullo*, 709 F.2d 1178, 1180 (7th Cir. 1983) (false work vouchers for snow removal submitted to city, which was using federal funds to pay for the work); *United States v. Notarantonio*, 758 F.2d 777, 786-87 (1st Cir. 1985) (false invoices and certificates for construction work submitted to a bank to release construction funds where the loan was guaranteed by the Small Business Administration); *United States v. Baker*, 626 F.2d 512, 514-16 (5th Cir. 1980) (false time sheets for work hours were submitted to city, which paid for services under the federal grant).

In each of those cases, there was some causative link between the falsehood (or concealment) and the impairment (or likely impairment) of the federal agency. In *St. Michael's Credit Union*, for example, a credit union employee showed copies of currency transaction reports to state bank examiners, stating falsely that the reports had been filed with the IRS; the bank examiner was auditing the credit union to ensure its compliance with state and federal laws and regulations and, in fact, had been specifically instructed by the government to enforce the CTR laws against state banking institutions. 880 F.2d at 582. In *Notarantonio*, the false invoices and construction certificates submitted to the bank to obtain loan proceeds endangered the SBA guarantee of that loan. 758 F.2d at 786-87.

Although there does not appear to be case law on point, by analogy the same principle should apply to information concealed from one federal agency that is alleged to have impaired the functions of another. Certainly it would be unreasonable to assume that concealment from

one federal agency is necessarily a concealment from all. The FBI, the CBP, and the IRS are highly structured agencies, with reasonably clear jurisdictional boundaries. The FBI and the CBP do not determine the charitable status of corporations, and, in the ordinary course, do not enforce the tax laws of the United States. Accordingly, a false statement to the FBI or the CBP could impair the functions of the IRS only if there were a sufficient nexus, or link, between the deception of one and the impairment of the function of the other. The question then is whether such a nexus was proved here.

The only evidence of any type of connection established at the trial was that of Agent Peet of the FBI, who interviewed Muntasser in April 2003, was a member of a joint terrorism task force that included representatives of the FBI and the IRS Criminal Investigation Division.[40] There was no evidence, however, that the FBI spoke to the IRS before or after the interview; that any FBI agent contemplated sharing any tax information with the IRS; that the FBI routinely shared such information with the IRS; that it expected to, or intended to, or was reasonably likely to, share such information. And there was no evidence of any link or connection of any kind between the INS or the CBP and the IRS.

The validity of Count One therefore turns upon the following question: whether the mere existence of a joint task force including both the FBI and the IRS-CID supports the reasonable inference that if the material information concealed by Muntasser had been provided to the FBI, the FBI would have shared it with the IRS-CID, which would have passed it onto the IRS charitable organizations division, which would have reevaluated Care's § 501(c)(3) status.

Proof of a crime beyond a reasonable doubt need not rest solely on direct evidence, but

---

[40] The IRS also participated in the search of Mubayyid's home and storage locker in April 2003.

may be based on reasonable inferences from the evidence. At some point, however, an inference is simply too tenuous to sustain a conviction. This is such a case. The inference that a concealment of tax-related information from the FBI could impair the functions of the IRS is unreasonable here, given that the tax-related information was never communicated, and was not reasonably likely to have been communicated, to the IRS. In the absence of any evidence—other than the mere existence of a joint task force—the jury could not fairly infer the necessary connection between the FBI and the IRS. The Court will therefore enter a judgment of acquittal as to defendant Muntasser.

### 4.    Evidence as to Defendant Al-Monla

A similar analysis applies as to defendant Al-Monla. Al-Monla was not indicted until March 8, 2007, and therefore there must have been proof of an affirmative act of concealment by him that was committed after March 8, 2002. The affirmative act of concealment, if any, took place during an FBI interview on April 7, 2003.[41]

The April 2003 interview was conducted by Special Agent Davis of the FBI. Like Muntasser, Al-Monla described Care as a charitable organization, and stated that he solicited donations on behalf of Care in support of widows, orphans, and mosques. He also gave a variety of other misleading or false responses, at least some of which were likely to have been material to the IRS.[42] There was no evidence, however, that Agent Davis—who apparently was not a

---

[41] Al-Monla signed a Form 990 on February 16, 2000, but that act was outside the limitations period. Al-Monla was also interviewed by the FBI on September 17, 2001. The latter interview was outside the five-year statute of limitations under 18 U.S.C. § 3282(a), but inside the six-year period under 26 U.S.C. § 6531. The inclusion of that interview in the Court's analysis would not change the result.

[42] For example, Al-Monla understated Care's receipts, and said that no one at Care received a salary. He also denied that Care had any association with Benevolence International Foundation, Holy Land Foundation, or Help the Needy. Agent Davis apparently did not ask any questions regarding whether Care was an outgrowth or

member of the joint task force at the time—shared, intended to share, or was reasonably likely to share any tax-related information with the IRS.

Again, there is not sufficient evidence of a nexus or connection between the concealment of information from the FBI and the impairment of the IRS to sustain a conviction under § 1001(a)(1). Accordingly, a judgment of acquittal as to Count One will be entered for defendant Al-Monla.

### 5.    Evidence as to Defendant Mubayyid

The analysis as to defendant Mubayyid is different, as he made statements directly to the IRS within the limitations period. Mubayyid was indicted on May 11, 2005, and thus any affirmative act of concealment by him must have occurred after May 11, 2000. Mubayyid filed Forms 990 with the IRS in November 2000, July 2001, and June 2002.[43] Those statements were made directly to the IRS concerning the activities of Care, and all were made within the limitations period.

Mubayyid contends, however, that his responses to Form 990 cannot form the basis of a prosecution. As noted, the Form 990 is an annual report required to be filed with the IRS on an annual basis by a § 501(c)(3) organization. Question 76 on each Form 990 asked whether the organization had engaged "in any activity not previously reported to the IRS," and required "a detailed description of each activity" if the answer was affirmative.

Mubayyid first argues that Question 76 asks only for information concerning that

---

successor to Al-Kifah, or indeed any questions about Al-Kifah at all.

[43] Mubayyid was interviewed in September 2001 by Trooper Ball of the Massachusetts State Police and Special Agent Treadway of the FBI. Because the Court has concluded that the false Forms 990 are sufficient to sustain the conviction, it is not necessary to consider statements made in that interview.

particular tax year. Thus, for example, according to Mubayyid, the 1997 Form 990 asked only about activities that took place in, or changes that occurred, during the year 1997, and the jury should have been so charged. At the trial, the Court declined to accept that interpretation. It did rule, however, that the question, as posed on the form, was arguably ambiguous. It thus instructed the jury that if it found that the question was ambiguous, and if under any reasonable construction of the question the defendant did not give a false statement, the defendant should be acquitted. With that instruction, the jury convicted Mubayyid on each of the counts based on Form 990.

Mubayyid further argues that even if there are two objectively reasonable interpretations of Question 76—(1) one that calls for disclosure of any activity not previously reported, regardless of the year in which the activity occurred, and (2) one that calls for disclosure of such activities only as to the current tax year—he should nonetheless be acquitted. He relies upon the general principle that responses provided to the government cannot be the basis of a false statement prosecution if they are true under any objectively reasonable interpretation of the question asked. *See United States v. Prigmore*, 243 F.3d 1, 17-18 (1st Cir. 2001); *United States v. Rowe*, 144 F.3d 15, 21 (1st Cir. 1998). From that, he argues that the evidence was insufficient to sustain a conviction under the second alternative—that is, if the question were interpreted to call for disclosure only of previously-undisclosed activities in the current tax year.

Even if Question 76 only called for disclosure of activities in the current year, there was sufficient evidence to sustain the conviction. The last Al-Hussam newsletter was published by Care in 1997, albeit in January. After 1997, articles from past Al-Hussams were republished on Care's website. Mubayyid was in charge of the creation of a new website, www.care-intl.org,

which was set up in about November 1998.  After its creation, Mubayyid had substantial control

over, and input into, the contents of the website, although other individuals were also involved.

That website, which was operational from that date through at least 2000 and 2001, also

contained direct solicitations for financial support for mujahideen.  None of that activity was ever

reported to the IRS.

Accordingly, there is sufficient evidence to sustain the conviction as to defendant

Mubayyid on Count One.

### B.    Conspiracy to Defraud the United States – 18 U.S.C. § 371

Count Two charged a so-called *Klein* conspiracy—that is, a conspiracy to defraud the

United States by impairing and impeding the lawful functions of the IRS.  *See United States v.*

*Klein*, 247 F.2d 908 (2d Cir. 1957).  Specifically, the conspiracy charged was one with the

following purpose:  "to defraud the United States for the purpose of impeding, impairing,

interfering [*sic*], obstructing and defeating through deceit, craft, trickery and dishonest means the

lawful functions of the [IRS] in the ascertainment, assessment, and determination of whether Care

International, Inc., qualified and should be designated as a § 501(c)(3) organization in 1993 and

should continue to be accorded status as a § 501(c)(3) organization thereafter."  Put simply,

Count Two was charged as a tax conspiracy, with a specific purpose:  impairing the IRS's

determination as to whether Care qualified for, and should continue to be accorded, charitable

status.

A conspiracy, of course, requires at least two members; a person cannot conspire by

himself.  *See, e.g., United States v. Goldberg*, 105 F.3d 770, 774 (1st Cir. 1997) ("a conspiracy to

defraud requires at least two who share that aim"); *United States v. Morrow*, 39 F.3d 1228, 1234

40

(1st Cir. 1994) (the "core concept of conspiracy" is an agreement between two or more persons).

Three co-conspirators were named in the indictment:  Muntasser, Mubayyid, and Al-Monla.  The

government identified two unindicted co-conspirators:  Mohammed Akra and Yassin Waseem.

### 1.    The Object of the Agreement

As noted, the indictment alleges in substance that the defendants conspired to obtain *and*

maintain charitable status for Care.  The government disputes, however, that it was required to

prove that the defendants agreed to *obtain* that charitable status, and contends that it was

sufficient to prove an agreement (presumably beginning at some point in 1995 or thereafter) to

*maintain* it.  In substance, the government argues that the object of the agreement was simply to

defraud the United States—and, indeed, that all *Klein* conspiracies have the same object.

According to the government, the defendants undertook multiple means to achieve that object,

one of which was obtaining charitable status for Care, and one of which was maintaining that

status.  Accordingly, the government contends, because the law permits it to convict if it proves

any one of the means charged, the convictions should be upheld.  *See, e.g., United States v.*

*Capozzi*, 486 F.3d 711, 718-19 (1st Cir. 2007); *United States v. McDonough*, 56 F.3d 381, 390

(2d Cir. 1995).

The government's argument misapprehends the distinction between the purpose, or object,

of a conspiracy and the manner and means by which it is accomplished.[44]  Obtaining and

maintaining charitable status for Care was not the means by which the agreement was

accomplished, but the purpose and object of the conspiracy itself.

As an initial matter, it should be noted that a conspiracy may have a single object or

---

[44] In this context, the terms "purpose" and "object" are essentially interchangeable.

multiple objects; if the latter, the government need prove only one of the objects to secure a conviction. *Capozzi*, 486 F.3d at 718-19. Here, the government agrees that this was not a multiple-object conspiracy, and that instead it had a single, unitary object. The only issue is what that object is.

The answer lies in the plain wording of the indictment. Count Two begins with the statement that all previous paragraphs are incorporated by reference. Next is the key charging paragraph, the paragraph that identifies the dates of the offense, the names of the defendants, and the offense committed. Among other things, it states that defendants conspired to defraud the United States "for the purpose of" impairing and impeding the IRS in determining whether Care "qualified and should be designated" as a charitable organization and "should continue to be accorded that status thereafter." That, in turn, is followed by five numbered paragraphs outlining the "manner and means by which the conspiracy was sought to be accomplished" and nine other numbered paragraphs setting forth the overt acts committed to effect the object of the conspiracy.

Indictments are to be read in a practical and common-sense manner. *See, e.g., United States v. Flemmi*, 245 F.3d 24, 29 (1st Cir. 2001); *United States v. Stoner*, 98 F.3d 527, 531 (10th Cir. 1996). The most common-sense reading of the indictment is that the *purpose* of the agreement is set forth in the sentence containing the word "purpose," and that the *means* by which the agreement was accomplished is set forth in the section captioned "manner and means." The government drafted the indictment, and surely it is not too much to hold it to the plain meaning of the language it chose. The purpose of the alleged agreement, therefore, was to impair and impede the IRS in the determination of whether Care qualified for charitable status and should

42

continue to be accorded that status thereafter.[45]

## 2.     The Sufficiency of the Evidence as to an Agreement

The indictment alleged that the conspiracy began "in or about" April 1993.[46]  Muntasser

incorporated Care in April 1993, and applied for charitable status for the organization in June

1993; the IRS granted that status in October 1993.  The government appears to concede that

Al-Monla and Mubayyid were not involved in the obtaining of charitable status for Care in 1993,

and argues instead that they joined the conspiracy at some later unidentified point (presumably,

approximately 1995 in the case of Al-Monla and approximately 1997 in the case of Mubayyid).

Accordingly, if a conspiracy to obtain charitable status existed in 1993, it had to have

involved Muntasser, Akra, or Yassin, or some combination of those persons.  In other words,

Yassin and/or Akra must have joined the agreement charged in the indictment, which was alleged

to have an unlawful tax purpose.  It is not enough to prove that they worked for Care, that they

were active in Care, that they were formerly active in Al-Kifah, or that they supported and

promoted jihad and mujahideen.

As described above, Akra was a religious leader, who gave lectures on the subject of Islam

---

[45] The government's position that all *Klein* conspiracies have same broad purpose or object (defrauding the United States) does not appear to be supported by the case law.  Thus, in *Goldberg*, the First Circuit noted that "[t]he crime with which Goldberg was charged . . . was that he conspired to interfere with the IRS *through the filing of false tax documents*," and that "the evidentiary question" raised in the appeal was "does the evidence in this case show that Goldberg and at least one other conspirator shared a purpose to interfere with IRS functions *by the filing of false income reports with the IRS?*"  105 F.3d at 773, 774 (emphasis added).  *See also, e.g., United States v. Mollica*, 849 F.2d 723, 730 (2d Cir. 1988) (. . . "[*Klein*] does not support the proposition that when the indictment specifically alleges a conspiracy to defraud the government by impeding and obstructing the Treasury Department in the collection of income taxes, the defendant can be convicted of a general conspiracy to defraud the government, without showing that the conspiracy was related to income taxes."); *United States v. Attanasio*, 870 F.2d 809, 817 (2d Cir. 1989) ("The object of the conspiracy . . . [was] not only that the IRS was being defrauded of income taxes, but that the taxes were owed by Louis and Marie Attanasio for the years 1983 and 1984.").

[46] It also alleged that the conspiracy continued until in or about April 2003.

in which he exhorted his listeners to engage in jihad and to support mujahideen.  In 1993, he invited Kadri and two other persons to a meeting at his house, at which neither Muntasser nor Yassin was present.  At the meeting, Akra asked his guests whether he could use their names in forming a new organization.  At some point thereafter, Muntasser organized Care.  The Articles of Organization for Care listed Muntasser as president and Akra as a director.  Muntasser signed the articles; Akra did not.  The Articles of Organization stated that Care intended to apply for tax-exempt status.

On June 10, 1993, less than two weeks after the formation of Care, Akra gave a lecture espousing the importance of jihad; that lecture was organized by Care.  He continued to give lectures on or behalf of Care on the same or similar topics, and served as the president of Care between 1998 and 2000.

As also described above, Yassin was the "go-around guy," who took care of "anything that needs to be done" for the Boston branch of Al-Kifah and later Care.  He did not attend the dinner at Akra's house in 1993.  Like Akra, he was listed in the Articles of Organization as a director.

There is no evidence that Muntasser spoke to, or communicated with, either Yassin or Akra about the application to obtain charitable status, or about any tax matters of any kind.  There is no evidence that Yassin or Akra were involved in the process of preparing the Form 1023 or submitting it to the IRS.  Neither Yassin nor Akra signed the Articles of Organization, and there is no evidence that they read them, or saw them, or had them in their files.  Indeed, there is no evidence that Yassin or Akra discussed any tax issues with anyone in 1993.

The government acknowledges that there is no direct evidence that Akra or Yassin knew

that Care would fraudulently apply for charitable status, or otherwise that they had a tax-related purpose. It argues nonetheless that sufficient circumstantial evidence exists to sustain the convictions. In essence, the government argues that because (1) Care was a small organization; (2) Akra and Yassin were directors of the organization; (3) Care held itself out as a charity; and (4) Care engaged in non-charitable activities, Akra and Yassin must have known about the IRS application and must have known that Care would have to hide its non-charitable purposes in order to obtain charitable status. Similarly, the government argues that because (1) Akra and Yassin's names were listed in the Articles of Organization; (2) those articles specifically state that Care intended to apply for § 501(c)(3) status; and (3) Akra and Yassin knew that Care was engaged in non-charitable activities, Akra and Yassin must have known and agreed that the IRS would have to be defrauded in order to obtain that tax-exempt status.

It is certainly true that Care was a small organization. However, a person's role in an organization, even a small organization, is not sufficient to infer knowledge of the specific activities of others within the organization. *Cf. In re Suprema Specialties, Inc., Sec. Litig.*, 438 F.3d 256, 282 (3d Cir. 2006) (scienter requirement for civil securities fraud); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999) (same). Furthermore, there is no evidence that either Akra or Yassin ever saw or discussed the Articles of Organization. It is not reasonable to infer that they had knowledge of the contents of the document merely from the fact that their names appear on it.

More generally, there is simply no evidence that Akra or Yassin had a tax motive or purpose or that they were aware of the application for charitable status. And even if they had been aware that Muntasser had made such an application, there is no reasonable basis to infer that

they had any knowledge that a false statement had been made, or that a material fact had been concealed, in connection with that application. Certainly it is not reasonable to draw the inference that Yassin or Akra must have known that Care would have to make a false statement in its application in order to gain approval. In fact, the IRS itself acknowledged that it might have approved Care's application had accurate information been provided to it (although it would have scrutinized that application more carefully).

While a conviction may rest on circumstantial evidence, or upon reasonable inferences from the facts proved at trial, the stacking of multiple inferences raises serious concerns. *See United States v. Valerio*, 48 F.3d 58, 64 (1st Cir. 1995) ("we are loath to stack inference upon inference in order to uphold the jury's verdict"); *United States v. DeLutis*, 722 F.2d 902, 907 (1st Cir. 1983). Here, the stacking of inferences necessary to conclude that an agreement existed in 1993 between Muntasser, Akra, and Yassin to defraud the IRS is simply too great to sustain a conviction. There is, therefore, no evidence of a conspiracy for the purpose of obtaining charitable status for Care beginning in or about April or June, 1993.

Again, the government charged a single agreement, an agreement to obtain and maintain tax-exempt status for Care. There was no evidence that there was a conspiracy to *obtain* that status, and no evidence that there was a conspiracy of any kind in or about 1993. Even if Mubayyid or Al-Monla, or both, agreed with Muntasser in 1995 or later to *maintain* the charitable status of Care or to commit another offense, that is not the agreement charged in the indictment. To sustain a conviction, there must be sufficient evidence of the conspiracy charged in the indictment—that conspiracy, and not some other conspiracy. *E.g., United States v. Toler*, 144 F.3d 1423, 1426 (11th Cir. 1998).

Accordingly, the evidence does not support a conviction under Count Two, and a judgment of acquittal will be entered as to all three defendants on that count.

### C.    Counts Three, Four, and Five – False Statements – 18 U.S.C. § 1001(a)(2)

Counts Three, Four, and Five charged defendant Mubayyid with making false statements in violation of 18 U.S.C. § 1001(a)(2). Each count is based on the submission of a false Form 990 directly to the IRS. For the reasons stated above, the evidence is sufficient to sustain the convictions based on the filing of false Form 990s; a filing of a false tax return may form the basis of a false statement prosecution under § 1001. *See, e.g., United States v. Parsons*, 967 F.2d 452, 456 (10th Cir. 1992) (making a false claim to the IRS for a tax refund may be prosecuted under § 1001); *see also United States v. Fern*, 696 F.2d 1269, 1272 (11th Cir. 1983) (making a false statement to an IRS tax auditor may be prosecuted under § 1001).

### D.    Count Six – False Statement – 18 U.S.C. § 1001(a)(2)

Count Six as to Muntasser charged that he made a false statement to the FBI in April 2003, when he denied having traveled to Afghanistan. There is no statute of limitations issue, and drawing all inferences from the evidence in the light most favorable to the government, the evidence was clearly sufficient to support the conviction.

### E.    Count Eight – Interference with Internal Revenue Law – 26 U.S.C. § 7212(a)

Count Eight charged defendant Mubayyid with corruptly obstructing and impeding the IRS in violation of 26 U.S.C. § 7212(a). Count Eight was originally brought against all three defendants. Because the Court concluded that the concealment of information from the FBI (or the INS or the CBP) by Muntasser or Al-Monla could not constitute statements or acts impairing the due administration of the Internal Revenue Code, it entered a judgment of acquittal as to those

47

defendants at the close of the government's evidence.  For the reasons stated above, however, the evidence was sufficient to sustain a conviction on Count Eight as to Mubayyid based on his submission of false Form 990s directly to the IRS.  *See United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998) (act designed to impede IRS "from uncovering tax evasion scheme that had already been effectuated" sufficient to sustain conviction under § 7212(a)).

## V.    <u>Conclusion</u>

For the foregoing reasons, the motion of defendant Emadeddin Muntasser for judgment of acquittal is GRANTED as to Counts One and Two, and DENIED as to Count Six.  The motion of defendant Samir Al-Monla for judgment of acquittal is GRANTED.  The motion of defendant Muhamed Mubayyid is GRANTED as to Count Two, and DENIED as to Counts One, Three, Four, Five, and Eight.  The motion of the United States for reconsideration is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: July 24, 2008